## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| In re: | Chapter 11 |
| **ROUST CORPORATION,** *et al.* | Case No. 16-23786 |
| Debtors.[1] | **(Joint Administration Pending)** |

## DECLARATION OF GRANT WINTERTON IN SUPPORT
## OF CHAPTER 11 PETITIONS, FIRST DAY PLEADINGS, AND CONFIRMATION OF
## THE JOINT PREPACKAGED CHAPTER 11 PLAN OF REORGANIZATION OF
## ROUST CORPORATION, ET AL.

I, Grant Winterton, being duly sworn, hereby depose and state as follows:

1.    I am Chief Executive Officer of Roust Corporation ("Roust"), a company incorporated under the laws of the state of Delaware.  Roust is the direct parent of CEDC Finance Corporation LLC ("CEDC FinCo LLC"), a Delaware limited liability company, as well as the indirect parent of CEDC Finance Corporation International, Inc., a Delaware corporation ("CEDC FinCo" and, together with Roust and CEDC FinCo LLC, the "Debtors").  Roust also is the indirect parent of numerous non-debtor operating subsidiaries organized under the laws of Poland, Russia, Hungary and several other nations (the "Operating Subsidiaries," and together with Roust, CEDC FinCo and CEDC FinCo LLC, the "Company").

2.    I have held the position of CEO since January 10, 2013. I joined the Company on April 4, 2012. Between then and January 10, 2013, I served as General Manager of the Roust Russia Group (then known as Russian Alcohol Group), a non-debtor, Russian subsidiary of the

---

[1]    The Debtors and their respective addresses are as follows: Roust Corporation, 777 Westchester Avenue, Suite 101, White Plains, New York 10604 and CEDC Finance Corporation International, Inc. and CEDC Finance Corporation LLC, 1209 Orange Street, Wilmington, DE 19801.

Company that generates the majority of Roust's revenues. I have over twenty (20) years of international experience working in marketing, sales and general management positions for Campbells Soup, The Coca-Cola Company, Wimm Bill Dann, and Red Bull. I have lived and worked in Russia for over fifteen years, working in the consumer goods industry, and have extensive experience across the Russia, Ukraine, Belarus and Commonwealth of Independent States ("CIS") markets. I have a Bachelor of Commerce Degree in Marketing/Finance from the University of New South Wales, Australia.

3.      As a result of my position as CEO of Roust, my involvement in the Debtors' restructuring efforts, my review of voluminous relevant documents, and my many discussions with members of the Debtors' management team and advisors, I am familiar with the Debtors' day-to-day operations, business affairs, and books and records. Accordingly, except as otherwise indicated, I have personal knowledge of the matters set forth herein or have gained knowledge of such matters from the Debtors' employees or retained advisors that report to me in the ordinary course of my responsibilities and, if called as a witness, would testify competently thereto.[2]

4.      I submit this Declaration in support of the Debtors' voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") filed on the date hereof (the "Petition Date"), the relief requested in the Debtors' various "first day" applications and motions (the "First Day Motions"), and confirmation of the Joint Prepackaged Plan of Roust

---

[2]      Certain of the disclosures herein relate to matters within the knowledge of other professionals at the Debtors and their legal and financial advisors and rely in part on information and materials that the Debtors' personnel and other advisors have gathered, prepared, verified and provided.

Corporation, et al. (as it may be amended or modified, the "Plan")[3], filed contemporaneously herewith.  I am authorized to submit this Declaration on behalf of the Debtors.

## I. BACKGROUND

### A.    Overview of the Company's Business

5.    The Company operates primarily in the alcoholic beverage industry.  It is one of the world's largest vodka producers and is Central and Eastern Europe's largest integrated spirit beverages business (measured by total volume) with approximately 24.6 million nine-liter cases produced and distributed in 2015.  The Company's business primarily involves the production and sale of its own spirit brands (principally vodka), as well as importing and exporting a wide variety of spirits and wines on an exclusive basis. Its primary operations are conducted in Poland, Russia, Ukraine and Hungary.

6.    The Company is the largest vodka producer in Poland, with a portfolio that includes valuable and recognizable brands such as *Absolwent, Żubrówka, Soplica,* and *Bols*, each of which is produced at the Company's Polish distilleries.  The Company is also one of the largest vodka producers and a brand leader in Russia, the world's largest vodka market, where its brand portfolio includes *Green Mark*, *Talka*, *Parliament* and *Russian Standard Vodka*, the leading brand in the premium segment of the Russian vodka market.  The Russian Standard Vodka business ("RSV"), its operations and its importance to the proposed restructuring, is discussed further below.

7.    The Company is also one of the leading importers of alcoholic beverages in Poland, Russia and Hungary.  Its portfolio in Poland includes many of the world's biggest and internationally recognized brands, such as *Grant's* whiskey, *Campari*, *Jägermeister*, *Remy*

---

[3]    Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Plan.

*Martin* cognac, *E&J Gallo* wines, *Carlo Rossi* wines, *Metaxa* brandy, *Sierra* tequila, *Cinzano*, *Old Smuggler* whiskey, and *Concha y Toro* wines. In Russia, the Company's import portfolio includes *Robert Mondavi*, *E&J Gallo*, *Concha y Toro* and *Paul Masson*, and other global liquor brands such as *Jägermeister*, *Remy Martin*, *Gancia*, and *Sierra Tequila*.

8.     The Company has six operational manufacturing facilities located in Poland and Russia and a total workforce of approximately 3,500 employees. In 2015, the Polish and Russian operations accounted for 43% and 47% of revenues, respectively, and excluding certain unallocated corporate charges, 64.7% and 33.5% of its operating profit, respectively. The Company generated net sales (when calculated at a constant foreign exchange rate) of $445.8 million for the nine months ended September 30, 2016, which represents a 15% increase from the nine month period ending September 30, 2015.

9.     In addition to operations in Poland and Russia, the Company has sales offices in Hungary and in Ukraine and distribution agreements in a number of key international markets, including the CIS, the Baltic states, Germany, France, the United States and the United Kingdom, for *Green Mark*, *Talka*, *Zhuravli*, *Parliament* and *Żubrówka*. Additionally, as a result of the Company's acquisition of Roust Distribution Limited on December 30, 2015, the Company has distribution contracts for RSV products in a number of key international markets. Based on management's estimates, in 2015, international sales (excluding Russia and Poland) represented 13.3% of the Company's sales by value. For the nine-month period ended September 30, 2016, they represented approximately 21.6% of the Company's sales by value.

**B.     Corporate Organization and Capital Structure**

10.     Roust is a Delaware holding company with very limited operations and executive offices in White Plains, New York and Warsaw, Poland. Its employees are executive officers

whose services benefit numerous Operating Subsidiaries.  Roust's primary assets are its direct

and indirect interests in the two other Debtors in these cases, CEDC FinCo and CEDC FinCo

LLC, and in the non-Debtor Operating Subsidiaries in Poland, Russia, and other non-U.S.

jurisdictions.  CEDC FinCo and CEDC FinCo LLC are holding companies that were formed for

the purposes of obtaining debt financing and do not have any other independent operations.  A

simplified corporate organization chart of the Company is attached as Exhibit A.

11.     Roust is a wholly owned, indirect subsidiary of Roust Trading Ltd. ("RTL"), a

holding company of the Russian Standard Group of companies. The Russian Standard Group is a

private company controlled by Russian businessman Roustam Tariko, with business interests in

premium vodka (notably RSV), spirits distribution, banking, and insurance.  Mr. Tariko is

Chairman of Roust's Board of Directors.  Mr. Tariko was responsible for saving Roust (then

known as Central European Distribution Corporation, or CEDC) in 2013, when CEDC was in

severe financial distress.

12.     At the time, CEDC was burdened by debt and accounting inconsistencies that

required the restatement of its financial statements (which had the not-incidental effect of

rendering a recent $100 million investment by Mr. Tariko in CEDC nearly worthless).  Both the

Chief Executive Officer and Chief Financial Officer at the time had to be replaced due to the

accounting discrepancies.  Mr. Tariko worked with CEDC to develop a restructuring proposal

pursuant to which Mr. Tariko invested significant cash into the business, forgave material debts,

and ultimately became (through RTL) the 100% shareholder in the Company.  This restructuring

proposal was effectuated through a prepackaged chapter 11 case in 2013.  Without Mr. Tariko's

investment -- financial, temporal and otherwise -- in CEDC, the Company likely would not have

survived.

13.     Mr. Tariko's commitment to Roust continues to this day.  As described further below, Mr. Tariko, Russian Standard Bank (which is part of the Russian Standard Group of companies) and RTL have agreed to support a comprehensive restructuring of Roust's balance sheet (the "Proposed Restructuring"), pursuant to which they will contribute significant value to the Reorganized Debtors.

14.     The Debtors and certain of the Operating Subsidiaries collectively are obligors on two primary sets of debt obligations (other than certain local lines and intercompany obligations, described separately below) that are being restructured under the Plan.  Debtor CEDC Finco is the issuer of  Senior Secured Notes due 2018 (the "Existing Senior Secured Notes") and Senior Convertible PIK Notes due 2018 (the "Existing Convertible Notes" and, together with the Existing Senior Secured Notes, the "Existing Notes").  Roust is the parent guarantor of the Existing Notes; CEDC Finco LLC and certain of the Operating Subsidiaries are subsidiary guarantors.  The Existing Notes were issued as part of the 2013 restructuring in satisfaction of certain claims against CEDC.  Approximately $488 million in principal amount of the Existing Senior Secured Notes is outstanding, and approximately $279 million in principal amount of the Existing Convertible Notes is outstanding.[4]

15.     The Company also has debt and overdraft facilities from banks and other institutions of approximately $160.4 million that is not being restructured under the Plan.  None of the Debtors are obligors or guarantors of such bank debt.  This debt is primarily owed to local Russian banks by certain non-Debtor Operating Subsidiaries.  The Company anticipates that it will be able to extend the maturity of its bank debt as it comes due, as it has been successful in

---

[4]     In each case, the principal amount outstanding includes accrued interest through October 31, 2016 but is exclusive of other accrued and unpaid interest, fees, and other amounts due and payable under the Existing Notes.

doing so for several years, and that the loans will be renewed to manage the Company's working capital needs.  Indeed, the Proposed Restructuring contemplated by the Plan significantly restructures the Existing Notes (including by equitizing approximately half of the aggregate outstanding principal amount of the Existing Notes), thereby enhancing the credit-worthiness of the Operating Subsidiaries.

16.    Separately, certain of the Operating Subsidiaries, including in particular Operating Subsidiaries in Poland and Russia, are party to several, separate credit support obligations, facilities and guarantee arrangements provided by several local lenders in those jurisdictions.  These obligations include factoring lines and similar revolving facilities in the approximate amount of $89.0 million and significant guarantees in the approximate amount of $279.1 million that support the Company's obligation to collect and remit excise and other taxes to regulatory authorities in Russia.  None of these credit support obligations are being restructured in these chapter 11 cases.  Indeed, none of Roust's Polish, Russian or other Operating Subsidiaries are subject to any insolvency proceedings.  Those entities are fundamentally sound, profitable and will continue to operate in the ordinary course of business. Accordingly, the Company will continue honoring all its obligations to vendors, employees, and local credit support providers in the ordinary course of business, without interruption.

17.    Certain of the Company's and RSV's related party debt will be compromised in the Proposed Restructuring.  In particular, approximately $116 million of debt owing from subsidiaries of Roust and RSV to certain of RTL's non-Roust subsidiaries will be exchanged for new equity in reorganized Roust ("Reorganized Roust").  In addition, approximately $100 million of loans (plus interest thereon) owed to the Company by RTL and its direct and indirect

7

subsidiaries will be deemed repaid on account of RTL's contributions of the RSV business to Roust as part of the Proposed Restructuring.

**C.    Events Leading to the Chapter 11 Cases and Consideration of Restructuring Alternatives**

18.    Roust emerged from chapter 11 protection in 2013 primed for success.  The Company has realized that potential in its key markets.  Despite challenging economic conditions, the Company has achieved record market shares in Poland, Hungary, Israel, the UK, France and Germany.  The Polish business, in particular, has been extremely successful. Comparing the first nine months of 2016 to the first nine months of 2015, the Polish business has grown by 15.8% by volume and, on a currency neutral basis, revenue increased by 24.5%, gross margin rose by 28.6% and EBITDA increased by 50.9%.  The Russian business is also developing well compared to overall negative market trends.  Sales by volume have increased 6% for the period of September – November 2016 against the same period for 2015.  The premium brands that the Company distributes in Russia continue to grow even faster, with 18%, 9% and 22% shipment increases in the third quarter of 2016, compared with the same period for 2015, for *RSV*, *Remy* and *Jägermeister*, respectively.

19.    However, this positive performance has been offset by macroeconomic conditions beyond the Company's control, which have left the Company over-leveraged and hampered by liquidity constraints and high borrowing costs.  These macroeconomic factors  include, the economic crisis in Russia and depreciation of currencies in four of the Company's markets – Russia, Poland, Kazakhstan and Ukraine – each of which drastically reduced the Company's EBITDA as expressed in U.S. dollars and made re-paying debts, most of which are denominated in U.S. dollars, burdensome.  The depreciation of the Russian ruble also resulted in significant

increases in imported brand price and led to declining volumes in the imported brand side of the business.

20.     Second, illegal alcohol sales within the black and parallel, or grey, markets, as well as competition by competitors with lower excise tax requirements, have eroded the mainstream vodka market share.  Third, the lending environment in Russia has contracted. Many Russian banks have moved to reduce credit lines to operating companies and to significantly increase interest rates, which have almost doubled in recent years.  Finally, volumes for Roust's Ukrainian business have declined 90% due to the ban on Russian products in that country.

21.     Faced with these extrinsic and immitigable pressures, in March 2016, the Company engaged with the largest holders of its Existing Notes to discuss a potential balance sheet restructuring.  Meetings with these holders culminated in the Company presenting a restructuring proposal at the end of March 2016.  Although the largest holders of Existing Senior Secured Notes (who comprise the "Existing Senior Secured Notes Committee") negotiated with the Company regarding the terms of this proposal, no agreement was reached at that time.  The Company and the Existing Senior Secured Notes Committee continued to revise their respective proposals and the Company engaged in ongoing discussions with both sets of noteholders, while at the same time exploring financing alternatives.  These discussions resulted in proposals being passed between the various parties throughout May and June 2016.

22.     In July and August 2016, the Company made considerable progress towards agreeing to the terms of a restructuring with a newly-formed committee of Existing Convertible Notes (who comprise the "Existing Convertible Notes Committee"), and continued to negotiate with the Existing Senior Secured Notes Committee.  Additionally, a subsidiary of the Company

9

secured $58 million of interim financing from a third party on August 11, 2016, which provided much needed short term liquidity.

23.     Through September and October, the Company continued to negotiate the terms of a restructuring with both committees and ultimately the parties were able to craft a consensual restructuring proposal that all parties agreed was in the best interests of creditors and the Company.  On November 9, 2016, the Debtors entered into a restructuring support agreement and term sheet (the "RSA") with holders of 90% in aggregate principal amount of the Existing Senior Secured Notes and holders of approximately two-thirds in aggregate principal amount of the Existing Convertible Notes (together, the "Consenting Noteholders"), and Russian Standard Bank, RTL and Mr. Tariko (collectively with non-Roust affiliates, the "Russian Standard Parties," and with the Consenting Noteholders, the "Plan Support Parties").

**D.      The Proposed Restructuring**

24.     The RSA outlines the Proposed Restructuring and provides the framework and support for the Plan which, if effectuated, will strengthen the Reorganized Debtors' capitalization by over $500 million, deleverage their balance sheet by at least $462 million, result in funding of $55 million in new equity capital and result in the contribution to Reorganized Roust of strategic assets, namely RSV, and related intellectual property with an estimated value of between $510 million and $570 million. The Debtors Proposed Restructuring will immediately provide greater value to all of the Debtors' stakeholders by positioning Reorganized Roust for accelerated revenue and profit growth within the global alcohol market.  The Proposed Restructuring will enable Roust Corporation to more effectively execute its business strategy and take advantage of growth opportunities worldwide to ensure that it is well positioned for an initial public offering of its stock within the next two to three years.

25.     Briefly, the Proposed Restructuring and the Plan contemplate the following transactions.  Holders of Existing Senior Secured Notes will receive payment in full in the form of (i) new senior secured notes due 2022 in the aggregate principal amount of $385 million at 10% interest payable semi-annually, commencing on January 1, 2017 (the "New Senior Secured Notes"), (ii) cash consideration of $20 million, (iii) a debt-to-equity conversion of the remaining balance of the Existing Senior Secured Notes (including all accrued and unpaid interest through and inclusive of the Petition Date) in exchange for 12.08% of the new common stock in Reorganized Roust (subject to the right of holders of Existing Convertible Notes to subscribe for that same common stock, with the proceeds of such subscription to be paid in cash to holders of Existing Senior Secured Notes in lieu of such new common stock, which is described in the Plan as the "Existing Senior Secured Notes Equity Subscription")  and  (iv) the right to participate in the $55 million offering of new common stock in Reorganized Roust (the "Share Placement"), with the Existing Senior Secured Notes Committee agreeing to backstop $5 million of the Share Placement.

26.     Holders of Existing Convertible Notes will receive an estimated recovery of approximately 27%[5] in the form of (i) 10.59% of the equity of Reorganized Roust through a debt-to-equity conversion of the Existing Convertible Notes, (ii) 1.00% of the equity in Reorganized Roust (contributed by the Russian Standard Parties to the holders of Existing Convertible Notes), (iii) the right to participate in the Share Placement, with the Existing Convertible Notes Committee agreeing to backstop $50 million of the Share Placement, and

---

[5]   49.3% including consideration received for participation in the Share Placement.

(iv) the right to participate in the Existing Senior Secured Notes Equity Subscription described above.

27.     The Proposed Restructuring is made possible in part by the Russian Standard Parties' agreement to contribute significant value to Reorganized Roust.  In particular, the Russian Standard Parties will contribute RSV and all related RSV intellectual property and compromise certain debt owed by subsidiaries of Roust to certain of RTL's non-Roust subsidiaries.[6]  In exchange for these contributions, the Russian Standard Parties are entitled to receive 64.04% of the equity in Reorganized Roust.  However, the Russian Standard Parties will allocate 1.00% of this equity to holders of the Existing Convertible Notes and 6.00% of this equity to participants in the Share Placement.  The implementation of these concurrent transactions will be considered repayment in full of all intercompany loans owed to the Company from RTL and its direct and indirect subsidiaries.

28.     The contribution of RSV to Roust represents a tremendous contribution by the Russian Standard Parties.  RSV is a powerhouse in Russia, with a leading market share in the Russian vodka market of 30%.  RSV exports vodka to more than 80 countries.  Over 75% of its sales volume in 2015 was from international markets.  In 2014 and 2015, RSV generated approximately $88 million and $69 million of revenue (net of taxes), respectively, with reported EBITDA of approximately $30 million and $18 million, respectively, and adjusted EBITDA of approximately $34 million and $28 million, respectively. RSV's financial performance year-to-date through September 30, 2016 has continued to strengthen, with revenue growth of approximately 4.0% year-over-year, LTM reported EBITDA of approximately $19 million and

---

[6]     As described above, approximately $116 million of debt owing from Roust and its subsidiaries to certain of RTL's non-Roust subsidiaries will be equitized in the form of new equity in Reorganized Roust under the Proposed Restructuring.

LTM adjusted EBITDA of approximately $31 million. Forecasted fiscal year 2016 Adjusted

EBITDA for RSV is approximately $37 million.

### E.   Voting Results and the Need for Prompt Confirmation of the Debtors' Plan of Reorganization

29.     The Proposed Restructuring, as embodied in the RSA and the Plan, is also

described in the Offering Memorandum, Consent Solicitation Statement and Disclosure

Statement Soliciting Acceptances of the Prepackaged Plan of Reorganization of Roust

Corporation, CEDC Finance Corporation International, Inc. and CEDC Finance Corporation

LLC, dated as of December 1, 2016 and filed concurrently herewith (the "Disclosure

Statement").  The only impaired creditors entitled to vote on the Plan are the holders of each of

the Existing Senior Secured Notes and the Existing Convertible Notes.

30.     Solicitation of votes on the Plan began on December 1, 2016.  Voting on the Plan

closed on December 30, 2016.  According to the official vote tabulation prepared by Roust's

voting and information agent, creditors have voted overwhelmingly to accept the Plan.  In

particular, the Plan was accepted by approximately 100% in number and 100% in amount of

Existing Senior Secured Notes that were voted on the Plan.  The Plan also was accepted by

approximately 100% in number and 100% in amount of Existing Convertible Notes that were

voted on the Plan.  Moreover, participation in the Plan vote by holders of Existing Notes was

extraordinarily high, with approximately 90% of all holders of Existing Senior Secured Notes

and approximately 93% of all holders of Existing Convertible Notes voting.

31.     Prior to filing for chapter 11 protection, the Debtors sought, and received, a court

date for a combined hearing on the adequacy of the information contained in the Disclosure

Statement and confirmation of the Plan.  Notice of the date for the combined hearing, January 6,

2017, was distributed to all creditors and parties in interest concurrently with the documents

soliciting votes on the Plan.  Concurrently herewith, the Debtors have requested that the Court entering a scheduling order setting the combined hearing date for January 6, 2017.

32.   The Debtors sought permission to expedite these proceedings because it is critical that the confirmation hearing on the Plan be considered as soon as possible so that the Debtors can bring their restructuring to a successful conclusion in January.  Part of the urgency springs from the fact that while none of Roust's foreign Operating Subsidiaries is subject to any insolvency proceedings, chapter 11 is a concept that is alien to Roust's non-U.S. employees, vendors and local credit support providers, and bankruptcy is perceived as an extremely negative event in countries such as Russia, Poland and Hungary.  Lengthy chapter 11 cases could impair the Company's business operations and threaten their viability as going concerns. Therefore, it is important that Roust exit chapter 11 as quickly as possible, so that local employees, vendors and credit support providers remain willing to do business with the Company.

33.   An even more pressing deadline is that the Company owes significant excise taxes to Russia in January, and requires the additional capital that the Company will receive on the effective date of the Plan in order to pay these taxes.  Briefly, Russia and Poland impose very significant excise taxes on the sale of alcohol.  The Company's business is seasonal, and vodka sales in the fourth quarter, holiday season are significantly higher than in other quarters.  As a result of these higher sales in the fourth quarter of 2016, the Company owes higher than usual excise taxes in January 2017.  The Company requires the new funds that it will receive through the completed Share Placement in order to pay these excise taxes, making it critically important that the Plan become effective as early as possible in January.  Without payment of these excise taxes, the domestic business would have severe issues with ongoing operations.

*     *     *

## II. FIRST DAY MOTIONS

34.     The Debtors expect to file a minimal number of First Day Motions.  I have reviewed each of the First Day Motions and Orders (including the exhibits to the Motions and Orders).  The facts set forth therein are true and correct to the best of my knowledge, information and belief based upon my personal knowledge or the knowledge gained of such matters from the Debtors' employees or retained advisors.  Moreover, I believe that the relief sought in each of the First Day Motions and Orders (a) is vital to enable the Debtors to make the transition to, and operate in, chapter 11 with minimum interruption or disruption to their businesses or loss of productivity or value and (b) constitutes a critical element in achieving the Debtors' successful reorganization.

**A.      Administrative and Procedural Matters**

<u>Joint Administration of Cases</u>

35.     As noted above, Roust is the direct parent of CEDC FinCo LLC.  Similarly, CEDC FinCo is the wholly-owned subsidiary of CEDC FinCo LLC.  I anticipate that the notices, applications, motions, other pleadings, hearings and orders in these cases will affect each of the Debtors.  Thus, I believe that the joint administration of these cases will avoid the unnecessary time and expense of duplicative motions, applications, orders and other pleadings, thereby saving considerable time and expense for the Debtors and resulting in substantial savings for their estates.  I also believe that such duplication of substantially identical documents would be extremely wasteful and would unnecessarily overburden the Clerk of the Court with voluminous filings.  Finally, I believe that the use of a simplified caption for the jointly administered cases will enable parties-in-interest in each of the above-captioned cases to be apprised of the various matters before the Court.

## Notification of Creditors

36.     The Debtors have record holders of securities, creditors, and other parties in interest whom the Debtors and/or the office of the Clerk of the United States Bankruptcy Court for the Southern District of New York (the "Clerk") must serve various notices, pleadings and other documents filed in these cases.  To relieve the Clerk of these burdens, the Debtors seek to engage Epiq Bankruptcy Solutions, LLC ("Epiq") as noticing and claims agent in these chapter 11 cases. The Debtors believe that the appointment of Epiq as an outside noticing and claims agent is the most effective and efficient manner by which to provide noticing and claims administration in these chapter 11 cases and is in the best interests of the Debtors, their estates, and creditors.

37.     I believe that such assistance will expedite service of notices, streamline the case administration process and permit the Debtors to focus on their reorganization efforts.  I believe that Epiq is well-qualified to provide such services, expertise, consultation and assistance.

## Voting and Special Noticing Agent

38.     The Debtors also seek authority to retain Epiq as voting agent and special noticing agent in these chapter 11 cases.  Epiq rendered services in connection with the solicitation of votes for the Plan and consent solicitation prior to the commencement of these chapter 11 cases.  A representative of Epiq is prepared to testify competently to the facts regarding the solicitation of votes on the Plan and the tabulation of such votes, if called upon to do so.

## Schedules and Statements

39.     The Debtors seek to extend the deadline to file their schedule of assets and liabilities, schedule of current income and current expenditures, schedule of executory contracts and unexpired leases, and statement of financial affairs (the "Schedules and Statements") by

forty-six (46) days, until sixty (60) days after the Petition Date, subject to a final waiver of the

requirement that the Schedules and Statements be filed if a plan of reorganization is confirmed

before such date, and without prejudice to the Debtor's ability to request additional time should it

become necessary.

40.     I believe that the request for a final waiver of the requirement to file the

Schedules and Statements is appropriate in a prepackaged case.  In general, it is my

understanding that a debtor is required to file the Schedules and Statements in order to permit

parties in interest to understand and assess the Debtors' assets and liabilities and thereafter

negotiate and confirm a plan of reorganization.  In these chapter 11 cases, the Debtors have

already negotiated the Plan and solicited votes from those parties impaired under the Plan and

entitled to vote thereon.  Accordingly, the primary justifications for requiring the filing of

Schedules and Statements do not exist in this case.  Requiring the Schedules and Statements to

be filed other than as requested in this motion would only impose an additional administrative

burden on and expense to the Debtors' estate, without any corresponding benefit to parties in

interest.  In addition, much of the information that would be contained in the Schedules and

Statements is already available in the Offering Memorandum and Disclosure Statement related to

the Plan.  I believe that to require the Debtors to file the Schedules and Statements would be

impracticable, duplicative, and unnecessarily burdensome to the Debtors' estates.

41.     I also understand that Bankruptcy Rule 2015.3 provides that a chapter 11 debtor

shall file periodic financial reports disclosing the value, operations, and profitability of each

entity that is not a publicly traded corporation or a debtor in these chapter 11 cases, and in which

the estate holds a substantial or controlling interest (the "2015.3 Entities").  In the instant case, I

believe such filings are unnecessary, as the Debtors disclose the company's financial information

through periodic reports (the "Financial Reports") which are made publicly available on the

Debtors' website (http://www.roust.com).  The Financial Reports are presented on a consolidated

basis and include financial information for the Debtors and the 2015.3 Entities.  Given that the

Financial Reports are presented in this manner, I believe that compliance with Bankruptcy Rule

2015.3 is unnecessary, of limited value to interested parties, unduly burdensome, and otherwise

duplicative of information that is already publicly available.  Indeed, the Financial Reports—

which contain consolidated assets, liabilities, value, operations and profitability information—

essentially satisfy the reporting requirements contained in Bankruptcy Rule 2015.3.  Duplication

of this information in separate reports for the 2015.3 Entities would be administratively

burdensome on the Debtors' already stretched resources and present additional costs that provide

no commensurate benefit to the Debtors, their creditors, or any other party in interest.

**B.      Business Operations of the Debtor**

<center>Cash Management, Bank Accounts and Business Forms</center>

42.      The Company maintains a coordinated cash management system to collect,

transfer and disburse funds generated by its foreign operations and to record accurately all such

transactions as they are made in the ordinary course of business (collectively, the "Cash

Management System").[7]  Because the Debtors are holding companies, they do not have operating

receipts and are funded by their Operating Subsidiaries.  Funds flow to the Debtors' bank

accounts from the Operating Subsidiaries' accounts as necessary to cover debt servicing

obligations of the Debtors as well as Roust's corporate expenses, such as taxes, insurance,

---

[7]      Although for convenience of reference the defined term "Cash Management System" refers to the Company's
global cash management system, the relief requested by the Debtors is limited to the bank accounts held by the
Debtors.

professional expenses for Roust's U.S. directors[8] and limited operational costs (including mail and vendor payments).

43.     All cash disbursements from, and inflows to, the Debtors are approved and monitored by the Debtors' personnel located at the Debtors' headquarters in Warsaw, Poland. By centralizing oversight of the Cash Management System, the Company is able to facilitate cash forecasting and reporting, monitor collections and approve disbursement of funds, reduce administrative expenses by facilitating the movement of funds and the conversion to appropriate currencies, develop timely and accurate balance and presentment information, and administer the various bank accounts required to effect the collection, disbursement and movement of cash.

44.     Although the Operating Subsidiaries maintain over 300 bank accounts to collect, transfer and disburse funds generated by their operations in several countries in Central and Eastern Europe as part of the Company's sophisticated cash management system, the Debtors' cash management system is relatively simple. The Debtors own eleven (11) bank accounts (the "Bank Accounts"). A schedule of the Bank Accounts, including the names and addresses of the institutions and the Bank Account numbers is attached as Exhibit A to the Debtors' underlying First Day Motion.

45.     **Existing Senior Secured Notes and Existing Convertible Notes Accounts.**
CEDC FinCo maintains an account at PNC Bank and three accounts at Bank Pekao S.A. (a Polish bank). Prior to the Petition Date, all of these accounts were used primarily to service obligations under and pay other fees and expenses related to the Existing Senior Secured Notes and Existing Convertible Notes issued by CEDC FinCo. Such accounts were funded on an as

---

[8]     Payroll and employment-related expenses for the Debtors' foreign employees and directors are paid from accounts maintained by Non-Debtor Subsidiaries under separate contractual relationships with such Non-Debtor Subsidiaries.

needed basis and otherwise hold only nominal amounts, if any, typically less than $10,000.

Because no payments will be made on account of the Existing Notes during the Chapter 11

Cases, there will be no receipts to or disbursements from these accounts during the Chapter 11

Cases.[9]

46.      **Roust's Foreign Accounts.**  Roust maintains three accounts at Bank Pekao S.A.

that historically have been used as operating accounts.  In addition, Roust maintains three

accounts with ING Bank Slaski S.A. (a Polish branch) as back-up for the Bank Pekao S.A.

accounts.  As with the CEDC FinCo accounts, these accounts were funded on an as-needed basis

and otherwise hold only nominal amounts, if any.  These accounts also will be dormant during

the pendency of the Chapter 11 Cases.

47.      **PNC Operating Account.**  Finally, Roust utilizes a United States based operating

account with PNC Bank (xx xxxx 8606).  To avoid any concerns that may arise due to estate

funds being held in a foreign account, the Bank Pekao and ING accounts will maintain a zero (or

nominal) balance and the Debtors' funds (other than nominal amounts that may be held in the

other Bank Accounts) will be held in the United States in Roust's PNC Bank account[10] and the

Debtors will rely exclusively on this account for all transactions under the Cash Management

System involving the Debtors during the pendency of the Chapter 11 Cases.

48.      I believe that the Cash Management System allows for (a) overall oversight and

management of funds, (b) cash availability when and where needed among the Debtors and their

non-Debtor Operating Subsidiaries, and (c) the reduction of administrative costs through a

method of coordinating funds collection, currency conversion and funds movement.  I believe

---

[9]      CEDC FinCo LLC, which guarantees the Existing Notes, does not hold any bank accounts.

[10]     PNC Bank, N.A. is on the U.S. Trustee's list of approved depository banks.

the Debtors' smooth transition into, and out of, chapter 11, while preventing disruption at their

non-debtor Operating Subsidiaries, will be facilitated by their ability to maintain these Bank

Accounts and operate this Cash Management System without interruption.  Moreover, the

Debtors intend to use funds flowing through the Cash Management System to fund these cases.

The Cash Management System allows the Company to manage all of their cash flow needs and

includes the necessary accounting controls to enable the tracing of funds through the system to

ensure that all transactions are adequately documented and readily ascertainable.  The Debtors

will continue to maintain detailed records reflecting all transfers of funds made through the Cash

Management System.

49.     I believe that the cash management procedures utilized by the Debtors constitute

ordinary, usual and essential business practices and are similar to those used by other major

corporate enterprises.  The Cash Management System benefits the Debtors in significant ways,

including the ability to (i) provide oversight and management of funds in an integrated manner,

(ii) ensure availability of funds when necessary, and (iii) reduce administrative expenses by

facilitating movement of the funds and currency conversions and the development of more

timely and accurate balance and presentment information.  I believe that requiring the Debtors to

adopt a new cash management system for the short duration expected for these chapter 11 cases,

and to integrate that system with the non-Debtor Operating Subsidiaries' Cash Management

System, would create unnecessary administrative problems and would be much more disruptive

than productive.  It is my belief that such disruption could have a negative impact on the Debtors'

chapter 11 cases and their goal to reorganize expeditiously.  Consequently, I believe that the

maintenance of the existing Cash Management System is in the best interests of all creditors and

other parties-in-interest.

50.      I understand that the U.S. Trustee has established certain operating guidelines for debtors-in-possession in order to supervise the administration of chapter 11 cases. I believe that under the circumstances, a waiver of the U.S. Trustee's requirement that the Bank Accounts be closed and that new post-petition bank accounts be opened is warranted. The Debtors expect to seek confirmation of their prepackaged Plan at a hearing one week after the Petition Date. During the short pendency of these cases, the Debtors anticipate that the efforts of the Debtors' few employees will be focused on emergence from chapter 11. As a result, I believe that enforcement of the United States Trustee's requirement to close the Bank Accounts and open new bank accounts for the anticipated short period of the chapter 11 cases would be unnecessarily burdensome and would divert the attention of key individuals whose efforts will be needed for the Debtors to successfully reorganize on an expedited timeline.

51.      Moreover, although the Debtors seek to use only Roust's PNC Bank account during these chapter 11 cases, I believe that permitting the Debtors to keep all other Bank Accounts open will aid the Debtors in expeditiously and efficiently resuming use of such accounts as part of the Cash Management System at the conclusion of the chapter 11 cases. I also believe that this relief is necessary to aid the Debtor in their collective efforts to complete their reorganization efforts successfully and rapidly.

52.      In order to minimize expenses to their estates, and in light of the expected short duration of these chapter 11 cases, the Debtors are also seeking authorization to continue using all correspondence and business forms (including without limitation, letterhead, purchase orders, and invoices), without reference to the Debtors' status as debtors in possession. I believe that a requirement that the Debtors change correspondence and business forms would be burdensome to the Debtors' estates and disruptive to the Company's business operations, without conferring

22

any benefit upon those dealing with the Debtors.   Most parties doing business with the Debtors

undoubtedly will be aware of the Debtors' status as debtors in possession as a result of various

notices and any additional press coverage.   Indeed, all holders of debt claims have received

notice of the chapter 11 cases by virtue of the prepetition solicitation of the Plan.

53.      Prior to the Petition Date, the Debtors engaged in intercompany transactions with

each other and with their non-Debtor Operating Subsidiaries (collectively, the "Intercompany

Transactions").   Historically, the Debtors have invested in the non-Debtor Operating

Subsidiaries, including through the investment of the proceeds of the Existing Notes, and other

debt.   In turn, the non-Debtor Operating Subsidiaries upstreamed cash payments to the Debtors

in order to service such debt obligations and to provide the Debtors with necessary liquidity for

corporate overhead.   The Intercompany Transactions were reflected in the books and records of

each individual Company entity.   Accordingly, the Company maintains records of all

Intercompany Transactions and can ascertain, trace, and account for all Intercompany

Transactions.

54.      To minimize the relief requested hereby, Roust will not transfer funds to the other

Debtors during the chapter 11 cases, and will only transfer funds to non-Debtor Operating

Subsidiaries to the extent necessary to satisfy payments authorized by separate order of the

Court.   The Debtors, however, may require continued intercompany advances from their non-

Debtor Operating Subsidiaries in order to maintain their liquidity and going concern value.

These Intercompany Transactions will be used to fund these chapter 11 cases, including payment

of professional fees, U.S. Trustee fees and any other administrative costs that may arise while the

Debtors remain in chapter 11.   Accordingly, I believe that approval and authorization to continue

to undertake the Intercompany Transactions in the ordinary course and consistent with past

practice is appropriate and warranted under the circumstances.

## C.     Plan-Related Relief

<u>Combined Hearing</u>

55.     As set forth above, the Debtors solicited votes on the Plan prior to commencing

these cases, and have received overwhelming support for the Plan.  Accordingly, the Debtors

have requested a combined hearing for approval of the Offering Memorandum and Disclosure

Statement and confirmation of the Plan, to be held on January 6, 2017, as well as deadlines

associated with the requested combined hearing.  I believe that such a combined hearing in these

chapter 11 cases would promote judicial economy and the expedient reorganization of the

Debtors.  Any adverse effects of the chapter 11 filings upon the Debtors' businesses and going

concern value will be minimized, and the benefit to creditors maximized, through prompt

distributions and the reduction of administrative expenses of the estate – which are the hallmarks

of a prepackaged plan of reorganization.

56.     In light of the prepackaged nature of these cases, the extremely short duration of

the time during which the Debtors expects to be in bankruptcy, and the fact that the Debtor's Plan

has been overwhelmingly accepted by creditors entitled to vote thereon, I believe that the relief

requested in the solicitation procedures motion is in the best interests of the Debtors, their

estates, their creditors and other stakeholders.

57.     The Debtors are also requesting that the Court, under section 341(e) of the

Bankruptcy Code, order the Office of the United States Trustee (the "<u>U.S. Trustee</u>") not convene

a meeting of creditors or equity security holders in these chapter 11 cases (a "<u>Section 341</u>

<u>Meeting</u>").  It is my understanding that the purpose of a Section 341 Meeting is to provide parties

24

in interest with a meaningful opportunity to examine the debtor and obtain important information about the debtor.  In these cases, however, the Plan has been negotiated and voted on. Therefore, I believe that parties are not likely to receive any significant benefit from a Section 341 Meeting.  In addition, the notice and scheduling requirements associated with convening such a meeting during these chapter 11 cases may cause an unwarranted delay in consummating the Plan.

<u>Assumption of the RSA, Backstop Agreement and Related Relief</u>

58.     As noted above, the Debtors and Plan Support Parties have entered into an RSA pursuant to which certain holders of Existing Senior Secured Notes and Existing Convertible Notes agreed to compromise and restructure their debts, and the Russian Standard Parties agreed to compromise their debts and contribute extensive new value to the Reorganized Debtors. Without the RSA, the Debtors would not have been able to proceed with the implementing the Proposed Restructuring through the prepackaged Plan and these expedited chapter 11 cases.

59.     As described above, the RSA is the product of lengthy, arms-length negotiations between sophisticated parties.  The Proposed Restructuring was fiercely negotiated by these parties, and it is my belief that the resulting deal embodied in the RSA and the Plan is in the best interests of the Debtors, their creditors and stakeholders.  Hence, I strongly believe it is in the best interests of the Debtors' estate that the RSA and related backstop agreement (the "<u>Backstop Agreement</u>") in connection with the $55 million Share Placement be assumed by the Debtors.

60.     I believe that the assumption of the RSA ensures that the agreement that forms the foundation for the Debtors' consensual restructuring continues to be valid and enforceable against all signatories and to provide the Debtors with the benefits they bargained for thereunder. The RSA not only requires the parties to vote in favor of the Plan, but prohibits such parties from

opposing confirmation of the Plan or the approval of the Disclosure Statement, in each case subject to the terms of the RSA. Notably, the RSA contains a reasonable "fiduciary out" which has ensured the Debtors can continue to exercise their fiduciary duties, including allowing the Debtors to receive and review unsolicited alternative transactions in consultation with the Consenting Noteholders.

61.     I also believe that the Backstop Agreement is a critical part of the Debtors' reorganization efforts and the transaction agreed to in the RSA. Certain noteholders (the "Backstop Noteholders") have agreed to backstop the Share Placement contemplated by the RSA, which will provide the Debtors with assurance that $55 million of New Common Stock in Reorganized Roust will be purchased in connection with the Share Placement. The Backstop Agreement, like the RSA, was the product of arm's-length negotiations and ensures that sufficient funds will be generated by the Share Placement to effectuate the restructuring contemplated by the Plan.

62.     In consideration for the Backstop Noteholders' commitment to purchase the New Common Stock, the Backstop Noteholders will receive a backstop fee equal to 0.25% of the shares of the New Common Stock to be issued and outstanding on the Effective Date. In addition, the Backstop Agreement requires the Debtors to indemnify, and pay certain contribution and reimbursement claims to, the Backstop Noteholders.

63.     Both the RSA and the Backstop Agreement provide that the Debtors shall pay or reimburse the reasonable fees and expenses of the Consenting Noteholders' counsel and advisors. The RSA additionally provides that the Debtors shall assume the fee letters entered into by the Debtors and those professionals. Hence, I believe that the assumption of the fee letters and payment of the reasonable fees and expenses of Consenting Noteholders' counsel and advisors

26

will ensure the Debtors comply with all their obligations under, and receive the attendant benefits of, the RSA.

64.     In view of the importance of the RSA and Backstop Agreement to the restructuring, I believe authorization for the Debtors' to assume these agreements and to perform their obligations thereunder is essential.  As consummation of the RSA and Backstop Agreement are contingent on confirmation and consummation of the Plan, and the Debtors are seeking authorization to assume such agreements simultaneously with confirmation of the Plan, approval of their assumption does not dictate the terms of – or require the Court to preapprove – any plan of reorganization in these chapter 11 cases.

65.     Accordingly, the Debtors will be seeking to assume the RSA and Backstop Agreement in conjunction with the "first day" hearing in these chapter 11 cases, and approval of the fees, indemnification, and other obligations set forth therein, which efforts I believe are an exercise of sound business judgment.

### III.  PLAN CONFIRMATION

**A.     Good Faith Proposal of Plan**

66.     As discussed herein, in my view, consummation of the Plan will allow the Debtors to maximize value for stakeholders and emerge from chapter 11 as a stronger business enterprise.  The Plan and the transactions incorporated therein are the result of arm's length negotiations and have been proposed in good faith and for a proper purpose.  As set forth in more detail above, the Plan is the result of intense negotiations over many months among the various parties in interest culminating in the resolution embodied in the RSA.  The Company has worked closely with Existing Senior Secured Notes Committee and the Existing Convertible Notes Committee to reach a unanimous deal.  During this period, the parties had regular meetings to

discuss, negotiate, and document the Plan, which reflects the end product of active and extensive arm's length negotiations conducted in good faith.

67.     In summary, I believe the Plan has been proposed in good faith, with the legitimate and honest purpose of reorganizing the Debtors' ongoing businesses and enhancing the financial viability of the Reorganized Debtors, while providing recovery in full to the majority of the Debtors' creditors, including the holders of Existing Senior Secured Notes, and a significant recovery to the holders of Existing Convertible Notes.  I believe that the support of the Debtors' primary constituencies and the overwhelming acceptance of the Plan by the holders of Existing Senior Secured Notes and the holders of Existing Convertible Notes reflects the overall fairness of the Plan and the acknowledgement by the Debtors' claimholders that the Plan has been proposed in good faith and for proper purposes.  Accordingly, I believe that confirmation of the Plan proposed by the Debtors is in the best interest of all creditors and should be approved.

68.     Additionally, the principal purpose of the Plan is not the avoidance of taxes or the avoidance of the application of section 5 of the Securities Act of 1933 (15 U.S.C. § 77e).

**B.    The Disclosure Statement Contains Adequate Information**

69.     I reviewed the Disclosure Statement prior to its dissemination and believe it is accurate and comprehensive. Indeed, Roust and its advisors engaged in a very comprehensive process of drafting and review of the information contained in the Disclosure Statement to ensure that the information presented in the Disclosure Statement, including all descriptions of the Debtors, their financial conditions and risks related to the Plan, were true, complete and correct in all material respects. The Debtors' review of the Disclosure Statement was designed to ensure that the information regarding the Debtors did not contain any untrue statement of material fact or omit any material facts necessary to make the statements made, in light of the circumstances

28

under which they were made, not misleading. Additionally, information was verified so that parties in interest could make informed decisions with respect to the Plan.

70.    Based on the foregoing, I believe that the Disclosure Statement contains adequate information within the meaning of section 1125(a) of the Bankruptcy Code, as this provision has been explained to me.

## C.    The Plan is Feasible

71.    In connection with the development of the Plan, the Debtors analyzed their ability to satisfy their financial obligations while maintaining sufficient liquidity and capital resources. In this regard, the management of the Company, including myself, with the assistance of Houlihan Lokey Capital, Inc. ("Houlihan Lokey"), developed and refined a business plan and prepared the pro forma financial projections as attached to the Disclosure Statement as Exhibit D (the "Projections"). I believe that there is a good faith basis for the assumptions and the conclusions set forth in the Projections. Accordingly, based upon the Projections and the liquidity to be provided pursuant to the Share Placement, I believe the Reorganized Debtors should have sufficient liquidity to meet their debts as such debts mature in the ordinary course of business.

72.    In general, the Projections demonstrate that with the significantly deleveraged capital structure and increased liquidity, the Reorganized Debtors will generate positive EBITDA and should have sufficient cash flow and availability to make all payments required pursuant to the Plan while conducting ongoing business operations. The Projections demonstrate that confirmation and consummation of the Plan, therefore, is not likely to be followed by the liquidation or further reorganization of the Reorganized Debtors.

73.     Due to my role at the Company and my involvement in the business planning process, I have extensive knowledge of the analysis, key assumptions and underlying data that was used to develop the Projections.  Based on the extensive business planning process that the Company undertook in developing the Projections, as well as my understanding of the assumptions underlying them and the analysis above, and under the assumption that the Company will be well managed and will follow the business plan underlying the Projections, I believe that the Projections are reasonable, subject to the risks described in the Disclosure Statement. Further, as discussed above, upon emergence, the Reorganized Debtors will be significantly deleveraged and have substantial liquidity.

74.     Based on the above, I believe that the Reorganized Debtors will have sufficient operating cash to pay interest and scheduled amortization on all of their outstanding indebtedness.  Moreover, based on my review of the Projections, I believe that, as of the Effective Date and after taking into account the transactions contemplated by the Plan, the Reorganized Debtors will, subject to the risks described in the Disclosure Statement, (i) be able to meet their debts as such debts mature, (ii) not be left with unreasonably small capital to operate their businesses as a result of the Plan or any transactions contemplated by the Plan, and (iii) be solvent.

**D.     Best Interests of the Creditors**

75.     The Debtors, with the assistance of Houlihan Lokey, performed a liquidation analysis, attached to the Disclosure Statement as Exhibit E (the "Liquidation Analysis"), to determine whether the Plan satisfies the "best interests" test and to assist creditors in determining whether to accept the Plan. As set forth in the Liquidation Analysis, the overall values that may

be realized by the holders of Claims in hypothetical chapter 7 cases are significantly less than the value of the recoveries to these holders under the Plan.

76.     As described in more detail in the Liquidation Analysis, the holders of Existing Senior Secured Notes Claims in Class 2 will receive more under the Plan than in a liquidation: in the event of a liquidation of the Debtors, the proceeds available for holders of Class 2 Claims would range from approximately $141.2 million to $242.6 million resulting in a recovery of between 29% and 50%.  In contrast, under the Plan, holders of Allowed Class 2 Claims will receive various forms of consideration, including the New Senior Secured Notes in a principal amount of $385 million, that afford a 100% recovery. The New Senior Secured Notes alone are greatly in excess of the likely recoveries to holders of Allowed Class 2 Claims in a liquidation scenario. In addition, holders of Allowed Class 2 Claims will receive $20 million in Cash, the right to participate in the Share Placement, and 12.08% of the equity in Reorganized Roust and/or the proceeds of the Existing Senior Secured Notes Equity Subscription.

77.     Similarly, as described in more detail in the Liquidation Analysis, the holders of Existing Convertible Notes Claims in Class 3 will receive more under the Plan than in a liquidation: in the event of a liquidation of the Debtors, there would not be any proceeds available for holders of Class 3 Claims.  In contrast, under the Plan, holders of Allowed Class 3 Claims will receive 10.59% of the equity in Reorganized Roust, an additional 1.00% of the equity in Reorganized Roust (contributed by the Russian Standard Parties to the holders of Existing Convertible Notes), the right to participate in the Share Placement and the right to participate in the Existing Senior Secured Notes Equity Subscription.  Therefore, holders of Impaired Claims and Equity Interests will receive recoveries that are substantially more under the Plan than in a liquidation.

**E.      The Plan Releases and Exculpation Should be Approved**

78.      I understand that the Plan contemplates certain releases and exculpations,

including (a) a release by the Debtors and the Reorganized Debtors of the Released Parties[11] (the

"Debtors' Release"), (b) releases by holders of Claims and other Releasing Parties[12] of the

Released Parties (the "Non-Debtor Release"); (c) an exculpation provision for the Exculpated

Parties[13] (the "Exculpation Provision") and (d) an injunction provision intended to implement the

Debtors' Release, the Non-Debtor Release and the Exculpation Provision (the "Injunction

---

[11]   The Released Parties under the Plan include each of: (a) the Debtors; (b) the current and former directors and officers of the Debtors; (c) any statutory committee appointed in these Chapter 11 Cases and the current and former members thereof, in their capacity as such; (d) the Russian Standard Parties; (e) the current and former directors and officers of the Russian Standard Parties; (f) RSV and its subsidiaries; (g) the current and former officers and directors of RSV and its subsidiaries; (h) the Backstop Noteholders; (i) the current and former members of the Steering Committees; (j) the Steering Committees; (k) the Consenting Noteholders; (l) each of the Non-Debtor Affiliates that is a subsidiary of Roust; (m) the current and former directors and officers of each of the Non-Debtor Affiliates that is a subsidiary of Roust; (n) the Indenture Trustees; (o) the Existing Notes Agents; and (p) with respect to each of the foregoing Persons in clauses (a) through (o), such Person's current and former affiliates, subsidiaries, managed accounts or funds, officers, directors, partners, principals, employees, agents, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, management companies, fund advisors and other professionals, and officers, directors, partners, principals, employees and agents thereof, in each case in their capacity as such.

[12]   The Releasing Parties under the Plan include collectively: (a) the Existing Senior Secured Notes Indenture Trustee, (b) the holders of Existing Senior Secured Notes, (c) the Existing Convertible Notes Indenture Trustee, (d) the holders of Existing Convertible Notes, (e) the Existing Notes Agents, (f) any and all other holders of Claims or Interests, and (h) with respect to each of the foregoing clauses (a) through (f), to the fullest extent permitted by law, such Person's current and former affiliates, subsidiaries, managed accounts or funds, officers, directors, partners, principals, employees, agents, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, management companies, fund advisors and other professionals, and officers, directors, partners, principals, employees and agents thereof, in each case in their capacity as such.

[13]   The Exculpated Parties under the Plan include each of: (a) the Debtors; (b) the current and former directors and officers of the Debtors; (c) any statutory committee appointed in these Chapter 11 Cases and the current and former members thereof, in their capacity as such; (d) the Russian Standard Parties; (e) the current and former officers and directors of the Russian Standard Parties; (f) RSV and its subsidiaries; (g) the current and former officers and directors of RSV and its subsidiaries; (h) the Backstop Noteholders; (i) the current and former members of the Steering Committees; (j) the Steering Committees; (k) the Consenting Noteholders; (l) each of the Non-Debtor Affiliates that is a subsidiary of Roust; (m) the current and former directors and officers of each of the Non-Debtor Affiliates that is a subsidiary of Roust; (n) the Indenture Trustees; (o) the Existing Notes Agents; and (p) with respect to each of the foregoing Persons in clauses (a) through (o), such Person's current and former affiliates, subsidiaries, managed accounts or funds, officers, directors, partners, principals, employees, agents, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, management companies, fund advisors and other professionals, and officers, directors, partners, principals, employees and agents thereof, in each case in their capacity as such.

Provision"). I believe the Releases are (i) fair, equitable and reasonable, (ii) integral elements of the restructuring and resolution of these chapter 11 cases in accordance with the Plan, (iii) necessary for the reorganization of the Debtors, and (iv) supported by reasonable consideration.

79.    Pursuant to the Debtors' Release, the Debtors will release various claims and causes of actions against the Released Parties. I consider the Debtors' Release to be a vital component of the Plan. Indeed, during the course of the Plan negotiations, it was clear that the Debtors' Release would be a necessary condition of the Restructuring Support Agreement and consummation of the Proposed Restructuring embodied in the Plan. Without the Debtors' Release, I believe that the Debtors and their stakeholders would not have been able to secure the substantial benefits provided by the Plan, including the significant reduction of debt. In consideration for the Debtors' Release, the Debtors and their estates will receive reciprocal releases from potential claims and causes of action of the Releasing Parties, in addition to the significant benefits provided to the Debtors through this consensual prepackaged bankruptcy. Importantly, I do not believe the Debtors have any claims or causes of action of any kind against any of the Released Parties. For these reasons, I believe agreeing to the Debtors' Release constitutes a sound exercise of the Debtors' business judgment.

80.    Pursuant to the Non-Debtor Releases, certain third-party claims against the Released Parties are released. In my view, the Non-Debtor Releases are integral and necessary to the Debtors' Plan as they were made by the Released Parties in contemplation of and in exchange for significant and substantial contributions to the Debtors' estates. Such contributions will aid in the successful implementation of the Debtors' proposed restructuring.

81.     The Consenting Noteholders, the Steering Committees and the members thereof have provided substantial and necessary contributions in exchange for their Releases, including, among other things, (i) relinquishing their Existing Senior Secured Notes Claims and/or Existing Convertible Notes Claims, as applicable, and any other potential claims against the Released Parties, including, importantly, the Non-Debtor Affiliates, (ii) voting in favor of the Plan, and (iii) consenting to the Proposed Amendments in the Consent Solicitation.  Under the Plan, the Consenting Noteholders relinquishment of their Existing Notes Claims in exchange for the consideration under the Plan will allow the Debtors to significantly reduce their debt burden by approximately $462 million.  Moreover, the Consenting Noteholders' releases were negotiated as part of the Restructuring Support Agreement, which provided concrete evidence to the market of the support of the Consenting Noteholders and in turn provided stability to the Debtors' business while they navigated the restructuring process.  This support combined with the Consenting Noteholders' agreement to receive substantially less debt in the Reorganized Debtors constitutes contributions of substantial value to the Proposed Restructuring.

82.     The Backstop Noteholders have also received bargained for Releases in exchange for providing substantial and necessary contributions.  As noted above, the Share Placement, which is being backstopped by the Backstop Noteholders, is an essential part of the Debtors' reorganization efforts as it will provide critical liquidity to the Debtors. This liquidity is particularly crucial in the short-term due to the Debtors' upcoming excise tax obligations in Russia.  The Backstop Noteholders are providing the Debtors with assurance that the $55 million of New Common Stock in Reorganized Roust will be purchased in connection with the Share Placement, thereby guaranteeing that the Debtors receive such necessary liquidity.  In my view,

the Backstop Noteholders would not have agreed to backstop the Share Placement absent the Releases.

83.     The Russian Standard Parties have similarly provided unique and substantial contributions necessary to implement the Proposed Restructuring and the Plan.  Significantly, and as discussed in greater detail above, the Russian Standard Parties are providing significant value by contributing strategic assets, namely RSV and all related RSV intellectual property. The contribution of RSV was essential to gaining the support of the Consenting Noteholders for the Restructuring.  In addition, certain of RTL's non-Roust subsidiaries will convert debt owed by subsidiaries of Roust into equity, and the Russian Standard Parties will allocate 1.0% of the equity received in Reorganized Roust to holders of Existing Convertible Notes and 6.0% of the equity received in Reorganized Roust to participants in the Share Placement.  Without the considerable contributions of the Russian Standard Parties, the Proposed Restructuring contemplated by the Plan would not be achievable.

84.     The Debtors' management and other Released Parties have likewise made unique and substantial commitments of time and effort to bring this Proposed Restructuring before the Court for confirmation.  For instance, Debtors' management will continue to work in their present roles for the Reorganized Debtors and, as such, make indispensable contributions to the successful reorganization of the Debtors.  Moreover, continuity of management in light of the Proposed Restructuring was important to the Consenting Noteholders.  In addition, as an integral aspect of the Plan, Reorganized Roust is assuming all of its indemnification obligations to directors and officers under its charter, a copy of which will be included in the Plan Supplement. Therefore, a suit against the officers and directors effectively would constitute a suit against Reorganized Roust and hence, would defeat the purposes of Plan's discharge and injunction

provisions.  In addition, the Indenture Trustee and the Existing Notes Agents are providing valuable contributions to the Reorganization by assisting with and helping to effect the distributions under the Plan.  Further, as the Debtors are holding companies that do not operate, the Proposed Restructuring would not be possible without the contributions of the operating Non-Debtor Affiliates whose revenue streams will ultimately fund consideration under the Plan, including the New Senior Secured Notes.  In addition, the Non-Debtor Affiliates will guarantee the New Senior Secured Notes and pledge assets to secure those guarantees.

85.    The Released Parties' contributions together comprise the foundation for the Debtors' effective reorganization.  In light of the Projections, it is clear to me that the Debtors' business would not survive absent the Proposed Restructuring being implemented in the Plan.  Absent including the Releases in the Plan, the Debtors would have been unable to secure the support and the contributions of the Released Parties necessary to implement the Proposed Restructuring and consummate the Plan.  The Releases are thus essential to the reorganization and maximizing and preserving value for the benefit of all the Debtors' constituencies.  I do not believe that the Debtors' Proposed Restructuring or the consummation and implementation of the Plan can be accomplished without the contributions of the Released Parties.  Finally, the Plan has been overwhelmingly accepted by creditors and the Plan provides a mechanism for substantial recovery of the claims of persons affected by the releases. For this reason and the other reasons outlined above, I believe that the Debtors' releases are appropriate and should be approved.

86.    Extensive negotiations and compromises were crucial to the formulation of a feasible and consensual Plan, and in my view, could not have concluded successfully without the protection from liability that the Exculpation Provision provides to the Released Parties.  Indeed, absent the assurances provided by the Exculpation Provision, I believe that the Released Parties

may not have agreed to participated in negotiations or make concessions in favor of the Debtors that are contained in and critical to the Plan.  For the same reasons that the Debtors' releases are proper, I believe that the exculpation is appropriate, insofar as the Released Partis formulated the Plan after negotiating extensively with the Plan Support Parties in good faith in the time leading up to the Petition Date.

87.    Like the Exculpation Provision, I consider the Injunction Provision necessary to preserve and enforce the Debtors' Releases, the Non-Debtor Releases, and the Exculpation Provision.

## F.    Additional Confirmation Requirements

88.    In addition to the foregoing, in further support of confirmation of the Plan, I submit the following factual precedent for satisfying the requirements of Bankruptcy Code section 1129:

a) I believe that valid business, factual and legal reasons exist for the various Classes of Claims and Interests created under the Plan, and I believe that such Classes do not unfairly discriminate between holders of Claims or Interests.

b) There is no governmental regulatory commission that has jurisdiction over the Debtors' or the Reorganized Debtors' rates.

c) I have reviewed the list of claimants in Class 2 Existing Senior Secured Notes and Class 3 Existing Convertible Notes and believe that such classes are comprised exclusively of non-insider claims.

## IV.  CONCLUSION

89.    The Debtors' ultimate goal is to reorganize their financial affairs under the terms of a confirmed chapter 11 plan.  The Debtors' also seek to minimize any loss of value of their

business during their restructuring and to maintain "business-as-usual" during the pendency of these chapter 11 cases, with as little interruption or disruption as possible to the operations of the Debtors and the non-Debtor Operating Subsidiaries.  I believe that if the Court grants the relief requested in each of the First Day Motions, the prospect for achieving these objectives and completing a successful, rapid reorganization of the Debtors' business will be substantially enhanced.

90.    In addition, based on the foregoing, I believe that the Plan and the transactions embodied therein have been structured to accomplish the Debtors' goal of maximizing the returns available to stakeholders. I believe that the Plan is feasible and that the holders of Claims that are impaired under the Plan will retain or receive property that is at least equal to the amount that they would receive if the Debtors were liquidated under a hypothetical chapter 7. I believe that the overwhelming support of the holders of the Existing Convertible Notes and Existing Senior Secured Notes further reflects the overall fairness and reasonableness of the Plan and that the Plan has been proposed in good faith and for proper purposes. As a result, I believe that the Plan will position the Reorganized Debtors to operate successfully upon their emergence from chapter 11.

91.    I hereby reserve my right to amend the testimony set forth herein as necessary at the hearing to consider confirmation of the Plan.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 30 day of December 2016.

By: *s/ Grant Winterton*

Grant Winterton

Chief Executive Officer of Roust
Corporation

# EXHIBIT A

## Corporate Organizational Chart





Bermuda
Cyprus
USA
Luxemburg
Poland
Canada
Ukraine
Russia
Isle of Man
Hungary
Singapore
Switzerland
Roust Corporation
100%
90.986%
9,014%
LLC "RSV"
ROUST Hungary Kft
PWW sp. z o.o.
CEDC International sp. z o.o.
50% + 1 share
CEDC ASIA PTE.LTD (Singapore)
Jelegat Holdings Limited
CEDC Finance Corporation LLC
CEDC Finance Corporation International Inc.
Digital Data Holding Limited
Russian Standard Intellectual Property Holding AG
WHL Holdings Limited
Lion/Rally Lux 1
Lion/Rally Lux 2
Lion/Rally Lux 3
83,33%
16,67%
Copecresto Enterprises Limited
Dancraig Wine & Spirits Trading Limited
Lugano Holding Limited
Ardy Investments Limited
«WHITEHALL-CENTER»
WHIC
«Whitehall-Saint-Petersburg» Co.Ltd
"Parliament Production", LLC
"Parliament Distribution", LLC
«White Hall North-West» Ltd
85%
15%
LLC «WH Rostov-on-Don»
Pasalba Limited (Cyprus)
Vlaktor Trading Limited
AUK Holdings Limited
Latchey Ltd.
Roust Distribution Limited
99,9930%
0,0070%
Joint Stock Company "Roust Russia"
OOO "Chornyi & Mikola"
ROUST UKRAINE LLC
OOO "Glavspirttrest"
CJSC "ROUST INC."
JSC "Distillery 'Topaz"
AO "Sibirskiy LVZ"
Bravo Premium, LLC
99%
1%
LLC "The Trading House "Russian Alcohol"
"The Trading House "Russian Alcohol - Centre" LLC
"The Trading House "Russian Alcohol - North-West" LLC
"The Trading house "Russian Alcohol - SIBERIA" LLC
"Trading house "Russian Alcohol - Moscow" LLC

## EXHIBIT B

### Committees Organized Prepetition

To the best of the Debtors ' knowledge and pursuant to Local Bankruptcy Rule 1007-2(a)(3), the following committees have been organized prior to the Petition Date:

| Type of Committee | Counsel for Committee |
| --- | --- |
| Steering Committee of Holders of Existing Senior Secured Notes | Kirkland & Ellis LLP<br>  601 Lexington Avenue<br>  New York, NY 10022<br>  Attn:  Paul M. Basta, P.C.<br>    Robert Britton |
| Steering Committee of Holders of Existing Convertible Notes | Cadwalader, Wickersham & Taft LLP<br>  Dashwood House<br>  69 Old Broad Street<br>  London EC2M 1QS<br>  Attn:  Richard L. Nevins<br>    Gregory M. Petrick |

**EXHIBIT C**

**Consolidated List of the Holders of the Debtors' 20 Largest Unsecured Claims[1]**

Pursuant to Local Bankruptcy Rule 1007-2(a)(4), the following is a consolidated list of the Debtors' creditors holding the 20 largest unsecured claims (the "Consolidated Creditor List") based on the Debtors' unaudited books and records as of the Petition Date. The Consolidated Creditor List has been prepared in accordance with Bankruptcy Rule 1007(d) and does not include (i) persons who come within the definition of "insider" set forth in section 101(31) of the Bankruptcy Code or (ii) secured creditors, unless the value of the collateral is such that the unsecured deficiency places the creditor among the holders of the 20 largest unsecured claims.

The information contained herein shall not constitute an admission of liability by, nor is it binding on, the Debtors. The Debtors reserve all rights to assert that any debt or claim included herein is a disputed claim or debt, and to challenge the priority, nature, amount, or status of any such claim or debt. In the event of any inconsistencies between the summaries set forth below and the respective corporate and legal documents relating to such obligations, the descriptions in the corporate and legal documents shall control.

| | Name of creditor and complete mailing address, including zip code | Name, telephone number and email address of creditor contact | Nature of claim (for example, trade debts, bank loans, professional services, and government contracts) | Indicate if claim is contingent, unliquidated, or disputed | Amount of claim If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | | | | | Total claim, if partially secured | Deduction for value of collateral or setoff | Unsecured claim |
| 1 | WHITE & CASE LLP 200 S BISCAYNE BLVD., MIAMI, FL 33131 | Tel. +1 305-371-2700 Fax. +1 305-358-5744/5766 | TRADE DEBT | | | | $376,692.64 |

---

[1]  As of the date of the filing of the Chapter 11 Cases, the Debtors had less than twenty (20) unsecured creditors. As such, this list includes all of the Debtors' unsecured creditors as of the filing of the Chapter 11 Cases.

| | Name of creditor and complete mailing address, including zip code | Name, telephone number and email address of creditor contact | Nature of claim (for example, trade debts, bank loans, professional services, and | Indicate if claim is contingent, unliquidated, or disputed | Amount of claim If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|---|---|
| 2 | MOODY'S INVESTORS SERVICE LTD EC3R 7XB LONDON, MINISTER COURT 2 | Tel.  +44 207-772-1000 | TRADE DEBT | | | | $80,265.35 |
| 3 | HOAGLAND, LONGO, MORAN, DUNST & DOUKAS, LLP ATTORNEYS AT LAW 40 PATERSON ST. NEW BRUNSWICK, NJ 08901 | Tel. +1 732-545-4717 | TRADE DEBT | | | | $32,100.00 |
| 4 | JONES DAY 51 LOUISIANA AVE NW, WASHINGTON, DC 20001 | Tel. +1 202-879-3939 | TRADE DEBT | | | | $24,015.53 |
| 5 | BROADRIDGE ICS PO BOX 416423 BOSTON, MA 02241-6423 | Tel. +1 617-338-0107 | TRADE DEBT | | | | $21,896.30 |
| 6 | WSE WARSAW GIEŁDA PAPIERÓW WARTOŚCIOWYCH 00-498 WARSAW, KSIĄŻĘCA 4 | Tel. (4822) 628 32 32 Fax. (4822) 628 17 54 | TRADE DEBT | | | | $16,533.66 |

| | Name of creditor and complete mailing address, including zip code | Name, telephone number and email address of creditor contact | Nature of claim (for example, trade debts, bank loans, professional services, and | Indicate if claim is contingent, unliquidated, or disputed | Amount of claim If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | | |
|---|---|---|---|---|---|---|---|---|
| 7 | KPMG LLP PO BOX 120522 DALLAS, TX 75312-0522 | Tel. +1 214-840- 2000 Fax. +1 214 -840 -2297 | TRADE DEBT | | | | | $13,3000.00 |
| 8 | PR NEWS WIRE ASSOCIATION, LLC PO BOX 5897 NEW YORK, NY 10087-5897 | Tel. 800-776-8090 Fax. 800-793-9313 | TRADE DEBT | | | | | $7,395.00 |
| 9 | THOMSON REUTERS 121 RIVER ST #1000 HOBOKEN, NJ 07030 | Tel. +1 201-356-6260 | TRADE DEBT | | | | | $4,641.66 |
| 10 | PREMIERE GLOBAL SERVICES PO BOX 404351 ATLANTA, GA 30384-4351 | Tel. +1 404-262-8400 | TRADE DEBT | | | | | $2,382.36 |

3

| | Name of creditor and complete mailing address, including zip code | Name, telephone number and email address of creditor contact | Nature of claim (for example, trade debts, bank loans, professional services, and | Indicate if claim is contingent, unliquidated, or disputed | Amount of claim If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|---|---|
| 11 | AMERICAN STOCK TRANSFER & TRUST COMPANY, LLC 6201 15TH AVE, BROOKLYN, NY 11219 | Tel. 877-814-9688 | TRADE DEBT | | | | $2,076.00 |

4

## EXHIBIT D

### Consolidated List of the Holders of the Debtors' Five Largest Secured Claims

Pursuant to Local Bankruptcy Rule 1007-2(a)(5), the following is a list of creditors holding the five largest secured claims against the Debtors, on a consolidated basis, as of the Petition Date.

The information contained herein shall not constitute an admission of liability by, nor is it binding on, the Debtors. The Debtors reserve all rights to assert that any debt or claim included herein is a disputed claim or debt, and to challenge the priority, nature, amount, or status of any such claim or debt. The descriptions of the collateral securing the underlying obligations are intended only as brief summaries. In the event of any inconsistencies between the summaries set forth below and the respective corporate and legal documents relating to such obligations, the descriptions in the corporate and legal documents shall control.

| Creditor Name | Creditor Contact | Amount of Claim | Collateral Description |
|---|---|---|---|
| U.S. Bank National Associations as Indenture Trustee | 100 Wall Street, Suite 1600, New York, New York 10005 | $496.8 million | Pledges of the capital stock of each of CEDC Finance Corporation LLC and CEDC Finance Corporation International Inc.; Pledges of the intercompany loans made by CEDC Finance Corporation International Inc. to CEDC International Sp. z. o. o and Jelegat Holdings Ltd. (respectively) |
| U.S. Bank National Associations as Indenture Trustee | 100 Wall Street, Suite 1600, New York, New York 10005 | $283.8 million | Pledges of the capital stock of each of CEDC Finance Corporation LLC and CEDC Finance Corporation International Inc.; Pledges of the intercompany loans made by CEDC Finance Corporation International Inc. to CEDC International Sp. z. o. o and Jelegat Holdings Ltd. (respectively) |

## EXHIBIT E

### Summary of the Debtors' Assets and Liabilities

Pursuant to Local Bankruptcy Rule 1007-2(a)(6), the following are estimates of the Debtors' total assets and liabilities on a consolidated basis. The following financial data is the latest available information and reflects the Debtors' financial condition, as consolidated with its affiliated Debtors and non-Debtors.

The information contained herein shall not constitute an admission of liability by, nor is it binding on, the Debtors. The Debtors reserve all rights to assert that any debt or claim included herein is a disputed claim or debt, and to challenge the priority, nature, amount, or status of any such claim or debt.

| Assets and Liabilities | Amount[1] |
| --- | --- |
| Total Assets | $1,373,863,812.06 |
| Total Liabilities | $787,054,813.17 |

---

[1]   Amounts as of November 30, 2016.

## **EXHIBIT F**

### **Summary of the Publicly Held Securities of the Debtors**

Pursuant to Local Bankruptcy Rule 1007-2(a)(7), the following lists the number and classes of shares of stock, debentures, or other securities of the Debtors that are publicly held, and the number of holders thereof as of the Petition Date, including those held by the Debtors' directors and officers and the amounts so held.

The outstanding Common Stock of the Debtors is privately held, and there is no established public trading market for such Common Stock. The Debtors' publicly held debt securities are:

| Debt Security | Value Outstanding | Approximate Number of Record Holders[1] |
|---|---|---|
| Senior Secured Notes | $496,762,858 | 20 |
| Convertible Notes | $283,839,176 | 20 |

None of the Debtors' directors and officers hold any Senior Secured Notes or Convertible Notes.

---

[1]  This approximate number of holders solely reflects record holders and does not reflect the number of beneficial holders of the Senior Secured Notes or Convertible Notes.

## <u>EXHIBIT G</u>

### Summary of Debtors' Property Held by Third Parties

Pursuant to Local Bankruptcy Rule 1007-2(a)(8), the Debtors, as of the Petition Date, do not have property that is in the possession or custody of any custodian, public officer, mortgagee, pledge, assignee of rents, secured creditor, or agent for any such entity.

## EXHIBIT H

**Summary of Debtors' Property From Which the Debtors' Operate Their Business**

Pursuant to Local Bankruptcy Rule 1007-2(a)(9), the following lists the location of the premises owned, leased, or held under other arrangement from which the Debtors operate their businesses as of the Petition Date.

| Property Address | City | State | Country | Owned or Leased |
|---|---|---|---|---|
| 777 Westchester Avenue, Suite 101 | White Plains | New York | USA | Leased |

## EXHIBIT I

**Location of the Debtors' Substantial Assets, Books and Records, and Nature and Location of Debtors' Assets Outside the United States**

Pursuant to Local Bankruptcy Rule 1007-2(a)(10), the following provides the location of the Debtors' substantial assets, books and records, and the nature, location, and value of any assets held by the Debtors outside the territorial limits of the United States as of the Petition Date.

| Debtors' Assets | Location |
| --- | --- |
| Books and Records | Bobrowiecka 6, 00-728 Warsaw, Poland |
| Books and Records | Novoorlovskaya Street, Building 5, 119633 Moscow, Russian Federation |

## EXHIBIT J

### Summary of Legal Actions Against the Debtors

Pursuant to Local Bankruptcy Rule 1007-2(a)(11), as of the Petition Date, there are no material legal actions or proceedings, pending or threatened, against the Debtors or their properties where a judgment against the Debtors or a seizure of their property may be imminent.

## <u>EXHIBIT K</u>

### The Debtors' Senior Management

Pursuant to Local Bankruptcy Rule 1007-2(a)(12), the following provides the names of the individuals who constitute the Debtors' existing senior management, their tenure with the Debtors, and a brief summary of their responsibilities and relevant experience as of the Petition Date.

| Name / Position | Relevant Experience / Responsibility | Tenure |
|---|---|---|
| Roustam Tariko<br><br>Executive Chairman | Roustam Tariko was appointed Executive Chairman of our board of directors on July 9, 2012 and continues to serve in this role. Mr. Tariko also served as Interim President of the Company from October 23, 2012 to January 10, 2013. Mr. Tariko is the founder of Russian Standard, one of the largest Russian privately owned companies working in the consumer market. Russian Standard has leading positions in banking, premium vodka, sparkling wines and spirits distribution. Dating back to 1992, the Russian Standard family of companies today includes RSV (a producer and distributor of the number one premium vodka in Russia, present in over 75 countries), Roust Inc. (a leading Russian distributor of alcoholic beverages), *Gancia* (a legendary Italian producer of sparkling wines and vermouths founded in 1850), Russian Standard Bank (a leading consumer lender and credit card issuer in Russia) and Russian Standard Insurance. Mr. Tariko is a graduate of the Moscow Institute for Railway Engineering with a degree in economics, which he supplemented with courses at INSEAD Executive School. The Company believes that Mr. Tariko's extensive experience in the alcohol production and distribution business in Russia and globally makes him a significant and valued Executive Chairman of our board of directors. | 2012-Present |

| | | |
|---|---|---|
| Eberhard von Löhneysen<br><br>Director | Eberhard von Löhneysen has been a director of the Company since June 5, 2013. Mr. von Löhneysen has built an extensive career in business consulting and corporate management. After working at the World Bank with a focus on Latin America for eight years, Mr. von Löhneysen spent more than two decades with McKinsey & Co. in different fields and countries. He was responsible for the German financial institutions practice and managed the McKinsey & Co.'s office in Berlin for several years; later he moved to Moscow, where he was responsible for the Eastern European office complex. After leaving McKinsey & Co., Mr. von Löhneysen worked as group Chief Executive Officer of Russian Standard Corporation. Currently, Mr. von Löhneysen serves as the Chairman and Director for Strategy in 10EQS, an online knowledge utility that organizes the collaboration of independent experts. The Company believes that Mr. von Löhneysen's experience in business consulting and management enables him to make valuable contributions as a member of our board of directors. | 2013-Present |
| Pavel Merkul<br><br>Director | Pavel Merkul has been a director of the Company since June 5, 2013. Mr. Merkul has been Chief of Staff since 2009 and Managing Director in Russian Standard Corporation. He is responsible for the key corporate projects of Russian Standard Group, including mergers and acquisitions and post-merger integration, as well as Russian Standard Group's finances. He has been actively involved in the negotiations between RTL and Roust since 2011. He began his career in 2001 working on mergers and acquisitions projects in Russia, and then worked with Boston Consulting Group from 2004 through 2009, focusing on strategy development and corporate restructuring projects for leading banking and telecom companies throughout Russia and Ukraine. He received his BA in economics from Moscow State University and his MBA from INSEAD in France and Singapore. The Company believes that Mr. Merkul's experience in corporate restructuring and mergers and acquisitions makes him a valuable member of our board of directors. | 2013-Present |
| Alessandro Picchi<br><br>Director | Alessandro Picchi has been a director of the Company since April 23, 2012. He is a lawyer enrolled in the Bar of Milan and the Bar of the Italian Highest Court. From December 2011 to April 15, 2012, he was General Counsel of Russian Standard Corporation. From 2006 to 2011, he was a partner of Morri, Cornelli & Associates, a Tax and Law Firm with offices in Milan and Rome. From 2000 to 2006, he was chairman of the board of directors of Globalfin International with headquarters in Switzerland and director of Motorel Investments BV. From 1996 to 2000 he was General Counsel of Globalfin International SA and a member of the board of directors. The Company believes that Mr. Picchi's legal experience in international contracts and trade, mergers and acquisitions and corporate governance allows him to make valuable contributions as a member of our board of directors. | 2012-Present |

| | | |
|---|---|---|
| Grant Winterton<br><br>Chief Executive Officer | Grant Winterton joined the Company as General Manager of the Russian Alcohol Group in April 2012 and has been Chief Executive Officer of the Company since January 10, 2013. Mr. Winterton has over 20 years of experience working in marketing, sales and general management positions for Campbell Soup (Australia), The Coca-Cola Company (Australia, Russia, Ukraine, China), Wimm Bill Dann (Russia) and Red Bull (Russia). Mr. Winterton has lived in Russia for over 15 years, working in the consumer goods industry, and has extensive working experience across the Russia, Ukraine, Belarus and CIS markets. Mr. Winterton has a Bachelor of Commerce Degree in Marketing/Finance from the University of New South Wales, Australia. | 2013-Present |
| Goran Ljubicic<br><br>Chief Financial Officer | Goran Ljubicic joined the Company as Chief Financial Officer of Roust Poland on November 13, 2013 and has been Chief Financial Officer of the Company since October 10, 2014. Mr. Ljubicic has extensive international work experience with fast-moving consumer goods companies, including 10 years in Russia. Prior to his work with the Company, Mr. Ljubicic was a member of the board of directors and Finance Director, Central European and Balkan Region, at Kreis Swiss from 2009 to 2013 and Region Managing Director, Dairy Business, Balkan Region, at Salford Capital Management Fund from 2005 to 2009. Mr. Ljubicic graduated in 1996 with a Bachelor of Arts degree in finance and statistical analyses from the Alfred University. | 2014-Present |

## <u>EXHIBIT L</u>

### Debtors' Payroll for the 30 Day Period Following the Petition Date

Pursuant to Local Bankruptcy Rules 1007-2(b)(1)-(2)(A) and (C), the following provides, for the 30-day period following the Petition Date, the estimated amount of weekly payroll to employees (exclusive of officers, directors, and stockholders), the estimated amount paid and proposed to be paid to officers, stockholders, and directors, and the amount paid or proposed to be paid to financial and business consultants retained by Debtors.

| Payments | Payment Amount |
|---|---|
| Payments to employees (not including officers, directors, and stockholders) | $0 |
| Payments to officers, directors, and stockholders | $34,166.00 |
| Estimated payments to financial and business consultants | $0 |

## EXHIBIT M

**Debtors' Estimated Cash Receipts and Disbursements for the Thirty-Day Period Following the Filing of the Chapter 11 Petitions**

Pursuant to Local Bankruptcy Rule 1007-2(b)(3), the following provides, for the 30-day period following the Petition Date, the Debtors' estimated cash receipts and disbursements, net cash gain or loss, and obligations and receivables expected to accrue that remain unpaid, other than professional fees.

| Type | Amount |
|---|---|
| Cash Receipts | $0 |
| Cash Disbursements | $0 |
| Net Cash Loss | $0 |
| Unpaid Obligations (excluding professional fees) | $0 |
| Unpaid Receivables (excluding professional fees) | $0 |