SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

Jay M. Goffman
Mark A. McDermott
Raquelle L. Kaye
Julie Lanz
Four Times Square
New York, New York 10036-6522
Telephone: (212) 735-3000
Fax: (212) 735-2000

*Proposed Counsel for Debtors
and Debtors in Possession*

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| **In re:** | : | **Chapter 11** |
| | : | |
| **ROUST CORPORATION**, *et al.* | : | **Case No. 16-23786** |
| | : | |
| **Debtors.**[1] | : | **(Joint Administration Pending)** |
| | : | |
| | : | |

## NOTICE OF FILING OF DISCLOSURE STATEMENT

**PLEASE TAKE NOTICE** that on December 30, 2016, the debtors and debtors in possession in the above-captioned cases (collectively, the "Debtors") filed the Offering Memorandum, Consent Solicitation and Disclosure Statement Soliciting Acceptances of a Prepackaged Plan of Reorganization, dated December 1, 2016 (the "Offering Memorandum and Disclosure Statement"), attached hereto as Exhibit A.

---

[1]   The Debtors and their respective addresses are as follows: Roust Corporation, 777 Westchester Avenue, Suite 101, White Plains, New York 10604 and CEDC Finance Corporation International, Inc. and CEDC Finance Corporation LLC, 1209 Orange Street, Wilmington, Delaware 19801.

Dated: New York, New York
December 30, 2016

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

*/s/  Jay M. Goffman*
Jay M. Goffman
Mark A. McDermott
Raquelle L. Kaye
Julie Lanz
Four Times Square
New York, New York 10036-6522
Telephone: (212) 735-3000
Fax: (212) 735-2000

*Proposed Counsel for Debtors and Debtors in Possession*

## EXHIBIT A

Offering Memorandum and Disclosure Statement

**OFFERING MEMORANDUM, CONSENT SOLICITATION STATEMENT AND DISCLOSURE STATEMENT**
**SOLICITING ACCEPTANCES OF THE PREPACKAGED PLAN OF REORGANIZATION**

# ROUST CORPORATION

# CEDC FINANCE CORPORATION INTERNATIONAL, INC.

# CEDC FINANCE CORPORATION LLC

Roust Corporation ("*Roust Corporation*" or "*Roust*") is

(1) soliciting acceptances of the prepackaged plan of reorganization attached hereto as Appendix A (the "*Plan*" or "*Plan of Reorganization*") for Roust, CEDC Finance Corporation International, Inc. ("*CEDC FinCo*") and CEDC Finance Corporation LLC ("*CEDC FinCo LLC*") (collectively, the "*Debtors*") under which the Senior Secured Notes due 2018 ("*Existing Senior Secured Notes*") and the Senior Convertible PIK Notes due 2018 (the "*Existing Convertible Notes*" and, collectively with the Existing Senior Secured Notes, the "*Existing Notes*") each issued by CEDC FinCo will be cancelled and in exchange (a) the holders of the Existing Senior Secured Notes will receive (i) the new senior secured notes in an aggregate principal amount of $385 million (the "*New Senior Secured Notes*"); (ii) cash consideration in an amount of $20 million; (iii) 12.08% of the shares of common stock in Roust issued and outstanding on the Effective Date (as defined in the Plan) following the reorganization of Roust under the Plan (the "*New Common Stock*") subject to dilution on account of the MIP (as defined below) and/or the cash proceeds of the Existing Senior Secured Notes Equity Subscription (as defined below), if any; and (iv) the right to participate in the Share Placement (as defined and described herein) and (b) the holders of the Existing Senior Secured Notes will receive (i) 11.59% of the New Common Stock subject to dilution on account of the MIP (as defined below); (ii) the right to participate in the Share Placement (as defined and described herein); and (iii) the right to participate in the Existing Senior Secured Notes Equity Subscription,

(2) offering to holders of the Existing Notes the opportunity to subscribe for New Common Stock (on the terms described herein) (the "*Share Placement*"),

and

(3) soliciting consents (the "*Consents*") to certain proposed amendments to and waivers of the indenture governing the Existing Senior Secured Notes (the "*Existing Senior Secured Notes Indenture*") and the indenture governing the Existing Convertible Notes (the "*Existing Convertible Notes Indenture*" and together with the Existing Senior Secured Notes Indenture, the "*Existing Notes Indentures*") (the "*Consent Solicitation*"),

upon the terms and subject to the conditions set forth in this offering memorandum, consent solicitation statement and disclosure statement soliciting acceptances of the Plan of Reorganization (as it may be amended from time to time, the "*Offering Memorandum and Disclosure Statement*") for accepting or rejecting the Plan of Reorganization, and the subscription form for participating in the Share Placement included herein as Appendix C (the "*Subscription Form*").

---

The deadline to vote to accept or reject the Plan of Reorganization is 5:00 p.m. New York City Time on December 30, 2016 (such time and date, as the same may be extended, the "*Voting Deadline*"). The Consent Solicitation will expire on the Voting Deadline, unless extended or earlier terminated by us. The holders of the Existing Convertible Notes (as of the Share Placement Record Date), the holders of Existing Senior Secured Notes (as of the Share Placement Record Date) and the Russian Standard Parties (collectively, the "*Eligible Holders*") desiring to subscribe for New Common Stock pursuant to the Share Placement must validly deliver their Subscription Form in accordance with the instructions contained therein at or prior to the Voting Deadline, unless extended by us. Subscriptions pursuant to the Share Placement cannot be withdrawn after they have been submitted. Consents and acceptances of the Plan of Reorganization may be withdrawn at any time prior to the Voting Deadline, but not thereafter, unless such deadline is otherwise extended by us. Holders of the Existing Notes should refer to the Ballot(s) included herewith and the Subscription Form attached hereto as Appendix C, for instructions on how to vote on the Plan of Reorganization and/or subscribe for New Common Stock. All allocations will be subject to dilution on account of the MIP (as defined below). We may, at our discretion, extend the deadline for any of the vote on the Plan of Reorganization, the subscription for New Common Stock or the Consent Solicitation without extending any other deadlines. If the Chapter 11 Case (as defined below) is commenced, it is anticipated that a hearing will be held on January 6, 2017 at 10:00 a.m. (prevailing Eastern time), before the Honorable Robert D. Drain in the United States Bankruptcy Court for the Southern District of New York, White Plains, to consider (i) the adequacy of the information contained in this Offering Memorandum and Disclosure Statement and (ii) confirmation of the Plan of Reorganization.

---

The Plan of Reorganization and our acceptance of the Consents is conditioned upon sufficient holders of the Existing Notes (collectively, the "*Noteholders*", and each a "*Noteholder*") voting to accept the Plan of Reorganization such that such holders' respective class(es) constitute an accepting class for purposes of Section 1129(a)(8) of the U.S. Bankruptcy Code (the "*Bankruptcy Code*") (the "*Minimum Reorganization Condition*"). We reserve the right, in our sole discretion, to waive certain of the conditions to the Consent Solicitation at any time prior to the Voting Deadline.

You should rely only on the information contained herein and in the related Ballot, in making your decision to participate in the Consent Solicitation and/or to vote to accept the Plan of Reorganization.

The Plan of Reorganization involves a high degree of risk. See "Risk Factors" beginning on page 20 of this Offering Memorandum and Disclosure Statement. The New Senior Secured Notes, the related guarantees and the New Common Stock are being offered only to holders of the Existing Notes (i) in the United States in a private placement pursuant to section 4(a)(2) of the Securities Act of 1933, as amended (the "*Securities Act*"), where such holders are "qualified institutional buyers" as that term is defined in Rule 144A under the Securities Act or "accredited investors" as that term is defined in Rule 501 of Regulation D or (ii) that are persons other than "U.S. persons," as that term is defined in Rule 902 of Regulation S under the Securities Act, in offshore transactions in reliance upon Regulation S under the Securities Act.

NEITHER THE U.S. SECURITIES AND EXCHANGE COMMISSION (THE "*SEC*") NOR ANY SECURITIES COMMISSION OF ANY U.S. STATE OR ANY OTHER JURISDICTION HAS APPROVED OR DISAPPROVED OF THIS TRANSACTION OR THESE SECURITIES, PASSED UPON THE MERITS OR FAIRNESS OF THE TRANSACTION OR DETERMINED IF THIS OFFERING MEMORANDUM AND DISCLOSURE STATEMENT IS TRUTHFUL OR COMPLETE. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE IN THE UNITED STATES.

THIS SOLICITATION OF ACCEPTANCES OF THE PLAN OF REORGANIZATION IS BEING CONDUCTED TO OBTAIN SUFFICIENT ACCEPTANCES OF THE PLAN OF REORGANIZATION PRIOR TO THE FILING OF A VOLUNTARY CASE UNDER CHAPTER 11 OF THE U.S. BANKRUPTCY CODE. BECAUSE NO CHAPTER 11 CASE HAS YET BEEN COMMENCED BY THE DEBTORS, THIS OFFERING MEMORANDUM AND DISCLOSURE STATEMENT HAS NOT BEEN APPROVED BY ANY COURT AS CONTAINING ADEQUATE INFORMATION WITHIN THE MEANING OF SECTION 1125(A) OF THE U.S. BANKRUPTCY CODE.

The date of this Offering Memorandum and Disclosure Statement is December 1, 2016.

Assuming the Debtors obtain sufficient acceptances of the Plan of Reorganization, the Debtors will seek to file petitions under Chapter 11 of the Bankruptcy Code to consummate the Plan of Reorganization.

Through the Plan of Reorganization, among other things:

- the holders of Existing Senior Secured Notes will receive their pro rata share of and interests in (i) the New Senior Secured Notes in an aggregate principal amount of $385 million on the terms and conditions described herein, (ii) $20 million in cash, (iii) 12.08% of the shares of the New Common Stock issued and outstanding on the Effective Date, which shall be issued in the form of series B New Common Stock (the "*Existing Senior Secured Notes Equity Allocation*"), as further discussed in the section entitled "Description of Common Stock", subject to the Existing Senior Secured Notes Equity Subscription (as defined below), if any, and (iv) the right to participate in the Share Placement (as described herein) subject to certain priorities.

- holders of the Existing Convertible Notes will receive their pro rata share of and interests in (i) 10.59% of the shares of the New Common Stock issued and outstanding on the Effective Date ("*the Existing Convertible Notes Equity Allocation*") which shall be issued in the form of series C New Common Stock, as further discussed in the section entitled "Description of Common Stock", (ii) 1.00% of the shares of New Common Stock issued and outstanding on the Effective Date otherwise allocable to the Russian Standard Parties (as defined below) (the "*Additional Convertible Notes Equity Allocation*") which shall be issued in the form of series C New Common Stock, (iii) the right to participate in the Share Placement subject to certain priorities, and (iv) the right to participate in the Existing Senior Secured Notes Equity Subscription.

- all Existing Notes will be deemed automatically cancelled and the obligations of the Debtors thereunder will be discharged; and

- Roust Trading Ltd. and each of its direct and indirect non-Roust affiliates and subsidiaries ("*RTL*") and Roustam Tariko (collectively, the "*Russian Standard Parties*") will contribute certain strategic assets, namely Russian Standard Vodka ("*RSV*") and related intellectual property, to Reorganized Roust and will convert certain of its outstanding debt into equity of Reorganized Roust which shall be issued in the form of series A New Common Stock as further discussed in the section entitled "Material Terms of the Plan of Reorganization".

All equity allocations will be subject to dilution if any shares are awarded pursuant to the management incentive plan, which is described further in this Offering Memorandum and Disclosure Statement.

In accordance with the Minimum Reorganization Condition, the Plan is conditioned upon sufficient Noteholders voting to accept the Plan such that the holders' respective class(es) constitute an accepting class for purposes of Section 1129(a)(8) of the Bankruptcy Code.

You may vote to accept or reject the Plan of Reorganization by providing the appropriate instruction to your nominee (a "*Nominee*") as contained in the Ballot. By providing an instruction to your Nominee to vote to accept the Plan of Reorganization on your behalf, you are making certain certifications, as contained in the Ballot. If you vote against, or take no action with respect to, the Plan of Reorganization, we may not be able to consummate the Plan of Reorganization. You may only change your vote by withdrawing, to the extent permitted, your Ballot prior to the Voting Deadline, unless such deadline is extended by us.

As part of the Plan of Reorganization, CEDC FinCo is making the Consent Solicitation in order to solicit Consents from Noteholders to certain amendments (the "*Proposed Amendments*") to the Existing Notes Indentures, pursuant to which all restricted subsidiaries shall be designated as unrestricted under such indentures and all of the liens on the collateral securing the Existing Notes and all subsidiary guarantees will be released. In addition, the Proposed Amendments will include an amendment to the acceleration provisions in the Existing Notes Indentures as more fully described in the "Consent Solicitation" section. For more information, see "The Material Terms of the Plan of Reorganization – Supplemental Indentures and Collateral and Guarantee Release."

i

In addition, the shares of New Common Stock equal to 13.03% of the New Common Stock issued and outstanding as of the Effective Date (which shall be issued as series A, B or C New Common Stock, as applicable) shall be issued in exchange for $55 million in cash in a share placement to be conducted as part of the Plan.

All participants in the Share Placement shall receive their respective share of 6.00% of the shares of the New Common Stock issued and outstanding on the Effective Date which were otherwise allocable to the Russian Standard Parties under the Plan, which such parties have agreed shall instead be transferred pro rata to participants (including any Russian Standard Parties participants) in the Share Placement (the "*Additional Share Placement Equity Allocation*") as series A, B or C New Common Stock, as applicable. Series A, B or C New Common Stock will collapse into a single series of New Common Stock upon the consummation of an initial public offering.

Certain holders of Existing Convertible Notes (the "*Backstop Convertible Noteholders*") and certain other holders of the Existing Senior Secured Notes (the "*Backstop Senior Noteholders*" and, collectively with the Backstop Convertible Noteholders, the "*Backstop Noteholders*") holding 66% and 29%, of the Existing Convertible Notes and the Existing Senior Secured Notes, respectively, as of the effective date of the RSA, will agree to subscribe for any shares not otherwise subscribed in the Share Placement in accordance with the terms of the backstop agreement, which will have the terms herein described, with such changes as are agreed amongst the parties thereto, Russian Standard Parties, the Company and the Backstop Noteholders (the "*Backstop Agreement*"). The Backstop Noteholders will receive a fee for their commitment to subscribe for any unsubscribed shares in the Share Placement (the "*Backstop Commitment Fee*") in the form of New Common Stock as described in more detail in the "Share Placement" section.

The holders of Existing Convertible Notes also have the right to subscribe for any and all shares of the New Common Stock to be issued to the holders of Existing Senior Secured Notes at a price of $25.98 per share (representing the plan equity value of $649.4 million ("*Plan Value*")), with the proceeds of any such subscription being distributed pro rata to holders of the Existing Senior Secured Notes in lieu of such equity (the "*Existing Senior Secured Notes Equity Subscription*").

Each Eligible Holder participating in the Share Placement may subscribe for some, all or none of the New Common Stock it is eligible to purchase in the Share Placement by properly completing the Subscription Form and delivering it to its broker, dealer, commercial bank, trust company or other Nominee responsible for tendering its Existing Notes as instructed in the Subscription Form. Deliveries of Subscription Forms by Eligible Holders shall be binding on such holders after their submission to the relevant Nominee. Eligible Holders who elect to participate in the Share Placement will be obligated to deliver the Subscription Price (as defined below) by the Payment Deadline (as defined below) if the Plan of Reorganization is confirmed. Pursuant to the Backstop Agreement, the Backstop Noteholders will be deemed to have subscribed for shares of New Common Stock representing their respective backstop commitments in the Share Placement to the extent that shares of New Common Stock are not otherwise subscribed for in the Share Placement.

Prior to the date of this Offering Memorandum and Disclosure Statement, holders of approximately 90% in aggregate principal amount of the Existing Senior Secured Notes and approximately two-thirds in aggregate principal amount of the Existing Convertible Notes, in each case including the Backstop Noteholders, executed an agreement (the "*Restructuring Support Agreement*") whereby they agreed to vote all of their Existing Notes to accept the Plan of Reorganization at or prior to the Voting Deadline. The Restructuring Support Agreement is subject to certain conditions including that the parties to the Restructuring Support Agreement receive satisfactory due diligence information related to the Debtors and RSV, that we obtain confirmation of the Plan of Reorganization by January 31, 2017, that the United States Bankruptcy Court for the Southern District of New York (the "*Bankruptcy Court*") approves the Plan of Reorganization in all material respects and that we do not amend or modify the Plan of Reorganization in any way that is materially adverse to Eligible Holders who have signed the Restructuring Support Agreement.

**This Offering Memorandum and Disclosure Statement contains projected financial information that demonstrates the feasibility of the Plan of Reorganization and statements about our ability to continue operations upon emergence from proceedings under the Bankruptcy Code. Such information was prepared for the limited purpose of furnishing Noteholders with adequate information to make an informed decision regarding acceptance of the Plan of Reorganization. The projections and estimates of value should not be regarded for the purpose of this Offering Memorandum and Disclosure Statement as representations or**

warranties by the Debtors, other parties to the Restructuring Support Agreement, any of their respective affiliates or any other person as to the accuracy of such information or that any such projections or valuations will be realized.

You must rely upon your own examination of us and the terms of the Share Placement, Consent Solicitation and the Plan of Reorganization, including the merits and risks involved. You should carefully consider the risk factors under "Risk Factors" in this Offering Memorandum and Disclosure Statement before deciding whether or not to participate in the Share Placement, deliver your Consent to the Consent Solicitation or vote to accept the Plan of Reorganization. See "Risk Factors".

Noteholders should be aware that they may be required to bear the financial risks of their investment in the New Senior Secured Notes or New Common Stock, as applicable, for an indefinite period of time.

The Share Placement, Consent Solicitation and the Plan of Reorganization are subject to the terms and conditions set forth in this Offering Memorandum and Disclosure Statement, the Ballot and the Subscription Form.

The Existing Notes are listed on the Global Exchange Market of the Irish Stock Exchange. An application will be made to list the New Senior Secured Notes on the Global Exchange Market of the Irish Stock Exchange (the "*ISE*") or the Channel Islands Securities Exchange (the "*CISE*") and to admit the notes for trading on the exchange market thereof. There can be no assurances that our application to list the New Senior Secured Notes will be approved on the Official List of the ISE or the CISE or that the New Senior Secured Notes will be admitted to trade on the Global Exchange Market of the ISE or the CISE.

––––––––––––––––

THE NOTEHOLDERS PARTY TO THE RESTRUCTURING SUPPORT AGREEMENT, THE TRUSTEES AND THE SECURITY AGENTS EXPRESS NO OPINION AS TO THE MERITS OF THE CONSENT SOLICITATION, THE PLAN OF REORGANIZATION OR ANY OTHER MATTER PRESENTED OR DISCUSSED IN THIS OFFERING MEMORANDUM AND DISCLOSURE STATEMENT. FURTHERMORE, THE NOTEHOLDERS PARTY TO THE RESTRUCTURING SUPPORT AGREEMENT, THE TRUSTEES AND THE SECURITY AGENTS MAKE NO ASSESSMENT OF THE IMPACT OF THE PLAN OF REORGANIZATION AS PRESENTED TO NOTEHOLDERS ON THE INTERESTS OF ANY OF THE NOTEHOLDERS EITHER AS A CLASS OR CLASSES OR AS INDIVIDUALS AND MAKE NO RECOMMENDATION AS TO WHETHER ANY NOTEHOLDERS SHOULD DELIVER CONSENTS OR VOTE WITH RESPECT TO THE PLAN OF REORGANIZATION.

THE INFORMATION PROVIDED IN THIS OFFERING MEMORANDUM AND DISCLOSURE STATEMENT IS PROVIDED SOLELY BY THE DEBTORS. NONE OF THE NOTEHOLDERS PARTY TO THE RESTRUCTURING SUPPORT AGREEMENT, TRUSTEES, INFORMATION AGENTS OR THE SECURITY AGENTS HAS VERIFIED OR MAKES ANY REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, OR ASSUMES ANY RESPONSIBILITY, AS TO THE ACCURACY OR ADEQUACY OF ANY INFORMATION CONTAINED HEREIN OR OTHERWISE MAKES ANY STATEMENT, REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, WITH RESPECT TO THE DEBTORS, OR THE PLAN OF REORGANIZATION. NO PERSON HAS BEEN AUTHORIZED TO GIVE ANY INFORMATION OR MAKE ANY REPRESENTATIONS ON BEHALF OF ANY OF THE TRUSTEES AND, IF GIVEN OR MADE, SUCH INFORMATION OR REPRESENTATIONS MUST NOT BE RELIED UPON AS HAVING BEEN AUTHORIZED BY SUCH TRUSTEE.

––––––––––––––––

THIS SOLICITATION OF ACCEPTANCES OF THE PLAN OF REORGANIZATION BY THE DEBTORS IS BEING CONDUCTED TO OBTAIN SUFFICIENT ACCEPTANCES OF THE PLAN OF REORGANIZATION PRIOR TO THE FILING OF A VOLUNTARY CASE UNDER CHAPTER 11 OF THE U.S. BANKRUPTCY CODE. BECAUSE NO CHAPTER 11 CASE HAS YET BEEN COMMENCED BY THE DEBTORS, THIS OFFERING MEMORANDUM AND DISCLOSURE STATEMENT HAS NOT BEEN APPROVED BY ANY COURT AS CONTAINING ADEQUATE INFORMATION WITHIN THE MEANING OF SECTION 1125(A) OF THE U.S. BANKRUPTCY CODE. NONE OF THE DEBTORS OR THEIR SUBSIDIARIES OR OTHER AFFILIATES HAS COMMENCED CHAPTER 11 CASES, NOR

iii

**HAVE THEY TAKEN ANY CORPORATE ACTION AUTHORIZING THE COMMENCEMENT OF SUCH CASES. IF WE FOR ANY REASON DETERMINE THAT IT WOULD BE MORE ADVANTAGEOUS OR EXPEDITIOUS AND THE MINIMUM REORGANIZATION CONDITION IS MET, EACH OF THE DEBTORS MAY COMMENCE CHAPTER 11 CASE(S) UNDER THE U.S. BANKRUPTCY CODE TO RESTRUCTURE THEIR FINANCIAL AFFAIRS.**

———————————

## TABLE OF CONTENTS

NOTICE TO INVESTORS ..................................................................................................................vii

FORWARD-LOOKING STATEMENTS ..............................................................................................ix

SUMMARY ............................................................................................................................................ 1

TIMETABLE AND DEADLINES..........................................................................................................9

SUMMARY OF THE TERMS OF THE PLAN OF REORGANIZATION ............................................ 10

RISK FACTORS ..................................................................................................................................20

UNAUDITED PRO FORMA FINANCIAL INFORMATION............................................................... 61

CAPITALIZATION ..............................................................................................................................66

USE OF PROCEEDS ...........................................................................................................................67

MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS
OF OPERATIONS ........................................................................................................................68

BUSINESS OF THE COMPANY........................................................................................................125

BUSINESS OF RUSSIAN STANDARD VODKA ............................................................................. 141

MANAGEMENT .................................................................................................................................145

CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS ...................................................155

THE CONSENT SOLICITATION ......................................................................................................162

DIVIDEND POLICY ..........................................................................................................................163

DESCRIPTION OF COMMON STOCK.............................................................................................164

SHARE PLACEMENT .......................................................................................................................169

THE PLAN OF REORGANIZATION.................................................................................................175

MATERIAL TERMS OF THE PLAN OF REORGANIZATION........................................................181

PROCEDURES FOR VOTING ON THE PLAN OF REORGANIZATION ........................................203

DESCRIPTION OF NEW SENIOR SECURED NOTES ....................................................................206

UNITED STATES FEDERAL INCOME TAX CONSEQUENCES.....................................................271

TRANSFER RESTRICTIONS............................................................................................................281

INFORMATION AGENT AND VOTING AGENT ............................................................................282

SOLICITATION AGENT ...................................................................................................................283

LEGAL MATTERS ............................................................................................................................284

INDEPENDENT AUDITORS ............................................................................................................285

CERTAIN FEDERAL AND OTHER SECURITIES LAWS MATTERS ............................................286

v

CORPORATE ORGANIZATIONAL CHART ........................................................................................... Annex 1
INDUSTRY COMPETITORS ........................................................................................................... Annex 2
PLAN OF REORGANIZATION ....................................................................................................... Appendix A
FORM OF SUPPLEMENTAL INDENTURE .......................................................................................Appendix B
SUBSCRIPTION FORM .................................................................................................................Appendix C
PROJECTIONS.............................................................................................................................. Appendix D
LIQUIDATION ANALYSIS ..............................................................................................................Appendix E
VALUATION ANALYSIS .................................................................................................................Appendix F
FINANCIAL STATEMENTS............................................................................................................. Appendix G

---

**You should rely only on the information contained or incorporated by reference in this Offering Memorandum and Disclosure Statement or to which we have otherwise referred you. We have not authorized anyone to provide you with information that is different. This Offering Memorandum and Disclosure Statement may only be used where it is legal to offer the New Senior Secured Notes or New Common Stock to holders and conduct the Consent Solicitation. You should not assume that the information provided in this Offering Memorandum and Disclosure Statement is accurate as of any date other than the date of this Offering Memorandum and Disclosure Statement.**

## NOTICE TO INVESTORS

You should not construe the contents of this Offering Memorandum and Disclosure Statement as investment, legal or tax advice. You should consult your own counsel, accountant and other advisors as to legal, tax, business, financial and related aspects of your participation in the Consent Solicitation, Share Placement or vote on the Plan of Reorganization and must make your own decision as to whether to participate in the Consent Solicitation, Share Placement or the Plan of Reorganization. None of us, the trustees under the Existing Notes and the New Senior Secured Notes, the Voting Agent (as defined below), or the Information Agent (as defined below) or any affiliate of any of the foregoing is making any representation to you regarding the legality of participation in the Consent Solicitation or Share Placement, or vote on the Plan of Reorganization by you under appropriate legal investment or similar laws.

This Offering Memorandum and Disclosure Statement is being provided to Noteholders for informational use solely in connection with their consideration of the transactions described herein. The use of this Offering Memorandum and Disclosure Statement for any other purpose is not authorized.

The information contained in this Offering Memorandum and Disclosure Statement is as of the date of this Offering Memorandum and Disclosure Statement and is subject to change, completion or amendment without notice. The delivery of this Offering Memorandum and Disclosure Statement at any time shall not, under any circumstances, create any implication that there has been no change in the information contained or incorporated by reference in this Offering Memorandum and Disclosure Statement or in our affairs or the affairs of any of our subsidiaries or affiliates since the date of this Offering Memorandum and Disclosure Statement.

Although we are not under any obligation to do so, we reserve the right in the future to seek to acquire Existing Notes, by means of open market purchases, privately negotiated acquisitions, exchange or tender offers, redemptions under the provisions of the Existing Notes Indentures or otherwise, in any such case in compliance with applicable laws.

Each prospective investor must comply with all applicable laws and regulations in force in any jurisdictions in which it possesses or distributes the Offering Memorandum and Disclosure Statement and must obtain any consent, approval or permission required under the laws and regulations in force in any jurisdictions to which such prospective investor is subject. Neither we nor any of our representatives shall have any responsibility therefor.

**This Offering Memorandum and Disclosure Statement, including the documents incorporated by reference herein, the Ballots, Consent and the Subscription Form contain important information that should be read before any decision is made to vote on the Plan of Reorganization or to participate in the Consent Solicitation.**

### Non-GAAP Financial Measures

In this Offering Memorandum and Disclosure Statement the Company has included forward-looking EBITDA, Adjusted EBITDA and Underlying EBITDA information. EBITDA, Adjusted EBITDA and Underlying EBITDA are non-GAAP financial measures. The Company has not provided a reconciliation of forward-looking EBITDA, Adjusted EBITDA and Underlying EBITDA to the directly comparable GAAP measure because, due primarily to variability and difficulty in making accurate forecasts and projections, not all of the information necessary to forecast and quantify the exact amount of the items excluded from the EBITDA, Adjusted EBITDA and Underlying EBITDA that will be included in the comparable GAAP financial measures is available to the Company without unreasonable efforts.

### Notice to Polish and other European Economic Area Investors

IN POLAND THIS OFFERING MEMORANDUM IS ONLY BEING DISTRIBUTED TO AND IS ONLY DIRECTED TO FEWER THAN 150 PERSONS. DISTRIBUTION OF THIS OFFERING MEMORANDUM DOES NOT CONSTITUTE: (I) ANY PUBLIC OFFERING IN THE TERRITORY OF POLAND WITHIN THE MEANING OF ARTICLE 3 SECTION 1 OF THE ACT ON PUBLIC OFFERING, CONDITIONS GOVERNING THE INTRODUCTION OF FINANCIAL INSTRUMENTS TO ORGANIZED TRADING, AND PUBLIC COMPANIES OF JULY 29, 2005 (CONSOLIDATED TEXT: DZ. U. 2013, ITEM 1582, AS AMENDED).

("OFFERING ACT"); (II) MAKING AVAILABLE OF INFORMATION TO PROMOTE THE PURCHASE OR ACQUISITION OF THE NEW SENIOR SECURED NOTES OR THE NEW COMMON STOCK OR AN INDUCEMENT OF THEIR PURCHASE OR ACQUISITION WITHIN THE MEANING OF ARTICLE 53 SECTION 1 OF OFFERING ACT; OR (III) A PROMOTIONAL CAMPAIGN WITH RESPECT TO THE NEW SENIOR SECURED NOTES OR THE NEW COMMON STOCK WITHIN THE MEANING OF ARTICLE 53 SECTION 2 OFFERING ACT.

THIS OFFERING MEMORANDUM HAS BEEN PREPARED ON THE BASIS THAT ALL OFFERS OF THE NEW SENIOR SECURED NOTES OR THE NEW COMMON STOCK WILL BE MADE PURSUANT TO AN EXEMPTION UNDER THE PROSPECTUS DIRECTIVE, AS IMPLEMENTED IN THE MEMBER STATES OF THE EEA, FROM THE REQUIREMENT TO PRODUCE A PROSPECTUS FOR OFFERS OF THE NEW SENIOR SECURED NOTES OR THE NEW COMMON STOCK. ACCORDINGLY, ANY PERSON MAKING OR INTENDING TO MAKE ANY OFFER WITHIN THE EEA FOR THE NEW SENIOR SECURED NOTES OR THE NEW COMMON STOCK, SHOULD ONLY DO SO IN CIRCUMSTANCES IN WHICH NO OBLIGATION ARISES TO PRODUCE A PROSPECTUS OR ANY OTHER OFFERING DOCUMENT FOR SUCH OTHER FORWARD-LOOKING STATEMENTS.

**Documents Available for Inspection**

For as long as the notes remain listed on the ISE or CISE and admitted for trading on such exchange market thereof, and the rules of such exchange so require, electronic copies of the documents listed below will be made available, upon request, to any holder or prospective purchaser of the notes:

- this offering memorandum;

- the certificate of incorporation of the Issuer; and

- the Indenture (which includes the form of the notes and the guarantees).

Any such requests should be directed to the trustee for the New Senior Secured Notes.

## FORWARD-LOOKING STATEMENTS

Certain statements in this Offering Memorandum and Disclosure Statement may constitute "forward-looking statements". You may find discussions containing such forward-looking statements in the sections entitled "Summary", "Risk Factors", "Management's Discussion and Analysis of Financial Condition and Results of Operations" and "Business", as well as within this Offering Memorandum and Disclosure Statement generally. In addition, when used in this Offering Memorandum and Disclosure Statement, the words "believes", "anticipates", "expects", "estimates", "plans", "projects", "intends" and similar expressions are intended to identify forward-looking statements. These forward-looking statements include statements other than historical information or statements of current condition and represent our beliefs regarding future events, including certain projected revenues and synergies, many of which, by their nature, are inherently uncertain and outside of our control. Such forward-looking statements include, for example, (i) the financial statement projections included herein, (ii) information about the expected benefits of the Plan on our business, results of operations and financial condition including our expected ability to obtain financing on better terms once the Plan is implemented, (iii) statements with respect to our strategy and plans, and (iv) information on possible or assumed future results of operations, trends in financial results and business plans, including those related to earnings growth and revenue growth, liquidity, prospects, strategies and the industry in which the Company and its affiliates operate. Our actual results may differ, possibly materially, from the anticipated results indicated in these forward-looking statements. Important factors that could cause actual results to differ from those in our forward-looking statements include, but are not limited to, those discussed under "Risk Factors", as well as:

- our financial condition and liquidity, our leverage and our debt service obligations;

- our ability to consummate the Plan of Reorganization and realize the expected benefits of the Plan of Reorganization;

- the assumptions underlying projections of our and RSV's revenues, income, EBITDA, Adjusted EBITDA, capital expenditures, dividends, capital structure or other financial items;

- failure to achieve the expected benefits of the RSV Contribution;

- the level of capital resources required for our operations and our ability to continue to access sources of liquidity necessary for our operations, including but not limited to bank loans, bank guarantees and factoring agreements;

- termination of or amendment to material distribution and import agreements;

- the maturity of our existing indebtedness and the consequences of a failure to meet our obligations thereunder;

- capital expenditures and other costs and commitments;

- adverse changes in the alcohol beverage industry in the markets where we operate;

- changes in the legal and regulatory environment, in particular governmental policies and regulations in the key markets of Russia and Poland regarding consumption of alcohol, retail sales of alcohol or alcohol excise taxes and financing procedures;

- failure to achieve expected performance of our brands in the jurisdictions where we operate;

- actions by our competitors;

- the effects of supplier price fluctuations on our operations, including fluctuations in the price of raw materials we use;

- conditions in global and local credit markets;

- the financial condition of our customers;

- changes in tax rates in the countries in which we operate;

- changes in interest rates;

- changes in exchange rates;

- shifts in consumer preferences, including reductions in the consumption of alcoholic beverages;

- termination or non-renewal of our import agreements;

- our ability to realize expected cost-savings and synergies from operational efficiency initiatives;

- our ability to attract and retain agency brands;

- our ability to attract and retain key personnel; and

- downgrades in, or lower than expected, credit ratings.

**Consequently, readers of this Offering Memorandum and Disclosure Statement should consider these forward-looking statements only as our current plans, estimates and beliefs. We undertake no obligation to update or revise any forward-looking statement in this Offering Memorandum and Disclosure Statement to reflect any new events or any change in conditions or circumstances. All of the forward-looking statements in this Offering Memorandum and Disclosure Statement are expressly qualified by these cautionary statements. Even if our plans, estimates or beliefs change because of future events or circumstances after the date of these statements, or because anticipated or unanticipated events occur, we disclaim any obligation to update these forward-looking statements. The projections in this Offering Memorandum and Disclosure Statement should not be relied upon in any way or manner and should not be regarded for the purpose of this Offering Memorandum and Disclosure Statement as representations or warranties by the Debtors, their affiliates or any other person, as to the accuracy of such information or that any such projections or valuations will be realized.**

# SUMMARY

*This summary highlights certain of the information contained elsewhere in this Offering Memorandum and Disclosure Statement. This summary should be read in conjunction with, and is qualified in its entirety by, the more detailed information and financial statements (including the accompanying notes) appearing elsewhere or incorporated by reference in this Offering Memorandum and Disclosure Statement. You should read this entire Offering Memorandum and Disclosure Statement carefully, including "Risk Factors", "Forward-Looking Statements" and the financial statements and related notes included in this Offering Memorandum and Disclosure Statement, before making a decision as to whether to participate in the Share Placement, the Consent Solicitation, and whether to vote to accept the Plan of Reorganization.*

*References to the "Company", "we", "our" and "us" and similar terms mean Roust Corporation, CEDC FinCo and CEDC FinCo LLC, and their consolidated subsidiaries, except as otherwise indicated in this Offering Memorandum and Disclosure Statement or unless the context otherwise requires.*

**Overview of the Transaction**

On November 9, 2016, Roust Corporation, CEDC FinCo and CEDC FinCo LLC signed the Restructuring Support Agreement with holders of approximately 90% in aggregate principal amount of the Existing Senior Secured Notes (the "*Existing Senior Secured Notes Steering Committee*"), approximately two-thirds in aggregate principal amount of the Existing Convertible Notes (the "*Existing Convertible Notes Steering Committee*"), and the Russian Standard Parties. The Restructuring Support Agreement binds the parties, subject to certain conditions, to support the Plan of Reorganization that will strengthen Roust Corporation's capitalization by over $500 million and deleverage its balance sheet by at least $462 million. In particular, the transactions under the Plan of Reorganization will result in the reduction of Roust Corporation's existing funded debt by approximately $462 million, the receipt by Roust Corporation of funding of $55 million in new equity capital and the contribution of strategic assets, namely RSV and related intellectual property, to Roust Corporation by RTL and certain subsidiaries of it. For more information see "Certain Relationships and Related Transactions—Restructuring Support Agreement."

We believe that Roust Corporation's new capital and organizational structure will provide immediately greater value to all stakeholders by positioning Roust Corporation for accelerated revenue and profit growth within the global alcohol market, thereby strengthening Roust Corporation's position as the number two vodka company by volume worldwide and the number one alcohol company in Central/Eastern Europe and Russia by volume.

We believe that upon the successful completion of the transactions contemplated under the Plan of Reorganization, the reduction in Roust Corporation's indebtedness and the liquidity provided by the new equity capital will enable Roust Corporation to more effectively execute its business strategy and take advantage of growth opportunities worldwide to ensure that it is well positioned for an initial public offering of its stock within the next two to three years.

The transactions under the Plan of Reorganization are expected to include the following:

Holders of the Existing Senior Secured Notes will receive (i) the new senior secured notes due 2022 in an aggregate principal amount of $385 million and 10% coupon payable semi-annually, commencing on January 1, 2017, (ii) cash consideration of $20 million, (iii) a debt-to-equity conversion of the remaining balance of the Existing Senior Secured Notes (including all accrued and unpaid interest through and inclusive of the Petition Date) in exchange for 12.08% of the New Common Stock in the reorganized entity ("*Reorganized Roust*") subject to the Existing Senior Secured Notes Equity Subscription, and (iv) the right to participate in the Share Placement. No interest will be paid on the Existing Senior Secured Notes after the Petition Date.

Holders of the Existing Convertible Notes will receive (i) 10.59% of the equity of Reorganized Roust through a debt-to-equity conversion of the Existing Convertible Notes (including all accrued and unpaid interest through and inclusive of the date the Chapter 11 cases of the Debtors are filed under chapter 11 of the Bankruptcy Code in the Bankruptcy Court ("*Chapter 11 Case*"), (ii) 1.00% of the equity in Reorganized Roust pursuant to the Additional Convertible Notes Equity Allocation, (iii) the right to participate in the Share Placement, and (iv) the right to participate in the Existing Senior Secured Notes Equity Subscription. No interest will be paid on the Existing

1

Convertible Notes after the date on which the Debtors file their petitions for reorganization relief in the Bankruptcy Court (the "*Petition Date*").

On the Effective Date, the Russian Standard Parties will implement a number of concurrent transactions, including:

- The Russian Standard Parties will receive approximately 64.04% of the equity in Reorganized Roust (or 57.04% of the equity in Reorganized Roust after giving effect to the allocations described below) in consideration for their contribution of strategic assets, namely RSV and all related RSV intellectual property, and the conversion of certain debt owed by subsidiaries of Roust to certain of RTL's non-Roust subsidiaries into equity; and

- The Russian Standard Parties will allocate 1.00% of the equity received in Reorganized Roust to holders of the Existing Convertible Notes in the Additional Convertible Notes Equity Allocation and 6.00% of the equity received in Reorganized Roust to participants in the Share Placement in the Additional Share Placement Equity Allocation.

The implementation of these concurrent transactions will be considered repayment in full of all intercompany loans owed to the Company from RTL and its direct and indirect subsidiaries.

All shares of New Common Stock issued in accordance with the Plan will be subject to dilution on account of the MIP (as defined below).

**Our Business**

In connection with the Plan of Reorganization, the RSV business will be combined with the Roust Corporation business.

*Roust Corporation Overview*

Roust Corporation and its subsidiaries operate primarily in the alcoholic beverage industry. We are one of the largest producers of vodka in the world and are Central and Eastern Europe's largest integrated spirit beverages business, measured by total volume, with approximately 24.6 million nine-liter cases produced and distributed in 2015. Our business, with a total work force of approximately 3,500 employees, primarily involves the production and sale of our own spirit brands (principally vodka), as well as the importation of a wide variety of spirits and wines on an exclusive basis. Our primary operations are conducted in Poland, Russia, Ukraine and Hungary. We have six operational manufacturing facilities located in Poland and Russia. The ultimate beneficial owner of the Company is Mr. Roustam Tariko.

We are the largest vodka producer in Poland, with a brand portfolio that includes the *Absolwent*, *Żubrówka*, *Żubrówka Biała*, *Soplica*, *Żytniówka*, *Bols* and *Palace* brands, each of which we produce at our Polish distilleries. Our *Żubrówka Master* Brand has grown rapidly in recent years. In 2014, it grew by 19% compared to 2013 and was the fastest growing brand of vodka in the world by volume. In 2015, *Żubrówka* grew an additional 20% compared to 2014 and achieved an annual volume of 6.2 million nine-liter cases. *Żubrówka* has continued to grow in 2016 by a further 17.7% increase by volume according to a Nielsen report for September year-to-date 2016 compared to the same period in 2015. This result estimates that *Żubrówka* is the world's third largest global brand of vodka by volume.

In Russia, the world's largest vodka market, trade statistics for 2015 revealed Roust Russia Group (formerly Russian Alcohol Group) as not only one of the largest vodka producers in the country but also as a nationwide brand leader. Our *Green Mark* brand remains a top-selling mainstream vodka and our *Talka*, *Parliament* and *Zhuravli* brands are among the top-selling sub-premium vodkas in the country. Our *Urozhay* and *Yamskaya* brands are sold in the economy segment and our *Russian Standard Vodka* remains the leading brand in the premium segment. In September 2016, we launched the sale of our champion vodka brand *Żubrówka* in Russia (under the trademark *Zubrovka*).

In 2015, the Russian economy was in crisis due to the imposition of economic sanctions by the United States and members of the European Union. This led to a significant decline in many economic indicators, including a decrease in Russian gross domestic product by 4% in 2015. Devaluation of the Russian ruble also led to inflation of about 11% in 2015, which in turn caused price increases for almost all products. Since March 2015, wage arrears have shown double-digit growth, amounting to 61% in November 2015. Consumers began buying more products on promotion due to continued negative economic trends in 2015 and Russian retail sales reversed from a positive growth of 5% in 2014 to a decline of 12% in 2015. With these economic forces in play, the Russian vodka market declined by 8% in 2015 and showed a record decline across all categories. There was similarly a significant decline of imported alcohol in the Russian market due to the devaluation of the Russian ruble and the decline in consumer purchasing power. According to Federal Customs Service data, in 2015 (when compared with the previous year) whiskey, the largest import category in Russia, fell by 22%, imported vodka sales dropped four times, and still and sparkling wine sales decreased by 33% and 34%, respectively.

In Russia, sales by volume have increased by 6% in September through November 2016 compared with the same period in 2015, and by 8% excluding economy vodka. This represents a significant improvement and is a major trend change from the volume declines in the first eight months of 2016, and is driven by the significant growth of the legal vodka market and strong Roust in store activation. Our premium brands continue to grow even faster, at 18%, 9% and 22% for *RSV*, *Remy* and *Jägermeister*, respectively, in September through November 2016. As market and economic conditions have improved in the third quarter of 2016, the vodka market has expanded and our Russian results have improved. Consequently, Russian revenues in the third quarter of 2016 (calculated in Russian rubles) showed an improvement compared to the same period in 2015, and we expect a further improvement in our Russian results in the fourth quarter of 2016.

Our brands in Poland and Russia are well-represented in all vodka segments. Our portfolio strategy in Poland is to focus on our top two brands, *Żubrówka* and *Soplica*, as well as three core brands in different price categories: *Bols* in the premium segment, *Żytniówka* in the economy segment and *Absolwent* in the lower mainstream segment. These categories are highly driven by innovation and our portfolio and margin growth is driven by new product development in Poland. Our production capacity in these countries gives us the ability to launch new brands in both markets with minimal outlay. In 2014, we successfully launched new flavors of our brands *Absolwent Grapefruit* and *Absolwent Apple Mint*. In 2014, we extended the *Żubrówka* brand with new flavored *Żubrówka Kora Dębu (Oak Bark)*. *Soplica Plum* and *Soplica Blackcurrant* were launched during 2014. In 2015, we introduced the new package and labeling for *Absolwent* and our economy brand *Żytniówka*, launched *Soplica Walnut*, *Soplica Strawberry*, *Absolwent Cherry*, *Absolwent Tangerine*, *Absolwent Wild Strawberry*, *Żytniówka Lemon Peel* and two sweet bitter flavors, *Żubrówka Pine Shoots* and *Żubrówka Maple Leaves*. Finally, we also launched the new 350ml *Soplica* flavor packaging.

*Talka*, which was launched in Russia in July 2011, accounted for almost 2 million nine-liter cases in 2015. In 2015, we restyled *Green Mark* and launched new package and labeling sizes to attract a wider range of customers and to fulfill a wider range of consumer demands. We believe our ability to introduce new brands into the market in an ever-changing economic and consumer preference environment gives us a distinct advantage.

In the year ended December 31, 2015, our Polish and Russian operations accounted for 43.0% and 43.7% of our revenues, respectively, and, excluding certain unallocated corporate charges, 64.7% and 33.5% of our operating profit, respectively.

As a leading importer of spirits and wines in Poland, Russia and Hungary, we seek to develop a complete portfolio of premium imported wines and spirits in each of the markets we serve. In Poland, we maintain exclusive import contracts for a number of internationally recognized brands, including *Grant's* whiskey, *Campari*, *Jägermeister*, *Remy Martin* cognac, *E&J Gallo* wines, *Carlo Rossi* wines, *Metaxa* brandy, *Sierra* tequila, *Teacher's* whiskey, *Cinzano*, *Old Smuggler* whiskey, and *Concha y Toro* wines. In Russia, we expanded our import portfolio with well-known global brands as a result of our acquisition of Roust Inc. in the nine-month period ended September 30, 2016. We also distribute brands of wine, such as *Robert Mondavi*, *E&J Gallo*, *Concha y Toro* and *Paul Masson*, and other global liquor brands such as *Jägermeister*, *Remy Martin*, *Gancia*, and *Sierra Tequila* in Russia. In Russia, we also produce ready-to-drink alcoholic beverages, including wine-based *Amore*, gin-based *Bravo Classic*, *Elle* and *Russian Bear*. In 2015, we launched new vodka-based drinks, *Green Mark Vodka Orange* and *Green Mark Grapefruit*, as well as new flavors of *Chateau Amore–Pina Colada* and *Mojito*. We also launched *Enerbee's Sting* in

3

the alco-energy segment with a different, non-energy recipe (without caffeine and taurine) to comply with the recent development of legislation and project a healthy brand image.

In addition to our operations in Poland and Russia, we have sales offices in Hungary and in Ukraine and distribution agreements in a number of key international markets, including the Commonwealth of Independent States ("*CIS*"), the Baltic states, Germany, France, the United States and the United Kingdom, for *Green Mark*, *Talka*, *Zhuravli*, *Parliament* and *Żubrówka*. Additionally, as a result of our acquisition of Roust Distribution Limited, we have distribution contracts for RSV products in a number of key international markets. Based on management's estimates, in 2015, international sales (excluding Russia and Poland) represented 13.3% of our sales by value. In the nine-month period ended September 30, 2016, they represented approximately 21.6% of our sales by value.

*Russian Standard Vodka Overview*

RSV is a leading producer of vodka, with a leading market share in Russia (30% as of December 2015), and a distillery located in St. Petersburg, Russia. RSV exports vodka to more than 80 countries and over 75% of its sales volume in 2015 was from international markets. In addition, RSV distributes its products world-wide through a distribution arrangement with a subsidiary of the Company.

In 2014 and 2015, RSV generated approximately $88 million and $69 million of revenue (net of taxes), respectively, with reported EBITDA of approximately $30 million and $18 million, respectively, and Adjusted EBITDA (excluding extraordinary items and other adjustments) of approximately $34 million and $28 million, respectively. RSV's financial performance year-to-date through September 30, 2016 has continued to strengthen, with a revenue growth of approximately 4.0% year-over-year, LTM reported EBITDA of approximately $19 million and LTM Adjusted EBITDA (excluding extraordinary items and other adjustments) of approximately $31 million. Forecasted fiscal year 2016 Adjusted EBITDA for RSV is approximately $35 million.

Bringing RSV into Reorganized Roust contributes significantly towards the combined group's financial strength.

A corporate organizational chart of Reorganized Roust is attached to this Offering Memorandum and Disclosure Statement as <u>Annex 1</u>.

**The Plan of Reorganization**

Assuming the Debtors obtain sufficient acceptances of the Plan of Reorganization, the Debtors will seek to file petitions under Chapter 11 of the Bankruptcy Code to consummate the Plan of Reorganization.

Pursuant to the Plan of Reorganization, among other things:

- the holders of Existing Senior Secured Notes will receive their pro rata share of and interests in (i) the New Senior Secured Notes in an aggregate principal amount of $385 million, (ii) $20 million in cash, (iii) 12.08% of the shares of the New Common Stock issued and outstanding on the Effective Date, which shall be issued in the form of series B New Common Stock, subject to the Existing Senior Secured Notes Equity Subscription, and (iv) the right to participate in the Share Placement subject to the terms thereof.

- the holders of Existing Convertible Notes will receive their pro rata share of and interests in (i) 10.59% of the shares of the New Common Stock issued and outstanding on the Effective Date, which shall be issued in the form of series C New Common Stock, (ii) 1.00% of the shares of New Common Stock issued and outstanding on the Effective Date otherwise allocable to the Russian Standard Parties, which shall be issued in the form of series C New Common Stock, (iii) the right to participate in the Share Placement subject the terms thereof, and (iv) the right to participate in the Existing Senior Secured Notes Equity Subscription.

- all Existing Notes will be deemed automatically cancelled and the obligations of the Debtors thereunder will be discharged; and

4

- The Russian Standard Parties will contribute certain strategic assets, namely RSV and all related RSV intellectual property, to Reorganized Roust and will convert certain of its outstanding debt into equity of Reorganized Roust which shall be issued in the form of series A New Common Stock as further discussed in the section entitled "Material Terms of the Plan of Reorganization".

All equity allocations will be subject to dilution if any shares are awarded pursuant to the MIP (as defined below), which is described herein.

In accordance with the Minimum Reorganization Condition, the Plan of Reorganization is conditioned upon sufficient Noteholders voting to accept the Plan of Reorganization such that each of the respective class(es) entitled to vote on the Plan of Reorganization constitutes an accepting class for purposes of Section 1129(a)(8) of the Bankruptcy Code.

You may vote to accept or reject the Plan of Reorganization by providing the appropriate instruction to your Nominee as contained in the Ballot. By providing an instruction to your Nominee to vote to accept the Plan of Reorganization on your behalf, you are making certain certifications, as contained in the Ballot, and agreeing to certain provisions contained in the Plan of Reorganization, including exculpation, injunction and release provisions. If you vote against, or take no action with respect to, the Plan of Reorganization, we may be unable to consummate the Plan of Reorganization. You may only change your vote, to the extent permitted, by withdrawing your Ballot prior to the Voting Deadline, unless such deadline is otherwise extended.

**Consent Solicitation**

As part of the Plan of Reorganization, CEDC FinCo is making the Consent Solicitation in order to solicit Consents from holders of the Existing Notes to the Proposed Amendments, which will provide, among other things, for the release of all of the liens on the collateral securing the Existing Notes and all subsidiary guarantees (the "*Collateral and Guarantee Amendments*"), including by amending the Existing Notes Indentures and by terminating or amending, as applicable, the related security documents. The Collateral and Guarantee Amendments will become operative upon consummation of the Plan.

The Proposed Amendments will also include an amendment to the acceleration provisions in the Existing Notes Indentures to provide that a filing by Roust Corporation under Chapter 11 of the Bankruptcy Code will not result in the automatic acceleration of the obligations of the subsidiary guarantees of the Existing Notes, but a filing by Roust Corporation under Chapter 11 of the Bankruptcy Code would (as the Existing Notes Indentures currently provide) result in an automatic acceleration of the obligations of CEDC FinCo, the issuer, under the Existing Notes and amounts outstanding under the Roust Corporation and the CEDC FinCo LLC guarantees of the Existing Notes (such amendments, the "*Bankruptcy Waiver Amendments*"). The Bankruptcy Waiver Amendments will be approved under the Existing Senior Secured Notes Indenture and the Existing Convertible Notes Indenture if holders of at least a majority of the aggregate principal amount of each of the outstanding Existing Senior Secured Notes and Existing Convertible Notes, as applicable, deliver the Consents (the "*Requisite Majority Consents*"). If the Bankruptcy Waiver Amendments are not approved, holders of over 50% of the aggregate outstanding principal amount of each of the Existing Senior Secured Notes and Existing Convertible Notes could accelerate (i.e. declare immediately due and payable) the subsidiary guarantors' obligations under the applicable Existing Notes upon or following a Chapter 11 filing by Roust Corporation, subject to the terms and conditions in the Existing Notes Indentures. The Bankruptcy Waiver Amendments will become operative upon execution of the supplemental indentures to the Existing Notes Indentures (the "*Supplemental Indentures*"); provided that if a Confirmation Order (as defined below) is not issued on or prior to March 31, 2017, the Bankruptcy Waiver Amendments will no longer be effective or operative and such provisions will revert to the language as the Existing Notes Indentures currently provide prior to the entry into the Supplemental Indentures.

The Proposed Amendments will also include an amendment to the change of control provisions in the Existing Notes Indentures to provide that a change in Roust's jurisdiction, from Delaware to New York prior to the Effective Date and in accordance with the filing by Roust Corporation under Chapter 11 of the Bankruptcy Code, will not result in a change of control under the Existing Notes (such amendments, the "*Change of Control Amendments*"). The Change of Control Amendments will become operative upon execution of the Supplemental Indentures.

5

On and after the Effective Date, the following actions shall be deemed authorized and approved in all respects, without the need for further approval or agreement under the Existing Notes Indentures or by the directors or officers of the Debtors, the Existing Notes Indenture trustees, any security agent under the Existing Notes Indentures, or otherwise and pursuant to entry of the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code (the "*Confirmation Order*"): (i) the Supplemental Indentures shall be and shall be deemed to be executed and effective in all regards and in accordance with their terms; (ii) the Collateral and Guarantee Amendments and Change of Control Amendments shall be and shall be deemed to be in effect; (iii) CEDC FinCo shall deliver notice to each of the Existing Notes Indenture trustees that it designates all non-debtor affiliates of RTL (the "*Non-Debtor Affiliates*") as Unrestricted Subsidiaries (as defined in the Existing Notes Indentures); and (iii) upon designation of such Non-Debtor Affiliates as Unrestricted Subsidiaries, the guarantees by such Unrestricted Subsidiaries of the Existing Notes shall be automatically released pursuant to each of the Existing Notes Indentures and all liens on assets of such Non-Debtor Affiliates designated as Unrestricted Subsidiaries that secure each of the Existing Notes shall be automatically released pursuant to each of the Existing Notes Indentures.

**Effects of Bankruptcy Filing Without a "Prepackaged" or Other Agreed Plan of Reorganization**

It is our intention to pursue the restructuring of our capital and organizational structures through the Plan of Reorganization. If, however, we do not achieve the Minimum Reorganization Condition, we may file for bankruptcy protection and seek approval of a "prearranged" or "pre-negotiated" plan of reorganization. In the event of a bankruptcy filing without an agreed plan of reorganization, we are likely to be subject to a more lengthy and costly bankruptcy process. Such a filing could cause substantial damage to our business and reputation. In addition, such a filing could substantially erode our customers' confidence in our business. Lenders, bank guarantors, factoring partners, and other partners could seek to terminate their relationships with us, require financial assurances or enhanced returns, or refuse to provide credit or other services on the same terms as prior to filing. Furthermore, employees could be distracted or more easily attracted to other career opportunities, and it may be more difficult to attract or replace key employees. Suppliers could require prepayments or other payment restrictions. There can be no assurance that the Supporting Noteholders (as defined below) will continue to support any alternative plan of reorganization. If you vote against, or take no action with respect to, the Plan of Reorganization, we may not be able to consummate the Plan of Reorganization.

**The Restructuring Support Agreement**

On November 9, 2016, certain holders of Existing Notes, including the Backstop Noteholders, which collectively hold approximately 90% in aggregate principal amount of the Existing Senior Secured Notes (the "*Supporting Senior Noteholders*") and approximately two-thirds in aggregate principal amount of the Existing Convertible Notes (the "*Supporting Junior Noteholders*" and together with the Supporting Senior Noteholders, the "*Supporting Noteholders*"), each executed the Restructuring Support Agreement whereby they agreed to vote in favor of the Plan of Reorganization. The Restructuring Support Agreement is subject to certain conditions, including that the Supporting Noteholders receive satisfactory confirmatory diligence information regarding the Debtors and RSV, that we obtain confirmation of the Plan of Reorganization on or before January 31, 2017, that the Bankruptcy Court approve the Plan of Reorganization in all material respects, and that we do not amend or modify the Plan of Reorganization in any way that is materially adverse to the Eligible Holders who have signed the Restructuring Support Agreement. See "Certain Relationships and Related Transactions—Restructuring Support Agreement."

**The Investor Rights Agreement**

In connection with and upon the consummation of the Plan of Reorganization, Roust Corporation will enter into an investor rights agreement (the "*Investor Rights Agreement*") with the holders of the series B New Common Stock, the holders of the series C New Common Stock, the Russian Standard Parties, and certain other parties. Prior to entering into the Investor Rights Agreement, Roust will file a new certificate of incorporation (the "*Certificate of Incorporation*") with the Secretary of State of the State of New York and adopt new by-laws (the "*By-Laws*" and collectively with the Certificate of Incorporation and the Investor Rights Agreement, the "*Corporate Governance Documents*") in order to provide holders of the series B New Common Stock and holders of the series C New Common Stock with certain rights, including director appointment rights, a requirement that the Company obtain the approval of such directors prior to taking certain actions (referred to as *"Reserved Matters"*) and certain customary registration and piggy-back rights. See the section entitled "Description of Common Stock" for a description of certain terms of the Certificate of Incorporation and By-Laws. Holders of the series B New Common Stock will be

6

entitled to appoint one director to the board of directors and Holders of the series C New Common Stock will be entitled to elect one director to the board of directors through their ownership of series C New Common Stock. The Russian Standard Parties will have the right to appoint a majority of directors for so long as the Russian Standard Parties ownership of the fully diluted equity of Reorganized Roust does not fall below 45%. The Investor Rights Agreement will also contain certain tag-along, drag-along and preemptive rights. The New Common Stock issued pursuant to the Plan will be subject to restrictions on transfers to competitors of Roust. See the section entitled "Certain Relationships and Related Transactions —Investor Rights Agreement."

**The Share Placement**

Eligible Holders will have the right to participate in a $55 million Share Placement of New Common Stock at a price of $16.88 per share, $50 million of which is backstopped by the Backstop Convertible Noteholders and $5 million of which is backstopped by the Backstop Senior Noteholders, subject to certain terms and conditions. Participants in the Share Placement will receive their pro rata share of approximately 13.03%[1] of the equity in Reorganized Roust (in addition to the Backstop Commitment Fee payable to the Backstop Noteholders).

All shares of New Common Stock issued to Noteholders as described above will be subject to dilution in the event shares are awarded pursuant to the MIP (as defined below) and will also be subject to certain transfer restrictions relating to transfers to competitors.

In addition, pursuant to the Existing Senior Secured Notes Equity Subscription, the holders of Existing Convertible Notes shall have the right to subscribe for any and all of the shares of Common Stock to be issued to the holders of Existing Senior Secured Notes at Plan Value, with the proceeds of any such subscription being distributed pro rata to the holders of the Existing Senior Secured Notes in lieu of such equity. See the section entitled "Share Placement."

**Backstop Commitment Fee**

The Backstop Noteholders will receive a Backstop Commitment Fee equal to 3.0% of their respective equity backstop commitments. The Backstop Commitment Fee payable to the Backstop Convertible Noteholders will be payable in shares equivalent to approximately 0.23% of the equity of Reorganized Roust, on account of their backstopping $50 million of the Share Placement. The Backstop Commitment Fee payable to the Backstop Senior Noteholders will be payable in shares equivalent to approximately 0.02% of the equity of Reorganized Roust, on account of their backstopping $5 million of the Share Placement.

**Co-Investment Opportunity**

The Russian Standard Parties shall have the opportunity to make an optional equity investment in Reorganized Roust of up to $13.75 million in cash (the "*Co-Investment*") in the Share Placement, subject to the Subscription Priority Scheme (as defined below).

**No Accrued and Unpaid Interest for Noteholders**

Pursuant to the Plan, Noteholders will not be entitled to receive any payment with respect to post-petition accrued and unpaid interest on Existing Notes, other than any portion of the debt-to-equity conversion described herein.

**Extensions, Termination and Amendments**

We may terminate the Consent Solicitation or voting on the Plan of Reorganization prior to the Voting Deadline, or extend the Consent Solicitation or voting on the Plan of Reorganization, at our option. In addition, we may also amend the Consent Solicitation or voting on the Plan of Reorganization in certain respects. If we make certain material changes to the terms of the Consent Solicitation or Plan of Reorganization, we may extend the

---

[1]   *To be 19.03% of equity in Reorganized Roust when including 6.00% on account of Additional Share Placement Equity Allocation.*

deadline for either submitting the vote for the Plan of Reorganization or the Consent Solicitation if necessary to comply with applicable securities laws. See "The Consent Solicitation—Voting Deadline; Consent Fee Deadline; Extensions; Termination; Amendments".

### Delivery of the New Senior Secured Notes

The delivery of the New Senior Secured Notes will occur on the Effective Date of the Plan, or as soon as reasonably practicable thereafter.

### United States Federal Income Tax Consequences

For a discussion of United States federal income tax considerations that may be relevant to Noteholders who participate in the Consent Solicitation, see "United States Federal Income Tax Consequences".

### Information Agent and Voting Agent

Questions and requests for assistance may be directed to Epiq Corporate Restructuring, which is acting as the information agent in the Consent Solicitation (the "*Information Agent*") and the voting agent in connection with the Plan of Reorganization (the "*Voting Agent*"), in each case at the addresses and telephone numbers set forth on the back cover of this Offering Memorandum and Disclosure Statement.

**TIMETABLE AND DEADLINES**

| | |
|---|---|
| Record Date for Voting on the Plan of Reorganization................................. | November 30, 2016. |
| Consent Solicitation Record Date................... | November 30, 2016. |
| Share Placement Record Date ........................ | November 30, 2016. |
| Voting Deadline, Consent Deadline and Share Placement Deadline ............................. | 5:00 P.M., New York City time, on December 30, 2016, unless extended by us. |
| Petition Date .................................................... | No later than December 30, 2016. |
| Confirmation Hearing...................................... | January 6, 2017 at 10:00 a.m. (New York City time) |
| Deadline for Confirmation of the Plan ........... | No later than January 31, 2017. |
| Deadline for Effective Date of the Plan .......... | No later than February 15, 2017. |

9

## SUMMARY OF THE TERMS OF THE PLAN OF REORGANIZATION

*For purposes of this Summary of the Terms of the Plan of Reorganization, all capitalized terms used but not otherwise defined herein have the meanings provided in the Plan of Reorganization. This Summary does not include all of the terms provided under the Plan of Reorganization. You should review the Plan of Reorganization in its entirety for a full description of its terms. In the event of any inconsistencies between this Summary and the Plan of Reorganization, the Plan of Reorganization will control. The Plan of Reorganization is attached hereto as Appendix A. All equity allocations will be subject to dilution if any shares are awarded pursuant to the MIP(as defined below), which is described herein.*

Estimated Amount of the Existing Senior Secured Notes Claims: approximately $488[2] million in outstanding principal amount of the Existing Senior Secured Notes plus accrued and unpaid interest, fees, and other amounts due and payable under the Existing Senior Secured Notes Indenture through the Petition Date............................................

The Existing Senior Secured Notes Claims will be impaired under the Plan of Reorganization. Holders of Allowed Existing Senior Secured Notes Claims shall receive their pro rata share of and interests in (i) the New Senior Secured Notes in an aggregate principal amount of $385 million, (ii) $20 million in cash, (iii) 12.08% of the shares of New Common Stock issued and outstanding on the Effective Date, which shall be issued in the form of series B New Common Stock, and subject to the Existing Senior Secured Notes Equity Subscription and (iv) the right to participate in the Share Placement pursuant to the Subscription Priority Scheme (as defined below).

Pursuant to certain procedures, any confirmed holder of an Existing Senior Secured Notes Claim may designate any related party in which it or any of its affiliates (and/or any affiliate that is wholly-owned by any of such holder's affiliates) has a current or contingent interest that is not an Industry Competitor (as defined in Annex 2) (an "*Equity Transferee*"), to receive all or any part of its Existing Senior Secured Notes Equity Allocation or to receive all or any part of any shares it subscribes to in connection with the Share Placement by providing written notice to the Debtors, no later than three (3) business days prior to the Effective Date.

The estimated recovery for the holders of Existing Senior Secured Notes Claims is 100%.

---

[2]    *Including accrued interest through October 31, 2016*

| | |
|---|---|
| Estimated Amount of the Existing Convertible Notes Claims: approximately $279[3] million in outstanding principal amount of the Existing Convertible Notes plus accrued and unpaid interest, fees, and other amounts due and payable under the Existing Convertible Notes Indenture through the Petition Date ......... | The Existing Convertible Notes Claims will be impaired under the Plan of Reorganization. Holders of Allowed Existing Convertible Notes Claims shall receive their pro rata share of and interests in (i) 10.59% of the shares of the New Common Stock issued and outstanding on the Effective Date, which shall be issued in the form of series C New Common Stock, (ii) 1.00% of the shares of New Common Stock issued and outstanding on the Effective Date, which shall be issued in the form of series C New Common Stock, otherwise allocable to the Russian Standard Parties under the Plan, which shall instead be distributed pro rata to holders of the Existing Convertible Notes Claims, (iii) the right to participate in the Share Placement pursuant to the Subscription Priority Scheme, and (iv) the right to participate in the Existing Senior Secured Notes Equity Subscription. |
| | The estimated recovery for the holders of Existing Convertible Notes Claims is 27%.[4] |
| Existing Roust Interests ............................... | Existing Roust Interests will be impaired under the Plan of Reorganization. On the Effective Date, all Existing Roust Interests shall be deemed automatically cancelled without further action by the Debtors or Reorganized Debtors and the obligations of the Debtors and Reorganized Debtors thereunder shall be discharged. Holders of Existing Roust Interests shall receive no property under the Plan on account of such Interests. |
| Russian Standard Parties' Contributions ..... | The Russian Standard Parties will make the following contributions to the Debtors' restructuring: |
| | (i) the contribution of RSV by RTL and certain of its subsidiaries to Roust in exchange for shares of New Common Stock in Reorganized Roust, which shall include all of RSV's tangible and intangible assets, including (a) the entirety of RTL and certain of its subsidiaries' equity interests in RSV and (b) all intellectual property and trademarks relating to RSV not currently held by RSV or Roust (including, without limitation, 100% of the equity in Russian Standard IP Holding AG) (collectively, the "*RSV Contribution*"), |
| | (ii) the conversion of certain debt owed by certain subsidiaries of Roust to certain of RTL's non-Roust subsidiaries in exchange for shares of New Common Stock in Reorganized Roust as set forth in |

---

[3]   *Including accrued interest through October 31, 2016*

[4]   *49.8% including consideration received for participation in the Share Placement.*

11

the Restructuring Support Agreement (the "*RTL Debt to Equity Conversion*"),

(iii) the Additional Convertible Notes Equity Allocation,

(iv) the Additional Share Placement Equity Allocation, and

(v) the right of the Russian Standard Parties to invest up to $13.75 million in Cash in Reorganized Roust as part of the Share Placement (the "*Co-Investment Right*").

The Russian Standard Parties will make the Russian Standard Parties' Contributions in exchange for the Russian Standard Parties' Equity Allocation. The Russian Standard Parties Equity Allocation means 57.04% of the shares of New Common Stock issued and outstanding on the Effective Date (which shall be issued in the form of series A New Common Stock) after giving effect to the Additional Convertible Notes Equity Allocation and Additional Share Placement Equity Allocation. As consideration for the Russian Standard Parties' Contributions, any loans or obligations owed to Roust and its direct and indirect subsidiaries from RTL and its direct and indirect subsidiaries (other than direct and indirect subsidiaries of Roust) (the "*RTL Debt*") will be deemed repaid in full.

Unimpaired Classes of Claims and Interests ..................................................... With the exception of the Impaired Classes of Claims and Interests described above, Claims held by all other creditors will not be impaired under the Plan of Reorganization. Holders of these Unimpaired Claims will not vote on the Plan of Reorganization.

No Bankruptcy of Operating Subsidiaries .............................................. None of the Debtors' Polish, Hungarian, Ukrainian or Russian operating subsidiaries will commence any insolvency, restructuring or similar proceedings in connection with the transactions contemplated by the Plan of Reorganization. The operating subsidiaries will continue to operate in the ordinary course, and obligations to employees, vendors and credit support providers will be honored without interruption.

Share Placement .......................................... A total of 3,257,510 shares of New Common Stock equal to 13.03% of the New Common Stock issued and outstanding as of the Effective Date, shall be issued in exchange for $55 million in cash at a subscription price of $16.88 per share in accordance with the following subscription priority scheme (the "*Subscription Priority Scheme*"):

(i)        the Consenting Senior Secured Noteholders shall have the right to subscribe to up to their pro rata share of 296,137 series B shares for a total of $5 million;

(ii)       each holder of an Existing Convertible Notes Claim shall have the right to subscribe to up to its pro rata share of 2,961,373 series C shares for a total of $50 million, plus any shares left unsubscribed pursuant to (i);

(iii)      in the event the Share Placement is not fully subscribed per (i)

and (ii), the Russian Standard Parties shall have the right to subscribe for the unplaced shares up to an additional 296,137 series A shares for a total of $5 million pursuant to the Co-Investment Right;

(iv)    to the extent the Share Placement is not fully subscribed pursuant to (i), (ii) and (iii), then (a) the Russian Standard Parties shall have the right to subscribe to 50% of the remaining unplaced shares (in the form of series A shares), subject to the maximum number of shares imposed by the Co-Investment Right, and (b) each Backstop Convertible Noteholder shall have the right to subscribe to up to 50% of the remaining unplaced shares (in the form of series C shares), provided that in the event of oversubscription (x) the unplaced shares shall be allocated pro rata (for the purpose of this subclause (iv), pro rata shall be based on the respective commitments of the Backstop Convertible Noteholders as set forth in the Backstop Agreement) and (y) if a Backstop Convertible Noteholder subscribes to less than its maximum pro rata allocation the difference (between what such Backstop Convertible Noteholder subscribed to and what it was entitled to subscribe to) shall be made available to the remaining Backstop Convertible Noteholders pro rata. To the extent any unplaced shares remain after (y), the obligation in (y) shall repeat until the maximum pro rata allocation available to each Backstop Convertible Noteholder under this subclause (iv) has either been fully allocated (to the relevant Backstop Convertible Noteholder or to the Backstop Convertible Noteholders) or been made available to the Backstop Convertible Noteholders and been left unsubscribed;

(v)    to the extent the Share Placement is not fully subscribed pursuant to (i), (ii), (iii) and (iv), each holder of an Existing Convertible Notes Claim shall have the right to subscribe to the remaining unplaced shares (in the form of series C shares), provided that in the event of an oversubscription (x) each holder of an Existing Convertible Notes Claim shall have the right to subscribe to up to its pro rata share of the unplaced shares and (y) if a holder of an Existing Convertible Notes Claim subscribes to less than its maximum pro rata allocation the difference (between what such Existing Convertible Noteholder subscribed to and what it was entitled to subscribe to) shall be made available to the remaining holders of Existing Convertible Notes Claims on a pro rata basis. To the extent any unplaced shares remain after (y), the obligation in (y) shall repeat until the maximum pro rata allocation available to each holder of an Existing Convertible Notes Claim under this subclause (v) has either been fully allocated (to the relevant holder of Existing Convertible Notes Claims or to the holders of Existing Convertible Notes Claims) or been made available to the holders of Existing Convertible Notes Claims and been left unsubscribed;

(vi)    to the extent the Share Placement is not fully subscribed per (i), (ii), (iii), (iv) and (v), each holder of an Existing Senior Secured Notes Claim shall have the right to subscribe to the remaining unplaced shares (in the form of series B shares), provided that in the event of oversubscription (x) each holder of an Existing Senior Secured Notes Claim shall have the right to subscribe to up to its pro rata share of the unplaced shares and (y) if a holder of Existing Senior Secured Notes Claims subscribes to less than its maximum pro rata allocation the

13

difference (between what it subscribed to and what it was entitled to subscribe to) shall be made available to the remaining holders of Existing Senior Secured Notes Claims on a pro rata basis. To the extent any unplaced shares remain after (y), the obligation in (y) shall repeat until the maximum pro rata allocation available to each holder of Existing Senior Secured Notes Claims under this subclause (vi) has either been fully allocated (to the relevant holder of Existing Senior Secured Notes Claims or to the holders of Existing Senior Secured Notes Claims) or been made available to the holders of Existing Senior Secured Notes Claims and been left unsubscribed; and

(vii)    to the extent the Share Placement is not fully subscribed per (i), (ii), (iii), (iv), (v), and (vi), any remaining unplaced shares shall be allocated to and purchased by the Backstop Noteholders (in the form of series B and series C shares, as applicable) in accordance with the Backstop Agreement.

All participants in the Share Placement shall receive their respective shares of the Additional Share Placement Equity Allocation.

Share Placement Backstop............................ The Backstop Noteholders will agree to backstop the Share Placement in accordance with the terms of the Backstop Agreement in exchange for the Backstop Commitment Fee. The Backstop Commitment Fee is the fee in connection with the Share Placement to be paid to the Backstop Noteholders pursuant to the Backstop Agreement as follows: (i) 0.23% of the shares of the New Common Stock to be issued and outstanding on the Effective Date payable to the Backstop Convertible Noteholders, in the form of series C New Common Stock, and (ii) 0.02% of the New Common Stock to be issued and outstanding on the Effective Date payable to the Backstop Senior Noteholders in the form of series B New Common Stock. Subject to the transfer restrictions set forth in the Backstop Agreement, each of the Backstop Noteholders shall be permitted to transfer its backstop commitment to another Backstop Noteholder or any related party in which it or any of its affiliates (and/or any affiliate that is wholly-owned by any of such holder's affiliates) has a current or contingent interest, provided, that in the event such related party or affiliate defaults on its backstop obligations, the original Backstop Noteholder shall remain liable.

Existing Senior Secured Notes Equity
    Subscription ............................................. An offering shall be made, pursuant to this Offering Memorandum and Disclosure Statement and the Subscription Form, to each holder of an Existing Convertible Notes Claim to subscribe pro rata to the shares of New Common Stock being issued in connection with the Existing Senior Secured Notes Equity Allocation at a subscription price of $25.98 per share, provided that any New Common Stock subscribed to by any holder of an Existing Convertible Notes Claim pursuant to the Existing Senior Secured Notes Equity Subscription shall be issued in the form of series C New Common Stock rather than in the form of series B New Common Stock. As described above, the proceeds of the Existing Senior Secured Notes Equity Subscription, if any, shall be distributed pro rata to the holders of Existing Senior Secured Notes Claims.

Management Incentive Plan ........................ On or after the Effective Date, the Reorganized Debtors shall

implement a management incentive plan (the "*Management MIP*") for nominated members of management in the amount of up to 2.0% of all issued and outstanding New Common Stock (in the form of series A New Common Stock) on a fully diluted basis vesting over a period of two to four years. If Roust Corporation completes an initial public offering or the holders of the series B New Common Stock and holders of series C New Common Stock issued on the Effective Date sell at least 90% of the aggregate number of shares of New Common Stock held by series B New Common Stock and series C New Common Stock issued on the Effective Date ("*Exit Event*") on or prior to June 30, 2019, the lesser of (a) the remaining unvested Management MIP awards and (b) two-thirds of the Management MIP awards will vest in connection with such Exit Event. The specific form of and terms applicable to awards granted under the Management MIP, including vesting conditions, shall be determined by the new board of Reorganized Roust.

Separately, Roustam Tariko shall also receive a management incentive plan (the "*RT MIP*" and together with the Management MIP, the "*MIP*") that includes the following: (i) 2.0% of the equity in Reorganized Roust on a fully diluted basis (in the form of series A New Common Stock) (the "*Initial Earn Out Equity*") exercisable upon the occurrence of an Exit Event at a valuation of $250 million above Plan Value (the "*Initial Earn Out Equity Threshold*") and (ii) 1.0% of additional equity in Reorganized Roust (in the form of series A New Common Stock) on a fully diluted basis for each $250 million of equity value created above the Initial Earn Out Equity Threshold on the Effective Date, up to a maximum of 3.0% of incremental equity on a fully diluted basis (the "*Additional Earn Out Equity*", and collectively with the Initial Earn Out Equity, the "*RT Earn Out Equity*"). The triggering of an Additional Earn Out Equity award shall be based on a 30-day volume weighted average price of the Reorganized Roust stock post-Exit Event. Roustam Tariko will be entitled to receive Additional Earn Out Equity until July 31, 2019. The RT Earn Out Equity shall expire if an Exit Event has not occurred by June 30, 2019. The Management MIP, Additional Earn Out Equity and the RTL Earn Out Equity, are collectively referred to as the MIP.

Releases ....................................................... As of the Effective Date, (a) the Debtors; (b) the current and former directors and officers of the Debtors; (c) any statutory committee appointed in these Chapter 11 Cases and the current and former members thereof, in their capacity as such; (d) the Russian Standard Parties; (e) the current and former directors and officers of the Russian Standard Parties; (f) RSV and its subsidiaries; (g) the current and former officers and directors of RSV and its subsidiaries; (h) the Backstop Noteholders; (i) the current and former members of the Steering Committees; (j) the Steering Committees; (k) the Consenting Noteholders; (l) each of the Non-Debtor Affiliates that is a subsidiary of Roust; (m) the current and former directors and officers of each of

15

the Non-Debtor Affiliates that is a subsidiary of Roust; (n) the Indenture trustees; (o) the Polish Security Agent; (p) the Security Agent; and (q) with respect to each of the foregoing Persons in clauses (a) through (p), such Person's current and former affiliates, subsidiaries, managed accounts or funds, officers, directors, partners, principals, employees, agents, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, management companies, fund advisors and other professionals, and officers, directors, partners, principals, employees and agents thereof, in each case in their capacity as such (collectively, the "*Released Parties*"), shall be deemed released and discharged by, (a) the Existing Senior Secured Notes Indenture trustee, (b) the holders of Existing Senior Secured Notes, (c) the Existing Convertible Notes Indenture trustee, (d) the holders of Existing Convertible Notes, (e) the Security Agent, (f) the Polish Security Agent, (g) any and all other holders of Claims or Interests, and (h) with respect to each of the foregoing clauses (a) through (g), to the fullest extent permitted by law, such Person's current and former affiliates, subsidiaries, managed accounts or funds, officers, directors, partners, principals, employees, agents, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, management companies, fund advisors and other professionals, and officers, directors, partners, principals, employees and agents thereof, in each case in their capacity as such (collectively the "**Releasing Parties**").

Specifically, pursuant to Article IX.C of the Plan, each Releasing Party, to the fullest extent allowed by applicable law, as such law may be extended or interpreted subsequent to the Effective Date, shall be deemed to have conclusively, absolutely, unconditionally, irrevocably and forever, released and discharged the Debtors, the Reorganized Debtors, their Estates, the Non-Debtor Affiliates and the Released Parties and their respective property from any and all Claims, Interests, obligations, rights, suits, damages, Causes of Action, remedies and liabilities whatsoever, including any derivative Claims, assertable on behalf of a Debtor, whether known or unknown, foreseen or unforeseen, liquidated or unliquidated, contingent or non-contingent, existing or hereafter arising, in law, equity or otherwise, whether for tort, fraud, contract, violations of federal or state securities laws or otherwise, that such Person would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' restructuring, the Restructuring Support Agreement, the Debtors' Chapter 11 Cases, the Existing Senior Secured Notes, the Existing Convertible Notes, the purchase, sale or rescission of the purchase or sale of any security of the Debtors or the Reorganized Debtors, including (without limitation) any tender rights provided under any applicable law, rule, or regulation, the subject matter of, or the transactions or events giving rise to, any Claim that is treated in the Plan, the business or contractual arrangements between the Debtors

16

and any Released Party, the restructuring of Claims and Interests before or during the Chapter 11 Cases, the negotiation, formulation or preparation of the Restructuring Support Agreement, the Plan, the Disclosure Statement, the Plan Supplement or related agreements, instruments or other documents, with respect to any other act or omission, transaction, agreement, event or other occurrence taking place on or before the Confirmation Date; provided, however, that nothing in Article IX.C of the Plan shall be construed to release any party or entity from gross negligence, intentional fraud, willful misconduct or criminal conduct, as determined by a Final Order. Notwithstanding anything to the contrary in the Existing Senior Secured Notes Indenture or Existing Convertible Notes Indenture, or the instruments, guarantees, certificates, security documents and other documents related thereto, the Releasing Parties shall have conclusively, absolutely, unconditionally, irrevocably and forever, released and discharged the Non-Debtor Affiliates from any and all Claims, Interests, obligations, rights, suits, damages, Causes of Action, remedies and liabilities whatsoever, whether known or unknown, direct or indirect, foreseen or unforeseen, existing or hereafter arising, that relate to guarantees of the Existing Senior Secured Notes or Existing Convertible Notes, and any collateral of Non-Debtor Affiliates securing the Existing Notes or any guarantees thereto. Notwithstanding anything to the contrary in the foregoing, the release set forth above does not release any post-Effective Date obligations of any party under the Plan or any document, instrument or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

| | |
|---|---|
| Injunction | Except as otherwise expressly provided in the Plan, the Plan Supplement or related documents, or for obligations issued pursuant to the Plan, all persons who have held, hold or may hold Claims or Interests that have been released pursuant to Article IX.B or article IX.C of the Plan, discharged pursuant to article IX.E of the plan, or are subject to exculpation pursuant to article IX.D of the plan, are permanently enjoined, from and after the Effective Date, from taking any of the following actions: (1) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests, including any claims in respect of any guarantees or pledges with respect to the Existing Notes granted by Non-Debtor Affiliates ; (2) enforcing, attaching, collecting or recovering by any manner or means any judgment, award, decree or order against such persons on account of or in connection with or with respect to any such Claims or Interests; (3) creating, perfecting or enforcing any encumbrance of any kind against such persons or the property or estates of such persons on account of or in connection with or with respect to any such Claims or Interests; and (4) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests released, settled or discharged pursuant to the Plan. |

The rights afforded in the Plan and the treatment of all Claims and Interests in the Plan shall be in exchange for and in complete satisfaction of all Claims and Interests of any nature whatsoever, including any interest accrued on Claims from and after the Petition Date, against the Debtors or any of their assets, property or estates. On the Effective Date, all such claims against the Debtors shall be fully released and discharged.

Except as otherwise expressly provided for in the Plan or in obligations issued pursuant to the Plan from and after the Effective Date, all Claims against the Debtors shall be fully released and discharged, and all Interests shall be cancelled, and the Debtors' liability with respect thereto shall be extinguished completely, including any liability of the kind specified under section 502(g) of the Bankruptcy Code. All persons shall be precluded from asserting against the Debtors, the Debtors' estates, the Reorganized Debtors, each of their respective successors and assigns, and each of their assets and properties, any other claims or interests based upon any documents, instruments or any act or omission, transaction or other activity of any kind or nature that occurred before the Effective Date.

Temporary Injunction with Respect to Existing Notes Claims

To the extent such Claims are not otherwise released pursuant to Article IX.C of the Plan, the Confirmation Order approving the Plan shall act as a temporary injunction against the enforcement of any default against the Debtors or any Non-Debtor Affiliate obligated under the Existing Notes Claims. Holders of Existing Notes Claims shall be enjoined from commencing or continuing any action, employment of process, or act to collect, offset, or recover any Claim relating to the Existing Notes Claims so long as the Debtors or the Reorganized Debtors continue to provide or cause to be provided such treatment to holders of Existing Notes Claims as provided under the Plan. The temporary injunction will expire automatically if the Reorganized Debtors default under the Plan by failing to provide or cause to be provided such treatment to holders of Existing Notes Claims as provided under the Plan and fail to cure such default within 30 days.

Guarantees of Non-Debtor Affiliates............

Notwithstanding anything to the contrary in the Existing Notes Indentures, or the instruments, guarantees, certificates, and other documents related thereto, holders of Existing Notes Claims shall be deemed to agree to release and discharge the Non-Debtor Affiliates from all obligations relating to the guarantees of the Existing Notes Claims, including the Collateral and Guarantee Release, and a waiver and surrender of any rights that might otherwise be available with respect to such guarantees.

Exculpation..................................................

The Exculpated Parties shall be exculpated from any claim related to any act or omission in connection with, relating to or arising out of,

18

among other things, the Existing Notes, the Debtors' restructuring efforts, the Restructuring Support Agreement, the Chapter 11 cases, the Plan of Reorganization and the Share Placement (other than in the case of willful misconduct or fraud, to the extent imposed by applicable non-bankruptcy law), and upon Bankruptcy Court approval of the Plan of Reorganization shall be deemed to have participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code with regard to the solicitation and distribution of securities pursuant to the Plan of Reorganization.

**Supplemental Indentures and Collateral and Guarantee Release** ............................ On and after the Effective Date, the following actions shall be deemed authorized and approved in all respects, without the need for further approval or agreement under the Existing Notes Indentures, by the directors or officers of the Debtors or the Reorganized Debtors, the Existing Notes Indenture trustees, any security agent under the Existing Notes Indentures, or otherwise and pursuant to entry of the Confirmation Order: (i) the Supplemental Indentures shall be and shall be deemed to be executed and effective in all regards and in accordance with their terms; (ii) the Collateral and Guarantee Release shall be and shall be deemed to be in effect; (iii) CEDC FinCo shall deliver notice to each of the Existing Notes Indenture trustees that it designates all Non-Debtor Affiliates as Unrestricted Subsidiaries (as defined in the Existing Senior Secured Notes Indenture and the Existing Convertible Notes Indenture, respectively; and (iv) upon designation of such Non-Debtor Affiliates as Unrestricted Subsidiaries, the guarantees by such Unrestricted Subsidiaries of the Existing Notes shall be automatically released pursuant to each of the Existing Notes Indentures and all liens on assets of such Non-Debtor Affiliates designated as Unrestricted Subsidiaries that secure each of the Existing Notes shall be automatically released pursuant to each of the Existing Notes Indentures.

**Voting on the Plan of Reorganization**.......... The "*Voting Record Date*" for purposes of determining holders of Existing Notes that are eligible to vote on the Plan of Reorganization is November 30, 2016. The "*Voting Deadline*" is December 30, 2016 at 5:00 P.M. New York City time. To be counted, unless you are otherwise directed by your Nominee, a master ballot (a "*Master Ballot*") containing your vote must be received by the Voting Agent prior to the Voting Deadline.

## RISK FACTORS

*The Plan of Reorganization involves a high degree of risk and uncertainty. You should carefully consider the risks and uncertainties described below as well as the other information appearing elsewhere in this Offering Memorandum and Disclosure Statement before making a decision whether to participate in the Consent Solicitation, and vote to accept the Plan of Reorganization. We have described the risks and uncertainties that we believe are material, but these risks and uncertainties may not be the only ones we face. Additional risks and uncertainties of ours that are not currently known to us, or that we currently deem immaterial, may also have an adverse effect on our business, financial condition, results of operations or future prospects. If this occurs, the trading price of the New Senior Secured Notes or the New Common Stock may decline, and investors could lose all or part of their investment.*

*The order in which the risks are presented does not necessarily reflect the likelihood of their occurrence or the magnitude of their potential impact on our business, financial condition, results of operations, or the trading price of the New Senior Secured Notes or the New Common Stock. Noteholders should carefully consider whether an investment in the New Senior Secured Notes or the New Common Stock is suitable for them in light of the information in this Offering Memorandum and Disclosure Statement.*

**Risks Related to Failure to Consummate the Plan of Reorganization**

*We have significant indebtedness, which may impair our financial condition and our ability to grow and compete; we may also incur additional debt.*

We have significant indebtedness. As of September 30, 2016, we had total debt, including accrued but unpaid interest, of approximately $1,109.3 million, including debt relating to our Existing Senior Secured Notes of approximately $488.4 million, debt relating to our Existing Convertible Notes of approximately $277.0 million and bank debt of approximately $207.6 million. Our debt has important consequences for our financial condition, including:

- making it more difficult for us to satisfy the obligations under our indebtedness, including the Existing Notes;

- making it more difficult to refinance our liabilities as they fall due;

- increasing our vulnerability to general adverse economic, competitive and industry conditions;

- limiting our ability to obtain additional financing to fund future working capital and capital expenditures, implement our business strategy, acquisitions, operations and other general corporate requirements;

- limiting our ability to make strategic acquisitions or causing us to make non-strategic divestitures;

- requiring a substantial portion of our cash flow from operations to repay principal and interest on our debt and reducing our ability to use our cash flow to fund working capital, capital expenditures, the implementation of our business strategy, acquisitions, operations, working capital and general corporate requirements;

- limiting our ability to purchase raw materials on satisfactory credit terms, thereby limiting our sources of supply or increasing cash required to finance operations;

- limiting our flexibility in planning for, or reacting to, changes in our business and the industry in which we operate; and

- limiting our ability to receive trade credit from our vendors or otherwise placing us at a competitive disadvantage to other less-leveraged competitors.

20

We may incur additional debt in the future. The terms of the indentures that govern our Existing Notes restrict our ability to incur, but will not prohibit us from incurring, additional debt. If we were to incur additional debt, the related risks we now face could become greater.

If the Plan of Reorganization is approved, the Existing Notes will be cancelled, but we will still have significant indebtedness, including the New Senior Secured Notes, and the risks described above will continue to apply to the Company.

*Servicing our debt requires a significant amount of cash, while our ability to generate sufficient cash depends upon many factors, some of which are beyond our control.*

Our debt requires us to use a significant portion of our cash flows from operations to meet cash interest payments, with cash interest payments of $62.5 million in 2016 and $71.2 million in 2015. We also have principal payments due on our Existing Notes in 2018 and will need to refinance this indebtedness if the Plan of Reorganization is not consummated. If the Plan of Reorganization is consummated, the Existing Notes will be cancelled and we will issue the New Senior Secured Notes and as a result the New Senior Secured Notes will accrue interest from January 1, 2017 until their maturity so we will continue to have significant interest expense.

Our ability to make payments on and refinance our debt, finance planned capital expenditures and implement our business strategy depends on our ability to generate cash flow in the future. To some extent, this is subject to general economic (such as foreign exchange movements and consumer demand), financial, competitive and other factors that are beyond our control. For example, the negative situation in Russia and Ukraine and devaluation of the Russian ruble have put significant pressure on our cash flow and cash position, although in recent months we have seen a significant improvement in our results of operations from Russia and other CIS countries. There can be no assurance that our business will continue to generate cash flows at or above current levels or that we will be able to meet our cash needs, including with respect to the repayment of our indebtedness, any cash payments due upon the maturity of such indebtedness, the Existing Notes and the New Senior Secured Notes.

If we are unable to service our debt or experience a significant reduction in our liquidity, we could be forced to reduce or delay planned capital expenditures and other initiatives, sell assets, restructure or refinance our debt or seek additional equity capital, and we may be unable to take any of these actions on satisfactory terms or in a timely manner, or at all. Further, any of these actions may not be sufficient to allow us to service our debt obligations or may have a materially adverse effect on our results of operations and financial condition. Our existing debt agreements, and the indenture that will govern the New Senior Secured Notes, limit our ability to take certain of these actions, including sales of assets. Our failure to generate sufficient operating cash flows to pay our debts or refinance our indebtedness could have a material adverse effect on our results of operations and financial condition. If we cannot make scheduled payments on our debt, including the Existing Notes, we would be in default, and as a result, holders of such debt could declare all outstanding principal and interest to be due and payable and our existing and future lenders could, under certain circumstances, terminate their commitments to lend us money and foreclose on the assets securing our borrowings. Refer to "Management's Discussion and Analysis of Financial Condition and Results of Operations—Liquidity and Capital Resources" for further discussion on our current liquidity position.

In addition, we generate most of our revenues and profits in currencies other than the U.S. dollar, yet our Existing Notes are denominated in U.S. dollars. Accordingly, devaluations of the currencies in which we do business versus the U.S. dollar which we have recently experienced, will require us to devote a greater portion of our cash flows from operations to service interest on the New Senior Secured Notes or, if the Plan is not consummated, our Existing Notes.

If we are unable to refinance our New Senior Secured Notes before they fall due, we may be unable to meet the principal payments thereon, and any refinancing of these notes may result in higher interest expense, which would require us to devote a greater portion of our cash flows from operations for debt service.

*If we are unable to consummate the Plan of Reorganization, we may be unable to continue to access bank guarantee lines for excise taxes payable in respect of vodka sales in Russia which are critical to our operations in Russia.*

Our business in Russia depends on access to bank guarantees in respect of excise taxes payable in respect of vodka sales in Russia. Certain of our Russian subsidiaries, including Russian Alcohol, have guarantee lines in place for excise taxes of approximately $435 million. If we did not have access to these bank guarantee lines, we would be required to prepay these excise taxes and we do not have sufficient liquidity to make such prepayments. Therefore, a loss of these guarantee lines would significantly impair our ability to conduct operations in Russia. If providers of bank guarantees in Russia cancel or do not renew these guarantee lines due to a failure to consummate the Plan of Reorganization or otherwise, this would have a significant adverse effect on our Russian business.

*If the Plan of Reorganization is not confirmed, we may need to seek relief under the Bankruptcy Code without the benefit of a plan of reorganization approved by our creditors prior to commencement of any bankruptcy cases. If we seek bankruptcy relief under such circumstances, Noteholders may receive consideration that is substantially less than what is being offered in the Plan of Reorganization and it will likely take longer to receive.*

We believe that seeking relief under the Bankruptcy Code <u>other than in connection with the proposed Plan of Reorganization</u> could materially adversely affect the relationships between us and our existing and potential customers, employees, credit support providers, partners and other stakeholders. For example:

- it is likely that such a filing would substantially erode our customers' confidence in our ability to provide our products and, as a result, there could be a significant and precipitous decline in our revenues and cash flow;

- employees could be distracted from performance of their duties, or more easily attracted to other career opportunities;

- lenders and other credit support providers, particularly in Russia, Poland and Hungary, could seek to terminate their relationships with us, require financial assurances or enhanced returns, or refuse to provide credit on the same terms as prior to the reorganization case under Chapter 11 of the Bankruptcy Code;

- creditors and vendors, customers, lenders and others of our non-U.S. subsidiaries and affiliates may take certain actions against us, including commencement of foreign insolvency proceedings;

- the impacts of actions by any customers, employees, lenders, credit support providers, vendors and creditors could substantially impair our ability to produce and distribute our products and make us vulnerable to competition from other brands;

- we may be unable to continue to obtain bank guarantees in respect of our excise tax obligations— these guarantees are fundamental to the continuing operations of our business in Russia;

- we could be forced to operate in bankruptcy for an extended period of time while we attempt to develop a reorganization plan that is confirmed;

- if we are not able to confirm and implement a plan of reorganization we may be forced to liquidate under Chapter 7 of the Bankruptcy Code; and

- any distributions to you that you may receive in respect of your Existing Notes under a liquidation or under a protracted reorganization case or cases under Chapter 11 of the Bankruptcy Code would likely be substantially delayed and the value of any potential recovery likely would be adversely impacted by such delay and in any event may be substantially less than the value of such distributions to you contemplated by the Plan of Reorganization.

***If the Plan of Reorganization is not confirmed, our operating subsidiaries may be subject to proceedings, including insolvency proceedings, by our creditors in Russia, Poland, Hungary, the United States and other jurisdictions.***

In the event that we are unable to consummate the transactions contemplated herein through the Plan of Reorganization, creditors of our non-U.S. subsidiaries may bring actions (including potential involuntary insolvency proceedings) against our operating subsidiaries in Europe on account of the subsidiary guarantees of the Existing Notes and/or any alleged cross-defaults under our subsidiaries' local credit facilities. Even if we consummate the Plan of Reorganization, or if we are in the process of doing so, our operating subsidiaries in Europe could be subject to actions which could disrupt their operations or the Plan of Reorganization, as applicable. In the event that we are unable to consummate the transactions contemplated herein, the security granted by our non-U.S. operating subsidiaries, including in respect of the Existing Notes, may be enforced and as a result thereof our non-U.S. operating subsidiaries may be deprived of their significant assets, which may negatively affect our business and potentially lead to the insolvency of our non-U.S. operating subsidiaries. We believe that the confirmation of the Plan of Reorganization does not affect our domestic credit lines and local commercial partners.

***If the Plan of Reorganization is not confirmed, lenders under local credit lines with our non-U.S. operating subsidiaries may cease funding and/or seek to terminate such lines.***

In the event that we are unable to consummate the transactions contemplated herein, lenders to our non-U.S. operating subsidiaries, including trade creditors and factoring providers, may seek to cease present and future funding obligations to such operating subsidiaries or terminate such credit lines, thereby creating a liquidity issue for our operating subsidiaries which may negatively affect our businesses and ability to meet our obligations as they come due. This may lead to insolvency of these subsidiaries. Even if we consummate the Plan of Reorganization, or if we are in the process of doing so, the business reputation of our non-U.S. operating subsidiaries could suffer.

***If the Plan of Reorganization is not confirmed, our non-U.S. operating subsidiaries' reputation could deteriorate and commercial partners may seek to terminate commercial contracts with them.***

In the event that we are unable to consummate the transactions contemplated herein, the business reputation of our non-U.S. operating subsidiaries could deteriorate and their business partners may take this opportunity to require additional security or apply general clauses such as "material adverse change" to terminate commercial agreements, which may negatively affect our business. We believe that the confirmation of the Plan of Reorganization does not affect our domestic credit lines and local commercial partners.

***A long and protracted restructuring could cause us to lose key management employees and otherwise adversely affect our business.***

If we fail to consummate the Plan of Reorganization, any alternative we pursue, whether in or out of court, may take substantially longer to consummate than the Plan of Reorganization. A protracted financial restructuring could disrupt our business and would divert the attention of our management from operation of our business and implementation of our business plan, and could result in a loss of key management and employees. A loss of key management would likely make it difficult for us to complete a financial restructuring.

The uncertainty surrounding a prolonged financial restructuring could also have other adverse effects on us. For example, it could also adversely affect:

- our ability to raise additional capital;

- our ability to capitalize on business opportunities and react to competitive pressures;

- our ability to attract and retain employees;

- our liquidity; and

- how our business is viewed by investors, lenders, suppliers and customers.

23

**Risks Related to Consummating the Plan of Reorganization**

*Even if we successfully complete the Plan of Reorganization, our remaining indebtedness may impair our financial condition and our ability to grow and compete; we may also incur additional debt.*

Following the consummation of the Plan of Reorganization, we will continue to have substantial debt outstanding, including the New Senior Secured Notes. As of September 30, 2016, on a pro forma basis after giving effect to the cancellation of indebtedness contemplated by the Plan of Reorganization (including cancellation of the Existing Notes) and the issuance of the New Senior Secured Notes, our indebtedness would be $668.6 million. Our debt could have important consequences for our business and our financial condition, including:

- making it difficult for us to satisfy the obligations under the New Senior Secured Notes;

- making it difficult to refinance our obligations as they come due;

- requiring a substantial portion of our cash flow from operations for the payment of principal and interest on our debt, including the New Senior Secured Notes, and reducing our ability to use our cash flow to fund working capital, capital expenditures, execution of our business strategy, acquisitions, operations, working capital and general corporate requirements;

- having an inefficient tax structure as a result of being a U.S.-parented group;

- increasing our vulnerability to general adverse economic, competitive and industry conditions;

- limiting our ability to obtain additional financing to fund future working capital, capital expenditures, execute our business strategy, acquisitions, operations and other general corporate requirements;

- limiting our ability to purchase raw materials on satisfactory credit terms, thereby limiting our sources of supply or increasing cash required to fund operations;

- limiting our ability to retain and attract customers;

- limiting our ability to make strategic acquisitions or causing us to make non-strategic divestitures;

- limiting our flexibility in planning for, or reacting to, changes in our business and the industry in which we operate; and

- limiting our ability to receive trade credit from our vendors or otherwise placing us at a competitive disadvantage to other less-leveraged competitors.

We may incur additional debt in the future. The terms of the indenture that will govern the New Senior Secured Notes will restrict our ability to incur, but will not prohibit us from incurring, additional debt. If we incur additional debt, the related risks we now face may become greater.

*We may not be able to raise additional capital in the future on terms acceptable to us, or at all.*

We may need to obtain additional financing to fund our business and we will need to refinance the New Senior Secured Notes when they fall due, and we cannot assure you that such financing will be available in amounts or on terms acceptable to us, or at all. The current global market and economic conditions, as well as the conditions in the credit and capital markets, may make it difficult for companies to obtain additional financing in the future or to refinance their obligations, particularly for companies with a credit profile similar to ours. While we believe the Plan of Reorganization will lead to a substantial improvement in the availability and cost of domestic credit, there is no assurance of any such improvement, and the Plan of Reorganization, and the potential effects of this on our reputation, could make it difficult or more expensive for us to raise additional funds. If we raise funds by incurring further debt, our operations and finances may become subject to further restrictions and we may be required to limit or cease our operations or capital expenditure activities, or otherwise modify our business strategy. If we fail to

comply with financial or other covenants required in connection with any such financing or refinancing, our lenders may be able to exercise remedies that could substantially impair our ability to operate or have a material adverse effect on our results of operations or financial condition.

*The consummation of the Consent Solicitation may be delayed or may not occur.*

We are not obligated to consummate the Consent Solicitation under certain circumstances and unless and until certain conditions are satisfied. We may also terminate the Consent Solicitation at any time. Even if the Consent Solicitation is completed, it may not be completed on the schedule described in this Offering Memorandum and Disclosure Statement.

**Risks Related to the New Common Stock**

*The Subscription Price for the New Common Stock acquired through the Share Placement is the result of negotiations with the Consenting Noteholders and is not necessarily an indication of our value or the market value of the New Common Stock.*

The Subscription Price for the New Common Stock acquired through the Share Placement is $16.88 per share of New Common Stock. The Subscription Price represents a 35% discount from the Plan Value. This price is the result of negotiations with the Consenting Noteholders and is not intended to bear any relationship to our past or future operations, cash flows, net income, current financial condition, book value of our assets or any other established criteria for value. As a result, the Subscription Price should not be considered an indication of the actual value of shares of the New Common Stock.

*Our New Common Stock will not be listed on a stock exchange and an active trading market may not develop for the New Common Stock.*

Our New Common Stock will not be listed on any stock exchange and an active trading market may not develop for the New Common Stock. This may initially, at least, hinder your ability to sell your New Common Stock and result in you not be able to resell your shares of New Common Stock at their fair value or at all.

Because the ownership of our New Common Stock is highly concentrated, it will prevent you and other shareholders from influencing significant corporate decisions and will allow a few significant shareholders to control the direction of our business.

*The interests of our current controlling shareholder may conflict with the interests of other shareholders.*

Pursuant to the Certificate of Incorporation and our By-Laws, our controlling shareholders are, for so long as they own at least 45% of the outstanding shares of the Company, empowered to elect the majority of our board of directors. Our controlling shareholders may have an interest in acquisitions, disposal of assets and partnerships, may seek funding or take other decisions that could conflict with the interests of other shareholders and which may not result in any improvement in our operating results.

*New York law and provisions in our Certificate of Incorporation, By-Laws and in the Investor Rights Agreement may impede or discourage a takeover, which could cause the market price of our shares to decline.*

In connection with the transactions described in this Offering Memorandum and Disclosure Statement, we expect to be incorporated in New York. The anti-takeover provisions of New York law impose various impediments to the ability of a third party to acquire control of us, even if a change in control would be beneficial to our existing stockholders. Certain provisions of New York law, the Investor Rights Agreement, our Certificate of Incorporation and our By-Laws could impede a merger, takeover or other business combination involving us or discourage a potential acquirer from making a tender offer for our New Common Stock, which, under certain circumstances, could reduce the market price of our New Common Stock. Additionally, if certain events occur that constitute a Change of Control under the indenture that will govern the New Senior Secured Notes, this could also have the effect of impeding an offer to acquire our outstanding shares of New Common Stock.

*Enforcing legal liability against us and our directors and officers might be difficult.*

We are organized under the laws of the State of Delaware, and in connection with the Transaction, we will be incorporated in State of New York. Therefore, investors are able to effect service of process in the United States upon us and may be able to effect service of process upon our directors and executive officers. We are a holding company, however, and substantially all of our operating assets are located in Poland and Russia. Further, most of our directors and executive officers, and those of most of our subsidiaries, are non-residents of the United States, and our assets and the assets of our directors and executive officers are located outside the United States. As a result, you may not be able to enforce against our assets (or those of certain of our directors or executive officers) judgments of U.S. courts predicated upon the civil liability provisions of U.S. laws, including federal securities laws of the United States. In addition, awards of punitive damages in actions brought in the United States or elsewhere may not be enforceable in Poland or Russia.

## Risks Related to the New Senior Secured Notes

*The New Senior Secured Notes and the related guarantees will be structurally subordinated to indebtedness and other liabilities of our non-guarantor subsidiaries, and certain other senior indebtedness will be secured by collateral that will not be pledged to secure the New Senior Secured Notes.*

Not all of our subsidiaries will guarantee the New Senior Secured Notes. In the event of a liquidation, winding up, administration, reorganization or any other insolvency, our non-guarantor subsidiaries would pay the holders of their debt and their trade creditors before they would be able to distribute any of their assets to us.

Our lending banks have taken first ranking security over certain assets that have not been pledged to secure the New Senior Secured Notes, and certain assets that secure existing bank debt at RSV will secure the New Senior Secured Notes only on a second lien basis. To the extent that assets not pledged as collateral for the New Senior Secured Notes are pledged to third parties to secure debts, any claim on the guarantees is effectively subordinated to the obligations secured by such pledges to the extent of the value of the collateral pledged.

*The New Senior Secured Notes Indenture will not be required to and will not be qualified under the Trust Indenture Act.*

The indenture that will govern the New Senior Secured Notes (the "*New Senior Secured Notes Indenture*") will not be required to and will not be qualified under the Trust Indenture Act of 1939, as amended (the "*Trust Indenture Act*"), and the trustee under the New Senior Secured Notes Indenture will not be required to qualify as a trustee under the Trust Indenture Act. Therefore, holders of the New Senior Secured Notes will not have the protections of the Trust Indenture Act with respect to the New Senior Secured Notes.

*We rely on payments from our subsidiaries to make cash payments on the New Senior Secured Notes, and our subsidiaries are subject to various restrictions on making such payments.*

We are a holding company and hold most of our assets at, and conduct most of our operations through, direct and indirect subsidiaries. In order to make payments on the New Senior Secured Notes or to meet our other obligations, we depend upon receiving payments from our subsidiaries. In particular, we may be dependent on dividends and other payments by our direct and indirect subsidiaries to service our obligations. You will not have any direct claim on the cash flow or assets of our non-guarantor operating subsidiaries and our non-guarantor operating subsidiaries have no obligation, contingent or otherwise, to pay amounts due under the New Senior Secured Notes or the subsidiary guarantees (or the intercompany loans that will be pledged to secure the New Senior Secured Notes) or to make funds available to us for those payments. In addition, the payment of dividends and the making of loans and advances to us by our subsidiaries may be subject to various restrictions. Existing and future debt of certain of these subsidiaries may prohibit the payment of dividends or the making of loans or advances to us. In addition, the ability of our subsidiaries to make payments, loans or advances to us may be limited by the laws of the relevant jurisdictions in which such subsidiaries are organized or located. Any of the situations described above could make it more difficult for us to service our obligations in respect of the New Senior Secured Notes. If payments are not made to us by our subsidiaries, we may not have any other sources of funds available that would permit us to make payments on the New Senior Secured Notes.

*Covenant restrictions under the New Senior Secured Notes Indenture will, and other financing arrangement we may enter into in the future may, impose significant operating and financial restrictions on us and may limit our ability to operate our business and consequently to make payments on the New Senior Secured Notes.*

The New Senior Secured Notes Indenture will contain, and other financing arrangements that we may enter into in the future may contain, covenants that restrict our ability to finance future operations or capital needs or to take advantage of other business opportunities that may be in our interest. These covenants will restrict our ability to, among other things:

- incur additional indebtedness;

- make certain restricted payments;

- transfer or sell assets;

- enter into transactions with affiliates;

- create certain liens;

- pay dividends or other payments;

- issue guarantees of indebtedness by restricted subsidiaries;

- enter into sale and leaseback transactions;

- merge, consolidate, amalgamate or combine with other entities;

- designate restricted subsidiaries as unrestricted subsidiaries; and

- engage in any business other than a permitted business.

Events beyond our control, including changes in general business and economic conditions, may affect our ability to meet these requirements. A breach of any of these covenants could result in a default under the New Senior Secured Notes Indenture.

*We may not be able to repurchase the New Senior Secured Notes upon a change of control.*

Upon the occurrence of certain change of control events, we will be required to make an offer to holders of the New Senior Secured Notes in cash to repurchase all or any part of their New Senior Secured Notes at 101% of their principal amount, plus accrued and unpaid interest. If a change of control occurs, we may not have sufficient funds at that time to pay the purchase price for all tendered New Senior Secured Notes, particularly if that change of control event triggers a similar repurchase requirement for, or results in the acceleration of, any of our other debt. Any debt agreements we enter into in the future may contain similar provisions.

*An active trading market may not develop for the New Senior Secured Notes, in which case your ability to transfer the New Senior Secured Notes will be more limited.*

The New Senior Secured Notes are new securities for which there currently is no market. Although we intend to apply for the New Senior Secured Notes to be admitted to trading on the ISE or the CISE, we cannot assure you that such admission will take place or that we will be able to continue to maintain such listing in the future. The liquidity of any market for the New Senior Secured Notes will depend on the number of holders of the New Senior Secured Notes, prevailing interest rates, the market for similar securities and other factors, including general economic conditions and our own financial condition, performance and prospects, as well as recommendations of securities analysts. We cannot assure you that an active trading market for the New Senior Secured Notes will develop or, if one does develop, that it will be maintained. If no active trading market develops, you may not be able to resell your New Senior Secured Notes at their fair market value, if at all.

The liquidity of, and trading market for, the New Senior Secured Notes may also be hurt by declines in the market for high yield securities generally. Such a general decline may be caused by a number of factors, including but not limited to the following:

- general economic and business trends;

- variations in quarterly operating results;

- regulatory developments in our operating countries and the European Union;

- the condition of the alcoholic beverage industry in the countries in which we operate; and

- investor and securities analyst perceptions of us and other companies that investors deem comparable.

Such a decline may affect the liquidity and trading of the New Senior Secured Notes independent of our financial performance and prospects.

***The New Senior Secured Notes may be treated as having original issue discount ("OID"), which could cause certain Noteholders to recognize significant "phantom" taxable income.***

The New Senior Secured Notes will be issued with OID for U.S. federal income tax purposes if the "stated redemption price at maturity" of the New Senior Secured Notes (generally, their stated principal amount) exceeds the issue price of the New Senior Secured Notes by more than a statutorily defined de minimis amount. If the New Senior Secured Notes are treated as having OID, a U.S. Holder (as defined in "United States Federal Income Tax Consequences") that receives such New Senior Secured Notes pursuant to the Plan of Reorganization will generally be required to recognize ordinary taxable income in respect of that class of New Senior Secured Notes in advance of the receipt of cash to which the income is attributable, regardless of the U.S. Holder's regular method of tax accounting. Moreover, a U.S. Holder that has an unrealized loss in its Existing Senior Secured Notes will generally be required to recognize such "phantom" taxable income with respect to its New Senior Secured Notes even if the U.S. Holder cannot recognize such loss in connection with the Plan of Reorganization (and instead takes a "carryover" tax basis in the New Senior Secured Notes). However, if a U.S. Holder's tax basis in New Senior Secured Notes exceeds the "issue price" of such New Senior Secured Notes, the U.S. Holder will be treated as acquiring that class of New Senior Secured Notes with "amortizable bond premium" or "acquisition premium." In that case, the U.S. Holder may be able to exclude, or offset, all or a portion of the OID that would otherwise be taxable with respect to the New Senior Secured Notes.

Noteholders are urged to consult their tax advisors regarding the tax consequences of exchanging their Existing Senior Secured Notes, as well as any other tax consequences of the Plan of Reorganization. See the summary set forth below in "United States Federal Income Tax Consequences."

***The New Senior Secured Notes and the related guarantees thereunder will not be directly secured by Russian Alcohol, and if we violate covenants in respect of the loans secured by the assets of Russian Alcohol such security may be effectively invalidated or unenforceable.***

Due to limitations under Russian law, the New Senior Secured Notes and the related guarantees thereunder will not be directly secured by Russian Alcohol. Jelegat Holdings Limited, a Cypriot corporation, will be used for the purpose of lending to Russian Alcohol to facilitate the perfection of security interests on intercompany loans to Russian Alcohol. The intercompany loan from CEDC FinCo to Jelegat Holdings Limited, the corresponding on-loans to Russian Alcohol and the shares of Jelegat Holdings Limited will all be pledged as security for the New Senior Secured Notes and the related guarantees thereunder. The on-loans from Jelegat Holdings Limited to Russian Alcohol, in turn, will be secured by share pledges over the Russian Alcohol Guarantors, assignments of rights under certain non-Russian bank accounts and withdrawal rights agreements for certain Russian bank accounts of the Russian Alcohol Guarantors and mortgages over certain real property and fixtures in Russia. As a result of this structure, the amount that can be realized from the enforcement of the security interest over Russian Alcohol is limited to the amount of the debt secured, which is the $271 million intercompany loans from Jelegat Holdings

28

Limited to Russian Alcohol (which principal amount of loans may be reduced in connection with the issuance of the New Senior Secured Notes).

It is expected that the terms of the intercompany loans (e.g., interest rate and maturity) will be amended to reflect those of the New Senior Secured Notes.

The shares of Jelegat Holdings Limited are wholly owned by CEDC International sp. z o.o. The loans securing the New Senior Secured Notes and the related guarantees thereunder from Russian Alcohol are, therefore, effectively controlled by Roust Corporation. If we do not comply with the covenants limiting the activities of Jelegat Holdings Limited, the collateral that secures that loan may be effectively invalidated or unenforceable, in which case the holders of New Senior Secured Notes will only have unsecured claims over the assets of Russian Alcohol.

***A refinancing or replacement of certain indebtedness could result in a release of the liens on the collateral. Although the security may be reinstated on substantially similar terms, the security could be subject to avoidance by an insolvency administrator or third-party creditors.***

The Indenture and the security documents that will secure the New Senior Secured Notes will provide that in connection with the refinancing or replacement of certain indebtedness, security interests in the property and assets securing the New Senior Secured Notes and/or the related guarantees thereunder as such may be amended, modified, restated, supplemented or replaced from time to time, may be released, provided that such security interests are re-taken on substantially similar terms to secure the New Senior Secured Notes. Although such re-taken security interests would, subject to registration, perfection or any other required actions, be established on substantially the same terms as the original security interests, in certain jurisdictions there will be new hardening periods applicable to such re-taken security interests following the date on which such replacement occurs during which, under the laws of those jurisdictions, the transaction creating the new security interests may be avoided by an insolvency administrator or third-party creditors if the entity granting such security interest becomes insolvent. See "Description of New Senior Secured Notes—Security".

***Fraudulent conveyance laws, rules prohibiting financial assistance, regulations relating to bankruptcy, insolvency or restructuring proceedings and other limitations on the guarantees and other transactions may adversely affect their validity and enforceability.***

The subsidiary guarantors will guarantee the payment of the New Senior Secured Notes on a senior secured basis. The subsidiary guarantors are organized under the laws of Poland, Russia, Hungary, Cyprus and Luxembourg. See the section entitled "Description of New Senior Secured Notes." Although laws differ among various jurisdictions, in general, under fraudulent conveyance and other laws, a court could subordinate or void any guarantee and, if payment had already been made under the relevant guarantee, require that the recipient return the payment to the relevant guarantor, if the court found that:

- the guarantee was incurred with actual intent to hinder, delay or defraud creditors or shareholders of the guarantor or, in certain jurisdictions, even when the recipient was simply aware that the guarantor was insolvent when it issued the guarantee;

- the guarantor did not receive fair consideration or reasonably equivalent value for the guarantee and/or the guarantee was not directly issued in connection with the receipt of consideration by the guarantor and/or the guarantor was: (i) insolvent or was rendered insolvent as a result of having granted the guarantee; (ii) undercapitalized or became undercapitalized because of the guarantee; or (iii) intended to incur, or believed that it would incur, indebtedness beyond its ability to pay at maturity;

- the value of the guarantee that has been issued as the moment of issuance thereof exceeds more than by half the value of the debt secured with such guarantee (in which case the excess guarantee is deemed ineffective);

- the guarantee was held not to be in the best interests or not to be for the corporate benefit of the guarantor or the guarantee was held to constitute a 'hidden' return of capital by the guarantor to its shareholders; or

- the aggregate amounts paid or payable under the guarantee were in excess of the maximum amount permitted under applicable law.

The measure of insolvency for purposes of fraudulent conveyance laws varies depending on the law applied. Generally, however, a guarantor would be considered insolvent if it could not pay its debts as they become due and/or if its liabilities exceed its assets. If a court decided any guarantee was a fraudulent conveyance and voided the guarantee, or held it unenforceable for any other reason, you would cease to have any claim in respect of the guarantor and would be a creditor solely of the issuer and the remaining guarantors.

The guarantees granted by Polish guarantors, to the extent that they secure obligations of companies other than such Subsidiary Guarantors and their subsidiaries (i.e., upstream and cross-stream guarantees/securities), will contain express limitation language that limits the scope of the obligations secured thereunder in order to preserve the corporate interest of such Subsidiary Guarantors/security providers and/or to protect such Subsidiary Guarantors against the risk of their insolvency/bankruptcy as a result of granting the guarantees/securities.

In addition to the limitations on the enforcement of the guarantees set out above, the following limitations specific to the laws of Poland, Russia, Hungary, Luxembourg and Cyprus will apply.

*Poland*

Pursuant to Polish civil code (*Kodeks cywilny*), any third-party creditor of a Polish Guarantor may challenge the effectiveness of the security interests to be created under the Polish law security documents if such creditor can prove that the entity which granted the security interests acted with the intention to impair the creditors' rights and the applicable Security Agent was aware, or ought to have been aware, that the establishment of such security interests was prejudicial to such creditors' rights (*actio pauliana*).

In addition to the fraudulent conveyance rules (*actio pauliana*), Polish bankruptcy law (*Prawo upadłościowe*) and Polish restructuring law (*Prawo restrukturyzacyjne*) include provisions which may adversely affect the guarantees and/or the security granted by persons or entities to which Polish bankruptcy law or Polish restructuring law applies.

In particular, without limitation, under Polish bankruptcy law:

- provisions of any agreement to which a bankrupt entity is a party, which provide for change or termination of such an agreement upon the filing of a motion for bankruptcy or upon the announcement of bankruptcy, are invalid; provisions of any agreement to which a bankrupt entity is a party, which make impossible, or which create obstacles in, the achieving of the goal of the bankruptcy proceedings, are ineffective towards the bankruptcy estate;

- any transaction made by a bankrupt entity within one year prior to filing a motion for the declaration of bankruptcy, concerning the disposal of its assets, is ineffective towards the bankruptcy estate if performed gratuitously or for consideration but with the value of the bankrupt's performance being glaringly in excess of the consideration received or promised for the bankrupt entity or for a third party;

- any repayment of, or any security interests established in respect of, obligations which are not yet due and payable (*dług niewymagalny*), made by the bankrupt entity within six months prior to filing a motion for the declaration of bankruptcy of such entity, is ineffective towards the bankruptcy estate. However, a person who received repayment or in favor of whom a security interest was established may apply to a court to recognize such actions as effective if such person was not aware of the grounds for bankruptcy at the moment when it received repayment or when the security interest was established;

- security assignment of a future receivable, if such assigned receivable is created after the announcement of bankruptcy, is ineffective towards the bankruptcy estate, unless the assignment was executed within six months prior to the filing of the motion to declare the bankruptcy and under a document with date certain;

30

- any action, in relation to which the bankrupt entity received consideration (*czynność prawna odpłatna*), taken by the bankrupt entity within six months prior to filing a motion for the declaration of bankruptcy of such entity, will be declared ineffective towards the bankruptcy estate by the judge-commissioner *ex officio* or by the judge-commissioner at the motion of bankruptcy receiver, if such action is taken, *inter alia*, by the bankrupt entity with its shareholders, its representatives (or their spouses), as well as with related entities, their shareholders or representatives (or their spouses) with its dominant entities or subsidiaries, unless the other party to the relevant action proves that creditors have not been harmed;

- the judge-commissioner will, at the request of the court receiver, declare any encumbrances established over the assets of the bankrupt debtor in the form of a mortgage, pledge, registered pledge or maritime pledge, ineffective towards the bankruptcy estate if the bankrupt was not the personal debtor of the secured creditor and if the encumbrance was established within one year prior to the filing of the motion to declare the bankruptcy and the bankrupt did not obtain any benefit in connection with such security interest (or if the encumbrance was established in exchange of the performance which is glaringly low in comparison to the value of the security); irrespective of the value of the performance received by the bankrupt, the judge-commissioner will declare the aforementioned encumbrances ineffective towards the bankruptcy estate if the encumbrance was granted as a security for the repayment of the debt of a shareholder of the bankrupt, its partners or their representatives, the bankrupt's related entities, their partners or representatives, as well as the bankrupt's dominant entities or the bankrupt's subsidiaries unless the other party to the relevant legal act(s) proves that creditors have not been harmed;

- debts denominated in currency other than Polish zloty (PLN) for the purpose of including such debts on a list of creditors are recalculated into PLN, generally at the exchange rate announced by the National Bank of Poland on the date of announcement of bankruptcy; if such debts are satisfied in bankruptcy proceedings they are satisfied in PLN, hence the creditors face a foreign exchange risk.

In particular, without limitation, under Polish restructuring law (*Prawo restrukturyzacyjne*):

- Polish restructuring law entered into force on January 1, 2016; it regulates four types of restructuring proceedings: arrangement approval proceedings (*postępowanie o zatwierdzenie układu*), accelerated arrangement proceedings (*przyspieszone postępowanie układowe*), arrangement proceedings (*postępowanie układowe*) and remedial proceedings (*postępowanie sanacyjne*); in general, these proceedings are novelty in Polish law and there is no established wider practice, 'case law' or legal doctrine with respect to such proceedings;

- provisions of any agreement to which an entity which is subject to any of the restructuring proceedings is a party, which provide for a change or termination of such an agreement upon the filing of a motion for opening of any of the restructuring proceedings or upon the opening of any of such proceedings, are invalid;

- provisions of any agreement to which an entity which is subject to any of the restructuring proceedings is a party, which make impossible, or which create obstacles in, the achieving of the goal of any of the restructuring proceedings, are ineffective towards the restructuring estate;

- the impact of the restructuring proceedings on the transactions made by a debtor entity which is subject to such proceedings depends on the type of the proceedings; for example, in remedial proceedings (*postępowanie sanacyjne*):

  (i)    upon the opening of the remedial proceedings all powers of attorney granted by the debtor expire, including (without limitation) all powers of attorney granted to the Polish Security Agent for security purposes;

  (ii)   legal act(s) of the debtor, performed gratuitously or for consideration, concerning the disposal of its assets, are ineffective towards the remedial estate (*masa sanacyjna*) if given legal act was executed within one year prior to the filing the motion to open the

31

remedial proceedings (*postępowanie sanacyjne*) of the debtor and if performed gratuitously or for consideration but with the value of the debtor's consideration being glaringly in excess of that received by the debtor, or of that promised for the debtor or for a third party;

(iii)     establishment of a security interest by the debtor to secure a claim is ineffective towards the remedial estate if the security interest was established within one year prior to the filing of the motion to initiate the remedial proceedings if given security interest was not established directly in connection with a receipt of a performance (consideration) by the debtor;

(iv)     establishment of a security interest by the debtor is ineffective towards the remedial estate to the extent that as at the date of establishment of given security exceeds by more than a half the value of the secured performance (benefit) received by the debtor, along with ancillary claims specified in the document being the basis for the establishment of the security interest, if the security interest was established within one year prior to the filing of the motion to initiate the repair proceedings;

(v)     the rules described in points (i)-(iii) immediately above apply accordingly to sureties (*poręczenia*), guarantees and to other similar actions made in order to secure someone's performance.

- debts denominated in currency other than Polish zloty (PLN) for the purpose of including such debts on a list of creditors are recalculated into PLN, generally at the exchange rate announced by the National Bank of Poland on the date of opening of the restructuring proceedings; if such debts are satisfied in the restructuring proceedings they are satisfied in the original currency, unless the restructuring proposal provide that they are satisfied in PLN, hence, in the latter scenario, the creditors face a foreign exchange risk.

For the purposes of Polish bankruptcy law and Polish restructuring law, it should be noted that Roust Corporation, Roust Trading Limited, CEDC FinCo, CEDC FinCo LLC, Mr. Roustam Tariko, other entities controlled and/or related to Mr. Roustam Tariko (directly or indirectly) and the Polish Subsidiary Guarantor(s) are all related entities and Roust Corporation controls CEDC FinCo and the Polish Subsidiary Guarantor(s), hence the provisions (limitation) under Polish bankruptcy law and Polish restructuring law relating to transactions between related entities generally apply.

*Cyprus*

Under Cyprus law, subject to certain exceptions, the receipt of economic benefits in the context of loan transactions by a person which is not a financial institution in an amount which exceeds the reference rate set out from time to time by the Central Bank of Cyprus (the ''*Reference Rate*'') constitutes a criminal offence and is unenforceable. At present, the Reference Rate is set at 9.77 % per annum. Although this rule generally applies to loans, its application remains untested in Cyprus courts and it is possible that this rule could be applied to contingent obligations, including the guarantees given by subsidiaries organized in Cyprus. There are certain circumstances under Cyprus law when the Reference Rate does not apply, including when a loan is provided to a legal entity and is disbursed outside of Cyprus, provided that the amount of such loan exceeds €1,000,000 and the minimum disbursement is €500,000. In the event any amounts payable by the applicable Cyprus subsidiary guarantors are deemed to constitute interest rate payable in excess of the Reference Rate and no exemption is available, a Cyprus court would consider the person charging the interest to be committing a criminal offence and recovery in full or in part of amounts payable under the guarantees of the New Senior Secured Notes may not be possible.

According to section 202A(1) of the Companies Law Cap. 113, where it appears to the Court that: (a) a Cyprus company is, or is likely to be, unable to pay its debts, (b) no resolution for the winding up of the company has been passed and published in the Gazette, and (c) no order has been made for the winding up of the Cyprus company, it may, on application by petition presented, appoint an examiner to the Cyprus company for the purpose of examining the state of the Cyprus company's affairs and performing such duties in relation to the Cyprus company as may be imposed by or under the said law. The court will issue such a court order only if it is satisfied

32

that there is reasonable prospect of survival of the Cyprus company and its whole or any part of its business as a going concern. Section 202H(2)(f)(iii) of the Companies Law Cap. 113, provides that in the case of an appointment of an examiner in a Cyprus company where any claim against such Cyprus company is secured by a mortgage, charge, lien or other encumbrance or a pledge of, on or affecting the whole or any part of the property, effects or income of the Cyprus company, no action may be taken to realize the whole or any part of that security, except with the consent of the examiner.

The new statutory examinership provisions provide, among others, that in case that on the application of an examiner of a Cyprus company it is proved to the satisfaction of the court that (a) any property of the company of whatever form was disposed, either through a sale, transfer, mortgage, security, loan or through any other way, whether by an action or omission, and (b) the result of such disposition was to commit a fraud on the Cyprus company, its creditors or shareholders, the court, if it considers fair and in accordance with the principles of equity, may order any person that appears to have the use, control or possession of such property or the proceeds of its sale or its development, to deliver it or pay such amount in relation to it to the examiner under such terms or conditions, as the court may deem appropriate.

The appointment of an examiner to a Cyprus company may also have an adverse effect on guarantees given guaranteeing its obligations.

The above examinership provisions will not apply if the following section 301 of the Companies Law Cap. 113 apply. Under Cyprus law, according to section 301 of the Companies Cap 113 any conveyance, charge, mortgage, delivery of goods, payment, execution or other act relating to property made or done by or against a company within 6 months before the commencement of its winding up which, had it been made or done by or against an individual within 6 months before the presentation of a bankruptcy petition on which he is adjudged bankrupt, would be deemed in his bankruptcy a fraudulent preference, shall in the event of the company being wound up be deemed a fraudulent preference of its creditors and be invalid accordingly. Section 47 of the Bankruptcy Law Cap. 5, stipulates that every conveyance or transfer of property, or charge thereon made, every payment made, every obligation incurred and every judicial proceeding taken or suffered by any person unable to pay his debts as they become due from his own money in favor of any creditor, or of any person in preference over the other creditors, shall, if the person making, taking, paying or suffering the same is adjudged bankrupt on a bankruptcy petition presented within three months after the date of making or, taking, paying, or suffering the same, be deemed fraudulent and void as against the trustee in the bankruptcy.

The effect of the above provisions is that if a Cyprus company at the time of making a transfer of its assets or giving security (a) is insolvent and (b) the Cyprus company is wound up within six months from the time of making the transfer of assets or giving the security the liquidator of the company may consider the transfer or security as void. For the purposes of calculating the said six months period any time period during which the company is under the protection of the court by virtue of what is stated in the examinership provisions referred to above shall not be taken into account.

Furthermore, it is possible under Cyprus law that in cases where a transaction involved fraudulent actions by the directors such transaction to be tainted with illegality and be rendered void irrespective of how long such transaction took place before the commencement of the winding up of the company.

*Russia*

The hardening period under Russian law for a bankruptcy ranges from 30 days to three years, and is counted from the date of formal acceptance by a Russian court of a bankruptcy claim. Generally, the following transactions entered into during a hardening period may be set aside (voided) under the Russian bankruptcy law:

- transactions involving unfair consideration on behalf of the debtor's counterparty;

- transactions that are detrimental to the creditors' property rights if the debtor's counterparty was aware (or should have been aware) that, inter alia, the debtor fell under the criteria for financial insolvency or insufficient assets; and

- transactions which result or may result in a preference conferred upon a particular creditor of the debtor (including granting of security).

Where any related party is involved in any foregoing transaction, Russian law provides for more stringent criteria. CEDC FinCo is likely to be deemed to be a related party in respect of the Russian obligors.

Given the relative novelty of the above-mentioned Russian bankruptcy law provisions, there is currently no published court practice or legislative guidance on their application. It is therefore unclear how Russian courts would apply the foregoing criteria to the Russian law security where a relevant Russian obligor is in bankruptcy.

*Hungary*

In Hungary a creditor or the liquidator may submit a claim to the court within ninety days from the time of gaining knowledge, or within a one-year forfeit deadline from the date of publication of the notice of liquidation, to rescind – among others – agreements concluded or other commitments made (i) within two years preceding the filing of a liquidation claim and thereafter, if it was intended to transfer the debtor's assets without consideration or to encumber any part of the debtors' assets without consideration, or if the stipulated consideration constitutes unreasonable and extensive benefits to a third party; or (ii) within five years preceding the filing of a liquidation claim and thereafter, if intended to conceal the debtor's assets or to defraud any one creditor or the creditors, and the other party had or should have had knowledge of such intent. In this respect bad faith and/or gratuitous nature shall be presumed in the case of contracts with a controlled company, with a shareholder, or with a company that is controlled by the same person or the same entity that is controlling the liquidated company.

Under Hungarian law, any payments to the shareholders of a guarantor are mandatorily subordinated to the claims of other creditors if the liquidation of such guarantor company is ordered by a court. Quota pledges are no longer enforceable after the commencement of a liquidation procedure.

*Luxembourg*

The Luxembourg law dated August 10, 1915 on commercial companies, as amended (the ''*Companies Act*'') does not specifically provide for rules governing the ability of a Luxembourg guarantor to guarantee the indebtedness of another entity of the same group.

Within a group of companies, the corporate interest (intérêt social) of each individual corporate entity could, to a certain extent, be tempered by, and subordinated to, the interest of the group. The notion of interest of group is recognized neither by the Luxembourg law nor by published Luxembourg case law. A reciprocal assistance from one group company to another does not necessarily conflict with the interest of the assisting company. However, this assistance must be temporary and in proportion with the real financial means of the assisting company. A Luxembourg guarantor may give a guarantee provided that the giving of the guarantee is covered by the company's corporate objects and is in the best interest of the company.

The test regarding the Luxembourg guarantor's corporate interest is whether in providing the guarantee does the Luxembourg guarantors receive some (direct or indirect) consideration in return (such as an economic or commercial benefit) and whether the benefit is proportional to the burden of the assistance. A guarantee that substantially exceeds the guarantor company's ability to meet its obligations to the beneficiary of the guarantee and to its other creditors would expose its directors or managers (as applicable) to personal liability. Furthermore, under certain circumstances, the directors or managers (as applicable) of a Luxembourg company might incur criminal penalties based on the concept of misappropriation of corporate assets (article 171-1 of the Companies Act). The Guarantees granted by each the Luxembourg guarantor, for the obligations of a relevant obligor which is not a direct or indirect subsidiary of that Luxembourg guarantor, will be limited to a certain percentage of, among others, the relevant company's own fund as provided for in the Senior Secured Notes Indenture.

The guarantee, to the extent it is granted by a Luxembourg guarantor could, if submitted to a Luxembourg court, depending on the terms of such guarantee, possibly be construed by such court as a suretyship (cautionnement) and not a demand guarantee or an independent guarantee. Article 2012 of the Luxembourg Civil Code provides that the validity and the enforceability of a suretyship (which constitutes an accessory obligation) are subject to the validity of the underlying obligation. If the New Senior Secured Notes were invalid or challenged, it

cannot be excluded that each of the Luxembourg guarantors would be released from its liabilities under the Guarantee.

### *Certain security will be granted as conditions subsequent.*

Certain of the security to be granted for the benefit of the New Senior Secured Notes will not be delivered on the issue date of the New Senior Secured Notes. CEDC FinCo has agreed to use its reasonable efforts to deliver certain security as soon as reasonably practicable following the issue date of the New Senior Secured Notes. Please see the sections entitled "Description of New Senior Secured Notes—Security" for a description of the security to be delivered after the issue date of the New Senior Secured Notes. If the Debtors default or become insolvent before such security is granted, the holders of the New Senior Secured Notes will have a less comprehensive security package at the time of such default and/or insolvency. Accordingly, prospects for recovery would be diminished.

### *Security will not be granted in favor of bondholders directly, but to the Security Agents.*

The security over certain of the Collateral will be granted to the applicable Security Agent as a separate creditor rather than as an agent for the holders of the New Senior Secured Notes. The ability of such Security Agent to enforce the Collateral may be restricted by local law.

The ability of the applicable Security Agent to enforce the security is subject to mandatory provisions of the laws of each jurisdiction in which security over the Collateral is taken. There is some uncertainty under the laws of certain jurisdictions as to whether obligations to beneficial owners of the New Senior Secured Notes that are not identified as registered holders in a security document will be validly secured.

In several jurisdictions the security over the Collateral that will constitute security for the obligations under the indenture governing the New Senior Secured Notes will not be granted directly to the holders of the New Senior Secured Notes or not only to the holders of the New Senior Secured Notes but in favor of the applicable Security Agent as beneficiary of parallel debt obligations (the "*Parallel Debt*"). The Parallel Debt is in the same amount and payable at the same time as the guarantee of the relevant security grantor in respect to the obligations of CEDC FinCo under the indenture in respect of the New Senior Secured Notes (the "*Principal Obligations*"). Any payment in respect of the Principal Obligations shall discharge the corresponding Parallel Debt, and any payment in respect of the Parallel Debt shall discharge the corresponding Principal Obligations. In respect of the security interests granted to secure the Parallel Debt, the holders of the New Senior Secured Notes will not have direct security and will not be entitled to take enforcement actions in respect of such security, except through the applicable Security Agent. As a result, the holders of the New Senior Secured Notes bear some risks associated with a possible insolvency or bankruptcy of the applicable Security Agent. There is no assurance that such Parallel Debt structure will be effective before all courts, as there is no judicial or other guidance as to its efficiency.

Under the general understanding of Russian law, a creditor may only take and hold security for the purposes of securing its own claim. Russian law does not envisage granting a pledge to a third party acting for the benefit of a creditor (such as a security agent or a security trustee). The pledge created under the Russian law pledge agreements in favor of the applicable Security Agent will secure the Parallel Debt obligation of CEDC FinCo to pay to such Security Agent, as creditor in its own right and not as representative of the holders of New Senior Secured Notes, any amounts payable to the holders of New Senior Secured Notes under the indenture governing the New Senior Secured Notes. However, such arrangements have not been tested in a Russian court, and to the extent that enforcement of the security established by such security documents requires the involvement of the Russian courts, the lack of precedent and experience of the Russian courts may make it difficult for such Security Agent to establish its entitlement to such security.

Similar rules and problems apply in Hungary: the concept of Security Agent is not expressly regulated by Hungarian law. Although it is not forbidden by Hungarian law to engage the Security Agent with the collection of the secured obligations under certain circumstances, this concept has not been challenged before courts so far and consequently the outcome of a lawsuit in which the right of the Security Agent to collect the secured obligations is challenged, is unpredictable.

***The value of the Collateral may not be sufficient to satisfy CEDC FinCo's and the relevant guarantors' obligations under the New Senior Secured Notes and the related guarantees, and the Collateral securing the New Senior Secured Notes may be reduced or diluted under certain circumstances.***

In the event of foreclosure on the Collateral, the proceeds from the sale of the Collateral may not be sufficient to satisfy the obligations under the New Senior Secured Notes. No appraisals of any of the Collateral have been prepared by us or on our behalf in connection with the offering of the New Senior Secured Notes. The value of the Collateral and the amount to be received upon a sale of such Collateral will depend upon many factors, including, among others, whether or not our business is sold as a going concern, the condition of the Collateral and the industry in which we operate, the ability to sell the Collateral in an ordinary sale, the condition of the international, national and local economies and the availability of buyers. The book value of the Collateral should not be relied upon as a measure of realizable value for such assets. By their nature, portions of the Collateral, including any pledged capital stock of any of our subsidiaries, may be illiquid and may have no readily ascertainable market value.

In addition, the New Senior Secured Notes Indenture will permit the granting of certain liens other than those in favor of the holders of New Senior Secured Notes on assets constituting Collateral. To the extent that holders of other secured indebtedness or third parties enjoy liens, including statutory liens, whether or not permitted by the New Senior Secured Notes Indenture or the security documents governing the security for the New Senior Secured Notes, such holders or third parties may have rights and remedies with respect to all or a portion of the Collateral that, if exercised, could reduce the proceeds available to satisfy our obligations under the New Senior Secured Notes. Moreover, if we issue additional New Senior Secured Notes as we are permitted to do in certain circumstances, under the New Senior Secured Notes Indenture, holders of such additional New Senior Secured Notes will benefit from the same Collateral and guarantees as the holders of the New Senior Secured Notes being offered, effectively diluting your ability to benefit from the liens on the Collateral and the related guarantees.

***The enforcement of the security is subject to certain risks under local law.***

*Poland*

The establishment and perfection of certain security instruments in Poland require the execution of certain documents and entry in the registers. The establishment of the mortgages on real estate in Poland will require execution of a deed before a Polish notary public and entry in the land and mortgage registers held by the Polish court.

The establishment of the registered pledge will require execution of the registered pledge agreements and the entry of each registered pledge in the appropriate register held by the Polish court.

CEDC International Sp. z o.o. (the "*Polish Guarantor*") will execute deeds on establishment of the mortgages and enter into registered pledge agreements and will file motions for the registration of the mortgages and registered pledges with the appropriate courts on or about the issue date of the New Senior Secured Notes. However, the registration proceedings are expected to last up to several weeks and, until they are completed, the mortgages or, respectively, the registered pledges will not legally exist. Once they are registered, the statutory priority of the mortgages or registered pledges will be determined by the priority of the filing motions for the registration thereof. In respect of movable assets and certain rights (e.g., shares) on which the registered pledges are to be established, from the moment of the pledge agreement execution until the entry of the registered pledges in the registers, the payment obligations under the New Senior Secured Notes will be secured by ordinary or financial pledges (depending, in particular on the subject of the pledge). These pledges, and in particular the ordinary pledges, may provide significantly lesser legal protection for the secured creditors in comparison to the registered pledges.

As a general rule, the establishment of the pledges (registered and ordinary or financial) or mortgages over the assets of the Polish Guarantor will not prevent third-party creditors from initiating enforcement proceedings under the Polish Code of Civil Procedure (the "*PCCP*") to satisfy their claims from the assets encumbered by the pledges or mortgages. In such event, the applicable Security Agent will be able to participate in the distribution of funds resulting from such enforcement if it joins the proceedings within the time frame provided under the PCCP. In such case, claims raised by the Security Agent will have priority over unsecured claims of third parties (except for

certain court-enforcement expenses, alimony claims and employee and pension claims) and claims secured with the lower-ranking pledges or mortgages according to the order of priorities set forth in accordance with the PCCP.

In the event that the Polish Guarantor is declared bankrupt, only ordinary pledges, financial pledges, registered pledges, mortgages, or assignments of movable assets or rights for security purposes will allow secured creditors to rely on such security instruments in enforcing their claims.

Additionally, Polish law does not recognize a universal pledge/mortgage over the entire enterprise (*przedsiębiorstwo*), i.e. one security interest over the whole business of an entity including all of its assets and liabilities. In particular, without limitation, mortgages over real estate and pledges over movable assets or transferrable rights are separate security interests from which the secured creditors have to satisfy separately. Such separate enforcement of a number of separate security interests may be expensive and time-consuming and may reduce the overall amount of the enforcement proceeds.

Claims secured by registered pledges and ordinary pledges or financial pledges may be satisfied directly from the sale proceeds of the assets encumbered with such pledges (after subtracting the costs of such sale). However, the proceeds of the sale of shares will be of limited economic value when the issuer of such shares becomes insolvent. In addition, in respect of the registered pledges, the applicable Security Agent will generally have the right to satisfy claims secured with such registered pledges by assuming title to the pledged assets on the terms set out in the respective pledge agreement or by the sale of such assets via an auction made by a notary public or a court enforcement officer. However, if third-party creditors initiate enforcement proceedings to satisfy their claims from the assets encumbered by such pledges, the applicable Security Agent may not be able to exercise any out-of-court methods of enforcement of the registered pledges (e.g., by taking the title to the encumbered assets and by sale of such assets via an auction made by a notary public or a court enforcement officer), but may only be entitled to enforce such pledges via standard court enforcement process which is usually more lengthy and costly for the secured creditor.

Under the Polish bankruptcy law the motion for a declaration of bankruptcy may be filed by a debtor and any of its personal creditors.

Secondary bankruptcy proceedings may be commenced in Poland based on a motion from a creditor having the place of residence, registered seat or center of main interest (COMI) in Poland, a creditor whose receivables result from the debtor's economic activity pursued in Poland or a creditor to whom the debtor owes receivables secured on the debtor's assets located in Poland with a mortgage, pledge, treasury pledge, registered pledge, maritime pledge, security transfer of assets or security assignment of receivables or other property rights.

As a rule, after the date of the declaration of bankruptcy no asset of the bankruptcy estate may be encumbered with mortgage, pledge, registered pledge, treasury pledge or maritime pledge in order to secure the claim that came to existence prior to the declaration of bankruptcy (the same rule applies following the opening of the accelerated restructuring proceedings (*przyspieszone postępowanie układowe*) unless the board of creditors gives its consent to such encumbrance).

That the claims secured with a mortgage, pledge, registered pledge, treasury pledge or maritime mortgage are satisfied in the bankruptcy from the proceeds of liquidation of the assets encumbered with such security interests in accordance with their ranking (subject to certain claims within defined limits, e.g. the costs of the bankruptcy proceedings, that are going to be satisfied from such proceeds with priority).

As regards the out-of-court options to seize the title to the pledged assets or sell them in a public auction during the bankruptcy proceedings, please note the following:

(i)       if the pledged asset is in the possession of the pledgee or a third party, the pledgee shall notify the bankruptcy receiver of the satisfaction from the pledged asset (the judge-commissioner may appoint an appropriate time for the pledgee to satisfy its claims from the pledged asset and if the pledgee does not exercise such right within the appointed time, the person in possession of the pledged asset shall deliver it to the bankruptcy receiver who shall sell it and use to the proceeds to satisfy the creditors' claims in accordance with the provisions of the Polish bankruptcy law, including the priority in satisfaction of the creditors whose claims are secured over such assets, as described above);

(ii)     if the pledged asset is in the possession of the bankruptcy receiver, and the secured creditor may enforce the pledge by way of seizure of title to the pledged asset, the judge-commissioner will appoint a time to the pledgee to seize the title to the pledged asset (not shorter than one month) and if the right to seize is not exercised within the appointed time the pledged asset will be sold in accordance with applicable provisions of the Polish bankruptcy law (and the right to enforce the pledge by way of sale of the pledged asset in accordance with the Polish registered pledge law may not be enforced and the pledged asset is going to be sold by the bankruptcy receiver in accordance with the provisions of the Polish bankruptcy law);

(iii)     additionally, the bankruptcy receiver retains the discretion to prevent the applicable Security Agent from acquiring title to the pledged assets or from sale of such assets via an auction made by a notary public or a court enforcement officer if the pledged asset is a part of the debtor's enterprise and its sale together with the enterprise would be more beneficial than the sale of the asset itself (however, the proceeds from the sale of the pledged asset as a result of the sale of the debtor's enterprise are separated from the proceeds of the sale of the enterprise in order to satisfy the pledge with priority from other creditors).

Under Polish restructuring law, as a rule only a debtor may file a motion to initiate the restructuring proceedings. With respect to remedial proceedings, in addition to a debtor, a motion for initiation of such proceedings may be also filed by (i) a curator (*kurator*) established pursuant to the Act on the National Court Register for such a person (entity) and/or (ii) with regard to a legal person (entity) which is insolvent – by a personal debtor of such person (entity).

An arrangement does not cover the claims secured over the assets of the debtor with a mortgage, pledge, registered pledge, treasury pledge, maritime mortgage, security transfer of assets or security assignment of receivables or other rights, to the extent such claim is covered by the value of the encumbered asset, unless the creditor has irrevocably and unconditionally agreed to include such a claim with an arrangement prior to voting over the arrangement. In practice, establishing the value of the asset subject to security interest at a specific point of time may pose a problem (as the Polish restructuring law does not determine when and how such valuation shall be conducted) and therefore it may be difficult in practice to establish to what extent a claim is subject to the arrangement. Furthermore, in so-called "partial arrangement", if the debtor presented to a creditor whose claim is secured with a mortgage, pledge, registered pledge, treasury pledge, maritime mortgage, security transfer of assets or security assignment of receivables or other rights, arrangement options providing for full satisfaction of its claim together with ancillary outstandings covered by the agreement for the establishment of security interests (even if such agreement has been terminated or expired), within the time specified in the arrangement, or providing for satisfaction of the creditor's claim at least to the extent the creditor could expect in the event of satisfaction of its claim together with ancillary outstandings by way of enforcement of the security over the encumbered asset, the consent of such creditor is not necessary for the purpose of including its claim in the partial arrangement.

In remedial proceedings, the enforcement proceedings addressed to the debtor's property constituting a part of the remedial estate, initiated before the opening of remedial proceedings, shall be suspended by operation of law with effect as of the date of opening the proceedings (in addition to other instruments available under Polish restructuring law weakening the position of the creditors during the course of the remedial proceedings). Following the date of opening of the remedial proceedings, it is not possible to start any judicial enforcement proceedings or execute interim injunctions towards the debtor's property constituting a part of the remedial estate (and certain legal doubts exist whether the out-of-court methods of enforcement of registered pledges or financial pledges, such as seizure of legal title or out-of-court sale, may be pursued following opening of repair proceedings).

Within the accelerated arrangement proceedings, a creditor having a claim secured with a mortgage, pledge, registered pledge, treasury pledge or maritime mortgage, may enforce solely from the subject of the security. The judge-commissioner at the request of the debtor or the court supervisor may suspend the enforcement proceedings, for the period not longer than three months) as to claims that are not covered by the arrangement by virtue of law, if the enforcement has been designated for the collateral needed to run the enterprise.

The parallel debt concept has been tested under Polish law only to limited extent. Also, Polish law does not recognize the concept of "trust" or "trustee". There have been no decisions of Polish courts clearly recognizing such structures as a parallel debt. Therefore, there is no assurance that such a structure (based on a foreign law and having no equivalent under Polish law) will be recognized before Polish court in a particular case. There have been,

however, several judgments issued by the bankruptcy courts under which validity of a foreign law parallel debt structure was not challenged (however, there is no doctrine of "precedent" under Polish law).

Further, under Polish law, mortgages and pledges are considered accessory to the underlying secured obligations, which automatically terminate if the secured obligations become void or terminate or otherwise expire. Furthermore, in case of foreclosure on a pledge on shares in a Polish company not only the Polish procedural rules with respect to a foreclosure of a right of pledge have to be followed, but also the provisions of Polish company law with respect to the transfer of shares have to be abided, which may lead to complications and difficulties with foreclosing the pledged shares and/or lower revenue from the foreclosure, which may adversely affect the position of the holders of the New Senior Secured Notes.

Under Polish law, the priority of the security over pledged shares that is shared with other creditors depends on the termination of existing pledges or agreement on priority with the beneficiaries of the existing pledges. We note that according to certain Polish commentators in the situation where the secured claim is not discharged but only the registered pledge securing such claim is released, the registered pledge expires only upon the actual deregistration of such registered pledge from the pledge registry (and not upon delivery of a release statement (*zrzeczenie*)). If the registered pledge expires only upon deregistration, then the 'old' registered pledges in may have priority of ranking ahead of the 'new' pledges, until the 'old' registered pledges have been de-registered and the 'new' pledges are established (registered in the pledge registry).

The security established for the benefit of the applicable Security Agent in Poland includes (or may include) the establishment of both financial pledges and registered pledges over the same assets and securing the same claim(s). The status of the co-existence of registered and financial pledges established as encumbrances over a single asset securing the same claim(s) is not entirely clear under Polish law (in particular we cannot ultimately exclude that the validity or effectiveness of such coexisting registered and financial pledges could not be subject to challenge on the basis of doctrine of overcollateralization (*nadzabezpieczenie*) in exceptional circumstances, as claimed by certain Polish commentators).

There are restrictions under Polish law on acquiring control over certain assets. Pursuant to the Polish Antimonopoly Law (*Ustawa o ochronie konkurencji i konsumentów*), taking control over an entrepreneur by way of, inter alia, an acquisition of shares or any part of its assets or an acquisition of a right to exercise voting rights of shares in such entrepreneur may require prior approval of the Polish Antimonopoly Authority or antimonopoly authorities of other countries and/or the European Commission. Therefore, if the applicable Security Agent enforces the registered pledges by way of an acquisition of title to the encumbered shares or by exercising the voting rights in respect of shares encumbered by pledges (registered or financial pledges), it may require prior approval(s) of the respective antimonopoly authority(ies). Such approval may be subject to certain conditions, such as sale of some or all of the assets of the entrepreneurs participating in the acquisition. Violation of the Antimonopoly Law or other respective antimonopoly laws or regulations may result in fines imposed on the participating companies and their management.

Under the Polish Law on the Acquisition of Real Estate by Foreigners (*Ustawa o nabywaniu nieruchomości przez cudzoziemców*), the acquisition of real estate in Poland or the acquisition of shares in a Polish company which owns real estate in Poland or any other action through which such Polish company becomes controlled by a foreign entity, in certain situations requires a permit from the Polish Ministry of the Interior (an "*MOI Permit*"). Only persons domiciled in countries which are members of the EEA are exempted from the duty to obtain an MOI Permit. Pursuant to the provisions of the Law on the Acquisition of Real Estate by Foreigners an acquisition, by the applicable Security Agent or by other entities, of shares in such Polish Guarantor in the course of enforcement of the pledges established on such shares, may also require such an MOI Permit if the acquirers are not domiciled in EEA countries.

The Act on Shaping the Agricultural System sets forth additional restrictions in case of acquisition of agricultural property. The definition of agricultural prosperty is broad and covers all properties which can be potentially used for agricultural purpose. The Act is not applicable to: (i) properties designated in local zoning plan for purposes other than agricultural, and properties in which a zoning decision was issued (and became final before 30 April 2016), (ii) properties with the area smaller than 0.3 ha, and (ii) properties with the area not larger than 0.5 ha, with residential buildings or buildings, structures and facilities currently not used for agricultural production together with neighbouring land necessary for their proper use and designated for adjacent garden, if such land

forms an organised economic entity and has not been excluded from agricultural use. In case of lack of local zoning plan and zoning decision, the description of land in the land register may be indicative. According to the Act, the transactions involving agricultural property are subject to control of Agency of Agricultural Properties of the State Treasury ("*ANR*").

The restrictions are as follows:

1)      the scope of persons entitled to acquire agricultural property without the State's control is limited to acquisition: (i) by individual farmers, the State Treasury, local government units, religious associations and close relatives of the current owner, (ii) by way of inheritance or specific bequest (vindicatory record); (iii) in the event of unintentional crossing of the land border upon construction of a building or other facility, (iv) in the event a *bona fide* possessor of the land raised a building or other facility of a value materially in excess of the value of the land; (v) in the course of remedial proceedings. Other persons should obtain a consent of the President of the ANR for the acquisition. The President of the ANR grants consent only if the seller fulfils certain conditions, i.e. is able to continue the agricultural activity on the land. The acquisition of agricultural property without the consent of the President of the ANR is invalid;

2)      if there is no lessee (*dzierżawca*), the sale of agricultural property is subject to the right of first refusal vested in the ANR, regardless of the area of the real property (however, the sale agreements concluded with the consent of the President of the ANR as described above, are exempted from the right of first refusal);

3)      the transfer of ownership right to the agricultural property under an agreement other than a sale agreement, or under any other legal transaction (such as merger of companies, donation or even succession) is subject to the buy-out-right vested in the ANR (however, the acquisitions subject to the consent of the President of the ANR as described above, are exempted from the right of first refusal);

4)      the ANR has the right of first refusal in the case of sale of shares of a company holding the title to an agricultural property (other than shares admitted to trading on regulated market).

*Russia*

Although Russian security documents provide that the security period terminates when the secured obligations are irrevocably discharged, the concept of "irrevocability" of performance has no distinctive meaning under Russian law.

Russian law withdrawal rights agreements do not create a security interest per se; rather, they seek to restrict the ability of an account holder to dispose of funds in a bank account and provide a creditor with the right to withdraw funds in a bank account without the instruction of the account holder. The provisions of Russian law that establish the order of priority of withdrawals from a bank account where the aggregate amount of the claims against the account exceeds its balance may affect the creditor's rights under withdrawal rights agreements. It is unclear under Russian law whether any restrictions on the ability of an account holder to dispose of funds in a bank account are enforceable. It is further unclear whether rights of a third party to dispose of funds in a bank account are revocable by the account holder. Also, the account holder may close its bank account at any time, unless there are any restrictions regarding disposal of funds on that account (such as arrest of funds, suspension of operation on a bank account upon request of tax authority or the like).

Under Russian and other laws under which we operate, there are restrictions on acquiring control over certain assets.

The Russian Alcohol Guarantors will grant multiple pledges in connection with the RAG On-Loans in order to secure the performance of the obligations of the borrowers under such loans. These pledges will be of different priority with respect to each other, but no other pledges shall rank senior to such pledges, and will effectively secure the aggregate amount of the RAG On-Loans. Upon an event of default under the New Senior Secured Notes, the holders of the New Senior Secured Notes would need to rely on cross-default provisions in the RAG On-Loans to enforce security provided by the Russian Alcohol Guarantors. The shares (or participatory interests) of OOO Glavspirttirest will be pledged both to secure the New Senior Secured Notes on a first priority

basis and the Guarantee of Latchey Limited, its parent company, on a second priority basis, with no other pledges ranking senior to such pledges.

In the event that the applicable Security Agent enforces on the real estate mortgages over Russian assets (except for the land plots and buildings of non-industrial use), the consent of the Russian Federal Antimonopoly Service ("*FAS*") in Russia may be required where the balance sheet value of the assets enforced upon exceeds 20% of the aggregate book value of the key production and intangible assets (such as intellectual property) of the mortgagor.

Under Russian law, collateral (which includes, among others, pledges and mortgages) are considered secondary obligations, which automatically terminate if the secured obligations become void. Generally, the parties may agree on court or out-of-court pledge enforcement procedure. However, in certain cases there is a statutory requirement for enforcement through court (which overrules any agreement of the parties to the contrary) which may substantially delay the enforcement. To the extent the security is enforced through court, a court in certain circumstances may delay such public sale for a period of up to one year upon a pledgor's application. Also, the foreclosure on the pledged asset (irrespectively of the chosen enforcement method) is not permitted if the debtor's default is immaterial and the value of the claim is clearly disproportional to the value of the collateral provided.

In the event of an out-of-court enforcement of an asset pledged under a Russian law pledge agreement, the initial sale price of such asset in most cases should be fixed on the basis of its market value, as determined by an independent appraiser, which may affect the timing of enforcement.

A mortgage under Russian law is a pledge over real property, such as land and buildings, which requires state registration to be valid. Under Russian law, a participatory interest pledge agreement shall be certified by a notary public. Due to the novelty of such requirement with respect to Russian law pledge of participatory interests, there may be practical difficulties in obtaining the above-mentioned certification.

In general, Russian law has no pledge perfection system for collateral other than mortgages, shares in Russian joint stock companies and from July 1, 2009, participatory interests in Russian limited liabilities companies, which may lead to unexpected or conflicting claims of secured creditors upon the pledged property. Therefore, holders of New Senior Secured Notes may have difficulty foreclosing on collateral or enforcing other security if there is a default, which may adversely affect our financial condition and results of operations.

The provisions of Russian law that establish the order of priority of withdrawals from a bank account where the aggregate amount of the claims against the account exceeds its balance may affect the creditor's rights pursuant to Russian law withdrawal rights agreements. It is unclear under Russian law whether any restrictions on the ability of an account holder to dispose of funds in a bank account are enforceable. Also, the account holder may close its bank account at any time.

Further, under Russian law, the right to issue guarantees (as primary obligations independent from the secured obligations) is reserved to banks, other credit institutions and insurance companies while other corporate entities (such as the Russian Guarantors) are only capable to provide suretyship which are considered as secondary obligations the validity of which depends on the validity of the principal obligation (for example, the suretyship automatically terminates (i) if the principal obligation secured by a suretyship terminates or becomes invalid; or (ii) the obligations secured by such suretyship are altered without the surety's consent, and such alteration increases the liability of the surety or has other adverse consequences for it). While the Guarantees to be provided by the Russian Guarantors will be governed by the laws of the State of New York, it is unclear whether their intended effect will be preserved given the Russian law provisions relating to the right to issue guarantees.

*Cyprus*

Under Cyprus contract law, there are certain requirements which, if not fulfilled, will render any pledge over shares in a Cyprus company invalid and unenforceable. These requirements include giving formal notice of the pledge together with a certified copy thereof to the company in which the pledged shares are held, the company making a memorandum of such pledge in its register of shareholders against the shares in respect of which the notice has been given, and the company delivering to the pledgee a certificate confirming that a memorandum of such pledge has been made in its register of shareholders.

In order to ensure that certain classes of security over its assets are not rendered void against a liquidator or any creditor, a company registered in Cyprus must deliver the instrument creating or evidencing the security, together with the prescribed particulars thereof, to the Registrar of Companies for registration within 21 days after the creation of such security. The Registrar of Companies will then issue a certificate of registration of charge, which is conclusive evidence that the procedure required by the legislation to register with the Registrar of Companies in Cyprus the security concerned has been complied with. There is no authority in Cyprus as to what the position would be were a Cyprus company to go insolvent between the date of the filing of the security at the companies registry and the Registrar issuing the certificate of registration of charge.

Any rights of a pledgee holding a pledge over shares in a Cyprus company to sell the pledged shares will be subject to the provisions of the articles of association of that company. A transfer of shares in a Cyprus company is not complete until and unless it is entered into the company's register of members. Following the commencement of the winding up of a Cyprus company no transfer of shares in, nor any transfer of assets of, such company can take place unless the court otherwise orders.

The effectiveness of Cyprus law share pledges has not been tested under Cypriot law by any Cypriot court to date. Further, according to section 303 of the Cypriot Companies Law Cap. 113 where a company is being wound up, a floating charge on the undertaking or property of the company created within 12 months of the commencement of the winding up shall, unless it is proved that the company immediately after the creation of the charge was solvent, be invalid, except to the amount of any cash paid to the company at the time of or subsequently to the creation of, and in consideration for, the charge, together with interest on that amount at the rate of 5% per annum or such other rate as may for the time being be prescribed by order of the Accountant-General.

*Hungary*

Under Hungarian law, certain types of security interests (such as mortgages over real property and pledges over the quotas in Hungarian companies) are established and perfected upon registration by the competent Hungarian authorities (e.g., the land registry office or a company court of registration), in addition to and following the execution of the relevant security documents. Registration takes place within 30 days following a request to the relevant authority and is done retroactively to the date of the execution of the security document in case of share pledges. Under the pledge agreement relating to the shares held in *Bols* Hungary Kft. (the "*Hungarian Guarantor*"), the pledgor is expected to undertake to file the registration request with the competent company court of registration within 30 days following the execution of the pledge agreement. Enforcement is subject to applicable Hungarian rules that provide for both judicial and extra-judicial (private sale) enforcement methods. Pledges incorporated into notary deeds are subject to simplified judicial enforcement procedure.

Under Hungarian law, the foreclosure of the pledge shall take place on the basis of a court decision if the parties have not agreed on the terms of private sale, or such private sale is not successful within a certain period of time. Obtaining such court decision might take months or even years if the creditor needs to commence litigation against the obligor in the absence of directly enforceable public deed relating to the pledge.

In the event that the Hungarian Guarantor is declared insolvent and the liquidation of such guarantor is ordered by the court, any of the creditors or the liquidator may challenge before the court contracts or undertakings which (i) conceal the debtors assets or defraud the creditors, or (ii) are aimed at the transfer of the guarantors' assets without due compensation, or (iii) are intended to encumber any part of guarantors' assets; or (iv) ensure unreasonable and extensive benefits to a third party or (v) gives preference to creditors in any way (including providing securities to such creditor).

*Luxembourg*

According to Luxembourg conflict of law rules, the courts in Luxembourg will generally apply the *lex rei sitae* or *lex situs* (the law of the place where the assets or subject matter of the pledge or security interest is situated) in relation to the creation, perfection and enforcement of security interests over such assets. As a consequence, Luxembourg law will apply in relation to the creation, perfection and enforcement of security interests over assets located or deemed to be located in Luxembourg, such as registered shares in Luxembourg companies, bank accounts held with a Luxembourg bank, receivables or claims governed by Luxembourg law and/or having debtors located in Luxembourg, tangible assets located in Luxembourg, securities which are held through an account located in

42

Luxembourg, bearer securities physically located in Luxembourg, etc. If there are assets located or deemed to be located in Luxembourg, the security interests over such assets will be governed by Luxembourg law and must be created, perfected and enforced in accordance with Luxembourg law.

The Luxembourg law of 5 August 2005 on financial collateral arrangements, as amended (the "*Luxembourg Collateral Law*") governs the creation, validity, perfection and enforcement of pledges over shares, bank accounts and receivables located or deemed to be located in Luxembourg.

Under the Luxembourg Collateral Law, the perfection of security interests depends on certain registration, notification and acceptance requirements. A share pledge agreement must be (i) acknowledged and accepted by the company which has issued the shares (subject to the security interest) and (ii) registered in the shareholders' register of such company. If future shares are pledged, the perfection of such pledge will require additional registration in the shareholders' register of such company. A pledge over receivables becomes enforceable against the debtor of the receivables and third parties from the moment when the agreement pursuant to which the pledge was created is entered into between the pledgor and the pledgee. However, if the debtor has not been notified of the pledge or if he did not otherwise acquire knowledge of the pledge, he will be validly discharged if he pays the pledgor. A bank account pledge agreement must be notified to and accepted by the account bank. In addition, the account bank has to waive any pre-existing security interests and other rights in respect of the relevant account. If (future) bank accounts are pledged, the perfection of such pledge will require additional notification to, acceptance and waiver by the account bank. Until such registrations, notifications and acceptances occur, the pledge agreements are not effective and perfected against the debtors, the account banks and other third parties.

Article 11 of the Luxembourg Collateral Law sets forth the following enforcement remedies available upon the occurrence of an enforcement event:

(a)     direct appropriation of the pledged assets at (i) a value determined in accordance with a valuation method agreed upon by the parties or (ii) the listing or latest published net asset value price of the pledged assets;

(b)     sale of the pledged assets (i) in a private transaction at commercially reasonable terms (*conditions commerciales normales*), (ii) by a public sale at the stock exchange or (iii) by way of a public auction;

(c)     court allocation of the pledged assets to the pledgee in discharge of the secured obligations following a valuation made by a court-appointed expert; or

(d)     set-off between the secured obligations and the pledged assets.

As the Luxembourg Collateral Law does not provide any specific time periods and depending on (i) the method chosen, (ii) the valuation of the pledged assets, (iii) any possible recourses, and (iv) the possible need to involve third parties, such as, e.g., courts, stock exchanges and appraisers, the enforcement of the security interests might be substantially delayed.

The Luxembourg Collateral Law expressly provides that financial collateral arrangements (including pledges and transfer of title by way of security) including enforcement measures are valid and enforceable, even if entered into during the hardening period, against third parties including supervisory, receivers, liquidators and any other similar persons or bodies irrespective of any bankruptcy, liquidation or other situation, national or foreign, of composition with creditors or reorganisation affecting any one of the parties.

The appointment of a foreign security agent will be recognised under Luxembourg law, (i) to the extent that the designation is valid under the law governing such appointment and (ii) subject to possible restrictions. Generally, according to paragraph 2(4) of the Luxembourg Collateral Law, a security (financial collateral) may be provided in favour of a person acting on behalf of the collateral taker, a fiduciary or a trustee in order to secure the claims of third party beneficiaries, whether present or future, provided that these third party beneficiaries are determined or may be determined. Without prejudice to their obligations vis-a-vis third party beneficiaries of the security, persons acting on behalf of beneficiaries of the security, the fiduciary or the trustee benefit from the same rights as those of the direct beneficiaries of the security aimed at by such law.

43

Foreign law-governed security interests and the powers of any receivers or administrators may not be enforceable in respect of assets located or deemed to be located in Luxembourg. Security interests or arrangements, which are not expressly recognized under Luxembourg law and the powers of any receivers or administrators might not be recognized or enforced by the Luxembourg courts, in particular where the Luxembourg security grantor becomes subject to Luxembourg insolvency proceedings or where the Luxembourg courts otherwise have jurisdiction because of the actual or deemed location of the relevant rights or assets, except if ''main insolvency proceedings'' (as defined in the EU Council Regulation No. 1346/2000 of May 29, 2000 on insolvency proceedings (the "*EU Insolvency Regulation*")) are opened under Luxembourg law and such security interests/arrangements constitute rights in rem over assets located in another Member State in which the EU Insolvency Regulation applies, and in accordance of article 5 of the EU Insolvency Regulation.

The perfection of the security interests created pursuant to the pledge agreements does not prevent any third-party creditor from seeking attachment or execution against the assets, which are subject to the security interests created under the pledge agreements, to satisfy their unpaid claims against the pledgor. Such creditor may seek the forced sale of the assets of the pledgors through court proceedings, although the beneficiaries of the pledges will in principle remain entitled to priority over the proceeds of such sale (subject to preferred rights by operation of law).

Under Luxembourg law, certain creditors of an insolvent party have rights to preferred payments arising by operation of law, some of which may, under certain circumstances, supersede the rights to payment of secured or unsecured creditors, and most of which are undisclosed preferences (*priviléges occultes*). This includes in particular the rights relating to fees and costs of the insolvency official as well as any legal costs, the rights of employees to certain amounts of salary, and the rights of the Luxembourg Treasury and certain assimilated parties (such as social security bodies), which preferences may extend to all or part of the assets of the insolvent party. This general privilege takes in principle precedence over the privilege of a pledgee in respect of pledged assets.

The tax consequences of foreclosing on the Collateral or enforcing these guarantees have not been fully examined.

***Insolvency laws and other limitations on the Guarantees and security may adversely affect their validity and enforceability.***

CEDC FinCo's obligations under the New Senior Secured Notes will be guaranteed and secured by certain assets of CEDC FinCo and the guarantors party to the Senior Secured Notes Indenture. The Guarantors are organized under the laws of Poland, Russia, Hungary, Cyprus, Luxembourg, Bermuda and the United States. Although laws differ among jurisdictions, in general, applicable insolvency laws and limitations on the enforceability of judgments obtained in New York courts in such jurisdictions would limit the enforceability of judgments against CEDC FinCo and the Guarantors of the New Senior Secured Notes and the Guarantees (as defined below). The following discussion of insolvency laws, although an overview, describes generally applicable terms and principles, which are defined under the relevant jurisdictions' insolvency statutes. In an insolvency proceeding, it is possible that creditors of the Guarantors or an appointed insolvency administrator may challenge the Guarantees and security, and intercompany obligations generally, as fraudulent transfers or conveyances or on other grounds. In certain situations the respective bankruptcy court may also act ex officio and declare the Guarantees or other security interests as ineffective, unenforceable or void. If so, such laws may permit the court, if it makes certain findings, to:

- avoid or invalidate all or a portion of a Guarantor's obligations under its Guarantee or the security provided by such Guarantor;

- direct that holders of the New Senior Secured Notes return any amounts paid under a Guarantee or any security document to the relevant guarantor or to a fund for the benefit of the Guarantor's creditors; or

- take other action that is detrimental to holders of the New Senior Secured Notes.

Different jurisdictions evaluate insolvency on various criteria, but a Guarantor is generally considered insolvent at the time it issued a Guarantee or created any security if:

- its liabilities exceed the fair market value of its assets;

- it cannot pay its debts as and when they become due;

- it is unable to obtain new financing; or

- the present salable value of its assets is less than the amount required to pay its total existing debts and liabilities, including contingent and prospective liabilities, as they mature or become absolute.

We cannot assure you which standard a court would apply in determining whether a Guarantor was "insolvent" as of the date the Guarantees were issued or security was created or at any other date or time or that, regardless of the method of valuation, a court would not determine that a Guarantor was insolvent on any such date or time, or that a court would not determine, regardless of whether or not a Guarantor was insolvent on any such date or time, that payments to holders of the New Senior Secured Notes constituted fraudulent conveyance (transfers) or are ineffective, unenforceable, void or voidable on any other grounds.

Additionally, under the bankruptcy regulations in EU Member States, the bankruptcy proceedings may be initiated not only in the country where the entity is registered (incorporated) but also in other EU Member States where the bankrupt entity conducts or conducted its business activity or where the assets of the bankrupt entity are located. Irrespective of the attempts to harmonize the bankruptcy regulations in EU Members States, the regulations in various states differ and the bankruptcy proceedings conducted in more than one state may create additional legal risks and costs for the creditors of the bankrupt entity.

*Russia*

Furthermore, Russian law does not recognize the concept of subordination of payment arrangements (with certain limited exceptions) and the operation of the provisions of the New Senior Secured Notes Indenture and/or the Guarantees implementing such a concept is subject to significant uncertainty. Moreover, any provisions of the indenture governing the New Senior Secured Notes and/or the Guarantees contemplating the subordination in right of payment of the claims to a Russian obligor would not be effective in the event of insolvency proceedings against such obligor.

*Cyprus*

Under Cyprus law a continuing guarantee may, at any time be revoked by the surety, as to future transactions, by notice to the creditor. Also, any variance, made without the surety's consent, in the terms of the contract between the principal and the creditor, discharges the surety as to transactions subsequent to the variance. The surety is discharged by any contract between the creditor and the principal debtor, by which the principal debtor is released, or by any act or omission of the creditor, the legal consequence of which is the discharge of the principal debtor. A contract between the creditor and the principal debtor, by which the creditor makes a composition with, or promises to give time to, or not to sue, the principal debtor, discharges the surety, unless the surety assents to such contract. If the creditor does any act which is inconsistent with the rights of the surety, or omits to do any act which his duty to the surety requires him to do, and the eventual remedy of the surety himself against the principal debtor is thereby impaired, the surety is discharged. Where a guaranteed debt has become due, or default of the principal debtor to perform a guaranteed duty has taken place, the surety, upon payment or performance of all that he is liable for, is invested with all the rights which the creditor had against the principal debtor. Also, a surety is entitled to the benefit of every security which the creditor has against the principal debtor at the time when the contract of suretyship is entered into, whether the surety knows of the existence of such security or not; and, if the creditor loses or, without the consent of the surety, parts with such security, the surety is discharged to the extent of the value of the security.

*Poland*

Under Polish laws the subordination of payment arrangements and/or intercreditor agreements may be ineffective for the bankruptcy receiver or any similar officer of a party which is a party to such arrangements on agreements.

The guarantee(s) granted by the Polish Guarantor(s) is/are also subject to certain provisions of the Polish Commercial Companies Code. In accordance with Article 189 sec. 2 of the Polish Commercial Companies Code, shareholders of a limited liability company (*spółka z ograniczoną odpowiedzialnością*) may not receive, on whatever account, payments out of a company's assets which are necessary for the share capital to be fully paid up. A more general Article 189 sec. 1 prohibits the return of capital, either full or partial, to such shareholders. In the Polish legal doctrine opinions are expressed that in certain situations the payment under the guarantee to the benefit of the shareholder (or the shareholder's creditors) may constitute in fact the return of capital to the shareholder. A breach of these rules results in the shareholders' obligation to return the payments up to the amount of the share capital. Therefore, we cannot exclude the risk that the guarantee of a Polish Guarantor incorporated under Polish law in such form will be affected, or could be set aside, to the extent it would result in a reduction of its assets necessary to cover in full its share capital in breach of Article 189 sec. 2 of the Polish Commercial Companies Code, or a return of capital prohibited by Article 189 sec.1 of the Polish Commercial Companies Code.

The maximum interest rate per annum permitted pursuant to Article 359 sec. $2^1$ of the Polish Civil Code is equal to twice the rate of the statutory interest rate, determined by the Minister of Justice. The maximum default interest rate per annum permitted pursuant to Article 481 sec. $2^1$ of the Polish Civil Code is equal to twice the rate of the statutory default interest rate, determined by the Minister of Justice. As of the date of this Offering Memorandum and Disclosure Statement the maximum interest rate is 10% per annum, and the maximum default interest rate is 14% per annum. Therefore, the Polish Guarantor potentially could not be held liable for interest exceeding such maximum interest rate set by the Polish Civil Code.

*Hungary*

Under Hungarian law, in the case of a company restructuring proceeding there is a moratorium period of 90 days which may be extended to up to 365 days if certain circumstances are met. During this moratorium period, no payment occurs to creditors and no claim can be enforced against a guarantor.

The allocation of proceeds from the sale of a pledged asset in bankruptcy proceedings of a Russian entity is made as follows:

(a)     The secured creditor receives the lesser of (a) 70 percent of the gross proceeds (80 percent for bank or other financial creditors enforcing loan agreements), or (b) the full amount of the outstanding principal and interest; and

(b)     Thirty percent of the gross proceeds (20 percent for bank or other financial creditors) are transferred to a special bank account of the debtor and applied as follows: (a) Two-thirds of this amount (that is, 20 percent of the gross proceeds) are paid to employees and individuals with salary and health claims, if the debtor's other assets are insufficient to satisfy such claims (or 15 percent of the gross proceeds in the case of bank or other financial creditors). Any funds remaining revert to the relevant secured creditor, and after the debt is satisfied in full, any balance is included in the general bankruptcy estate of the debtor; and (b) Ten percent of the gross proceeds are used to pay the court-appointed trustee (referred to in an arbitration manager) and for other court-related costs, or 5 percent of gross proceeds in the case of bank or other financial creditors. After such costs are compensated in full, any balance is included in the general bankruptcy estate of the debtor.

*Luxembourg*

Lion/Rally Lux 1 S.A., Lion/Rally Lux 2 S.à r.l. and Lion/Rally Lux 3 S.à r.l. are incorporated under the laws of Luxembourg, and as such any insolvency proceedings applicable to such companies are in principle governed by Luxembourg law. The insolvency laws of Luxembourg may not be as favorable to your interests as creditors as the laws of the United States or other jurisdictions with which you may be familiar.

Under Luxembourg law, the following types of proceedings (collectively referred to as "insolvency proceedings") may be opened against a company with registered office in Luxembourg having its centre of main interests in Luxembourg or an establishment within the meaning of the EU Insolvency Regulation (in relation to secondary proceedings):

(a)     bankruptcy proceedings (faillite), the opening of which may be requested by the company, by any of its creditors or by the Luxembourg public prosecutor. Following such a request, the courts having jurisdiction may open bankruptcy proceedings if the company (i) is in a state of cessation of payments (cessation des paiements) and (ii) has lost its commercial creditworthiness (ébranlement de crédit). If a court finds that these conditions are satisfied, it may open bankruptcy proceedings ex officio (absent a request made by the company or a creditor). The main effect of such proceedings is the suspension of all measures of enforcement against the company, except, subject to certain limited exceptions, for enforcement by secured creditors and the payment of the secured creditors in accordance with their rank upon realization of the assets;

(b)     controlled management proceedings (*gestion contrôlée*), the opening of which may only be requested by the company and not by its creditors and under which a court may order a provisional suspension of payments, including a stay of enforcement of claims by secured creditors; or

(c)     composition proceedings (concordat préventif de faillite), the opening of which may only be requested by the company (subject to obtaining the prior consent of the majority of its creditors holding 75% at least of the claims against such company) and not by its creditors themselves. The court's decision to admit a company to composition proceedings triggers a provisional stay on enforcement of claims by creditors. Except as provided for in the Luxembourg Collateral Law, while the composition is being negotiated, unsecured creditors may not take action against the company to recover their claims. Secured creditors who do not participate in the composition proceedings may take action against the company to recover their claims and to enforce their security.

In addition to these proceedings, your ability to receive payment may be affected by a decision of a court to grant a reprieve from payments (*sursis de paiement*) or to put the company into judicial liquidation (*liquidation judiciaire*). Judicial liquidation proceedings may be opened at the request of the public prosecutor against companies pursuing an activity that violates criminal laws or that are in serious breach or violation of the commercial code or of the Companies Act. The management of such liquidation proceedings will generally follow rules similar to those applicable to bankruptcy proceedings. Liability of the company in respect of the relevant debt will, in the event of a liquidation of the company following bankruptcy or judicial liquidation proceedings, only rank after the cost of liquidation (including any debt incurred for the purpose of such liquidation) and those debts of the relevant entity that are entitled to priority under Luxembourg law. Preferential debts under Luxembourg law include, among others:

(a)     certain amounts owed to the Luxembourg revenue;

(b)     VAT and other taxes and duties owed to the Luxembourg customs and excise;

(c)     social security contributions; and

(d)     remuneration owed to employees.

For the avoidance of doubt, the above list is not exhaustive.

Assets over which a security interest has been granted will in principle not be available for distribution to unsecured creditors (except after enforcement and to the extent a surplus is realized), and subject to application of the relevant priority rule and liens and privileges arising mandatorily by law.

During such insolvency proceedings, all enforcement measures by unsecured creditors are suspended. The ability of certain secured creditors to enforce their security interest may also be limited, particularly in the event of controlled management proceedings providing expressly that the rights of secured creditors are frozen until a final decision has been taken by the court as to the petition for controlled management, and may be affected thereafter by a reorganization order given by the court. A reorganization order requires the prior approval by more than 50% of the creditors representing more than 50% of the relevant Luxembourg company's liabilities in order to take effect. Furthermore, declarations of default and subsequent acceleration (such as acceleration upon the occurrence of an event of default) may not be enforceable during controlled management proceedings.

Luxembourg insolvency law may affect transactions entered into or payments made by the company during the period before bankruptcy, the ''suspect period'' (*periode suspecte*), which is a maximum of six months from the date on which the Luxembourg commercial court formally adjudicates a person bankrupt and, as for specific payments and transactions, during an additional period of ten days before the commencement of such period preceding the judgment declaring bankruptcy, except that in certain specific situations the court may set the start of the suspect period at an earlier date, if the bankruptcy judgment was preceded by another insolvency proceeding (e.g., a suspension of payments or controlled management proceedings) under Luxembourg law.

In particular:

(a)     pursuant to article 445 of the Luxembourg Code of Commerce (*code de commerce*), specified transactions (such as the granting of a security interest for antecedent debts, save in respect of financial collateral arrangements within the meaning of the Luxembourg Collateral Law; the payment of debts that have not fallen due; whether payment is made in cash or by way of assignment, sale, set-off or by any other means; the payment of debts that have fallen due by any means other than in cash or by a bill of exchange; or the sale of assets without consideration or with substantially inadequate consideration) entered into during the suspect period (or the ten days preceding it) must be set aside or declared null and void, if so requested by the insolvency receiver;

(b)     pursuant to article 446 of the Luxembourg Code of Commerce (*code de commerce*), payments made for matured debts as well as other transactions concluded for consideration during the suspect period are subject to cancellation by the court upon proceedings instituted by the insolvency receiver if they were concluded with the knowledge of the bankrupt party's cessation of payments;

(c)     regardless of the suspect period, article 448 of the Luxembourg Code of Commerce (*code de commerce*) and article 1167 of the Civil Code (*action paulienne*) give the bankruptcy receiver (acting on behalf of the creditors) the right to challenge any fraudulent payments and transactions, including the granting of security with an intent to defraud, made prior to the bankruptcy without any time limit; and

(d)     pursuant to Article 21(2) of the Luxembourg Collateral Law, a financial collateral arrangement entered into after the opening of liquidation proceedings or the coming into force of reorganization measures or the entry into force of such measures is valid and binding against third parties, administrators, insolvency receivers or liquidators notwithstanding the suspect period referred to in Articles 445 and 446 of the Luxembourg Code of Commerce (*code de commerce*), if the collateral taker proves that it was unaware of the fact that such proceedings had been opened or that such measures had been taken or that it could not reasonably be aware of it.

In principle, a bankruptcy order rendered by a Luxembourg court does not result in automatic termination of contracts except for *intuitu personae* contracts, that is, contracts for which the identity of the company or its solvency were crucial. The contracts, therefore, subsist after the bankruptcy order. However, the insolvency receiver may choose to terminate certain contracts so as to avoid worsening the financial situation of the company. As of the date of adjudication of bankruptcy, no interest on any unsecured claim will accrue vis-á-vis the bankruptcy estate. Insolvency proceedings may therefore have a material adverse effect on a Luxembourg company's business and assets and the Luxembourg company's respective obligations under the New Senior Secured Notes.

The bankruptcy receiver decides whether or not to continue performance under ongoing contracts (i.e., contracts existing before the bankruptcy order). The bankruptcy receiver may elect to continue the business of the debtor, provided the bankruptcy receiver obtains the authorization of the court and such continuation does not cause any prejudice to the creditors. However, two exceptions apply:

(a)     the parties to an agreement may contractually agree that the occurrence of a bankruptcy constitutes an early termination or acceleration event; and

48

(b)     *intuitu personae* contracts (i.e., contracts whereby the identity of the other party constitutes an essential element upon the signing of the contract) are automatically all terminated as of the bankruptcy judgment since the debtor is no longer responsible for the management of the company. Parties can agree to continue to perform under such contracts.

The bankruptcy receiver may elect not to perform the obligations of the bankrupt party that are still to be performed after the bankruptcy under any agreement validly entered into by the bankrupt party prior to the bankruptcy. The counterparty to that agreement may make a claim for damages in the bankruptcy and such claim will rank *pari passu* with claims of all other unsecured creditors and/or seek a court order to have the relevant contract dissolved. The counterparty may not require specific performance of the contract.

### Enforcing legal liability against us and our directors and officers might be difficult.

We are organized under the laws of the State of Delaware of the United States and we and the Issuer of the New Senior Secured Notes will become New York corporations prior to the Effective Date. Therefore, investors are able to effect service of process in the United States upon us and may be able to effect service of process upon our directors and executive officers. We are a holding company, however, and substantially all of our operating assets are located in Poland, Russia and Hungary. Further, most of our directors and executive officers, and those of most of our subsidiaries, are non-residents of the United States, and our assets and the assets of our directors and executive officers are located outside the United States. The Russian courts will not recognize or enforce any judgment obtained in the courts of any other country unless such enforcement is envisaged by an international treaty to which Russia is a party or by an "ad hoc" treaty in effect between such country and Russia providing for enforcement of such judgments on a reciprocal basis and only in accordance with the terms of such treaty. Russia is not a party to any such treaty with the United States. As a result, you may not be able to enforce against our assets (or those of certain of our directors or executive officers) judgments of United States courts predicated upon the civil liability provisions of United States laws, including federal securities laws of the United States. In addition, awards of punitive damages in actions brought in the United States or elsewhere may not be enforceable in Poland or Russia.

Additionally, the courts of the respective jurisdictions may have exclusive jurisdiction in certain matters. In particular, without limitation, Polish courts have exclusive jurisdiction in any matters related to rights to real properties located in Poland (ownership and other rights in rem) or the possession of such real properties. In such matters judgments of any courts other than Polish courts will not be recognized or enforced in Poland.

There is no international treaty between Hungary and the United States regarding the recognition and execution of non-arbitral decisions. In addition, there is no reciprocity between Hungary and the United States with respect to commercial matters either. A decision of a U.S. court will be recognized in Hungary and enforced against a Hungarian guarantor only if the jurisdiction of the U.S. court rendering the decision had been agreed by the parties in writing. There is no international treaty between Poland and the United States regarding the recognition and enforcement of court judgments (non-arbitral awards). A foreign court judgment issued by the courts of New York may be enforceable in Poland subject to an enforcement order given by the Polish court. The Polish court will issue the enforcement order with respect to a foreign court judgment (e.g. the court of New York) only if the judgment is enforceable in a country in which the judgment was issued and none of the following circumstances exist: (i) such judgment is not final in the country where it was issued; (ii) it was issued in a case which belongs to the exclusive jurisdiction of Polish courts; (iii) the defendant, who has not engaged in dispute as to the substance of the matter, has not been served with a letter initiating the proceedings in a due manner and in a time enabling him to defend his rights; (iv) a party has been deprived of the right to defend its rights in the course of proceedings; (v) an action based on the same claim and between the same parties was filed with the Polish court (or any other competent Polish authority) before being filed with the foreign court; (vi) a judgment, issued in the case based on the same claim and between the same parties, is contrary to the previous final judgment of the Polish court (or any other competent Polish authority) or a previous final judgment of the foreign court (or any other competent foreign authority) provided that such earlier foreign court judgment (or decision of any other competent foreign authority) fulfills the conditions necessary for its recognition by the Polish court; or (vii) the enforcement of the judgment would be contrary to the basic principles of the legal order in Poland (ordre publique).

**Risks Related to the Chapter 11 Case and the Plan of Reorganization**

*The commencement of a Chapter 11 case for the purpose of implementing the Plan of Reorganization may result in a number of adverse consequences.*

**The Chapter 11 environment may adversely affect our business model.**

We are principally engaged in producing and exporting alcoholic beverages through our operating subsidiaries. Although we intend to continue to produce and export alcoholic beverages to our customers in the normal course, there can be no assurances that counterparties will continue to conduct business with us while we are in Chapter 11. While we have the support from the Supporting Noteholders and we have received positive reaction from our customers and other creditors for the proposed restructuring, any failure to continue to conduct business in the ordinary course could have a material adverse effect on us.

**If we are unable to proceed with the Plan of Reorganization, we may seek an alternative restructuring.**

If we obtain the requisite votes to accept the Plan of Reorganization in accordance with the requirements of the Bankruptcy Code, the Debtors may file voluntary petitions for reorganization under Chapter 11 of the Bankruptcy Code and seek, as promptly as practicable thereafter, confirmation of the Plan of Reorganization. In the event we are unable to proceed with the Plan of Reorganization, we may or may not file petitions for relief under Chapter 11 or Chapter 7 of the Bankruptcy Code. In such event, we may seek to accomplish an alternative restructuring of our obligations to creditors.

**If we receive the requisite votes to accept the Plan of Reorganization and file for bankruptcy under Chapter 11 of the Bankruptcy Code, there can be no assurance that the Bankruptcy Court will confirm the Plan of Reorganization.**

Although the Debtors may obtain the requisite votes to accept the Plan of Reorganization, there can be no assurance that parties will not seek to oppose confirmation of the Plan of Reorganization or that the Bankruptcy Court may otherwise decline to confirm the Plan of Reorganization.

**If the Plan of Reorganization is confirmed, there can be no assurance that the Effective Date of the Plan of Reorganization will occur.**

Although we believe that the Effective Date of the Plan of Reorganization will occur reasonably soon after the date the Plan of Reorganization is confirmed, there can be no assurance as to such timing or as to whether it will occur.

**If we file for bankruptcy under Chapter 11 of the Bankruptcy Code and seek confirmation of the Plan of Reorganization, there can be no assurance that the Bankruptcy Court will approve the classification scheme in the Plan of Reorganization.**

The Bankruptcy Court, which sits as a court of equity, may exercise substantial discretion in connection with the Plan of Reorganization. Section 1122 of the Bankruptcy Code requires that a plan of reorganization classify claims against, and interests in, the debtor(s). The Bankruptcy Code also provides that a plan of reorganization may place a claim or interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class. We believe that all claims and interests have been appropriately classified in the Plan of Reorganization. There can be no assurance, however, that the Bankruptcy Court will conclude that such claims and interests are properly classified in the Plan of Reorganization.

**If the Bankruptcy Court determines that our solicitation of the votes on the Plan of Reorganization did not comply with the requirements of the Bankruptcy Code, we may need to resolicit acceptances which would delay confirmation of the Plan of Reorganization.**

Section 1126(b) of the Bankruptcy Code provides that the holder of a claim against, or interest in, a debtor who accepts or rejects a plan before the commencement of a Chapter 11 case is deemed to have accepted or rejected such plan under the Bankruptcy Code so long as the solicitation of such acceptance was made in accordance with applicable nonbankruptcy law governing the adequacy of disclosure in connection with such solicitations, or, if such

laws do not exist, such acceptance was solicited after disclosure of "adequate information", as defined in section 1125 of the Bankruptcy Code. In addition, Bankruptcy Rule 3018(b) provides that a holder of a claim or interest who has accepted or rejected a plan before the commencement of the case under the Bankruptcy Code will not be deemed to have accepted or rejected the plan if the court finds after notice and a hearing that the plan was not transmitted in accordance with reasonable solicitation procedures.

We believe that our solicitation of votes to accept or reject the Plan of Reorganization is proper under applicable non-bankruptcy law, rules, and regulations, and contains adequate information as defined by section 1125(a) of the Bankruptcy Code. We cannot be certain, however, that the solicitation of acceptances or rejections will be approved by the Bankruptcy Court. The Bankruptcy Court may decide that the solicitation failed to meet the requirements of section 1126(b) of the Bankruptcy Code. If the Bankruptcy Court determines that the solicitation did not comply with the requirements of section 1126(b) of the Bankruptcy Code, we may seek to resolicit acceptances, and, in that event, confirmation of the Plan of Reorganization could be delayed and possibly jeopardized.

***Our actual financial results may vary significantly from the projections filed with the Bankruptcy Court***

This Offering Memorandum and Disclosure Statement contain projected financial information that demonstrate the feasibility of the Plan of Reorganization and our ability to continue operations upon emergence from proceedings under the Bankruptcy Code. The information was prepared for the limited purpose of furnishing recipients of the Offering Memorandum and Disclosure Statement with adequate information to make an informed judgment regarding acceptance of the Plan of Reorganization, and was not prepared for the purpose of providing the basis for an investment decision relating to the New Senior Secured Notes and the New Common Stock. The projections should not be relied upon in any way or manner in connection with the Plan of Reorganization and should not be regarded as representations or warranties by us or any other person as to the accuracy of such information or that any such projections or valuations will be realized. Those projections will not be updated on an ongoing basis, and they were not audited or reviewed by independent accountants. They reflect numerous assumptions concerning our anticipated future performance and with respect to prevailing and anticipated market and economic conditions that were, and remain, beyond our control. Projections are inherently subject to substantial and numerous uncertainties and to a wide variety of significant business, economic and competitive risks, and the assumptions underlying the projections may be wrong in material respects. Actual results may vary and may continue to vary significantly from those contemplated by the projections. As a result, you should not rely on those projections in deciding whether to vote for or against the Plan of Reorganization.

**Risks Related to our Business**

***We are exposed to exchange rate risks that could have a material adverse effect on our financial results and financial condition.***

Our functional currencies are primarily the Polish zloty, the Russian ruble and the Hungarian forint. Our reporting currency, however, is the U.S. dollar, and the translation effects of fluctuations in exchange rates of our functional currencies into U.S. dollars may materially impact our financial results and financial condition and may affect the comparability of our results between financial periods.

A substantial portion of our borrowings are denominated in U.S. dollars. Almost 45% and 30% of our net revenues for 2015 and the nine months ended September 30, 2016, respectively, were denominated in Russian rubles. Movements in the exchange rate of the U.S. dollar against the Russian ruble could therefore increase the amount of cash, in Russian rubles, which needs to be generated in order to pay principal and interest on our dollar-denominated borrowings. We have not entered into any arrangements to reduce exchange risk with respect to the remaining future U.S. dollar denominated payments on our existing indebtedness. The recent devaluation of the Russian ruble increases the portion of our cash flows from operations that we must devote to debt service on our U.S. dollar obligations. The Russian ruble weakened by approximately 20.27% against the U.S. dollar from December 31, 2014 to RUB 70.0678 to the U.S. dollar as of December 31, 2015. The Russian ruble further slightly strengthened to RUB 67.7297 to the U.S. dollar, as of September 30, 2016. Additionally the Polish zloty also depreciated against the U.S. dollar since December 31, 2014 by approximately 11.23% to PLN 3.9011 to the U.S. dollar as of December 31, 2015. The Polish zloty slightly strengthened to PLN 3.7590 against the U.S. dollar, as of September 30, 2016.

***We operate in highly competitive industries.***

The alcoholic beverages production and distribution industries in our markets are highly competitive. The principal competitive factors in these industries include product range, pricing, distribution capabilities and responsiveness to consumer preferences, with varying emphasis on these factors depending on the market and the product.

In Russia, hypermarket and large retail chains are continuing to grow their share of the market. Traditional trade outlets typically provide us with higher margins from sales than hypermarkets and large retail chains, which have higher bargaining power. There is a risk that the expansion of hypermarkets and large retail chains will continue to occur in the future together with the natural decline in the number of traditional outlets selling alcoholic beverages due to the strengthening of the rules on alcohol licensing, thus reducing the margins that we can achieve from sales to wholesalers that primarily serve the traditional trade. We have started discussing the issue with both officials and major chains to move to a discount structure based on net price (excluding excise tax) or fixed payments per volume unit sold. The idea is highly supported by the major vodka producers and now by the government which has already announced the intention to introduce changes in the calculation of retailer rebates from a revenue included excise tax to a product price based revenue that excludes excise tax.

Russia has seen rapid growth of the Status Group company that sells vodka at cheap prices (at a legal minimum price of 185 Russian ruble). This is possible due to semi-legal excise rebates implemented by the local authorities in several regions of Russia. Had we sold at such prices, it would have generated a negative margin. In March 2016, the Status Group began experiencing government pressure in relation with their semi-legal schemes, and as a result, we have already seen improvement in the mainstream legal vodka segment in the second half of 2016.

As a manufacturer of vodka in Poland and Russia, we face competition from other local producers. We compete with other alcoholic and nonalcoholic beverages for consumer purchases in general, as well as shelf space in retail stores, restaurant presence and distributor attention. In addition, we compete for customers on the basis of the brand strength of our products with respect to our competitors' products. Our success depends on maintaining the strength of our consumer brands by continuously improving our offerings and appealing to the changing needs and preferences of our customers and consumers. While we devote significant resources to the continuous improvement of our products and marketing strategies, it is possible that our competitors' actions may adversely affect our sales, margins and profitability.

***Changes in the prices of supplies and raw materials could have a material adverse effect on our business.***

Prices of raw materials used for vodka production may increase in the future, while our inability to pass these increases on to our customers could reduce our margins and profits and have a material adverse impact on our business. We cannot guarantee that the price of raw materials will not continue to increase and that we will not lose the ability to maintain our inventory of raw materials, either of which would have a material adverse impact on our financial condition and the results of operations, as we may not be able to pass this cost on to the consumers.

The significant devaluation of the Russian ruble negatively affected our import business and some of the raw materials driven by double-digit price increase, thereby damaging volumes. Continuing devaluation of the Russian ruble could have an adverse effect on our business and future results of operations.

***Reliance on single source suppliers could have a material adverse effect on our business and our financial results.***

In Russia, because we have one dominant spirit supplier, we have an increased risk of supply disruptions and price increases. If we experience supply disruptions, we may not be able to develop alternative sourcing in a timely manner. Any disruption to our production schedule caused by a shortage of raw materials could adversely affect our business. If our raw material suppliers increase prices, we may not be able to find an economically feasible alternative in the short term, especially for spirits, due to the high level of regulation and consolidation of suppliers. Any increased costs caused by an increase in raw material costs could adversely affect our financial results.

***We are subject to extensive government regulation and are required to obtain and renew various permits and licenses; changes in or breaches of laws or regulations or the failure to obtain or renew permits and licenses could materially adversely affect our business and profitability.***

Our business of producing, importing and distributing alcoholic beverages in Poland and Hungary is subject to regulation by national and local governmental agencies and European Union authorities. In addition, our business in Russia is subject to extensive regulation by the Russian authorities. These regulations and laws address such matters as licensing and permit requirements, regarding the production, storage and import of alcoholic products, competition and anti-trust matters, trade and pricing practices, taxes, distribution methods and relationships, required labeling and packaging, advertising, sales promotion and relations with wholesalers and retailers. A loss of production capacity due to regulatory issues can adversely affect our sales and increase our operating costs as we attempt to increase production at other facilities during that time to offset the lost production. It is possible that these and other similar issues will adversely affect our sales and operating costs. Additionally, new or revised regulations or requirements or increases in excise taxes, customs duties, income taxes or sales taxes could materially adversely affect our business, financial condition and results of operations.

In addition, we are subject to numerous environmental and occupational, health and safety laws and regulations in the countries in which we operate. We may incur significant costs to maintain compliance with evolving environmental and occupational, health and safety requirements, to comply with more stringent enforcement of existing applicable requirements or to defend against challenges or investigations, even those without justification. Future legal or regulatory challenges to the industry in which we operate or our business practices and arrangements could give rise to liability and fines, or cause us to change our practices or arrangements, which could have a material adverse effect on us, our revenues and our profitability.

Governmental regulation and supervision, as well as future changes in laws, regulations or government policy, such as deoffshorization in Russia (or in the interpretation of existing laws or regulations), which affect us, our competitors or our industry generally, strongly influence our viability and how we operate our business. Complying with existing laws, regulations and government policy is burdensome and future changes may increase our operational and administrative expenses and limit our revenues.

Additionally, governmental regulatory and tax authorities have a high degree of discretion and may, at times, exercise this discretion in a manner which is in conflict with the law or established practices. Such conduct can be more prevalent in jurisdictions with less developed or evolving regulatory systems, such as Russia. Our business would be materially and adversely affected if there were any adverse changes in the relevant laws or regulations or in their interpretation or enforcement. Our ability to introduce new products and services may also be affected if we cannot predict how existing or future laws, regulations or policies would apply to such products or services.

***We are subject to Russian regulatory requirements that we obtain bank guarantees for the payment of statutory excise duties, the loss of which would have a material adverse impact on our business and financial condition.***

Under Russian law, before purchasing ethanol for manufacturing alcohol and excisable ethanol-containing products, Russian manufacturers of alcohol and excisable ethanol-containing products are required to make an advance payment of the applicable statutory excise duty to the state budget in the Russian Federation. The advance payment is to be made before the 15th day of the current tax period on the basis of the total volume of the alcohol/ethanol-containing products to be purchased (transferred) by the manufacturers within the tax period following the current tax period.

In order to be exempted from making an advance payment of the applicable statutory excise duty, manufacturers are required to submit a bank guarantee to the local tax authority, which is issued by an appropriate bank on behalf of the manufacturer and notify such tax authority of the exemption from the obligation to make the advance payment of the applicable statutory excise duty. A bank guarantee and notice of exemption from making an advance payment of excise duty must be submitted to the tax authority no later than on the 18th day of the current tax period.

The bank guarantee must satisfy the following requirements:

- the term of the bank guarantee must be no less than six months from the tax period in which the ethanol was purchased. After the taxpayer has paid the applicable statutory excise duty, the tax authority notifies the bank issuing the guarantee about the release from this guarantee; and

- the amount for which a bank guarantee is granted must secure the full amount of the liability from the excise duty to be paid as the advance payment.

We currently have all required bank guarantees for the payment of statutory excise duties. Loss of the bank guarantees could lead to liquidity problems, which would have a material adverse impact on our business and financial condition.

### *We may lose our excise guarantee exemption in Poland.*

In order to be exempted from making an advance payment of the applicable statutory excise duty in Poland, manufacturers need to submit a bank guarantee to the tax authority, which is issued by an appropriate bank for the manufacturer. We are currently exempt from providing bank guarantees up to the limit of 800 million Polish zlotys. In order to retain this exemption, we need to maintain a generally solid financial position and we are obliged to punctually submit CEDC International Sp. z o.o.'s statutory financial statements to the tax authority, among other formal requirements. Recently, in March 2016, we obtained a two-year renewal of the exemption. However, in the future, if we do not submit the financial statements on time, we may lose the exemption and, if this happens, we may have difficulties in obtaining the required bank guarantees.

### *We may not be able to protect our intellectual property rights.*

We own and license trademarks (for our product names and packaging, among other things) and other intellectual property rights that are important to our business and competitive position, and we endeavor to protect them. However, we cannot guarantee that the steps we have taken or will take will be sufficient to protect our intellectual property rights or to prevent others from seeking to invalidate our trademarks or block sales of our products as a breach of the third party trademarks and intellectual property rights. In addition, we cannot guarantee that third parties will not breach or misappropriate our rights, imitate our products, or assert rights in, or ownership of our trademarks and other intellectual property rights or marks that are similar to ours or marks that we license or market. In some cases, there may be trademark proprietors who hold prior rights to our marks or to similar marks. Moreover, Russia generally offers less intellectual property protection than Western Europe or North America. We are currently involved in opposition and cancellation proceedings with respect to trademarks that are similar to some of our brands and other proceedings, both in Poland and elsewhere. If we are unable to protect our intellectual property rights against infringement or misappropriation, or if others assert rights in or seek to invalidate our intellectual property rights, this could materially harm our future financial results and our ability to develop our business.

### *We have incurred and may, in the future, incur impairment charges on our trademarks and goodwill.*

At September 30, 2016, the Company had goodwill and other intangible assets of $362.1 million, which constituted 39.6% of our total assets. While we believe the estimates and judgments about future cash flows used in the goodwill impairment tests are reasonable, we cannot provide assurance that future impairment charges will not be required if the expected cash flow estimates as projected by management are not realized, especially if a recession takes place and continues for a longer period or becomes severe, or if acquisitions made by the Company fail to achieve expected returns or there is a force majeure or trade or other sanctions. We incurred impairment charges in 2013 and each of the preceding three years. In 2014 and 2015 the Company did not recognize any impairment charges related to our goodwill and trademarks, although we cannot guarantee that we will not recognize further impairment charges in the future. If we incur impairment charges on our trademarks and goodwill, it could materially impact our financial results.

### *Our import contracts and agency brand contracts and licenses may be terminated.*

As a leading importer of major international brands of alcoholic beverages in Poland and Hungary, we have been working with the same suppliers in those countries for many years and either have verbal understandings or

written distribution agreements with them. Where a written agreement is in place, it is usually valid for between one and five years.

Although we believe we are currently in compliance with the terms and conditions of our import and distribution agreements, there is no assurance that all of our import agreements will continue to be renewed on a regular basis, or that, if they are terminated, we will be able to replace them with alternative arrangements with other suppliers. Moreover, our ability to continue to distribute imported products on an exclusive basis depends on some factors which are out of our control, such as ongoing consolidation in the wine, beer and spirit industry worldwide, or producers' decisions from time to time to change their distribution channels, including in the markets in which we operate. If our import and agency brands contracts or licences are terminated, it may adversely affect our business and future financial results.

***Our business, results of operations and financial condition may be adversely affected if we acquire businesses that do not perform as we expect or which are difficult for us to integrate.***

At any particular time, we may be in various stages of assessment, discussion and negotiation with regard to one or more potential acquisitions, not all of which will be consummated. We make public disclosure of pending and completed acquisitions when appropriate and required by applicable securities laws and regulations and as required under the indentures.

Acquisitions involve numerous risks and uncertainties. If we complete one or more acquisitions, our results of operations and financial condition may be affected by a number of factors, including the failure of the acquired businesses to achieve the financial results we have projected in either the near or long term, the assumption of unknown liabilities, the fair value of assets acquired and liabilities assumed, the difficulties of imposing adequate financial and operating controls on the acquired companies and their management and the potential liabilities that might arise pending the imposition of adequate controls, the challenges of preparing and consolidating financial statements of acquired companies in a timely manner, the difficulties in integration of the operations, technologies, services and products of the acquired companies and the failure to achieve the strategic objectives of these acquisitions. In addition, we may acquire a significant, but non-controlling stake in a business, which could expose us to the risk of decisions taken by the acquired business' controlling shareholder. Acquisitions involve unique risks in addition to those mentioned above, including those related to the integration of operations across different cultures and languages, exchange risks and the particular economic, political, and regulatory risks associated with specific countries.

Future acquisitions or mergers may result in a need to issue additional equity securities, spend our cash, or incur debt, liabilities or amortization expenses related to intangible assets, any of which could reduce our profitability.

***The economy in Russia may materially adversely affect our business and results of operations.***

In 2015, the Russian economy was significantly hit by crisis due to strained relationship with the United States and the European Union countries, which led to economic sanctions. As a result, many economic indicators dropped significantly. For example, in 2015, Russia's gross domestic product decreased to a negative 4% according to the latest Rosstat data. Russian ruble devaluation led to inflation increase which was about 11% in 2015; as a result, there were price increases for almost all products. Since March 2015, wage arrears have been showing double-digit growth, amounting to 61% in November 2015 compared with November 2014. Consumers started to buy more on promotion due to the continued negative trend in 2015. Russia retail sales reversed from positive growth of 5% in 2014 to a deep decline of 12% in 2015, according to the latest Rosstat data. The Russian alcohol market showed a significant decline in all categories in 2015. Russian ruble devaluation and the decline in purchasing power led to a significant decline of imported alcohol in the Russian market. Whiskey, the biggest import category in Russia, fell by 22% in 2015 compared with the previous year. Imported vodka sales dropped four times in 2015 compared with 2014. Still and sparkling wine sales decreased by 33% and 34%, respectively, in 2015 compared with 2014 according to Federal Customs Service data. In the second half of 2016 we have seen improving economic conditions, a growing legal vodka market, and in September and October, growth in Roust Russia sales.

***The developing legal and tax systems in Russia create a number of uncertainties that could have a materially
adverse effect on our business.***

Russia is still developing the legal framework required to support a market economy, which creates
uncertainty related to our Russian business. Risks related to the developing legal system in Russia include:

- inconsistencies between and among the constitution, federal and regional laws, presidential and
governmental decrees, ministerial and local orders, decisions, resolutions and other acts;

- conflicting local, regional and federal rules and regulations;

- the lack of judicial and administrative guidance on interpreting legislation;

- the relative lack of experience of judges and courts in interpreting legislation;

- the lack of an independent judiciary;

- a high degree of discretion on the part of governmental authorities, which could result in arbitrary
or selective actions against us, including the suspension or termination of the licenses we need to
operate in Russia;

- poorly developed bankruptcy procedures that are subject to abuse; and

- incidents of crime or corruption that could disrupt our ability to conduct our business effectively.

The recent nature of much of Russian legislation, the lack of consensus about the scope, content and pace
of economic and political reform and the rapid evolution of this legal system in ways that may not always coincide
with market developments cast doubt over the enforceability and underlying constitutionality of laws and result in
ambiguities, inconsistencies and anomalies. Any of these factors could have a material adverse effect on our Russian
business.

The tax system in Russia is unpredictable and gives rise to significant uncertainties, which complicate our
tax planning and decisions related to our Russian businesses. Tax laws in Russia have been in force for a relatively
short period of time as compared to tax laws in more developed market economies and we have less experience
operating under Russian tax regulations than those of other countries.

Russian companies are subject to a broad range of taxes imposed at the federal, regional and local levels,
including but not limited to value added taxes, excise duties, income taxes, payroll-related taxes, property taxes, and
taxes or other liabilities related to transfer pricing and other taxes. Russia's federal and local tax laws and
regulations are subject to frequent change, varying interpretations and inconsistent or unclear enforcement. Excise
stamps are typically purchased every two to three weeks from the Russian authorities and need to be purchased
before the production of any vodka. Without these stamps, which must be affixed to each container of an alcoholic
beverage of over 9% alcohol by volume produced in Russia, factories are unable to produce vodka. Such loss of
production capacity can negatively affect our sales and increase our costs as we attempt to increase production at
other facilities to offset the lost production.

In addition, it is not uncommon for differing opinions regarding the interpretation of laws to exist between
companies which are subject to such taxes, ministries and organizations of the Russian government and different
branches of the Russian government, such as the Federal Tax Service and its various local tax inspectorates,
resulting in uncertainties and areas of conflict. Tax declarations are subject to review and investigation by a number
of tax authorities, which are legally entitled to impose penalties and interest charges. The fact that a tax declaration
has been audited by tax authorities does not bar that tax return, or any other tax declaration which is applicable to
that year, from a further tax audit by a superior tax authority during a three-year period. As previous audits do not
rule out subsequent claims relating to the audited period, the statute of limitations is not entirely effective. In some
instances, even though it may potentially be considered unconstitutional, Russian tax authorities have applied certain
taxes retroactively. Over the past few years, the Russian tax authorities appear to be taking a more aggressive stance
in their interpretation of the legislation and assessments, and it is possible that transactions and activities that have

not been challenged in the past may be challenged. As a result, significant additional taxes, penalties and interest may be assessed. In addition, our Russian business is and will be subject to periodic tax inspections that may result in tax assessments and additional amounts owed by us for prior tax periods. The uncertainty related to Russian transfer pricing rules and the new deoffshorization legislation could lead the tax authorities to the imposition of significant additional tax liabilities as a result of transfer pricing adjustments or other similar claims and could have a material adverse impact on our Russian businesses and our Company as a whole.

***Frequent changes in Polish tax regulations may have an adverse impact on the results of our operations and financial condition.***

The Polish tax system is subject to frequent changes. Tax laws in Poland may need to be amended in order to implement new European Union legislation. The current Polish Government is particularly focused on collectability of taxes which may result in tougher tax audits. The frequent changes in tax regulations and resulting uncertainties related to tax law application have had and may, in the future, have negative effects on our business. In addition, it shall be also note that as of July 15, 2016 a General Anti-Avoidance Clause has been introduced to the Polish tax law. Pursuant to the wording of General Anti-Avoidance Clause, a transaction performed mainly for the purpose of obtaining tax benefit, in a given circumstances contradicting to the object and purpose of the tax law, should not result in a tax benefit, if the manner of actions of the taxpayer was artificial (tax avoidance).

***Continued significant increases in excise tax may either reduce overall demand for vodka or reduce our margins.***

Excise tax increases require us to raise prices, which, in turn, could reduce demand for our products as price-sensitive consumers shift to lower cost products. In addition, because our rebates to customers are based on a percentage of gross sales revenue, an increase in excise tax without a corresponding price increase will negatively affect our gross margins.

Despite no expected increases in excise tax in Russia and Poland in 2017, the imposition of such tax increases is a significant business risk for our industry that may adversely affect our sales volumes and reduce our margins.

***We may be required to seek additional financing to meet our future capital needs and our failure to raise capital when needed could harm our competitive position, business, financial condition and results of operations.***

From time to time, our business may require additional capital. In the future, it is possible that we will be required to raise additional funds through public or private financing, collaborative relationships or other arrangements. Our Existing Notes mature in 2018 and, if the Plan of Reorganization is successful the New Senior Secured Notes will mature in 2022, and we expect that we will need to refinance any outstanding notes at, or prior to, maturity. In the late 2000s global credit markets and the financial services industry experienced a period of unprecedented turmoil, characterized by the bankruptcy, failure or sale of various financial institutions and an unprecedented level of intervention from the United States and other governments. These events led to unparalleled levels of volatility and disruption to the capital and credit markets and significantly adversely impacted global economic conditions, resulting in additional, significant recessionary pressures and further declines in investor confidence and economic growth. Despite significant government intervention, global investor confidence remained low and credit remained relatively scarce. Such disruptions in the financial markets, including the bankruptcy and restructuring of certain financial institutions, may adversely affect the availability of credit and cost of credit in the future. Accordingly, if we need to seek additional funding, we may be significantly restricted in our ability to attract public or private financing or financial partners or relationships as a source of additional capital. In addition, this additional funding, if needed, may not be available on terms attractive to us, if at all. Furthermore, any additional debt financing, if available, may involve restrictive covenants that could restrict our ability to raise additional capital or operate our business. Our failure to raise capital when needed could harm our competitive position, business, financial condition and results of operations.

***The Company may be subject to litigation or regulatory action that could be costly, protracted and divert management's attention, and harm our business.***

Companies in the alcoholic beverage industry are, from time to time, exposed to class action or other litigation relating to alcohol advertising, product liability, alcohol abuse problems or health consequences from the misuse of alcohol. We may also be subject to litigation arising from other litigation in the ordinary course of our operations. We are further subject to the risk of litigation by tax, customs and other regulatory authorities, including with respect to the methodology for assessing importation value, transfer pricing or compliance matters. Changes in the political and economic climate have resulted in an increased focus on tax collection in recent years, and tax authorities are showing an increased appetite to challenge the methodology used by multinational enterprises, even where it is compliant with international best practice guidelines.

These types of lawsuits and regulatory actions can be protracted, time-consuming, distracting to management and expensive and, whether or not the claims are ultimately successful, could ultimately have an adverse effect on our business, operating results and cash flows.

***Our failure to attract or retain key executive or employee talent could adversely affect our business.***

Our success depends upon the efforts and abilities of our senior management team, other key employees, and a high-quality employee base, as well as our ability to attract, motivate, reward, and retain them. Difficulties in hiring or retaining key executive or other employee talent, or the unexpected loss of experienced employees, could have an adverse impact on our business performance.

***Our results are linked to economic conditions and shifts in consumer preferences, including a reduction in the consumption of alcoholic beverages, which could have an adverse effect on our financial performance.***

Our results of operations are affected by the overall economic trends in Poland, Russia, Hungary and other regions in which we operate and sell our products, including the level of consumer spending, the rate of taxes levied on alcoholic beverages and consumer confidence in future economic conditions. The current market environment including consumer trends, raw spirit price increases, excise increases, volatility in energy costs, diminished liquidity and credit availability, weakened consumer confidence and falling consumer demand, have contributed to lower levels of consumer spending, including consumption of alcoholic beverages.

During the current period of volatility, reduced consumer confidence and spending may result in continued reduced demand for our products and may limit our ability to increase prices and finance marketing and promotional activities. These factors could have an adverse effect on our results of operations. We cannot guarantee that this will not lead to the recognition of asset impairments or that we will not experience declines in our financial performance in connection with continued market instability. A continued recessionary environment would probably make it more difficult to forecast operating results and to make decisions about future investments, while a major shift in consumer preferences or a significant reduction in sales of alcoholic beverages could have a material adverse impact on our business, financial condition and results of operations.

***Our business and results of operations may be adversely affected by geopolitical events in, and possible trade sanctions related to, the countries in which we operate.***

Our business may be adversely affected in the markets in which we operate by geopolitical events, trade disagreements, barriers to financial flows or unilateral economic actions by governments. Such events could affect our ability to fund our operations, make payments on our obligations or reduce our earnings and cash flows due to a rapid movement in the currencies in which we hold our debt, in particular our U.S. dollar denominated debt, versus our principal functional currencies: the Polish zloty, Russian ruble and Hungarian forint. We cannot predict how political events in our countries of operations will unfold or whether or how such developments might adversely affect our business and results of operations. We cannot guarantee that such developments and influences will not have an adverse effect on our business and results of operations.

***Our business and results of operations may be adversely affected by geopolitical events in Poland.***

The political risk in Poland after the last election won by the Law and Justice (PiS) party has increased noticeably, and this risk will not subside quickly. The new government is introducing a number of reforms (in the fields of, among others, social security system, public finance, state owned-property management and judicial system) the outcome of which is unknown, but may according to certain commentators significantly impact the business environment in Poland. The developments in the political situation in Poland may, among others, potentially negatively impact the currency exchange risk, the credit risk (including Poland's credit rating) as well as lead to sanctions being imposed by the European Union or other international bodies. Weakening Polish zloty causes decrease of our U.S. dollar denominated EBITDA. We cannot guarantee that further political development in Poland will not have an adverse effect on our business, financial condition and results of operations.

***We may not be able to extend our existing factoring arrangements.***

We use factoring arrangements to finance our working capital needs. We cannot guarantee that such financing will be available at the current amount and on similar terms, or at all. If we fail to extend our factoring arrangements on terms that are acceptable to us, this could substantially impair our ability to operate or have an adverse effect on our results of operations or financial condition.

***We may not be able to raise additional capital in the future.***

We may need to obtain additional financing to fund our business or refinance existing indebtedness, and our New Senior Secured Notes, and we cannot guarantee that such financing will be available in the amounts or on terms that acceptable to us, or at all. The short term liquidity pressure can now place at risk the ongoing value of the business cause working capital shortfalls, and create other legal risks to the business future operational performance. If we raise funds by incurring further debt, our operations and finances may become subject to further restrictions and we may be required to limit or cease our operations or capital expenditure activities, or otherwise modify our business strategy. If we fail to comply with financial or other covenants required in connection with any such financing or refinancing, our lenders may be able to exercise remedies that could substantially impair our ability to operate or have a material adverse effect on our results of operations or financial condition.

***Our suppliers may not extend payment terms any further, while our ability to make payments on time depends on cash generation which is further dependent on many factors, some of which are beyond our control.***

We currently are able to service our trade payables as agreed with suppliers. There can, however, be no assurance that our business will continue to generate cash flows at or above current levels. As described above in such case we might be unable to find the relevant source of financing on a timely manner. If we are unable to pay our suppliers on a timely manner, we may experience supply disruption. As a result, we may face out-of stock situation and not be able to maintain planned sales level. Such situation would adversely affect our business and future results of operation.

***Product recalls or other product liability claims could materially and adversely affect our sales.***

The success of our brands depends upon the positive image that consumers have of those brands. We could decide to, or be required to, recall our products due to suspected or confirmed product contamination, product tampering, spoilage, or other quality issues. Any of these events could adversely affect our sales. Actual contamination, whether deliberate or accidental, could lead to inferior product quality and even illness, injury or death to consumers, potential liability claims, and material loss. Should a product recall become necessary, or we voluntarily recall a product in the event of contamination, damage, or other quality issue, sales of the affected product or our broader portfolio of brands could be adversely affected. A significant product liability judgment or widespread product recall may negatively impact the sales and profitability of the affected brand or brands. Even if a product liability claim is unsuccessful or is not fully pursued, resulting negative publicity could adversely affect our reputation with existing and potential customers and our corporate and brand image.

***A breach of our data security could negatively affect our operations.***

The security and reliability of our data infrastructure are critical to maintaining the availability and effective operation of the technology used in our business, the accurate collection and processing of financial and operational data, and the maintenance of confidential information. A breach of the security or reliability of our data infrastructure, whether by intentional act or otherwise, could result in an interruption of our operations and, in some circumstances, could result in property loss, breaches of regulations, legal liabilities or reputational damage.

***The vote by the United Kingdom to leave the European Union could adversely affect us.***

In a referendum held on June 23, 2016, the United Kingdom voted to exit the European Union (referred to as Brexit), which could cause disruptions to and create uncertainty surrounding our business, including affecting our relationships with our existing and future customers and suppliers, which could have an adverse effect on our business, financial results and operations. The effects of Brexit will depend on any agreements the United Kingdom makes to retain access to EU markets either during a transitional period or more permanently. The measures could potentially disrupt the markets we serve and the tax jurisdictions in which we operate and adversely change tax benefits or liabilities in these or other jurisdictions, and may cause us to lose customers or suppliers. In addition, Brexit could lead to legal uncertainty and potentially divergent national laws and regulations as the United Kingdom determines which EU laws to replace or replicate.

## UNAUDITED PRO FORMA FINANCIAL INFORMATION

*The pro forma financial information set forth below sets forth pro forma balance sheet data as of September 30, 2016 and pro forma income statement data for the year ended December 31, 2015 and nine months ended September 30, 2016, giving pro forma effect to (i) the cancellation of indebtedness contemplated by the Plan of Reorganization, including cancellation of the Existing Notes and the cancellation of certain receivables owed to the Company by related parties, (ii) the issuance of the New Senior Secured Notes and (iii) the contribution of the RSV business to the Company.*

This pro forma financial information of Reorganized Roust are based on U.S. GAAP financial information of Roust Corporation and financial information of Russian Standard Vodka (RSV) prepared in accordance with International Financial Reporting Standards ("*IFRS*"). Management believes that adjustments to transform RSV's IFRS reporting to U.S. GAAP would not be material. Management used the pooling of interest method in accordance with U.S. GAAP for the accounting of acquisition of RSV by Roust Corporation when preparing this pro forma financial information.

Currently management is considering the adoption of the IFRS reporting framework by Reorganized Roust. As part of the transition to IFRS management plans to use the option to restate business combinations that occurred before the reporting in accordance with and after June 2014 and to account for acquisitions under common control at acquisition method under IFRS 3 "Business combinations". The anticipated effects of the conversion to IFRS of the U.S. GAAP financial information of Roust Corporation is set forth in the columns below entitled "Pro forma IFRS conversion effects".

Adoption of IFRS will result in accounting for acquisitions of Roust Inc. and RDL at acquisition method and measuring the fair value of assets acquired and liabilities assumed at the acquisition date. This option will also result in accounting for acquisition of RSV at acquisition method and measuring the fair value of assets acquired and liabilities assumed at the acquisition date. The transition to IFRS reporting and accounting for business combinations at acquisition method will positively affect the prospective equity of Reorganized Roust, e.g. based on the Plan valuation numbers the equity of Reorganized Roust will exceed $500 million. The pro forma income statement below does not take into account any changes to depreciation or amortization as a result of any revaluation of assets as described above. It should also be noted that the pro forma information below does not take into account other effects of adoption of IFRS the Reorganized Roust, including tax effects of the adjustments in the pro forma balance sheet and income statements, impairment considerations, etc. Allocation of adjustments between balance sheet lines in the column "Pro forma IFRS conversion effects" is preliminary and could be subject to change in the future.

The pro forma financial information gives effect to the Plan of Reorganization, including the following:
• Cancellation of the Existing Notes and issuance of the New Senior Secured Notes,
• Cancellation of certain indebtedness owing from the Company to Russian Standard Parties and cancellation of certain indebtedness owing from Russian Standard Parties to the Company, and
• Contribution of the RSV business to the Company,in the case of pro forma income statement data, as if such transactions had occurred on January 1, 2015, and in the case of pro forma balance sheet data, as if such transactions had occurred on September 30, 2016.

The pro forma adjustments relating to the effect of the Plan of Reorganization are reflected in the tables below under columns entitled "Pro forma Plan effects and Intercompany eliminations".
The pro forma financial information gives effect to the combination of the Company and RSV businesses, and as these businesses have engaged in transactions in the periods covered below, inter-company transactions are eliminated in the adjustments below as set forth in the columns entitled "Pro forma Plan effects and Intercompany eliminations".

**Unaudited Pro Forma Condensed Combined Balance Sheet**
**as of September 30, 2016**
*(in thousands of US dollars)*

| | Roust Corporation Historical | RSV (Acquiree) Historical | Pro Forma Plan Effects and Intercompany Eliminations | Notes | Combined Pro Forma | Pro Forma IFRS Conversion Effects | Combined Pro Forma IFRS |
|---|---|---|---|---|---|---|---|
| Cash and cash equivalents (incl. restricted cash) | $ 7 486 | $ 1 734 | $ 16 440 | (1) | $ 25 660 | $ - | $ 25 660 |
| Accounts receivable, net of allow ance for doubtful accounts | 166 450 | 2 886 | (12 580) | | 156 756 | 55 680 | 212 436 |
| Inventories | 97 898 | 6 131 | (1 361) | | 102 668 | - | 102 668 |
| Other current assets | 186 198 | - | (131 026) | (2) | 55 172 | - | 55 172 |
| **Total Current Assets** | **$ 458 032** | **$ 10 751** | **$ (128 527)** | | **$ 340 256** | **$ 55 680** | **$ 395 936** |
| Intangible assets, net | 187 482 | 132 902 | (3 000) | | 317 384 | 588 643 | 906 027 |
| Goodw ill | 174 592 | | | | 174 592 | | 174 592 |
| Property, plant and equipment, net | 81 705 | 35 866 | (1 000) | | 116 571 | - | 116 571 |
| Other non-current assets | 12 199 | | (6 779) | (2) | 5 420 | - | 5 420 |
| **Total Non-Current Assets** | **$ 455 978** | **$ 168 768** | **$ (10 779)** | | **$ 613 967** | **$ 588 643** | **$ 1 202 610** |
| **Total Assets** | **$ 914 010** | **$ 179 519** | **$ (139 306)** | | **$ 954 223** | **$ 644 323** | **$ 1 598 546** |
| | | | | | | | |
| Trade accounts payable | $ 107 929 | $ 62 462 | $ (49 510) | (1a) | $ 120 881 | $ 1 000 | $ 121 881 |
| Bank loans, overdraft facilities and other borrow ings | 276 401 | 36 854 | (110 036) | (3) | 203 219 | 50 112 | 253 331 |
| Interest accrued under Existing Notes | 19 358 | | (19 358) | (4) | - | - | - |
| Other current liabilities | 201 093 | 3 873 | (15) | | 204 951 | - | 204 951 |
| **Total Current Liabilities** | **$ 604 781** | **$ 103 189** | **$ (178 919)** | | **$ 529 051** | **$ 51 112** | **$ 580 163** |
| Non-current obligations under Existing Notes | $ 746 007 | $ - | $ (746 007) | (4) | $ - | $ - | $ - |
| New Senior Notes | - | - | 385 000 | (5) | 385 000 | - | 385 000 |
| Non-current bank loans and other borrow ings | 67 544 | 28 500 | (5 970) | (3) | 90 074 | - | 90 074 |
| Other non-current liabilities | 34 019 | 4 969 | (4 000) | | 38 988 | - | 38 988 |
| **Total Non-Current Liabilities** | **$ 847 570** | **$ 33 469** | **$ (366 977)** | | **$ 514 062** | **$ -** | **$ 514 062** |
| **Total Stockholders' Equity / (Deficit)** | **$ (538 341)** | **$ 42 861** | **$ 406 590** | (6) | **$ (88 890)** | **$ 593 211** | **$ 504 321** |
| **Total Liabilities and Equity / (Deficit)** | **$ 914 010** | **$ 179 519** | **$ (139 306)** | | **$ 954 223** | **$ 644 323** | **$ 1 598 546** |

**Unaudited Pro Forma Condensed Combined Statement of Operations**
**for the nine month period ended September 30, 2016**
*(in thousands of US dollars, except share and per share information)*

| | Roust Corporation Historical | RSV (Acquiree) Historical | Pro Forma Plan Effects and Intercompany Eliminations | Notes | Combined Pro Forma | Pro Forma IFRS Conversion Effects | Combined Pro Forma IFRS |
|---|---|---|---|---|---|---|---|
| Sales | $ 1 004 431 | $ 62 705 | $ (42 284) | (10) | $ 1 024 852 | $ - | $ 1 024 852 |
| Excise taxes | (589 351) | (13 632) | - | | (602 983) | | (602 983) |
| **Net sales** | **415 080** | **49 073** | **(42 284)** | | **421 869** | **-** | **421 869** |
| Cost of goods sold | 255 750 | 24 641 | (49 523) | | 230 868 | - | 230 868 |
| **Gross profit** | **159 330** | **24 432** | **7 239** | | **191 001** | **-** | **191 001** |
| Operating expenses | 124 062 | 7 272 | (8 608) | (8) | 122 726 | - | 122 726 |
| **Operating income / (loss)** | **35 268** | **17 160** | **15 847** | | **68 275** | **-** | **68 275** |
| Interest income / (expense), net | (68 364) | (1 947) | 19 751 | (9) | (50 560) | - | (50 560) |
| Other non-operating income / (expense), net | (7 369) | (2 693) | (4 000) | | (14 062) | 5 568 | (8 494) |
| **Income / (Loss) before reorganization items and income taxes** | **(40 465)** | **12 520** | **31 598** | | **3 653** | **5 568** | **9 221** |
| Reorganization items | | | - | | - | | - |
| **Income / (loss) before income taxes** | **(40 465)** | **12 520** | **31 598** | | **3 653** | **5 568** | **9 221** |
| Income tax benefit / (expense) | (1 639) | (2 619) | | | (4 258) | | (4 258) |
| Less net income / (loss) attributable to non-controlling interest | (476) | | | | (476) | | (476) |
| **Net income / (loss)** | **$ (41 628)** | **$ 9 901** | **$ 31 598** | | **$ (129)** | **$ 5 568** | **$ 5 439** |
| Net income / (loss) per share: basic and diluted | $ (4 162,80) | | | | $ (0,01) | $ | 0,22 |
| *Weighted average number of shares* | *10 000* | | *24 990 000* | | *25 000 000* | | *25 000 000* |

62

**Unaudited Pro Forma Condensed Combined Statement of Operations**
**for the year ended December 31, 2015**
*(in thousands of US dollars, except share and per share information)*

| | Roust Corporation | RSV (Acquiree) | Pro Forma Plan Effects and Intercompany Eliminations | Notes | Combined | Pro Forma IFRS Conversion Effects | Combined |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | Historical | Historical | | | Pro Forma | | Pro Forma IFRS |
| Sales | $ 1 416 993 | $ 92 655 | $ (47 001) | (10) | $ 1 462 647 | $ - | $ 1 462 647 |
| Excise taxes | (832 762) | (23 789) | - | | (856 551) | - | (856 551) |
| **Net sales** | **584 231** | **68 866** | **(47 001)** | | **606 096** | **-** | **606 096** |
| Cost of goods sold | 375 932 | 38 513 | (66 458) | | 347 987 | - | 347 987 |
| **Gross profit** | **208 299** | **30 353** | **19 457** | | **258 109** | **-** | **258 109** |
| Operating expenses | 155 419 | 17 218 | - | | 172 637 | - | 172 637 |
| **Operating income / (loss)** | **52 880** | **13 135** | **19 457** | | **85 472** | **-** | **85 472** |
| Interest income / (expense), net | (85 070) | (4 363) | 24 940 | (9) | (64 493) | - | (64 493) |
| Other non-operating income / (expense), net | (34 398) | (1 779) | - | | (36 177) | - | (36 177) |
| **Income / (Loss) before reorganization items and income taxes** | **(66 588)** | **6 993** | **44 397** | | **(15 198)** | **-** | **(15 198)** |
| Reorganization items | | | 327 496 | (7) | 327 496 | | 327 496 |
| **Income / (loss) before income taxes** | **(66 588)** | **6 993** | **371 893** | | **312 298** | **-** | **312 298** |
| Income tax benefit / (expense) | 13 357 | (1 543) | - | | 11 814 | - | 11 814 |
| Less net income / (loss) attributable to non-controlling interest | (195) | - | - | | (195) | - | (195) |
| **Net income / (loss)** | **$ (53 036)** | **$ 5 450** | **$ 371 893** | | **$ 324 307** | **$ - $** | **324 307** |
| Net income / (loss) per share: basic and diluted | $ (4 162,80) | | | | $ 12,97 | $ | $ 12,97 |
| *Weighted average number of shares* | *10 000* | | *24 990 000* | | *25 000 000* | | *25 000 000* |

**Pro Forma Plan Effects and Intercompany Eliminations** that will result from the Plan are described below:

1) Net cash inflow as of September 30, 2016 amounting to $16.4 million and comprising:

   - $55.0 million of cash obtained through the Share Placement,

   - $20.0 million of cash paid to the holders of the Existing Senior Secured Notes, and

   - $18.6 million of cash paid to advisors upon restructuring (total estimated advisors fees are $20.0 million, of which $1.4 million were paid prior to September 30, 2016).

1a) Elimination of payables to advisors $7.2 million resulting from restructuring, as they all are assumed to be paid as of September 30, 2016. The actual amount recognized in the statement of operations for the nine month period ended September 30, 2016 is $8.6 million, of which $1.4 million was paid before September 30, 2016. The residual amount of $7.2 million was recognized in Trade Payables in the balance sheet of Roust as of September 30, 2016.

2) Cancellation of Related Party financing granted by Roust, as of September 30, 2016 amounting to $99.4 million and comprising:

   - current portion of $92.7 million, consisting of $86.5 million of current portion of loans granted to Related Parties as well as $6.2 million of other current financial receivable from Related Parties and

   - $6.7 million of non-current portion of loans granted to Related Parties.

3) Cancellation of bank loans and borrowings from Related Parties as of September 30, 2016 amounting to $116.0 million and comprised of $110.0 million of current portion and $6.0 million of non-current portion.

4) Cancellation of Existing Notes, as of September 30, 2016 amounting to $765.4 million and comprising:

   - $19.4 million of current interest accrued,

   - $15.5 million of non-current interest accrued,

   - $265.9 million of principal amount of Existing Convertible Notes and

   - $464.6 million of principal amount of Senior Secured Notes.

5) Issuance of New Senior Secured Notes of $385.0 million as of September 30, 2016.

6) Net positive impact on total stockholders' equity / (deficit) amounting to $420.5 million as of September 30, 2016 comprising:

- increase in share capital resulting from the Share Placement amounting to $55.0 million as of September 30, 2016 – see point (1) above,

- decrease in accumulated deficit resulting from cancellation of Related Party financing granted by Roust amounting to $99.4 million as of September 30, 2016 – see point (2) above,

- increase in accumulated deficit resulting from cancellation of bank loans and borrowings from Related Parties amounting to $116.0 million as of September 30, 2016 – see point (3) above,

- net increase in accumulated deficit amounting to $745.4 million as of September 30, 2016, comprising:

  o increase resulting from cancellation of Existing Notes amounting to $765.4 million – see point (4) above, and

  o decrease resulting from cash paid to the holders of the Existing Senior Secured Notes amounting to $20.0 million as of December 31, 2015 and September 30, 2016 – see point (1) above,

- decrease in accumulated deficit resulting from issuance of New Senior Secured Notes amounting to $385.0 million as of December 31, 2015 and September 30, 2016 – see point (5) above,

- decrease in accumulated deficit of $11.4 million resulting from additional advisors fees that are expected to be incurred during the restructuring process and for this pro forma balance sheet are assumed to be incurred as of September 30, 2016 (total estimated advisors fees are $20.0 million, of which $8.6 million is already included in Roust Corporation accumulated deficit as of September 30, 2016).

7) Net positive impact of reorganization items on statement of operations amounting to $327.5 million for the year ended December 31, 2015 comprising:

- negative impact resulting from cancellation of Related Party financing granted by Roust amounting to $99.4 million – see point (2) above,

- positive impact resulting from cancellation of bank loans and borrowings from Related Parties amounting to $116.0 million

- net positive impact amounting to $715.9 million for, comprising:

  o positive impact resulting from cancellation of Existing Notes amounting to $735.9 million, and

  o negative impact resulting from cash paid to the holders of the Existing Senior Secured Notes amounting to $20.0 million – see point (1) above,

- negative impact resulting from issuance of New Senior Secured Notes amounting to $385.0 million – see point (5) above;

- negative effect of advisors fees relating to restructuring of $20.0 million.

8) Positive impact of elimination of reorganization costs on statement of operations for the nine month period ended September 30, 2016 amounting to $8.6 million – as all reorganization costs are assumed to be incurred as of January 1, 2015 and are included in net positive impact of reorganization items on statement of operations for the year ended December 31, 2015 as described in point (7) above.

9) Net positive impact of the Plan on interest cost amounting to $24.9 million and $19.8 million for the year ended December 31, 2015 and for the nine month period ended September 30, 2016, respectively, comprising:

- positive impact of elimination of interest on the Existing Notes amounting to $68.0 million and $52.7 million for the year ended December 31, 2015 and for the nine month period ended September 30, 2016, respectively,

- negative impact of including interest on the New Senior Secured Notes amounting to $38.5 million and $28.9 million for the year ended December 31, 2015 and for the nine month period ended September 30, 2016, respectively,

- positive impact of elimination of interest on the bank loans and borrowings from Related Parties amounting to $8.6 million and $11.6 million for the year ended December 31, 2015 and for the nine month period ended September 30, 2016, respectively,

- negative impact of elimination of interest income from Related Party financing granted by Roust amounting to $13.2 million and $15.7 million for the year ended December 31, 2015 and for the nine month period ended September 30, 2016, respectively,

10) Positive impact of elimination of pre-restructuring costs related to liquidity maintenance amounting to $20.7 million and $17.1 million for the year ended December 31, 2015 and for the nine month period ended September 30, 2016, respectively.

Other than described above adjustments in the columns entitled "Pro forma Plan effects and Intercompany eliminations" relates to the intercompany eliminations of the Company and RSV businesses.

### Pro Forma IFRS Conversion effects

- Calculation of effect from conversion to IFRS has been limited to the following adjustments

  o Revaluation of Roust Inc. and RDL $275.4 million,

  o RSV revaluation $313.2 million,

  o Costs of bank guarantees -$1.0 million, and

  o Recourse factoring adjustment amounting to $55.7 million increase in accounts receivable, with corresponding $50.1 million increase in other borrowings and $5.6 million increase in accumulated deficit.

## CAPITALIZATION

The following table sets forth Roust Corporation and its consolidated subsidiaries' cash and capitalization as of September 30, 2016: (i) on an actual basis and (ii) as adjusted to give pro forma effect to the Plan of Reorganization, including the RSV Contribution. We reserve the right to modify certain components of the Plan of Reorganization in accordance with the terms of the Restructuring Support Agreement. Any such modifications could cause the table presented below to change.

The information presented below should be read in conjunction with, and is qualified in its entirety by, "Management's Discussion and Analysis of Financial Condition and Results of Operations" and the financial statements included in this Offering Memorandum and Disclosure Statement. The pro forma adjustments relating to the Plan of Reorganization have been prepared on the basis of the following assumptions:

- All of our outstanding Existing Senior Secured Notes (approximately $488.4 million aggregate principal amount excluding applicable net discounts) will be cancelled and we will issue $385 million aggregate principal amount of New Senior Secured Notes and all of our outstanding Existing Convertible Notes (approximately $277.0 million aggregate principal amount excluding applicable net discounts) will be cancelled;

- Transaction fees of $16.5 million have been treated as expensed in 2016 and are not capitalized; and

- All balance sheet items (capital expenses) relating to the original issuance of the Existing Notes are reversed.

The Plan of Reorganization may not be consummated unless the related conditions are satisfied or waived. The pro forma information below assumes that all Existing Notes are cancelled.

| | Actual[1] as of September 30, 2016 | | Pro Forma reflecting completion of the Plan of Reorganization as of September 30, 2016 | | Pro Forma IFRS Conversion Effects | | Combined Pro Forma IFRS | |
|---|---|---|---|---|---|---|---|---|
| Cash and cash equivalents (incl. restricted cash) | $ | 7 486 | $ | 25 660 | $ | | $ | 25 660 |
| **Debt (excluding borrowings from Related Parties)** | | | | | | | | |
| Existing bank loans, overdraft facilities and other borrowings - current (excluding borrowings from Related Parties) | $ | 187 880 | $ | 193 520 | $ | | $ | 193 520 |
| Existing Bank Loans and Overdraft Facilities (excluding borrowings from related parties) | | 61 574 | | 90 074 | | | | 90 074 |
| Existing Senior Secured Notes (including accrued interest) | | 488 395 | | - | | | | - |
| Existing Convertible Notes (including accrued interest) | | 276 970 | | - | | | | - |
| New Senior Secured Notes | | - | | 385 000 | | | | 385 000 |
| **Total Debt** | $ | 1 014 819 | $ | 668 594 | $ | - | $ | 668 594 |
| **Net debt** | $ | 1 007 333 | $ | 642 934 | $ | - | $ | 642 934 |
| **Stockholder's equity:** | | | | | | | | |
| Share and Additional paid-in-capital | $ | (137 727) | $ | (50 216) | $ | | $ | (50 216) |
| Accumulated deficit | | (368 806) | | (7 730) | | 593 211 | | 585 481 |
| Accumulated other comprehensive income | | (31 808) | | (30 944) | | | | (30 944) |
| **Total Stockholders' Equity** | $ | (538 341) | $ | (88 890) | $ | 593 211 | $ | 504 321 |
| **Total Capitalization** | $ | 468 992 | $ | 554 044 | $ | 593 211 | $ | 1 147 255 |

[1]                                      *Excluding Russian Standard Vodka*

**USE OF PROCEEDS**

All Existing Notes will be retired and cancelled. We anticipate that the Share Placement will result in net proceeds of approximately $55.0 million. The net proceeds will be used (i) for working capital purposes of the Parent, (ii) to pay expenses in connection with the Plan and (iii) to distribute $20 million in cash to the holders of the Existing Senior Secured Notes as contemplated by the Plan.

**MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION
AND RESULTS OF OPERATIONS**

The following analysis should be read in conjunction with the consolidated financial statements and the notes thereto appearing in Appendix G to this Offering Memorandum and Disclosure Statement (the "*Consolidated Financial Statements*"). All amounts presented in tables are expressed in thousands.

**Overview**

The Company is one of the world's largest vodka producers and Central and Eastern Europe's largest integrated spirit beverages business with its primary operations in Poland, Russia and Hungary. In our key markets, we have a market leading portfolio of domestic vodkas covering all key sectors. In addition to our domestic vodka portfolio, we have a complementary import portfolio of leading import wines and spirits. Our portfolio is very well positioned to grow its share in the largest vodka markets in the world, such as Russia and Poland, and to participate in the growth of a dynamic category across major international markets. Our mission is focused on the key strengths of our brands and our core principle of authenticity, which in turn positions us favorably to compete and differentiate ourselves to consumers around the world. We also benefit competitively from vertical and horizontal integration as brand owner, producer and distributor. Additionally, working with the RSV group, we have also benefited from our ability to access high quality spirit sourcing for our sub-premium products in Russia and internationally. Through our acquisition of Roust Inc. in 2014 we have broadened our import portfolio in Russia by well-known global brands such as *Remy Martin*, *Jägermeister* or *Gancia*. Our acquisition of RDL in 2015 means that we acquired the RSV international distribution contracts which strengthens our International segment of operations.

For a detailed list of our vodkas and other brands from our portfolio please see "Business".

In 2016, the Company continued to focus on developing sales volumes in its key markets. We also continued to seek new international sales opportunities for our vodka brands by extending package sizes in existing markets, entering new markets (including new distribution partners) and extending our brand portfolio.

*Poland*

The third quarter of 2016 was another successful quarter for the Polish business. After nine months of 2016, the Polish business is growing 15.8% by volume compared to the prior year. Compared with the nine month period ended September 30, 2015 on a currency neutral basis, revenue increased by 24.5%, gross margin rose by 28.6% and EBITDA increased by 50.9%.

In 2015, shipments increased by 14% compared with 2014, and on a currency-neutral basis, revenue increased by 10%, gross margin rose by 3.5% (decline of 2.1 percentage points in gross margin compared with the previous year) and net contribution increased by 4.1%, reflecting efficiency in logistics costs and marketing spend, which was front-loaded in the first half of 2015. As a result of the above, as well as due to further fixed cost management, operating income adjusted for depreciation, impairment charges and other excluded items (which are: non-recurring costs related to business reorganization, costs of acquisitions and disposals of subsidiaries and other one-time items) ("*Underlying EBITDA*") increased by 25.7% compared with the previous year from 167 million Polish zlotys (approximately $52.8 million) in 2014 to 210 million Polish zlotys (approximately $55.7 million) in 2015. Even after adjusting for year on year Polish currency devaluation against the U.S. dollar, the trends in 2014 were still very satisfactory: revenue growth of 10% and Underlying EBITDA growth of 26.2% compared with 2014.

The third quarter of 2016 saw a further manifestation of our strategic imperatives:

- **On people and capabilities** – we changed our customer focus and knowledge-based collaboration with several key customers. Examples include category management, range review, joint promotional activities and joint business planning, which affected our results in the third quarter of 2016, and will have an impact in the future. Overall, as a team, we continue to operate as a highly performing unit. The increased focus on developing the future pipeline of talents via the HI Potential program (a development program for employees with high potential) is already bringing benefits in internal promotions, as well as in Cross Functional Projects, which are future-oriented.

Structured career path programs have been developed in sales, resulting in internal promotions. Capabilities are being continuously verified and replenished through Performance and Calibration Appraisals. Involvement is actively being increased through annual Employee Opinion Surveys and the introduction of specific action plans to address opportunities. Employees are motivated through recognition and idea-generating initiatives. We are focusing this year on the involvement of our middle managers in the Company strategy, sharing this with other employees through dedicated workshops. Feedback and ideas from these forums will be aggregated, analyzed and acted upon. The strategy rollout will then be cascaded to all other employees via functional workshops. We have introduced a company training curriculum where employees can improve the skills they need, as identified in the Annual Appraisal process.

- **On the breakthrough innovation pipeline** – further launches in the flavored vodka arena have significantly affected our positive financial results, namely the launch of *Absolwent Wild Strawberry, Absolwent Tangerine, Absolwent Cherry, Absolwent Lime, Absolwent Cranberry, Absolwent Strong Cherry, Absolwent Strong Lemon, Żytniówka Lemon Peel, Żytniówka Ginger, Soplica Walnut, Soplica Strawberry, Soplica Blueberry, Soplica Mirabelle Plum, Żubrówka Maple Leaves, Żubrówka Pine Shoots* and recently in the third quarter further flavor line extensions of *Absolwent Blackberry, Absolwent Plum, Żytniówka Bitter with Quince* and *Żytniówka Bitter with Orange*. This has enabled us to continue winning market share of flavored small packs in which we achieved 39.4%, which continued to grow by 8.8 percentage points compared to last year (September 2016 year-to-date compared to September 2015 year-to-date according to Nielsen data) and by 12 percentage points in 2015 compared with 2014.

  We are also delighted by the initial results of our recent launch of Żubrówka Czarna – our entry into the super-premium clear vodka segment in which we previously did not compete. In September 2016, Żubrówka Czarna's share was 8.4% within the super premium clear vodka segment, which is better result than Amundsen and Smirnoff Black.

- **On the improvement in the pack mix** - we are continuing to drive a positive pack and category mix, as small packs grew at a rate of 27%, while big packs grew 6% in the third quarter of 2016 compared to the third quarter of last year and flavored vodka grew at 18%, while clear vodka grew at 10% in the third quarter of 2016 compared to the third quarter of last year. Our position in the small packs segment is supported by over 22,000 coolers placed onto the market in recent years. In the first quarter of 2016, we gained leadership in the small pack vodka category and, with our share reaching 39.8% in September 2016 according to Nielsen (increase of 5.6 percentage points compared to prior year), we maintained our leadership in the small packs vodka segment.

- **On the improvement of traditional trade coverage and execution capabilities** – we have increased our traditional field sales force by a further 53 people since August 2015, thereby increasing our coverage to over 34,000 traditional retail stores. Our Perfect Store program is continuing to expand and is now active in over 24,000 traditional retail stores. This, together with innovations and the revision of our portfolio strategy, has been the key factor of rapid growth in market share in this key channel and the achievement of a leading market position in October 2015. In September 2016, we achieved a market share of 41.4% in traditional trade, which gives us a 9.1 percentage point higher share than our competitor, compared to the 0.9 percentage point positive gap last year. It is particularly noteworthy that Żubrówka Biała is the best-selling vodka brand on the Polish market, with a share of 17.8% in September 2016. Żytniówka has profitably emerged as the number one economy brand on the Polish market and Soplica flavors have become the number one brand in flavored vodka in Poland with a total share of 5.5% of the total vodka market in September 2016. Our more recent innovations using Żytniówka, Żubrówka and Absolwent in flavored vodkas are continuing to perform well, with 39% growth in shipments of flavored small packs in the third quarter of 2016 compared with the third quarter of the prior year and with over 47% growth in 2015 compared to 2014.

- **On securing strategic agency brands and leveraging the synergy between vodka, whiskey and wine** – we have recently secured a new long-term contract with Remy Cointreau over and

69

above the recent long-term contracts signed with Gallo Wines, William Grants and Concha Y Toro. We are also well advanced in closing the negotiations on a new contract with Jägermeister, as well the extension of the contract with Gruppo Campari. Additionally, we are satisfied with *Gancia*'s presence on the Polish market. We believe that *Gancia* will be the number two premium sparkling wine on the Polish market by the end of the year as a result of the development of sales of the *Gancia* sparkling wine portfolio and the brand building investment. The results of the performance of our agency brands have been good: our growth of *Gallo* in September 2016 year-to-date is 13.9% compared to the same period of last year, while growth of *Remy* is 11.1%, *William Grants* is over 34.8% and *Jägermeister* is 54%. These results, together with growth in flavored vodkas, small packs and traditional trade, have been the key driver of our financial results. Our 2015 growth compared to 2014 for *Gallo* was more than 14%, for *Remy* 10%, for *William Grants* more than 25% and for *Jägermeister* more than 46%. These results, together with growth in flavored vodkas, small packs and traditional trade, have been a key driver of our financial results.

- **On Quality, Cost, Delivery and Service** – we are continuing to improve our standards, with greater collaboration with our key suppliers. Moreover, major cost-saving initiatives ranging from packaging to procurement and supply chain management have strongly affected our results. We are satisfied that we are reaching customer service levels close to 99%, which is an all-time high, supported by significant improvements in our key routines in innovation, demand planning, inventory management and production planning, while being close to operating at maximum capacity.

In September 2016, our vodka category market share by volume in Poland was 40.9% (an increase of 3.4 percentage points compared to September 2015).

| Nielsen Vodka Market Shares Total Poland | | | | |
|---|---|---|---|---|
| | December 2015 (market share and change versus PY) | | September 2016 (market share and change versus PY) | |
| ROUST* | 38.1% | +6.0 p.p. | 40.9% | +3.4 p.p. |
| Stock Spirits | 25.7% | -7.2 p.p. | 26.5% | -3.0 p.p. |
| Sobieski | 14.7% | +0.4 p.p. | 15.4% | +1.4 p.p. |

*ROUST's Polish subsidiary - CEDC International Sp. z o.o.

Since July 2013, Roust and Stock Spirits have held aggregate shares of between 60% and 67% of the total Polish vodka market. During this period, Roust has become the market leader, starting from 22.7% of the market in July 2013 (compared to Stock's market share of 37.6%) and reaching 40.9% of the market share in September 2016 (compared to Stock's market share of 26.3%), having overtaken Stock Spirits in January 2015.

While the increase in market share reflects a strong strategy of Roust's Polish business, it also reflects weakness in Stock Spirits' trading performance. Whilst Stock Spirits' current market position is weak compared to Roust, the new Stock Spirits management team seems to be focusing its new strategy on aggressive pricing to stop the long-term trend of their declining sales.

According to Nielsen, Stock's sell-out dropped by 6% in the third quarter of 2016 compared to the prior year, while Roust's grew by 16%; total vodka category sales increased by 5%. In September 2016 year-to-date, vodka category sales increased by 3% compared to the prior year in Poland. The growth was driven mainly by traditional trade, where vodka sales increased by 5%. Roust vodka sales in traditional trade increased by 25% in September 2016 year-to-date, as opposed to Stock, the sales of which declined by 11%.

In September 2016, with a market share 40.9%, our result is 14.4 percentage points higher than Stock, which means that the gap between us and Stock Spirits increased from 8.1 percentage points in September 2015 to 14.4 percentage points in September 2016.

| Nielsen Vodka Market Shares Traditional Trade | | | | |
|---|---|---|---|---|
| | December 2015 (market share and change versus PY) | | September 2016 (market share and change versus PY) | |
| ROUST* | 38.5% | +7.1 p.p. | 41.4% | +4.6 p.p. |
| Stock Spirits | 32.4% | -7.8 p.p. | 32.3% | -3.6 p.p. |
| Sobieski | 13.3% | -0.2 p.p. | 13.1% | +0.5 p.p. |

*ROUST's Polish subsidiary - CEDC International Sp. z o.o.

| Nielsen Vodka market shares Total Poland | | | | |
|---|---|---|---|---|
| Company | December 2015 market share (%) change with the previous year (p.p.) | | Full year 2015 market share (%) and change compared with the previous year (p.p.) | |
| CEDC International | 37.9 | 6.5 | 36.5 | 8.3 |
| Stock Spirits | 26.4 | (7.6) | 29.7 | (7.7) |
| Sobieski | 15.2 | 0.5 | 15.0 | 0.7 |

We managed to turn our shortfall in market share of 2.6 percentage points against Stock Spirits in December 2014 into a share which is 11.5 percentage points higher than Stock Spirits in December 2015.

Our performance in the third quarter of 2016 in the key traditional sales channel is excellent. We are continuing to generate above-average gains in share of this key channel. Specifically:

- Roust has a share of 41.4% (September 2016), having increased its leadership to 9.1 percentage points over Stock Spirits in this key channel compared to 0.9 percentage point positive gap last year; and

- our growth in the share of traditional trade (4.6 percentage points growth in market share compared with September 2015) is higher than the overall country average (3.3 percentage points growth in market shares compared with September 2015), which means we are outperforming the rest of the market in traditional trade (excluding modern trade and discounters).

In September 2016, Roust strengthened its position in the whiskey category with a share of 17.7% (an increase of 5.7 percentage points compared to September 2015). Our market share gap to Diageo (the second player on the whiskey market in Poland) narrowed from 15.8 percentage points in September 2014 to just 1.8 percentage points in September 2016. Roust's September 2016 year-to-date share in whiskey is 17.1% and has increased by 2.7 percentage points compared to last year. The growth was driven by balanced expansion across all channels. In traditional trade, Roust overtook Diageo and became the second largest whiskey player with a share of 20.5% in September 2016.

Our performance in 2015 in the traditional sales channel, through which over 60% of vodkas and an even larger share of flavored vodkas and small packs are sold, was solid and we continue to generate above-average gains in share of this key channel. Specifically:

- CEDC International closed a shortfall of almost 20 percentage points against Stock to become the leader in this key channel.

- CEDC International's growth in the share of traditional trade is higher than the overall country average, which means we are outperforming the rest of the market in traditional trade (excluding modern trade and discounters).

- Stock's decline in share is greater in traditional trade than their total country decline. This means they are actually performing relatively better in modern trade and discounters.

- Sobieski is showing little to no share growth in traditional trade, which means that their entire total country growth in share is generated exclusively by modern trade and discounters.

71

| Nielsen Vodka market shares Traditional Trade | | | | |
|---|---|---|---|---|
| Company | December 2015 market share (%) change compared with the previous year (p.p.) | | Full year 2015 market share (%) and change compared with the previous year (p.p.) | |
| CEDC International | 38.1 | 7.6 | 35.7 | 9.2 |
| Stock Spirits | 32.6 | (8.5) | 35.9 | (0.1) |
| Sobieski | 13.9 | (0.1) | 13.8 | - |

Overall, we are optimistic about the future of our Polish business, especially since we still see opportunities for continued improvement in small packs, flavored vodkas, traditional trade and imports, as well as opportunities for further price increases and improvements in the mix. We believe we have the scale and depth to capitalize on these opportunities while maintaining our leadership position. We believe that implementation of the transactions agreed to with the Supporting Noteholders pursuant to the Plan of Reorganization and resulting strengthened capitalization and deleveraging of Roust's balance sheet is necessary to enable us to access sufficient liquidity to maximize the performance of this business.

### *Russia*

Our Russian business is developing well compared to overall market trends and is making significant progress in the integration process, enabling the business to reduce costs and optimize its structure for future growth of market share. In Russia, sales by volume have increased 6% in the period September – November 2016 against the same period of the prior year, and 8% excluding economy vodka. This represents a significant improvement and is a major trend change from YTD August decline, and is driven by significant growth of the legal vodka market and strong Roust in store activation. Our premium brands continue to grow even faster, at 18%, 9% and 22% for *RSV*, *Remy* and *Jägermeister*, respectively.

- **Our Russian revenues in Russian rubles were higher than last year in September 2016 and the business continued to improve in October 2016** – these are signs of recovery from previous quarter sales, but now we have resolved some temporary supply issues, the stock level has optimized and we expect further improvements in sales in the fourth quarter of 2016. The Russian vodka market is now growing by 1.5% year-to-date in 2016 compared to last year, according to the Nielsen. We are working to further improve our customer service level with the aim of achieving a positive impact of approximately 15% on our sales. September-October shipments (without economy brands and ready-to-drink) grew by 2% compared to the last year – it is the first time in the last two years when two months shipments are growing in Russia. We also expect significant shipment growth in November 2016 compared to the prior year.

- **RSV's market share continues to grow.** We saw growth in RSV's market share by volume, achieving 34.7% of the premium vodka market in April-May 2016, which, according to Nielsen data, is an increase of 0.7 percentage points compared with the same period a year earlier. In the third quarter of 2016, shipments by volume increased by 18% as compared to the third quarter of 2015.

- **In the period from January to September 2016, *Remy Cointreau* has been demonstrating positive growth of 10% year to date compared to last year**. *Remy* cognac is growing 6% year-to-date September compared to last year. The result is driven by growth in the premium VSOP and XO categories by 7% and 61%, respectively. *Louis XIII* luxury cognac almost doubled its volume, growing 78% year-to-date September compared to last year. *Cointreau*, *Metaxa* and *St. Remy* grew by 13%. These results were achieved by the implementation of an aggressive promo calendar and the special focus of our sales team in national key accounts and distributor channels. We are strengthening our plan in the fourth quarter of 2016 and expect growth of 16% compared to last year (all brands in the Remy Cointreau portfolio).

- **Jägermeister demonstrates further growth of 7%.** After a successful 2015, Jägermeister continues its outstanding performance in the Roust portfolio in Russia. With the current annual business plan, which is approved by our German partner and has appropriate budget support, we

have a strong opportunity to achieve this target in 2016. The brand is currently performing perfectly well in all channels and is demonstrating 7% growth by volume and 31% by value. The existing aggressive promotional calendar for the fourth quarter of 2016 enables us to expect further growth of up to 32% compared to last year.

- **Growith in Gancia sparkling wines increased by 15% compared with last year in the period from January to September 2016.** Strong growth is demonstrated by the key SKUs: Prosecco (growth of 39% compared to last year) and Rose (growth of 41% compared to last year). The main driver is the national key accounts channel (growth of 56%) with new listings, in-out promotions and strong trade marketing activation. Growth in the fourth quarter will be supported by incentive programs for the sales teams, a tasting program for consumers, branded pallet placements and a digital campaign.

- **In September 2016, we started selling our champion vodka brand, Żubrówka, in Russia.** In 2016, Roust received a license from Soyuzplodoimport to produce and sell Żubrówka in Russia (under the Zubrovka trademark). We have already launched two core SKUs and, thanks to the planned marketing support, we expect significant volumes to be sold in the fourth quarter of 2016 and thereafter.

The improvement of our results has been driven by the following strategies and activities:

- **Cost management** – Cost optimization continued after Roust's acquisition of Roust Inc.'s distribution business in Russia, which enabled us to make faster progress on a combined structure. The number of employees was reduced by over three quarters in 2016, which led to annualized savings of 159.7 million Russian rubles (approximately $2.6 million). Our operations department runs a pool of projects/initiatives with cumulative annualized cost savings of 900 million Russian rubles (approximately $12.9 million), including the following:

  - **Production footprint** – we are optimizing manufacturing assets to reduce production costs, improve efficiency and simplify and streamline manufacturing. Headcount was reduced at the plants. In 2016, total savings should amount to 80 million Russian rubles (approximately $1.1 million).

  - **Spirit Supply** – we restarted the spirit supply contract parameters and audit principles with the group's supplier, and we are preparing for a further investment program to increase the share of spirits produced by our sister company – RSV. The program will be implemented in 2016–2020 and will give annual savings of over 300 million Russian rubles (approximately $4.3 million).

  - **Glass Supply** – we are developing alternative strategic suppliers, such as alternative glass suppliers to our Siberian facility in terms of quality and price. A positive impact of 100 million Russian rubles (approximately $1.4 million) is expected this year.

- **Marketing activities**:

  - We continued to develop distribution of our latest launches, such as small packs of Green Mark (Green Mark 0.25l which accounts for 25% of the active customer base), a new flavor of Urozhay Medovaya and Talka Siberian Pine. We put more time and effort into improving the quality of our marketing programs by increasing in-store demonstrations to explain our product range.

  - We launched Green Mark restyling in the fourth quarter of 2015 and we are currently continuing to focus on supporting the launch of Green Mark, restyling in the fourth quarter of 2016.

  - We started the restyling process for Talka to protect it against counterfeiting (introducing more protective elements for the cap and labels).

- The perception of the "modern rectification system" and "advanced technology" is still strongly associated with the Parliament brand in the consumer's mind in the sub-premium segment. Furthermore, according to Comcon data, brand loyalty and awareness levels remain high on the market. In addition, the brand acceleration strategy and the new effective price program have been implemented to drive these factors forward. A new design launch strategy is being prepared for 2017 to build a stronger image and gain better positions on the market.

- **<u>Product quality</u>** – Our liquid quality improvements are moving forward rapidly, bolstering the reputation of our brands among consumers.

  - We established tighter controls over third-party spirit production in Russia and improved liquid consistency at our own plants through a "one brand – one distillery" policy, which has resulted in a shift of some production of our brands to single plants. Our Global Operations team has appointed new executives focusing on quality (liquid, dry goods and systems).

  - The Russian and Polish teams are integrated, sharing knowledge and resources across large vodka markets.

  - We have completed the introduction of a methodology for filtering new ingredients at all plants in Russia. This has helped us significantly improve the filtration process.

  - In September 2016, we successfully launched production of Żubrówka in Russia (under the Zubrovka trademark): we launched production of Zubrovka vodka (Biała) and Zubrovka flavored vodka (Bison Grass). We expect Zubrovka to be the leader in the mainstream vodka segment as it is currently in Poland.

- **<u>Revenue Growth Management</u>** - Last year, we applied the principles of "Revenue Growth Management" to our Russian business. This involves introducing real price increases on certain products without a significant impact on volume, promoting a positive brand, pack and channel mix, controlling and increasing the return on investment of discounts and trade-spend, controlling cross-channel pricing and price-point management, so our most profitable channels are protected, and prioritizing the highest net contribution opportunities in our portfolio. The positive brand mix effect on net sales revenue in the third quarter of 2016 was $5.6 million. We will continue to focus on "resetting" our profitability in the following months of 2016 in Russia through negotiations with key accounts on pricing and contractual terms, a reduction in the levels of promotional discounts, monitoring foreign exchange rate fluctuations and corresponding price increases on all categories of our brands.

- **<u>Effective industry legislation</u>** – We continued to work actively and productively with the alcohol industry and government in Russia to develop commercially viable but responsible legislation.

  We partnered with the government in its efforts to clamp down on the black market, which included the following new legislation:

  - A law has been passed by the State Duma introducing obligatory state registration of equipment for the production of ethyl alcohol. Any unregistered equipment will be seized and destroyed.

  - A united governmental tracking system (EGAIS) for each bottle of alcohol was introduced in retail from July 1, 2016.

  - A bill was introduced in the State Duma increasing the criminal sanctions for producing and using counterfeit excise stamps to the level of the sanctions set for producing and selling counterfeit money.

Consequently, we expect a reduction in the volume of counterfeit alcohol that should benefit alcohol producers such as Roust.

- A new trade law has been passed by the State Duma reducing the maximum fees and allowances payable to retail chains from 10% to 5% of turnover. The maximum payment term for buyers has been cut, in particular for alcohol from 45 to 40 days. We expect these changes to be of benefit to our margins in Russia through the reduction in fees and discounts.

- The minimum admissible retail price for alcohol was raised by the Government to 190 Russian rubles per 0.5 liter bottle from June 13, 2016. We believe this will improve the competitiveness of our products.

With our market share now stabilized and a clear government decision not to increase excise tax in 2016, we expect increases in the volume of our core brands in our Russian vodka business. Our large vodka portfolio is now bolstered with premium agency brands in high-growth alcohol categories, creating potential for revenue growth and substantial EBITDA growth in the future in Russia.

### Hungary

Our strategy, which was developed in 2015 with the launch of the herbal version of Royal Vodka, Żubrówka Bison Grass and Żubrówka Złota, which are exempt from the health tax introduced on January 1, 2015, continued to work well in the first three quarters of 2016. We were able to maintain our leadership position with the increase in September 2016 MAT market share by volume to 64.4%, which is 1.4 percentage points higher than the same period of last year. RSV achieved a market share of 13.8% MAT by volume, which is a 3.8 percentage point increase on last year. We are also achieving good results with *Jägermeister*, with flat market share (on a MAT basis) and 1.2% volume growth in retail. We also continued to grow our other key brand – Gancia.

Our overall sales based on shipments in the third quarter of 2016 increased by 62.9 thousand nine-liter cases, which is a 40.3% increase in volume compared to the third quarter of 2015. Overall, in the first three quarters of 2016, our sales based on shipments increased by 150.0 thousand nine-liter cases, which is a 41.3% increase in volume compared to the same period of 2015.

| Hungary Market Share by Volume (SOM) | | | | | | |
|---|---|---|---|---|---|---|
| Brand | Category | September 2016 (MAT market share and change versus PY) | | September 2016 YTD (market share and change versus PY) | | September 2016 (market share and change versus PY) |
| *Royal Vodka* | Mainstream Vodka (VFM) | 64.4% | +1.4 p.p. | 64.1% | -1.3 p.p. | 62.2% | -6.5 p.p. |
| *Russian Standard* | Premium Vodka | 13.8% | +3.8 p.p. | 14.7% | +4.5 p.p. | 18.3% | +5.3 p.p. |
| *Jägermeister* | Premium Bitter | 34.6% | +0.0 p.p. | 34.8% | -0.4 p.p. | 30.8% | -4.4 p.p. |

The macroeconomic indicators showed significant improvements in the market conditions in Hungary throughout 2015. Economic stabilization had a positive impact on purchasing power, consumer confidence, household consumption and retail sales, which means domestic demand was recovering throughout the first half of 2016. In the case of the spirits business, all these promising economic trends were adversely affected by the introduction of the health tax on spirits on January 1, 2015 (21% loss of volume on sales of spirits compared with 2014). Additionally, the government is planning to make further adjustments to the health tax on spirit products from January 1, 2017.

- **Portfolio extension** – In the first three quarters of 2016, we continued to work on the extension of our portfolio and finalized our projects of the launch of Royal Vodka flavors. In April 2016, we launched 100 ml Royal Vodka and two innovative flavored Royal Vodka brand extensions: Royal Vodka Lemongrass and Royal Vodka Elderflower which were received very well, both by our customers and consumers. In the third quarter of 2016, we successfully completed our 2016 listing plan for our new Royal vodka brand extensions. We also launched the re-formulated health tax free Metaxa 3* as a result of the regulatory changes in Hungary. The re-formulated Metaxa 3* was launched at a competitive retail price at the end of the first quarter of 2016. We also started to work with Molinari, with which we signed a three-year distribution agreement and we started to

distribute Molinari Sambuca and Limoncello di Capri from the second quarter of 2016, by taking over the distribution from Heinemann. All of these activities constitute our response to the new trends in spirit consumption in the various segments, as well as the changing market conditions arising from the introduction of the health tax by the Hungarian government on January 1, 2015.

- **Marketing plans and investments** – The changing market conditions have meant that we had to reconsider our 2015 plans to achieve and manage sustainable volume growth and increased marketing investments in the Roust brands, mainly in Royal Vodka – the number one brand of spirits in Hungary. We shall continue our investments into brand-building communications in 2016 to ensure sustainable growth of brand equity. We started to develop the first ever, Royal Vodka TV commercial, which will be broadcast in December this year. We also invested in our other key brand, Żubrówka Bison Grass, with an ATL TV campaign run in May 2016. The owners of third party brands keep their investments, in order to gain further leverage on the potential of the core brands within our portfolio, namely Jägermeister, Grant's whiskey, Hendrick's gin, Glenfiddich and Metaxa. Gancia sparkling wines had double-digit growth in 2015, constituting a base for further brand investment and business growth throughout 2016.

- **Agency partnerships** – We strengthened the partnerships with our key agency brands, achieving extensions of our contracts with Jägermeister through the end of 2018. We also signed a new five-year contract with William Grant & Sons and a three-year contract with Rémy Cointreau Group. We maintained strong relations with Lucas Bols and acquired the distribution rights to the Molinari brands in Hungary from the beginning of 2016. Our aim is to solidify these strong relationships with our selected, strategic key brand owners by offering appropriate implementation of joint marketing strategies, including extensions to the brand portfolio, appropriate pricing and continued investment in brand equity building.

- **Distribution** – We continued to focus on weighted distribution growth of our core brands, continuing a good relationship with the key retailers in Hungary. Our September year-to-date weighted distribution of Royal Vodka increased to 84.9%, which is 5.5 percentage point growth compared to last year, while Jägermeister increased to 80.9% (1.1 percentage point growth on the same period of last year).

We also continued to work closely with major local chains and intensified cooperation with other small, local retail chains and convenience stores, including National Tobacco Stores selling spirits through our wholesale partners.

| Hungary Weighted Distribution | | | | | | | |
|---|---|---|---|---|---|---|---|
| Brand | Category | September 2016 (MAT weighted distribution and change versus PY) | | September 2016 YTD (weighted distribution and change versus PY) | | September 2016 (weighted distribution and change versus PY) | |
| *Royal Vodka* | Mainstream Vodka (VFM) | 84.9% | +7.6 p.p. | 84.9% | +5.5 p.p. | 85.5% | +3.3 p.p. |
| *Jägermeister* | Premium Bitter | 82.8% | +2.5 p.p. | 80.9% | +1.1 p.p. | 80.0% | -3.0 p.p. |

- **Sales** – we extended our Perfect Store program, which was initiated in the CBA Prima stores, to Coop stores. We also continued to work with our top wholesale partners and continued a project encompassing major National Tobacco Shops that sell spirits. We are also pursuing various projects targeted at the HoReCa (Hotel/Restaurant/Café) sector focusing on our premium vodka portfolio (RSV), the Gancia sparkling wine portfolio and key agency brands (Jägermeister, Metaxa, Hendrick's and Grant's). Furthermore, we have been working with an external sales team since the second quarter of 2015, which is supported by our field sales force in a "Mainstream HoReCa" program to cover more mainstream HoReCa outlets not regularly visited by our team. We boosted this project in the first half of 2016 with greater focus on execution, monitoring and reporting to deliver in excess of the agreed targets for 2016, with further improvements and increased coverage and we added independent retail outlets to the program in the third quarter of the year.

76

We are closely monitoring and evaluating our trade support investments and trade activities through our enhanced control system in order to improve our effectiveness, increase return on investment and control our trade budget.

These actions have resulted in material improvements to all of our key numerical and financial KPIs:

- **Our flagship brand, Royal Vodka has maintained its strong No. 1 position in the mainstream category** and achieved a market share of 64.4% MAT by volume in the mainstream vodka category in retail in September 2016, increasing by +1.4 percentage points with respect to the same period of the prior year and achieving 29.9% MAT growth by volume in retail compared with the previous year.

- **Our key agency brand Jägermeister is still the No. 1 brand of imported spirits in Hungary** and achieved a 34.6% MAT market share by volume in the premium bitter category in retail in September 2016, which remained unchanged as compared to the same period of the prior year, with volume growth of 1.2% in retail.

| Hungary Retail Volume Sales Change | | | | |
|---|---|---|---|---|
| Brand | Category | September 2016 (MAT retail volume share) | September 2016 YTD (retail volume share and change versus PY ) | September 2016 (retail volume share and change versus |
| *Royal Vodka* | Mainstream Vodka (VFM) | 29.9% | 19.1% | -2.1% |
| *Russian Standard* | Premium Vodka | 25.9% | 30.4% | 40.5% |
| *Jägermeister* | Premium Bitter | 1.2% | -0.9% | -15.9% |

*International expansion onto other markets*

Our objective is to achieve a leading position in all of the top ten vodka countries around the world. We currently hold significant shares in seven of these ten countries. The Baltic States, France, the United Kingdom and Germany remain the top performers among Roust's international markets.

*United Kingdom*

- **Consumer Confidence and Brexit fears** – British consumers appear to have shrugged off Brexit fears about the economy as wages continue to grow faster than prices, rising employment boosts income and low interest rates encourage people to spend rather than save. Expectations for the general economic situation over the next 12 months are improving. Also, personal finances for the next 12 months were assessed more positively.

- Promising market trends continue, despite some increase in overall inflation – British consumer prices rose during the year through August 2016. It is expected that inflation will grow with the weakening pound, which has dropped from 1.5 to 1.2 dollars to the pound in the last few months.

- Spirits continued to drive total alcohol volume growth, following impressive 5.8% growth in on-trade with off-trade also contributing by growing 1.3%. The value of vodka sales increasing 3% is significantly behind other spirit categories, such as gin (growing 17%), American whiskey (growing 5%) and non-cream liqueurs (growing 5%), golden rum (growing 17%), and sales by volume are also lower (at 1%).

- In the off-trade the vodka category continues to be driven by a lower average price per bottle (decrease by 1% compared with last year), and volumes only increased by 1% MAT compared with 2015, while sales by value declined (decrease by 0.2%), as a result of increased competition from the major players, such as Smirnoff (growth of 4%), Russian Standard (growth of 9%), New Amsterdam (growth of 324%), Absolut (growth of 19%), all in MAT growth by volume compared with 2015, with declines across the tertiary brands/brands not investing in above-the-line marketing. This is partly due to range rationalization by grocers in favor of categories with higher growth or which deliver more margin (such as gin, etc.)

- Spirits in the on-trade continue to see value grow faster than volume. The main driver of growth by value is the increasing importance of premium spirit brands on the market.

- Development of core Roust brands - In the UK, a strategically important export market for Roust, combined Nielsen (off-trade) and CGA (on-trade) reports show that MAT growth in the share of vodka in our portfolio by volume increased by 0.6% percentage points compared to last year, achieving almost 11.4% of the total vodka market (Nielsen MAT to September 2016 compared with 2015). RSV is the key driver here, reaching 13% MAT share by volume in groceries, and an overall UK share of 9.4% MAT (growth of 0.5% compared to last year). Żubrówka continues to grow with growth of 32% MAT compared to 2015, but Green Mark (decline of 5% MAT compared with 2015) suffered because of range losses in the grocery stores, where overall range rationalization has been taking place by customers to reduce space allocated to vodka.

  - *RSV* – strong performance year to date of 4% MAT by volume across total trade in 2016, as we continue our momentum with the new distributor, William Grant and Sons. We are continuing to grow strongly in off-trade with growth of 8% year-to-date compared to 2015, but the on-trade has declined (by 21% year to date) due to the loss of a key account to Smirnoff at the end of 2015, which we decided not to maintain due to large losses from the contract.

  - *Żubrówka* – Growth in off-trade (46%) and on-trade (18%) year-to-date by volume compared with 2015, with continuing strong double-digit growth, with growth continuing in the latest quarter at 24% total trade compared with 2015.

### Germany

- **Stable market trends** – solid base for our further grow

  - Total alcohol category – the German market is dominated by beer, wine and local spirits. There is good potential for driving conversion into new categories and international brands.

  - Vodka remains the largest category in Germany with a 15% share of total spirits. The growth of vodka is continuing on a stable basis, slightly increasing by 4% in 2016 (September MAT).

  - Vodka has the third highest promotion volumes (after brandy and herbal liqueur), increasing by 4% in 2016 (September MAT). Competition for promotional slots continues with some leading brands achieving over 50% volume on promotion. The market is dominated by low value vodka in the sub 6 euro ($6.4) per 0.7 liter bottle sector, accounting for 49% of the market. Mainstream vodka in the 6-10 euro ($6.4-$10.7) sector, accounts for 33% of the market. Premium vodka, with price over 10 euro ($10.7), accounts for 18% of volume but 30% of value.

- **Growth of Roust's brands** - Overall, according to Nielsen, the Roust portfolio is continuing to perform well, with volumes up by 7% (September MAT). Green Mark is the star performer with volume up 23% compared to 2015 (September MAT). According to Nielsen (September MAT), the portfolio share is stable and accounts for 5% of the total market for the whole Roust portfolio (including Yamskaya).

  - *RSV* – is Roust's leading brand in Germany and has been flat in the first nine months of 2016, with depletions up by 10% on a MAT (September MAT) basis compared to last year. The market share has grown to nearly 2% (September MAT), despite strong promotional pressure from Absolut and Three Sixty. We expect to maintain this performance in the final quarter of 2016, as we expand our promotional activities and have a second run of the above-the-line campaign via television and digital media.

78

- *Green Mark* – has continued to be a strong performer with current year to date performance at end of September of 23% by volume compared to 2015. We currently have a continuous supply and good stock levels and with more promotional activities in the second half of the year we expect good results in the fourth quarter.

- *Yamskaya* – our exclusive contract with Aldi continues to be a great success. We expect to continue building momentum on the brand to reach over 80 thousand nine-liter cases this year through Aldi South alone. We are looking to get a trial listing into Aldi North, which offers the same potential as Aldi South, in 2017.

- *Żubrówka* – in just the second year after the launch of the brand, we are continuing to build distribution, more than doubling the levels from 2015 (120%) to 17% August year to date. We are focusing on driving turnover from a low base to start building consumer pull, as well as starting to develop in the on-trade. We have already started to distribute the other new Żubrówka flavors, targeting the Polish communities in Germany.

- Soplica and other Polish vodkas – smaller brands are performing well with growth at 10% (September year-to-date 2016) compared to 2015. We have launched new *Soplica* flavors.

### *France*

- **Challenging market trends**

  - The total spirits and total alcohol category is declining. The key upward trend across various categories is premiumization.

  - Growth in the vodka category is static with the vodka market flat (September MAT) compared with 2015. The mid-tier price segment at 12-14 euros ($12.9-$15) is in decline by 7.2%, losing to both low- and high-price tiers. The high-price tier is performing well, with volumes growing by 10.2% (September MAT). Promotional volumes keep driving sales across the segments. Poliakoff, Sobieski, Żubrówka and Absolut are the key winners at the expense of Eristoff, Smirnoff and private labels.

- **Growth of Roust's brands** – The total portfolio is growing faster than the market. *Żubrówka,* our major brand on the French market, is continuing to develop strongly in France, with 8% growth in volume September 2016 year-to-date compared to the same period of 2015, driven by *Żubrówka Biała*.

  - Up-weighted above-the-line across the whole of the *Żubrówka* brand by spending over $1.0 million in two "Out of Home bursts" (22% year-on-year increase in above-the-line investment),

  - Increased the level of in-store presence and activation through an increased rate of sales and per cent sold on promotion to 30%, and

  - Grown brand share to 3.5% (according to Nielsen data, December 2015), which is growth of 23% on 2014, and achieved brand awareness of 48%.

We are continuing to see very good progress on *Żubrówka* behind the strong off-trade activation plan on *Bison Grass* and *Biała* in 2016 year to date. We shall continue to seed other Polish brands (e.g. *Soplica*) in France for the rest of the portfolio.

### *Sales volumes by segment*

Sales volumes in the reported periods by segments are presented below (in thousands of nine-liter cases).

| Segment Volumes (in thousand of 9 liter cases) | | | |
|---|---|---|---|
| | three-month period ended September 30, 2015 (unaudited, as recast) | three-month period ended September 30, 2016 (unaudited) | three-month period ended September 30, 2016 vs. three-month period ended September 30, 2015 | |
| Poland domestic | 3,323 | 3,711 | 388 | 11.7% |
| Russia domestic | 1,975 | 1,586 | (389) | (19.7%) |
| International | 771 | 1,212 | 441 | 57.2% |
| **Total Sales Volumes** | **6,069** | **6,509** | **440** | **7.2%** |

| Segment Volumes (in thousand of 9 liter cases) | | | |
|---|---|---|---|
| | nine-month period ended September 30, 2015 (unaudited, as recast) | nine-month period ended September 30, 2016 (unaudited) | nine-month period ended September 30, 2016 vs. nine-month period ended September 30, 2015 | |
| Poland domestic | 9,153 | 10,600 | 1,447 | 15.8% |
| Russia domestic | 5,579 | 4,099 | (1,480) | (26.5%) |
| International | 1,599 | 3,054 | 1,455 | 91.0% |
| **Total Sales Volumes** | **16,331** | **17,753** | **1,422** | **8.7%** |

Sales by volume in Poland increased by 11.7% in the third quarter of 2016 (15.8% in the nine-month period ended September 30, 2016), increasing market share by 3.4 percentage points to 40.9% as at the quarter-end compared to the third quarter of 2015. Since February 2015, we are the No.1 player on the Polish vodka market and since February 2016, Soplica has been the flavored vodka market leader holding around 24% of the flavored vodka market share.

In Russia depreciation of the local currency against the U.S. dollar led to a reduction in real consumer income and resulted in a reduced purchasing power and lower domestic sales volume by 19.7% in the third quarter of 2016 (26.5% in the nine-month period ended September 30, 2016). Over the third quarter the market and economic situation in Russia was improving and September was the best month in 2016, showing highest results compared to last year. Additionally September-October shipments (without economy brands and ready-to-drink) grew by 2% compared to the last year – it is the first time in two last years when two months shipments are growing in Russia. In previous months we suffered negative impact of cheap (including illegal) vodka sales on our mainstream vodka sales. However current government actions against illegal vodka market should benefit legal vodka producers such as Roust.

**Reorganization and fresh start accounting**

On April 7, 2013, the Company and its two wholly owned subsidiaries, CEDC Finance Corporation International Inc. and CEDC Finance Corporation LLC filed Chapter 11 cases under the Bankruptcy Code in the Bankruptcy Court in the District of Delaware in order to effectuate the Debtors' prepackaged plan of reorganization. The Chapter 11 cases were jointly administered under the caption "In re: Central European Distribution Corporation, et al." Case No. 13-10738. The plan of reorganization was confirmed by the bankruptcy court on May 13, 2013. The plan of reorganization became effective when all material conditions to it were satisfied and the debtors emerged from bankruptcy protection on June 5, 2013.

In accordance with ASC 852, the Company adopted fresh start accounting and adjusted the historical carrying value of its assets and liabilities to their respective fair values at the effective date. The Company simultaneously determined the fair value of its equity at the effective date. For financial reporting convenience, the Company elected to use May 31, 2013 financial and tax accounting records, adjusted for the effects of the June 5, 2013 plan of reorganization, as the basis for the June 5, 2013 fresh start financial presentation. As a result, the Company recorded fresh start accounting adjustments to historical carrying values of assets and liabilities using market prices, discounted cash flow methodologies based primarily on observable market information and, to a lesser extent, unobservable market information, and other techniques. The adoption of fresh start accounting results in a new reporting entity. In applying fresh start accounting upon emergence from Chapter 11, we effectively re-valued our balance sheet to reflect the expected performance of our underlying business. Any deterioration of our

80

performance in the future versus the original fresh start accounting assumptions may result in future impairment charges.

**Acquisition of Roust Distribution Limited**

On December 30, 2015, Pasalba Limited, a wholly-owned subsidiary of Roust Corporation, acquired all of the outstanding shares of Roust Distribution Limited ("*RDL*") from RTL, in accordance with the share purchase agreement, dated December 30, 2015, between the Company and RTL. A key reason for the acquisition of RDL was to assume the international contracts and apply relevant processes in order to efficiently organize international distribution of alcohol beverages within Roust Corporation Group.

RDL is a worldwide distributor of RSV. Through the acquisition of RDL we acquired the RSV international distribution contracts, which were historically managed by RTL's subsidiaries. The acquisition of RDL was the next step for Roust in distributing this premium brand globally. It follows the great success of Roust Inc., which distributes *Russian Standard Vodka* in Russia.

RSV has had significant investments globally over recent years to build a 3 million nine-liter cases premium growing business. It is now a well-established brand internationally, being the number 3 vodka in the United Kingdom excluding private labels (after *Smirnoff* and *Glen*'s), number 7 in Germany (after for example *Absolut* and *Smirnoff*), number 4 in Global Travel Retail and having 2 million nine-liter cases of international sales with 12% revenue compound average growth rate (CAGR) over the last 5 years. RSV's strengths are authenticity, quality and prominence. These features give us significant competitive advantage being in line with recent trends in global consumptions.

After the acquisition of RDL, Roust now has a full portfolio of brands to compete in western markets in all price segments. Bringing RSV into our international portfolio gives us a significant opportunity to accelerate our market share, in particular in such markets as Germany, France, the United Kingdom, the United States and Israel. Roust now has a complete vodka portfolio to serve client's needs in these markets.

Strategically, the Company believes the transaction will allow it to benefit from the significant incremental EBITDA and cash flows increase, leading to a much stronger position in its International segment of operations, and to capture significant synergies across the key international markets through the integration of the Company's existing own and agency brands portfolios with the leading RSV brand, as well through the integration of sales and route to market opportunities. It strongly supports our objective to become a leading global alcohol business.

RTL is the sole shareholder of RDL and Roust, and therefore for accounting purposes, the acquisition was accounted for under the "as if pooling-of-interest" method of accounting which applies to the transfer of assets or exchange of equity interests between entities under common control. Under the "as if pooling-of-interest" method of accounting, the value of the assets and liabilities transferred is recognized at historical carrying cost as at the date of the transfer, rather than at fair value. However, in accordance with our debt agreements we engaged an independent valuation expert who performed a valuation of the RDL business and issued a fairness opinion on its valuation, to ensure that the conditions of the transactions are at least as favorable as might reasonably have been obtained from a non-Affiliate. In accordance with Accounting Standards Codification Topic 805-50 ("*ASC 805-50*") common control of RDL and Roust is deemed to have existed since August 2014, the date of RDL's inception. However, as RDL commenced its activity in June 2015, RDL's assets, liabilities, income, expenses and cash flows did not have any material impact on Roust's Consolidated Financial Statements till June 30, 2015. As a result the recast of historical financial statements for the year ended December 31, 2014 and the subsequent interim periods ended March 31, 2015 and June 30, 2015 was not performed. The first recast comparative information is presented for the interim periods ended September 30, 2015.

As mentioned above, we engaged an independent valuation expert who developed the range of fair value of RDL to ensure that the conditions of the transactions are at least as favorable as might reasonably have been obtained from a non-Affiliate. After analyzing the independent valuation and the Company's strategic objectives, an aggregate purchase price for RDL was agreed to at $40.0 million. The purchase price was settled as follows:

- the deposits of $4.8 million and $9.0 million were paid in October and December 2015, respectively;

- the majority of the consideration amounting to $22.3 million was settled against loans granted by Roust to related parties (within the RTL legal structure); and

- the remaining $3.9 million of the consideration was paid in cash in February 2016.

The share purchase agreement between RTL and Pasalba Ltd. related to the RDL acquisition (the "*SPA*") sets forth a framework of the terms for contracts between RDL and RSV. The document specifies the 10-year nature of the arrangement and other key criteria. In particular, the SPA prescribes that RTL take necessary actions by the end of 2016 to assure that the CIS is included in the permitted territories for distribution and that the contract term is extended till the end of 2025.

As of March 31, 2016, RDL was party to a supply contract with RSV, which was signed in May 2015 and subsequently amended in March 2016 (the "*Contract*"). It fixed Russian ruble pricing per SKU. RSV had the right to revisit pricing in case of increase in production costs of the goods as opposed to the same as of the date of the latest negotiations of the price list under the Contract, and in case monthly average exchange rate exceeds 75 Russian ruble per U.S. dollar. Margin split between RSV and RDL was 65/35, which falls within the normal range of comparables for a distribution contract.

The amended distribution agreement was signed between RSV and RDL in May 2016 for a 10 year duration. Under the new contract RSV has no right to terminate the agreement at its sole discretion. The agreement confirms the terms of SPA and covers all jurisdictions except Russia. The above described pricing arrangements remain valid under the distribution agreement. Governing law remains Russian.

**Acquisition of Roust Inc.**

As a part of its strategy, on June 30, 2014 the Company completed its acquisition of Roust Inc. from RTL. To effect the transaction, on June 30, 2014, Pasalba Limited, a wholly-owned subsidiary of Roust, acquired all of the outstanding shares of Roust Inc. from RTL, in accordance with a share purchase agreement, dated May 26, 2014, between the Company, RTL and certain subsidiaries of the Company and RTL. The transaction is accretive to our earnings and cash flows.

The board of directors of the Company engaged an independent U.S. investment bank to prepare a valuation of Roust Inc.'s business under the indentures governing the Existing Notes and issue a fairness opinion on its valuation. The aggregate purchase price for Roust Inc. was $250.0 million, consisting of cash consideration and consideration in-kind. $0.4 million of the cash consideration was paid after December 31, 2015. Roust was and continues to be a guarantor to certain related parties after the transaction. These guarantees were taken into account when calculating the accretive effect of the transaction as required by the indentures governing the Existing Notes.

Roust Inc. is a twenty-year-old sales and distribution company and the leading spirits distribution business in Russia, which has helped build many existing premium alcohol brands in the last 20 years. Roust Inc. is currently distributing the market leading premium vodka *Russian Standard*, the fast growing *Gancia* brand, *Remy* range, *Jägermeister*, *Concha y Toro* wines, *Constellation* wines, *Jose Cuervo* and *Sierra* tequilas, *Sevan* Armenian brandy, *DeKuyper* spirits and a number of other leading premium spirit brands.

Roust acquired Roust Inc., giving Roust the opportunity to combine a large vodka business with a premium spirits business, in the same way as the Polish and Hungarian Roust business units currently operate. Premium spirits, wine, whisky and cognac have, in general, been growing faster than the vodka market in the last five years in Russia, giving Roust access to faster growing alcohol categories. RSV and many of the premium spirit brands have a higher margin per case than our core Russian Alcohol business. Based on an official announcement of the Ministry of Finance of the Russian Federation, no further excise tax increase is expected in Russia in 2016. Therefore we see substantial opportunity to drive volume growth for these new brands.

The Company considers the $250 million purchase price of Roust Inc. as beneficial to it, given the clearly quantified cost reduction opportunities, growth potential, including strengthening relationship with our key import portfolio suppliers, and market leading history of the Roust distribution business. We see the Roust acquisition as consistent with our global mission, driving significant value and Underlying EBITDA increases, improving our

business size and strength, in particular the ability of our Russian business to drive strong and profitable future growth from entry into the new categories and brands.

The accounting for Roust Inc. acquisition under common control resulted in the excess of the purchase price of the transaction of $250 million over the book value of Roust Inc. being charged immediately to our shareholder's equity. Our equity has also been negatively affected by fresh start accounting adjustments, impairment charges, foreign exchange and translation differences and one-time costs.

As a result of the Roust Inc. acquisition that took place on June 30, 2014, Roust has already seen substantial financial benefits from the Roust Inc.'s business with $217.4 million net sales revenue and $31.6 million EBITDA throughout 2014 and 2015.

As a consequence of the acquisition of Roust Inc., our Whitehall Group subsidiaries were re-restricted, and are now "Restricted Subsidiaries" as defined by the indentures governing the Existing Notes. Roust Inc. is also a "Restricted Subsidiary" and became a guarantor of the Existing Notes on August 19, 2014.

**Significant factors affecting our consolidated results of operations**

*Indebtedness and debt servicing*

As of September 30, 2016, we had total debt, including interest accrued, of $1,109.3 million, including borrowings from related parties of $94.5 million, debt relating to our Existing Senior Secured Notes of $488.4 million, debt relating to our Existing Convertible Notes of $277.0 million and bank debt from external lenders of $207.6 million. Our debt has important consequences for our financial condition, including:

- making it more difficult for us to satisfy the obligations under the Existing Notes;

- making it more difficult to refinance our liabilities as they fall due;

- increasing our vulnerability to general adverse economic, competitive and industry conditions;

- limiting our ability to obtain additional financing to fund working capital and capital expenditures, implement our business strategy, acquisitions, operations and other general corporate requirements and to maximize our business operations;

- limiting our ability to make strategic acquisitions or causing us to make non-strategic divestitures;

- requiring a substantial portion of our cash flow from operations to repay principal and interest on our debt and reducing our ability to use our cash flow to fund working capital, capital expenditures, the implementation of our business strategy, acquisitions, operations, working capital and general corporate requirements;

- limiting our ability to purchase raw materials on satisfactory credit terms, thereby limiting our sources of supply or increasing cash required to finance operations;

- limiting our flexibility in planning for, or reacting to changes in our business and the industry in which we operate; and

- limiting our ability to receive trade credit from our vendors or otherwise placing us at a competitive disadvantage to other less-leveraged competitors.

Earlier in November 2016, Roust announced that it had agreed to a significant transaction with holders of approximately 90% in aggregate principal amount of the Existing Senior Secured Notes and approximately two-thirds in aggregate principal amount of the Existing Convertible Notes and its controlling shareholder to strengthen its capitalization by over $500 million and deleverage its balance sheet. The transaction will result in the reduction of the Company's existing debt by approximately $462 million, plus funding of $55 million in new equity capital and the contribution of strategic assets, namely RSV and related intellectual property, to the Company by RTL. In

connection with, among other things, the contribution of such strategic assets to the Company, all intercompany loans owed by RTL to the Company will be considered repaid in full. For more information on the transaction, see our Form 8-K dated November 11, 2016. If the Plan of Reorganization is approved, the Existing Notes will be cancelled and our total indebtedness will be significantly reduced, but we will still have significant indebtedness, including the New Senior Secured Notes, and the factors described above will continue to apply to the Company.

As a result of the transaction, the combination of Roust with RSV will create a global company with a strong balance sheet and strong liquidity that will help to utilize growth opportunities. Upon the successful completion of the transaction, the reduction of indebtedness and the liquidity provided by the new equity capital, will enable Roust to more effectively execute its business strategy, take advantage of growth opportunities worldwide, and ensure that it is well positioned for an IPO within the next two to three years.

Based on the significant support the Company has received from holders of its Existing Notes, the interest payment on the Existing Senior Secured Notes due on October 31, 2016 was not and will not be paid in cash, but instead will be paid as part of the New Senior Secured Notes to be issued in accordance with the Plan of Reorganization. The Company has the support of the Consenting Noteholders with respect to such arrangement.

The transaction is expected to be consummated through a prepackaged Chapter 11 plan of reorganization of the Company through a voluntary reorganization case in the United States. Only the Company and certain of its U.S. non-operating affiliates would be part of the Chapter 11 Case. None of the Company's operating subsidiaries will be involved in the Chapter 11 Case. The Company intends to commence its Chapter 11 Case in December 2016 and expects that the Plan (and related transactions) will be consummated between 35 and 45 days thereafter. Customers, suppliers, employees, trade and other creditors will not be affected by the proposed transaction and should experience no change in the way the Company does business with them.

The Company's ability to meet its obligations depends on the consummation of the Plan being achieved. The consummation of the Plan is subject to a number of conditions, the satisfaction of which cannot be assured, including among other things, the negotiation and agreement of definitive documentation and the provision by the Company of satisfactory and confirmatory due diligence to the Consenting Noteholders. Consummation of the Plan is also subject to confirmation by the Bankruptcy Court.

### *Effect of Exchange Rate and Interest Rate Fluctuations*

Our operations are conducted primarily in Poland and Russia, substantially all of Company's operating cash flows and assets are denominated in Polish zlotys, Russian rubles and Hungarian forints and our functional currencies are primarily the Polish zloty, Hungarian forint and Russian ruble and the reporting currency is the U.S. dollar. Our financial instruments consist primarily of cash and cash equivalents, accounts receivable, accounts payable, investments, bank loans, overdraft facilities and long-term debt. All of the monetary assets represented by these financial instruments are located in Poland, Russia and Hungary. Consequently, they are subject to currency translation movements when reporting in U.S. dollars. The impact on working capital items is demonstrated in the cash flow statement as the movement in exchange on cash and cash equivalents. The impact on the statement of operations arises from the movement of the average exchange rate used to translate the statements of operations from Polish zlotys, Russian rubles, Hungarian forints and Ukrainian hryvnias to U.S. dollars. The amounts shown as exchange gains or losses in the statements of operations only apply to gains or losses realized on transactions that are not denominated in Polish zlotys, Russian rubles, Hungarian forints or Ukrainian hryvnias.

The table below presents the exchange rates used for translation of our balance sheet as of September 30, 2015, December 31, 2015 and September 30, 2016 and the statement of operations and comprehensive income balances for the three-month period ended September 30, 2015 and for the three-month period ended September 30, 2016.

| | Balance sheet rate as of | | | *% change Sept 30, 2016 vs Dec 31, 2015* | *% change Sep 30, 2016 vs Sep 30, 2015* | Average rates for the three-month periods ended | |
|---|---|---|---|---|---|---|---|
| | September 30, 2015 | December 31, 2015 | September 30, 2016 | | | September 30, 2015 | September 30, 2016 |
| PLN/USD | 3.7754 | 3.9011 | 3.8558 | *(1.2%)* | *2.1%* | 3.7653 | 3.8891 |
| RUB/USD | 65.5451 | 73.8845 | 63.3136 | *(14.3%)* | *(3.4%)* | 62.8482 | 64.6084 |
| HUF/USD | 279.0598 | 286.8245 | 276.4609 | *(3.6%)* | *(0.9%)* | 280.4902 | 278.7685 |

Because the Company's reporting currency is the U.S. dollar, the translation effects of fluctuations in the exchange rate of our functional currencies have impacted the Company's financial condition and results of operations and have affected the comparability of our results between financial periods.

If the U.S. dollar strengthens against the Polish zloty, Russian ruble or Hungarian forint, the value in U.S. dollars of assets, liabilities, revenues and expenses originally recorded in Polish zlotys, Russian rubles or Hungarian forints will decrease. Conversely, if the U.S. dollar weakens against the Polish zloty, Russian ruble or Hungarian forint, the value in U.S. dollars of assets, liabilities, revenues and expenses originally recorded in Polish zlotys, Russian rubles or Hungarian forints will increase. Thus, increases and decreases in the value of the U.S. dollar can have a material impact on the value in U.S. dollars of our non-US dollar assets, liabilities, revenues and expenses, even if the value of these items has not changed in their original currency.

The Russian ruble has appreciated against the U.S. dollar since September 30, 2015 by approximately 3.4% to 63.3136 Russian ruble for the U.S. dollar as of September 30, 2016. Additionally the Polish zloty depreciated against the U.S. dollar since September 30, 2015 by approximately 2.1% to 3.8558 Polish zloty for the U.S. dollar as of September 30, 2016.

As of September 30, 2016, the Company's indebtedness included the Existing Senior Secured Notes and the Existing Convertible Notes that are denominated in U.S. dollars, which have been lent to our operations where the functional currency is the Polish zloty and the Russian ruble. The effect of having debt denominated in currencies other than the Company's functional currencies is to increase or decrease the value of the Company's liabilities on that debt in terms of the Company's functional currencies when those functional currencies depreciate or appreciate in value, respectively. As a result, the Company is exposed to gains and losses on the re-measurement of these liabilities. The table below summarizes the pre-tax impact of a one percent movement in each of the exchange rates which could result in a significant impact in the results of the Company's operations.

| Exchange rate | Value of notional amount | | Pre-tax impact of a 1% movement in exchange rate | |
|---|---|---|---|---|
| USD-Polish zloty | $ | 480,738 | $ | 4,640 |
| USD-Russian ruble | $ | 263,449 | $ | 2,543 |

### *Effect of Impairment Testing*

The Company continued to observe an overall market environment of declining vodka consumption in its core markets of Poland and Russia. Additionally, the Company experienced other changes in market conditions, including changing the sales channel and product mix, as well as a decline in the economic environment in Russia. As a result of the annual impairment test on goodwill performed as at December 31, 2015, the Company did not recognize an additional impairment charge, as the fair value of the reporting unit exceeds its carrying value.

We cannot guarantee that we will not recognize further asset impairments or experience declines in our financial performance in connection with the ongoing challenges that we are facing in our core markets.

**Nine-month period ended September 30, 2016 compared to nine-month period ended September 30, 2015**

The following discussion and analysis relates to items that have affected the results of operations of the nine-month periods ended September 30, 2015 and 2016, respectively. This analysis should be read in conjunction with our unaudited interim condensed Consolidated Financial Statements and the accompanying notes thereto included as Appendix G in this Offering Memorandum and Disclosure Statement.

A summary of the Company's operating performance is presented below.

| | | nine-month period ended September 30, 2015 (unaudited, as recast) | | nine-month period ended September 30, 2016 (unaudited) | | nine-month period ended September 30, 2016 vs. nine-month period ended September 30, 2015 | |
|---|---|---|---|---|---|---|---|
| Sales | $ | 951,070 | $ | 997,693 | $ | 46,623 | 4.9% |
| Sales to Related Parties | | 6,040 | | 6,738 | | 698 | 11.6% |
| Excise taxes | | (571,075) | | (589,351) | | (18,276) | (3.2%) |
| **Net sales** | | **386,035** | | **415,080** | | **29,045** | **7.5%** |
| Cost of goods sold | | 239,406 | | 249,990 | | (10,584) | (4.4%) |
| Cost of goods sold to Related Parties | | 3,285 | | 5,760 | | (2,475) | (75.3%) |
| **Gross profit** | | **143,344** | | **159,330** | | **15,986** | **11.2%** |
| Selling, general and administrative expenses | | 111,161 | | 122,706 | | (11,545) | (10.4%) |
| Provision for doubtful debts | | 1,358 | | 1,356 | | 2 | 0.1% |
| **Operating income / (loss)** | | **30,825** | | **35,268** | | **4,443** | **14.4%** |
| **Non-operating income / (expense), net** | | | | | | | |
| Interest income | | 71 | | 21 | | (50) | (70.4%) |
| Interest income from Related Parties | | 8,083 | | 10,957 | | 2,874 | 35.6% |
| Interest expense | | (65,809) | | (69,906) | | (4,097) | (6.2%) |
| Interest expense to Related Parties | | (5,394) | | (9,436) | | (4,042) | (74.9%) |
| Foreign exchange gains / (losses), net | | (2,524) | | 14,850 | | 17,374 | -- |
| Other non-operating income / (expense), net | | (13,206) | | (22,219) | | (9,013) | (68.2%) |
| **Income / (loss) before income taxes** | | **(47,954)** | | **(40,465)** | | **7,489** | **15.6%** |
| Income tax benefit / (expense) | | (2,651) | | (1,639) | | 1,012 | 38.2% |
| **Net income / (loss)** | | **(50,605)** | | **(42,104)** | | **8,501** | **16.8%** |
| Less net income / (loss) attributable to non-controlling interest | | (180) | | (476) | | (296) | (164.4%) |
| **Net income / (loss) attributable to the Company** | | **(50,425)** | | **(41,628)** | | **8,797** | **17.4%** |
| Net income / (loss) per share: basic and diluted | $ | (5,042.50) | $ | (4,162.80) | $ | 879.70 | 17.4% |
| Other comprehensive income / (loss), net of tax | | | | | | | |
| Foreign currency translation adjustments, net of tax $0 | | (14,403) | | (6,556) | | 7,847 | 54.5% |
| **Comprehensive income / (loss)** | $ | **(65,008)** | $ | **(48,660)** | $ | **16,348** | **25.1%** |
| Less comprehensive loss attributable to non-controlling interest | | (180) | | (476) | | (296) | (164.4%) |
| **Comprehensive income / (loss) attributable to the Company** | $ | **(64,828)** | $ | **(48,184)** | $ | **16,644** | **25.7%** |

*Net Sales*

Net sales represent total sales net of all customer rebates, excise tax on production and imports and value added tax.

Our business split by segment, which represents our primary geographic locations of operations, Poland domestic, Russia domestic and International, is presented below:

| | **Net Sales** nine-month period ended September 30, 2015 (unaudited, as recast) | | | nine-month period ended September 30, 2016 (unaudited) | | nine-month period ended September 30, 2016 vs. nine-month period ended September 30, 2015 | |
|---|---|---|---|---|---|---|---|
| *Segment* | | | | | | | |
| Poland domestic | $ | 170,250 | $ | 203,024 | $ | 32,774 | 19.3% |
| Russia domestic | | 176,098 | | 122,544 | | (53,554) | (30.4%) |
| International | | 39,687 | | 89,512 | | 49,825 | 125.5% |
| **Total Net Sales** | $ | **386,035** | $ | **415,080** | $ | **29,045** | **7.5%** |

### *Net Sales Key Highlights*

| | Segment Net Sales nine-month period ended September 30, 2015 (unaudited, as recast) | nine-month period ended September 30, 2016 (unaudited) | *nine-month period ended September 30, 2016 vs. nine-month period ended September 30, 2015* | |
|---|---|---|---|---|
| Net Sales reported | $        386,035 | 415,080 | *$     29,045* | *7.5%* |
| Foreign exchange impact | | 30,798 | *30,798* | *-* |
| **Net sales at constant foreign exchange rate** | **$        386,035** | **445,878** | ***$     59,843*** | ***15.5%*** |
| of which: | | | | |
| Poland domestic | 170,250 | 211,898 | *41,648* | *24.5%* |
| Russia domestic | 176,098 | 139,793 | *(36,305)* | *(20.6%)* |
| International | 39,687 | 94,187 | *54,500* | *137.3%* |
| **Net sales at constant foreign exchange rate** | **$        386,035** | **445,878** | ***$     59,843*** | ***15.5%*** |

On a currency-neutral basis, **our total net sales increased by approximately 15.5% or $59.9 million**.

- sales in Poland increased by 24.5% on a currency-neutral basis as a result of a 15.8% higher volumes sold on the domestic market,

- sales in the Russian segment decreased by 20.6% on a currency-neutral basis as a result of a reduction in real consumer purchasing power and overall market decline; in the nine-month period ended September 30, 2016 we also suffered from growth in cheap vodka segment, driven by illegal vodka, that impacted our mainstream vodka sales. These factors were only partially offset by good performance of our premium brands, and

- sales for the International Segment increased by 137.3% on a currency-neutral basis mainly as a result of RDL acquisition and synergies with our related parties.

The negative foreign exchange impact contributed $30.8 million to the total change. Total net sales increased by $29.0 million (approximately 7.5%) from $386.0 million for the nine-month period ended September 30, 2015 to $415.1 million for the nine-month period ended September 30, 2016.

### *Changes in net sales value of the Poland domestic segment*

| Changes in Net Sales - Poland domestic | | |
|---|---|---|
| **Net sales for the nine-month period ended September 30, 2015 (unaudited, as recast)** | **$** | **170,250** |
| Domestic sales volume increase | | 26,833 |
| Price, channel and brand mix impact, net of excise tax effect | | 7,295 |
| Discounts & allowances | | (807) |
| Trade marketing expenses | | 7,532 |
| Other changes | | 795 |
| **Net sales for the nine-month period ended September 30, 2016 excluding foreign exchange impact** | | **211,898** |
| Foreign exchange impact | | (8,874) |
| **Net sales for the nine-month period ended September 30, 2016 (unaudited)** | **$** | **203,024** |

**Poland domestic net sales on a currency-neutral basis increased by $41.6 million (24.5%)** from $170.3 million for the nine-month period ended September 30, 2015 to $211.9 million for the nine-month period ended September 30, 2016. This change was driven mainly by:

- domestic sales volume growth of $26.8 million – total sales by volume in Poland increased by 15.8% in the nine-month period ended September 30, 2016, increasing vodka market share by 3.3 percentage points to 40.9% as at the quarter-end compared to the previous year. Since February 2015, we are the No.1 player in the Polish vodka market and since February 2016, *Soplica* has been the flavored vodka market leader holding around 5.5% of total vodka market share. Domestic growth was driven mainly by:

- constantly growing *Żubrówka* brands – which increased by 16.3% comparing to the nine-month period ended September 30, 2015 and reached over 4.6 million nine-liter cases sold in the first nine months of 2016,

- increase by 23.7% or 395 thousand nine-liter cases sold of *Soplica* vodkas,

- *Żytniówka* volumes sold higher by 20.7% or 227 thousand nine-liter cases,

- successful import brands, *Jägermeister* and *Gancia*, growing by 54.0% and 85.6% respectively,

- growth of 34.9% or 74 thousands nine-liter cases sold of *Grant's* whisky,

- an increase of 89 thousand nine-liter cases sold or 14.0% in *Carlo Rossi* wines,

- a favorable price, channel and brand mix impact, net of the excise tax, of $7.3 million,

- lower trade marketing expenses and discount & allowances by $6.7 million net, and

- other factors with a positive impact of $0.8 million.

The negative foreign exchange effect from the weakening of the Polish zloty against the U.S. dollar accounted for $8.9 million on net sales.

### Changes in net sales value of the Russia domestic segment

| Changes in Net Sales - Russia | | |
|---|---|---|
| Net sales for the nine-month period ended September 30, 2015 (unaudited, as recast) | $ | 176,098 |
| Domestic sales volume decline | | (43,759) |
| Price, channel and brand mix impact | | 37,719 |
| Discounts & allowances including trade marketing expenses | | (19,818) |
| Excise | | (6,865) |
| Other changes | | (3,582) |
| Net sales for the nine-month period ended September 30, 2016 excluding foreign exchange impact | | 139,793 |
| Foreign exchange impact | | (17,249) |
| Net sales for the nine-month period ended September 30, 2016 (unaudited) | $ | 122,544 |

Net sales in Russia on a currency-neutral basis decreased by $36.3 million (20.6%), from $176.1 million for the nine-month period ended September 30, 2015 to $139.8 million for the nine-month period ended September 30, 2016, mainly as a result of:

- depreciation of the local currencies against the U.S. dollar, which led to a reduction in real consumer income, that resulted in a reduced domestic sales volume and caused our gross sales in U.S. dollar terms to be lower by $43.8 million;

- decrease in sales related mainly to mainstream vodka and agency brands, and

- discounts and trade marketing expenses increased by $19.8 million as an effect of fixed part of trade marketing expenses.

We have taken several actions to protect our results in Russia. These actions positively impacted our net sales. Favorable price, channel and brand mix were the main drivers, resulting in a positive impact of $37.7 million for the nine-month period ended September 30, 2016. The negative impact of higher excise taxes amounted to $6.9 million.

Negative foreign exchange effect from the significant weakening of the Russian ruble against the U.S. dollar accounted for the $17.2 million negative effect on sales.

*Changes in net sales value of the International segment*

| Changes in Net Sales - International | | |
|---|---|---|
| Net sales for the nine-month period ended September 30, 2015 (unaudited, as recast) | $ | 39,687 |
| International sales volume increase | | 7,036 |
| Price, channel and brand mix impact, net of excise tax effect | | 5,657 |
| Discounts & allowances including trade marketing expenses | | 16,383 |
| Excise | | 398 |
| RDL acquisition | | 24,694 |
| Other changes | | 332 |
| Net sales for the nine-month period ended September 30, 2016 excluding foreign exchange impact | | 94,187 |
| Foreign exchange impact | | (4,675) |
| Net sales for the nine-month period ended September 30, 2016 (unaudited) | $ | 89,512 |

In the first nine months of 2016, we continued our efforts to expand the international business (i.e. sales to markets other than Poland and Russia).

**International sales on a currency-neutral basis increased by $54.5 million (137.3%)**, from $39.7 million for the nine-month period ended September 30, 2015 to $94.2 million for the nine-month period ended September 30, 2016. This change was driven mainly by:

- the acquisition of RDL and the consolidation of its results for the first half of 2016 that contributed $24.7 million,

- positive effect on discounts, allowances and trade marketing of $16.4 million,

- increase in international sales volume with impact of $7.0 million, and

- favorable effect on price, channel and brand mix of $5.7 million.

Negative foreign exchange effect from the weakening of the functional currencies of our international segments, namely Polish zloty, Russian ruble, Hungarian forint, Ukrainian hryvnia and euro, against the U.S. dollar accounted for $4.7 million, causing total net sales for the nine-month period ended September 30, 2016, amounting to $89.5 million, to be higher by $49.8 million as compared to previous period.

### Gross Profit

**On a currency-neutral basis gross profit increased by $24.7 million**, from $143.4 million for the nine-month period ended September 30, 2015 to $168.0 million for the nine-month period ended September 30, 2016. Gross profit, as a percentage of net sales, increased by 1.3 percentage points from 37.1% for the nine-month period ended September 30, 2015 to 38.4% for the nine-month period ended September 30, 2016.

Negative foreign exchange effect accounted to $8.7 million, causing total gross profit for the nine-month period ended September 30, 2016, amounting to $159.3 million, to be higher by $16.0 million compared to previous year.

| | Gross profit | | | | | |
|---|---|---|---|---|---|---|
| | nine-month period ended September 30, 2015 (unaudited, as recast) | | nine-month period ended September 30, 2016 (unaudited) | | *nine-month period ended September 30, 2016 vs. nine-month period ended September 30, 2015* | |
| Gross profit reported | $ | 143,344 | $ | 159,330 | $ | *15,986* | *11.2%* |
| Foreign exchange impact | | | | 8,716 | | *8,716* | *-* |
| Gross profit at constant foreign exchange rate | $ | 143,344 | $ | 168,046 | $ | *24,702* | *17.2%* |

### Operating expenses

Operating expenses comprise selling, general and administrative expenses ("*SG&A*") and impairment charges. SG&A consists of staff costs, warehousing and transportation costs, marketing expenses, administrative

expenses and non-production depreciation and amortization. Total operating costs increased by $11.5 million, from $112.5 million for the nine-month period ended September 30, 2015 to $124.1 million for the nine-month period ended September 30, 2016. This change was primarily driven by non-recurring legal and professional fees related to efforts to decrease the leverage and improve the liquidity of the Roust business, offset by positive exchange differences of $10.3 million. RDL activity, which started in 2015 and is not fully comparable, also resulted in higher marketing expenses in the nine-month period ended September 30, 2016 compared to the corresponding period of 2015.

The following table presents the items of operating expenses.

| | **Operating Expenses** | | | |
|---|---|---|---|---|
| | nine-month period ended September 30, 2015 | nine-month period ended September 30, 2016 | *nine-month period ended September 30, 2016 vs. nine-month period ended September 30, 2015* | |
| | (unaudited, as recast) | (unaudited) | | |
| Staff costs | $ 64,093 | $ 59,369 | *$ 4,724* | *7.4%* |
| Warehousing and transportation | 20,935 | 17,648 | *3,287* | *15.7%* |
| Marketing | 11,961 | 19,488 | *(7,527)* | *(62.9%)* |
| Administrative and other operating expenses | 9,069 | 20,780 | *(11,711)* | *(129.1%)* |
| Depreciation and amortization | 5,103 | 5,421 | *(318)* | *(6.2%)* |
| **Selling, general and administrative expenses** | **$ 111,161** | **$ 122,706** | *$ (11,545)* | *(10.4%)* |
| Provision for doubtful debts | 1,358 | 1,356 | *2* | *0.1%* |
| **Total operating costs** | **$ 112,519** | **$ 124,062** | *$ (11,543)* | *(10.3%)* |
| **Total operating costs as % of net sales** | **29.1%** | **29.9%** | | |

**Total SG&A increased by $11.5 million** from $111.2 million for the nine-month period ended September 30, 2015 to $122.7 million for the nine-month period ended September 30, 2016 and, as a percent of net sales, they increased by 0.8 percentage points from 29.1% for the nine-month period ended September 30, 2015 to 29.9% for the nine-month period ended September 30, 2016.

**Staff costs were reduced by $4.7 million** from $64.1 million for the nine-month period ended September 30, 2015 to $59.4 million for the nine-month period ended September 30, 2016. This decrease was mainly a result of positive foreign exchange rate effect of $5.6 million, which was partially offset by including RDL's expenses for the whole nine-month period of 2016, compared to effectively three months consolidated in 2015.

**Warehousing and transportation costs were reduced by $3.3 million** from $20.9 million for the nine-month period ended September 30, 2015 to $17.6 million for the nine-month period ended September 30, 2016, of which $1.5 million is saving due to lower volumes sold in Russia, and $1.8 million is a result of positive foreign exchange rate changes.

**Marketing costs increased by $7.5 million** from $12.0 million for the nine-month period ended September 30, 2015 to $19.5 million for the nine-month period ended September 30, 2016, of which $9.0 million is increase in marketing relating to the international business, partially offset by $0.7 million of foreign exchange rate changes.

**Administrative expenses increased by $11.7 million** from $9.1 million for the nine-month period ended September 30, 2015 to $20.8 million for the nine-month period ended September 30, 2016. Administrative expenses mainly consist of legal, professional and office costs. The increase is primarily driven by the non-recurring legal and professional costs related to efforts to decrease the leverage and improve the liquidity of the Roust business.

**Depreciation and amortization increased by $0.3 million** and amounted to $5.1 million for the nine-month period ended September 30, 2015 compared to $5.4 million for the nine-month period ended September 30, 2016.

*Operating Income / (Loss)*

**Total operating income increased by $4.4 million** from $30.9 million for the nine-month period ended September 30, 2015 to $35.3 million for the nine-month period ended September 30, 2016, mainly due to the impact

of the good operating results in Poland and International markets, partially offset by increased corporate overheads and underperformance of our Russian business in 2016.

The following table summarizes the segmental split of operating income/(loss):

| | | Operating Income / (Loss) | | | | |
|---|---|---|---|---|---|---|
| | | nine-month period ended September 30, 2015 | | nine-month period ended September 30, 2016 | nine-month period ended September 30, 2016 vs. nine-month period ended September 30, 2015 | |
| | | (unaudited, as recast) | | (unaudited) | | |
| Poland domestic | | 24,184 | | 36,631 | 12,447 | 51.5% |
| Foreign exchange impact | | | | 1,427 | 1,427 | - |
| Poland domestic at constant foreign exchange rate | | 24,184 | | 38,058 | 13,874 | 57.4% |
| Russia domestic | | 8,689 | | (2,900) | (11,589) | - |
| Foreign exchange impact | | | | (1,391) | (1,391) | - |
| Russia domestic at constant foreign exchange rate | | 8,689 | | (4,291) | (12,980) | - |
| International | | 4,593 | | 15,956 | 11,363 | 247.4% |
| Foreign exchange impact | | | | (1,484) | (1,484) | - |
| International at constant foreign exchange | | 4,593 | | 14,472 | 9,879 | 215.1% |
| General corporate overhead | | (6,641) | | (14,419) | (7,778) | (117.1%) |
| Foreign exchange impact | | | | 3,403 | 3,403 | - |
| General corporate overhead at constant foreign exchange rate | | (6,641) | | (11,016) | (4,375) | (65.9%) |
| **Total Operating Income / (Loss) reported** | $ | **30,825** | $ | **35,268** | 4,443 | 14.4% |
| Foreign exchange impact | | - | | 1,955 | 1,955 | - |
| **Total Operating Income / (Loss) at constant foreign exchange rate** | $ | **30,825** | $ | **37,223** | 6,398 | 20.8% |

**Operating income in Poland domestic, on a currency neutral basis, increased by $13.9 million** (approximately 57.4%) from $24.2 million for the nine-month period ended September 30, 2015 to $38.1 million for the nine-month period ended September 30, 2016, mainly due to the increase in net sales of $40.9 million offset by higher cost of goods sold of $23.9 million related to higher volumes sold and increase of spirit and sugar prices, and the $3.9 million increase in operating expenses. A negative foreign exchange effect from the weakening of the Polish zloty against the U.S. dollar accounted for $1.4 million, causing operating income in Poland for the nine-month period ended September 30, 2016, amounting to $36.6 million, to be higher by $12.4 million as compared to previous period.

**Operating income in Russia domestic, on a currency neutral basis, decreased by $13.0 million** from $8.7 million income for the nine-month period ended September 30, 2015 to a loss of $4.3 million for the nine-month period ended September 30, 2016, mainly as a result of the $36.6 million decline in net sales, offset by savings in cost of sales of $18.3 million and in operating costs of $5.1 million. A positive foreign exchange effect from the weakening of the Russian ruble against the U.S. dollar accounted for $1.4 million, causing operating result in Russia for the nine-month period ended September 30, 2016, amounting to $2.9 million loss, to be lower by $11.6 million compared to previous year.

**Operating income in International, on a currency neutral basis, increased by $9.9 million** (approximately 215.0%) from $4.6 million for the nine-month period ended September 30, 2015 to $14.5 million for the nine-month period ended September 30, 2016, mainly as a result of consolidation of RDL's results for all nine months which contributed $12.6 million and good performance of our brands on Hungarian market giving $2.6 million of positive impact. A positive foreign exchange effect from the strengthening of our functional currencies against the U.S. dollar accounted for $1.5 million, causing operating income in international for the nine-month period ended September 30, 2016 to be higher by $11.4 million compared to previous year and amounting to $16.0 million.

**Corporate overheads increased by $7.8 million** (approximately 117.1%) from $6.6 million for the nine-month period ended September 30, 2015 to $14.4 million for the nine-month period ended September 30, 2016, mainly as a result of the non-recurring professional fees related to efforts to decrease the leverage and improve the liquidity of the Roust business. All recurring corporate costs are strictly monitored.

### *EBITDA*

The Company's management assesses the performance of the business based on the EBITDA i.e. operating income adjusted for depreciation and impairment charges. Our EBITDA increased by $5.2 million, or 13.6%, from $38.2 million for the nine-month period ended September 30, 2015 to $43.4 million for the nine-month period ended September 30, 2016. The tables below present a reconciliation of our operating results to EBITDA and our EBITDA by segment.

In previous years the Management assessed the performance of the business based on Underlying EBITDA, i.e. operating income adjusted for depreciation, impairment charges and other excluded items. Underlying EBITDA is now used as an additional measure of performance.

| EBITDA (non-GAAP measure) to Operating Income reconciliation | | | | |
|---|---|---|---|---|
| | nine-month period ended September 30, 2015 (unaudited, as recast) | nine-month period ended September 30, 2016 (unaudited) | *nine-month period ended September 30, 2016 vs. nine-month period ended September 30, 2015* | |
| Operating income / (loss) | $    30,825 | $    35,268 | *4,443* | *14.4%* |
| Depreciation and amortization | 7,407 | 8,162 | *755* | *10.2%* |
| Impairment charge | - | - | | |
| **EBITDA** | **38,232** | **43,430** | *5,198* | *13.6%* |
| Other excluded items (non-GAAP measure) | 16,297 | 8,608 | *(7,689)* | *(47.2%)* |
| **Total Underlying EBITDA** | $    **54,529** | $    **52,038** | *(2,491)* | *(4.6%)* |

| EBITDA (non-GAAP measure) | | | | |
|---|---|---|---|---|
| | nine-month period ended September 30, 2015 (unaudited, as recast) | nine-month period ended September 30, 2016 (unaudited) | *nine-month period ended September 30, 2016 vs. nine-month period ended September 30, 2015* | |
| **Segment** | | | | |
| Poland domestic | $    28,899 | $    41,933 | *13,034* | *45.1%* |
| Russia domestic | 11,075 | (319) | *(11,394)* | *-* |
| International | 4,856 | 16,209 | *11,353* | *233.8%* |
| Corporate | (6,598) | (14,393) | *(7,795)* | *(118.1%)* |
| **Total EBITDA** | $    **38,232** | $    **43,430** | *5,198* | *13.6%* |

| Underlying EBITDA (non-GAAP measure) | | | | |
|---|---|---|---|---|
| | nine-month period ended September 30, 2015 (unaudited, as recast) | nine-month period ended September 30, 2016 (unaudited) | *nine-month period ended September 30, 2016 vs. nine-month period ended September 30, 2015* | |
| **Segment** | | | | |
| Poland domestic | $    37,680 | $    42,201 | *4,521* | *12.0%* |
| Russia domestic | 18,559 | (320) | *(18,879)* | *-* |
| International | 4,889 | 16,209 | *11,320* | *231.5%* |
| Corporate | (6,599) | (6,052) | *547* | *8.3%* |
| **Total Underlying EBITDA** | $    **54,529** | $    **52,038** | *(2,491)* | *(4.6%)* |

We recognized $16.3 million and $8.6 million of excluded items in the nine-month periods ended September 30, 2015 and 2016, respectively. In the nine-month period ended September 30, 2015 excluded items related mainly to the impact of early payments discounts to secure possible bad debts in Russia and in Poland to secure working capital due to rapid business growth. In the nine-month period ended September 30, 2016 these

excluded items mainly relate to one-off legal and professional costs. No costs of revenue acceleration deals were excluded from the Underlying EBITDA for the nine-month period ended September 30, 2016. Management believes that approximately 50% of such costs (i.e. approximately $8.6 million) is recoverable in 2017. Were these costs excluded our Underlying EBITDA for the nine-month period ended September 30, 2016 would amount to $60.6 million.

Notwithstanding the weakening of our local currencies, the decline in the purchasing power of the citizens in Russia, and the CIS countries, and political headwinds, the Company's performance remains solid with our EBITDA in the nine-month period ended September 30, 2016 amounting to $43.4 million, as compared to $38.2 million for the nine-month period ended September 30, 2015.

The table below presents the significance of seasonality by quarter in our statements of operations for the last four quarters ended September 30, 2015 and September 30, 2016.

| | Fourth Quarter | First Quarter | Second Quarter | Third Quarter |
| | 2015 | 2016 | 2016 | 2016 |
| | (unaudited) | (unaudited) | (unaudited) | (unaudited) |
|---|---|---|---|---|
| Net sales | $    198,196 | $    109,985 | $    145,163 | $    159,932 |
| **Seasonality*** | **32.3%** | **17.9%** | **23.7%** | **26.1%** |
| Gross profit | 64,906 | 40,531 | 58,010 | 60,789 |

| | Fourth Quarter | First Quarter | Second Quarter | Third Quarter |
| | 2014 | 2015 | 2015 | 2015 |
| | (unaudited) | (unaudited) | (unaudited) | (unaudited, as recast) |
|---|---|---|---|---|
| Net sales | $    243,614 | $    107,488 | $    136,626 | $    141,921 |
| **Seasonality*** | **38.7%** | **17.1%** | **21.7%** | **22.5%** |
| Gross profit | 85,443 | 44,748 | 46,934 | 51,662 |

*Net sales for the given period as a percentage of the total net sales for the relevant four quarters as presented in the table.*

### Interest Income / (Expense)

Total net interest expense increased by approximately 8.4%, or $5.3 million, from $63.0 million for the nine-month period ended September 30, 2015 to $68.4 million for the nine-month period ended September 30, 2016. This increase was primarily driven by higher interest expense from Existing Notes and other borrowings due to higher balance of Existing Notes resulting from capitalization of PIK interest, as well as higher other borrowings balance.

| Interest Income / (Expense) | | | | |
|---|---|---|---|---|
| | nine-month period ended September 30, 2015 (unaudited, as recast) | nine-month period ended September 30, 2016 (unaudited) | nine-month period ended September 30, 2016 vs. nine-month period ended September 30, 2015 | |
| Interest income | $    8,154 | $    10,978 | $    2,824 | 34.6% |
| *Interest expense* | | | | |
| Notes | $    (50,730) | $    (52,655) | $    (1,925) | (3.8%) |
| Other borrowings | (20,473) | (26,687) | (6,214) | (30.4%) |
| **Total interest expense** | **$    (71,203)** | **$    (79,342)** | **$    (8,139)** | **(11.4%)** |
| **Total interest income / (expense), net** | **$    (63,049)** | **$    (68,364)** | **$    (5,315)** | **(8.4%)** |

*Other Financial Income / (Expense)*

The Company recognized $2.5 million of foreign exchange losses and $14.9 million of foreign exchange gains for the nine-month periods ended September 30, 2015 and September 30, 2016, respectively.

Foreign exchange losses in the nine-month period ended September 30, 2015 include the negative impact of foreign exchange translation of approximately $22.4 million related to bond proceeds on-lent in U.S. dollars to subsidiaries having local functional currencies different from U.S. dollar. These foreign exchange losses are offset by net foreign exchange gains of approximately $19.9 million arising on other loans and other balance sheet items.

Foreign exchange gains in the nine-month period ended September 30, 2016 include the positive impact of foreign exchange translation of approximately $49.2 million related to bond proceeds on-lent in U.S. dollars to subsidiaries having local functional currencies different from U.S. dollar. These foreign exchange gains are offset by net foreign exchange losses of approximately $35.0 million arising on other loans and other balance sheet items.

| | Foreign exchange gains / (losses), net | | | | | | |
|---|---|---|---|---|---|---|---|
| | nine-month period ended September 30, 2015 (unaudited, as recast) | | nine-month period ended September 30, 2016 (unaudited) | | *nine-month period ended September 30, 2016 vs. nine-month period ended September 30, 2015* | | |
| Unrealized foreign exchange impact related to foreign currency financing | $ | (3,498) | $ | 22,254 | $ | *25,752* | - |
| Unrealized foreign exchange impact - other balance sheet items | | (1,895) | | (5,683) | | *(3,788)* | *(66.7%)* |
| Other gains / (losses) | | 2,869 | | (1,721) | | *(4,590)* | - |
| **Total foreign exchange gains / (losses), net** | $ | **(2,524)** | $ | **14,850** | $ | *17,374* | - |

*Other Non-Operating Expenses*

Total other non-operating expenses increased by $9.0 million from $13.2 million for the nine-month period ended September 30, 2015 to $22.2 million for the nine-month period ended September 30, 2016.

The main items included in other non-operating expenses are as follows:

- factoring expenses amounting to $8.5 million and $16.4 million for the nine-month periods ended September 30, 2015 and September 30, 2016, respectively;

- the cost of bank guarantees, which decreased by $0.8 million from $3.4 million to $2.6 million for the nine-month periods ended September 30, 2015 and September 30, 2016, respectively;

- the cost of loans granted to one of our Related Party written off in the amount of $0.5 million in the nine-month period ended September 30, 2016.

| | Non-operating Income / (Expense) | | | | | | |
|---|---|---|---|---|---|---|---|
| | nine-month period ended September 30, 2015 (unaudited, as recast) | | nine-month period ended September 30, 2016 (unaudited) | | *nine-month period ended September 30, 2016 vs. nine-month period ended September 30, 2015* | | |
| Factoring costs and bank guarantee fees | $ | (11,895) | $ | (19,008) | $ | *(7,113)* | *(59.8%)* |
| Other gains / (losses) | | (1,311) | | (3,211) | | *(1,900)* | *(144.9%)* |
| **Total other non-operating income / (expense), net** | $ | **(13,206)** | $ | **(22,219)** | $ | *(9,013)* | *(68.2%)* |

***Income Tax***

The income tax expense for the nine-month period ended September 30, 2015 was $2.7 million, which represents an effective tax rate for this period of negative 5.5%. The income tax expense for the nine-month period ended September 30, 2016 was $1.6 million, which represents an effective tax rate for this period of negative 4.1% The difference between the effective tax rate and the statutory rates (20% in Russia, 19% in Poland and Hungary, 18% in Ukraine and 35% in the United States) was primarily due to the valuation allowance recorded against tax loss carryforwards that the Company believes will not be utilized in the future.

**Year ended December 31, 2015 compared to year ended December 31, 2014**

A summary of the Company's operating performance (expressed in thousands except per share amounts) is presented below.

| | Note | Year ended December 31, 2014 | Year ended December 31, 2015 | Year ended December 31, 2015 vs. year ended December 31, 2014 | |
|---|---|---|---|---|---|
| Sales | | $ 1,870,995 | $ 1,399,296 | $ (471,699) | (25.2%) |
| Sales to Related Parties | 20 | 2,029 | 17,697 | 15,668 | 772.2% |
| Excise taxes | | (1,028,646) | (832,762) | 195,884 | 19.0% |
| **Net sales** | | **844,378** | **584,231** | **(260,147)** | **(30.8%)** |
| Cost of goods sold | | 520,045 | 369,610 | 150,435 | 28.9% |
| Cost of goods sold to Related Parties | 20 | 997 | 6,322 | (5,325) | (534.1%) |
| **Gross profit** | | **323,336** | **208,299** | **(115,037)** | **(35.6%)** |
| Selling, general and administrative expenses | 22 | 250,499 | 153,586 | 96,913 | 38.7% |
| Provision for doubtful debts | 6 | (3,559) | 1,833 | (5,392) | - |
| **Operating income / (loss)** | | **76,396** | **52,880** | **(23,516)** | **(30.8%)** |
| *Non-operating income / (expense), net* | | | | | |
| Interest income | | 357 | 96 | (261) | (73.1%) |
| Interest income from Related Parties | 20 | 13,114 | 11,372 | (1,742) | (13.3%) |
| Interest (expense) | 23 | (88,278) | (87,978) | 300 | 0.3% |
| Interest (expense) to Related Parties | 20, 23 | (7,846) | (8,560) | (714) | (9.1%) |
| Foreign exchange (losses), net | 24 | (75,082) | (15,643) | 59,439 | 79.2% |
| Other non-operating (expense), net | 25 | (21,133) | (18,755) | 2,378 | 11.3% |
| **Income / (Loss) before reorganization items and income taxes** | | **(102,472)** | **(66,588)** | **35,884** | **35.0%** |
| Reorganization items | | - | - | - | |
| **Income / (Loss) before income taxes** | | **(102,472)** | **(66,588)** | **35,884** | **35.0%** |
| Income tax benefit / (expense) | | (12,334) | 13,357 | 25,691 | - |
| **Net income / (loss)** | | **(114,806)** | **(53,231)** | **61,575** | **53.6%** |
| Less net income / (loss) attributable to non-controlling interest | | (379) | (195) | 184 | 48.5% |
| **Net income / (loss) attributable to the Company** | | **$ (114,427)** | **$ (53,036)** | **61,391** | **53.7%** |
| from operations per share of common stock, basic | 26 | $ (11,442.70) | $ (5,303.60) | - | - |
| from operations per share of common stock, diluted | 26 | $ (11,442.70) | $ (5,303.60) | - | - |
| **Other comprehensive income / (loss), net of tax** | | | | | |
| Foreign currency translation adjustments, net of tax $0 | 27 | (41,769) | (14,776) | 26,993 | 64.6% |
| **Comprehensive income / (loss)** | | **$ (156,575)** | **$ (68,007)** | **88,567** | **56.6%** |
| Less comprehensive income attributable to non-controlling interest | | (379) | (195) | 184 | 48.5% |
| **Comprehensive income / (loss) attributable to the Company** | | **$ (156,196)** | **$ (67,812)** | **88,383** | **56.6%** |

*Net Sales*

Net sales represent total sales net of all customer rebates, excise tax on production and imports and value added tax.

Our business split by segment, which represents our primary geographic locations of operations, Poland, Russia and Hungary, is presented below:

| | Segment Net Sales | | |
| | Year ended December 31, 2014 | Year ended December 31, 2015 | Year ended December 31, 2015 vs. year ended December 31, 2014 | |
| --- | --- | --- | --- | --- |
| **Previous segment** | | | | |
| Poland | $    287,999 | 260,154 | $    (27,845) | (9.7%) |
| Russia | 525,082 | 297,357 | (227,725) | (43.4%) |
| Hungary | 31,297 | 26,720 | (4,577) | (14.6%) |
| **Total Net Sales** | $    844,378 | 584,231 | $    (260,147) | (30.8%) |

| | Segment Net Sales | |
| | | Year ended December 31, 2015 |
| --- | --- | --- |
| **Segment** | | |
| Poland domestic | $ | 252,425 |
| Russia domestic | | 256,185 |
| International | | 75,621 |
| **Total Net Sales** | $ | 584,231 |

*Net Sales Key Highlights*

| | Segment Net Sales | | |
| | Year ended December 31, 2014 | Year ended December 31, 2015 | Year ended December 31, 2015 vs. year ended December 31, 2014 | |
| --- | --- | --- | --- | --- |
| Net Sales reported | $    844,378 | 584,231 | $    (260,147) | (30.8%) |
| Foreign exchange impact | | 233,738 | 233,738 | - |
| **Net sales at constant foreign exchange rate** | **$    844,378** | **817,969** | **$    (26,409)** | **(3.1%)** |
| of which: | | | | |
| Poland | 287,999 | 311,226 | 23,227 | 8.1% |
| Russia | 525,082 | 474,868 | (50,214) | (9.6%) |
| Hungary | 31,297 | 31,875 | 578 | 1.8% |
| **Net sales at constant foreign exchange rate** | **$    844,378** | **817,969** | **$    (26,409)** | **(3.1%)** |

On a currency-neutral basis, our total net sales remained relatively stable declining only by approximately 3.1% or $26.4 million.

- sales in Poland increased by 8.1% on a currency-neutral basis as a result of a higher volumes sold on the domestic market,

- sales in the Russian segment decreased by 9.6% on a currency-neutral basis as a result of a reduction in real consumer income and inflationary price increases,

- sales for Hungary increased by 1.8% on a currency-neutral basis as a result of the better price, channel and brand mix.

The negative foreign exchange impact contributed $233.7 million to the total decline year on year. Total net sales decreased by $260.1 million (approximately 30.8%) from $844.4 million for the year ended December 31, 2014 to $584.2 million for the year ended December 31, 2015.

97

*Changes in net sales value of the Polish segment*

| Changes in Net Sales - Poland | | |
|---|---|---:|
| Net sales for the year ended December 31, 2014 | $ | 287,999 |
| Price, channel and brand mix impact net of excise tax increase effect | | (123) |
| Domestic sales volume increase | | 43,768 |
| Destocking impact | | (3,069) |
| International sales decrease | | (2,899) |
| Discounts and allowances | | (3,714) |
| Trade marketing expenses | | (10,208) |
| Other changes | | (528) |
| Net sales for the year ended December 31, 2015 excluding foreign exchange impact | | 311,226 |
| Foreign exchange impact | | (51,072) |
| Net sales for the year ended December 31, 2015 | $ | 260,154 |

Poland's sales on a currency-neutral basis increased by $23.2 million, from $288.0 million for the year ended December 31, 2014 to $311.2 million for the year ended December 31, 2015. This change was driven mainly by:

- domestic sales volume growth of $43.8 million – total sales by volume in Poland increased by 13.9% in 2015, increasing market share by 6.5 percentage points to 37.9% as at the year-end compared to 2014. Since February 2015, we are the No. 1 player on Polish vodka market. Domestic growth was driven mainly by:

  - the continued success of the *Żubrówka* brands – which increased by 20.9% from 2014 and reached 5.9 million nine-liter cases sold,

  - 22.8% or $12.2 million increase in net sales value of *Soplica* vodkas,

  - growth of 25.3% or 80 thousands nine-liter cases of *Grant*'s whisky by volume,

  - an increase of 126 thousand nine-liter cases or 14.7% in *Carlo Rossi* wines by volume,

- a stable price, channel and brand mix impact, net of the excise tax increase (of negative $0.1 million),

- negative effect of distributors destocking which was performed throughout 2015 to decrease level of inventory kept by distributors, in the amount of $ 3.1 million,

- increased trade marketing expenses of $10.2 million,

- a higher level of discounts and allowances of $3.7 million, being an effect of higher cash discounts given in 2015,

- international sales which decreased by $2.9 million, mainly due to the discontinuance of unprofitable private label production and destocking of *Green Mark*,

- other factors with a negative impact of $0.5 million.

- The negative foreign exchange effect from the weakening of the Polish zloty against the U.S. dollar accounted for $51.1 million, causing total net sales for the year ended December 31, 2015 amounting to $260.2 million to be lower by $27.8 million compared to previous year.

*Changes in net sales value of the Russian segment*

| Changes in Net Sales - Russia | | |
|---|---|---|
| Net sales for the year ended December 31, 2014 | $ | 525,082 |
| Price, channel and brand mix impact net of excise tax increase effect | | 64,016 |
| International sales increase resulting from RDL acquisition (distribution of *Russian Standard Vodka*) | | 32,308 |
| Domestic sales volume decrease | | (97,293) |
| Destocking impact | | (38,602) |
| International sales decrease - other brands | | (18,502) |
| Discounts and allowances | | 6,830 |
| Trade marketing expenses | | (538) |
| Other changes | | 1,567 |
| Net sales for the year ended December 31, 2015 excluding foreign exchange impact | $ | 474,868 |
| Foreign exchange impact | | (177,511) |
| Net sales for the year ended December 31, 2015 | | 297,357 |

Sales in Russia on a currency-neutral basis decreased by $50.2 million, from $525.1 for the year ended December 31, 2014 to $474.9 million for the year ended December 31, 2015, mainly as a result of:

- a shrinking vodka market in Russia and depreciation of the local currencies against the U.S. dollar, which led to a reduction in real consumer income, resulted in a reduced domestic sales volume and caused our profit in U.S. dollar terms to be lower by $97.3 million.

- total domestic sales volume decline includes also the negative effect of distributors destocking throughout 2015 at the amount of $38.6 million; as a result of destocking we reduced the level of inventory kept by distributors to a minimal economically available levels; the destocking process is now completed;

- the $18.5 million decrease in international sales due to the difficult geopolitical situation in Ukraine and depreciation of local currencies against the U.S. dollar in the CIS countries, which led to inflationary price increases and a decline in consumer income.

We have taken several actions to protect our results in Russia. These actions positively impacted our net sales:

- a favorable price, channel and brand mix, net of the excise tax increase, had a positive impact of $64.0 million,

- the acquisition of RDL and consolidation of its results for the second half of 2015, contributed $32.3 million, and

- lower discounts and allowances given to customers contributed $6.8 million.

Negative foreign exchange effect from the significant weakening of the Russian ruble against the U.S. dollar accounted for $177.5 million, causing total net sales for the year ended December 31, 2015 amounting to $297.4 million to be lower by $227.7 million compared to previous year.

*Changes in net sales value of the Hungarian segment*

| Changes in Net Sales - Hungary | | |
|---|---|---|
| Net sales for the year ended December 31, 2014 | $ | 31,297 |
| Price, channel and brand mix impact net of excise tax increase effect | | 4,898 |
| Discounts & allowances and trade marketing expenses | | (1,734) |
| Domestic sales volume increase | | 2,897 |
| Destocking impact | | (5,048) |
| Other changes | | (435) |
| Net sales for the year ended December 31, 2015 excluding foreign exchange impact | | 31,875 |
| Foreign exchange impact | | (5,155) |
| Net sales for the year ended December 31, 2015 | $ | 26,720 |

Hungary's sales on a currency-neutral basis increased by $0.6 million, from $31.3 million for the year ended December 31, 2014 to $31.9 million for the year ended December 31, 2015. This change was driven mainly by:

- a favorable price, channel and brand mix of $4.9 million,

- an increase of $ 2.9 million in domestic sales,

- which was partially offset by a $5.0 million destocking impact due to the introduction of a health tax on alcoholic beverages from January 1, 2015 and a decrease in *Royal* vodka volumes of 12.4% or 39.7 thousand nine-liter cases mainly caused by the build-up of inventory at the end of 2014.

- Our market share in the mainstream vodka segment grew by 11.2 percentage points, increasing from 53.5% to 64.7% in the fourth quarter of 2015 (according to available Nielsen October - November 2015 data). We also achieved a record high market share on a MAT basis at 64.4% (which is an increase of 12.6%), with retail depletion rising in October – November by 67.0% and 47.7% year to date, as well as 46.6% on a MAT basis compared to the prior year.

- Negative foreign exchange effect from the weakening of the Hungarian forint against the U.S. dollar accounted for $5.2 million, causing total net sales for the year ended December 31, 2015 amounting to $26.7 million to be lower by $4.6 million compared to previous year.

### *Expansion of international business*

In 2015, we continued efforts to expand our international business (i.e. sales to markets other than Poland and Russia). We noted growing depletions in our international business. We recorded a 15.1% increase in our international sales volumes, growing from 1.9 million nine-liter cases for the year ended December 31, 2014 to 2.2 million nine-liter cases for the year ended December 31, 2015. Our international sales value increased by 3.9%, from $42.7 million for the year ended December 31, 2014 to $44.4 million for the year ended December 31, 2015.

Total international volumes (thousands of nine-liter cases) and net sales are presented below:

| | International Sales | | |
| --- | --- | --- | --- |
| | Year ended December 31, 2014 | Year ended December 31, 2015 | Year ended December 31, 2015 vs. year ended December 31, 2014 |
| International sales - volume (thousands of 9 liter cases) | 1,889 | 2,175 | 286 | 15.1% |
| International sales - value | $ 42,748 | $ 44,411 | $ 1,663 | 3.9% |

### *Gross Profit*

Gross profit, as a percentage of net sales, decreased by 2.6 percentage points from 38.3% for the year ended December 31, 2014 to 35.7% for the year ended December 31, 2015. On a currency-neutral basis gross profit decreased by $42.8 million, from $323.3 million for the year ended December 31, 2014 to $280.5 million for the year ended December 31, 2015, mainly due to the market decline in Russia and CIS countries not fully offset by better results achieved by Poland and Hungary.

Negative foreign exchange effect accounted to $72.2 million, causing total gross profit for the year ended December 31, 2015 amounting to $208.3 million to be lower by $115.0 million compared to previous year.

| | Year ended December 31, 2014 | Year ended December 31, 2015 |
| --- | --- | --- |
| Gross profit reported | $ 323,336 | $ 208,299 |
| Foreign exchange impact | | 72,206 |
| **Gross profit at constant foreign exchange rate** | **$ 323,336** | **$ 280,505** |

*Operating Expenses*

Operating expenses comprise SG&A and impairment charges. SG&A consists of staff costs, warehousing and transportation costs, marketing expenses, administrative expenses and non-production depreciation and amortization. Total operating costs decreased by $91.5 million, from $246.9 million for the year ended December 31, 2014 to $155.4 million for the year ended December 31, 2015. This change was primarily driven by better control over operating expenses and synergies in Russia, increased by exchange differences of $60.7 million.

The following table presents the items of operating expenses:

| | **Operating Expenses** | | | | |
|---|---|---|---|---|---|
| | Year ended December 31, 2014 | | Year ended December 31, 2015 | | Year ended December 31, 2015 vs. year ended December 31, 2014 |
| Staff costs | $ | 126,006 | $ | 85,191 | $ | 40,815 | 32.4% |
| Warehousing and transportation | | 47,816 | | 29,831 | | 17,985 | 37.6% |
| Marketing | | 29,051 | | 16,401 | | 12,650 | 43.5% |
| Administration expenses | | 40,164 | | 15,414 | | 24,750 | 61.6% |
| Depreciation and amortization | | 7,462 | | 6,749 | | 713 | 9.6% |
| **Selling, general and administrative expenses** | $ | 250,499 | $ | 153,586 | $ | 96,913 | 38.7% |
| Provision for doubtful debts | | (3,559) | | 1,833 | | (5,392) | - |
| **Total operating costs** | $ | 246,940 | $ | 155,419 | $ | 91,521 | 37.1% |
| **Total operating costs as % of net sales** | | 29.2% | | 26.6% | | | |

**Total SG&A were reduced by $96.9 million** from $250.5 million for the year ended December 31, 2014 to $153.6 million for the year ended December 31, 2015 and, as a percent of net sales, they decreased by 3.6 percentage points from 29.7% for the year ended December 31, 2014 to 26.2% for the year ended December 31, 2015.

**Staff costs were reduced by $40.8 million** from $126.0 million for the year ended December 31, 2014 to $85.2 million for the year ended December 31, 2015. This decrease was mainly a result of foreign exchange rate effect of $34.5 million and a reduction of provision for bonuses of $3.4 million, which were partially offset by the consolidation of RDL results for the full year 2015, which contributed $2.9 million.

**Warehousing and transportation costs were reduced by $18.0 million** from $47.8 million for the year ended December 31, 2014 to $29.8 million for the year ended December 31, 2015, of which $12.9 million is a result of foreign exchange rate changes, while the remaining decrease is mainly due to the decline in oil prices compared to 2014 and lower sales in volume terms.

**Marketing costs were reduced by $12.7 million** from $29.1 million for the year ended December 31, 2014 to $16.4 million for the year ended December 31, 2015, due to additional restrictions in alcohol advertising in Russia and cancelled activities related to Russian brands in Ukraine, as a result of the political conflict. This was partially offset by higher marketing investments in Poland, as we invested to increase brand equity and market share.

**Administrative expenses were reduced by $24.8 million** from $40.2 million for the year ended December 31, 2014 to $15.4 million for the year ended December 31, 2015. Administrative expenses mainly consist of legal, professional and office costs. The decrease is mainly due to back office efficiency and lower legal and professional costs, partially offset by income from management services from related parties of $1.7 million.

**Depreciation and amortization decreased by $0.7 million** from $7.5 million for the year ended December 31, 2014 to $6.8 million for the year ended December 31, 2015. This decrease was mainly a result of the exchange rate influence of $2.3 million, which was offset by the higher depreciation charge due to investments in new equipment in Poland.

The Company performed an annual impairment test of goodwill and other intangible assets on December 31, 2015. We have applied a consistent valuation model to test the fair value of our business. As a result, no impairment charge was recognized in 2015.

*Operating Income / (Loss) and Underlying EBITDA*

**Total operating income decreased by $23.5 million** from $76.4 million for the year ended December 31, 2014 to $52.9 million for the year ended December 31, 2015, mainly due to the impact of the operating result in Russia, reduced corporate overheads and no impairment charge recorded as at December 31, 2015.

The following table summarizes the segmental split of operating income/(loss):

| Operating Income / (Loss) | | | | |
|---|---|---|---|---|
| | Year ended December 31, 2014 | Year ended December 31, 2015 | Year ended December 31, 2015 vs. year ended December 31, 2014 | |
| Poland | 36,383 | 33,575 | (2,808) | (7.7%) |
| Foreign exchange impact | | 6,927 | 6,927 | - |
| Poland at constant foreign exchange rate | 36,383 | 40,502 | 4,119 | 11.3% |
| | | | | |
| Russia | 40,220 | 18,365 | (21,855) | (54.3%) |
| Foreign exchange impact | | 3,853 | 3,853 | - |
| Russia at constant foreign exchange rate | 40,220 | 22,218 | (18,002) | (44.8%) |
| | | | | |
| Hungary | 4,447 | 3,409 | (1,038) | (23.3%) |
| Foreign exchange impact | | 569 | 569 | |
| Hungary at constant foreign exchange rate | 4,447 | 3,978 | (469) | (10.5%) |
| | | | | |
| General corporate overhead | (4,654) | (2,469) | 2,185 | 46.9% |
| **Total Operating Income / (Loss) reported** | $ 76,396 | $ 52,880 | $ (23,517) | (30.8%) |
| Foreign exchange impact | | 11,349 | 11,349 | - |
| **Total Operating Income / (Loss) at constant foreign exchange rate** | $ 76,396 | $ 64,229 | $ (12,168) | (15.9%) |

**Operating income in Poland on a currency neutral basis increased by $4.1 million** (approximately 11.3%) from $36.4 million for the year ended December 31, 2014 to $40.5 million for the year ended December 31, 2015, mainly due to the increase in net sales of $33.6 million offset by the higher cost of goods sold of $20.5 million and the $9.0 million increase in operating expenses. A negative foreign exchange effect from the weakening of the Polish zloty against the U.S. dollar accounted for $6.9 million, causing operating income in Poland for the year ended December 31, 2015 amounting to $33.6 million to be lower by $2.8 million compared to previous year.

**Operating income in Russia on a currency neutral basis decreased by $18.0 million** (approximately 44.8%) from $40.2 million for the year ended December 31, 2014 to $22.2 million for the year ended December 31, 2015, mainly as a result of the $50.2 million decline in net sales, offset by savings on operating costs of $25.9 million and operating income of $5.3 million generated by RDL. A negative foreign exchange effect from the weakening of the Russian ruble against the U.S. dollar accounted for $3.9 million, causing operating income in Russia for the year ended December 31, 2015 amounting to $18.4 million to be lower by $21.9 million compared to previous year.

**Operating income in Hungary on a currency neutral basis decreased by $0.4 million** (approximately 10.5%) from $4.4 million for the year ended December 31, 2014 to $4.0 million for the year ended December 31, 2015, as a result of the introduction of the Health Tax in the country. A negative foreign exchange effect from the weakening of the Hungarian forint against the U.S. dollar accounted for $0.6 million, causing operating income in Hungary for the year ended December 31, 2015 to be lower by $1.0 million compared to previous year and amounting to $3.4 million.

**Corporate overheads were reduced by $2.2 million**. We strictly monitor our corporate costs and savings were achieved in comparison with 2014.

The Company's management assesses the performance of the business based on the Underlying EBITDA. Our Underlying EBITDA decreased by $18.5 million, or 17.2%, from $107.6 million for the year ended December

31, 2014 to $89.1 million for the year ended December 31, 2015. The tables below present a reconciliation of our operating results to Underlying EBITDA and our Underlying EBITDA by segment.

| Underlying EBITDA (non US GAAP measure) to Operating Income reconciliation | | | | |
|---|---|---|---|---|
| | Year ended December 31, 2014 | Year ended December 31, 2015 | Year ended December 31, 2015 vs. year ended December 31, 2014 | |
| Operating income / (loss) | $ 76,396 | $ 52,880 | $ (23,516) | (30.8%) |
| Depreciation and amortization | 11,811 | 10,358 | (1,453) | (12.3%) |
| Other excluded items (non US GAAP measures) | 19,384 | 25,865 | 6,481 | 33.4% |
| **Total Underlying EBITDA** | **$ 107,591** | **$ 89,103** | **$ (18,488)** | **(17.2%)** |

| Underlying EBITDA (non US GAAP measure) | | | | |
|---|---|---|---|---|
| | Year ended December 31, 2014 | Year ended December 31, 2015 | Year ended December 31, 2015 vs. year ended December 31, 2014 (non US GAAP measures) | |
| **Previous segment** | | | | |
| Poland | $ 55,080 | $ 56,300 | $ 1,220 | 2.2% |
| Russia | 50,101 | 31,612 | (18,489) | (36.9%) |
| Hungary | 4,774 | 3,660 | (1,114) | (23.3%) |
| Corporate overhead | (2,364) | (2,469) | (105) | (4.4%) |
| **Total Underlying EBITDA** | **$ 107,591** | **$ 89,103** | **$ (18,488)** | **(17.2%)** |

| Underlying EBITDA (non US GAAP measure) | |
|---|---|
| | Year ended December 31, 2015 |
| **Segment** | |
| Poland domestic | $ 55,654 |
| Russia domestic | 30,170 |
| International | 11,711 |
| Corporate | (8,432) |
| **Total Underlying EBITDA** | **$ 89,103** |

We recognized $19.4 million and $25.9 million of excluded items in the year ended December 31, 2014 and in the year ended December 31, 2015, respectively. In 2014 excluded items related mainly to Roust Inc. acquisition costs. In 2015 these excluded items mainly relate to early payment discounts to secure possible bad debts in Russia and greater discounts to secure working capital in Poland due to rapid business growth.

The following table presents other excluded items:

| Other excluded items | | | | |
|---|---|---|---|---|
| | Year ended December 31, 2014 (non US GAAP measures) | Year ended December 31, 2015 (non US GAAP measures) | Year ended December 31, 2015 vs. year ended December 31, 2014 (non US GAAP measures) | |
| Roust Inc. aquisition related cost | $ 16,140 | $ - | $ (16,140) | - |
| Early payment discounts | - | 20,719 | 20,719 | - |
| Other excluded items | 3,244 | 5,146 | 1,902 | 58.6% |
| **Total other excluded items** | **$ 19,384** | **$ 25,865** | **$ 6,481** | **33.4%** |

**Strong Underlying EBITDA for last twelve months** - notwithstanding the substantial weakening of our local currencies, the decline in the purchasing power of the citizens in our largest markets of Russia, Poland and the CIS countries, destocking, which ended in the fourth quarter of 2015 and political headwinds, the Company's performance remains strong with our underlying EBITDA in the year ended December 31, 2015 amounting to $89.1 million.

| Underlying EBITDA  (non US GAAP measure) | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | three month period ended March 31, 2015 | | three month period ended June 30, 2015 | | three month period ended September 30, 2015 | | three month period ended December 31, 2015 | Year ended December 31, 2015 |
| **Previous segment** | | | | | | | | | |
| Poland | $ | 8,986 | $ | 15,773 | $ | 13,484 | $ | 18,057 | $ 56,300 |
| Hungary | | 3,638 | | 442 | | 11,852 | | 15,680 | 31,612 |
| Russia | | (518) | | 1,295 | | 1,365 | | 1,518 | 3,660 |
| Corporate overhead | | (408) | | (758) | | (621) | | (682) | (2,469) |
| **Total Underlying EBITDA** | $ | **11,698** | $ | **16,752** | $ | **26,080** | $ | **34,573** | $ **89,103** |

*Interest Income / (Expense)*

Total net interest expense, increased by approximately 2.9%, or $2.4 million, from $82.7 million for the year ended December 31, 2014 to $85.1 million for the year ended December 31, 2015. This increase was primarily driven by a higher balance of Notes, due to the capitalization of Convertible Note PIK Interest as well as higher interest rates on external debt due to sanctions imposed on selected Russian banks because of negative global trends.

| Interest Income / (Expense) | | | | | | | |
|---|---|---|---|---|---|---|---|
| | | Year ended December 31, 2014 | | Year ended December 31, 2015 | | Year ended December 31, 2015 vs. year ended December 31, 2014 | |
| Interest income | $ | 13,471 | $ | 11,468 | $ | (2,003) | (14.9%) |
| *Interest expense* | | | | | | | |
| New Notes | $ | (65,543) | $ | (68,002) | $ | (2,459) | (3.8%) |
| Other borrowings | | (30,581) | | (28,536) | | 2,045 | 6.7% |
| **Total interest (expense)** | $ | **(96,124)** | $ | **(96,538)** | $ | **(414)** | **(0.4%)** |
| **Total interest income / (expense), net** | $ | **(82,653)** | $ | **(85,070)** | $ | **(2,417)** | **(2.9%)** |

*Other Financial Income / (Expense)*

The Company recognized $15.6 million of non-cash net unrealized foreign exchange losses in the year ended December 31, 2015, as compared to $75.1 million of losses for the year ended December 31, 2014. Foreign exchange losses for the year ended December 31, 2015 include the negative impact of currency translation of approximately $109.7 million related to foreign currency financing of local subsidiaries, mainly to bond proceeds on-lent in U.S. dollars to subsidiaries having local functional currencies which are not the U.S. dollar. These exchange losses are offset by net exchange gains of approximately $94.6 million arising on other loans.

104

| | Foreign exchange gains / (losses), net | | | |
| | Year ended | Year ended | Year ended December 31, 2015 vs. year ended December 31, 2014 | |
| | December 31, 2014 | December 31, 2015 | | |
| Unrealized foreign exchange impact related to foreign currency financing | $ (49,636) | $ (15,081) | $ 34,555 | 69.6% |
| Unrealized foreign exchange impact - other balance sheet items | (23,488) | (1,833) | 21,655 | 92.2% |
| Other gains / (losses) | (1,958) | 1,271 | 3,229 | - |
| **Total foreign exchange (losses), net** | **$ (75,082)** | **$ (15,643)** | **$ 59,439** | **79.2%** |

### Other Non-Operating Expenses

Total other non-operating expenses decreased by $2.3 million from $21.1 million for the year ended December 31, 2014 to $18.8 million for the year ended December 31, 2015. Expenses in 2014 and 2015 primarily consisted of factoring costs in Poland and Russia, amounting to $20.0 million and $17.6 million, respectively and other losses of $1.1 million and $1.2 million, respectively.

| | Non-operating Income / (Expense) | | | |
| | Year ended | Year ended | Year ended December 31, 2015 vs. year ended December 31, 2014 | |
| | December 31, 2014 | December 31, 2015 | | |
| Factoring costs and bank fees | $ (20,022) | $ (17,551) | $ 2,471 | 12.3% |
| Other gains / (losses) | (1,111) | (1,204) | (93) | (8.3%) |
| **Total other non-operating income / (expense), net** | **$ (21,133)** | **$ (18,755)** | **$ 2,378** | **11.3%** |

### Income Tax

The following table presents statutory rate reconciliation for continuing operations:

| | Year ended | Year ended | Year ended December 31, 2015 vs. year ended December 31, 2014 | |
| | December 31, 2014 | December 31, 2015 | | |
| **Tax at US statutory rate of 35%** | $ (35,865) | $ (23,306) | $ 12,559 | 35.0% |
| Tax rate differences | 18,002 | 11,516 | (6,486) | (36.0%) |
| Valuation allowance | (1,811) | (16,132) | (14,321) | (790.8%) |
| Permanent differences | 12,785 | 5,725 | (7,060) | (55.2%) |
| Reduction of net operating losses due to cancellation of indebtness income | 13,045 | - | (13,045) | - |
| Other | 6,178 | 8,840 | 2,662 | 43.1% |
| **Income tax (benefit)/expense** | **$ 12,334** | **$ (13,357)** | **$ (25,691)** | **-** |

The U.S. statutory rate is 35%. The jurisdictions with lower tax rates that have the most significant effective tax rate impact in the periods presented include Russia and Poland, where the income tax rates are 20% and 19%, respectively.

Our tax charge for 2014 was $12.3 million, which represents an effective tax rate for the year ended December 31, 2014 of negative 12.0%. The permanent differences for 2014 are primarily related to costs incurred by the Company that are not deductible for local tax purposes. In 2014, the underperformance of certain of the Company's subsidiaries meant that the Company determined an additional valuation allowance for a deferred tax asset of $11.2 million was required and took the charge during the year. Additionally, the Company did not recognize a tax asset for losses at these subsidiaries in 2014, so the tax expense for the profitable entities was not offset by a tax benefit at the loss-making entities. This was offset by a reduction to zero of the valuation allowance of $13.0 million related to net operating losses ("NOLs") that were reduced to zero on January 1, 2014.

Our tax benefit for 2015 was $13.4 million, which represents an effective tax rate for the year ended December 31, 2015 of 20.0%. The permanent differences for 2015 are primarily related to costs incurred by the Company that are not deductible for local tax purposes. In 2015, the underperformance of certain of the Company's subsidiaries meant that the Company determined an additional valuation allowance for deferred tax asset of $6.5 million was required and took the charge during the year.

The uncertain income tax position balance was $14.8 million and $11.0 million as at December 31, 2014 and as at December 31, 2015, respectively.

**Year ended December 31, 2014 compared to year ended December 31, 2013**

A summary of the Company's operating performance (expressed in thousands except per share amounts) is presented below.

| | Note | Predecessor one hundred fifty-six-day period ended June 5, 2013 | Successor Two hundred and nine days ended December 31, 2013 | Combined Year ended December 31, 2013 (non US GAAP measures) | Successor year ended December 31, 2014 | Year ended December 31, 2014 vs. year ended December 31, 2013 (non US GAAP measures) | |
|---|---|---|---|---|---|---|---|
| Sales | | $ 579,137 | $ 1,373,190 | $ 1,952,327 | $ 1,870,995 | $ (81,332) | (4.2%) |
| Sales to Related Parties | 20 | 1,006 | 1,709 | 2,715 | 2,029 | (686) | (25.3%) |
| Excise taxes | | (306,678) | (714,169) | (1,020,847) | (1,028,646) | (7,799) | (0.8%) |
| Net sales | | 273,465 | 660,730 | 934,195 | 844,378 | (89,817) | (9.6%) |
| Cost of goods sold | | 154,247 | 427,368 | 581,615 | 520,045 | 61,570 | 10.6% |
| Cost of goods sold to Related Parties | 20 | 900 | 494 | 1,394 | 997 | 397 | 28.5% |
| Gross profit | | 118,318 | 232,868 | 351,186 | 323,336 | (27,850) | (7.9%) |
| Selling, general and administrative expenses | 22 | 101,967 | 203,115 | 305,082 | 250,499 | 54,583 | 17.9% |
| Provision for doubtful debts | 6 | 601 | 4,930 | 5,531 | (3,559) | 9,090 | - |
| Impairment charge | | - | 83,324 | 83,324 | - | (83,324) | - |
| Operating income / (loss) | | 15,750 | (58,501) | (42,751) | 76,396 | 119,147 | - |
| *Non-operating income / (expense), net* | | | | | | | |
| Interest income | | 714 | 567 | 1,281 | 357 | (924) | (72.1%) |
| Interest income from Related Parties | 20 | - | 8,747 | 8,747 | 13,114 | 4,367 | 49.9% |
| Interest (expense) | 23 | (44,986) | (50,079) | (95,065) | (88,278) | 6,787 | 7.1% |
| Interest (expense) to Related Parties | 20, 23 | (1,339) | (4,441) | (5,780) | (7,846) | (2,066) | (35.7%) |
| Foreign exchange (losses), net | 24 | (58,013) | (18,144) | (76,157) | (75,082) | 1,075 | 1.4% |
| Other non-operating (expense), net | 25 | (6,350) | (8,829) | (15,179) | (21,133) | (5,954) | (39.2%) |
| Income / (Loss) before reorganization items and income taxes | | (94,224) | (130,680) | (224,904) | (102,472) | 122,432 | 54.4% |
| Reorganization items | | 213,273 | - | 213,273 | - | (213,273) | - |
| Income / (Loss) before income taxes | | 119,049 | (130,680) | (11,631) | (102,472) | (90,841) | (781.0%) |
| Income tax benefit / (expense) | | 17,134 | 12,750 | 29,884 | (12,334) | (42,218) | - |
| Equity in net income / (expense) | | - | - | - | - | | |
| Net income / (loss) | | 136,183 | (117,930) | 18,253 | (114,806) | (133,059) | ` |
| Less net income / (loss) attributable to non-controlling interest | | - | - | - | (379) | (379) | - |
| Net income / (loss) attributable to the Company | | 136,183 | (117,930) | 18,253 | (114,427) | (132,680) | - |
| from operations per share of common stock, basic | 26 | $ 1.67 | $ (11,793.04) | N/A* | $ (11,442.70) | | |
| from operations per share of common stock, diluted | 26 | $ 1.66 | $ (11,793.04) | N/A* | $ (11,442.70) | | |
| Other comprehensive income / (loss), net of tax | | | | | | | |
| Foreign currency translation adjustments, net of tax $0 | 27 | 22,164 | 31,286 | 53,450 | (41,769) | (95,219) | - |
| Comprehensive income / (loss) | | $ 158,347 | $ (86,644) | $ 71,703 | $ (156,575) | $ (228,278) | - |
| Less comprehensive income attributable to non-controlling interest | | - | - | - | (379) | (379) | - |
| Comprehensive income / (loss) attributable to the Company | | $ 158,347 | $ (86,644) | $ 71,703 | $ (156,196) | $ (227,899) | - |

*not meaningful

### Net Sales

Net sales represent total sales net of all customer rebates, excise tax on production and imports and value added tax.

Our business split by segment, which represents our primary geographic locations of operations, Poland, Russia and Hungary, is shown below:

| Segment Net Sales | | | | | | |
|---|---|---|---|---|---|---|
| | Predecessor one hundred fifty-six-day period ended June 5, 2013 | Successor Two hundred and nine days ended December 31, 2013 | Combined Year ended December 31, 2013 (non US GAAP measures) | Successor Year ended December 31, 2014 | Year ended December 31, 2014 vs. year ended December 31, 2013 (non US GAAP measures) | |
| Poland | $  89,572 | $  185,959 | $  275,531 | 287,999 | $  12,468 | 4.5% |
| Russia | 177,267 | 455,770 | 633,037 | 525,082 | (107,955) | (17.1%) |
| Hungary | 6,626 | 19,001 | 25,627 | 31,297 | 5,670 | 22.1% |
| Total Net Sales | $  273,465 | $  660,730 | $  934,195 | 844,378 | $  (89,817) | (9.6%) |

### Net Sales Key Highlights

Total net sales decreased by $89.8 million (approximately 9.6%) to $844.4 million for the year ended December 31, 2014 from $934.2 million for the year ended December 31, 2013. On a currency neutral basis our net sales increased by $36.6 million (approximately 3.9%).

- sales in Poland grew by 4.5% as a result of better price, channel and brand mix and higher volumes sold in the domestic market;

- sales in the Russian segment on a currency neutral basis grew by $14.8 million. Due to negative foreign exchange rates the actual sales is lower by 17.1%;

- sales for Hungary increased by 22.1% as a result of domestic sales volumes growth; and

- the negative foreign exchange impact contributed $126.6 million of total decrease year on year.

### Changes in net sales value of the Polish segment

| Changes in Net Sales - Poland | |
|---|---|
| Net sales for the year ended December 31, 2013 | $  275,531 |
| Price, channel and brand mix impact net of excise tax increase effect | 31,172 |
| Domestic sales volume increase | 26,079 |
| International sales increase | 2,160 |
| Depletions of 2013 prebuild | (20,659) |
| Discounts and allowance | (11,260) |
| Trade marketing expenses | (14,851) |
| Other changes | 1,799 |
| Net sales for the year ended December 31, 2014 excluding foreign exchange impact | 289,971 |
| Foreign exchange impact | (1,972) |
| Net sales for the year ended December 31, 2014 | $  287,999 |

Sales for Poland increased by $12.5 million, from $275.5 million for the year ended December 31, 2013 to $288.0 million for the year ended December 31, 2014.

This increase was driven mainly by:

- favorable price, channel and brand mix impact of $108.5 million ($31.2 million net of excise tax increase);

- domestic sales volume growth – total sales in volumes in Poland increased by 2.0% in 2014 gaining market share by 6.2 p.p. to 31.4% as of year-end comparing to 2013. In February 2015 our market share increased to 35.3% and we became the No. 1 player in the Polish vodka market. The above mentioned domestic volume growth was driven mainly by:

  - continued success of the *Żubrówka* brands – which grew by 16.2% from 2013 and reached 4.9 million nine-liter cases sold, resulting in a $4.0 million growth in net sales value

108

- an 11.9% or $5.7 million increase in net sales value of *Soplica* vodkas,

- growth of 40.0% or $6.6 million of whiskey *Grant*'s net sales value, and

- increase in net sales value of *Carlo Rossi* wines of $4.3 million (14.0%).

- international sales which grew by $2.2 million,

- other factors with positive impact of $1.8 million,

- offsetting some of this growth was the impact of depletions of 2013 prebuild from distributors in the amount of $20.7 million,

- higher level of discounts and allowances in the amount of $11.3 million due to higher cash discounts given in 2014,

- increased trade marketing expenses of $14.9 million due to *Żubrówka Biała* and *Żubrówka Złota* promotional activities and the launch of our "Perfect Store program",

- negative foreign exchange effect from the weakening of the Polish zloty against the U.S. dollar, accounted for $2.0 million.

### *Changes in net sales value of the Russian segment*

| Changes in Net Sales - Russia | | |
|---|---|---|
| Net sales for the year ended December 31, 2013 | $ | 633,037 |
| Traditional trade | | 80,405 |
| Price, channel and brand mix impact net of excise tax increase effect | | 75,676 |
| Roust Inc. acquisition | | 40,565 |
| International sales increase | | 3,871 |
| Trade marketing expenses impact | | (1,107) |
| Destocking impact | | (22,966) |
| Discounts and allowances | | (30,401) |
| Domestic sales volume decline | | (131,191) |
| Other changes | | (56) |
| Net sales for the year ended December 31, 2014 excluding foreign exchange impact | $ | 647,833 |
| Foreign exchange impact | | (122,751) |
| Net sales for the year ended December 31, 2014 | | 525,082 |

Sales in Russia decreased by $108.0 million, from $633.0 for the year ended December 31, 2013 to $525.1 million for the year ended December 31, 2014. On a currency neutral basis sales for Russia increased by $14.8 million, mainly as a result of:

- commencement of selling Russian Standard brands and import brands from the Roust portfolio by Roust Russia through the traditional trade channel, which contributed $80.4 million,

- favorable price, channel and brand mix in the amount of $75.7 million,

- the acquisition of Roust Inc. and consolidation of its results for the full year 2014 while in 2013 only four months' results were consolidated, which contributed $40.6 million,

- an increase in international sales of $3.9 million,

- offsetting this growth was the negative effect of distributors destocking which occurred throughout 2014 to decrease level of inventory kept by distributors, in the amount of $23.0 million,

- higher discounts and allowances given to customers, and higher trade marketing expenses contributed $30.4 million and $1.1 million, respectively,

- the shrinking vodka market in Russia resulted in a $131.2 million decrease in domestic sales volume, and

- the negative foreign currency exchange effect from significant weakening of the Russian ruble against the U.S. dollar, that accounted for $122.8 million.

### Changes in net sales value of the Hungarian segment

| Changes in Net Sales - Hungary | | |
|---|---|---|
| Net sales for the year ended December 31, 2013 | $ | 25,627 |
| Domestic sales volume growth | | 9,218 |
| Other changes | | (1,781) |
| Net sales for the year ended December 31, 2014 excluding foreign exchange impact | | 33,064 |
| Foreign exchange impact | | (1,767) |
| Net sales for the year ended December 31, 2014 | $ | 31,297 |

Sales for Hungary increased by $5.7 million, from $25.6 million for the year ended December 31, 2013 to $31.3 million for the year ended December 31, 2014 which resulted from:

- a $9.2 million increase in domestic sales volumes mainly caused by an increase of 40.1% (or $2.8 million) in net sales of *Royal* vodka, and an increase of 11.4% ($1.4 million) of *Jägermeister* net sales,

- offset by unfavorable price/channel mix and other factors of $1.8 million, and

- the negative effect of weakening the Hungarian forint against the U.S. dollar which accounted for approximately $1.8 million.

Our market share in the mainstream vodka segment grew by 4.1 percentage points, increasing from 48.9% to 53.0% in the fourth quarter of 2014 (according to available Nielsen October - November 2014 data).

### Expansion of international business

In 2014 we continued efforts to expand our international business (i.e. sales to markets other that Poland, Russia and Hungary). We noted growing depletions in our international business. We noted a 7.0% increase in our international sales volumes, growing from 1.8 million nine-liter cases for the year ended December 31, 2013 to 1.9 million nine-liter cases for the year ended December 31, 2014. Our international sales value grew by 4.9%, from $40.8 million for the year ended December 31, 2013 to $42.7 million for the year ended December 31, 2014.

Total international volumes (thousands of nine-liter cases) and net sales are presented below:

| | International Sales | | | | | |
|---|---|---|---|---|---|---|
| | Predecessor | Successor | Combined | Successor | | |
| | one hundred fifty-six-day period ended | Two hundred and nine days ended | | Year ended | | |
| | June 5, 2013 | December 31, 2013 | Year ended December 31, 2013 (non US GAAP measures) | December 31, 2014 | Year ended December 31, 2014 vs. year ended December 31, 2013 (non US GAAP measures) | |
| International sales - volume (thousands of 9 liter cases) | 698 | 1,067 | 1,765 | 1,889 | 124 | 7.0% |
| International sales - value | $ 16,207 | 24,549 | $ 40,756 | $ 42,748 | $ 1,992 | 4.9% |

### Gross Profit

Gross profit as a percentage of net sales increased by 0.7 p.p. from 37.6% to 38.3% for the year ended December 31, 2014 as compared to the year ended December 31, 2013.

- total gross profit decreased by approximately 7.9% or $27.9 million, from $351.2 million for the year ended December 31, 2013 to $323.3 million for the year ended December 31, 2014,

- gross profit as a percentage of net sales at a constant rate would be 37.3% for the year ended December 31, 2014 as compared to 37.6% for the year ended December 31, 2013,

- decrease mainly as a result of negative foreign exchange rate influence of $38.9 million,

- savings on cost of goods sold amounted to $20.5 million.

| | Combined Year ended December 31, 2013 (non US GAAP measures) | Year ended December 31, 2014 |
|---|---|---|
| Gross profit reported | $ 351,186 | $ 323,336 |
| Fresh start accounting adjustments | 19,691 | - |
| **Gross profit excluding FSA** | **$ 370,877** | **$ 323,336** |
| Foreign Exchange impact | | 38,938 |
| **Gross profit at constant foreign exchange rate** | **$ 370,877** | **$ 362,274** |

### *Operating Expenses*

Operating expenses are comprised of SG&A and impairment charges. Total operating costs, including fair value adjustments, decreased by $147.0 million, from $393.9 million for the year ended December 31, 2013 to $246.9 million for the year ended December 31, 2014. This change was primarily driven by an impairment charge for Russia (including Ukraine) and Hungary recorded as of December 31, 2013 amounting to $83.3 million compared to no impairment recognized in 2014.

SG&A consists of staff cost, warehousing and transportation costs, marketing expenses, administrative expenses and non-production depreciation and amortization.

For comparability of costs between periods, items of operating expenses after excluding these fair value adjustments are shown separately in the table below.

The table below sets forth the items of operating expenses.

| Operating Expenses | | | | | | |
|---|---|---|---|---|---|---|
| | Predecessor one hundred fifty-six-day period ended June 5, 2013 | Successor Two hundred and nine days ended December 31, 2013 | Combined Year ended December 31, 2013 (non US GAAP measures) | Successor Year ended December 31, 2014 | Year ended December 31, 2014 vs. year ended December 31, 2013 (non US GAAP measures) | |
| Staff costs | $ 52,227 | $ 91,262 | 143,489 | $ 126,006 | 17,483 | 12.2% |
| Warehousing and transportation | 23,389 | 38,967 | 62,356 | 47,816 | 14,540 | 23.3% |
| Marketing | 9,247 | 30,810 | 40,057 | 29,051 | 11,006 | 27.5% |
| Administration expenses | 13,743 | 38,627 | 52,370 | 40,164 | 12,206 | 23.3% |
| Depreciation and amortization | 3,361 | 3,449 | 6,810 | 7,462 | (652) | (9.6%) |
| **Selling, general and administrative expenses** | **$ 101,967** | **$ 203,115** | **305,082** | **$ 250,499** | **54,583** | **17.9%** |
| Provision for doubtful debts | 601 | 4,930 | 5,531 | (3,559) | 9,090 | - |
| **Total operating costs excluding impairment charges** | **102,568** | **208,045** | **310,613** | **246,940** | **(63,673)** | **(20.5%)** |
| Impairment charges | - | 83,324 | 83,324 | - | 83,324 | |
| **Total operating costs** | **$ 102,568** | **$ 291,369** | **393,937** | **$ 246,940** | **146,997** | **37.3%** |

111

**Total SG&A decreased by $54.6 million** from $305.1 million for the year ended December 31, 2013 to $250.5 million for the year ended December 31, 2014 and as a percent of net sales they decreased by 3.0 percentage points from 32.7 % for the year ended December 31, 2013 to 29.7% for the year ended December 31, 2014.

**Staff costs decreased by $17.5 million** to $126.0 million for the year ended December 31, 2014 from $143.5 million for the year ended December 31, 2013. This decrease was mainly a result of a foreign exchange rate influence of $17.4 million. Moreover Whitehall wind-down resulted in lower costs of $14.3 million, and a lower number of board members and executives in comparison to year ended December 31, 2013 resulted in savings of corporate costs in the amount of $5.1 million. Offsetting this, were higher costs of new staff employed in Poland and Roust Russia to build competencies in sales, marketing and finance in the amount of $7.2 million. Consolidation of Roust Inc.'s results for the full year 2014 contributed $10.8 million of the increase.

**Warehousing and transportation costs decreased by $14.5 million**, from $62.4 million for the year ended December 31, 2013 to $47.8 million for the year ended December 31, 2014 mainly due to the fact that stock levels built up ahead of the excise tax increase in Russia were higher in 2013 and the period of its storage was longer.

**Marketing costs decreased by $11.0 million**, from $40.1 million for the year ended December 31, 2013 to $29.1 million for the year ended December 31, 2014, due to additional restrictions in alcohol advertisement in Russia and cancelled activities related to Russian brands in Ukraine, as a result of political conflict. This was partially offset by higher marketing investment in Poland as we invested to increase brand equity and market share.

**Administrative expenses decreased by $12.2 million**, from $52.4 million for the year ended December 31, 2013 to $40.2 million for the year ended December 31, 2014. Administrative expenses consist mainly of legal, professional and office costs and in 2013 the Company incurred higher costs due to the Fresh Start Accounting process. Moreover, savings are also a result of Whitehall wind-down.

**Depreciation and amortization increased by $0.7 million**, from $6.8 million for the year ended December 31, 2013 to $7.5 million for the year ended December 31, 2014, due to investments in new equipment in Poland.

The Company performed an annual impairment test of goodwill and other intangible assets on December 31, 2014.

We have applied a consistent valuation model to test the fair value of our business. As a result no impairment charge was recognized in 2014.

*Operating Income / (Loss) and Underlying EBITDA*

**Total operating result improved by $119.1 million**, from a $42.8 million loss for the year ended December 31, 2013 to $76.4 million income for the year ended December 31, 2014, due to the improvement of operating results in Poland, reduced corporate overhead and no impairment charge being recorded as of December 31, 2014. The table below summarizes the segmental split of operating income/(loss).

| | Predecessor one hundred fifty-six-day period ended June 5, 2013 | Successor Two hundred and nine days ended December 31, 2013 | Combined Year ended December 31, 2013 (non US GAAP measures) | Year ended December 31, 2014 | Year ended December 31, 2014 vs. year ended December 31, 2013 (non US GAAP measures) | |
|---|---|---|---|---|---|---|
| **Operating Income / (Loss)** | | | | | | |
| Segment | | | | | | |
| Poland before fair value adjustments | $ 12,860 | $ (1,118) | $ 11,742 | $ 36,383 | $ 24,641 | 209.9% |
| Russia before fair value adjustments | 8,044 | 29,121 | 37,165 | 40,220 | 3,056 | 8.2% |
| Hungary before fair value adjustments | 320 | 1,657 | 1,977 | 4,447 | 2,470 | 124.9% |
| Corporate Overhead | | | | | | |
| General corporate overhead | (5,063) | (4,837) | (9,900) | (4,654) | 5,246 | 53.0% |
| Option expense | (411) | - | (411) | - | 411 | |
| **Total Operating Income / (Loss) before fair value adjustments** | **$ 15,750** | **$ 24,823** | **$ 40,573** | **$ 76,396** | **35,824** | **88.3%** |
| Impairment charge - Poland | - | - | - | - | - | |
| Impairment charge - Russia | - | (73,847) | (73,847) | - | 73,847 | |
| Impairment charge - Hungary | - | (9,477) | (9,477) | - | 9,477 | |
| **Total impairment charges** | **-** | **(83,324)** | **(83,324)** | **-** | **83,324** | |
| Poland after fair value adjustments | 12,860 | (1,118) | 11,742 | 36,383 | 24,641 | 209.9% |
| Russia after fair value adjustments | 8,044 | (44,726) | (36,682) | 40,220 | 76,903 | - |
| Hungary after fair value adjustments | 320 | (7,820) | (7,500) | 4,447 | 11,947 | - |
| Corporate Overhead | - | | - | - | - | |
| General corporate overhead | (5,063) | (4,837) | (9,900) | (4,654) | 5,246 | 53.0% |
| Option expense | (411) | - | (411) | - | 411 | |
| **Total Operating Income / (Loss)** | **$ 15,750** | **$ (58,501)** | **$ (42,751)** | **$ 76,396** | **$ 119,147** | **-** |

**Operating income in Poland, excluding fair value adjustments, increased by $24.6 million** (approximately 209.9%) from $11.7 million for the year ended December 31, 2013 to $36.4 million for the year ended December 31, 2014, mainly due to increase in sales of $12.6 million, savings on cost of goods sold in the amount of $8.0 million and savings on operating expenses of $3.4 million.

**Operating income in Russia, excluding fair value adjustments, increased by $3.1 million** (approximately 8.2%) from $37.2 million for the year ended December 31, 2013 to $40.2 million for the year ended December 31, 2014, mainly as a results of savings on operating expenses and operating income of $3.2 million generated by Roust Inc.

**Operating income in Hungary, excluding fair value adjustments, increased by $2.5 million** (approximately 124.9%) from $2.0 million for the year ended December 31, 2013 to $4.4 million for the year ended December 31, 2014, as a result of gross margin higher by $2.8 million.

**Corporate overhead and option expenses decreased by $5.7 million**. In 2013 we incurred costs of severance payments for top management members and costs from options granted to management. The options program was extinguished in June 2013. Moreover we strictly monitor our corporate costs and achieved savings as compared to 2013.

The Company's management assesses performance of the business based on the Underlying EBITDA. The tables below present a reconciliation of our operating results to Underlying EBITDA and our Underlying EBITDA by segment.

In the year ended December 31, 2013 we recognized $33.6 million of one-time items. In the year ended December 31, 2014 we recognized $19.4 million of one-time items. They relate mainly to the Roust Inc. acquisition.

| Underlying Successor EBITDA (non US GAAP measure) | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | three month period ended March 31, 2014 | | three month period ended June 30, 2014 | | three month period ended September 30, 2014 | | three month period ended December 31, 2014 | Year ended December 31, 2014 |
| Poland | $ | 9,951 | $ | 19,334 | $ | 10,156 | | 15,639 | $ | 55,080 |
| Russia | | 720 | | 13,581 | | 19,342 | | 16,459 | | 50,102 |
| Hungary | | 486 | | 1,383 | | 726 | | 2,179 | | 4,774 |
| Corporate overhead | | (2,145) | | 1,975 | | (2,438) | | 244 | | (2,365) |
| **Total Underlying EBITDA** | **$** | **9,012** | **$** | **36,273** | **$** | **27,786** | | **34,521** | **$** | **107,591** |

If no tax increases had taken place, our pro forma Underlying EBITDA would have amounted to $122.8 million and it would have been higher by $14.3 million as compared to Underlying EBITDA for the year ended December 31, 2013. It is due to the fact that distributors destocking process that was performed in Russia during 2014 and contributed $8.2 million decrease to EBITDA. Depletions of stock in Poland negatively influenced EBITDA by $7.0 million.

The table below presents other excluded items:

| | Year ended December 31, 2014 (non US GAAP measures) |
|---|---|
| Roust transaction related costs | $ | 16,140 |
| Whitehall wind-down n | | 955 |
| Other excluded items | | 2,289 |
| **Total other excluded items** | **$** | **19,384** |

### *Interest Income / (Expense)*

Total net interest expense, decreased by approximately 9.0%, or $8.2 million, from $90.8 million for the year ended December 31, 2013 to $82.7 million for the year ended December 31, 2014. This decrease was primarily driven by the fact that current obligations under the Existing Notes are lower than under the notes they replaced following Roust's previous restructuring.

| Interest Income / (Expense) | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Predecessor one hundred fifty-six-day period ended June 5, 2013 | | Successor Two hundred and nine days ended December 31, 2013 | | Combined Year ended December 31, 2013 (non US GAAP measures) | | Successor Year ended December 31, 2014 | | Year ended December 31, 2014 vs. year ended December 31, 2013 (non US GAAP measures) | |
| Interest income | $ | 714 | $ | 9,314 | $ | 10,028 | $ | 13,471 | $ | 3,443 | 34.3% |
| *Interest expense* | | | | | | | | | | |
| Notes* | $ | (40,296) | $ | (36,917) | $ | (77,213) | $ | (65,543) | $ | 11,670 | 15.1% |
| Other borrow ings | | (6,029) | | (17,603) | | (23,632) | | (30,581) | | (6,949) | (29.4%) |
| **Total interest (expense)** | **$** | **(46,325)** | **$** | **(54,520)** | **$** | **(100,845)** | **$** | **(96,124)** | **$** | **4,721** | **4.7%** |
| **Total interest income / (expense), net** | **$** | **(45,611)** | **$** | **(45,206)** | **$** | **(90,817)** | **$** | **(82,653)** | **$** | **8,164** | **9.0%** |

---

\*    *Notes: The SSN and the Convertible Senior Notes due 2013 for the Predecessor; the NSSN and the NCJSN for the Successor.*

### *Other Financial Income / (Expense)*

The Company recognized $75.1 million of non-cash unrealized foreign exchange rate expense in the year ended December 31, 2014, primarily related to the impact of movements in exchange rates in U.S. dollar, as compared to $76.2 million of expense for the year ended December 31, 2013. Foreign exchange losses of $75.1 million in 2014 include the negative impact of foreign exchange translation of approximately $208.2 million related mainly to bond proceeds on-lent in U.S. dollars to subsidiaries having local functional currencies different from U.S. dollar. These foreign exchange losses are offset by net foreign exchange gains of approximately $133.1 million arising from other loans.

114

| Foreign exchange gains / (losses), net | | | | | |
|---|---|---|---|---|---|
| | Predecessor one hundred fifty-six-day period ended June 5, 2013 | Successor Two hundred and nine days ended December 31, 2013 | Combined Year ended December 31, 2013 (non US GAAP measures) | Successor Year ended December 31, 2014 | Year ended December 31, 2014 vs. year ended December 31, 2013 (non US GAAP measures) |
| Unrealized foreign exchange impact related to foreign currency financing | (54,332) | 85,940 | 31,608 | (49,636) | (81,244) | - |
| Unrealized foreign exchange impact - other balance sheet items | $ - | $ (4,731) | $ (4,731) | $ (23,488) | $ (18,757) | (396.5%) |
| Other gains / (losses) * | (3,681) | (99,353) | (103,034) | (1,958) | 101,076 | 98.1% |
| **Total foreign exchange (losses), net** | $ (58,013) | $ (18,144) | $ (76,157) | $ (75,082) | $ 1,075 | 1.4% |

* other gains / (losses) for the Successor period of two hundred and nine days ended December 31, 2013 includes $94.0 million of realized foreign exchange differences on loans

### Other Non-Operating Expenses

Total other non-operating expenses increased by $6.0 million, from $15.2 million for the year ended December 31, 2013 to $21.1 million for the year ended December 31, 2014. Expenses in 2013 and 2014 primarily consisted of factoring costs in Poland and Russia amounting to $5.5 million and $11.2 million, respectively and bank guarantees costs mainly in Russia amounting to $10.8 million and $8.8 million, respectively.

| Non-operating Income / (Expense) | | | | | |
|---|---|---|---|---|---|
| | Predecessor one hundred fifty-six-day period ended June 5, 2013 | Successor Two hundred and nine days ended December 31, 2013 | Combined Year ended December 31, 2013 (non US GAAP measures) | Successor Year ended December 31, 2014 | Year ended December 31, 2014 vs. year ended December 31, 2013 (non US GAAP measures) |
| Factoring costs and bank fees | (5,631) | (10,699) | (16,330) | (20,022) | (3,692) | (22.6%) |
| Other gains / (losses) | (719) | 1,870 | 1,151 | (1,111) | (2,262) | - |
| **Total other non-operating income / (expense), net** | $ (6,350) | $ (8,829) | $ (15,179) | $ (21,133) | $ (5,954) | (39.2%) |

### Reorganization Items

In accordance with ASC 852, reorganization items are presented separately in the accompanying consolidated statements of operations and include expenses, gains and losses directly related to the 2013 reorganization proceedings. A summary of reorganization items, net for the Company as in existence prior to the 2013 restructuring (the "*Predecessor*") is shown below:

| | Predecessor One hundred fifty-six days ended June 5, 2013 |
|---|---|
| Gain on settlement of prepetition liabilities upon emergence [a] | $ 509,260 |
| Revaluation of assets and liabilities [b] | (233,351) |
| Professional and other fees directly related to reorganization [c] | (62,636) |
| **Total Reorganization Items** | $ 213,273 |

[a] Net gain on prepetition liabilities reflects amounts related to the settlement of prepetition obligations pursuant to the plan of reorganization, net of fair value of consideration.

[b] The revaluation of assets and liabilities relates to the fresh start adjustments in accordance with ASC 852.

[c] Professional and other fees comprise legal costs of $33.2 million, financial and assurance fees of $7.9 million, consent fee of $4.4 million, investment advisory fees of $11.9 million and other professional costs of $5.2 million directly associated with the reorganization process. The consent fee in the amount of $4.4 million relates to consents to the Covenant Amendments, the Collateral and Guarantee Amendments and the Bankruptcy Waiver Amendments, each as defined in the Amended and Restated Offering Memorandum, Consent Solicitation Statement and Disclosure Statement, dated March 8, 2013 (the "*2013 Offering*

*Memorandum*"), filed as an exhibit to a tender offer statement on Schedule TO-I/A on March 8, 2013, as amended and supplemented by Supplement No. 1 to the Offering Memorandum, dated March 18, 2013, filed as an exhibit to the Form 8-K filed on March 19, 2013.

### Income Tax

The table below presents statutory rate reconciliation for continuing operations:

| | Predecessor one hundred fifty-six-day period ended June 5, 2013 | Successor Two hundred and nine days ended December 31, 2013 | Combined Year ended December 31, 2013 (non US GAAP measures) | Successor Year ended December 31, 2014 | Year ended December 31, 2014 vs. year ended December 31, 2013 (non US GAAP measures) | |
|---|---|---|---|---|---|---|
| **Tax at US statutory rate of 35%** | $ 41,667 | $ (45,738) | $ (4,071) | $ (35,865) | $ (31,794) | (781.0%) |
| Tax rate differences | 53,830 | 51,343 | 105,173 | 18,002 | (87,171) | (82.9%) |
| Valuation allowance | 7,958 | (21,225) | (13,267) | (1,811) | 11,456 | 86.3% |
| Permanent differences | 34,174 | 22,280 | 56,454 | 12,785 | (43,669) | (77.4%) |
| Reorganization related permanent differences | (157,977) | - | (157,977) | - | 157,977 | |
| Utilization of tax loss covered by valuation allowance | - | (11,947) | (11,947) | - | 11,947 | - |
| Reduction of net operating losses due to cancellation of indebtness income | | - | - | 13,045 | 13,045 | - |
| Other | 3,214 | (7,463) | (4,249) | 6,178 | 10,427 | 0% |
| **Income tax (benefit)/expense** | $ (17,134) | $ (12,750) | $ (29,884) | $ 12,334 | $ 42,218 | - |

Our tax benefit for 2013 was $29.9 million, which represents an effective tax rate for the year ended December 31, 2013 of 256.9%. The permanent differences for 2013 (both for Roust and the Predecessor) are mainly related to costs incurred by the Company that were not deductible for local tax purposes. Additionally in 2013, upon fresh start accounting, the Company recognized a downward revaluation of goodwill of $109.0 million and a gain on cancelation of debt, amounting to $509.3 million, which had no impact on tax. The Company also recognized additional impairment of goodwill of $24.6 million in 2013, which had no impact on tax. The decrease in valuation allowance is mainly driven by utilization of NOLs that previously were covered by a valuation allowance of $11.9 million.

Our tax charge for 2014 was $12.3 million, which represents an effective tax rate for the year ended December 31, 2013 of negative 12.0%. The permanent differences for 2014 are primarily related to costs incurred by the Company that are not deductible for local tax purposes. In 2014 due to underperformance of certain of the Company's subsidiaries the Company determined that an additional valuation allowance for deferred tax asset of $11.2 million was required and took the charge during the year. Additionally in 2014, the Company did not recognize a tax asset for losses at these subsidiaries. Therefore the tax expense for the profitable entities was not offset by a tax benefit at loss-making entities. This was offset by a reduction to zero of the valuation allowance amounting to $13.0 million related to NOLs that were reduced to zero on January 1, 2014.

As of December 31, 2013 and as of December 31, 2014, the uncertain income tax position balance was $17.3 million and $14.8 million, respectively.

### Statement of Liquidity and Capital Resources

During the year ended December 31, 2015, the Company's primary sources of liquidity were credit facilities and cash generated from operating activities. The Company's primary uses of cash were to finance its working capital requirements, service indebtedness and finance its capital expenditures. The following table presents selected information about the Company's consolidated cash flow during the periods indicated.

| | Predecessor one hundred fifty-six-day period ended June 5, 2013 | Cash Flow Successor Two hundred and nine days ended December 31, 2013 | Combined Year ended December 31, 2013 (non US GAAP measures) | Successor Year ended December 31, 2014 | Successor Year ended December 31, 2015 |
|---|---|---|---|---|---|
| Cash flow from / (used in) operating activities | $ 26,085 | $ 56,686 | $ 82,771 | $ 94,187 | $ 2,345 |
| Cash flow from / (used in) investing activities | (3,674) | (127,135) | (130,809) | (159,887) | (69,675) |
| Cash flow from / (used in) financing activities | (35,701) | 45,920 | 10,219 | 59,726 | 47,837 |

Management views and performs analysis of financial and non-financial performance indicators of the business by segments that are split by countries. The extensive analysis of indicators such as sales value in local currencies, gross margin and operating expenses by segment is included earlier in this Offering Memorandum and Disclosure Statement.

### Nine-month period ended September 30, 2016 cash flow

Net cash flow from operating activities represents net cash from operations and interest.

During the nine-month period ended September 30, 2016, the Company reported an operating cash outflow of $89.3 million. The overall cash flow from operating activities decreased by $85.7 million, from cash outflow of $3.6 million for the nine-month period ended September 30, 2015. The above-mentioned decrease is mainly driven by investment in working capital during the nine-month period ended September 30, 2016 as compared to the nine-month period ended September 30, 2015.

Overall working capital movements of accounts receivable, inventory, prepayments, other current assets, other accrued liabilities and payables and trade accounts payable resulted in a cash outflow of $21.8 million in the nine-month period ended September 30, 2015 and an outflow of $107.3 million in the nine-month period ended September 30, 2016.

Days of sales outstanding ("*DSO*") amounted to 30 days on September 30, 2015 compared to 35 days on September 30, 2016.

The number of days in inventory ("*DIO*") as of September 30, 2015 and 2016 amounted to 28 days. As of December 31, 2015 DIO amounted to 23 days.

Days of payables outstanding ("*DPO*") amounted to 114 days, 91 days and 78 days as of September 30, 2015, December 31, 2015 and September 30, 2016, respectively, reaching what we believe is our optimal level of DPO.

| | September 30, 2015 | December 31, 2015 | September 30, 2016 |
|---|---|---|---|
| DSO | 30 | 39 | 35 |
| DIO | 28 | 23 | 28 |
| DPO | 114 | 91 | 78 |

The ratio of our current assets, net of inventories to current liabilities, amounted to 0.66 as of September 30, 2015, 0.60 as of December 31, 2015 and 0.60 as of September 30, 2016.

During the nine-month period ended September 30, 2016, the Company paid $46.4 million in interest on its debt and received $7.8 million in interest on loans granted to related parties. During the nine-month period ended September 30, 2015 the Company paid $41.2 million interest on its debt and received $3.2 million interest on loans granted to related parties .

### Net cash flow used in investing activities

Net cash flows used in investing activities represent net cash used to grant loans and acquire fixed assets.

The net cash outflow in the nine-month period ended September 30, 2015 was $51.4 million. Net cash outflow for the nine-month period ended September 30, 2016 was $84.7 million. The increase in outflow by $33.3 million was mainly driven by higher net outflow of loans granted to related parties ($66.8 million net outflow in the nine-month period ended September 30, 2016 as compared to $14.2 million net outflow in the nine-month period ended September 30, 2015) as well as payments related to acquisition of Roust, Roust Moscow office ("*UTS*") and RDL, amounting to $9.1 million, $11.5 million and $9.0 million, respectively in the nine-month period ended September 30, 2015, as compared to payment for the acquisition of RDL of $3.9 million in the nine-month period ended September 30, 2016. Additionally, during the nine-month period ended September 30, 2016 the Company acquired from related parties physical product recipe and related technology, incurred other capital expenditures related to production and warehousing projects in Poland and made payment for the acquisition of marketing rights. The total amount of acquired assets is $7.0 million.

*Net cash flow from financing activities*

Net cash inflow from financing activities was $38.0 million for the nine-month period ended September 30, 2015 as compared to an inflow of $166.7 million for the nine-month period ended September 30, 2016. The increase is driven mainly by net inflow from external financing of $98.8 million whereas in the nine-month period ended September 30, 2015 there was a net cash outflow related to external financing in the amount of $13.0 million. Also, in the nine-month period ended September 30, 2016, net inflow from Related Party financing of $69.2 million was higher by $18.1 million in comparison to the nine-month period ended September 30, 2015.

*Changes in working capital recorded in the consolidated balance sheet*

Accounts receivable, net of allowance for doubtful debts, decreased by $6.2 million from $172.6 million as of December 31, 2015 to $166.5 million as of September 30, 2016. Inventories (including inventories consigned to others) increased by $23.1 million, from $74.8 million as of December 31, 2015 to $97.9 million as of September 30, 2016. Trade accounts payable decreased by $10.9 million, from $118.8 million as of December 31, 2015 to $107.9 million as of September 30, 2016. These changes are linked to the seasonality of the Company's business. The Company has its highest turnover in the fourth quarter of the year. Inventory is built up during the second half of the year and higher sales occur in the fourth quarter. Accounts payable are paid in the following months. Phasing in the collection of accounts receivable collection is partially neutralized by factoring.

### Fiscal year 2015 versus 2014 cash flow

Net cash flow from operating activities represents net cash from operations and interest. The Company generated operating cash flow of $2.3 million in 2015. Overall cash flow from operating activities decreased by $91.9 million from a cash inflow of $94.2 million for the year ended December 31, 2014 to $2.3 million for the year ended December 31, 2015. Cumulatively from June 5, 2013 (the date of Fresh Start Accounting) through December 31, 2015 we generated $179.3 million of operating cash flow compared with full three years estimate of $105.8 million presented in the 2013 Offering Memorandum.

Overall working capital changes in accounts receivable, inventory, prepayments, other current assets, other accrued liabilities and payables and trade accounts payable resulted in a cash outflow of approximately $31.0 million.

The Company had $16.9 million of unrealized foreign exchange losses for the year ended December 31, 2015, compared to $73.1 million of unrealized foreign exchange losses for the year ended December 31, 2014.

DSO as of December 31, 2015 amounted to 39 days, compared to 30 days as of December 31, 2014, Phasing in the collection of accounts receivable is partially neutralized because of the factoring agreements that the Company has entered into.

DIO was 23 days as of both December 31, 2015 and December 31, 2014, mainly due to no increase in excise tax.

DPO as of December 31, 2015 amounted to 91 days, compared to 65 days as of December 31, 2014.

|  | December 31, 2014 | December 31, 2015 |
|---|---|---|
| DSO | 30 | 39 |
| DIO | 23 | 23 |
| DPO | 65 | 91 |

The quick ratio (current assets less inventories to current liabilities) was 0.60 as at December 31, 2015, compared to 0.66 as at December 31, 2014.

*Net cash flow from investing activities*

Net cash flows from investing activities represents net cash used to grant loans, acquire fixed assets and acquire additional subsidiaries. The net cash outflow for the year ended December 31, 2015 was $69.7 million, compared to an outflow of $159.9 million for the year ended December 31, 2014. The decrease was mainly driven by the 2014 outflow from the acquisition of Roust Inc., which was partially offset by loans repaid by related parties. The outflow in 2015 mainly reflects loans granted to related parties in the amount of $35.9 million, the purchase of fixed assets of $11.3 million and payments related to RDL acquisition of $13.8 million.

*Net cash flow from financing activities*

Net cash flow from financing activities represents cash used for servicing indebtedness and borrowings under credit facilities. Net cash inflow from financing activities was $47.8 million for the year ended December 31, 2015, compared to an inflow of $59.7 million for the year ended December 31, 2014. This decrease was mainly driven by lower net payments related to bank borrowings partially offset with higher net payments related to borrowings from related parties.

### Fiscal year 2014 versus 2013 cash flow

*Net cash flow from operating activities*

Net cash flow from operating activities represents net cash from operations and interest. The Company generated strong positive operating cash flow of $94.2 million in 2014. Overall cash flow from operating activities increased by $11.4 million from cash inflow of $82.8 million for the year ended December 31, 2013 to cash inflow of $94.2 million for the year ended December 31, 2014. For the year ended December 31, 2014 the Company had $66.1 million of positive change in accounts receivable as compared to a positive change of $10.9 million for the year ended December 31, 2013.

Overall working capital changes in accounts receivable, inventory, prepayments, other current assets, other accrued liabilities and payables and trade accounts payable resulted in cash inflow of approximately $45.6 million.

*Net cash flow from investing activities*

Net cash flows from investing activities represent net cash used to grant loans, acquire fixed assets and acquire additional subsidiaries. Net cash outflow for the year ended December 31, 2014 was $159.9 million as compared to $130.8 million outflow for the year ended December 31, 2013. The increase was mainly driven by outflow due to the acquisition of Roust Inc. partially offset with loans repaid by related parties.

*Net cash flow from financing activities*

Net cash flow from financing activities represents cash used for servicing indebtedness and borrowings under credit facilities. Net cash inflow in financing activities was $59.7 million for the year ended December 31, 2014 as compared to an inflow of $10.2 million for the year ended December 31, 2013. This increase was mainly driven by higher bank borrowings partially offset with higher repayments of bank borrowings.

### The Company's Future Liquidity and Capital Resources

Roust's Consolidated Financial Statements have been prepared under the assumption that the Company will continue as a going concern, realizing assets and paying liabilities in the normal course of business as described in

Note 1 of the Roust Corporation Consolidated Financial Statements for the period ended December 31, 2015 included in Appendix G.

As previously noted, while our functional currencies are primary the Polish zloty, the Russian ruble and the Hungarian forint, our borrowings are primary denominated in U.S. dollars. See "Risk factors – Risks related to our business – We are exposed to exchange rate risks that could have a material adverse effect on our financial results and financial condition".

The Company had cash and cash equivalents of $12.6 million as of December 31, 2015 and amounts available under facilities of $7.4 million. The Company has not made any assumptions and has not raised any financing as of December 31, 2015 in relation to the conversion option on Existing Convertible Notes effective December 2014. No holders of these notes have exercised their option to convert the notes into equity of the Company. Our cash flow forecasts used in making this determination include the assumption that certain credit and factoring facilities that are falling due in 2016 will be renewed to manage the Company's working capital needs.

### Financing Arrangements

The Company's liquidity requirements include cash interest payments on its Existing Senior Secured Notes and its bank loans facilities.

Our key financing arrangements are:

- Existing Senior Secured Notes

- Existing Convertible Notes

- Bank loans, overdraft facilities and other borrowings

All these facilities are discussed in Note 14 of the Roust Corporation Consolidated Financial Statements for the period ended December 31, 2015 included in Appendix G.

As discussed in this Offering Memorandum and Disclosure Statement, if the Plan of Reorganization is approved, the Existing Senior Secured Notes and Existing Convertible Notes will be cancelled and the New Senior Secured Notes in aggregate principal amount of $385 million will be issued.

### Capital Expenditure

Our net capital expenditure on tangible and intangible fixed assets for the years ended December 31, 2013, 2014, and 2015 was $7.3 million, $15.7 million and $10.8 million, respectively. Capital expenditures during the years ended December 31, 2013, 2014 and 2015 were used primarily for production equipment and the car fleet, as well as SAP implementation.

| | Predecessor one hundred fifty-six-day period ended June 5, 2013 | Successor Two hundred and nine days ended December 31, 2013 | Year ended December 31, 2014 | Year ended December 31, 2015 |
|---|---|---|---|---|
| Net capital expenditure on tangible fixed assets | 2,902 | $ 4,405 | $ 15,724 | $ 10,841 |

We have estimated that capital expenditure for 2016 will be approximately $20.0 million, and cumulatively through 2020 will amount to approximately $93.2 million. A substantial portion of these future amounts of capital expenditure are discretionary, and we may adjust spending in any period according to our needs. We currently intend to finance all of our capital expenditure through cash generated from operating activities.

### Contractual Obligations

The following table summarizes our contractual obligations as at December 31, 2015:

| | | | Payments due by periods | | |
|---|---|---|---|---|---|
| | **Total** | 2016 | 2017-2018 | 2019-2020 | After 2020 |
| Non-current debt obligations | $ 732,207 | $ - | $ 732,207 | $ - | $ - |
| Interest on non-current debt | 189,687 | 46,459 | 143,228 | - | - |
| Current debt obligations | 206,826 | 206,826 | - | - | - |
| Interest on current debt | 13,386 | 13,386 | - | - | - |
| Operating leases | 30,621 | 6,752 | 11,641 | 7,464 | 4,764 |
| Capital leases | 4,211 | 1,972 | 1,914 | 325 | - |
| Contracts with suppliers | - | - | - | - | - |
| Current FIN 48 liabilities | 642 | 642 | - | - | - |
| **Total** | $ 1,177,580 | $ 276,037 | $ 888,990 | $ 7,789 | $ 4,764 |

The remaining FIN 48 liabilities are excluded from the contractual obligations table because the Company cannot make a reasonably reliable estimate of the period of cash settlement with the relevant tax authority.

## Critical Accounting Policies and Estimates

### General

The Company's discussion and analysis of its financial condition and results of operations are based on the Company's Consolidated Financial Statements which have been prepared in accordance with the accounting principles generally accepted in the United States. The preparation of these financial statements requires the Company to make estimates and judgments that affect the reported amounts of net sales, expenses, assets and liabilities. The Company bases its estimates on historical experience and on various other assumptions that are believed to be reasonable under the circumstances. Actual results may differ from these estimates under different assumptions and conditions. Significant items subject to such estimates and assumptions include: discounts and allowances, valuation allowance for a deferred tax asset, brand valuation, the economic value of business units and allowance for doubtful debts.

### Revenue Recognition

The Company's revenues include sales of its own produced brands of spirits, imported wines, beer and brands of spirits, as well as other third party alcoholic products purchased locally. Each of the revenue streams from these sales are processed and accounted for in the same manner. The Company recognizes revenue for all of its revenue sources when convincing evidence of an arrangement exists, delivery of product has occurred, the sales price charged is fixed or determinable and collectability is reasonably assured. This generally means that revenue is recognized when the title to the products is transferred to our customers. In particular, the title is usually transferred upon shipment to or receipt at our customers' sites, as determined by the specific terms of sale of the transactions.

Sales are stated net of sales tax (VAT) and reflect reductions attributable to the consideration given to customers in various customer incentive programs, including price discounts on single transactions, volume discounts, promotional listing fees and advertising allowances, cash discounts and rebates. In most countries where the company does business, the local authorities impose an alcohol/excise tax. It is generally a sliding scale tax based on alcohol content. In general, the tax liability is triggered at the moment of sale in Poland and at the moment of purchase of spirits in Russia. The payment is due within 25 days of the triggering event in Poland and made in advance in Russia if there is no bank guarantee. If a bank guarantee is issued, the payment in Russia may be deferred, in which case, it becomes due within 25 days after the month in which the triggering event took place. Net sales are presented net of excise tax.

### Revenue Dilution

Under the normal business terms with customers, the Company provides for additional discounts and rebates off our standard list price for all of the products we sell. These revenue reductions are typically associated with annual or quarterly purchasing levels, as well as payment terms. These rebates are divided into on-invoice and off-invoice discounts. The on-invoice reductions are presented on the sales invoice and deducted from the gross sales value on the invoice. The off-invoice reductions are calculated on the basis of an analysis performed by management and are provided for in the same period in which the related sales are recorded. Discounts or fees that

121

are subject to contractually based term arrangements are amortized over the term of the contract. The early payment discounts are also presented as a reduction in revenue. The Company recognized $161.2 million ($122.1 million for Roust and $39.1 million for the Predecessor Company), $182.7 million and $140.7 million of off-invoice rebates and early payment discounts as a reduction to net sales for the years ended December 31, 2013, 2014 and 2015, respectively.

### Accounts Receivable

Accounts receivable are recorded on the basis of the invoice price, inclusive of VAT (sales tax), and where a delivery note has been signed by the customer and returned to the Company. The allowances for doubtful accounts receivable are based on our experience with past due accounts, collectability, history of write-offs, aging of accounts receivable, our analysis of customer data and our relationships with our customers and their economic status. Provisions are established for individual trade receivables when management deems them not to be fully collectable. The Company typically does not provide for past due amounts due from large international retail chains (hypermarkets and supermarkets), as there have not been any issues historically with collectability of these amounts. When trade account receivables are deemed uncollectible, the balance is charged against the allowance for doubtful accounts.

The transfer of accounts receivable to financial institutions is accounted for as a sale when all of the following conditions are met: 1) the transferred accounts receivable are isolated from the Company, 2) the receiving financial institution has the right to pledge or sell the factored accounts receivable, and 3) the Company does not maintain effective control over the transferred accounts receivable. The transferred accounts receivable are isolated from the Company when, based on a legal opinion, it is established that, in accordance with local legislation, the transferred accounts receivable are put presumptively beyond the reach of the Company and its creditors, even in the event of the Company's bankruptcy. Once it is established that the transfer of the accounts receivable should be booked as a sale, the related accounts receivable are de-consolidated from the balance sheet, the recourse liability (if applicable) is recorded and the resulting gain or loss recorded in the statement of comprehensive income / (loss) in the period the transfer is complete.

### Goodwill

Goodwill is not subject to amortization. Goodwill is tested for impairment annually in December or earlier, upon the occurrence of certain events or substantive changes in circumstances that indicate goodwill is more likely than not impaired, which could arise from significant adverse changes in the business climate and declines in the value of our business. Such indicators may include a decline in our expected future cash flows, an adverse change in the economic or business environment, or the testing for recoverability of a significant asset group. Fair value measurement techniques, such as the discounted cash flow methodology, are used to assess potential impairments. The goodwill is tested at the level of each reporting unit. The Company performs a two-step goodwill impairment test. The first step, used to identify potential impairment, compares the fair value of a reporting unit with its carrying amount, including goodwill. If the first step does not indicate that the carrying value of the reporting unit exceeds its fair value, the second step is not required. When the first step indicates potential impairment, the Company completes the second step of the impairment test and compares the implied fair value of the reporting unit's goodwill to the corresponding carrying value of goodwill. Instead of calculating the fair value of a reporting unit, the Company may assess qualitative factors to determine whether it is more likely than not that the fair value of a reporting unit is less than its carrying amount, including goodwill. Potential impairment is evaluated on the basis of the weight of evidence provided by the analysis of events and circumstances that may affect the determination of whether it is more likely than not that the fair value of a reporting unit is less than its carrying amount.

The impairment test was performed under the assumption of 100% achievement of the budgeted operating income in the forecast period. As a result of the test, it was determined that the fair value of all tested reporting units substantially exceeds their carrying values. The Company also carries out a sensitivity analysis while performing first step of the goodwill impairment test. According to this sensitivity analysis, a 1 percentage point increase in the discount rate, 0.2 percentage point decrease in the terminal growth rate or a 5 percentage point decrease in the operating income would result in no impairment charge.

### Intangible assets other than goodwill

Intangible assets with an indefinite life are not amortized but are reviewed at least annually for impairment in December, or more frequently if facts and circumstances indicate such a need. Intangible assets consist primarily of acquired trademarks. The Company has acquired trademark rights to various brands, which were capitalized as a part of the purchase price allocation process in connection with acquisitions of Bols, Polmos Bialystok, Parliament and Roust Russia Group (previously Russian Alcohol Group). These trademarks include *Soplica*, *Żubrówka*, *Absolwent*, *Royal* vodka, *Parliament*, *Green Mark*, *Zhuravli* and the trademark rights to *Bols* vodka in Poland and Hungary. As a result of fresh start accounting, we also recognized the Talka brand, which was not previously on the books. Management considers trademarks associated with high or market-leader brand recognition within their market segments to be assets with indefinite lives, based on the length of time they have existed, the relatively high volumes sold and their general market positions with respect to other products in their respective market segments.

Based on the foregoing and together with evidence provided by analyses of vodka product life cycles, market studies, competitive and environmental trends, we believe that these trademarks will continue to generate cash flows for an indefinite term and that the useful lives of these trademarks are therefore indefinite.

In order to support the value of the trademarks, the Company calculates the fair value of the trademarks using a discounted cash flow approach based on a five-year forecast discounted to the present value. The result of the test led to the conclusion that the fair value of the trademarks exceeds their carrying value. The Company also performs a sensitivity analysis. According to the sensitivity analysis of our trademarks, a 1 percentage point increase in the discount rate, 0.2 percentage point decrease in the terminal growth rate or a 5 percentage point decrease in the net sales would result in no impairment charge.

### Impairment of long lived assets

The Company reviews its long-lived assets for impairment whenever events or changes in circumstances indicate that the carrying amount of an asset may not be recoverable. Recoverability of assets to be held and used is measured by comparing the carrying amount of an asset to the estimated undiscounted cash flows expected to be generated by the asset. If the carrying amount of an asset exceeds its estimated undiscounted future cash flows, the asset is deemed to be impaired. An impairment charge is recognized for the amount by which the carrying amount of an asset exceeds its estimated fair value. No impairments in property, plant and equipment have been recognized in the accompanying financial statements.

### Income Taxes and Deferred Taxes

The provision for income taxes is determined using the balance sheet method. Deferred tax assets and liabilities are recognized for the tax consequences of temporary differences between the financial reporting basis and the tax basis of existing assets and liabilities. The tax rate used to determine the deferred tax assets and liabilities is the enacted tax rate for the year and the manner in which the differences are expected to reverse. Deferred tax assets are reduced by a valuation allowance if it is more likely than not that some portion, or all of the deferred tax assets will not be realized. A provision is generally established for taxes payable on remittances of foreign earnings; no provision is made for taxes on foreign retained earnings that are deemed to be permanently reinvested.

The Company uses a comprehensive model to recognize, measure, present and disclose in its financial statements uncertain tax positions that the Company has taken or expects to take on an income tax return.

Benefits from tax positions are recognized in the financial statements only when it is more likely than not that the tax position will be sustained upon examination by the appropriate tax authority that would have full knowledge of all relevant information. A tax position that meets the more-likely-than-not recognition threshold is measured at the largest amount of benefit that is greater than fifty percent likelihood of being realized upon ultimate settlement. Tax positions that previously failed to meet the more-likely-than-not recognition threshold should be recognized in the first subsequent financial reporting period in which that threshold is met. Previously recognized tax positions that no longer meet the more-likely-than-not recognition threshold are derecognized in the first subsequent financial reporting period in which that threshold is no longer met. The Company recognizes interest expenses and penalties related to unrecognized tax benefits in income tax expense.

### *Loans granted to related parties*

The Company has classified the loans granted to our majority shareholder as assets on our accompanying balance sheet. Under U.S. GAAP, such loans are presented as assets or in shareholders' equity depending on the underlying facts and circumstances. We have reflected them as assets as we believe our majority shareholder has the intention and ability to settle the loans upon maturity.

### *Legal Contingencies*

We are involved in various lawsuits, claims, investigations and proceedings that arise in the ordinary course of business. We record a provision for a liability when we believe that it is both probable that a liability has been incurred and the amount can be reasonably estimated. Significant judgment is required to determine both the probability and the estimated amount. We review these provisions at least quarterly and adjust these provisions to reflect the impact of negotiations, settlements, rulings, advice of legal counsel and updated information. Litigation is inherently unpredictable and is subject to significant uncertainties, some of which are beyond our control. Should any of these estimates and assumptions change or prove to have been incorrect, this could have a material impact on our results of operations, financial position and cash flows. See Note 18 of the Roust Corporation Consolidated Financial Statements for the period ended December 31, 2015 included in Appendix G for a further discussion of litigation and contingencies.

### *Recently Issued Accounting Pronouncements*

Recently Issued Accounting Pronouncements are described in Note 1 of the Roust Corporation Consolidated Financial Statements for the period ended September 30, 2016 included in Appendix G. None of them had a material impact on our operating results, financial condition or financial statements.

The company is currently analyzing ASU 2016-02 Leases (Topic 842), which the Company plans to implement in the first quarter 2019. The Company does not expect that the adoption of other amendments will have material impact on the Consolidated Financial Statements of the Company.

## BUSINESS OF THE COMPANY

Roust Corporation, a Delaware corporation incorporated on September 4, 1997, and its subsidiaries operate primarily in the alcoholic beverage industry. We are one of the largest producers of vodka in the world and are Central and Eastern Europe's largest integrated spirit beverages business, measured by total volume, with approximately 24.6 million nine-liter cases produced and distributed in 2015. Our business primarily involves the production and sale of our own spirit brands (principally vodka), as well as importing of a wide variety of spirits and wines on an exclusive basis. Our primary operations are conducted in Poland, Russia, Ukraine and Hungary. We have six operational manufacturing facilities located in Poland and Russia. The ultimate beneficial owner of the Company is Mr. Roustam Tariko. Roust has a total work force of approximately 3,500 employees.

Our brands in Poland and Russia are well-represented in all vodka segments.

We are the largest vodka producer in Poland, with a brand portfolio that includes the *Absolwent, Żubrówka, Żubrówka Biała, Soplica, Żytniówka, Bols* and *Palace* brands, each of which we produce at our Polish distilleries. Our *Żubrówka Master* Brand has grown rapidly in recent years. In 2014, it grew by 19% compared to 2013 and was the fastest growing brand of vodka in the world by volume. In 2015, *Żubrówka* grew by a further 20% compared to 2014 and achieved an annual volume of 6.2 million nine-liter cases. *Żubrówka* continues to grow in 2016 by a further 17.7% according to Nielsen September year-to-date 2016 compared to the same period in 2015. This result estimates *Żubrówka* as being the world's third largest global brand of vodka.

Our portfolio strategy in Poland is to focus on our top two brands: *Żubrówka* and *Soplica*, as well as three core brands in various price categories: *Bols* in the premium segment, *Żytniówka* in the economy segment and *Absolwent* in the lower mainstream segment. The category is highly driven by innovation, while our portfolio and margin growth are driven by new product development. In 2015, we launched *Soplica Walnut, Soplica Strawberry, Absolwent Cherry, Absolwent Tangerine, Absolwent Wild Strawberry, Żytniówka Lemon Peel* and two sweet bitter flavors: *Żubrówka Pine Shoots* and *Żubrówka Maple Leaves*. We also launched the new 350 ml *Soplica* flavor packaging.

In the first half of 2016, we launched new *Żubrówka Czarna* in the super premium vodka segment and the flavor line extension: *Soplica Blueberry, Soplica Mirabelle Plum, Absolwent Lime, Absolwent Cranberry, Absolwent Strong Cherry, Absolwent Strong Lemon and Żytniówka Ginger*. In the third quarter of 2016, we have further extended our portfolio, launching *Absolwent Blackberry, Absolwent Plum, Żytniówka Bitter with Quince and Żytniówka Bitter with Orange.*

In Russia, the world's largest vodka market, trade statistics for 2015 show that we were one of the largest vodka producers in the country. Also in 2015, Roust Russia Group was a nationwide brand leader on the Russian market. Our *Green Mark* brand remains a top-selling mainstream vodka and our *Talka, Parliament* and *Zhuravli* brands are among the top-selling sub-premium vodkas in the country. We sell the *Urozhay* and *Yamskaya* brands in the economy segment and RSV – the leading brand in the premium segment. We also started to sell our champion vodka brand *Żubrówka* in Russia from September 2016 (under the trademark *Zubrovka*).

In Russia, sales by volume have increased by 6% in September through November 2016 compared with the same period in 2015, and by 8% excluding economy vodkas.

We launched *Talka* in Russia in July 2011, which accounts for almost 2 million nine-liter cases in 2015. In 2015, we restyled *Green Mark* and now we are planning a new design for *Parliament*. We launched new pack sizes to attract a wider range of customers and satisfy a greater scope of consumer demands. We believe our ability to launch new brands and portfolio extensions onto the market in an ever-changing economic and consumer preference environment gives us a distinct advantage.

We are a leading importer of spirits and wines in Poland and Russia and we generally seek to develop a complete portfolio of premium imported wines and spirits in each of the markets we serve. In Poland, we are maintaining exclusive import contracts for a number of internationally recognized brands, including *Grant's whisky, Tullamore Dew whiskey, Old Smuggler whisky, Balvenie whisky, Glen Grant whisky, Glenfiddich whisky, Wild Turkey bourbon, Metaxa brandy, Sierra tequila, Jägermeister, Remy Martin cognac, Carlo Rossi wines, Concha y Toro wines, Torres wines, Gancia, Campari, Cinzano, Aperol, Bols liquors, Cointreau, Carolans*. In Russia, we

expanded our import portfolio with well-known global brands as a result of the Roust Inc. acquisition. We distribute global brands, such *as Jägermeister, Remy Martin, Gancia, Sierra Tequila*, and wine brands, such as *Robert Mondavi, E&J Gallo, Concha y Toro* and *Paul Masson*. In Russia, we also produce ready-to-drink alcoholic beverages: wine-based *Amore*, gin-based *Bravo Classic, Elle* and *Russian Bear* with a taste of cognac and almonds. In 2015, we launched a new vodka-based drink, *Green Mark Vodka Orange* and *Green Mark Grapefruit*, as well as new flavors of *Chateau Amore – Pina Colada* and *Mojito*. We also launched *Enerbee's Sting* in the alco-energy segment with a different, non-energy recipe (without caffeine and taurine) to comply with the recent development of legislation and a healthy brand image.

In addition to our operations in Poland and Russia, we have sales offices in Hungary and in Ukraine and distribution agreements in a number of key international markets including the CIS, the Baltic States, Germany, France, the United States and the United Kingdom, for Green Mark, Talka, Zhuravli, Parliament and Żubrówka. Additionally, as a result of the acquisition of RDL, we have distribution contracts of RSV products in a number of key international markets. In 2015, international sales (excluding Poland domestic and Russia domestic) represented approximately 10.3% of our sales by value. In the nine-month period ended September 30, 2016, they represented approximately 21.6% of our sales by value.

## Our Competitive Strengths as a Group

The make-up of the Roust portfolio, comprised mainly of vodkas, is very well positioned to increase its share in the largest vodka markets in the world, such as Russia and Poland, and to participate in the growth of a dynamic category across major international markets. The Roust mission is focused on the key strengths of our brands and our core principle of authenticity, which, in turn, positions us favorably to compete and differentiate ourselves to consumers around the world. We also benefit competitively from vertical and horizontal integration as brand owner, producer and distributor. Additionally, cooperating with the RSV group, we have also benefited from our ability to access high quality spirit sourcing for our sub-premium products in Russia and internationally.

*Leading Brand Portfolio in Poland, Russia and Hungary* – In Poland, Russia and Hungary, we have a leading portfolio of domestic vodkas covering all key sectors. In addition to our domestic vodka portfolio we have a complementary import portfolio of leading import wines and spirits. This combined portfolio gives us a distinct advantage in the market by allowing us to provide a full spectrum of top domestic and import brands.

*Strength of the market position in Poland* – We are currently the number one vodka player in Poland in terms of share by volume. In September 2016, our vodka category market share by volume in Poland was 40.9% (increase of 3.4 percentage points compared to September 2015) and with a 36.5% market share for 2015, an increase of 8.3 percentage points compared with the previous year (37.9% share in December 2015, and an increase of 6.5 percentage points compared with the previous year), overtaking our main competitor, Stock Spirits, by 6.8 percentage points full year (or by 11.5 percentage points in December 2015). Our *Żubrówka Biała* is the best-selling vodka brand in Poland, with a market share of 15.6% for the full year of 2015, an increase of 5 percentage points compared with the previous year (16.4% in December 2015, an increase of 3.9 percentage points compared with the previous year) overtook Czysta de Luxe by 4.6 percentage points full year (7 percentage points in December 2015). We are also a leading importer of alcoholic beverages in Poland. Our portfolio includes top-selling brands that we produce, as well as brands that we import on an exclusive basis. Our broad range of products, including our own vodka brands, as well as imported wine and spirit brands, allows us to address a wide range of consumer tastes and trends, as well as wholesaler needs, and provides us with a solid portfolio base. Additionally, we have the scope and ability to bring new products to market in a timely and cost effective manner to meet the changing demands of our consumers.

*Solid platform for further expansion in the fragmented Russian vodka market* – The Russian vodka market is now growing by 1.5% year-to-date in 2016 compared to last year, according to the Nielsen and we were one of the largest vodka producers in Russia in 2015. Our large portfolio of alcoholic beverages consists of our own brands, including *Green Mark*, which was the top-selling mainstream vodka brand in Russia in 2015, top-selling sub-premium vodka brands in Russia such as *Parliament*, *Zhuravli* and *Talka*, the most dynamic brand in the segment, and imported products. These vodka and imported brands are supported by a combined sales force (line sales managers, representatives and merchandisers) of approximately 1,500 people. We believe our combined size and the geographic coverage of our sales force enable us to benefit from the ongoing consolidation in the Russian

126

vodka market. Furthermore, we believe we have the necessary infrastructure to introduce new brands to the market place in the segments where consumer demand is strongest.

Our sales force in Russia includes people allocated to Exclusive Sales Teams ("*ESTs*"). ESTs are employed by distributors that carry our vodka products but focus exclusively on the merchandising, marketing and sales of our portfolio. Because alcohol advertising is heavily regulated in Russia, we believe that this structure provides us with meaningful marketing benefits, as it allows us to maintain direct relationships with retailers and to ensure that our products receive prominent shelf space. Distributors who employ our ESTs are solely compensated through a rebate on purchases of our vodka brands. This arrangement enables us to maintain an expansive exclusive sales force covering almost all regions of Russia with limited associated fixed overhead costs.

*Attractive import platform for international spirit companies to market and sell products in Poland and Hungary* – Our existing import platform, in which we are the exclusive importer of numerous brands of spirits and wines into each of our core markets, combined with our sales and marketing organizations in Poland and Hungary, provide us with an opportunity to continue to expand our import portfolio. We believe we are well-positioned to serve the needs of other international spirit companies that wish to sell products on these markets.

**Business Strategies**

*Capitalization on the consolidation of the Russian market* – The Russian vodka market is currently fragmented and we believe we will be able to take market share from smaller competitors in the near and long-term. We estimate that the top five vodka producers in Russia accounted for an estimated 43% of the total vodka market in 2015 as compared to an estimated 26% in 2006. We believe that, based on our experience of the consolidation trends in Poland, the combined market share of the top five vodka producers in Russia could increase from 43% as the Russian market continues to consolidate. We intend to capitalize on our leading brand position, the breadth of our portfolio, our ability to bring new brands to market and our expansive sales and distribution network to increase our market share in Russia. According to available Nielsen data (August 2016 – September 2016), our market share by value amounted to approximately 8%.

*Development of our portfolio of exclusive import brands* – In addition to the development of our own brands, our strategy is to be the leading importer of wines and spirits in the markets where we operate. We have already developed an extensive wine and spirit import portfolio in Poland. We also plan to utilize the platform we have developed in Ukraine for importing wines, spirits and ready-to-drink alcoholic beverages. In Russia, due to the Roust Inc. acquisition, we have broadened our portfolio to include well-known global brands, such as *Remy Martin*, *Jägermeister*, *Gallo*, *Concha Y Toro*, and *JP Chenet*.

*Acceleration of high value core brands* – In Poland, we intend to continue our marketing efforts supporting *Żubrówka Bison Grass* and *Żubrówka Biała*, the brand that became the market leader in 2015. We have just in March 2016 launched a new entry to the super premium segment with *Żubrówka* Czarna. Within Russia, we have concentrated our efforts on the development and restyling of our core brands, such as *Green Mark*, *Zhuravli*, *Talka*, *Parliament* and *Urozhay*.

*Development of international sales opportunities for our vodka brands* – We continue to seek new international sales opportunities for our vodka brands by extending package sizes existing markets, entering new markets (including through new distribution partners) and extending our brands portfolio. The international sales structure was finalized in 2013 to maximize the potential for international sales through leveraging the Group's brand portfolio strength.

The number of countries where our top five brands were distributed in 2013 and 2015 is presented in the table below.

| Brand | 2013 (# countries) | 2015 (# countries) |
|---|---|---|
| *Żubrówka* | 30 | 40 |
| *Green Mark* | 22 | 30 |
| *Talka* | 12 | 13 |
| *Soplica* | 6 | 10 |
| *Parliament* | 10 | 14 |
| *RSV* * | | >75 |

We aim to continue to expand globally to achieve a leading position in all of the top ten vodka countries in the world.

**Operating Segments**

We manage our business on the basis of the following segments: Poland domestic, Russia domestic, International (comprising export activities of Poland-based and Russia-based entities and other activities of an international nature) and Corporate, which is comprised of other non-production and non-trading activities.

Management assesses the results of the segments based on operating income adjusted for depreciation and impairment charges ("*EBITDA*"). In previous years, management used Underlying EBITDA, i.e. operating income adjusted for depreciation, impairment charges and other excluded items (which are: non-recurring costs related to business reorganization, costs of acquisitions and disposals of subsidiaries and other one-time items). Underlying EBITDA is now used as a supplementary measure of performance. The below presents both: the primary measure used by the management to assess segment performance, and the measure which was used by Management in previous years.

Selected financial data splits based upon these segmentations are shown below for the relevant periods (intercompany revenues and profits are eliminated in line with management accounting policies):

| Net Sales | | three-month period ended September 30, 2015 (unaudited, as recast) | | three-month period ended September 30, 2016 (unaudited) |
|---|---|---|---|---|
| **Segment** | | | | |
| Poland domestic | $ | 62,202 | $ | 70,648 |
| Russia domestic | | 62,315 | | 49,565 |
| International | | 17,404 | | 39,719 |
| **Total Net Sales** | $ | **141,921** | $ | **159,932** |

| Net Sales | | nine-month period ended September 30, 2015 (unaudited, as recast) | | nine-month period ended September 30, 2016 (unaudited) |
|---|---|---|---|---|
| **Segment** | | | | |
| Poland domestic | $ | 170,250 | $ | 203,024 |
| Russia domestic | | 176,098 | | 122,544 |
| International | | 39,687 | | 89,512 |
| **Total Net Sales** | $ | **386,035** | $ | **415,080** |

128

### EBITDA (non-GAAP measure)

| Segment | | three-month period ended September 30, 2015 (unaudited, as recast) | | three-month period ended September 30, 2016 (unaudited) |
|---|---|---|---|---|
| Poland | $ | 10,624 | $ | 14,719 |
| Russia | | 9,531 | | 3,711 |
| International | | 835 | | 6,812 |
| Corporate Overhead | | (673) | | (4,124) |
| **Total EBITDA** | **$** | **20,317** | **$** | **21,118** |

### EBITDA (non-GAAP measure)

| Segment | | nine-month period ended September 30, 2015 (unaudited, as recast) | | nine-month period ended September 30, 2016 (unaudited) |
|---|---|---|---|---|
| Poland | $ | 28,899 | $ | 41,933 |
| Russia | | 11,075 | | (319) |
| International | | 4,856 | | 16,209 |
| Corporate Overhead | | (6,598) | | (14,393) |
| **Total EBITDA** | **$** | **38,232** | **$** | **43,430** |

### Underlying EBITDA (non-GAAP measure)

| Segment | | three-month period ended September 30, 2015 (unaudited, as recast) | | three-month period ended September 30, 2016 (unaudited) |
|---|---|---|---|---|
| Poland | $ | 13,166 | $ | 14,806 |
| Russia | | 12,744 | | 3,711 |
| International | | 841 | | 6,807 |
| Corporate Overhead | | (672) | | (2,329) |
| **Total Underlying EBITDA *** | **$** | **26,079** | **$** | **22,995** |

### Underlying EBITDA (non-GAAP measure)

| Segment | | nine-month period ended September 30, 2015 (unaudited, as recast) | | three month period ended September 30, 2016 (unaudited) |
|---|---|---|---|---|
| Poland | $ | 37,680 | $ | 42,201 |
| Russia | | 18,559 | | (320) |
| International | | 4,889 | | 16,209 |
| Corporate Overhead | | (6,599) | | (6,052) |
| **Total Underlying EBITDA *** | **$** | **54,529** | **$** | **52,038** |

*\* From the Underlying EBITDA for the three-month and nine-month periods ended September 30, 2016 no costs of revenue acceleration deals were excluded. Management believes that approximately 50% of such costs incurred year-to-date, i.e. approximately $8.6 million, is recoverable in 2017. Were these costs excluded the Underlying EBITDA for the three-month and nine-month periods would amount to $25.5 million and $60.6 million, respectively.*

| EBITDA (non-GAAP measure) to Operating Income reconciliation | | |
|---|---|---|
| | three-month period ended | three-month period ended |
| | September 30, 2015 | September 30, 2016 |
| | (unaudited, as recast) | (unaudited) |
| Operating income / (loss) | $ 17,788 | $ 18,423 |
| Depreciation and amortization | 2,529 | 2,695 |
| Impairment charge | - | - |
| **Total EBITDA** | **20,317** | **21,118** |
| Other excluded items (non-GAAP measure) | 5,762 | 1,877 |
| **Total Underlying EBITDA** | **$ 26,079** | **$ 22,995** |

| EBITDA (non-GAAP measure) to Operating Income reconciliation | | |
|---|---|---|
| | nine-month period ended | nine-month period ended |
| | September 30, 2015 | September 30, 2016 |
| | (unaudited, as recast) | (unaudited) |
| Operating income / (loss) | $ 30,825 | $ 35,268 |
| Depreciation and amortization | 7,407 | 8,162 |
| Impairment charge | - | - |
| **Total EBITDA** | **38,232** | **43,430** |
| Other excluded items (non-GAAP measure) | 16,297 | 8,608 |
| **Total Underlying EBITDA** | **$ 54,529** | **$ 52,038** |

| Depreciation / Amortization Expense | | |
|---|---|---|
| | three-month period ended | three-month period ended |
| | September 30, 2015 | September 30, 2016 |
| | (unaudited, as recast) | (unaudited) |
| **Segment** | | |
| Poland domestic | $ 1,552 | $ 1,821 |
| Russia domestic | 890 | 784 |
| International | 73 | 80 |
| Corporate | 14 | 10 |
| **Total depreciation / amortization expense** | **$ 2,529** | **$ 2,695** |

| Depreciation / Amortization Expense | | |
|---|---|---|
| | nine-month period ended | three month period ended |
| | September 30, 2015 | September 30, 2015 |
| | (unaudited, as recast) | (unaudited) |
| **Segment** | | |
| Poland domestic | $ 4,715 | $ 5,303 |
| Russia domestic | 2,385 | 2,580 |
| International | 264 | 253 |
| Corporate | 43 | 26 |
| **Total depreciation / amortization expense** | **$ 7,407** | **$ 8,162** |

*Poland*

In September 2016, our vodka category market share by volume in Poland was 40.9% (an increase of 3.4 percentage points compared to September 2015).

| Nielsen Vodka Market Shares Total Poland | | | | |
|---|---|---|---|---|
| | December 2015 (market share and change versus PY) | | September 2016 (market share and change versus PY) | |
| ROUST* | 38.1% | +6.0 p.p. | 40.9% | +3.4 p.p. |
| Stock Spirits | 25.7% | -7.2 p.p. | 26.5% | -3.0 p.p. |
| Sobieski | 14.7% | +0.4 p.p. | 15.4% | +1.4 p.p. |

*ROUST's Polish subsidiary - CEDC International Sp. z o.o.

We own two production sites in Poland, one in Oborniki and one in Białystok. The brands of spirits we produce at the Oborniki distillery include the *Bols* and *Soplica* vodka brands, whereas we produce *Absolwent*, *Żubrówka Bison Grass*, *Żubrówka Biała* and *Żytniówka* in Białystok. In December 2015, *Żubrówka Biała* strengthened its leading position and achieved 16.4% of the vodka market (3.9 percentage points compared with the previous year). Our *Żubrówka Bison Grass* is sold internationally on many markets around the world, including France, the United Kingdom and Japan. In 2015, *Soplica* continued to increase its market share and reached a market share by volume of 9.2% in December 2015, which is growth of 1.8 percentage points compared with the previous year. Brand growth was driven by higher sales of *Soplica* flavored as a result of our strong activities in the market (coolers, perfect store program, extended sales forces, etc.), together with the impact of two new launches: *Soplica Strawberry* and *Soplica Walnut*. Furthermore, *Soplica* flavored vodka further increased its share to 5.2% of the vodka market, which is 1 percentage point growth on the previous year. Our economy brand – *Żytniówka* – further strengthened its position as the leading economy vodka with a market share of 4.9 % in December 2015, constituting growth of 0.8 percentage points compared with the previous year. In 2015, *Bols* defended its position as the leading premium vodka brand in Poland with a market share of 3% by volume. In 2015, we launched two new variants of *Absolwent* flavored (*Grapefruit* and *Apple&Mint*), which enabled the brand to reach a 2.8% market share of the flavored vodka segment by the end of 2014. In 2015, we launched three more flavor variants of *Absolwent* (*Tangerine*, *Wild Strawberry* and *Cherry*).

We are one of the leading importers of wine and spirits in Poland. We currently import approximately 40 leading brands of spirits and wines on an exclusive basis from almost 20 producers.

*Own Brands and Import Portfolio*

We sold over 13.7 million nine-liter cases of vodka, wine and spirits through our Polish business (excluding exports) in 2015, including our own produced vodka brands, as well as our exclusive agency import brands.

Our mainstream vodkas are represented by the following brands (among others): *Absolwent*, *Soplica*, *Żubrówka Bison Grass* and *Żubrówka Biała*. In 2015, our icon brand, *Żubrówka Bison Grass*, remained a strong player, being one of the best-selling infused and colored vodkas in Poland, while *Żubrówka Biała* was a top selling brand with over 5.4 million nine-liter cases sold in 2015. Our *Soplica* brand saw solid growth in the mainstream category as a result of its flavored variants. Our successful launch of new flavors, *Soplica Wild Strawberry* and *Walnut*, with a distinctive marketing campaign, enabled us to increase sales of the *Soplica* trademark by 20% by volume (*Soplica Clear* and *Soplica* flavored increased by 14% and 30% compared with the previous year, respectively). We are actively developing our flavored vodka segment with new product launches: *Absolwent Wild Strawberry*, *Absolwent Tangerine*, *Absolwent Cherry* and *Żytniówka Lemon Peel*, enabling us to grow our flavored vodka variants by 14 in 2015.

*Bols* vodka continues to be our best-selling premium vodka in Poland. Sales of *Bols* Platinum, which was launched in 2013, continued to grow in 2014 and 2015, helping us rebuild the perception of its quality and strengthen its premium brand position.

We have the exclusive rights to import and distribute approximately 40 leading brands of spirits and wines into Poland and distribute these products throughout the country. We also provide marketing support to the suppliers who have entrusted us with their brands.

The brands we produce and import exclusively in Poland include:

131

| Vodka | Wine & Champagnes | Brown Spirits | Vermouth & Bitters | Liqueurs | White Spirits |
|---|---|---|---|---|---|
| *Bols* * | Gallo | Balvenie | Cinzano | Amaretto | Cachaca |
| *Soplica* * | B. P. Rothschild | Glen Grant | Campari | Carolans | Finsbury |
| *Absolwent* * | Frescobaldi | Glenfiddich | Jägermeister | Cointreau | Hendricks |
| Palace | Codorniu | Grant's | Aperol | Passoa | Old Pascas |
| *Żubrówka* * | Penfolds | Metaxa | Gancia | Bols Liqueurs | Sierra |
| *Żytniówka* * | Trivente | Monkey Shoulder | | | |
| | Rosemount | Old Smuggler | | | |
| | Trinity Oaks | Sailor Jerry | | | |
| | Terra d'oro | Torres | | | |
| | M.Chapoutier | Tullamore Dew | | | |
| | BoireManoux | Wild Turkey | | | |
| | Faustino | Remy Martin | | | |
| | J. Moreau & Fils | | | | |
| | Kressmann | | | | |
| | Laroche | | | | |
| | Gancia | | | | |
| | Barefoot | | | | |
| | Carlo Rossi | | | | |
| | Cinzano | | | | |
| | Gran Dolce | | | | |
| | Cassilero del Diablo | | | | |
| | Marques de Casa Concha | | | | |
| | Frontera | | | | |
| | Sunrise | | | | |
| | Sendero | | | | |
| | Torres | | | | |
| | Apothic Red | | | | |
| | Rancho Zabaco | | | | |
| **Annual sales** | | | | | |
| above 11,990k nine-liter cases | above 1,120k nine-liter cases | around 513k nine-liter cases | around 67k nine-liter cases | above 18k nine-liter cases | around 14k nine-liter cases |

*\* brands with annual sales of over 1 million nine-liter cases (9l cs)*

The following table illustrates the breakdown of our sales in Poland in the years ended December 31, 2013, 2014 and 2015:

| Volume sales mix by product category | 2013 | 2014 | 2015 |
|---|---|---|---|
| Vodka domestic | 75% | 81% | 85% |
| Vodka international | 5% | 4% | 3% |
| Wine | 8% | 7% | 8% |
| Spirits other than vodka | 12% | 7% | 4% |
| Other | 0% | 1% | 0% |
| **Total** | **100%** | **100%** | **100%** |

*Employees*

As of December 31, 2015, we had 1,048 employees in Poland on full-time employment contracts (Polish Business – 1,012, Corporate Office - 26, Exports - 10)

Polish labor laws require that certain benefits are provided to employees, such as a certain number of days of vacation, maternity leave and retirement bonuses. The law also restricts us from terminating employment contracts without cause and, in most instances, requires a severance payment at a level of one to three times the monthly salary. Additionally, we are required to make monthly contributions to the governmental health and pension system. Most of our employees are not unionized and we have had no significant issues with employee relations. In addition to the Polish labor law requirements, we provide supplemental health insurance for qualified employees.

*Trademarks*

We became the owners of trademarks of vodka brands with the acquisitions of Polish distilleries. The major trademarks we have are: the *Bols* vodka brand (we have franchise rights to the *Bols* vodka brand in Poland and Hungary) and the *Soplica*, *Absolwent* and *Żubrówka* brands. We also have the trademark for *Royal* vodka, which is produced in Poland and which we currently sell in Hungary through our Hungarian subsidiary.

*Russia*

According to available Nielsen data (August 2016 – September 2016) we are the leading integrated spirit beverages business in Russia with a market share of approximately 8% by value in vodka production (with a higher share in nation-wide chains). We sell RSV – the leading brand in the premium segment, and produce *Green Mark* which is in one of the top three brands in the mainstream segment, and the three leading sub-premium vodkas in Russia: *Parliament*, *Zhuravli* and *Talka*. We also produce *Yamskaya*, an economy vodka in Russia, under a manufacturing contact with Tatspirtprom, and premixed alcoholic drinks (or long drinks).

The hypermarkets and large retail chains are expanding throughout Russia with different sized and formatted stores, which are expected to increase penetration of those areas outside the major cities of Russia. As we have central agreements in place with these hypermarkets and large retail chains, we expect to benefit from this expansion. Our share in these retail chains is higher than average.

In 2014, we continued integration of the Roust Russia (formerly Russian Alcohol Group) and Roust Inc. businesses, improving operational efficiencies and strengthening our Route-to-Market. The Roust Inc. portfolio will benefit from the access to new distribution points leveraged by the Roust Russia sales apparatus, especially in traditional trade, where Roust Russia can increase the distribution of RSV and key partner brands.

*Own Brands and Import Portfolio*

We sold approximately 6.8 million nine-liter cases of vodka through our Russian business in 2015 in the main vodka segments in Russia: premium, sub-premium, mainstream and economy. In addition, we sold approximately 1.1 million nine-liter cases of long drinks.

We produce *Green Mark*, the leading mainstream vodka in Russia, as well as *Talka*, *Zhuravli* and *Parliament* which are among the leading sub-premium brands.

We are also the exclusive distributor of RSV – the number one premium brand in Russia.

We broadened our import portfolio in Russia with well-known global brands through our acquisition of Roust Inc. Our import and distribution business is based on four foundations: vodkas, sparkling wines, brown spirits and still wines. We import and distribute Italy's oldest brand of sparkling wine – *Gancia* and a wide range of still wines, including *Gallo*.

In 2015, we continued our portfolio optimization, which was initiated in 2014, to reach a reduced level of 400 SKUs. This will help us improve and develop our strategic brands with more focus, and reduce our working capital.

In 2014, we extended our contract with *Jägermeister* for three years. *Jägermeister* has a high growth trend and high brand awareness in Russia. Brand awareness grew 16% in 2015, reaching 57%, the highest level in history. Moreover our key brand, *Remy Martin*, has demonstrated 9% growth compared to the previous year, despite the crisis in Russia.

The brands we produce and import in Russia include:

| Vodka | White Spirits | Brown Spirits | Vermouth & Bitters | Wine & Champagnes | Liqueurs |
|---|---|---|---|---|---|
| *Russian Standard* | *Molinari* ** | *Remy Martin* ** | *Gancia* ** | *Gancia wines* ** | *Cointreau* |
| *Green Mark* * | *Mount Gay* | *Metaxa* | *Jägermeister* ** | *Grand Reale* | *DeKuyper* |
| *Parliament* | *Sierra Tequila* ** | *Saint Remy* | | *Piper Heidsieck* | |
| *Talka* * | | *King Robert II* ** | | *Sandeman* | |
| *Zhuravli* | | *Hedges&Butler* ** | | *Offley* | |
| *Urozhay* | | | | *Concha y Toro* | |
| *Marusya* | | | | *Trivento* | |
| *Yamskaya* | | | | *Pascual Toso* | |
| *Kauffman* | | | | *Sileni* | |
| | | | | *Tahuna* | |
| | | | | *Seghesio* | |
| | | | | *Gallo Family Vinyards* | |
| | | | | *Carlo Rossi* | |
| | | | | *Robert Mondavi* | |
| | | | | *Paul Masson* | |
| | | | | *J.P.Chenet* | |
| **Annual sales 2015** | | | | | |
| around 5,900k nine-liter cases | above 12k nine-liter cases | above 99k nine-liter cases | around 144k nine-liter cases | around 448k nine-liter cases | around 25k nine-liter cases |

*\* brands with annual sales over 1 million nine-liter cases (9l cs)*

*\*\* brands brought to the portfolio through Roust Inc. acquisition*

*Sales Organization and Distribution*

In Russia, we have a strong sales team that sells directly to our key retail accounts and we primarily use third-party distribution, with distributors reaching the small to medium sized outlets. We also have ESTs that were introduced in 2006 for selling our vodka brands. These teams have the mission of maintaining direct relations with retailers and ensuring that the Company's products are properly positioned on the shelf. The members of the ESTs are generally on the payrolls of the distributors, which are indirectly compensated by us through the discounts granted to those distributors. ESTs deal exclusively with our vodka products and controlled deliveries to approximately 67,000 points-of-sale (which is about 60% of all licensed points-of-sale in Russia) in 2015, or about 80% of our traditional trade sales.

The following table illustrates the breakdown of our Russian sales:

| Volume sales mix by product category | 2013 | 2014 | 2015 |
|---|---|---|---|
| Vodka domestic | 72% | 69% | 69% |
| Vodka international | 7% | 9% | 8% |
| Ready to drink products | 14% | 12% | 13% |
| Wine and spirits other than vodka | 7% | 10% | 10% |
| **Total** | **100%** | **100%** | **100%** |

*Employees*

As of December 31, 2015, we directly employed 2,549 people in Russia.

*Trademarks*

The main trademarks we have are *Parliament*, *Green Mark*, *Talka* and *Zhuravli*. We also have trademarks with other brands we own in Russia.

**International**

**Hungary**

We operate our business in Hungary through Roust Hungary Kft. ("*Roust Hungary*").

*Brands*

In July 2006, we acquired the *Royal* vodka trademark which we produce in Poland and which we currently sell in Hungary through our Hungarian subsidiary. *Royal* vodka is the number one selling vodka in Hungary, with a market share in retail of 64.7% within the Value-for-Money vodka segment, giving Roust Hungary a 30.7% share of the total vodka category (source: Nielsen Retail Audit, October–November 2015 period data).

Our exclusive import brands in Hungary include the following:

| Vodka | White Spirits | Brown Spirits | Vermouth & Bitters | Wine & Champagnes | Liqueurs |
|---|---|---|---|---|---|
| Bols | José Cuervo | Remy Martin | Jägermeister | Gancia wines | Bols Liqueurs |
| Żubrówka | Ron Varadero | Metaxa | Cinzano | Cinzano | Cointreau |
| Royal | Silver Top Gin | St Remy | Campari | | Carolans |
| Russian Standard | Bols Genever | Grant's | Aperol | | Galliano |
| | | Glenfiddich | | | Frangelico |
| | | Tullamore Dew | | | Bols Advocaat |
| | | Glen Grant | | | Ouzo 12 |
| | | Old Smuggler | | | |
| **Annual sales** | | | | | |
| around 305k nine-liter cases | around 5k nine-liter cases | around 40k nine-liter cases | around 210k nine-liter cases | around 16k nine-liter cases | around 8k nine-liter cases |

*Sales Organization and Distribution*

In Hungary, we employ approximately 24 sales people who cover primarily on-trade and key account customers throughout the country. We also regularly visit key wholesale and independent retail customers.

*Employees*

As of December 31, 2015, we employed 60 employees in Hungary, including 58 people employed full time.

**Sources and Availability of Raw Materials for Spirits that we Produce**

The principal components in the production of our distilled spirits are products of agricultural origin, such as rectified spirit, as well as flavorings, such as bison grass for *Żubrówka*, and packaging materials, such as bottles, labels, caps and cardboard boxes. We purchase raw materials by contractual arrangement through purchases on the open market. Agreements with the suppliers of these raw materials are generally negotiated with indefinite terms, subject to each party's right of termination with six months' prior written notice. Prices for these raw materials, excluding spirits, are negotiated on average once a year. Spirit prices are affected by underlying grain price trends which can fluctuate quickly and therefore tend to be purchased through short term or spot rate agreements.

We have several suppliers for each raw material in order to minimize the effect on our business if a supplier terminates its agreement with us or if supplies of raw materials are disrupted for any other reason. We have not recently experienced any significant difficulty in satisfying our requirements with respect to any of the products needed for our spirit production and consider our sources of supply to be adequate at the present time. For certain brands, we are heavily reliant on one to two bottle suppliers. In certain instances, primarily spirits in Russia, we purchase raw materials primarily from one dominant supplier which increases our risk of price increases and supply disruptions.

**Government Regulations**

The alcohol and spirit markets are subject to extensive government regulations in Poland and Russia. We are subject to a range of regulations in the countries in which we operate including laws and regulations on the environment, trademark and brand registration, packaging and labeling, distribution methods and relationships, pricing and price changes, sales promotions and public relations. As explained below in "Risk Factors," we may be required to obtain permits and licenses to operate our facilities. We are also subject to rules and regulations relating to changes in officers or directors, ownership or control.

**No excise tax increases in 2016** – In October 2014, the State Duma of the Russian Federation indicated that there would be no further excise tax increases in 2015–2016. This decision shows that the government has recognized that damage has been inflicted on the sector through multiple increases in excise tax since 2012. Additionally, the government has started to pass laws with higher penalties for illegal producers, including immediate confiscation of equipment.

**Effective industry legislation** – We continued to work actively and productively with the alcohol industry and government in Russia in 2015 to develop commercially viable but responsible legislation.

We partnered with the government in its efforts to curtail on the black market, which included new legislation:

- introducing a united governmental tracking system (EGAIS) for each bottle of alcohol in retail and wholesale from January 2016;

- providing government bodies with the authority to disassemble and destroy equipment used for counterfeit alcohol production.

Consequently, we are expecting a reduction in the quantity of counterfeit alcohol and an increase in our revenue.

We expect that the State Duma will pass a new trade law in 2016 reducing the maximum fees and allowances payable to retail chains from 10% to 3% of turnover. The bill was passed at the first reading in May 2015. We expect this to benefit our margins in Russia by reducing fees and discounts.

We collaborated with the industry and the government to exclude superfluous bank statements from the list of documents confirming the export of alcoholic products from Russia. Previously the period for bank export guarantees was dependent on the time when bank statements confirming receipt of the payment for the goods from foreign buyers are presented. According to the bill enacted in 2015, it is enough to provide shipping and customs documents to confirm export and to cancel bank guarantee. It will enable the shortening of the life of bank export guarantees from 10 months to 3–4 months and will lead to significant potential savings for Russian entities on payments for bank guarantees (approximately $1.5 million annually).

We managed to obtain a "zero" environmental fee for 2015 for manufacturers and importers of goods that do not recycle the waste from the consumption of their goods themselves.

The owners of vehicles with a mass of over 12 tonnes are required to pay a "road fee". This will lead to increased costs of transportation and a potential shortage of carriers.

We partnered with the alcohol industry and worked hard to lift the legislative ban on on-line alcohol sales. This will open a new sales channel for our products in Russia. We have continued this work in 2016.

We also partnered with Russian industry and actively worked towards lifting the ban on the use of trademarks with images of people or animals in alcohol advertising. The government has given a positive opinion on the draft law which has the purpose of lifting such a ban. We expect this to expand our opportunities in promotion and increase our sales and profits.

The Polish government increased excise taxes on spirits by 15% in January 2014, from PLN 49.6 per liter of 100% spirit to PLN 57.04 per liter of 100% spirit.

We believe we are in material compliance with all applicable governmental laws and regulations in the countries in which we operate and expect all material governmental permits and consents to be renewed by the relevant governmental authorities upon expiration. We believe that the costs of administration and compliance with the applicable laws and regulations, as well as our liability for this, do not and are not expected to have a material adverse impact on our financial condition, results of operations or cash flows.

**Alcohol Advertising Restrictions**

Polish and Russian regulations do not allow for alcoholic beverages with an alcohol content of more than 18% any form of "above-the-line" advertising and promotion, which is an advertising technique that is conventional in nature and impersonal to customers, using current traditional media such as television, newspapers, magazines, radio, outdoor and internet mass media.

We believe we are in material compliance with the government regulations regarding "above-the-line" advertising and promotion and we have not been notified of any breach of these regulations.

**Environmental Matters**

We are subject to a variety of laws and regulations relating to land use and environmental protection, including the Polish Environmental Protection Law of April 27, 2001 (Dz.U.2016.672 text codified, as amended), the Polish Waste Law of December, 14, 2012 (Dz.U.2013.21 as amended), the Polish Water Law Act of July 18, 2001 (Dz.U.2015.469 text codified, as amended) and the Polish Act on Entrepreneurs' obligations regarding the management of some types of waste and product fees of May 11, 2001 (Dz.U.2061.1478 text codified, as amended). We are not required to receive an integrated permit to operate our Bialystok and Oborniki plants. However, we receive certain permits for the economic use of the environment, including water permits and permits for the emission of pollutants (gases and/or dusts) into the atmosphere and made relevant notifications when required. In addition, we have entered into certain agreements related to the recovery and disposal of our waste, including raw materials and products which are unsuitable for consumption or processing, paper, plastic, metal, glass and cardboard packaging, filtration materials (spent water filter refills), used computer parts, unsegregated (mixed) municipal waste, damaged thermometers and alcohol meters, spent engine and transmission oils, batteries and other waste containing hazardous substances. In addition, we pay the required environmental fees and charges related primarily to the packaging materials and fuel consumption and we believe we are in material compliance with our regulatory requirements in this regard. While we may be subject to possible costs, such as clean-up costs, fines and third-party claims for property damage or personal injury due to violations of or liability under environmental laws and regulations, we believe we are in material compliance with the applicable requirements and are not aware of any material breaches of these laws and regulations.

**Corporate Operations and Other**

The Corporate Operations and Other division encompasses traditional corporate-related items including executive management, corporate finance, human resources, internal audit, investor relations, legal and public relations.

**Taxes**

We operate in the following tax jurisdictions: the United States, Poland, Hungary, Russia, Ukraine, Cyprus and Luxembourg. In Poland, Russia, Hungary and Ukraine, we are primarily subject to value added tax (VAT), corporate income tax, payroll taxes, excise taxes and import duties. In the United States, we are primarily subject to federal and Delaware state income taxes, Delaware franchise tax and local municipal taxes. We believe we are in material compliance with all relevant tax regulations.

Excise taxes comprise significant portions of the price of alcohol and their calculations differ by country. In Poland and Russia, where our production takes place, the value of excise tax rates as at December 31, 2015 amounted to PLN 57.04 ($14.62) and RUB 500 ($6.77) per liter of 100% alcohol.

Taxes payable other than income taxes comprise mainly excise and VAT payable as presented in the table below.

137

|  | September 30, 2015 (unaudited, as recast) | December 31, 2015 | September 30, 2016 (unaudited) |
|---|---|---|---|
| VAT payable | $ 39,396 | $ 30,140 | $ 35,828 |
| Excise tax payable | 85,862 | 78,495 | 94,392 |
| Other taxes and charges payable | 3,035 | 2,930 | 2,860 |
| **Total** | **$ 128,293** | **$ 111,565** | **$ 133,080** |

## Research and Development

We do not have a separate research and development unit, as new product developments are primarily performed by our marketing and production department. Our activity in this field is generally related to the development of new brands, as well as improvements in packaging and extensions of our existing brand portfolio or revised production processes leading to improved taste.

## Material Contracts

### Restructuring Support Agreement

Prior to the date of this Offering Memorandum and Disclosure Statement, holders of approximately 90% in aggregate principal amount of the Existing Senior Secured Notes and approximately two-thirds in aggregate principal amount of the Existing Convertible Notes, including the Backstop Noteholders, executed the Restructuring Support Agreement whereby they agreed to vote all of their Notes to accept the Plan of Reorganization at or prior to the Voting Deadline. The Restructuring Support Agreement is subject to certain conditions including that the parties to the Restructuring Support Agreement receive satisfactory due diligence information related to the Debtors and RSV, that we obtain confirmation of the Plan of Reorganization by January 31, 2017, that the Bankruptcy Court approves the Plan of Reorganization in all material respects and that we do not amend or modify the Plan of Reorganization in any way that is materially adverse to Eligible Holders who have signed the Restructuring Support Agreement.

### Investor Rights Agreement

In connection with and upon consummation of the Plan of Reorganization, Roust Corporation will enter into the Investor Rights Agreement with the holders of the series B New Common Stock, the holders of the series C New Common Stock, the Russian Standard Parties, and certain other parties. Prior to entering into the Investor Rights Agreement, Roust will have filed the Certificate of Incorporation with the Secretary of State of the State of New York and adopted the By-Laws in order to provide the series B New Common Stock and the holders of the series C New Common Stock with certain rights, including director appointment rights, a requirement that the Company obtain the approval of the Minority Directors prior to taking actions related to the Reserved Matters and certain customary registration rights and piggy-back rights. See the section entitled "Description of Common Stock" for a description of certain terms of the Certificate of Incorporation and By-Laws. The Investor Rights Agreement will obligate each party to, among other things, take all necessary or desirable actions within each party's control to ensure that the board of directors of Reorganized Roust is composed in accordance with the Certificate of Incorporation, which will include a provision for the appointment of the Minority Directors by the holders of the series B New Common Stock and the series C New Common Stock. The Certificate of Incorporation will also provide that the Russian Standard Parties will have the right to appoint a majority of the directors to the board of directors for so long as the Russian Standard Parties ownership of the fully diluted equity of Reorganized Roust does not fall below 45%. The Investor Rights Agreement will also contain certain tag-along, drag-along and preemptive rights.

### Backstop Agreement

The Backstop Convertible Noteholders and the Backstop Senior Noteholders will agree to subscribe for any shares not otherwise subscribed in the Share Placement in accordance with the terms of a Backstop Agreement, which will have the terms herein described, with such changes as are agreed among the parties thereto, Russian Standard Parties, the Company and the Backstop Noteholders. The Backstop Noteholders will receive a fee for their commitment to subscribe for any unsubscribed shares in the form of New Common Stock as described in more detail in the "Share Placement" section. Pursuant to the Backstop Agreement, the Backstop Noteholders will agree

to subscribe for New Common Stock representing their respective backstop commitments in the Share Placement to the extent that shares of New Common Stock are not otherwise subscribed for in the Share Placement.

*New Senior Secured Notes Indenture*

For a description of the New Senior Secured Notes and the associated indenture, see "Description of New Senior Secured Notes."

## Geographic Data

Net sales and long-lived assets, by geographic area, consisted of the following for the three-month and nine-month periods ended September 30, 2015 and 2016:

| Net Sales to External Customers (a) | three-month period ended September 30, 2015 (unaudited, as recast) | three-month period ended September 30, 2016 (unaudited) |
|---|---|---|
| United States | $ 3,599 | $ 2,819 |
| Rest of the World | | |
| Poland | 62,202 | 70,648 |
| Russia | 62,315 | 49,566 |
| Other Countries | 13,805 | 36,899 |
| Total Rest of the World | 138,322 | 157,113 |
| Total | $ 141,921 | $ 159,932 |

| Net Sales to External Customers (a) | nine-month period ended September 30, 2015 (unaudited, as recast) | nine-month period ended September 30, 2016 (unaudited) |
|---|---|---|
| United States | $ 4,232 | $ 7,769 |
| Rest of the World | | |
| Poland | 170,250 | 203,024 |
| Russia | 176,098 | 122,544 |
| Other Countries | 35,455 | 81,743 |
| Total Rest of the World | 381,803 | 407,311 |
| Total | $ 386,035 | $ 415,080 |

| Long-lived Assets (b) | September 30, 2015 (unaudited, as recast) | December 31, 2015 | September 30, 2016 (unaudited) |
|---|---|---|---|
| United States | $ - | $ - | $ - |
| Other Countries | | | |
| Poland | 275,465 | 267,227 | 273,040 |
| Russia | 151,322 | 133,337 | 153,193 |
| Other Countries | 11,348 | 11,026 | 14,546 |
| Total Rest of the World | 438,135 | 411,590 | 440,779 |
| Total consolidated long-lived assets | $ 438,135 | $ 411,590 | $ 440,779 |

(a) Net sales to external customers based on the location to which the sale was delivered.

(b) Long-lived assets primarily consist of property, plant and equipment and trademarks.

**Available Information**

We maintain a website at http://www.roust.com. Please note that our internet address is included in this Offering Memorandum as an inactive textual reference only. The information contained on our website is not incorporated by reference into this Offering Memorandum and should not be considered part of this report.

We currently do not file reports with the United States Securities and Exchange Commission. As required by the indentures governing our Existing Notes (and as will be required by the indenture that will govern the New Senior Secured Notes), we make our annual report on Form 10-K, quarterly reports on Form 10-Q, current reports on Form 8-K, and amendments to those reports available free of charge through our website.

We have adopted a code of conduct that is applicable to all of our officers, directors and employees, including our Chief Executive Officer and Chief Financial Officer (who is also our Principal Accounting Officer). The code of conduct is publicly available on the investor relations page of our website at http://www.roust.com. We intend to disclose any amendment to, or waiver from, any provision in our code of ethics that applies to our Chief Executive Officer and Chief Financial Officer by posting such information in the investor relations section of our website.

## BUSINESS OF RUSSIAN STANDARD VODKA

As part of the transaction effected through the Plan of Reorganization, RSV will become part of Reorganized Roust. See Appendix G for the Consolidated Financial Statements of RSV as of and for the years ended December 31, 2014 and 2015 and as of and for the nine-month period ended September 30, 2016.

**Russian Standard Vodka**

*Overview*

RSV is the world's number one Russian premium vodka (IMPACT, 2016). The RSV portfolio dominates the premium segment in Russia with a 35% market share and sales of over 3.2 million cases in 2015 in Russia, and more than 80 export markets across Europe, the U.S. and Asia.

Roustam Tariko, the founder of Russian Standard, introduced the flagship product, Russian Standard Original, in 1998 as the first authentic Russian premium vodka. Two years after launch, sales of Russian Standard Original surpassed all imported premium vodkas on the Russian market, leading to broad international expansion and the launch of Russian Standard Platinum in 2001, IMPERIA vodka, the company's luxury brand, in 2004, and Russian Standard Gold in 2008.

Every bottle of Russian Standard is created, distilled and bottled at one of the most modern and advanced vodka distilleries in the world in St. Petersburg, the home and inspiration for the brand. A city standing close to Lake Ladoga, the best water source for making naturally perfect vodka, St. Petersburg was also the home, in the late 1800s, of Dmitri Mendeleev.

Russian Standard is inspired by the work of world-famous scientist Dmitri Mendeleev, inventor of the periodic table of elements. Mendeleev's philosophy on equilibrium led to the identification of the perfect balance between water and alcohol, which in turn underpinned the original Russian Empire Standard set by Tsar Alexander III in 1894.

RSV only uses water of glacial origin from Lake Ladoga in Russia's frozen north. The vast granite basin of Lake Ladoga was created by glaciers in the last Ice Age and it is this basin that preserves the softness and purity of the water.

Every bottle of RSV is made from Russian winter wheat, grown in the black earth of the Russian Steppes, to Russian Standard's detailed specifications. Winter wheat is selected because it contributes to the unique sensory profile and taste of our vodka.

*Products*

Russian Standard Original adheres faithfully to Dmitri Mendeleev's 1894 principles for the creation of vodka and is considered the benchmark for excellence in the homeland of vodka. Its classic aroma with a hint of fresh bread has won millions of consumers all over the world.

Russian Standard Gold is inspired from an ancient Siberian vodka recipe made popular by Peter the Great and has extracts of Siberian Golden Root. This ingredient creates a unique rich tasting vodka, which adds vitality to any celebration.

Russian Standard Platinum employs a proprietary silver filtration system known for its unique natural refining values. This exclusive process produces an extraordinary silky smooth vodka with an ultra-clean finish.

IMPERIA vodka has been crafted to the highest standards to create a pristine Russian vodka for those who enjoy the finer things in life. Produced by the world's most advanced distillation process and layer-filtered through quartz crystal from the Ural Mountains, IMPERIA is allowed to rest in relaxation tanks for 72 hours before bottling.

*Marketing*

In 2013, Russian Standard started a successful collaboration with America's famous performance philosopher and filmmaker Jason Silva. The incredible story of RSV is told through an innovative new, integrated campaign crossing television, PR and digital. The blend of amazing Russian locations, Jason's infectious passion and never-seen-before special effects made this one of the most ambitious and complicated productions Russian Standard has ever commissioned.

Throughout its history, Russian Standard has cooperated with world's best talent, starting from print campaign by the famous still life photographer Guido Mocafico to the Real Russia TV saga directed by the mythic Michael Haussman.

*Performance*

RSV is a leading producer of vodka, with a leading market share in Russia (30% as of December 2015), and a distillery located in St. Petersburg, Russia. RSV exports to more than 80 countries and more than 75% of its sales volume in 2015 was from international markets. RSV distributes its products world-wide through a distribution arrangement with a subsidiary of the Company.

In 2014 and 2015, RSV generated approximately $88 million and $69 million of revenue (net of taxes), respectively, with reported EBITDA of approximately $30 million and $18 million, respectively, and Adjusted EBITDA (excluding extraordinary items and other adjustments) of approximately $34 million and $18 million, respectively. RSV's financial performance year-to-date through September 30, 2016 has continued to strengthen, with Revenue (net of taxes) growth of approximately 4% year-over-year, LTM reported of approximately $19 million and LTM Adjusted EBITDA (excluding extraordinary items and other adjustments) of approximately $31 million. Forecasted 2016 Adjusted EBITDA for RSV is approximately $35 million.

Bringing RSV into Reorganized Roust contributes significantly towards the combined group's financial strength. RSV carries low leverage, with third-party indebtedness of approximately $32 million as of November 2016.

RSV is the number three vodka in the United Kingdom, excluding private labels (after *Smirnoff* and *Glen's*), number seven in Germany (after brands such as *Absolut* and *Smirnoff*), number four in Global Travel Retail and having international sales of 2 million nine-liter cases in 2015, with 12% Compound Annual Growth Rate ("*CAGR*") in revenue over the last 5 years. RSV grew 14% globally in the nine-month period ended September 30, 2016 compared to prior year. RSV has made significant investments globally over recent years to build a 3 million nine-liter cases premium growing business. RSV's strengths are authenticity, quality and prominence. RSV is subject to seasonality. There is a lower demand for vodka during the first three fiscal quarters of the year. Historically, sales in the fourth quarter have been significantly higher than in the other quarters of the year due to higher demand for vodka during the holiday season at year end. Sales in the first quarter have been historically the lowest of all quarters. RSV's results in any particular quarter might therefore not be a reliable basis to formulate expectations of our performance over a full fiscal year and may not be comparable with the results in other fiscal quarters.

Set forth below is a list of our top ten international distributors by volume.

| Russian Standard International market from highest to lowest by volume | | | |
|---|---|---|---|
| Rank | COUNTRY | Distributor | TOP-2 competitors |
| 1 | UK | William Grant & Sons UK Limited | Smirnoff, New Amsterdam |
| 2 | USA | Russian Standard Vodka (USA), Inc. | Titos, Absolut |
| 3 | Germany | BORCO-Marken-Import Mathiessen GmbH&Co.KG | Three Sixty, Absolut |
| 4 | Israel | Eurostandard LTD | Finlandia, Absolut |
| 5 | Remy DF | REMY COINTREAU INTERNATIONAL Pte Ltd. | Smirnoff, Absolut |
| 6 | Canada | RSV Canada | Absolut, Stoli |
| 7 | Australia | Suntory Aust. PTY Ltd. | Smirnoff |
| 8 | Italy | F.lli Gancia&C. SPA | Absolut, Smirnoff |
| 9 | Bulgaria | Softstock Ltd. | Absolut, Finlandia |
| 10 | Lithuania | JSC " Mineraliniai vandenys" | Absolut, Finlandia |

Russia. RSV is the leading brand in the premium segment in the Russian market. RSV grew its Russian market share by volume, achieving 34.7% of the premium vodka market in April–May 2016, which, according to Nielsen data, is an increase of 0.7 percentage points compared with the same period a year earlier. In the third quarter of 2016, shipments by volume increased by 18% as compared to the third quarter of 2015.

Set forth below is a list of our top five customers in the Russian market by volume.

| TOP-5 Russian Standard Vodka customers in Russia from highest to lowest by volume | |
|---|---|
| Rank | Customer |
| 1 | Metro |
| 2 | X5 |
| 3 | Krasnoe i beloe |
| 4 | Lenta |
| 5 | Magnit |

United Kingdom. In the UK, RSV emerged as the number three vodka behind *Smirnoff* and *Glen's* with market share of 9.2% in the third quarter of 2016, an increase of 0.1 percentage points compared to the same period of last year. RSV reached 13% MAT share by volume in groceries, and an overall UK share of 9.4% MAT (growth of 0.5% compared to last year). RSV is continuing to grow strongly in off-trade with growth of 8% year-to-date compared to 2015, but the on-trade has declined (by 21% year to date) due to the loss of a key account to Smirnoff at the end of 2015, which we decided not to maintain due to large losses from the contract.

Germany. RSV's distribution is 64% in August 2016 MAT, which was an increase of 1.1 percentage points compared to the same period of last year

Hungary. RSV achieved a market share of 13.8% MAT by volume, which is a 3.8 percentage point increase on last year.

*Roust Inc. and RDL Acquisition*

On December 30, 2015, Pasalba Limited, a wholly-owned subsidiary of Roust, acquired all of the outstanding shares of RDL from RTL, pursuant to a share purchase agreement, dated December 30, 2015, between Roust and RTL. RDL is a worldwide distributor of RSV. Through the acquisition of RDL, Roust acquired the RSV international distribution contracts, which were historically managed by RTL's subsidiaries. The acquisition of RDL was the next step for Roust in distributing this premium brand globally. In June 2015, RDL started to take over contracts related to international distribution of RSV products that were previously managed by RTL's subsidiaries and established key processes in order to efficiently organize international distribution of alcohol beverages within Roust Corporation Group. Roust has benefited from RSV's ability to access high quality spirit sourcing for our sub-premium products in Russia and internationally. No processes used previously by RTL's subsidiaries were taken over by RDL.

143

Roust's acquisition of Roust Inc. brought 9% of the shares of LLC "Russian Standard Vodka" with a historically de minimis book value. Roust believes that the fair market value of these shares is significantly higher than its book value.

*RSV Material Contracts*

RSV is party to a supply contract with RDL, dated May 11, 2015 (the "*RDL Contract*"), as amended. Pursuant to the RDL Contract, RSV has provided RDL with the right of exclusive distribution of the goods to any categories of customers within the territory.

*Potential Synergies*

We expect potential synergies of the RSV contribution contemplated by the Plan of Reorganization to include:

- integration of the accounting and tax accounting functions of RSV and UTS into a unified organizational structure of "Roust Russia", which will provide accounting and tax accounting services;

- processes standardization at all Roust locations;

- optimization of payroll costs while maintaining high service quality;

- the creation of a single competency decision-making center responsible for the accounting and tax accounting functions of all Roust Russia's centralized accounting locations; and

- an increase of reporting transparency within Roust Russia.

**Financials**

Financial statements for RSV for the year ended December 31, 2014 and 2015 and the nine months ended September 30, 2015 and 2016 can be found in Appendix G of this Offering Memorandum and Disclosure Statement.

# MANAGEMENT

## Directors, Executive Officers and Corporate Governance

The current directors and executive officers of the Company are as follows:

| Name | Age | Position(s) |
| --- | --- | --- |
| Roustam Tariko | 54 | Executive Chairman of the board of directors |
| Eberhard von Löhneysen | 66 | Director |
| Pavel Merkul | 35 | Director |
| Alessandro Picchi | 59 | Director |
| Grant Winterton | 46 | Chief Executive Officer |
| Goran Ljubicic | 42 | Chief Financial Officer |

**Roustam Tariko** was appointed Executive Chairman of our board of directors on July 9, 2012 and continues to serve in this role. Mr. Tariko also served as Interim President of the Company from October 23, 2012 to January 10, 2013. Mr. Tariko is the founder of Russian Standard, one of the largest Russian privately owned companies working in the consumer market. Russian Standard has leading positions in banking, premium vodka, sparkling wines and spirits distribution. Dating back to 1992, the Russian Standard family of companies today includes RSV (a producer and distributor of the number one premium vodka in Russia, present in over 75 countries), Roust Inc. (a leading Russian distributor of alcoholic beverages), *Gancia* (a legendary Italian producer of sparkling wines and vermouths founded in 1850), Russian Standard Bank (a leading consumer lender and credit card issuer in Russia) and Russian Standard Insurance. Mr. Tariko is a graduate of the Moscow Institute for Railway Engineering with a degree in economics, which he supplemented with courses at INSEAD Executive School. We believe that Mr. Tariko's extensive experience in the alcohol production and distribution business in Russia and globally makes him a significant and valued Executive Chairman of our board of directors.

**Eberhard von Löhneysen** has been a director of the Company since June 5, 2013. Mr. von Löhneysen has built an extensive career in business consulting and corporate management. After working at the World Bank with a focus on Latin America for eight years, Mr. von Löhneysen spent more than two decades with McKinsey & Co. in different fields and countries. He was responsible for the German financial institutions practice and managed the McKinsey & Co.'s office in Berlin for several years; later he moved to Moscow, where he was responsible for the Eastern European office complex. After leaving McKinsey & Co., Mr. von Löhneysen worked as group Chief Executive Officer of Russian Standard Corporation. Currently, Mr. von Löhneysen serves as the Chairman and Director for Strategy in 10EQS, an online knowledge utility that organizes the collaboration of independent experts. We believe that Mr. von Löhneysen's experience in business consulting and management enables him to make valuable contributions as a member of our board of directors.

**Pavel Merkul** has been a director of the Company since June 5, 2013. Mr. Merkul has been Chief of Staff since 2009 and Managing Director in Russian Standard Corporation. He is responsible for the key corporate projects of Russian Standard Group, including mergers and acquisitions and post-merger integration, as well as Russian Standard Group's finances. He has been actively involved in the negotiations between RTL and Roust since 2011. He began his career in 2001 working on mergers and acquisitions projects in Russia, and then worked with Boston Consulting Group from 2004 through 2009, focusing on strategy development and corporate restructuring projects for leading banking and telecom companies throughout Russia and Ukraine. He received his BA in economics from Moscow State University and his MBA from INSEAD in France and Singapore. We believe that Mr. Merkul's experience in corporate restructuring and mergers and acquisitions makes him a valuable member of our board of directors.

**Alessandro Picchi** has been a director of the Company since April 23, 2012. He is a lawyer enrolled in the Bar of Milan and the Bar of the Italian Highest Court. From December 2011 to April 15, 2012, he was General Counsel of Russian Standard Corporation. From 2006 to 2011, he was a partner of Morri, Cornelli & Associates, a Tax and Law Firm with offices in Milan and Rome. From 2000 to 2006, he was chairman of the board of directors of Globalfin International with headquarters in Switzerland and director of Motorel Investments BV. From 1996 to 2000 he was General Counsel of Globalfin International SA and a member of the board of directors. We believe that Mr. Picchi's legal experience in international contracts and trade, mergers and acquisitions and corporate governance allows him to make valuable contributions as a member of our board of directors.

**Grant Winterton** joined the Company as General Manager of the Russian Alcohol Group in April 2012 and has been Chief Executive Officer of the Company since January 10, 2013. Mr. Winterton has over 20 years of experience working in marketing, sales and general management positions for Campbell Soup (Australia), The Coca-Cola Company (Australia, Russia, Ukraine, China), Wimm Bill Dann (Russia) and Red Bull (Russia). Mr. Winterton has lived in Russia for over 13 years, working in the consumer goods industry, and has extensive working experience across the Russia, Ukraine, Belarus and CIS markets. Mr. Winterton has a Bachelor of Commerce Degree in Marketing/Finance from the University of New South Wales, Australia.

**Goran Ljubicic** joined the Company as Chief Financial Officer of Roust Poland on November 13, 2013 and has been Chief Financial Officer of the Company since October 10, 2014. Mr. Ljubicic has extensive international work experience with fast-moving consumer goods companies, including 10 years in Russia. Prior to his work with the Company, Mr. Ljubicic was a member of the board of directors and Finance Director, Central European and Balkan Region, at Kreis Swiss from 2009 to 2013 and Region Managing Director, Dairy Business, Balkan Region, at Salford Capital Management Fund from 2005 to 2009. Mr. Ljubicic graduated in 1996 with a Bachelor of Arts degree in finance and statistical analyses from the Alfred University.

Pursuant to the Certificate of Incorporation, on the Effective Date the holders of the series B New Common Stock and series C New Common Stock will each have the right to appoint one Minority Director. For more information see "Certain Relationships and Related Transactions – Investor Rights Agreement" and "Description of Common Stock". Therefore, as of the Effective Date one of the existing directors will be removed and replaced by a Minority Director.

## Board of Directors Leadership Structure

Mr. Tariko is Executive Chairman of our board of directors. Mr. Grant Winterton serves as our Chief Executive Officer with responsibility for the day-to-day operations of the Company. The board of directors believes that it is currently appropriate to have the positions of Chairman and Chief Executive Officer separated to ensure adequate oversight of management.

## Director Independence

Our common stock is not listed on any national securities exchange or inter-dealer quotation system with a requirement that a majority of our board of directors be independent. Therefore, we are not subject to any director independence requirements. As a result, our board of directors has not made any formal determination as to whether any of the current members of our board of directors are independent.

## Role in Risk Oversight

Risk is inherent in every business, and how well a business manages risk is an integral part of its ability to succeed. Our goal is to manage risk prudently, not to eliminate risk. In our business, we face a number of risks, including economic risks, regulatory risks, risks stemming from conducting operations in multiple countries and in different currencies, risks in integrating our acquired companies and other risks, such as the impact of competition and weather conditions. Management is responsible for the day-to-day management of risks the company faces, while the board of directors, as a whole and through its committees, has responsibility for the oversight of risk management. In its risk oversight role, the board of directors has the responsibility to satisfy itself that the risk management processes designed and implemented by management are adequate and functioning as designed.

The board of directors believes that establishing the right "tone at the top" and full and open communication between management and the board of directors are essential for effective risk management and oversight. Our executive management team meets regularly with our board of directors to discuss strategy and risks facing the company. Members of senior management attend meetings of the board of directors and are available to address any questions or concerns raised by the board of directors on risk management-related and any other matters. The board of directors receives regular presentations from senior management on strategic matters involving our operations. The board of directors holds executive sessions at which members of the management team are not present.

146

While the board of directors is ultimately responsible for risk oversight, committees of the board of directors assist the board of directors in fulfilling its oversight responsibilities in certain areas of risk. The audit committee assists the board of directors in fulfilling its oversight responsibilities with respect to risk management in the areas of financial reporting, internal controls and compliance with legal and regulatory requirements and discusses policies with respect to risk assessment and risk management. The compensation committee assists the board of directors in fulfilling its oversight responsibilities with respect to the management of risks arising from our compensation policies and programs. The governance, compliance and nominating committee assists the board of directors in fulfilling its oversight responsibilities with respect to the management of risks associated with board of directors' organization, membership and structure, succession planning and corporate governance.

**Narrative Disclosure of our Compensation Policies and Practices as They Relate to Risk Management**

The compensation committee reviews the Company's executive compensation program and its executive compensation policies and practices to assess whether any aspect of the program or the policies and practices would encourage any of the Company's named executive officers to take any unnecessary or inappropriate risks that could threaten the value of the Company or create or increase risks that are reasonably likely to have a material adverse effect on the Company. As a result of our review, we concluded that any risks arising from our compensation programs, policies and practices are not reasonably likely to have a material adverse effect on the Company.

**Meetings of the Board of Directors and of Committees**

During 2015, the board of directors held one in person meeting and two meetings via teleconference and each director attended all of the board meetings.

The board of directors has three standing committees: an audit committee, a compensation committee and a governance, compliance and nominating committee. In accordance with the By-Laws, each committee of the board of directors must include at least one Minority Director, who, subject to certain exceptions, is required to be present for each committee to have a quorum.

### Audit Committee

The audit committee operates under a written charter adopted by the board of directors that may be amended by the board of directors at any time. A current copy of the audit committee's charter is available in the 'Investor Relations' section of the Company's website at http://www.roust.com, under the heading 'Corporate Governance.' Messrs. von Löhneysen and Merkul currently constitute the audit committee. Mr. von Löhneysen currently serves as the chairman of the audit committee. As described above, our common stock is not listed on any stock exchange or inter-dealer quotation system, and we are not required to have a separately designated audit committee whose members are independent. Therefore, our board of directors has not made a formal determination of whether the members of our audit committee are independent or whether that committee includes at least one audit committee financial expert. The audit committee oversees our corporate financial reporting process, internal accounting controls, audit plans and results and financial reports. In addition, the audit committee appoints, compensates, retains and oversees the work of the firm of independent auditors employed by the Company to conduct the annual audit of the Company's financial statements. The members meet with the independent auditors and financial management to review the scope of the proposed audit for the year, the audit procedures to be utilized, audit fees, and, at the conclusion of the audit, the audit reports. In addition, the audit committee reviews the financial statements, the related footnotes and independent auditors' report and makes recommendations to the board of directors as the audit committee deems appropriate. The audit committee met six times during 2015.

### Compensation Committee

The compensation committee operates under a written charter adopted by the board of directors that may be amended by the board of directors at any time. A current copy of the compensation committee's charter is available in the 'Investor Relations' section of the Company's website at http://www.roust.com, under the heading 'Corporate Governance.' Messrs. von Löhneysen, Merkul and Picchi currently constitute the compensation committee. As described above, our common stock is not listed on any stock exchange or inter-dealer quotation system, and we are not required to have a separately designated compensation committee whose members are independent. Therefore, our board of directors has not made a formal determination of whether the members of our compensation committee

are independent. The compensation committee's responsibilities include (i) making recommendations to the board of directors on salaries, bonuses and other forms of compensation for the Company's officers and other key management and executive employees, (ii) consulting with independent outside compensation consultants regarding the Company's executive officer and director compensation policies and (iii) reviewing any proposed plans or practices of the Company relating to compensation of its employees or directors. The compensation committee held no meetings in 2015. All actions of the compensation committee during 2015 were undertaken by written consent without a meeting.

### Governance, Compliance and Nominating Committee

The governance, compliance and nominating committee operates under a written charter adopted by the board of directors that may be amended by the board of directors at any time. A current copy of the governance, compliance and nominating committee's charter is available in the Investor Relations section of the Company's website at http://www.roust.com, under the heading Corporate Governance. The information contained on our website is not incorporated by reference into this Offering Memorandum and should not be considered part of this report. The members of the governance, compliance and nominating committee are Messrs. Picchi and von Löhneysen. Mr. Picchi currently serves as the chairman of the governance, compliance and nominating committee. The governance, compliance and nominating committee identifies individuals qualified to become members of the Company's board of directors and makes board candidate recommendations, reviews and assesses the adequacy of the Company's corporate governance principles and, if appropriate, develops and recommends to the board of directors additional corporate governance principles and oversees and reviews the Company's compliance procedures and corporate practices. The responsibilities of the governance, compliance and nominating committee include oversight of the process of evaluating the performance of the board of directors, its committees and individuals directors, maintenance of the Company's succession plan, convening executive sessions of the board of directors at which no members of management or other representatives of the Company are present and recommending to the board of directors a candidate for lead director. The governance, compliance and nominating committee held no meetings in 2015. All actions of the governance, compliance and nominating committee during 2015 were undertaken by written consent without a meeting.

### Board of Directors Diversity

The governance, compliance and nominating committee believes that, in order to be effective, a board of directors should consist of directors with varying experiences and personal backgrounds. In particular, for a company that has operations around the world, the board of directors should include representatives from different industries and regions that are relevant to the Company's business. To this end, the governance, compliance and nominating committee values diversity of professional experience and geographic background among its members. This diversity contributes significantly to the insight that our board of directors has into the challenges facing the Company.

### Communications with the Board of Directors

Communications to the board of directors can be mailed to the attention of the Company's Corporate Secretary at 2711 Centerville Road, Suite 400 Wilmington, New Castle County, Delaware 19808. The mailing envelope must contain a clear notation indicating that the enclosed letter is a "Stakeholder—Board Communication". All such letters must identify the author as a stakeholder and clearly state whether the intended recipients are all members of the board of directors or certain specified individual directors. The Corporate Secretary will circulate the letter to the appropriate director or directors, unless the communication is unduly hostile, threatening, illegal or similarly inappropriate, in which case the Corporate Secretary has the authority to discard it.

### Family Relationships

There are no family relationships among any directors or executive officers.

### Code of Conduct

The Company has adopted a Code of Conduct that applies to the Company's employees, officers and directors. The Company's Code of Conduct is available in the 'Investor Relations' section of the Company's website

148

at http://www.roust.com, under the heading 'Corporate Governance.' Any changes or waivers to the Code of Conduct for the Company's principal executive officer, principal financial officer or principal accounting officer or persons performing similar functions will be disclosed on the Company's website.

**Compensation Discussion and Analysis**

**Overview**

This Compensation Discussion and Analysis discusses the objectives, policies and elements of our executive compensation program and analyzes our decisions concerning compensation for the individuals named below who served as executive officers during 2015:

- Grant Winterton – Chief Executive Officer

- Goran Ljubicic – Chief Financial Officer

**Compensation Philosophy**

The primary purpose of our compensation philosophy is to attract and retain a qualified, talented team of executive officers in a way that is aligned with the long-term interests of our stakeholders. Therefore, a significant portion of our compensation program is not fixed and instead, in an attempt to align overall compensation with performance, is variable based on the actual performance of the individual as well as that of the Company. This performance is measured against goals established by the board of directors and the compensation committee. During 2015, the goals for our executive compensation program were to:

- attract and retain a qualified, talented team of executive officers to provide leadership for the Company's success in competitive markets,

- accomplish the above objective in a way that is aligned with the long-term interests of our stakeholders,

- increase the overall performance of the Company,

- increase stakeholder value, and

- incentivize the executive officers to prudently achieve the highest level of the Company's annual and long-term financial performance.

We believe that our executive compensation policies must remain competitive with those of our peer companies and that they should be structured in a way that rewards consistently high performance. During 2015, a substantial portion of the compensation packages for executive officers was in the form of annual cash bonus opportunities intended to reward executive officers for meeting annual financial performance goals.

We review compensation survey data and believe it is a useful guide for comparative purposes. However, we also believe that a successful compensation program requires us to apply our own judgment and subjective determination of individual executive officer performance related to overall corporate performance. We therefore reconcile the program's objectives with the realities of rewarding strong performance and retaining valued members of management. We periodically evaluate the types and levels of compensation we pay to ensure that we are able to attract and retain qualified executive officers and that their compensation remains comparable to compensation paid to similarly situated executive officers in comparable companies.

**Executive Compensation Components**

Our executive compensation for 2015 consisted of three basic elements outlined below.

| Compensation Element | Objectives | Key Features |
|---|---|---|
| Base Salary | Attracts, retains and rewards named | Annual cash compensation which, assuming |

|  | executive officers by providing a fixed level of cash compensation to reward demonstrated experience, skills and competencies relative to the market value of the job. | acceptable performance, is not at risk.

Targeted at or near average base salaries of similarly situated executive officers of peer groups. |
|  | Can be periodically reevaluated based on (a) individual performance and (b) changes in the median level of salary of peer companies. | Adjustments are considered as the compensation committee sees fit, usually in consultation with independent compensation consultants. |
| Annual Performance Based Incentive | Focuses executive officers on our annual results by being directly linked to the Company's financial performance.

Aligns each executive officer's interests with those of our stakeholders by promoting strong annual results through revenue growth and operating efficiency.

Retains named executive officers by providing market-competitive compensation. | Annual awards are paid in cash which are at risk because they are based on financial targets.

Each annual award can vary from 0% to 150% of the target amount with goals set high and difficult to achieve. |
| Long-Term Time Based Incentive Awards | Promotes retention and enables us to attract and motivate our executive officers.

Retains executive officers through multi-year vesting of incentive awards. | Long-term cash based compensation which is at risk due to vesting requirements. |

The following describes in more specific terms the elements of compensation that implement the compensation philosophy and objectives described above.

*Base Salaries*

Base salaries of executive officers are determined at the time a person initially becomes an executive officer by evaluating the responsibilities of the position, experience and knowledge of the individual and the competitive marketplace at that time for executive talent, including a comparison to base salaries for comparable positions (considered in the context of the total compensation paid by such companies). Salaries are reviewed from time to time thereafter, generally in connection with the expiration of employment agreements or when other considerations warrant such review in the discretion of the compensation committee and the board of directors, considering the foregoing factors as well as the executive officer's performance and the other factors considered in setting total compensation described above.

When salary adjustments are considered, they are made in the context of the total compensation for executive officers, consistent with the core principles discussed earlier in this Compensation Discussion and Analysis. In each case, the participants involved in recommending and approving salary adjustments consider the performance of each executive officer. Individual performance evaluations take into account such factors as new responsibilities, the Company's performance during the previous year and the achievement of specific individual objectives. The factors impacting base salary levels are not assigned specific weights but are considered as a totality, against the backdrop of our overall compensation philosophy and knowledge of market conditions.

The annualized base salaries (in U.S. dollars unless indicated otherwise) for our executive officers during 2015 were as follows:

150

| Executive Officer | Position(s) | Annual Base Salary (in U.S. dollars) |
|---|---|---|
| Grant Winterton | Chief Executive Officer | $750,000 |
| Goran Ljubicic | Chief Financial Officer | $396,900 |

*Annual Incentive Awards*

We have historically paid annual cash bonuses to our executive officers based on the Company's performance, as measured by reference to factors which the compensation committee believes reflect objective performance criteria over which management generally has the ability to exert some degree of control. The Company establishes the performance criteria each year and amounts that can be earned by each executive officer based upon, among other things, assessment by the compensation committee and the board of directors of each executive officer's level of responsibility, expertise, tenure and ability to influence improvements in the Company's financial results.

The board of directors set performance criteria for 2015 that reflected its desire to incentivize our executive officers to maximize operational performance while also prudently managing the balance sheet. The board of directors believed that including financial measures as performance targets appropriately balanced incentives to reward strong performance without encouraging undue risk-taking and that the overall 2015 performance criteria represented an appropriate balance of management priorities.

The performance targets were set by the board of directors upon the recommendation of the compensation committee. The Company does not disclose future financial targets because we believe this information is not material to understanding our executive compensation. The board of directors and the compensation committee set performance targets at levels they consider to be reasonably attainable but challenging.

*Other Incentive Awards*

A third component of our executive officers' compensation during 2015 was in the form of incentive awards granted in the form of cash awards. For 2015, these incentive awards consisted of (i) performance-based awards with an Underlying EBITDA target of $106.4 million, and (ii) time-based awards that vest over three years.

*Management Incentive Plan*

The Plan provides for the implementation by Reorganized Roust of the MIP for nominated members of management in the amount of up to 2.0% of all issued and outstanding New Common Stock (in the form of series A New Common Stock) on a fully diluted basis vesting over a period of two to four years. If an Exit Event is completed by June 30, 2019, the lesser of (a) the remaining unvested MIP and (b) two-thirds of the MIP will vest in connection with such Exit Event. The specific form of and terms applicable to awards granted under the incentive plan for management, including vesting conditions, shall be determined by the new board of Reorganized Roust.

Separately, the Plan also provides for a management incentive plan for Roustam Tariko that includes the following: (i) 2.0% of the equity in Reorganized Roust on a fully diluted basis (in the form of series A New Common Stock) exercisable upon the occurrence of an Exit Event at a valuation of $250 million above Plan Value and (ii) 1.0% of additional equity in Reorganized Roust (in the form of series A New Common Stock) on a fully diluted basis for each $250 million of equity value created above the Initial Earn Out Equity Threshold on the Effective Date, up to a maximum of 3.0% of incremental equity on a fully diluted basis. The triggering of an Additional Earn Out Equity award shall be based on a 30-day volume weighted average price of the Reorganized Roust stock post-Exit Event. Roustam Tariko will be entitled to receive Additional Earn Out Equity until July 31, 2019. The RT Earn Out Equity shall expire if an Exit Event has not occurred by June 30, 2019.

**Employment Agreements**

Each of the executive officers of the Company is party to an employment agreement. The Company currently enters into employment agreements with its executive officers because it generally believes that, in respect of key executive officers, there is a significant value in its competitive markets to setting out compensation and fringe benefit expectations in writing, maintaining appropriate non-competition, non-solicitation of employees and confidentiality agreements with key executive officers and agreeing to post-termination payments and other

obligations. These employment agreements are described below in more detail under the caption "Employment Agreements."

**Summary Compensation**

For the years ended December 31, 2013, 2014 and 2015 the total compensation (in U.S. dollars) awarded to or earned by our Chief Executive Officer amounted to $2,540,505, $2,278,205 and $1,940,000, respectively. For the years ended December 31, 2014 and 2015 the total compensation (in U.S. dollars) awarded to or earned by our Chief Executive Officer amounted to $606,713 and $700,547, respectively.

**Grants of Plan-Based Awards During 2015**

The following table sets forth information regarding all grants of plan-based awards made to our named executive officers during the fiscal year ended December 31, 2015.

Estimated future payouts under non-equity incentive plan awards (in U.S. dollars):

| Name | Grant Date | Threshold | | Target | Maximum |
|------|-----------|-----------|---|--------|---------|
| Grant Winterton | May 2015 | | $ | 1,950,000 | |
| Goran Ljubicic | March 2015 | | $ | 364,500 | |

*Employment Agreements*

*Grant Winterton*

Mr. Winterton has served as Chief Executive Officer of the Company since January 10, 2013. Pursuant to his employment agreement, Mr. Winterton is paid an annual base salary of $750,000.

Mr. Winterton's employment agreement provides for a yearly cash bonus of up to 100% of his salary. The conditions for earning a yearly cash bonus are based upon the achievement of project and financial targets to be established by the board of directors in consultation with Mr. Winterton at the beginning of each fiscal year. The financial target portion of the yearly cash bonus is earned on a sliding scale from between 0% and 150% of the yearly cash bonus. The project target portion of the yearly cash bonus is earned based on a good faith assessment of the achievement of the project targets by the board of directors in consultation with Mr. Winterton.

Pursuant to his employment agreement, Mr. Winterton is also eligible to receive additional bonus awards granted on January 1st of each year. The agreement provides for these awards to be granted in the form of restricted stock units. However, when the Company became privately-owned, the awards were converted to cash based awards. The first type of award is a performance-based bonus with a value of $800,000. Subject to Mr. Winterton's continued employment through the vesting date, the performance-based awards vest on the first anniversary of the date of grant based on the achievement of financial targets aimed towards Company value and value creation and in line with the Company's stockholders' interests. The performance-based bonuses vest on a sliding scale from between 0% and 150%. The second type of award is a time-based bonus with a value of $400,000. Subject to Mr. Winterton's continued employment through the vesting date, the time-based bonuses will vest in three equal annual installments.

Subject to certain dollar amount limitations, Mr. Winterton's employment agreement provides for fringe benefits in the form of two roundtrip business class flights each year to Australia, rental expenses for Mr. Winterton's apartment, health insurance coverage for Mr. Winterton and his family, a company paid car and driver, as well as a company issued phone and laptop.

*Goran Ljubicic*

Mr. Ljubicic has served as Chief Financial Officer of the Company since October 10, 2014. Pursuant to his employment agreement, Mr. Ljubicic is entitled to an annual base salary of $396,900.

Mr. Ljubicic's employment agreement provides for a contractual salary increase of 5% annually since October every year, as well as an annual performance bonus of up to 100% of his annual salary. As a result, the

annual base salary earned by Mr. Lubicic for 2015 amounted to $364,500. In 2015, the conditions for earning a yearly cash bonus were based upon management by objectives ("*MBO*") for Roust Corporation Group. Mr. Ljubicic's employment agreement further provides for a long term bonus of up to 100% of his annual salary after three years of service with the Company.

Subject to certain dollar amount limitations, Mr. Ljubicic's employment agreement provides for fringe benefits in the form of roundtrip flights home, rental expenses for Mr. Ljubicic's apartment, health insurance coverage for Mr. Ljubicic and his family, school allowance for Mr. Ljubicic's children, a company paid car and driver, as well as relocation expenses from Belgrade to Warsaw.

Mr. Ljubicic's employment agreement may be terminated either by the Company or by Mr. Ljubicic's upon three months' notice. In the event Mr. Ljubicic's employment with the Company is terminated other than for cause, Mr. Ljubicic will be entitled to six months' compensation pursuant to the terms of the employment agreement.

### Potential Payments Upon Termination of Employment

The Company's employment agreements with its executive officers provide for certain payments upon termination. Generally, the material terms and payment provisions under the employment agreements, including those that relate to payments upon termination of employment, were the result of individual negotiations with the relevant executive officer over the terms of his employment, and the potential payments under these arrangements were not separately considered from the entire compensation package contemplated by the employment agreement. The compensation committee considers these potential payments upon termination of employment as one portion of total potential compensation, but such payments do not materially and directly influence the decisions made regarding other aspects of compensation.

If Mr. Winterton were to have been terminated on December 31, 2015, his employment agreement sets forth termination benefits to which he may have been entitled. If the Company terminated Mr. Winterton's employment other than for cause, disability or death, and such termination did not constitute a qualifying change in control termination, then (i) Mr. Winterton would have been paid a lump sum payment in an amount equal to 1.5 times his base salary, (ii) Mr. Winterton would have received a bonus in cash equal to 50% of the yearly cash bonus applicable in the relevant year under the assumption that 92.5% of the targets for the relevant year were achieved, (iii) all of Mr. Winterton's unvested time-based awards would have been forfeited, (iv) all of Mr. Winterton's unvested performance-based awards would have vested immediately under the assumption that 92.5% of the targets for the relevant year were achieved, and (v) Mr. Winterton's housing, car and driver allowance would continue to have been paid for six months following the date of termination. If Mr. Winterton terminated his employment under conditions constituting a qualifying change in control termination, then (i) Mr. Winterton would have been paid his remaining base salary for the remainder of the term of the employment agreement, (ii) Mr. Winterton would have received a bonus in cash equal to 50% of the yearly cash bonus applicable in the relevant year under the assumption that 92.5% of the targets for the relevant year were achieved, (iii) all of Mr. Winterton's unvested time-based awards would have been forfeited, (iv) all of Mr. Winterton's unvested performance-based awards would have vested immediately under the assumption that 92.5% of the targets for the relevant year were achieved, and (v) Mr. Winterton's housing, car and driver allowance would continue to have be paid for six months following the date of termination.

If Mr. Ljubicic were to have been terminated on December 31, 2015, his employment agreement sets forth termination benefits to which he may have been entitled. If the Company terminated Mr. Ljubicic's employment other than for cause, disability or death, and such termination did not constitute a qualifying change in control termination, then Mr. Ljubicic would have been paid a lump sum payment in an amount equal to 50% of his base salary.

## Director Compensation

The following table sets forth information regarding the compensation of the non-employee directors of the Company for the year ended December 31, 2015.

| Name | Fees Earned or Paid in Cash | | Bonus | | Equity Awards | | All Other Compensation | | Total | |
|---|---|---|---|---|---|---|---|---|---|---|
| Eberhard von Löhneysen | $ | 205,000 | $ | - | $ | - | $ | - | $ | 205,000 | |
| Pavel Merkul | $ | 217,564 | $ | - | $ | - | $ | - | $ | 217,564 | |
| Alessandro Picchi | $ | 205,000 | $ | - | $ | - | $ | - | $ | 205,000 | |
| Roustam Tariko | $ | 1,250,605 | $ | - | $ | - | $ | 137,822 (1) | $ | 1,388,427 | (2) |

(1)    Total amount of perquisites.

(2)    All fees reflected in the above table were paid to Mr. Tariko by Roust Russia Group and Roust Inc.

For 2015, the components of compensation paid to our directors were as follows (in U.S. dollars):

- Annual cash fee of $85,000

- Annual fee in lieu of equity of $100,000

- Lead Director and Vice Chairman fee $50,000

- Audit, Compensation and Governance members fee of $10,000

- Audit, Compensation and Governance chair fees of $10,000 (in addition to member fees)

- Physical board meeting fees of $2,500

- Physical committee meeting fees of $2,500

Mr. Tariko receives the following compensation from Roust Russia and Roust Inc. (in U.S. dollars):

- Annual salary of $1,525,000

In 2015 Mr. Tariko's annual salary amounted to $1,250,605. The compensation committee reviewed these amounts and deemed them to be appropriate compensation for an Executive Chairman of the Company. As part of its review, the compensation committee compared these amounts to levels of compensation paid to former and current executive officers.

**Compensation Committee Interlocks and Insider Participation**

During 2015, the compensation committee consisted of Messrs. Merkul and Picchi. None of the members of the compensation committee has been an officer of the Company. None of our executive officers served on the board of directors or compensation committee of a company that has an executive officer that served on our board of directors or the compensation committee.

**Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters**

Pursuant to the Company's 2013 Chapter 11 plan of reorganization, all of the Company's pre-emergence common stock was cancelled as of June 5, 2013 and RTL and its affiliates acquired control of 100% of the Company's new common stock.

154

## CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS

A Related Party transaction is defined as any transaction in which (1) the Company is a participant, (2) any related person has a direct or indirect material interest and (3) the amount involved exceeds $120,000 but excludes any transaction that does not require disclosure under Item 404(a) of Regulation S-K. A Related Party is:

- an executive officer, director or director nominee of the Company;

- any person who is known to be the beneficial owner of more than 5% of the Company's common stock;

- any person who is an immediate family member (as defined under Item 404 of Regulation S-K) of an executive officer, director or director nominee or beneficial owner of more than 5% of the Company's common stock; and

- any firm, corporation or other entity in which any of the foregoing persons is employed or is a partner or principal or in a similar position or in which such person, together with any other of the foregoing persons, has a 5% or greater beneficial ownership interest.

It is the Company's policy that directors, executive officers and any other related persons are required to report any Related Party transactions to the Chief Executive Officer. The audit committee, with the assistance of legal counsel and such other advisors as it deems appropriate, is responsible for reviewing and approving or ratifying Related Party transactions. In addition, the governance committee is responsible for ensuring that certain affiliate transactions comply with the Company's obligations under its indentures. The audit committee intends to approve only those Related Party transactions that it believes are in, or not inconsistent with, the best interests of the Company. A written policy to this effect has been adopted by the board of directors.

Every quarter, a report maintained by the Company's accounting staff is reviewed and approved by the Chief Executive Officer and the Chief Financial Officer. The audit committee conducts an annual review of all transactions between related parties and the Company.

Upon emergence from bankruptcy protection as of June 5, 2013 (as described in Note 2 of the Roust Corporation Consolidated Financial Statements for the period ended December 31, 2015 included in Appendix G), Mr. Roustam Tariko became the sole ultimate stockholder of Roust. Further, Mr. Tariko has been appointed to Roust's board of directors as Executive Chairman. Given that Mr. Tariko indirectly controls RTL and RTL directly controls Russian Standard Corporation (and indirectly controls other Russian Standard entities), all entities controlled by Mr. Tariko have become related parties of Roust, including Russian Standard Bank, Russian Standard Corporation, Russian Standard Vodka (USA), Inc., LLC "Russian Standard Vodka", Union Trust Stroy and F.lli *Gancia* & C. SpA.

In the ordinary course of business, the Company is involved in transactions with entities controlled by Mr. Tariko that result in the recognition of revenues, expenses, assets and liabilities by the Company.

The following table summarizes our transactions with the related parties as included in our Consolidated Financial Statements.

**CONSOLIDATED STATEMENTS OF OPERATIONS AND COMPREHENSIVE INCOME**

| | | three-month period ended September 30, 2015 | | three-month period ended September 30, 2016 |
|---|---|---|---|---|
| | | (unaudited, as recast) | | (unaudited) |
| Net sales | $ | 5,038 | $ | 4,843 |
| Cost of goods sold | | 2,531 | | 2,566 |
| Purchases of goods | | 17,540 | | 29,894 |
| Purchases of raw materials | | 374 | | 485 |
| Selling, general and administrative expenses | | 1,222 | | 5,032 |
| Other operating income | | 1,053 | | - |
| Interest expense | | 1,935 | | 3,402 |
| Interest Income | | 2,886 | | 3,749 |
| Other Income | | 10 | | 226 |
| Other Expense | | - | | 519 |
| Factoring costs | $ | - | $ | 2,787 |

**CONSOLIDATED STATEMENTS OF OPERATIONS AND COMPREHENSIVE INCOME**

| | | nine-month period ended September 30, 2015 | | nine-month period ended September 30, 2016 |
|---|---|---|---|---|
| | | (unaudited, as recast) | | (unaudited) |
| Net sales | $ | 6,040 | $ | 6,738 |
| Cost of goods sold | | 3,285 | | 5,760 |
| Purchases of goods | | 36,480 | | 62,682 |
| Purchases of raw materials | | 2,844 | | 1,538 |
| Selling, general and administrative expenses | | 2,180 | | 11,210 |
| Other operating income | | 6,061 | | - |
| Interest expense | | 5,394 | | 9,436 |
| Interest Income | | 8,083 | | 10,957 |
| Other Income | | 35 | | 243 |
| Other Expense | | 100 | | 526 |
| Factoring costs | $ | - | $ | 8,536 |

**CONSOLIDATED BALANCE SHEETS**

| | | September 30, 2015 (unaudited, as recast) | | December 31, 2015 | | September 30, 2016 (unaudited) |
|---|---|---|---|---|---|---|
| *Assets* | | | | | | |
| Accounts receivable | $ | 14,804 | $ | 24,293 | $ | 37,314 |
| Prepaid expenses | | 23,732 | | 5,780 | | 35,439 |
| Other current receivables | | 3,336 | | 3,010 | | 20,649 |
| Loans granted to Related Parties | | 101,833 | | 97,299 | | 93,232 |
| Long-term investments | | 80 | | 30 | | 29 |
| **Total due from Related Parties** | $ | **143,785** | $ | **130,412** | $ | **186,663** |
| *Liabilities* | | | | | | |
| Trade accounts payable | $ | 12,745 | $ | 20,221 | $ | 8,175 |
| Other accounts payable | | 3,091 | | 6,142 | | 844 |
| Other accrued liabilities | | - | | - | | 7,100 |
| Bank loans and borrowings from Related Parties* | | 92,216 | | 86,392 | | 94,491 |
| Deferred income | | 16,239 | | 16,038 | | - |
| **Total due to Related Parties** | $ | **124,291** | $ | **128,793** | $ | **110,610** |

| CONDENSED CONSOLIDATED STATEMENTS OF OPERATIONS AND COMPREHENSIVE INCOME | Predecessor one hundred fifty-six-day period ended June 5, 2013 | Successor Two hundred and nine days ended December 31, 2013 | Year ended December 31, 2014 | Year ended December 31, 2015 |
|---|---|---|---|---|
| Net sales | $ 1,006 | $ 1,709 | $ 2,029 | $ 17,697 |
| Cost of goods sold | 900 | 494 | 997 | 6,322 |
| Purchases of goods | 643 | 51,077 | 64,051 | 69,240 |
| Purchases of raw materials | 1,545 | 4,486 | 3,387 | 3,248 |
| Selling, general and administrative expenses | 653 | 10,623 | 3,387 | 4,415 |
| Other operating income | - | - | - | 9,288 |
| Interest expense | 1,339 | 4,441 | 7,846 | 8,560 |
| Interest Income | - | 8,747 | 13,114 | 11,372 |
| Other income | - | 782 | 200 | 133 |
| Other expense | $ - | $ - | $ - | $ 100 |

| CONDENSED CONSOLIDATED BALANCE SHEETS | December 31, 2014 | December 31, 2015 |
|---|---|---|
| **Assets** | | |
| Accounts receivable | $ 6,453 | 24,293 |
| Prepaid expenses | 1,025 | 5,780 |
| Other current assets (other current receivables) | 676 | 3,010 |
| Loans granted to Related Parties* | 83,836 | 97,299 |
| Long-term investments | - | 30 |
| **Total due from Related Parties** | $ 91,990 | 130,412 |
| **Liabilities** | | |
| Trade accounts payable | $ 13,149 | 20,221 |
| Other accounts payable | 9,549 | 6,142 |
| Bank loans and borrowings from Related Parties** | 49,331 | 86,392 |
| Deferred income*** | - | 16,038 |
| **Total due to Related Parties** | $ 72,029 | 128,793 |

_____

*These facilities include loans in aggregate principal amount of $17.8 million granted by Roust Inc., which originate from the period prior to the acquisition of Roust Inc.*

** Loans from Russian Standard Bank and Russian Standard Insurance.*

*** Interest prepaid on loans granted to related parties .*

Accounts receivable and trade accounts payable arise from sale, purchases of goods and transactions related to marketing activities made primarily with LLC "Russian Standard Vodka", F.lli Gancia & C. SpA, RTL, Russian Standard Vodka (USA) Inc. in the ordinary course of business. For details on prepaid expenses and other current receivables please refer to Note 18 of the Roust Corporation Consolidated Financial Statements for the period ended September 30, 2016 included in Appendix G. Deferred income represented prepaid interest on a loan granted to RTL. Selling, general and administrative expenses apply mainly to warehousing costs and costs of renting office premises from LLC "Union Trust Stroy" and LLC "Russian Standard Vodka" as well as marketing services performed by Roust Trading (Cyprus) Ltd and Russian Standard Vodka (USA) Inc. Additionally, in the nine-month period ended September 30, 2016, the Company recognized $1.3 million in income of management service recharges to related parties . As of December 31, 2015 other accounts payable include the outstanding liability for the Roust Inc. acquisition in the amount of $0.4 million and for the RDL acquisition in the amount of $3.9 million. The liability for the RDL acquisition was paid in February 2016. As of September 30, 2016, other accounts payable of $0.8 million include the outstanding liability for the Roust Inc. acquisition in the amount of $0.4 million. Additionally, during the three month period ended September 30, 2016 the Company acquired from related parties physical product recipe and related technology, incurred other capital expenditures related to production and warehousing projects in Poland and made payment for the acquisition of marketing rights. The total amount of acquired assets is $7.0 million.

The acquisition of Roust Inc. brought 9% of the shares of LLC "Russian Standard Vodka" with a historically de minimis book value. The Company believes that the fair market value of these shares is significantly higher than its book value.

On December 31, 2015 the Company completed its acquisition of RDL from RTL through the transfer of the 100% ownership interest in RDL from RTL to Pasalba Ltd., a wholly owned subsidiary of Roust. After analyzing the independent valuation of the RDL business and the Company's strategic objectives, an aggregate purchase price for RDL was agreed at $40.0 million. The deposits of $4.8 million and $9.0 million were paid in October and December 2015, respectively. The majority of the consideration amounting to $22.3 million was settled against loans granted by Roust to related parties (within the RTL legal structure). The remaining $3.9 million of the consideration was paid in cash in February 2016.

### *Loans granted to related parties*

As of September 30, 2015, December 31, 2015 and September 30, 2016 the Company had loan and other financial receivables from related parties in principal amount equal to $91.2 million, $91.1 million and $91.2 million, respectively. All of the loan and other financial receivables as of September 30, 2016, together with accrued interest, amount to $99.4 million. The loans were granted to RTL and Russian Standard Corporation, to support the growth of their business. These facilities include the loans of principal amount of $20.8 million which originate from the period before the Roust Inc. acquisition, which is not included in the investment basket. The details of loans granted as of September 30, 2016 are presented in the table below.

| Principal amount* | Date of signing the agreement | Maturity date | Interest rate |
|---|---|---|---|
| $49.1 million | February 17, 2014 - March 1, 2016 | September 30, 2016 - September 14, 2022 | 13.8%-15.0% |
| $22.9 million | February 20, 2014 - March 23, 2016 | October 22, 2016 | 17.0%-18.5% |
| $6.4 million | March 17, 2014 - April 18, 2014 | October 22, 2016 | 10.0% |
| $3.7 million | March 01, 2016 | March 10, 2022 | 12.0% |
| $2.9 million | October 16, 2015 - November 2, 2015 | October 16, 2016 - November 2, 2016 | 7.0% |
| **Total $85.0 million** | **February 2014 - March 2016** | **September 2016 - September 2022** | **7.0%-18.5%** |

*\* these facilities include the loans of principal amount of $20.8 million which originate from the period prior to the acquisition Roust Inc., which is not included in the investment basket.*

These loans have been guaranteed by certain Related Party subsidiaries. In connection with, among other things, the contribution of such strategic assets to the Company, all intercompany loans owed by RTL to the Company will be considered repaid in full as part of the transactions contemplated by the agreement reached with the Supporting Noteholders described herein. For more information on the transaction, see our Form 8-K dated November 11, 2016.

Since September 30, 2016, up to the date of this Offering Memorandum and Disclosure Statement, related parties did not receive any loans from and did not repay any loans to the Company.

As of December 31, 2014 and December 31, 2015, the Company had loan receivables from related parties in principal amount equal to $77.9 million and $91.1 million, respectively. All of the loans as of December 31, 2015 together with accrued interest amount to $97.3 million. The loans were granted to RTL, LLC "Russian Standard Vodka" and Russian Standard Corporation, to support the growth of their business. The details of loans granted as of December 31, 2015 are presented in the table below.

| Principal amount* | Date of signing the agreement | Maturity date | Interest rate |
|---|---|---|---|
| $61.8 million | February 17, 2014 - December 21, 2015 | January 25, 2015 - September 14, 2022 | 13.8%-18.0% |
| $23.7 million | February 20, 2014 - June 29, 2015 | November 15, 2015 - June 29, 2020 | 10.0% |
| $2.4 million | October 16, 2015 - November 2, 2015 | October 16, 2016 - November 2, 2016 | 7.0% |
| $3.2 million | March 24, 2014 | March 10, 2022 | 12.0% |

*\* these facilities include loans of principal amount of $17.8 million granted by Roust Inc., which originate from the period before the Roust Inc. acquisition*

These loans have been guaranteed by Related Party subsidiaries. We believe RTL, LLC "Russian Standard Vodka" and Russian Standard Corporation have intent and ability to settle the loans upon maturity and therefore these loans are presented as assets in balance sheet not in shareholders' equity.

In the year ended December 31, 2015 related parties repaid loans in an amount of $58.2 million.

### Factoring from related parties

Related parties also support the Company by providing factoring. As of December 31, 2015 and September 30, 2016 the utilized limit of non-recourse factoring provided by related parties amounted to $10.6 million and $20.9 million, respectively. As of September 30, 2015 the Company had no active factoring arrangements with related parties . Additionally, related parties made available to Roust a factoring limit of $41.1 million, which remained unutilized as of September 30, 2016.

Since September 30, 2016, up to the date of this Offering Memorandum and Disclosure Statement related parties provided additional net factoring support in the amount of $10.4 million.

### Borrowings from related parties

As of September 30, 2016, the Company had bank borrowings from related parties in the amount of $94.5 million, which represents 45.5% of our bank loans portfolio. For details please Note 18 of the Roust Corporation Consolidated Financial Statements for the period ended September 30, 2016 included in Appendix G.

Since September 30, 2016, up to date of this Offering Memorandum and Disclosure Statement the Company did not receive, repay or roll over any borrowings from related parties .

As of December 31, 2014 and December 31, 2015, the Company had borrowings from related parties in the amount of $49.3 million and $86.4 million, respectively, which represents 26.4% and 42.4% of our bank loans portfolio, respectively, and which are described in Note 20 of the Roust Corporation Consolidated Financial Statements for the period ended December 31, 2015.

### Guarantees from related parties

Roust Inc. has provided guarantees of $128.1 million to related parties as of September 30, 2016. These amounts date from the period before the Roust Inc. acquisition. related parties have provided guarantees of $12.4 million to Roust Inc. as of September 30, 2016. The guarantees relate to excise stamps, typical and necessary for our industry, as well as bank loans and factoring facilities.

### Investor Rights Agreement

In connection with and upon the consummation of the restructuring transactions pursuant to the Plan, Roust Corporation will enter into the Investor Rights Agreement. Any Eligible Holder of Notes receiving New Common Stock in the Share Placement or under the Plan of Reorganization or any transferee of such New Common Stock may enter into the Investor Rights Agreement.

Roust will provide certain rights to holders of the series B New Common Stock and the series C New Common Stock in its Corporate Governance Documents, the terms of which shall be substantially the same as described herein with such changes as may be collectively approved among the relevant Debtors, the Russian Standard Parties, the Existing Senior Secured Notes Steering Committee and the Existing Convertible Notes Steering Committee. See the section entitled "Description of Common Stock" for a description of the terms of the Corporate Governance Documents.

The Investor Rights Agreement will obligate each party thereto to to, among other things, take all necessary or desirable actions within each party's control to ensure that the board of directors of Reorganized Roust will be composed and office is held in accordance with the Corporate Governance Documents. During the Protected Period, the Corporate Governance Documents will require the board of directors to consist of five members: (i) three directors appointed by the holders of series A New Common Stock and (ii) two minority directors ("*Minority Directors*"). One Minority Director will be appointed by the holders of series B New Common Stock (the "*Senior Minority Director*") and the second Minority Director will be appointed by the holders of series C New Common Stock (the "*Junior Minority Director*"). Representatives of the Russian Standard Parties shall collectively maintain the right to elect a majority of the directors to the board of directors for so long as the Russian Standard Parties hold at least 45% of the fully diluted equity in Reorganized Roust. In the event the Russian Standard Parties hold less than 45% but more than 30.0% of the fully diluted equity in Reorganized Roust, the Russian Standard Parties shall

have the ability to appoint two members of the board of directors. A quorum for any board of directors meeting or board of directors matter must include both Minority Directors. Following the Senior Sell Down Date the series C New Common Stock will have the right to appoint the two Minority Directors.  Following the Junior Sell Down Date the two Minority Directors will be appointed by any holders of the series B New Common Stock and series C New Common Stock outstanding.

The Investor Rights Agreement or the Certificate of Incorporation will also include the following Reserved Matters which will require prior approval by both of the Minority Directors:

(i) issuance or authorization of additional equity securities of Reorganized Roust subject to certain exceptions, including the MIP;

(ii) incurrences of new debt (including recourse factoring facilities but excluding refinancings and debt incurred under the Seasonality Basket (as defined in the Description of New Senior Secured Notes) in excess of $25 million, provided that Minority Director approval shall be required for any refinancing or amendment to existing debt which results in an interest rate in excess of 15.0% (or 24.0% for any loan denominated in Russian rubles) for debt maturing on or before the 18 month anniversary of the Effective Date, and for debt maturing thereafter an interest rate in excess of 12.0% (or 18.0% for any loan denominated in Russian rubles);

(iii) all transactions between Reorganized Roust and its subsidiaries on the one hand and RTL or its affiliates (excluding Reorganized Roust and its subsidiaries) on the other hand shall require majority approval from the board of directors and unanimous approval by the Minority Directors, subject to the following carve-outs:

- issuance of securities as approved under (i) above;

- agreements and arrangements in place on the Plan effective date as set forth in a schedule to be provided (including ordinary course arrangements with Gancia) and renewals, supplements and amendments thereof as set forth in a schedule;

- pro rata dividend to all stockholders in accordance with the New Senior Secured Notes Indenture and the advance amount permitted by paragraph 2 of the Covenant Term Sheet;

- any one or series of related transactions consisting of (i) the repayment of indebtedness (including debt for borrowed money and hedging obligations) that are undertaken in order to comply with regulatory requirements or (ii) transactions that do not involve the transfer of cash, cash equivalents, other assets or security interests and that are undertaken in order to comply with regulatory requirements (the assumption or guarantee of affiliate debt or the provision of services for below market consideration shall not receive the benefit of this carve-out); *provided that* copies of any regulatory notice related to such transaction shall be provided to the Minority Directors within one business day of such transaction;

- employment agreements other than CEO and CFO service agreements; *provided that* no approval shall be required for amendments to (or new) CEO or CFO service agreements except in the case of the provision of any compensation equal to or greater than two times the agreed amount of CEO or CFO (as applicable) compensation (at plan value) as of the effective date of the plan; and

- the performance of SEC registration rights granted pursuant to the Plan;

(iv) amendments to the MIP;

(v) amendments to the Corporate Governance Documents;

(vi) certain mergers, acquisitions and asset transactions involving the sale or purchase by Reorganized Roust of significant assets or subsidiaries, outside the ordinary course of business;

(vii) adoption of a plan of complete or partial liquidation, dissolution, merger, consolidation, restructuring, recapitalization or other reorganization of any company in the Reorganized Roust group of companies or alteration through merger, liquidation, reorganization or restructuring of the corporate structure of any of its subsidiaries;

(viii) changes in the auditor of the Company if (i) such new auditor is not one of the Big 4 accounting firms or (ii) the Company has changed auditors in the preceding 2 years;

(ix) significant changes in the scope of the business;

(x) significant activities outside the scope of production, distribution and sale of vodka, spirits and other alcohol products;

(xi) any new financing transaction such as a rights offering, issuing of convertible securities or any other hybrid financing (excluding refinancings and debt incurred under the Seasonality Basket) in excess of $25 million; and

(xii) any other transaction in excess of $50 million (other than refinancing transactions and ordinary course multiyear distribution arrangements with unrelated third parties).

No Reserved Matters can be delegated to committees of the board of directors. All subsidiaries shall be party to the Investor Rights Agreement, which shall provide that the subsidiaries are subject to the Reserved Matters and, in the sole discretion of the holders of series B New Common Stock, but subject to local law restrictions, the charter or other corporate governance documents of any subsidiary of the Company shall be amended in form and substance satisfactory to the holders of series B New Common Stock in order to provide for similar rights and restrictions. During the Protected Period, each of series B New Common Stock and series C New Common Stock shall have, in their sole discretion, the right to appoint a director, member, observer or similar person to each subsidiary's board of directors or similar governing body in order to enforce Reserved Matters at such subsidiary level, which right may be exercised at any time.

The Investor Rights Agreement will also be subject to restrictions on transfers to competitors and contain certain tag-along, drag-along and preemptive rights.

*Registration Rights Agreement*

On the Effective Date, Reorganized Roust will enter into one or more registration rights agreements, providing holders of series A New Common Stock with customary registration rights for the New Common Stock, subject to the terms of the Investor Rights Agreement and the Corporate Governance Documents.

## THE CONSENT SOLICITATION

As part of the Plan of Reorganization, CEDC FinCo is making the Consent Solicitation in order to solicit Consents from holders of the Existing Notes to the Proposed Amendments to the Existing Notes Indentures, among other things, to provide for the release of all of the liens on the collateral securing the Existing Notes and all subsidiary guarantees, including by amending the Existing Notes Indentures and by terminating or amending, as applicable, the related security documents. Such amendments, if approved, would become effective upon the Effective Date of the Plan.

The Supplemental Indentures will also include an amendment to the acceleration provisions in the Existing Notes Indentures to provide that a filing by Roust Corporation under Chapter 11 of the Bankruptcy Code will not result in the automatic acceleration of the obligations of the subsidiary guarantees of the Existing Notes, but a filing by Roust Corporation under Chapter 11 of the Bankruptcy Code would (as the Existing Notes Indentures currently provide) result in an automatic acceleration of the obligations of CEDC FinCo, the issuer, under the Existing Notes and amounts outstanding under the Roust Corporation and the CEDC FinCo LLC guarantees of the Existing Notes. The Bankruptcy Waiver Amendments will be approved under the Existing Senior Secured Notes Indenture and the Existing Convertible Notes Indenture if holders of at least a majority of the aggregate principal amount of each of the outstanding Existing Senior Secured Notes and Existing Convertible Notes, as applicable, deliver the Consents. If the Bankruptcy Waiver Amendments are not approved, holders of over 50% of the aggregate outstanding principal amount of each of the Existing Senior Secured Notes and Existing Convertible Notes could accelerate (i.e. declare immediately due and payable) the subsidiary guarantors' obligations under the applicable Existing Notes upon or following a Chapter 11 filing by Roust Corporation, subject to the terms and conditions in the Existing Notes Indentures. The Bankruptcy Waiver Amendments will become operative upon execution of the supplemental indentures to the Existing Notes Indentures; provided that if a Confirmation Order (as defined below) is not issued on or prior to March 31, 2017, the Bankruptcy Waiver Amendments will no longer be effective or operative and such provisions will revert to the language as the Existing Notes Indentures currently provide prior to the entry into the Supplemental Indentures. A form of each Supplemental Indenture is included with this Offering Memorandum and Disclosure Statement as Appendix B.

On and after the Effective Date, the following actions shall be deemed authorized and approved in all respects, without the need for further approval or agreement under the Existing Notes Indentures, by the directors or officers of the Debtors, the Existing Notes Indenture trustees, any security agent under the Existing Notes Indentures, or otherwise and pursuant to entry of the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code: (i) the Supplemental Indentures shall be and shall be deemed to be executed and effective in all regards and in accordance with their terms; (ii) the Collateral and Guarantee Release shall be and shall be deemed to be in effect; (iii) CEDC FinCo shall deliver notice to each of the Existing Notes Indenture trustees that it designates all non-debtor affiliates of RTL as Unrestricted Subsidiaries (as defined in the Existing Senior Secured Notes Indenture and the Existing Convertible Notes Indenture, respectively); and (iv) upon designation of such Non-Debtor Affiliates as Unrestricted Subsidiaries, the guarantees by such Unrestricted Subsidiaries of the Existing Notes shall be automatically released pursuant to each of the Existing Notes Indentures and all liens on assets of such Non-Debtor Affiliates designated as Unrestricted Subsidiaries that secure each of the Existing Notes shall be automatically released pursuant to each of the Existing Notes Indentures.

The Proposed Amendments will also include an amendment to the change of control provisions in the Existing Notes Indentures to provide that a change in Roust's jurisdiction, from Delaware to New York prior to the Effective Date and in accordance with the filing by Roust Corporation under Chapter 11 of the Bankruptcy Code, will not result in a change of control under the Existing Notes. The Change of Control Amendments will become operative upon execution of the Supplemental Indentures.

## DIVIDEND POLICY

Roust Corporation has never declared or paid any dividends on its capital stock. As a general matter, Roust Corporation currently intends to retain future earnings for use in the operation and expansion of its business. Future dividends, if any, will be subject to approval by Roust Corporation's board of directors and will depend upon, among other things, the results of Roust Corporation's operations, capital requirements, surplus, general financial condition and contractual restrictions and such other factors as the board of directors may deem relevant. In addition, subject to limited exceptions, the New Senior Secured Notes Indenture will limit the amount of cash dividends that may be paid on its common stock to amounts calculated in accordance with a formula based upon our net income and other factors and certain baskets. See "Description of the New Senior Secured Notes".

Roust Corporation earns the majority of its cash in non-U.S dollar currencies and any potential future dividend payments would be impacted by foreign exchange rates at that time. Additionally, the ability to pay dividends may be limited by local equity requirements, therefore retained earnings are not necessarily the same as distributable earnings of Roust Corporation.

## DESCRIPTION OF COMMON STOCK

*The following description is a summary of the material terms and provisions of Reorganized Roust's New Common Stock as expected to be in effect from the Effective Date, with such changes as may be collectively approved among the relevant Debtors, the Russian Standard Parties, the Existing Senior Secured Notes Steering Committee and the Existing Convertible Notes Steering Committee. This description does not restate the Certificate of Incorporation in its entirety. You may obtain copies of the Certificate of Incorporation from us upon written request.*

**Authorized Stock**

Reorganized Roust's Certificate of Incorporation will authorize the issuance of the New Common Stock, comprised of series A New Common Stock, series B New Common Stock and series C New Common Stock. Series A, B and C New Common Stock will collapse into a single series of New Common Stock upon the consummation of an initial public offering.

**Common Stock**

Reorganized Roust's Certificate of Incorporation will provide for the issuance of three classes of New Common Stock. Series A New Common Stock will be issued to the Russian Standard Parties. Series B New Common Stock will be issued to the holders of the Existing Senior Secured Notes. Series C New Common Stock will be issued to the holders of the Existing Convertible Notes. Subject to the transfer restrictions described herein, upon the transfer of series B New Common to an entity other than holders of the Existing Senior Secured Notes or Russian Standard Parties (who shall hold series A New Common Stock), such series B New Common Stock will automatically convert into series C New Common Stock.

Holders of New Common Stock will have the same rights, preferences, privileges, interests and attributes and are subject to the same limitations as every other holder of New Common Stock, subject to certain provisions set forth in Reorganized Roust's Certificate of Incorporation and the Investor Rights Agreement. At each annual or special meeting of stockholders, each holder of New Common Stock shall be entitled to one vote in person or by proxy for each share of New Common Stock standing in such person's name on the stock transfer records in connection with all actions submitted to a vote of stockholders, with the exception of the election of directors. Reorganized Roust's Certificate of Incorporation will not provide for cumulative voting. Reorganized Roust's Certificate of Incorporation also provides that in the event of any liquidation, dissolution or winding up of Reorganized Roust, the holders of the New Common Stock shall be entitled, after payment or provision for payment of all debts and liabilities of Reorganized Roust, to receive the remaining assets of Reorganized Roust available for distribution, in cash or in kind. The holders of New Common Stock have no subscription, redemption or conversion rights.

**Limitation's on Liability and Indemnification**

*Limitations on Director Liability*

Section 402(b) of the Business Corporation Law of the State of New York ("*NYBCL*") permits a certificate of incorporation to set forth a provision limiting or eliminating the personal liability of directors to a corporation or its shareholders for damages for any breach of duty in such capacity, provided that no such provision shall eliminate or limit the liability of a director if a judgment or other final adjudication adverse to him or her establishes (i) that his or her acts or omissions were in bad faith or involved intentional misconduct or a knowing violation of law or (ii) that he or she personally gained in fact a financial profit or other advantage to which he or she was not legally entitled, or (iii) that his or her acts violated Section 719 of the NYBCL. Reorganized Roust's Certificate of Incorporation will limit the liability of directors to Reorganized Roust or its stockholders to the fullest extent permitted by Section 402 of the NYBCL. Specifically, directors of Reorganized Roust will not be personally liable for monetary damages to Reorganized Roust or its stockholders for breach of the director's fiduciary duty as a director, except for liability: (a) for any breach of the director's duty of loyalty to Reorganized Roust or its stockholders; (b) for acts or omissions not in good faith or that involve intentional misconduct or a knowing violation of law; (c) for unlawful payments of dividends or unlawful stock repurchases or redemptions; or (d) for any transaction from which the director derived an improper personal benefit.

164

*Indemnification*

To the maximum extent permitted by law (including Article 7 of the NYBCL), Reorganized Roust's By-Laws will provide for mandatory indemnification of directors and officers of Reorganized Roust against any expense, liability and loss to which they may become subject, or which they may incur as a result of being or having been a director or officer of Reorganized Roust. In addition, the By-laws will provide that Reorganized Roust must advance or reimburse directors and officers for expenses incurred by them in connection with indemnifiable claims. Reorganized Roust also maintains directors' and officers' liability insurance.

## Certain Anti-Takeover Minority Shareholder Protection Provisions

Reorganized Roust's Certificate of Incorporation and the By-Laws contain, among other things, certain provisions described below that may reduce the likelihood of a change in the composition of the board of directors or voting control of Reorganized Roust without the consent of the board of directors. These provisions could have the effect of discouraging, delaying, or preventing tender offers or takeover attempts that some or a majority of the stockholders might consider to be in the stockholders' best interest, including offers or attempts that might result in a premium over the market price for the New Common Stock.

*Protected Period*

Certain provisions of the Investor Rights Agreement, Reorganized Roust's Certificate of Incorporation and Reorganized Roust's By-Laws are only effective during the period (the "*Protected Period*"), namely Minority Director approval being required for Reorganized Roust or its subsidiaries to take certain actions or enter into certain transactions (referred to herein as Reserved Matters), beginning with the Effective Date and ending upon the earliest to occur of (i) the date holders of the series B New Common Stock and holders of series C New Common Stock issued on the Effective Date  sell at least 90% of the aggregate number of shares of New Common Stock held by series B New Common Stock and series C New Common Stock issued on the Effective Date; or (ii) with respect to the holders of the New Senior Secured Notes the earlier of (a) the date on which the holders of  New Notes hold less than three percent (3%) of the New Common Stock issued on the Effective Date and (b) the date on which less than 10% of the aggregate principal amount of New Notes issued on the Effective Date are outstanding (the "Senior Sell-Down Date"); and (iii) with respect to the holders of series C New Common Stock, the date the holders of series C New Common Stock hold less than 5% of the New Common Stock outstanding as of the Effective Date (the "*Junior Sell-Down Date*").

*Board Composition*

During the Protected Period, the board of directors will be composed of five directors. For so long as the Russian Standard Parties maintain at least 45% of the fully diluted equity of Reorganized Roust, the Russian Standard Parties will have the right to elect three members of the board of directors. If the Russian Standard Parties hold more than 30%, but less than 45%, of the fully diluted equity of Reorganized Roust, the Russian Standard Parties will have the right to elect two members of the board of directors.

During the Protected Period, the Senior Holders shall have the right to appoint the Senior Minority Director (until the Senior Sell-Down Date). During the Protected Period, the Junior Holders shall have the right to appoint the Junior Minority Director. Minority Directors shall hold office from the Effective Date of the Plan and may be removed with or without cause by the affirmative vote of the holders of not less than two-thirds of the applicable series of stock which has the right to appoint such director, following a meeting called by holders of at least 20% of the applicable class of New Common Stock. Following the Senior Sell-Down Date and Junior Sell-Down Date, as applicable, the right of  holders of series B Common Stock and series C Common Stock, respectively, to appoint a director shall terminate, but in such case, such director appointment right shall become a right of all holders of series B and series C Common Stock (together) to appoint a member of the board of directors, such that there remains a total of two directors elected by holders of series B Common Stock and series C Common Stock even after the applicable sell down dates. At the end of the Protected Period, the Minority Directors will be appointed by the outstanding holders of the series B New Common Stock and the series C New Common Stock, but Reserved Matters will no longer require Minority Director approval. Subject to the transfer restrictions described herein, upon the transfer of series B New Common to an entity other than holders of the Existing Senior Secured Notes or Russian

Standard Parties (who shall hold series A New Common Stock), such series B New Common Stock will automatically convert into series C New Common Stock.

*Filling Board Vacancies; Removal*

Other than as set forth below, any vacancy occurring in the board of directors, including any vacancy created by an increase in the number of directors, shall be filled by the vote of a majority of the directors then in office, whether or not a quorum, and any director so chosen shall hold office until such director's successor shall have been elected and qualified. Directors may only be removed with cause by the affirmative vote of the holders of not less than two-thirds outstanding shares of the class of New Common Stock then entitled to vote for the election of such directors.

During the Protected Period, until the Senior Sell-Down Date, if any Senior Minority Director ceases to serve on the board of directors, the holders of the series B New Common Stock shall have the right to appoint a successor Minority Director to fill such vacancy and, until the Junior Sell-Down Date if any Junior Minority Director ceases to serve on the board of directors, the holders of the series C New Common Stock shall have the right to appoint a successor Minority Director to fill such vacancy and if any Russian Standard Director ceases to serve on the board of directors, the Russian Standard Parties shall have the right to appoint a successor Russian Standard Director to fill such vacancy. During the Protected Period, removal of a Junior Minority Director may be made with or without cause by the affirmative vote of the holders of not less than two-thirds of the series C New Common Stock, and removal of a Senior Minority Director may be made with or without cause by the affirmative vote of the holders of not less than two-thirds of the series B New Common Stock. Following the Senior Sell-Down Date and Junior Sell-Down Date, as applicable, any vacancy with respect to the relevant director appointed by the holders of the series B New Common Stock and the series C New Common Stock, respectively, shall be filled with the approval of a majority of the holders of the series B New Common Stock and series C New Common Stock, such that there remains a total of two directors elected to the board of directors by holders of the series B New Common Stock and the series C New Common Stock even after the applicable sell down dates.

*Stockholder Action by Written Consent*

Any action required or permitted to be taken by the stockholders, or any class of stockholders, must be effected at a duly called annual or special meeting of such holders and may not be effected by any consent in writing by such holders, unless such consent is by not less than two-thirds of such holders, or class thereof.

*Call of Special Meetings*

Special meetings of stockholders may be called at any time by the board of directors, the Chairman of the board of directors, the Chief Executive Officer or the President, and shall be called by the President or the Secretary of Reorganized Roust at the request in writing of stockholders possessing at least 10% of the voting power of the issued and outstanding capital stock of Reorganized Roust entitled to vote generally in the election of directors. Such a request shall include a statement of the purpose or purposes of the proposed meeting.

*Bylaw Amendments*

The stockholders may amend the By-Laws by the affirmative vote of the holders of at least a majority of the outstanding shares of stock of Reorganized Roust entitled to vote thereon. Directors also may amend the By-Laws by an affirmative vote of at least a majority of the directors then in office.

During the Protected Period, Reorganized Roust's By-Laws may not be amended, modified, waived or supplemented in any manner, whether by course of conduct or otherwise, except with the consent of Reorganized Roust, a majority of the holders of series B New Common Stock, a majority of the holders of series C New Common Stock and the Minority Directors.

*Certificate of Incorporation*

Except as set forth in Reorganized Roust's Certificate of Incorporation or as otherwise specifically required by law, no amendment of any provisions of the Certificate of Incorporation shall be made unless such amendment

has been first proposed by the board of directors upon the affirmative vote of at least a majority of the directors then in office at a duly constituted meeting of the board of directors called for such purpose and thereafter approved by the Stockholders by the affirmative vote of at least a majority of the holders of the outstanding shares of stock of Reorganized Roust entitled to vote thereon, and during the Protected Period, by the affirmative vote of both Minority Directors.

During the Protected Period, Reorganized Roust's Certificate of Incorporation may not be amended, modified, waived or supplemented in any manner, whether by course of conduct or otherwise, except with the consent of Reorganized Roust and the majority of the holders of the series B New Common Stock and the majority of the holders of the series C New Common Stock.

*Stockholder Meetings*

With certain exceptions, Reorganized Roust's By-Laws will require that stockholders intending to present business for consideration at a meeting of stockholders must notify Reorganized Roust's secretary not less than 10 days, and not more than 60 days, before the date of the meeting.

*Board Meetings*

During the Protected Period:

- a quorum for any board meeting must include both Minority Directors;

- at least one Minority Director shall serve on each committee of the board of directors and such director must be present for a quorum of such committee;

- Minority Directors will serve on an initial public offering sale committee (which may include other directors) to drive a process towards an initial public offering or a sale to a third party;

- the IPO sale committee will need to report to the board of directors and final decisions will be taken by the board of directors; and

- board of directors meetings must occur at least quarterly and must be in London or New York, unless Minority Directors agree to a different venue.

*No Transfers to an Industry Competitor*

Prior to an initial public offering of Reorganized Roust, no holder can make any transfers of New Common Stock to an Industry Competitor (as defined in the Annex 2) without the prior written consent of the board of directors. In the event an Exit Event has not been completed on or prior to June 30, 2019, the transfer restriction to Industry Competitors will terminate. Following the termination of this restriction, a holder may transfer any New Common Stock to an Industry Competitor, subject to prior consultation with the Company.

*Certain Statutory Provisions*

Section 912 of the NYBCL provides, in general, that a stockholder acquiring more than 20% of the outstanding voting shares of a corporation subject to the NYBCL (an "*Interested Stockholder*"), may not engage in certain business combinations (including mergers, asset sales and other transactions resulting in a financial benefit to the interested shareholder) with such corporation for a period of five years subsequent to the date on which the stockholder became an Interested Stockholder unless (a) the transaction resulting in a person becoming an interested shareholder was approved by the board of directors of the corporation prior to that person becoming an interested shareholder; or (b) the business combination is approved by the holders of a majority of the outstanding voting stock not beneficially owned by such interested shareholder; or (c) the business combination is approved by the disinterested shareholders at a meeting called no earlier than five years after the interested shareholder's stock acquisition date; or (d) the business combination meets certain valuation requirements for the stock of a New York corporation.

**Plan of Reorganization**

       If the restructuring of our capital structure is effected through the Plan of Reorganization, all of the existing common stock in Roust Corporation will be cancelled, extinguished and discharged. See "Plan of Reorganization".

## SHARE PLACEMENT

*The following describes the terms of the Share Placement. Holders of Existing Notes that hold such Existing Notes in a brokerage account or through a Nominee, please also refer to "—Method of Subscription—Subscription by Eligible Beneficial Owners of Existing Notes" below.*

**The Share Placement**

Concurrently with the Consent and Plan Solicitation, Roust is also offering Eligible Holders of Existing Notes the opportunity to subscribe for up to an aggregate of $55.0 million of New Common Stock (the "*Offered Amount*"). Fractional shares of New Common Stock will not be issued in the Share Placement and any fractional shares due to Eligible Holders will be rounded down to the nearest whole number. The consummation of the Share Placement is conditioned upon the substantially concurrent consummation of the Plan of Reorganization.

A total of 3,257,510 shares of New Common Stock equal to 13.03% of the New Common Stock issued and outstanding as of the Effective Date, subject to dilution on account of the MIP, shall be issued in exchange for $55 million in cash at a subscription price of $16.88 per share in accordance with the following Subscription Priority Scheme:

(i)        the Consenting Senior Secured Noteholders shall have the right to subscribe to up to their pro rata share of 296,137 series B shares for a total of $5 million;

(ii)        each holder of an Existing Convertible Notes Claim shall have the right to subscribe to up to its pro rata share of 2,961,373 series C shares for a total of $50 million, plus any shares left unsubscribed pursuant to (i);

(iii)        in the event the Share Placement is not fully subscribed per (i) and (ii), the Russian Standard Parties shall have the right to subscribe for the unplaced shares up to an additional 296,137 series A shares for a total of $5 million pursuant to the Co-Investment Right;

(iv)        to the extent the Share Placement is not fully subscribed pursuant to (i), (ii) and (iii), then (a) the Russian Standard Parties shall have the right to subscribe to 50% of the remaining unplaced shares (in the form of series A shares), subject to the maximum number of shares imposed by the Co-Investment Right, and (b) each Backstop Convertible Noteholder shall have the right to subscribe to up to 50% of the remaining unplaced shares (in the form of series C shares), provided that in the event of oversubscription (x) the unplaced shares shall be allocated pro rata (for the purpose of this subclause (iv), pro rata shall be based on the respective commitments of the Backstop Convertible Noteholders as set forth in the Backstop Agreement) and (y) if a Backstop Convertible Noteholder subscribes to less than its maximum pro rata allocation the difference (between what such Backstop Convertible Noteholder subscribed to and what it was entitled to subscribe to) shall be made available to the remaining Backstop Convertible Noteholders pro rata. To the extent any unplaced shares remain after (y), the obligation in (y) shall repeat until the maximum pro rata allocation available to each Backstop Convertible Noteholder under this subclause (iv) has either been fully allocated (to the relevant Backstop Convertible Noteholder or to the Backstop Convertible Noteholders) or been made available to the Backstop Convertible Noteholders and been left unsubscribed;

(v)        to the extent the Share Placement is not fully subscribed pursuant to (i), (ii), (iii) and (iv), each holder of an Existing Convertible Notes Claim shall have the right to subscribe to the remaining unplaced shares (in the form of series C shares), provided that in the event of oversubscription (x) each holder of an Existing Convertible Notes Claim shall have the right to subscribe to up to its pro rata share of the unplaced shares and (y) if a holder of an Existing Convertible Notes Claim subscribes to less than its maximum pro rata allocation the difference (between what such Existing Convertible Noteholder subscribed to and what it was entitled to subscribe to) shall be made available to the remaining holders of Existing Convertible Notes Claims on a pro rata basis. To the extent any unplaced shares remain after (y), the obligation in (y) shall repeat until the maximum pro rata allocation available to each holder of an Existing Convertible Notes Claim under this subclause (v) has either been fully allocated (to the relevant holder of Existing Convertible Notes Claims or to the holders of Existing Convertible Notes Claims) or been made available to the holders of Existing Convertible Notes Claims and been left unsubscribed;

169

(vi)        to the extent the Share Placement is not fully subscribed per (i), (ii), (iii), (iv) and (v), each holder of an Existing Senior Secured Notes Claim shall have the right to subscribe to the remaining unplaced shares (in the form of series B shares), provided that in the event of oversubscription (x) each holder of an Existing Senior Secured Notes Claim shall have the right to subscribe to up to its pro rata share of the unplaced shares and (y) if a holder  of Existing Senior Secured Notes Claims subscribes to less than its maximum pro rata allocation the difference (between what it subscribed to and what it was entitled to subscribe to) shall be made available to the remaining holders of Existing Senior Secured Notes Claims on a pro rata basis. To the extent any unplaced shares remain after (y), the obligation in (y) shall repeat until the maximum pro rata allocation available to each holder of Existing Senior Secured Notes Claims under this subclause (vi) has either been fully allocated (to the relevant holder of Existing Senior Secured Notes Claims or to the holders of Existing Senior Secured Notes Claims) or been made available to the holders of Existing Senior Secured Notes Claims and been left unsubscribed; and

(vii)        to the extent the Share Placement is not fully subscribed per (i), (ii), (iii), (iv), (v), and (vi), any remaining unplaced shares shall be allocated to and purchased by the Backstop Noteholders (in the form of series B and series C shares, as applicable) in accordance with the Backstop Agreement.

All participants in the Share Placement shall receive their respective shares of the Additional Share Placement Equity Allocation.

**Existing Senior Secured Notes Equity Subscription**

An offering shall be made, pursuant to this Offering Memorandum and Disclosure Statement and the Subscription Form, to each holder of an Existing Convertible Notes Claim to subscribe pro rata to the shares of New Common Stock being issued in connection with the Existing Senior Secured Notes Equity Allocation at a subscription price of $25.98 per share, provided that any New Common Stock subscribed to by any holder of an Existing Convertible Notes Claim pursuant to the Existing Senior Secured Notes Equity Subscription shall be issued in the form of series C New Common Stock rather than in the form of series B New Common Stock. As described above, the proceeds of the Existing Senior Secured Notes Equity Subscription, if any, shall be distributed pro rata to the holders of Existing Senior Secured Notes Claims.

**Subscription Form**

Each Eligible Holder participating in the Share Placement or the Existing Senior Secured Notes Equity Subscription may subscribe for some, all or none of the New Common Stock it is eligible to purchase in the Share Placement and the Existing Senior Secured Notes Equity Allocation by properly completing the Subscription Form included herein as Appendix C and delivering it to its Nominee. Deliveries of Subscription Forms by Eligible Holders of Existing Notes shall be binding on such holders upon delivery to the Subscription Agent. Eligible Holders of Existing Notes who elect to participate in the Share Placement will be obligated to deliver the Subscription Price by the applicable Payment Deadline if the Plan of Reorganization is confirmed.

**Allotted Amount**

Each Eligible Holder participating in the Share Placement may subscribe for some, all or none of the New Common Stock it is eligible to purchase in the Share Placement (the "*Allotted Amount*"). Each Eligible Holder of Existing Notes may not purchase more than its Allotted Amount in the Share Placement. Upon the occurrence of a Share Placement Reduction, no more than the adjusted offered amount will be issued in connection with the Share Placement. If the total number of shares of New Common Stock subscribed for in the Share Placement by tendering Eligible Holders of Existing Notes, including the Backstop Noteholders, exceeds the Offered Amount, each such holder's Allotted Amount will be reduced on a pro rata basis such that the total shares of New Common Stock issued in the Share Placement will equal the Offered Amount. If the number of shares of New Common Stock validly purchased in the Share Placement would result in less than the Offered Amount being issued in the Share Placement, then the Backstop Senior Noteholders will backstop up to $5 million and the Backstop Junior Noteholders will backstop up to $50 million, pursuant to the terms of the Backstop Agreement. Roust expects to receive $55.0 million in the Share Placement.

**The Backstop Fee**

The Backstop Convertible Noteholders and the Backstop Senior Noteholders have agreed to backstop the Share Placement in accordance with the terms of the Backstop Agreement. In connection with the Share Placement the Backstop Noteholders will receive a Backstop Commitment Fee equal to: (i) 0.23% of the shares of the New Common Stock to be issued and outstanding on the Effective Date payable to the Backstop Convertible Noteholders, and (ii) 0.02% of the New Common Stock to be issued and outstanding on the Effective Date payable to the Backstop Senior Noteholders. Subject to certain transfer restrictions described in "Description of Common Stock – No Transfers to an Industry Competitor" each of the Backstop Noteholders shall be permitted to transfer its backstop commitment to another Backstop Noteholder or any related party in which it or any of its affiliates has a current or contingent interest, provided, that in the event such related party or affiliate defaults on its backstop obligations, the original Backstop Noteholder shall remain liable.

**Conditions**

Any subscription by an Eligible Holder for New Common Stock in the Share Placement is subject to and conditioned upon, among other things, (i) the confirmation of the Plan of Reorganization and (ii) the valid payment of the Subscription Price by such holder at or prior to the applicable payment deadline to be announced by Roust via press release or other public announcement promptly following the confirmation of the Plan of Reorganization (the "*Payment Deadline*").

**Voting Deadline and Payment Deadline; Closing; Amendments**

Eligible Holders of Existing Notes or their Nominees must arrange for the delivery of their Subscription Forms by the Voting Deadline in order for such delivery to be valid. Subscriptions may not be withdrawn after they are delivered the Solicitation Agent. Eligible Holders of Existing Notes that elect to participate in the Share Placement will be obligated to deliver the Subscription Price by the applicable Payment Deadline if the Plan of Reorganization is confirmed. We will not be obligated to honor any purported Subscription Form received by the Subscription Agent after the Voting Deadline.

Eligible Holders of Existing Notes must deliver the Subscription Price at or prior to the applicable Payment Deadline. We will announce the date of the Payment Deadline via press release or other public announcement promptly following the Voting Deadline or the confirmation of the Plan of Reorganization, as applicable. The Payment Deadline will occur on or about two business days after confirmation of the Plan of Reorganization or as otherwise notified by us. Shares of New Common Stock purchased in the Share Placement shall be issued to Eligible Holders of Existing Notes in book-entry form and held through the transfer agent. Roust reserves the right to amend, extend, cancel, terminate or otherwise modify the terms of the Share Placement.

**Anticipated Proceeds From the Share Placement**

We expect the net proceeds to us from the Share Placement to be approximately $55.0 million. See "Use of Proceeds."

**Method of Subscription**

Eligible Holders of Existing Notes may participate in the Share Placement as follows:

*Subscription by Eligible Holders of Existing Notes.* Eligible Holders who wish to participate in the Share Placement must properly complete and execute the Subscription Form, together with any required signature guarantees, and forward it to the Subscription Agent at the address set forth under "—Subscription Agent" below, prior to the Voting Deadline. All payments must be submitted by the applicable Payment Deadline in accordance with the wire transfer instructions contained in the Subscription Form. See "—Payment Method" below.

*Subscription by Eligible Beneficial Owners of Existing Notes.* Eligible Holders of Existing Notes who hold such Existing Notes through a Nominee and wish to participate in the Share Placement must instruct such Nominee to deliver all documents and payment on such Eligible Holders' behalf, including all documents required in

171

connection with the Subscription Form, to the Subscription Agent prior to the Voting Deadline and Payment Deadline, as applicable.

To participate in the Share Placement, Eligible Holders of Existing Notes should complete and return the Subscription Agent all documentation required by the Subscription Form. Such holders should receive this documentation from their Nominee. Eligible Holders of Existing Notes wishing to obtain their Subscription Form directly should contact their Nominee as soon as possible and request that a separate Subscription Form be issued to them. Such holders should contact their Nominee if they do not receive this form, but believe they are entitled to participate in the Share Placement. We are not responsible if Eligible Holders of Existing Notes do not receive the Subscription Form from their Nominee or if such holders receive it without sufficient time to participate.

Eligible Holders of Existing Notes will be deemed not to participate in the Share Placement unless the Subscription Agent actually receives from such holders or their Nominees, as the case may be, all of the required documents and the full Subscription Price payment prior to Voting Deadline or Payment Deadline, as applicable.

**Payment Method**

Except for the Backstop Noteholders, each Eligible Holder must remit payment for the shares of New Common Stock deliverable pursuant to the Share Placement in cash by wire transfer as directed in the Subscription Form on or prior to the applicable Payment Deadline. If an Eligible Holder subscribes for New Common Stock pursuant to the Share Placement but fails to submit payment in accordance with these procedures, such holder shall be deemed to have relinquished, forfeited and waived its subscription. In addition, upon the occurrence of any Share Placement Reduction, the Subscription Agent will provide notice to each Eligible Holder of Existing Notes that subscribed for shares of New Common Stock in the Share Placement to the extent there is any change in such holder's aggregate purchase price for such shares.

**Instructions for Completing the Subscription Form**

Eligible Holders of Existing Notes should read the instruction letter accompanying the Subscription Form carefully and strictly follow it. **Do not send Subscription Forms or payments to us.** We will not consider any subscriptions received until the Subscription Agent has received delivery of a properly completed and duly executed Subscription Form. Delivery of Subscription Forms and payment of the Subscription Price to the Subscription Agent will be at the risk of participating Eligible Holders of Existing Notes.

**Missing or Incomplete Subscription Information; Manner of Delivery**

If Eligible Holders of Existing Notes do not indicate the number of shares being purchased pursuant to the Share Placement, or do not forward full payment of the total Subscription Price by wire transfer for the number of shares of New Common Stock that such holders indicate are being exercised by the applicable Payment Deadline, then such holders will be deemed to have forfeited their rights to subscribe for any shares of New Common Stock in the Share Placement. If Eligible Holders of Existing Notes deliver the Subscription Form or the Subscription Price in a manner different from that described in this Offering Memorandum and Disclosure Statement, we may not honor such subscriptions.

**Conditions and Cancellation**

We reserve the right to amend, extend, cancel, terminate or otherwise modify the Share Placement at any time before completion of the Voting Deadline for any reason. We may amend, extend, cancel, terminate or otherwise modify the Share Placement, in whole or in part, if, at any time before completion of the Voting Deadline if there is any judgment, order, decree, injunction, statute, law or regulation entered, enacted, amended or held to be applicable to the Share Placement that in the sole judgment of our board of directors would or might make the Share Placement or its completion, whether in whole or in part, illegal or otherwise restrict or prohibit completion of the Share Placement.

**Subscription Agent**

Epiq Corporate Restructuring, is serving as the Subscription Agent in connection with the Share Placement. The telephone number of the Subscription Agent is +1 (866) 734-9393.

**Fees and Expenses**

We will pay all fees charged by the Subscription Agent and the Information Agent. Eligible Holders of Existing Notes are responsible for paying any other commissions, fees, taxes or other expenses incurred in connection with their participation in the Share Placement. Neither we nor the Subscription Agent will pay such expenses.

**Validity of Subscriptions**

We will resolve all questions regarding the validity and form of the subscription privileges, including time of receipt and eligibility to participate in the Share Placement. Our determination will be final and binding. Once made, subscriptions and directions are irrevocable, and we will not accept any alternative, conditional or contingent subscriptions or directions. We reserve the absolute right to reject any subscriptions or directions not properly submitted or the acceptance of which would be unlawful. Participating Eligible Holders of Existing Notes must resolve any irregularities in connection with their subscriptions before the Voting Deadline, unless waived by us in our sole discretion. Neither the Subscription Agent nor we shall be under any duty to notify Eligible Holders of Existing Notes or their representatives of defects in their subscription(s). A subscription will be considered accepted, subject to our right to cancel the Share Placement, only when a properly completed and duly executed Subscription Form and any other required documents have been received by the Subscription Agent. The Subscription Price must be received by wire transfer at or prior to the applicable Payment Deadline. Our interpretations of the terms and conditions of the Share Placement will be final and binding.

**Restrictions on Transfer**

All shares of New Common Stock that you purchase in the Share Placement will be issued in book-entry form and held through the Transfer Agent and will be subject to certain restrictions on transfer. See "Notice to Investors—Restrictions on Transfer" and "Description of Common Stock." When issued, the shares of New Common Stock will be registered in the name of the holder who completed the Subscription Form. As soon as practicable after the Voting Deadline or confirmation of the Plan of Reorganization, as applicable, the Subscription Agent will arrange for issuance to each Eligible Holder of Existing Notes that has validly exercised its subscription privilege, the shares of New Common Stock purchased pursuant to the Share Placement.

**Release**

Each Eligible Holder that participates in the Share Placement shall, upon the occurrence of the Effective Date, be deemed by virtue of such participation to have unconditionally released and irrevocably discharged us from any and all claims, obligations, suits, judgments, damages, rights, causes of action and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity or otherwise, based in whole or in part on any act, omission, transaction or occurrence arising out of or related to the receipt, delivery, disbursements, calculations, transmission, or segregation of cash and New Common Stock in connection with the Share Placement from the date hereof to the consummation of the Plan of Reorganization. The foregoing release shall not apply to any contract or agreement entered into between Roust and the Subscription Agent and any of the Eligible Holders pursuant to, in connection with, or contemplated by, the Plan of Reorganization.

**Regulatory Limitation**

We will not be required to issue shares of New Common Stock pursuant to the Share Placement if, in our opinion, Eligible Holders of Existing Notes are required to obtain prior clearance or approval from, or submit a prior notice to, any state or federal regulatory authorities to own or control the shares and if, at the Voting Deadline, we determine that such holders have not properly obtained such clearance or approval or submitted such notice.

**Disclaimer**

Eligible Holders of Existing Notes that choose to participate in the Share Placement should rely only on the historic information provided in this Offering Memorandum and Disclosure Statement, and not on the projections provided herein, in deciding whether to participate in the Share Placement and invest in the New Common Stock.

## THE PLAN OF REORGANIZATION

**NONE OF ROUST, CEDC FINCO, CEDC FINCO LLC OR THEIR SUBSIDIARIES HAS COMMENCED CHAPTER 11 CASES UNDER THE BANKRUPTCY CODE, NOR HAVE THEY TAKEN ANY CORPORATE ACTION AUTHORIZING THE COMMENCEMENT OF SUCH CASES.**

**THIS OFFERING MEMORANDUM AND DISCLOSURE STATEMENT SOLICITS THE ADVANCE ACCEPTANCE OF THE PLAN OF REORGANIZATION FROM HOLDERS OF EXISTING NOTES AND CONTAINS IMPORTANT INFORMATION RELEVANT TO YOUR DECISION TO ACCEPT THE PLAN OF REORGANIZATION. A COPY OF THE PLAN OF REORGANIZATION IS ATTACHED TO THIS OFFERING MEMORANDUM AND DISCLOSURE STATEMENT AS APPENDIX A. PLEASE READ THE PLAN OF REORGANIZATION COMPLETELY AND CAREFULLY.**

To enhance the likelihood that we will succeed in our restructuring efforts, we have formulated the Plan of Reorganization to be consummated through a reorganization case under Chapter 11 of the Bankruptcy Code. Terms used under the heading "The Plan of Reorganization" and "Material Terms of the Plan of Reorganization" but not otherwise defined herein have the meanings provided in the Plan of Reorganization. The Plan of Reorganization annexed hereto as Appendix A covers Roust, CEDC FinCo, and CEDC FinCo LLC (as noted above the parties filing the Chapter 11 Cases are also referred to herein as the Debtors) and provides the treatment set forth below to holders of Claims against and Interests in the Debtors. If the Plan of Reorganization is confirmed and consummated, all holders of Claims against and Interests in the Debtors, would receive the treatment set forth in the Plan of Reorganization and described below, whether or not they vote to accept the Plan of Reorganization.

The statements contained in this Offering Memorandum and Disclosure Statement include summaries of the provisions contained in the Plan of Reorganization and in documents referred to therein. The statements contained in this Offering Memorandum and Disclosure Statement do not purport to be precise or complete statements of all the terms and provisions of the Plan of Reorganization or documents referred to therein, and reference is made to the Plan of Reorganization and to such documents for the full and complete statements of such terms and provisions.

The Plan of Reorganization itself and the documents referred to therein control the actual treatment of Claims against and Interests in the Debtors under the Plan of Reorganization and will, upon the Effective Date, be binding upon all holders of Claims against and Interests in the Debtors, the Estates, the Reorganized Debtors and other parties in interest. In the event of any conflict between this Offering Memorandum and Disclosure Statement, on the one hand, and the Plan of Reorganization or any other operative document, on the other hand, the terms of the Plan of Reorganization and such other operative document(s) are controlling.

We reserve all of our rights to pursue any and all of our strategic alternatives in the event the proposed restructuring is not consummated.

**Reasons for the Solicitation**

As set forth above, we are soliciting the requisite acceptances of the Plan of Reorganization (prior to the filing of any voluntary petitions for reorganization under Chapter 11 of the Bankruptcy Code) from holders of Existing Notes. We anticipate that by conducting the solicitation in advance of commencing any Chapter 11 Case, the anticipated duration of the Chapter 11 Cases will be significantly shortened, and the administration of the cases, which otherwise could be lengthy, complex, and expensive, will be greatly simplified and much less costly.

**Anticipated Events During the Chapter 11 Case**

At the time that any Chapter 11 Cases are commenced, all creditor actions and proceedings against the Debtors, and all acts to obtain property of the Debtors, will be stayed under section 362 of the Bankruptcy Code. The Debtors will continue to operate their businesses and manage their respective properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

We do not expect the Chapter 11 Cases to be protracted. To expedite emergence from Chapter 11, on the Petition Date, in addition to filing this Offering Memorandum and Disclosure Statement and the Plan of

Reorganization, the Debtors would file motions seeking the relief outlined below, among other relief, from the Bankruptcy Court (collectively, the "*First Day Motions*"). Such relief, if granted, will facilitate the administration of the Chapter 11 Cases; there can be no assurance, however, that the Bankruptcy Court will grant the relief sought. Subject to the terms of the Restructuring Support Agreement, which provide for, among other things, certain reasonable consent rights of the Supporting Noteholder with respect to the form and substance of the First Day Motions, holders of Existing Notes voting to accept the Plan of Reorganization shall, and shall be deemed to, by so voting, indicate their consent to the relief sought by the Debtors pursuant to the First Day Motions.

### *Motion to Assume Restructuring Support Agreement, Advisor Letters and Backstop Agreement*

The Debtors will seek authorization to assume the Restructuring Support Agreement, the engagement and fee letters of each of the Advisors to the Supporting Noteholders and the Backstop Agreement. Each of these agreements is integral to the restructuring negotiated among the Debtors and their stakeholders, and, accordingly, prompt assumption of these agreements is consistent with the Debtors' objective to quickly consummate a consensual restructuring.

### *Motion to Approve Combined Disclosure Statement and Confirmation Hearing*

We intend to seek an order scheduling a combined hearing on this Offering Memorandum and Disclosure Statement and confirmation of the Plan of Reorganization (the "*Confirmation Hearing*") for January 6, 2017. At the Confirmation Hearing, the Debtors will seek approval of the confirmation of the Plan of Reorganization pursuant to sections 1125, 1128 and 1129 of the Bankruptcy Code. At that time, the Debtors will also request that the Bankruptcy Court approve the prepetition solicitation of votes on the Plan of Reorganization. There can be no assurance that the Bankruptcy Court will approve the request to schedule the Confirmation Hearing on January 6, 2017.

### *Motion to Continue Using Existing Cash Management Systems*

Because we expect the Chapter 11 Cases to be pending for less than two (2) weeks, and because of the administrative hardship that any operating changes would impose, the Debtors intend to seek authority to continue using their existing cash management system, bank accounts and business forms and to follow internal investment and deposit guidelines. Absent the Bankruptcy Court's authorization of the continued use of the cash management system, our cash flow could be impaired to the detriment of the Estates and creditors. Continued use of our existing cash management system will facilitate a smooth and orderly transition into the Chapter 11 Cases, minimize the disruption of businesses while in Chapter 11, and expedite emergence from Chapter 11. As a result of set-up time and expenses, requiring the Debtors to adopt and implement a new cash management system would likely increase the costs of the Chapter 11 Cases. For the same reasons, requiring the Debtors to close existing bank accounts and establish new accounts or requiring the creation of new business forms would only frustrate efforts to reorganize expeditiously.

### *Motion to Extend the Deadline to File Schedules and Statement Of Financial Affairs and Final Waiver if the Plan is Confirmed*

Section 521 of the Bankruptcy Code and Bankruptcy Rule 1007 direct that, unless otherwise ordered by the court, a debtor must prepare and file certain schedules of claims, executory contracts and unexpired leases and related information (collectively, the "*Schedules*") and a statement of financial affairs (the "*Statement*") within fifteen (15) days of the commencement of a Chapter 11 case. The purpose of this requirement is to provide a debtor's creditors, equity security holders and other interested parties with sufficient information to make informed decisions with respect to the debtor's reorganization. In appropriate circumstances, however, a bankruptcy court may modify or dispense with the filing of the Schedules and the Statement pursuant to section 521 of the Bankruptcy Code. We believe that such circumstances would exist in the Chapter 11 Cases, and the Debtors intend to request that the Bankruptcy Court extend the deadline until sixty (60) days after the Petition Date, subject to a final waiver of the requirement that the Schedules and Statements be filed if a plan of reorganization is confirmed before such date.

*Applications For Retention Of the Debtors' Professionals*

We intend to seek retention of certain professionals to represent and assist in connection with the Chapter 11 Cases. These professionals were intimately involved with the negotiation and development of the restructuring transactions and the Plan of Reorganization. These professionals include Skadden, Arps, Slate, Meagher & Flom LLP, as counsel, Houlihan Lokey Capital, Inc., as investment banker, and Epiq Corporate Restructuring as claims and solicitation agent.

**Timetable for Chapter 11 Case**

Assuming that the Bankruptcy Court approves the Offering Memorandum and Disclosure Statement and confirms the Plan of Reorganization on the schedule requested, the Debtors would seek to emerge from Chapter 11 within less than two (2) weeks after the Petition Date. There can be no assurance, however, that the Bankruptcy Court's orders will permit the Chapter 11 Cases to proceed as expeditiously as anticipated. If an order approving the Plan of Reorganization is not entered by the Bankruptcy Court on or before January 31, 2017, or if the Effective Date of the Plan does not occur by February 15, 2017, the Supporting Noteholders will have the right to withdraw their support for the Plan of Reorganization in accordance with the terms of the Restructuring Support Agreement.

**Overview of Chapter 11**

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. Under Chapter 11 of the Bankruptcy Code, a debtor is authorized to reorganize its business for the benefit of itself, its creditors and interest holders. Another goal of Chapter 11 is to promote equality of treatment for similarly situated creditors and similarly situated interest holders. The commencement of a Chapter 11 case creates an estate that is comprised of all of the legal and equitable interests of the debtor as of the filing date. The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor in possession".

The consummation of a plan of reorganization is the principal objective of a Chapter 11 case. A plan of reorganization sets forth the means for satisfying claims against and interests in a debtor. Confirmation of a plan of reorganization by the Bankruptcy Court makes the plan binding upon the debtor, any issuer of securities under the plan, any person or entity acquiring property under the plan and any creditor of or equity security holder in the debtor, whether or not such creditor or equity security holder (i) is impaired under or has accepted the plan or (ii) receives or retains any property under the plan. Subject to certain limited exceptions and other than as provided in the plan itself or the confirmation order, the confirmation order discharges the debtor from any debt that arose prior to the date of confirmation of the plan and substitutes therefore the obligations specified under the confirmed plan, and terminates all rights and interests of equity security holders.

THE REMAINDER OF THIS SECTION PROVIDES A SUMMARY OF THE STRUCTURE OF THE PLAN OF REORGANIZATION, AND OF THE CLASSIFICATION AND TREATMENT OF CLAIMS AND EQUITY INTERESTS UNDER THE PLAN OF REORGANIZATION, AND IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE PLAN OF REORGANIZATION (AS WELL AS THE EXHIBITS THERETO AND DEFINITIONS THEREIN), WHICH IS ANNEXED TO THIS OFFERING MEMORANDUM AND DISCLOSURE STATEMENT AS <u>APPENDIX A</u>.

THE STATEMENTS CONTAINED IN THIS OFFERING MEMORANDUM AND DISCLOSURE STATEMENT INCLUDE SUMMARIES OF THE PROVISIONS CONTAINED IN THE PLAN OF REORGANIZATION AND IN DOCUMENTS REFERRED TO THEREIN. THE STATEMENTS CONTAINED IN THIS OFFERING MEMORANDUM AND DISCLOSURE STATEMENT DO NOT PURPORT TO BE PRECISE OR COMPLETE STATEMENTS OF ALL THE TERMS AND PROVISIONS OF THE PLAN OF REORGANIZATION OR DOCUMENTS REFERRED TO THEREIN, AND REFERENCE IS MADE TO THE PLAN OF REORGANIZATION AND TO SUCH DOCUMENTS FOR THE FULL AND COMPLETE STATEMENTS OF SUCH TERMS AND PROVISIONS.

THE PLAN OF REORGANIZATION ITSELF AND THE DOCUMENTS REFERRED TO THEREIN CONTROL THE ACTUAL TREATMENT OF CLAIMS AGAINST AND EQUITY INTERESTS IN THE DEBTORS UNDER THE PLAN OF REORGANIZATION AND WILL, UPON OCCURRENCE OF THE EFFECTIVE DATE, BE BINDING UPON ALL HOLDERS OF CLAIMS AGAINST AND EQUITY INTERESTS

IN THE DEBTORS, THE ESTATES, THE REORGANIZED DEBTORS, ALL PARTIES RECEIVING PROPERTY UNDER THE PLAN OF REORGANIZATION AND OTHER PARTIES IN INTEREST. IN THE EVENT OF ANY CONFLICT BETWEEN THIS OFFERING MEMORANDUM AND DISCLOSURE STATEMENT, ON THE ONE HAND, AND THE PLAN OF REORGANIZATION, OR ANY OTHER OPERATIVE DOCUMENT, ON THE OTHER HAND, THE TERMS OF THE PLAN OF REORGANIZATION OR SUCH OTHER OPERATIVE DOCUMENT(S) WILL CONTROL.

**Creditors Entitled to Vote**

As more fully described below, the Plan of Reorganization designates separate classes of Claims against and Interests in the Debtors (other than Administrative Claims and Priority Tax Claims). Holders of Class 2 Claims, which Class is comprised of Existing Senior Secured Notes Claims and Class 3 Claims, which Class is comprised of Existing Convertible Notes Claims, would be Impaired under the Plan of Reorganization and only the votes of such Classes will be solicited. Holders of Class 7 Interests, which Class is comprised of Existing Roust Interests, would be Impaired under the Plan of Reorganization, would not be entitled to vote to accept or reject the Plan of Reorganization, and would be deemed to have rejected the Plan of Reorganization. In addition to holders of Administrative Claims and Priority Tax Claims (which are not classified under the Plan of Reorganization), holders of Class 1 Priority Non-Tax Claims, Class 4 Other Secured Claims, Class 5 General Unsecured Claims, Class 6 Intercompany Claims, and Class 8 Intercompany Interests are Unimpaired by the Plan of Reorganization, would not be entitled to vote to accept or reject the Plan of Reorganization, and would be deemed to have accepted the Plan of Reorganization.

Bankruptcy Rule 3018(b) prescribes the conditions that must be satisfied to count the ballots solicited with respect to a plan of reorganization prior to the commencement of a Chapter 11 case. Bankruptcy Rule 3018(b) requires that (i) the Chapter 11 plan of reorganization must have been disseminated to substantially all impaired creditors and equity security holders in the classes entitled to vote, (ii) the time prescribed for voting on the plan of reorganization must be sufficient and (iii) the solicitation must have been conducted in accordance with section 1126(b) of the Bankruptcy Code, which requires compliance with all applicable non-bankruptcy laws, rules, or regulations or, if there are no such applicable laws, rules or regulations, that the disclosure with respect to the plan of reorganization contains "adequate information" as defined in section 1125(a) of the Bankruptcy Code. Section 1125(a)(1) defines "adequate information" as information of a kind and in sufficient detail as far as is reasonably practicable in light of the nature and history of a company and the condition of such company's books and records, as would enable a hypothetical reasonable investor typical of holders of claims or equity interests of the relevant class to make an informed judgment about the plan of reorganization. We believe that all of the requirements of Bankruptcy Rule 3018(b) would be satisfied in the event that we sought confirmation of the Plan of Reorganization.

**Certain Matters Regarding Classification and Treatment of Claims and Interests**

Section 1123 of the Bankruptcy Code provides that a plan of reorganization must classify the claims and interests of a debtor's creditors and equity interest holders. As described above, the Plan of Reorganization divides Claims and Interests into Classes and sets forth the treatment for each Class (other than Administrative Claims and Priority Tax Claims which, pursuant to section 1123(a)(1), need not and have not been classified). We believe that the Plan of Reorganization has classified all Claims and Interests in compliance with the provisions of section 1122 of the Bankruptcy Code, which requires that Classes contain Claims and Interests that are substantially similar to the other Claims and Interests in such Classes if the Chapter 11 Cases were to be commenced.

It is possible, however, that a holder of a Claim or Interest may challenge our classification of Claims and Interests and that the Bankruptcy Court may find that a different classification is required for the Plan of Reorganization to be confirmed. In that event, we would intend, to the extent permitted by the Bankruptcy Code, the Plan of Reorganization and the Bankruptcy Court, to make such reasonable modifications of the classifications through the Plan of Reorganization to permit confirmation and to use the acceptances of the Plan of Reorganization that are marked on the Ballots received in this Solicitation Package for the purpose of obtaining the approval of the reconstituted Class or Classes of which each accepting holder ultimately would be deemed to be a member. Any such reclassification could adversely affect the Class in which such holder initially was a member, or any other Class in the Plan of Reorganization, by changing the composition of such Class and the vote required of that Class for approval of the Plan of Reorganization. Furthermore, a reclassification of a Claim or Interest after approval of the Plan of Reorganization could necessitate a resolicitation of acceptances of the Plan of Reorganization.

We believe that the consideration, if any, that would be provided through the Plan of Reorganization to holders of Claims and Interests would reflect an appropriate resolution of their Claims and Interests, and would take into account the differing nature and priority (including applicable contractual subordination) of such Claims and Interests. The Bankruptcy Court would be required to find, however, that a number of statutory tests are met before it could confirm the Plan of Reorganization. Many of these tests are designed to protect the interests of holders of Claims or Interests who would not be entitled to vote on the Plan of Reorganization, or would not vote to accept the Plan of Reorganization, but who would be bound by the provisions of the Plan of Reorganization if it were confirmed by the Bankruptcy Court.

**The Confirmation Hearing**

When the Debtors commence the anticipated Chapter 11 Cases, the Bankruptcy Court will schedule a hearing on the confirmation of the Plan of Reorganization. If Chapter 11 Cases are commenced, it is anticipated that a hearing will be held on January 6, 2017 at 10:00 a.m. (prevailing Eastern time), before the Honorable Robert D. Drain in the United States Bankruptcy Court for the Southern District of New York, White Plains, to consider (i) the adequacy of the information contained in this Offering Memorandum and Disclosure Statement and (ii) confirmation of the Plan. At the Confirmation Hearing, the Bankruptcy Court would consider whether the Plan of Reorganization satisfies the various requirements of the Bankruptcy Code, including whether the Plan of Reorganization is feasible and whether the Plan of Reorganization is in the best interests of the holders of Claims against and Interests in the Debtors. At that time, the Debtors would submit a report to the Bankruptcy Court concerning the votes for acceptance or rejection of the Plan of Reorganization by the parties entitled to vote thereon

Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to confirmation of the Plan of Reorganization. Any objections to the adequacy of the Disclosure Statement or confirmation of the Plan must (a) be in writing; (b) comply with the Bankruptcy Rules, the Local Bankruptcy Rules and other case management rules and orders of the Court; (c) set forth the name of the objector, and the nature and amount of any claim or interest asserted by the objector against the estate or property of the Debtors; (d) state with particularity the legal and factual basis for such objection; (e) be filed with the Clerk of the United States Bankruptcy Court for the Southern District of New York, together with proof of service thereof; and (f) be served by personal service or by overnight delivery, so as to be ACTUALLY RECEIVED no later than 4:00 p.m. (prevailing Eastern time) on December 30, 2016 by (i) the Debtors, Roust Corporation, 777 Westchester Avenue, Suite 101, White Plains, New York 10604, Attn: Grant Winterton; (ii) counsel to the Debtors, Skadden, Arps, Slate, Meagher & Flom LLP, Four Times Square, New York, New York 10036, Attn: Jay Goffman, Esq. (Jay.Goffman@skadden.com), Mark A. McDermott, Esq. (Mark.McDermott@skadden.com) and Raquelle L. Kaye, Esq. (Raquelle.Kaye@skadden.com); (iii) the Office of the United States Trustee for the Southern District of New York, Office of the United States Trustee for Region 2, 201 Varick Street, Suite 1006, New York, New York 10014, Attn: Linda A. Riffkin; (iv) counsel for the Existing Senior Secured Notes Steering Committee, Kirkland & Ellis LLP, 601 Lexington Avenue, New York, New York 10022, Attn: Paul Basta, P.C. (pbasta@kirkland.com) and Robert Britton, Esq. (Robert.Britton@kirkland.com); (v) counsel for the Existing Convertible Notes Steering Committee, Cadwalader, Wickersham & Taft LLP, Dashwood House, 69 Old Broad Street, London EC2M 1QS, United Kingdom, Attn: Richard L. Nevins, Esq. (Richard.Nevins@cwt.com) and Gregory Petrick, Esq. (Gregory.Petrick@cwt.com); (vi) the Russian Standard Parties, World Trade Center, Office 1507, Krasnopresnenskaya Emb., 12, Moscow 123610, Russia, Attn: Dmitry Gultsev and Sergey Berestovoy; (vii) the indenture trustee, U.S. Bank National Association, 100 Wall Street, Suite 1600, New York, New York 10005 Attn: Beverly Freeney; (viii) the Polish Security Agent, Deutsche Bank AG, London Branch, Winchester Street, London EC2N 2DB, United Kingdom, Attn: Trust and Security Servic; (ix) the security agent, TMF Trustee Limited, Fifth Floor, 6 ST. Andrew Street, London, EC4A 3AE, United Kingdom, Attn: The Directors.

If the chapter 11 cases are commenced, any objections received by the Debtors will be forwarded to the Bankruptcy Court and the Debtors' top twenty (20) largest creditors listed on each of their bankruptcy petitions and be filed on the Bankruptcy Court's docket by the Debtors immediately upon the filing of such chapter 11 cases. Unless an objection to confirmation is timely served and filed, it may not be considered by the Bankruptcy Court.

At the Confirmation Hearing, the Bankruptcy Court could confirm the Plan of Reorganization only if all of the requirements of section 1129 of the Bankruptcy Code are met. Among the requirements for confirmation of a plan of reorganization are that the plan is (i) accepted by all impaired classes of claims and equity interests or, if rejected by an impaired class, that the plan "does not discriminate unfairly" and is "fair and equitable" as to such

class, (ii) feasible and (iii) in the "best interests" of creditors and interest holders that are impaired under the plan of reorganization.

## MATERIAL TERMS OF THE PLAN OF REORGANIZATION

This summary of material terms does not include all of the terms provided under the Plan of Reorganization. You should review the Plan of Reorganization in its entirety for a full description of terms and treatment. In the event of any inconsistencies between this summary and the Plan of Reorganization, the Plan of Reorganization will control. Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Plan.

### Treatment of Unclassified Claims

### Administrative Claims

Except with respect to Administrative Claims that are Claims for Accrued Professional Compensation, each holder of an Allowed Administrative Claim shall receive, in full satisfaction, settlement, release and discharge of and in exchange for its Administrative Claim, Cash equal to the unpaid portion of its Allowed Administrative Claim on the latest of (i) the first Distribution Date, (ii) the date on which its Administrative Claim becomes an Allowed Administrative Claim, (iii) the date on which its Administrative Claim becomes payable under any agreement with the Debtors relating thereto, (iv) in respect of liabilities incurred in the ordinary course of business, the date upon which such liabilities are payable in the ordinary course of the Debtors' business, consistent with past practice, or (v) such other date as may be agreed upon between the holder of such Allowed Administrative Claim and the Debtors or the Reorganized Debtors, as the case may be.

### Priority Tax Claims

The legal and equitable rights of the holders of Priority Tax Claims are Unimpaired by the Plan of Reorganization. Unless the holder of such Claim and the Debtors agree to a different treatment, on the Effective Date, each holder of an Allowed Priority Tax Claim shall have its Claim Reinstated. We do not believe we have any Priority Tax Claims.

### Classification and Treatment of Claims and Interests

#### *Summary of Classified Claims and Interests*

| Class | Impaired/Unimpaired; Entitlement to Vote |
|---|---|
| Class 1—Priority Non-Tax Claims | Unimpaired—Conclusively presumed to have accepted the Plan of Reorganization and, therefore, not entitled to vote |
| Class 2—Existing Senior Secured Notes Claims | Impaired—Entitled to vote |
| Class 3—Existing Convertible Notes Claims | Impaired—Entitled to vote |
| Class 4—Other Secured Claims | Unimpaired—Conclusively presumed to have accepted the Plan of Reorganization and, therefore, not entitled to vote |
| Class 5—General Unsecured Claims | Unimpaired—Conclusively presumed to have accepted the Plan of Reorganization and, therefore, not entitled to vote |
| Class 6—Intercompany Claims | Unimpaired—Conclusively presumed to have accepted the Plan of Reorganization and, therefore, not entitled to vote |
| Class 7—Existing Roust Interests | Impaired—Conclusively presumed to have rejected the Plan of Reorganization and, therefore, not entitled to vote |
| Class 8—Intercompany Interests | Unimpaired—Conclusively presumed to have accepted the Plan of Reorganization and, therefore, not entitled to vote |

#### *Acceptance by Impaired Classes*

Impaired Classes 2 and 3 shall have accepted the Plan of Reorganization if (i) the holders of at least two-thirds in amount of the Allowed Claims actually voting in such classes have voted to accept the Plan of Reorganization and (ii) the holders of more than one-half in number of the Allowed Claims actually voting in such

classes have voted to accept the Plan of Reorganization, in each case not counting the vote of any holder designated under section 1126(e) of the Bankruptcy Code as having been cast in bad faith.

### *Treatment of Classes*

Pursuant to the terms of the Plan of Reorganization, each of the holders of Claims and Interests in Classes 1 through 8 will receive the treatment described below.

Class 1—Priority Non-Tax Claims

*Treatment*: Unless the holder of such Claim and the Debtors agree to a different treatment, on the Effective Date, each holder of an Allowed Priority Non-Tax Claim shall have its Claim Reinstated.

Class 2—Existing Senior Secured Notes Claims

*Treatment*: On the Effective Date, or as soon as reasonably practicable thereafter, except to the extent that a holder of an Existing Senior Secured Notes Claim and the Debtors agree to less favorable treatment, each holder of an Allowed Existing Senior Secured Notes Claim shall receive its pro rata share of and interests in (i) the New Senior Secured Notes, (ii) $20 million in Cash, (iii) the right to participate in the Share Placement pursuant to the Subscription Priority Scheme, and (iv) the Existing Senior Secured Notes Equity Allocation and/or the proceeds of the Existing Senior Secured Notes Equity Subscription, if any.

A holder of Senior Secured Notes Claims that submits its Existing Senior Secured Notes for cancellation by Deposit or Withdrawal At Custodian ("*DWAC*") withdrawal by five business days prior to the anticipated Effective Date in accordance with the required procedures shall receive its pro rata distribution of Cash and Existing Senior Secured Notes Equity Allocation on the Effective Date, and its pro rata distribution of the New Senior Secured Notes will be made available for DWAC deposit by such holder of Existing Senior Secured Notes Claims on the Effective Date. Any confirmed holder of an Existing Senior Secured Notes Claim may designate any related party in which it or any of its affiliates (and/or any affiliate that is wholly-owned by any of such holder's affiliates) has a current or contingent interest that is not an Industry Competitor (an "*Equity Transferee*"), to receive all or any part of its Existing Senior Secured Notes Equity Allocation or to receive all or any part of any shares it subscribes to in connection with the Share Placement by providing written notice to the Debtors, no later than three (3) business days prior to the Effective Date, subject to confirmation following the distribution of Cash and New Senior Secured Notes through The Depository Trust Company ("*DTC*") by such holder's DTC participant of the amount of Existing Senior Secured Notes held by such holder as of the Distribution Date; and provided, that such Equity Transferee becomes a party to the Investor Rights Agreement.

As described further in Article IX.C of the Plan, each holder of an Allowed Existing Senior Secured Notes Claim shall be deemed to have conclusively, absolutely, unconditionally, irrevocably and forever, released and discharged the Non-Debtor Affiliates from any and all Claims, Interests, obligations, rights, suits, damages, Causes of Action, remedies and liabilities whatsoever, whether known or unknown, direct or indirect, foreseen or unforeseen, existing or hereafter arising, that relate to guarantees of the Existing Senior Secured Notes, and any collateral of Non-Debtor Affiliates securing the Existing Notes upon the occurrence of the Effective Date, except as otherwise set forth in the Plan.

Class 3—Existing Convertible Notes Claims

*Treatment*: On the Effective Date, or as soon as reasonably practicable thereafter, except to the extent that a holder of an Existing Convertible Notes Claim and the Debtors agree to less favorable treatment, each holder of an Allowed Existing Convertible Notes Claim shall receive its pro rata share of and interests in (i) the Existing Convertible Notes Equity Allocation; (ii) the Additional Convertible Notes Equity Allocation; (iii) the right to participate in the Share Placement pursuant to the Subscription Priority Scheme; and (iv) the right to participate in the Existing Senior Secured Notes Equity Subscription.

As described further in Article IX.C of the Plan, each holder of an Allowed Existing Convertible Notes Claim shall be deemed to have conclusively, absolutely, unconditionally, irrevocably and forever, released and discharged the Non-Debtor Affiliates from any and all Claims, Interests, obligations, rights, suits, damages, Causes

of Action, remedies and liabilities whatsoever, whether known or unknown, direct or indirect, foreseen or unforeseen, existing or hereafter arising, that relate to guarantees of the Existing Convertible Notes, and any collateral of Non-Debtor Affiliates securing the Existing Notes upon the occurrence of the Effective Date, except as otherwise set forth in the Plan.

Class 4—Other Secured Claims

*Treatment*: On the Effective Date, or as soon as reasonably practicable thereafter, except to the extent that a holder of an Other Secured Claim and the Debtors agree to a less favorable treatment, each holder of an Allowed Other Secured Claim shall have its Claim Reinstated. Other Secured Claims will not be impaired by the Plan.

Class 5—General Unsecured Claims.

*Treatment*: On the Effective Date, or as soon as reasonably practicable thereafter, except to the extent that the holder of such Claim and the Debtors agree to different treatment, each holder of an Allowed General Unsecured Claim shall have its Claim Reinstated; *provided*, *however*, that all Allowed General Unsecured Claims arising from the rejection of the Debtors' Executory Contracts or Unexpired Leases, if any, as set forth in Article VI of the Plan shall be paid the full amount of such Allowed Claim in Cash.

Class 6—Intercompany Claims.

*Treatment*: On the Effective Date, or as soon as reasonably practicable thereafter, all Allowed Intercompany Claims shall, at the election of the Reorganized Debtors and the Steering Committees, be either (a) Reinstated, subject to express contractual subordination to the New Senior Secured Notes, (b) released, waived, and discharged, (c) treated as a dividend, or (d) contributed to capital or exchanged for equity. A schedule setting forth the treatment of the Intercompany Claims shall be included in the Plan Supplement.

Class 7—Existing Roust Interests.

*Treatment*: On the Effective Date, all Existing Roust Interests shall be deemed automatically cancelled without further action by the Debtors or the Reorganized Debtors and the obligations of the Debtors and Reorganized Debtors thereunder shall be discharged. Holders of Existing Roust Interests shall receive no property under the Plan on account of such Interests.

Class 8—Intercompany Interests.

*Treatment*: On the Effective Date, all Intercompany Interests shall be Reinstated and rendered Unimpaired in accordance with section 1124 of the Bankruptcy Code.

### Special Provision Governing Unimpaired Claims

Except as otherwise provided in the Plan, nothing under the Plan will affect the Debtors' rights in respect of any Unimpaired Claims, including, without limitation, all rights in respect of legal and equitable defenses to or setoffs or recoupments against any such Unimpaired Claims, including the right to Cure any arrearages or defaults that may exist with respect to contracts to be assumed under the Plan.

### Discharge of Claims

Except as otherwise provided in the Plan, and effective as of the Effective Date: (i) the rights afforded herein and the treatment of all Claims herein will be in exchange for and in complete satisfaction, settlement, discharge, and release of all Claims of any nature whatsoever, including any interest accrued on such Claims from and after the Petition Date, against the Debtors or any of their assets, property, or Estates; (ii) the Plan will bind all holders of Claims, notwithstanding whether any such holders abstained from voting to accept or reject the Plan or voted to reject the Plan; (iii) all Claims will be satisfied, discharged, and released in full, and the Debtors' liability with respect thereto will be extinguished completely, including any liability of the kind specified under section 502(g) of the Bankruptcy Code; and (iv) except as otherwise expressly provided for in the Plan, all entities will be precluded from asserting against, derivatively on behalf of, or through, the Debtors, the Debtors' Estates, the Reorganized Debtors, each of their successors and assigns, and each of their assets and properties, any other Claims

based upon any documents, instruments or any act or omission, transaction, or other activity of any kind or nature that occurred prior to the Effective Date.

## Means of Implementation of the Plan of Reorganization

### Sources of Consideration for Plan Distributions

#### *Cash Consideration*

All Cash consideration necessary for the Reorganized Debtors to make payments or distributions to the holders of Existing Senior Secured Notes Claims under Article III.C.2 of the Plan shall be obtained from the Share Placement, the Existing Senior Secured Notes Equity Subscription and other Cash on hand of the Debtors, including Cash derived from business operations. Further, the Debtors and the Reorganized Debtors, as the case may be, will be entitled to transfer funds from Non-Debtor Affiliates, in consultation with the Steering Committees as they determine to be necessary or appropriate to enable the Reorganized Debtors to satisfy their obligations under the Plan. Except as set forth in the Plan, any changes in intercompany account balances resulting from such transfers will be accounted for and settled in accordance with the Debtors' historical intercompany account settlement practices and will not violate or otherwise be affected by the terms of the Plan.

#### *New Securities*

On the Effective Date or as soon as practicable thereafter, Reorganized Roust shall issue or cause to be issued (i) 3,020,661 shares of series B New Common Stock for distribution of the Existing Senior Secured Notes Equity Allocation to holders of Allowed Existing Senior Secured Notes Claims and/or, if applicable up to 3,020,661 shares of series C New Common Stock for distribution to holders of Allowed Existing Convertible Notes Claims that have participated in the Existing Senior Secured Notes Equity Subscription, (ii) 2,648,090 shares of series C New Common Stock for distribution of the Existing Convertible Notes Equity Allocation to the holders of Allowed Existing Convertible Notes Claims, (iii) 250,000 shares of series C New Common Stock in connection with the Additional Convertible Notes Equity Allocation; (iv) 14,260,217 shares of series A New Common Stock in connection with the Russian Standard Parties Equity Allocation, (v) 5,775 shares of series B New Common Stock and 57,747 shares of series C New Common Stock in connection with the Backstop Commitment Fee, (vi) 3,257,510 shares of New Common Stock in connection with the Share Placement (to be issued as series A New Common Stock, series B New Common Stock and series C New Common Stock, as applicable), (vii) 1,500,000 shares of New Common Stock in connection with the Additional Share Placement Equity Allocation (to be issued as series A New Common Stock, series B New Common Stock and series C New Common Stock, as applicable), and (viii) the New Senior Secured Notes in partial exchange for the Existing Senior Secured Notes. Shares of New Common Stock issued and outstanding on the Effective Date are subject to dilution on account of the MIP. All of the shares of New Common Stock issued pursuant to the Plan shall be duly authorized, validly issued, fully paid and nonassessable. Reorganized Roust's certificate of incorporation will provide for the issuance of three series of New Common Stock. Series A New Common Stock will be issued to the Russian Standard Parties. Series B New Common Stock will be issued to the Existing Senior Secured Noteholders. Series C New Common Stock will be issued to the Existing Convertible Noteholders. All series of New Common Stock will have the same voting rights, provided that pursuant to the Investor Rights Agreement, the holders of series A New Common Stock will have the right to appoint three directors, the holders of series B New Common Stock will have the right to appoint one director, and the holders of series C New Common Stock will have the right to appoint one director, as set forth in Article V.D. of the Plan.

Each distribution and issuance referred to in Article VII shall be governed by the terms and conditions set forth in the Plan applicable to such distribution or issuance and by the terms and conditions of the instruments evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Person receiving such distribution or issuance. Notwithstanding the Effective Date, the New Senior Secured Notes shall accrue interest from January 1, 2017, in accordance with the terms of the indenture governing the New Senior Secured Notes.

**Cancellation of Securities and Agreements**

Except as otherwise specifically provided for in the Plan, on the Effective Date: (1) all purchase rights, instruments, guarantees, certificates, warrants, options, puts, agreements, and other documents evidencing the Existing Roust Interests, and any other Interests in the Debtors (except as provided in Article III.C of the Plan) shall be deemed cancelled, and the obligations of the Debtors thereunder and in any way related thereto shall be fully satisfied, released, and discharged, (2)(i) all indentures, notes, bonds, purchase rights, instruments, guarantees, certificates, warrants, options, puts, agreements, pledges security documents, and other documents evidencing the Existing Senior Secured Notes and the guarantees and security relating thereto including the Existing Senior Secured Notes Indenture shall be deemed cancelled, and the obligations of the Debtors thereunder and in any way related thereto shall be fully satisfied, released, and discharged, and (ii) the Existing Senior Secured Notes Indenture trustee shall mark the Global Notes (as defined in the Existing Senior Secured Notes Indenture) cancelled and deliver such cancelled Global Notes to Reorganized Roust, and (3)(i) all indentures, notes, bonds, purchase rights, instruments, guarantees, certificates, warrants, options, puts, agreements, pledges security documents and other documents evidencing the Existing Convertible Notes and the guarantees and security relating thereto including the Existing Convertible Notes Indenture shall be deemed cancelled, and the obligations of the Debtors thereunder and in any way related thereto shall be fully satisfied, released, and discharged, and (ii) the Existing Convertible Notes Indenture trustee shall mark the Global Notes (as defined in the Existing Convertible Notes Indenture) cancelled and deliver such cancelled Global Notes to Reorganized Roust; provided, however, that notwithstanding Confirmation or the occurrence of the Effective Date, the Existing Notes Indentures or other agreement that governs the rights of the holders of a Claim shall continue in effect solely for purposes of (a) allowing holders of Existing Notes to receive distributions under the Plan as provided therein, and (b) allowing the Indenture trustees, if applicable, to make distributions under the Plan as provided therein; provided further, however, that the preceding proviso shall not affect the discharge of Claims pursuant to the Bankruptcy Code, the Confirmation Order or the Plan, or result in any expense or liability to the Reorganized Debtors, except to the extent set forth in or provided for under the Plan; provided further, however, that the cancellation of indentures, notes, instruments, guarantees, certificates, and other documents hereunder shall not itself alter the obligations or rights among third parties (apart from the Debtors, the Reorganized Debtors, and the Non-Debtor Affiliates). Upon cancellation of the Existing Notes Indentures, all duties and responsibilities of the Existing Senior Secured Notes Indenture trustee under the Existing Senior Secured Notes Indenture and the Existing Convertible Notes Indenture trustee under the Existing Convertible Notes Indenture, respectively, shall be discharged except to the extent required in order to effectuate the Plan.

**Section 1145 Exemption**

The issuance of the New Senior Secured Notes, including the guarantees thereto, shall be made pursuant to Section 4(a)(2) of the Securities Act of 1933 (the "*Securities Act*"), as amended, or Regulation S under the Securities Act and the New Common Stock distributed to creditors on account of their Claims shall be authorized under section 1145 of the Bankruptcy Code as of the Effective Date without further act or action by any person, unless required by provisions of the relevant corporate documents or applicable law, regulation, order or rule, and shall thereby be exempt from the requirements of section 5 of the Securities Act and any state or local laws requiring registration for the offer and sale of a security, and all documents evidencing the same shall be executed and delivered as provided for in the Plan or the Plan Supplement. New Common Stock issued pursuant to the Share Placement will be exempt from registration pursuant to section 1145 of the Bankruptcy Code to the extent permitted or under the Securities Act by virtue of Section 4(a)(2) thereof and Regulation D promulgated thereunder or pursuant to the safe harbor provided by Regulation S under the Securities Act.  To the extent that the New Senior Secured Notes and New Common Stock being issued in the Share Placement is issued in reliance on Section 4(a)(2) of the Securities Act, such securities will constitute "restricted securities" within the meaning of Rule 144 under the Securities Act and accordingly may not be offered, sold, resold, pledged, delivered, allotted or otherwise transferred except in transactions that are exempt from, or in transactions not subject to, the registration requirements of the Securities Act and in compliance with any applicable state securities laws, and such New Senior Secured Notes and shares of New Common Stock shall bear a legend restricting their transferability until no longer required under applicable requirements of the Securities Act and state securities laws.

**Reorganized Debtors' Boards of Directors**

On the Effective Date, the board of directors of Reorganized Roust shall consist of 5 members: (i) three directors appointed by the Russian Standard Parties and (ii) the Minority Directors. The Senior Minority Director

will be appointed by the Existing Senior Secured Notes Steering Committee and the Junior Minority Director will be appointed by the Existing Convertible Notes Steering Committee.

Board of directors meetings for Reorganized Roust must occur at least quarterly and must be in London or New York, unless the Minority Directors agree to a different venue. Two Business Days' written notice must be provided for telephonic meetings of the board of directors of Reorganized Roust and one week's written notice must be provided for in-person meetings of the board of directors of Reorganized Roust. If a Minority Director is not present for a meeting of the board of directors of Reorganized Roust, despite notice being provided, the meeting can proceed. Notice requirements for meetings of the board of directors of Reorganized Roust can be waived by unanimous approval of the Minority Directors.

A quorum for any board meeting or board matter with respect to Reorganized Roust must include both Minority Directors. At least one Minority Director shall serve on each committee of the board of Reorganized Roust and such director must be present for a quorum of such committee. The Minority Directors shall serve on a committee to be charged with the Exit Event process. Such committee must report to the board of directors of Reorganized Roust and final decisions with respect to an Exit Event will be made by the board of directors of Reorganized Roust.

For as long as the Russian Standard Parties maintain at least 45.0% of the fully diluted equity, representatives of the Russian Standard Parties shall have the right to appoint the majority of the members of the board of directors. For as long as the Russian Standard Parties hold less than 45.0%, but more than 30.0% of the fully diluted equity, the Russian Standard Parties shall have the right to appoint two members of the board of directors. The identities of the members of the new boards of each of the Reorganized Debtors shall be identified in the Plan Supplement or in a filing with the Bankruptcy Court at or prior to the Confirmation Hearing. Each member of the new board of Reorganized Roust will serve from and after the Effective Date pursuant to applicable law and the terms of the Corporate Governance Documents.

A Minority Director may be replaced by the vote or written action of 66 2/3% of shares entitled to appoint such member. Any meeting for the purpose of replacing a Minority Director may be called by 20% of the shares entitled to vote at such meeting. For the avoidance of doubt, the Senior Minority Director cannot be removed without approval of the holders of Existing Senior Secured Notes and the Junior Minority Director cannot be removed without approval of the holders of the Existing Convertible Notes.

The terms governing the board of directors of Reorganized Roust, including certain requirements for Reserved Matters, are set forth in the Corporate Governance Documents and the indenture and related documentation governing the New Senior Secured Notes.

## Governance Documents and Corporate Existence

On the Effective Date, the Corporate Governance Documents of the Debtors shall be amended or filed, as appropriate, in a form as may be required to be consistent with the provisions of the Plan and the Bankruptcy Code (including, without limitation, section 1123(a)(6) of the Bankruptcy Code) and shall be included in the Plan Supplement. The terms of such documents shall be substantially the same as described in the Disclosure Statement with such changes as may be collectively approved among the relevant Debtors, the Russian Standard Parties, the Existing Senior Secured Notes Steering Committee and the Existing Convertible Notes Steering Committee. Any such amended Corporate Governance Documents will be filed by the Reorganized Debtors with the applicable Secretaries of State and/or other applicable authorities in their respective state of formation or incorporation in accordance with the corporate or the business entity laws of such state on the Effective Date or as soon as practicable thereafter.

## Vesting of Assets in the Reorganized Debtors

Except as otherwise provided in the Plan or any agreement, instrument or other document incorporated therein, on the Effective Date, all property in each Estate and all Causes of Action (except those released pursuant to the releases by the Debtors) shall vest in each respective Reorganized Debtor, free and clear of all Liens, Claims, charges or other encumbrances. On and after the Effective Date, except as otherwise provided in the Plan, the Reorganized Debtors may operate their businesses and may use, acquire or dispose of property and compromise or

186

settle any Claims, Interests or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

**Russian Standard Parties' Contributions**

On the Effective Date, the Russian Standard Parties will make the Russian Standard Parties' Contributions in exchange for the Russian Standard Parties Equity Allocation. As part of the consideration for the Russian Standard Parties' Contributions, the RTL Debt will be deemed repaid in full. For the avoidance of doubt, upon the completion of the RSV Contribution, all intellectual property and trademarks relating to, but not limited to, distilleries managed by and brands sold by Reorganized Roust (the "*IP*") will be the sole property of the Reorganized Roust group. IP shall be broadly construed and no IP shall be held outside the Reorganized Roust group in any capacity, including either individually by Roustam Tariko or by any of his affiliated entities.

**Share Placement**

*The Share Placement Subscription*

A total of 3,257,510 shares of New Common Stock equal to 13.03% of the New Common Stock issued and outstanding as of the Effective Date, subject to dilution on account of the MIP, shall be issued in exchange for $55 million in cash at a subscription price of $16.88 per share in accordance with the following Subscription Priority Scheme:

(i)    the Consenting Senior Secured Noteholders shall have the right to subscribe to up to their pro rata share of 296,137 series B shares for a total of $5 million;

(ii)    each holder of an Existing Convertible Notes Claim shall have the right to subscribe to up to its pro rata share of 2,961,373 series C shares for a total of $50 million, plus any shares left unsubscribed pursuant to (i);

(iii)    in the event the Share Placement is not fully subscribed per (i) and (ii), the Russian Standard Parties shall have the right to subscribe for the unplaced shares up to an additional 296,137 series A shares for a total of $5 million pursuant to the Co-Investment Right;

(iv)    to the extent the Share Placement is not fully subscribed pursuant to (i), (ii) and (iii), then (a) the Russian Standard Parties shall have the right to subscribe to 50% of the remaining unplaced shares (in the form of series A shares), subject to the maximum number of shares imposed by the Co-Investment Right, and (b) each Backstop Convertible Noteholder shall have the right to subscribe to up to 50% of the remaining unplaced shares (in the form of series C shares), provided that in the event of oversubscription (x) the unplaced shares shall be allocated pro rata (for the purpose of this subclause (iv), pro rata shall be based on the respective commitments of the Backstop Convertible Noteholders as set forth in the Backstop Agreement) and (y) if a Backstop Convertible Noteholder subscribes to less than its maximum pro rata allocation the difference (between what such Backstop Convertible Noteholder subscribed to and what it was entitled to subscribe to) shall be made available to the remaining Backstop Convertible Noteholders pro rata. To the extent any unplaced shares remain after (y), the obligation in (y) shall repeat until the maximum pro rata allocation available to each Backstop Convertible Noteholder under this subclause (iv) has either been fully allocated (to the relevant Backstop Convertible Noteholder or to the Backstop Convertible Noteholders) or been made available to the Backstop Convertible Noteholders and been left unsubscribed;

(v)    to the extent the Share Placement is not fully subscribed pursuant to (i), (ii), (iii) and (iv), each holder of an Existing Convertible Notes Claim shall have the right to subscribe to the remaining unplaced shares (in the form of series C shares), provided that in the event of oversubscription (x) each holder of an Existing Convertible Notes Claim shall have the right to subscribe to up to its pro rata share of the unplaced shares and (y) if a holder of an Existing Convertible Notes Claim subscribes to less than its maximum pro rata allocation the difference (between what such Existing Convertible Noteholder subscribed to and what it was entitled to subscribe to) shall be made available to the remaining holders of Existing Convertible Notes Claims on a pro rata basis. To the extent any unplaced shares remain after (y), the obligation in (y) shall repeat until the maximum pro rata allocation available to each holder of an Existing Convertible Notes Claim under this subclause (v) has either been

187

fully allocated (to the relevant holder of Existing Convertible Notes Claims or to the holders of Existing Convertible Notes Claims) or been made available to the holders of Existing Convertible Notes Claims and been left unsubscribed;

(vi) to the extent the Share Placement is not fully subscribed per (i), (ii), (iii), (iv) and (v), each holder of an Existing Senior Secured Notes Claim shall have the right to subscribe to the remaining unplaced shares (in the form of series B shares), provided that in the event of oversubscription (x) each holder of an Existing Senior Secured Notes Claim shall have the right to subscribe to up to its pro rata share of the unplaced shares and (y) if a holder of Existing Senior Secured Notes Claims subscribes to less than its maximum pro rata allocation the difference (between what it subscribed to and what it was entitled to subscribe to) shall be made available to the remaining holders of Existing Senior Secured Notes Claims on a pro rata basis. To the extent any unplaced shares remain after (y), the obligation in (y) shall repeat until the maximum pro rata allocation available to each holder of Existing Senior Secured Notes Claims under this subclause (vi) has either been fully allocated (to the relevant holder of Existing Senior Secured Notes Claims or to the holders of Existing Senior Secured Notes Claims) or been made available to the holders of Existing Senior Secured Notes Claims and been left unsubscribed; and

(vii) to the extent the Share Placement is not fully subscribed per (i), (ii), (iii), (iv), (v), and (vi), any remaining unplaced shares shall be allocated to and purchased by the Backstop Noteholders (in the form of series B and series C shares, as applicable) in accordance with the Backstop Agreement.

All participants in the Share Placement shall receive their respective shares of the Additional Share Placement Equity Allocation.

### The Share Placement Backstop

The Backstop Noteholders have agreed to backstop the Share Placement in accordance with the terms of the Backstop Agreement in exchange for the Backstop Commitment Fee. Subject to the transfer restrictions set forth in the Backstop Agreement, each of the Backstop Noteholders shall be permitted to transfer its backstop commitment to another Backstop Noteholder or any related party in which it or any of its affiliates (and/or any affiliate that is wholly-owned by any of such holder's affiliates) has a current or contingent interest, provided, that in the event such related party or affiliate defaults on its backstop obligations, the original Backstop Noteholder shall remain liable.

### Existing Senior Secured Notes Equity Subscription

Pursuant to the Existing Senior Secured Notes Equity Subscription, each holder of Existing Convertible Notes Claims shall have the right to subscribe pro rata to the shares of New Common Stock issued in connection with the Existing Senior Secured Notes Equity Allocation at a subscription price of $25.98 per share. To the extent the Existing Senior Secured Notes Equity Subscription is not fully subscribed, each holder of an Existing Convertible Notes Claim that subscribed to shares of New Common Stock issued in connection with the Existing Senior Secured Notes Equity Allocation shall have the right to subscribe to up to its pro rata share of the unplaced shares of those holders of Existing Convertible Notes Claims who chose not to subscribe. For the avoidance of doubt, any shares subscribed to by the holders of Existing Convertible Notes Claims pursuant to the Existing Senior Secured Notes Equity Subscription shall be issued in the form of series C New Common Stock The proceeds of the Existing Senior Secured Notes Equity Subscription, if any, shall be distributed pro rata to holders of Existing Senior Secured Notes Claims.

## Co-Investment Right

The Russian Standard Parties shall have the Co-Investment Right in connection with the Share Placement in the priorities and dollar amounts specified in the Subscription Priority Scheme.

## Management Incentive Plan

On or after the Effective Date, the Reorganized Debtors shall implement the Management MIP for nominated members of management in the amount of up to 2.0% of all issued and outstanding New Common Stock

(in the form of series A New Common Stock) on a fully diluted basis vesting over a period of two to four years. If an Exit Event is completed by June 30, 2019, the lesser of (a) the remaining unvested MIP and (b) two-thirds of the MIP will vest in connection with such Exit Event. The specific form of and terms applicable to awards granted under the incentive plan for management, including vesting conditions, shall be determined by the new board of Reorganized Roust.

Separately, Roustam Tariko shall also receive a management incentive plan that includes the following: (i) 2.0% of the equity in Reorganized Roust on a fully diluted basis (in the form of series A New Common Stock) exercisable upon the occurrence of an Exit Event at a valuation of $250 million above Plan Value and (ii) 1.0% of additional equity in Reorganized Roust (in the form of series A New Common Stock) on a fully diluted basis for each $250 million of equity value created above the Initial Earn Out Equity Threshold on the Effective Date, up to a maximum of 3.0% of incremental equity on a fully diluted basis. The triggering of an Additional Earn Out Equity award shall be based on a 30-day volume weighted average price of the Reorganized Roust stock post-Exit Event. Roustam Tariko will be entitled to receive Additional Earn Out Equity until July 31, 2019. The RT Earn Out Equity shall expire if an Exit Event has not occurred by June 30, 2019.

**Supplemental Indentures and Collateral and Guarantee Release**

On and after the Effective Date, the following actions shall be deemed authorized and approved in all respects, without the need for further approval or agreement under the Existing Notes Indentures, or any further action by the directors or officers of the Debtors or the Reorganized Debtors, the Existing Notes Indenture trustees, any security agent under the Existing Notes Indentures, or otherwise and pursuant to entry of the Confirmation Order: (i) the Supplemental Indentures shall be and shall be deemed to be executed and effective in all regards and in accordance with their terms; (ii) the Collateral and Guarantee Release shall be and shall be deemed to be in effect; (iii) CEDC FinCo shall deliver notice to each of the Existing Notes Indenture trustees that it designates all Non-Debtor Affiliates as Unrestricted Subsidiaries (as defined in the Existing Senior Secured Notes Indenture and the Existing Convertible Notes Indenture, respectively) under each of the Existing Notes Indentures; and (iii) upon designation of such Non-Debtor Affiliates as Unrestricted Subsidiaries, the guarantees by such Unrestricted Subsidiaries of the Existing Notes shall be automatically released pursuant to each of the Existing Notes Indentures and all liens on assets of such Non-Debtor Affiliates designated as Unrestricted Subsidiaries that secure each of the Existing Notes shall be automatically released pursuant to each of the Existing Notes Indentures.

**Restructuring Transactions**

On the Effective Date or as soon as reasonably practicable thereafter, the Reorganized Debtors may take all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by or necessary to effectuate the Plan, including: (1) the execution and delivery of appropriate agreements or other documents of merger, consolidation, restructuring, conversion, disposition, transfer, dissolution or liquidation containing terms that are consistent with the terms of the Plan and that satisfy the requirements of applicable law and any other terms to which the applicable Persons may agree; (2) the execution and delivery of appropriate instruments of transfer, assignment, assumption or delegation of any asset, property, right, liability, debt or obligation on terms consistent with the terms of the Plan and having other terms for which the applicable Persons agree; (3) the filing of appropriate certificates or articles of incorporation or amendments thereof, reincorporation, merger, consolidation, conversion or dissolution pursuant to applicable law; and (4) all other actions that the applicable Persons determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law.

**Corporate Action**

Upon the Effective Date, all actions contemplated by the Plan shall be deemed authorized and approved in all respects, including (1) selection of the directors and officers of the Reorganized Debtors; and (2) all other actions contemplated by the Plan (whether to occur before, on or after the Effective Date). All matters provided for in the Plan involving the corporate structure of the Debtors or the Reorganized Debtors, and any corporate action required by the Debtors or the Reorganized Debtors in connection with the Plan shall be deemed to have occurred and shall be in effect, without any requirement of further action by the directors or officers of the Debtors or the Reorganized Debtors.

On or (as applicable) before the Effective Date, the appropriate officers of the Debtors or the Reorganized Debtors, as applicable, shall be authorized and directed to issue, execute and deliver the agreements, documents, securities, certificates of incorporation, operating agreements and instruments contemplated by the Plan (or necessary or desirable to effect the transactions contemplated by the Plan) in the name of and on behalf of the Reorganized Debtors. The authorizations and approvals contemplated by Article V of the Plan shall be effective notwithstanding any requirements under non-bankruptcy law.

**Effectuating Documents; Further Transactions**

On and after the Effective Date, the Reorganized Debtors and the officers and members of the board of directors thereof are authorized to issue, execute, deliver, file or record such contracts, securities, instruments, releases and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement and further evidence the terms and conditions of the Plan and the securities issued pursuant to the Plan in the name of and on behalf of the Reorganized Debtors, without the need for any approvals, authorization or consents except for those expressly required pursuant to the Plan.

**Section 1146 Exemption from Certain Taxes and Fees**

Pursuant to section 1146(a) of the Bankruptcy Code, any transfers of property in contemplation of, in connection with, or pursuant to the Plan shall not be subject to any stamp tax or other similar tax or governmental assessment in the United States, and the Confirmation Order shall direct and be deemed to direct the appropriate state or local governmental officials or agents to forgo the collection of any such tax or governmental assessment and to accept for filing and recordation instruments or other documents pursuant to such transfers of property without the payment of any such tax or governmental assessment. Such exemption specifically applies, without limitation, to (1) the creation of any mortgage, deed of trust, lien or other security interest; (2) the making or assignment of any lease or sublease; (3) any restructuring transaction authorized by Article V of the Plan; and (4) the making or delivery of any deed or other instrument of transfer under, in furtherance of or in connection with the Plan, including: (a) any merger agreements; (b) agreements of consolidation, restructuring, disposition, liquidation or dissolution; (c) deeds; or (d) assignments executed in connection with any transaction occurring under the Plan.

**D&O Liability Insurance Policies and Indemnification Provisions**

Notwithstanding anything in the Plan to the contrary, as of the Effective Date, the D&O Liability Insurance Policies and Indemnification Provisions shall be treated as though they are executory contracts that the Debtors shall assume (and assign to the Reorganized Debtors if necessary to continue the D&O Liability Insurance Policies in full force) pursuant to section 365(a) of the Bankruptcy Code. Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the Debtors' foregoing assumption of each of the D&O Liability Insurance Policies and Indemnification Provisions.

**Preservation of Causes of Action**

In accordance with section 1123(b) of the Bankruptcy Code, and except where such Causes of Action have been expressly released (including, the releases by the Debtors provided by Article IX.B of the Plan), the Reorganized Debtors shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action, whether arising before or after the Petition Date, and the Reorganized Debtors' rights to commence, prosecute or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date. The Reorganized Debtors may pursue such Causes of Action, as appropriate, in accordance with the best interests of the Reorganized Debtors. No Person may rely on the absence of a specific reference in the Plan or the Disclosure Statement to any Cause of Action against them as any indication that the Debtors or Reorganized Debtors, as applicable, will not pursue any and all available Causes of Action against them. Except with respect to Causes of Action as to which the Debtors or Reorganized Debtors have released any Person on or before the Effective Date (including pursuant to the releases by the Debtors or otherwise), the Debtors or Reorganized Debtors, as applicable, expressly reserve all rights to prosecute any and all Causes of Action against any Person, except as otherwise expressly provided in the Plan. Unless any Causes of Action against a Person are expressly waived, relinquished, exculpated, released, compromised or settled in the Plan or a Bankruptcy Court order, the Reorganized Debtors expressly reserve all Causes of Action, for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial,

190

equitable or otherwise) or laches, shall apply to such Causes of Action upon, after or as a consequence of the Confirmation or consummation of the Plan.

**Single Satisfaction of Claims**

Holders of Allowed Claims may assert such Claims against each Debtor obligated with respect to such Claim, and such Claims shall be entitled to share in the recovery provided for the applicable Class of Claims against each obligated Debtor based upon the full Allowed amount of the Claim. Notwithstanding the foregoing, in no case shall the aggregate value of all property received or retained under the Plan on account of Allowed Claims exceed 100% of the underlying Allowed Claim.

**Proofs of Claim**

Notwithstanding in the Plan, in the Bankruptcy Code, in the Bankruptcy Rules, or in any other order of the Bankruptcy Court to the contrary, neither the Indenture trustees nor any holder of any Existing Notes Claims will be required to file proofs of claim in any of the Chapter 11 Cases or any successor cases, and the findings of fact in the Confirmation Order shall be deemed to constitute a timely filed proof of claim. Notwithstanding the foregoing, the Indenture trustees may, in their discretion or at the direction of at least 50.1% of the holders of Existing Convertible Notes Claims or Existing Senior Secured Notes Claims, as applicable, file a single proof of claim on account of all such Existing Convertible Notes Claims or Existing Senior Secured Notes Claims, as applicable. Any order entered by this Court in relation to the establishment of a bar date for any claim (including, without limitation, administrative claims) in any of the Chapter 11 Cases or successor cases shall not apply to the Indenture trustees or the holders of Existing Notes Claims with respect to the Existing Notes.

**U.S. Federal Income Tax Treatment of Existing Notes Claims**

For U.S. federal income tax purposes, (a) Reorganized Roust shall be treated as contributing to CEDC FinCo the consideration to be distributed with respect to the Existing Senior Secured Notes Claims pursuant to Article III.C.2 (other than the New Senior Secured Notes), and CEDC FinCo shall be treated as transferring such consideration and issuing the New Senior Secured Notes in exchange for the Existing Senior Secured Notes Claims, and (b) Reorganized Roust shall be treated as contributing to CEDC FinCo the consideration to be distributed with respect to the Existing Convertible Notes Claims pursuant to Article III.C.3, and CEDC FinCo shall be treated as transferring such consideration in exchange for the Existing Convertible Notes Claims.

**Confirmation and Consummation of the Plan of Reorganization**

**Conditions Precedent to Confirmation**

The following are conditions precedent to confirmation of the Plan of Reorganization, each of which must be satisfied or waived in accordance with the Plan of Reorganization:

1.      The Bankruptcy Court shall have entered an order in form and substance reasonably acceptable to the Debtors, the Russian Standard Parties, the Existing Senior Secured Notes Steering Committee and the Existing Convertible Notes Steering Committee, approving the Disclosure Statement with respect to the Plan as containing adequate information within the meaning of section 1125 of the Bankruptcy Code.

2.      The Confirmation Order (a) shall be, in form and substance, reasonably acceptable to the Debtors, the Russian Standard Parties, the Existing Senior Secured Notes Steering Committee and the Existing Convertible Notes Steering Committee, and (b) shall include a finding by the Bankruptcy Court that the New Senior Secured Notes and the New Common Stock to be issued on the Effective Date will be authorized and exempt from registration under applicable securities law pursuant to section 1145 of the Bankruptcy Code or section 4(a)(2) of the Securities Act and Regulation D, and shall not be subject to any stay or subject to an unresolved request for revocation under section 1144 of the Bankruptcy Code.

3.      The Plan and the Plan Supplement, including any schedules, documents, supplements and exhibits thereto shall, in form and substance, be reasonably acceptable to the Debtors, the Russian Standard Parties, the

Existing Senior Secured Notes Steering Committee and the Existing Convertible Notes Steering Committee, consistent in all material respects with the Restructuring Support Agreement.

4. The Bankruptcy Court shall have entered one or more orders in form and substance reasonably acceptable to the Debtors, the Russian Standard Parties, the Existing Senior Secured Notes Steering Committee and the Existing Convertible Notes Steering Committee, authorizing and directing the Debtors to assume (a) the Restructuring Support Agreement, (b) the Backstop Agreement and (c) the engagement or fee letters of each of the Advisors.

5. The Restructuring Support Agreement shall not have been terminated and shall be in full force and effect.

**Conditions Precedent to Effective Date**

The following are conditions precedent to the Effective Date, each of which must be satisfied or waived in accordance with the Plan of Reorganization:

1. The Bankruptcy Court shall have entered one or more orders (which may include the Confirmation Order) authorizing the assumption and rejection of Executory Contracts and Unexpired Leases by the Debtors as contemplated in the Plan in form and substance acceptable to the Debtors, the Russian Standard Parties, the Existing Senior Secured Notes Steering Committee and the Existing Convertible Notes Steering Committee.

2. The Confirmation Order shall be consistent with the Restructuring Support Agreement and in form and substance reasonably acceptable to the Debtors, the Russian Standard Parties, the Existing Senior Secured Notes Steering Committee and the Existing Convertible Notes Steering Committee and shall have been entered by the Bankruptcy and shall not be subject to any stay subject to an unresolved request for revocation under section 1144 of the Bankruptcy Code.

3. The Share Placement shall have been consummated.

4. All of the schedules, documents, supplements and exhibits to the Plan shall have been filed in form and substance reasonably acceptable to the Debtors, the Russian Standard Parties, the Existing Senior Secured Notes Steering Committee and the Existing Convertible Notes Steering Committee and shall be consistent with the terms of the Restructuring Support Agreement.

5. All authorizations, consents, and regulatory approvals required, if any, in connection with the consummation of the Plan shall have been obtained.

6. All actions, documents, certificates, and agreements necessary to implement the Plan including, without limitation, the Investor Rights Agreement, the Reorganized Debtors' Corporate Governance Documents and the indenture and related documentation for the New Senior Secured Notes shall be consistent with the terms of the Restructuring Support Agreement and shall have been effected or executed and delivered to the required parties and, to the extent required, filed with the applicable governmental units in accordance with applicable laws. All conditions precedent to the effectiveness of such documents and agreements shall have been satisfied or waived pursuant to the terms thereof.

7. The Consenting Noteholders, acting reasonably and in good faith, shall have received satisfactory confirmatory diligence regarding the Debtors, the Non-Debtor Affiliates and RSV including satisfaction of any "Know Your Client" requirements and customary FCPA/anti-bribery and sanctions diligence.

8. The Debtors shall have paid all fees and expenses of the Advisors through and including the Effective Date in full in Cash, including all RSA Parties' Professional Fee Claims the Existing Notes Indenture trustees' Fee and Expense Claim.

9. The Effective Date shall have occurred by February 15, 2017.

10. The Restructuring Support Agreement shall not have been terminated and shall be in full force and effect.

192

**Waiver of Conditions**

The conditions to Confirmation of the Plan and to consummation of the Plan set forth in Article X of the Plan may be waived at any time upon receipt of written waivers from each of the Debtors, the Russian Standard Parties, and the Existing Senior Secured Notes Steering Committee and the Existing Convertible Notes Steering Committee.

**Effect of Failure of Conditions**

If the consummation of the Plan does not occur, the Plan shall be null and void in all respects and nothing contained in the Plan or the Disclosure Statement shall: (1) constitute a waiver or release of any Claims against or Interests in the Debtors; (2) prejudice in any manner the rights of the Debtors, any holders of Claims or any other Person; or (3) constitute an admission, acknowledgment, offer or undertaking by the Debtors, any holders or any other Person in any respect.

**Effect of Confirmation of Plan of Reorganization**

**Compromise and Settlement of Claims, Interests and Controversies**

Pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good faith compromise of all Claims, Interests and controversies relating to the contractual, legal and subordination rights that a holder of a Claim or Interest may have with respect to any Allowed Claim or Interest, or any distribution to be made on account of such Allowed Claim or Interest. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estates and holders of Claims and Interests and is fair, equitable and reasonable. In accordance with the provisions of the Plan, without any further notice to or action, order or approval of the Bankruptcy Court, after the Effective Date, the Reorganized Debtors may compromise and settle Claims against them and Causes of Action against other Persons.

**Releases by the Debtors**

**Pursuant to section 1123(b) of the Bankruptcy Code and to the fullest extent allowed by applicable law, and except as otherwise specifically provided in the Plan or the Plan Supplement, for good and valuable consideration, including (i) the service of the Released Parties to facilitate the expeditious reorganization of the Debtors and the implementation of the restructuring contemplated by the Plan, (ii) the contribution of RSV to the Reorganized Debtors, (iii) the execution and delivery of the Restructuring Support Agreement and the performance of all material obligations thereunder, (iv) the execution and delivery of the Backstop Agreement and the performance of all material obligations thereunder, (v) participation in the Share Placement, (vi) the discharge of debt and all other good and valuable consideration paid pursuant hereto, and (vii) the services of the Debtors', the Non-Debtor Affiliates', the Russian Standard Parties' and RSV's present and former officers, directors, managers and advisors in facilitating the expeditious implementation of the restructuring contemplated hereby, on and after the Effective Date (such that the Reorganized Debtors will not receive any Claim or Cause of Action released hereunder), the Released Parties and their respective property are released and discharged by the Debtors, the Reorganized Debtors, the Estates, and the Non-Debtor Affiliates from any and all claims, obligations, rights, suits, damages, Causes of Action, remedies and liabilities whatsoever, including any derivative claims, asserted or assertable on behalf of the Debtors, the Reorganized Debtors, their Estates and the Non-Debtor Affiliates, whether known or unknown, foreseen or unforeseen, liquidated or unliquidated, contingent or non-contingent, existing or hereinafter arising, in law, equity or otherwise, whether for tort, fraud, contract, violations of federal or state securities laws or otherwise, that the Debtors, the Reorganized Debtors, the Estates, or the Non-Debtor Affiliates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest or other Person, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' restructuring, the Restructuring Support Agreement, the Debtors' Chapter 11 Cases, the Existing Senior Secured Notes, the Existing Convertible Notes, the purchase, sale or rescission of the purchase or sale of any security of the Debtors or the Reorganized Debtors, the subject**

matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor, Reorganized Debtor, Estate or Non-Debtor Affiliate and any Released Party, the restructuring of Claims and Interests before or during the Chapter 11 Cases, the negotiation, formulation or preparation of the Plan, the Disclosure Statement, the Plan Supplement or related agreements, instruments or other documents, or with respect to any other act or omission, transaction, agreement, event or other occurrence taking place on or before the Effective Date; **provided**, **however**, that nothing in **Article IX.B** of the Plan shall be construed to release any party or entity from gross negligence, intentional fraud, willful misconduct, or criminal conduct, as determined by a Final Order.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Debtor releases pursuant to **Article IX.B**, of the Plan which includes by reference each of the related provisions and definitions contained herein, and further shall constitute the Bankruptcy Court's finding that such Debtor releases are (i) in exchange for the good and valuable consideration provided by the Released Parties, (ii) a good faith settlement and compromise of the claims released by such Debtor releases, (iii) in the best interests of the Debtors and all holders of Claims and Interests, (iv) fair, equitable and reasonable, (v) given and made after due notice and opportunity for hearing, and (vi) a bar to any of the Debtors or the Reorganized Debtors asserting any Claim or Cause of Action released pursuant to such Debtor releases.

Releases by Holders of Claims

Except as otherwise provided in the Plan or the Plan Supplement, as of the Effective Date, each Releasing Party, to the fullest extent allowed by applicable law, as such law may be extended or interpreted subsequent to the Effective Date, shall be deemed to have conclusively, absolutely, unconditionally, irrevocably and forever, released and discharged the Debtors, the Reorganized Debtors, their Estates, the Non-Debtor Affiliates and the Released Parties and their respective property from any and all Claims, Interests, obligations, rights, suits, damages, Causes of Action, remedies and liabilities whatsoever, including any derivative Claims, assertable on behalf of a Debtor, whether known or unknown, foreseen or unforeseen, liquidated or unliquidated, contingent or non-contingent, existing or hereafter arising, in law, equity or otherwise, whether for tort, fraud, contract, violations of federal or state securities laws or otherwise, that such Person would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' restructuring, the Restructuring Support Agreement, the Debtors' Chapter 11 Cases, the Existing Senior Secured Notes, the Existing Convertible Notes, the purchase, sale or rescission of the purchase or sale of any security of the Debtors or the Reorganized Debtors, including (without limitation) any tender rights provided under any applicable law, rule, or regulation, the subject matter of, or the transactions or events giving rise to, any Claim that is treated in the Plan, the business or contractual arrangements between the Debtors and any Released Party, the restructuring of Claims and Interests before or during the Chapter 11 Cases, the negotiation, formulation or preparation of the Restructuring Support Agreement, the Plan, the Disclosure Statement, the Plan Supplement or related agreements, instruments or other documents, with respect to any other act or omission, transaction, agreement, event or other occurrence taking place on or before the Confirmation Date; **provided**, **however**, that nothing in **Article IX.C** of the Plan shall be construed to release any party or entity from gross negligence, intentional fraud, willful misconduct or criminal conduct, as determined by a Final Order. Notwithstanding anything to the contrary in the Existing Senior Secured Notes Indenture or Existing Convertible Notes Indenture, or the instruments, guarantees, certificates, and other documents related thereto, the Releasing Parties shall have conclusively, absolutely, unconditionally, irrevocably and forever, released and discharged the Non-Debtor Affiliates from any and all Claims, Interests, obligations, rights, suits, damages, Causes of Action, remedies and liabilities whatsoever, whether known or unknown, direct or indirect, foreseen or unforeseen, existing or hereafter arising, that relate to guarantees of the Existing Senior Secured Notes or Existing Convertible Notes, and any collateral of Non-Debtor Affiliates securing the Existing Notes. Notwithstanding anything to the contrary in the foregoing, the release set forth above does not release any post-Effective Date obligations of any party under the Plan or any document, instrument or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

**Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the third party releases pursuant to <u>Section IX.C of the Plan</u>, which includes by reference each of the related provisions and definitions contained herein, and further shall constitute the Bankruptcy Court's finding that such third party releases are (i) in exchange for the good and valuable consideration provided by the Debtors, the Reorganized Debtors, the Non-Debtor Affiliates and the Released Parties, (ii) a good faith settlement and compromise of the claims released by such third party releases, (iii) in the best interests of the Debtors and all holders of Claims and Interests, (iv) fair, equitable and reasonable, (v) given and made after due notice and opportunity for hearing, and (vi) a bar to any of the Releasing Parties asserting any Claim or Cause of Action released pursuant to such Debtor releases.**

Exculpation

**Except as otherwise specifically provided in the Plan or Plan Supplement, no Exculpated Party shall have or incur, and each Exculpated Party is hereby released and exculpated from, any Exculpated Claim, obligation, cause of action or liability for any Exculpated Claim, except for gross negligence, intentional fraud or willful misconduct (to the extent such duty is imposed by applicable non-bankruptcy law). The Debtors and the Reorganized Debtors (and each of their respective Affiliates, agents, directors, officers, employees, advisors and attorneys) have, and upon Confirmation of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code with regard to the solicitation and distribution of the Plan securities pursuant to the Plan, and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.**

Discharge of Claims and Termination of Interests

Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan, the distributions, rights and treatment that are provided in the Plan shall be in full and final satisfaction, settlement, release and discharge, effective as of the Effective Date, of all Claims, Interests and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests, including demands, liabilities and Causes of Action that arose before the Effective Date, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h) or 502(i) of the Bankruptcy Code, in each case whether or not: (1) a Proof of Claim or Interest based upon such Claim, debt, right or Interest is filed or deemed filed pursuant to section 501 of the Bankruptcy Code; (2) a Claim or Interest based upon such Claim, debt, right or Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (3) the holder of such a Claim or Interest has accepted the Plan. Except as otherwise provided in the Plan, any default by the Debtors or their Affiliates with respect to any Claim or Interest that existed before or on account of the filing of the Chapter 11 Cases shall be deemed cured on the Effective Date. The Confirmation Order shall be a judicial determination of the discharge of all Claims and Interests subject to the Effective Date occurring, except as otherwise expressly provided in the Plan.

Injunction

EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THE PLAN, THE PLAN SUPPLEMENT OR RELATED DOCUMENTS, OR FOR OBLIGATIONS ISSUED PURSUANT TO THE PLAN, ALL PERSONS WHO HAVE HELD, HOLD OR MAY HOLD CLAIMS OR INTERESTS THAT HAVE BEEN RELEASED PURSUANT TO ARTICLE IX.B OR ARTICLE IX.C OF THE PLAN, DISCHARGED PURSUANT TO ARTICLE IX.E OF THE PLAN, OR ARE SUBJECT TO EXCULPATION PURSUANT TO ARTICLE IX.D OF THE PLAN, ARE PERMANENTLY ENJOINED, FROM AND AFTER THE EFFECTIVE DATE, FROM TAKING ANY OF THE FOLLOWING ACTIONS: (1) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS, INCLUDING ANY CLAIMS IN RESPECT OF ANY GUARANTEES OR PLEDGES WITH RESPECT TO THE EXISTING NOTES GRANTED BY NON-DEBTOR AFFILIATES; (2) ENFORCING, ATTACHING, COLLECTING OR RECOVERING BY ANY MANNER OR MEANS ANY JUDGMENT, AWARD, DECREE OR ORDER AGAINST SUCH PERSONS ON

ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; (3) CREATING, PERFECTING OR ENFORCING ANY ENCUMBRANCE OF ANY KIND AGAINST SUCH PERSONS OR THE PROPERTY OR ESTATES OF SUCH PERSONS ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; AND (4) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS RELEASED, SETTLED OR DISCHARGED PURSUANT TO THE PLAN.

THE RIGHTS AFFORDED IN THE PLAN AND THE TREATMENT OF ALL CLAIMS AND INTERESTS IN THE PLAN SHALL BE IN EXCHANGE FOR AND IN COMPLETE SATISFACTION OF ALL CLAIMS AND INTERESTS OF ANY NATURE WHATSOEVER, INCLUDING ANY INTEREST ACCRUED ON CLAIMS FROM AND AFTER THE PETITION DATE, AGAINST THE DEBTORS OR ANY OF THEIR ASSETS, PROPERTY OR ESTATES. ON THE EFFECTIVE DATE, ALL SUCH CLAIMS AGAINST THE DEBTORS SHALL BE FULLY RELEASED AND DISCHARGED.

EXCEPT AS OTHERWISE EXPRESSLY PROVIDED FOR IN THE PLAN OR IN OBLIGATIONS ISSUED PURSUANT TO THE PLAN FROM AND AFTER THE EFFECTIVE DATE, ALL CLAIMS AGAINST THE DEBTORS SHALL BE FULLY RELEASED AND DISCHARGED, AND ALL INTERESTS SHALL BE CANCELLED, AND THE DEBTORS' LIABILITY WITH RESPECT THERETO SHALL BE EXTINGUISHED COMPLETELY, INCLUDING ANY LIABILITY OF THE KIND SPECIFIED UNDER SECTION 502(G) OF THE BANKRUPTCY CODE. ALL PERSONS SHALL BE PRECLUDED FROM ASSERTING AGAINST THE DEBTORS, THE DEBTORS' ESTATES, THE REORGANIZED DEBTORS, EACH OF THEIR RESPECTIVE SUCCESSORS AND ASSIGNS, AND EACH OF THEIR ASSETS AND PROPERTIES, ANY OTHER CLAIMS OR INTERESTS BASED UPON ANY DOCUMENTS, INSTRUMENTS OR ANY ACT OR OMISSION, TRANSACTION OR OTHER ACTIVITY OF ANY KIND OR NATURE THAT OCCURRED BEFORE THE EFFECTIVE DATE.

**Temporary Injunction with Respect to Existing Notes Claims**

TO THE EXTENT SUCH CLAIMS ARE NOT OTHERWISE RELEASED PURSUANT TO ARTICLE IX.C OF THE PLAN, THE CONFIRMATION ORDER APPROVING THE PLAN SHALL ACT AS A TEMPORARY INJUNCTION AGAINST THE ENFORCEMENT OF ANY DEFAULT AGAINST THE DEBTORS OR ANY NON-DEBTOR AFFILIATE OBLIGATED UNDER THE EXISTING NOTES CLAIMS. HOLDERS OF EXISTING NOTES CLAIMS SHALL BE ENJOINED FROM COMMENCING OR CONTINUING ANY ACTION, EMPLOYMENT OF PROCESS, OR ACT TO COLLECT, OFFSET, OR RECOVER ANY CLAIM RELATING TO THE EXISTING NOTES CLAIMS SO LONG AS THE DEBTORS OR THE REORGANIZED DEBTORS CONTINUE TO PROVIDE OR CAUSE TO BE PROVIDED SUCH TREATMENT TO HOLDERS OF EXISTING NOTES CLAIMS AS PROVIDED UNDER THE PLAN. THE TEMPORARY INJUNCTION WILL EXPIRE AUTOMATICALLY IF THE REORGANIZED DEBTORS DEFAULT UNDER THE PLAN BY FAILING TO PROVIDE OR CAUSE TO BE PROVIDED SUCH TREATMENT TO HOLDERS OF EXISTING NOTES CLAIMS AS PROVIDED UNDER THE PLAN AND FAIL TO CURE SUCH DEFAULT WITHIN 30 DAYS.

**Term of Injunctions or Stays**

Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order) shall remain in full force and effect until the Effective Date. All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

**Release of Liens and Guarantees**

Except as otherwise provided herein or in any contract, instrument, release or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, all mortgages, deeds of trust, Liens, guarantees, pledges or other security interests

196

against any property of the Estates shall be fully released and discharged, and all of the right, title and interest of any holder of such mortgages, deeds of trust, Liens, guarantees, pledges or other security interests shall revert to the Reorganized Debtors and their successors and assigns. For the avoidance of doubt, all guarantees, mortgages, deeds of trust, Liens, pledges or other security interests against any property of the Estates shall be fully released and discharged on the Effective Date without any further action of any party, including, but not limited to, further order of the Bankruptcy Court or filing updated schedules or statements typically filed pursuant to the Uniform Commercial Code.

## Summary of Other Provisions of the Plan of Reorganization

### Modification and Amendments

Except as otherwise specifically provided in the Plan, and with the consent of the Russian Standard Parties, and the Existing Senior Secured Notes Steering Committee and the Existing Convertible Notes Steering Committee, the Debtors reserve the right to modify the Plan as to material terms and seek Confirmation consistent with the Bankruptcy Code and, as appropriate, not re-solicit votes on such modified Plan. Subject to certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019 and those restrictions on modifications set forth in the Plan, and with the consent of the Russian Standard Parties, the Existing Senior Secured Notes Steering Committee and the Existing Convertible Notes Steering Committee, the Debtors expressly reserve their rights to alter, amend or modify materially the Plan one or more times, after Confirmation, and, to the extent necessary, may initiate proceedings in the Bankruptcy Court to so alter, amend or modify the Plan or remedy any defect or omission, or reconcile any inconsistencies in the Plan, the Disclosure Statement or the Confirmation Order, in such matters as may be necessary to carry out the purposes and intent of the Plan.

### Effect of Confirmation on Modifications

Entry of a Confirmation Order shall mean that all modifications or amendments to the Plan occurring after the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or re-solicitation under Bankruptcy Rule 3019.

### Revocation or Withdrawal of the Plan

The Debtors reserve the right to revoke or withdraw the Plan in consultation with the Steering Committees and subject to the terms of the Restructuring Support Agreement before the Effective Date. If the Debtors revoke or withdraw the Plan, or if Confirmation or consummation of the Plan does not occur, then: (1) the Plan shall be null and void in all respects; (2) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain of any Claim or Interest or Class of Claims or Interests), assumption or rejection of Executory Contracts or Unexpired Leases effected by the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void; and (3) nothing contained in the Plan shall: (a) constitute a waiver or release of any Claims or Interests; (b) prejudice in any manner the rights of the Debtors or any other Person; or (c) constitute an admission, acknowledgement, offer or undertaking of any sort by the Debtors or any other Person.

### Professional Compensation

#### Claims for Accrued Professional Compensation

Professionals or other Persons asserting a Claim for Accrued Professional Compensation for services rendered to the Debtors or any statutory committee appointed in these Chapter 11 Cases before the Effective Date must file and serve on the Debtors and such other Persons who are designated by the Bankruptcy Rules, the Confirmation Order or other order of the Bankruptcy Court an application for final allowance of such Claim for Accrued Professional Compensation no later than 45 days after the Effective Date. Objections to any Claim for Accrued Professional Compensation must be filed and served on the Reorganized Debtors, any statutory committee appointed in these Chapter 11 Cases, the Office of the U.S. trustee and the requesting party no later than 60 days after the Effective Date.

*Post- Effective Date Fees and Expenses*

Upon the Effective Date, any requirement that Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Reorganized Debtors may employ and pay any Professional for services rendered or expenses incurred after the Effective Date in the ordinary course of business without any further notice to any party or action, order or approval of the Bankruptcy Court.

## Section 1125(e) of the Bankruptcy Code

Upon entry of the Confirmation Order, the Debtors will be deemed to have solicited votes on the Plan in good faith and in compliance with the Bankruptcy Code and any applicable non-bankruptcy law, and pursuant to section 1125(e) of the Bankruptcy Code, the Debtors and their respective Affiliates, agents, representatives, members, principals, shareholders, officers, directors, employees, advisors and attorneys shall be deemed to have participated in good faith and in compliance with the Bankruptcy Code in the offer, issuance, sale and purchase of Plan securities offered and sold under the Plan, and, therefore, will have no liability for the violation of any applicable law, rule or regulation governing the solicitation of votes on the Plan or the offer, issuance, sale or purchase of the securities offered and sold under the Plan.

## Feasibility of the Plan of Reorganization

The Bankruptcy Code requires that the Bankruptcy Court determine that confirmation of a plan of reorganization is not likely to be followed by liquidation or the need for further financial reorganization of the debtor(s). For purposes of showing that the Plan of Reorganization meets this feasibility standard, we have analyzed our ability to meet the obligations under the Plan of Reorganization and retain sufficient liquidity and capital resources to conduct business. We believe that with a deleveraged capital structure, we will be able to support the financial projections set forth in Appendix D to this Offering Memorandum and Disclosure Statement (the "*Projections*").

Holders of Claims against and Interests in the Debtors are advised, however, that the Projections were not prepared with a view toward compliance with the published guidelines of the American Institute of Certified Public Accountants or any other regulatory or professional agency or body or generally accepted accounting principles. FURTHERMORE, THE COMPANY'S INDEPENDENT CERTIFIED PUBLIC ACCOUNTANTS HAVE NOT COMPILED, EXAMINED OR PERFORMED ANY OTHER PROCEDURES TO THE PROJECTIONS AND, ACCORDINGLY, DO NOT EXPRESS ANY OPINION OR ANY OTHER FORM OF ASSURANCE WITH RESPECT THERETO AND ASSUME NO RESPONSIBILITY FOR THE PROJECTIONS.

**In addition to the assumptions footnoted in the Projections themselves, the Projections also assume that (i) the Plan of Reorganization will be confirmed and consummated in accordance with its terms, (ii) there will be no material adverse change in legislation or regulations, or the administration thereof, including environmental legislation or regulations that will have an unexpected effect on the operations of the Reorganized Debtor(s), (iii) there will be no change in United States generally accepted accounting principles that will have a material effect on the reported financial results of the Reorganized Debtor(s), and (iv) there will be no material contingent or unliquidated litigation or indemnity claims applicable to the Reorganized Debtors. To the extent that the assumptions inherent in the Projections are based upon future business decisions and objectives, they are subject to change. In addition, although they are presented with numerical specificity and considered reasonable by us when taken as a whole, the assumptions and estimates underlying the Projections are subject to significant business, economic and competitive uncertainties and contingencies, many of which will be beyond the control of the Reorganized Debtors.**

Accordingly, the Projections are only estimates that are necessarily speculative in nature. It can be expected that some or all of the assumptions in the Projections will not be realized, and that actual results will vary from the Projections, which variations may be material and are likely to increase over time. The Projections should therefore not be regarded as a representation by the Debtors or any other person that the results set forth in the Projections will be achieved. In light of the foregoing, readers are cautioned not to place undue reliance on the Projections. The Projections should be read together with the information in the sections of this Offering Memorandum and Disclosure Statement entitled "*Risk Factors*" and "*The Plan of Reorganization—Risks Associated with Plan of*

*Reorganization*" which set forth important factors that could cause actual results to differ from those in the Projections.

We do not intend to update or otherwise revise the Projections, including any revisions to reflect events or circumstances existing or arising after the date of this Offering Memorandum and Disclosure Statement or to reflect the occurrence of unanticipated events, even if any or all of the underlying assumptions do not come to fruition. Furthermore, we do not intend to update or revise the Projections to reflect changes in general economic or industry conditions.

**Best Interests Test**

Pursuant to section 1129(a)(7) of the Bankruptcy Code (often referred to as the "*Best Interests Test*"), each holder of an impaired claim or interest must either (a) accept the plan or (b) receive or retain under the plan property of a value, as of the effective date of the plan, that is not less than the value such non-accepting holder would receive or retain if the debtor's assets were to be liquidated under Chapter 7 of the Bankruptcy Code on the effective date. In determining whether the Best Interests Test has been met, the dollar amount that would be generated from a hypothetical liquidation of the debtor's assets in a Chapter 7 proceeding must be determined. Such amount then would be reduced by the costs and expenses of the liquidation. Prior to determining whether the Best Interests Test has been satisfied, available cash and the proceeds from the liquidation of the debtor's assets would be applied to secured claims (to the extent of the value of the underlying collateral) and to satisfy administrative, priority tax and other priority claims, all of which are senior in priority to general unsecured claims, including any incremental administrative claims that may result from the termination of the debtor's business and the liquidation of its assets. Any remaining cash would be available for distribution to general unsecured claims and stockholders in accordance with the distribution hierarchy established by section 726 of the Bankruptcy Code.

The liquidation analysis annexed to this Offering Memorandum and Disclosure Statement as Appendix E ("*Liquidation Analysis*") was prepared by Roust and CEDC FinCo with assistance from their financial advisors, and represents the Debtors' best estimate of the cash proceeds, net of liquidation related costs, which would be available for distribution to the holders of claims and equity interests if each were to be liquidated in Chapter 7 cases that do not preserve the going concern value of their estates. Underlying the Liquidation Analysis are a number of estimates and assumptions regarding liquidation proceeds that, although developed and considered reasonable by the Debtors and their professionals, are inherently subject to significant business, economic, and competitive uncertainties and contingencies beyond the control of the Debtors and their management.

THE INFORMATION SET FORTH IN THE LIQUIDATION ANALYSIS IS PRELIMINARY AND IS SUBJECT TO MODIFICATION AND SUPPLEMENTATION BY THE DEBTORS AT ANY TIME UP TO THE CONFIRMATION HEARING. THERE CAN BE NO ASSURANCE THAT THE VALUES REFLECTED IN THE LIQUIDATION ANALYSIS WOULD BE REALIZED IF ROUST, CEDC FINCO AND CEDC FINCO LLC WERE, IN FACT, TO UNDERGO SUCH A LIQUIDATION UNDER CHAPTER 7, AND ACTUAL RESULTS COULD VARY MATERIALLY FROM THOSE ESTIMATED HERE.

The Liquidation Analysis is premised upon a number of estimates and assumptions that, although developed and considered reasonable by the Debtors and their financial advisors, are inherently subject to significant business, economic and competitive uncertainties and contingencies that are beyond the control of the Debtors and their management. Accordingly, there can be no assurance that the estimated values reflected in the Liquidation Analysis would be realized if the Debtors' estates were, in fact, to undergo a liquidation under Chapter 7. In addition, any such liquidation would take place under future circumstances that cannot be predicted with certainty. Accordingly, although the analysis that follows is necessarily presented with numerical specificity, if the Debtors' estates were in fact liquidated as described herein, the actual liquidation proceeds could vary significantly from the amounts set forth in the Liquidation Analysis. Such actual liquidation proceeds could be materially higher or lower than the amounts set forth herein, and no representation or warranty can be or is being made with respect to the actual proceeds that would be generated from a liquidation of the Debtors under Chapter 7 of the Bankruptcy Code.

Asset values used in the Liquidation Analysis reflect the audited book values of the Debtors' assets as of September 30, 2016. Estimates of hypothetical liquidation values were determined primarily by assessing classes of assets at percentage discounts to book value, as opposed to appraising specific assets. Neither Roust nor CEDC FinCo retained third party experts to value individual assets in preparing the Liquidation Analysis.

199

The Debtors are holding companies that have no business operations and generate only limited revenues through the receipt of dividends and extension of intercompany loans. These holding companies depend on the local business units ("*Operating Subsidiaries*") to generate revenue and pay debt service. As a result, any liquidation of the Debtors for value would necessitate a liquidation of the Operating Subsidiaries. The Liquidation Analysis assumes that the Operating Subsidiaries would be forced to cease substantially all operations almost immediately upon conversion of the Debtors' Chapter 11 Cases to Chapter 7 cases. Further, it assumes that commencing liquidation proceedings in multiple jurisdictions would require the Operating Subsidiaries to hire numerous liquidators and counsel and incur substantial related expenses. The likely consequences of the conversion to Chapter 7 include the following:

The liquidating Operating Subsidiaries' workforce consists of employees (specifically their sales force) who will likely be able to gain employment elsewhere in a relatively short timeframe. With the Operating Subsidiaries facing certain liquidation, those employees are therefore likely to quickly leave the Operating Subsidiaries, which would not only make an orderly wind down significantly more problematic but also render difficult the possibility of continuing operations in an effort to complete a going concern sale. The inability to retain employees for a transitional period would be further complicated by concerns over the Operating Subsidiaries' ability to fund ongoing payroll obligations. In such circumstances, the Operating Subsidiaries may incur substantial severance and related costs. For the purposes of this analysis, only a portion of the severance and related costs have been included. To the extent that severance and other related costs and additional wages paid as a means of retaining certain employees in facilitating an orderly liquidation are incurred, the wind down costs could rise significantly. This would further reduce the expected recovery levels from the Operating Subsidiaries.

Substantially all of Operating Subsidiaries' revenues are derived from the sale of spirits. Customers have the ability to shift their purchases from the Operating Subsidiaries' brands and products to competing brands and/or other mediums. It is highly unlikely that a liquidator could maintain many, if any, of the Operating Subsidiaries' customers for any meaningful period of time upon the commencement of the wind down. The current inventory would effectively be sold at a discount to market rates. Liquidating inventory would be further complicated by a likely loss of Roust's licenses to sell spirits. Such licenses could be revoked upon an announcement of a liquidation and would therefore prohibit the Operating Subsidiaries from continued sales in both Poland and Russia. The loss of such licenses has not been factored into the Liquidation Analysis and therefore represents a substantial downside scenario to these figures.

In addition to inventory, outstanding receivables would be difficult to collect in full. Although the liquidator may retain certain existing employees of Roust to run a collection effort for the existing accounts receivables, such collection efforts would be significantly less effective compared to an ongoing business situation. However, there are few levers to obtain these receivables.

The majority of the Operating Subsidiaries' property, plant and equipment ("*PP&E*") consists of depreciated production facilities and warehouses. The Operating Subsidiaries lease substantially all of their office space and warehouses. These assets have limited value in the secondary market and it is unlikely that any meaningful value would be realized from the liquidation of such assets.

A substantial portion of the Operating Subsidiaries' assets are intangible and are in the form of brand names and trademarks. While the value of these assets would be compromised in a liquidation scenario, some value would likely be realized from such a sale.

All asset proceeds and creditor recoveries are shown at nominal amounts and the Liquidation Analysis does not consider the discounting of values over time. The discounting of values would result in lower recoveries to creditors than presented in the Liquidation Analysis.

We believe that the Plan of Reorganization meets the Best Interests Test. We believe that the members of (i) Impaired Class 7 will receive the same or greater distribution under the Plan of Reorganization as in a liquidation and (ii) each of Impaired Classes 2 and 3 will receive more under the Plan of Reorganization than they would receive in a liquidation.

Although we believe that the Plan of Reorganization meets the Best Interests Test, there can be no assurance that the Bankruptcy Court will determine that the Plan of Reorganization meet this test. Notwithstanding

the foregoing, we believe that any liquidation analysis with respect to the Debtors, as applicable, is inherently speculative. The Liquidation Analysis necessarily contains estimates of the net proceeds that would be received from a forced sale of assets or business units, as well as the amount of Claims that will ultimately become Allowed Claims. The estimate of the amount of Allowed Claims set forth in the liquidation analysis should not be relied on for any other purpose, including, without limitation, any determination of the value of any distribution to be made on account of Allowed Claims.

**Valuation of Roust**

Houlihan Lokey, our investment banker, has determined the estimated range of enterprise value of Reorganized Roust to be approximately $1,215 million to $1,500 million (with a mid-point estimate of approximately $1,358 million) as of an assumed valuation date of December 31, 2016 (the "*Reorganized Roust Enterprise Value*"). The Reorganized Roust Enterprise Value is based upon the estimated range of the enterprise value of Roust attributable to the Company's operations of $705 million to $930 million (with a midpoint estimate of approximately $818 million) and the estimated range of the enterprise value of RSV attributable to the entity's operations of $510 million to $570 million (with a mid-point estimate of approximately $540 million). The estimate of Reorganized Roust Enterprise Value is solely for the purposes of this Offering Memorandum and Disclosure Statement and is based on a number of assumptions, including a successful reorganization of our business and finances in a timely manner, the implementation of Roust's business plan and the achievement of the Projections reflected therein, the continuing leadership of the existing senior management team of Roust following consummation of the Plan of Reorganization contemplated in this Offering Memorandum and Disclosure Statement, the general financial and market conditions will not differ materially from those conditions prevailing as of the date of this Offering Memorandum and Disclosure Statement or through the projection period, projected foreign exchange rates utilized in the Projections, the Plan of Reorganization becoming effective in accordance with the estimates and other assumptions discussed herein. The valuation is supported by the analysis (the "*Valuation Analysis*") attached hereto as Appendix F and will be further supported by the presentation at the Confirmation Hearing. The valuation assumptions are not a prediction or reflection of post-Confirmation trading prices of the New Common Stock. Such securities may trade at substantially lower or higher prices because of a number of factors. The trading prices of securities issued under a plan of reorganization are subject to many unforeseeable circumstances and therefore cannot be predicted.

### Alternatives to Confirmation and Consummation of the Plan of Reorganization

We believe that the Plan of Reorganization affords holders of Claims the potential for the greatest recovery and, therefore, is in the best interests of such holders. If, however, the requisite acceptances are not received, or the Plan of Reorganization is not confirmed and consummated, the theoretical alternatives include: (i) formulation of an alternative plan of reorganization or (ii) liquidation of the Debtors under Chapter 7 or Chapter 11 of the Bankruptcy Code.

**Alternative Plan of Reorganization**

If the requisite acceptances are not received or if the Plan of Reorganization is not confirmed, the Debtors may file Chapter 11 petitions and attempt to formulate and propose a different plan of reorganization. Such a plan might involve either a reorganization and continuation of the Company's businesses or an orderly liquidation of assets. The Company's businesses could suffer from increased costs, erosion of customer confidence and liquidity difficulties if they remained debtors in possession during a lengthy Chapter 11 process while trying to negotiate a plan of reorganization. We believe that the Plan of Reorganization enables creditors to realize the greatest possible value under the circumstances and that, compared to any later alternative plan of reorganization, the Plan of Reorganization has the greatest chance to be confirmed and consummated.

**Liquidation Under Chapter 7 or Chapter 11**

If no plan is confirmed, the Debtors may be forced to liquidate under Chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be elected or appointed to liquidate the Company's assets for distribution to creditors in accordance with the priorities established by the Bankruptcy Code. The Debtors believe that in a liquidation under Chapter 7, before creditors received any distribution, additional administrative expenses involved in the appointment of a trustee or trustees and attorneys, accountants and other professionals to assist such trustees

would cause a substantial diminution in the value of the Estates. The assets available for distribution to creditors would be reduced by such additional expenses and by Claims, some of which would be entitled to priority, which would arise by reason of the liquidation.

We believe that a failure to restructure the Debtors' debt obligations pursuant to the Plan of Reorganization would jeopardize our Operating Subsidiaries. Such scenario could result in a liquidation of the Debtors under either Chapter 7 or Chapter 11 of the Bankruptcy Code. We believe that such a scenario could lead to insolvency proceedings in non-U.S. jurisdictions by our Operating Subsidiaries, which would result in a rapid deterioration of our assets and businesses.

We believe that any alternative liquidation under chapter 7 or chapter 11 is a much less attractive alternative to creditors than the Plan of Reorganization because of the greater return we believe is provided to creditors under the Plan of Reorganization.

## PROCEDURES FOR VOTING ON THE PLAN OF REORGANIZATION

This Offering Memorandum and Disclosure Statement is being transmitted to holders of Claims in Class 2 and Class 3 of the Plan of Reorganization. ALL SUCH HOLDERS ARE ENCOURAGED TO READ THIS OFFERING MEMORANDUM AND DISCLOSURE STATEMENT, ITS ANNEXES AND APPENDICES CAREFULLY AND IN THEIR ENTIRETY BEFORE DECIDING TO VOTE EITHER TO ACCEPT OR TO REJECT THE PLAN OF REORGANIZATION. This Offering Memorandum and Disclosure Statement contains important information about the Plan of Reorganization and considerations pertinent to acceptance or rejection of the Plan of Reorganization.

THIS OFFERING MEMORANDUM AND DISCLOSURE STATEMENT, THE BALLOTS AND THE SUBSCRIPTION FORM ARE THE ONLY DOCUMENTS TO BE USED IN CONNECTION WITH THE SOLICITATION OF VOTES ON THE PLAN OF REORGANIZATION. No solicitation of votes may be made except after distribution of this Offering Memorandum and Disclosure Statement, and no person has been authorized to distribute any information concerning the Debtors other than the information contained herein.

CERTAIN OF THE INFORMATION CONTAINED IN THIS OFFERING MEMORANDUM AND DISCLOSURE STATEMENT IS BY ITS NATURE FORWARD LOOKING AND CONTAINS ESTIMATES, ASSUMPTIONS, AND PROJECTIONS THAT MAY BE MATERIALLY DIFFERENT FROM ACTUAL, FUTURE RESULTS. Except with respect to the Projections and except as otherwise specifically and expressly stated herein, this Offering Memorandum and Disclosure Statement does not reflect any events that may occur subsequent to the date hereof and that may have a material impact on the information contained in this Offering Memorandum and Disclosure Statement. The Company does not intend to update the Projections; thus, the Projections will not reflect the impact of any subsequent events not already accounted for in the assumptions underlying the Projections. Further, the Company does not anticipate that any amendments or supplements to this Offering Memorandum and Disclosure Statement will be distributed to reflect such occurrences. Accordingly, the delivery of this Offering Memorandum and Disclosure Statement will not under any circumstance imply that the information herein is correct or complete as of any time subsequent to the date hereof.

EXCEPT WHERE SPECIFICALLY NOTED, THE FINANCIAL INFORMATION CONTAINED HEREIN HAS NOT BEEN AUDITED BY AN INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM AND HAS NOT BEEN PREPARED IN ACCORDANCE WITH GENERALLY ACCEPTED ACCOUNTING PRINCIPLES.

Each holder of Existing Notes Claims in Classes 2 and 3 of the Plan of Reorganization, by providing instructions to be included on a Master Ballot (or Ballot that has been validated by the Nominee) will be confirming that (i) such holder or legal and financial advisors acting on its behalf has had the opportunity to ask questions of and receive answers from the Debtors concerning the terms of the Plan of Reorganization, the business of the Debtors and other related matters, (ii) the Debtors have made available to such holder or its agents all documents and information relating to the Plan of Reorganization and related matters reasonably requested by or on behalf of such holder, and (iii) except for information provided by the Debtors in writing, and by its own agents, such holder has not relied on any statements made or other information received from any person with respect to the Plan of Reorganization.

Each holder of Existing Notes Claims in Classes 2 and 3 of the Plan of Reorganization, by providing instructions to be included on a Master Ballot (or Ballot that has been validated by the Nominee) by submitting a Ballot, also acknowledges that the securities being offered and distributed pursuant to the Plan of Reorganization are not being offered pursuant to a registration statement filed with the Securities and Exchange Commission and represents that any such securities will be acquired for its own account and not with a view to any distribution of such interests in violation of the Securities Act.

**By providing instructions to their Nominees holding their Existing Notes, beneficial holders of Existing Notes are directing that their Nominees execute a Master Ballot on the Beneficial Holder's behalf that reflects their instructions with respect to the Plan of Reorganization. Holders of Claims against the Debtors will be deemed to consent to the releases set forth in Article IX.C of the Plan of Reorganization as of the Effective Date of the Plan.**

**Subject to the terms of the Restructuring Support Agreement, which provide for, among other things, certain reasonable consent rights of the Supporting Noteholders with respect to the form and substance of the First Day Motions, holders of Existing Notes voting to accept the Plan of Reorganization shall and shall be deemed to, by so voting, indicate their consent to the relief sought by the Debtors pursuant to the First Day Motions described herein.**

**Tabulation Procedures**

In addition to the requirements set forth in the Ballots, Master Ballots and in this Offering Memorandum and Disclosure Statement, the Voting Agent shall use the following tabulation procedures in the preparation of its vote certification:

- Votes cast by a Beneficial Holder on a Ballot that has been validated by the Nominee or on a Master Ballot through a Nominee will be applied against the positions held by such entities in the applicable security as of the Voting Record Date, as evidenced by the record and depository listings. Voters submitted by a Nominee, pursuant to the Master Ballots or validated Ballots, will not be counted in excess of the principal amount of such securities held by such Nominee;

- To the extent that conflicting votes or "overvotes" are submitted by a Nominee, the Voting Agent, in good faith, will attempt to reconcile discrepancies with the Nominee;

- To the extent that any overvotes are not reconcilable prior to the preparation of the vote certification, the Voting Agent will apply the votes to accept and to reject the Plan in the same proportion as the votes to accept and reject the Plan of Reorganization submitted on the Master Ballots or validated Ballots that contained the overvote, but only to the extent of the Nominee's position in the applicable security;

- For the purposes of tabulating votes, each Beneficial Holder will be deemed to have voted the principal amount relating to such security, although the Voting Agent may adjust such principal amount to reflect the claim amount, including prepetition interest.

- A single Nominee may complete and deliver to the Voting Agent multiple Master Ballots, Votes reflected on multiple Master Ballots shall be counted except to the extent that they are duplicative of other Master Ballots. If two or more Master Ballots are inconsistent, the last properly completed Master Ballot received prior the Voting Deadline shall, to the extent of such inconsistency, supersede any prior Master Ballot.

**Waivers of Defects, Irregularities, Etc.**

Unless otherwise directed by the Bankruptcy Court, all questions as to the validity, form, eligibility (including time of receipt), interpretation, acceptance, and revocation or withdrawal of Ballots or Master Ballots (and their respective instructions) will be determined by the Debtors, in their sole discretion, which determination will be final and binding on all parties. Effective withdrawals of Ballots must be delivered to the Voting Agent prior to the Voting Deadline. We reserve the absolute right to contest the validity of any such withdrawal. We also reserve the right to reject any and all Ballots not in proper form, the acceptance of which would, in the opinion of the Debtors or their counsel, be unlawful.

We further reserve the right to waive any defects or irregularities or conditions of delivery as to any particular Ballot. Unless waived, any defects or irregularities in connection with deliveries of Ballots must be cured within such time as the Debtors (or the Bankruptcy Court) determine. Neither the Debtors, nor any other person will be under any duty to provide notification of defects or irregularities with respect to deliveries of Ballots nor will any of them incur any liabilities for failure to provide such notification. Unless otherwise directed by the Bankruptcy Court, delivery of such Ballots will not be deemed to have been made until such irregularities have been cured or waived. Ballots previously furnished (and as to which any irregularities have not theretofore been cured or waived) will be invalidated.

**Further Information; Additional Copies**

If you have any questions or require further information about the voting procedure for voting your Claim or about the packet of material you received, or if you wish to obtain an additional copy of this Offering Memorandum and Disclosure Statement, or any exhibits or appendices to such documents, please contact the Voting Agent, whose contact information is set forth on the back cover of this Offering Memorandum and Disclosure Statement.

## DESCRIPTION OF NEW SENIOR SECURED NOTES

The following is a description of the $385,000,000 aggregate principal amount of 10.0% senior secured notes due 2022 (the "*Notes*"). The Notes will be issued by CEDC Finance Corporation International, Inc., currently a Delaware corporation (the "*Issuer*"), a subsidiary of Roust Corporation, currently a Delaware corporation (the "*Parent*"). In this Description of the New Senior Secured Notes, the term Parent refers only to Roust Corporation and the term Issuer refers only to CEDC Finance Corporation International, Inc., and not to any of their respective subsidiaries. You can find the definitions of certain terms used in this Description of New Senior Secured Notes under the subheading "—*Certain Definitions*."

The Issuer will issue the Notes under an indenture (the "*Indenture*") to be dated as of the Effective Date among, *inter alios*, itself, Parent, as a guarantor, the other Guarantors,            as trustee (the "*Trustee*"),          , as security agent (the "*Security Agent*"),            , as Polish security agent (the "*Polish Security Agent*"), and          , as principal paying agent, transfer agent and registrar, in a private transaction that is not subject to the registration requirements of the Securities Act. See "Notice to Investors." On or before the Effective Date, the Issuer and the Parent will consummate the Mergers such that each of the Issuer and the Parent will be incorporated in the State of New York prior to the issuance of the Notes. The issuance of the Notes is contingent on the prior or concurrent completion of the Transactions (other than the issuance of the Notes), including the RSV Contribution.

The following description is a summary of the material provisions of the Notes, the Guarantees, the Indenture and the Security Documents. Because this is a summary, it does not restate those agreements in their entirety and may not contain all the information that is important to you. The terms of the Notes include those expressly set forth in the Indenture. We urge you to read the Indenture (including the form of Notes and the form of Guarantees attached to the Indenture) and the Security Documents because they, and not this description, define your rights as Holders of the Notes. Copies are available as set forth below under "—*Additional Information*."

The registered Holder of a Note will be treated as the owner of it for all purposes. Only registered Holders will have rights under the Indenture.

### Listing of the Notes

We intend to apply to admit the Notes either (i) to the Official List and to trading on the Global Exchange Market of the Irish Stock Exchange or (ii) to the Channel Islands Securities Exchange and will use commercially reasonable efforts to maintain a listing of the Notes on the Irish Stock Exchange or the Channel Islands Securities Exchange or another exchange of similar global recognition.

### Brief Description of the Issuer, the Notes and the Guarantees

*The Issuer*

The Issuer is a special-purpose financing vehicle created in connection with the issuance of the Old Notes to issue the Old Notes and to on-lend the proceeds of the Old Notes to Subsidiaries of the Parent pursuant to the Intercompany Loans. The Issuer has no operating activities other than (i) prior to the Transactions, as issuer of the Existing Notes and, following the Transactions, the Notes and (ii) as lender under the Intercompany Loans.

The Issuer's only material assets are the Intercompany Loans (which will be amended in connection with the Transactions). The Issuer will be entirely dependent upon payments by the Intercompany Borrowers on the Intercompany Loans to make payments on the Notes.

*The Notes*

The Notes will:

- be general senior secured obligations of the Issuer;

- rank *pari passu* in right of payment to all future senior Indebtedness of the Issuer;

206

- be secured on a first-priority basis by the Collateral and, for so long as the RSV Loans are outstanding, on a second-priority basis by the RSV Pledged Collateral, in each case subject to Liens permitted under the Indenture;

- be senior in right of payment to all existing and future Indebtedness of the Issuer that is expressly subordinated to the Notes;

- be unconditionally guaranteed, jointly and severally, by each Guarantor on a senior secured basis;

- be effectively subordinated to any existing and future Indebtedness of the Parent and its Subsidiaries that is secured by Liens on assets that do not constitute a part of the Collateral to the extent of the value of such assets;

- be structurally subordinated to all existing and future Indebtedness and other claims and liabilities, including preferred stock, of Subsidiaries of the Parent (other than the Issuer) that are not Guarantors; and

- be secured as described below under the caption entitled "—*Security*."

*The Guarantees*

The Notes will be guaranteed by the Parent and the other Guarantors.

The guarantees (each a "*Guarantee*") of the Notes by each Guarantor will:

- be a general senior secured obligation of that Guarantor;

- rank *pari passu* in right of payment to all existing and future senior Indebtedness of that Guarantor;

- be secured on a first-priority basis by the Collateral and, for so long as the RSV Loans are outstanding, on a second-priority basis by the RSV Pledged Collateral, in each case, subject to certain Liens permitted under the Indenture;

- be senior in right of payment to all existing and future Indebtedness of that Guarantor that is expressly subordinated to the Guarantee;

- be effectively subordinated to any existing and future Indebtedness of that Guarantor that is secured by a Lien on assets that do not constitute part of the Collateral to the extent of the value of such assets;

- be structurally subordinated to all existing and future Indebtedness and other claims and liabilities, including preferred stock, of any Subsidiaries of that Guarantor that are not Guarantors; and

- be secured as described below under the caption entitled "—*Security*."

As of September 30, 2016, after giving *pro forma* effect to the Transactions, (i) the Parent and the Issuer would have no Indebtedness other than the Notes, (ii) the Subsidiary Guarantors would have had approximately $192.6 million of Indebtedness (excluding intra-group Indebtedness), of which $128.6 million would have been secured Indebtedness, including $67.2 million of Indebtedness secured by assets other than the Collateral (in each case excluding the guarantees of the Notes); and our Restricted Subsidiaries that are not Subsidiary Guarantors would have had $11.7 million of Indebtedness outstanding, of which $6.1 million would have been secured Indebtedness, all of which is secured by assets other than the Collateral.

Not all of the Parent's Subsidiaries will guarantee the Notes. In the event of a bankruptcy, liquidation or reorganization of any of these non-guarantor Subsidiaries, the non-guarantor Subsidiaries will pay the holders of their debt and their trade creditors before they will be able to distribute any of their assets to the Issuer or the Parent. As of and for the nine months ended September 30, 2016, after giving effect to the Transactions,  the Issuer, the Parent and the other Guarantors of the Notes would have accounted for 81.9% of the aggregated net sales of the

Parent and its Restricted Subsidiaries (including RSV and its subsidiaries), 91.4% of the aggregated EBITDA of the Parent and its Restricted Subsidiaries (including RSV and its subsidiaries) and 77.4% of the aggregated assets of the Parent and its Restricted Subsidiaries (including RSV and its subsidiaries).

Initially, the Guarantors of the Notes will consist of the Parent, each subsidiary of the Parent that guarantees the Existing Notes and the RSV Guarantors.

As of the Effective Date, all of the Parent's Subsidiaries, including the Issuer and all of the RSV Entities will be "Restricted Subsidiaries". However, under the circumstances described below under the subheading "—*Certain Definitions—Unrestricted Subsidiaries*", the Parent will be permitted to designate certain of its Subsidiaries, other than the Issuer, as "*Unrestricted Subsidiaries*". Unrestricted Subsidiaries will not be subject to any of the restrictive covenants in the Indenture.

## The Intercompany Loans

In connection with the issuance of the Old Notes, the Issuer entered into the Intercompany Loans to on-loan the net proceeds of the Old Notes to the Parent's operating subsidiaries and provide for payments to the Issuer in connection with payments due under the Old Notes. In connection with the cancellation of the Old Notes and the issuance of the Existing Notes, the Intercompany Loans were amended to provide for the terms of the Existing Notes. In connection with the consummation of the Transactions, the Intercompany Loans will be amended, cancelled and/or exchanged for equity of the applicable intercompany borrower, such that the aggregate principal amount of the Intercompany Loans will reflect the aggregate principal amount of the Notes and provide for the other terms of the Notes. It is expected that the terms of the Intercompany Loans (e.g., interest rate and maturity) will reflect those of the Notes.

## Principal, Maturity and Interest

On the Effective Date, the Issuer will issue $385.0 million aggregate principal amount of Notes under the Indenture. The Indenture will provide for the issuance of additional Notes ("*Additional Notes*") having identical terms and conditions to the Notes offered hereby, subject to compliance with all of the covenants in the Indenture, including the covenant described below under the caption "—*Certain Covenants—Incurrence of Indebtedness and Issuance of Preference Stock*"; *provided* that Additional Notes will not be issued with the same CUSIP, ISIN or other identifying number as the Notes offered hereby unless such Additional Notes are fungible with the Notes offered hereby for U.S. federal income tax purposes. The Notes and any Additional Notes subsequently issued under the Indenture will be treated as a single class for all purposes under the Indenture. The Issuer will issue Notes in denominations of $2,000 principal amount and integral multiples of $1,000 above $2,000. The Notes will mature on December 31, 2022.

Interest on the Notes will accrue from (and including) January 1, 2017. Interest will be computed on the basis of a 360-day year comprised of twelve 30-day months.

Interest on the Notes will accrue at the rate of 10.0% per annum.

Interest on the Notes will be payable semi-annually in arrears on June 30 and December 31, commencing on June 30, 2017. The Issuer will make each interest payment to the Holders of record on the immediately preceding June 15 and December 15.

If the due date for any payment in respect of any Note is not a business day at the place in which such payment is due to be paid, the Holder thereof will not be entitled to payment of the amount due until the next succeeding business day at such place, and will not be entitled to any further interest or other payment as a result of any such delay.

## Methods of Receiving Payments on the Notes

Principal of, premium and interest on Notes held in global form will be payable at the corporate office of the Principal Paying Agent (as defined below). The Principal Paying Agent will, in turn, make such payments to the

U.S. Paying Agent for further credit to DTC, which will in turn distribute such payments in accordance with its procedures. See "*Book Entry; Delivery and Form—Payments on Global Notes.*"

If any definitive registered Notes are issued in the future, principal of, or premium and interest on any such definitive registered Notes will be payable at the office of one or more Paying Agents (as defined below) in New York as maintained for such purposes. In addition, interest on definitive registered notes may be paid by check mailed to the Person entitled thereto as shown on the register for definitive registered notes.

**Paying Agent, Registrar and Transfer Agents for the Notes**

The Issuer will maintain one or more paying agents (each, a "*Paying Agent*") for the Notes in the City of New York (the "*Principal Paying Agent*"). Also, if for so long as the Notes are listed on the Global Exchange Market of the Irish Stock Exchange or the Channel Islands Securities Exchange and the rules of such exchange so require, then we will maintain a paying agent in Dublin or the Channel Islands, as applicable. Neither the rules of the Irish Stock Exchange nor the rules of the Channel Islands Securities Exchange currently require a paying agent in Dublin or the Channel Islands, respectively. If the Notes are listed on an exchange other than the Global Exchange Market of the Irish Stock Exchange or the Channel Islands Securities Exchange, we will maintain any paying agent required by the rules of such exchange. The initial Paying Agent will be          , as Principal Paying Agent.

The Issuer will also maintain a registrar (the "*Registrar*") with offices in the City of New York and a transfer agent in the City of New York. The Registrar and transfer agent will be          in New York. The Registrar and the transfer agent in New York will maintain a register reflecting ownership of any definitive registered Notes outstanding from time to time and will make payments on and facilitate transfer of definitive registered Notes on the behalf of the Issuer.

Upon notice to the Trustee, the Issuer may change the Paying Agents, the Registrar or the transfer agents without prior notice to the Holders; *provided*, *however*, that in no event shall the Issuer appoint a Principal Paying Agent in any European Union Member State where the Principal Paying Agent would be obligated to withhold or deduct tax in connection with any payment made by it in relation to the Notes unless the Principal Paying Agent would be so obligated in each of the other European Union Member States if it were located in that European Union Member State.

**Additional Guarantees**

The Parent may from time to time designate a Restricted Subsidiary as an additional guarantor of the Notes (an "*Additional Guarantor*") by causing it to execute and deliver to the Trustee a supplemental indenture pursuant to which such Restricted Subsidiary will provide a Guarantee (an "*Additional Guarantee*") and become a Guarantor. Following the Issue Date, Subsidiaries will be required to Guarantee the Notes to the extent required under "*— Additional Security and Guarantees.*"

Any Additional Guarantee shall be issued on substantially the same terms as the Guarantees. For purposes of the Indenture and this "*Description of New Senior Secured Notes*", references to the Guarantees include references to any Additional Guarantees and references to the Guarantors include references to any Additional Guarantors.

**Release of the Guarantees**

The Indenture will provide that a Guarantee shall be released automatically and without further action on the part of any Holder of the Notes or the Trustee:

(1)      in connection with any sale or other disposition of all or substantially all of the assets of that Guarantor (including by way of merger, consolidation, amalgamation or other business combination) to a Person that is not (either before or after giving effect to such transaction) the Issuer, the Parent or a Restricted Subsidiary of the Parent, if the sale or other disposition complies with the covenant described in the first paragraph under the caption "*—Asset Sales*" (in which case the Guarantee of each Subsidiary of that Guarantor also shall be released);

(2)     in connection with any sale or other disposition of the Capital Stock of that Guarantor to a Person that is not (either before or after giving effect to such transaction) the Issuer, the Parent or a Restricted Subsidiary of the Parent, following which such Guarantor is no longer a Restricted Subsidiary, if the sale or other disposition complies with the covenant described in the first paragraph under the caption "—*Asset Sales*" (in which case the Guarantee of each Subsidiary of that Guarantor also shall be released);

(3)     if the Parent designates any Restricted Subsidiary that is a Guarantor to be an Unrestricted Subsidiary in accordance with the applicable provisions of the Indenture (in which case the Guarantee of each Subsidiary of that Guarantor also shall be released); provided that such Subsidiary Guarantee shall be reinstated if it is re-designated as a Restricted Subsidiary of the Parent (in which case the Guarantee of each Subsidiary of the Guarantor also shall be reinstated, to the extent such Subsidiary was a Guarantor prior to being designated an Unrestricted Subsidiary);

(4)     upon legal defeasance or satisfaction and discharge of the Notes in accordance with the Indenture as provided below under the captions "—*Legal Defeasance and Covenant Defeasance*" and "—*Satisfaction and Discharge*";

(5)     in the case of any Restricted Subsidiary that after the Effective Date is required to Guarantee the Notes as described under "—*Certain Covenants—Additional Security and Guarantees*," upon the release or discharge of the guarantee of Indebtedness by such Restricted Subsidiary that resulted in the obligation to Guarantee the Notes;

(6)     upon payment in full of principal, interest and all other obligations in respect of the Notes (including any Additional Notes) issued under the Indenture; and

(7)     as described under "—*Amendment, Supplement and Waiver*" below.

The Trustee is authorized, without the consent of any Holder, to take all necessary actions (including directing the Security Agents) to effectuate any release in accordance with these provisions. At the request and expense of the Issuer, the Parent or any Subsidiary of the Parent, the Trustee and the Security Agents will at the Issuer's cost execute and deliver any document reasonably requested to evidence such release and discharge.

## Security

*Security Agent*

The Security Agent and the Polish Security Agent are expected to act as security agents (the "*Security Agents*") under the Security Documents and the Indenture until such time, if any, that a new Security Agent is appointed under the provisions of the Security Documents. The Polish Security Agent shall only act as Security Agent in respect of the collateral identified under "—*Security—Poland*" below.

*Security*

The collateral that will secure the Notes will consist of (i) the same assets that secure the Existing Notes and substantially all other assets of the Guarantors (other than (a) accounts receivable, (b) inventory and (c) other assets securing Guarantors' obligations in existence as of the Effective Date) and (ii) the RSV Collateral, including the following.

The Notes and the Guarantees will be secured by first-priority Liens as follows:

*Poland*

- Pledges of shares in each of CEDC International and PWW sp. z.o.o.

- Mortgages over real property in Poland owned by CEDC International on which the production plants in Oborniki and Białystok are located.

- Pledges over trademarks owned by CEDC International relating to the Żubrówka, Absolwent, Palace and Soplica brands, in each case, which are registered in Poland and, in the case of the Soplica brand only, which are registered with the European Union trademark registration agency.

*Hungary*

- Registered business quota pledge over Bols Hungary Kft.

- Security over certain intellectual property rights owned by CEDC International in respect of the "Royal", "Royal Feny" and "Royal Vodka" trademarks.

*Cyprus*

- Registered pledges of shares in each of Latchey Limited, Jelegat Holdings Limited, Pasalba Ltd, WHL Holdings Limited, Copecresto Enterprises Limited, Lugano Holdings Limited and Ardy Investments Limited.

*United Kingdom*

- English law assignment of the Roust Russian On-Loans granted by Jelegat Holdings Ltd.

*Luxembourg*

- Pledges of shares in all of the Luxembourg Guarantors

*United States*

- All assets of the Guarantors located in the United States, including:

- Pledges of the capital stock of each of CEDC Finance Corporation LLC and CEDC Finance Corporation International Inc.

- Pledges of the intercompany loans made by the CEDC Finance Corporation International Inc. to CEDC International and Jelegat Holdings Limited (respectively).

*Isle of Man*

- Pledge of shares in Dancraig Wine & Spirits Trading Limited.

*Russia*

- Registered pledges of shares in each of JSC "Distillery Topaz" (100%), JSC "Roust Russia" (100%), CJSC "Roust Inc." (100%) and JSC "Siberian Distillery" (100%).

- Registered pledges of participatory interests in each of LLC "Glavspirttirest" (100%), Bravo Premium LLC (100%), LLC "The TH Russian Alcohol" (100%), LLC "Parliament Distribution" (100%) and LLC "Parliament Production" (42.56%).

- Mortgages over real property, land rights and fixtures (to the extent qualified as real property under Russian law) of the JSC "Siberian Distillery".

- Security over certain intellectual property rights relating to the "Green Mark", "Talka", "Parliament", "Zhuravli", "Marussya", "Yamskaya", "Urozhay" and "Kauffman Vodka" trademarks.

*Specified Bank Accounts*

- Under the terms of the Indenture, Roust has an ongoing obligation to pledge "Specified Bank Accounts" (being bank accounts which contain deposits of at least $5,000,000 at any fiscal quarter end date). Pledges

211

over Specified Bank Accounts can only be enforced upon acceleration of the Notes (and not upon the occurrence of a Default or an Event of Default that does not result in acceleration of the Notes).

The Roust Russia On-Loans which secure the Notes and the Guarantees will, in turn, be secured on a first priority basis by:

- registered pledges of shares (or participatory interests) in all of the Roust Russia Guarantors;

- assignments of rights under each non-Russian Specified Bank Account and withdrawal rights agreements for each Russian Specified Bank Account of Roust Russia Guarantors; and

- mortgages over real property, land rights and fixtures (to the extent qualified as real property under Russian law) of the Roust Russia Group's Siberian Distillery (together, the "*Roust Russia Security*").

*RSV collateral*

The Notes and the Guarantees will be secured by first-priority Liens as follows:

- Russian law pledge of shares in Russian Standard Vodka LLC.

- Swiss law pledge of shares in Russian Standard IP Holding AG.

- Bermudan law pledge of shares in Digital Data Holding.

- Security over material Russian Standard Vodka trademarks registered in Russia, England, Israel, Germany, France and the United States of America.

- Security over the Vodka.com domain under New York law.

The Notes and the Guarantees will be secured by second-priority Liens (which will become first-lien following the termination of the RSV Loans) over certain real property and fixtures of Russian Standard Vodka located in Russia currently subject to first-ranking security in favor of VTB or UniCredit Bank, as lenders of the RSV Loans, as applicable, subject to the written consent of the lenders to the extent required under the RSV Loans, and in the event of refinancing the RSV loans, to the extent practicable, *provided* that such Liens will remain second lien in the event of a refinancing of such RSV Loans (to the extent practicable and will become first-priority Liens once the RSV Loans (or any refinancing thereof) are no longer outstanding.

Certain of the security to be granted for the benefit of the Notes will not be delivered on the Effective Date. The Parent has agreed to use its reasonable efforts to deliver certain security within set timeframes on a reasonable efforts basis as set out under the caption "—*Delivery of Security and Guarantees*", subject to completion of corporate and registration proceedings and any perfection requirements under applicable law, including filing requirements. The enforcement of the security is subject to certain risks under local law.

Any acquisition of direct or indirect control over Russian Alcohol or fixed assets of Russian Alcohol, or any entity which controls Russian Alcohol by way of an enforcement action would require the prior consent from the FAS in Russia, the Antimonopoly Committee of the Ukraine and any other relevant jurisdiction requiring such approval. There is no assurance such approval would be obtained.

The terms of certain existing agreements governing Indebtedness may restrict the ability to provide security over certain Specified Bank Accounts. The Parent has agreed to use reasonable best efforts to obtain the relevant consents to allow such security to be granted as set out under the caption "—*Delivery of Security and Guarantees*." The Parent does not anticipate that such agreements will prevent it from providing security over any material amount of the Specified Bank Accounts.

In addition, certain of the Russian, Polish, Hungarian, Cypriot, Isle of Man and Luxembourg security is subject to the completion of corporate and registration proceedings. Such security will be delivered on the Effective Date or within the set timeframes set out under the caption "—*Delivery of Security and Guarantees*", subject to perfection requirements under applicable law, including filing requirements. See "*Risk Factors—The enforcement of*

*the security is subject to certain risks under local law*" and, if the Collateral is stock of a Guarantor, in connection with any merger, consolidation, amalgamation or other combination in which such Guarantor is not the surviving corporation if the transaction does not violate the provisions described under the caption "*—Certain Covenants— Merger, Consolidation and Sale of Assets.*"

The enforceability of the security and Guarantees will be subject to significant limitations under relevant local laws. See "*Risk Factors—Risks Related to the New Notes.*"

The Collateral will also secure any Additional Notes and may also secure significant additional Indebtedness incurred as permitted by the Indenture.

No appraisals of any of the Collateral have been prepared by or on behalf of the Issuer or the Guarantors in connection with the issuance of the Notes and the Guarantees. There can be no assurance that the proceeds from the sale of the Collateral remaining after the satisfaction of all obligations owed to the holders of Liens that have priority over the Liens securing the Notes would be sufficient to satisfy the obligations owed to the Holders of the Notes and any other creditor whose Indebtedness is secured with the property and assets that secure the Notes. By its nature, some or all of the Collateral will be illiquid and may have no readily ascertainable market value. Accordingly, there can be no assurance that the Collateral will be able to be sold in a short period of time, if at all. The Parent and its Subsidiaries will be permitted to incur additional Indebtedness, which may be secured Indebtedness, in accordance with the terms of the Indenture.

The Trustee will, and by accepting a Note, each Holder will be deemed to have, irrevocably agreed to the appointment of the Security Agents to act as its agent and security trustee under the Security Documents. The Trustee has, and by accepting a Note, each Holder will be deemed to have, irrevocably authorized each Security Agent to: (i) perform the duties and exercise the rights, powers and discretions that are specifically given to it under any of the Security Documents, together with any other incidental rights, power and discretions; and (ii) execute each document expressed to be executed by such Security Agent on its behalf.

*Intercompany Loans Assignment*

The Issuer's obligations under the Notes and the Indenture also will be secured by a first-ranking assignment of the Issuer's rights under the Intercompany Loans. The assignment of the Intercompany Loans as provided in the Security Documents will be granted in favor of one or both Security Agents on a first-priority basis. Such assignment of the Intercompany Loans shall be released upon the full repayment and cancellation of the Intercompany Loans.

### *Release of Collateral*

Liens on Collateral securing the Notes and the Guarantees (other than the Intercompany Loans) will be automatically and unconditionally released:

(1)     upon payment in full of principal, interest and all other obligations in respect of the Notes (including any Additional Notes) issued under the Indenture;

(2)     in connection with any sale or other disposition of Collateral if the sale or other disposition does not violate the provisions described in the first paragraph under the caption "*—Asset Sales*" and, if the Collateral is stock of a Guarantor, in connection with any merger, consolidation amalgamation or other combination in which such Guarantor is not the surviving corporation if the transaction does not violate the provisions described under "*—Certain Covenants—Merger, Consolidation or Sale of Assets*";

(3)     if the Collateral is an asset of a Guarantor (or one of its Subsidiaries) that is to be designated as an Unrestricted Subsidiary, upon designation of the Guarantor as an Unrestricted Subsidiary in accordance with the applicable provisions of the Indenture; provided that such Collateral shall be reinstated if the Subsidiary is re-designated as a Restricted Subsidiary;

(4)     if the Collateral is an asset of a Guarantor (or one of its Subsidiaries) that is to be released from its Guarantee pursuant to the terms of the Indenture, upon release of the Guarantor from its Guarantee;

(5)     in accordance with the Security Documents (as in effect on the Effective Date or as amended, supplemented or otherwise modified after the Effective Date) upon the occurrence of an enforcement action;

(6)     upon legal defeasance or satisfaction and discharge of the Notes in accordance with the Indenture as provided below under the captions "—*Legal Defeasance and Covenant Defeasance*" and "—*Satisfaction and Discharge*"; and

(7)     as described under "—*Amendment, Supplement and Waiver*" and "—*Certain Covenants—Liens*" below.

The Security Documents provide that the Security Agents are authorized to release and each Holder, by accepting a Note, is deemed to authorize the relevant Security Agent to release (and the relevant Security Agent will, at the request of the Parent or Issuer, release) the security interest in all or any portion of the Collateral in connection with the granting of any Permitted Collateral Lien as contemplated under "—*Certain Covenants—Liens.*" The Indenture will require that the Issuer or the relevant Guarantor will regrant to the relevant Security Agent or the Trustee and the relevant Security Agent, immediately after such Permitted Collateral Lien is granted, a security interest in such released Collateral; *provided* that: (i) the release and re-taking of any security interest in the Collateral in accordance with the terms of this paragraph shall only be undertaken to the extent necessary, as determined in good faith by the Issuer or the relevant Guarantor (which determination shall be conclusive) to be required to grant the Permitted Collateral Lien, and (ii) the Issuer or the relevant Guarantor shall provide the relevant Security Agent and/or the Trustee with an opinion of counsel regarding the validity and enforceability of any security interest securing the Notes that is re-taken, which opinion may be subject to exceptions, limitations and exclusions reasonably determined by such counsel to be necessary or appropriate, including in light of applicable law. The release and re-taking of the security interests in the Collateral could restart preference or hardening periods which could be of significant duration. See "Risk Factors—A refinancing or replacement of certain indebtedness could result in a release of the liens on the collateral. Although the security may be reinstated on substantially similar terms, the security could be subject to avoidance by an insolvency administrator or third-party creditors."

The Trustee and/or the Security Agents are authorized, without the consent of any Holder, to take all necessary actions to effectuate any release in accordance with these provisions. At the request and expense of the Issuer or any Guarantor, the Trustee and/or the Security Agents will execute any document reasonably requested to evidence such release and discharge.

*Intercreditor Agreement and Additional Intercreditor Agreements*

The Indenture will provide that the Issuer, each Guarantor, the Security Agent and the Trustee will be authorized (without any further consent of the Holders) to enter into the Intercreditor Agreement in favor of the holders of the Notes and the creditors of the RSV Pledged Collateral and any Additional Intercreditor Agreement. The Indenture will provide that it will be subject to the terms of such Intercreditor Agreement and Additional Intercreditor Agreement.

Pursuant to the terms of the Intercreditor Agreement, any liability in respect of obligations under the RSV Pledged Collateral Agreements will have priority (over the obligations under the New Notes) to any proceeds received upon any enforcement action over any RSV Pledged Collateral. Any proceeds received upon any enforcement over any RSV Pledged Collateral, after all obligations will be applied (i) first, pro rata in repayment of all obligations under the RSV Loans, and (ii) when all obligations under the RSV Loans have been repaid or discharged, any remaining proceeds will be applied pro rata in repayment of all obligations under the Indenture and the Notes.

## Optional Redemption

The Issuer may redeem all or a part of the Notes upon not less than 10 nor more than 60 days' notice, at the redemption prices (expressed as percentages of principal amount) set forth below plus accrued and unpaid interest on the Notes redeemed, to the applicable redemption date, if redeemed during the periods indicated below, subject to the rights of holders of Notes on the relevant record date to receive interest on the relevant interest payment date:

214

| Period | Percentage |
|---|---|
| Effective Date through 9 months from the Effective Date .......................................................... | 100.000% |
| 9 months plus one day from the Effective Date through 1 year from the Effective Date ............. | 103.000% |
| 1 year plus one day from the Effective Date through 2 years from the Effective Date ................ | 102.000% |
| 2 years plus one day from the Effective Date through 3 years from the Effective Date ............... | 101.000% |
| 3 years plus one day from the Effective Date and thereafter ....................................................... | 100.000% |

Unless the Issuer defaults in the payment of the redemption price, interest will cease to accrue on the Notes or portions thereof called for redemption on the applicable redemption date.

**Mandatory Redemption**

Except as set forth in the following paragraph, the Issuer is not required to make mandatory redemption or sinking fund payments with respect to the Notes.

Within 30 days of the receipt of Net Proceeds from any Asset Sale, the Issuer shall give notice of redemption of a principal amount of the Notes equal to the Net Proceeds from the Asset Sale at a price equal to 100% of the principal amount of the Notes to be redeemed plus accrued and unpaid interest on the Notes redeemed to the applicable redemption date. The redemption notice shall provide for redemption upon not less than 10 and not more than 60 days from the date the redemption notice is given.

The Issuer's ability to redeem the Notes with the Net Proceeds of an Asset Sale may be limited by a number of factors. Certain existing and future Indebtedness of the Parent or its Subsidiaries contain or may contain prohibitions on the occurrence of certain events that would constitute an Asset Sale or require such Indebtedness to be repurchased or repaid upon an Asset Sale. The terms of other Indebtedness of the Parent or its Subsidiaries may prohibit the Issuer's prepayment of the Notes or any payment by the Issuer or restrict the ability of the Parent or its Subsidiaries to fund any such payments. Consequently, if the Parent or its Subsidiaries are not able to prepay or cause to be prepaid the Indebtedness outstanding under any such Indebtedness (to the extent containing such restrictions) or obtain requisite waivers or consents, the Issuer may be unable to fulfill its mandatory redemption obligations, resulting in a default under the Indenture.

Under certain circumstances, the Issuer may be required to offer to purchase Notes as described under "—*Repurchase at the Option of Holders in connection with a Change of Control*."

**Selection and Notice**

If less than all of the Notes are to be redeemed at any time, the Trustee or the Registrar (as the case may be) will select Notes for redemption on a *pro rata* basis or by such other method as the Trustee in its sole discretion will deem to be fair and appropriate and as required by law or mandatory requirements, rules or regulations of the relevant clearing systems including by pool factor. The Trustee or the Registrar (as the case may be) will not be liable for selections made by it in accordance with this paragraph.

Definitive registered Notes, if any, in a principal amount of $2,000 or less cannot be redeemed in part. Notices of redemption will be delivered at least 10 but not more than 60 days before the redemption date to each Holder of Notes to be redeemed at its registered address. Any such redemption or notice may be subject to the satisfaction of one or more conditions precedent at the Issuer's discretion.

If any Note is to be redeemed in part only, the notice of redemption that relates to that Note will state the portion of the principal amount of that Note that is to be redeemed. A new Note in principal amount equal to the unredeemed portion of the original Note will be issued in the name of the Holder of Notes upon cancellation of the original Note. Notes called for redemption become due on the date fixed for redemption. On and after the redemption date, interest ceases to accrue on Notes or portions of Notes called for redemption unless the Issuer defaults in the payment of the redemption price.

**Withholding Tax Gross Up on Non-U.S. Guarantees**

All payments made by or on behalf of any of the non-U.S. Guarantors (including any successor entity) with respect to any Guarantee will be made free and clear of and without withholding or deduction for, or on account of,

215

any present or future Taxes unless the withholding or deduction of such Taxes is then required by law. If any deduction or withholding for, or on account of, any Taxes imposed or levied by or on behalf of any jurisdiction in which any non-U.S. Guarantor (including any successor entity), is then incorporated, engaged in business or resident for tax purposes or any jurisdiction by or through which payment is made or any political subdivision thereof or therein (each, a "*Tax Jurisdiction*"), will at any time be required to be made from, or any Taxes are imposed directly on any Holder or beneficial owner of the Notes on, any payments made by any of the non-U.S. Guarantors with respect to any Guarantee, including payments of principal, redemption price, purchase price, interest or premium, the relevant non-U.S. Guarantor, will pay such additional amounts as may be necessary in order that the net amounts received and retained in respect of such payments by each Holder (including such additional amounts) after such withholding, deduction or imposition will equal the respective amounts that would have been received and retained in respect of such payments in the absence of such withholding, deduction or imposition; *provided, however*, that no such additional amounts will be payable with respect to:

(1)     any Taxes that would not have been imposed but for the Holder or the beneficial owner of the Notes being a citizen or resident or national of, incorporated in or carrying on a business, in the relevant Tax Jurisdiction in which such Taxes are imposed other than by the mere acquisition, holding, ownership or disposition of such Note or enforcement or exercise of any rights thereunder or the receipt of payments in respect thereof or any other connection with respect to the Notes;

(2)     any Taxes that are imposed or withheld as a result of the failure of the Holder of the Notes or beneficial owner of the Notes to comply with any written request, made to that Holder or beneficial owner in writing at least 30 days (or such other period as may be required by any law, rule or regulation or local tax practice (including, without limitation, in order for any Guarantor to make any payment under the Guarantee free and clear of and without withholding or reduction))  before any such withholding or deduction would be payable, by any of the non-U.S. Guarantors (or their agents) to provide timely or accurate information concerning the nationality, residence or identity of such Holder or beneficial owner or to make any valid or timely declaration or similar claim or satisfy any certification, information or other reporting requirement, that is required or imposed by a statute, treaty, regulation or administrative practice of the relevant Tax Jurisdiction as a precondition to exemption from all or part of such Taxes; ;

(3)     any Note presented for payment (where Notes are in the form of definitive registered Notes and presentation is required) more than 30 days after the relevant payment is first made available for payment to the Holder (except to the extent that the Holder would have been entitled to such additional amounts had the note been presented on the last day of such 30 day period);

(4)     any estate, inheritance, gift, sale, transfer, personal property or similar tax or assessment;

(5)     [Reserved];

(6)     any Note presented for payment by or on behalf of a Holder of Notes who would have been able to avoid such withholding or deduction by presenting the relevant Note to another Paying Agent in a European Union Member State;

(7)     any Taxes imposed under Sections 1471 through 1474 of the United States Internal Revenue Code of 1986, as amended, or any law implementing an intergovernmental approach thereto and any regulations promulgated thereunder or official governmental interpretations thereof (collectively, "FATCA"), to the extent that such Taxes would not have been imposed but for the failure by a Holder of Notes to (i) comply with applicable reporting and other requirements under FATCA and/or (ii) provide, upon reasonable demand by the Paying Agent, and at the time or times prescribed by applicable law, any form, document or certification required under FATCA, which, if provided, would establish that the payments are exempt from withholding under FATCA; or

(8)     any combination of items (1) through (7) above.

**Repurchase at the Option of Holders in connection with a Change of Control**

If a Change of Control occurs, unless the Issuer has previously or concurrently therewith delivered a redemption notice with respect to all the outstanding Notes as described under "- Optional Redemption", the Issuer must offer to repurchase all the Notes pursuant to an offer on the terms set forth in the Indenture ("*Change of Control Offer*"). In the Change of Control Offer, the Issuer will offer a payment in cash equal to 101% of the aggregate principal amount of Notes repurchased plus accrued and unpaid interest on the Notes repurchased to the date of purchase (the "*Change of Control Payment*"), subject to the rights of Holders of Notes on the relevant record date to receive interest due on the relevant interest payment date. Within 30 days following any Change of Control, the Issuer and the Parent will deliver a notice to each Holder (with a copy to the Trustee and the relevant Paying Agent) describing the transaction or transactions that constitute the Change of Control and offering to repurchase Notes on the date (the "*Change of Control Payment Date*") specified in the notice, which date will be no earlier than 10 days and no later than 60 days from the date such notice is delivered, pursuant to the procedures required by the Indenture and described in such notice. To the extent that the provisions of any securities laws or regulations conflict with the Change of Control provisions of the Indenture, compliance by the Issuer and the Parent with the applicable securities laws and regulations will not be deemed to be a breach of their obligations under the Change of Control provisions of the Indenture.

On the Change of Control Payment Date, the Issuer will, to the extent lawful:

(1)    accept for payment all Notes or portions of Notes properly tendered pursuant to the Change of Control Offer;

(2)    deposit with the Paying Agent an amount equal to the Change of Control Payment in respect of all Notes or portions of Notes properly tendered; and

(3)    deliver or cause to be delivered to the Trustee the Notes properly accepted together with an Officers' Certificate stating the aggregate principal amount of Notes or portions of Notes being purchased by the Issuer.

The Paying Agent will promptly pay (by wire transfer of immediately available funds, by mail or otherwise) to each Holder of Notes properly tendered the Change of Control Payment for such Notes, and the Trustee will promptly authenticate, or cause an authentication agent appointed by it, to authenticate and deliver (or cause to be transferred by book entry) to each Holder a new Note equal in principal amount to any unpurchased portion of the Notes surrendered, if any. The Issuer will publicly announce the results of the Change of Control Offer on or as soon as practicable after the Change of Control Payment Date. To the extent payments are made to the Holders by the Parent or any other Guarantor in respect of the Change of Control Offer, the amount of the Intercompany Loans will be correspondingly reduced, repaid or deemed repaid proportionally by the obligors thereon to the Issuer to the extent of such reduction.

Except as described above and below, the provisions described above that require the Issuer to make a Change of Control Offer following a Change of Control will be applicable whether or not any other provisions of the Indenture are applicable. Except as described above with respect to a Change of Control, the Indenture does not contain provisions that permit the Holders of the Notes to require that the Issuer repurchase or redeem the Notes in the event of a takeover, recapitalization or similar transaction.

The Issuer will not be required to make a Change of Control Offer upon a Change of Control if (i) a third party makes the Change of Control Offer in the manner, at the times and otherwise in compliance with the requirements set forth in the Indenture applicable to a Change of Control Offer made by the Issuer and purchases all Notes properly tendered and not withdrawn under the Change of Control Offer; or (ii) a notice of redemption has been given pursuant to the Indenture as described above under the caption "—*Optional Redemption*", unless and until there is a default in payment of the applicable redemption price. A Change of Control Offer may be made in advance of a Change of Control (and will satisfy the Issuer's obligation to make such an offer upon such Change of Control), and may be conditional upon consummation of such Change of Control, if a definitive agreement is in place at the time of the making of the Change of Control Offer that would, upon consummation, result in a Change of Control, and if such Change of Control Offer is otherwise made by the Issuer or such third party in compliance with the provisions of this section.

The Issuer's ability to repurchase Notes issued by it pursuant to a Change of Control Offer may be limited by a number of factors. Certain existing and future Indebtedness of the Parent or its Subsidiaries contain or may contain prohibitions on the occurrence of certain events that would constitute a Change of Control or require such Indebtedness to be repurchased or repaid upon a Change of Control. Moreover, the exercise by the Holders of their right to require the Issuer to repurchase the Notes could cause a default under, or require a repurchase of, such Indebtedness, even if the Change of Control itself does not, due to the financial effect of such repurchase on the Issuer. Finally, the Issuer's ability to pay cash to the Holders upon a repurchase may be limited by the Issuer's then existing financial resources. There can be no assurance that sufficient funds will be available when necessary to make any required repurchases.

Even if sufficient funds were otherwise available, the terms of other Indebtedness of the Parent or its Subsidiaries may prohibit the Issuer's prepayment of the Notes or any payment by the Issuer in respect of the Notes or restrict the ability of the Parent or its Subsidiaries to fund any such payments before the scheduled maturity of the Notes. Consequently, if the Parent or its Subsidiaries are not able to prepay or cause to be prepaid the Indebtedness outstanding under any such Indebtedness (to the extent containing such restrictions) or obtain requisite waivers or consents, the Issuer may be unable to fulfill its repurchase obligations if Holders exercise their repurchase rights following a Change of Control, resulting in a default under the Indenture.

The definition of Change of Control includes a phrase relating to the direct or indirect sale, lease, transfer, conveyance or other disposition of "all or substantially all" of the properties or assets of the Parent and its Restricted Subsidiaries taken as a whole. Although there is a limited body of case law interpreting the phrase "substantially all", there is no precise established definition of the phrase under applicable law. Accordingly, the ability of a Holder of Notes to require the Issuer to repurchase its Notes as a result of a sale, lease, transfer, conveyance or other disposition of less than all of the assets of the Parent and its Restricted Subsidiaries taken as a whole to another Person or group may be uncertain.

Asset Sales

The Parent will not, and will not permit any of its Restricted Subsidiaries to, consummate an Asset Sale unless:

(1)    the Parent (or a Restricted Subsidiary) receives consideration at the time of the Asset Sale at least equal to the Fair Market Value (determined at the time of entering into an agreement to effect such Asset Sale by the Board of Directors in good faith with the Fair Market Value of consideration other than cash and Cash Equivalents being determined by an independent investment banking firm of international standing) of the assets or Equity Interests issued or sold or otherwise disposed of; and

(2)    at least 75% of the consideration received in the Asset Sale by the Parent or such Restricted Subsidiary is in the form of cash or Cash Equivalents. For purposes of this provision (but not for purposes of the definition of Net Proceeds), each of the following will be deemed to be cash:

(a)    any liabilities, as shown on the Parent's most recent consolidated balance sheet, of the Parent or any Restricted Subsidiary (other than contingent liabilities and liabilities that are by their terms subordinated to the Notes, any Guarantee or the Intercompany Loans) that are assumed in connection with the transfer of any such assets pursuant to an agreement that releases the Parent or such Restricted Subsidiary from further liability in respect of those liabilities; and

(b)    any securities, notes or other obligations received by the Parent or any such Restricted Subsidiary from such transferee that are converted by the Parent or such Restricted Subsidiary into cash or Cash Equivalents within 90 days, to the extent of the cash or Cash Equivalents received in that conversion;

The Issuer shall apply the Net Proceeds of an Asset Sale to redeem Notes as described under the caption "—*Mandatory Redemption*". Any consideration for an Asset Sale other than cash shall be considered "Non-Cash Consideration."

Pending the final application of any Net Proceeds, the Parent or any Restricted Subsidiary may temporarily reduce revolving credit borrowings denominated in U.S. dollars or otherwise invest the Net Proceeds in cash and Cash Equivalents denominated in U.S. dollars in any manner that is not prohibited by the Indenture.

## Certain Covenants

*Restricted Payments*

The Parent will not, and will not permit any of its Restricted Subsidiaries to, directly or indirectly:

(1)     declare or pay any dividend  or make any other payment or distribution on account of the Parent's or any of its Restricted Subsidiaries' Equity Interests (including, without limitation, any payment in connection with any merger, consolidation, amalgamation or other business combination involving the Parent or any of its Restricted Subsidiaries) or to the direct or indirect holders of the Parent's or any of its Restricted Subsidiaries' Equity Interests in their capacity as such (other than dividends or distributions payable in Equity Interests (other than Disqualified Stock) of the Parent and other than dividends or distributions payable to the Parent or a Restricted Subsidiary of the Parent);

(2)     purchase, redeem or otherwise acquire or retire for value (including, without limitation, in connection with any merger, consolidation, amalgamation or other business combination involving the Parent) any Equity Interests of the Parent or any direct or indirect parent of the Parent, in each case held by Persons other than the Parent or a Restricted Subsidiary;

(3)     make any payment on or with respect to, or purchase, redeem, defease or otherwise acquire or retire for value any Indebtedness of the Issuer or any Guarantor that is contractually subordinated to the Notes, any Guarantee or the Intercompany Loans (excluding any Indebtedness between or among the Parent and/or any of its Restricted Subsidiaries), except a payment, purchase, redemption, defeasance, or other acquisition or retirement of interest and, or principal no more than 365 days prior to the original Stated Maturity thereof or the scheduled payment date of any sinking fund payment in respect therefor; or

(4)     make any Restricted Investment

(all such payments and other actions set forth in clauses (1) through (4) above being collectively referred to as "*Restricted Payments*"), *provided* that, the Parent shall not be restricted from making such Restricted Payment if at the time of such Restricted Payment and after giving effect to such Restricted Payment:

(1)     no Default or Event of Default has occurred and will be continuing or would occur as a consequence of such Restricted Payment;

(2)     after giving *pro forma* effect to such Restricted Payment as if such Restricted Payment had been made at the beginning of the applicable four-fiscal quarter period, the Parent would have been permitted to incur at least $1.00 of additional Indebtedness pursuant to the Net Leverage Ratio test set forth in the first paragraph under the caption "*—Certain Covenants—Incurrence of Indebtedness and Issuance of Preferred Stock*"; and

(3)     the aggregate amount of such Restricted Payment, together with the aggregate amount of all other Restricted Payments made by the Parent and its Restricted Subsidiaries since the Effective Date (excluding Restricted Payments permitted by clauses (2), (3), (4), (6), (8), (9), (10), (11) and (12) of the following paragraph) is less than the sum, without duplication, of the following (the "*Restricted Payment Build-up*"):

(a)     50% of the Consolidated Net Income of the Parent for the period (treated as one accounting period) from the first day of the first fiscal quarter following the Effective Date to the end of the Parent's most recently ended fiscal quarter for which publicly available financial statements are available at the time of such Restricted Payment (the "*Restricted Payment Period*") (or, if such Consolidated Net Income for such period is a deficit, less 100% of such deficit); *plus*

219

(b)     100% of the aggregate net cash proceeds received by the Parent during the Restricted Payment Period (i) as a contribution to its common equity capital; (ii) from the issue or sale of Equity Interests of the Parent (other than Disqualified Stock); or (iii) from the issue or sale of convertible or exchangeable Disqualified Stock or convertible or exchangeable debt securities of the Parent that have been converted into or exchanged for such Equity Interests (other than Equity Interests (or Disqualified Stock or debt securities) sold to a Subsidiary of the Parent or an employee stock ownership plan, option plan or similar trust to the extent such sale to an employee stock ownership plan, option plan or similar trust is financed by loans from or guaranteed by the Parent or any Restricted Subsidiary unless such loans have been repaid with cash on or prior to the date of determination) (less the amount of any cash, or the Fair Market Value of any other property, distributed by the Parent upon such conversion or exchange, and increased, without duplication, by the amount of such cash or property received by the Parent or a Restricted Subsidiary upon such conversion or exchange); *plus*

(c)     the amount equal to the net reduction in Restricted Investments made by the Parent or any of its Restricted Subsidiaries in any Person during the Restricted Payment Period resulting from:

(i)     repurchases or redemptions of such Restricted Investments by such Person, proceeds realized upon the sale of such Restricted Investment to an unaffiliated purchaser, repayments of loans or advances or other transfers of assets (including by way of dividend or distribution) by such Person to the Parent or any Restricted Subsidiary not to exceed, in the case of any Person, the amount of Restricted Investments previously made by the Parent or any Restricted Subsidiary in such Person; or

(ii)     the redesignation of Unrestricted Subsidiaries as Restricted Subsidiaries (valued in each case as provided in the definition of "Investments") not to exceed, in the case of any Unrestricted Subsidiary, the amount of Investments previously made by the Parent or any Restricted Subsidiary in such Unrestricted Subsidiary, which amount in each case under this clause (c) was included in the calculation of the amount of Restricted Payments; *provided*, *however*, that no amount will be included under this clause (c) to the extent it is already included in Consolidated Net Income; *plus*

(d)     100% of any cash dividends received by the Parent or a Restricted Subsidiary of the Parent after the Effective Date from an Unrestricted Subsidiary of the Parent, to the extent that such dividends were not otherwise included in the Consolidated Net Income of the Parent for such period.

The preceding provisions will not prohibit:

(4)     the payment of any dividend or the consummation of any irrevocable redemption within 60 days after the date of declaration of the dividend or giving of the redemption notice, as the case may be, if at the date of declaration or notice, the dividend or redemption payment would have complied with the provisions of the Indenture;

(5)     the making of any Restricted Payment in exchange for, or out of the net cash proceeds of the substantially concurrent sale (other than to a Restricted Subsidiary of the Parent) of, Equity Interests of the Parent (other than Disqualified Stock) or from the substantially concurrent contribution of common equity capital to the Parent;

(6)     the repurchase, redemption, defeasance or other acquisition or retirement for value of Indebtedness of the Parent or any Guarantor that is contractually subordinated to the Notes or any Guarantee with the net cash proceeds from a substantially concurrent incurrence of Permitted Refinancing Indebtedness;

(7)     the payment of any dividend (or, in the case of any partnership, limited liability company or other Person, any similar payment) by a Restricted Subsidiary of the Parent to the holders of its Equity Interests on a *pro rata* basis;

(8)     [Reserved];

(9)     the repurchase of Equity Interests deemed to occur upon the exercise of stock options, warrants, or convertible or exchangeable securities to the extent such Equity Interests represent a portion of the exercise price of those stock options, warrants, or convertible or exchangeable securities;

(10)    if the Parent's Net Leverage Ratio is at least 6.25:1.00 (without giving effect to such payment), the payment, within 24 months of the Effective Date, of any dividend on common stock of the Parent, *provided*, such dividend is paid to all holders of Parent's common stock on a pro rata basis, *provided further*, such dividend may be paid (i) in cash to stockholders that are RTL Parties with such cash dividend not to exceed $20 million (the "*Advance Dividend Amount Basket*");  and (ii) in kind to all stockholders other than RTL Parties at a 10% discount to Plan Value; notwithstanding the forgoing, this clause (7) is only available if RSB, as ultimate beneficial owner of the RTL Parties, (x) certifies in writing on its letterhead signed by an independent officer or board member confirming receipt of such dividend and confirming the application of such funds to RSB's own capital account and (y) procures written confirmation from its independent auditors regarding such capital infusion; any cash amounts paid pursuant to this clause (7), a "*Stockholder Advance*"; the Advance Dividend Amount Basket may also be used to repurchase common stock held by the RTL Parties (instead of a cash dividend) at Plan Value;

(11)    the repurchase, redemption or other acquisition for value of Capital Stock of the Parent or any Restricted Subsidiary of the Parent representing fractional shares of such Capital Stock in connection with a share dividend, distribution, share split, reverse share split, merger, consolidation, amalgamation or other business combination of the Parent or such Restricted Subsidiary, in each case, permitted under the Indenture, provided, that any such payment shall not be for the purpose of evading any limitation of this covenant or otherwise to facilitate any dividend or other return of capital to the holder of such Capital Stock (as determined in good faith by the Minority Directors);

(12)    cash payments in lieu of the issuance of fractional shares in connection with stock dividends, splits or combinations, the exercise of warrants, options or other securities convertible into or exchangeable for Capital Stock of the Parent, in each case, permitted under the Indenture, *provided* that any such payment shall not be for the purpose of evading any limitation of this covenant or otherwise to facilitate any dividend or other return of capital to the holder of such Capital Stock (as determined in good faith by the Minority Directors);

(13)    the purchase, repurchase, redemption, defeasance or other acquisition or retirement for value of any Indebtedness of the Parent or any Guarantor which is contractually subordinated to the Notes or Guarantees; (i) to the extent that the purchase price is not greater than 101% of the principal amount of such Indebtedness in the event of a Change of Control (plus accrued and unpaid interest thereon); or (ii) to the extent that the purchase price is not greater than 100% of the principal amount thereof in accordance with provisions similar to those provided in under the caption "—*Asset Sales*", in each case to the extent required by any agreement or instrument pursuant to which such contractually subordinated Indebtedness was issued; *provided* that, prior to or simultaneously with such purchase, repurchase, redemption, defeasance or other acquisition or retirement, either, as applicable, (i) a Change of Control Offer, as provided under the caption "—*Repurchase at the Option of Holders in connection with a Change of Control*" has been made and the repurchase or redemption of all Notes validly tendered for payment and not withdrawn in connection with such Change of Control Offer or (ii) a mandatory redemption, as provided under the caption "—*Mandatory Redemption*" has been completed;

(14)    the purchase, redemption, acquisition, cancellation or other retirement for a nominal value per right of any rights granted to all the holders of Equity Interests of the Parent pursuant to any shareholders' rights plan adopted for the purpose of protecting shareholders from unfair takeover tactics; *provided* that any such purchase, redemption, acquisition, cancellation or other retirement of such rights shall not be for

the purpose of evading the limitations of this covenant (all as determined in good faith by the Board of Directors) and, *provided further*, that the aggregate price paid for all such purchased, redeemed, acquired, cancelled or retired rights shall not exceed $2.0 million in the aggregate;

(15)     [Reserved]; and

(16)     any of the Transactions.

The amount of all Restricted Payments (other than cash) will be the Fair Market Value on the date of the Restricted Payment of the asset(s) or securities proposed to be transferred or issued by the Parent or such Restricted Subsidiary, as the case may be, pursuant to the Restricted Payment (other than cash). If the Fair Market Value of any Restricted Payment (other than cash) exceeds $40.0 million, any determination thereof must be based upon an opinion or appraisal by an Approved Fairness Opinion Provider.

For the avoidance of doubt, dividends funded in whole or in part through the reduction or offset of one more Intercompany Loans, paid to or from the Parent, the Issuer or any Restricted Subsidiary, shall not be counted to increase Consolidated Net Income, or as net cash proceeds received by the Parent, as a contribution to its common equity or otherwise, or as a net reduction in Restricted Investments, or as a cash dividend deemed received from one or more Unrestricted Subsidiaries, for purposes of computing amounts available to make Restricted Payments pursuant to this covenant.

*Incurrence of Indebtedness and Issuance of Preferred Stock*

The Parent will not, and will not permit any of its Restricted Subsidiaries to, directly or indirectly, create, incur, issue, assume, guarantee or otherwise become directly or indirectly liable, contingently or otherwise (collectively, "*incur*"), with respect to any Indebtedness (including Acquired Debt), and the Parent will not issue any Disqualified Stock and will not permit any of its Restricted Subsidiaries to issue any shares of preferred stock; provided, however, that, the Parent and any Restricted Subsidiary may incur Indebtedness (including Acquired Debt), and the Parent may issue Disqualified Stock and any Restricted Subsidiary may issue preferred stock if the Parent's Net Leverage Ratio for the Parent's most recently ended four full fiscal quarters for which publicly available financial statements are available immediately preceding the date on which such additional Indebtedness is incurred or such Disqualified Stock or preferred stock is issued, as the case may be, would have been no greater than (i) prior to the date which is four years after the Effective Date, 4.75:1.00 and (ii) from and including the date which is four years after the Effective Date, 4.00:1.00, in each case, determined on a pro forma basis (including a pro forma application of the net proceeds therefrom), as if such Indebtedness had been incurred or the Disqualified Stock or preferred stock had been issued, as the case may be, at the beginning of such four-fiscal quarter period.

The first paragraph of this covenant will not prohibit the incurrence of any of the following items of Indebtedness (collectively, "*Permitted Debt*"):

(1)     the incurrence by the Parent or the Parent's Restricted Subsidiaries of Indebtedness (including in the form of Credit Facilities) in an aggregate principal amount at any one time outstanding under this clause not to exceed $345.0 million; *provided that* during the Protected Period, any Indebtedness incurred under this clause (1) maturing on or before the 18 month anniversary of the Effective Date may not have an interest rate greater than 15.0% (or 24.0% for any Indebtedness denominated in Russian rubles), and any such Indebtedness maturing thereafter may not have an interest rate greater than 12.0% (or 18.0% for any Indebtedness denominated in Russian rubles) unless Minority Director Approval has been obtained;

(2)     [Reserved];

(3)     the incurrence by the Issuer and the Guarantors of Indebtedness represented by the Notes and the Guarantees thereof to be issued on the Effective Date (for the avoidance of doubt, no Additional Notes may be issued in reliance on this clause (3));

(4)     the incurrence by the Parent or any of its Restricted Subsidiaries of Indebtedness, not to exceed an aggregate principal amount of $51.75 million (the "*Seasonality Basket*") at any time outstanding during

the period from October 1 to and including December 31 of each calendar year and from January 1 to and including March 25 of the subsequent year;

(5)     the incurrence by the Parent or any of its Restricted Subsidiaries of Permitted Refinancing Indebtedness in exchange for, or the net proceeds of which are used to renew, refund, refinance, replace, defease or discharge any Indebtedness (other than Indebtedness between or among any of the Parent and/or its Restricted Subsidiaries) that was permitted by the Indenture to be incurred under the first paragraph of this covenant or clauses (3), (5) or (6);

(6)     Indebtedness of a Person incurred and outstanding on the date on which such Person becomes a Restricted Subsidiary of the Parent or any of its Restricted Subsidiaries or is merged, consolidated, amalgamated or otherwise combined with, or all or substantially all of its assets are transferred to, the Parent or any of its Restricted Subsidiaries (other than Indebtedness incurred in contemplation of, or in connection with, the transaction or series of related transactions pursuant to which such Person became a Restricted Subsidiary of or was otherwise acquired by the Parent or a Restricted Subsidiary of the Parent); *provided*, *however*, that on the date that such Person is acquired by the Parent or a Restricted Subsidiary or merged, consolidated, amalgamated or otherwise combined with the Parent or any of its Restricted Subsidiaries, either (i) the Parent would have been able to incur $1.00 of additional Indebtedness pursuant to the Net Leverage Ratio test in the first paragraph of this covenant after giving effect to the incurrence of  such Indebtedness or (ii) the Parent's Net Leverage Ratio improves;

(7)     the incurrence by the Parent or any of its Restricted Subsidiaries of Indebtedness between or among the Parent and any of its Restricted Subsidiaries; *provided*, *however*, that:

> (a) if any Guarantor is the obligor on such Indebtedness and the payee is not the Issuer or a Guarantor, such Indebtedness must be expressly subordinated to the prior payment in full in cash of all Obligations then due with respect to the Notes, in the case of the Issuer, or the Guarantee, in the case of a Guarantor; and

> (b)  (i) any subsequent issuance or transfer of Equity Interests that results in any such Indebtedness being held by a Person other than the Parent or a Restricted Subsidiary of the Parent; and (ii) any sale or other transfer of any such Indebtedness to a Person that is not either the Parent or a Restricted Subsidiary of the Parent, will be deemed, in each case, to constitute an incurrence of such Indebtedness by the Parent or such Restricted Subsidiary, as the case may be, that was not permitted by this clause (7);

(8)     the issuance by any of the Parent's Restricted Subsidiaries to the Parent or to any of its Restricted Subsidiaries of shares of preferred stock; *provided*, *however*, that:

> (a) any subsequent issuance or transfer of Equity Interests that results in any such preferred stock being held by a Person other than the Parent or a Restricted Subsidiary of the Parent; and

> (b) any sale or other transfer of any such preferred stock to a Person that is not either the Parent or a Restricted Subsidiary of the Parent,

will be deemed, in each case, to constitute an issuance of such preferred stock by such Restricted Subsidiary that was not permitted by this clause (8);

(9)     the incurrence by the Parent or any of its Restricted Subsidiaries of Hedging Obligations (i) relating to any Indebtedness of the Company or its Restricted Subsidiaries denominated in a currency other than U.S. dollars or (ii) relating to interest rates under any Indebtedness of the Company or its Restricted Subsidiaries;

(10)     any guarantee of the Notes or of Indebtedness permitted to be incurred under the Indenture;

(11)     the incurrence by the Parent or any of its Restricted Subsidiaries of Indebtedness in respect of workers' compensation claims, self-insurance obligations, bankers' acceptances, performance bonds, completion guarantees and warranties and surety bonds in the ordinary course of business (including guarantees or indemnities related thereto);

(12)     the incurrence by the Parent or any of its Restricted Subsidiaries of Indebtedness arising from the honoring by a bank or other financial institution of a check, draft or similar instrument drawn against insufficient funds, so long as such Indebtedness is covered within five Business Days;

(13)     Indebtedness of the Parent or any of its Restricted Subsidiaries consisting of advance or extended payment terms by suppliers of inventory, marketing services or equipment and distribution fees by distributors in the ordinary course of business;

(14)     Indebtedness of the Parent or any of its Restricted Subsidiaries constituting reimbursement obligations with respect to bank or insurance company bonds or guarantees and VAT guarantees issued in the ordinary course of business; *provided*, *however*, that, upon valid demand being made under such reimbursement obligations, such demands are satisfied within 90 days of the date of such demand;

(15)     Indebtedness of the Parent or any of its Restricted Subsidiaries consisting of overdraft facilities, cash pooling facilities or other similar arrangements owed on a short-term basis to banks or other financial institutions incurred in the ordinary course of business of the Parent and its Restricted Subsidiaries maintained with such banks or financial institutions and which arises in connection with ordinary banking arrangements to manage cash balances of the Parent and its Restricted Subsidiaries, excluding factoring arrangements;

(16)     customer deposits and advance payments received from customers in the ordinary course of business for goods purchased in the ordinary course of business, excluding factoring arrangements;

(17)     the incurrence by the Parent or any of its Restricted Subsidiaries of Indebtedness arising from agreements of the Parent or a Restricted Subsidiary providing for indemnification, adjustment of purchase price or similar obligations, in each case, incurred or assumed in connection with the disposition of any business, assets or Capital Stock of a Restricted Subsidiary, other than guarantees of Indebtedness of the Restricted Subsidiary disposed of, or incurred or assumed by any Person acquiring all or any portion of such business, assets or Capital Stock for the purpose of financing such acquisition; *provided* that the maximum liability of the Parent and its Restricted Subsidiaries in respect of all such Indebtedness shall at no time exceed the gross proceeds, including the Fair Market Value of non-cash proceeds (measured at the time received and without giving effect to any subsequent changes in value) actually received by the Parent and its Restricted Subsidiaries in connection with such disposition;

(18)     Indebtedness of the Issuer or any Restricted Subsidiary consisting of (i) the financing of insurance premiums or (ii) take-or-pay obligations contained in supply arrangements, in each case, in the ordinary course of business;

(19)     [Reserved]; and

(20)     the incurrence of Indebtedness represented by the issuance of Additional Notes issued in exchange for the cancellation of or the net proceeds of which are used to refinance (fully or partially) the Interim Loan Facility, *provided* that any collateral securing such Interim Loan Facility will also be pledged as Collateral to secure the Notes (including such Additional Notes), and *provided further* that such Indebtedness shall, for so long as it is outstanding, reduce the amounts available under clause (1) of this paragraph by the amount of any Indebtedness incurred pursuant to this clause (20).

The Parent will not incur, and will not permit any Guarantor to incur, any Indebtedness (including Permitted Debt) that is contractually subordinated in right of payment to any other Indebtedness of the Parent or such Guarantor unless such Indebtedness is also contractually subordinated in right of payment to the Notes or the applicable Guarantee; *provided*, *however*, that no Indebtedness will be deemed to be contractually subordinated in

right of payment to any other Indebtedness of the Parent solely by virtue of being unsecured or by virtue of being secured on a junior or second Lien basis or by virtue of not being Guaranteed.

For purposes of determining compliance with this caption "—*Certain Covenants—Incurrence of Indebtedness and Issuance of Preferred Stock*", in the event that an item or portion of an item of proposed Indebtedness meets the criteria of more than one of the provisions described in clauses (1) through (20) of the second paragraph above, or is entitled to be incurred pursuant to the first paragraph of this covenant, the Issuer, the Parent and any Restricted Subsidiary of the Parent will be permitted to classify such item or portion of an item of Indebtedness on the date of its incurrence, and later reclassify all or a portion of such item of Indebtedness, in any manner that complies with this covenant, except that all Indebtedness outstanding on the Effective Date shall be deemed incurred under clause (1) of the second paragraph of this covenant. The accrual of interest, the accretion or amortization of original issue discount, the payment of interest on any Indebtedness in the form of additional Indebtedness with the same terms, the reclassification of preferred stock as Indebtedness due to a change in accounting principles, and the payment of dividends on Disqualified Stock in the form of additional shares of the same class of Disqualified Stock will not be deemed to be an incurrence of Indebtedness or an issuance of Disqualified Stock for purposes of this covenant. For the avoidance of doubt, any Indebtedness permitted to be incurred pursuant to the provisions described under this caption "—*Certain Covenants—Incurrence of Indebtedness and Issuance of Preferred Stock*" may also include (without double-counting) any "parallel debt" or similar obligations created in respect thereto.

For purposes of determining compliance with the restrictions in clauses (1), (4) and (20) of the second paragraph of this covenant, the U.S. dollar equivalent principal amount of any Indebtedness denominated in a foreign currency shall be calculated based on the relevant currency exchange rate in effect as of the Effective Date.

The amount of any Indebtedness outstanding as of any date will be:

(1)     the accreted value of the Indebtedness, in the case of any Indebtedness issued with original issue discount;

(2)     the principal amount of the Indebtedness, in the case of any other Indebtedness;

(3)     in respect of Indebtedness of another Person secured by a Lien on the assets of the specified Person, the lesser of:

(a) the Fair Market Value of such assets at the date of determination; and

(b) the amount of the Indebtedness of the other Person;

(c) the greater of the liquidation preference or the maximum fixed redemption or repurchase price of the Disqualified Stock, in the case of Disqualified Stock; and

(d) the Attributable Debt related thereto, in the case of any lease that is part of a sale and leaseback transaction.

In each case above, Indebtedness permitted to be incurred also is permitted to include any "parallel debt" or similar obligations created in respect thereof.

*Liens*

The Issuer will not, and the Parent will not cause or permit the Issuer to, directly or indirectly, create, incur, assume or permit or suffer to exist any Liens of any kind against or upon any of its property other than Issuer Permitted Liens.

The Parent will not, and will not cause or permit any of its Restricted Subsidiaries (other than the Issuer) to, directly or indirectly, create, incur, assume or permit or suffer to exist any Liens of any kind against or upon any property or assets of the Parent or any of its Restricted Subsidiaries constituting Collateral, whether owned on the Effective Date or acquired after the Effective Date other than Permitted Collateral Liens

225

The Parent will not, and will not cause or permit any of its Restricted Subsidiaries to, directly or indirectly, create, incur, assume or permit or suffer to exist any Liens (other than Permitted Liens) of any kind against or upon any property or assets of the Parent or any of its Restricted Subsidiaries not constituting Collateral, whether owned on the Effective Date or acquired after the Effective Date securing Indebtedness unless contemporaneously with the incurrence of such Liens provision is made to secure the Indebtedness due under the Notes (including any Additional Notes) or, in respect of Liens on any Guarantor's property or assets, any Guarantee of such Guarantor, equally and ratably with the Indebtedness secured by such Lien for so long as such Indebtedness is so secured.

Any such Lien in favor of the Trustee and the Holders of the Notes will be automatically and unconditionally released and discharged concurrently with (i) the release of the Lien which gave rise to the Lien in favor of the Trustee and the Holders of the Notes (other than as a consequence of an enforcement action with respect to the assets subject to such Lien); (ii) upon the full and final payment of all amounts payable by the Issuer and the Guarantors under the Notes, the Indenture and the Guarantees; or (iii) upon legal defeasance or satisfaction and discharge of the Notes as provided below under the captions "—*Legal Defeasance and Covenant Defeasance*" and "—*Satisfaction and Discharge*."

*Dividend and Other Payment Restrictions Affecting Subsidiaries*

The Parent will not, and will not permit any of its Restricted Subsidiaries to, directly or indirectly, create or permit to exist or become effective any consensual encumbrance or restriction on the ability of any Restricted Subsidiary to:

(1)     pay dividends or make any other distributions on its Capital Stock to the Parent or any of its Restricted Subsidiaries or pay any Indebtedness owed to the Parent or any of its Restricted Subsidiaries;

(2)     make loans or advances to the Parent or any of its Restricted Subsidiaries; or

(3)     sell, lease or transfer any of its properties or assets to the Parent or any of its Restricted Subsidiaries;

*provided* that (x) the priority of any preferred stock in receiving dividends or liquidating distributions prior to dividends or liquidating distributions being paid on common Capital Stock and (y) the subordination of (including but not limited to, the application of any standstill requirements to) loans or advances made to the Parent or any Restricted Subsidiary to other Indebtedness Incurred by the Parent or any Restricted Subsidiary, shall not be deemed to constitute such an encumbrance or restriction.

However, the preceding restrictions will not apply to encumbrances or restrictions existing under or by reason of:

(4)     agreements and instruments (including agreement and instruments of the RSV Entities) as in effect on the Effective Date (including the Existing Notes and the indenture governing the Existing Notes, the Existing Guarantees and any security documents related to the foregoing) and any amendments, restatements, modifications, renewals, supplements, refundings, replacements or refinancings of those agreements or instruments with, as applicable, the same or different counterparties; *provided* that the amendments, restatements, modifications, renewals, supplements, refundings, replacements or refinancings are not materially more restrictive or materially less favorable to the Holders of the Notes, in each case, taken as a whole, with respect to such dividend and other payment restrictions than those contained in those agreements on the Effective Date;

(5)     the Indenture, the Notes (including any Additional Notes permitted to be issued pursuant to the Indenture), the Guarantees, and the Security Documents;

(6)     any applicable law, rule, regulation or order;

(7)     any instrument or agreement of or relating to a Person or property or asset acquired by the Parent or any of its Restricted Subsidiaries in effect at the time of such acquisition, which encumbrance or restriction is not applicable to any Person, or the properties or assets of any Person, other than the Person, or the property or assets of the Person, so acquired and its Subsidiaries; *provided* that, in the case of

226

Indebtedness, such Indebtedness was permitted by the terms of the Indenture to be incurred and was not incurred in connection with or in contemplation of such acquisition;

(8)     customary non-assignment provisions in contracts, leases, and licenses and similar contracts entered into in the ordinary course of business;

(9)     purchase money obligations for property acquired and Capital Lease Obligations that impose restrictions on the property purchased or leased of the nature described in clause (3) of the preceding paragraph;

(10)    any agreement for the sale or other disposition of a Restricted Subsidiary that restricts distributions by that Restricted Subsidiary pending the sale or other disposition;

(11)    solely with respect to clause (3) of the preceding paragraph, Liens permitted to be incurred under the provisions described above under the caption "—*Certain Covenants—Liens*" that limit the right of the debtor to dispose of the assets subject to such Liens;

(12)    customary provisions limiting the disposition or distribution of assets or property in joint venture agreements, asset sale agreements, sale-leaseback agreements, stock sale agreements and other similar agreements entered into with the approval of the Parent's Board of Directors, which limitation is applicable only to the assets that are the subject of such agreements;

(13)    restrictions on cash or other deposits or net worth imposed by customers under contracts entered into in the ordinary course of business;

(14)    net worth provisions in leases and other agreements entered into by the Parent or any Restricted Subsidiary in the ordinary course of business;

(15)    (x) any agreement or instrument relating to (a) Indebtedness of the Parent or any Restricted Subsidiary permitted to be incurred under clause (1), (4) or (20) of the second paragraph under the caption "—*Certain Covenants—Incurrence of Indebtedness and Issuance of Preferred Stock*," if the encumbrances or restrictions contained in the relevant agreement, taken as a whole, are not materially less favorable to the Holders of the Notes than is customary in comparable financings or agreements (as to which a determination in good faith by the Board of Directors shall be conclusive) or (b) Capital Markets Debt permitted to be incurred under the provisions described under the caption "—*Certain Covenants—Incurrence of Indebtedness and Issuance of Preferred Stock*" if the encumbrances or restrictions contained in the relevant agreement, taken as a whole, are not materially less favorable to the Holders of the Notes than those contained in the Indenture (as to which a determination in good faith by the Board of Directors shall be conclusive) and (y) either (i) the Board of Directors has determined in good faith that such encumbrance or restriction will not materially adversely affect the ability of the Issuer to make payments of principal and interest on the Notes when due; or (ii) such encumbrance or restriction applies only if a default occurs in respect of a payment or financial covenant relating to such Indebtedness;

(16)    any encumbrances or restrictions with respect to the Indenture, the Notes, any Guarantee or the Security Documents, the Investor Rights Agreement or the Charter Documents; and

(17)    any encumbrance or restriction applicable to a Restricted Subsidiary at the time it becomes a Restricted Subsidiary that is not created in contemplation thereof shall not be deemed to be so created), *provided* that such restriction apply only to such Restricted Subsidiary, and *provided further* that the exception provided by this clause (14) shall not apply to any encumbrance or restriction contained in any Indebtedness that refunds, refinances, replaces, defeases or discharges any Indebtedness which was in existence at the time such Restricted Subsidiary became a Restricted Subsidiary.

*Merger, Consolidation or Sale of Assets*

Neither the Parent nor the Issuer may, directly or indirectly: (x) merge, consolidate, amalgamate or otherwise combine with or into another Person (whether or not the Parent or the Issuer (as applicable) is the surviving corporation); or (y) sell, assign, transfer, convey or otherwise dispose of all or substantially all of the properties or assets of the Parent and its Restricted Subsidiaries taken as a whole or the Issuer and its Restricted Subsidiaries, taken as a whole, in one or more related transactions, to another Person, unless:

(1)     either: (a) the Parent or the Issuer (as applicable) is the surviving Person (the "*Successor*"); or (b) the Person formed by or surviving any such merger, consolidation, amalgamation or other business combination (if other than the Parent or the Issuer (as applicable)) or to which such sale, assignment, transfer, conveyance or other disposition has been made is an entity organized or existing under the laws of any European Union Member State, the United Kingdom, Switzerland, Norway, Canada, the United States, any state of the United States or the District of Columbia;

(2)     the Person formed by or surviving any such merger, consolidation, amalgamation or other business combination (if other than the Parent or the Issuer (as applicable)) or the Person to which such sale, assignment, transfer, conveyance or other disposition has been made assumes all the obligations of the Issuer or the Parent (as applicable) under the Notes or the Parent's Guarantee, respectively, the Indenture and the Security Documents pursuant to agreements reasonably satisfactory to the Trustee;

(3)     immediately after giving pro forma effect to such transaction, no Default or Event of Default exists and is continuing; and

(4)     the Parent, the Issuer (as applicable) or the Person formed by or surviving any such merger, consolidation, amalgamation or other business combination (if other than the Parent or the Issuer (as applicable)), or to which such sale, assignment, transfer, conveyance or other disposition has been made:

    (a)     (unless the transaction involves a merger with a corporation having no Indebtedness, material assets, material contractual obligations or material liabilities, in which the Parent or the Issuer (as applicable) survives), on the date of such transaction after giving pro forma effect thereto and any related financing transactions as if the same had occurred at the beginning of the applicable four-quarter period, either (i) would be permitted to incur at least $1.00 of additional Indebtedness pursuant to the Net Leverage Ratio test set forth in the first paragraph under the caption "—*Certain Covenants—Incurrence of Indebtedness and Issuance of Preferred Stock*"; or (ii) as a result of the transaction, the Net Leverage Ratio of the Parent (or the person surviving a merger with the Parent, as applicable) remains the same or improves compared to the Parent's Net Leverage Ratio prior to the transaction; and

    (b)     furnishes to the Trustee an Officers' Certificate stating that the transaction complies with the Indenture.

In addition, neither the Parent nor the Issuer may, directly or indirectly, lease all or substantially all of its properties and assets of it and its Restricted Subsidiaries taken as a whole, in one or more related transactions, to any other Person.

A Guarantor (other than the Parent) may not:

(5)     directly or indirectly merge, consolidate, amalgamate or otherwise combine with or into another Person (whether or not such Guarantor is the surviving corporation) or, in respect of the Russian Guarantors only, enter into any merger (*sliyaniye obschestva*), company accession (*prisoedinyeniye obschestva*), company division (*razdelyeniye obschestva*), company separation (*vydelyeniye obschestva*), company transformation (*preobrazovaniye obschestva*) or other company reorganisation (*reorganizatsiya obschestva);* or

(6)    sell, assign, transfer, convey or otherwise dispose of all or substantially all of its assets (including by way of liquidation or similar transaction), taken as a whole, in one or more related transactions, to another Person; unless

   (a)    (i) in the case of CEDC International, CEDC International is the surviving entity or (ii) in the case of any other Guarantor, the Person formed by surviving such transaction is incorporated in the same jurisdiction as the Guarantor subject to the transaction, the United States, any state in the United States or the District of Columbia, an European Union Member State;

   (b)    prior to or immediately after giving pro forma effect to such transaction, no Default or Event of Default exist and is continuing; and

   (c)    either:

      (i)    if such entity remains (or its successor will remain) a Subsidiary Guarantor: (A) such Guarantor is the surviving Person; or (B) the Person formed by or surviving any such consolidation or merger (if other than such Guarantor or another Guarantor) or to which such sale, assignment, transfer, conveyance or other distribution has been made if not a Guarantor assumes all the obligations of that Guarantor under the Indenture and its Guarantee pursuant to a supplemental indenture satisfactory to the Trustee; or

      (ii)    the merger, consolidation, amalgamation or other combination or sale or disposition of all or substantially all of its assets complies with the provisions described in the first paragraph under the caption "—*Repurchase at the Option of Holders in connection with a Change of Control*";

Notwithstanding the two preceding paragraphs:

(7)    any Guarantor other than CEDC International may merge, consolidate, amalgamate or otherwise combine with or into an Affiliate primarily for the purpose of reincorporating such Guarantor under the laws of any European Union Member State, the United Kingdom, Switzerland, Norway, Canada, Russia, Cyprus, Luxembourg, the United States, any state of the United States or the District of Columbia (except that the Parent may so reincorporate only in any state of the United States or the District of Columbia, any European Union Member State or the United Kingdom); and

(8)    any Restricted Subsidiary other than CEDC International may merge, consolidate, amalgamate or otherwise combine with or into or sell, assign, transfer, convey, lease or otherwise dispose of assets to the Parent or any of its Restricted Subsidiaries.

Any successor entity (if other than a Guarantor or the Issuer, as the case may be) will succeed to, and be substituted for, and may exercise every right and power of, the non-surviving Guarantor or the Issuer, as the case may be, under the Indenture, the Notes, the non-surviving Guarantor's Guarantee, the Intercompany Loans and the Security Documents (and other relevant agreements hereunder), in each case, to the extent a party thereto, and, upon such substitution, the predecessor Person shall be released.

Notwithstanding the three preceding paragraphs none of the Guarantors organized in any state in the United States or the District of Columbia or in any European Union Member State may merge, consolidate, amalgamate or otherwise reorganize as entities incorporated in Russia or Cyprus.

*Transactions with Affiliates*

The Parent will not, and will not permit any of its Restricted Subsidiaries to, make any payment to, or sell, lease, transfer or otherwise dispose of any of its properties or assets to, or purchase any property or assets from, or enter into or make or amend any transaction, contract, agreement, understanding, loan, or guarantee with, or for the benefit of, any Affiliate of the Parent (each, an "*Affiliate Transaction*") unless:

229

(1)     the Affiliate Transaction is on terms that are no less favorable to the Parent or the relevant Restricted Subsidiary than those that reasonably could be obtained at the time of such transaction in arm's-length dealings in a comparable transaction with a Person that is not an Affiliate; and

(2)     if the Parent and its Restricted Subsidiaries engage in Affiliate Transactions involving aggregate consideration in excess of $10 million since the Effective Date (less any Indebtedness that constitutes an Affiliate Transaction and which has been repaid in full and any commitments thereunder have been canceled), the Parent shall have received an opinion as to the fairness to the Parent and its Restricted Subsidiaries of such Affiliate Transaction or Affiliate Transactions from a financial point of view or that such Affiliate Transaction or Affiliate Transactions are not materially less favorable than those that might reasonably have been obtained in a comparable transaction at such time on an arms-length basis from a Person that is not an Affiliate issued by an Approved Fairness Opinion Provider (such opinion, a "*Fairness Opinion*").  A copy of any fairness opinion provided pursuant to this clause will immediately be made available to the Minority Directors during the Protected Period.

The following items will not be deemed to be Affiliate Transactions and, therefore, will not be subject to the provisions of the prior paragraph:

(3)     any employment agreement, employee benefit plan, officer or director indemnification agreement or any similar arrangement entered into by the Parent or any of its Restricted Subsidiaries in the ordinary course of business and compensation (including bonuses and equity compensation) paid to and other benefits (including retirement, health and other benefit plans) and indemnification arrangements provided on behalf of directors, officers and employees of the Parent or any Restricted Subsidiary;

(4)     transactions between or among the Parent and/or its Restricted Subsidiaries;

(5)     ordinary course commercial transactions, such as purchase, supply and distribution arrangements on an arms' length basis consistent with past practice;

(6)     any issuance of securities, or other payments, awards or grants in cash, securities or otherwise pursuant to, or the funding of, employment agreements and other compensation arrangements, options to purchase Equity Interests of the Parent, restricted share plans, long-term incentive plans, share appreciation rights plans, participation plans or similar employee benefits plans and/or indemnity provided on behalf of directors, officers and employees approved by the Board of Directors;

(7)     Guarantees issued by the Parent or a Restricted Subsidiary in accordance with "—Incurrence of Indebtedness and Issuance of Preferred Stock";

(8)     the performance of obligations of the Parent or any Restricted Subsidiary under the terms of any agreement (i) to which the Parent or any Restricted Subsidiary is a party on the Effective Date and (ii) listed on a schedule to the Indenture, as these agreements may be amended, modified, supplemented, extended or renewed from time to time; *provided*, *however*, that any future amendment, modification, supplement, extension or renewal entered into after the Effective Date will be permitted to the extent that its terms, taken as a whole, are not more materially disadvantageous to the Holders than the terms of the agreements in effect on the Effective Date;

(9)     any issuance of Equity Interests (other than Disqualified Stock) of the Parent to Affiliates of the Parent;

(10)    any Restricted Payment that does not violate the provisions of the Indenture described above under the caption "—*Restricted Payments*" or Permitted Investments;

(11)    loans or advances to employees in the ordinary course of business not to exceed $2.5 million in the aggregate at any one time outstanding;

(12)    the entering into of a tax sharing agreement, or payments pursuant thereto, between the Parent and/or one or more Restricted Subsidiaries, on the one hand, and any other Person with which the Parent or such Restricted Subsidiaries are required or permitted to file a consolidated tax return or with which the

Parent or such Restricted Subsidiaries are part of a consolidated group for tax purposes, on the other hand, provided that any payments by the Parent and the Restricted Subsidiaries required under such agreement are not in excess of the tax liabilities that would have been payable by them on a stand-alone basis;

(13)    banking transactions with Russian Standard Bank in the ordinary course of business, and on arms' length terms, and  where the Minority Directors approve the fairness of the terms of such transactions (as (i) fair from a financial point of view to the Company or (ii) not materially less favorable than those that might reasonably have been obtained in a comparable transaction at such time on an arms-length basis from a Person that is not an Affiliate), and, if requested by the Minority Directors, covered by a Fairness Opinion; the Minority Director approval contemplated by this clause (11) shall cover the terms of agreements and arrangements with Russian Standard Bank, and once such agreements or arrangements have been approved, it shall not be necessary to obtain further approval by the Minority Directors of particular transactions (including, for example,  loan drawings and repayments and factoring transactions) that are in accordance with the terms or agreements or arrangements that have been approved by the Minority Shareholders (and such particular transactions shall be deemed to fall under this clause (11)), provided that the Minority Director will have access to sufficient information relating to loan drawings and repayments and factoring transactions to determine that such transactions comply with the arrangements contemplated in this paragraph or are covered by such Fairness Opinion;

(14)    any of the Transactions;

(15)    the granting and performance of SEC registration rights for securities of the Parent or any Parent Entity;

(16)    any one or series of transactions consisting of (i) the repayment of Indebtedness (including Indebtedness for borrowed money or Hedging Obligations) that are undertaken in order to comply with regulatory requirements or (ii) transactions that do not involve the transfer of cash, cash equivalents, other assets or security interests and that are undertaken in order to comply with regulatory requirements; *provided that* during the Protected Period copies of any regulatory notice related to such transaction shall be immediately be provided to the Minority Directors, and in any event not later than one Business Day prior to such transaction; and

(17)    transactions that have been covered by a Fairness Opinion.

*Business Activities*

The Parent will not, and will not permit any of its Restricted Subsidiaries to, engage in any business other than a Permitted Business, except to such extent as would not be material to the Parent and its Restricted Subsidiaries taken as a whole.

*Limitation on Activities of the Issuer*

Notwithstanding anything contained in the Indenture to the contrary, the Issuer will not engage in any business activity or undertake any other activity, except any activity (a) relating to the offering, sale or issuance of the Notes and the Additional Notes, if any, and any Capital Markets Debt, lending or otherwise advancing the proceeds thereof to any Guarantor and any other activities in connection therewith (including pursuant to the Intercompany Loans), (b) undertaken with the purpose of fulfilling any obligations under the Notes, the Additional Notes, the Indenture, the Investor Rights Agreement or any Capital Markets Debt or any security documents or other agreements relating to any of the foregoing, (c) directly related to the establishment and/or maintenance of the Issuer's corporate existence, (d) performing any act incidental to or necessary in connection with any of the above or (e) other activities that are not specified in (a) through (e) above that are *de minimis* in nature.

The Issuer shall not (a) incur any Indebtedness other than the Indebtedness represented by the Notes and, subject to compliance with the provisions described under the caption "—*Certain Covenants—Incurrence of Indebtedness and Issuance of Preferred Stock*", Additional Notes and any Capital Markets Debt, (b) issue any Capital Stock other than the issuance of its ordinary shares to the Parent, any Wholly Owned Restricted Subsidiary

231

of the Parent or (c) make any Restricted Payment or Permitted Investment, other than cash, Cash Equivalents and Intercompany Loans.

Notwithstanding the foregoing, the Issuer may pay a dividend to the Parent using amounts received from the repayment of Intercompany Loans pursuant to clause (iii) of the last paragraph under the caption "—*Certain Covenants—Amendments to or Repayments of the Intercompany Loans*" (and not in connection with any repayment of Intercompany Loans in connection with a corresponding repayment, redemption or repurchase of any Notes).

The Issuer shall not create, incur, assume or suffer to exist any Lien of any kind (other than Issuer Permitted Liens) against or upon any of its property or assets, or any proceeds therefrom.

The Issuer shall at all times remain a Wholly-Owned Restricted Subsidiary of the Parent.

The Issuer shall not merge, consolidate, amalgamate or otherwise combine with or into another Person except the Parent or a wholly owned Guarantor, or sell, convey, transfer, lease or otherwise dispose of (other than pursuant to any Issuer Permitted Collateral Lien, or any Restricted Payment or Permitted Investment permitted by the covenant described under this caption "—*Limitation on Activities of the Issuer*") any material property or assets to any Person except the Parent or a wholly owned Guarantor, *provided* that, in the event it so combines with the Parent or a wholly owned Guarantor or so disposes of property or assets to the Parent or a wholly owned Guarantor, then immediately after such transaction the Parent or such wholly owned Guarantor shall (a) assume all of the obligations of the Issuer under the Indenture and the Notes pursuant to a supplemental indenture in form reasonably satisfactory to the Trustee and (b) deliver to the Trustee an Officers' Certificate which complies with applicable provisions of the Indenture or investments in the Notes, the Guarantees, Existing Notes and the guarantees of the Existing Notes.

For so long as any Notes are outstanding, none of the Issuer, the Parent or any other Guarantor will commence or take any action to cause a winding-up or liquidation of the Issuer.

Except as provided in the Indenture, the Issuer shall not, and the Parent shall procure that the Issuer does not, assign or novate its rights under the Intercompany Loans.

*Limitations on Activities of Jelegat Holdings Limited*

The Parent and the Issuer will procure that Jelegat Holdings Limited will not, without the prior written consent of the Trustee acting on the instruction of Holders of not less than a majority of the aggregate principal amount of Notes then outstanding: (a) sell, factor, discount, transfer, assign, lend or otherwise dispose of any of its right, title or interest in or to the Roust Russia On-Loans, nor will it create or permit to be outstanding any mortgage, pledge, Lien, charge, encumbrance or other security interest over the Roust Russia On-Loans, other than in accordance with the Indenture; (b) engage in any business other than: (i) making and performing its obligations under the Roust Russia On-Loans; (ii) issuing and performing its obligations under the Proceeds Loan; (iii) entering into, exercising rights under, performing obligations under or enforcing the Roust Russia Transaction Documents; (iv) activities directly related to the establishment and/or maintenance of the Jelegat Holdings Limited's corporate existence; (v) performing any act incidental to or necessary in connection with any of the above or (vi) other activities that are not specified in (a) through (b) above that are *de minimis* in nature; (c) amend its constitutional documents (other than as is reasonably appropriate to implement the provisions of this Description of the New Secured Notes or as required under the Investor Rights Agreement); (d) have any subsidiaries; (e) have any employees (for the avoidance of doubt, the Directors of Jelegat Holdings Limited do not constitute employees); (f) issue any shares (other than such shares as are in issue as at the Effective Date) and other Equity Interests (other than Disqualified Stock issued to CEDC International) nor redeem or purchase any of its issued share capital; (g) amend any term or condition of any of the Proceeds Loan or the Roust Russia On-Loans (other than in accordance with the terms of the Indenture including amendments permitted under caption "—*Certain Covenants— Amendments to or Prepayments of the Intercompany Loans*"); (h) incur any Indebtedness for borrowed money or any guarantees other than in respect of the Proceeds Loan or any document entered into in connection with the Proceeds Loan or the sale thereof or pursuant to the terms of the Indenture; (i) enter into any reconstruction, amalgamation, merger or consolidation; (j) enter into any lease in respect of, or own premises; (k) agree to any amendment to any provision of or grant any waiver or consent under the Roust Russia Transaction Documents to which it is a party or execute any agreement (other than in accordance with the terms of the Indenture including

232

amendments permitted under the caption "—*Certain Covenants—Amendments to or Prepayments of the Intercompany Loans*"); or (l) otherwise than as contemplated in the Roust Russia Transaction Documents, release from or terminate the appointment of a collateral manager under a collateral management agreement or a collateral administrator under a collateral administration agreement (including in each case any transactions entered into thereunder) or release any of them from any executory obligation thereunder.

Jelegat Holdings Limited will pay its debts as they fall due (provided that the foregoing shall not apply to any interest payment on any Roust Russia On-Loans originally due prior to the Effective Date). Jelegat Holdings Limited will do all such things as are necessary to maintain its corporate existence.

Notwithstanding the foregoing, (i) the Roust Russia On-Loans may be amended to provide for the issuance of additional Senior Secured Notes, to cure any ambiguity, mistake, omission, defect or inconsistency and to provide for the assumption by a successor Person, and may be prepaid or reduced to facilitate or otherwise accommodate or reflect a repayment, redemption or repurchase of Notes or the Senior Secured Notes; (ii) the Roust Russia On-Loans may be novated or assigned to any Guarantor; (iii) the Roust Russia On-Loans may be repaid or amended to reduce the principal amount of such loans in an amount corresponding to a reduction in principal amount in the Intercompany Loans permitted under the final paragraph under the caption "—*Certain Covenants— Amendments to or Prepayments of the Intercompany Loans*"; and (iv) the interest rate on the Roust Russia On-Loans may be amended in a manner consistent with the amendment of the interest rate on the Intercompany Loans permitted under the final paragraph under the caption "—*Certain Covenants—Amendments to or Prepayments of the Intercompany Loans*".

Notwithstanding any other provision of this section, Jelegat Holdings Limited may pay a dividend using amounts received from the repayment of Roust Russia On-Loans pursuant to clause (iii) of the last paragraph under the caption "—*Certain Covenants—Amendments to or Prepayments of the Intercompany Loans*" (and not in connection with any repayment of Roust Russia On-Loans in connection with a corresponding repayment, redemption or repurchase of any Notes).

*Additional Security and Guarantees*

If the Parent or any Restricted Subsidiary acquires or creates another Significant Subsidiary or a Subsidiary with Material Unencumbered Assets, then: (i) such Significant Subsidiary or Subsidiary with Material Unencumbered Assets shall become a Guarantor, within 20 Business Days of having been acquired or created, by executing and delivering (a) a supplemental indenture to the Indenture providing for a Guarantee by such Restricted Subsidiary and (b) a joinder or supplement to the Subordination Deed; (ii) the parent of such Significant Subsidiary or Subsidiary with Material Unencumbered Assets shall have executed one or more Security Documents granting to the relevant Security Agent or the Polish Security Agent, as applicable, subject to for the benefit of the Holders of the Notes a first priority pledge of all shares in such Significant Subsidiary or Subsidiary with Material Unencumbered Assets within such 20 Business Day period (subject to Permitted Collateral Liens and subject to perfection requirements under applicable law, including filing requirements); (iii) the parent of such Significant Subsidiary or Subsidiary with Material Unencumbered Assets shall have taken all reasonably required steps under applicable law and undertaken other customary procedures in connection with the granting of such security interests, *provided*, *however*, that no Significant Subsidiary or Subsidiary with Material Unencumbered Assets will be required to become a Guarantor nor shall its shares be required to be so pledged to the extent and for so long as the incurrence of such Guarantee or granting of such pledge: (x) would be reasonably likely to result in any violation of applicable law that cannot be avoided or otherwise prevented through measures reasonably available to the parent or such Significant Subsidiary or Subsidiary with Material Unencumbered Assets, any liability for the officers, directors or shareholders of such Significant Subsidiary or Subsidiary with Material Unencumbered Assets or any current or future cost expense, liability or obligation (including any tax) other than *de minimis* costs and expenses; or (y) would be prohibited by the terms of any Acquired Debt in respect of such new Significant Subsidiary or Subsidiary with Material Unencumbered Assets (including any Indebtedness of the RSV Entities) and such Acquired Debt is otherwise permitted to be incurred under the Indenture and provided such Acquired Debt has not been incurred in contemplation of, or in connection with, the transaction or series of transactions pursuant to which such Person becomes a Significant Subsidiary or Subsidiary with Material Unencumbered Assets of or was otherwise acquired by the Parent or a Restricted Subsidiary and for only so long as such Acquired Debt remains outstanding; and (iv) to the extent the assets of any of such Significant Subsidiary or Subsidiary with Material Unencumbered Assets would constitute Collateral, execute and deliver a supplement or joinder to the Security

Documents or new Security Documents and take all actions required thereunder to perfect the Liens created thereunder. Notwithstanding the foregoing, the Copecresto Subsidiaries will not be required to become Guarantors, regardless of whether they become a Significant Subsidiary or Subsidiary with Material Unencumbered Assets, *provided* that on each Guarantor Testing Date (as defined below), the aggregate unconsolidated EBITDA provided by the Restricted Subsidiaries does not fall below the 85% threshold set forth in the following paragraph.

After the Effective Date, the Parent will cause one or more additional Restricted Subsidiaries: (u) to become a Guarantor; (v) to execute a supplemental indenture, so that Guarantees are provided by such Restricted Subsidiaries of the Parent whose aggregate unconsolidated EBITDA and assets, taken together with the unconsolidated EBITDA and assets of the Parent, comprise at least 85% of the Consolidated EBITDA and consolidated assets of the Parent, respectively, determined as of each date (the "*Guarantor Testing Date*") on which the Parent is required to provide to the Trustee and the Holders of the Notes: (i) an annual report; or (ii) a quarterly report in accordance with the provisions set out in under the caption "—*Certain Covenants—Reports*", in each case after giving *pro forma* effect to any sales or other distributions of assets not reflected therein, and in each case except to the extent that the incurrence of such Guarantees: (i) would be reasonably likely to result in any violation of applicable law that cannot be avoided or otherwise prevented through measures reasonably available to Parent or such Significant Subsidiary, any liability for the officers, directors or shareholders of such Significant Subsidiary or any current or future cost, expense, liability or obligation (including any tax) other than *de minimis* costs and expenses; or (ii) would be prohibited by the terms of any Acquired Debt in respect of such new Restricted Subsidiary and such Acquired Debt is otherwise permitted to be incurred under the Indenture and *provided* such Acquired Debt has not been incurred in contemplation of, or in connection with, the transaction or series of transactions pursuant to which such Person becomes a Restricted Subsidiary (and for only so long as such Acquired Debt remains in effect); (w) to cause the parent of such Restricted Subsidiary to execute one or more Security Documents granting to the relevant Security Agent or the Polish Security Agent, as applicable, subject to for the benefit of the Holders of the Notes a first priority pledge of all shares in such Restricted Subsidiary within such 20 Business Day period (subject to Permitted Collateral Liens and subject to perfection requirements under applicable law, including filing requirements and except to the extent (i) would be reasonably likely to result in any violation of applicable law that cannot be avoided or otherwise prevented through measures reasonably available to Parent or such Significant Subsidiary, any liability for the officers, directors or shareholders of such Significant Subsidiary or any current or future cost, expense, liability or obligation (including any tax) other than de minimis costs and expenses; or (ii) would be prohibited by the terms of any Acquired Debt in respect of such new Restricted Subsidiary and such Acquired Debt is otherwise permitted to be incurred under the Indenture); (x) to cause the parent of such Restricted Subsidiary to take all reasonably required steps under applicable law and undertake other customary procedures in connection with the granting of such security interests; (y) to enter into the Subordination Deed; and (z) to the extent any such Restricted Subsidiaries' assets would constitute Collateral, to execute and deliver a supplement or joinder to the Security Documents or new Security Documents and take all actions required thereunder to perfect the Liens created thereunder.

The Parent will not permit any Restricted Subsidiary that is not a Guarantor (other than a Copecresto Subsidiary) to incur or guarantee any Indebtedness for borrowed money of any Guarantor, the Parent or the Issuer (other than intercompany loans between or among the Parent and/or the Restricted Subsidiaries), unless within 20 Business Days thereof (i) such Restricted Subsidiary executes and delivers to the Trustee a supplemental indenture pursuant to which such Restricted Subsidiary will, to the maximum extent permitted by law, guarantee payment of the Notes on substantially the same terms and conditions as those set forth in the Indenture; *provided*, *however*, that no Restricted Subsidiary will be required to become a Guarantor to the extent and for so long as a consequence of the incurrence of such Guarantee would be reasonably likely to result in any violation of applicable law that cannot be avoided or otherwise prevented through measures reasonably available to the Parent or such Significant Subsidiary, any liability for the officers, directors or shareholders of such Significant Subsidiary or any current or future cost, expense, liability or obligation (including any tax) other than *de minimis* costs and expenses, (ii) the parent of such Restricted Subsidiary shall have executed one or more Security Documents granting to the relevant Security Agent or the Polish Security Agent, as applicable, subject to for the benefit of the Holders of the Notes a first priority pledge of all shares in such Restricted Subsidiary within such 20 Business Day period (subject to Permitted Collateral Liens and subject to perfection requirements under applicable law, including filing requirements); (iii) the parent of such Restricted Subsidiary shall have taken all reasonably required steps under applicable law and undertaken other customary procedures in connection with the granting of such security interests; (iv) such Restricted Subsidiary has entered into the Subordination Deed; and (v) to the extent any such Restricted

234

Subsidiary's assets would constitute Collateral, execute and deliver a supplement or joinder to the Security Documents or new Security Documents and take all actions required thereunder to perfect the Liens created thereunder. As described in the covenant entitled "–Liens", other than certain limited exceptions, neither the Parent nor any Guarantor will grant Liens on assets to secure any Indebtedness for borrowed money permitted under the Indenture without granting a Lien in such assets to the Security Agent for the ratable benefit of the Senior Secured Notes.

### Designation of Restricted and Unrestricted Subsidiaries

The Board of Directors of the Parent may designate any Restricted Subsidiary to be an Unrestricted Subsidiary if that designation would not cause a Default, *provided* that in no event will the business operated on the Effective Date by any of the Parent and CEDC International be transferred to or held by an Unrestricted Subsidiary. If a Restricted Subsidiary is designated as an Unrestricted Subsidiary, the aggregate Fair Market Value of all outstanding Investments owned by the Parent and its Restricted Subsidiaries in the Subsidiary designated as an Unrestricted Subsidiary will be deemed to be an Investment made as of the time of the designation and will reduce the amount available for Restricted Payments under the provisions described above under the caption "—*Certain Covenants—Restricted Payments*" or under one or more clauses of the definition of Permitted Investments, as determined by the Parent; *provided* that this restriction shall not apply if the subsidiary has less than $1,000 of total assets. That designation will only be permitted if the Investment would be permitted at that time and if the Restricted Subsidiary otherwise meets the definition of an Unrestricted Subsidiary. The Board of Directors of the Parent may redesignate any Unrestricted Subsidiary to be a Restricted Subsidiary if that redesignation would not cause a Default.

Any designation of a Subsidiary of the Parent as an Unrestricted Subsidiary will be evidenced to the Trustee by filing with the Trustee a certified copy of a resolution of the Board of Directors giving effect to such designation and an Officers' Certificate certifying that such designation complied with the preceding conditions and was permitted by the provisions described above under the caption "—*Certain Covenants—Restricted Payments*." If, at any time, any Unrestricted Subsidiary would fail to meet the preceding requirements as an Unrestricted Subsidiary, it will thereafter cease to be an Unrestricted Subsidiary for purposes of the Indenture and any Indebtedness of such Subsidiary will be deemed to be incurred by a Restricted Subsidiary of the Parent as of such date and, if such Indebtedness is not permitted to be incurred as of such date under the provisions described under the caption "—*Certain Covenants—Incurrence of Indebtedness and Issuance of Preferred Stock*," the Parent will be in default of such covenant. The Board of Directors of the Parent may at any time designate any Unrestricted Subsidiary to be a Restricted Subsidiary *provided* that such designation will be deemed to be an incurrence of Indebtedness by a Restricted Subsidiary of the Parent of any outstanding Indebtedness of such Unrestricted Subsidiary, and such designation will only be permitted if: (i) such Indebtedness is permitted under the provisions described under the caption "—*Certain Covenants—Incurrence of Indebtedness and Issuance of Preferred Stock*", calculated on a *pro forma* basis as if such designation had occurred at the beginning of the four-quarter reference period; and (ii) no Default or Event of Default would be in existence following such designation.

The Company will not have any Unrestricted Subsidiaries as of the Effective Date.

### Sale and Leaseback Transactions

The Parent will not, and will not permit any of its Restricted Subsidiaries to, enter into any sale and leaseback transaction; *provided* that any Guarantor may enter into a sale and leaseback transaction if:

(1)     that Guarantor, as applicable, could have: (a) incurred Indebtedness in an amount equal to the Attributable Debt relating to such sale and leaseback transaction under the Net Leverage Ratio test in the first paragraph or under an exemption in the second paragraph of the provisions described above under the caption "—*Certain Covenants—Incurrence of Indebtedness and Issuance of Preferred Stock*" (without regard to any limitation under the first paragraph of such covenant that such Indebtedness be expressly subordinated to the Notes); and (b) incurred a Lien to secure such Indebtedness pursuant to the covenant described above under the caption "—*Liens*";

(2)     the net cash proceeds of that sale and leaseback transaction are at least equal to the Fair Market Value of the property that is the subject of that sale and leaseback transaction; and

(3)    the Parent or a Restricted Subsidiary applies the net proceeds of such transaction in compliance with, the provisions described above under the captions "—*Asset Sales*" and "—*Mandatory Redemption*."

*Impairment of Security Interest*

The Parent shall not and shall not permit any Restricted Subsidiary to take or knowingly or negligently omit to take any action which action or omission would have the result of materially impairing the security interest with respect to the Collateral (it being understood that the incurrence of Liens on the Collateral permitted by the definition of Permitted Collateral Liens (including the release and re-taking of one or more Liens in connection with the incurrence of Permitted Collateral Liens) shall under no circumstances be deemed to materially impair the security interest with respect to the Collateral) for the benefit of the Trustee and the Holders of the Notes (including any Additional Notes), and the Parent shall not, and shall not permit any Restricted Subsidiary to, grant to any Person other than the Security Agent (or Polish Security Agent), for the benefit of the Trustee and the Holders of the Notes (including any Additional Notes) and the other beneficiaries described in the Security Documents, any interest in any of the Collateral; *provided* that the Parent and its Restricted Subsidiaries may incur Liens on the Collateral permitted by the definition of Permitted Collateral Liens; *provided further*, *however*, that (a) nothing in this provision shall restrict the release or replacement of any Collateral in compliance with the terms of the Indenture, the Security Documents and any intercreditor agreements; and (b) any Collateral or any Security Document relating to any Collateral may be amended, extended, renewed, restated, supplemented or otherwise modified or replaced (i) if contemporaneously with any such action, the Parent delivers to the Trustee an Officers' Certificate confirming that the relevant entity granting the Collateral is solvent or an opinion of counsel, in form and substance reasonably satisfactory to the Trustee, confirming that, after giving effect to any transactions related to such amendment, extension, renewal, restatement, supplement, modification or replacement (an "*Amendment*"), the Lien or Liens (other than in respect of Liens on assets that have been added to the Collateral as a result of such Amendment) created under any Security Document relating to any Collateral so amended, extended, renewed, restated, supplemented, modified or replaced are valid Liens enforceable in accordance with their terms against the grantor of the Liens and not otherwise subject to any limitation, imperfection or new hardening period, in equity or at law, that such Lien or Liens were not otherwise subject to immediately prior to such Amendment; or (ii) to allow for the conversion of an entity the shares of which constitute Collateral to another form of Person (or to allow for conversion, recapitalization or similar transactions involving the shares or other Equity Interests of any such entity) if contemporaneously with any such action, the Parent delivers to the Trustee an opinion of counsel, in form and substance reasonably satisfactory to the Trustee, confirming that, after giving effect to any transactions related to such an Amendment, the Lien or Liens created in respect of such Collateral so amended, extended, renewed, restated, supplemented, modified or replaced are valid Liens enforceable in accordance with their terms against the grantor of the Liens. In the event that the Parent complies with the requirements of this covenant, the Trustee and the Security Agents shall consent to any such Amendment without the need for instructions from Holders of the Notes.

*Delivery of Security and Guarantees*

The Parent will deliver on the Effective Date or as soon as practicable thereafter: (i) pledges (or charges) of shares in the Issuer and the U.S. Guarantors (other than the Parent), and, subject to filing, registration and similar requirements, Dancraig Wine & Spirits Trading, the Whitehall Subsidiaries and the Luxembourg Guarantors, and evidence of the deposit for filing, application for registration thereof or compliance with other similar requirements; (ii) pledges of, or in the applicable jurisdictions, assignments of rights under, each Specified Bank Account of the Issuer and each Guarantor (other than the Russian Guarantors or Polish Guarantors) as of the Effective Date; and (iii) a pledge (or assignment) of the Intercompany Loan made by the Issuer to CEDC International and, upon funding, pledges (or assignments) of the Intercompany Loan made by the Issuer to Jelegat Holdings Limited and the Roust Russia On-Loans.

The Parent will use its reasonable efforts to, within 15 Business Days after the Effective Date or as soon as is reasonably practicable thereafter: (i) deliver pledges of shares in the Cyprus Guarantors; and (ii) deliver pledge agreements, and evidence of the filing thereof for registration with the appropriate authority, over the Intellectual Property Rights (other than with respect to security governed by Polish law).

The Parent will use its reasonable efforts to, within two months after the Effective Date or as soon as is reasonably practicable thereafter or: (i) deliver registered pledges of participatory interests of or shares in, as appropriate, the Russian Guarantors; (ii) deliver a registered business quota pledge of the Hungarian Guarantor; and

(iii) deliver assignment of rights under each non-Russian Specified Bank Account and withdrawal rights agreements for each Russian Specified Bank Account of the Russian Guarantors.

The Guarantees granted by the Polish Obligors will be subject to customary limitations language, including with respect to Polish bankruptcy, corporate and civil laws. With respect to security governed by Polish law the Parent will deliver (or procure the delivery) to the Polish Security Agent: (i) on or about the Effective Date: (1) with respect to ordinary, financial and registered pledges (as the case may be) – copies of agreements relating to such pledges; and (2) with respect to mortgages over real property in Poland – excerpt(s) from notarial deed(s) on establishment of such mortgages; (ii) within ten (10) Business Days of execution of the agreements relating to registered pledges – copies of motions filed with the respective Polish court(s) to register such registered pledges; (iii) within ten (10) Business Days of execution of the agreements relating to ordinary pledges on trademarks – copies of motions filed with the respective trademark registration agency to register such ordinary pledges on trademarks; (iv) within ten (10) Business Days of their receipt, copies of decisions of the Polish court(s) or the trademark registration agency (as the case may be) on registration of the relevant pledges or mortgages by such Polish court(s) or by the trademark registration agency (as the case may be); (v) within ten (10) Business Days of receipt of the decision of Polish court(s) on registration of the registered pledges on trademarks – copies of motions filed with the respective trademark registration agency to register such registered pledges.

The Parent will use its reasonable efforts to deliver within six months after the Effective Date or as soon as reasonably practicable thereafter, signed and registered mortgage agreements evidencing the creation of the mortgages over real property, land rights and fixtures (to the extent qualified as real property under Russian law) of the Siberian Distillery and First Kupazhniy Factory owned by the Russian Alcohol Guarantors.

At any time that the Issuer or any Guarantor creates, acquires or otherwise owns or holds a Specified Bank Account after the Effective Date, the Parent shall use its reasonable best efforts to deliver pledges or, in the applicable jurisdictions, assignments of rights under each Specified Bank Account (or withdrawal rights agreements in the case of any Russian Specified Bank Account of a Russian Guarantor) as promptly as reasonably practicable.

In obtaining any consent or amendment required in respect of any such security agreed to be provided, no covenant herein shall require that the Parent or any of its subsidiaries pay any fee or other payment that is unduly burdensome, as determined in the good faith judgment of the senior officers or Board of Directors of the Parent.

At any time that the Issuer or any Restricted Subsidiary creates, acquires or otherwise owns Specified Intellectual Property Rights after the Effective Date, the Parent shall use reasonable efforts to deliver pledges or, in the applicable jurisdictions, assignments of rights relating to such Specified Intellectual Property Rights as promptly as reasonably practicable provided that the Parent shall not be required to deliver pledges or assignments of rights relating to Specified Intellectual Property Rights if (i) such a pledge or assignment would result in a violation of any applicable law or director's duties or breach of any contract in existence on the date hereof or on the date that such Specified Intellectual Property Right is created or acquired and such breach cannot be avoided without unreasonable efforts; or (ii) the costs of granting such pledge or assignment would be disproportionate relative to the value of such Specified Intellectual Property Right as determined by the directors of the Parent acting in good faith.

At any time following the termination of the RSV Loans, the Parent and the Guarantors shall use reasonable efforts to take such steps as are necessary to ensure that the Security Agent, for the ratable benefit of the Senior Secured Notes, has a first-priority lien in the assets that constitute collateral in respect of the RSV Loans.

*Payments for Consent*

The Parent will not, and will not permit any of its Restricted Subsidiaries to, directly or indirectly, pay or cause to be paid any consideration to or for the benefit of any Holder of Notes for or as an inducement to any consent, waiver or amendment of any of the terms or provisions of the Indenture or the Notes unless such consideration is offered to be paid and is paid to all Holders of the Notes that consent, waive or agree to amend in the time frame set forth in the solicitation documents relating to such consent, waiver or agreement, other than any Holder who waives the right to receive all or any part of such consideration.

237

*Amendments to or Prepayments of the Intercompany Loans*

Without the consent of the Holders of at least a majority in aggregate principal amount of the Notes then outstanding, the Issuer and the Parent will not, and will not permit any Restricted Subsidiary to, (i) prepay or otherwise reduce or permit the prepayment or reduction of any Intercompany Loan; or (ii) amend, modify or alter the Intercompany Loans in any manner adverse to the Holders of the Notes; *provided*, that, without the consent of Holders of at least 90% of the outstanding principal amount of the Notes, the Issuer and the Parent will not, and will not permit any Restricted Subsidiary to, amend, modify or alter any Intercompany Loan to:

    (1)    change the Stated Maturity of the principal of, or any instalment of interest on such loan (other than as a result of a prepayment or reduction approved by the Holders of not less than a majority of Notes as contemplated by the paragraph above);

    (2)    reduce the rate of interest on such loan to below the interest rate on the Notes;

    (3)    change the currency for payment of principal or interest on such loan;

    (4)    reduce the above-stated percentage of Notes the consent of whose Holders is necessary to modify or amend such loans;

    (5)    waive a default in the payment of any amount under such loan originally falling due prior to the Effective Date; or

    (6)    sell or transfer such loan other than pursuant to its terms or as otherwise permitted by the Indenture.

Notwithstanding the foregoing, (i) the Intercompany Loans and any Roust Russia On Loans may be amended to change the principal amount, interest rate, maturity and other terms to conform to those of the Notes and to provide for the issuance of Additional Notes, or to cure any ambiguity, mistake, omission, defect or inconsistency and to provide for the assumption by a successor Person, and may be prepaid or reduced to facilitate or otherwise accommodate or reflect a repayment, redemption or repurchase of Notes or Additional Notes and (ii) the Intercompany Loans and any Roust Russia On Loans may be novated or assigned to any Guarantor; (iii) the Intercompany Loans may be repaid or amended to reduce the principal amount of such loans provided that the aggregate principal amount of the Intercompany Loans is not reduced to an amount less than the aggregate principal amount of the Notes; (iv) the Intercompany Loans may be refunded or refinanced to the extent required in connection with any permitted refinancing of the Notes and (v) the interest rate of the Intercompany Loans and any Roust Russia On-Loans may be amended provided that the weighted average interest rates on all Intercompany Loans is not reduced to a rate less than the weighted average interest rate applicable to the Notes.

*Reports*

The Parent shall provide the Trustee (and if the Parent is subject to the reporting requirements of Sections 13 or 15(d) of the Exchange Act, file with or furnish to the SEC) annual reports on Form 10-K, quarterly reports on Form 10-Q and current reports on Form 8-K (or, in each case, any successor form), in each case containing the information required to be contained therein, in accordance with the requirements for filing such reports prescribed by the SEC that would be applicable to the Parent if the Parent were subject to the reporting requirements of Sections 13 or 15(d) of the Exchange Act as such requirements may be modified by the SEC from time to time. The Parent shall also publish such reports on its website (without password restriction) at the time it delivers such reports to the Trustee. If the Parent is subject to the reporting requirements of Section 13 or 15(d) of the Exchange Act, the requirement to provide any such report to the Trustee and publish such reports on the Parent's website shall be deemed satisfied if such report has been filed with the SEC through the Electronic Data Gathering Analysis and Retrieval system (or any successor method of filing) ("*EDGAR*"). As soon as reasonably practicable after such reports are filed it shall hold a public investor call to discuss the contents of such reports. Such reports will (i) disclose all material terms of any Non-Recourse Factoring Facilities that were in effect on any date covered by such report and such reports shall state that such Non-Recourse Factoring Facility provides for no recourse to the Company or any of its Affiliates under any circumstances and (ii) include the disclosure required by the second paragraph under the caption "—*Certain Covenants—Reserved Matters*.". Notwithstanding the foregoing, the Parent's annual report on Form 10-K for the year ended December 31, 2016 will be due 120 days following

December 31, 2016 and the Parent's quarterly report on Form 10-Q for the first quarter of 2017 will be due 75 days following March 31, 2017, in each case provided that the Parent issues an "earnings release" summarizing the material results to be disclosed on such Form 10-K or Form 10-Q, within the time periods such report would be required to be published pursuant to the first sentence above.

The Financial Statements (selected financials, MD&A discussion and other financial statements) included in the annual and quarterly reports provided pursuant to the forgoing paragraph may be prepared under IFRS (notwithstanding requirements under the Exchange Act). Financial statements prepared in compliance with U.S. GAAP, including any footnotes thereto,  may be provided in separate reports that will accompany the relevant Form 10-K and Form 10-Q and will be available at the same time as the publicly available reports provided in IFRS on a password protected website which is accessible by holders of Notes and common stock of the Parent, bona fide prospective purchasers of Notes or common stock of the Parent, securities analysts and market making financial institutions.

In addition to the foregoing, if the Parent is subject to the reporting requirements of Sections 13 or 15(d) of the Exchange Act, the Parent shall provide the Trustee, within 10 days after it files with, or furnishes to, the SEC copies of any other information, documents and reports (or copies of such portions of any of the foregoing as the SEC may by rules and regulations prescribe) which it is required to file with the SEC pursuant to Section 13 of 15(d) of the Exchange Act or is required to furnish to the SEC pursuant to this Indenture. The requirement to provide any such report to the Trustee shall be deemed satisfied if such report has been filed through EDGAR.

If the Parent has designated any of its Subsidiaries as Unrestricted Subsidiaries, then the quarterly and annual financial information required by the first paragraph of this covenant shall include a reasonably detailed presentation, either on the face of the financial statements or in the notes and footnotes thereto, to the extent permitted by the rules and regulations of the SEC, and in the "*Operating Review and Financial Prospects*" of the financial condition and results of operations of the Parent and its Restricted Subsidiaries separate from the financial condition and results of operations of the Unrestricted Subsidiaries of the Parent.

The Parent, the Issuer and the Guarantors agree that, for so long as any Notes remain outstanding, at any time they are not required to file the reports required by the preceding paragraphs with the SEC, they will furnish to the Trustee and to the Holders of Notes and bona fide prospective investors, upon their request, the information required to be delivered pursuant to Rule 144A(d)(4) under the Securities Act. In addition, for so long as the Notes are listed on the Global Exchange Market of the Irish Stock Exchange or the Channel Islands Stock Exchange and the rules of the exchange so require, all such reports will be available at the office of the Irish paying agent or the Channel Islands payment agent, as applicable, if any. Neither the rules of the Irish Stock Exchange not the rules of the Channel Islands Stock Exchange currently require a paying agent.

If the Parent is not subject to the reporting requirements of Section 13 or 15(d) of the Exchange Act, the reports required to be provided under the first paragraph of this covenant shall not be required to contain any exhibits or comply with (i) Item 10(e) of Regulation S-K promulgated by the SEC, (ii) Sections 302, 404 or 906 of the Sarbanes-Oxley Act of 2002 or related Items 307 and 308 of Regulation S-K promulgated by the SEC; and (iii) such reports shall not be required to contain separate financial statements contemplated by Rule 3-09, Rule 3-10 or Rule 3-16 of Regulation S-X promulgated by the SEC, *provided* that the Parent will present summary information related to Guarantors and Non-Guarantors setting out the percentage of sales, EBITDA and assets of the Parent that are provided by Guarantors and Non-Guarantors, respectively.

### *Specified Reserved Matters*

During the Protected Period, the provisions set forth below under this section entitled "Reserved Matters" shall apply.

Subject to the Specified Reserved Matter Cure Period (as defined below), Parent shall not, and shall cause each Restricted Subsidiary not to, take any action which is a Specified Reserved Matter without obtaining Minority Director Approval, provided that a failure to comply with the foregoing shall not constitute a breach of this covenant unless the relevant transaction for which approval was required and not obtained, (a) involves consideration (whether cash or non-cash) in excess of $5.0 million, or (b) together with all other transactions for which Minority

Director Approval was required but not obtained at the time of the transaction, and was not subsequently obtained, involves consideration (whether cash or non-cash) in excess of $10.0 million.

In each of its quarterly reports on Form 10-Q and annual reports on Form 10-K, the Parent shall disclose (i) the total amount of issued and outstanding Indebtedness incurred under clauses (1), (4) and (20) of the second paragraph under the caption "—*Certain Covenants—Incurrence of Indebtedness and Issuance of Preferred Stock*" as of the end of the relevant reporting period, and (ii) whether or not the Parent has knowledge of the occurrence of any transaction constituting a Specified Reserved Matter which has not received Minority Director Approval.

The Parent shall have 20 days from the date that it issues or posts any report acknowledging such occurrence of a Specified Reserved Matter without requisite Minority Director Approval (the "*Specified Reserved Matter Cure Period*") to cure any breach arising as a result thereof.

Any Specified Reserve Matter that is not approved by a Minority Director but is approved by the relevant Minority Shareholders that nominated such Minority Director in accordance with the provisions of the Investor Rights Agreement and the Certificate of Incorporation after the Board of Directors requests that such Minority Shareholders approve such Specified Reserved Matter, such Specified Reserved Matter shall be deemed to be approved by such Minority Director for the purposes of the Indenture and no Event of Default will occur as a result of consummating such Specified Reserved Matter; *provided that* in requesting a vote of the Minority Shareholders that nominated such Minority Director, no material non-public information shall be provided such Minority Shareholders regarding Parent or any of its Restricted Subsidiaries without the prior written consent of such Minority Shareholders; *provided further* that in the event an such material non-public information is provided to any Minority Shareholder, by Parent or any Restricted Subsidiary or any person acting on their behalf, Parent will promptly, but in any event no more than 3 days following such disclosure, make such material non-public information public following the vote of such Minority Shareholders. Every incurrence of Indebtedness, including any refinancing, that requires approval by a Minority Director pursuant to the terms of the Indenture and the Investor Rights Agreement will require the Company to provide the Minority Director with a certificate showing compliance with the provisions described under the caption "—*Certain Covenants—Incurrence of Indebtedness and Issuance of Preferred Stock*," including calculations thereto.

**Auditors**

Any change in the Parent's auditor will require the consent of the Holders of at least a majority in aggregate principal amount of the Notes then outstanding if either, (i) such auditor is not an Approved Auditor or (ii) the Parent has changed its auditor in the preceding two-year period.

**Events of Default and Remedies**

Each of the following is an "*Event of Default*":

(1)     default for 30 days in the payment when due of interest on if any, with respect to, the Notes;

(2)     default in the payment when due (at maturity, upon redemption or otherwise) of the principal of, or premium, if any, on the Notes;

(3)     failure by the Parent or any Guarantor to comply with the provisions described under the caption "—*Certain Covenants—Merger, Consolidation or Sale of Assets*";

(4)     failure by the Parent or any of its Subsidiaries to comply with the provisions described under the caption "—*Reserved Matters*";

(5)     failure by the Parent or any of its Restricted Subsidiaries for 30 days after written notice to the Parent by the Trustee or the Holders of at least 25% in aggregate principal amount of the Notes then outstanding to comply with any of the other agreements in the Indenture or the Security Documents;

(6)     failure by the Parent or any of its Restricted Subsidiaries to comply with its obligation to appoint Minority Directors pursuant to the Charter Documents and the Investor Rights Agreement, the dismissal

240

of a Minority Director by the Parent other than in accordance with the Charter Documents and the Investor Rights Agreement or the amendment or removal of the provisions of the Charter Documents or the Investor Rights Agreement relating to the Minority Directors other than in accordance with the amendment provisions of such documents in effect on the Effective Date;

(7) default (after giving effect to any applicable grace period) under any mortgage, indenture or instrument under which there may be issued or by which there may be secured or evidenced any Indebtedness for money borrowed by the Parent or any of its Restricted Subsidiaries (or the payment of which is guaranteed by the Parent or any of its Restricted Subsidiaries), whether such Indebtedness or Guarantee now exists, or is created after the Effective Date, if that default:

(a) is caused by a failure to pay principal of, or interest or premium, if any, on, such Indebtedness prior to the expiration of the grace period provided in such Indebtedness on the date of such default (a "*Payment Default*"); or

(b) results in the acceleration of such Indebtedness prior to its express maturity,

and, in each case, the principal amount of any such Indebtedness, together with the principal amount of any other such Indebtedness the maturity of which has been so accelerated, aggregates $25.0 million or more;

(8) failure by the Parent or any of its Restricted Subsidiaries to pay final judgments entered by a court or courts of competent jurisdiction aggregating in excess of $25.0 million (net of any amounts which are covered by enforceable insurance policies issued by solvent carriers), which judgments are not paid, discharged or stayed for a period of 60 days;

(9) breach by the Parent or any of its Restricted Subsidiaries of any material representation or warranty or agreement in the Security Documents, the repudiation by the Parent or any of its Restricted Subsidiaries of any of its obligations under the Security Documents or the unenforceability of the Security Documents against the Parent or any of its Restricted Subsidiaries for any reason;

(10) except as permitted by the Indenture, any Guarantee of the Parent or any of its Significant Subsidiaries (or any group of Subsidiaries which together would constitute a Significant Subsidiary) is held in any judicial proceeding to be unenforceable or invalid or ceases for any reason to be in full force and effect, or the Parent or any of its Significant Subsidiaries (or any group of Subsidiaries which together would constitute a Significant Subsidiary), or any Person acting on behalf of any such Person, denies or disaffirms its obligations under its Guarantee;

(11) (x) any Intercompany Loan ceases to be in full force and effect or is declared fully or partially void in a judicial proceeding or any Intercompany Borrower asserts that any Intercompany Loan is fully or partially invalid and (y) the Guarantee of the Parent is held in any judicial proceeding to be unenforceable or invalid or ceases for any reason to be in full force and effect, or the Parent, or any Person acting on behalf of any the Parent, denies or disaffirms its obligations under its Guarantee; or

(12) (i) any Roust Russia On-Loan ceases to be in full force and effect or is declared fully or partially void in a judicial proceeding or any Roust Russia Intercompany Borrower asserts that any Roust Russia On-Loan is fully or partially invalid, (ii) the repudiation or disaffirmation by Russian Alcohol Finance Limited of its obligations under any of the Security Documents or the determination in a judicial proceeding that any of the Security Documents is unenforceable or invalid against Russian Alcohol Finance Limited for any reason, (iii) any Security Document ceases to be in full force and effect (other than in accordance with its respective terms or the terms of the Indenture), or ceases to be effective in all material respects to grant a Security Agent a perfected Lien on the Roust Russia On-Loans with the priority purported to be created thereby or; (iv) the Issuer or Russian Alcohol Finance Limited amends any constitutional documents in any manner which adversely affects the enforceability, validity, perfection or priority of a Security Agent's Lien on any Roust Russia On-Loan or which adversely affects the value of any Roust Russia On-Loan in any material respect;

(13)    (a) the Parent or any of its Significant Subsidiaries (or any group of Subsidiaries which together would constitute a Significant Subsidiary), pursuant to or within the meaning of Bankruptcy Law:

    (i)    commences a voluntary case or proceeding, or any other case or proceeding to be adjudicated bankrupt or insolvent, or consents to the filing of a petition, application, answer or consent seeking reorganization or relief;

    (ii)    consents to the entry of an order or decree for relief against it in an involuntary case or proceeding, or to the commencement of any bankruptcy or insolvency case or proceeding against it;

    (iii)    consents to the appointment of, or taking possession by, a custodian, receiver, liquidator, administrator, supervisor, assignee, trustee, sequestrator (or other similar official) of it or for any substantial part of its property;

    (iv)    makes a general assignment for the benefit of its creditors; or

    (v)    admits in writing its inability to pay its debts generally as they become due; or

    (b)    a court of competent jurisdiction enters an order or decree under Bankruptcy Law that:

    (i)    is for relief against the Parent or any of its Significant Subsidiaries (or any group of Subsidiaries which together would constitute a Significant Subsidiary) in an involuntary case;

    (ii)    adjudges the Parent or any of its Significant Subsidiaries (or any group of Subsidiaries which together would constitute a Significant Subsidiary) bankrupt or insolvent, or seeks reorganization, arrangement, adjustment or composition of or in respect to the Parent or any of its Significant Subsidiaries (or any group of Subsidiaries which together would constitute a Significant Subsidiary);

    (iii)    appoints a custodian, receiver, liquidator, administrator, supervisor, assignee, trustee, sequestrator (or other similar official) of the Parent or any of its Significant Subsidiaries (or any group of Subsidiaries which together would constitute a Significant Subsidiary) or for all or substantially all of the property of the Parent of any of its Significant Subsidiaries (or any group of Subsidiaries which together would constitute a Significant Subsidiary); or

    (iv)    orders the winding-up or liquidation of the Parent or any of its Significant Subsidiaries (or any group of Subsidiaries which together would constitute a Significant Subsidiary);

and the order or decree remains unstayed and in effect for 60 consecutive days.

In the case of an Event of Default described in clause (12) above, all outstanding Notes will become due and payable immediately without action or notice. If any other Event of Default occurs and is continuing, the Trustee or the Holders of at least 25% in aggregate principal amount of the then outstanding Notes may declare all the Notes to be due and payable immediately.

Subject to certain limitations, Holders of a majority in aggregate principal amount of the then outstanding Notes may direct the Trustee in its exercise of any trust or power. The Trustee may withhold from Holders of the Notes notice of any continuing Default or Event of Default if it determines that withholding notice is in their interest, except a Default or Event of Default relating to the payment of principal, interest or premium, if any.

Subject to the provisions of the Indenture relating to the duties of the Trustee, in case an Event of Default occurs and is continuing, the Trustee will be under no obligation to exercise any of the rights or powers under the Indenture at the request or direction of any Holders of Notes unless such Holders have offered to the Trustee indemnity or security satisfactory to it against any loss, liability or expense. Except to enforce the right to receive

payment of principal, premium, if any, or interest, when due, no Holder of a Note may pursue any remedy with respect to the Indenture or the Notes unless:

(14)    such Holder has previously given the Trustee notice that an Event of Default is continuing;

(15)    Holders of at least 25% in aggregate principal amount of the then outstanding Notes have requested the Trustee to pursue the remedy;

(16)    such Holders have offered the Trustee security or indemnity satisfactory to it against any loss, liability or expense;

(17)    the Trustee has not complied with such request within 60 days after the receipt of the request and the offer of security or indemnity; and

(18)    Holders of a majority in aggregate principal amount of the then outstanding Notes have not given the Trustee a direction inconsistent with such request within such 60-day period.

The Holders of a majority in aggregate principal amount of the then outstanding Notes by notice to the Trustee may, on behalf of the Holders of all of the Notes, rescind an acceleration or waive any existing Default or Event of Default and its consequences under the Indenture except a continuing Default or Event of Default in the payment of interest or premium, if any, on, or the principal of, the Notes.

The Issuer and the Parent are required to deliver to the Trustee annually a statement regarding compliance with the Indenture. Upon becoming aware of any Default or Event of Default, the Issuer and the Parent are required to deliver to the Trustee within thirty days a statement specifying such Default or Event of Default.

**No Personal Liability of Directors, Officers, Employees and Stockholders**

No director, officer, employee, incorporator or stockholder of the Issuer, the Parent or any other Guarantor, as such, will have any liability for any obligations of the Issuer, the Parent or any other Guarantors under the Notes, the Indenture, the Guarantees, the Security Documents or for any claim based on, in respect of, or by reason of, such obligations or their creation. Each Holder of Notes by accepting a Note waives and releases all such liability. The waiver and release are part of the consideration for issuance of the Notes. The waiver may not be effective to waive liabilities under the U.S. federal securities laws.

**Legal Defeasance and Covenant Defeasance**

The Issuer may, at its option at any time, elect to have all of its obligations discharged with respect to the outstanding Notes and all obligations of the Guarantors discharged with respect to their Guarantees ("*Legal Defeasance*") except for:

(1)    the rights of Holders of outstanding Notes to receive payments in respect of the principal of, or interest or premium, if any, on, such Notes when such payments are due from the trust referred to below;

(2)    the Issuer's obligations with respect to the Notes concerning issuing temporary Notes, registration of Notes, mutilated, destroyed, lost or stolen Notes and the maintenance of an office or agency for payment and money for security payments held in trust;

(3)    the rights, powers, trusts, duties and immunities of the Trustee, and the Issuer's and the Guarantors' obligations in connection therewith; and

(4)    the Legal Defeasance and Covenant Defeasance provisions of the Indenture.

In addition, the Issuer may, at its option and at any time, elect to have the obligations of the Issuer and the Guarantors released with respect to certain covenants (including its obligation to make Change of Control Offers and Asset Sale Offers) that are described in the Indenture ("*Covenant Defeasance*") and thereafter any omission to comply with those covenants will not constitute a Default or Event of Default with respect to the Notes. In the event Covenant Defeasance occurs, certain events (not including non-payment, bankruptcy, receivership, rehabilitation

243

and insolvency events) described under "—Events of Default and Remedies" will no longer constitute an Event of Default with respect to the Notes. If the Issuer exercises its Legal Defeasance option, the Guarantor (other than the Parent) will be released from its Guarantee and the Security Documents to which it is a party. The Issuer may exercise its Legal Defeasance option notwithstanding its earlier exercise of its Covenant Defeasance option.

In order to exercise either Legal Defeasance or Covenant Defeasance:

(5)    the Issuer must irrevocably deposit with the Trustee or its designee, in trust, for the benefit of the Holders of the Notes, cash, non-callable government securities, or a combination of cash and non-callable government securities (such cash and government securities will be denominated in U.S. dollars in amounts corresponding to the obligations under the Notes), in amounts as will be sufficient, in the opinion of a nationally recognized investment bank, appraisal firm or firm of independent public accountants, to pay the principal of, and interest and premium, if any, on, the outstanding Notes on the stated date for payment thereof or on the applicable redemption date, as the case may be, and the Issuer must specify whether the Notes are being defeased to such stated date for payment or to a particular redemption date;

(6)    in the case of Legal Defeasance, the Issuer must deliver to the Trustee (a) an opinion of counsel in the United States reasonably acceptable to the Trustee confirming that (i) the Issuer has received from, or there has been published by, the U.S. Internal Revenue Service a ruling; or (ii) since the Effective Date, there has been a change in the applicable U.S. federal income tax law, in either case to the effect that, and based thereon such opinion of counsel will confirm that, the Holders of the outstanding Notes will not recognize income, gain or loss for federal income tax purposes as a result of such Legal Defeasance and will be subject to U.S. federal income tax on the same amounts, in the same manner and at the same times as would have been the case if such Legal Defeasance had not occurred; and (b) payments from the defeasance trust can be made free and exempt from any and all withholding and other taxes or whatever nature imposed or levied by or on behalf of the Republic of Poland or any taxing authority thereof;

(7)    in the case of Covenant Defeasance, the Issuer must deliver to the Trustee an opinion of counsel in the United States reasonably acceptable to the Trustee confirming that the Holders of the outstanding Notes will not recognize income, gain or loss for U.S. federal income tax purposes as a result of such Covenant Defeasance and will be subject to U.S. federal income tax on the same amounts, in the same manner and at the same times as would have been the case if such Covenant Defeasance had not occurred;

(8)    no Default or Event of Default shall have occurred and be continuing on the date of such deposit (other than a Default or Event of Default resulting from the borrowing of funds to be applied to such deposit);

(9)    such Legal Defeasance or Covenant Defeasance will not result in a breach or violation of, or constitute a default under, any material agreement or instrument (other than the Indenture) to which the Parent or any other Guarantor is a party or by which the Parent or any other Guarantor is bound;

(10)    the Parent and the Issuer must deliver to the Trustee an Officers' Certificate stating that the deposit was not made by the Issuer or any Guarantor with the intent of preferring the Holders of Notes over the other creditors of the Issuer or any Guarantor with the intent of defeating, hindering, delaying or defrauding any creditors of the Issuer or any Guarantor or others; and

(11)    the Parent and the Issuer must deliver to the Trustee an Officers' Certificate and an opinion of counsel, each stating that all conditions precedent relating to the Legal Defeasance or the Covenant Defeasance have been complied with.

## Amendment, Supplement and Waiver

Except as provided in the next two succeeding paragraphs, the Indenture, the Notes, any of the Security Documents or the Guarantees may be amended or supplemented with the consent of the Holders of at least a majority in aggregate principal amount of the Notes then outstanding (including, without limitation, consents

obtained in connection with a purchase of, or tender offer or exchange offer for, Notes), and, subject to certain exceptions, any existing Default or Event of Default or compliance with any provision of the Indenture, the Notes, any of the Security Documents or the Guarantees may be waived with the consent of the Holders of a majority in aggregate principal amount of the then outstanding Notes (including, without limitation, consents obtained in connection with a purchase of, or tender offer or exchange offer for, Notes).

Without the consent of holders of at least 90% of the then outstanding principal amount of Notes an amendment, supplement or waiver may not, with respect to any Notes issued thereunder and held by a non-consenting holder:

(1)    reduce the principal amount of Notes whose Holders must consent to an amendment, supplement or waiver;

(2)    reduce the principal of or change the Stated Maturity of any Note or reduce the premium payable upon the redemption or repurchase of any Note or change the time at which any Note may be redeemed or repurchased as described above under "—Optional Redemption", or, once an obligation to repurchase has arisen thereunder, as described under "—Repurchase at the Option of Holders in connection with a Change of Control" or "—Repurchase at the Option of Holders in connection with a Change of Control—Asset Sales";

(3)    reduce the rate of or change the time for payment of interest, including default interest, on any Note;

(4)    make any Note payable in money other than that stated in the Notes;

(5)    make any change in the provisions of the Indenture relating to waivers of past Defaults which require the consent of Holders of at least 90% of the then outstanding principal amount of Notes outstanding;

(6)    impair the contractual right of any Holder to receive payment of principal of and interest on such Holder's Notes on or after the due dates therefor or to institute suit for the enforcement of any such payment on or with respect to such Holder's Notes;

(7)    change the ranking of the Notes, the Guarantees or the Security granted under the Security Documents;

(8)    release any Lien on the Collateral except as permitted by the Indenture and the Security Documents;

(9)    modify or release any of the Guarantees in any manner materially adverse to the Holders of the Notes other than in accordance with the terms of the Indenture; or

(10)    make any change in the preceding amendment and waiver provisions.

Notwithstanding the preceding two paragraphs, without the consent of any Holder of Notes, the Issuer, the Guarantors, the Trustee and/or the Security Agents may amend or supplement (or take any other action or enter into any other document contemplated by "—*Impairment of Security Interest*"), the Indenture, the Notes, the Guarantees or the Security Documents:

(11)    to cure any ambiguity, mistake, omission, defect or inconsistency;

(12)    to provide for uncertificated Notes in addition to or in place of certificated Notes;

(13)    to provide for the assumption by a successor Person of the Issuer's or a Guarantor's obligations to Holders of Notes and Guarantees pursuant to the Indenture;

(14)    to make any change that would provide any additional rights or benefits to the Holders of Notes or that does not adversely affect the legal rights under the Indenture, the Notes, the Guarantees or the Security Documents of any such Holder in any respect;

(15)    to conform the text of the Indenture, the Guarantees, the Security Documents, the Intercompany Loans, the Roust Russia On-Loans, or the Notes to any provision of this "*Description of the New Senior*

245

*Secured Notes*" to the extent that such provision in this "*Description of the New Senior Secured Notes*" was intended to be a verbatim or substantially verbatim recitation of a provision of the Indenture, the Guarantees, the Security Documents, the Intercompany Loans, the Roust Russia On-Loans or the Notes;

(16)   to provide for the issuance of Additional Notes in accordance with the limitations set forth in the Indenture and to make such changes as may be required to the Security Documents (and any intercreditor agreement) to accommodate and implement such issuance of Additional Notes;

(17)   to allow any Subsidiary to execute a supplemental indenture and/or a Guarantee with respect to the Notes or to further secure the Notes;

(18)   to enter into, amend or supplement any intercreditor agreement with the holder, and/or any agent in respect thereof, of any other Indebtedness permitted to be incurred under the Indenture; *provided* that no such intercreditor agreement shall provide that the Notes or any Guarantee are subordinated to any such Indebtedness or subject to any payment blockage or enforcement standstill or that any Lien securing the Notes or the Guarantees ranks behind any Lien securing such Indebtedness;

(19)   evidence and provide for the acceptance and appointment under the Indenture or Security Documents of a successor Trustee or Security Agent pursuant to the requirement thereof; or

(20)   to the extent necessary to provide for the granting of a security interest for the benefit of any Person (including any release and re-grant of a Lien) and as otherwise contemplated by the provisions described under the caption "—*Certain Covenants—Impairment of Security Interest*," *provided* that, in each case, such amendment, supplement, modification, extension, renewal, restatement or replacement does not violate such covenant.

At the request of the Parent, the Issuer or any Subsidiary Guarantor, the Trustee and Security Agents are authorized to enter into one or more intercreditor agreements, and one or more amendments, extensions, renewals, restatements, supplements, modifications or replacements to any intercreditor agreement; *provided* that the terms thereof are not prohibited by any term of the Indenture.

Each Holder of the Notes agrees to and accepts the terms and conditions of any intercreditor agreement and the entry by the Trustee into any intercreditor agreement and the performance by the Trustee of its obligations and the exercise of its rights thereunder and in connection therewith.

The Trustee will be entitled to request, and rely absolutely on without further inquiry an opinion of counsel and an Officers' Certificate.

## Acts by Holders

In determining whether the Holders of the required principal amount of the Notes have concurred in any direction, waiver or consent, the Notes owned by the Issuer, any Guarantor or by any Subsidiary of the Parent will be disregarded and deemed not to be outstanding.

## Satisfaction and Discharge

The Indenture (and all Liens on Collateral created pursuant to the Security Documents) and the Guarantees will be discharged and will cease to be of further effect (except as to surviving rights of registration of transfer or exchange of the Notes as expressly provided for in the Indenture) as to all Notes issued thereunder, when:

(1)   either:

(a) all Notes that have been authenticated, except lost, stolen or destroyed Notes that have been replaced or paid and Notes for whose payment U.S. dollars has been deposited in trust and thereafter repaid to the Issuer, have been delivered to the Trustee for cancellation; or

(b) all Notes that have not been delivered to the Trustee for cancellation have become due and payable by reason of the delivering of a notice of redemption or otherwise or will become due and payable within one year and the Issuer, the Parent or any other Guarantor has irrevocably deposited or caused to be deposited with the Trustee as trust funds in trust solely for the benefit of the Holders, cash in dollars, non-callable government securities, or a combination of cash in dollars and non-callable government securities, in amounts as will be sufficient, without consideration of any reinvestment of interest, to pay and discharge the entire Indebtedness on the Notes not delivered to the Trustee for cancellation for principal, premium and accrued interest to the date of maturity or redemption;

(2)    no Default or Event of Default has occurred and is continuing on the date of the deposit (other than a Default or Event of Default resulting from the borrowing of funds to be applied to such deposit) and the deposit will not result in a breach or violation of, or constitute a default under, any other instrument to which the Issuer or any Guarantor is a party or by which the Issuer or any Guarantor is bound;

(3)    the Issuer, the Parent or any other Guarantor has paid or caused to be paid all sums payable by it under the Indenture; and

(4)    the Issuer has delivered irrevocable instructions to the Trustee under the Indenture to apply the deposited money toward the payment of the Notes at maturity or on the redemption date, as the case may be.

In addition, the Issuer and the Parent must deliver an Officers' Certificate and an opinion of counsel to the Trustee stating that all conditions precedent to satisfaction and discharge have been satisfied.

## Judgment Currency

U.S. dollars is the sole currency of account and payment for all sums payable by the Issuer or any Guarantor under the Notes, any Guarantee thereof and the Indenture. Any amount received or recovered in currency other than U.S. dollars in respect of the Notes, whether as a result of any judgment or order or the enforcement thereof or the liquidation of the Issuer or any Guarantor, shall constitute a discharge of the Issuer's or the Guarantor's obligation under the Indenture or the Notes, as the case may be, only to the extent of the U.S. dollar amount which the recipient is able to purchase with the amount so received or recovered in other currency in accordance with normal banking procedures on the first Business Day following that receipt or recovery (or, if it is not possible to make that purchase on that date, on the first date on which it is possible to do so). If that U.S. dollar amount is less than the U.S. dollar amount expressed to be due to the recipient under any Note, the Issuer and each Guarantor, jointly and severally, shall indemnify and hold harmless the recipient from and against all loss or damage arising out of, or as a result of, such deficiency. This indemnity shall constitute an obligation separate and independent from the other obligations contained in the Indenture, the Notes or the Guarantees, shall give rise to a separate and independent cause of action, shall apply irrespective of any indulgence granted by any Holder or the Trustee from time to time and shall continue in full force and effect notwithstanding any judgment or order for a liquidated sum in respect of an amount due hereunder or under any judgment or order.

## Consent to Jurisdiction and Service of Process

The Issuer and each of the Guarantors will irrevocably submit to the jurisdiction of any New York state or U.S. federal court located in The Borough of Manhattan, city of New York, State of New York in relation to any legal action or proceeding arising out of, related to or in connection with the Indenture, the Notes, the Guarantees and any related documents. The Issuer and each of the Guarantors will appoint CT Corporation System, 111 Eighth Avenue, 13th Floor, New York, New York, 10011, USA, as its agent for service of process in any such action or proceeding.

## Concerning the Trustee

If the Trustee becomes a creditor of the Issuer or any Guarantor, the Indenture limits the right of the Trustee to obtain payment of claims in certain cases, or to realize on certain property received in respect of any such

247

claim as security or otherwise. The Trustee will be permitted to engage in other transactions; however, if it acquires any conflicting interest it must eliminate such conflict within 90 days, or resign.

The Holders of a majority in aggregate principal amount of the then outstanding Notes will have the right to direct the time, method and place of conducting any proceeding for exercising any remedy available to the Trustee, subject to certain exceptions. The Indenture provides that in case an Event of Default occurs and is continuing, the Trustee will be required, in the exercise of its power, to use the degree of care of a prudent person in the conduct of his/her own affairs. Subject to such provisions, the Trustee will be under no obligation to exercise any of its rights or powers under the Indenture at the request of any Holder of Notes, unless such Holder has offered to the Trustee security and indemnity satisfactory to it against any loss, liability or expense.

**Additional Information**

Anyone who receives this Offering Memorandum and Disclosure Statement may obtain a copy of the Indenture, the form of Notes and Guarantees and the Security Documents (when available) without charge by writing to Roust Corporation, 16192 Coastal Highway, Lewes, County of Sussex, Delaware 19958, Attention: Company Secretary.

**Governing law**

The Indenture, the Notes and the Guarantees will be governed by and construed in accordance with the laws of the State of New York. The Security Documents will be governed by and construed in accordance with the laws of the relevant jurisdictions of organization of the Issuer and the various Guarantors or the location or governing law of the Collateral or otherwise, as required under applicable law.

**Certain Definitions**

Set forth below are certain defined terms used in the Indenture. Reference is made to the Indenture for a full disclosure of all defined terms used therein, as well as any other capitalized terms used herein for which no definition is provided.

"*Acquired Debt*" means, with respect to any specified Person:

(1)     Indebtedness of any other Person existing at the time such other Person is merged, consolidated, amalgamated or otherwise combined with or into, all or substantially all of its assets are transferred to, or becomes a Restricted Subsidiary of such specified Person, whether or not such Indebtedness is incurred in connection with, or in contemplation of, such other Person merging, consolidating, amalgamating or otherwise combining with or into, transferring assets to, or becoming a Restricted Subsidiary of, such specified Person; and

(2)     Indebtedness secured by a Lien encumbering any asset acquired by such specified Person existing at the time such asset is acquired,

*provided* that Indebtedness which is redeemed, defeased, retired or otherwise repaid at the time of or immediately upon consummation of such asset acquisition or the transactions by which such Person is merged or consolidated with or into the Parent or any Restricted Subsidiary transferring assets to, or becomes a Restricted Subsidiary shall not constitute Acquired Debt.

"*Affiliate*" of any specified Person means any other Person directly or indirectly controlling or controlled by or under direct or indirect common control with such specified Person. For purposes of this definition, "control," as used with respect to any Person, means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of such Person, whether through the ownership of voting securities, by agreement or otherwise; *provided* that beneficial ownership of 10% or more of the Voting Stock of a Person will be deemed to be control. For purposes of this definition: (i) the terms "*controlling*," "*controlled by*" and "*under common control with*" have correlative meanings; and (ii) "Affiliate" shall include funds advised by the specified Person.

"*Affiliate Transaction*" has the meaning set forth under the caption "*—Certain Covenants—Transactions with Affiliates.*"

"*Approved Fairness Opinion Provider*" means (i) Deloitte, (ii) Ernst & Young, (iii) KPMG, (iv) PricewaterhouseCoopers, or (v) Duff and Phelps, Inc., in each case, including their affiliated entities or such other firm that receives Minority Director Approval, or following the end of the Protected Period such other firm as approved by the Board of Directors.

"*Approved Auditor*" means (i) Deloitte, (ii) Ernst & Young, (iii) KPMG or (iv) PricewaterhouseCoopers, in each case including their affiliated entities.

"*Asset Sale*" means:

(1)     the sale, lease, conveyance or other disposition of any assets; *provided* that the sale, lease, conveyance or other disposition of all or substantially all of the assets of the Parent and its Restricted Subsidiaries taken as a whole or of the assets of the Issuer and its Restricted Subsidiaries taken as a whole will be governed by the provisions described above under the caption "*—Repurchase at the Option of Holders in connection with a Change of Control*" and/or the provisions described above under the caption "*—Certain Covenants—Merger, Consolidation or Sale of Assets*" and not by the provisions described under the caption "*—Asset Sales*;"

(2)     the issuance of Equity Interests in any of the Parent's Restricted Subsidiaries or the sale of Equity Interests in any of its Subsidiaries; and

(3)     any sales of receivables pursuant to any Non-Recourse Factoring Facility in which Parent or Restricted Subsidiary receives less than 80% of the receivable amount.

Notwithstanding the foregoing, none of the following items will be deemed to be an Asset Sale:

(1)     any single transaction or series of related transactions that involves assets having a Fair Market Value of less than $5.0 million in the aggregate, such threshold increasing to (i) $10.0 million if the Parent's Total Leverage Ratio at the time of any transaction or series of Related Transactions is less than or equal to 4.5:1.0 and (ii) $20.0 million if the Parent's Total Leverage ratio at the time of any transaction or series of related transactions is less than 3.5:1.0;

(2)     a transfer or other disposition of assets between or among the Parent and its Restricted Subsidiaries;

(3)     an issuance or sale of Equity Interests by a Restricted Subsidiary of the Parent to the Parent or to a Restricted Subsidiary of the Parent;

(4)     any sale or other disposition of inventory or of damaged, worn-out or obsolete assets or any sale of receivable under any Non-Recourse Facility in which Parent or a Restricted Subsidiary receives at least 80% of the receivable amount or any sales of receivables under any factoring facility that was incurred pursuant to clause (1) or clause (4) of the second paragraph under the caption "*—Certain Covenants—Incurrence of Indebtedness and Preferred Stock*", in each case, in the ordinary course of business;

(5)     the sale or other disposition of cash or Cash Equivalents;

(6)     any Restricted Payment that does not violate the provisions described above under the caption "*—Certain Covenants—Restricted Payments*" or a Permitted Investment;

(7)     dispositions by the Parent or any of its Restricted Subsidiaries in connection with the waiver, compromise, settlement, release or surrender of any right, claim or receivable in the ordinary course of business or in bankruptcy or similar proceedings;

249

(8)     the sale or other disposition of assets received by the Parent or any of its Restricted Subsidiaries in connection with the waiver, compromise, settlement, release or surrender of any right or claim of the Parent or any of its Restricted Subsidiaries, *provided*, *however* that the Net Proceeds of such sale or disposition are applied in accordance with the provisions described under the caption "— *Mandatory Redemption*";

(9)     dispositions in connection with Permitted Liens;

(10)    the licensing or sublicensing of intellectual property or other intangibles and licenses, leases or subleases of other property in the ordinary course and on an arm's length-basis that do not interfere in any material respect with the business of the Parent or any of its Restricted Subsidiaries, *provided*, such licensing or sublicensing does not reduce the value of the Collateral or the RSV Collateral;

(11)    foreclosure, condemnation or similar action with respect to any property or other assets;

(12)    [Reserved];

(13)    [Reserved];

(14)    any of the Transactions; and

(15)    the lease, assignment or sublease of any real property in the ordinary course of business.

"*Attributable Debt*" in respect of a sale and leaseback transaction means, at the time of determination, the present value of the obligation of the lessee for net rental payments during the remaining term of the lease included in such sale and leaseback transaction including any period for which such lease has been extended or may, at the option of the lessor, be extended. Such present value shall be calculated using a discount rate equal to the rate of interest implicit in such transaction, determined in accordance with GAAP; *provided*, *however*, that if such sale and leaseback transaction results in a Capital Lease Obligation, the amount of Indebtedness represented thereby will be determined in accordance with the definition of "*Capital Lease Obligation*."

"*Bankruptcy Law*" means (a) Title 11, United States Code (b) the Federal Law of the Russian Federation No. 127 FZ of 26 October 2002 "On Insolvency (Bankruptcy)", as amended or (c) any similar federal, state, or foreign law relating to bankruptcy, insolvency, receivership, winding-up, liquidation, reorganization or relief of debtors.

"*Beneficial Owner*" has the meaning assigned to such term in Rule 13d-3 and Rule 13d-5 under the Exchange Act, except that in calculating the beneficial ownership of any particular "person" (as that term is used in Section 13(d)(3) of the Exchange Act), such "person" will be deemed to have beneficial ownership of all securities that such "person" has the right to acquire by conversion or exercise of other securities, whether such right is currently exercisable or is exercisable only after the passage of time. The terms "*Beneficially Owns*" and "*Beneficially Owned*" have a corresponding meaning.

"*Board of Directors*" means:

(1)     with respect to a corporation, the board of directors of the corporation or any committee thereof duly authorized to act on behalf of such board;

(2)     with respect to a partnership, the board of directors of the general partner of the partnership;

(3)     with respect to a limited liability company, the managing member or members or any controlling committee of managing members thereof; and

(4)     with respect to any other Person, the board or committee of such Person serving a similar function.

Unless otherwise stated herein, all references to the "Board of Directors" shall be to the Board of Directors of the Parent.

250

"*Business Day*" means any day that is not a Saturday or Sunday or other day on which banks and financial institutions in London, England, United Kingdom, New York, New York, United States or the jurisdiction of the exchange on which the Notes are listed are authorized or required by law to close.

"*Capital Lease Obligation*" means, at the time any determination is to be made, the amount of the liability in respect of a capital lease that would at that time be required to be capitalized on a balance sheet prepared in accordance with GAAP (as in effect on the Effective Date for purposes of determining whether a lease is a Capital Lease Obligation), and the Stated Maturity thereof shall be the date of the last payment of rent or any other amount due under such lease prior to the first date upon which such lease may be prepaid by the lessee without payment of a penalty.

"*Capital Markets Debt*" means debt securities substantially similar to the Notes, other than with respect to interest, maturity and redemption provisions.

"*Capital Stock*" means:

(1)     in the case of a corporation, corporate stock;

(2)     in the case of an association or business entity, any and all shares, interests, participations, rights or other equivalents (however designated) of corporate stock;

(3)     in the case of a partnership or limited liability company, partnership interests (whether general or limited) or membership interests; and

(4)     any other interest or participation that confers on a Person the right to receive a share of the profits and losses of, or distributions of assets of, the issuing Person,

but excluding from all of the foregoing any debt securities convertible into Capital Stock, whether or not such debt securities include any right of participation with Capital Stock.

"*Cash Equivalents*" means:

(1)     securities issued or directly and fully guaranteed or insured by the United States of America or any state thereof, any European Union Member State or the United Kingdom (*provided* that the full faith and credit of the United States or such European Union Member State or the United Kingdom is pledged in support of those securities) in each case denominated in U.S. dollars, pounds sterling or euros and having maturities of not more than one year from the date of acquisition;

(2)     certificates of deposit, time deposits and other bank deposits in U.S. dollars, pounds sterling or euro with maturities of six months or less from the date of acquisition, bankers' acceptances with maturities not exceeding six months and overnight bank deposits, in each case, with any bank or trust company which is organized under the laws of a European Union Member State or the United States of America or any other state thereof or, in the case of any Restricted Subsidiary any such Investment in the direct obligations of any state or country in which such Restricted Subsidiary is organized or has operations; *provided* that such bank or trust company has capital, surplus and undivided profits aggregating in excess of $500.0 million (or the foreign currency equivalent thereof) and whose long-term debt is rated "A-1" or higher by Moody's or "A+" or higher by S&P or the equivalent rating category of another internationally recognized rating agency;

(3)     repurchase obligations with a term of not more than seven days for underlying securities of the types described in clauses (1) and (2) above entered into with any financial institution meeting the qualifications specified in clause (2) above;

(4)     commercial paper having one of the two highest ratings obtainable from Moody's or S&P and, in each case, maturing within six months after the date of acquisition; and

251

(5)     money market funds (i) denominated in U.S. dollar, euro or pound sterling that are rated "A3" or higher by Moody's or "AAA" or higher by S&P; or (ii) at least 95% of the assets of which constitute Cash Equivalents of the kinds described in clauses (1) through (4) of this definition.

"*CEDC International*" means CEDC International sp. z o.o.

"*Certificate of Incorporation*" means the certificate of Incorporation of the Parent, as in effect from time to time.

"*Change of Control*" means the occurrence of any of the following:

(1)     the Parent consolidates with, or merges with or into, another Person or sells, assigns, conveys, transfers, leases or otherwise disposes of all or substantially all of its assets to any Person, or any Person consolidates with, or merges with or into, the Parent, in any such event pursuant to a transaction in which the outstanding Voting Stock of the Parent is converted into or exchanged for cash, securities or other property, other than any such transaction where (i) the outstanding Voting Stock of the Parent is converted into or exchanged for (1) Voting Stock (other than Disqualified Stock) of the surviving or transferee corporation or its parent corporation; and/or (2) cash, securities or other property in any amount which could be paid by the Parent as a Restricted Payment under the Indenture; (ii) the Beneficial Owners of the Voting Stock of the Parent immediately before such transaction own, directly or indirectly, immediately after such transaction, at least a majority of the voting power of all Voting Stock of the surviving or transferee corporation or its parent corporation immediately after such transaction, as applicable; and (iii) immediately after such transaction, no "person" or "group" (as such terms are used in Sections 13(d) or 14(d) of the Exchange Act) other than Roustam Tariko or Related Parties is the Beneficial Owner, directly or indirectly, of more than 45% of the Voting Stock of such surviving or transferee corporation or its parent corporation, as applicable, or has, directly or indirectly, the right to elect or designate a majority of the board of directors of the surviving or transferee corporation or its parent corporation, as applicable;

(2)     the consummation of any transaction, whether as a result of the issuance of securities of the Parent, any merger or consolidation, purchase or otherwise, the result of which is that any "person" or "group" of related persons (within the meaning of Sections 13(d) or 14(d) of the Exchange Act but excluding any Person that was a wholly owned Subsidiary of the Parent prior to such transaction) other than Roustam Tariko or Related Parties has become, directly or indirectly, the Beneficial Owner of more than 45% of the voting power of the Voting Stock of the Parent on a fully-diluted basis, after giving effect to the conversion and exercise of all outstanding warrants, options and other securities of the Parent convertible into or exercisable for Voting Stock of the Parent (whether or not such securities are then currently convertible or exercisable); or

(3)     the consummation of any transaction that results in the reincorporation of the Parent or the Issuer in any jurisdiction other than the State of New York.

(4)     the adoption by the shareholders of the Parent of a plan for the liquidation or dissolution of the Parent.

"*Charter Documents*" means the Certificate of Incorporation and bylaws of the Parent, as in effect from time to time.

"*Collateral*" means the property and assets securing the Notes and/or the Guarantees, other than the RSV Pledged Collateral, as such may be amended, modified, restated, supplemented or replaced from time to time, *provided* that following the release of the Liens on RSV Pledged Collateral for the benefit of the RSV Loans, the RSV Pledged Collateral shall be considered Collateral for the purposes of the Indenture.

"*Consolidated EBITDA*" means, with respect to any specified Person for any period, the Consolidated Net Income of such Person for such period *plus*, without duplication:

(1)     provision for taxes based on income or profits of such Person and its Restricted Subsidiaries for such period, to the extent that such provision for taxes was deducted in computing such Consolidated Net Income; *plus*

(2)     the Fixed Charges of such Person and its Restricted Subsidiaries for such period, to the extent that such Fixed Charges were deducted in computing such Consolidated Net Income; *plus*

(3)     the amount of minority interest expense deducted in calculating Consolidated Net Income; *plus*

(4)     depreciation, amortization (including amortization of intangibles but excluding amortization of prepaid cash expenses that were paid in a prior period) and other non-cash expenses (excluding any such non-cash expense to the extent that it represents an accrual of or reserve for cash expenses in any future period or amortization of a prepaid cash expense that was paid in a prior period) of such Person and its Restricted Subsidiaries for such period to the extent that such depreciation, amortization and other non-cash expenses were deducted in computing such Consolidated Net Income; *minus*

(5)     non-cash items increasing such Consolidated Net Income for such period, other than the accrual of revenue in the ordinary course of business; *minus*

(6)     the cost of discounts in excess of customary discounts on sales of receivables (as determined by the Parent's Chief Executive Officer or Chief Financial Officer, acting in good faith) incurred in 2016.

in each case, on a consolidated basis and determined in accordance with GAAP.

Notwithstanding the foregoing, the provision for taxes based on the income or profits of, and the depreciation and amortization and other non-cash expenses of, a Restricted Subsidiary of the Parent will be added to Consolidated Net Income to compute Consolidated EBITDA of the Parent only to the extent that a corresponding amount would be permitted at the date of determination to be dividended to the Parent by such Restricted Subsidiary without prior governmental approval (that has not been obtained), and without direct or indirect restriction pursuant to the terms of its charter and all agreements, instruments, judgments, decrees, orders, statutes, rules and governmental regulations applicable to that Restricted Subsidiary or its stockholders (but only to the extent that the foregoing restricts the ability of the Parent to procure that an amount of cash equal to the amount of such Net Income for such period is transferable to the Parent or any Restricted Subsidiary of the Parent).

"*Consolidated Net Income*" means, with respect to any specified Person for any period, the aggregate of the Net Income of such Person and its Restricted Subsidiaries for such period, on a consolidated basis, determined in accordance with GAAP; *provided* that:

(1)     the Net Income (but not loss) of any Person that is not a Restricted Subsidiary or that is accounted for by the equity method of accounting will be included only to the extent of the amount of dividends or similar distributions paid in cash to the specified Person or a Restricted Subsidiary of the Person;

(2)     solely for purposes of determining the amount available for Restricted Payments, the Net Income of any Restricted Subsidiary will be excluded to the extent that the declaration or payment of dividends or similar distributions by that Restricted Subsidiary of that Net Income is not at the date of determination permitted without any prior governmental approval (that has not been obtained) or, directly or indirectly, by operation of the terms of its charter or any agreement, instrument, judgment, decree, order, statute, rule or governmental regulation applicable to that Restricted Subsidiary or its stockholders, but only to the extent that the foregoing restricts the ability of the Parent to procure that an amount of cash equal to the amount of such Net Income for such period is transferable to the Parent or any Restricted Subsidiary of the Parent;

(3)     the cumulative effect of a change in accounting principles will be excluded;

253

(4)      notwithstanding clause (1) above, the Net Income of any Unrestricted Subsidiary will be excluded, whether or not distributed to the specified Person or one of its Subsidiaries;

(5)      any currency translation gains and losses related to currency re-measurements of Indebtedness, any net loss or gain resulting from hedging transactions for currency exchange risk will be excluded, and any amortization of deferred charges resulting from the application of Accounting Principles Board Opinion No. APB 14-1, Accounting for Convertible Debt Instruments that may be settled in cash upon conversion (including partial cash settlement) will be excluded;

(6)      any expenses, charges or other costs related to the issuance of the Notes (including, in each case, amortization of any such expenses, charges or other costs that have been capitalized) and any other issuance of Equity Interests of the Parent or debt financing will be excluded;

(7)      any adjustments to the initial purchase price allocation for acquisitions done after the initial assessment period to the extent such items were included in Consolidated Net Income will be excluded;

(8)      any gain or loss realized upon the sale or other disposition of any asset which is not sold or otherwise disposed of in the ordinary course of business will be excluded;

(9)      any item classified as a restructuring, direct acquisition related expense, extraordinary or other non-operating gain or loss, including the costs of and accounting for, financial instruments and any loss, charge, cost, expense or reserve in respect of any restructuring or bankruptcy proceedings including the Plan of Reorganization or any alternative plan of reorganization, including any costs and expenses relating to legal, financial and other advisors, auditors and accountants, printer fees and expenses and any transaction (including any financing or disposition) or litigation related thereto) will be excluded;

(10)    any impairment loss relating to goodwill or other intangible assets will be excluded;

(11)    any premium, penalty, or fee paid in relation to any repayment, prepayment, redemption or purchase of debt will be excluded;

(12)    any noncash compensation charge or expense arising from any grant of stock, stock options or other equity based awards will be excluded; and

(13)    any capitalized, accrued or accreting or pay-in-kind interest on Subordinated Shareholder Funding will be excluded.

"*Credit Facilities*" means one or more debt facilities, commercial paper facilities, credit facility documentation, loan agreements, indentures, financing trust deeds, note purchase agreements or other financing arrangements in each case with banks, lenders, purchasers, funds, investors, trustees, agents or other representatives of any of the foregoing providing for revolving credit loans, term loans, receivables financing (including through the sale or factoring of receivables to such lenders or to special purpose entities formed to borrow from such lenders against such receivables), bank guarantees, letters of credit, overdrafts, capital market financings, capital leases, or other borrowings or other extensions of credit, including any related notes, mortgages, guarantees, collateral documents, instruments and agreements executed in connection therewith, in each case, as amended, restated, modified, supplemented, renewed, refunded, restructured, replaced (whether upon or after termination or otherwise), refinanced, increased or extended in whole or in part from time to time, and whether or not with the original arranging agent, administrative agent and lenders or another arranging or administrative agent or agents or other banks or lenders or purchasers, funds, investors, trustees, agents or other representatives of any of the foregoing and whether provided under any existing credit facility or one or more other credit agreements or financing agreements (without limitation as to amount outstanding or committed, or the maturity, terms, conditions, covenants, or other provisions thereof or parties thereto) and in each case including all agreements, instruments and documents executed and delivered pursuant to or in connection with the foregoing (including any letters of credit issued pursuant thereto and any guarantee and collateral agreement, patent and trademark security agreement, mortgages or letter of credit applications and other Guarantees, pledges, agreements, security agreements and collateral documents).

"*Currency Agreement*" means any foreign exchange contract, currency swap agreement or other similar agreement with respect to currency values.

"*Cyprus Guarantors*" means, collectively, Jelegat Holdings Limited and Pasalba Ltd.

"*Default*" means any event that is, or with the passage of time or the giving of notice or both would be, an Event of Default.

"*Disqualified Stock*" means any Equity Interests that, by its terms (or by the terms of any security into which it is convertible, or for which it is exchangeable, in each case, at the option of the holder of the Equity Interests), or upon the happening of any event, matures or is mandatorily redeemable, pursuant to a sinking fund obligation or otherwise, or redeemable at the option of the holder of the Equity Interests, in whole or in part, on or prior to the date that is 91 days after the date on which the Notes mature. Notwithstanding the preceding sentence, any Equity Interests that would constitute Disqualified Stock solely because the holders of the Equity Interests have the right to require the Parent to repurchase such Equity Interests upon the occurrence of a change of control or an asset sale will not constitute Disqualified Stock if the terms of such Equity Interests *provided* that the Parent may not repurchase or redeem any such Equity Interests pursuant to such provisions unless such repurchase or redemption complies with the provisions described under the caption "—*Certain Covenants—Restricted Payments*." The amount of Disqualified Stock deemed to be outstanding at any time for purposes of the Indenture will be the maximum amount that the Parent and its Restricted Subsidiaries may become obligated to pay upon the maturity of, or pursuant to any mandatory redemption provisions of, such Disqualified Stock, exclusive of accrued dividends.

"*dollar*", "*U.S. dollar*" or "*$*" means the currency of the United States of America.

"*Effective Date*" means the date upon which the Notes will be issued.

"*Equity Interests*" means Capital Stock and all warrants, options or other rights to acquire Capital Stock (but excluding any debt security that is convertible into, or exchangeable for, Capital Stock).

"*Equity Offering*" means any primary public or private offering of Equity Interests (other than Disqualified Stock) of the Parent or any holding company of the Issuer, other than (i) public offerings on Form S-4 or S-8 or equivalent forms in jurisdictions other than the United States or (ii) an issuance to any Subsidiary of the Parent.

"*European Union Member State*" means any country that is a member state of the European Union as of the Effective Date, but not including any country which becomes a member of the European Union after the Effective Date.

"*Exchange Act*" means the U.S. Securities Exchange Act of 1934, as amended.

"*Existing Junior Convertible Notes*" means the Convertible Junior Secured Notes due 2018 issued by the Issuer pursuant to an indenture dated June 5, 2013 by and between the Issuer, the Parent, the guarantors party thereto and U.S. Bank National Association, as trustee, Deutsche Bank Trust Company Americas as registrar, transfer agent and paying agent, Deutsche Bank AG, London Branch, as Polish security agent and TMF Trustee Limited, as Security Agent.

"*Existing Notes*" means the Existing Senior Secured Notes and the Existing Junior Convertible Notes.

"*Existing Senior Secured Notes*" means the Senior Secured Notes due 2018 issued by the Issuer pursuant to an indenture dated June 5, 2013 by and between the Issuer, the Parent, the guarantors party thereto and U.S. Bank National Association, as trustee, Deutsche Bank Trust Company Americas as registrar, transfer agent and paying agent, Deutsche Bank AG, London Branch, as Polish security agent and TMF Trustee Limited, as Security Agent.

"*Fair Market Value*" means, with respect to any asset or property, the value that would be paid by a willing buyer to a willing seller in an arm's-length transaction not involving distress or necessity of either party. Unless otherwise provided in the Indenture, a determination in good faith by the Board of Directors of the Parent as to Fair Market Value shall be conclusive.

"*GAAP*" means generally accepted accounting principles applicable in the United States as in effect from time to time.

"*Guarantee*" means a guarantee other than by endorsement of negotiable instruments for collection in the ordinary course of business, direct or indirect, in any manner including, without limitation, through letters of credit or reimbursement agreements in respect thereof, of all or any part of any Indebtedness.

"*Guarantors*" means each of:

(1)     the Initial Guarantors; and

(2)     any other Subsidiary of the Parent that issues a Guarantee in accordance with the provisions of the Indenture,

and their respective successors and assigns, in each case, until the Guarantee of such Person has been released in accordance with the provisions of the Indenture.

"*Hedging Obligations*" means, with respect to any specified Person, the obligations of such Person under:

(1)     interest rate swap agreements (whether from fixed to floating or from floating to fixed), interest rate cap agreements and interest rate collar agreements;

(2)     other agreements or arrangements designed to manage interest rates or interest rate risk; and

(3)     other agreements or arrangements designed to protect such Person against fluctuations in currency exchange rates or commodity or raw materials prices.

"*Holder*" means, with respect to any Note, the Person in whose name such Note is registered in the register maintained by the Registrar under the Indenture.

"*IFRS*" means the accounting standards issued by the International Accounting Standards Board and its predecessors as in effect from time to time.

"*Indebtedness*" means, with respect to any specified Person (in each case, excluding accrued expenses and trade payables and without double-counting):

(1)     the principal amount of indebtedness of such Person for borrowed money;

(2)     the principal component of obligations of such Person evidenced by bonds, notes, debentures or similar instruments;

(3)     the principal component of obligations of such Person in respect of banker's acceptances and letters of credit (other than obligations with respect to letters of credit entered into in the ordinary course of business of such Person to the extent such letters are not drawn upon or, if and to the extent drawn upon, such drawing is reimbursed no later than within 20 Business Days following payment on the letter of credit);

(4)     Capital Lease Obligations or Attributable Debt;

(5)     the balance deferred and unpaid of the purchase price of any property due more than six months after such property is acquired;

(6)     the principal component of all Indebtedness of other Persons secured by a Lien on any asset of such Person, whether or not such Indebtedness is assumed by such Person; *provided*, *however*, that the amount of such Indebtedness will be the lesser of (a) the Fair Market Value of such asset at such date of determination; and (b) the amount of such Indebtedness of such other Persons;

256

(7)     the principal component of Indebtedness of other Persons to the extent Guaranteed by such Person; or

(8)     to the extent not otherwise included in this definition, net obligations of such Person under Hedging Obligations (the amount of any such obligations to be equal at any time to the termination value of such agreement or arrangement giving rise to such obligation that would be payable by such Person at such time),

if and to the extent any of the preceding items (other than Attributable Debt and Hedging Obligations) would appear as a liability upon a balance sheet of the specified Person prepared in accordance with GAAP. Indebtedness shall not include Subordinated Shareholder Funding but shall include any interest not paid within contractual grace periods. For the avoidance of doubt, Indebtedness shall include any factoring facility other than a Non-Recourse Factoring Facility.

"*Initial Guarantors*" means each of:

(1)     the Parent and CEDC Finance Corporation, LLC (the "*U.S. Guarantors*");

(2)     CEDC International and PWW Sp. z o.o. (collectively, the "*Polish Guarantors*");

(3)     Bols Hungary Kft. (the "*Hungarian Guarantor*");

(4)     the Roust Russia Guarantors;

(5)     the Luxembourg Guarantors;

(6)     Russian Standard IP Holding (Switzerland);

(7)     the RSV Guarantors;

(8)     any other Subsidiary of the Parent that holds material unencumbered assets; and

(9)     any other entity that is created in connection with the implementation of the Plan.

"*Intellectual Property Rights*" means: the trademarks related to the Soplica brand owned by CEDC International Sp. z o.o. and registered in Poland as of the Effective Date and registered in the European Union under trademark numbers 004575304 and 003801362.

"*Intercompany Borrowers*" means CEDC International and Jelegat Holdings Limited.

"*Intercompany Loans*" means one or more loans between the Intercompany Borrowers, as borrowers, and the Issuer, as lender, of the proceeds received by the Issuer from the issuance of the Notes.  In connection with or following the issuance of the Notes it is expected that a portion of the existing intercompany loans will be amended, cancelled and/or exchanged for equity of the applicable Intercompany Borrower, such that the aggregate principal amount, interest, maturity and other terms of the Intercompany Loans will reflect the aggregate principal amount, interest, maturity and other terms of the Notes.

"*Interim Loan Facility*" means the Company's $58.5 million loan facility, dated August 11, 2016, secured by, amongst other things, certain accounts receivable and intellectual property rights of CEDC International.

"*Inventory*" means inventory, as determined in accordance with GAAP and any stock on consignment with customers classified as other receivables under GAAP.

"*Investments*" means, with respect to any Person, all direct or indirect investments by such Person in other Persons (including Affiliates) in the form of loans (including Guarantees or other obligations), advances or capital contributions (excluding commission, payroll, travel and similar advances to officers and employees made in the ordinary course of business), purchases or other acquisitions for consideration of Indebtedness, Equity Interests or other securities, together with all items that are or would be classified as investments on a balance sheet prepared in

accordance with GAAP. If the Parent or any Restricted Subsidiary of the Parent sells or otherwise disposes of any Equity Interests of any direct or indirect Subsidiary of the Parent such that, after giving effect to any such sale or disposition, such Person is no longer a Restricted Subsidiary of the Parent, the Parent will be deemed to have made an Investment on the date of any such sale or disposition equal to the Fair Market Value of the Parent's Investments in such Subsidiary that were not sold or disposed of in an amount determined as provided in the final paragraph of the described under the caption "—*Certain Covenants—Restricted Payments*." The acquisition by the Parent or any Restricted Subsidiary of the Parent of a Person that holds an Investment in a third Person will be deemed to be an Investment by the Parent or such Restricted Subsidiary in such third Person in an amount equal to the Fair Market Value of the Investments held by the acquired Person in such third Person in an amount determined as provided in the final paragraph under the caption "—*Certain Covenants—Restricted Payments*." Except as otherwise provided in the Indenture, the amount of an Investment will be determined at the time the Investment is made and without giving effect to subsequent changes in value.

"*Investor Rights Agreement*" means the investor rights agreement, to be dated as of the date of the Indenture, among the Company, RTL, and certain holders of the Existing Notes, as such agreement may be amended, supplemented or otherwise modified from time to time.

"*Issuer Permitted Liens*" means:

(1)     Liens relating to bank deposits or to secure the performance of statutory obligations, surety or appeal bonds or other obligations of a like nature incurred in the ordinary course of business;

(2)     Liens for taxes, assessments or governmental charges or claims that are not yet delinquent or thereafter can be paid without penalty or that are being contrasted in good faith by appropriate proceedings promptly instituted and diligently concluded; *provided* that any reserve or other appropriate provision as shall be required in conformity with GAAP shall have been made therefor;

(3)     Liens created for the benefit of or to secure the Notes or any Note Guarantee or any other Capital Markets Debt;

(4)     Liens granted to the Trustee or other agent for its compensation and indemnities pursuant to the Indenture or any Security Document (or to any trustee or other agent in respect of other Capital Markets Debt pursuant to any indenture or security document relating thereto).

"*Lien*" means, with respect to any asset, any mortgage, lien, pledge, charge, security interest or encumbrance of any kind in respect of such asset, whether or not filed, recorded or otherwise perfected under applicable law, including any conditional sale or other title retention agreement, any lease in the nature thereof, any option or other agreement to sell or give a security interest in and any filing of or agreement to give any financing statement under the Uniform Commercial Code (or equivalent statutes) of any jurisdiction.

"*Luxembourg Guarantors*" means, collectively, Lion/Rally Lux 1 S.A., Lion/Rally Lux 2 S.à r.l. and Lion/Rally Lux 3 S.à r.l.

 "*Merger Sub*" means any newly formed corporation organized under the laws of the State of New York for the purposes of migrating each of the Parent and the Issuer.

"*Mergers*" means (i) the merger of the Issuer and a newly formed Merger Sub organized under the laws of the State of New York and (ii) the merger of the Parent and a separate newly formed Merger Sub such that each of the Issuer and the Parent will be a New York corporation prior to the Effective Date.

"*Minority Directors*" means the Directors nominated by the Minority Stockholders pursuant to the Investor Rights Agreement.

"*Minority Director Approval*" means unanimous approval of the Minority Directors.

"*Minority Stockholders*" has the meaning set forth in the Investor Rights Agreement.

"*Moody's*" means Moody's Investors Service, Inc.

"*Net Income*" means, with respect to any specified Person, the net income (loss) of such Person, determined in accordance with GAAP and before any reduction in respect of preferred stock dividends, excluding, however:

(1)     any gain or loss, together with any related provision for taxes on such gain or loss, realized in connection with: (a) any Asset Sale by such Person or any of its Restricted Subsidiaries; (b) the disposition of any securities by such Person or any of its Restricted Subsidiaries or (c) the extinguishment of any Indebtedness of such Person or any of its Restricted Subsidiaries; and

(2)     any extraordinary gain or loss, together with any related provision for taxes on such extraordinary gain or loss.

"*Net Leverage Ratio*" as of any date of determination means the ratio of (a) consolidated total Indebtedness less cash and Cash Equivalents on the last day of the Reference Period (as defined below) to (ii) Consolidated EBITDA for the period of the most recent four consecutive fiscal quarters ending prior to such date of determination (the "*Reference Period*"); *provided, however,* that:

(1)     if the transaction giving rise to the need to calculate the Net Leverage Ratio is an Incurrence of Indebtedness, the amount of Indebtedness shall be calculated after giving effect on a pro forma basis to the Incurrence of such Indebtedness and the application of the net proceeds thereof;

(2)     if the Parent or any Restricted Subsidiary has repaid, repurchased, defeased or otherwise discharged any Indebtedness that was outstanding as of the end of such Reference Period or if any Indebtedness is to be repaid, repurchased, defeased or otherwise discharged on the date of the transaction giving rise to the need to calculate the Net Leverage Ratio (other than, in each case, Indebtedness incurred under any revolving credit agreement unless such Indebtedness has been permanently repaid and the related commitment terminated), the aggregate amount of Indebtedness shall be calculated on a pro forma basis giving effect to such repayment, repurchase, defeasance or discharge and Consolidated EBITDA shall be calculated as if the Issuer or such Restricted Subsidiary had not earned the interest income, if any, actually earned during the Reference Period in respect of cash or Cash Equivalents used to repay, repurchase, defease or otherwise discharge such Indebtedness;

(3)     if since the beginning of the Reference Period the Parent or any Restricted Subsidiary shall have made any Asset Sale, Consolidated EBITDA for the Reference Period shall be reduced by an amount equal to Consolidated EBITDA (if positive) directly attributable to the assets which are the subject of such Asset Sale for the Reference Period or increased by an amount equal to the Consolidated EBITDA (if negative) directly attributable thereto for the Reference Period;

(4)     if since the beginning of the Reference Period the Parent or any Restricted Subsidiary (by merger or otherwise) shall have made an Investment in any Restricted Subsidiary (or any Person which becomes a Restricted Subsidiary or that is merged with or into the Parent) or an acquisition of assets which constitutes all or substantially all of an operating unit of a business, Consolidated EBITDA, which shall include the RSV Entities, for the Reference Period shall be calculated after giving pro forma effect thereto (including the Incurrence of any Indebtedness) as if such Investment or acquisition occurred on the first day of the Reference Period; and

(5)     if since the beginning of the Reference Period any Person (that subsequently became a Restricted Subsidiary or was merged with or into the Parent or any Restricted Subsidiary since the beginning of such Reference Period) shall have Incurred any Indebtedness or made any Asset Sale, any Investment or acquisition of assets that would have required an adjustment pursuant to clause (3) or (4) above if made by the Parent or a Restricted Subsidiary during the Reference Period, Indebtedness, Consolidated EBITDA and Consolidated Interest Expense for the Reference Period shall be calculated after giving pro forma effect thereto as if such Incurrence of Indebtedness, Asset Sale, Investment or acquisition occurred on the first day of the Reference Period.

For purposes of this definition, the pro forma calculations shall be determined in good faith by a responsible financial or accounting Officer of the Parent. If any Indebtedness bears a floating rate of interest and is being given pro forma effect, the interest on such Indebtedness shall be calculated as if the rate in effect on the date of determination had been the applicable rate for the entire period. The amount of Indebtedness of any Person at any

date shall be determined after giving effect to any Currency Agreement then in effect that effectively converts the amount of such Indebtedness from one currency to another currency.

Any such pro forma calculation may include, without duplication, (1) adjustments appropriate to reflect cost savings, operating expenses calculations, restructuring charges and expenses and synergies reasonably expected to result from the applicable event to the extent set forth in the definition of "Consolidated EBITDA" and (2) all adjustments of the nature set forth under "Unaudited Pro Forma Financial Information" in this Offering Memorandum and Disclosure Statement for the Parent to the extent such adjustments, without duplication, continue to be applicable to the reference period.

"*Net Proceeds*" means (i) the aggregate cash proceeds and (ii) the Fair Market Value of any Non Cash Consideration,, in each case received by the Parent or any of its Restricted Subsidiaries in respect of any Asset Sale, net of the direct costs relating to such Asset Sale and disposition of non-cash consideration, including, without limitation, legal, accounting and investment banking fees, and brokerage and sales commissions, and any relocation expenses incurred as a result of the Asset Sale, taxes paid or payable as a result of the Asset Sale and disposition of Non-Cash Consideration, in each case, after taking into account any available tax credits or deductions and any tax sharing arrangements, and any reserve for adjustment in respect of the sale of such asset or assets established in accordance with GAAP.

"*Non-Recourse Debt*" means Indebtedness:

(1)     as to which neither the Parent nor any of its Restricted Subsidiaries (a) provides credit support of any kind (including any undertaking, agreement or instrument that would constitute Indebtedness), (b) is directly or indirectly liable as a guarantor or otherwise, or (c) constitutes the lender; *provided*, *however*, that the Equity Interests of such Unrestricted Subsidiary may be pledged or otherwise subject to security arrangements to secure Indebtedness of such Unrestricted Subsidiary; and

(2)     no default with respect to which (including any rights that the holders of the Indebtedness may have to take enforcement action against an Unrestricted Subsidiary) would permit upon notice, lapse of time or both any holder of any other Indebtedness of the Parent or any of its Restricted Subsidiaries to declare a default on such other Indebtedness or cause the payment of the Indebtedness to be accelerated or payable prior to its Stated Maturity.

"*Non-Recourse Factoring Facility*" means any factoring facility for which there is no recourse (either current or any future recourse, whether contingent or otherwise) against the Parent or any Restricted Subsidiary.  For the avoidance of doubt, any Guarantee by the Parent or any Restricted Subsidiary of a Non-Recourse Factoring Facility shall be considered Indebtedness unless such Guarantee meets the conditions of the previous sentence.

"*Obligations*" means any principal, interest, penalties, fees, indemnifications, reimbursements, damages and other liabilities payable under the documentation governing any Indebtedness.

"*Old Notes*" means the euro denominated senior secured notes and the U.S. dollar denominated senior secured notes issued under the indenture, dated December 2, 2009. among, *inter alios*, the CEDC Finance Corporation International, Inc., the Company, the guarantors named therein, and Deutsche Bank AG, London Branch as trustee, as such indenture has been amended and supplemented.

"*Officer*" means a supervisory board member, chief executive officer, chief financial officer, chief operating officer, chief accounting officer, any vice president, the treasurer or secretary or person in any equivalent position.

"*Officers' Certificate*" means a certificate signed by two Officers, one of whom must be a supervisory board member, the chief executive officer, the chief financial officer or the chief operating officer.

"*Parent Entity*" means any direct or indirect parent of the Parent.

"*Permitted Business*" means (i) the production and bottling of vodka and other alcoholic beverages and sales thereof; (ii) the importing, exporting, transportation, distribution and sale of beverages (including alcoholic beverages), cigars and cigarettes and other consumer goods; (iii) any other business in which the Parent or any of its Restricted Subsidiaries or the RSV Entities is engaged in on the Effective Date; and (iv) any activity or business that is a reasonable extension or expansion of, or reasonably related to, the businesses described in the preceding clauses (i), (ii) and (iii).

"*Permitted Collateral Liens*" means:

(1)     Liens securing (i) the Notes issued on the Effective Date, (ii) the Guarantees and the Proceeds Loan and (iii) any Additional Notes issued pursuant to clause (20) of Permitted Debt;

(2)     Liens securing Indebtedness permitted to be incurred pursuant to clause (1) of the second paragraph described under the caption "—*Certain Covenants—Incurrence of Indebtedness and Issuance of Preferred Stock*",  in an amount not to exceed the aggregate amount of Indebtedness outstanding pursuant to such clause on the Effective Date secured by Liens on the Collateral, *provided*, that, with respect to any such Indebtedness which is secured by inventory or receivables, the book value (including VAT) of such receivables and inventory shall not exceed 150% of the principal amount of any such Indebtedness and Hedging Obligations related thereto permitted to be incurred pursuant to clause (9) of the second paragraph under the caption "—*Certain Covenants—Incurrence of Indebtedness and Issuance of Preferred Stock*";

(3)     Liens existing on the Effective Date, including any Liens with respect to Existing Notes and Existing Guarantees which are in the process of being released following the consummation of the Plan;

(4)     any extension, renewal or replacement, in whole or in part, of any Lien described in the foregoing clauses (1) through (3) and clause (5) below; *provided* that any such extension, renewal or replacement will be no more restrictive in any material respect than the Lien so extended, renewed or replaced and will not extend in any material respect to any additional property or assets;

(5)     Liens described in clauses (4), (5), (6), (9), (10), (11), (14), (23), (24), (27) and (28) of the definition of Permitted Liens;

(6)     Liens securing Indebtedness Incurred to refinance Indebtedness that has been secured by a Permitted Collateral Lien, *provided* that (i) any such Lien will not extend to or cover any assets not securing the Indebtedness so refinanced unless such additional asset constitute a Permitted Lien; and (ii) the Indebtedness so refinanced will have been permitted to be incurred pursuant to the provisions described under the caption "—*Certain Covenants—Incurrence of Indebtedness and Issuance of Preferred Stock*".

 "*Permitted Investments*" means:

(1)     any Investment in the Parent or in a Restricted Subsidiary;

(2)     any Investment in cash or Cash Equivalents;

(3)     any Investment in a Person, if as a result of such Investment:

(a)     such Person becomes a Restricted Subsidiary of the Parent; or

(b)     such Person is merged, consolidated or amalgamated with or into, or transfers or conveys substantially all of its assets to, or is liquidated into, the Parent or a Restricted Subsidiary;

(4)     any Investment made as a result of the receipt of non-cash consideration from: (a) an Asset Sale that was made pursuant to and in compliance with the provisions described under the caption "—*Asset Sales*"; or (b) any other disposition of property or assets or the issuance or sale of Equity Interests not constituting an Asset Sale;

(5) any Investment to the extent made in exchange for the issuance of Equity Interests (other than Disqualified Stock) of the Parent;

(6) any Investments received in compromise, satisfaction or resolution of: (a) obligations of trade creditors or customers that were incurred in the ordinary course of business of the Parent or any of its Restricted Subsidiaries, including pursuant to any plan of reorganization or similar arrangement upon the bankruptcy or insolvency of any Person; or (b) judgments, Liens or security interests, litigation, arbitration or other disputes or pursuant to any plan of reorganization or similar arrangement upon bankruptcy or insolvency of any Persons who are not Affiliates;

(7) Investments represented by Hedging Obligations;

(8) loans or advances to employees of the Parent or any Restricted Subsidiary in an aggregate principal amount not to exceed $2.5 million at any one time outstanding;

(9) Investments in the Notes and Guarantees;

(10) Investments existing on the Effective Date (including Investments pursuant to a contractual commitment in existence on the Effective Date) and any amendment, modification, restatement, supplement, extension, renewal, refunding, replacement or refinancing, in whole or in part, thereof;

(11) any Investment to the extent such Investment consists of prepaid expenses and advances, negotiable instruments held for collection and lease, utility and workers' compensation, performance and other similar deposits made in the ordinary course of business by the Parent or any Restricted Subsidiary;

(12) any Investment held by a Person that becomes a Restricted Subsidiary, provided that such Investment was not acquired in contemplation of the acquisition of such Person (or in respect of which a binding commitment to make such Investment exists on the date such Person becomes a Restricted Subsidiary) and any extension, modification or renewal of such Investment or commitment; and

(13) any other Investment which, when taken together with all other Investments pursuant to this clause (13) and then outstanding, will not exceed $10 million (with the Fair Market Value of each Investment being measured at the time made and without giving effect to subsequent changes in value); *provided* Investments in an Affiliate shall require a fairness opinion as contemplated by clause (2) of the first paragraph under the caption the "—*Certain Covenants—Transactions with Affiliates*" covenant; *provided, further*, that if any Stockholder Advance has been made, no amounts under this clause (13) may be used at any time when the amount available under the Restricted Payment Build-Up is less than $0.

"*Permitted Liens*" means:

(1) Liens on Inventory, accounts receivable, bank accounts, plant, property and equipment, in each case not constituting Collateral and securing Indebtedness incurred under Credit Facilities permitted under clause (1) or clause (4) of the second paragraph and any Indebtedness incurred under the first paragraph of "—*Certain Covenants—Incurrence of Indebtedness and Issuance of Preferred Stock*";

(2) Liens in favor of the Parent or the Guarantors;

(3) Liens securing Indebtedness permitted to be incurred pursuant to clause (13) under the caption "—*Certain Covenants—Incurrence of Indebtedness and Issuance of Preferred Stock*";

(4) Liens on property of a Person existing at the time such Person is merged, consolidated, amalgamated or otherwise combined with or into the Parent or any Restricted Subsidiary of the Parent; *provided* that such Liens were in existence prior to the contemplation of such merger,

consolidation, amalgamation or other business combination, were not incurred in contemplation of such merger, consolidation, amalgamation or other business combination, and do not extend to any assets other than those of the Person merged into or consolidated with the Parent or the Restricted Subsidiary, and any modifications, replacements, refinancings, renewals or extensions thereof; *provided* that to the extent such Lien is modified, replaced, renewed, extended or refinanced in connection with any refinancing of the obligations secured by such Liens (if such obligations constitute Indebtedness) the Indebtedness being refinanced is permitted under "—*Certain Covenants—Incurrence of Indebtedness and Issuance of Preferred Stock*" and the Liens so modified, replaced, renewed, extended or refinanced shall not extend in any material respect to any additional property or assets;

(5)     Liens on property (including Capital Stock) existing at the time of acquisition of the property (or in the case of an acquisition of Capital Stock of a Person that becomes a Restricted Subsidiary of the Parent, Liens on property (including Capital Stock) owned by such Person existing at the time of acquisition of such Person's Capital Stock) by the Parent or any Restricted Subsidiary of the Parent; *provided* that such Liens were in existence prior to, and not incurred in contemplation of, such acquisition, and any modifications, replacements, refinancings, renewals or extensions thereof; *provided* that to the extent such Lien is modified, replaced, renewed, extended or refinanced in connection any refinancing of the obligations secured by such Liens (if such obligations constitute Indebtedness), the Indebtedness being refinanced is permitted under "—*Certain Covenants—Incurrence of Indebtedness and Issuance of Preferred Stock*" and the Liens so modified, replaced, renewed, extended or refinanced shall not extend in any material respect to any additional property or assets;

(6)     Liens to secure the performance of statutory obligations, surety or appeal bonds, performance bonds or other obligations of a like nature incurred in the ordinary course of business;

(7)     [Reserved];

(8)     Liens existing on the Effective Date, and any modifications, replacements, refinancings, renewals or extensions thereof; *provided* that to the extent such Lien is modified, replaced, renewed, extended or refinanced in connection with any refinancing of the obligations secured by such Liens (if such obligations constitute Indebtedness), the Indebtedness being refinanced is permitted under "—*Certain Covenants—Incurrence of Indebtedness and Issuance of Preferred Stock*" and the Liens so modified, replaced, renewed, extended or refinanced shall not extend in any material respect to any additional property or assets;

(9)     Liens for taxes, assessments or governmental charges or claims that are not yet delinquent or that are being contested in good faith by appropriate proceedings instituted within a reasonable period of time and diligently concluded; *provided* that any reserve or other appropriate provision as is required in conformity with GAAP has been made therefor;

(10)    Liens imposed by law, such as carriers', warehousemen's, landlord's and mechanics' Liens or other similar Liens, in each case, incurred in the ordinary course of business;

(11)    survey exceptions, easements or reservations of, or rights of others for, licenses, rights-of-way, sewers, electric lines, telegraph and telephone lines and other similar purposes, or zoning or other similar restrictions as to the use of real property that were not incurred in connection with Indebtedness and that do not in the aggregate materially impair their use in the operation of the business of such Person;

(12)    Permitted Collateral Liens;

(13)    Liens securing Hedging Obligations permitted to be incurred by clause (9) of the second paragraph under the caption entitled "—*Certain Covenants—Incurrence of Indebtedness and Issuance of Preferred Stock*";

(14)    judgment Liens not giving rise to an Event of Default so long as any appropriate legal proceedings which may have been duly initiated for the review of such judgment shall not have been finally terminated or the period within which such proceedings may be initiated shall not have expired;

(15)    Liens upon specific items of inventory or other goods and proceeds of any Person securing such Person's obligations in respect of bankers' acceptances issued or created for the account of such Person to facilitate the purchase, shipment or storage of such inventory or other goods;

(16)    Liens securing reimbursement obligations with respect to commercial letters of credit which encumber documents and other property relating to such letters of credit and products and proceeds thereof;

(17)    Liens on assets of a Restricted Subsidiary of the Parent that is not a Guarantor to secure Indebtedness of such Restricted Subsidiary that is otherwise permitted under the Indenture;

(18)    leases, subleases, licenses and sublicenses granted to others in the ordinary course of business of the Parent and its Restricted Subsidiaries;

(19)    banker's Liens, rights of setoff and similar Liens with respect to cash and Cash Equivalents on deposit in one or more bank accounts in the ordinary course of business;

(20)    Liens arising from U.S. Uniform Commercial Code financing statement filings (or similar filings in other applicable jurisdictions) regarding operating leases entered into by the Parent and the Restricted Subsidiaries in the ordinary course of business;

(21)    Liens securing Permitted Refinancing Indebtedness incurred to refinance Indebtedness that was previously so secured; *provided* that any such Lien is limited to all or part of the same property or assets that secured (or under the agreements pursuant to which such Lien arose, could have secured) the Indebtedness being refinanced (plus improvements and accessions to, such property or proceeds or distributions thereof);

(22)    Liens on the funds or securities deposited for the purpose of defeasing or redeeming any Indebtedness on or prior to its maturity date, to the extent such defeasance or redemption is permitted under the Indenture;

(23)    Liens incurred or deposits made in connection with workers' compensation, unemployment insurance, other types of social security and other types of related statutory obligations;

(24)    rights of set-off under contracts that do not relate to Indebtedness for borrowed money;

(25)    Liens in favor of customs or revenue authorities to secure payment of customs duties in connection with the importation of goods in the ordinary course of business;

(26)    Liens resulting from escrow arrangements unrelated to Indebtedness for borrowed money entered into in connection with a disposition of assets and from escrow arrangements in relation to the Lion Payment;

(27)    any retention of title reserved by any seller of goods or any Lien imposed, reserved or granted over goods supplied by such seller;

(28)    Liens arising out of or in connection with pre-judgment legal process or a judgment or a judicial award relating to security for costs;

(29)    Liens on and pledges of Equity Interests of any Unrestricted Subsidiary securing any Indebtedness of such Unrestricted Subsidiary;

(30)    Liens on the assets or property of a Restricted Subsidiary to secure Indebtedness of such Restricted Subsidiary owing to and held by the Parent, any other Guarantor or the Issuer;

264

(31)      [Reserved];

(32)      Liens on shares, assets or property of the Copecresto Subsidiaries (other than Parliament Distribution or any other Copecresto Subsidiary that owns the "Parliament" trademark) securing Indebtedness consisting of local lines of credit or working capital facilities; and

(33)      Liens to secure the Notes (including any Additional Notes).

"*Permitted Refinancing Indebtedness*" means any Indebtedness of the Parent or any of its Restricted Subsidiaries issued in exchange for, or the net proceeds of which are used to renew, refund, refinance, replace, defease or discharge ("*refinance*") other Indebtedness of the Parent or any of its Restricted Subsidiaries (other than intercompany Indebtedness); *provided* that:

(1)      the principal amount (or accreted value, if applicable) of such Permitted Refinancing Indebtedness does not exceed the principal amount (or accreted value, if applicable) of the Indebtedness renewed, refunded, refinanced, replaced, defeased or discharged (plus all accrued interest on the Indebtedness and the amount of all fees and expenses, including premiums, incurred in connection therewith);

(2)      if the Indebtedness being renewed, refunded, refinanced, replaced, defeased or discharged is subordinated in right of payment to the Notes or the Guarantees, such Permitted Refinancing Indebtedness has a final maturity date later than the final maturity date of and has a Weighted Life Average equal to or greater than the Weighted Life Average of the Maturity of, and is subordinated in right of payment to, the Notes or the Guarantees on terms not materially less favorable to the Holders of Notes or the Guarantees as those contained in the documentation governing the Indebtedness being renewed, refunded, refinanced, replaced, defeased or discharged; and

(3)      such Indebtedness is incurred either by the Parent or by the Restricted Subsidiary who is a borrower on the Indebtedness being renewed, refunded, refinanced, replaced, defeased or discharged.

"*Person*" means any individual, corporation, company, partnership, joint venture, association, joint-stock company, trust, unincorporated organization, limited liability company or government or other entity.

"*Plan of Reorganization*" means the Plan of Reorganization defined in the Offering Memorandum and Disclosure Statement.

"*Plan Value*" means $649.4 million.

"*Proceeds Loan*" means the loan between Jelegat Holdings Limited, as borrower, and the Issuer, as lender, made out of the proceeds of the issuance of the Old Notes, as such loan will be amended on the Effective Date to reflect the issuance of the Notes and the cancellation of the Existing Notes.

"*Protected Period*" means the period beginning with the Effective Date and ending upon the earlier to occur of (i) the date Parent completes a transaction pursuant to which holders of the series B common stock in the Parent and holders of the series C common stock in the Parent sell at least 90% of the aggregate number of shares of series B common stock and series C common stock issued on the Effective Date to any person in a bona fide arm's-length transaction; or (ii) the earlier of (a) the date on which the Senior Holders hold less than 3% of the total number of shares of Common Stock issued pursuant to the Plan and (b) the date on which less than 10% of the aggregate principal amount of Notes issued on the Effective Date are outstanding.

"*Roust Russia Guarantors*" means Bravo Premium LLC, JSC Distillery Topaz, JSC "Roust Russia", Limited Liability Company "The Trading House Russian Alcohol", Sibirsky LVZ, OOO First Tula Distillery and Mid-Russian Distilleries.

"*Roust Russia Intercompany Borrowers*" means the borrowers under the Roust Russia On-Loans.

"*Roust Russia On-Loans*" means the loans between the Roust Russia Guarantors, as borrowers, and Jelegat Holdings Limited, as lender, made out of the proceeds of an Intercompany Loan as such loans may be amended to reflect the principal amount, interest, maturity and other terms of the Notes.

"*Roust Russia Security Documents*" means each of the documents entered into by the Roust Russia Intercompany Borrowers creating or evidencing a Lien on property or assets of each of the Roust Russia Intercompany Borrowers for the benefit of Jelegat Holding Limited and any related intercreditor agreement, in each case as amended, modified, restated, supplemented or replaced from time to time.

"*Roust Russia Transaction Documents*" means the Roust Russia On-Loans and the Roust Russia Security Documents as such documents may be amended or modified.

"*Roust Russia Vendor Loan Notes*" means the series A Unsecured Subordinated Loan Notes issued by Lion/Rally Lux 2 prior to the Effective Date (and related payment in-kind notes).

"*Rating Agencies*" means (1) each of Moody's and S&P and (2) if any of Moody's or S&P ceases to rate the notes or fails to make a rating of the New Convertible Secured Notes publicly available for reasons outside of the Issuer's control, a "nationally recognized statistical rating organization" within the meaning of Rule 15c3-1(c)(2)(vi)(F) under the Exchange Act selected by the Issuer as a replacement agency for Moody's or S&P, or both of them, as the case may be.

"*Related Party*" means (i) the spouse or immediate family member of Roustam Tariko, or any direct descendent of Roustam Tariko, his spouse or any of their immediate family members; (ii) the estate, executors, administrators or similar Persons for any Person specified in clause (i) of this definition; or (iii) any Person controlled by or any trust for the benefit of, any Person specified in clauses (i) or (ii), including Roust Trading Ltd or any Affiliate of Roustam Tariko or any Person specified in (i) and (ii).

"*Restricted Investment*" means an Investment other than a Permitted Investment.

"*Restricted Subsidiary*" of a Person means any Subsidiary of the referent Person that is not an Unrestricted Subsidiary.

"*Restructuring Transactions*" means the Restructuring Transactions defined in this Offering Memorandum and Disclosure Statement.

"*RSV*" means Russian Standard Vodka.

"*RSV Contribution*" means the contribution of RSV by RTL and certain of its subsidiaries to Roust, which shall include all of RSV's tangible and intangible assets, including (a) the entirety of RTL and certain of its subsidiaries' equity interests in RSV and (b) all intellectual property and trademarks relating to RSV not currently held by RSV or Roust (including, without limitation, 100% of the equity in Russian Standard IP Holding AG).

"*RSV Entities*" means Limited liability company "Russian Standard Vodka", Digital Data Holding Limited, Russian Standard Intellectual Property Holding AG.

"*RSV Guarantors*" has the same meaning as RSV Entities.

"*RSV Loans*" means the loans issued by VTB and UniCredit Bank outstanding as of the Effective Date.

"*RSV Pledged Collateral*" means certain real property and fixtures of Limited liability company "Russian Standard Vodka" located in Russia currently subject to first-ranking security in favor of VTB Bank (Public Joint-Stock Company) or, Joint Stock Company UniCredit Bank, as applicable, to secure the obligations of the RSV Entities under the RSV Loans.

"*Russian Alcohol Finance Limited*" means a Cyprus corporation currently named Jelegat Holdings Limited.

"*Russian Guarantors*" means, collectively, OOO Glavspirttirest and the Roust Russia Guarantors.

"*RTL*" means Roust Trading Ltd.

"*RTL Debt*" means any loans or obligations owed to Roust and its direct and indirect subsidiaries by RTL and its direct and indirect subsidiaries (other than direct and indirect subsidiaries of Roust).

"*RTL Debt to Equity Conversion*" means the conversion of certain debt owed by certain subsidiaries of Roust to certain of RTL's non-Roust subsidiaries in exchange for shares of New Common Stock in Reorganized Roust, as contemplated by the Plan of Reorganization.

"*RTL Parties*" means RTL and its Affiliates.

"*S&P*" means Standard & Poor's Ratings Group.

"*Seasonality Basket*" means has the meaning set forth in clause (9) of the second paragraph under the caption "—*Certain Covenants—Incurrence of Indebtedness and Issuance of Preferred Stock*."

"*Securities Act*" means the U.S. Securities Act of 1933, as amended.

"*Security Documents*" means each of the documents entered into by the Parent or any of its Restricted Subsidiaries creating or evidencing a Lien on property or assets of the Parent or any Restricted Subsidiary for the benefit of the Holders and the Trustee and any intercreditor agreement, in each case as amended, modified, restated, supplemented or replaced from time to time.

"*Senior Holders*" means holders of Existing Senior Secured Notes immediately prior to the Effective Date.

"*Senior Secured Indebtedness*" means, as of any date of determination, the principal amount of any Indebtedness for borrowed money that is secured by a Lien.

"*Share Capital*" means:

(1)    in the case of a corporation, corporate stock;

(2)    in the case of an association or business entity, any and all shares, interests, participations, rights or other equivalents (however designated) of corporate stock;

(3)    in the case of a partnership or limited liability company, partnership interests (whether general or limited) or membership interests; and

(4)    any other interest or participation that confers on a Person the right to receive a share of the profits and losses of, or distributions of assets of, the issuing Person, but excluding from all of the foregoing any debt securities convertible into Share Capital, whether or not such debt securities include any right of participation with Share Capital.

"*Significant Subsidiary*" means any Subsidiary that would be a "significant subsidiary" as defined in Article 1, Rule 1-02 of Regulation S-X, promulgated pursuant to the Securities Act, as such Regulation is in effect on the date hereof, with calculations assuming that the RSV Entities have been acquired by the Parent on January 1, 2016.

"*Specified Bank Account*" means any bank account of the relevant Guarantor or the Issuer having at least $5.0 million (or, if in a currency other than U.S. dollars, the U.S. dollar equivalent thereof) in deposits, measured as of the Effective Date, and thereafter as of the last day of each fiscal quarter after the Effective Date.

"*Specified Intellectual Property Rights*" means any material intellectual property rights relating to the brands owned or used by the Parent and its Restricted Subsidiaries from time to time, as determined by the directors of the Parent acting in good faith.

"*Specified Reserved Matters*" has the meaning ascribed thereto in the Investor Rights Agreement, as in effect from time to time.

"*Stated Maturity*" means, with respect to any installment of interest or principal on any series of Indebtedness, the date on which the payment of interest or principal was scheduled and required to be paid in the documentation governing such Indebtedness as of the Effective Date, and will not include any contingent obligations to repay, redeem or repurchase any such interest or principal prior to the date originally scheduled for the payment thereof.

"*Subordinated Shareholder Funding*" means collectively, any funds provided to the Parent by (or any other debt obligations of the Issuer for borrowed money owed to), any Affiliate of the Parent, in exchange for or pursuant to any security, instrument or agreement other than Capital Stock, together with any such security, instrument or agreement and any other security or instrument other than Capital Stock issued in payment of any obligation under any Subordinated Shareholder Funding; *provided* that such Subordinated Shareholder Funding:

(a)     does not (including upon the happening of any event) mature or require any amortization or other payment of principal prior to the first anniversary of the maturity of the Notes (other than through conversion or exchange of any such security or instrument for Capital Stock (other than Disqualified Stock) of the Parent or for any other security or instrument meeting the requirements of the definition);

(b)     does not (including upon the happening of any event) require the payment of cash interest prior to the first anniversary of the maturity of the Notes;

(c)     does not (including upon the happening of any event) provide for the acceleration of its maturity nor confers on its shareholders any right (including upon the happening of any event) to declare a default or event of default or take any enforcement action, in each case prior to the first anniversary of the maturity of the Notes;

(d)     is not secured by a Lien on any assets of the Parent or a Restricted Subsidiary and is not guaranteed by any Subsidiary of the Parent;

(e)     is subordinated in right of payment to the prior payment in full of the Notes in the event of any Default, bankruptcy, reorganization, liquidation, winding up or other disposition of assets of the issuer and other restrictions, on payment and enforcement;

(f)     does not (including upon the happening of any event) restrict the payment of amounts due in respect of the Notes or compliance by the Issuer with its obligations under the Notes and the Indenture;

(g)     does not (including upon the happening of an event) constitute Voting Stock; and

(h)     is not (including upon the happening of any event) mandatorily convertible or exchangeable, or convertible or exchangeable at this option of the holder thereof); in whole or in part, prior to the date on which the Notes mature, other than into or for Capital Stock (other than Disqualified Stock) of the Parent.

"*Subordination Deed*" means the subordination deed entered into by the Issuer, the Parent and the Guarantors on the Effective Date.

"*Subsidiary*" means, with respect to any specified Person:

(1)     any corporation, association or other business entity of which more than 50% of the total voting power of shares of Capital Stock entitled (without regard to the occurrence of any contingency and after giving effect to any voting agreement or stockholders' agreement that effectively transfers voting power) to vote in the election of directors, managers or trustees of the corporation, association or other business entity is at the time owned or controlled, directly or indirectly, by that Person or one or more of the other Subsidiaries of that Person (or a combination thereof); and

(2)      any partnership (a) the sole general partner or the managing general partner of which is such Person or a Subsidiary of such Person; or (b) the only general partners of which are that Person or one or more Subsidiaries of that Person (or any combination thereof).

"*Subsidiary with Material Unencumbered Assets*" means a Subsidiary of the Parent that holds more than 3% of the total assets of the Parent as calculated by reference to the Company's most recently pushed annual or quarterly financial statements published in accordance with the covenant *"—Reporting"*.

"*Subsidiary Guarantor*" means any Guarantor other than the Parent.

"*Tax*" or "*Taxes*" means any tax, contribution, special contribution or defense, impost, withholding, levy or charge in the nature of tax in any jurisdiction together with any interest, penalty, or addition thereto, whether disputed or not.

"*Transactions*" means the transactions contemplated by the Plan of Reorganization, including the RSV Contribution, the Mergers, the RTL Debt to Equity Conversion, the cancellation of the RTL Debt, the cancellation of the Existing Notes and the issuance of the Notes.

"*Treasury Rate*" means, as of any redemption date, the yield to maturity as of such redemption date of United States Treasury securities with a constant maturity (as complied and published in the most recent Federal Reserve Statistical Release H.15 (519) that has become publicly available at least two Business Days prior to the redemption date (or, if such Statistical Release is no longer published, any publicly available source of similar market data)) most nearly equal to the period from the redemption date to December 1, 2013; *provided*, *however*, that if the period from the redemption date to December 1, 2013 is less than one year, the weekly average yield on actually traded United States Treasury securities adjusted to a constant maturity of one year will be used.

"*Unrestricted Subsidiary*" means any direct or indirect Subsidiary of the Parent that is designated by the Board of Directors of the Parent as an Unrestricted Subsidiary in accordance with the provisions summarized under "*—Certain Covenants—Designation of Restricted and Unrestricted Subsidiaries*" pursuant to a resolution of the Board of Directors, but only to the extent that such Subsidiary:

(1)      has no Indebtedness other than Non-Recourse Debt;

(2)      except as permitted by the covenant described above under the caption "*—Certain Covenants—Transactions with Affiliates*", is not party to any agreement, contract, arrangement or understanding with the Parent or any Restricted Subsidiary of the Parent unless the terms of any such agreement, contract, arrangement or understanding are no less favorable to the Parent or such Restricted Subsidiary than those that might be obtained at the time from Persons who are not Affiliates of the Parent;

(3)      is a Person with respect to which neither the Parent nor any of its Restricted Subsidiaries has any direct or indirect obligation (a) to subscribe for additional Equity Interests; or (b) to maintain or preserve such Person's financial condition or to cause such Person to achieve any specified levels of operating results; and

(4)      has not guaranteed or otherwise directly or indirectly provided credit support for any Indebtedness of the Parent or any of its Restricted Subsidiaries.

"*Voting Stock*" of any specified Person as of any date means the Capital Stock of such Person that is at the time entitled to vote in the election of the Board of Directors of such Person.

"*Weighted Average Life to Maturity*" means, when applied to any Indebtedness at any date, the number of years obtained by dividing:

(1)      the sum of the products obtained by multiplying: (a) the amount of each then remaining instalment, sinking fund, serial maturity or other required payments of principal, including payment at final maturity, in respect of the Indebtedness; by (b) the number of years (calculated to the nearest one-twelfth) that will elapse between such date and the making of such payment; by

(2)      the then outstanding principal amount of such Indebtedness.

"*Whitehall Subsidiaries*" means, collectively WHL Holdings Limited, OOO Whitehall-Center, OOO WH Import Company, OOO Whitehall Severo-Zapad, OOO Whitehall-Saint-Petersburg, OOO WH Rostov-on-Don, and Dancraig Wines & Spirits Trading Limited.

"*Wholly Owned Restricted Subsidiary*" of any specified Person means a Restricted Subsidiary of such Person all of the outstanding Capital Stock or other ownership interests of which (other than directors' qualifying shares or shares required by applicable law to be held by a Person other than the Parent or a Restricted Subsidiary) will at the time be owned by such Person or by one or more Wholly Owned Restricted Subsidiaries of such Person.

## UNITED STATES FEDERAL INCOME TAX CONSEQUENCES

The following discussion is a summary of U.S. federal income tax considerations generally applicable to Noteholders and the Company of the Plan of Reorganization. This discussion is based on the Internal Revenue Code of 1986, as amended (the "*Tax Code*"), existing and proposed U.S. Treasury Department regulations promulgated thereunder ("*Treasury Regulations*"), and judicial decisions and current administrative rulings and practice, all as in effect and existing on the date hereof and all of which are subject to change or differing interpretations, possibly with retroactive effect. We have not sought any rulings from the Internal Revenue Service (the "*IRS*") with respect to the statements made in this summary, and there can be no assurance that the IRS or a court would agree with such statements. No opinion of counsel has been or will be rendered with respect to the tax consequences of the Plan of Reorganization.

This summary does not address all of the tax consequences that may be relevant to Noteholders in light of their particular circumstances or to Noteholders that are subject to special treatment under U.S. federal income tax rules, including, for example, banks and other financial institutions; insurance companies; securities dealers; traders in securities who elect to use the mark-to-market method of accounting; tax-exempt investors; S corporations; Noteholders classified as a partnership or other flow-through entity under the Tax Code; Noteholders that hold Existing Notes, New Senior Secured Notes, New Common Stock, or Rights (as defined below) as part of a hedge, straddle, conversion transaction, or other integrated investment; and Noteholders whose functional currency is not the U.S. dollar. Further, this summary does not address any tax consequences of the receipt of the Backstop Commitment Fee to Noteholders that receive the Backstop Commitment Fee in connection with the Share Placement. This summary assumes that the Noteholders hold the Existing Notes exclusively as "capital assets" within the meaning of section 1221 of the Tax Code, and that the Existing Notes are properly characterized as indebtedness for U.S. federal income tax purposes. In addition, this summary does not address the 3.8% Medicare tax on the net investment income, or any aspects of foreign, state, local, estate, gift, or other tax laws that may be applicable to a particular Noteholder in connection with the Plan of Reorganization.

This summary of U.S. federal income tax considerations is for general information purposes only and is not tax advice. Each Noteholder is urged to consult its tax advisor regarding the tax consequences of the Plan of Reorganization to such Noteholder in light of its particular circumstances, including the applicability of U.S. federal, state, local, and foreign tax laws.

As used in this summary, the term "U.S. Holder" means a beneficial owner of Existing Notes for U.S. federal income tax purposes that is (i) an individual who is a citizen or resident of the United States; (ii) a corporation or other entity taxable as a corporation for U.S. federal income tax purposes that is created or organized in or under the laws of the United States or of any political subdivision thereof; (iii) an estate, the income of which is subject to U.S. federal income taxation regardless of its source; or (iv) a trust that (A) is subject to primary supervision by a court within the United States and with respect to which one or more United States persons, within the meaning of section 7701(a)(30) of the Tax Code, have the authority to control all substantial decisions or (B) has made a valid election to be treated as a United States person under applicable Treasury Regulations. The term "Non-U.S. Holder" means a beneficial owner of Existing Notes for U.S. federal income tax purposes (other than an entity classified as a partnership or other flow-through entity under the Tax Code) that is not a U.S. Holder.

If a partnership (or an entity or arrangement that is classified as a partnership for U.S. federal income tax purposes) is a beneficial owner of Existing Notes, the tax treatment of a partner in the partnership will generally depend on the status of the partner and the activities of the partner and the partnership. Partners in a partnership that beneficially owns Existing Notes are urged to consult their tax advisors regarding the U.S. federal income tax consequences of the Plan of Reorganization.

As used in this summary, the term "*Existing Senior Secured Notes Consideration*" means (i) the New Senior Secured Notes, (ii) the cash received by the holders of Existing Senior Secured Notes (including any cash received as a result of the Existing Senior Secured Notes Equity Subscription), (iii) the rights to participate in the Share Placement (the "*Share Placement Rights*") received by the holders of Existing Senior Secured Notes, and (iv) the shares of New Common Stock received by the holders of Existing Senior Secured Notes as part of the consideration for the Existing Senior Secured Notes (excluding any shares of New Common Stock acquired by the holders of Existing Convertible Notes as a result of the Existing Senior Secured Notes Equity Subscription). In addition, the term "*Existing Convertible Notes Consideration*" means (i) the shares of New Common Stock received

by holders of Existing Senior Secured Notes as part of the consideration for the Existing Convertible Notes, (ii) the Share Placement Rights received by holders of Existing Senior Secured Notes, and (iii) the rights to participate in the Existing Senior Secured Notes Equity Subscription (the "*Subscription Rights*," and together with the Share Placement Rights, the "*Rights*").

## U.S. Federal Income Tax Considerations for U.S. Holders

### Exchange of Existing Notes Pursuant to the Plan of Reorganization

*Exchange of Existing Senior Secured Notes for the Existing Senior Secured Notes Consideration*

We intend to take the position that the exchange of Existing Notes for the Existing Notes Consideration constitutes an exchange between Noteholders and CEDC FinCo for U.S. federal income tax purposes and the remainder of this discussion assumes such treatment. Nevertheless, such position is not binding on the IRS or the courts, and other characterizations of the exchange of Existing Notes for the Existing Notes Consideration may be possible. The U.S. federal income tax considerations applicable to such alternative characterizations may differ materially from those described herein. Accordingly, Noteholders are urged to consult their tax advisors regarding the characterization of the exchange of Existing Notes for Existing Notes Consideration pursuant to the Plan of Reorganization.

The treatment of the exchange of the Existing Senior Secured Notes for the Existing Senior Secured Notes Consideration depends on whether the terms of the New Senior Secured Notes differ from the terms of the Existing Senior Secured Notes to such an extent that the exchange constitutes a "significant modification" of the Existing Senior Secured Notes. In general, the modification of a debt instrument (or an exchange of an existing debt instrument for a new debt instrument by the same lenders) is a significant modification if, based on all the facts and circumstances and taking into account all modifications of the debt instrument collectively, the legal rights or obligations that are altered and the degree to which they are altered are economically significant. The Treasury Regulations provide that a change in the yield of a debt instrument is a significant modification if the yield on the modified instrument varies from the annual yield on the unmodified instrument (determined as of the date of the modification) by more than the greater of (i) 25 basis points and (ii) five percent of the annual yield of the unmodified instrument. For purposes of determining the yield on the modified debt instrument, any payments made to a holder as consideration for the modification, as well as any prior consent payments or other modifications that affect the yield on the debt instrument, are taken into account as an adjustment to the debt instrument's "issue price." In addition, a modification that changes the timing of payments due under a debt instrument is a significant modification if it results in the "material deferral" of scheduled payments (including repayments of principal). While the materiality of a deferral generally depends on all the facts and circumstances, a deferral of one or more scheduled payments within a specified safe-harbor period is not a material deferral if the deferred payments are unconditionally payable no later than at the end of the safe-harbor period. The safe-harbor period begins on the original due date of the first scheduled payment that is deferred and extends for a period equal to the lesser of five years or 50% of the original term of the instrument.

Based on the extended maturity and modified payment terms of the New Senior Secured Notes, and taking into account the receipt of cash, Share Placement Rights, and New Common Stock by the holders of Existing Senior Secured Notes, the exchange of Existing Senior Secured Notes for the Existing Senior Secured Notes Consideration should result in a "significant modification" of such Existing Senior Secured Notes for U.S. federal income tax purposes.

The U.S. federal income tax consequences of this exchange depend on whether the Existing Senior Secured Notes and New Senior Secured Notes are properly characterized as "securities" for U.S. federal income tax purposes. A debt instrument generally constitutes a security if, based on all the facts and circumstances, the debt instrument represents a meaningful investment in the issuer. Although a number of factors may affect whether a debt instrument is a security, one of the most important factors is the debt instrument's term to maturity. In general, debt instruments with an original term of less than five years are less likely to be treated as securities, and debt instruments with an original term of more than ten years are more likely to be treated as securities. Whether a debt instrument with an original term of between five and ten years should be characterized as a security is not entirely clear and generally depends on the facts and circumstances, including the creditworthiness of the issuer, whether the debt instrument is subordinated to other creditors, whether a holder has the right to vote or otherwise participate in

272

the issuer's management, whether the debt instrument is convertible into an equity interest in the issuer, and whether interest payments are fixed or contingent. Under a published IRS ruling, the term of a debt instrument received in a transaction that qualifies as "reorganization" under the Tax Code (including a "recapitalization") in exchange for another debt instrument may, in certain circumstances, be treated as including the latter's original term in determining whether the newly received debt instrument is a security.

Although the matter is not free from doubt, we intend to take the position that both the Existing Senior Secured Notes and New Senior Secured Notes are "securities" for U.S. federal income tax purposes. This position is based, in part, on the IRS ruling mentioned above as well as the fact that (i) the Existing Senior Secured Notes have an original maturity of approximately five years and were exchanged for preexisting indebtedness of CEDC FinCo in a previous debt exchange for notes that had an original maturity of either approximately six or approximately seven years, (ii) the New Senior Secured Notes will have a maturity of approximately six years, and (iii) our capital structure and the payment terms of the Existing Senior Secured Notes and New Senior Secured Notes are consistent with the treatment of such instruments as an investment subject to the risks of our business enterprise.

If this position is correct, the exchange of Existing Senior Secured Notes for the Existing Senior Secured Notes Consideration should be treated as a "recapitalization" for U.S. federal income tax purposes. In that event, subject to the discussion below in "—Payment of Accrued Interest on Existing Notes," a U.S. Holder that exchanges Existing Senior Secured Notes for the Existing Senior Secured Notes Consideration should generally recognize gain (but not loss) on the exchange in an amount equal to the lesser of (i) the amount of gain realized by the U.S. Holder on the exchange (if any) and (ii) the sum of the amount of cash and the aggregate fair market value of the Share Placement Rights and New Common Stock received in the exchange. The amount of gain realized by a U.S. Holder on the exchange should be equal to the positive difference, if any, between (i) the sum of (A) the "issue price" of the New Senior Secured Notes received in the exchange, (B) the amount of cash received in the exchange, and (C) the aggregate fair market value of the Share Placement Rights and New Common Stock received in the exchange and (ii) the U.S. Holder's adjusted tax basis in the Existing Senior Secured Notes surrendered in the exchange. As discussed below in "—Ownership and Disposition of New Senior Secured Notes—Issue Price," the issue price of a New Senior Secured Note should generally be equal to its fair market value as of the consummation of the exchange, reduced by the amount of Pre-Issuance Accrued Interest (as defined below) on the New Senior Secured Note. A U.S. Holder's tax basis in the New Senior Secured Notes received in the exchange generally should be equal to its adjusted tax basis in the Existing Senior Secured Notes surrendered in the exchange, decreased by the sum of the amount of cash and the aggregate fair market value of the Share Placement Rights and New Common Stock received in the exchange, and increased by the amount of gain recognized by the U.S. Holder on the exchange (if any). A U.S. Holder's tax basis in the Share Placement Rights and New Common Stock, respectively, received in the exchange should be equal to the fair market value of such Share Placement Rights and New Common Stock, respectively, as of the consummation of the exchange. In addition, a U.S. Holder's holding period in the New Senior Secured Notes received in the exchange should generally include its holding period in the Existing Senior Secured Notes surrendered in the exchange, while the U.S. Holder's holding period in the Share Placement Rights and New Common Stock received in the exchange should begin on and include the date of the exchange.

If, contrary to the position we intend to take, the Existing Senior Secured Notes and/or New Senior Secured Notes are not characterized as "securities," the exchange of Existing Senior Secured Notes for the Existing Senior Secured Notes Consideration should generally be a fully taxable transaction to U.S. Holders for U.S. federal income tax purposes. In that case, subject to the discussion below in "—Payment of Accrued Interest on Existing Notes," a U.S. Holder that exchanges Existing Senior Secured Notes for the Existing Senior Secured Notes Consideration should generally recognize gain or loss on the exchange in an amount equal to the difference between (i) the sum of (A) the "issue price" of the New Senior Secured Notes received in the exchange, (B) the amount of cash received in the exchange, and (C) the aggregate fair market value of the Share Placement Rights and New Common Stock received in the exchange and (ii) the U.S. Holder's adjusted tax basis in the Existing Senior Secured Notes surrendered in the exchange. As noted above, the issue price of a New Senior Secured Note should generally be equal to its fair market value as of the consummation of the exchange, reduced by the amount of Pre-Issuance Accrued Interest (as defined below) on the New Senior Secured Note. U.S. Holders of Existing Senior Secured Notes are urged to consult their tax advisors regarding the characterization of the Existing Senior Secured Notes and New Senior Secured Notes as "securities" and the potential tax consequences of a taxable exchange of Existing Senior Secured Notes for the Existing Senior Secured Notes Consideration.

Regardless of whether the exchange of Existing Senior Secured Notes for the Existing Senior Secured Notes Consideration qualifies as a "recapitalization" for U.S. federal income tax purposes, the New Senior Secured Notes will be issued with original issue discount ("*OID*") for U.S. federal income tax purposes if the "stated redemption price at maturity" of the New Senior Secured Notes (generally, their stated principal amount) exceeds the issue price of the New Senior Secured Notes by more than a statutorily defined de minimis amount. See the discussion of OID below in "—Ownership and Disposition of New Senior Secured Notes—OID and Stated Interest."

*Exchange of Existing Convertible Notes for the Existing Convertible Notes Consideration*

The exchange of Existing Convertible Notes for the Existing Convertible Notes Consideration should be a taxable transaction for U.S. federal income tax purposes. Accordingly, subject to the discussion below in "—Payment of Accrued Interest on Existing Notes," a U.S. Holder that exchanges Existing Convertible Notes for the Existing Convertible Notes Consideration should generally recognize gain or loss on the exchange in an amount equal to the difference between (i) the aggregate fair market value of the Rights and New Common Stock received in the exchange and (ii) the U.S. Holder's adjusted tax basis in the Existing Convertible Notes surrendered in the exchange. A U.S. Holder's tax basis in each of the Rights and New Common Stock, respectively, received in the exchange should be equal to the fair market value of such Rights and New Common Stock, respectively, as of the consummation of the exchange, and the U.S. Holder's holding period in each of such Rights and New Common Stock should begin on and include the date of the exchange.

*Character of Gain or Loss*

Subject to the discussions below in "—Market Discount Rules" and "—Payment of Accrued Interest on Existing Notes," if a U.S. Holder recognizes gain or loss on the exchange of Existing Notes pursuant to the Plan of Reorganization, such gain or loss will generally be capital gain or loss. Any such capital gain or loss will generally be treated as long-term capital gain or loss if the U.S. Holder's holding period in the Existing Notes surrendered in the exchange is greater than one year at the time of the exchange. Long-term capital gains recognized by individual and certain other non-corporate U.S. Holders are generally taxed at preferential U.S. federal income tax rates. A U.S. Holder's ability to deduct capital losses may be subject to limitations.

*Market Discount Rules*

Certain U.S. Holders that acquired their Existing Notes at a discount other than at original issuance may be subject to the "market discount" rules under the Tax Code. In general, a Noteholder will be considered to have acquired an Existing Note with market discount if its adjusted tax basis in the Existing Note is less than the "revised issue price" of such Existing Notes by more than a specified de minimis amount. The revised issue price of an Existing Note is generally equal to the sum of (i) the issue price of such Existing Note and (ii) all OID previously includible in the income of a Noteholder, less the sum of all remaining payments to be made on the Existing Note (other than payments of "qualified stated interest"). Any gain recognized by a U.S. Holder on an exchange of such an Existing Note pursuant to the Plan of Reorganization would generally be treated as ordinary income to the extent of the market discount that accrued on the Existing Note during such U.S. Holder's holding period, unless such U.S. Holder previously elected to include such market discount in income currently as it accrued.

If, consistent with the position we intend to take, the exchange of Existing Senior Secured Notes for the Existing Senior Secured Notes Consideration is treated as a "recapitalization" under the Tax Code, any accrued market discount on such Existing Senior Secured Notes in excess of the amount of gain recognized on the exchange (if any) should not be currently includible in income by a U.S. Holder. Instead, such accrued market discount should generally carry over to the New Senior Secured Notes received in the exchange, such that any gain recognized by the U.S. Holder on a subsequent sale, exchange, redemption, or other taxable disposition of such New Senior Secured Notes would generally be treated as ordinary income to the extent of any accrued market discount on the Existing Senior Secured Notes not previously included in income by the U.S. Holder.

*Payment of Accrued Interest on Existing Notes*

If there is accrued and unpaid interest on the Existing Notes at the time they are surrendered pursuant to the Plan of Reorganization, a portion of the Existing Notes Consideration may be considered attributable to such interest

for U.S. federal income tax purposes. Such amount would generally be taxable to the U.S. Holder as interest (i.e., ordinary income) to the extent the interest was not previously included in income by the U.S. Holder. Conversely, it is possible that a U.S. Holder could recognize a deductible loss to the extent any accrued and unpaid interest on the Existing Notes was previously included in income by the U.S. Holder and is not paid in full. Although not entirely clear, such a loss may be treated as an ordinary loss rather than a capital loss. U.S. Holders are urged to consult their tax advisors regarding the allocation of the Existing Notes Consideration received for the Existing Notes between outstanding principal and interest on the Existing Notes and the tax treatment of any accrued and unpaid interest.

**Ownership and Disposition of New Senior Secured Notes**

*Issue Price*

For U.S. federal income tax purposes, the New Senior Secured Notes will likely be treated as "publicly traded" as of their issue date. As a result, under the Treasury Regulations, the issue price of the New Senior Secured Notes should generally be equal to the fair market value of the New Senior Secured Notes as of their issue date, reduced by the amount of interest that accrues on the New Senior Secured Notes prior to their issue date (the "*Pre-Issuance Accrued Interest*"). Our determination of the issue price of the New Senior Secured Notes, which we will make available to Noteholders, will generally be binding on a U.S. Holder that receives New Senior Secured Notes pursuant to the Plan of Reorganization, unless the U.S. Holder discloses a contrary position on its U.S. federal income tax return in accordance with the Treasury Regulations. To the extent the issue price of the New Senior Secured Notes is less than the aggregate stated principal amount of the New Senior Secured Notes, such difference will generally be treated as additional OID under the rules described below in "—Stated Interest and OID."

*Stated Interest and OID*

Stated interest on the New Senior Secured Notes will be includable in the income of a U.S. Holder as ordinary interest income at the time the U.S. Holder receives or accrues such amounts, in accordance with its regular method of accounting for U.S. federal income tax purposes. Notwithstanding the preceding sentence, a U.S. Holder should not include in income the portion of the first payment of interest on a New Senior Secured Note that is attributable to Pre-Issuance Accrued Interest and should instead treat such amount as a non-taxable return of principal.

As noted above, the New Senior Secured Notes will be issued with OID for U.S. federal income tax purposes if the "stated redemption price at maturity" of the New Senior Secured Notes (generally, their stated principal amount) exceeds the issue price of the New Senior Secured Notes by more than a statutorily defined de minimis amount. Under the OID rules, subject to the discussions below in "—Amortizable Bond Premium" and "—Acquisition Premium," if the New Senior Secured Notes are issued with OID, a U.S. Holder will generally be required to include in income the daily portion of OID that accrues on a New Senior Secured Note for each day during the taxable year on which such U.S. Holder holds the New Senior Secured Note, regardless of its method of accounting for U.S. federal income tax purposes. Thus, the U.S. Holder will generally be required to include OID in income in advance of the receipt of the cash to which the OID is attributable. "Daily portions" of OID are determined by allocating to each day of an accrual period (generally, the period between interest payments or compounding dates) a pro rata portion of the OID allocable to such accrual period. In general, the amount of OID that will accrue on a New Senior Secured Note during an accrual period will be equal to the product of the New Senior Secured Note's "adjusted issue price" at the beginning of the accrual period multiplied by its "yield to maturity." The adjusted issue price of a New Senior Secured Note at the beginning of an accrual period will equal its issue price, increased by the aggregate amount of OID that has accrued on the New Senior Secured Note in all prior accrual periods and decreased by any payments made on the New Senior Secured Note during all prior accrual periods. The yield to maturity of a New Senior Secured Note will generally be the discount rate that causes the present value of all principal and interest payments on the New Senior Secured Note as of its issue date to equal the issue price of the New Senior Secured Note (which, as stated above, is expected to be the fair market value of the New Senior Secured Notes as of the exchange).

*Amortizable Bond Premium*

If a U.S. Holder's tax basis in a New Senior Secured Note is greater than the sum of all amounts payable on the New Senior Secured Note (other than payments of "qualified stated interest"), the New Senior Secured Note will

be treated as acquired with "amortizable bond premium." In that case, the U.S. Holder would not be required to include OID (if any) in income with respect to the New Senior Secured Note notwithstanding the rules described above in "—Stated Interest and OID." In addition, the U.S. Holder would generally be able to elect to amortize the bond premium over the New Senior Secured Note's stated term (on a constant yield basis) to offset stated interest paid or accrued on the New Senior Secured Note. The U.S. Holder's adjusted tax basis in the New Senior Secured Note would generally be reduced by any amount of bond premium amortized against such interest.

*Acquisition Premium*

If a U.S. Holder's tax basis in a New Senior Secured Note is (i) less than or equal to the sum of all amounts payable on the New Senior Secured Note (other than payments of "qualified stated interest") and (ii) greater than the New Senior Secured Note's issue price, the New Senior Secured Note will be treated as acquired with "acquisition premium." In that case, each daily portion of OID (if any) that would otherwise be includible in the U.S. Holder's income with respect to such New Senior Secured Note would generally be reduced by an amount equal to the product of (i) the amount that would otherwise be the daily portion and (ii) a fraction, the numerator of which is the excess of the U.S. Holder's adjusted tax basis in the New Senior Secured Note over its adjusted issue price and the denominator of which is the excess of the sum of all amounts payable on the New Senior Secured Note over its adjusted issue price.

*Sale, Disposition, or Retirement of New Senior Secured Notes*

Unless a nonrecognition provision of the Tax Code applies, and subject to the discussion above in "—Exchange of Existing Notes Pursuant to the Plan of Reorganization—Market Discount Rules," a U.S. Holder will generally recognize capital gain or loss on a sale, redemption, or other disposition of New Senior Secured Notes in an amount equal to the difference between (i) the sum of the amount of cash and the fair market value of any other property received in connection with the disposition (other than amounts attributable to accrued and unpaid interest, which would generally be taxable as ordinary income to the extent not previously included in income) and (ii) the U.S. Holder's adjusted tax basis in the New Senior Secured Notes. A U.S. Holder's adjusted tax basis in its New Senior Secured Notes will generally be equal to its initial tax basis in the New Senior Secured Notes (as described above in "— Exchange of Existing Notes Pursuant to the Plan of Reorganization—Exchange of Existing Senior Secured Notes for the Existing Senior Secured Notes Consideration"), (i) increased by the amount of OID (if any) included in the U.S. Holder's income prior to the disposition of the New Senior Secured Notes and (ii) decreased by the amount of Pre-Issuance Accrued Interest that the U.S. Holder previously received and any bond premium that the it previously amortized with respect to the New Senior Secured Notes. Any such capital gain or loss will generally be treated as long-term capital gain or loss if the U.S. Holder's holding period in such New Senior Secured Notes is greater than one year at the time of the disposition. Long-term capital gains recognized by individual and certain other non-corporate U.S. Holders are generally taxed at preferential U.S. federal income tax rates. A U.S. Holder's ability to deduct capital losses may be subject to limitations.

**Ownership, Exercise, and Disposition of Rights**

As described above, the receipt of Rights will generally be a taxable event to a U.S. Holder that exchanges Existing Notes pursuant to the Plan of Reorganization. Accordingly, a U.S. Holder's tax basis in Rights received pursuant to the Plan of Reorganization will be equal to the fair market value of such Rights as of the consummation of the exchange.

A U.S. Holder will generally recognize no gain or loss for U.S. federal income tax purposes as a result of an exercise of Rights. The basis of any New Common Stock acquired upon an exercise of Rights will equal the sum of the exercise price of such Rights and the U.S. Holder's tax basis in such Rights. The holding period of such New Common Stock will begin on and include the date the U.S. Holder exercises the Rights. Although the matter is not free from doubt, a U.S. Holder may be able to recognize a capital loss on the expiration of unexercised Rights in an amount equal to its tax basis in the Rights. A U.S. Holder's ability to deduct capital losses may be subject to limitations. U.S. Holders are urged to consult their tax advisors with respect to the potential availability of a capital loss on the expiration of an unexercised Right.

276

**Ownership and Disposition of New Common Stock**

*Dividends*

Any distributions made on the New Common Stock will generally constitute "dividends" for U.S. federal income tax purposes to the extent of our current and accumulated earnings and profits, as determined under U.S. federal income tax principles. A distribution paid in respect of New Common Stock that would otherwise be treated as a dividend but that exceeds our current and accumulated earnings and profits will be treated first as a non-taxable return of capital that reduces the U.S. Holder's adjusted tax basis in its shares of New Common Stock. Any portion of such a distribution in excess of the U.S. Holder's adjusted tax basis in its shares of New Common Stock, determined on a share-by-share basis, will generally be treated as capital gain. Subject to certain exceptions, dividends received by individual and certain other non-corporate U.S. Holders are generally taxed at preferential U.S. federal income tax rates, provided that certain holding period and other requirements are met. U.S. Holders that are corporations for U.S. federal income tax purposes may be eligible for a dividends received deduction with respect to dividends paid on their shares of New Common Stock.

*Sale or Other Disposition of New Common Stock*

Unless a nonrecognition provision of the Tax Code applies, a U.S. Holder will generally recognize capital gain or loss on a sale or other disposition of New Common Stock in an amount equal to the difference between (i) the sum of the amount of cash and the fair market value of any other property received in connection with the disposition and (ii) the U.S. Holder's adjusted tax basis in the New Common Stock. Any such capital gain or loss will generally be treated as long-term capital gain or loss if the U.S. Holder's holding period in its shares of New Common Stock is greater than one year at the time of the disposition. Long-term capital gains recognized by individual and certain other non-corporate U.S. Holders are generally taxed at preferential U.S. federal income tax rates. A U.S. Holder's ability to deduct capital losses may be subject to limitations

*U.S. Federal Income Tax Considerations for Non-U.S. Holders*

**Exchange of Existing Notes Pursuant to the Plan of Reorganization**

As discussed above in "—U.S. Federal Income Tax Considerations for U.S. Holders— Exchange of Existing Notes Pursuant to the Plan of Reorganization," the exchange of Existing Notes pursuant to the Plan of Reorganization will result in a disposition of such Existing Notes for U.S. federal income tax purposes, and we intend to take the position that the exchange of Existing Senior Secured Notes for the Existing Senior Secured Notes Consideration will be treated as a "recapitalization" for U.S. federal income tax purposes. A Non-U.S. Holder will generally not be subject to U.S. federal income tax on any gain recognized on the exchange of Existing Notes pursuant to the Plan of Reorganization (subject to the discussion below in "—Payment of Accrued Interest on Existing Notes") unless (i) the gain is effectively connected with the Non-U.S. Holder's conduct of a trade or business within the United States (and, if required by an applicable income tax treaty, is attributable to a United States permanent establishment of the Non-U.S. Holder) or (ii) the Non-U.S. Holder is an individual who is present in the United States for 183 days or more in the taxable year of the exchange and certain other conditions are met. In the case of gain recognized on the exchange of Existing Notes pursuant to the Plan of Reorganization (as described above in "—U.S. Federal Income Tax Considerations for U.S. Holders—Exchange of Existing Notes Pursuant to the Plan of Reorganization"), an individual Non-U.S. Holder described in (i) of the preceding sentence will generally be subject to tax on such gain under regular graduated U.S. federal income tax rates. A corporate Non-U.S. Holder described in (i) above will generally be subject to tax on such gain in the same manner as if it were a "United States person" as defined under the Tax Code, and may also be subject to a branch profits tax equal to 30% of its "effectively connected earnings and profits" (or a lower rate specified in an applicable income tax treaty). An individual Non-U.S. Holder described in (ii) above will generally be subject to a flat 30% tax on such gain, which may be offset by United States source capital losses in certain circumstances.

*Payment of Accrued Interest on Existing Notes*

As discussed above in "—U.S. Federal Income Tax Considerations for U.S. Holders— Exchange of Existing Notes Pursuant to the Plan of Reorganization—Payment of Accrued Interest on Existing Notes," if there is accrued and unpaid interest on the Existing Notes at the time they are surrendered pursuant to the Plan of

Reorganization, a portion of the Existing Notes Consideration may be considered attributable to the interest for U.S. federal income tax purposes. In general, any amount paid to a Non-U.S. Holder that is attributable to accrued and unpaid interest will not be subject to U.S. federal income tax (including withholding tax), provided that (i) such interest is not effectively connected with the Non-U.S. Holder's conduct of a trade or business in the United States (and, if required by an applicable income tax treaty, is not attributable to a United States permanent establishment of the Non-U.S. Holder), (ii) the Non-U.S. Holder does not actually or constructively own 10% or more of the total combined voting power of all classes of our voting stock, (iii) the Non-U.S. Holder is not a "controlled foreign corporation" related to us directly or constructively through stock ownership, and (iv) the Non-U.S. Holder has satisfied certain certification requirements. Such certification requirements will generally be met if the Non-U.S. Holder provides its name and address and certifies on IRS Form W-8BEN or W-8BEN-E (or a substantially similar form), under penalties of perjury, that it is not a U.S. person. Special procedures apply to payments to qualified foreign intermediaries and certain financial institutions that hold customers' securities in the ordinary course of their trade or business.

**Ownership and Disposition of New Senior Secured Notes**

*Stated Interest and OID*

        A Non-U.S. Holder will generally not be subject to U.S. federal income or withholding tax on payments of interest (other than Pre-Issuance Accrued Interest, which, as noted above, should be treated as a return of principal not subject to U.S. federal income tax) or OID (if any) on the New Senior Secured Notes, provided that (i) such interest or OID is not effectively connected with the Non-U.S. Holder's conduct of a trade or business within the United States (and, if required by an applicable income tax treaty, is not attributable to a United States permanent establishment of the Non-U.S. Holder), (ii) the Non-U.S. Holder does not actually or constructively own 10% or more of the total combined voting power of all classes of our voting stock, (iii) the Non-U.S. Holder is not a "controlled foreign corporation" related to us directly or constructively through stock ownership, and (iv) the Non-U.S. Holder satisfies certain certification requirements. Such certification requirements will generally be met if the Non-U.S. Holder provides its name and address and certifies on IRS Form W-8BEN or W-8BEN-E (or a substantially similar form), under penalties of perjury, that it is not a U.S. person. Special procedures apply to payments to qualified foreign intermediaries and certain financial institutions that hold customers' securities in the ordinary course of their trade or business.

*Sale, Disposition, or Retirement of New Senior Secured Notes*

        In general, any gain realized on a sale, redemption, or other disposition of New Senior Secured Notes by a Non-U.S. Holder will not be subject to U.S. federal income tax unless (i) the gain is effectively connected with the Non-U.S. Holder's conduct of a trade or business within the United States (and, if required by an applicable income tax treaty, is attributable to a United States permanent establishment of the Non-U.S. Holder) or (ii) the Non-U.S. Holder is an individual who is present in the United States for 183 days or more in the taxable year of that disposition and certain other conditions are met. Certain U.S. federal income tax rules applicable to non-U.S. holders ("*Non-U.S. Holders*") described in (i) or (ii) of the preceding sentence are described above in "— Exchange of Existing Notes Pursuant to the Plan of Reorganization." Any amounts received by a Non-U.S. Holder that are attributable to accrued and unpaid interest would generally be subject to the rules described above in "—Stated Interest and OID."

**Ownership and Disposition of New Common Stock**

*Dividends*

        As described above in "—U.S. Federal Income Tax Considerations for U.S. Holders—Ownership and Disposition of New Common Stock—Dividends," any distributions made on the New Common Stock will generally constitute "dividends" for U.S. federal income tax purposes to the extent of our current and accumulated earnings and profits, as determined under U.S. federal income tax principles. Dividends paid to a Non-U.S. Holder will generally be subject to withholding of U.S. federal income tax at a 30 percent rate or such lower rate as may be specified in an applicable income tax treaty. However, dividends that are effectively connected with the Non-U.S. Holder's conduct of a trade or business within the United States (and, if required by an applicable income tax treaty, that are attributable to a United States permanent establishment of the Non-U.S. Holder) will generally not be

278

subject to U.S. withholding tax, provided that certain certification and disclosure requirements are satisfied. An individual Non-U.S. Holder described in the preceding sentence will generally be subject to tax on such dividends under regular graduated U.S. federal income tax rates, and a corporate Non-U.S. Holder described in the preceding sentence will generally be subject to tax on such dividends in the same manner as if it were a "United States person," as defined under the Tax Code, and may also be subject to a branch profits tax equal to 30 percent of its "effectively connected earnings and profits" (or a lower rate specified in an applicable income tax treaty).

A Non-U.S. Holder that wishes to claim the benefit of an applicable treaty rate with respect to dividends paid on the New Common Stock will be required (i) to complete IRS Form W-8BEN or W-8BEN-E (or other applicable forms) and certify under penalty of perjury that such Non-U.S. Holder is not a "United States person," as defined under the Tax Code, and is eligible for treaty benefits, or (ii) if the New Common Stock is held through certain foreign intermediaries, to satisfy certain certification requirements under applicable Treasury Regulations. A Non-U.S. Holder of New Common Stock eligible for a reduced rate of United States withholding tax pursuant to an income tax treaty may obtain a refund of any excess amounts withheld by filing an appropriate claim for refund with the IRS.

*Sale or Other Disposition of New Common Stock*

In general, any gain realized on a sale or other disposition of New Common Stock by a Non-U.S. Holder will not be subject to U.S. federal income tax unless (i) the gain is effectively connected with the Non-U.S. Holder's conduct of a trade or business within the United States (and, if required by an applicable income tax treaty, is attributable to a United States permanent establishment of the Non-U.S. Holder) or (ii) the Non-U.S. Holder is an individual who is present in the United States for 183 days or more in the taxable year of that disposition and certain other conditions are met. Certain U.S. federal income tax rules applicable to Non-U.S. Holders described in (i) or (ii) of the preceding sentence are discussed above in "— Exchange of Existing Notes Pursuant to the Plan of Reorganization."

**Foreign Account Tax Compliance Act**

Under the Foreign Account Tax Compliance Act, withholding at a rate of 30% will generally be required in certain circumstances with respect to (i) interest payable on New Senior Secured Notes held by or through certain financial institutions (including investment funds), (ii) dividends paid in respect of New Common Stock held by or through such an institution, and (iii) after December 31, 2018, gross proceeds from the disposition of New Senior Secured Notes or New Common Stock held by or through such an institution, unless the institution certifies that it has entered into, and complies with, an agreement with the IRS to report, on an annual basis, information with respect to certain interests in, and accounts maintained by, the institution that are owned by certain U.S. persons or by certain non-U.S. entities that are wholly or partially owned by U.S. persons and to withhold on certain payments. An intergovernmental agreement between the United States and an applicable foreign country may modify these requirements. Similarly, (i) interest payable on New Senior Secured Notes held by a non-financial non-U.S. entity that does not qualify under certain exemptions, (ii) dividends paid in respect of New Common Stock held by such an entity, and (iii) after December 31, 2018, gross proceeds from the disposition of New Senior Secured Notes or New Common Stock held by such an entity will generally be subject to withholding at a rate of 30%, unless the entity either (A) certifies that the entity does not have any "substantial United States owners" or (B) provides certain information regarding the entity's "substantial United States owners," which will in turn be provided to the U.S. Treasury Department.

Non-U.S. Holders should consult their tax advisors regarding the possible implications of these rules on the ownership and disposition of New Senior Secured Notes and New Common Stock in light of their particular circumstances.

**Information Reporting and Backup Withholding**

A Non-U.S. Holder may be subject to U.S. federal backup withholding (currently imposed at a rate of 28%) with respect to interest and OID (if any) paid on the New Senior Secured Notes, dividends paid in respect of New Common Stock, and certain other reportable payments (including, potentially, amounts received pursuant to the Plan of Reorganization and proceeds from the sale, redemption, or other disposition of New Senior Secured Notes or New Common Stock), unless, generally, the Non-U.S. Holder certifies, under penalties of perjury, that it is not a

"United States person" as defined under the Tax Code or otherwise establishes an exemption. In addition, we must report annually to the IRS and to the Non-U.S. Holder the amount of any reportable payments and the tax withheld with respect to those payments, regardless of whether any tax was actually withheld. Copies of the information returns reporting such amounts may also be made available to the tax authorities in the country in which a Non-U.S. Holder resides under the provisions of an applicable income tax treaty. Backup withholding is not an additional tax. Any amounts withheld under the backup withholding rules are generally allowable as a refund or a credit against the taxpayer's U.S. federal income tax liability, provided that certain required information is timely furnished to the IRS.

**Certain U.S. Federal Income Tax Consequences to the Company**

In general, the Tax Code provides that income from the discharge of indebtedness ("*COD income*") realized by a solvent taxpayer is included in income for U.S. federal income tax purposes. In the case of a debt instrument, the amount of COD income realized by a taxpayer is generally the amount by which the "adjusted issue price" of the discharged debt instrument exceeds the fair market value (or, in the case of a debt instrument, the issue price) of any consideration given in exchange therefor. Certain statutory or judicial exceptions may apply to limit the amount of COD income realized by a taxpayer in certain circumstances. In addition, COD income is excluded from income if it is realized pursuant to a confirmed plan of reorganization or court order in a Chapter 11 bankruptcy case.

If COD income is excluded from a taxpayer's income under the bankruptcy exception, the Tax Code generally requires the taxpayer to reduce certain of its tax attributes (such as net operating loss ("*NOL*") carryforwards and current year NOLs, capital loss carryforwards, certain tax credits, and the taxpayer's tax basis in its assets) by the amount of the excluded COD income. Generally, the reduction in the tax basis of assets cannot exceed the excess of the total basis of the debtor's property held immediately after the debt discharge over the total liabilities of the debtor immediately after the discharge (the "*Liability Floor Rule*"). Any reduction in the taxpayer's tax attributes resulting from COD income excluded under this exception is generally made only after the determination of the taxpayer's U.S. federal income tax liability for the taxable year in which the excluded COD income is realized. In general, if the excluded COD income exceeds the amount of tax attributes that are available for reduction taking into account the Liability Floor Rule, the excess is permanently excluded from the taxpayer's income. Where the taxpayer joins in the filing of a consolidated U.S. federal income tax return, the Treasury Regulations may require the tax attributes of the taxpayer's consolidated subsidiaries to be reduced in certain circumstances.

It is expected that CEDC FinCo (which is a member of Roust's consolidated group for U.S. federal income tax purposes) will realize a significant amount of COD income as a result of the restructuring of the Existing Notes. The total amount of such COD income will depend on, among other things, the issue price of the New Senior Secured Notes (which, in turn, will generally depend on the fair market value of the New Senior Secured Notes upon consummation of the restructuring) and the fair market value of the Rights and New Common Stock issued as part of the consideration for the Existing Notes. Thus, the exact amount of COD income that we will realize will not be determinable until after the implementation of the Plan of Reorganization. In any event, such COD income will be excluded from our taxable income under the bankruptcy exception because the restructuring of the Existing Notes will be implemented through a Chapter 11 bankruptcy process (as contemplated by the Plan of Reorganization). As a result, it is anticipated that our consolidated NOL carryforwards (if any) and other tax attributes, including the tax basis of our assets, would be significantly reduced or eliminated as a result of the restructuring of the Existing Notes.

In addition, we expect to engage in several transactions with affiliated persons in connection with the Plan of Reorganization (*e.g.*, the RSV Contribution and the RTL Debt to Equity Conversion). We do not expect these transactions to result in any materially adverse U.S. federal income tax consequences to us.

## TRANSFER RESTRICTIONS

**Transfer Restrictions on the Common Stock**

For further information see "Description of Common Stock—No Transfers to an Industry Competitor."

## INFORMATION AGENT AND VOTING AGENT

We have retained Epiq Corporate Restructuring to act as the Information Agent in connection with the Consent Solicitation and Plan of Reorganization. The Information Agent will assist with the delivery of this Offering Memorandum and Disclosure Statement, the Letters of Transmittal, if applicable, the Ballot and related materials to Noteholders, as applicable, respond to inquiries of and provide information to Noteholders in connection with the Consent Solicitation and Plan of Reorganization and provide other similar advisory services as we may request from time to time.

Subject to the terms and conditions set forth in an agreement between us and the Information Agent, we have agreed to pay the Information Agent customary fees for its services in connection with the Consent Solicitation and Plan of Reorganization. We have also agreed to reimburse the Exchange Agent for its reasonable out-of-pocket expenses.

Questions regarding the terms of the Consent Solicitation and Plan of Reorganization or the related transactions may be directed to the Information Agent/Voting Agent at the following address:

Roust Processing
c/o Epiq Corporate Restructuring
777 Third Avenue, 12th Floor
Attn: Solicitation Group
New York, NY 10017

(866) 734-9393 (toll-free North America)

+1 (646) 282-2500 (direct-dial toll international)

## SOLICITATION AGENT

We have retained Epiq Corporate Restructuring to act as the Solicitation Agent in connection with the Share Placement and Plan of Reorganization. The Solicitation Agent will assist with the delivery of this Offering Memorandum and Disclosure Statement, the Letters of Transmittal, if applicable, the Ballot and related materials to Noteholders, as applicable, respond to inquiries of and provide information to Noteholders in connection with the Consent Solicitation and Plan of Reorganization and provide other similar advisory services as we may request from time to time.

Subject to the terms and conditions set forth in an agreement between us and the Solicitation Agent, we have agreed to pay the Solicitation Agent customary fees for its services in connection with the Share Placement and Plan of Reorganization. We have also agreed to reimburse the Solicitation Agent for its reasonable out-of-pocket expenses.

Questions regarding the terms of the Share Placement and Plan of Reorganization or the related transactions may be directed to Solicitation Agent at the following address:

Roust Processing
c/o Epiq Corporate Restructuring
777 Third Avenue, 12th Floor
Attn: Solicitation Group
New York, NY 10017

(866) 734-9393 (toll-free North America)

+1 (646) 282-2500 (direct-dial toll international)

## LEGAL MATTERS

We are being represented in connection with the Consent Solicitation and Plan of Reorganization by Skadden, Arps, Slate, Meagher and Flom LLP, New York, New York and Skadden, Arps, Slate, Meagher and Flom (UK) LLP, London, United Kingdom.

## INDEPENDENT AUDITORS

The Consolidated Financial Statements of Roust Corporation for the period from January 1, 2013 to June 5, 2013 and for the period from June 6, 2013 to December 31, 2013 have been audited by PricewaterhouseCoopers Sp. z o.o, for the years ended December 31 2014 and 2015, by JSC "KPMG". The Consolidated Financial Statements of RSV as of and for the period ended December 31, 2015, included in this Offering Memorandum have been audited by PricewaterhouseCoopers, independent registered public accountants, as stated in their report thereon.

## CERTAIN FEDERAL AND OTHER SECURITIES LAWS MATTERS

The issuance of the New Senior Secured Notes, including the guarantees thereto, shall be made pursuant to Section 4(a)(2) of the Securities Act of 1933 (the "Securities Act"), as amended, or Regulation S under the Securities Act and the New Common Stock distributed to creditors on account of their Claims shall be authorized under section 1145 of the Bankruptcy Code as of the Effective Date without further act or action by any person, unless required by provisions of the relevant corporate documents or applicable law, regulation, order or rule, and shall thereby be exempt from the requirements of section 5 of the Securities Act and any state or local laws requiring registration for the offer and sale of a security, and all documents evidencing the same shall be executed and delivered as provided for in the Plan or the Plan Supplement. New Common Stock issued pursuant to the Share Placement will be exempt from registration pursuant to section 1145 of the Bankruptcy Code to the extent permitted or under the Securities Act by virtue of Section 4(a)(2) thereof and Regulation D promulgated thereunder or pursuant to the safe harbor provided by Regulation S under the Securities Act.  To the extent that the New Senior Secured Notes and New Common Stock being issued in the Share Placement is issued in reliance on Section 4(a)(2) of the Securities Act, such securities will constitute "restricted securities" within the meaning of Rule 144 under the Securities Act and accordingly may not be offered, sold, resold, pledged, delivered, allotted or otherwise transferred except in transactions that are exempt from, or in transactions not subject to, the registration requirements of the Securities Act and in compliance with any applicable state securities laws, and such New Senior Secured Notes and shares of New Common Stock shall bear a legend restricting their transferability until no longer required under applicable requirements of the Securities Act and state securities laws.

PERSONS WHO RECEIVE NEW COMMON STOCK AND NEW SECURED NOTES UNDER THE PLAN OF REORGANIZATION ARE URGED TO CONSULT THEIR OWN LEGAL ADVISOR WITH RESPECT TO THE RESTRICTIONS APPLICABLE UNDER THE SECURITIES LAWS AND THE CIRCUMSTANCES UNDER WHICH SECURITIES MAY BE SOLD IN RELIANCE ON SUCH LAWS.

THE FOREGOING SUMMARY DISCUSSION IS GENERAL IN NATURE AND HAS BEEN INCLUDED IN THIS OFFERING MEMORANDUM AND DISCLOSURE STATEMENT SOLELY FOR INFORMATIONAL PURPOSES. ROUST AND CEDC FINCO MAKE NO REPRESENTATIONS CONCERNING, AND DOES NOT PROVIDE, ANY OPINIONS OR ADVICE WITH RESPECT TO THE NEW COMMON STOCK AND NEW SECURED NOTES OR THE BANKRUPTCY MATTERS DESCRIBED IN THIS DISCLOSURE STATEMENT. IN LIGHT OF THE UNCERTAINTY CONCERNING THE AVAILABILITY OF EXEMPTIONS FROM THE RELEVANT PROVISIONS OF FEDERAL AND STATE SECURITIES LAWS, ROUST AND CEDC FINCO ENCOURAGE EACH NOTEHOLDER AND PARTY-IN-INTEREST TO CONSIDER CAREFULLY AND CONSULT WITH ITS OWN LEGAL ADVISORS WITH RESPECT TO ALL SUCH MATTERS.  BECAUSE OF THE COMPLEX, SUBJECTIVE NATURE OF THE QUESTION OF WHETHER A PARTICULAR NOTEHOLDER MAY BE AN UNDERWRITER, ROUST AND CEDC FINCO MAKE NO REPRESENTATION CONCERNING THE ABILITY OF A PERSON TO DISPOSE OF THE NEW COMMON STOCK AND NEW SECURED NOTES.

ANNEX 1

## CORPORATE ORGANIZATIONAL CHART OF REORGANIZED ROUST[5]



---

[5]    *As of the Effective Date Roust Corporation will be held by the Russian Standard Parties, who will remain the controlling shareholders and holders of the Existing Notes.

ANNEX 2

## INDUSTRY COMPETITORS

"*Industry Competitor*" means any person (or any of its Affiliates) on the Restricted Purchasers' List, as amended from time to time in accordance with the Investor Rights Agreement, and any person or entity (or any of its Affiliates) which is an industry competitor of a member of the Reorganized Roust and any controlling shareholder of an industry competitor of any member of Reorganized Roust and any successor of such person or entity, or any person that is acting on behalf of or fronting for any such person, provided that a person will not be considered to be "fronting for" or "acting on behalf of" any such person if such person has confirmed in writing to Reorganized Roust that it is not fronting for or acting on behalf of a Industry Competitor or an Affiliate of an Industry Competitor. In the event an Exit Event has not been completed on or prior to June 30, 2019, the transfer restriction to Industry Competitors will terminate. Following the termination of the transfer restriction to Industry Competitors, a holder may transfer any New Common Stock to an Industry Competitor, subject to prior consultation with the Company. Industry Competitor shall include:[6]

1. Spi Group S.a.r.l.
2. Stoli Froup USA LLC
3. Spirits International B.V.
4. Sabiedrība ar ierobežotu atbildību "AMBER BEVERAGE GROUP"
5. JSC Rosspirprom
6. JSC Tatspirtprom
7. LLC Tatspirtprom
8. LLC Status Group
9. OJSC Synergy
10. Belvedere S.A.
11. Bayadera Group
12. Stock Spirits Group PLC
13. DIAGEO plc
14. Pernod Ricard (sp)
15. Suntory Holdings Limited
16. Brown Forman Corporation
17. Bacardi Limited
18. Emperador Inc.
19. REMY-COINTREAU S.A.
20. LVMH Moët Hennessy Louis Vuitton S.E.
21. William Grant & Sons Distillers Ltd.
22. Tequila Cuervo La Rojeña s.a. de c.v
23. Davide Campari-Milano S.p.A.
24. LABEL 5 First Blending Company Limited
25. Alcohol Siberian Group Ltd.

---

[6] *List will be updated on a periodic basis, updates subject to a limit of 3 parties added per year, with consent of the Minority Directors, not to be unreasonably withheld, it being understood that financial investors shall not be considered competitors for the purpose of transfer exclusions, unless such financial investor holds a majority or controlling stake in an Industry Competitor.*

APPENDIX A

**PLAN OF REORGANIZATION**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - | x | |
| | : | |
| In re: | : | Case No. 16- |
| | : | |
| ROUST CORPORATION, *et al.* | : | Chapter 11 |
| | : | |
| Debtors.[7] | : | |
| | : | |
| - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - | x | |

**JOINT PREPACKAGED CHAPTER 11 PLAN OF REORGANIZATION OF ROUST CORPORATION, ET AL.**

Jay M. Goffman
Mark A. McDermott
Raquelle L. Kaye
Julie Lanz
SKADDEN, ARPS, SLATE, MEAGHER
  & FLOM, LLP
Four Times Square
New York, New York 10036-6522
(212) 735-3000

Proposed Counsel for Debtors and Debtors in Possession

Dated: December 1, 2016

---

[7]   *The Debtors and the last four digits of their taxpayer identification numbers (as applicable) are as follows:   Roust Corporation (5271), CEDC Finance Corporation International, Inc. (0116), and CEDC Finance Corporation LLC (7136). The address for Roust Corporation is 777 Westchester Avenue, Suite 101, White Plains, New York 10604.  The address for CEDC Finance Corporation International, Inc. and CEDC Finance Corporation LLC is 16192 Coastal Highway, Lewes, Delaware 19958.*

# TABLE OF CONTENTS

**ARTICLE I DEFINED TERMS, RULES OF INTERPRETATION,  COMPUTATION OF TIME AND GOVERNING LAW** .................................................................................................................1

| | | | |
|---|---|---|---|
| A. | Defined Terms | ................................................................................ | 1 |
| B. | Rules of Interpretation | ........................................................................... | 12 |
| C. | Computation of Time | ............................................................................. | 13 |
| D. | Governing Law | ...................................................................................... | 13 |
| E. | Reference to Monetary Figures | ............................................................. | 13 |
| F. | Reference to the Debtors or the Reorganized Debtors | ........................... | 13 |

**ARTICLE II TREATMENT OF UNCLASSIFIED CLAIMS** ...............................................13

| | | | |
|---|---|---|---|
| A. | Administrative Claims | ........................................................................... | 13 |
| B. | Priority Tax Claims | ............................................................................... | 14 |

**ARTICLE III CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS** .....................................14

| | | | |
|---|---|---|---|
| A. | The Debtors | .......................................................................................... | 14 |
| B. | Classification of Claims and Interests | ................................................... | 14 |
| C. | Treatment of Claims and Interests | ......................................................... | 15 |
| D. | Special Provision Governing Unimpaired Claims | ................................... | 17 |
| E. | Discharge of Claims | .............................................................................. | 17 |

**ARTICLE IV ACCEPTANCE REQUIREMENTS** ...........................................................18

| | | | |
|---|---|---|---|
| A. | Acceptance or Rejection of the Plan | ..................................................... | 18 |
| B. | Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code | .......... | 18 |

**ARTICLE V MEANS FOR IMPLEMENTATION OF THE PLAN** .....................................18

| | | | |
|---|---|---|---|
| A. | Sources of Consideration for Plan Distributions | .................................... | 18 |
| B. | Cancellation of Securities and Agreements | ........................................... | 19 |
| C. | Section 1145 Exemption | ....................................................................... | 20 |
| D. | Reorganized Debtors' Boards of Directors | ............................................ | 20 |
| E. | Governance Documents and Corporate Existence | .................................. | 21 |
| F. | Vesting of Assets in the Reorganized Debtors | ....................................... | 21 |
| G. | Russian Standard Parties' Contributions | ............................................... | 21 |
| H. | Share Placement | .................................................................................. | 22 |
| I. | Co-Investment Right | ............................................................................ | 23 |
| J. | Management Incentive Plan | .................................................................. | 23 |
| K. | Supplemental Indentures and Collateral and Guarantee Release | .............. | 24 |
| L. | Restructuring Transactions | ................................................................... | 24 |
| M. | Corporate Action | ................................................................................. | 24 |
| N. | Effectuating Documents; Further Transactions | ...................................... | 25 |
| O. | Section 1146 Exemption from Certain Taxes and Fees | ........................... | 25 |
| P. | D&O Liability Insurance Policies and Indemnification Provisions | ............ | 25 |
| Q. | Preservation of Causes of Action | .......................................................... | 25 |
| R. | Single Satisfaction of Claims | ............................................................... | 26 |
| S. | Proofs of Claim | ................................................................................... | 26 |
| T. | U.S. Federal Income Tax Treatment of Existing Notes Claims | ................. | 26 |

**ARTICLE VI TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES** ...........................26

| | | | |
|---|---|---|---|
| A. | Assumption and Rejection of Executory Contracts and Unexpired Leases | ...... | 26 |
| B. | Claims Based on Rejection of Executory Contracts or Unexpired Leases | ...... | 27 |
| C. | Cure of Defaults for Assumed Executory Contracts and Unexpired Leases | ...... | 27 |
| D. | Insurance Policies | ................................................................................ | 28 |
| E. | Reservation of Rights. | ........................................................................... | 28 |
| F. | Contracts and Leases Entered Into After the Petition Date. | ..................... | 28 |

ARTICLE VII PROVISIONS GOVERNING DISTRIBUTIONS ...................................................28
    A.    Timing and Calculation of Amounts to Be Distributed ..............................................28
    B.    Disbursing Agent ...........................................................................................................28
    C.    Rights and Powers of Disbursing Agent ......................................................................29
    D.    Cash Distributions .........................................................................................................29
    E.    Rounding of Payments ..................................................................................................29
    F.    Distributions on Account of Claims Allowed After the Effective Date .......................29
    G.    Delivery of Distributions and Undeliverable or Unclaimed Distributions ..................30
    H.    Withholding and Reporting Requirements ....................................................................30
    I.    Setoffs ...........................................................................................................................30
    J.    Surrender of Cancelled Instruments or Securities ........................................................31
    K.    Lost, Stolen, Mutilated or Destroyed Securities ..........................................................31
    L.    Claims Paid or Payable by Third Parties ......................................................................31
    M.    Allocation of Distributions Between Principal and Unpaid Interest .............................32

ARTICLE VIII PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED AND DISPUTED
CLAIMS .......................................................................................................................................32
    A.    Prosecution of Objections to Claims ............................................................................32
    B.    Allowance of Claims .....................................................................................................32
    C.    Distributions After Allowance ......................................................................................32
    D.    Estimation of Claims .....................................................................................................32
    E.    Deadline to File Objections to Claims ..........................................................................33

ARTICLE IX SETTLEMENT, RELEASE, INJUNCTION AND RELATED PROVISIONS ..................33
    A.    Compromise and Settlement of Claims, Interests and Controversies ..........................33
    B.    Releases by the Debtors .................................................................................................33
    C.    Releases by Holders of Claims .....................................................................................34
    D.    Exculpation ....................................................................................................................35
    E.    Discharge of Claims and Termination of Interests .......................................................35
    F.    Injunction ......................................................................................................................35
    G.    Temporary Injunction with Respect to Existing Notes Claims ....................................36
    H.    Term of Injunctions or Stays ........................................................................................36
    I.    Release of Liens and Guarantees ..................................................................................36

ARTICLE X CONDITIONS PRECEDENT TO CONFIRMATION OF THE PLAN AND THE EFFECTIVE DATE
.....................................................................................................................................................37
    A.    Conditions Precedent to Confirmation .........................................................................37
    B.    Conditions Precedent to the Effective Date ..................................................................37
    C.    Waiver of Conditions ....................................................................................................38
    D.    Effect of Failure of Conditions .....................................................................................38

ARTICLE XI MODIFICATION, REVOCATION OR WITHDRAWAL OF THE PLAN .......................39
    A.    Modification and Amendments .....................................................................................39
    B.    Effect of Confirmation on Modifications .....................................................................39
    C.    Revocation or Withdrawal of the Plan .........................................................................39

ARTICLE XII RETENTION OF JURISDICTION ................................................................................39

ARTICLE XIII MISCELLANEOUS PROVISIONS ..............................................................................41
    A.    Immediate Binding Effect .............................................................................................41
    B.    Additional Documents ...................................................................................................41
    C.    Dissolution of any Statutory Committee .......................................................................41
    D.    Reservation of Rights ....................................................................................................41
    E.    Successors and Assigns .................................................................................................42
    F.    Service of Documents ....................................................................................................42
    G.    Entire Agreement ..........................................................................................................42

H.      Severability of Plan Provisions ................................................................................................42
I.      Exhibits ...................................................................................................................................43
J.      Votes Solicited in Good Faith ................................................................................................43
K.      Conflicts .................................................................................................................................43

## INTRODUCTION

Roust Corporation, CEDC Finance Corporation International, Inc. and CEDC Finance Corporation LLC (collectively, the "*Debtors*") respectfully propose the following joint chapter 11 plan of reorganization for the resolution of the outstanding Claims against and Interests in the Debtors.  Reference is made to the Disclosure Statement, distributed contemporaneously herewith, for a discussion of (i) the history, business, and operations of the Debtors and their subsidiaries, (ii) a summary and analysis of the Plan, and (iii) certain related matters, including risk factors relating to the consummation of the Plan.  Subject to certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code, Bankruptcy Rule 3019, and the Restructuring Support Agreement, the Debtors reserve the right to alter, amend, modify, revoke, or withdraw this Plan prior to its substantial consummation.

## DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME AND GOVERNING LAW

A.    *Defined Terms*

Unless the context otherwise requires, the following terms shall have the following meanings when used in capitalized form:

1.    "*Accrued Professional Compensation*" means, at any given moment, all accrued, contingent and/or unpaid fees (including success fees) for legal, financial advisory, accounting and other services and obligations for reimbursement of expenses rendered or incurred before the Effective Date that are awardable and allowable under sections 328, 330(a), 331 or 363 of the Bankruptcy Code by any retained Professional in the Chapter 11 Cases, or that are awardable and allowable under section 503 of the Bankruptcy Code, that the Bankruptcy Court has not denied by a Final Order, all to the extent that any such fees and expenses have not been previously paid.  To the extent that the Bankruptcy Court or any higher court denies or reduces by a Final Order any amount of a professional's fees or expenses, then those reduced or denied amounts shall no longer constitute Accrued Professional Compensation.  For the avoidance of doubt, Accrued Professional Compensation shall not include the Existing Notes Indenture Trustees' Fee and Expense Claims or the RSA Parties' Professional Fee Claims.

2.    "*Additional Convertible Notes Equity Allocation*" means 1.00% of the shares of the New Common Stock issued and outstanding on the Effective Date, subject to dilution on account of the MIP, otherwise allocable to the Russian Standard Parties under the Plan, which shall instead be distributed pro rata to holders of the Existing Convertible Notes Claims as series C New Common Stock.

3.    "*Additional Share Placement Equity Allocation*" means 6.00% of the shares of the New Common Stock issued and outstanding on the Effective Date, subject to dilution on account of the MIP, otherwise allocable to the Russian Standard Parties under the Plan, which shall instead be distributed pro rata to participants in the Share Placement as series A, B or C New Common Stock, as applicable.

4.    "*Administrative Claim*" means a Claim for payment of costs and expenses of administration pursuant to sections 503(b), 507(a)(2), 507(b) or 1114(e)(2) of the Bankruptcy Code, including:  (a) the actual and necessary costs and expenses incurred on or after the Petition Date and through the Effective Date of preserving the Estates and operating the businesses of the Debtors; (b) compensation for legal, financial advisory, accounting and other services and reimbursement of expenses Allowed pursuant to sections 328, 330(a), 331 or 363 of the Bankruptcy Code or otherwise for the period commencing on the Petition Date and through the Effective Date; (c) all fees and charges assessed against the Estates pursuant to chapter 123 of title 28 of the United States Code, 28 U.S.C. §§ 1–4001; (d) all requests for compensation or expense reimbursement for making a substantial contribution

in the Chapter 11 Cases pursuant to sections 503(b)(3), (4) and (5) of the Bankruptcy Code; (e) the Existing Notes Indenture Trustees' Fee and Expense Claims; (f) the RSA Parties' Professional Fee Claims, which fee claims shall be Allowed Administrative Claims; and (g) all other claims entitled to administrative claim status pursuant to an order of the Bankruptcy Court.

5.        "*Advisors*" has the meaning given to it in the Restructuring Support Agreement.

6.        "*Affiliate*" has the meaning set forth in section 101(2) of the Bankruptcy Code.

7.        "*Allowed*" means, with respect to a Claim or Interest within a particular Class, an Allowed Claim or Allowed Interest of the type described in such Class.

8.        "*Allowed Claim*" means a Claim (i) as to which no objection or request for estimation has been filed on or before the Claims Objection Bar Date or the expiration of such other applicable period fixed by the Bankruptcy Court or the Plan; (ii) as to which any objection has been settled, waived, withdrawn or denied by a Final Order or in accordance with the Plan; or (iii) that is allowed (a) by a Final Order, (b) by an agreement between the holder of such Claim and the Debtors or the Reorganized Debtors (in consultation with the Steering Committees) or (c) pursuant to the terms of the Plan; provided, however, that, notwithstanding anything herein to the contrary, by treating a Claim as an "Allowed Claim" under (i) above, the Debtors do not waive their rights to contest the amount and validity of any disputed, contingent and/or unliquidated Claim in the time, manner and venue in which such Claim would have been determined, resolved or adjudicated if the Chapter 11 Cases had not been commenced.  An Allowed Claim (i) includes a Disputed Claim to the extent such Disputed Claim becomes Allowed after the Effective Date and (ii) shall be net of any valid setoff exercised with respect to such Claim pursuant to the provisions of the Bankruptcy Code and applicable law.  Unless otherwise specified herein, in section 506(b) of the Bankruptcy Code or by Final Order of the Bankruptcy Court, "Allowed Claim" shall not, for purposes of distributions under the Plan, include interest on such Claim accruing from and after the Petition Date.

9.        "*Avoidance Actions*" means causes of action or rights arising under sections 510(c), 544, 545, 547, 548, 549, 550, 551 and 553 of the Bankruptcy Code, as defined in Chapter 5 of the Bankruptcy Code.

10.        "*Backstop Agreement*" means that certain Backstop Agreement by and between the Backstop Noteholders, Roust and the Russian Standard Parties, the terms of which shall be substantially the same as described in the Disclosure Statement with  such changes as may be collectively approved among the relevant Debtors, the Russian Standard Parties, the Existing Senior Secured Notes Steering Committee and the Existing Convertible Notes Steering Committee.

11.        "*Backstop Commitment Fee*" means the fee in connection with the Share Placement to be paid to the Backstop Noteholders pursuant to the Backstop Agreement as follows, subject to dilution on account of the MIP: (i) 0.23% of the shares of the New Common Stock to be issued and outstanding on the Effective Date payable to the Backstop Convertible Noteholders in the form of series C New Common Stock, and (ii) 0.02% of the New Common Stock to be issued and outstanding on the Effective Date payable to the Backstop Senior Noteholders in the form of series B New Common Stock.

12.        "*Backstop Convertible Noteholders*" means holders of Existing Convertible Notes that have agreed to backstop the Share Placement pursuant to the terms of the Restructuring Support Agreement, the Plan and the Backstop Agreement.

13.        "*Backstop Noteholders*" means the Backstop Senior Noteholders and the Backstop Convertible Noteholders.

14.    "*Backstop Senior Noteholders*" means holders of Existing Senior Secured Notes that have agreed to backstop the Share Placement pursuant to the terms of the Restructuring Support Agreement, the Plan and the Backstop Agreement.

15.    "*Backstop Senior Noteholders New Equity Investment*" means a new money equity investment of $5 million by the Backstop Senior Noteholders as part of the backstopped Share Placement in exchange for a pro rata share of the shares of the New Common Stock issued in connection with the Share Placement (which shall be issued in the form of series B New Common Stock), a pro rata share of the Backstop Commitment Fee, and a pro rata share of the Additional Share Placement Equity Allocation.

16.    "*Ballot*" means the form distributed to each holder of a Claim in an Impaired Class entitled to vote on the Plan on which to indicate its acceptance or rejection of the Plan and, if applicable, such other elections as may be made thereon.

17.    "*Bankruptcy Code*" means title 11 of the United States Code, as amended from time to time.

18.    "*Bankruptcy Court*" means the United States Bankruptcy Court for the Southern District of New York having jurisdiction over the Chapter 11 Cases or any other court having jurisdiction over the Chapter 11 Cases, including, to the extent of the withdrawal of any reference under 28 U.S.C. § 157, the United States District Court for the Southern District of New York.

19.    "*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure, as applicable to the Chapter 11 Cases, promulgated under section 2075 of title 28 of the United States Code, 28 U.S.C. §§ 1–4001, as well as the general and local rules of the Bankruptcy Court.

20.    "*Business Day*" means any day, other than a Saturday, Sunday or "legal holiday" (as defined in Bankruptcy Rule 9006(a)).

21.    "*Cash*" means legal tender of the United States of America.

22.    "*Causes of Action*" means any action, proceeding, agreement, claim, cause of action, controversy, demand, right, action, Lien, indemnity, guaranty, suit, obligation, liability, damage, judgment, account, defense, offset, power, privilege, license and franchise of any kind or character whatsoever, known, unknown, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively, whether arising before, on, or after the Petition Date, in contract or in tort, in law or in equity or pursuant to any other theory of law.  Causes of Action also include: (a) any right of setoff, counterclaim or recoupment and any claim on contracts or for breaches of duties imposed by law or in equity; (b) the right to object to Claims or Interests; (c) any claim pursuant to section 362 or chapter 5 of the Bankruptcy Code; (d) any claim or defense including fraud, mistake, duress and usury and any other defenses set forth in section 558 of the Bankruptcy Code; (e) any state law fraudulent transfer claim, and (f) any Avoidance Action.

23.    "*CEDC FinCo*" means CEDC Finance Corporation International, Inc., a Delaware corporation that is a direct, wholly owned subsidiary of Roust.

24.    "*CEDC FinCo LLC*" means CEDC Finance Corporation, LLC, a Delaware limited liability company that is a direct, wholly owned subsidiary of CEDC FinCo.

25.    "*Chapter 11 Cases*" means the chapter 11 cases of the Debtors pending under chapter 11 of the Bankruptcy Code in the Bankruptcy Court, and the phrase "Chapter 11 Case" when used with reference to a

particular Debtor means the particular case pending under chapter 11 of the Bankruptcy Code that such Debtor commenced in the Bankruptcy Court.

26. "*Claim*" means any claim against a Debtor as defined in section 101(5) of the Bankruptcy Code.

27. "*Claims Objection Bar Date*" means, for each Claim, the latest of (a) the date that is one hundred and eighty (180) days after the Effective Date, (b) as to a particular Claim, one hundred and eighty (180) days after the filing of a Proof of Claim, or request for payment of such Claim, and (c) such other period of limitation as may be specifically fixed by an order of the Bankruptcy Court for objecting to Claims.

28. "*Class*" means a category of holders of Claims or Interests as set forth in Article III.

29. "*Co-Investment Right*" means the right of the Russian Standard Parties to invest up to $13.75 million in cash in Reorganized Roust as part of the Share Placement.

30. "*Collateral*" means any property or interest in property of the Estates subject to a security interest to secure the payment or performance of a Claim, which security interest is not subject to avoidance under the Bankruptcy Code or otherwise invalid under the Bankruptcy Code or applicable law.

31. "*Collateral and Guarantee Release*" means the release, pursuant to the Consent Solicitation, by each consenting holder of Existing Notes Claims of the guarantees and Liens over any Collateral that secures such holder's Existing Notes and the release of any and all rights such holders have under the Existing Notes Indentures, in each case including the guarantees and related security agreements.

32. "*Confirmation*" means the entry of the Confirmation Order on the docket of the Chapter 11 Cases within the meaning of Bankruptcy Rules 5003 and 9021.

33. "*Confirmation Date*" means the date upon which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Cases within the meaning of Bankruptcy Rules 5003 and 9021.

34. "*Confirmation Hearing*" means the hearing held by the Bankruptcy Court on Confirmation of the Plan pursuant to section 1128 of the Bankruptcy Code.

35. "*Confirmation Order*" means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code, which order shall be in form and substance reasonably acceptable to the Debtors, the Russian Standard Parties, the Existing Senior Secured Notes Steering Committee and the Existing Convertible Notes Steering Committee.

36. "*Consent Solicitation*" means the solicitation of consents to amendments to the Existing Senior Secured Notes Indenture and Existing Convertible Notes Indenture pursuant to the Disclosure Statement.

37. "*Consenting Convertible Noteholders*" means those holders of Existing Convertible Notes who are parties to the Restructuring Support Agreement.

38. "*Consenting Noteholders*" means the Consenting Convertible Noteholders and the Consenting Senior Secured Noteholders.

39. "*Consenting Senior Secured Noteholders*" means those holders of Existing Senior Secured Notes who are parties to the Restructuring Support Agreement.

4

40.    "*Corporate Governance Documents*" means the certificate of incorporation, certificate of formation, limited liability company agreement, bylaws, Investor Rights Agreement and other formation documents of the Reorganized Debtors and their Non-Debtor Affiliates, the terms of which shall be substantially the same as described in the Disclosure Statement with  such changes as may be collectively approved among the relevant Debtors, the Russian Standard Parties, the Existing Senior Secured Notes Steering Committee and the Existing Convertible Notes Steering Committee and which shall be included in the Plan Supplement.

41.    "*Cure*" means the payment of Cash by the Debtors, or the distribution of other property (as the parties may agree or the Bankruptcy Court may order), as necessary to cure monetary defaults under an executory contract or unexpired lease of one or more of the Debtors and to permit the Debtors to assume that contract or lease under section 365(a) of the Bankruptcy Code.

42.    "*D&O Liability Insurance Policies*" means all insurance policies of any of the Debtors for directors', managers' and officers' liability.

43.    "*Debtor*" means Roust, CEDC FinCo or CEDC FinCo LLC, each in its respective individual capacity as a debtor and debtor in possession in the Chapter 11 Cases.

44.    "*Debtors*" means collectively Roust Corporation, CEDC FinCo and CEDC FinCo LLC.

45.    "*Disbursing Agent*" means the Reorganized Debtors or the Person or Persons chosen by the Reorganized Debtors to make or facilitate distributions pursuant to the Plan in accordance with the terms of the Restructuring Support Agreement.

46.    "*Disclosure Statement*" means that certain document entitled Offering Memorandum, Consent Solicitation and Disclosure Statement Soliciting Acceptances of a Prepackaged Plan of Reorganization, dated December 1, 2016, as may be further amended, supplemented, or modified.

47.    "*Disputed*" means, with respect to any Claim or Interest, any Claim or Interest that is not yet Allowed.

48.    "*Distribution Date*" means the date, occurring as soon as practicable after the Effective Date, on which the Disbursing Agent first makes distributions to holders of Allowed Claims as provided in Article VII of the Plan and any date thereafter on which the Disbursing Agent makes distributions to holders of Allowed Claims as provided in Article VII of the Plan.

49.    "*Effective Date*" means the first business day after which all provisions, terms and conditions specified in Article X.B have been satisfied or waived pursuant to Article X.C.

50.    "*Estate*" means, as to each Debtor, the estate created for the Debtor in its Chapter 11 Case pursuant to section 541 of the Bankruptcy Code.

51.    "*Exculpated Claim*" means any claim related to any act or omission in connection with, relating to or arising out of the Debtors' in or out-of-court restructuring efforts, the Debtors' Chapter 11 Cases, the formulation, preparation, dissemination, negotiation or filing of the Disclosure Statement or the Plan or any contract, instrument, release or other agreement or document created or entered into in connection with the Disclosure Statement or the Plan, including the Restructuring Support Agreement and the Share Placement, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of consummation of the Plan, the administration and implementation of the Plan, including the issuance of Plan securities, or the distribution of property under the Plan or any other related agreement; provided, however, that Exculpated Claims shall not include any claim arising out of any act or omission

5

that is determined in a Final Order to have constituted gross negligence, willful misconduct, or intentional fraud to the extent imposed by applicable non-bankruptcy law. For the avoidance of doubt, no Cause of Action, obligation or liability expressly set forth in or preserved by the Plan or the Plan Supplement constitutes an Exculpated Claim.

52.    "*Exculpated Party*" means each of: (a) the Debtors; (b) the current and former directors and officers of the Debtors; (c) any statutory committee appointed in these Chapter 11 Cases and the current and former members thereof, in their capacity as such; (d) the Russian Standard Parties; (e) the current and former officers and directors of the Russian Standard Parties; (f) RSV and its subsidiaries; (g) the current and former officers and directors of RSV and its subsidiaries; (h) the Backstop Noteholders; (i) the current and former members of the Steering Committees; (j) the Steering Committees; (k) the Consenting Noteholders; (l) each of the Non-Debtor Affiliates that is a subsidiary of Roust; (m) the current and former directors and officers of each of the Non-Debtor Affiliates that is a subsidiary of Roust; (n) the Indenture Trustees; (o) the Polish Security Agent; (p) the Security Agent; and (q) with respect to each of the foregoing Persons in clauses (a) through (p), such Person's current and former affiliates, subsidiaries, managed accounts or funds, officers, directors, partners, principals, employees, agents, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, management companies, fund advisors and other professionals, and officers, directors, partners, principals, employees and agents thereof, in each case in their capacity as such.

53.    "*Executory Contract*" means a contract to which one or more of the Debtors is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

54.    "*Existing Convertible Notes*" means the convertible junior secured notes due 2018 issued by CEDC FinCo pursuant to the Existing Convertible Notes Indenture.

55.    "*Existing Convertible Notes Claims*" means any Claim arising under or in connection with the Existing Convertible Notes (including all accrued and unpaid interest through and inclusive of the Petition Date).

56.    "*Existing Convertible Notes Equity Allocation*" means 10.59% of the shares of the New Common Stock issued and outstanding on the Effective Date, subject to dilution on account of the MIP, which shall be issued in the form of series C New Common Stock.

57.    "*Existing Convertible Notes Indenture*" means the Indenture, dated as of June 5, 2013, among the Debtors, the Existing Convertible Notes Indenture Trustee, the Polish Security Agent and Security Agent, relating to the Existing Convertible Notes, as amended, restated, supplemented or otherwise modified from time to time.

58.    "*Existing Convertible Notes Indenture Trustee*" means U.S. Bank National Association and/or its duly appointed successor, in its capacity as indenture trustee under the Existing Convertible Notes Indenture.

59.    "*Existing Convertible Notes Steering Committee*" means the steering committee of certain holders of Existing Convertible Notes represented by Cadwalader, Wickersham & Taft LLP and Moelis & Company and any other local counsel, regulatory counsel or consultant that may be retained by the Existing Convertible Notes Steering Committee in connection with the restructuring.

60.    "*Existing Notes*" means the Existing Convertible Notes and the Existing Senior Secured Notes.

61.    "*Existing Notes Claims*" means the Existing Convertible Notes Claims and the Existing Senior Secured Notes Claims.

62.    "*Existing Notes Indentures*" means the Existing Senior Secured Notes Indenture and the Existing Convertible Notes Indenture.

63.      "*Existing Notes Indenture Trustees' Fee and Expense Claims*" means all reasonable fees and expenses incurred by the Indenture Trustees and their attorneys and advisors in connection with the negotiation, evaluation, formulation and consummation of the Plan and the distributions under the Plan, which fees shall be treated as Allowed Administrative Claims hereunder and paid without the need for any application to the Bankruptcy Court.

64.      "*Existing Roust Interests*" means all Interests in Roust that are authorized, issued, and outstanding prior to the Effective Date.

65.      "*Existing Senior Secured Notes*" means the senior secured notes due April 2018 issued by CEDC FinCo pursuant to the Existing Senior Secured Notes Indenture.

66.      "*Existing Senior Secured Notes Claims*" means any Claim arising under or in connection with the Existing Senior Secured Notes (including all accrued and unpaid interest through and inclusive of the Petition Date).

67.      "*Existing Senior Secured Notes Equity Allocation*" means 12.08% of the shares of the New Common Stock issued and outstanding on the Effective Date, subject to dilution on account of the MIP, which shall be issued in the form of series B New Common Stock.

68.      "*Existing Senior Secured Notes Equity Subscription*" means an offering at plan equity value, made pursuant to the Disclosure Statement, to each holder of an Existing Convertible Notes Claim to subscribe pro rata to the shares of New Common Stock being issued in connection with the Existing Senior Secured Notes Equity Allocation, provided that any New Common Stock subscribed to by any holder of an Existing Convertible Notes Claim pursuant to the Existing Senior Secured Notes Equity Subscription shall be issued in the form of series C New Common Stock, rather than in the form of series B New Common Stock.

69.      "*Existing Senior Secured Notes Indenture*" means the Indenture, dated as of June 5, 2013, among the Debtors, the Existing Senior Secured Notes Indenture Trustee, the Polish Security Agent and Security Agent, relating to the Existing Senior Secured Notes, as amended, restated, supplemented or otherwise modified from time to time.

70.      "*Existing Senior Secured Notes Indenture Trustee*" means U.S. Bank National Association and/or its duly appointed successor, in its capacity as indenture trustee under the Existing Senior Secured Notes Indenture.

71.      "*Existing Senior Secured Notes Steering Committee*" means the steering committee of certain holders of Existing Senior Secured Notes represented by Kirkland & Ellis LLP, Alvarez & Marsal CIS LLP and its affiliates, Wierciński, Kwieciński, Baehr Sp.k., and any other local counsel, regulatory counsel or consultant that may be retained by the Existing Senior Secured Notes Steering Committee in connection with the restructuring.

72.      "*Exit Event*" means (i) the completion of an initial public offering of new shares by Reorganized Roust or an offering of existing shares in Reorganized Roust by shareholders wishing to sell and concurrent listing on a recognized stock exchange or (ii) a sale by the holders of Existing Notes of not less than 90% of the aggregate number of shares acquired by holders of Existing Notes pursuant to the Plan and Share Placement (including new money investors) to a third party for cash, provided that, except as otherwise provided in the Restructuring Support Agreement, such third party shall not be an Industry Competitor) in a one-time transaction actively solicited by Reorganized Roust management and its advisors which offers each minority shareholder the right, but not the obligation, to sell up to all of its common shares at a minimum price equal to $649.4 million (the plan equity value) provided the logistics of (i) and (ii) shall be governed by the terms and conditions set forth in the Corporate Governance Documents.

73.     "*Final Order*" means, as applicable, an order or judgment of the Bankruptcy Court or other court of competent jurisdiction, which has not been reversed, stayed, modified or amended, and as to which the time to appeal or seek certiorari has expired and no appeal or petition for certiorari has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been or may be filed has been resolved by the highest court to which the order or judgment could be appealed or from which certiorari could be sought or the new trial, reargument or rehearing shall have been denied, resulted in no modification of such order or has otherwise been dismissed with prejudice.

74.     "*General Unsecured Claims*" means any unsecured claim that is not: (a) an Intercompany Claim, (b) an Administrative Claim, (c) a Priority Tax Claim, (d) a Priority Non-Tax Claim, (e) an Accrued Professional Compensation Claim, or (f) an Existing Notes Claim.

75.     "*Impaired*" means, when used in reference to a Claim or an Interest, a Claim or Interest that is impaired within the meaning of section 1124 of the Bankruptcy Code.

76.     "*Impaired Class*" means a Class that is impaired within the meaning of section 1124 of the Bankruptcy Code.

77.     "*Indemnification Provisions*" means each of the indemnification provisions, agreements or obligations of the Debtors in place as of the Petition Date, whether in the bylaws, certificate of incorporation or other formation documents, board resolutions or employment contracts, in each case for the benefit of the current and former directors, officers, members, employees, attorneys, other professionals and agents of the Debtors.

78.     "*Indemnified Parties*" means, collectively, current and former directors, officers, members (including ex officio members), employees, attorneys, other professionals and agents of the Debtors and any other persons who are beneficiaries of Indemnification Provisions.

79.     "*Indenture Trustees*" means the Existing Convertible Notes Indenture Trustee and the Existing Senior Secured Notes Indenture Trustee.

80.     "*Industry Competitor*" shall have the meaning set forth in <u>Annex 1</u> hereto.

81.     "*Insurance Policies*" means, collectively, all of the Debtors' insurance policies.

82.     "*Intercompany Claim*" means any Claim held by a Debtor or a Non-Debtor Affiliate against a Debtor.

83.     "*Intercompany Interest*" means any Interest held by a Debtor or an Affiliate.

84.     "*Interest*" means any equity interest in the Debtors as defined in section 101(16) of the Bankruptcy Code, including all issued, unissued, authorized or outstanding shares of capital stock of the Debtors together with any warrants, options or contractual rights (including any rights under registration agreements or equity incentive agreements) to purchase or acquire such equity securities at any time and all rights arising with respect thereto.

85.     "*Investor Rights Agreement*" means that certain agreement by and between the Reorganized Debtors, RTL, any of RTL's subsidiaries that shall receive equity in Reorganized Roust, Roustam Tariko and the minority shareholders of the Reorganized Debtors, which shall be included in the Plan Supplement.

86.     "*Lien*" has the meaning set forth in section 101(37) of the Bankruptcy Code.

8

87.    "*MIP*" has the meaning set forth in <u>Article V.J</u>.

88.    "*New Common Stock*" means (i) 42,780,652 series A common shares of Reorganized Roust authorized pursuant to the Plan, of which up to 14,260,217 series A common shares shall be initially issued and outstanding on the Effective Date, (ii) 10,376,808 series B common shares of Reorganized Roust authorized pursuant to the Plan, of which up to 3,458,936 series B common shares shall be initially issued and outstanding on the Effective Date, and (iii) 21,842,539 series C common shares of Reorganized Roust authorized pursuant to the Plan, of which up to 7,280,846 series C common shares shall be initially issued and outstanding on the Effective Date, all as further described in the Investors Rights Agreement.

89.    "*New Senior Secured Notes*" means those certain new senior secured notes to be issued by Reorganized Roust in the aggregate principal amount of $385 million upon the terms described in the Disclosure Statement under the heading, "Description of New Senior Secured Notes."

90.    "*Non-Debtor Affiliate*" means any Affiliate of the Debtors that has not filed a case under chapter 11 of the Bankruptcy Code.

91.    "*Other Secured Claims*" means any Secured Claim against a Debtor other than an Existing Senior Secured Notes Claim or Existing Convertible Notes Claim.

92.    "*Person*" has the meaning set forth in section 101(41) of the Bankruptcy Code.

93.    "*Petition Date*" means the date on which the Debtors filed their petitions for reorganization relief in the Bankruptcy Court.

94.    "*Plan*" means this Joint Prepackaged Chapter 11 Plan of Reorganization of Roust Corporation, et al., including the Plan Supplement and all exhibits, appendices and schedules hereto, which are incorporated herein by reference, in either present form or as may be further amended, restated, supplemented or otherwise modified from time to time in accordance with the Bankruptcy Code and the Bankruptcy Rules, in each case reasonably acceptable in form and substance to the Debtors, the Russian Standard Parties, the Existing Senior Secured Notes Steering Committee and the Existing Convertible Notes Steering Committee.

95.    "*Plan Supplement*" means the compilation of documents and forms of documents, schedules and exhibits to the Plan to be filed by the Debtors prior to the Confirmation Hearing and in each case in form and substance reasonably acceptable to the Debtors, the Russian Standard Parties, the Existing Senior Secured Notes Steering Committee and the Existing Convertible Notes Steering Committee.

96.    "*Polish Security Agent*" means Deutsche Bank AG, London Branch.

97.    "*Priority Non-Tax Claims*" means any Claim accorded priority in right of payment under section 507(a) of the Bankruptcy Code, other than (a) an Administrative Claim or (b) a Priority Tax Claim.

98.    "*Priority Tax Claim*" means any Claim of a governmental unit, as defined in section 101(27) of the Bankruptcy Code, of the kind specified in section 507(a)(8) of the Bankruptcy Code.

99.    "*Professional*" means a Person: (a) retained pursuant to an order of the Bankruptcy Court in accordance with sections 327, 363 or 1103 of the Bankruptcy Code and to be compensated for services rendered before or on the Effective Date, pursuant to sections 327, 328, 329, 330, 363 or 331 of the Bankruptcy Code, or (b) awarded compensation and reimbursement by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code.

100.    "*Proof of Claim*" means any proof of Claim filed against any of the Debtors in the Chapter 11 Cases.

101.    "*Proposed Amendments*" means those certain amendments to the Existing Notes Indentures as described in the Disclosure Statement.

102.    "*Reinstate," "Reinstated" or "Reinstatement*" means (i) leaving unaltered the legal, equitable and contractual rights to which a Claim or Interest entitles the holder of such Claim or Interest so as to leave such Claim or Interest unimpaired in accordance with section 1124 of the Bankruptcy Code or (ii) notwithstanding any contractual provision or applicable law that entitles the holder of such Claim or Interest to demand or receive accelerated payment of such Claim or Interest after the occurrence of a default, (a) curing any such default that occurred before or after the Petition Date, other than a default of a kind specified in section 365(b)(2) of the Bankruptcy Code; (b) reinstating the maturity of such Claim or Interest as such maturity existed before such default; (c) compensating the holder of such Claim or Interest for any damages incurred as a result of any reasonable reliance by such holder on such contractual provision or such applicable law; and (d) not otherwise altering the legal, equitable or contractual rights to which such Claim or Interest entitles the holder of such Claim or Interest; provided, however, that any contractual right that does not pertain to the payment when due of principal and interest on the obligation on which such Claim or Interest is based, including, but not limited to, financial covenant ratios, negative pledge covenants, covenants or restrictions on merger or consolidation, and affirmative covenants regarding corporate existence, prohibiting certain transactions or actions contemplated by the Plan, or conditioning such transactions or actions on certain factors, shall not be required to be reinstated in order to accomplish Reinstatement and shall be deemed cured on the Effective Date.

103.    "*Released Party*" means each of: (a) the Debtors; (b) the current and former directors and officers of the Debtors; (c) any statutory committee appointed in these Chapter 11 Cases and the current and former members thereof, in their capacity as such; (d) the Russian Standard Parties; (e) the current and former directors and officers of the Russian Standard Parties; (f) RSV and its subsidiaries; (g) the current and former officers and directors of RSV and its subsidiaries; (h) the Backstop Noteholders; (i) the current and former members of the Steering Committees; (j) the Steering Committees; (k) the Consenting Noteholders; (l) each of the Non-Debtor Affiliates that is a subsidiary of Roust; (m) the current and former directors and officers of each of the Non-Debtor Affiliates that is a subsidiary of Roust; (n) the Indenture Trustees; (o) the Polish Security Agent; (p) the Security Agent; and (q) with respect to each of the foregoing Persons in clauses (a) through (p), such Person's current and former affiliates, subsidiaries, managed accounts or funds, officers, directors, partners, principals, employees, agents, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, management companies, fund advisors and other professionals, and officers, directors, partners, principals, employees and agents thereof, in each case in their capacity as such.

104.    "*Releasing Parties*" means, collectively: (a) the Existing Senior Secured Notes Indenture Trustee, (b) the holders of Existing Senior Secured Notes, (c) the Existing Convertible Notes Indenture Trustee, (d) the holders of Existing Convertible Notes, (e) the Security Agent, (f) the Polish Security Agent, (g) any and all other holders of Claims or Interests, and (h) with respect to each of the foregoing clauses (a) through (g), to the fullest extent permitted by law, such Person's current and former affiliates, subsidiaries, managed accounts or funds, officers, directors, partners, principals, employees, agents, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, management companies, fund advisors and other professionals, and officers, directors, partners, principals, employees and agents thereof, in each case in their capacity as such.

105.    "*Reorganized*" means, with respect to the Debtors, any Debtor or any successor thereto, by merger, consolidation or otherwise, on or after the Effective Date.  For the avoidance of doubt, "Reorganized Roust" means Reorganized Roust post-combination with RSV.

10

106.    "*Reserved Matters*" has the meaning set forth in the Restructuring Support Agreement and the Disclosure Statement.

107.    "*Restructuring Support Agreement*" means that certain restructuring support agreement, including all exhibits and amendments thereto, by and among, among others, the Debtors, RTL, Roustam Tariko and the Consenting Noteholders entered into on November 9, 2016.

108.    "*Roust*" means Roust Corporation, a Delaware corporation.

109.    "*RSA Parties' Professional Fee Claims*" means all reasonable fees and expenses incurred by the Steering Committees, the members of the Steering Committees, and each of their respective advisors and consultants in connection with the Existing Notes or the negotiation, evaluation, formulation and consummation of the Restructuring Support Agreement, the Chapter 11 Plan, the Disclosure Statement, the Plan Supplement, the backstop obligations and any exhibits, schedules, and supplements thereto, including the reasonable fees and expenses of any local counsel retained in Russia, Poland or elsewhere as necessary, which fees shall be treated as Allowed Administrative Claims hereunder and paid without the need for any application to the Bankruptcy Court.

110.    "*RSV*" means Russian Standard Vodka.

111.    "*RSV Contribution*" means the contribution of RSV by RTL and certain of its subsidiaries to Roust, which shall include all of RSV's tangible and intangible assets, including (a) the entirety of RTL and certain of its subsidiaries' equity interests in RSV and (b) all intellectual property and trademarks relating to RSV not currently held by RSV or Roust (including, without limitation, 100% of the equity in Russian Standard IP Holding AG).

112.    "*RTL*" means Roust Trading Ltd.

113.    "*RTL Debt*" means any loans or obligations owed to Roust and its direct and indirect subsidiaries by RTL and its direct and indirect subsidiaries (other than direct and indirect subsidiaries of Roust).

114.    "*RTL Debt to Equity Conversion*" means the conversion of certain debt owed by certain subsidiaries of Roust to certain of RTL's non-Roust subsidiaries in exchange for shares of New Common Stock in Reorganized Roust, which shall be issued in the form of series A New Common Stock, as set forth in the Restructuring Support Agreement.

115.    "*Russian Standard Parties*" means RTL (and each of its direct and indirect non-Roust affiliates and subsidiaries) and Roustam Tariko.

116.    "*Russian Standard Parties' Contributions*" means the RSV Contribution, the RTL Debt to Equity Conversion, the Additional Convertible Notes Equity Allocation, the Additional Share Placement Equity Allocation and the Co-Investment Right.

117.    "*Russian Standard Parties Equity Allocation*" means 57.04% of the shares of New Common Stock issued and outstanding on the Effective Date after giving effect to the Additional Convertible Notes Equity Allocation and Additional Share Placement Equity Allocation, subject to dilution on account of the MIP, which shall be issued in the form of series A New Common Stock.

118.    "*Schedules*" means, collectively, any schedules of assets and liabilities, schedules of Executory Contracts and Unexpired Leases and statements of financial affairs filed by the Debtors pursuant to section 521 of the Bankruptcy Code and in substantial accordance with the Official Bankruptcy Forms, as may be amended from

11

time to time before entry of a final decree; provided, however, that the Debtors may seek a waiver of the requirement set forth in section 521 of the Bankruptcy Code.

119.    "*Secured*" means, when referring to a Claim: (a) secured by a Lien on property in which the Estate of the Debtor against which the Claim is asserted has an interest, which Lien is valid, perfected and enforceable pursuant to applicable law or by reason of a Bankruptcy Court order, to the extent of the value of the creditor's interest in the Estate's interest in such property as determined pursuant to section 506(a) of the Bankruptcy Code; (b) subject to setoff pursuant to section 553 of the Bankruptcy Code, to the extent of the value of the property subject to setoff; or (c) otherwise Allowed pursuant to the Plan as a Secured Claim.

120.    "*Security Agent*" means TMF Trustee Limited.

121.    "*Share Placement*" means an offering, made pursuant to the Disclosure Statement, of 13.03% of the shares of the New Common Stock (which shall be issued as series A, B or C New Common Stock, as applicable) to be issued and outstanding on the Effective Date, subject to dilution on account of MIP, for an aggregate offering price of $55 million.

122.    "*Steering Committees*" means the Existing Senior Secured Notes Steering Committee and the Existing Convertible Notes Steering Committee.

123.    "*Subscription Priority Scheme*" shall have the meaning set forth in Article V.H.

124.    "*Supplemental Indentures*" means the supplemental indentures to the Existing Notes Indentures in substantially the form attached to the Disclosure Statement as Appendix B providing for the Proposed Amendments.

125.    "*Unexpired Lease*" means a lease to which one or more of the Debtors is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

126.    "*Unimpaired*" means any Claim or Interest that is not designated as Impaired.

127.    "*U.S. Trustee*" means the United States Trustee for the Southern District of New York.

128.    "*Voting Deadline*" means 5:00 p.m. (prevailing Eastern Time) on December 30, 2016.

B.    *Rules of Interpretation*

For purposes of this Plan: (a) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine or neuter gender shall include the masculine, feminine and the neuter gender; (b) any reference herein to an existing document or exhibit having been filed or to be filed shall mean that document or exhibit, as it may thereafter be amended, modified or supplemented in accordance with the terms of the Restructuring Support Agreement and the Plan; (c) unless otherwise specified, all references herein to "Articles" are references to Articles hereof or hereto; (d) unless otherwise stated, the words "herein," "hereof" and ''hereto'' refer to the Plan in its entirety rather than to a particular portion of the Plan; (e) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation hereof; (f) the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; and (g) any immaterial effectuating provisions may be interpreted by the Reorganized Debtors in a manner that is consistent with the overall purpose and intent of the Plan all without further Bankruptcy Court order.

C.    *Computation of Time*

The provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein.

D.    *Governing Law*

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated, the laws of the State of New York, without giving effect to the principles of conflict of laws, shall govern the rights, obligations, construction and implementation of the Plan, any agreements, documents, instruments or contracts executed or entered into in connection with the Plan (except as otherwise set forth in those agreements, in which case the governing law of such agreement shall control); provided, however, that corporate governance matters relating to the Debtors or the Reorganized Debtors, as applicable, shall be governed by the laws of the state of incorporation of the Debtors or Reorganized Debtors, as applicable.

E.    *Reference to Monetary Figures*

All references in the Plan to monetary figures shall refer to currency of the United States of America, unless otherwise expressly provided.

F.    *Reference to the Debtors or the Reorganized Debtors*

Except as otherwise specifically provided in the Plan to the contrary, references in the Plan to the Debtors or to the Reorganized Debtors shall mean the Debtors and the Reorganized Debtors, as applicable, to the extent the context requires.


**TREATMENT OF UNCLASSIFIED CLAIMS**

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Priority Tax Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in Article III and shall have the following treatment:

*Administrative Claims*

Administrative Claims. Except with respect to Administrative Claims that are Claims for Accrued Professional Compensation, each holder of an Allowed Administrative Claim shall receive, in full satisfaction, settlement, release and discharge of and in exchange for its Administrative Claim, cash equal to the unpaid portion of its Allowed Administrative Claim on the latest of (i) the first Distribution Date, (ii) the date on which its Administrative Claim becomes an Allowed Administrative Claim, (iii) the date on which its Administrative Claim becomes payable under any agreement with the Debtors relating thereto, (iv) in respect of liabilities incurred in the ordinary course of business, the date upon which such liabilities are payable in the ordinary course of the Debtors' business, consistent with past practice, or (v) such other date as may be agreed upon between the holder of such Allowed Administrative Claim and the Debtors or the Reorganized Debtors, as the case may be.

<u>Professional Compensation</u>

Claims for Accrued Professional Compensation

Professionals or other Persons asserting a Claim for Accrued Professional Compensation for services rendered to the Debtors or any statutory committee appointed in these Chapter 11 Cases before the Effective Date must file and serve on the Debtors and such other Persons who are designated by the Bankruptcy Rules, the Confirmation Order or other order of the Bankruptcy Court an application for final allowance of such Claim for Accrued Professional Compensation no later than 45 days after the Effective Date. Objections to any Claim for Accrued Professional Compensation must be filed and served on the Reorganized Debtors, any statutory committee appointed in these Chapter 11 Cases, the Office of the U.S. Trustee and the requesting party no later than 60 days after the Effective Date.

Post- Effective Date Fees and Expenses

Upon the Effective Date, any requirement that Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Reorganized Debtors may employ and pay any Professional for services rendered or expenses incurred after the Effective Date in the ordinary course of business without any further notice to any party or action, order or approval of the Bankruptcy Court.

*Priority Tax Claims*

The legal and equitable rights of the holders of Priority Tax Claims are Unimpaired by the Plan. Unless the holder of such Claim and the Debtors agree to a different treatment, on the Effective Date, each holder of an Allowed Priority Tax Claim shall have its Claim Reinstated.

## ARTICLE III

## CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS

*The Debtors*

There are a total of three Debtors. Each Debtor has been assigned a letter below. The Claims against and Interests in each Debtor, in turn, have been assigned separate numbered Classes based on the type of Claim or Interest involved. Accordingly, the classification of any particular Claim or Interest in any of the Debtors depends on the particular Debtor against which such Claim or Interest is asserted (or in which such Interest is held) and the type of Claim or Interest in question. The letters applicable to the three Debtors are as follows:

| Letter | Debtor Name |
|--------|-------------|
| A | Roust Corporation |
| B | CEDC Finance Corporation International, Inc. |
| C | CEDC Finance Corporation LLC |

*Classification of Claims and Interests*

Pursuant to section 1122 of the Bankruptcy Code, set forth below is a designation of Classes of Claims and Interests. A Claim or Interest is placed in a particular Class for the purposes of voting on the Plan and receiving distributions pursuant to the Plan only to the extent that such Claim or Interest has not been paid, released, withdrawn or otherwise settled before the Effective Date. The categories of Claims and Interests set forth below classify all Claims against and Interests in the Debtors for all purposes of this Plan. A Claim or Interest shall be deemed classified in a particular Class only to the extent the Claim or Interest qualifies within the description of that Class and shall be deemed classified in a different Class to the extent that any remainder of such Claim or Interest

14

qualifies within the description of such different Class. The treatment with respect to each Class of Claims and Interests provided for in this <u>Article III</u> shall be in full and complete satisfaction, release and discharge of such Claims and Interests.

| Class | Designation | Impairment | Entitled to Vote |
|-------|-------------|------------|------------------|
| Class 1 | Priority Non-Tax Claims | Unimpaired | No (deemed to accept) |
| Class 2 | Existing Senior Secured Notes Claims | Impaired | Yes |
| Class 3 | Existing Convertible Notes Claims | Impaired | Yes |
| Class 4 | Other Secured Claims | Unimpaired | No (deemed to accept) |
| Class 5 | General Unsecured Claims | Unimpaired | No (deemed to accept) |
| Class 6 | Intercompany Claims | Unimpaired | No (deemed to accept) |
| Class 7 | Existing Roust Interests | Impaired | No (deemed to reject) |
| Class 8 | Intercompany Interests | Unimpaired | No (deemed to accept) |

*Treatment of Claims and Interests*

**Classes 1A, 1B, and 1C – Priority Non-Tax Claims.**

 <u>Impairment and Voting</u>. Classes 1A, 1B , and 1C are Unimpaired by the Plan. Each holder of an Allowed Priority Non-Tax Claim shall be conclusively deemed to have accepted the Plan.

 <u>Distribution</u>. On the Effective Date, or as soon as reasonably practicable thereafter, unless the holder of a Priority Non-Tax Claim and the Debtors agree to different treatment, each holder of an Allowed Priority Non-Tax Claim shall have its Claim Reinstated.

**Classes 2A, 2B, and 2C – Existing Senior Secured Notes Claims.**

 <u>Impairment and Voting</u>. Classes 2A, 2B, and 2C are Impaired by the Plan. Each holder of an Allowed Existing Senior Secured Notes Claim is entitled to vote to accept or reject the Plan. All Existing Senior Secured Notes Claims are Allowed Claims.

 <u>Distribution</u>. On the Effective Date, or as soon as reasonably practicable thereafter, except to the extent that a holder of an Allowed Existing Senior Secured Notes Claims and the Debtors agree to less favorable treatment, in full and final satisfaction, settlement, extinguishment, cancellation, release, and discharge of and in exchange for all of the Debtors' obligations under the Existing Senior Secured Notes, each holder of an Allowed Existing Senior Secured Notes Claim shall receive its pro rata share of and interests in:

  the New Senior Secured Notes;

$20 million in Cash;

the right to participate in the Share Placement pursuant to the Subscription Priority Scheme; and

the Existing Senior Secured Notes Equity Allocation and/or, the proceeds of the Existing Senior Secured Notes Equity Subscription, if any.

A holder of Senior Secured Notes Claims that submits its Existing Senior Secured Notes for cancellation by Deposit or Withdrawal At Custodian ("*DWAC*") withdrawal by five business days prior to the anticipated Effective Date in accordance with the required procedures shall receive its pro rata distribution of Cash and Existing Senior Secured Notes Equity Allocation on the Effective Date, and its pro rata distribution of the New Senior Secured Notes will be made available for DWAC deposit by such holder of Existing Senior Secured Notes Claims on the Effective Date. Any confirmed holder of an Existing Senior Secured Notes Claim may designate any related party in which it or any of its affiliates (and/or any affiliate that is wholly-owned by any of such holder's affiliates) has a current or contingent interest that is not an Industry Competitor (an "*Equity Transferee*"), to receive all or any part of its Existing Senior Secured Notes Equity Allocation or to receive all or any part of any shares it subscribes to in connection with the Share Placement by providing written notice to the Debtors, no later than three (3) business days prior to the Effective Date subject to confirmation following the distribution of Cash and New Senior Secured Notes through The Depository Trust Company ("*DTC*") by such holder's DTC participant of the amount of Existing Senior Secured Notes held by such holder as of the Distribution Date; and provided, that such Equity Transferee becomes a party to the Investor Rights Agreement.

**Classes 3A, 3B, and 3C – Existing Convertible Notes Claims.**

Impairment and Voting. Classes 3A, 3B, and 3C are Impaired by the Plan. Each holder of an Allowed Existing Convertible Notes Claim is entitled to vote to accept or reject the Plan. All Existing Convertible Notes Claim are Allowed Claims.

Distribution. On the Effective Date, or as soon as reasonably practicable thereafter, except to the extent that a holder of an Existing Convertible Notes Claim and the Debtors agree to less favorable treatment, in full and final satisfaction, settlement, extinguishment, cancellation, release, and discharge of and in exchange for all of the Debtors' obligations under the Existing Convertible Notes, each holder of an Allowed Existing Convertible Notes Claim shall receive its pro rata share of and interests in:

the Existing Convertible Notes Equity Allocation;

the Additional Convertible Notes Equity Allocation;

the right to participate in the Share Placement pursuant to the Subscription Priority Scheme; and

the right to participate in the Existing Senior Secured Notes Equity Subscription.

**Classes 4A, 4B, and 4C – Other Secured Claims**

Impairment and Voting. Classes 4A, 4B, and 4C are Unimpaired by the Plan. Each holder of an Allowed Other Secured Claim shall be conclusively deemed to have accepted the Plan.

<u>Distribution</u>.  On the Effective Date, or as soon as reasonably practicable thereafter, except to the extent that a holder of an Other Secured Claim and the Debtors agree to a less favorable treatment, each holder of an Allowed Other Secured Claim shall have its Claim Reinstated.

**Classes 5A, 5B, and 5C – General Unsecured Claims.**

<u>Impairment and Voting</u>.  Classes 5A, 5B, and 5C are Unimpaired by the Plan.  Each holder of an Allowed General Unsecured Claim shall be conclusively deemed to have accepted the Plan.

<u>Distribution</u>.  On the Effective Date, or as soon as reasonably practicable thereafter, except to the extent that the holder of a General Unsecured Claim and the Debtors agree to different treatment, each holder of an Allowed General Unsecured Claim shall have its Claim Reinstated; <u>provided</u>, <u>however</u>, that all Allowed General Unsecured Claims arising from the rejection of the Debtors' Executory Contracts or Unexpired Leases, if any, as set forth in <u>Article VI</u> of the Plan shall be paid the full amount of such Allowed Claim in Cash.

**Classes 6A, 6B, and 6C – Intercompany Claims.**

<u>Impairment and Voting</u>.  Classes 6A, 6B, and 6C are Unimpaired by the Plan.  Each holder of an Allowed Intercompany Claim shall be conclusively deemed to have accepted the Plan.

<u>Distribution</u>.   On the Effective Date, or as soon as reasonably practicable thereafter, all Allowed Intercompany Claims shall, at the election of the Reorganized Debtors and the Steering Committees, be either (a) Reinstated, subject to express contractual subordination to the New Senior Secured Notes, (b) released, waived, and discharged, (c) treated as a dividend, or (d) contributed to capital or exchanged for equity.  A schedule setting forth the treatment of the Intercompany Claims shall be included in the Plan Supplement.

**Class 7A – Existing Roust Interests.**

<u>Impairment and Voting</u>.  Class 7A is Impaired by the Plan.  Each Holder of an Allowed Existing Roust Interest is conclusively deemed to have rejected the Plan and is not entitled to vote to accept or reject the Plan.

<u>Distribution</u>.  On the Effective Date, all Existing Roust Interests shall be deemed automatically cancelled without further action by the Debtors or Reorganized Debtors and the obligations of the Debtors and Reorganized Debtors thereunder shall be discharged.  Holders of Existing Roust Interests shall receive no property under the Plan on account of such Interests.

**Classes 8B and 8C – Intercompany Interests.**

<u>Impairment and Voting</u>.  Classes 8B and 8C are Unimpaired by the Plan.  Each holder of an Allowed Intercompany Interest shall be conclusively deemed to have accepted the Plan.

<u>Distribution</u>.  On the Effective Date, Allowed Intercompany Interests shall be Reinstated and rendered Unimpaired in accordance with section 1124 of the Bankruptcy Code.

*Special Provision Governing Unimpaired Claims*

Except as otherwise provided in the Plan, nothing under the Plan will affect the Debtors' rights in respect of any Unimpaired Claims, including, without limitation, all rights in respect of legal and equitable defenses to or setoffs or recoupments against any such Unimpaired Claims, including the right to Cure any arrearages or defaults that may exist with respect to contracts to be assumed under the Plan.

*Discharge of Claims*

17

Except as otherwise provided in the Plan, and effective as of the Effective Date: (i) the rights afforded herein and the treatment of all Claims herein will be in exchange for and in complete satisfaction, settlement, discharge, and release of all Claims of any nature whatsoever, including any interest accrued on such Claims from and after the Petition Date, against the Debtors or any of their assets, property, or Estates; (ii) the Plan will bind all holders of Claims, notwithstanding whether any such holders abstained from voting to accept or reject the Plan or voted to reject the Plan; (iii) all Claims will be satisfied, discharged, and released in full, and the Debtors' liability with respect thereto will be extinguished completely, including any liability of the kind specified under section 502(g) of the Bankruptcy Code; and (iv) except as otherwise expressly provided for in the Plan, all entities will be precluded from asserting against, derivatively on behalf of, or through, the Debtors, the Debtors' Estates, the Reorganized Debtors, each of their successors and assigns, and each of their assets and properties, any other Claims based upon any documents, instruments or any act or omission, transaction, or other activity of any kind or nature that occurred prior to the Effective Date.

## ACCEPTANCE REQUIREMENTS

*Acceptance or Rejection of the Plan*

1.    Voting Classes

Classes 2 and 3 are Impaired under the Plan and are entitled to vote to accept or reject the Plan.

2.    Presumed Acceptance of the Plan

Classes 1, 4, 5, 6, and 8 are Unimpaired under the Plan and are, therefore, conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.

3.    Presumed Rejection of the Plan

Class 7 is Impaired under the Plan and holders of Class 7 Interests shall not receive or retain any property under the Plan on account of such Interests and are, therefore, conclusively presumed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.

*Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code*

The Debtors shall seek Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to rejecting Classes of Claims and Interests. The Debtors reserve the right to modify the Plan in accordance with Article XI hereof, to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification.

## MEANS FOR IMPLEMENTATION OF THE PLAN

*Sources of Consideration for Plan Distributions*

1.    Cash Consideration

All Cash consideration necessary for the Reorganized Debtors to make payments or distributions to holders of Existing Senior Secured Notes Claims under Article III.C.2 shall be obtained from the Share Placement, the Existing Senior Secured Notes Equity Subscription and other Cash on hand of the Debtors, including Cash derived from business operations. Further, the Debtors and the Reorganized Debtors, as the case may be, will be entitled to

transfer funds from Non-Debtor Affiliates, in consultation with the Steering Committees, as they determine to be necessary or appropriate to enable the Reorganized Debtors to satisfy their obligations under the Plan.  Except as set forth herein, any changes in intercompany account balances resulting from such transfers will be accounted for and settled in accordance with the Debtors' historical intercompany account settlement practices and will not violate or otherwise be affected by the terms of the Plan.

 2. <u>New Securities</u>

 On the Effective Date or as soon as practicable thereafter, Reorganized Roust shall issue or cause to be issued (i) 3,020,661 shares of series B New Common Stock for distribution of the Existing Senior Secured Notes Equity Allocation to holders of Allowed Existing Senior Secured Notes Claims and/or, if applicable up to 3,020,661 shares of series C New Common Stock for distribution to holders of Allowed Existing Convertible Notes Claims that have participated in the Existing Senior Secured Notes Equity Subscription, (ii) 2,648,090 shares of series C New Common Stock for distribution of the Existing Convertible Notes Equity Allocation to the holders of Allowed Existing Convertible Notes Claims, (iii) 250,000 shares of series C New Common Stock in connection with the Additional Convertible Notes Equity Allocation; (iv) 14,260,217 shares of series A New Common Stock in connection with the Russian Standard Parties Equity Allocation, (v) 5,775 shares of series B New Common Stock and 57,747 shares of series C New Common Stock in connection with the Backstop Commitment Fee, (vi) 3,257,510 shares of New Common Stock in connection with the Share Placement (to be issued as series A New Common Stock, series B New Common Stock and series C New Common Stock, as applicable), (vii) 1,500,000 shares of New Common Stock in connection with the Additional Share Placement Equity Allocation (to be issued as series A New Common Stock, series B New Common Stock and series C New Common Stock, as applicable), and (viii) the New Senior Secured Notes in partial exchange for the Existing Senior Secured Notes. Shares of New Common Stock issued and outstanding on the Effective Date are subject to dilution on account of the MIP. All of the shares of New Common Stock issued pursuant to the Plan shall be duly authorized, validly issued, fully paid and nonassessable.  Reorganized Roust's certificate of incorporation will provide for the issuance of three series of New Common Stock. Series A New Common Stock will be issued to the Russian Standard Parties. Series B New Common Stock will be issued to the Existing Senior Secured Noteholders. Series C New Common Stock will be issued to the Existing Convertible Noteholders. All series of New Common Stock will have the same voting rights, provided that pursuant to the Investor Rights Agreement, the holders of series A New Common Stock will have the right to appoint three directors, the holders of series B New Common Stock will have the right to appoint one director, and the holders of series C New Common Stock will have the right to appoint one director, as set forth in <u>Article V.D.</u> below.

 Each distribution and issuance referred to in <u>Article VII</u> shall be governed by the terms and conditions set forth in the Plan applicable to such distribution or issuance and by the terms and conditions of the instruments evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Person receiving such distribution or issuance.  Notwithstanding the Effective Date, the New Senior Secured Notes shall accrue interest from January 1, 2017, in accordance with the terms of the indenture governing the New Senior Secured Notes.

 *Cancellation of Securities and Agreements*

 Except as otherwise specifically provided for in the Plan, on the Effective Date: (1) all purchase rights, instruments, guarantees, certificates, warrants, options, puts, agreements, and other documents evidencing the Existing Roust Interests, and any other Interests in the Debtors (except as provided in <u>Article III.C</u>) shall be deemed cancelled, and the obligations of the Debtors thereunder and in any way related thereto shall be fully satisfied, released, and discharged, (2)(i) all indentures, notes, bonds, purchase rights, instruments, guarantees, certificates, warrants, options, puts, agreements, pledges, security documents and other documents evidencing the Existing Senior Secured Notes and the guarantees and security relating thereto including the Existing Senior Secured Notes Indenture shall be deemed cancelled, and the obligations of the Debtors thereunder and in any way related thereto shall be fully satisfied, released, and discharged, and (ii) the Existing Senior Secured Notes Indenture Trustee shall mark the Global Notes (as defined in the Existing Senior Secured Notes Indenture) cancelled and deliver such cancelled Global Notes to Reorganized Roust, and (3)(i) all indentures, notes, bonds, purchase rights, instruments, guarantees, certificates, warrants, options, puts, agreements, pledges, security documents and other documents

evidencing the Existing Convertible Notes and the guarantees and security relating thereto including the Existing Convertible Notes Indenture shall be deemed cancelled, and the obligations of the Debtors thereunder and in any way related thereto shall be fully satisfied, released, and discharged, and (ii) the Existing Convertible Notes Indenture Trustee shall mark the Global Notes (as defined in the Existing Convertible Notes Indenture) cancelled and deliver such cancelled Global Notes to Reorganized Roust; provided, however, that notwithstanding Confirmation or the occurrence of the Effective Date, the Existing Notes Indentures or other agreement that governs the rights of the holder of a Claim shall continue in effect solely for purposes of (a) allowing holders of Existing Notes to receive distributions under the Plan as provided herein, and (b) allowing the Indenture Trustees, if applicable, to make distributions under the Plan as provided herein; provided further, however, that the preceding proviso shall not affect the discharge of Claims pursuant to the Bankruptcy Code, the Confirmation Order or the Plan, or result in any expense or liability to the Reorganized Debtors, except to the extent set forth in or provided for under this Plan; provided further, however, that the cancellation of indentures, notes, instruments, guarantees, certificates, and other documents hereunder shall not itself alter the obligations or rights among third parties (apart from the Debtors, the Reorganized Debtors, and the Non-Debtor Affiliates).  Upon cancellation of the Existing Notes Indentures, all duties and responsibilities of the Existing Senior Secured Notes Indenture Trustee under the Existing Senior Secured Notes Indenture and the Existing Convertible Notes Indenture Trustee under the Existing Convertible Notes Indenture, respectively, shall be discharged except to the extent required in order to effectuate the Plan.

### Section 1145 Exemption

The issuance of the New Senior Secured Notes, including the guarantees thereto, shall be made pursuant to Section 4(a)(2) of the Securities Act of 1933 (the "*Securities Act*"), as amended, or Regulation S under the Securities Act and the New Common Stock distributed to creditors on account of their Claims shall be authorized under section 1145 of the Bankruptcy Code as of the Effective Date without further act or action by any person, unless required by provisions of the relevant corporate documents or applicable law, regulation, order or rule, and shall thereby be exempt from the requirements of section 5 of the Securities Act and any state or local laws requiring registration for the offer and sale of a security, and all documents evidencing the same shall be executed and delivered as provided for in the Plan or the Plan Supplement. New Common Stock issued pursuant to the Share Placement will be exempt from registration pursuant to section 1145 of the Bankruptcy Code to the extent permitted or under the Securities Act by virtue of Section 4(a)(2) thereof and Regulation D promulgated thereunder or pursuant to the safe harbor provided by Regulation S under the Securities Act.  To the extent that the New Senior Secured Notes and New Common Stock being issued in the Share Placement is issued in reliance on Section 4(a)(2) of the Securities Act, such securities will constitute "restricted securities" within the meaning of Rule 144 under the Securities Act and accordingly may not be offered, sold, resold, pledged, delivered, allotted or otherwise transferred except in transactions that are exempt from, or in transactions not subject to, the registration requirements of the Securities Act and in compliance with any applicable state securities laws, and such New Senior Secured Notes and shares of New Common Stock shall bear a legend restricting their transferability until no longer required under applicable requirements of the Securities Act and state securities laws.

### Reorganized Debtors' Boards of Directors

On the Effective Date, the board of directors of Reorganized Roust shall consist of five members: (i) three directors appointed by the Russian Standard Parties and (ii) two minority directors (the "*Minority Directors*"). One Minority Director will be appointed by the Existing Senior Secured Notes Steering Committee (the "*Senior Minority Director*") and the second Minority Director will be appointed by the Existing Convertible Notes Steering Committee (the "*Junior Minority Director*").

Board of directors meetings for Reorganized Roust must occur at least quarterly and must be in London or New York, unless the Minority Directors agree to a different venue.  Two Business Days' written notice must be provided for telephonic meetings of the board of directors of Reorganized Roust and one week's written notice must be provided for in-person meetings of the board of directors of Reorganized Roust. If a Minority Director is not present for a meeting of the board of directors of Reorganized Roust, despite notice being provided, the meeting can proceed.  Notice requirements for meetings of the board of directors of Reorganized Roust can be waived by unanimous approval of the Minority Directors.

A quorum for any board meeting or board matter with respect to Reorganized Roust must include both Minority Directors. At least one Minority Director shall serve on each committee of the board of Reorganized Roust and such director must be present for a quorum of such committee. The Minority Directors shall serve on a committee to be charged with the Exit Event process. Such committee must report to the board of directors of Reorganized Roust and final decisions with respect to an Exit Event will be made by the board of directors of Reorganized Roust.

For as long as the Russian Standard Parties maintain at least 45.0% of the fully diluted equity, representatives of the Russian Standard Parties shall have the right to appoint the majority of the members of the board of directors. For as long as the Russian Standard Parties hold less than 45.0%, but more than 30.0% of the fully diluted equity, the Russian Standard Parties shall have the right to appoint two members of the board of directors. The identities of the members of the new boards of each of the Reorganized Debtors shall be identified in the Plan Supplement or in a filing with the Bankruptcy Court at or prior to the Confirmation Hearing. Each member of the new board of Reorganized Roust will serve from and after the Effective Date pursuant to applicable law and the terms of the Corporate Governance Documents.

A Minority Director may be replaced by the vote or written action of $66^{2/3}$% of shares entitled to appoint such member. Any meeting for the purpose of replacing a Minority Director may be called by 20% of the shares entitled to vote at such meeting. For the avoidance of doubt, the Senior Minority Director cannot be removed without approval of the holders of Existing Senior Secured Notes and the Junior Minority Director cannot be removed without approval of the holders of the Existing Convertible Notes.

The terms governing the board of directors of Reorganized Roust, including certain requirements for Reserved Matters, are set forth in the Corporate Governance Documents and the indenture and related documentation governing the New Senior Secured Notes.

*Governance Documents and Corporate Existence*

On the Effective Date, the Corporate Governance Documents of the Debtors shall be amended or filed, as appropriate, in a form as may be required to be consistent with the provisions of the Plan and the Bankruptcy Code (including, without limitation, section 1123(a)(6) of the Bankruptcy Code) and shall be included in the Plan Supplement. The terms of such documents shall be substantially the same as described in the Disclosure Statement with such changes as may be collectively approved among the relevant Debtors, the Russian Standard Parties, the Existing Senior Secured Notes Steering Committee and the Existing Convertible Notes Steering Committee. Any such amended Corporate Governance Documents will be filed by the Reorganized Debtors with the applicable Secretaries of State and/or other applicable authorities in their respective state of formation or incorporation in accordance with the corporate or the business entity laws of such state on the Effective Date or as soon as practicable thereafter.

*Vesting of Assets in the Reorganized Debtors*

Except as otherwise provided in the Plan or any agreement, instrument or other document incorporated therein, on the Effective Date, all property in each Estate and all Causes of Action (except those released pursuant to the releases by the Debtors) shall vest in each respective Reorganized Debtor, free and clear of all Liens, Claims, charges or other encumbrances. On and after the Effective Date, except as otherwise provided in the Plan, the Reorganized Debtors may operate their businesses and may use, acquire or dispose of property and compromise or settle any Claims, Interests or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

*Russian Standard Parties' Contributions*

On the Effective Date, the Russian Standard Parties will make the Russian Standard Parties' Contributions in exchange for the Russian Standard Parties Equity Allocation. As part of the consideration for the Russian Standard Parties' Contributions, the RTL Debt will be deemed repaid in full. For the avoidance of doubt, upon the

completion of the RSV Contribution, all intellectual property and trademarks relating to, but not limited to, distilleries managed by and brands sold by Reorganized Roust (the "*IP*") will be the sole property of the Reorganized Roust group.  IP shall be broadly construed and no IP shall be held outside the Reorganized Roust group in any capacity, including either individually by Roustam Tariko or by any of his affiliated entities.

*Share Placement*

1.    <u>The Share Placement Subscription</u>

A total of 3,257,510 shares of New Common Stock equal to 13.03% of the New Common Stock issued and outstanding as of the Effective Date, subject to dilution on account of the MIP, shall be issued in exchange for $55 million in cash at a subscription price of $16.88 per share in accordance with the following Subscription Priority Scheme:

(i)    the Consenting Senior Secured Noteholders shall have the right to subscribe to up to their pro rata share of 296,137 series B shares for a total of $5 million;

(ii)    each holder of an Existing Convertible Notes Claim shall have the right to subscribe to up to its pro rata share of 2,961,373 series C shares for a total of $50 million, plus any shares left unsubscribed pursuant to <u>(i)</u>;

(iii)    in the event the Share Placement is not fully subscribed per <u>(i)</u> and <u>(ii)</u>, the Russian Standard Parties shall have the right to subscribe for the unplaced shares up to an additional 296,137 series A shares for a total of $5 million pursuant to the Co-Investment Right;

(iv)    to the extent the Share Placement is not fully subscribed pursuant to <u>(i)</u>, <u>(ii)</u> and <u>(iii)</u>, then (a) the Russian Standard Parties shall have the right to subscribe to 50% of the remaining unplaced shares (in the form of series A shares), subject to the maximum number of shares imposed by the Co-Investment Right, and (b) each Backstop Convertible Noteholder shall have the right to subscribe to up to 50% of the remaining unplaced shares (in the form of series C shares), provided that in the event of oversubscription (x) the unplaced shares shall be allocated pro rata (for the purpose of this subclause <u>(iv)</u>, pro rata shall be based on the respective commitments of the Backstop Convertible Noteholders as set forth in the Backstop Agreement) and (y) if a Backstop Convertible Noteholder subscribes to less than its maximum pro rata allocation the difference (between what such Backstop Convertible Noteholder subscribed to and what it was entitled to subscribe to) shall be made available to the remaining Backstop Convertible Noteholders pro rata. To the extent any unplaced shares remain after (y), the obligation in (y) shall repeat until the maximum pro rata allocation available to each Backstop Convertible Noteholder under this subclause <u>(iv)</u> has either been fully allocated (to the relevant Backstop Convertible Noteholder or to the Backstop Convertible Noteholders) or been made available to the Backstop Convertible Noteholders and been left unsubscribed;

(v)    to the extent the Share Placement is not fully subscribed pursuant to <u>(i)</u>, <u>(ii)</u>, <u>(iii)</u> and <u>(iv)</u>, each holder of an Existing Convertible Notes Claim shall have the right to subscribe to the remaining unplaced shares (in the form of series C shares), provided that in the event of oversubscription (x) each holder of an Existing Convertible Notes Claim shall have the right to subscribe to up to its pro rata share of the unplaced shares and (y) if a holder of an Existing Convertible Notes Claim subscribes to less than its maximum pro rata allocation the difference (between what such Existing Convertible Noteholder subscribed to and what it was entitled to subscribe to) shall be made available to the remaining holders of Existing Convertible Notes Claims on a pro rata basis. To the extent any unplaced shares remain after (y), the obligation in (y) shall repeat until the maximum pro rata allocation available to each holder of an Existing Convertible Notes Claim under this subclause (v) has either been fully allocated (to the relevant holder of Existing Convertible Notes Claims or to the holders of Existing Convertible Notes Claims) or been made available to the holders of Existing Convertible Notes Claims and been left unsubscribed;

(vi)       to the extent the Share Placement is not fully subscribed per (i), (ii), (iii), (iv) and (v), each holder of an Existing Senior Secured Notes Claim shall have the right to subscribe to the remaining unplaced shares (in the form of series B shares), provided that in the event of oversubscription (x) each holder of an Existing Senior Secured Notes Claim shall have the right to subscribe to up to its pro rata share of the unplaced shares and (y) if a holder  of Existing Senior Secured Notes Claims subscribes to less than its maximum pro rata allocation the difference (between what it subscribed to and what it was entitled to subscribe to) shall be made available to the remaining holders of Existing Senior Secured Notes Claims on a pro rata basis. To the extent any unplaced shares remain after (y), the obligation in (y) shall repeat until the maximum pro rata allocation available to each holder of Existing Senior Secured Notes Claims under this subclause (vi) has either been fully allocated (to the relevant holder of Existing Senior Secured Notes Claims or to the holders of Existing Senior Secured Notes Claims) or been made available to the holders of Existing Senior Secured Notes Claims and been left unsubscribed; and

(vii)       to the extent the Share Placement is not fully subscribed per (i), (ii), (iii), (iv), (v), and (vi), any remaining unplaced shares shall be allocated to and purchased by the Backstop Noteholders (in the form of series B and series C shares, as applicable) in accordance with the Backstop Agreement.

All participants in the Share Placement shall receive their respective shares of the Additional Share Placement Equity Allocation.

2.       The Share Placement Backstop

The Backstop Noteholders will agree to backstop the Share Placement in accordance with the terms of the Backstop Agreement in exchange for the Backstop Commitment Fee.  Subject to the transfer restrictions set forth in the Backstop Agreement, each of the Backstop Noteholders shall be permitted to transfer its backstop commitment to another Backstop Noteholder or any related party in which it or any of its affiliates (and/or any affiliate that is wholly-owned by any of such holder's affiliates) has a current or contingent interest, provided, that in the event such related party or affiliate defaults on its backstop obligations, the original Backstop Noteholder shall remain liable.

3.       Existing Senior Secured Notes Equity Subscription

Pursuant to the Existing Senior Secured Notes Equity Subscription, each holder of Existing Convertible Notes Claims shall have the right to subscribe pro rata to the shares of New Common Stock issued in connection with the Existing Senior Secured Notes Equity Allocation  at a subscription price of $25.98 per share.  To the extent the Existing Senior Secured Notes Equity Subscription is not fully subscribed, each holder of an Existing Convertible Notes Claim that subscribed to shares of New Common Stock issued in connection with the Existing Senior Secured Notes Equity Allocation shall have the right to subscribe to up to its pro rata share of the unplaced shares of those holders of Existing Convertible Notes Claims who chose not to subscribe.  For the avoidance of doubt, any shares subscribed to by holders of Existing Convertible Notes Claims pursuant to the Existing Senior Secured Notes Equity Subscription shall be issued in the form of series C New Common Stock.  The proceeds of the Existing Senior Secured Notes Equity Subscription, if any, shall be distributed pro rata to holders of Existing Senior Secured Notes Claims as set forth in Article III.C.2 herein.

*Co-Investment Right*

The Russian Standard Parties shall have the Co-Investment Right in connection with the Share Placement in the priorities and dollar amounts specified in the Subscription Priority Scheme.

*Management Incentive Plan*

On or after the Effective Date, the Reorganized Debtors shall implement a management incentive plan (the "*Management MIP*") for nominated members of management in the amount of up to 2.0% of all issued and outstanding New Common Stock (in the form of series A New Common Stock) on a fully diluted basis vesting over

a period of two to four years. If an Exit Event is completed by June 30, 2019, the lesser of (a) the remaining unvested MIP and (b) two-thirds of the MIP will vest in connection with such Exit Event. The specific form of and terms applicable to awards granted under the incentive plan for management, including vesting conditions, shall be determined by the new board of Reorganized Roust.

Separately, Roustam Tariko shall also receive a management incentive plan that includes the following: (i) 2.0% of the equity in Reorganized Roust on a fully diluted basis (in the form of series A New Common Stock) (the "*Initial Earn Out Equity*") exercisable upon the occurrence of an Exit Event at a valuation of $250 million above $649.4 million (the plan equity value) (the "*Initial Earn Out Equity Threshold*") and (ii) 1.0% of additional equity in Reorganized Roust (in the form of series A New Common Stock) on a fully diluted basis for each $250 million of equity value created above the Initial Earn Out Equity Threshold on the Effective Date, up to a maximum of 3.0% of incremental equity on a fully diluted basis (the "*Additional Earn Out Equity*", and collectively with the Initial Earn Out Equity, the "*RT Earn Out Equity*"). The triggering of an Additional Earn Out Equity award shall be based on a 30-day volume weighted average price of the Reorganized Roust stock post-Exit Event. Roustam Tariko will be entitled to receive Additional Earn Out Equity until July 31, 2019. The RT Earn Out Equity shall expire if an Exit Event has not occurred by June 30, 2019. The Management MIP, Additional Earn Out Equity and the RTL Earn Out Equity, are collectively referred to as the MIP.

*Supplemental Indentures and Collateral and Guarantee Release*

On and after the Effective Date, the following actions shall be deemed authorized and approved in all respects, without the need for further approval or agreement under the Existing Notes Indentures or any further action, by the directors or officers of the Debtors or the Reorganized Debtors, the Existing Notes Indenture Trustees, any security agent under the Existing Notes Indentures, or otherwise and pursuant to entry of the Confirmation Order: (i) the Supplemental Indentures shall be and shall be deemed to be executed and effective in all regards and in accordance with their terms; (ii) the Collateral and Guarantee Release shall be and shall be deemed to be in effect; (iii) CEDC FinCo shall deliver notice to each of the Existing Notes Indenture Trustees that it designates all Non-Debtor Affiliates as Unrestricted Subsidiaries (as defined in the Existing Senior Secured Notes Indenture and the Existing Convertible Notes Indenture, respectively) under each of the Existing Notes Indentures; and (iii) upon designation of such Non-Debtor Affiliates as Unrestricted Subsidiaries, the guarantees by such Unrestricted Subsidiaries of the Existing Notes shall be automatically released pursuant to each of the Existing Notes Indentures and all liens on assets of such Non-Debtor Affiliates designated as Unrestricted Subsidiaries that secure each of the Existing Notes shall be automatically released pursuant to each of the Existing Notes Indentures.

*Restructuring Transactions*

On the Effective Date or as soon as reasonably practicable thereafter, the Reorganized Debtors may take all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by or necessary to effectuate the Plan, including: (1) the execution and delivery of appropriate agreements or other documents of merger, consolidation, restructuring, conversion, disposition, transfer, dissolution or liquidation containing terms that are consistent with the terms of the Plan and that satisfy the requirements of applicable law and any other terms to which the applicable Persons may agree; (2) the execution and delivery of appropriate instruments of transfer, assignment, assumption or delegation of any asset, property, right, liability, debt or obligation on terms consistent with the terms of the Plan and having other terms for which the applicable Persons agree; (3) the filing of appropriate certificates or articles of incorporation or amendments thereof, reincorporation, merger, consolidation, conversion or dissolution pursuant to applicable law; and (4) all other actions that the applicable Persons determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law.

*Corporate Action*

Upon the Effective Date, all actions contemplated by the Plan shall be deemed authorized and approved in all respects, including (1) selection of the directors and officers of the Reorganized Debtors; and (2) all other actions contemplated by the Plan (whether to occur before, on or after the Effective Date). All matters provided for in the

Plan involving the corporate structure of the Debtors or the Reorganized Debtors, and any corporate action required by the Debtors or the Reorganized Debtors in connection with the Plan shall be deemed to have occurred and shall be in effect, without any requirement of further action by the directors or officers of the Debtors or the Reorganized Debtors.

On or (as applicable) before the Effective Date, the appropriate officers of the Debtors or the Reorganized Debtors, as applicable, shall be authorized and directed to issue, execute and deliver the agreements, documents, securities, certificates of incorporation, operating agreements and instruments contemplated by the Plan (or necessary or desirable to effect the transactions contemplated by the Plan) in the name of and on behalf of the Reorganized Debtors. The authorizations and approvals contemplated by this Article V shall be effective notwithstanding any requirements under non-bankruptcy law.

### Effectuating Documents; Further Transactions

On and after the Effective Date, the Reorganized Debtors and the officers and members of the board of directors thereof are authorized to issue, execute, deliver, file or record such contracts, securities, instruments, releases and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement and further evidence the terms and conditions of the Plan and the securities issued pursuant to the Plan in the name of and on behalf of the Reorganized Debtors, without the need for any approvals, authorization or consents except for those expressly required pursuant to the Plan.

### Section 1146 Exemption from Certain Taxes and Fees

Pursuant to section 1146(a) of the Bankruptcy Code, any transfers of property in contemplation of, in connection with, or pursuant to the Plan shall not be subject to any stamp tax or other similar tax or governmental assessment in the United States, and the Confirmation Order shall direct and be deemed to direct the appropriate state or local governmental officials or agents to forgo the collection of any such tax or governmental assessment and to accept for filing and recordation instruments or other documents pursuant to such transfers of property without the payment of any such tax or governmental assessment. Such exemption specifically applies, without limitation, to (1) the creation of any mortgage, deed of trust, lien or other security interest; (2) the making or assignment of any lease or sublease; (3) any restructuring transaction authorized by Article V hereof; and (4) the making or delivery of any deed or other instrument of transfer under, in furtherance of or in connection with the Plan, including: (a) any merger agreements; (b) agreements of consolidation, restructuring, disposition, liquidation or dissolution; (c) deeds; or (d) assignments executed in connection with any transaction occurring under the Plan.

### D&O Liability Insurance Policies and Indemnification Provisions

Notwithstanding anything herein to the contrary, as of the Effective Date, the D&O Liability Insurance Policies and Indemnification Provisions shall be treated as though they are executory contracts that the Debtors shall assume (and assign to the Reorganized Debtors if necessary to continue the D&O Liability Insurance Policies in full force) pursuant to section 365(a) of the Bankruptcy Code. Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the Debtors' foregoing assumption of each of the D&O Liability Insurance Policies and Indemnification Provisions.

### Preservation of Causes of Action

In accordance with section 1123(b) of the Bankruptcy Code, and except where such Causes of Action have been expressly released (including, the releases by the Debtors provided by Article IX.B hereof), the Reorganized Debtors shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action, whether arising before or after the Petition Date, and the Reorganized Debtors' rights to commence, prosecute or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date. The Reorganized Debtors may pursue such Causes of Action, as appropriate, in accordance with the best interests of the Reorganized Debtors. No Person may rely on the absence of a specific reference in the Plan or the Disclosure Statement to any Cause of Action against them as any indication that the Debtors or Reorganized Debtors, as

applicable, will not pursue any and all available Causes of Action against them. Except with respect to Causes of Action as to which the Debtors or Reorganized Debtors have released any Person on or before the Effective Date (including pursuant to the releases by the Debtors or otherwise), the Debtors or Reorganized Debtors, as applicable, expressly reserve all rights to prosecute any and all Causes of Action against any Person, except as otherwise expressly provided in the Plan. Unless any Causes of Action against a Person are expressly waived, relinquished, exculpated, released, compromised or settled in the Plan or a Bankruptcy Court order, the Reorganized Debtors expressly reserve all Causes of Action, for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise) or laches, shall apply to such Causes of Action upon, after or as a consequence of the Confirmation or consummation of the Plan.

### Single Satisfaction of Claims

Holders of Allowed Claims may assert such Claims against each Debtor obligated with respect to such Claim, and such Claims shall be entitled to share in the recovery provided for the applicable Class of Claims against each obligated Debtor based upon the full Allowed amount of the Claim. Notwithstanding the foregoing, in no case shall the aggregate value of all property received or retained under the Plan on account of Allowed Claims exceed 100% of the underlying Allowed Claim.

### Proofs of Claim

Notwithstanding anything herein, in the Bankruptcy Code, in the Bankruptcy Rules, or in any other order of the Bankruptcy Court to the contrary, neither the Indenture Trustees nor any holder of any Existing Notes Claims will be required to file proofs of claim in any of the Chapter 11 Cases or any successor cases, and the findings of fact in the Confirmation Order shall be deemed to constitute a timely filed proof of claim. Notwithstanding the foregoing, the Indenture Trustees may, in their discretion or at the direction of at least 50.1% of the holders of Existing Convertible Notes Claims or Existing Senior Secured Notes Claims, as applicable, file a single proof of claim on account of all such Existing Convertible Notes Claims or Existing Senior Secured Notes Claims, as applicable. Any order entered by this Court in relation to the establishment of a bar date for any claim (including, without limitation, administrative claims) in any of the Chapter 11 Cases or successor cases shall not apply to the Indenture Trustees or the holders of Existing Notes Claims with respect to the Existing Notes.

### U.S. Federal Income Tax Treatment of Existing Notes Claims

For U.S. federal income tax purposes, (a) Reorganized Roust shall be treated as contributing to CEDC FinCo the consideration to be distributed with respect to the Existing Senior Secured Notes Claims pursuant to Article III.C.2 (other than the New Senior Secured Notes), and CEDC FinCo shall be treated as transferring such consideration and issuing the New Senior Secured Notes in exchange for the Existing Senior Secured Notes Claims, and (b) Reorganized Roust shall be treated as contributing to CEDC FinCo the consideration to be distributed with respect to the Existing Convertible Notes Claims pursuant to Article III.C.3, and CEDC FinCo shall be treated as transferring such consideration in exchange for the Existing Convertible Notes Claims.

## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

### Assumption and Rejection of Executory Contracts and Unexpired Leases

Except as otherwise provided herein, or in any contract, instrument, release, indenture or other agreement or document entered into in connection with the Plan, each of the Debtors' Executory Contracts and Unexpired Leases shall be deemed assumed as of the Effective Date, unless such Executory Contract or Unexpired Lease: (1) was assumed or rejected previously by the Debtors; (2) expired or terminated pursuant to its own terms before the Effective Date; (3) is the subject of a motion to reject filed on or before the Effective Date; or (4) is identified as an Executory Contract or Unexpired Lease to be rejected pursuant to the Plan Supplement before the Effective Date.

Entry of the Confirmation Order shall constitute a Bankruptcy Court order approving the assumptions or rejections of such Executory Contracts or Unexpired Leases as set forth in the Plan, all pursuant to sections 365(a) and 1123 of the Bankruptcy Code. Unless otherwise indicated, all assumptions or rejections of Executory Contracts and Unexpired Leases pursuant to the Plan are effective as of the Effective Date.

All Assumed Executory Contracts and Unexpired Leases shall remain in full force and effect for the benefit of the Reorganized Debtors, and be enforceable by the Reorganized Debtors in accordance with their terms, notwithstanding any provision in such assumed Executory Contract or Unexpired Lease that prohibits, restricts or conditions such assumption, assignment or transfer. Any provision in the assumed Executory Contracts and Unexpired Leases that purports to declare a breach or default based in whole or in part on commencement or continuance of these Chapter 11 Cases or any successor cases is hereby deemed unenforceable. To the extent any provision in any Executory Contract or Unexpired Lease assumed pursuant to the Plan (including, without limitation, any "change of control" provision) restricts or prevents, or purports to restrict or prevent, or is breached or deemed breached by, the Reorganized Debtors' assumption of such Executory Contract or Unexpired Lease, then such provision will be deemed modified such that the transactions contemplated by the Plan will not entitle the non-debtor party thereto to terminate such Executory Contract or Unexpired Lease or to exercise any other default-related rights with respect thereto. Each Executory Contract or Unexpired Lease assumed pursuant to the Plan or by Bankruptcy Court order but not assigned to a third party before the Effective Date shall revest in and be fully enforceable by the applicable contracting Reorganized Debtor in accordance with its terms, except as such terms may have been modified by such order or by applicable law. Notwithstanding anything to the contrary in the Plan, the Debtors or the Reorganized Debtors, as applicable, reserve the right to alter, amend, modify or supplement the list of Executory Contracts and Unexpired Leases identified in the Plan Supplement at any time before the Effective Date in consultation with the Steering Committees. After the Effective Date, the Reorganized Debtors shall have the right to terminate, amend or modify any intercompany contracts, leases or other agreements without approval of the Bankruptcy Court.

*Claims Based on Rejection of Executory Contracts or Unexpired Leases*

All Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, if any, must be filed with the Bankruptcy Court within 30 days after the date of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such rejection. Any Claims arising from the rejection of an Executory Contract or Unexpired Lease not filed with the Bankruptcy Court within such time will be automatically disallowed, forever barred from assertion and shall not be enforceable against the Debtors or the Reorganized Debtors, the Estates or their property without the need for any objection by the Reorganized Debtors or further notice to, or action, order or approval of the Bankruptcy Court. All Allowed Claims arising from the rejection of the Debtors' Executory Contracts or Unexpired Leases shall be classified as Class 5 General Unsecured Claims against the applicable Debtor and shall be treated in accordance with Article III of the Plan.

*Cure of Defaults for Assumed Executory Contracts and Unexpired Leases*

Any monetary amounts by which any Executory Contract or Unexpired Lease to be assumed under the Plan is in default shall be satisfied, under section 365(b)(1) of the Bankruptcy Code, by Cure. If there is a dispute regarding (i) the nature or amount of any Cure, (ii) the ability of the Reorganized Debtors to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed or (iii) any other matter pertaining to assumption, Cure shall occur following the entry of a Final Order of the Bankruptcy Court resolving the dispute and approving the assumption.

Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time before the effective date of the assumption.

27

*Insurance Policies*

Notwithstanding anything herein to the contrary, as of the Effective Date, the Debtors shall assume (and assign to the Reorganized Debtors if necessary to continue the Insurance Policies in full force) all of the Insurance Policies pursuant to section 365(a) of the Bankruptcy Code.  Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the Debtors' foregoing assumption of each of the Insurance Policies.

*Reservation of Rights.*

Neither the exclusion nor inclusion of any Executory Contract or Unexpired Lease on the Rejected Executory Contract and Unexpired Lease List, nor anything contained in the Plan, shall constitute an admission by the Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that any Reorganized Debtor has any liability thereunder.  If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors or Reorganized Debtors, as applicable, shall have 45 days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease.

*Contracts and Leases Entered Into After the Petition Date.*

Contracts and leases entered into after the Petition Date by any Debtor, including any Executory Contracts and Unexpired Leases assumed by such Debtor, will be performed by the Debtor or Reorganized Debtor in the ordinary course of its business.  Accordingly, such contracts and leases (including any assumed Executory Contracts and Unexpired Leases) will survive and remain unaffected by entry of the Confirmation Order.


## PROVISIONS GOVERNING DISTRIBUTIONS

*Timing and Calculation of Amounts to Be Distributed*

Except as otherwise provided in the Plan, on the Effective Date or as soon as reasonably practicable thereafter (or if a Claim is not an Allowed Claim on the Effective Date, on the date that such a Claim becomes an Allowed Claim, on the next Distribution Date or as soon as reasonably practicable thereafter), each holder of an Allowed Claim against the Debtors shall receive the full amount of the distributions that the Plan provides for Allowed Claims in the applicable Class List and in the manner provided herein.  In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.  If and to the extent that there are Disputed Claims, distributions on account of any such Disputed Claims shall be made pursuant to the provisions set forth in Article VIII hereof.  Except as otherwise provided herein, holders of Claims shall not be entitled to interest, dividends or accruals on the distributions provided for herein, regardless of whether such distributions are delivered on or at any time after the Effective Date.

*Disbursing Agent*

Except as otherwise provided herein, all distributions under the Plan shall be made by the Reorganized Debtors as Disbursing Agent or such other Person designated by the Reorganized Debtors as a Disbursing Agent on the Effective Date.

*Rights and Powers of Disbursing Agent*

1.    Powers of the Disbursing Agent

The Disbursing Agent shall be empowered to: (a) affect all actions and execute all agreements, instruments and other documents necessary to perform its duties under the Plan; (b) make all distributions contemplated hereby; (c) employ professionals to represent it with respect to its responsibilities; and (d) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions hereof.

2.    Expenses Incurred On or After the Effective Date

Except as otherwise ordered by the Bankruptcy Court, the amount of any reasonable fees and expenses incurred by the Disbursing Agent on or after the Effective Date (including taxes) and any reasonable compensation and expense reimbursement claims (including reasonable attorney fees and expenses) made by the Disbursing Agent shall be paid in Cash by the Reorganized Debtors.

*Cash Distributions*

Distributions of Cash may be made either by check drawn on a domestic bank or wire transfer from a domestic bank, at the option of the Reorganized Debtors, except that Cash payments made to foreign creditors may be made in such funds and by such means as are necessary or customary in a particular foreign jurisdiction.

*Rounding of Payments*

Whenever payment of a fraction of a cent or share would otherwise be called for, the actual payment shall reflect a rounding down of such fraction to the nearest whole dollar or share, or zero if the amount is less than one dollar or share. To the extent Cash, notes, warrants, shares, or stock that are to be distributed under the Plan remain undistributed as a result of the rounding of such fraction to the nearest whole cent or share, such Cash, notes, or shares shall be treated as an unclaimed distribution under the Plan as set forth in Article VII.H herein.

*Distributions on Account of Claims Allowed After the Effective Date*

1.    Payments and Distributions on Disputed Claims

Distributions made after the Effective Date to holders of Disputed Claims that are not Allowed Claims as of the Effective Date but which later become Allowed Claims shall be deemed to have been made on the Effective Date.

2.    Special Rules for Distributions to Holders of Disputed Claims

Notwithstanding any provision otherwise in the Plan and except as may be agreed to by the Debtors or the Reorganized Debtors, on the one hand, and the holder of a Disputed Claim, on the other hand, no partial payments and no partial distributions shall be made with respect to any Disputed Claim until all Disputed Claims held by the holder of such Disputed Claim have become Allowed Claims or have otherwise been resolved by settlement or Final Order.

*Delivery of Distributions and Undeliverable or Unclaimed Distributions*

1.     <u>Delivery of Distributions in General</u>

Except as otherwise provided in the Plan, distributions to holders of Allowed Claims shall be made to holders of record by the Disbursing Agent: (a) to the signatory set forth on any of the Proofs of Claim filed by such holder or other representative identified therein (or at the last known addresses of such holder if no Proof of Claim is filed or if the Debtors have been notified in writing of a change of address); (b) at the addresses set forth in any written notices of address changes delivered to the Disbursing Agent after the date of any related Proof of Claim; (c) at the addresses reflected in the Schedules if no Proof of Claim has been filed and the Disbursing Agent has not received a written notice of a change of address; (d) on any counsel that has appeared in the Chapter 11 Cases or any successor cases on the holder's behalf or (e) at the addresses reflected in the Debtors' books and records. Distributions under the Plan on account of Allowed Claims shall not be subject to levy, garnishment, attachment or like legal process, so that each holder of an Allowed Claim shall have and receive the benefit of the distributions in the manner set forth in the Plan.  None of the Debtors, the Reorganized Debtors and the applicable Disbursing Agent shall incur any liability whatsoever on account of any distributions under the Plan except for gross negligence, willful misconduct or fraud.

Except as otherwise provided in the Plan, (i) all distributions to holders of Existing Senior Secured Notes shall be governed by the Existing Senior Secured Notes Indenture, and shall be deemed completed when made to or at the direction of the Indenture Trustee, who shall in turn make or direct distributions in accordance with the Existing Senior Secured Notes Indenture, and (ii) all distributions to holders of Existing Convertible Notes shall be governed by the Existing Convertible Notes Indenture, and shall be deemed completed when made to or at the direction of the Indenture Trustee, who shall in turn make or direct distributions in accordance with the Existing Convertible Notes Indenture.

2.     <u>Undeliverable Distributions and Unclaimed Property</u>

In the event that any distribution to any holder is returned as undeliverable, no distribution to such holder shall be made unless and until the Disbursing Agent has determined the then current address of such holder, at which time such distribution shall be made as soon as practicable after such distribution has become deliverable or has been claimed to such holder without interest; <u>provided</u>, <u>however</u>, that such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code and forfeited at the expiration of six months from the applicable Distribution Date.  After such date, all "unclaimed property" or interests in property shall revert to the Reorganized Debtors (notwithstanding any applicable federal or state escheat, abandoned or unclaimed property laws to the contrary), and the Claim of any holder to such property shall be discharged and forever barred.

*Withholding and Reporting Requirements*

In connection with the Plan and all instruments issued in connection therewith, the Disbursing Agent shall comply with all applicable withholding and reporting requirements imposed by any federal, state or local taxing authority, and all distributions under the Plan shall be subject to any such withholding or reporting requirements.

*Setoffs*

Except as set forth herein, the Debtors and the Reorganized Debtors may withhold (but not set off except as set forth below) from the distributions called for under the Plan on account of any Allowed Claim an amount equal to any claims, equity interests, rights and Causes of Action of any nature that the Debtors or the Reorganized Debtors may hold against the holder of any such Allowed Claim.  In the event that any such claims, equity interests, rights and Causes of Action of any nature that the Debtors or the Reorganized Debtors may hold against the holder of any such Allowed Claim are adjudicated by Final Order or otherwise resolved, the Debtors may, pursuant to section 558 of the Bankruptcy Code or applicable non-bankruptcy law, set off against any Allowed Claim and the distributions to be made pursuant hereto on account of such Allowed Claim (before any distribution is made on account of such Allowed Claim) the amount of any adjudicated or resolved claims, equity interests, rights and

Causes of Action of any nature that the Debtors or the Reorganized Debtors may hold against the holder of any such Allowed Claim, but only to the extent of such adjudicated or resolved amount. Neither the failure to effect such a setoff nor the allowance of any Claim under the Plan shall constitute a waiver or release by the Debtors or the Reorganized Debtors of any such claims, equity interests, rights and Causes of Action that the Debtors or the Reorganized Debtors may possess against any such holder, except as specifically provided herein.

*Surrender of Cancelled Instruments or Securities*

As a condition precedent to receiving any distribution pursuant to the Plan on account of an Allowed Claim evidenced by the instruments, securities, notes, or other documentation canceled pursuant to Article V.B of the Plan, the Holder of such Claim will tender the applicable instruments, securities, notes or other documentation evidencing such Claim (or a sworn affidavit identifying the instruments, securities, notes or other documentation formerly held by such Holder and certifying that they have been lost), to the Reorganized Debtors or another applicable Distribution Agent unless waived in writing by the Debtors or the Reorganized Debtors, as applicable.

*Lost, Stolen, Mutilated or Destroyed Securities*

In addition to any requirements under any applicable agreement and applicable law, any Holder of a Claim evidenced by a security or note that has been lost, stolen, mutilated, or destroyed will, in lieu of surrendering such security or note to the extent required by the Plan, deliver to the Reorganized Debtors and other applicable Distribution Agent: (x) evidence reasonably satisfactory to the Reorganized Debtors and other applicable Distribution Agent of such loss, theft, mutilation, or destruction; and (y) such security or indemnity as may be required by the Reorganized Debtors and other applicable Distribution Agents to hold such party harmless from any damages, liabilities, or costs incurred in treating such individual as a Holder of an Allowed Claim. Upon compliance with this Article VII.K of the Plan as determined by the Debtors or Reorganized Debtors by a Holder of a Claim evidenced by a security or note, such Holder will, for all purposes under the Plan, be deemed to have surrendered such security or note to the Reorganized Debtors and other applicable Distribution Agents.

*Claims Paid or Payable by Third Parties*

1.      Claims Paid by Third Parties

The Debtors or the Reorganized Debtors, as applicable, shall reduce in part or in full a Claim to the extent that the holder of such Claim receives payment in part or in full on account of such Claim from a party other than the Debtors or Reorganized Debtors. To the extent a holder of a Claim receives a distribution on account of such Claim from a party other than the Debtors or Reorganized Debtors, such holder shall, within two weeks of receipt thereof, repay or return the distribution to the applicable Reorganized Debtor, to the extent the holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such distribution under the Plan.

2.      Insurance Claims

No distributions under the Plan shall be made on account of Allowed Claims until the holder of such Allowed Claim has exhausted all remedies with respect to the Debtors' Insurance Policies. To the extent that one or more of the Debtors' insurers agrees to satisfy in full a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such insurers' agreement, such Claim may be expunged without a Claims objection having to be filed and without any further notice to or action, order or approval of the Bankruptcy Court.

3.      Applicability of Insurance Policies

Except as otherwise provided in the Plan, distributions to holders of Allowed Claims shall be made in accordance with the provisions of any applicable Insurance Policy. Nothing contained in the Plan shall constitute or

31

be deemed a waiver of any Cause of Action that the Debtors or any Person may hold against any other Person, including insurers under any policies of insurance, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

*Allocation of Distributions Between Principal and Unpaid Interest*

To the extent that any Claim entitled to a distribution under the Plan is comprised of indebtedness and accrued but unpaid interest thereon, such distribution shall, for U.S. federal income tax purposes, be allocated on the Debtors' books and records to the principal amount of the Claim first and then, to the extent the consideration exceeds the principal amount of the Claim, to the accrued but unpaid interest.

## PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED AND DISPUTED CLAIMS

*Prosecution of Objections to Claims*

The Debtors (before the Effective Date) or the Reorganized Debtors (on or after the Effective Date), as applicable, shall have the exclusive authority to file, settle, compromise, withdraw or litigate to judgment any objections to Claims as permitted under the Plan. From and after the Effective Date, the Reorganized Debtors may settle or compromise any Disputed Claim without approval of the Bankruptcy Court. The Debtors reserve all rights to resolve any Disputed Claim outside the Bankruptcy Court under applicable governing law.

*Allowance of Claims*

Except as expressly provided herein or in any order entered in the Chapter 11 Cases before the Effective Date (including the Confirmation Order), the Reorganized Debtors after the Effective Date will have and retain any and all rights and defenses held by the Debtors with respect to any Claim as of the Petition Date. All claims of any Person against any Debtor shall be disallowed unless and until such Person pays, in full, the amount it owes each such Debtor.

*Distributions After Allowance*

On the Distribution Date following the date that the order or judgment of the Bankruptcy Court allowing any Disputed Claim becomes a Final Order, the Disbursing Agent shall provide to the holder of such Claim the distribution (if any) to which such holder is entitled under the Plan as of the Effective Date, without any interest to be paid on account of such Claim.

*Estimation of Claims*

The Debtors (before the Effective Date) or Reorganized Debtors (on or after the Effective Date) may, at any time, and from time to time, request that the Bankruptcy Court estimate any Disputed Claim pursuant to section 502(c) of the Bankruptcy Code regardless of whether an objection was previously filed with the Bankruptcy Court with respect to such Claim, or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court will retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including during the pendency of any appeal relating to any such objection. In the event that the Bankruptcy Court estimates any Disputed Claim, that estimated amount will constitute either the Allowed amount of such Claim or a maximum limitation on such Claim against any party or Person, as determined by the Bankruptcy Court. If the estimated amount constitutes a maximum limitation on such Claim, the Debtors (before the Effective Date) or the Reorganized Debtors (after the Effective Date), may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim. All of the objection, estimation, settlement and resolution procedures set forth

in the Plan are cumulative and not necessarily exclusive of one another.  Claims may be estimated and subsequently compromised, objected to, settled, withdrawn or resolved by any mechanism approved by the Bankruptcy Court.

*Deadline to File Objections to Claims*

Any objections to Claims shall be filed no later than the Claims Objection Bar Date; provided, however, that the Debtors' failure to file an objection by the Claims Objection Bar Date shall not cause any Claim to be deemed an Allowed Claim nor shall it prejudice the Debtors' right to resolve any Disputed Claim outside the Bankruptcy Court under applicable governing law.

## SETTLEMENT, RELEASE, INJUNCTION AND RELATED PROVISIONS

*Compromise and Settlement of Claims, Interests and Controversies*

Pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good faith compromise of all Claims, Interests and controversies relating to the contractual, legal and subordination rights that a holder of a Claim or Interest may have with respect to any Allowed Claim or Interest, or any distribution to be made on account of such Allowed Claim or Interest.  The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estates and holders of Claims and Interests and is fair, equitable and reasonable.  In accordance with the provisions of the Plan, without any further notice to or action, order or approval of the Bankruptcy Court, after the Effective Date, the Reorganized Debtors may compromise and settle Claims against them and Causes of Action against other Persons.

### *Releases by the Debtors*

**Pursuant to section 1123(b) of the Bankruptcy Code and to the fullest extent allowed by applicable law, and except as otherwise specifically provided in the Plan or the Plan Supplement, for good and valuable consideration, including (i) the service of the Released Parties to facilitate the expeditious reorganization of the Debtors and the implementation of the restructuring contemplated by the Plan, (ii) the contribution of RSV to the Reorganized Debtors, (iii) the execution and delivery of the Restructuring Support Agreement and the performance of all material obligations thereunder, (iv) the execution and delivery of the Backstop Agreement and the performance of all material obligations thereunder, (v) participation in the Share Placement, (vi) the discharge of debt and all other good and valuable consideration paid pursuant hereto, and (vii) the services of the Debtors', the Non-Debtor Affiliates', the Russian Standard Parties' and RSV's present and former officers, directors, managers and advisors in facilitating the expeditious implementation of the restructuring contemplated hereby, on and after the Effective Date (such that the Reorganized Debtors will not receive any Claim or Cause of Action released hereunder), the Released Parties and their respective property are released and discharged by the Debtors, the Reorganized Debtors, the Estates, and the Non-Debtor Affiliates from any and all claims, obligations, rights, suits, damages, Causes of Action, remedies and liabilities whatsoever, including any derivative claims, asserted or assertable on behalf of the Debtors, the Reorganized Debtors, their Estates and the Non-Debtor Affiliates, whether known or unknown, foreseen or unforeseen, liquidated or unliquidated, contingent or non-contingent, existing or hereinafter arising, in law, equity or otherwise, whether for tort, fraud, contract, violations of federal or state securities laws or otherwise, that the Debtors, the Reorganized Debtors, the Estates, or the Non-Debtor Affiliates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest or other Person, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' restructuring, the Restructuring Support Agreement, the Debtors' Chapter 11 Cases, the Existing Senior Secured Notes, the Existing Convertible Notes, the purchase, sale or rescission of the purchase or sale of any security of the Debtors or the Reorganized Debtors, the subject**

matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor, Reorganized Debtor, Estate or Non-Debtor Affiliate and any Released Party, the restructuring of Claims and Interests before or during the Chapter 11 Cases, the negotiation, formulation or preparation of the Plan, the Disclosure Statement, the Plan Supplement or related agreements, instruments or other documents, or with respect to any other act or omission, transaction, agreement, event or other occurrence taking place on or before the Effective Date; **provided**, **however**, that nothing in this **Article IX.B** shall be construed to release any party or entity from gross negligence, intentional fraud, willful misconduct, or criminal conduct, as determined by a Final Order.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Debtor releases pursuant to this **Article IX.B**, which includes by reference each of the related provisions and definitions contained herein, and further shall constitute the Bankruptcy Court's finding that such Debtor releases are (i) in exchange for the good and valuable consideration provided by the Released Parties, (ii) a good faith settlement and compromise of the claims released by such Debtor releases, (iii) in the best interests of the Debtors and all holders of Claims and Interests, (iv) fair, equitable and reasonable, (v) given and made after due notice and opportunity for hearing, and (vi) a bar to any of the Debtors or the Reorganized Debtors asserting any Claim or Cause of Action released pursuant to such Debtor releases.

*Releases by Holders of Claims*

Except as otherwise provided in the Plan or the Plan Supplement, as of the Effective Date, each Releasing Party, to the fullest extent allowed by applicable law, as such law may be extended or interpreted subsequent to the Effective Date, shall be deemed to have conclusively, absolutely, unconditionally, irrevocably and forever, released and discharged the Debtors, the Reorganized Debtors, their Estates, the Non-Debtor Affiliates and the Released Parties and their respective property from any and all Claims, Interests, obligations, rights, suits, damages, Causes of Action, remedies and liabilities whatsoever, including any derivative Claims, assertable on behalf of a Debtor, whether known or unknown, foreseen or unforeseen, liquidated or unliquidated, contingent or non-contingent, existing or hereafter arising, in law, equity or otherwise, whether for tort, fraud, contract, violations of federal or state securities laws or otherwise, that such Person would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' restructuring, the Restructuring Support Agreement, the Debtors' Chapter 11 Cases, the Existing Senior Secured Notes, the Existing Convertible Notes, the purchase, sale or rescission of the purchase or sale of any security of the Debtors or the Reorganized Debtors, including (without limitation) any tender rights provided under any applicable law, rule, or regulation, the subject matter of, or the transactions or events giving rise to, any Claim that is treated in the Plan, the business or contractual arrangements between the Debtors and any Released Party, the restructuring of Claims and Interests before or during the Chapter 11 Cases, the negotiation, formulation or preparation of the Restructuring Support Agreement, the Plan, the Disclosure Statement, the Plan Supplement or related agreements, instruments or other documents, with respect to any other act or omission, transaction, agreement, event or other occurrence taking place on or before the Confirmation Date; **provided**, **however**, that nothing in this **Article IX.C** shall be construed to release any party or entity from gross negligence, intentional fraud, willful misconduct or criminal conduct, as determined by a Final Order. Notwithstanding anything to the contrary in the Existing Senior Secured Notes Indenture or Existing Convertible Notes Indenture, or the instruments, guarantees, certificates, security documents and other documents related thereto, the Releasing Parties shall have conclusively, absolutely, unconditionally, irrevocably and forever, released and discharged the Non-Debtor Affiliates from any and all Claims, Interests, obligations, rights, suits, damages, Causes of Action, remedies and liabilities whatsoever, whether known or unknown, direct or indirect, foreseen or unforeseen, existing or hereafter arising, that relate to guarantees of the Existing Senior Secured Notes or Existing Convertible Notes, and any collateral of Non-Debtor Affiliates securing the Existing Notes or any guarantees thereto.  Notwithstanding anything to the contrary in the foregoing, the release set forth above does not release any post-Effective Date obligations of any party under the Plan or any document, instrument or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

**Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the third party releases pursuant to this Article IX.C, which includes by reference each of the related provisions and definitions contained herein, and further shall constitute the Bankruptcy Court's finding that such third party releases are (i) in exchange for the good and valuable consideration provided by the Debtors, the Reorganized Debtors, the Non-Debtor Affiliates and the Released Parties, (ii) a good faith settlement and compromise of the claims released by such third party releases, (iii) in the best interests of the Debtors and all holders of Claims and Interests, (iv) fair, equitable and reasonable, (v) given and made after due notice and opportunity for hearing, and (vi) a bar to any of the Releasing Parties asserting any Claim or Cause of Action released pursuant to such Debtor releases.**

*Exculpation*

**Except as otherwise specifically provided in the Plan or Plan Supplement, no Exculpated Party shall have or incur, and each Exculpated Party is hereby released and exculpated from, any Exculpated Claim, obligation, cause of action or liability for any Exculpated Claim, except for gross negligence, intentional fraud or willful misconduct (to the extent such duty is imposed by applicable non-bankruptcy law). The Debtors and the Reorganized Debtors (and each of their respective Affiliates, agents, directors, officers, employees, advisors and attorneys) have, and upon Confirmation of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code with regard to the solicitation and distribution of the Plan securities pursuant to the Plan, and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.**

*Discharge of Claims and Termination of Interests*

Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan, the distributions, rights and treatment that are provided in the Plan shall be in full and final satisfaction, settlement, release and discharge, effective as of the Effective Date, of all Claims, Interests and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests, including demands, liabilities and Causes of Action that arose before the Effective Date, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h) or 502(i) of the Bankruptcy Code, in each case whether or not: (1) a Proof of Claim or Interest based upon such Claim, debt, right or Interest is filed or deemed filed pursuant to section 501 of the Bankruptcy Code; (2) a Claim or Interest based upon such Claim, debt, right or Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (3) the holder of such a Claim or Interest has accepted the Plan. Except as otherwise provided herein, any default by the Debtors or their Affiliates with respect to any Claim or Interest that existed before or on account of the filing of the Chapter 11 Cases shall be deemed cured on the Effective Date. The Confirmation Order shall be a judicial determination of the discharge of all Claims and Interests subject to the Effective Date occurring, except as otherwise expressly provided in the Plan.

*Injunction*

EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THE PLAN, THE PLAN SUPPLEMENT OR RELATED DOCUMENTS, OR FOR OBLIGATIONS ISSUED PURSUANT TO THE PLAN, ALL PERSONS WHO HAVE HELD, HOLD OR MAY HOLD CLAIMS OR INTERESTS THAT HAVE BEEN RELEASED PURSUANT TO ARTICLE IX.B OR ARTICLE IX.C, DISCHARGED PURSUANT TO ARTICLE IX.E, OR ARE SUBJECT TO EXCULPATION PURSUANT TO ARTICLE IX.D, ARE PERMANENTLY ENJOINED, FROM AND AFTER THE EFFECTIVE DATE, FROM TAKING ANY OF THE FOLLOWING ACTIONS: (1) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS, INCLUDING ANY CLAIMS IN RESPECT OF ANY GUARANTEES OR PLEDGES WITH RESPECT TO THE EXISTING NOTES GRANTED BY NON-DEBTOR AFFILIATES; (2) ENFORCING,

ATTACHING, COLLECTING OR RECOVERING BY ANY MANNER OR MEANS ANY JUDGMENT, AWARD, DECREE OR ORDER AGAINST SUCH PERSONS ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; (3) CREATING, PERFECTING OR ENFORCING ANY ENCUMBRANCE OF ANY KIND AGAINST SUCH PERSONS OR THE PROPERTY OR ESTATES OF SUCH PERSONS ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; AND (4) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS RELEASED, SETTLED OR DISCHARGED PURSUANT TO THE PLAN.

THE RIGHTS AFFORDED IN THE PLAN AND THE TREATMENT OF ALL CLAIMS AND INTERESTS HEREIN SHALL BE IN EXCHANGE FOR AND IN COMPLETE SATISFACTION OF ALL CLAIMS AND INTERESTS OF ANY NATURE WHATSOEVER, INCLUDING ANY INTEREST ACCRUED ON CLAIMS FROM AND AFTER THE PETITION DATE, AGAINST THE DEBTORS OR ANY OF THEIR ASSETS, PROPERTY OR ESTATES.  ON THE EFFECTIVE DATE, ALL SUCH CLAIMS AGAINST THE DEBTORS SHALL BE FULLY RELEASED AND DISCHARGED.

EXCEPT AS OTHERWISE EXPRESSLY PROVIDED FOR HEREIN OR IN OBLIGATIONS ISSUED PURSUANT TO THE PLAN FROM AND AFTER THE EFFECTIVE DATE, ALL CLAIMS AGAINST THE DEBTORS SHALL BE FULLY RELEASED AND DISCHARGED, AND ALL INTERESTS SHALL BE CANCELLED, AND THE DEBTORS' LIABILITY WITH RESPECT THERETO SHALL BE EXTINGUISHED COMPLETELY, INCLUDING ANY LIABILITY OF THE KIND SPECIFIED UNDER SECTION 502(G) OF THE BANKRUPTCY CODE.  ALL PERSONS SHALL BE PRECLUDED FROM ASSERTING AGAINST THE DEBTORS, THE DEBTORS' ESTATES, THE REORGANIZED DEBTORS, EACH OF THEIR RESPECTIVE SUCCESSORS AND ASSIGNS, AND EACH OF THEIR ASSETS AND PROPERTIES, ANY OTHER CLAIMS OR INTERESTS BASED UPON ANY DOCUMENTS, INSTRUMENTS OR ANY ACT OR OMISSION, TRANSACTION OR OTHER ACTIVITY OF ANY KIND OR NATURE THAT OCCURRED BEFORE THE EFFECTIVE DATE.

*Temporary Injunction with Respect to Existing Notes Claims*

TO THE EXTENT SUCH CLAIMS ARE NOT OTHERWISE RELEASED PURSUANT TO <u>ARTICLE IX.C</u> OF THIS PLAN, THE CONFIRMATION ORDER APPROVING THIS PLAN SHALL ACT AS A TEMPORARY INJUNCTION AGAINST THE ENFORCEMENT OF ANY DEFAULT AGAINST THE DEBTORS OR ANY NON-DEBTOR AFFILIATE OBLIGATED UNDER THE EXISTING NOTES CLAIMS. HOLDERS OF EXISTING NOTES CLAIMS SHALL BE ENJOINED FROM COMMENCING OR CONTINUING ANY ACTION, EMPLOYMENT OF PROCESS, OR ACT TO COLLECT, OFFSET, OR RECOVER ANY CLAIM RELATING TO THE EXISTING NOTES CLAIMS SO LONG AS THE DEBTORS OR THE REORGANIZED DEBTORS CONTINUE TO PROVIDE OR CAUSE TO BE PROVIDED SUCH TREATMENT TO HOLDERS OF EXISTING NOTES CLAIMS AS PROVIDED UNDER THE PLAN.  THE TEMPORARY INJUNCTION WILL EXPIRE AUTOMATICALLY IF THE REORGANIZED DEBTORS DEFAULT UNDER THE PLAN BY FAILING TO PROVIDE OR CAUSE TO BE PROVIDED SUCH TREATMENT TO HOLDERS OF EXISTING NOTES CLAIMS AS PROVIDED UNDER THE PLAN AND FAIL TO CURE SUCH DEFAULT WITHIN 30 DAYS.

*Term of Injunctions or Stays*

Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order) shall remain in full force and effect until the Effective Date.  All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

*Release of Liens and Guarantees*

Except as otherwise provided herein or in any contract, instrument, release or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, all guarantees, mortgages, deeds of trust, Liens, pledges or other security interests against any property of the Estates shall be fully released and discharged, and all of the right, title and interest of any holder of such guarantees, mortgages, deeds of trust, Liens, pledges or other security interests shall revert to the Reorganized Debtors and their successors and assigns.  For the avoidance of doubt, all guarantees, mortgages, deeds of trust, Liens, pledges or other security interests against any property of the Estates shall be fully released and discharged on the Effective Date without any further action of any party, including, but not limited to, further order of the Bankruptcy Court or filing updated schedules or statements typically filed pursuant to the Uniform Commercial Code.

## CONDITIONS PRECEDENT TO CONFIRMATION OF THE PLAN AND THE EFFECTIVE DATE

*Conditions Precedent to Confirmation*

It shall be a condition to Confirmation hereof that the following provisions, terms and conditions shall have been satisfied or waived pursuant to the provisions of Article X.C.

The Bankruptcy Court shall have entered an order in form and substance reasonably acceptable to the Debtors, the Russian Standard Parties, the Existing Senior Secured Notes Steering Committee and the Existing Convertible Notes Steering Committee, approving the Disclosure Statement with respect to the Plan as containing adequate information within the meaning of section 1125 of the Bankruptcy Code.

The Confirmation Order (a) shall be, in form and substance, reasonably acceptable to the Debtors, the Russian Standard Parties, the Existing Senior Secured Notes Steering Committee and the Existing Convertible Notes Steering Committee, and (b) shall include a finding by the Bankruptcy Court that the New Senior Secured Notes and the New Common Stock to be issued on the Effective Date will be authorized and exempt from registration under applicable securities law pursuant to section 1145 of the Bankruptcy Code or section 4(a)(2) of the Securities Act and Regulation D, and shall not be subject to any stay or subject to an unresolved request for revocation under section 1144 of the Bankruptcy Code.

The Plan and the Plan Supplement, including any schedules, documents, supplements and exhibits thereto shall, in form and substance, be reasonably acceptable to the Debtors, the Russian Standard Parties, the Existing Senior Secured Notes Steering Committee and the Existing Convertible Notes Steering Committee, consistent in all material respects with the Restructuring Support Agreement.

The Bankruptcy Court shall have entered one or more orders in form and substance reasonably acceptable to the Debtors, the Russian Standard Parties,  the Existing Senior Secured Notes Steering Committee and the Existing Convertible Notes Steering Committee, authorizing and directing the Debtors to assume (a) the Restructuring Support Agreement, (b) the Backstop Agreement, and (c) the engagement or fee letters of each of the Advisors.

The Restructuring Support Agreement shall not have been terminated and shall be in full force and effect.

*Conditions Precedent to the Effective Date*

It shall be a condition to the Effective Date that the following provisions, terms and conditions shall have been satisfied or waived pursuant to the provisions of Article X.C.

The Bankruptcy Court shall have entered one or more orders (which may include the Confirmation Order) authorizing the assumption and rejection of Executory Contracts and Unexpired Leases by the Debtors as contemplated herein in form and substance acceptable to the Debtors, the Russian Standard Parties, the Existing Senior Secured Notes Steering Committee and the Existing Convertible Notes Steering Committee.

The Confirmation Order shall be consistent with the Restructuring Support Agreement and in form and substance reasonably acceptable to the Debtors, the Russian Standard Parties, the Existing Senior Secured Notes Steering Committee, and the Existing Convertible Notes Steering Committee and shall have been entered by the Bankruptcy Court and shall not be subject to any stay subject to an unresolved request for revocation under section 1144 of the Bankruptcy Code.

The Share Placement shall have been consummated.

All of the schedules, documents, supplements and exhibits to the Plan shall have been filed in form and substance reasonably acceptable to the Debtors, the Russian Standard Parties, the Existing Senior Secured Notes Steering Committee and the Existing Convertible Notes Steering Committee and shall be consistent with the terms of the Restructuring Support Agreement.

All authorizations, consents, and regulatory approvals required, if any, in connection with the consummation of the Plan shall have been obtained.

All actions, documents, certificates, and agreements necessary to implement this Plan including, without limitation, the Investor Rights Agreement, the Reorganized Debtors' Corporate Governance Documents and the indenture and related documentation for the New Senior Secured Notes shall be consistent with the terms of the Restructuring Support Agreement and shall have been effected or executed and delivered to the required parties and, to the extent required, filed with the applicable governmental units in accordance with applicable laws. All conditions precedent to the effectiveness of such documents and agreements shall have been satisfied or waived pursuant to the terms thereof.

The Existing Senior Secured Notes Steering Committee and the Existing Convertible Notes Steering Committee, each acting reasonably and in good faith, shall have received satisfactory confirmatory diligence regarding the Debtors, the Non-Debtor Affiliates, and RSV including satisfaction of any "Know Your Client" requirements and customary FCPA/anti-bribery and sanctions diligence.

The Debtors shall have paid all fees and expenses of the Advisors through and including the Effective Date in full in Cash, including all RSA Parties' Professional Fee Claims and the Existing Notes Indenture Trustees' Fee and Expense Claims.

The Effective Date shall have occurred by February 15, 2017.

The Restructuring Support Agreement shall not have been terminated and shall be in full force and effect.

*Waiver of Conditions*

The conditions to Confirmation of the Plan and to consummation of the Plan set forth in this Article X may be waived at any time upon receipt of written waivers from each of the Debtors, the Russian Standard Parties, the Existing Senior Secured Notes Steering Committee and the Existing Convertible Notes Steering Committee.

*Effect of Failure of Conditions*

If the consummation of the Plan does not occur, the Plan shall be null and void in all respects and nothing contained in the Plan or the Disclosure Statement shall: (1) constitute a waiver or release of any Claims against or Interests in the Debtors; (2) prejudice in any manner the rights of the Debtors, any holders of Claims or any other

Person; or (3) constitute an admission, acknowledgment, offer or undertaking by the Debtors, any holders or any other Person in any respect.

## MODIFICATION, REVOCATION OR WITHDRAWAL OF THE PLAN

*Modification and Amendments*

Except as otherwise specifically provided herein, and with the consent of the Russian Standard Parties, the Existing Senior Secured Notes Steering Committee and the Existing Convertible Notes Steering Committee, the Debtors reserve the right to modify the Plan as to material terms and seek Confirmation consistent with the Bankruptcy Code and, as appropriate, not re-solicit votes on such modified Plan.  Subject to certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019 and those restrictions on modifications set forth in the Plan, and with the consent of the Russian Standard Parties, and the Existing Senior Secured Notes Steering Committee and the Existing Convertible Notes Steering Committee, the Debtors expressly reserve their rights to alter, amend or modify materially the Plan one or more times, after Confirmation, and, to the extent necessary, may initiate proceedings in the Bankruptcy Court to so alter, amend or modify the Plan or remedy any defect or omission, or reconcile any inconsistencies in the Plan, the Disclosure Statement or the Confirmation Order, in such matters as may be necessary to carry out the purposes and intent of the Plan.

*Effect of Confirmation on Modifications*

Entry of a Confirmation Order shall mean that all modifications or amendments to the Plan occurring after the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or re-solicitation under Bankruptcy Rule 3019.

*Revocation or Withdrawal of the Plan*

The Debtors reserve the right to revoke or withdraw the Plan in consultation with the Steering Committees and subject to the terms of the Restructuring Support Agreement before the Effective Date.  If the Debtors revoke or withdraw the Plan, or if Confirmation or consummation of the Plan does not occur, then:  (1) the Plan shall be null and void in all respects; (2) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain of any Claim or Interest or Class of Claims or Interests), assumption or rejection of Executory Contracts or Unexpired Leases effected by the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void; and (3) nothing contained in the Plan shall:  (a) constitute a waiver or release of any Claims or Interests; (b) prejudice in any manner the rights of the Debtors or any other Person; or (c) constitute an admission, acknowledgement, offer or undertaking of any sort by the Debtors or any other Person.

## RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Bankruptcy Court shall retain such jurisdiction over the Chapter 11 Cases and all matters arising out of or related to the Chapter 11 Cases and the Plan including jurisdiction to:

allow, disallow, determine, liquidate, classify, estimate or establish the priority, secured or unsecured status, or amount of any Claim or Interest, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the secured or unsecured status, priority, amount or allowance of Claims;

decide and resolve all matters related to the granting and denying, in whole or in part, of any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or the Plan;

resolve any matters related to: (a) the assumption, assumption and assignment or rejection of any Executory Contract or Unexpired Lease to which the Debtors are party or with respect to which a Debtor may be liable in any manner and to hear, determine and, if necessary, liquidate, any Claims arising therefrom, including Claims based on the Debtors' rejection of Executory Contracts or Unexpired Leases as set forth in Article VI, Cure Claims pursuant to section 365 of the Bankruptcy Code or any other matter related to such Executory Contract or Unexpired Lease; (b) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed; (c) the Reorganized Debtors amending, modifying or supplementing, after the Effective Date, pursuant to Article VI, any Executory Contracts or Unexpired Leases or the list of Executory Contracts and Unexpired Leases to be assumed or rejected or otherwise; and (d) any dispute regarding whether a contract or lease is or was executory or expired.

ensure that distributions to holders of Allowed Claims are accomplished pursuant to the provisions of the Plan;

adjudicate, decide or resolve any motions, adversary proceedings, contested or litigated matters and any other matters, and grant or deny any applications involving a Debtor that may be pending on the Effective Date;

adjudicate, decide or resolve any and all matters related to any Cause of Action;

adjudicate, decide or resolve any and all matters related to section 1141 of the Bankruptcy Code;

resolve any avoidance or recovery actions under sections 105, 502(d), 542 through 551 and 553 of the Bankruptcy Code;

resolve any cases, controversies, suits, disputes or Causes of Action that may arise in connection with the consummation, interpretation or enforcement of the Plan or any Person's obligations incurred in connection with the Plan;

issue injunctions, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Person with consummation or enforcement of the Plan;

resolve any cases, controversies, suits, disputes or Causes of Action with respect to the discharge, releases, injunctions, exculpations, indemnifications and other provisions contained in Article IX and enter such orders as may be necessary or appropriate to implement such releases, injunctions and other provisions;

enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked or vacated;

adjudicate any and all disputes arising from or relating to distributions under the Plan;

consider any modifications of the Plan, cure any defect or omission or reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

determine requests for the payment of Claims entitled to priority pursuant to section 507 of the Bankruptcy Code;

hear and determine disputes arising in connection with the interpretation, implementation or enforcement of the Plan or the Confirmation Order, including disputes arising under agreements, documents or instruments executed in connection with the Plan;

hear and determine matters concerning state, local and federal taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code;

hear and determine all disputes involving the existence, nature or scope of the Debtors' discharge, including any dispute relating to any liability arising out of the termination of employment or the termination of any employee or retiree benefit program, regardless of whether such termination occurred before or after the Effective Date;

determine any other matters that may arise in connection with or related to the Plan, the Disclosure Statement or the Confirmation Order;

enforce all orders previously entered by the Bankruptcy Court;

hear any other matter not inconsistent with the Bankruptcy Code; and

enter an order concluding or closing the Chapter 11 Cases.

## MISCELLANEOUS PROVISIONS

*Immediate Binding Effect*

Subject to Article X.B, and notwithstanding Bankruptcy Rules 3020(e), 6004(h) or 7062 or any other Bankruptcy Rule, upon the occurrence of the Effective Date, the terms of the Plan and the Plan Supplement shall be immediately effective and enforceable and deemed binding upon the Debtors, the Reorganized Debtors and any and all holders of Claims or Interests (irrespective of whether such Claims or Interests are deemed to have accepted the Plan), all Persons that are parties to or are subject to the settlements, compromises, releases, discharges and injunctions described in the Plan, each Person acquiring property under the Plan, and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtors.

*Additional Documents*

On or before the Effective Date, the Debtors may file with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.  The Debtors or Reorganized Debtors, as applicable, and all holders of Claims receiving distributions pursuant to the Plan and all other parties in interest shall, from time to time, prepare, execute and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

*Dissolution of any Statutory Committee*

On the Effective Date, any statutory committee formed in connection with the Chapter 11 Cases shall dissolve automatically and all members thereof shall be released and discharged from all rights, duties and responsibilities arising from or related to the Chapter 11 Cases.

*Reservation of Rights*

None of the Plan, any statement or provision contained in the Plan or any action taken or not taken by any Debtor with respect to the Plan, the Disclosure Statement or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of any Debtor with respect to the holders of Claims or Interests before the Effective Date.

*Successors and Assigns*

The rights, benefits and obligations of any Person named or referred to in the Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor or assign, affiliate, officer, director, manager, agent, representative, attorney, beneficiaries or guardian, if any, of each Person.

*Service of Documents*

After the Effective Date, any pleading, notice or other document required by the Plan to be served or delivered shall be served as follows:

1.      If to the Reorganized Debtors, to:

Roust Corporation
777 Westchester Avenue
Suite 101
White Plains, New York 10604
Attn:    Grant Winterton

with copies to:

Skadden, Arps, Slate, Meagher and Flom LLP
4 Times Square
New York, New York 10036
Attn:    Jay M. Goffman
           Mark A. McDermott

2.      After the Effective Date, the Debtors may, in their sole discretion, notify Persons that, in order to continue receiving documents pursuant to Bankruptcy Rule 2002, such Persons must file a renewed request to receive documents pursuant to Bankruptcy Rule 2002.  After the Effective Date, the Debtors are authorized to limit the list of Persons receiving documents pursuant to Bankruptcy Rule 2002 to those Persons who have filed such renewed requests.

*Entire Agreement*

Except as otherwise indicated, the Plan and the Plan Supplement supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings and representations on such subjects, all of which have become merged and integrated into the Plan.

*Severability of Plan Provisions*

If, before Confirmation of the Plan, any term or provision of the Plan is held by the Bankruptcy Court or any other court exercising proper jurisdiction to be invalid, void or unenforceable, the Bankruptcy Court or other court exercising proper jurisdiction shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired or invalidated by such holding, alteration or interpretation.  Notwithstanding the foregoing, if any provision of the Plan is materially altered or rendered unenforceable, the Plan shall not be confirmed without the written consent of the Debtors in consultation with the Steering Committees.

*Exhibits*

All exhibits and documents included in the Plan Supplement are incorporated into and are a part of the Plan as if set forth in full in the Plan.  After the exhibits and documents are filed, copies of such exhibits and documents shall be available upon request to the Debtors' counsel, by contacting Skadden, Arps, Slate, Meagher and Flom LLP, 4 Times Square, New York, New York 10036, at the Bankruptcy Court's website at https://ecf.nysb.uscourts.gov or at the website of the voting agent, Epiq Corporate Restructuring at http://dm.epiq11.com/Roust.  To the extent any exhibit or document is inconsistent with the terms of the Plan, unless otherwise ordered by the Bankruptcy Court, the non-exhibit or non-document portion of the Plan shall control.

*Votes Solicited in Good Faith*

Upon entry of the Confirmation Order, the Debtors will be deemed to have solicited votes on the Plan in good faith and in compliance with the Bankruptcy Code and any applicable non-bankruptcy law, and pursuant to section 1125(e) of the Bankruptcy Code, the Debtors and their respective Affiliates, agents, representatives, members, principals, shareholders, officers, directors, employees, advisors and attorneys will be deemed to have participated in good faith and in compliance with the Bankruptcy Code in the offer, issuance, sale and purchase of Plan securities offered and sold under the Plan, and, therefore, will have no liability for the violation of any applicable law, rule or regulation governing the solicitation of votes on the Plan or the offer, issuance, sale or purchase of the securities offered and sold under the Plan.

*Conflicts*

Except as set forth in the Plan, to the extent that any provision of the Disclosure Statement or any other order (other than the Confirmation Order) referenced in the Plan (or any exhibits, schedules, appendices, supplements or amendments to any of the foregoing), conflict with or are in any way inconsistent with any provision of the Plan, the Plan shall govern and control; provided, however, that if there is a conflict between this Plan and a Plan Supplement document, the Plan Supplement document shall govern and control.

Dated:  December 1, 2016

Respectfully submitted,

Roust Corporation

By:      /s/ Grant Winterton
Name: Grant Winterton
Title:   Chief Executive Officer

Jay M. Goffman
Mark A. McDermott
Raquelle L. Kaye
Julie Lanz
SKADDEN, ARPS, SLATE, MEAGHER
 & FLOM, LLP
Four Times Square
New York, New York 10036-6522
(212) 735-3000

Proposed Counsel for Debtors and Debtors in Possession

43

## ANNEX 1

"Industry Competitor" means any person (or any of its affiliates) on the Restricted Purchasers' List, as amended from time to time in accordance with the Investor Rights Agreement,  and any person or entity (or any of its affiliates) which is an Industry Competitor of a member of Reorganized Roust and any controlling shareholder of an Industry Competitor of any member of Reorganized Roust and any successor of such person or entity, or any person that is acting on behalf of or fronting for any such person, provided that a person will not be considered to be "fronting for" or "acting on behalf of" any such person if such person has confirmed in writing to Reorganized Roust that it is not fronting for or acting on behalf of a competitor or an affiliate of an Industry Competitor.  In the event an Exit Event has not been completed prior to June 30, 2019, the Competitor Transfer Restrictions (as defined in the Restructuring Support Agreement and the Investor Rights Agreement) will terminate.  Following the termination of the Competitor Transfer Restriction, a holder may transfer any shares of New Common Stock to an Industry Competitor, subject to prior consultation with the Reorganized Debtors.

RESTRICTED PURCHASERS' LIST[8]

| | |
|---|---|
| 1. | Spi Group S.a.r.l. |
| 2. | Stoli Froup USA LLC |
| 3. | Spirits International B.V. |
| 4. | Sabiedrība ar ierobežotu atbildību "AMBER BEVERAGE GROUP" |
| 5. | JSC Rosspirprom |
| 6. | JSC Tatspirtprom |
| 7. | LLC Tatspirtprom |
| 8. | LLC Status Group |
| 9. | OJSC Synergy |
| 10. | Belvedere S.A. |
| 11. | Bayadera Group |
| 12. | Stock Spirits Group PLC |
| 13. | DIAGEO plc |
| 14. | Pernod Ricard (sp) |
| 15. | Suntory Holdings Limited |
| 16. | Brown Forman Corporation |
| 17. | Bacardi Limited |
| 18. | Emperador Inc. |
| 19. | REMY-COINTREAU S.A. |
| 20. | LVMH Moët Hennessy Louis Vuitton S.E. |
| 21. | William Grant & Sons Distillers Ltd. |
| 22. | Tequila Cuervo La Rojeña s.a. de c.v |
| 23. | Davide Campari-Milano S.p.A. |
| 24. | LABEL 5 First Blending Company Limited |
| 25. | Alcohol Siberian Group Ltd. |

---

[8] *List will be updated on a periodic basis, updates subject to a limit of 3 parties added per year, with consent of the Minority Directors, not to be unreasonably withheld, it being understood that financial investors shall not be considered competitors for the purpose of transfer exclusions, unless such financial investor holds a majority or controlling stake in an Industry Competitor.*

APPENDIX B

## FORM OF SUPPLEMENTAL INDENTURE

Senior Secured Notes Supplemental Indenture

SUPPLEMENTAL INDENTURE, dated as of          , 2016 among (i) CEDC FINANCE CORPORATION INTERNATIONAL, INC. (the "Issuer"), (ii) ROUST CORPORATION (formerly CENTRAL EUROPEAN DISTRIBUTION CORPORATION) (the "Parent"), (iii) the entities listed on Schedule I hereto (collectively, the "Guarantors"), (iv) U.S. BANK NATIONAL ASSOCIATION, as Trustee (the "Trustee"), (v) DEUTSCHE BANK TRUST COMPANY AMERICAS, as Registrar, Transfer Agent and Paying Agent (the "Registrar, Transfer Agent and Paying Agent"), (vi) DEUTSCHE BANK AG, LONDON BRANCH, as Polish Security Agent (the "Polish Security Agent") and (vii) TMF TRUSTEE LIMITED, as Security Agent (the "Security Agent"). Terms used but not defined herein have the meaning set forth in the Indenture.

W I T N E S S E T H :

WHEREAS, reference is made to that certain Indenture, dated as of June 5, 2013 (the "Indenture"), among the Issuer, the Parent, the Guarantors, the Trustee, the Registrar, Transfer Agent, and Paying Agent, the Polish Security Agent and the Security Agent, with respect to the Issuer's Senior Secured Notes due 2018 (collectively, the "Senior Secured Notes");

WHEREAS, pursuant to Section 9.1(a) of the Indenture and subject to Sections 9.1(b) and 9.1(c) of the Indenture, the Indenture, the Senior Secured Notes, any of the Security Documents or the Guarantees may be amended or supplemented with the consent of the Holders of at least a majority of the then outstanding principal amount of the Senior Secured Notes, and, subject to Section 6.10 (*Rights of Holders to Receive Payment*) of the Indenture, any existing Default or Event of Default or compliance with any provision of the Indenture, the Senior Secured Notes, any of the Security Documents or the Guarantees may be waived with the consent of the Holders of a majority in aggregate principal amount of the then outstanding Senior Secured Notes;

WHEREAS, pursuant to Sections 9.1(b)(viii) and (ix) of the Indenture, with the consent of each Holder affected thereby, an amendment, supplement or waiver may (i) release any Lien on the Collateral and (ii) release any of the Guarantees; and

WHEREAS, the Issuer has (i) solicited acceptances of the prepackaged plan of reorganization (the "Plan of Reorganization") attached as Appendix A to the Offering Memorandum and Disclosure Statement, dated December 1, 2016 (the "Offering Memorandum"), for the Parent, the Issuer and CEDC Finance Corporation LLC under which the Senior Secured Notes and the Senior Convertible PIK Notes due 2018 each issued by CEDC FinCo will be cancelled and in exchange (a) the Holders of the Senior Secured Notes will receive (1) the new senior secured notes in an aggregate principal amount of $385 million, (2) cash consideration in an amount of $20 million; (3) 12.08% of the shares of common stock in the reorganized Parent issued and outstanding on the Effective Date (as defined in the Offering Memorandum) subject to dilution on account of the MIP (as defined in the Offering Memorandum) and/or the cash proceeds of the Existing Senior Secured Notes Equity Subscription (as defined in the Offering Memorandum), if any; and (iv) the right to participate in the Share Placement (as defined below) and (b) the holders of Senior Convertible PIK Notes due 2018 will receive (1) 11.59% of the shares of common stock in the reorganized Parent issued and outstanding on the Effective Date (as defined in the Offering Memorandum) subject to dilution on account of the MIP (as defined in the Offering Memorandum), (2) the right to participate in the Share Placement (as defined below) and (3) the right to participate in the Existing Senior Secured Notes Equity Subscription (as defined in the Offering Memorandum), (ii) offered to holders of the Senior Secured Notes and the Senior Convertible PIK Notes due 2018 (the "Senior Convertible Notes") the opportunity to subscribe for shares of common stock in the reorganized Parent (the "Share Placement"), and (iii) solicited consents from the Holders of the Senior Secured Notes and the Holders of the Senior Convertible Notes to provide for certain amendments to the Indenture under in connection with the Plan of Reorganization, including amendments to the acceleration provisions of the Indenture following certain Events of Default and amendments to the provisions of the Indenture governing the ability of the Issuer to designate subsidiaries as Unrestricted Subsidiaries as set forth in this Supplemental Indenture (the "Proposed Amendments"); and

WHEREAS, Holders of more than a majority in principal amount of the Senior Secured Notes have consented to the Proposed Amendments.

WHEREAS, each party hereto has duly authorized the execution and delivery of this Supplemental Indenture and has done all things necessary to make this Supplemental Indenture a valid agreement in accordance with its terms.

NOW, THEREFORE, in consideration of the foregoing and for other good and valuable consideration, the receipt of which is hereby acknowledged, the Indenture is hereby amended as follows:

SECTION 1. <u>Definitions</u>. Capitalized terms used herein without definition shall have the meanings ascribed to them in the Indenture.

SECTION 2. <u>Effectiveness</u>. This Supplemental Indenture shall take effect and be binding upon its execution. Section 3 of this Supplemental Indenture shall become operative at the date and time that the Issuer gives notice to the Trustee that the Plan of Reorganization has become effective (the "<u>Plan of Reorganization Operative Date</u>"). Sections 4 and 5 shall be operative from the date of this Supplemental Indenture.

SECTION 3. <u>Amendments to the Indenture</u>. From and after the Plan of Reorganization Operative Date, the following amendments to the Indenture shall be effective in accordance with Section 2 of this Supplemental Indenture with respect to the Senior Secured Notes as specified herein:

(a) The definition of "Unrestricted Subsidiary" in Section 1.1 shall be deleted in its entirety and replaced with the following:

"Unrestricted Subsidiary" means any Subsidiary of the Parent that is designated by the Board of Directors of the Parent as an Unrestricted Subsidiary in accordance with the provisions of Section 4.25 (Designation of Restricted and Unrestricted Subsidiaries) pursuant to a resolution of the Board of Directors.

(b) Section 4.25 shall be deleted in its entirety and replaced with the following text:

"Section 4.25 Designation of Restricted and Unrestricted Subsidiaries. The Board of Directors of the Parent may designate any Restricted Subsidiary to be an Unrestricted Subsidiary."

SECTION 4. <u>Bankruptcy Waiver Amendment</u>. From and after the date that this Supplemental Indenture becomes effective, as set forth in Section 2, the following amendments to the Indenture shall be effective with respect to the Senior Secured Notes as specified herein.

(a) Section 6.2(c) shall be replaced with the following:

"(c) If an Event of Default described in clause (xi) of Section 6.1 (*Events of Default*) occurs and is continuing, (i) the principal of, premium, if any, and accrued and unpaid interest on the obligations of the Issuer and the Guarantees by the Parent and CEDC Finance Corporation LLC of the Notes will become and be immediately due and payable without any declaration or other act on the part of the trustee or any Holders and (ii) the Holders of at least 50% in principal amount of the outstanding Notes by notice to the Issuer and the Trustee, may, and the Trustee at the request of such Holders shall, declare the principal of, premium, if any, and accrued and unpaid interest, if any, on all the Notes and all of the Guarantees by any Subsidiary Guarantor under the Indenture to be due and payable. Upon such a declaration, such principal, premium and accrued and unpaid interest shall be due and payable immediately."

SECTION 5. <u>Change of Control Amendment</u>. From and after the date that this Supplemental Indenture becomes effective, as set forth in Section 2, the following amendments to the Indenture shall be effective with respect to the Senior Secured Notes as specified herein.

(a) the words "State of Delaware" in clause (5) of the Change of Control definition in Section 1.1 of the Indenture will be deleted and replaced with "other than any state of the United States".

SECTION 6. <u>Section and Other References</u>. To the extent any amendments result in the renumbering of sections or clauses, any references thereto shall be deemed amended so as to refer to the amended section or clause.

SECTION 7. <u>Amendments to Senior Secured Notes</u>. Effective as of the date that this Supplemental Indenture becomes effective, without further act by any Person, the Senior Secured Notes shall be deemed to be amended and modified to make all conforming changes necessary to reflect the amendments and modifications described in Sections 4 and 5 of this Supplemental Indenture, and effective as of the Plan of Reorganization Operative Date, without further act by any Person, the Senior Secured Notes shall be deemed to be amended and modified to make all conforming changes necessary to reflect the amendments and modifications described in Section 3 of this Supplemental Indenture.

SECTION 8. <u>Parties</u>. Nothing expressed or mentioned herein is intended or shall be construed to give any Person, firm or corporation, other than the Holders, the Trustee, the Polish Security Agent and the Security Agent, any legal or equitable right, remedy or claim under or in respect of this Supplemental Indenture or the Indenture or any provision herein or therein contained.

SECTION 9. <u>Governing Law</u>. This Supplemental Indenture shall be governed by the laws of the State of New York.

SECTION 10. <u>Severability Clause</u>. In case any provision in this Supplemental Indenture shall be invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired thereby and such provision shall be ineffective only to the extent of such invalidity, illegality or unenforceability.

SECTION 11. <u>Ratification of Indenture; Supplemental Indenture Part of Indenture</u>. Except as expressly amended hereby, the Indenture is in all respects ratified and confirmed and all the terms, conditions and provisions thereof shall remain in full force and effect. This Supplemental Indenture shall form a part of the Indenture for all purposes, and every Holder of a Senior Secured Note heretofore or hereafter authenticated and delivered shall be bound hereby. The Trustee makes no representation or warranty as to the validity or sufficiency of this Supplemental Indenture.

SECTION 12. <u>Counterparts</u>. The parties hereto may sign one or more copies of this Supplemental Indenture in counterparts, all of which together shall constitute one and the same agreement.

SECTION 13. <u>Headings</u>. The headings of the Sections in this Supplemental Indenture are for convenience of reference only and shall not be deemed to alter or affect the meaning or interpretation of any provisions hereof.

SECTION 14. <u>Successors</u>. All covenants and agreements in this Supplemental Indenture by the parties hereto shall bind their successors and assigns, whether so expressed or not.

SECTION 15. <u>Trustee, Security Agent and Polish Security Agent</u>. The Trustee, the Security Agent and the Polish Security Agent shall not be responsible in any manner whatsoever for or in respect of the validity or sufficiency of this Supplemental Indenture or for or in respect of the recitals contained herein, all of which recitals have been made solely by the Issuer and the Guarantors. The Issuer and the Guarantors shall reimburse the Trustee, the Security Agent and the Polish Security Agent to the same extent as under Section 7.6 of the Indenture for any disbursements, expenses and advances (including reasonable fees and expenses of its counsel) incurred by the Trustee, the Security Agent and/or the Polish Security Agent arising out of or in connection with its execution and performance of this Supplemental Indenture. This provision shall survive the final payment in full of the Senior Secured Notes and the resignation or removal of the Trustee, the Security Agent and/or the Polish Security Agent.

*[Signature Page Follows]*

IN WITNESS WHEREOF, the parties hereto have caused this Supplemental Indenture to be duly executed as of the date first above written.

CEDC FINANCE CORPORATION INTERNATIONAL, INC.
as the Issuer

By: _____
Name:
Title:

ROUST CORPORATION
as the Parent

By: _____
Name:
Title:

BOLS HUNGARY KFT.
as a Guarantor

By: _____
Name:
Title:

BRAVO PREMIUM LLC
as a Guarantor

By: _____
Name:
Title:

By: _____
Name:
Title:

*[Signature Page to Supplemental Indenture]*

CEDC FINANCE CORPORATION, LLC
as a Guarantor

By: _____
Name:
Title:

CEDC INTERNATIONAL SP.Z.O.O.
as a Guarantor

By: _____
Name:
Title:

JELEGAT HOLDINGS LIMITED
as a Guarantor

By: _____
Name:
Title:

JOINT STOCK COMPANY "DISTILLERY TOPAZ"
as a Guarantor

By: _____
Name:
Title:

JOINT STOCK COMPANY "RUSSIAN ALCOHOL GROUP"
as a Guarantor

By: _____
Name:
Title:

*[Signature Page to Supplemental Indenture]*

LATCHEY LIMITED
as a Guarantor

By: _____
Name:
Title:

LIMITED LIABILITY COMPANY "THE
TRADING HOUSE RUSSIAN ALCOHOL"
as a Guarantor

By: _____
Name:
Title:

LION/RALLY LUX 1 S.A.
as a Guarantor

By: _____
Name:
Title:

LION/RALLY LUX 2 S.À.R.L.
as a Guarantor

By: _____
Name:
Title:

LION/RALLY LUX 3 S.À.R.L.
as a Guarantor

By: _____
Name:
Title:

*[Signature Page to Supplemental Indenture]*

MID-RUSSIAN DISTILLERIES
as a Guarantor

By: _____
Name:
Title:

OOO "FIRST TULA DISTILLERIES"
as a Guarantor

By: _____
Name:
Title:

OOO "GLAVSPIRTTIREST"
as a Guarantor

By: _____
Name:
Title:

*[Signature Page to Supplemental Indenture]*

PASALBA LIMITED
as a Guarantor

By: _____
Name:
Title:


PWW SP. Z O.O.
as a Guarantor

By: _____
Name:
Title:


SIBIRSKY LVZ
as a Guarantor

By: _____
Name:
Title:


DEUTSCHE BANK TRUST COMPANY AMERICAS
as Registrar, Transfer Agent, and Paying Agent

By: _____
Name:
Title:


By: _____
Name:
Title:


*[Signature Page to Supplemental Indenture]*

DEUTSCHE BANK AG, LONDON BRANCH
as Polish Security Agent

By: _____
Name:
Title:

By: _____
Name:
Title:

TMF TRUSTEE LIMITED
as Security Agent

By: _____
Name:
Title:

*[Signature Page to Supplemental Indenture]*

<u>SCHEDULE I</u>

<u>TO THE SUPPLEMENTAL INDENTURE</u>

**GUARANTORS**

| NAME | JURISDICTION OF INCORPORATION |
| --- | --- |
| 1. Bols Hungary Kft. | Hungary |
| 2. Bravo Premium LLC | Russia |
| 3. CEDC Finance Corporation, LLC | United States of America |
| 4. CEDC International Sp. z o.o. | Poland |
| 5. Jelegat Holdings Limited | Cyprus |
| 6. JSC "Distillery Topaz" | Russia |
| 7. JSC "Russian Alcohol Group" | Russia |
| 8. Latchey Limited | Cyprus |
| 9. Limited Liability Company "The Trading House Russian Alcohol" | Russia |
| 10. Lion/Rally Lux 1 S.A. | Luxembourg |
| 11. Lion/Rally Lux 2 S.à.r.l. | Luxembourg |
| 12. Lion/Rally Lux 3 S.à.r.l. | Luxembourg |
| 13. Mid-Russian Distilleries | Russia |
| 14. OOO "First Tula Distilleries" | Russia |
| 15. OOO "Glavspirttirest" | Russia |
| 16. Pasalba Limited | Cyprus |
| 17. PWW Sp. z o.o. | Poland |
| 18. Sibirsky LVZ | Russia |

Senior Convertible Notes Supplemental Indenture

SUPPLEMENTAL INDENTURE, dated as of         , 2016 among (i) CEDC FINANCE CORPORATION INTERNATIONAL, INC. (the "Issuer"), (ii) ROUST CORPORATION (formerly CENTRAL EUROPEAN DISTRIBUTION CORPORATION) (the "Parent"), (iii) the entities listed on Schedule I hereto (collectively, the "Guarantors"), (iv) U.S. BANK NATIONAL ASSOCIATION, as Trustee (the "Trustee"), (v) DEUTSCHE BANK TRUST COMPANY AMERICAS, as Registrar, Transfer Agent and Paying Agent (the "Registrar, Transfer Agent and Paying Agent"), (vi) DEUTSCHE BANK AG, LONDON BRANCH, as Polish Security Agent (the "Polish Security Agent") and (vii) TMF TRUSTEE LIMITED, as Security Agent (the "Security Agent"). Terms used but not defined herein have the meaning set forth in the Indenture.

W I T N E S S E T H :

WHEREAS, reference is made to that certain Indenture, dated as of June 5, 2013 (the "Indenture"), among the Issuer, the Parent, the Guarantors, the Trustee, the Registrar, Transfer Agent, and Paying Agent, the Polish Security Agent and the Security Agent, with respect to the Issuer's Senior Convertible PIK Notes due 2018 (collectively, the "Senior Convertible Notes");

WHEREAS, pursuant to Section 9.1(a) of the Indenture and subject to Sections 9.1(b) and 9.1(c) of the Indenture, the Indenture, the Senior Convertible Notes, any of the Security Documents or the Guarantees may be amended or supplemented with the consent of the Holders of at least a majority of the then outstanding principal amount of the Senior Convertible Notes, and, subject to Section 6.10 (*Rights of Holders to Receive Payment*) of the Indenture, any existing Default or Event of Default or compliance with any provision of the Indenture, the Senior Convertible Notes, any of the Security Documents or the Guarantees may be waived with the consent of the Holders of a majority in aggregate principal amount of the then outstanding Senior Convertible Notes;

WHEREAS, pursuant to Sections 9.1(b)(viii) and (ix) of the Indenture, with the consent of each Holder affected thereby, an amendment, supplement or waiver may (i) release any Lien on the Collateral and (ii) release any of the Guarantees; and

WHEREAS, the Issuer has (i) solicited acceptances of the prepackaged plan of reorganization (the "Plan of Reorganization") attached as Appendix A to the Offering Memorandum and Disclosure Statement, dated December 1, 2016 (the "Offering Memorandum"), for the Parent, the Issuer and CEDC Finance Corporation LLC under which the Senior Convertible Notes and the Senior Secured Notes due 2018 (the "Senior Secured Notes") each issued by CEDC FinCo will be cancelled and in exchange (a) the Holders of the Senior Secured Notes will receive (1) the new senior secured notes in an aggregate principal amount of $385 million, (2) cash consideration in an amount of $20 million; (3) 12.08% of the shares of common stock in the reorganized Parent issued and outstanding on the Effective Date (as defined in the Offering Memorandum) subject to dilution on account of the MIP (as defined in the Offering Memorandum) and/or the cash proceeds of the Existing Senior Secured Notes Equity Subscription (as defined in the Offering Memorandum), if any; and (iv) the right to participate in the Share Placement (as defined below) and (b) the holders of Senior Convertible PIK Notes due 2018 will receive (1) 11.59% of the shares of common stock in the reorganized Parent issued and outstanding on the Effective Date (as defined in the Offering Memorandum) subject to dilution on account of the MIP (as defined in the Offering Memorandum), (2) the right to participate in the Share Placement (as defined below) and (3) the right to participate in the Existing Senior Secured Notes Equity Subscription (as defined in the Offering Memorandum), (ii) offered to holders of the Senior Secured Notes and the Senior Convertible Notes the opportunity to subscribe for shares of common stock in the reorganized Parent (the "Share Placement"), and (iii) solicited consents from the Holders of the Senior Secured Notes and the Holders of the Senior Convertible Notes to provide for certain amendments to the Indenture under in connection with the Plan of Reorganization, including amendments to the acceleration provisions of the Indenture following certain Events of Default and amendments to the provisions of the Indenture governing the ability of the Issuer to designate subsidiaries as Unrestricted Subsidiaries set forth in this Supplemental Indenture (the "Proposed Amendments"); and

WHEREAS, Holders of more than a majority in principal amount of the Senior Convertible Notes have consented to the Proposed Amendments.

WHEREAS, each party hereto has duly authorized the execution and delivery of this Supplemental Indenture and has done all things necessary to make this Supplemental Indenture a valid agreement in accordance with its terms.

NOW, THEREFORE, in consideration of the foregoing and for other good and valuable consideration, the receipt of which is hereby acknowledged, the Indenture is hereby amended as follows:

SECTION 1. Definitions. Capitalized terms used herein without definition shall have the meanings ascribed to them in the Indenture.

SECTION 2. Effectiveness. This Supplemental Indenture shall take effect and be binding upon its execution. Section 3 of this Supplemental Indenture shall become operative at the date and time that the Issuer gives notice to the Trustee that the Plan of Reorganization has become effective (the "Plan of Reorganization Operative Date"). Sections 4 and 5 shall be operative from the date of this Supplemental Indenture

SECTION 3. Amendments to the Indenture. From and after the Plan of Reorganization Operative Date, the following amendments to the Indenture shall be effective in accordance with Section 2 of this Supplemental Indenture with respect to the Senior Convertible Notes as specified herein:

(a) The definition of "Unrestricted Subsidiary" in Section 1.1 shall be deleted in its entirety and replaced with the following:

"Unrestricted Subsidiary" means any Subsidiary of the Parent that is designated by the Board of Directors of the Parent as an Unrestricted Subsidiary in accordance with the provisions of Section 4.25 (Designation of Restricted and Unrestricted Subsidiaries) pursuant to a resolution of the Board of Directors.

(b) Section 4.25 shall be deleted in its entirety and replaced with the following text:

"Section 4.25 Designation of Restricted and Unrestricted Subsidiaries. The Board of Directors of the Parent may designate any Restricted Subsidiary to be an Unrestricted Subsidiary.

SECTION 4. Bankruptcy Waiver Amendment. From and after the date that this Supplemental Indenture becomes effective, as set forth in Section 2, the following amendments to the Indenture shall be effective with respect to the Senior Convertible Notes as specified herein.

(a) Section 6.2(c) shall be replaced with the following:

"(c) If an Event of Default described in clause (xi) of Section 6.1 (Events of Default) occurs and is continuing, (i) the principal of, premium, if any, and accrued and unpaid interest on the obligations of the Issuer and the Guarantees by the Parent and CEDC Finance Corporation LLC of the Notes will become and be immediately due and payable without any declaration or other act on the part of the trustee or any Holders and (ii) the Holders of at least 50% in principal amount of the outstanding Notes by notice to the Issuer and the Trustee, may, and the Trustee at the request of such Holders shall, declare the principal of, premium, if any, and accrued and unpaid interest, if any, on all the Notes and all of the Guarantees by any Subsidiary Guarantor under the Indenture to be due and payable. Upon such a declaration, such principal, premium and accrued and unpaid interest shall be due and payable immediately."

SECTION 5. Change of Control Amendment. From and after the date that this Supplemental Indenture becomes effective, as set forth in Section 2, the following amendments to the Indenture shall be effective with respect to the Senior Convertible Notes as specified herein.

(a) the words "State of Delaware" in clause (5) of the Change of Control definition in Section 1.1 of the Indenture will be deleted and replaced with "other than any state of the United States".

SECTION 6. Section and Other References. To the extent any amendments result in the renumbering of sections or clauses, any references thereto shall be deemed amended so as to refer to the amended section or clause.

SECTION 7. Amendments to Senior Convertible Notes. Effective as of the date that this Supplemental Indenture becomes effective, without further act by any Person, the Senior Convertible Notes shall be deemed to be amended and modified to make all conforming changes necessary to reflect the amendments and modifications described in Sections 4 and 5 of this Supplemental Indenture, and effective as of the Plan of Reorganization Operative Date, without further act by any Person, the Senior Convertible Notes shall be deemed to be amended and modified to make all conforming changes necessary to reflect the amendments and modifications described in Section 3 of this Supplemental Indenture.

SECTION 8. Parties. Nothing expressed or mentioned herein is intended or shall be construed to give any Person, firm or corporation, other than the Holders, the Trustee, the Polish Security Agent and the Security Agent, any legal or equitable right, remedy or claim under or in respect of this Supplemental Indenture or the Indenture or any provision herein or therein contained.

SECTION 9. Governing Law. This Supplemental Indenture shall be governed by the laws of the State of New York.

SECTION 10. Severability Clause. In case any provision in this Supplemental Indenture shall be invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired thereby and such provision shall be ineffective only to the extent of such invalidity, illegality or unenforceability.

SECTION 11. Ratification of Indenture; Supplemental Indenture Part of Indenture. Except as expressly amended hereby, the Indenture is in all respects ratified and confirmed and all the terms, conditions and provisions thereof shall remain in full force and effect. This Supplemental Indenture shall form a part of the Indenture for all purposes, and every Holder of a Senior Convertible Note heretofore or hereafter authenticated and delivered shall be bound hereby. The Trustee makes no representation or warranty as to the validity or sufficiency of this Supplemental Indenture.

SECTION 12. Counterparts. The parties hereto may sign one or more copies of this Supplemental Indenture in counterparts, all of which together shall constitute one and the same agreement.

SECTION 13. Headings. The headings of the Sections in this Supplemental Indenture are for convenience of reference only and shall not be deemed to alter or affect the meaning or interpretation of any provisions hereof.

SECTION 14. Successors. All covenants and agreements in this Supplemental Indenture by the parties hereto shall bind their successors and assigns, whether so expressed or not.

SECTION 15. Trustee, Security Agent and Polish Security Agent. The Trustee, the Security Agent and the Polish Security Agent shall not be responsible in any manner whatsoever for or in respect of the validity or sufficiency of this Supplemental Indenture or for or in respect of the recitals contained herein, all of which recitals have been made solely by the Issuer and the Guarantors. The Issuer and the Guarantors shall reimburse the Trustee, the Security Agent and the Polish Security Agent to the same extent as under Section 7.6 of the Indenture for any disbursements, expenses and advances (including reasonable fees and expenses of its counsel) incurred by the Trustee, the Security Agent and/or the Polish Security Agent arising out of or in connection with its execution and performance of this Supplemental Indenture. This provision shall survive the final payment in full of the Senior Convertible Notes and the resignation or removal of the Trustee, the Security Agent and/or the Polish Security Agent.

*[Signature Page Follows]*

IN WITNESS WHEREOF, the parties hereto have caused this Supplemental Indenture to be duly executed as of the date first above written.

CEDC FINANCE CORPORATION INTERNATIONAL, INC.
as the Issuer

By: _____
Name:
Title:


ROUST CORPORATION
as the Parent

By: _____
Name:
Title:


BOLS HUNGARY KFT.
as a Guarantor

By: _____
Name:
Title:


BRAVO PREMIUM LLC
as a Guarantor

By: _____
Name:
Title:


By: _____
Name:
Title:


*[Signature Page to Supplemental Indenture]*

**CEDC FINANCE CORPORATION, LLC**
as a Guarantor

By: _____
Name:
Title:

**CEDC INTERNATIONAL SP.Z.O.O.**
as a Guarantor

By: _____
Name:
Title:

**JELEGAT HOLDINGS LIMITED**
as a Guarantor

By: _____
Name:
Title:

**JOINT STOCK COMPANY "DISTILLERY TOPAZ"**
as a Guarantor

By: _____
Name:
Title:

**JOINT STOCK COMPANY "RUSSIAN ALCOHOL GROUP"**
as a Guarantor

By: _____
Name:
Title:

*[Signature Page to Supplemental Indenture]*

LATCHEY LIMITED
as a Guarantor

By: _____
Name:
Title:

LIMITED LIABILITY COMPANY "THE
TRADING HOUSE RUSSIAN ALCOHOL"
as a Guarantor

By: _____
Name:
Title:

LION/RALLY LUX 1 S.A.
as a Guarantor

By: _____
Name:
Title:

LION/RALLY LUX 2 S.À.R.L.
as a Guarantor

By: _____
Name:
Title:

LION/RALLY LUX 3 S.À.R.L.
as a Guarantor

By: _____
Name:
Title:

*[Signature Page to Supplemental Indenture]*

MID-RUSSIAN DISTILLERIES
as a Guarantor

By: _____
Name:
Title:


OOO "FIRST TULA DISTILLERIES"
as a Guarantor

By: _____
Name:
Title:


OOO "GLAVSPIRTTIREST"
as a Guarantor

By: _____
Name:
Title:


*[Signature Page to Supplemental Indenture]*

PASALBA LIMITED
as a Guarantor

By: _____
Name:
Title:

PWW SP. Z O.O.
as a Guarantor

By: _____
Name:
Title:

SIBIRSKY LVZ
as a Guarantor

By: _____
Name:
Title:

DEUTSCHE BANK TRUST COMPANY AMERICAS
as Registrar, Transfer Agent, and Paying Agent

By: _____
Name:
Title:


By: _____
Name:
Title:


*[Signature Page to Supplemental Indenture]*

DEUTSCHE BANK AG, LONDON BRANCH
as Polish Security Agent

By: _____
Name:
Title:

By: _____
Name:
Title:

TMF TRUSTEE LIMITED
as Security Agent

By: _____
Name:
Title:

*[Signature Page to Supplemental Indenture]*

<u>SCHEDULE I</u>

<u>TO THE SUPPLEMENTAL INDENTURE</u>

**GUARANTORS**

| NAME | JURISDICTION OF INCORPORATION |
|------|-------------------------------|
| 1. Bols Hungary Kft. | Hungary |
| 2. Bravo Premium LLC | Russia |
| 3. CEDC Finance Corporation, LLC | United States of America |
| 4. CEDC International Sp. z o.o. | Poland |
| 5. Jelegat Holdings Limited | Cyprus |
| 6. JSC "Distillery Topaz" | Russia |
| 7. JSC "Russian Alcohol Group" | Russia |
| 8. Latchey Limited | Cyprus |
| 9. Limited Liability Company "The Trading House Russian Alcohol" | Russia |
| 10. Lion/Rally Lux 1 S.A. | Luxembourg |
| 11. Lion/Rally Lux 2 S.à.r.l. | Luxembourg |
| 12. Lion/Rally Lux 3 S.à.r.l. | Luxembourg |
| 13. Mid-Russian Distilleries | Russia |
| 14. OOO "First Tula Distilleries" | Russia |
| 15. OOO "Glavspirttirest" | Russia |
| 16. Pasalba Limited | Cyprus |
| 17. PWW Sp. z o.o. | Poland |
| 18. Sibirsky LVZ | Russia |

APPENDIX C

## SUBSCRIPTION FORM

### SUBSCRIPTION FORM FOR
### SHARE PLACEMENT IN CONNECTION WITH
### ROUST CORPORATION'S PLAN OF REORGANIZATION

SUBSCRIPTION FORM by and among Roust Corporation, a Delaware corporation ("Roust" or the "Issuer") and the undersigned subscribers (the "Subscribers").

To Subscribers:

On November 30, 2016, the Company commenced the solicitation of votes on the proposed *Joint Prepackaged Plan of Reorganization of Roust Corporation and its Debtor Affiliates Under Chapter 11 of the Bankruptcy Code* (the "Plan"). The Plan is attached as Appendix A to the *Offering Memorandum and Disclosure Statement* (the "Offering Memorandum"). Pursuant to the Plan of Reorganization, each Subscriber has the right to subscribe for Share Placement Shares based on such Subscriber's Maximum Claim Amount (as set out in Item 1 of this Subscription Form). See "Share Placement" of the Offering Memorandum for a complete description of the Share Placement.

In support of the Plan, the Company also entered into a Restructuring Support Agreement, dated November 9, 2016 (the "Support Agreement"), with Consenting Noteholders (as defined therein) holding approximately 90% in aggregate principal amount of the Senior Secured Notes due 2018(the "Existing Senior Secured Notes") and approximately two-thirds in aggregate principal amount of the Senior Convertible PIK Notes due 2018 ("Existing Convertible Notes") and other parties signatories thereto (the "Supporting Parties").

**If all of the steps outlined below are not completed by the Share Placement Deadline (as defined below), your right to participate in the Share Placement will terminate; provided, however, that pursuant to the Backstop Agreement, the Backstop Noteholders will agree to acquire any and all New Common Stock offered in the Share Placement but not subscribed and paid for by Subscribers after the Share Placement Deadline.**

### SUBSCRIPTION INSTRUCTIONS:

To participate in the Share Placement, you must take all of the following steps (ALL steps must be completed by the Share Placement Deadline):

1.    **Complete** Item 2 of the Subscription Form, indicating the Individual Subscription Percentage of the Share Placement Amount for which you wish to subscribe, and the Individual Subscription Amount, in connection with your exercise of your right to participate in the Share Placement.

2.    **Provide** contact details in accordance with Item 3 of the Subscription Form. (Be sure to include the name, email address, and telephone number for the person to receive any communications).

3.    **Read and Complete** the certification in Item 4 of the Subscription Form (including tax forms).

4.    **Arrange** to have your NOMINEE complete the Nominee Certification in Item 5.

5.    **Return** the fully completed Subscription Form (including tax forms and Nominee Certification) to the Subscription Agent at the address provided below. Either you or your Nominee may return the fully completed Subscription Form to the Subscription Agent.

### PAYMENT INSTRUCTIONS:

Please note that payment for any Subscription is **not** being requested at this time. A notice to provide payment is expected to be sent as soon as practicable after the Share Placement Deadline (the "Notice to Provide

Payment"). Cash payment by wire transfer of immediately available funds to the Subscription Agent will be required in accordance with the instructions provided in the Notice to Provide Payment, which funds will be held in escrow until [the Effective Date]. The Subscription Payment Date (as defined below) is expected to be two (2) Business Days following the posting of the Notice to Provide Payment to the case website at http://dm.epiq11.com/Roust. The Notice to Provide Payment is expected to be posted as soon as practicable following the Share Placement Deadline. The wire instructions for the Subscription Agent will be included in the Notice to Provide Payment.

The execution and delivery of the Subscription Form is an agreement to purchase the Subscribed Shares based on your Individual Subscription Amount.

Please see additional information regarding payment procedures in Item 3, below.

**QUESTIONS AND MAILING ADDRESS:**

Please return the Subscription Form to Epiq Corporate Restructuring (the "Subscription Agent") at:

Roust Subscription Processing
c/o Epiq Corporate Restructuring
777 Third Avenue, 12th Floor
Attn: Solicitation Group
New York, NY 10017

**The Subscription Agent must receive your
Subscription Form by
December 30, 2016 at 5:00 p.m. Eastern Time,
or the exercise will be void and your rights will
terminate and be cancelled.**

If you have any questions about the Subscription Form or the subscription or payment procedures described herein, please contact the Subscription Agent, Epiq Corporate Restructuring, Telephone: (866) 734-9393 (toll-free North America) or +1 (646) 282-2500 (direct-dial toll international), Questions may be directed to the Voting Agent by emailing: tabulation@epiqsystems.com (please reference Roust in the subject line)

**Subscription Rights.** Pursuant to the Plan of Reorganization, each Holder of Existing Senior Secured Notes or Existing Convertible Notes as of the Share Placement Record Date (November 30, 2016) (a "Share Placement Participant") is entitled to participate in the Share Placement subject to certain terms and conditions described in the Offering Memorandum. By subscribing for a percentage of the Share Placement Amount (such Subscriber's "Individual Subscription Percentage") (to be completed below in Item 2), such Subscriber is agreeing to purchase an amount of Share Placement Shares (rounded down to the nearest whole number and determined at the Effective Date) based on such Subscriber's Individual Subscription Amount (calculated below in Item 2).

To subscribe, read Item 1 below; fill out Item 2 below; read Item 3 below and read and complete Item 4 below. Your Nominee must complete Item 5 below. *All other steps (as outlined above) must also be completed by the Share Placement Deadline.*

**Item 1. Amount of Allowed Prepetition Credit Agreement Claims.** I certify that I am a Share Placement Participant, that I held the following principal amount of Existing Senior Secured Notes as of the Share Placement Record Date and that I am a Subscriber or the authorized signatory of that Subscriber.

| Amount of Existing Senior Secured Notes held: |
|---|
| $_____ |

| Amount of Existing Junior Convertible Notes held: |
|---|
| $_____ |

---

**Item 2. Individual Subscription Percentage and Individual Subscription Amount.**

By filling in the following blanks, you are agreeing to purchase Share Placement Shares based on your Individual Subscription Percentage (in the first blank specify a percentage of the Share Placement Amount, that you wish to subscribe for) at your Individual Subscription Amount (calculated below), on the terms and subject to the conditions set forth in the Offering Memorandum and the Plan.

|  | x | $55.0 million Share Placement Amount | = |  |
|---|---|---|---|---|

Individual Subscription Percentage of the Share Placement Amount you elect to purchase – not to exceed the Maximum Percentage Participation in Item 2

Individual Subscription Amount (rounded up to nearest whole penny)*

* Will be used to calculate how many Share Placement Shares are actually purchased as of the Share Placement Deadline Date. A total enterprise value of $1,215 million to $1,500 million (with a mid- point estimate of approximately $1,358 million) will be used to calculate the number of Share Placement Shares issued. Approximately 3,257,510 Share Placement Shares will be issued in the aggregate with a per share value of approximately $16.88, which shall represent a discount of approximately 35% to the per share value of the common stock of Roust prior to the Share Placement. No fractional shares will be issued. The number of Share Placement Shares will be calculated to one decimal place and rounded to the next lower whole share.

**Item 3.    Procedure for Payment for Subscription.**

The Individual Subscription Amount indicated in Item 2 above must be sent by wire transfer in immediately available funds so that it is received by the Subscription Agent on or before the deadline that will be indicated on the Notice to Provide Payment (the "*Subscription Payment Date*"), which funds will be held by the Subscription Agent until the Effective Date. The Subscription Payment Date is expected to be two (2) Business Days following the posting of the Notice to Provide Payment to the case website at http://dm.epiq11.com/Roust. The Notice to Provide Payment is expected to be posted as soon as practicable following the Share Placement Deadline. The wire instructions for the Subscription Agent will be included in the Notice to Provide Payment.

If (i) prior to the Share Placement Deadline, all of the steps outlined in this Subscription Form are not completed, or (ii) on or prior to the Subscription Payment Date, payment of your Individual Subscription Amount has not been received by the Subscription Agent, you will be deemed to have relinquished and waived your right to participate in the Share Placement (other than in the case of the Backstop Noteholders, each of whom will agree, subject to the terms and conditions set forth in the Backstop Agreement, to purchase, severally and not jointly, its backstop amount of any and all New Common Stock offered in the Share Placement but not subscribed for by Subscribers).

The Parent or the Subscription Agent may give notice of a defect or irregularity to any Subscriber in connection with any purported subscription by such Subscriber and may permit such defect or irregularity to be cured within such time as it may determine in good faith to be appropriate; provided, however, that neither the Issuer nor the Subscription Agent will have any obligation to provide such notice, nor will they incur any liability for failure to give notification.

**Item 4. Subscription Certifications.** I certify that (i) I am the Subscriber, or the authorized signatory of the Subscriber, and (ii) I am, or such Subscriber is, entitled to participate in the Share Placement.

Date:_____          Subscriber Full Legal Account Name:

                             _____

                             Signature:_____

                             Name of Signatory:_____

                             Title:_____

                             Address: _____

                             Address:_____

                             City:_____ State: _____

                             Postal Code:_____

                             Country (if other than United States)_____

                             Taxpayer Identification Number:_____ **and attach W-9**

                             Or if Non-U.S. holder, check here **and attach W-8**:
                                      ☐ Non-U.S. holder

                             Contact Name:_____

                             Contact Telephone Number:_____

                             Contact Email Address:_____

                             Contact Fax Number: _____
                             All requested information must be fully completed. A contact name, telephone number, and email address MUST be included. The contact will be sent the Notice to Provide Payment, and may be contacted if there are any questions in connection with the registration information.

**PLEASE NOTE: NO SUBSCRIPTION WILL BE VALID UNLESS
ALL REQUIRED STEPS ARE TAKEN TO PROCESS YOUR SUBSCRIPTION
ON OR BEFORE THE SHARE PLACEMENT DEADLINE AND PAYMENT OF YOUR INDIVIDUAL
SUBSCRIPTION AMOUNT IS RECEIVED BY THE SUBSCRIPTION AGENT ON OR BEFORE THE
SUBSCRIPTION PAYMENT DATE.**

**<u>THE NOMINEE MUST COMPLETE ITEM 5 ON THE FOLLOWING PAGE</u>.**

**Item 5. Nominee Certification**

---

**For Use Only by the Nominee**

DTC Participant Name: _____

DTC Participant Number: _____

**Principal Amount of Existing Senior Secured Notes, held for this account as of the _____, 2016 Share Placement Record Date:**

CUSIP xxxxx:  $_____

CUSIP xxxxx:  $_____

CUSIP xxxxx:  $_____

**Principal Amount of Existing Junior Convertible Notes, held for this account as of the _____, 2016 Share Placement Record Date:**

CUSIP xxxxx:  $_____

CUSIP xxxxx:  $_____

CUSIP xxxxx:  $_____

**MEDALLION GUARANTEE:**
*(In lieu of providing an original medallion stamp, a Nominee may provide an original notarized signature on this registration instruction sheet and a list of authorized signatories on the letterhead of the Nominee.)*

**NOMINEE CONTACT INFORMATION:**

Contact Name:_____

Contact Telephone Number:_____

Contact Email Address:_____

**PLEASE PRINT CLEARLY!**

**APPENDIX D**

## PROJECTIONS

For purposes of assisting holders of Existing Notes determine whether to accept or reject the Plan of Reorganization, the Projections were prepared by management of Roust. The Projections reflect Reorganized Roust's estimate of the expected consolidated financial position, results of operations and cash flows of Reorganized Roust for fiscal years 2017 through 2020, the first four years during which the consolidated group will operate as one entity. For reference, the section entitled "Unaudited Pro Forma Financial Information" shows illustrative pro forma historical financial statements and relevant assumptions for their calculation. Accordingly, the Projections reflect management's judgement, as of the date of this Offering Memorandum, of expected future operating and business conditions, which are subject to change.

Roust does not, as a matter of course, publish its business plans and strategies or forward looking projections of financial position, results from operations and cash flows. Accordingly, Reorganized Roust does not anticipate that it will, and disclaims no obligation to, furnish updated business plans or projections to the holders of Claims or equity interest after the date of this Offering Memorandum, or to include such information in documents required to be filed with the SEC or to otherwise make such information public.

All estimates and assumptions disclosed herein are those that Reorganized Roust believes to be significant to the Projections. The Projections are forward-looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995. Although the Company's management is of the opinion that these assumptions are reasonable under the circumstances, such assumptions are subject to significant uncertainties, such as (i) spirit consumption volumes, particularly in Poland and Russia; (ii) currency movements, particularly of the Russian Ruble, which directly impacts ability to service U.S. dollar / euro denominated debt; (iii) ability to pass through onto the customer any excise tax and production cost increases; (iv) growth in the non-duty paid spirits market; and (v) the ability of Reorganized Roust to fund working capital through local credit lines, and to secure bank guarantees and factoring required to support normal business activities. Despite management's efforts to foresee and plan for the effects of changes in these circumstances, Reorganized Roust cannot predict their impact with certainty. Consequently, actual financial results could vary significantly from projected results.

THE PROJECTIONS SHOULD NOT BE REGARDED AS A PRESENTATION OR WARRANTY BY REORGANIZED ROUST OR ANY OTHER PERSON AS TO THE ACCURACY OF THE PROJECTIONS OR THAT ANY PROJECTIONS SET FORTH HEREIN WILL BE REALIZED.

THE PROJECTED FINANCIAL INFORMATION WAS PREPARED BY ROUST; IT HAS NOT BEEN AUDITED OR REVIEWED BY INDEPENDENT ACCOUNTANTS. THE SIGNIFICANT ASSUMPTIONS USED IN THE PREPARATION OF THE PROJECTIONS ARE STATED BELOW.

THE PROJECTIONS SHOULD BE READ IN CONJUNCTION WITH THE ASSUMPTIONS AND QUALIFICATIONS CONTAINED HEREIN, THE RISK FACTORS DESCRIBED IN THE OFFERING MEMORANDUM UNDER THE HEADING "RISK FACTORS" AND THE HISTORICAL AUDITED CONSOLIDATED FINANCIAL STATEMENTS INCORPORATED BY REFERENCE AS PART OF THE OFFERING MEMORANDUM.

Please note that the transactions contemplated in this Offering Memorandum may not be accounted for in accordance with "fresh start" accounting rules as per the American Institute of Certified Public Accountant's Statement of Position 90-7. Therefore, the Projections do not reflect any "fresh start" adjustments.

The following Projections are included herein:

- Pro forma projected Consolidated Statements of Income of Reorganized Roust for each of the fiscal years ending December 31st for the period from 2017 through 2020.

- Pro forma projected Consolidated Statements of Cash Flow of Reorganized Roust for each of the fiscal years ending December 31st for the period from 2017 through 2020.

The Projections have been prepared on the basis of generally accepted accounting principles consistent with those currently utilized by Roust in the preparation of its consolidated financial statements, unless noted in the following assumptions. The Projections should be read in conjunction with the significant assumptions, qualifications and notes set forth below.

WHILE ROUST BELIEVES THE ASSUMPTIONS UNDERLYING THE PROJECTIONS, WHEN CONSIDERED ON AN OVERALL BASIS, ARE REASONABLE IN LIGHT OF CURRENT CIRCUMSTANCES AND EXPECTATIONS, NO ASSURANCE CAN BE GIVEN THAT ANY PROJECTIONS WILL BE REALIZED.

A. GENERAL ASSUMPTIONS

FY 2017 THROUGH 2020 PROJECTIONS – MAJOR ASSUMPTIONS

The Projections assume certain specific economic and business conditions for the FY 2017 through FY 2020 period, with general assumptions based upon future industry volume indicators, historic growth and estimated directions of specific brands and markets based on information available. To the extent Reorganized Roust is able to further increase its local lines further beyond historic levels, the Company's liquidity would materially improve beyond what is reflected in the Projections.

In addition to the annual Projections shown herein, the Company estimates seasonal variances in cash due to seasonality in the business. In particular, in January and February, there is an expected working capital movement of $29.7 million largely due to seasonal tax payments and further reduction in DPO to 61 days in Q1 2017 from 78 days in Q3 2016. To manage these liquidity requirements within the year, the Company has a number of potential initiatives that will ensure adequate liquidity in the business going forward, including the ability to accelerate revenues through purchaser deals, additional factoring of accounts receivable and increased financing through local credit facilities.

**General:**

*Methodology*: The Projected Consolidated Statements of Income, capital expenditures and working capital were built on a "top-down" basis based on the achievable volumes for the operating business units

*Effective Date*: The Projections are based on the assumption that the Effective Date occurs on January 1, 2017.

*Industry*: Please refer to the section in the Offering Memorandum under the heading "Business" for an overview of Reorganized Roust's business.

**Projected Consolidated Statement of Operations:**

*Currency*: Reorganized Roust will operate within a number of national markets, including Russia, Poland, Hungary, Ukraine, the United Kingdom, the United States, Germany and Israel, with in excess of 60% of balance sheet debt denominated in U.S. dollars while less than 10% of revenue is generated in U.S. dollars after accounting for the pro forma effect of the Plan. The Projections are therefore reflective of the flat-line estimates of future exchange rates by Roust's management to convert the local currencies into U.S. dollars. Given their volatility, Reorganized Roust's performance throughout the forecast period could differ materially from the Projections.

*Revenues*: Revenue estimates for the business units are based upon several factors including management's estimate of Reorganized Roust's ability to recapture market share in a persistently weak vodka market in Russia and retain already substantial market share in Poland. In other international markets, Reorganized Roust's revenue estimates depend on the continued growth in popularity of key brands such as, but not limited to, Russian Standard Vodka. Management anticipates that there will be no further rounds of excise tax increases in Poland and Russia. To the extent further excise tax increases occur, management anticipates that Reorganized Roust will be able to pass-through cost increases to its customers in the form of higher prices for its core brands.

| (US$ in millions) | Pro Forma Projected Segment Details | | | |
| | Fiscal Year Ending December 31 | | | |
| | 2017 | 2018 | 2019 | 2020 |
| **Segment Revenues** | | | | |
| Gross Revenue - Russia Domestic | $489.8 | $530.7 | $551.1 | $574.6 |
| Net Revenue - Russia Domestic | 212.9 | 231.3 | 239.4 | 248.2 |
| *Gross Revenue (% of Total)* | *26.2%* | *26.6%* | *25.7%* | *25.0%* |
| *Net Revenue / Gross Revenue* | *43.5%* | *43.6%* | *43.4%* | *43.2%* |
| | | | | |
| Gross Revenue - Poland Domestic | $1,162.6 | $1,221.3 | $1,328.6 | $1,438.0 |
| Net Revenue - Poland Domestic | 341.8 | 366.5 | 393.7 | 413.9 |
| *Gross Revenue (% of Total)* | *62.3%* | *61.2%* | *62.0%* | *62.6%* |
| *Net Revenue / Gross Revenue* | *29.4%* | *30.0%* | *29.6%* | *28.8%* |
| | | | | |
| Gross Revenue - International | $213.8 | $244.8 | $264.1 | $284.0 |
| Net Revenue - International | 119.0 | 136.5 | 149.9 | 167.2 |
| *Gross Revenue (% of Total)* | *11.5%* | *12.3%* | *12.3%* | *12.4%* |
| *Net Revenue / Gross Revenue* | *55.7%* | *55.7%* | *56.8%* | *58.9%* |
| | | | | |
| Gross Revenue - Total | $1,866.2 | $1,996.9 | $2,143.7 | $2,296.5 |
| Net Revenue - Total | 673.6 | 734.3 | 783.0 | 829.3 |

*Cost of Goods Sold*: Reorganized Roust's gross margin is forecasted to improve considerably from 44.5% in 2017 to 46.7% in 2020. This margin expansion is primarily due to revenue growth per case driven by discount optimization, and higher prices as the Company shifts towards premium brands, adjusts it channel mix and grows total SKUs.

*Total Operating Cost*: Operating expenses consist of costs related to payroll and benefits, advertising & communications, transport & logistics, general & administrative as well as corporate overhead. Management anticipates some cost reduction associated with back-office and staff related expenses, offset by an increase in marketing expenditure in 2017. Total operating costs are anticipated to decrease as a percentage of revenue throughout the forecast period.

*EBITDA Margin*: The Projections reflect a modest improvement in the EBITDA margin from approximately 18.6% in 2017 to 22.7% in 2020. This margin expansion is driven by growing export volumes, recaptured market share in the Russian market without substantial price competition, optimizing discounts and shifts toward higher margin brand, pack and distribution channel mixes.

*Factoring Costs & Bank Guarantee Fees*: Reorganized Roust will continue to factor a large portion of its accounts receivable and utilize bank guarantee facilities. Due to regulations on the sale of alcoholic products in Russia, excise stamps are required to be paid for, obtained and applied to products before spirits can be sold. Reorganized Roust will rely on access to spirit-related bank guarantees for production. As the Company generates sufficient cash flow throughout the forecast period, it is expected to factor a smaller percentage of total accounts receivable and to do so at lower interest rates.

*Cash Taxes*: The Company pays income taxes in several jurisdictions. The Company is expected to generate positive pre-tax income in the projection period with foreign statutory tax rates of 19% (Poland) and 20% (Russia). The Projections assume that these tax rates remain constant, but these statutory tax rates are projected to be significantly lower than the effective tax rates given considerable net operating losses in recent years.

|  | Pro Forma Statement of Operations | | | |
|  | Fiscal Year Ending December 31 | | | |
| *(US$ in millions)* | 2017 | 2018 | 2019 | 2020 |
|---|---|---|---|---|
| Gross Sales Revenue | $1,866.2 | $1,996.9 | $2,143.7 | $2,296.5 |
| Trade Marketing | (294.5) | (305.8) | (323.0) | (343.6) |
| Excise Taxes | (898.1) | (956.8) | (1,037.6) | (1,123.6) |
| **Net Sales Revenue** | **$673.6** | **$734.3** | **$783.0** | **$829.3** |
| *% Growth* | *N/A* | *9.0%* | *6.6%* | *5.9%* |
| Cost of Goods Sold (excl. D&A) | (374.1) | (402.4) | (424.2) | (442.0) |
| **Gross Margin** | **$299.5** | **$331.8** | **$358.8** | **$387.4** |
| *Gross Margin %* | *44.5%* | *45.2%* | *45.8%* | *46.7%* |
| Total Operating Costs (excl. D&A) | (174.0) | (182.7) | (191.0) | (199.3) |
| **EBITDA** | **$125.5** | **$149.1** | **$167.8** | **$188.1** |
| *EBITDA Margin %* | *18.6%* | *20.3%* | *21.4%* | *22.7%* |
| Depreciation & Amortization | (12.7) | (13.4) | (13.9) | (14.3) |
| **Operating Income** | **$112.8** | **$135.7** | **$154.0** | **$173.8** |
| *Operating Margin %* | *16.8%* | *18.5%* | *19.7%* | *21.0%* |
| Factoring Costs & Bank Guarantee Fees | (22.9) | (22.8) | (23.1) | (23.4) |
| Interest on Local Credit Facilities | (25.1) | (24.8) | (21.9) | (18.6) |
| Interest on Senior Secured Notes | (38.5) | (38.5) | (38.5) | (38.5) |
| Cash Taxes | (2.4) | (3.3) | (4.1) | (5.0) |
| **Net Income** | **$23.9** | **$46.3** | **$66.3** | **$88.2** |

**Projected Statement of Cash Flows:**

*Working Capital*: Balances for accounts receivable, inventory and accounts payable are built on a "top-down" basis considering consolidated gross revenue, cost of goods sold and excluding excise impact for inventory. Roust's payment terms with suppliers and vendors are expected return to normal levels in 2017 and remain relatively unchanged throughout the forecast period. Similarly, Reorganized Roust does not include any reduction to net change in working capital due to improved inventory management.

|  | Pro Forma Working Capital Details | | | |
|  | Fiscal Year Ending December 31 | | | |
| *(US$ in millions)* | 2017 | 2018 | 2019 | 2020 |
|---|---|---|---|---|
| Accounts Receivable | $178.9 | $191.5 | $205.6 | $220.2 |
| Inventory | 30.7 | 33.1 | 34.9 | 36.3 |
| Accounts Payable | (61.5) | (66.2) | (69.7) | (72.6) |
| **Total Working Capital** | **148.2** | **158.4** | **170.7** | **183.9** |
| Net Change in Working Capital | (18.2) | (10.2) | (12.3) | (13.2) |

*Capital Expenditures*: Going forward, management believes $15 million of annual capital expenditures supports the forecasted level of growth for increases in production and distribution capacity.

*Post-restructuring Debt*: Roust maintains local bank lines in Poland and Russia which are serviced through interest payments. The lines currently in place are expected to remain with an increase in 2017 to refinance certain lines with lower interest cost – due to the improved financial condition of Reorganized Roust – and to ensure the Company has sufficient liquidity post-reorganization during its peak working capital season in January and February. In outer years of the forecast, a portion of excess cash flow each period will go to repay select local credit lines with higher interest rates while other similarly expensive facilities will be refinanced to reflect the improved credit quality of the business. As discussed above, the Projections also reflect interest on the secured loan raised in 2016 beyond its maturity at the end of 2017. The Company anticipates that it will be able to refinance the loan on substantially similar terms annually if required. Additionally, the Projections reflect interest expense associated with $385 million principal outstanding of New Senior Secured Notes at a rate of 10.0% per year. The Projections contemplate that the

Appendix D-4

New Senior Secured Notes will remain outstanding until their maturity and thus are not forecasted to be repaid during the projection period.

| (US$ in millions) | Pro Forma Statement of Cash Flows | | | |
|---|---|---|---|---|
| | Fiscal Year Ending December 31 | | | |
| | 2017 | 2018 | 2019 | 2020 |
| EBITDA | $125.5 | $149.1 | $167.8 | $188.1 |
| Changes in Working Capital | (18.2) | (10.2) | (12.3) | (13.2) |
| Other Non-Operating Costs[1] | (11.0) | - | - | - |
| Cash Taxes | (2.4) | (3.3) | (4.1) | (5.0) |
| **Operating Cash Flows** | **$94.0** | **$135.6** | **$151.4** | **$169.9** |
| **Investing Cash Flows** | **($18.4)** | **($15.0)** | **($15.0)** | **($15.0)** |
| Factoring Costs & Bank Guarantee Fees | ($22.9) | ($22.8) | ($23.1) | ($23.4) |
| Interest on Local Credit Facilities | (25.1) | (24.8) | (21.9) | (18.6) |
| Interest on Senior Secured Notes | (38.5) | (38.5) | (38.5) | (38.5) |
| Changes in Borrowings Payable | 20.0 | (12.0) | (15.7) | (20.6) |
| **Financing Cash Flows** | **($66.6)** | **($98.2)** | **($99.2)** | **($101.2)** |
| Cash at Beginning of Period | $30.7 | $39.8 | $62.2 | $99.4 |
| Net Cash Flows | 9.0 | 22.5 | 37.2 | 53.7 |
| **Cash at End of Period** | **$39.8** | **$62.2** | **$99.4** | **$153.1** |

APPENDIX E

## LIQUIDATION ANALYSIS

| Asset Category | Notes | Book Value as of 9/30/2016 | Estimated Recoveries | | | |
|---|---|---|---|---|---|---|
| | | | % Recovery | | $ Recovery | |
| | | | Lower | Higher | Lower | Higher |
| Cash & Cash Equivalents | A | | | | | |
| Cash & Cash Equivalents | | $6.7 | 100% | 100% | $6.7 | $6.7 |
| Restricted Cash | | 0.8 | 0% | 0% | - | - |
| Accounts Receivable | B | | | | | |
| from Third Parties | | 129.1 | 50% | 70% | 64.6 | 90.4 |
| from Related Parties | | 37.3 | 100% | 100% | 37.3 | 37.3 |
| Other | | 44.2 | 50% | 70% | 22.1 | 30.9 |
| Inventories | C | | | | | |
| Raw Materials and Supplies | | 14.6 | 0% | 10% | - | 1.5 |
| In-process Inventories | | 4.1 | 0% | 10% | - | 0.4 |
| Finished Goods and Goods for Resale | | 79.1 | 66% | 82% | 52.2 | 64.9 |
| Property, Plant and Equipment, Net | D | 81.7 | 25% | 50% | 20.4 | 40.9 |
| Prepaid Expenses | E | | | | | |
| To Third Parties | | 7.8 | 0% | 0% | - | - |
| To Related Parties | | 32.4 | 100% | 100% | 32.4 | 32.4 |
| Loans Granted to Related Parties | | 93.2 | 100% | 100% | 93.2 | 93.2 |
| Deferred Income Taxes | E | 4.7 | 0% | 0% | - | - |
| Intangible Assets (primarily Trademarks) | F | 187.5 | 70% | 85% | 131.2 | 159.4 |
| Goodwill[1] | F | 134.6 | 0% | 0% | - | - |
| RDL Contracts | F | 40.0 | 50% | 90% | 20.0 | 36.0 |
| Other Assets (VAT, Income Tax Receivable, etc.) | | 16.1 | 0% | 0% | - | - |
| **Gross Liquidation Proceeds** | | | | | **$480.1** | **$594.0** |

| Liquidation Costs | | | | |
|---|---|---|---|---|
| | Notes | | Lower | Higher |
| Contractual Obligations | G | | | |
| Excise Taxes Payable | | | $94.4 | $94.4 |
| Trustee Fees @ 3% | H | | 14.4 | 17.8 |
| Transaction and Other Admin @ 3% | H | | 14.4 | 17.8 |
| Wind-Down Costs @ 5% | H | | 24.0 | 29.7 |
| **Chapter 7 Fees and Expenses** | | | **$147.2** | **$159.7** |
| **Total Proceeds Available for Distribution** | | | **$332.9** | **$434.3** |

| Distribution of Proceeds | | | | | | |
|---|---|---|---|---|---|---|
| Claim | Notes | Amount | % Recovery | | $ Recovery | |
| | | | Lower | Higher | Lower | Higher |
| Secured Local Credit Lines | I | $191.7 | 100% | 100% | $191.7 | $191.7 |
| Class 2: Senior Secured Notes (Plan Recovery: 100%) | | 487.8 | 29% | 50% | 141.2 | 242.6 |
| Class 3: Junior Convertible Secured Notes (Plan Recovery: 27%) | | 279.2 | 0% | 0% | 0.0 | 0.0 |
| Unsecured Local Credit Lines | | 152.2 | 0% | 0% | - | - |
| Class 7: Existing Roust Interests | | N/A | N/A | N/A | 0.0 | 0.0 |
| **Total Claims** | | **$1,111.0** | **30%** | **39%** | **$332.9** | **$434.3** |

---

*(1) Excludes $40mm of value associated with RDL contracts. RDL was acquired by Roust in December 2015 for an economic value of $40mm.*

## FOOTNOTES TO LIQUIDATION ANALYSIS

## Note A- Cash and Cash Equivalents

Cash & Equivalents consists of cash in the Operating Subsidiaries and Roust's bank accounts, approximately half of which are located in Russia. The analysis assumes that no additional cash will be generated from operations during the liquidation period (other than net proceeds from the disposition of non-cash assets). The estimated recovery for Cash & Cash Equivalents is 100% of book value.

## Note B- Accounts Receivable

The Liquidation Analysis assumes that the liquidator would retain certain existing employees of the Operating Subsidiaries to run a collection effort for the existing accounts receivable from Related Parties. Therefore, Roust has estimated a recovery of 100% of the book value of accounts receivable from Related Parties. For the remaining receivables related to third parties, the Liquidation Analysis assumes that the collection efforts will be less effective than in a going concern situation as some of the key levers to enforce collection (e.g., refusal to continue sales relationships) will no longer be available. The estimated recovery rates are based on management's estimates of collectability. In this Liquidation Analysis, Roust has estimated a net recovery of 50% to 70% of the book value of accounts receivable from third parties and other accounts receivable.

## Note C- Inventories

Inventory includes raw materials, work-in-process, finished goods, and inventory consigned to third parties. Recovery estimates reflect proceeds after shipping costs. Raw material, mainly spirits, would likely be returned to the suppliers given the limited secondary market for these raw materials. Therefore, the analysis assumes recoveries of 0% to 10% on raw materials. Moreover, recoveries are further impacted due to the customized nature of the work-in-process inventory, particularly packaging. Work-in-process has an assumed recovery of 0% to 10% as a result of incomplete product or unfinished job lots. The estimated recovery rates on finished goods inventories are based on management's estimates, which includes segmenting finished goods into slow-moving and easily saleable assets. Slow-moving inventory is estimated to account for approximately 20% of total finished goods and has an estimated recovery of approximately 50% of book value. Easily saleable inventory is estimated to account for the balance (80%) of total finished goods and has an estimated recovery range of 70% to 90% of book value. Importantly, the higher range of recoveries also assumes that Roust is able to retain all required alcohol production licenses without which it would be unable to sell finished product (as it would not be stamped). The resulting weighted average recoveries on finished goods are estimated at 66% to 82% of book value as both segments could be "run-off" through distribution channels.

## Note D- Property, Plant and Equipment, Net

The Operating Subsidiaries currently operate six production plants and lease a number of offices and distribution facilities. The estimated recovery rates are based on management's estimates of sale proceeds. For purposes of the liquidation analysis, a 25% to 50% recovery was assumed for these production facilities, which include a discount to the estimated recoverable value of Plant, Property and Equipment associated with business performed in Russia based on the macroeconomic environment in the country (see "Risk Factors – Risks Related to our Business"). Given the layout of the plants and the nature of the spirits industry, these facilities would likely be of greatest value to those parties who also purchase the brands and do not have sufficient utilization capacity in their own facilities.

## Note E- Prepaid Expenses, Deferred Income Taxes, and Debt Issuance Cost

In this Liquidation Analysis, it is assumed that the estate would receive little to no value for Roust's deferred income tax and debt issuance cost. The majority of the prepaid expenses are associated with related parties. Roust estimates a net 100% recovery on the book value of prepaid expenses associated with related parties. The remaining prepaid expenses are associated with local providers who would likely not refund any prepayments. Therefore, the recovery on these items is assumed to be 0%.

## Note F- Goodwill and Intangibles

This category consists primarily of goodwill, customer lists, and trademarks. Trademarks are assumed to retain 70% to 85% of their book value in a wind down based on the weighted average realizable value of Polish and Russian brands. Due to their rapid growth and sizeable market share (see "Management Discussion and

Analysis of Financial Condition and Results of Operations"), the Polish brands are assumed to recover substantially greater than any Russian trademarks, which would be sold within the context of a weaker macroeconomic environment. No recovery is assumed for goodwill in a liquidation scenario except for goodwill attributable to the acquisition of RDL on December 31, 2015 for assumption of international contracts with respect to Russian Standard Vodka, which are estimated to have a recoverable value of between $20 million and $36 million (or 50% and 90% of carrying value). This range of recoverable value accounts for the approximately nine years remaining on the term of the contract as well as the likelihood that RTL, as counterparty to the RDL contract, chooses to waive the change of control provision.

### Note G- Contractual Obligations

Tax liabilities reflected herein are preliminary in nature and are based on management's initial estimates. As discussed in other sections of this Offering Memorandum, the Operating Subsidiaries make periodic payments to governments in the form of excise taxes. As of September 30, 2016, the Operating Subsidiaries had a consolidated excise tax payable of approximately $94.4 million. Excise tax is deemed payable immediately upon a liquidation given that non- payment could risk removal of licenses, which is not assumed in the Liquidation Analysis.

### Note H- Trustee Fees, Other Professional Fees, Wind- Down Costs of Chapter 7 Estates, and Transaction Fees

Compensation for the Chapter 7 trustee will be limited to fee guidelines in section 326(a) of the Bankruptcy Code. It is assumed that the trustee fees will be 3.0% of gross proceeds available for creditors.

Transaction fees include legal and accounting fees expected to be incurred by the Chapter 7 Trustee during the wind down period and not already deducted from liquidation values. Cost of monthly professional fees for legal, accounting and other staff to assist the estates and the Chapter 7 Trustee with the liquidation process are assumed to be 1.0% of the gross proceeds. Given the jurisdictions of the business units, it is possible that multiple liquidation proceedings would be initiated in several jurisdictions. The transaction and other admin expenses associated with multiple liquidation proceeding are assumed to be an additional 2.0% of the gross proceeds (excluding cash and cash equivalents). Wind-down costs reflect corporate salaries and wages, and facility costs (not considered in the liquidation of inventory), along with employee incentive and/or retention plans during the wind-down period.

### Note I- Local Credit Lines

Roust relies on local credit lines for production. These credit lines are utilized to fund all aspects of production from purchase of raw material to assisting in the payment of excise taxes. Under the Existing Notes, the Company is permitted to raise borrowings up to a certain limit. As of September 30, 2016, indebtedness due to local credit lines was below the limit. Approximately $192 million of local credit lines are secured by pledges on assets at the operating subsidiaries and have first priority on those assets in the event of a liquidation. For the purposes of this Liquidation Analysis, it is assumed that the collateral backing such secured debt (consisting of cash, accounts receivable, inventory, certain plant, property & equipment and certain intangible assets) is sufficient to pay those debts in full. The balance of the local credit lines are unsecured and therefore receive their recoveries on distributable assets after the Existing Notes.

**APPENDIX F**

**VALUATION ANALYSIS**

**A.      Feasibility; Projections.**

The Bankruptcy Code permits a Plan of Reorganization to be confirmed only if confirmation is not likely to be followed by liquidation or the need for further financial reorganization, except as contemplated by the Plan of Reorganization. For purposes of determining whether the Plan of Reorganization meets this requirement, Reorganized Roust has analyzed its ability to meet its obligations under the Plan of Reorganization. As part of this analysis, management has prepared projections of the financial performance of Reorganized Roust for each of the four fiscal years beginning with 2017.

The Projections, and the assumptions on which they are based, are set forth in Appendix D hereto. Based upon these Projections, management believes that Reorganized Roust will be able to make all payments required pursuant to the Plan of Reorganization while conducting ongoing businesses operations and, therefore, that confirmation of the Plan of Reorganization is not likely to be followed by liquidation or the need for further reorganization, except as set forth in the Plan of Reorganization.

THE PROJECTIONS, INCLUDING THE UNDERLYING ASSUMPTIONS, SHOULD BE CAREFULLY REVIEWED IN EVALUATING THE PLAN OF REORGANIZATION. WHILE MANAGEMENT BELIEVES THE ASSUMPTIONS UNDERLYING THE PROJECTIONS, WHEN CONSIDERED ON AN OVERALL BASIS, ARE REASONABLE IN LIGHT OF CURRENT CIRCUMSTANCES AND EXPECTATIONS, NO ASSURANCE CAN BE GIVEN THAT THE PROJECTIONS WILL BE REALIZED. THE MANAGEMENT OF REORGANIZED ROUST MAKES NO REPRESENTATION OR WARRANTY AS TO THE ACCURACY OF THE PROJECTIONS.

Reorganized Roust has prepared the Projections based upon certain assumptions that it believes to be reasonable under the circumstances. Those assumptions that are considered to be significant are described in Appendix D hereto. The Projections have not been examined or compiled by independent accountants. The management of Reorganized Roust makes no representation as to the accuracy of the Projections or its ability to achieve the projected results. All holders of Claims are urged to examine carefully all of the assumptions on which the Projections are based in connection with their evaluation of this Offering Memorandum.

**B.      Valuation.**

  *1.      Overview.*

Roust has been advised by Houlihan Lokey, its financial advisor, with respect to the enterprise value of Roust Corporation (the "*Roust Enterprise Value*"), Russian Standard Vodka (the "*RSV Enterprise Value*") and the consolidated enterprise value of Reorganized Roust on a going concern basis (the "*Reorganized Roust Enterprise Value*"). Solely for purposes of this Offering Memorandum, the analysis performed by Houlihan Lokey indicates that the estimated range of reorganization value of Reorganized Roust is assumed to be $1,215 million to $1,500 million (with a mid- point estimate of approximately $1,358 million) with an assumed valuation date of January 1, 2017. Houlihan Lokey performed this valuation on a sum- of- the- parts basis by assessing and analyzing the two main existing operating entities which will be consolidated to form Reorganized Roust, Roust Corporation and Russian Standard Vodka. The sum-of-the-parts valuation took into consideration the fact that (i) the two businesses are materially different in terms of overall size and scope of operations and (ii) certain non-operating assets of the two entities will be collapsed into Reorganized Roust and will subsequently contribute value indistinguishable from the consolidated business's operations. The Roust Enterprise Value also accounts for the unique characteristics of Roust's operations across different geographies (see "Management Discussion and Analysis of Financial Condition and Results of Operations").

Based upon the estimated range of the Roust Enterprise Value attributable to the Company's operations of $705 million to $930 million (with a mid- point estimate of approximately $818 million) and the estimated range of the RSV Enterprise Value attributable to the entity's operations of $510 million to $570 million (with a mid-point estimate of approximately $540 million), the Reorganized Roust Enterprise Value is estimated to be between $1,215 million to $1,500 million (with a mid- point estimate of approximately $1,358 million). The Reorganized Roust Enterprise Value assumes execution of the Plan of Reorganization, which includes the combination of Roust Corporation and Russian Standard Vodka, resulting in a consolidated business with performance estimated to be substantially in line with the Projections and underlying assumptions in Appendix D. Per the terms of the Plan of Reorganization and solely for the purposes of this Offering Memorandum, Houlihan Lokey has estimated the range of equity value for Reorganized Roust to be between $525 million to $810 million (with a mid- point estimate of approximately $668 million).

The debt facilities contemplated in the range of equity value for Reorganized Roust discussed above include the existing local credit facilities (which reflect the reported balances as of September 30, 2016 and to the extent they are unaffected by the Plan), the New Senior Secured Notes, and recourse factoring and quasifactoring. The transaction contemplated by the Plan is based on an implied equity value of Reorganized Roust of $649.4 million.

There could be substantial upside in the equity value of Reorganized Roust, assuming the EBITDA growth in the projections is realized and the industry valuation multiples stay consistent with levels in the market today. Capitalizing Reorganized Roust's projected EBITDA for 2018 and 2019 by applying the range of 2016E EBITDA multiples implied in the low and high end of the concluded total enterprise valuation range for the Plan of 10.6x and 13.1x and assuming pro forma debt for the restructuring transaction, the implied future equity value of Reorganized Roust would be approximately $890 million to $1,510 million.

THE ESTIMATED HYPOTHETICAL RANGE OF REORGANIZATION VALUES ASSUMES A VALUATION DATE OF JANUARY 1, 2017, REFLECTS WORK PERFORMED BY HOULIHAN LOKEY ON THE BASIS OF INFORMATION CONCERNING THE BUSINESS, AND ASSETS OF ROUST AVAILABLE TO HOULIHAN LOKEY AS OF NOVEMBER 30, 2016. IT SHOULD BE UNDERSTOOD THAT, ALTHOUGH SUBSEQUENT DEVELOPMENTS MAY AFFECT HOULIHAN LOKEY'S CONCLUSIONS, HOULIHAN LOKEY DOES NOT HAVE ANY OBLIGATION TO UPDATE, REVISE, OR REAFFIRM ITS ESTIMATE.

In preparing its analysis of the estimated hypothetical Reorganized Roust Enterprise Value, Houlihan Lokey, among other analyses: (i) reviewed certain historical financial information of Roust and Russian Standard Vodkafor recent years and interim periods, including the most current unaudited financial results through September 30, 2016; (ii) reviewed certain internal and public financial and operating data of Roust and Russian Standard Vodka, including financial projections prepared and provided by management relating to their business and its prospects; (iii) met with certain members of senior management of Roust to discuss Reorganized Roust's operations and future prospects; (iv) reviewed publicly available financial data and considered the market value of public companies which Houlihan Lokey deemed generally comparable to the operating businesses of Reorganized Roust; (v) considered certain economic and industry information relevant to reorganized Roust; and (vi) conducted such other analysis, inquiries, and investigations as it deemed appropriate.

The Projections prepared by management also reflect management's estimates of average currency exchange rates for 2017 through 2020, which convert the revenues and cash flows generated in Poland, Russia, Hungary, the Ukraine and other international segments into U.S. dollars. The valuation prepared by Houlihan Lokey utilizing the Projections is therefore dependent on these forward currency exchange rates. Deviations from these projected rates will have a material impact on the Projections and therefore the valuation discussed herein.

ALTHOUGH HOULIHAN LOKEY CONDUCTED A REVIEW AND ANALYSIS OF REORGANIZED ROUST'S BUSINESS, OPERATING ASSETS AND LIABILITIES AND REORGANIZED ROUST'S PROJECTIONS, IT ASSUMED AND RELIED ON THE ACCURACY AND COMPLETENESS OF ALL (I) FINANCIAL AND OTHER INFORMATION FURNISHED TO IT BY ROUST, AND (II) PUBLICLY AVAILABLE INFORMATION. IN ADDITION, HOULIHAN LOKEY DID NOT INDEPENDENTLY VERIFY MANAGEMENT'S PROJECTIONS IN CONNECTION WITH SUCH ESTIMATES OF THE REORGANIZATION VALUE, AND NO INDEPENDENT VALUATIONS OR APPRAISALS OF ROUST OR RUSSIAN STANDARD VODKA WERE SOUGHT OR OBTAINED IN CONNECTION WITH THE HYPOTHETICAL RANGE OF REORGANIZATION VALUES SET FORTH HEREIN.

THE ESTIMATED HYPOTHETICAL RANGE OF REORGANIZATION VALUES DESCRIBED HEREIN DOES NOT PURPORT TO BE AN APPRAISAL OR NECESSARILY REFLECT THE VALUES WHICH MAY BE REALIZED IF ASSETS ARE SOLD AS A GOING CONCERN, IN LIQUIDATION, OR OTHERWISE.

THE ANALYSIS OF REORGANIZED ROUST'S EQUITY VALUE PREPARED BY HOULIHAN LOKEY REPRESENTS THE HYPOTHETICAL RANGE OF EQUITY VALUES AND IS BASED ON THE ASSUMPTIONS CONTAINED HEREIN. THE ANALYSIS WAS DEVELOPED SOLELY FOR PURPOSES OF THE FORMULATION AND NEGOTIATION OF A PLAN OF REORGANIZATION AND THE DETERMINATION OF IMPLIED RELATIVE RECOVERIES TO CREDITORS THEREUNDER. SUCH ESTIMATES REFLECT COMPUTATIONS OF THE RANGE OF EQUITY VALUES OF REORGANIZED ROUST THROUGH THE APPLICATION OF VARIOUS GENERALLY ACCEPTED VALUATION TECHNIQUES AND DO NOT PURPORT TO REFLECT OR CONSTITUTE APPRAISALS, LIQUIDATION VALUES, OR ESTIMATES OF THE ACTUAL MARKET VALUE THAT MAY BE REALIZED THROUGH THE SALE OF ANY SECURITIES TO BE ISSUED PURSUANT TO THE PLAN, WHICH MAY BE SIGNIFICANTLY DIFFERENT THAN THE AMOUNTS SET FORTH HEREIN.

THE VALUE OF AN OPERATING BUSINESS IS SUBJECT TO NUMEROUS UNCERTAINTIES AND CONTINGENCIES WHICH ARE DIFFICULT TO PREDICT, AND WILL FLUCTUATE WITH CHANGES IN FACTORS AFFECTING THE FINANCIAL CONDITION AND PROSPECTS OF SUCH A BUSINESS. AS A RESULT, THE ESTIMATE OF THE RANGE OF EQUITY VALUES OF REORGANIZED ROUST SET FORTH HEREIN IS NOT NECESSARILY INDICATIVE OF ACTUAL OUTCOMES, WHICH MAY BE SIGNIFICANTLY MORE OR LESS FAVORABLE THAN THOSE SET FORTH HEREIN. BECAUSE SUCH ESTIMATES ARE INHERENTLY SUBJECT TO UNCERTAINTIES, NEITHER ROUST, HOULIHAN LOKEY, NOR ANY OTHER PERSON ASSUMES RESPONSIBILITY FOR THEIR ACCURACY. IN ADDITION, THE VALUATION OF NEWLY ISSUED SECURITIES IS SUBJECT TO ADDITIONAL UNCERTAINTIES AND CONTINGENCIES, ALL OF WHICH ARE DIFFICULT TO PREDICT.

2.    *Assumptions regarding Reorganized Roust*

Solely for purposes of the Plan of Reorganization, with respect to the hypothetical range of Reorganized Roust Enterprise Value, in addition to the foregoing, Houlihan Lokey has relied upon the following assumptions:

- The successful contribution of the Russian Standard Vodka business into Reorganized Roust's;

- The successful restructuring of the capital structures of both Roust Corporation and Russian Standard Vodka concurrently with their consolidation into Reorganized Roust's;

- The implementation of Reorganized Roust's business plan and the achievement of Projections reflected therein;

- The continuing leadership of the existing senior management team of Reorganized Roust following consummation of the Plan of Reorganization contemplated in this Offering Memorandum; and

- The general financial and market conditions will not differ materially from those conditions prevailing as of the date of this Offering Memorandum or through the projection period.

Houlihan Lokey's estimate represents a hypothetical range of value that reflects the estimated intrinsic value of Reorganized Roust derived through the application of various valuation techniques. Such analysis does not purport to represent valuation levels that would be achieved in, or assigned by, the public markets for debt and equity securities or private markets for corporations. Houlihan Lokey's estimate of the hypothetical range of Enterprise Value does not purport to be an appraisal or to necessarily reflect the values which may be realized if assets are sold as a going concern, in liquidation, or otherwise.

i   Valuation Methodology.

The following is a brief summary of certain financial analyses performed by Houlihan Lokey, including a discounted cash flow analysis, publicly traded company analysis and precedent transactions analysis, to arrive at its estimate of the hypothetical range of both Roust Enterprise Value and RSV Enterprise Value. Houlihan Lokey performed certain procedures, including each of the financial analyses described below, and reviewed the assumptions with the management of Roust on which such analyses were based and other factors, including the projected financial results of Reorganized Roust and the pro rata allocation to each of the Roust Corporation and Russian Standard Vodka businesses. Houlihan Lokey's estimates of the hypothetical range of Enterprise Values relied upon the discounted cash flow analysis methodology, publicly traded company analysis and precedent transactions analysis in determining the Roust Enterprise Value and Russian Standard Enterprise Value for reasons described below.

(a)   Discounted Cash Flow Analysis

The discounted cash flow ("*DCF*") valuation methodology relates the value of an asset or business to the present value of expected future cash flows to be generated by that asset or business. The DCF methodology is a "forward looking" approach that discounts the expected future cash flows by an estimated weighted average cost of capital ("*WACC*"). The expected future cash flows have two components: the present value of the projected unlevered free cash flows for a determined period and the present value of the terminal value of cash flows (representing firm value beyond the time horizon of the projections). Houlihan Lokey's discounted cash flow valuation is based on the projection of Roust's and Russian Standard Vodka's operating results. This approach relies on the company's ability to project future cash flows with some degree of accuracy. Since both entities' contribution to the Projections reflect significant assumptions made by its management concerning anticipated results, the assumptions and judgments used in the projections may or may not prove correct and therefore, no assurance can be provided that projected results are attainable or will be realized. Houlihan Lokey cannot and does not make any representations or warranties as to the accuracy or completeness of Reorganized Roust's projections.

(b)   Comparable Companies Analysis

The comparable company analysis involves identifying a group of publicly traded companies whose businesses are similar to those of Roust and Russian Standard Vodka and then calculating ratios of enterprise value to EBITDA of these companies based upon the public market value of such companies' securities. Criteria for selecting comparable companies include, among other relevant characteristics, similar lines of business, business risks, growth prospects, business maturity, market presence, and size and scale of operations. The selection of truly comparable companies is often difficult and subject to interpretation. However, the underlying concept is to develop a premise for relative value, which, when coupled with other approaches, presents a foundation for determining firm value. The ranges of ratios derived were then applied to Reorganized Roust's projected financial results across the two businesses to derive a range of implied values.

(c)      Precedent Transactions Analysis

The comparable transaction analysis estimates value by examining public merger and acquisition transactions involving companies that have operating and financial characteristics similar to Roust's and Russian Standard Vodka's operating businesses. The valuations paid in such acquisitions or implied in such mergers are analyzed as ratios of various financial results. These transaction multiples are calculated based on the purchase price (including any debt assumed) paid to acquire companies that are comparable to Reorganized Roust.

The same factors were used in selecting comparable acquisitions as in the comparable publicly traded company analysis. As with the comparable company analysis, because no acquisition used in any analysis is identical to a target transaction, valuation conclusions cannot be based solely on quantitative results. The reasons for and circumstances surrounding each acquisition transaction are specific to such transaction, and there are inherent differences between the businesses, operations and prospects of each. Therefore, qualitative judgments must be made concerning the differences between the characteristics of these transactions and other factors and issues that could affect the price an acquirer is willing to pay in an acquisition.

THE RANGE OF REORGANIZATION VALUES DETERMINED BY HOULIHAN LOKEY IS AN ESTIMATE AND DOES NOT NECESSARILY REFLECT VALUES THAT COULD BE ATTAINABLE IN PUBLIC OR PRIVATE MARKETS.

**APPENDIX G**

**FINANCIAL STATEMENTS**

**Roust Corporation**

**U.S. Generally Accepted Accounting Principles**

**Interim Condensed Consolidated Financial Statements**

**30 September 2016**

## PART I.    FINANCIAL INFORMATION

**Item 1.  Interim Condensed Consolidated Financial Statements (unaudited)**

### CONSOLIDATED BALANCE SHEETS – UNAUDITED

| | Note | September 30, 2015 | December 31, 2015 | September 30, 2016 |
|---|---|---|---|---|
| | | (unaudited, as recast) | | (unaudited) |
| **ASSETS** | | | | |
| *Current Assets* | | | | |
| Cash and cash equivalents | | $ 15,517 | $ 12,591 | $ 6,652 |
| Restricted cash | 3 | 1,009 | 948 | 834 |
| Accounts receivable, net of allow ance for doubtful accounts at September 30, 2015 of $11,703 at December 31, 2015 of $11,634 and at September 30, 2016 of $11,680 | 4 | 138,810 | 148,350 | 129,136 |
| Related Party receivable, net of allow ance for doubtful accounts at September 30, 2015 of nil, at December 31, 2015 of nil and at September 30, 2016 of nil | 18 | 14,804 | 24,293 | 37,314 |
| Inventories | 5 | 89,873 | 74,818 | 97,898 |
| Prepaid expenses | 6 | 30,362 | 9,975 | 39,486 |
| Loans granted to Related Parties | 18 | 79,361 | 82,671 | 86,488 |
| Other loans granted | | - | 118 | 2 |
| Income taxes receivable | 11 | 6,249 | 2,567 | 2,445 |
| Deferred income taxes | 11 | 10,488 | - | |
| Other current assets | 7 | 49,063 | 31,450 | 57,777 |
| **Total Current Assets** | | $ 435,536 | $ 387,781 | $ 458,032 |
| *Non-Current Assets* | | | | |
| Intangible assets, net | 8 | 181,397 | 169,526 | 187,482 |
| Goodw ill | 9 | 175,917 | 167,393 | 174,592 |
| Property, plant and equipment, net | 10 | 80,821 | 74,671 | 81,705 |
| Deferred income taxes | 11 | 2,605 | 4,875 | 4,692 |
| Loans granted to Related Parties | 18 | 22,472 | 14,628 | 6,744 |
| Other non-current assets | 6 | 886 | 835 | 763 |
| **Total Non-Current Assets** | | $ 464,098 | $ 431,928 | $ 455,978 |
| **Total Assets** | | $ 899,634 | $ 819,709 | $ 914,010 |
| **LIABILITIES AND EQUITY / (DEFICIT)** | | | | |
| *Current Liabilities* | | | | |
| Trade accounts payable | | $ 101,374 | $ 98,558 | $ 99,754 |
| Related Party trade accounts payable | 18 | 12,745 | 20,221 | 8,175 |
| Bank loans and overdraft facilities | 12 | 110,334 | 109,849 | 109,957 |
| Bank loans and borrow ings from Related Parties | 18 | 71,924 | 79,448 | 88,521 |
| Other borrow ings | 12 | 20,454 | 20,618 | 77,923 |
| Interest accrued under New Notes | 12 | 19,358 | 7,743 | 19,358 |
| Income taxes payable | 11 | 7,598 | 6,057 | 6,131 |
| Deferred income taxes | 11 | 955 | - | |
| Taxes other than income taxes | 13 | 128,293 | 111,565 | 133,080 |
| Other accrued liabilities | 14 | 37,440 | 45,887 | 47,594 |
| Other current liabilities | 15 | 15,863 | 20,488 | 14,288 |
| **Total Current Liabilities** | | $ 526,338 | $ 520,434 | $ 604,781 |
| *Non-Current Liabilities* | | | | |
| Non-current obligations under New Junior Convertible Secured Notes | 12 | 241,172 | 253,230 | 265,892 |
| Non-current obligations under New Senior Secured Notes | 12 | 464,590 | 464,590 | 464,590 |
| Interest accrued under New Notes | 12 | 16,776 | 10,376 | 15,525 |
| Non-current bank loans | 12 | 1,158 | 2,707 | 3,192 |
| Non-current bank loans and borrow ings from Related Parties | 18 | 20,292 | 6,944 | 5,970 |
| Non-current other borrow ings | 12 | - | 4,737 | 58,382 |
| Non-current accruals and other long term liabilities | 14, 15 | 18,647 | 17,592 | 2,149 |
| Non-current income taxes payable | 11 | 9,539 | 10,377 | 11,297 |
| Deferred income taxes | 11 | 47,805 | 18,403 | 20,573 |
| Commitments and contingent liabilities | 15 | - | - | |
| **Total Non-current Liabilities** | | $ 819,979 | $ 788,956 | $ 847,570 |
| *Stockholders' Equity / (Deficit)* | | | | |
| Successor common stock  ($0.01 par value, 90,000 shares authorized, 10,000 shares issues and outstanding at December 31, 2015 and September 30, 2016) | 17 | - | - | - |
| Additional paid-in-capital | | (97,727) | (137,727) | (137,727) |
| Accumulated deficit | | (324,267) | (326,878) | (368,506) |
| Accumulated other comprehensive income / (loss) | 25 | (24,879) | (25,252) | (31,808) |
| **Total Equity / (Deficit)  attributable to the Company Stockholders** | | $ (446,873) | $ (489,857) | $ (538,041) |
| Non-controlling interest | | 190 | 176 | (300) |
| **Total Stockholders' Equity / (Deficit)** | | (446,683) | (489,681) | (538,341) |
| **Total Liabilities and Equity / (Deficit)** | | $ 899,634 | $ 819,709 | $ 914,010 |

The accompanying notes are an integral part of the interim condensed consolidated financial statements.

**CONSOLIDATED STATEMENTS OF OPERATIONS AND COMPREHENSIVE INCOME – UNAUDITED**

| | Note | three-month period ended September 30, 2015 (unaudited, as recast) | three-month period ended September 30, 2016 (unaudited) |
|---|---|---|---|
| Sales | | $          338,857 | $          368,382 |
| Sales to Related Parties | 18 | 5,038 | 4,843 |
| Excise taxes | | (201,974) | (213,293) |
| **Net sales** | | **141,921** | **159,932** |
| Cost of goods sold | | 87,728 | 96,577 |
| Cost of goods sold to Related Parties | 18 | 2,531 | 2,566 |
| **Gross profit** | | **51,662** | **60,789** |
| Selling, general and administrative expenses | 20 | 33,303 | 42,339 |
| Provision for doubtful debts | | 571 | 27 |
| **Operating income / (loss)** | | **17,788** | **18,423** |
| *Non-operating income / (expense), net* | | | |
| Interest income | | (45) | 6 |
| Interest income from Related Parties | 18 | 2,886 | 3,749 |
| Interest expense | 21 | (22,219) | (24,554) |
| Interest expense to Related Parties | 18,21 | (1,935) | (3,402) |
| Foreign exchange gains / (losses), net | 22 | (8,297) | (1,811) |
| Other non-operating income / (expense), net | 23 | (3,718) | (8,502) |
| **Income / (loss) before income taxes** | | **(15,540)** | **(16,091)** |
| Income tax benefit / (expense) | | (480) | (2,275) |
| **Net income / (loss)** | | **(16,020)** | **(18,366)** |
| Less net income / (loss) attributable to non-controlling interest | | (119) | (434) |
| **Net income / (loss) attributable to the Company** | | **(15,901)** | **(17,932)** |
| Net income / (loss) per share: basic and diluted | 24 | $          (1,590.10) | $          (1,793.20) |
| Other comprehensive income / (loss), net of tax | | | |
| Foreign currency translation adjustments, net of tax $0 | 25 | 8,395 | 9,254 |
| **Comprehensive income / (loss)** | | $          **(7,625)** | $          **(9,112)** |
| Less comprehensive loss attributable to non-controlling interest | | (119) | (434) |
| **Comprehensive income / (loss) attributable to the Company** | | $          **(7,506)** | $          **(8,678)** |

The accompanying notes are an integral part of the interim condensed consolidated financial statements.

| | Note | nine-month period ended September 30, 2015 (unaudited, as recast) | nine-month period ended September 30, 2016 (unaudited) |
|---|---|---|---|
| Sales | | $ 951,070 | $ 997,693 |
| Sales to Related Parties | 18 | 6,040 | 6,738 |
| Excise taxes | | (571,075) | (589,351) |
| **Net sales** | | **386,035** | **415,080** |
| Cost of goods sold | | 239,406 | 249,990 |
| Cost of goods sold to Related Parties | 18 | 3,285 | 5,760 |
| **Gross profit** | | **143,344** | **159,330** |
| Selling, general and administrative expenses | 20 | 111,161 | 122,706 |
| Provision for doubtful debts | | 1,358 | 1,356 |
| **Operating income / (loss)** | | **30,825** | **35,268** |
| ***Non-operating income / (expense), net*** | | | |
| Interest income | | 71 | 21 |
| Interest income from Related Parties | 18 | 8,083 | 10,957 |
| Interest expense | 21 | (65,809) | (69,906) |
| Interest expense to Related Parties | 18, 21 | (5,394) | (9,436) |
| Foreign exchange gains / (losses), net | 22 | (2,524) | 14,850 |
| Other non-operating income / (expense), net | 23 | (13,206) | (22,219) |
| **Income / (loss) before income taxes** | | **(47,954)** | **(40,465)** |
| Income tax benefit / (expense) | | (2,651) | (1,639) |
| **Net income / (loss)** | | **(50,605)** | **(42,104)** |
| Less net income / (loss) attributable to non-controlling interest | | (180) | (476) |
| **Net income / (loss) attributable to the Company** | | **(50,425)** | **(41,628)** |
| Net income / (loss) per share: basic and diluted | 24 | $ (5,042.50) | $ (4,162.80) |
| **Other comprehensive income / (loss), net of tax** | | | |
| Foreign currency translation adjustments, net of tax $0 | 25 | (14,403) | (6,556) |
| **Comprehensive income / (loss)** | | **$ (65,008)** | **$ (48,660)** |
| Less comprehensive loss attributable to non-controlling interest | | (180) | (476) |
| **Comprehensive income / (loss) attributable to the Company** | | **$ (64,828)** | **$ (48,184)** |

The accompanying notes are an integral part of the interim condensed consolidated financial statements.

**CONSOLIDATED STATEMENTS OF CASH FLOWS – UNAUDITED**

| | nine-month period ended September 30, 2015 (unaudited, as recast) | nine-month period ended September 30, 2016 (unaudited) |
|---|---|---|
| ***Cash flows from operating activities*** | | |
| Net loss attributable to the Company | $ (50,424) | $ (41,628) |
| Net loss attributable to non-controlling interest | (180) | (476) |
| **Net income / (loss)** | **(50,604)** | **(42,104)** |
| ***Adjustments to reconcile net loss to net cash provided by operating activities:*** | | |
| Depreciation and amortization | 7,407 | 8,162 |
| Deferred income taxes | (5,493) | 1,540 |
| Unrealized foreign exchange (gains) / losses | 5,393 | (16,571) |
| Interest accrued (net of interest capitalized) | 50,021 | 52,480 |
| New Convertible Junior Secured Notes interest paid-in-kind | 11,484 | 12,662 |
| Other non cash items | (1,233) | 1,706 |
| Changes in restricted cash | 1,110 | 114 |
| ***Changes in operating assets and liabilities:*** | | |
| Accounts receivable | 8,401 | 12,703 |
| Inventories | 619 | (18,811) |
| Prepayments and other current assets | 1,774 | (36,420) |
| Trade accounts payable | (8,024) | (23,239) |
| Other accrued liabilities and payables (including taxes) | (24,476) | (41,545) |
| **Net cash provided by / (used in) operating activities** | **(3,621)** | **(89,323)** |
| ***Cash flows from investing activities*** | | |
| Purchase of fixed assets | (7,796) | (14,213) |
| Proceeds from the disposal of fixed assets | 97 | 276 |
| Loans granted to related parties | (54,796) | (81,111) |
| Loans repaid by related parties | 40,598 | 14,278 |
| RDL acquisition | (9,000) | (3,883) |
| Roust acquisition | (9,050) | - |
| UTS acquisition prepayment | (11,450) | - |
| **Net cash provided by / (used in) investing activities** | **(51,397)** | **(84,653)** |
| ***Cash flows from financing activities*** | | |
| Borrowings of bank loans, overdraft facility and other borrowings | 115,072 | 212,847 |
| Repayment of bank loans, overdraft facility and other borrowings | (128,119) | (114,091) |
| Related Party Borrowings | 72,439 | 126,580 |
| Payment of Related Party Borrowings | (21,360) | (57,352) |
| Debt issuance costs | - | (1,317) |
| **Net cash provided by / (used in) financing activities** | **38,032** | **166,667** |
| Currency effect on brought forward cash balances | (2,538) | 1,370 |
| **Net increase / (decrease) in cash** | **(19,524)** | **(5,939)** |
| Cash and cash equivalents at beginning of period | 35,041 | 12,591 |
| **Cash and cash equivalents at end of period** | **$ 15,517** | **$ 6,652** |
| | | |
| **Supplemental disclosures of cash flow information** | | |
| Interest paid | $ (41,222) | $ (46,430) |
| Interest received from Related Parties | $ 3,186 | $ 7,806 |
| Income tax (paid) / received | $ (4,553) | $ (1,305) |

The accompanying notes are an integral part of the interim condensed consolidated financial statements.

**NOTES TO THE INTERIM CONDENSED CONSOLIDATED FINANCIAL STATEMENTS
(UNAUDITED)**

## 1.    *ORGANIZATION AND SIGNIFICANT ACCOUNTING POLICIES*

**Organization and Description of the Business**

Roust Corporation, a Delaware corporation incorporated on September 4, 1997, and its subsidiaries (collectively referred to as "ROUST," "we," "us," "our," or the "Company") operate primarily in the alcoholic beverage industry. We are one of the largest producers of vodka in the world and are Central and Eastern Europe's largest integrated spirit beverages business, measured by total volume, with approximately 24.6 million nine-liter cases produced and distributed in 2015. Our business primarily involves the production and sale of our own spirit brands (principally vodka), as well as importing of a wide variety of spirits and wines on an exclusive basis. Our primary operations are conducted in Poland, Russia, Ukraine and Hungary. We have six operational manufacturing facilities located in Poland and Russia. The ultimate beneficial owner of the Company is Mr. Roustam Tariko. ROUST has a total work force of approximately 3,500 employees.

Our brands in Poland and Russia are well-represented in all vodka segments.

We are the largest vodka producer in Poland, with a brand portfolio that includes the *Absolwent*, *Żubrówka*, *Żubrówka Biała*, *Soplica*, *Żytniówka*, *Bols* and *Palace* brands, each of which we produce at our Polish distilleries. Our legendary *Żubrówka* Master Brand has grown rapidly in recent years. In 2014, it grew by 19% compared to 2013 and was the fastest growing brand of vodka in the world by volume. In 2015, *Żubrówka* grew by a further 20% compared to 2014 and achieved an annual volume of 6.2 million nine-liter cases. *Żubrówka* continues to grow in 2016 by a further 17.7% according to Nielsen September year-to-date 2016 compared to the same period in 2015. This result estimates *Żubrówka* as being the world's third largest global brand of vodka.

*Our portfolio strategy in Poland is to focus on our top two brands: Żubrówka and Soplica, as well as three core brands in various price categories: Bols in the premium segment, Żytniówka in the economy segment and Absolwent in the lower mainstream segment. The category is highly driven by innovation, while our portfolio and margin growth are driven by new product development. In 2015, we launched Soplica Walnut and Soplica Strawberry, Absolwent Cherry, Absolwent Tangerine, Absolwent Wild Strawberry, Żytniówka Lemon Peel and two sweet bitter flavors: Żubrówka Pine Shoots and Żubrówka Maple Leaves. We also launched the new 350 ml Soplica flavor packaging.*

*In the first half of 2016, we launched new Żubrówka Czarna in the super premium vodka segment and the flavor line extension: Soplica Blueberry, Soplica Mirabelle Plum, Absolwent Lime, Absolwent Cranberry, Absolwent Strong Cherry, Absolwent Strong Lemon and Żytniówka Ginger. In the third quarter of 2016, we have further extended our portfolio, launching Absolwent Blackberry, Absolwent Plum, Żytniówka Bitter with Quince, and Żytniówka Bitter with Orange.*

In Russia, the world's largest vodka market, trade statistics for 2015 show that we were one of the largest vodka producers in the country. Also in 2015, Roust Russia Group was a nationwide brand leader on the Russian market. Our *Green Mark* brand remains a top-selling mainstream vodka and our *Talka*, *Parliament* and *Zhuravli* brands are among the top-selling sub-premium vodkas in the country. We sell the *Urozhay* and *Yamskaya* brands in the economy segment and *Russian Standard Vodka* – the leading brand in the premium segment. We also started to sell our champion vodka brand *Żubrówka* in Russia from September 2016 (under the trademark *Zubrovka*).

Market and economic conditions have now improved in the third quarter of 2016 resulting in a growing vodka market and improving Roust Russia results. As a consequence Russian revenues in Russian rubles were above last year in September 2016. We expect further improvement of Russian results in the fourth quarter of 2016.

We launched *Talka* in Russia in July 2011, which accounts for almost 2 million nine-liter cases in 2015. In 2015, we restyled *Green Mark* and now we are planning a new design for *Parliament*. We launched new pack sizes to attract a wider range of customers and satisfy a greater scope of consumer demands. We believe our ability to

launch new brands and portfolio extensions onto the market in an ever-changing economic and consumer preference environment gives us a distinct advantage.

We are a leading importer of spirits and wines in Poland and Russia and we generally seek to develop a complete portfolio of premium imported wines and spirits in each of the markets we serve. In Poland, we are maintaining exclusive import contracts for a number of internationally recognized brands, including *Grant's* whisky, *Tullamore Dew* whiskey, *Old Smuggler* whisky, *Balvenie* whisky, *Glen Grant* whisky, *Glenfiddich* whisky, *Wild Turkey* bourbon, *Metaxa* brandy, *Sierra* tequila, *Jägermeister*, *Remy Martin* cognac, *Carlo Rossi* wines, *Concha y Toro* wines, *Torres* wines, *Gancia, Campari, Cinzano, Aperol, Bols* liquors, *Cointreau, Carolans*. In Russia, we expanded our import portfolio with well-known global brands as a result of the Roust Inc. acquisition. We distribute global brands, such as *Jägermeister, Remy Martin, Gancia, Sierra Tequila*, and wine brands, such as *Robert Mondavi, E&J Gallo, Concha y Toro* and *Paul Masson*. In Russia, we also produce ready-to-drink alcoholic beverages: wine-based *Amore*, gin-based *Bravo Classic*, *Elle* and *Russian Bear* with a taste of cognac and almonds. In 2015, we launched a new vodka-based drink, *Green Mark Vodka Orange* and *Green Mark Grapefruit*, as well as new flavors of *Chateau Amore – Pina Colada* and *Mojito*. We also launched *Enerbee's Sting* in the alco-energy segment with a different, non-energy recipe (without caffeine and taurine) to comply with the recent development of legislation and a healthy brand image.

In addition to our operations in Poland and Russia, we have a sales office in Hungary and in Ukraine and distribution agreements in a number of key international markets including the CIS, the Baltic States, Germany, France, the United States and the United Kingdom, for *Green Mark*, *Talka*, *Zhuravli*, *Parliament* and *Żubrówka*. Additionally, as a result of the acquisition of RDL, we have distribution contracts of *Russian Standard Vodka* products in a number of key international markets. In 2015, international sales (excluding Poland domestic and Russia domestic) represented approximately 10.3% of our sales by value. In the nine-month period ended September 30, 2016, they represented approximately 21.6% of our sales by value.

The detailed list of our vodkas and other brands from our portfolio is presented in the Overview section of "Item 2. Management's Discussion and Analysis of the Financial Condition and Results of Operations".

**Basis of Presentation**

These unaudited interim condensed consolidated financial statements were prepared in accordance with US GAAP requirements for interim financial information. In the opinion of the management they include all known accruals and adjustments necessary for a fair presentation of consolidated financial position of the Company and its results of operations and cash flows. All such adjustments are of a normal and recurring nature. As applicable for interim financial information prepared under US GAAP, certain notes and other information have been condensed or omitted from the interim financial statements included in this report, therefore, these unaudited interim condensed consolidated financial statements should be read in conjunction with the consolidated financial statements and related notes included in our Annual Report on Form 10-K for the year ended December 31, 2015, posted to our website on April 1, 2016 (the "2015 Financial Statements").

**Recast of comparative financial information as of September 30, 2015**

In accordance with the Accounting Standards Codification Topic 805-50 ("ASC 805-50") in case of business combination under common control the receiving entity shall present the statement of financial position and other financial information as of the beginning of the period as though the assets and liabilities had been transferred at that date. Financial statements and financial information presented for prior years also shall be retrospectively adjusted to furnish comparative information. All adjusted financial statements and financial summaries shall indicate clearly that financial data of previously separate entities are combined. However, the comparative information in prior years shall only be adjusted for periods during which the entities were under common control.

Common control of RDL and ROUST is deemed to have existed since August 2014, the date of RDL's inception. However, as RDL commenced its activity in June 2015 and RDL's assets, liabilities, income, expenses and cash flows did not have any material impact on ROUST's consolidated financial statements till June 30, 2015, the recast of historical financial statements for the year ended December 31, 2014 and subsequent interim periods ended March 31, 2015 and June 30, 2015 was not performed. The first adjusted comparative periods are three- and

nine-month periods ended September 30, 2015, included in these unaudited interim condensed consolidated financial statements and marked as "recast".

**Liquidity and Going Concern**

These unaudited interim condensed consolidated financial statements have been prepared under the assumption that the Company will continue as a going concern, realizing assets and paying liabilities in the normal course of business.

As of September 30, 2016, the Company has a Stockholder's Deficit of $538.3 million, which is mainly resulting from the impact of the accounting effect of the acquisition of entities under common control and foreign currency translation adjustment. The deficit includes the accounting effect of the business combination with RDL and Roust Inc. under common control amounting to -$290.0 million as described in Note 2 below. Additionally, it includes accumulated negative effect of other comprehensive income resulting from translations of balance sheet and statements of operations items from the functional currency to the reporting currency amounting to $31.8 million.

Taking into account the above, net current liability position and negative operating cash flow as described below, management is implementing a plan to confirm that the business is a going concern. Management considered, among others, the following significant factors:

- Net sales during the nine-month period ended September 30, 2016 is $29.1 million higher than net sales for corresponding 2015 period.

- Our operating income in the nine-month period ended September 30, 2016 was $4.4 million higher and our EBITDA[9] was $5.2 million higher than in the corresponding 2015 period.

- The Company is expanding its marketing activities and continuously focusing on the trade spend efficiency, which we believe will contribute to an increase in sales.

- The Company believes that future cash flows from operations and the available credit bank and factoring facilities of $54.4 million will be sufficient to finance its anticipated cash requirements for working capital purposes and normal capital expenditure.

- We have been able to roll over most of our bank debts as they fall due for several years and believe the loans, which fall due in 2016 and later, as well as factoring facilities, and we expect that such loans will be renewed to manage the Company's working capital needs. Our current debt is primarily in Russia with local Russian banks and our payments of principal and interest due are in full compliance with the debt agreements. We have been working with the banks for several years and no local lenders have ever called in our debt early, even when the Company was going through the Chapter 11 process in 2013. Since September 30, 2016, up to the date of this report we received $6.4 million, repaid $2.6 million and rolled over $44.4 million of principal of our external debt and utilized $5.8 million of recourse factoring (borrowing type) from third parties.

- The acquisition of RDL resulted in the overall improvement of our financial condition and is intended to further strengthen our performance in the international segment. This not only increases our sales and EBITDA, but strengthens the share of our International business, helping further to hedge profit against any Russian ruble depreciation.

- We are working with our Related Parties to maintain favorable Related Party total financing net exposure (calculated as loans granted to and non-operational receivables from Related Parties less borrowings from, off-balance sheet factoring provided by and non-operational liabilities to Related

---

[9] *For more information about EBITDA, which is a non-GAAP financial measure, please see Item 2. "Management's Discussion and Analysis of the Financial Condition and Results of Operations" ("MD&A").*

Parties) over 2016. Our total financing net liability with Related Parties decreased in the third quarter of 2016 by $17.6 million (from $33.5 million to $15.9 million).

At the same time the Company's current liabilities exceed its current assets by $146.8 million and operating cash flow for the nine-month period of 2016 was an outflow of $89.3 million driven by significant investment in working capital to accelerate growth ahead of peak season and interest paid. Operations brought the positive EBITDA of $43.4 million.

Our global business trend is improving with volumes growth of 8.7% in the nine-month period ended September 30, 2016 versus comparable period of 2015, and we see stronger growth potential in the rest of 2016 compared to previous years. However, to continue our accelerated growth we need to invest more in working capital in order to realize the full growth potential of our business. In particular our business requires strong liquidity to increase sales (e.g. to fund suppliers and tax payments) and roll-over or replace short term working capital facilities and factoring lines. The Company believes that it is important to reduce its leverage and create strong balance sheet and liquidity to ensure utilization of its growth opportunities.

In order to ensure we have the necessary capital to achieve the maximum potential of our business, we have engaged in discussions with holders of our outstanding New Senior Secured Notes ("NSSN") and New Convertible Junior Secured Notes ("NCJSN") for possible options that will help us enhance liquidity, and optimize the capital structure to increase enterprise value.

Earlier in November 2016, ROUST announced that it has agreed to a significant transaction with holders of approximately 90% in principal amount of the NSSN and approximately two-thirds in principal amount of the NCJSN (the Supporting Noteholders) and its controlling shareholder to strengthen its capitalization by over $500 million, including a deleveraging of its balance sheet. The transaction would result in the reduction of the Company's existing debt by approximately $462 million, plus funding of $55 million in new equity capital and the contribution of strategic assets, including Russian Standard Vodka, to the Company by RTL. In connection with, among other things, the contribution of such strategic assets to the Company, all intercompany loans owed by RTL to the Company will be considered repaid in full. For more information on the transaction, see our Form 8-K dated November 11, 2016.

As a result of the transaction ROUST combined with Russian Standard Vodka is creating a great global company with strong balance sheet and strong liquidity, that would help to utilize growth opportunities. Upon the successful completion of the transaction, the reduction of indebtedness and the liquidity provided by the new equity capital, will enable ROUST to more effectively execute its business strategy, take advantage of the growth opportunities worldwide, to ensure that it is well positioned for an IPO within the next two to three years.

Based on the significant support the Company has received from holders of its Existing Notes, the interest payment on the NSSN due on October 31, 2016 will be paid in new notes to be issued in accordance with the terms of the anticipated transaction, instead of cash, thereby preserving cash liquidity to capture growth opportunities. The Company has the support of the Consenting Noteholders with respect to such arrangement.

The transaction is expected to be consummated through a prepackaged Chapter 11 plan of reorganization of the Company (the Plan) through a voluntary reorganization case in the United States (the Chapter 11 Case). Only the Company and certain of its U.S. non-operating affiliates would be part of the Chapter 11 Case. None of the Company's operating subsidiaries would be involved in the Chapter 11 Case. The Company intends to commence its Chapter 11 Case in December and expects that the Plan (and related transactions described in this announcement) will be consummated between 35 and 45 days thereafter. Customers, suppliers, employees, trade and other creditors will not be affected by the proposed transaction and should experience no change in the way the Company does business with them.

The Company's ability to meet its obligations depends on the consummation of the Plan being achieved. The consummation of the Plan is subject to a number of conditions, the satisfaction of which cannot be assured, including among other things, the negotiation and agreement of definitive documentation and the provision by the Company of satisfactory and confirmatory due diligence to the consenting noteholders. The Plan would also be subject to obtaining a court confirmation. The terms and conditions of the Plan would be outlined in more detail in a disclosure statement that would be sent to security holders and creditors entitled to vote on the Plan. There can be no

absolute assurance that the Company will be successful, but after carefully considering the above factors and the recent positive performance of the business, management has concluded that the going concern basis of the presentation of the Company's consolidated financial statements is appropriate.

**Recently Issued Accounting Pronouncements**

In June 2015, FASB issued ASU 2015-10 Technical Corrections and Improvements. The amendments cover a wide range of Topics in the FASB Accounting Standards Codification ("Codification"). The amendments represent changes to clarify the Codification, to correct unintended application of guidance and to make minor improvements to the Codification to make it easier to understand and easier to apply however but do not represent changes to core principles of the Codification. We have started to follow the amendments in this update as they became effective and consider them implemented.

In July 2015, FASB issued ASU 2015-11 Inventory (Topic 330), Simplifying the Measurement of Inventory. The amendments apply to inventory that is measured using first-in, first-out (FIFO) or average cost. According to the update an entity should measure inventory at the lower of cost and net realizable value instead of applying measurement at the lower of cost or market. The amendments are effective for fiscal years beginning after December 15, 2016, including interim periods within those fiscal years. The amendments in this update should be applied prospectively with earlier application permitted as of the beginning of an interim or annual reporting period. We reviewed the amendments in ASU 2015-11 and do not expect material impact on our consolidated financial statements. We plan to implement amended requirements in the first quarter 2017.

In February 2016, FASB issued ASU 2016-02 Leases (Topic 842). This update creates a new Topic 842, Leases, of FASB Accounting Standards Codification. The main difference between previous GAAP and Topic 842 is the recognition of lease assets and lease liabilities for those leases classified as operating leases under previous GAAP. The amendments in this update are effective for fiscal years beginning after December 15, 2018, including interim periods within those fiscal years. Early application of the amendments in this update is permitted. We began analysis of the changes and expect the amendments will have a material impact on the Company's financial statements. The Company plans to implement the amendments of this update in the first quarter 2019.

In May and April 2016, FASB issued the following Accounting Standards Updates related to Topic 606, Revenue from Contracts with Customers: ASU 2016-12 Revenue from Contracts with Customers (Topic 606), Narrow-Scope Improvements and Practical Expedients and ASU 2016-10 Revenue from Contracts with Customers (Topic 606), Identifying Performance Obligations and Licensing, respectively. The amendments in these updates clarify the following aspects of Topic 606: assessing collectability, presentation of sales taxes, noncash consideration, and completed contracts and contract modifications at transition and identifying performance obligations and the licensing implementation guidance, while retaining the related principles for those areas. The amendments in these updates affect the guidance in ASU 2014-09, Revenue from Contracts with Customers (Topic 606), which is not yet effective. The effective date and transition requirements for the amendments in these updates are the same as the effective date and transition requirements in Topic 606 (and any other Topic amended by Update 2014-09). ASU 2015-14, Revenue from Contracts with Customers (Topic 606): Deferral of the Effective Date, defers the effective date of ASU 2014-09 by one year. In result of the deferral Topic 606 is effective in annual reporting periods beginning after December 15, 2017, including interim reporting periods within that reporting period. Earlier application is permitted only as of annual reporting periods beginning after December 15, 2016, including interim reporting periods within that reporting period. We are in the process of analyzing the changes in ASU 2014-09 and other related updates and intend to take advantage of the deferral permitted by ASU 2015-14.

In June 2016, FASB issued ASU 2016-13 Financial Instruments - Credit Losses (Topic 326), Measurement of Credit Losses on Financial Instruments. According to the update the incurred loss impairment methodology is replaced with a methodology that reflects expected credit losses and requires consideration of a broader range of reasonable and supportable information to inform credit loss estimates. The amendments in the ASU are effective for fiscal years, and interim periods within those fiscal years, beginning after December 15, 2020. The update can be adopted earlier as of the fiscal years beginning after December 15, 2018, including interim periods within those fiscal years. We are in the process of analyzing the changes in ASU 2016-13 and their impact on our consolidated financial statements. We plan to adopt ASU 2016-13 in the first quarter 2019.

In August 2016, FASB issued ASU 2016-15 Statement of Cash Flows (Topic 230), Classification of Certain Cash Receipts and Cash Payments. The ASU includes specific guidance on the eight cash flow classification issues. This update is effective for fiscal years beginning after December 15, 2017, and interim periods within those fiscal years. Early adoption is permitted, including adoption in an interim period. The amendments in this update should be applied in the same period and using a retrospective transition method to each period presented. We analyzed eight specific cash flow issues amended by ASU 2016-15 and they have no impact on our current period consolidated financial statements. The Company will implement amendments of this update in the future at occurrence of the issues mentioned in ASU 2016-15.

In October 2016, FASB issued ASU 2016-16 Income Taxes (Topic 740), Intra-Entity Transfers of Assets Other Than Inventory. According to the update, an entity should recognize the tax expense from the sale of the asset other than inventory in the seller's tax jurisdiction when the transfer occurs, even though the pre-tax effects of that transaction are eliminated in consolidation. Any deferred tax asset that arises in the buyer's jurisdiction would also be recognized at the time of the transfer. The ASU is effective in fiscal years beginning after December 15, 2017, including interim periods within those years. Early adoption is permitted, but the guidance can only be adopted in the first interim period of a fiscal year. We expect that the adoption of ASU 2016-16 will have no material impact on our consolidated financial statements. We consider to adopt the ASU in the first quarter 2017.

In November 2016, FASB issued ASU 2016-18 Statement of Cash Flows (Topic 230), Restricted Cash. When cash, cash equivalents, restricted cash and restricted cash equivalents are presented in more than one line item on the balance sheet, the new guidance requires a reconciliation of the totals in the statement of cash flows to the related captions in the balance sheet. This reconciliation can be presented either on the face of the statement of cash flows or in the notes to the financial statements. The update is effective in fiscal years beginning after December 15, 2017, and interim periods within those years. We plan to adopt the update in the first quarter of 2018.

Other accounting pronouncements that have been issued since the last annual report for the year ended December 31, 2015 have no impact on the Company's consolidated financial statements nor are expected to have an impact on the Company's consolidated financial statements in future periods.

## Use of Estimates and Interim Period

In the opinion of management, these unaudited interim condensed consolidated financial statements, have been prepared in accordance with the requirements of US GAAP for interim reporting, with the use of certain assumptions and estimates, including all adjustments considered necessary to state such information fairly. In the interim periods, costs and expenses other than product costs are charged to income as incurred, or are allocated among interim periods based on an estimate of time expired, benefit received or activity associated with the periods. Actual results may differ from those estimates. Income taxes are recognized using an estimated annual effective tax rate adjusted for tax amendments related to prior years and changes in estimates.

ROUST's subsidiaries keep their accounts and prepare their statutory financial statements in their respective local currencies. The financial statements of the subsidiaries have been adjusted to reflect US GAAP for interim financial information and in accordance with the instructions to Form 10-Q and Article 10 of Regulation S-X. In the opinion of the management, all adjustments (consisting of normal recurring adjustments) considered necessary to fairly state our financial condition, results of operations and comprehensive income and cash flows for the interim periods have been included. The operating results for the three-month period ended September 30, 2016 are not necessarily indicative of the results that may be expected for the year ending December 31, 2016.

## Critical Accounting Policies and Estimates

### Revenue Recognition

Revenues of the Company include sales of its own produced spirit brands, imported wine and spirit brands as well as other third party alcoholic products purchased locally. The sale of each of these revenue streams is processed and accounted for in the same manner. For all of its sources of revenue, the Company recognizes revenue when persuasive evidence of an arrangement exists, delivery of product has occurred, the sales price charged is fixed or determinable and collectability is reasonably assured. This generally means that revenue is recognized when title

to the products are transferred to our customers. In particular, title usually transfers upon shipment to or receipt at our customers' locations, as determined by the specific sales terms of the transactions.

Sales are stated net of sales tax (VAT) and reflect reductions attributable to consideration given to customers in various customer incentive programs, including pricing discounts on single transactions, volume discounts, promotional listing fees and advertising allowances, cash discounts and rebates. In most countries where the company does business the local authorities impose an alcohol/excise tax. It is generally a sliding scale tax based on alcohol content. In general tax liability is triggered at the moment of sale in Poland and at the spirit purchase in Russia. The payment is due within 25 days of the triggering event in Poland and made in advance in Russia if there is no bank guarantee. If a bank guarantee is issued in Russia the payment may be postponed and will become due within 25 days of the month the triggering event occurred. Net sales are presented net of excise tax.

*Revenue Dilution*

As part of normal business terms with customers, the Company provides for additional discounts and rebates off our standard list price for all of the products we sell. These revenue reductions are typically associated with annual or quarterly purchasing levels as well as payment terms. These rebates are divided into on-invoice and off-invoice discounts. The on-invoice reductions are presented on the sales invoice and deducted from the invoice gross sales value. The off-invoice reductions are calculated based on an analysis performed by management and are provided for in the same period the related sales are recorded. Discounts or fees that are subject to contractual based term arrangements are amortized over the term of the contract. The early payment discounts are also presented as revenue reduction.

*Accounts Receivable*

Accounts receivable are recorded based on the invoice price, inclusive of VAT (sales tax). Past due amounts are determined based on established payment term. The allowances for doubtful accounts are based on our experience with past due accounts, collectability, history of write-offs, aging of accounts receivable, our analysis of customer data and our relationships with the economic status of our customers. Individual trade receivables are provided against when management deems them not to be fully collectable. When a trade account receivable is deemed uncollectible, the balance is charged off against the allowance for doubtful accounts.

The transfer of accounts receivable to financial institutions is accounted for as a sale when all of the following conditions are met: 1) the transferred accounts receivable are isolated from the Company, 2) the receiving financial institution has the right to pledge or sell the factored accounts receivable, and 3) the Company does not maintain effective control over the transferred accounts receivable. Isolation of the transferred accounts receivable from the Company occurs when, based on a legal opinion, it is determined that in accordance with local legislation the transferred accounts receivable are put presumptively beyond the reach of the Company and its creditors even in the event of bankruptcy of the Company. Once it is determined that the transfer of the accounts receivable should be accounted for as a sale, the related accounts receivable are derecognized from the balance sheet, the recourse liability (if applicable) is recorded, and the resulting gain or loss recorded in the statement of comprehensive income / (loss) in the period the transfer is complete.

*Loans Receivable*

Loans receivable are initially measured at fair value plus directly attributable transaction costs, and are subsequently measured at amortized cost using the effective interest method (including interest accruals less provision for impairment).

*Debt*

Debt instruments are measured using effective interest rate method. Debt discounts or premiums and debt issuance costs are amortized into interest expense using the effective interest method.

## 2.   *ACQUISITION UNDER COMMON CONTROL*

**Acquisition of Roust Distribution Limited ("RDL")**

On December 30, 2015 the Company completed its acquisition of Roust Distribution Limited ("RDL") from Roust Trading Ltd. ("RTL") through the transfer of the 100% ownership interest in RDL from RTL to Pasalba Limited, a wholly owned subsidiary of ROUST.

RDL is a worldwide distributor of *Russian Standard Vodka*. Through the acquisition of RDL we acquired the *Russian Standard Vodka* international distribution contracts, which were historically managed by RTL's subsidiaries (other than Roust Corporation and its subsidiaries). The acquisition of RDL was the next step for ROUST in distributing this premium brand globally. It follows the great success of Roust Inc., which distributes *Russian Standard Vodka* in Russia.

*Russian Standard Vodka* have had significant investments globally over recent years. It is now well established brand internationally, being number 3 vodka in UK excluding private labels (after *Smirnoff* and *Glen's*), number 7 in Germany (after for example *Absolut* and *Smirnoff*), number 4 in Global Travel Retail and having 2 million nine-liter cases in 2015, with 12% Compound Annual Growth Rate ("CAGR") over the last 5 years. *Russian Standard Vodka* strengths are authenticity, quality and prominence. These features give us significant competitive advantage being in line with recent trends in global consumptions.

After acquisition of RDL, ROUST has now a full portfolio of brands to compete in western markets in all price segments. Bringing *Russian Standard Vodka* into our international portfolio gives us a significant opportunity to accelerate our market share, in particular in such markets as Germany, France, the UK, the US and Israel. ROUST has now a complete vodka portfolio to serve client's needs on these markets.

Strategically, the Company believes the transaction will allow it to benefit from the significant incremental EBITDA and cash flows of the RDL business, leading to a much stronger position in its International segment of operations, and to capture significant synergies across the key international markets through the integration of the Company's existing own and agency brands portfolios with the leading *Russian Standard Vodka* brand, as well through the integration of sales and route to market opportunities. It strongly supports our objective to become a leading global alcohol business.

Before ROUST entered into this agreement the board of directors of the Company engaged an independent valuation expert to perform a valuation of the RDL business and issue a fairness opinion on its valuation, to ensure that the conditions of the transactions are at least as favorable as might reasonably have been obtained from a non-affiliate. After analyzing the independent valuation and the Company's strategic objectives, an aggregate purchase price for RDL was agreed at $40.0 million. The deposits of $4.8 million and $9.0 million were paid in October and December 2015, respectively. The majority of the consideration amounting to $22.3 million was settled against loans granted by ROUST to Related Parties (within the RTL group of companies). The remaining $3.9 million of the consideration was paid in cash in February 2016.

RDL was incorporated in August 2014 and for 10 months was dormant. In June 2015 RDL started to take over contracts related to international distribution of LLC "Russian Standard Vodka" ("RSV") products that were previously managed by RTL's subsidiaries and established key processes in order to efficiently organize international distribution of alcohol beverages within Roust Corporation Group. No processes used previously by RTL's subsidiaries were taken over by RDL.

*Presentation of Results of Operations after the Acquisition of RDL*

RTL is the sole shareholder of RDL and ROUST, therefore for accounting purposes, the acquisition was accounted for under the "as if pooling-of-interest" method of accounting applicable to the transfer of assets or exchange of equity interests between entities under common control. Under the "as if pooling-of-interest" method of accounting, the value of the assets and liabilities transferred is recognized at historical carrying costs as of the date of the transfer, rather than at fair value.

As RDL commenced its activity in June 2015, there was no impact on prior period income or expense or assets and liabilities under the "as if pooling-of-interests" method. Given that RDL established its own processes, management has determined the contracts taken over by RDL from RTL subsidiaries, prior to the acquisition of

RDL by ROUST, RDL did not represent a business and therefore prospective accounting for the activities of RDL is appropriate.

The RDL transaction has an economic value of $40.0 million, however that value is not reflected in our accompanying financial statements as an asset. The treatment of an acquisition on a common control basis versus the traditional approach of fair valuing the assets acquired and liabilities assumed is based on the concept that because there is a controlling shareholder on both seller and buyer sides of the transaction, the transaction misses the fundamental third party aspect to validate its value. However, as required by the indentures of our long-term debt, the Company followed a stringent corporate governance process in approving the transaction to ensure that all parties were treated on an arm's length basis. In particular, the valuation of RDL was subject to an independent third party assessment that was used as the basis to negotiate the final purchase price. Under common control accounting, and as opposed to typical purchase accounting in an acquisition, the "difference" between the historical net assets of the acquired company and the total consideration paid is charged to equity, whereas in the typical acquisition accounting, the net assets are fair valued and the difference goes to goodwill. The effect on the balance sheet for a common control transaction, therefore, is that net equity will typically be lower than in a purchase accounting situation. In effect, under common control the goodwill (or "premium" paid over the historical net assets) is written off to equity on the date of the combination. The Company recognized $40.0 million, being the difference between net assets of the acquired entity and consideration paid, as a decrease in equity (whole amount was charged to additional paid in capital). Therefore, the common control treatment of the transaction has substantially decreased our book equity, despite the fact that the transaction has an economic value of $40.0 million.

*Significant Changes in Shareholder's Equity*

As noted above, the accounting for the RDL acquisition under common control resulted in the excess of the purchase price of the transaction of $40.0 million over the book value of RDL being charged immediately to our stockholders' equity. It resulted in the Total Stockholders' Deficit at the end of 2015 amounting to $489.7 million.

Our combined shareholder's equity, immediately before the book keeping entry for the RDL common control acquisition, was a retained deficit of approximately $449.7 million.

In addition, as disclosed in our Annual Report on Form 10-K for the year ended December 31, 2014, Total Stockholders' Deficit as of December 31, 2014 was also impacted by the similarly accounted transaction of Roust Inc. common control acquisition in 2014 amounting to $250.0 million.

## 3.    RESTRICTED CASH

As of September 30, 2015 the Company had $0.4 million of deposits with custom offices and $0.6 million of bank guarantees. As of December 31, 2015 the Company had $0.3 million of deposits for custom office, and $0.6 million of bank guarantees. As of September 30, 2016 the Company had $0.8 million of bank guarantees. The Company has presented these funds as restricted cash since the use of the funds is restricted to pre-determined use.

## 4.    ACCOUNTS RECEIVABLE

**Sale of Accounts Receivable (Factoring)**

From time to time the Company enters into factoring arrangements with financial institutions to sell trade accounts receivable under recourse and non-recourse agreements. As of September 30, 2015, December 31, 2015, and September 30, 2016 the Company was a party to the following factoring agreements:

| Party to the agreement | Date of signing the agreement | Recourse/ Non-recourse | Financing limit under the Agreement | Status as of September 30, 2015 (unaudited, as recast) | Status as of December 31, 2015 | Status as of September 30, 2016 (unaudited) |
|---|---|---|---|---|---|---|
| Financial Institution 1 | April 2015 | non-recourse | none | active | active | closed, transferred to Financial Institution 2 (see below) |
| Financial Institution 2 | February 2016 | non-recourse | none | N/A | N/A | active |
| Financial Institution 3 | January 2012 | non-recourse | none | active | active | active |
| Financial Institution 4 | August 2012 | non-recourse | none | active | active | active |
| Financial Institution 5 | January 2013 | non-recourse | 60 million Polish zloty till April 14, 2013; 82 million Polish zloty till November 4, 2013; 150 million Polish zloty till January 13, 2014; 200 million Polish zloty till March 31, 2014; 190 million Polish zloty till May 4, 2014 and 180 million Polish zloty since May 5, 2014 (as per appendix signed) | active | active, in proces of transfer to Financial Institution 2 (see below) | closed, transferred to Financial Institution 2 (see below) |
| Financial Institution 2 | December 2015 | non-recourse | 180 million Polish zloty | N/A | active | active |
| Financial Institution 1 | February 2013 | recourse (borrow ing type) / non-recourse | initially only service factoring w ithout financing; 20 million Polish zloty since December 2013; 37 million Polish zloty since August 2014 (recourse option added as per appendix signed) | active | active | active |
| Financial Institution 5 | March 2013 | non-recourse | none | active | active | closed, transferred to Financial Institution 6 (see below) |
| Financial Institution 6 | March 2016 | non-recourse | none | N/A | N/A | active |
| Financial Institution 7 | May 2014 | non-recourse | none | active | active | active |
| Financial Institution 8 | October 2014 | non-recourse | 30 million Polish zloty | active | active | active |
| Financial Institution 8 | October 2014 | recourse (borrow ing type) | 60 million Polish zloty till December 22, 2014; 95 million Polish zloty till January 15, 2015; 75 million Polish zloty till February 15, 2015; 60 million Polish zloty since February 16, 2015; 95 million Polish zloty in period November 1, 2015 - February 29, 2016; 60 million Polish zloty in period March 1, 2016 - March 22, 2016; 105 million Polish zloty since March 23, 2016; (as per appendix signed) | active | active | active |
| Financial Institution 9 | February 2016 | non-recourse | 15 million Polish zloty | N/A | N/A | active |
| Financial Institution 10 | December 2013 | recourse* | 3,000 million Russian rubles | active | active | active |
| Financial Institution 11 | October 2014 | recourse* | 500 million Russian rubles | active | active | active |
| RSB | December 2015 | non-recourse | 1,085 million Russian rubles | N/A | active | active |
| RSB | April 2016 | non-recourse | 2,700 million Russian rubles | N/A | N/A | active |
| RSB | June 2016 | non-recourse | 2 million EUR | N/A | N/A | active |
| Financial Institution 12 | October 2014 | recourse (borrow ing type) | 440 million Hungarian forints till June 21, 2015; 874 million Hungarian forints since June 22, 2015; 1,748 million Hungarian forints since September 19, 2016 till February 28, 2017; 874 million Hungarian forints after that date | active | active | active |

*These recourse factoring agreements were not qualified as a secured borrowing. As a result, the underlying receivables were derecognized and no liability was recognized.*

The Company has no continuing involvement with the receivables sold under non-recourse factoring agreements. In case of such arrangements, the receivables are derecognized upon sale to the factor. There is no Company's liability for the potential future non-performance of the original debtor.

In case of recourse factoring, if the Company's original debtors will not pay the amounts due under the factoring agreement, the factors have the right to require payments from the Company. The accounting treatment of recourse factoring arrangements is twofold and is dependent on the specific provisions of the particular arrangement:

- recourse factoring accounted for as a secured borrowing (borrowing type) – the receivables are not derecognized and the related liability to the factor is recognized;

- recourse factoring not qualified as a secured borrowing - as there are no substantial risks of the debtors not paying on time the receivables are derecognized; separately a potential liability to the factor is considered. In case of potential future non-performance of the original debtor the Company would have to re-recognize the receivable from the debtor and recognize related liability to the factor. The Company considers risk associated with the agreements on recourse factoring

not qualified as a secured borrowing as low. Based on our history we have not faced such obligations yet.

The table below summarizes our exposure to potential re-recognition of the transferred financial assets under recourse factoring arrangements not qualified as secured borrowings.

| September 30, 2015 (unaudited, as recast) | | December 31, 2015 | | September 30, 2016 (unaudited) | |
|---|---|---|---|---|---|
| Carrying amount of receivables derecognized | Gross cash proceeds received for assets derecognized | Carrying amount of receivables derecognized | Gross cash proceeds received for assets derecognized | Carrying amount of receivables derecognized | Gross cash proceeds received for assets derecognized |
| $ 42,846 | $ 38,562 | $ 39,826 | $ 35,843 | $ 55,680 | $ 50,112 |

Due to the short-term nature of factored receivables their carrying values approximate their fair values.

The Company entered into certain recourse factoring agreements which are qualified as secured borrowings. As of September 30, 2015, December 31, 2015 and as of September 30, 2016 our gross obligations resulting from recourse factoring accounted for as secured borrowings amounted to $18.3 million, $27.8 million and $28.4 million, respectively (see also Note 12 "Notes and Borrowings"). All of our obligations of this type mature up to 90 days.

During the three-month period ended September 30, 2016 certain customers repaid the factored amounts to the Company instead of the factor. As a result the Company has a liability of $60.7 million, which is presented as other borrowings in our balance sheet as of September 30, 2016 ($20.5 million as of September 30, 2015 and $19.3 million as of December 31, 2015). For details refer to Note 1, section "Critical Accounting Polices and Estimates" and Note 12 "Notes and Borrowings".

During the three-month period ended September 30, 2015 and the three-month period ended September 30, 2016, we recognized costs related to factoring in the statement of operations and comprehensive income in the amounts of $2.2 million and $6.2 million, respectively.

During the nine-month period ended September 30, 2015 and the nine-month period ended September 30, 2016, we recognized costs related to factoring in the statement of operations and comprehensive income in the amounts of $8.5 million and $16.4 million respectively.

## 5.    INVENTORIES

The table below summarizes our inventories and inventories consigned to others.

| | September 30, 2015 (unaudited, as recast) | December 31, 2015 | September 30, 2016 (unaudited) |
|---|---|---|---|
| Raw materials and supplies | $ 12,343 | $ 12,516 | $ 14,641 |
| In-process inventories | 2,664 | 3,251 | 4,146 |
| Finished goods and goods for resale | 74,866 | 59,051 | 76,651 |
| **Total** | **$ 89,873** | **$ 74,818** | **$ 95,438** |
| Inventories consigned to others | - | - | 2,460 |
| **Total inventories, including consigned to others** | **$ 89,873** | **$ 74,818** | **$ 97,898** |

Because of the nature of the products supplied by the Company, great attention is paid to inventory rotation. The number of days in inventory amounted to 28 days, 23 days and 28 days as of September 30, 2015 and December 31, 2015 and September 30, 2016, respectively.

Consigned inventory is typically inventory placed in third party warehouses. The Company still retains control over the inventory. As of September 30, 2015 and December 31, 2015 and September 30, 2016 inventory consigned to others amounts to nil, nil and $2.5 million, respectively.

## 6.    PREPAID EXPENSES

The table below presents balances of our prepaid expenses.

| | September 30, 2015 (unaudited, as recast) | | December 31, 2015 | | September 30, 2016 (unaudited) |
|---|---|---|---|---|---|
| Prepaid expenses - current | $ | 30,362 | $ | 9,975 | $ | 39,486 |
| Prepaid expenses - non current | | 806 | | 805 | | 733 |
| **Total** | **$** | **31,168** | **$** | **10,780** | **$** | **40,219** |
| of which: | | | | | | |
| Prepaid to Related Parties | $ | 23,732 | $ | 5,780 | $ | 32,439 |

The prepaid expenses comprise prepaid insurance and prepaid marketing services which will be performed in future periods, as well as prepayments for goods for resale and for spirit.

Prepaid expenses to Related Parties as of September 30, 2015 include other prepayments of $12.8 million, prepayments for goods of $10.6 million and prepayments for spirit of $0.3 million. As of September 30, 2015 other current prepayments consist mainly of an advance payment on acquisition of LLC "Union Trust Stroy''. Prepaid expenses to related Parties as of December 31, 2015 include prepayments for purchases of goods of $5.8 million. As of September 30, 2016 prepaid expenses to Related Parties consist of prepayments for purchases of goods of $32.4 million (prepaid by RDL and Roust Russia). The remaining amount as of September 30, 2016 relates to other prepayments.

## 7.    OTHER CURRENT ASSETS

The table below summarizes our other current assets.

| | September 30, 2015 (unaudited, as recast) | | December 31, 2015 | | September 30, 2016 (unaudited) |
|---|---|---|---|---|---|
| Other accounts receivable | $ | 20,953 | $ | 15,981 | $ | 44,200 |
| Short-term investments | | 9,000 | | - | | - |
| VAT | | 9,087 | | 9,021 | | 7,230 |
| Other taxes and duties | | 10,007 | | 6,426 | | 6,330 |
| Other current assets | | 16 | | 22 | | 17 |
| **Total** | **$** | **49,063** | **$** | **31,450** | **$** | **57,777** |

The following table summarizes other accounts receivable.

| | September 30, 2015 (unaudited, as recast) | | December 31, 2015 | | September 30, 2016 (unaudited) |
|---|---|---|---|---|---|
| Receivables related to amounts held by factors | $ | 3,255 | $ | 4,933 | $ | 13,832 |
| Recharges receivable for marketing services | | 6,186 | | 4,718 | | 15,279 |
| Receivables from subcontracted producers | | 4,604 | | 490 | | 242 |
| Receivables from employees | | 300 | | 301 | | 467 |
| Other receivables | | 6,574 | | 5,539 | | 14,377 |
| Receivable from the insurer related to the claim | | 3 | | - | | 3 |
| Receivables from consignment partners (prebuild partners) | | 31 | | - | | - |
| **Total** | **$** | **20,953** | **$** | **15,981** | **$** | **44,200** |

Significant increase (September 2016 vs. December 2015) in other accounts receivable is caused mainly by increase of receivables related to the factoring, growth of marketing services recharge receivable and the recognition of $6.2 million of the non-operational receivable from Related Party resulting from the assignment of loan granted for consideration.

8.    *INTANGIBLE ASSETS OTHER THAN GOODWILL*

Intangible assets other than goodwill consist of trademarks and related rights. These trademarks include Soplica, Żubrówka, Absolwent, Royal, Parliament, Talka, Green Mark, Zhuravli and the trademark rights to Bols Vodka in Poland and Hungary. Management considers trademarks associated with high or market-leader brand recognition within their market segments to be indefinite-lived assets, based on the length of time they have existed, the comparatively high volumes sold and their general market positions relative to other products in their respective market segments.

Intangible assets with an indefinite life are not amortized but are reviewed for impairment annually or more frequently, if facts and circumstances indicate such need. As described in the 2015 Financial Statements, the Company performed its annual impairment test of trademarks as of December 31, 2015. The test indicated that no trademarks were impaired, the fair market value of each trademark was above its carrying value.

Management closely monitors performance of each trademark throughout the year. No impairment charge was recognized during the three-month period ended September 30, 2015 or during the three-month period ended September 30, 2016.

Accumulated impairment related to trademarks as of December 31, 2015 and September 30, 2016 amounts to $26.0 million and $30.3 million, respectively. The main changes in the value of our trademarks between December 31, 2015 and September 30, 2016 resulted from foreign exchange rates movements.

The table below summarizes balances and movements in our intangible assets other than goodwill.

| | Trademarks and trademark rights | Other Intangible assets | Total Intangible assets |
|---|---:|---:|---:|
| **Balance as of January 01, 2015** | $ 197,947 | $ 1,291 | $ 199,238 |
| Acquisition during the period | - | 62 | 62 |
| Depreciation charge for the period | - | (151) | (151) |
| Effect of translation | (8,478) | 2 | (8,476) |
| **Balance as of March 31, 2015 (unaudited)** | $ 189,469 | 1,204 | 190,673 |
| Acquisition during the period | - | 16 | 16 |
| Depreciation charge for the period | - | (185) | (185) |
| Effect of translation | 4,308 | 51 | 4,359 |
| **Balance as of June 30, 2015 (unaudited)** | $ 193,777 | 1,086 | 194,863 |
| Depreciation charge for the period | - | (145) | (145) |
| Effect of translation | (13,171) | (150) | (13,321) |
| **Balance as of September 30, 2015 (unaudited, as recast)** | $ 180,606 | 791 | 181,397 |

| | Trademarks and trademark rights | Other Intangible assets | Total Intangible assets |
|---|---:|---:|---:|
| **Balance as of January 01, 2016** | $ 168,922 | $ 604 | $ 169,526 |
| Depreciation charge for the period | (1) | (110) | (111) |
| Effect of translation | 9,810 | 462 | 10,272 |
| **Balance as of March 31, 2016 (unaudited)** | $ 178,731 | 956 | 179,687 |
| Acquisition during the period | - | 411 | 411 |
| Disposals during the period | - | (162) | (162) |
| Depreciation charge for the period | (1) | (139) | (140) |
| Effect of translation | (2,156) | (369) | (2,525) |
| **Balance as of June 30, 2016 (unaudited)** | $ 176,574 | 697 | 177,271 |
| Acquisition during the period | - | 6,003 | 6,003 |
| Depreciation charge for the period | (1) | (140) | (141) |
| Effect of translation | 4,342 | 7 | 4,349 |
| **Balance as of September 30, 2016 (unaudited)** | $ 180,915 | 6,567 | 187,482 |

9.    *GOODWILL*

Goodwill is not amortized but is reviewed for impairment annually, or more frequently, if facts and circumstances indicate such need. As described in the 2015 Financial Statements, the Company performed its annual impairment test of goodwill as of December 31, 2015. As a result of this test no impairment charge was recognized in 2015. Management closely monitors performance of each business unit based on the analysis of year to date performance aligned with the expected year-to-go results, as well as benchmarking versus current macroeconomic and industry market factors. The Company assessed that there were no impairment indicators in the three-month period ended September 30, 2016. As a result no impairment test was performed during this period. Accumulated impairment related to goodwill as of December 31, 2015 and September 30, 2016 amounts to $12.2 million and $12.1 million, respectively (including foreign exchange impact). Changes in the net value of goodwill between December 31, 2015 and September 30, 2016 were the result of foreign exchange rates movements.

The table below summarizes balances and movements in goodwill.

|  | | Poland | | Russia | | Hungary | | Total |
|---|---|---|---|---|---|---|---|---|
| Balance as of January 1, 2015 | $ | 139,206 | $ | 40,598 | $ | 11,328 | $ | 191,132 |
| Foreign currency translation adjustment | | (11,149) | | 409 | | (807) | | (11,547) |
| Balance as of March 31, 2015 (unaudited) | $ | 128,057 | | 41,007 | | 10,521 | | 179,585 |
| Foreign currency translation adjustment | | 1,633 | | 1,465 | | (143) | | 2,955 |
| Balance as of June 30, 2015 (unaudited) | $ | 129,690 | | 42,472 | | 10,378 | | 182,540 |
| Foreign currency translation adjustment | | (374) | | (6,388) | | 139 | | (6,623) |
| Balance as of September 30, 2015 (unaudited, as recast) | $ | 129,316 | | 36,084 | | 10,517 | | 175,917 |

|  | | Poland | | Russia | | Hungary | | Total |
|---|---|---|---|---|---|---|---|---|
| Balance as of January 1, 2016 | $ | 125,149 | $ | 32,012 | $ | 10,232 | $ | 167,393 |
| Foreign currency translation adjustment | | 4,731 | | 2,909 | | 375 | | 8,015 |
| Balance as of March 31, 2016 (unaudited) | $ | 129,880 | $ | 34,921 | $ | 10,607 | $ | 175,408 |
| Foreign currency translation adjustment | | (7,222) | | 1,921 | | (287) | | (5,588) |
| Balance as of June 30, 2016 (unaudited) | $ | 122,658 | | 36,842 | | 10,320 | | 169,820 |
| Foreign currency translation adjustment | | 3,962 | | 515 | | 295 | | 4,772 |
| Balance as of September 30, 2016 (unaudited) | $ | 126,620 | | 37,357 | | 10,615 | | 174,592 |

## 10. PROPERTY, PLANT AND EQUIPMENT

The table below summarizes balances of our property, plant and equipment.

|  | | September 30, 2015 (unaudited, as recast) | | December 31, 2015 | | September 30, 2016 (unaudited) |
|---|---|---|---|---|---|---|
| Land and Buildings | $ | 52,580 | $ | 48,060 | $ | 53,964 |
| Equipment and other fixed assets | | 25,300 | | 27,821 | | 28,225 |
| Motor vehicles | | 6,323 | | 6,066 | | 7,196 |
| Motor vehicles under lease | | 4,144 | | 3,934 | | 3,707 |
| Computer hardware and software | | 6,301 | | 6,067 | | 6,825 |
| Fixed assets under construction | | 2,516 | | 3,227 | | 6,866 |
| Other fixed assets under lease | | 3,510 | | - | | 4,124 |
| Total gross book value | | 100,674 | | 95,175 | | 110,907 |
| Less - Accumulated depreciation | | (18,218) | | (18,783) | | (26,462) |
| Less - Accumulated depreciation of leased assets | | (1,635) | | (1,721) | | (2,740) |
| Total | $ | 80,821 | $ | 74,671 | $ | 81,705 |

Property, plant and equipment is presented net of accumulated depreciation in the consolidated balance sheets. Depreciation expenses for three-month period ended September 30, 2015 and September 30, 2016 amounted to $2.3 million and $2.5 million respectively. Depreciation expenses for nine-month period ended September 30, 2015 and September 30, 2016 amounted to $6.5 million and $7.7 million respectively. The accumulated depreciation of property, plant and equipment as of September 30, 2015, December 31, 2015 and September 30, 2016 amounted to $19.8 million, $20.5 million and $29.2 million, respectively.

## 11. INCOME TAXES

The tax charge for the three-month period ended September 30, 2015 was $0.5 million which represents an effective tax rate for this period of negative 3.1%. The tax charge for the nine-month period ended September 30, 2015 was $2.7 million which represents an effective tax rate for this period of negative 5.5%.

Our tax loss for the three-month period ended September 30, 2016 was $2.3 million which represents an effective tax rate for this period of negative 14.1%. Our tax loss for the nine-month period ended September 30, 2016 was $1.6 million which represents an effective tax rate for this period of negative 4.1%.

The Company's underlying tax rates in key jurisdictions are 20% in Russia, 19% in Poland and Hungary, 18% in Ukraine and 35% in the United States. The difference between the effective tax rate and the statutory rates for the nine-month periods ended September 30, 2015 and 2016 was primarily due to a valuation allowance recorded against tax loss carryforwards that the Company believes will not be utilized in the future.

As of September 30, 2015, December 31, 2015 and September 30, 2016 the uncertain income tax position balance was $12.3 million, $11.0 million and $11.4 million, respectively. Changes in the Company's uncertain income tax positions are presented in the table below.

| | | three-month period ended September 30, 2015 (unaudited, as recast) | | three-month period ended September 30, 2016 (unaudited) | |
| --- | --- | --- | --- | --- | --- |
| | | Unrecognized income tax benefits | Interest and penalties | Unrecognized income tax benefits | Interest and penalties |
| **Balance, beginning of the period** | $ | 10,127 | 3,262 | $ 8,921 | 3,302 |
| Additions based on tax positions related to the current period | | 479 | 148 | 120 | 29 |
| Additions of tax positions of prior periods | | - | 156 | 17 | 174 |
| Reductions of tax positions of prior periods | | - | - | (789) | (400) |
| Reduction of tax positions relating to settlements with tax authorities | | - | - | (46) | (19) |
| Foreign currency translation adjustments | | (1,396) | (492) | 76 | 33 |
| **Balance, end of period** | $ | 9,210 | 3,074 | $ 8,299 | 3,119 |

| | | nine-month period ended September 30, 2015 (unaudited, as recast) | | nine-month period ended September 30, 2016 (unaudited) | |
| --- | --- | --- | --- | --- | --- |
| | | Unrecognized income tax benefits | Interest and penalties | Unrecognized income tax benefits | Interest and penalties |
| **Balance, beginning of the period** | $ | 12,058 | 2,786 | $ 8,287 | 2,733 |
| Additions based on tax positions related to the current period | | 1,658 | 435 | 167 | 41 |
| Additions of tax positions of prior periods | | 335 | 614 | 243 | 622 |
| Reductions of tax positions of prior periods | | (3,764) | (345) | (795) | (546) |
| Reduction of tax positions relating to settlements with tax authorities | | - | (18) | (539) | (87) |
| Lapse of statute of limitations | | - | - | (34) | (18) |
| Foreign currency translation adjustments | | (1,077) | (398) | 970 | 374 |
| **Balance, end of period** | $ | 9,210 | 3,074 | $ 8,299 | 3,119 |

## 12.    NOTES AND BORROWINGS

### Existing Notes

*New Senior Secured Notes*

On June 5, 2013, the Company along with CEDC Finance Corporation International, Inc. ("Issuer"), entered into an Indenture between the Company, certain subsidiary guarantors and US Bank N.A., as the Trustee. In connection with the New Senior Secured Notes Indenture, the Company issued $464.6 million Senior Secured Notes

due in 2018 (the "New Senior Secured Notes" or "NSSN") to the holders of the SSN, which were cancelled pursuant to the Plan of Reorganization (as described in more detail in 2015 Financial Statements, Part I, Item 1). The issuance of the New Senior Secured Notes to holders of the SSN was completed on June 25, 2013.

The NSSN are secured, among other things by:

- a first-priority pledge over the shares of the Issuer and certain subsidiaries of the Company;

- a first-priority assignment of rights under certain bank accounts of the Company;

- certain intercompany loans, and

- a first-priority mortgage over certain real property and fixtures.

The New Senior Secured Notes bear interest as follows:

| Period | Interest rate |
|---|---|
| From June 1, 2013 to but excluding April 30, 2014 | 8.0% |
| From April 30, 2014 to but excluding April 30, 2015 | 9.0% |
| From April 30, 2015 to but excluding April 30, 2018 | 10.0% |

Interest under the NSSN is payable in cash on April 30 and October 31 of each year. The first interest payment of $15.5 million was made on October 31, 2013. The following interest payments of $18.6 million, $20.9 million, $20.9 million, $23.2 million and $23.2 million were paid in cash on April 28, 2014, October 30, 2014, April 30, 2015, October 28, 2015 and April 29, 2016 respectively. As of September 30, 2015, December 31, 2015 and September 30, 2016 the balance of interest accrued under the effective interest method amounted to $26.2 million, $14.0 million and $23.8 million, respectively.

As discussed above, in connection with the agreement in principle reached with Supporting Noteholders, the cash coupon due on October 31, 2016 will be paid in new notes to be issued in accordance with the terms of the anticipated transaction, instead of cash, thereby preserving cash liquidity to capture growth opportunities. The Company has the support of the consenting noteholders with respect to such arrangement.

During the period from issuance of the NSSN up to the date of this report, the Company has not repurchased any of the NSSN.

Total obligations under the NSSN are presented in the table below. There are no deferred finance costs relating to the NSSN.

| | September 30, 2015 (unaudited, as recast) | December 31, 2015 | September 30, 2016 (unaudited) |
|---|---|---|---|
| New Senior Secured Notes - principal amount | $ 464,590 | $ 464,590 | $ 464,590 |
| Interest accrued | 26,166 | 13,969 | 23,805 |
| **Total** | **$ 490,756** | **$ 478,559** | **$ 488,395** |

The Level 1 fair value of the NSSN as of September 30, 2015, December 31, 2015 and September 30, 2016 was $401.9 million, $409.4 million and $370.5 million, respectively (86.50 cents, 88.13 cents and 79.75 cents per 1 US dollar of face value of NSSN).

*New Convertible Junior Secured Notes*

The Company and the Issuer, entered into an Indenture ("New Convertible Junior Secured Notes Indenture") on June 5, 2013, between the Company, the Issuer, certain subsidiary guarantors named therein, and US Bank N.A., as the Trustee ("Trustee"). In connection with the New Convertible Junior Secured Notes Indenture, the Issuer issued $200 million Convertible Junior Secured Notes due in 2018 ("New Convertible Junior Secured Notes" or "NCJSN" and, together with the New Senior Secured Notes, "New Notes") to the holders of the SSN, which were cancelled under the Plan of Reorganization. The issuance of the New Convertible Junior Secured Notes to holders of the SSN was completed on June 25, 2013.

The NCJSN are secured, among other things by:

- a first-priority pledge[10] over the shares of the Issuer and certain subsidiaries of the Company;

- a first-priority assignment of rights under certain bank accounts of the Company;

- certain intercompany loans, and

- a first-priority mortgage over certain real property and fixtures.

The NCJSN bear interest at a rate of 10% per annum. Interest on the NCJSN is payable, at the election of the Issuer, (1) entirely in cash, (2) in-kind, by increasing the principal amount of the outstanding NCJSN or (3) in a combination of cash interest and payment-in-kind interest. The first interest payment was payment-in-kind interest of $8.3 million on October 31, 2013. The second and third in-kind interest payment of $10.4 million and $10.9 million was capitalized on April 30, 2014 and October 31, 2014, respectively. In 2015 the Company capitalized the following in-kind interest: $11.5 million on April 30, 2015 and $12.1 million on October 30, 2015. On April 30, 2016 the Company capitalized in-kind interest payment in the amount of $12.7 million. As of September 30, 2015, December 31, 2015 and September 30, 2016 the balance of interest accrued under the effective interest method amounts to $10.0 million, $4.2 million and $11.1 million respectively. The paid-in-kind coupon due on the NCJSN was capitalized on October 31, 2016, as required under the NCJSN indenture.

The NCJSN are redeemable at any time at par value. The NCJSN must be redeemed in increments of $20 million, although if a redemption results in less than $130 million outstanding, all the NCJSN must be redeemed by the Issuer. Starting from December 1, 2014, any holder of the NCJSN over $0.1 million can convert its NCJSN into shares of the Company's common stock. The conversion rate depends on the period in which conversion is exercised. Until the date of this report none of the NCJSN was converted or redeemed.

The total obligations under the NCJSN are presented in the table below. There are no deferred finance costs relating to the NCJSN.

| | September 30, 2015 (unaudited, as recast) | December 31, 2015 | September 30, 2016 (unaudited) |
|---|---|---|---|
| New Convertible Junior Secured Notes - principal amount | $ 241,172 | $ 253,230 | $ 265,892 |
| Interest accrued | 9,968 | 4,150 | 11,078 |
| **Total** | **$ 251,140** | **$ 257,380** | **$ 276,970** |

The Level 1 fair value of the NCJSN as of September 30, 2015, December 31, 2015 and September 30, 2016 was $119.1 million and $125.0 million and $82.8 million, respectively (49.38 cents, 49.38 cents and 31.13 cents per 1 US dollar of face value of NCJSN).

*Covenants under Existing Notes*

The NSSN Indenture and NCJSN Indenture (together the "Existing Notes indentures") contain a number of covenants restricting the actions of ROUST and its Restricted Subsidiaries.

As of September 30, 2015 and December 31, 2015 ROUST and its Restricted Subsidiaries have complied with all material conditions and covenants under the Existing Notes indentures. As discussed above, in connection with the agreement in principle reached with Supporting Noteholders, the cash coupon due on October 31, 2016 was not paid.

More details about existing covenants are presented in Note 14 of the 2015 Financial Statements.

---

[10] *The Security for the NSJCN is the second in priority in terms of proceeds entitlement to the NSSN.*

*Bank Loans, Overdraft Facilities and Other Borrowings*

According to the NSSN and the NCJSN the Company is permitted to raise borrowings up to a certain limit ("Permitted Debt"). As of September 30, 2015, December 31, 2015 and September 30, 2016 our indebtedness is below the limit. Please refer to the table on the following page for details of our bank loans and overdraft facilities.

As of September 30, 2015, December 31, 2015 and September 30, 2016, borrowings raised in the local currencies of the entities, party to the applicable facility agreement, amounted to $182.4 million, $163.4 million and $192.6 million respectively. As a result, the Company's exposure to exchange rate fluctuations is partially mitigated, as the debt issued locally by our subsidiaries is in their local currency.

Total unutilized overdraft and credit facilities (including borrowing-type recourse factoring facilities) as of September 30, 2016 amounted to $8.1 million.

As of September 30, 2015 the Company had other borrowings of $20.5 million which represented the amount of factored receivables repaid by customers to the Company instead of the factor. As of December 31, 2015 the Company had other borrowings of $25.4 million, comprised of the amount of factored receivables repaid by customers to the Company instead of the factor in the amount $19.3 million and borrowings from other than banks third parties in the amount of $6.1 million. As of September 30, 2016, the Company had other borrowings of $136.3 million, comprised of the amount of factored receivables repaid by customers to the Company instead of the factor in the amount $60.7 million and borrowings from other than banks third parties in the amount of $75.6 million.

As of September 30, 2015 and December 31, 2015, our Related Parties - Russian Standard Bank and its affiliates - provided financial support to us of $92.1 million and $86.4 million, being 45.3% and 43.4% of total of the total portfolio of bank loans, respectively. As of September 30, 2016 finance support provided by Russian Standard Bank and its affiliates to us amounted to $94.5 million and represented 45.5% of our bank loans portfolio.

| Lender | Type of the facility | Facility currency | Date of drawing | Maturity date | Outstanding liability including accrued interest | | |
|---|---|---|---|---|---|---|---|
| | | | | | September 30, 2015 (unaudited, as recast) | December 31, 2015 | September 30, 2016 (unaudited) |
| **External debt** | | | | | | | |
| Bank 1 | credit line | USD | 10/19/2015 | 4/19/2016 | $ - | $ 20,000 | $ - |
| Bank 1 | credit line | USD | 3/4/2016 | 10/19/2016 | - | - | 20,002 |
| Bank 2 | credit line | RUB | 10/16/2014 | 10/16/2015 | 524 | - | - |
| Bank 2 | credit line | RUB | 2/11/2015 | 5/27/2016 | 2,679 | 2,378 | - |
| Bank 2 | credit line | RUB | 7/10/2015 | 10/13/2016 | 1,161 | 794 | 100 |
| Bank 2 | credit line | RUB | 11/16/2015 | 2/17/2017 | - | 1,362 | 1,048 |
| Bank 2 | credit line | RUB | 12/28/2015 | 3/28/2017 | - | 1,071 | 1,000 |
| Bank 2 | credit line | RUB | 12/29/2015 | 3/28/2017 | - | 268 | 318 |
| Bank 2 | credit line | RUB | 4/14/2016 | 10/13/2017 | - | - | 650 |
| Bank 2 | credit line | USD | 6/1/2016 | 6/1/2018 | - | - | 3,709 |
| Bank 2 | credit line | USD | 9/23/2016 | 3/25/2018 | - | - | 922 |
| Bank 3 | credit line | RUB | 4/8/2015 | 10/8/2015 | 1,530 | - | - |
| Bank 3 | credit line | RUB | 4/10/2015 | 10/10/2015 | 2,295 | - | - |
| Bank 3 | credit line | RUB | 4/17/2015 | 10/17/2015 | 3,059 | - | - |
| Bank 3 | credit line | RUB | 5/13/2015 | 11/13/2015 | 765 | - | - |
| Bank 3 | credit line | RUB | 5/18/2015 | 11/18/2015 | 2,294 | - | - |
| Bank 3 | credit line | RUB | 5/20/2015 | 11/20/2015 | 5,352 | - | - |
| Bank 3 | credit line | RUB | 5/22/2015 | 11/22/2015 | 1,529 | - | - |
| Bank 3 | credit line | RUB | 6/17/2015 | 12/17/2015 | 4,129 | - | - |
| Bank 3 | credit line | RUB | 7/14/2015 | 1/14/2016 | 1,529 | - | - |
| Bank 3 | credit line | RUB | 7/22/2015 | 1/22/2016 | 1,835 | 1,628 | - |
| Bank 3 | credit line | RUB | 7/23/2015 | 1/23/2016 | 1,529 | 1,357 | - |
| Bank 3 | credit line | RUB | 7/27/2015 | 1/27/2016 | 1,529 | 1,357 | - |
| Bank 3 | credit line | RUB | 8/6/2015 | 2/6/2016 | 2,752 | 2,443 | - |
| Bank 3 | credit line | RUB | 8/20/2015 | 2/20/2016 | 1,529 | 1,357 | - |
| Bank 3 | credit line | RUB | 8/21/2015 | 2/21/2016 | 1,223 | 1,086 | - |
| Bank 3 | credit line | RUB | 8/26/2015 | 2/26/2016 | 2,293 | 2,036 | - |
| Bank 3 | credit line | RUB | 9/17/2015 | 3/17/2016 | 3,058 | 2,714 | - |
| Bank 3 | credit line | RUB | 9/18/2015 | 3/18/2016 | 2,293 | 2,036 | - |
| Bank 3 | credit line | RUB | 9/23/2015 | 3/23/2016 | 2,294 | 2,036 | - |
| Bank 3 | credit line | RUB | 9/30/2015 | 3/30/2016 | 2,289 | 2,036 | - |
| Bank 3 | credit line | RUB | 10/1/2015 | 4/1/2016 | - | 679 | - |
| Bank 3 | credit line | RUB | 10/2/2015 | 4/2/2016 | - | 3,393 | - |
| Bank 3 | credit line | RUB | 10/19/2015 | 10/19/2016 | - | 6,785 | 7,910 |
| Bank 3 | credit line | RUB | 11/10/2015 | 5/10/2016 | - | 1,357 | - |
| Bank 3 | credit line | RUB | 11/10/2015 | 6/10/2016 | - | 679 | - |
| Bank 3 | credit line | RUB | 11/20/2015 | 5/20/2016 | - | 679 | - |
| Bank 3 | credit line | RUB | 11/24/2015 | 5/24/2016 | - | 2,036 | - |
| Bank 3 | credit line | RUB | 12/16/2015 | 6/16/2016 | - | 3,664 | - |
| Bank 3 | credit line | RUB | 12/29/2015 | 6/29/2016 | - | 1,355 | - |
| Bank 3 | credit line | RUB | 4/4/2016 | 10/4/2016 | - | - | 794 |
| Bank 3 | credit line | RUB | 4/21/2016 | 10/21/2016 | - | - | 1,266 |
| Bank 3 | credit line | RUB | 5/6/2016 | 11/6/2016 | - | - | 1,107 |
| Bank 3 | credit line | RUB | 5/17/2016 | 11/17/2016 | - | - | 791 |
| Bank 3 | credit line | RUB | 5/20/2016 | 11/20/2016 | - | - | 2,373 |
| Bank 3 | credit line | RUB | 6/3/2016 | 12/3/2016 | - | - | 1,819 |
| Bank 3 | credit line | RUB | 6/10/2016 | 12/10/2016 | - | - | 791 |
| Bank 3 | credit line | RUB | 6/15/2016 | 12/15/2016 | - | - | 1,661 |
| Bank 3 | credit line | RUB | 6/24/2016 | 12/24/2016 | - | - | 1,582 |
| Bank 3 | credit line | RUB | 6/29/2016 | 12/29/2016 | - | - | 3,955 |
| Bank 3 | credit line | RUB | 7/11/2016 | 1/11/2017 | - | - | 1,898 |
| Bank 3 | credit line | RUB | 9/27/2016 | 3/27/2017 | - | - | 791 |
| Bank 3 | credit line | RUB | 7/18/2016 | 1/18/2017 | - | - | 1,582 |
| Bank 3 | credit line | RUB | 7/19/2016 | 1/19/2017 | - | - | 1,582 |
| Bank 3 | credit line | RUB | 7/27/2016 | 1/27/2017 | - | - | 1,740 |
| Bank 3 | credit line | RUB | 8/4/2016 | 2/4/2017 | - | - | 2,373 |
| Bank 3 | credit line | RUB | 8/12/2016 | 2/12/2017 | - | - | 7,909 |
| Bank 3 | credit line | RUB | 8/31/2016 | 3/8/2017 | - | - | 2,373 |
| Bank 3 | credit line | RUB | 9/30/2016 | 3/3/2017 | - | - | 3,159 |
| Bank 4 | credit line | RUB | 6/9/2014 | 9/1/2016 | 12,205 | 5,461 | - |
| Bank 4 | credit line | RUB | 11/11/2015 | 9/1/2016 | - | 3,413 | - |
| Bank 4 | credit line | RUB | 7/8/2016 | 3/31/2017 | - | - | 9,560 |
| Bank 7 | credit line | RUB | 9/18/2014 | 3/17/2015 | - | - | - |
| Bank 7 | credit line | RUB | 3/4/2015 | 6/2/2015 | - | - | - |
| Bank 7 | credit line | RUB | 3/4/2015 | 3/1/2016 | 5,423 | 4,815 | - |
| Bank 7 | credit line | RUB | 3/19/2015 | 6/17/2015 | - | - | - |
| Bank 9 | overdraft | RUB | 7/7/2015 | 7/6/2016 | 338 | 270 | - |

| Lender | Type of the facility | Facility currency | Date of drawing | Maturity date | Outstanding liability including accrued interest | | |
|---|---|---|---|---|---|---|---|
| | | | | | September 30, 2015 (unaudited, as recast) | December 31, 2015 | September 30, 2016 (unaudited) |
| **External debt** | | | | | | | |
| Other banks * | | | | | 24,833 | 2,720 | - |
| *Prepaid interest presented as assets* | | | | | - | - | 5 |
| Recourse factoring (borrowing type) | | | | | 18,265 | 27,811 | 28,379 |
| Letter of credit | | | | | 958 | 1,480 | - |
| **Bank Loans and Overdrafts Facilities** | | | | | **111,492** | **112,556** | **113,149** |
| *- Current* | | | | | *110,334* | *109,849* | *109,957* |
| *- Non-Current* | | | | | *1,158* | *2,707* | *3,192* |
| Other 3rd party borrowings | | | | | - | 6,102 | 75,654 |
| Amounts repayable to the factor | | | | | 20,454 | 19,253 | 60,651 |
| **Other Borrowings** | | | | | **20,454** | **25,355** | **136,305** |
| *- Current* | | | | | *20,454* | *20,618* | *77,923* |
| *- Non-Current* | | | | | *-* | *4,737* | *58,382* |
| **Related Party debt** | | | | | | | |
| RSB | credit lines | RUB | 11/16/2012-7/22/2015 | 12/25/2015-12/30/2017 | 45,750 | 42,123 | 35,577 |
| RSB | credit lines | USD | 1/1/2011-9/16/2016 | 12/21/2015-3/29/2017 | 41,727 | 40,858 | 56,338 |
| Bank Forward | credit line | UAH | 12/14/2015 | 11/14/2016 | - | 422 | 671 |
| Russian Standard Insurance | credit lines | RUB | 1/2/2011-8/31/2013 | 10/31/2016 | 4,658 | 2,989 | 1,905 |
| *Prepaid interest presented as assets* | | | | | 81 | | |
| **Bank Loans and Borrowings from Related Parties** | | | | | **92,216** | **86,392** | **94,491** |
| *- Current* | | | | | *71,924* | *79,448* | *88,521* |
| *- Non-Current* | | | | | *20,292* | *6,944* | *5,970* |
| **Total loans and borrowings** | | | | | **$ 224,162** | **$ 224,303** | **$ 343,945** |

*\* Loans repaid before the reporting date*

As of September 30, 2016, 47% of all the external bank loans and bank borrowings from Related Parties agreements contain financial covenants.

As of September 30, 2016, $191.7 million out of the total amount of borrowings was secured by pledge on our assets. Additionally, $9.6 million of our borrowings was secured by pledge on assets of one of our Related Parties.

As of September 30, 2016 the Company has complied with covenants under its loan agreements.

The table below presents the amount of outstanding lines of credit for financing and the weighted average interest rate on these borrowings.

|  | September 30, 2015 (unaudited, as recast) | | December 31, 2015 | | September 30, 2016 (unaudited) | |
| --- | --- | --- | --- | --- | --- | --- |
|  | Amount outstanding | Weighted average interest rate | Amount outstanding | Weighted average interest rate | Amount outstanding | Weighted average interest rate |
| Bank loans and overdraft facilities and other 3rd party borrowings (principal) | $  91,958 | 18.2% | $  89,082 | 15.8% | $  159,300 | 15.0% |
| Amounts repayable to the factor | 20,454 | - | 19,253 | - | 60,651 | - |
| Bank loans and borrowings from Related Parties (principal) | 89,351 | 13.2% | 83,599 | 14.1% | 92,085 | 15.0% |
| Recourse factoring (borrowing type) | 18,265 | - | 27,811 | - | 28,379 | - |
| Letters of credit | 958 | - | 1,480 | - | - | - |
| **Principal amount outstanding** | **220,986** | | **221,225** | | **340,415** | |
| *Accrued interest* | *3,176* | | *3,078* | | *3,530* | |
| ***Outstanding liability including accrued interest*** | **$  224,162** | | **$  224,303** | | **$  343,945** | |

As of September 30, 2015, December 31, 2015 and September 30, 2016 the liabilities from factoring with recourse amounted to $18.3 million, $27.8 million and $28.4 million respectively and are included in the short term bank loan in the balance sheet as described in Note 4.

*Debt Issuance Cost and Future Principal Repayments*

The debt issuance costs balance recognized as asset was nil as of September 30, 2015, December 31, 2015 and September 30, 2016.

The following is a schedule by years of the future principal repayments for borrowings as of September 30, 2016:

| Future repayments of borrowings (principal) | September 30, 2016 |
| --- | --- |
| 2016 | 203,846 |
| 2017 | 134,227 |
| 2018 | 732,824 |
| 2019 and beyond | - |
| **Total** | **$  1,070,897** |

## 13.    TAXES OTHER THAN INCOME TAXES

Taxes payable other than income taxes comprise mainly excise and VAT payable as presented in the table below.

|  | September 30, 2015 (unaudited, as recast) | December 31, 2015 | September 30, 2016 (unaudited) |
| --- | --- | --- | --- |
| VAT payable | $  39,396 | $  30,140 | $  35,828 |
| Excise tax payable | 85,862 | 78,495 | 94,392 |
| Other taxes and charges payable | 3,035 | 2,930 | 2,860 |
| **Total** | **$  128,293** | **$  111,565** | **$  133,080** |

## 14.    ACCRUALS

**Current Accruals**

The table below presents details of our current accruals.

|  | September 30, 2015 | December 31, 2015 | September 30, 2016 |
|---|---|---|---|
|  | (unaudited, as recast) |  | (unaudited) |
| Accrued marketing related services | $          13,348 | $          20,703 | $          21,194 |
| Accrued employee benefits | 7,218 | 7,646 | 6,483 |
| Accrued cost to satisfy the claims | 1,119 | 500 | 1,034 |
| Accrued legal and professional services | 3,431 | 3,141 | 3,608 |
| Accrued retro-bonus expenses | 4,535 | 5,786 | 9,175 |
| Other | 7,789 | 8,111 | 6,100 |
| **Total** | $          37,440 | $          45,887 | $          47,594 |

As of December 31, 2015 the amount of marketing related services accruals increased mainly in Roust Inc. in amount of $7.4 million (due to lack of account receivables to be netted off) and they remain on comparable level of $21.2 million as of September 30, 2016. As of September 30, 2016 employee related accruals decreased by $2.0 million compared to December 31, 2015 due to employee bonuses paid and reduced untaken holidays. As of September 30, 2016 retro-bonus accruals increased in amount of $3.4 million compared to December 31, 2015 due to the decrease of the account receivables which can be netted off. As of September 30, 2016 other accruals decreased by $2.0 million compared to December 31, 2015 due to the reversal of unutilized staff accruals.

**Non-current Accruals**

Non-current accruals amount to $0.2 million as of September 30, 2015, $0.3 million as of December 31, 2015 and $0.2 million as of September 30, 2016. They are mainly comprised of retirement benefits and jubilee award accruals.

## 15.    OTHER LIABILITIES

**Other Current Liabilities**

Other current liabilities as of September 30, 2015, December 31, 2015 and September 30, 2016 amounted to $15.8 million, $20.5 million and $14.3 million, respectively. As of September 30, 2016 the amount of liability for the Roust Inc. acquisition is $0.4 million. The majority of other current liabilities relates to marketing services, finance leases, employee benefits payable and other.

**Other Non-current Liabilities**

Other non-current liabilities excluding non-current accruals described in Note 14 above, amount to $18.5 million as of September 30, 2015, $17.3 million as of December 31, 2015 and $2.0 million as of September 30, 2016. As of September 30, 2015, December 31, 2015 and September 30, 2016 deferred income due to interest income received in advance on loans granted to Related Parties amounts to $16.2 million, $16.0 million and nil, respectively. Current part of this deferred income amounting to nil, $0.8 million and nil, respectively, are presented in other current liabilities. The non-current part of this deferred income amounting to $16.2 million, $15.2 million and nil, respectively, is included in other non-current liabilities. The other non-current liabilities are comprised of finance lease liabilities.

## 16.    COMMITMENTS AND CONTINGENT LIABILITIES

**Bank Guarantees**

The Company is a party to guarantee agreements with banks relating to purchases of spirit, excise stamps and custom duties. In accordance with current legislation in Russia, a producer purchasing spirit alcohol must (a) prepay the excise tax in full or (b) provide the relevant tax body with a bank guarantee in the full amount of the excise tax before purchasing, to secure payment of the excise tax. The bank guarantee serves as insurance that the excise tax is paid on time.

The JSC "Roust Russia" and subsidiaries has in place a guarantee line agreement with multiple banks pursuant to which it has been provided with a guarantee limit of 16.8 billion Russian rubles (approximately $264.6 million) for a period up to one year.

Bravo Premium has also guarantee line agreements with multiple banks pursuant to which it has been provided with a total guarantee limit of 0.8 billion Russian rubles (approximately $12.6 million) for a period up to one year.

According to these agreements, our subsidiaries have the right to obtain bank guarantees during the agreement term for each purchase of excise stamps which are needed to import alcohol to the Russian Federation. The guarantees for excise stamps are being issued in favor of Central Custom for the whole period until products are delivered to the territory of the Russian Federation and passed the customs clearance procedure after which they are allowed to be sold on the territory of the Russian Federation.

In Poland, as of September 30, 2015, December 31, 2015 and September 30, 2016 the Company had bank guarantees related to excise stamps and customs duties on imported goods at a value of 5.8 million Polish zlotys (approximately $1.5 million), 5.8 million Polish zlotys (approximately $1.8 million), and 6.2 million Polish zlotys (approximately $1.6 million), respectively.

In Hungary, as of September 30, 2015 the Company had a guarantee related to office rent and insurance for bonded warehouse at a value of 21.9 million Hungarian forints (approximately $0.1 million) and 60.0 million Hungarian forints (approximately $0.2 million). As of December 31, the value of these guarantees was 20.1 million Hungarian forints (approximately $0.1 million) and 60.0 million Hungarian forints (approximately $0.2 million), respectively. As of September 30, 2016 the value of these guarantees is 21.6 million Hungarian forints (approximately $0.1 million) and 60.0 million Hungarian forints (approximately $0.2 million), respectively.

**Operating Leases and Rent Commitments**

Total rental expenses related to operating leases for the for three-month period ended September 30, 2015 and for three-month period ended September 30, 2016 amounted to $1.7 million and $0.9 million, respectively.

Total rental expenses related to operating leases for the for nine-month period ended September 30, 2015 and for nine-month period ended September 30, 2016 amounted to $4.7 million and $3.0 million, respectively.

The following is a schedule by years of the future rental payments under the non-cancelable operating leases as of September 30, 2016:

| Future rental payments under operating leases | September 30, 2016 (unaudited) |
|---|---|
| 2016 | $ 1,914 |
| 2017 | 7,214 |
| 2018 | 5,123 |
| 2019 | 3,948 |
| 2020 | 3,936 |
| Thereafter | 10,440 |
| **Total** | **$ 32,575** |

The future minimum lease payments for the assets under capital leases as of September 30, 2016 are as follows:

| Future minimum lease payments under capital leases | September 30, 2016 (unaudited) |
|---|---|
| 2016 | $ 713 |
| 2017 | 1,794 |
| 2018 | 950 |
| 2019 | 549 |
| 2020 | 43 |
| **Gross payments due** | **$ 4,049** |
| Less interest | 203 |
| **Net payments due** | **$ 3,846** |

**Factoring**

As of September 30, 2015, December 31, 2015 and September 30, 2016 the Company is a party to recourse factoring as described in Note 4. In case of recourse factoring, if our debtors will not pay the amounts due under the factoring agreement, the factors have the right to require payments from the Company. In case of recourse factoring accounted for as a secured borrowing, the related liability is recognized. In case of recourse factoring not qualified as a secured borrowing, the Company will have to re-recognize the related receivable from the debtor and related liability to the bank. The Company believes that there are no substantial risks of the debtors not paying on time.

**Assets Subject to Pledges in Respect of the NSSN and the NCJSN**

As of September 30, 2016 the following assets were subject to pledges:

- Poland:

  - pledges of shares in each of CEDC International Sp. z o.o. and PWW Sp. z o.o.;

  - mortgages over real property and fixtures at CEDC International Sp. z o.o.'s factories located at Oborniki and Bialystok;

  - security over certain intellectual property rights owned by CEDC International Sp. z o.o. related to the *Palace*, *Żubrówka*, *Absolwent* and *Soplica* brands;

- Hungary:

  - registered business quota pledge over Roust Hungary Kft (previously Bols Hungary Kft);

  - security over certain intellectual property rights owned by Roust Hungary Kft (previously Bols Hungary Kft) in respect of the *Royal*, *Royal Feny* and *Royal* vodka trademarks;

- Cyprus:

  - registered pledges of shares in each of Latchey Limited, Jelegat Holdings Ltd., Pasalba Ltd, Roust Distribution Limited;

- United Kingdom:

  - English law assignment of the intercompany proceeds loans from Jelegat Holdings Ltd. to Roust Russia (previously Russian Alcohol Group) subsidiaries granted by Jelegat Holdings Ltd.;

- Luxembourg:

  - pledges of shares in each of Lion/Rally Lux 1 S.A., Lion/Rally Lux 2 S.à r.l. and Lion/Rally Lux 3 S.à r.l.;

- United States:

  - pledges of the capital stock of each of CEDC Finance Corporation LLC and CEDC Finance Corporation International Inc.;

  - pledges of the intercompany loans made by CEDC Finance Corporation International Inc. to CEDC International Sp. z. o. o and Jelegat Holdings Ltd. (respectively);

- Russia:

- pledges of participatory interests in LLC "Glavspirttrest", Bravo Premium LLC, LLC "The TH Russian Alcohol";

- mortgages over real property, land rights and fixtures (to the extent qualified as real property under Russian law) of the JSC "Siberian Distillery" (First Tula Distillery LLC was merged with JSC Siberian Distillery in December 2014);

- pledges of shares of JSC "Distillery Topaz", JSC "Roust Russia", CJSC "Roust Inc.", JSC "Siberian Distillery" (First Tula Distillery LLC and CJSC Mid-Russian Distilleries was merged with JSC Siberian Distillery in December 2014);;

- security over certain intellectual property rights owned by LLC "Glavspirttrest", LLC "Parliament Distribution", JSC "Roust Russia", Vlaktor Trading Limited, AUK Holdings Limited and Ardy Investments Limited related to the *Green Mark*, *Zhuravli*, *Marusya*, *Yamskaya*, *Parliament*, *Talka*, *Urozhay*, *Perchik* and *Kauffman* vodka brands.

**Legal Proceedings**

From time to time, we are involved in litigation arising from the normal course of our business, including appeal and cancellation proceedings with respect to trademarks that are similar to some of our brands, as well as other proceedings, in the United States, Russia, Poland and elsewhere. Except as set forth below, we are not currently involved in or aware of any pending or threatened litigation that we reasonably expect, either individually or in aggregate, will result in a material adverse effect on our consolidated financial statements.

Our subsidiary, CEDC International Sp. z o.o., filed an action against Stock Polska S.A. ("Stock") in December 2013 for unfair competition relating to the misleading term, "wódka", placed on Stock's flagship product *Żołądkowa Gorzka*. Following CEDC International Sp. z o.o.'s petition, the court issued an interim injunction in December 2013 prohibiting Stock from selling the products with the misleading term "wódka". CEDC International Sp. z o.o. has taken a number of steps with respect to old inventory of products released by Stock onto the market, which still use the term "wódka" on the bottle. Three different court pleadings were filed, including a petition to extend the previously issued injunction. The court agreed with the arguments presented by CEDC International Sp. z o.o. and extended the original injunction, imposing the obligation on Stock to withdraw all incorrectly labeled products from the market. Stock filed an appeal against this new injunction imposing the obligation to withdraw the product. The Court of Appeal dismissed the interim injunction. The first instance court proceedings were completed on March 11, 2016. The court agreed with our claim, and ruled as follows:

- Stock's placement of "wódka" indicator on Żołądkowa Gorzka product was the unfair competition act in the meaning of unfair competition law,

- Stock must withdraw all products with wrong "wódka" indicator from the market,

- Stock must publish public apologies in "Rzeczpospolita" daily and on their Żołądkowa Gorzka website,

- Stock must pay a penalty of 50 thousand Polish zloty (approximately $13 thousand) in favor of local foundation in Białystok.

Stock filed the appeal against the first instance ruling described above. On October 25, 2016 the Court of Appeal issued its verdict upholding the entire first instance verdict, increasing the amount of penalty from 50 to 100 thousand Polish zloty (approximately $25 thousand). Consequently, the matter is now closed subject to potential extraordinary appeal that Stock may consider to file with the Poland's Supreme Court.

## 17. STOCKHOLDERS' EQUITY

**Authorized Shares**

The Company has 90,000 $0.01 par value shares of common stock authorized of which 10,000 shares are issued and outstanding as of September 30, 2015, December 31, 2015 and September 30, 2016. Additionally the Company has authorized 10,000 preferred shares none of which had been issued or were outstanding as of September 30, 2015, December 31, 2015 and September 30, 2016.

**Stock Option Plans and Warrants**

No equity based incentive compensation was recognized during the nine-month periods ended September 30, 2015 and 2016.

*18.    RELATED PARTY TRANSACTIONS*

**Identification of Related Parties**

As described in Note 2 of the 2015 Financial Statements, upon emergence from bankruptcy protection on June 5, 2013, Mr. Roustam Tariko became the sole ultimate shareholder of ROUST. Further, Mr. Roustam Tariko has been appointed to ROUST's Board of Directors as Executive Chairman of the Board. Given that Mr. Roustam Tariko indirectly controls RTL and RTL directly controls Russian Standard Corporation (and indirectly controls other Russian Standard entities), all entities controlled by Mr. Roustam Tariko, have become Related Parties of ROUST, including Russian Standard Bank, Russian Standard Corporation, Russian Standard Vodka (USA) Inc., LLC "Russian Standard Vodka", LLC "Union Trust Stroy" and F.lli Gancia & C. SpA.

**Transactions with Related Parties**

In the ordinary course of business, the Company is involved in transactions with entities controlled by Mr. Tariko that result in the recognition of revenues, expenses, assets and liabilities by the Company.

The following table summarizes our transactions with the Related Parties as included in these consolidated financial statements.

| CONSOLIDATED STATEMENTS OF OPERATIONS AND COMPREHENSIVE INCOME | three-month period ended September 30, 2015 (unaudited, as recast) | three-month period ended September 30, 2016 (unaudited) |
|---|---|---|
| Net sales | $ 5,038 | $ 4,843 |
| Cost of goods sold | 2,531 | 2,566 |
| Purchases of goods | 17,540 | 29,894 |
| Purchases of raw materials | 374 | 485 |
| Selling, general and administrative expenses | 1,222 | 5,032 |
| Other operating income | 1,053 | - |
| Interest expense | 1,935 | 3,402 |
| Interest Income | 2,886 | 3,749 |
| Other Income | 10 | 226 |
| Other Expense | - | 519 |
| Factoring costs | $ - | $ 2,787 |

**CONSOLIDATED STATEMENTS OF OPERATIONS AND COMPREHENSIVE INCOME**

| | | nine-month period ended September 30, 2015 (unaudited, as recast) | | nine-month period ended September 30, 2016 (unaudited) |
|---|---|---|---|---|
| Net sales | $ | 6,040 | $ | 6,738 |
| Cost of goods sold | | 3,285 | | 5,760 |
| Purchases of goods | | 36,480 | | 62,682 |
| Purchases of raw materials | | 2,844 | | 1,538 |
| Selling, general and administrative expenses | | 2,180 | | 11,210 |
| Other operating income | | 6,061 | | - |
| Interest expense | | 5,394 | | 9,436 |
| Interest Income | | 8,083 | | 10,957 |
| Other Income | | 35 | | 243 |
| Other Expense | | 100 | | 526 |
| Factoring costs | $ | - | $ | 8,536 |

**CONSOLIDATED BALANCE SHEETS**

| | | September 30, 2015 (unaudited, as recast) | | December 31, 2015 | | September 30, 2016 (unaudited) |
|---|---|---|---|---|---|---|
| *Assets* | | | | | | |
| Accounts receivable | $ | 14,804 | $ | 24,293 | $ | 37,314 |
| Prepaid expenses | | 23,732 | | 5,780 | | 32,439 |
| Other current receivables | | 3,336 | | 3,010 | | 14,432 |
| Other financial receivables | | - | | - | | 6,217 |
| Loans granted to Related Parties | | 101,833 | | 97,299 | | 93,232 |
| Long-term investments | | 80 | | 30 | | 29 |
| **Total due from Related Parties** | **$** | **143,785** | **$** | **130,412** | **$** | **183,663** |
| *Liabilities* | | | | | | |
| Trade accounts payable | $ | 12,745 | $ | 20,221 | $ | 8,175 |
| Other accounts payable | | 3,091 | | 6,142 | | 844 |
| Other accrued liabilities | | - | | - | | 7,100 |
| Bank loans and borrowings from Related Parties* | | 92,216 | | 86,392 | | 94,491 |
| Deferred income | | 16,239 | | 16,038 | | - |
| **Total due to Related Parties** | **$** | **124,291** | **$** | **128,793** | **$** | **110,610** |

*\* Loans from Russian Standard Bank, Russian Standard Insurance and Bank Forward.*

Accounts receivable and trade accounts payable arise from sale, purchases of goods and transactions related to marketing activities made primarily with LLC "Russian Standard Vodka", F.lli Gancia & C. SpA, RTL, Russian Standard Vodka (USA) Inc. in the ordinary course of business. For details on prepaid expenses and other current receivables please refer to Note 6 "Prepaid expenses" and Note 7 "Other current assets", respectively. Deferred income represented prepaid interest on a loan granted to RTL. Selling, general and administrative expenses apply mainly to warehousing costs and costs of renting office premises from LLC "Union Trust Stroy" and LLC "Russian Standard Vodka" as well as marketing services performed by Roust Trading (Cyprus) Ltd and Russian Standard Vodka (USA) Inc. Additionally, in the nine-month period ended September 30, 2016 the Company recognized $1.3 million income of management service recharges to Related Parties. As of December 31, 2015 other accounts payable include the outstanding liability for the Roust Inc. acquisition in amount of $0.4 million and for RDL acquisition (as described in Note 2) in amount of $3.9 million. The liability for RDL acquisition was paid in February 2016. As of September 30, 2016, other accounts payable of $0.8 million include the outstanding liability for the Roust Inc. acquisition in amount of $0.4 million. Additionally, during the three-month period ended September 30, 2016 the Company acquired from Related Parties physical product recipe and related technology, incurred other capital expenditures related to production and warehousing projects in Poland and made payment for the acquisition of marketing rights. The total amount of acquired assets is $7.0 million.

The acquisition of Roust Inc. brought 9% of the shares of LLC "Russian Standard Vodka" with a historically de minimis book value. The Company believes that the fair market value of these shares is significantly higher than its book value. The shareholder has a call option on the buy-back of the shares. The option is exercisable at fair market value.

**Loans Granted to Related Parties**

As of September 30, 2015, December 31, 2015 and September 30, 2016 the Company had loan and other financial receivables from Related Parties in principal amount equal to $91.2 million, $91.1 million and $91.2 million, respectively. All of the loan and other financial receivables as of September 30, 2016, together with accrued interest, amount to $99.4 million. The loans were granted to RTL and Russian Standard Corporation, to support the growth of their business. These facilities include the loans of principal of $20.8 million which originate from period before Roust Inc. acquisition, which is not included in the investment basket. The details of loans granted as of September 30, 2016 are presented in the table below.

| Principal amount* | Date of signing the agreement | Maturity date | Interest rate |
|---|---|---|---|
| $49.1 million | February 17, 2014 - March 1, 2016 | September 30, 2016 - September 14, 2022 | 13.8%-15.0% |
| $22.9 million | February 20, 2014 - March 23, 2016 | October 22, 2016 | 17.0%-18.5% |
| $6.4 million | March 17, 2014 - April 18, 2014 | October 22, 2016 | 10.0% |
| $3.7 million | March 01, 2016 | March 10, 2022 | 12.0% |
| $6.2 million | September 30, 2016 | December 31, 2016 | - |
| $2.9 million | October 16, 2015 - November 2, 2015 | October 16, 2016 - November 2, 2016 | 7.0% |
| **Total $91.2 million** | **February 2014 - September 2016** | **October 16, 2016 - November 2, 2016** | **7.0%-18.5%** |

*these facilities include the loans of principal amount of $20.8 million which originate from period before Roust Inc. acquisition, which is not included in the investment basket.*

These loans have been guaranteed by certain Related Party subsidiaries. As consideration for, among other things, the contribution of such strategic assets to the Company, all intercompany loans owed by RTL to the Company will be considered repaid in full as part of the transactions contemplated by the agreement reached with the Supporting Noteholders described herein. For more information on the transaction, see our Form 8-K dated November 11, 2016.

Since September 30, 2016, up to the date of this report Related Parties did not receive any loans from and did not repay any loans to the Company.

**Borrowings from Related Parties**

As of September 30, 2016 the Company had bank borrowings from Related Parties in the amount of $94.5 million, which represents 45.5% of our bank loans portfolio. For details please see Note 12 "Notes and Borrowings".

Since September 30, 2016, up to date of this report the Company did not receive, repay or roll over any borrowings from Related Parties.

**Factoring from Related Parties**

Related Parties support the Company also by providing factoring. As of December 31, 2015 and September 30, 2016 the utilized limit of non-recourse factoring provided by Related Parties amounted to $10.6 million and $20.9 million, respectively. As of September 30, 2015 the Company had no active factoring arrangements with Related Parties. Additionally, Related Parties made available to ROUST factoring limit of $41.1 million, which remained unutilized as of September 30, 2016.

Since September 30, 2016, up to date of this report Related Parties provided additional net factoring support in amount of $10.4 million.

**Guarantees from/to Related Parties**

Roust Inc. has provided guarantees of $128.1 million to Related Parties as of September 30, 2016. These amounts date from the period before the Roust Inc. acquisition. Related Parties have provided guarantees of $12.4 million to Roust Inc. as of September 30, 2016. The guarantees relate to excise stamps, typical and necessary for our industry, as well as bank loans and factoring facilities.

*19.    FAIR VALUE MEASUREMENTS*

As of September 30, 2015, December 31, 2015 and September 30, 2016, the Company held certain financial assets that are measured at fair value on a recurring basis. These consisted of cash and cash equivalents. The monetary assets represented by these financial instruments are primarily located in Poland, Hungary and Russia. Consequently, they are subject to currency translation risk when reporting in US dollars.

The Company does not have any financial assets measured at fair value on a recurring basis as Level 3. The Company has certain financial liabilities which are to be measured at fair value on a recurring basis for disclosure purposes only, namely, the NCJSN and NSSN. The fair value of NSSN and NCJSN is determined on the basis of the quoted market prices on public markets and is categorized as Level 1. The fair value of NSSN and NCJSN is disclosed in Note 12. There were no transfers in or out of Level 1, Level 2 or Level 3 during the three-month and nine-month periods ended September 30, 2015 and 2016.

The Company has other financial instruments, such as accounts receivable, accounts payable, overdrafts, short term bank loans and other liabilities. Due to the short-term nature of these instruments, their carrying values approximate their fair values. The Company did not have any other financial instruments within the scope of the fair value disclosure requirements as of September 30, 2015, December 31, 2015 and September 30, 2016.

Non-financial assets, such as goodwill, trademarks and long-lived assets, and liabilities are measured at fair value on a non-recurring basis. The book value of these assets is the fair value as established as of the fresh start date (as described in 2015 Financial Statements, Part I, Item 1) adjusted for subsequent changes including depreciation and amortization for definite-lived assets. These items are tested for impairment on the occurrence of a triggering event or in the case of goodwill and indefinite-lived trademarks, on at least an annual basis. The test was performed as of December 31, 2015 and no impairment was recognized as a result of the test. Refer to Notes 7, 8 and 9 for the carrying value of the Company's long-lived assets and amount of recognized impairment.

None of assets were measured at fair value on a non-recurring basis as of September 30, 2015, December 31, 2015 and September 30, 2016.

## 20.    OPERATING COSTS

Operating costs of the Company comprise selling, general and administrative expenses (including selling, general and administrative expenses charged by the Related Parties), provision for doubtful debts and impairment charges (if any). The table below presents details of our operating costs.

|  | three-month period ended September 30, 2015 (unaudited, as recast) | | three-month period ended September 30, 2016 (unaudited) |
|---|---|---|---|
| Staff costs | $ | 20,091 | $ 18,985 |
| Warehousing and transportation | | 7,553 | 6,158 |
| Marketing | | 2,975 | 10,173 |
| Administration expenses | | 1,050 | 5,237 |
| Depreciation and amortization | | 1,634 | 1,786 |
| **Selling, general and administrative expenses** | $ | 33,303 | $ 42,339 |
| Provision for doubtful debts | | 571 | 27 |
| **Total Operating Costs** | $ | 33,874 | $ 42,366 |

|  | | nine-month period ended September 30, 2015 (unaudited, as recast) | nine-month period ended September 30, 2016 (unaudited) |
|---|---|---|---|
| Staff costs | $ | 64,093 | $ 59,369 |
| Warehousing and transportation |  | 20,935 | 17,648 |
| Marketing |  | 11,961 | 19,488 |
| Administration expenses |  | 9,069 | 20,780 |
| Depreciation and amortization |  | 5,103 | 5,421 |
| **Selling, general and administrative expenses** | **$** | **111,161** | **$ 122,706** |
| Provision for doubtful debts |  | 1,358 | 1,356 |
| **Total Operating Costs** | **$** | **112,519** | **$ 124,062** |

The growth of the administration expenses in the three-month and the nine-month period ended September 30, 2016 is caused mainly by the non-recurring legal and professional costs incurred related to potential transaction discussed under Note 1 "Liquidity and Going Concern".

*21.* *INTEREST INCOME AND INTEREST EXPENSE*

The tables below present items included in interest income and interest expense for the three-month and nine-month periods ended September 30, 2015 and 2016. There was no payment-in-kind interest capitalized in the three-month period ended September 30, 2015 and September 30, 2016.

|  |  | three-month period ended September 30, 2015 (unaudited, as recast) | three-month period ended September 30, 2016 (unaudited) |
|---|---|---|---|
| **Total interest income** |  | **2,841** | **3,755** |
| of which: |  |  |  |
| Interest income from Related Parties | $ | 2,886 | $ 3,749 |

|  |  | nine-month period ended September 30, 2015 (unaudited, as recast) | nine-month period ended September 30, 2016 (unaudited) |
|---|---|---|---|
| **Total interest income** |  | **8,154** | **10,978** |
| of which: |  |  |  |
| Interest income from Related Parties | $ | 8,083 | $ 10,957 |

|  |  | three-month period ended September 30, 2015 (unaudited, as recast) | three-month period ended September 30, 2016 (unaudited) |
|---|---|---|---|
| Existing Notes* | $ | 17,221 | $ 17,793 |
| Other borrowings |  | 6,933 | 10,163 |
| **Total interest expense** | **$** | **24,154** | **$ 27,956** |
| of which: |  |  |  |
| Interest expense to Related Parties | $ | 1,935 | $ 3,402 |

|  |  | nine-month period ended September 30, 2015 (unaudited, as recast) | nine-month period ended September 30, 2016 (unaudited) |
|---|---|---|---|
| Existing Notes* | $ | 50,730 | $ 52,655 |
| Other borrowings |  | 20,473 | 26,687 |
| **Total interest expense** | **$** | **71,203** | **$ 79,342** |
| of which: |  |  |  |
| Interest expense to Related Parties | $ | 5,394 | $ 9,436 |

*The NSSN and the NCJSN notes*

Interest expense includes amortization of debt discounts/ provisions and debt issuance costs.

## 22. OTHER FINANCIAL INCOME / (EXPENSE), NET

For the three-month period and nine-month period ended September 30, 2015 and 2016, the following items are included in other financial income / (expense):

| | | three-month period ended September 30, 2015 (unaudited, as recast) | | three-month period ended September 30, 2016 (unaudited) |
|---|---|---|---|---|
| Unrealized foreign exchange impact related to foreign currency financing | | (6,632) | | (2,332) |
| Unrealized foreign exchange impact - other balance sheet items | $ | (2,777) | $ | 764 |
| Other gains / (losses) | | 1,112 | | (243) |
| **Total foreign exchange gains / (losses), net** | **$** | **(8,297)** | **$** | **(1,811)** |

| | | nine-month period ended September 30, 2015 (unaudited, as recast) | | nine-month period ended September 30, 2016 (unaudited) |
|---|---|---|---|---|
| Unrealized foreign exchange impact related to foreign currency financing | | (3,498) | | 22,254 |
| Unrealized foreign exchange impact - other balance sheet items | $ | (1,895) | $ | (5,683) |
| Other gains / (losses) | | 2,869 | | (1,721) |
| **Total foreign exchange gains / (losses), net** | **$** | **(2,524)** | **$** | **14,850** |

Foreign exchange gains / (losses), net include realized and unrealized exchange differences. The main item is the unrealized foreign exchange gain related to foreign currency financing. Unrealized foreign exchange impact related to other balance sheet items accounts for the difference from the translation of working capital items. Other gains / (losses) for three-month and nine-month periods ended September 30, 2015 and 2016 are mainly realized exchange differences related to foreign currency financing.

## 23. OTHER NON-OPERATING INCOME / (EXPENSE), NET

For the three-month and nine-month periods ended September 30, 2015 and 2016, respectively, the following items are included in other non-operating income / (expense):

| Non-operating income / (expense) | | | | |
|---|---|---|---|---|
| | | three-month period ended September 30, 2015 (unaudited, as recast) | | three-month period ended September 30, 2016 (unaudited) |
| Factoring costs and bank guarantee fees | $ | (3,287) | $ | (7,099) |
| Other gains / (losses) | | (431) | | (1,403) |
| **Total other non-operating income / (expense), net** | **$** | **(3,718)** | **$** | **(8,502)** |

| Non-operating income / (expense) | | | | |
|---|---|---|---|---|
| | nine-month period ended | | nine-month period ended | |
| | September 30, 2015 (unaudited, as recast) | | September 30, 2016 (unaudited) | |
| Factoring costs and bank guarantee fees | $ | (11,895) | $ | (19,008) |
| Other gains / (losses) | | (1,311) | | (3,211) |
| **Total other non-operating income / (expense), net** | **$** | **(13,206)** | **$** | **(22,219)** |

## 24.   EARNINGS / (LOSS) PER SHARE

The following table sets forth the computation of basic and diluted earnings / (loss) per share for the periods indicated.

| | three-month period ended | | three-month period ended | |
|---|---|---|---|---|
| | September 30, 2015 (unaudited, as recast) | | September 30, 2016 (unaudited) | |
| Income / (loss) from continuing operations, net of non-controlling interests in subsidiaries | $ | (15,901) | $ | (17,932) |
| Income / (loss) on discontinued operations | | | | |
| **Net Income / (loss) attributable to the Company** | | **(15,901)** | | **(17,932)** |
| Weighted average shares of common stock outstanding (used to calculate basic EPS) | | 10,000 | | 10,000 |
| **Net income / (loss) per common share - basic** | **$** | **(1,590.10)** | **$** | **(1,793.20)** |
| **Net income / (loss) per common share - diluted** | **$** | **(1,590.10)** | **$** | **(1,793.20)** |

| | nine-month period ended | | nine-month period ended | |
|---|---|---|---|---|
| | September 30, 2015 (unaudited, as recast) | | September 30, 2016 (unaudited) | |
| Income / (loss) from continuing operations, net of non-controlling interests in subsidiaries | $ | (50,425) | $ | (41,628) |
| Income / (loss) on discontinued operations | | | | |
| **Net Income / (loss) attributable to the Company** | | **(50,425)** | | **(41,628)** |
| Weighted average shares of common stock outstanding (used to calculate basic EPS) | | 10,000 | | 10,000 |
| **Net income / (loss) per common share - basic** | **$** | **(5,042.50)** | **$** | **(4,162.80)** |
| **Net income / (loss) per common share - diluted** | **$** | **(5,042.50)** | **$** | **(4,162.80)** |

No employee stock options were granted in the three-month and nine-month periods ended September 30, 2015 and 2016. No options were outstanding as of September 30, 2015, December 31, 2015 and September 30, 2016. There is no adjustment to diluted earnings per share related to the NCJSN as the inclusion of these shares would have been antidilutive.

## 25.   COMPREHENSIVE INCOME / (LOSS)

Comprehensive income is defined as all changes in equity during a period except for those resulting from investments by owners and distributions to owners. Comprehensive income of the Company includes net income adjusted by foreign currency translation adjustments. The foreign exchange losses / gains on the translation from foreign currencies to US dollars are classified separately as foreign currency translation adjustments within accumulated other comprehensive income included in stockholders' equity.

Other comprehensive loss of $6.6 million reported for the nine-month period ended September 30, 2016 on the face of the consolidated statement of operations and comprehensive income results from currency translation

adjustment. The adjustment is calculated for each group entity that has functional currency different from US dollar (primarily Polish zloty and Russian ruble) when its respective financial statements are translated into US dollar.

In the nine-month period ended September 30, 2015 functional currency exchange rates used to translate the balance sheet weakened against the US dollar as compared to the exchange rates as of December 31, 2014 and as a result a loss of $14.4 million of foreign currency translation adjustment was recognized for the nine-month period ended September 30, 2015.

In the nine-month period ended September 30, 2016 functional currency exchange rates used to translate the balance sheet weakened against the US dollar as compared to the exchange rates as of December 31, 2015 and as a result a loss of $6.6 million of foreign currency translation adjustment was recognized for the nine-month period ended September 30, 2016.

In the three-month periods ended September 30, 2015 and September 30, 2016 other comprehensive gains amounted to $8.4 million and $9.3 million, respectively.

## 26.   SEASONALITY OF THE BUSINESS

Our business is subject to seasonality. There is a lower demand for vodka during the first three fiscal quarters of the year. Historically, sales in the fourth quarter have been significantly higher than in the other quarters of the year due to higher demand for vodka during the holiday season at year end. Sales in the first quarter have been historically the lowest of all quarters. Our results in any particular quarter might therefore not be a reliable basis to formulate expectations of our performance over a full fiscal year and may not be comparable with the results in other fiscal quarters.

The table below demonstrates the movement and significance of seasonality by quarter in our statement of operations for the last four quarters ended September 30, 2015 and 2016.

| | | Fourth Quarter | | First Quarter | | Second Quarter | | Third Quarter |
|---|---|---|---|---|---|---|---|---|
| | | 2015 (unaudited) | | 2016 (unaudited, as adjusted)** | | 2016 (unaudited) | | 2016 (unaudited) |
| Net sales | $ | 198,196 | $ | 109,985 | $ | 145,163 | $ | 159,932 |
| **Seasonality*** | | **32.3%** | | **17.9%** | | **23.7%** | | **26.1%** |
| Gross profit | | 64,906 | | 40,531 | | 58,010 | | 60,789 |

| | | Fourth Quarter | | First Quarter | | Second Quarter | | Third Quarter |
|---|---|---|---|---|---|---|---|---|
| | | 2014 (unaudited) | | 2015 (unaudited) | | 2015 (unaudited) | | 2015 (unaudited, as recast) |
| Net sales | $ | 243,614 | $ | 107,488 | $ | 136,626 | $ | 141,921 |
| **Seasonality*** | | **38.7%** | | **17.1%** | | **21.7%** | | **22.5%** |
| Gross profit | | 85,443 | | 44,748 | | 46,934 | | 51,662 |

*Net sales for the given period as a percentage of the total net sales for the relevant four quarters as presented in the table.*

**After issuance of our first quarter 2016 report on Form 10-Q, dated May 19, 2016 we identified that the first quarter results included revenue and costs related to sale and repurchase transaction that should not have been recognized. This was subsequently adjusted as disclosed in Note 1 to our unaudited interim condensed consolidated financial statements included in our quarterly report on Form 10-Q for the period ended June 30, 2016, dated August 18, 2016.*

## 27.   SEGMENT INFORMATION

We manage our business on the basis of the following segments: Poland domestic, Russia domestic, International (comprising export activities of Poland-based and Russia-based entities and other activities of an international nature) and Corporate, which comprises other non-production and non-trading activities.

Management assesses the results of the segments based on operating income adjusted for depreciation and impairment charges ("EBITDA"). In previous year Management used Underlying EBITDA, i.e. operating income adjusted for depreciation, impairment charges and other excluded items (which are: non-recurring costs related to business reorganization, costs of acquisitions and disposals of subsidiaries and other one-time items). Underlying EBITDA is now used as a supplementary measure of performance. The below information presents both: the primary measure used by the Management to assess segments' performance, and the measure which was used by Management in previous year.

Selected financial data splits based upon these segmentations are shown below for the relevant periods (intercompany revenues and profits are eliminated in line with management accounting policies):

| Net Sales | | |
|---|---|---|
| | three-month period ended September 30, 2015 (unaudited, as recast) | three-month period ended September 30, 2016 (unaudited) |
| **Segment** | | |
| Poland domestic | $ 62,202 | $ 70,648 |
| Russia domestic | 62,315 | 49,565 |
| International | 17,404 | 39,719 |
| **Total Net Sales** | **$ 141,921** | **$ 159,932** |

| Net Sales | | |
|---|---|---|
| | nine-month period ended September 30, 2015 (unaudited, as recast) | nine-month period ended September 30, 2016 (unaudited) |
| **Segment** | | |
| Poland domestic | $ 170,250 | $ 203,024 |
| Russia domestic | 176,098 | 122,544 |
| International | 39,687 | 89,512 |
| **Total Net Sales** | **$ 386,035** | **$ 415,080** |

| EBITDA (non-GAAP measure) | | |
|---|---|---|
| | three-month period ended September 30, 2015 (unaudited, as recast) | three-month period ended September 30, 2016 (unaudited) |
| **Segment** | | |
| Poland | $ 10,624 | $ 14,719 |
| Russia | 9,531 | 3,711 |
| International | 835 | 6,812 |
| Corporate Overhead | (673) | (4,124) |
| **Total EBITDA** | **$ 20,317** | **$ 21,118** |

| EBITDA (non-GAAP measure) | | |
|---|---|---|
| | nine-month period ended September 30, 2015 (unaudited, as recast) | nine-month period ended September 30, 2016 (unaudited) |
| **Segment** | | |
| Poland | $ 28,899 | $ 41,933 |
| Russia | 11,075 | (319) |
| International | 4,856 | 16,209 |
| Corporate Overhead | (6,598) | (14,393) |
| **Total EBITDA** | **$ 38,232** | **$ 43,430** |

| Underlying EBITDA (non-GAAP measure) | | | | |
|---|---|---|---|---|
| | | three-month period ended September 30, 2015 | | three-month period ended September 30, 2016 |
| | | (unaudited, as recast) | | (unaudited) |
| **Segment** | | | | |
| Poland | $ | 13,166 | $ | 14,806 |
| Russia | | 12,744 | | 3,711 |
| International | | 841 | | 6,807 |
| Corporate Overhead | | (672) | | (2,329) |
| **Total Underlying EBITDA \*** | $ | 26,079 | $ | 22,995 |

| Underlying EBITDA (non-GAAP measure) | | | | |
|---|---|---|---|---|
| | | nine-month period ended September 30, 2015 | | three month period ended September 30, 2016 |
| | | (unaudited, as recast) | | (unaudited) |
| **Segment** | | | | |
| Poland | $ | 37,680 | $ | 42,201 |
| Russia | | 18,559 | | (320) |
| International | | 4,889 | | 16,209 |
| Corporate Overhead | | (6,599) | | (6,052) |
| **Total Underlying EBITDA \*** | $ | 54,529 | $ | 52,038 |

*\* From the Underlying EBITDA for the three-month and nine-month periods ended September 30, 2016 no costs of revenue acceleration deals were excluded. The Management believes that approximately 50% of such costs incurred year-to-date, i.e. approximately $8.6 million, is recoverable in 2017. Were these costs excluded the Underlying EBITDA for the three-month and nine-month periods would amount to $25.5 million and $60.6 million respectively.*

| EBITDA (non-GAAP measure) to Operating Income reconciliation | | | | |
|---|---|---|---|---|
| | | three-month period ended September 30, 2015 | | three-month period ended September 30, 2016 |
| | | (unaudited, as recast) | | (unaudited) |
| Operating income / (loss) | $ | 17,788 | $ | 18,423 |
| Depreciation and amortization | | 2,529 | | 2,695 |
| Impairment charge | | - | | - |
| **Total EBITDA** | | 20,317 | | 21,118 |
| Other excluded items (non-GAAP measure) | | 5,762 | | 1,877 |
| **Total Underlying EBITDA** | $ | 26,079 | $ | 22,995 |

| EBITDA (non-GAAP measure) to Operating Income reconciliation | | | | |
|---|---|---|---|---|
| | | nine-month period ended September 30, 2015 | | nine-month period ended September 30, 2016 |
| | | (unaudited, as recast) | | (unaudited) |
| Operating income / (loss) | $ | 30,825 | $ | 35,268 |
| Depreciation and amortization | | 7,407 | | 8,162 |
| Impairment charge | | - | | - |
| **Total EBITDA** | | 38,232 | | 43,430 |
| Other excluded items (non-GAAP measure) | | 16,297 | | 8,608 |
| **Total Underlying EBITDA** | $ | 54,529 | $ | 52,038 |

| Depreciation / Amortization Expense | | | |
|---|---|---|---|
| | three-month period ended September 30, 2015 (unaudited, as recast) | | three-month period ended September 30, 2016 (unaudited) |
| **Segment** | | | |
| Poland domestic | $ | 1,552 | $ | 1,821 |
| Russia domestic | | 890 | | 784 |
| International | | 73 | | 80 |
| Corporate | | 14 | | 10 |
| **Total depreciation / amortization expense** | $ | **2,529** | $ | **2,695** |

| Depreciation / Amortization Expense | | | |
|---|---|---|---|
| | nine-month period ended September 30, 2015 (unaudited, as recast) | | three month period ended September 30, 2015 (unaudited) |
| **Segment** | | | |
| Poland domestic | $ | 4,715 | $ | 5,303 |
| Russia domestic | | 2,385 | | 2,580 |
| International | | 264 | | 253 |
| Corporate | | 43 | | 26 |
| **Total depreciation / amortization expense** | $ | **7,407** | $ | **8,162** |

## 28.    GEOGRAPHIC DATA

Net sales and long-lived assets, by geographic area, consisted of the following for the three-month and nine-month periods ended September 30, 2015 and 2016:

| Net Sales to External Customers (a) | | | |
|---|---|---|---|
| | three-month period ended September 30, 2015 (unaudited, as recast) | | three-month period ended September 30, 2016 (unaudited) |
| **United States** | $ | **3,599** | $ | **2,819** |
| **Rest of the World** | | | |
| Poland | | 62,202 | | 70,648 |
| Russia | | 62,315 | | 49,566 |
| Other Countries | | 13,805 | | 36,899 |
| **Total Rest of the World** | | **138,322** | | **157,113** |
| **Total** | $ | **141,921** | $ | **159,932** |

| Net Sales to External Customers (a) | | | |
|---|---|---|---|
| | nine-month period ended September 30, 2015 (unaudited, as recast) | | nine-month period ended September 30, 2016 (unaudited) |
| **United States** | $ | **4,232** | $ | **7,769** |
| **Rest of the World** | | | |
| Poland | | 170,250 | | 203,024 |
| Russia | | 176,098 | | 122,544 |
| Other Countries | | 35,455 | | 81,743 |
| **Total Rest of the World** | | **381,803** | | **407,311** |
| **Total** | $ | **386,035** | $ | **415,080** |

| | Long-lived Assets (b) | | |
|---|---|---|---|
| | September 30, 2015 (unaudited, as recast) | December 31, 2015 | September 30, 2016 (unaudited) |
| **United States** | $ - | $ - | $ - |
| **Other Countries** | | | |
| Poland | 275,465 | 267,227 | 273,040 |
| Russia | 151,322 | 133,337 | 153,193 |
| Other Countries | 11,348 | 11,026 | 17,546 |
| **Total Rest of the World** | 438,135 | 411,590 | 443,779 |
| **Total consolidated long-lived assets** | $ 438,135 | $ 411,590 | $ 443,779 |

(a) Net sales to external customers based on the location to which the sale was delivered.
(b) Long-lived assets primarily consist of property, plant and equipment and trademarks.

*29.    SUBSEQUENT EVENTS*

Subsequent events were evaluated through November 18, 2016 which is the date these unaudited interim condensed consolidated financial statements were issued.

**Agreement with Creditors to Strengthen ROUST's Balance Sheet**

Earlier in November 2016, ROUST announced that it has agreed to a significant transaction with holders of approximately 90% in principal amount of the NSSN and approximately two-thirds in principal amount of the NCJSN and its controlling shareholder to strengthen its capitalization by over $500 million and deleverage its balance sheet. The transaction would result in the reduction of the Company's existing debt by approximately $462 million, plus funding of $55 million in new equity capital and the contribution of strategic assets, including Russian Standard Vodka, to the Company by RTL. In connection with, among other things, the contribution of such strategic assets to the Company, all intercompany loans owed by RTL to the Company will be considered repaid in full. For more information on the transaction, see our Form 8-K dated November 11, 2016.

As a result of the transaction ROUST combined with Russian Standard Vodka is creating a great global company with strong balance sheet and strong liquidity, that would help to utilize growth opportunities. Upon the successful completion of the transaction, the reduction of indebtedness and the liquidity provided by the new equity capital, will enable ROUST to more effectively execute its business strategy, take advantage of the growth opportunities worldwide, to ensure that it is well positioned for an IPO within the next two to three years.

Based on the significant support the Company has received from holders of its Existing Notes, the interest payment on the NSSN due on October 31, 2016 will be paid in new notes to be issued in accordance with the terms of the anticipated transaction, instead of cash, thereby preserving cash liquidity to capture growth opportunities. The Company has the support of the Consenting Noteholders with respect to such arrangement.

The transaction is expected to be consummated through a prepackaged Chapter 11 plan of reorganization of the Company (the Plan) through a voluntary reorganization case in the United States (the Chapter 11 Case). Only the Company and certain of its U.S. non-operating affiliates would be part of the Chapter 11 Case. None of the Company's operating subsidiaries would be involved in the Chapter 11 Case. The Company intends to commence its Chapter 11 Case in December and expects that the Plan (and related transactions described in this announcement) will be consummated between 35 and 45 days thereafter. Customers, suppliers, employees, trade and other creditors will not be affected by the proposed transaction and should experience no change in the way the Company does business with them.

The Company's ability to meet its obligations depends on the consummation of the Plan being achieved. The consummation of the Plan is subject to a number of conditions, the satisfaction of which cannot be assured, including among other things, the negotiation and agreement of definitive documentation and the provision by the Company of satisfactory and confirmatory due diligence to the consenting noteholders. The Plan would also be subject to obtaining a court confirmation. The terms and conditions of the Plan would be outlined in more detail in a disclosure statement that would be sent to security holders and creditors entitled to vote on the Plan. There can be no

absolute assurance that the Company will be successful, but after carefully considering the above factors and the recent positive performance of the business, management has concluded that the going concern basis of the presentation of the Company's consolidated financial statements is appropriate.

**Changes in external financing**

Since September 30, 2016, up to the date of this report ROUST received $6.4 million, repaid $2.6 million and rolled over $44.4 million of principal of our external debt and utilized $5.8 million of recourse factoring (borrowing type) from third parties.

**Changes to net exposure on Related Party financing**

Since September 30, 2016, up to the date of this report Related Parties did not receive any loans from and did not repay any loans to the Company.

Since September 30, 2016, up to date of this report the Company did not receive, repay or roll over any borrowings from Related Parties.

Since September 30, 2016, up to date of this report Related Parties provided additional net factoring support in amount of $10.4 million.

**Roust Corporation**

**U.S. Generally Accepted Accounting Principles**

**Financial Statements and Auditor's Report**

**31 December 2015**

**Independent Auditors' Report**

The Board of Directors
Roust Corporation:

**Report on the Financial Statements**

We have audited the accompanying consolidated financial statements of Roust Corporation and its subsidiaries, which comprise the consolidated balance sheets as of December 31, 2015 and 2014, and the related consolidated statements of operations and comprehensive income/(loss), changes in stockholders' equity/(deficit), and cash flows for the years then ended, and the related notes to the consolidated financial statements.

*Management's Responsibility for the Financial Statements*

Management is responsible for the preparation and fair presentation of these consolidated financial statements in accordance with U.S. generally accepted accounting principles; this includes the design, implementation, and maintenance of internal control relevant to the preparation and fair presentation of consolidated financial statements that are free from material misstatement, whether due to fraud or error.

*Auditors' Responsibility*

Our responsibility is to express an opinion on these consolidated financial statements based on our audits. We conducted our audits in accordance with auditing standards generally accepted in the United States of America. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the consolidated financial statements are free from material misstatement.

An audit involves performing procedures to obtain audit evidence about the amounts and disclosures in the consolidated financial statements. The procedures selected depend on the auditors' judgment, including the assessment of the risks of material misstatement of the consolidated financial statements, whether due to fraud or error. In making those risk assessments, the auditor considers internal control relevant to the entity's preparation and fair presentation of the consolidated financial statements in order to design audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the entity's internal control. Accordingly, we express no such opinion. An audit also includes evaluating the appropriateness of accounting policies used and the reasonableness of significant accounting estimates made by management, as well as evaluating the overall presentation of the consolidated financial statements.

We believe that the audit evidence we have obtained is sufficient and appropriate to provide a basis for our audit opinion.

*Opinion*

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of Roust Corporation and its subsidiaries as of December 31, 2015 and 2014, and the results of their operations and their cash flows for the years then ended in accordance with U.S. generally accepted accounting principles.

JSC "KPMG"
April 1, 2016
Moscow, Russian Federation

**Independent Auditors' Report**

To the Board of Directors and Shareholders' of Roust Corporation (previously Central European Distribution Company).

We have audited the accompanying consolidated financial statements of Roust Corporation and its subsidiaries (Successor Company), which comprise the consolidated statements of operations and comprehensive income, changes in stockholders' equity and cash flows for the period from June 6, 2013 to December 31, 2013.

### *Management's Responsibility for the Consolidated Financial Statements*

Management is responsible for the preparation and fair presentation of the consolidated financial statements in accordance with accounting principles generally accepted in the United States of America; this includes the design, implementation, and maintenance of internal control relevant to the preparation and fair presentation of consolidated financial statements that are free from material misstatement, whether due to fraud or error.

### *Auditor's Responsibility*

Our responsibility is to express an opinion on the consolidated financial statements based on our audit. We conducted our audit in accordance with auditing standards generally accepted in the United States of America. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the consolidated financial statements are free from material misstatement.

An audit involves performing procedures to obtain audit evidence about the amounts and disclosures in the consolidated financial statements. The procedures selected depend on our judgment, including the assessment of the risks of material misstatement of the consolidated financial statements, whether due to fraud or error. In making those risk assessments, we consider internal control relevant to the Successor Company's preparation and fair presentation of the consolidated financial statements in order to design audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the Successor Company's internal control. Accordingly, we express no such opinion. An audit also includes evaluating the appropriateness of accounting policies used and the reasonableness of significant accounting estimates made by management, as well as evaluating the overall presentation of the consolidated financial statements.

We believe that the audit evidence we have obtained is sufficient and appropriate to provide a basis for our qualified audit opinion.

### *Basis for Qualified Opinion*

In 2015, the Successor Company acquired a business that was under common control. Common control transactions create a change in the reporting entity, therefore requiring that the combined businesses be presented on a consistent basis for all periods presented. The Successor Company has only accounted for the transaction from June 1, 2015 until December 31, 2015. The acquired business was managed previously by other parts of the common control group, therefore in our opinion should be included in the Successor Company's 2013 statements of operations and cash flows. We were not provided the relevant information to assess the impact on the 2013 Successor Company's financial statements. Consequently, we were unable to determine whether any adjustments to the above-mentioned financial statements were necessary.

The Successor Company also changed its segment presentation in 2015. Generally accepted accounting standards require that changes in segments be retro-actively adjusted in order to present segments on the same basis for all periods presented. The Successor Company was not able to provide us the information to assess the segment disclosures for the Successor Company period from June 6, 2013 to December 31, 2013.

### *Qualified Opinion*

In our opinion, except for the effects of the matters described in the Basis for Qualified Opinion paragraph, the financial statements referred to above present fairly, in all material respects, the results of operations and of cash flows of Roust Corporation (Successor Company) for the period June 6, 2013 to December 31, 2013 in accordance with accounting principles generally accepted in the United States of America.

***Emphasis of Matter***

As discussed in Note 2 to the consolidated financial statements, Roust Corporation filed a petition on April 7, 2013 with the United States Bankruptcy Court for the district of Delaware for reorganization under the provisions of Chapter 11 of the Bankruptcy Code. The Plan of Reorganization was substantially consummated on June 5, 2013 and the Successor Company emerged from bankruptcy. In connection with its emergence from bankruptcy, the Successor Company adopted fresh start accounting. Our opinion is not modified with respect to this matter.

/s/ PricewaterhouseCoopers Sp. z o.o.
Warsaw, Poland

March 19, 2014 , except of the effect of the Roust Inc. acquisition under common control discussed in Note 4 to the consolidated financial statements presented herein, as to which the date is March 25, 2015, and except for the effect of the RDL acquisition under common control also discussed in Note 4, as to which the date is April 1, 2016.

**Independent Auditors' Report**

To the Board of Directors and Shareholders' of Roust Corporation (previously Central European Distribution Company).

We have audited the accompanying consolidated financial statements of Roust Corporation and its subsidiaries (Predecessor Company), which comprise the consolidated statements of operations and comprehensive income, changes in stockholders' equity and cash flows for the period from January 1, 2013 to June 5, 2013.

*Management's Responsibility for the Consolidated Financial Statements*

Management is responsible for the preparation and fair presentation of the consolidated financial statements in accordance with accounting principles generally accepted in the United States of America; this includes the design, implementation, and maintenance of internal control relevant to the preparation and fair presentation of consolidated financial statements that are free from material misstatement, whether due to fraud or error.

*Auditor's Responsibility*

Our responsibility is to express an opinion on the consolidated financial statements based on our audit. We conducted our audit in accordance with auditing standards generally accepted in the United States of America. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the consolidated financial statements are free from material misstatement.

An audit involves performing procedures to obtain audit evidence about the amounts and disclosures in the consolidated financial statements. The procedures selected depend on our judgment, including the assessment of the risks of material misstatement of the consolidated financial statements, whether due to fraud or error. In making those risk assessments, we consider internal control relevant to the Predecessor Company's preparation and fair presentation of the consolidated financial statements in order to design audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the Predecessor Company's internal control. Accordingly, we express no such opinion. An audit also includes evaluating the appropriateness of accounting policies used and the reasonableness of significant accounting estimates made by management, as well as evaluating the overall presentation of the consolidated financial statements. We believe that the audit evidence we have obtained is sufficient and appropriate to provide a basis for our audit opinion.

*Opinion*

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the results of operations and cash flows of Roust Corporation and its subsidiaries (Predecessor Company) for the period from January 1, 2013 to June 5, 2013 in accordance with accounting principles generally accepted in the United States of America.

*Emphasis of Matter*

As discussed in Note 1 to the consolidated financial statements, Roust Corporation filed a petition on April 7, 2013 with the United States Bankruptcy Court for the district of Delaware for reorganization under the provisions of Chapter 11 of the Bankruptcy Code. The Plan of Reorganization was substantially consummated on June 5, 2013 and the Roust Corporation emerged from bankruptcy. In connection with its emergence from bankruptcy, the Roust Corporation adopted fresh start accounting. Our opinion is not modified with respect to this matter.

/s/ PricewaterhouseCoopers Sp. z o.o.
Warsaw, Poland

March 19, 2014 , except of the effect of the acquisitions under common control discussed in Note 4 to the consolidated financial statements presented herein, as to which the date is March 25, 2015.

**CONSOLIDATED BALANCE SHEETS**

| ASSETS | Note | December 31, 2014 | December 31, 2015 |
|---|---|---|---|
| **Current Assets** | | | |
| Cash and cash equivalents | | $ 35,041 | $ 12,591 |
| Restricted cash | 5 | 2,119 | 948 |
| Accounts receivable, net of allow ance for doubtful accounts at December 31, 2014 of $13,317 , at December 31, 2015 of $11,634 | 6 | 177,779 | 148,350 |
| Related Party receivable, net of allow ance for doubtful accounts at December 31, 2014 of nil, December 31, 2015 of nil | 20 | 6,453 | 24,293 |
| Inventories | 7 | 95,948 | 74,818 |
| Inventories consigned to others | 7 | 239 | - |
| Prepaid expenses | 8 | 6,993 | 9,975 |
| Loans granted to Related Parties | 20 | 59,955 | 82,671 |
| Other loans granted | | - | 118 |
| Income taxes receivable | 13 | 4,018 | 2,567 |
| Deferred income taxes | 13 | 11,502 | - |
| Other current assets | 9 | 40,861 | 31,450 |
| **Total Current Assets** | | $ 440,908 | $ 387,781 |
| **Non-Current Assets** | | | |
| Intangible assets, net | 10 | 199,239 | 169,526 |
| Goodw ill | 11 | 191,132 | 167,393 |
| Property, plant and equipment, net | 12 | 88,584 | 74,671 |
| Deferred income taxes | 13 | 3,185 | 4,875 |
| Loans granted to Related Parties | 20 | 23,881 | 14,628 |
| Other non-current assets | | 1,013 | 835 |
| **Total Non-Current Assets** | | $ 507,034 | $ 431,928 |
| **Total Assets** | | $ 947,942 | $ 819,709 |
| **LIABILITIES AND EQUITY / (DEFICIT)** | | | |
| **Current Liabilities** | | | |
| Trade accounts payable | | $ 121,957 | $ 98,558 |
| Related Party trade accounts payable | 20 | 13,149 | 20,221 |
| Bank loans and overdraft facilities | 14 | 136,426 | 109,849 |
| Bank loans and borrow ings from Related Parties | 20 | 15,516 | 79,448 |
| Other borrow ings | 14 | 24,851 | 20,618 |
| Interest accrued under New Notes | 14 | 6,969 | 7,743 |
| Income taxes payable | 13 | 5,396 | 6,057 |
| Deferred income taxes | 13 | 16 | - |
| Taxes other than income taxes | 15 | 133,101 | 111,565 |
| Other accrued liabilities | 16 | 48,711 | 45,887 |
| Other current liabilities | 17 | 18,531 | 20,488 |
| **Total Current Liabilities** | | $ 524,623 | $ 520,434 |
| **Non-Current Liabilities** | | | |
| Non-current obligations under New Junior Convertible Secured Notes | 14 | 229,687 | 253,230 |
| Non-current obligations under New Senior Secured Notes | 14 | 464,590 | 464,590 |
| Interest accrued under New Notes | 14 | 10,828 | 10,376 |
| Non-current bank borrow ings | 14 | - | 2,707 |
| Non-current bank loans and borrow ings from Related Parties | 20 | 33,815 | 6,944 |
| Non-current other borrow ings | 14 | - | 4,737 |
| Non-current accruals and other non-current liabilities | 17 | 2,087 | 17,592 |
| Non-current income taxes payable | 13 | 11,749 | 10,377 |
| Deferred income taxes | 13 | 52,239 | 18,403 |
| **Total Non-Current Liabilities** | | $ 804,995 | $ 788,956 |
| **Stockholders' Equity / (Deficit)** | | | |
| Additional paid-in-capital | | (97,729) | (137,727) |
| Accumulated deficit | | (273,842) | (326,878) |
| Accumulated other comprehensive income | 27 | (10,476) | (25,252) |
| **Total Equity / (Deficit) attributable to the Company Stockholders** | | $ (382,047) | $ (489,857) |
| Non-controlling interest | | 371 | 176 |
| **Total Stockholders Equity / (Deficit)** | | (381,676) | (489,681) |
| **Total Liabilities and Equity / (Deficit)** | | $ 947,942 | $ 819,709 |

The accompanying notes are an integral part of the consolidated financial statements.

**CONSOLIDATED STATEMENTS OF OPERATIONS AND COMPREHENSIVE INCOME / (LOSS)**

| | Note | Predecessor one hundred fifty-six-day period ended June 5, 2013 | Successor | | |
| --- | --- | --- | --- | --- | --- |
| | | | Two hundred and nine days ended December 31, 2013 | Year ended December 31, 2014 | Year ended December 31, 2015 |
| Sales | | $ 579,137 | $ 1,373,190 | $ 1,870,995 | 1,399,296 |
| Sales to Related Parties | 20 | 1,006 | 1,709 | 2,029 | 17,697 |
| Excise taxes | | (306,678) | (714,169) | (1,028,646) | (832,762) |
| **Net sales** | | **273,465** | **660,730** | **844,378** | **584,231** |
| Cost of goods sold | | 154,247 | 427,368 | 520,045 | 369,610 |
| Cost of goods sold to Related Parties | 20 | 900 | 494 | 997 | 6,322 |
| **Gross profit** | | **118,318** | **232,868** | **323,336** | **208,299** |
| Selling, general and administrative expenses | 22 | 101,967 | 203,115 | 250,499 | 153,586 |
| Provision for doubtful debts | 6 | 601 | 4,930 | (3,559) | 1,833 |
| Impairment charge | | - | 83,324 | - | - |
| **Operating income / (loss)** | | **15,750** | **(58,501)** | **76,396** | **52,880** |
| ***Non-operating income / (expense), net*** | | | | | |
| Interest income | | 714 | 567 | 357 | 96 |
| Interest income from Related Parties | 20 | - | 8,747 | 13,114 | 11,372 |
| Interest (expense) | 23 | (44,986) | (50,079) | (88,278) | (87,978) |
| Interest (expense) to Related Parties | 20, 23 | (1,339) | (4,441) | (7,846) | (8,560) |
| Foreign exchange (losses), net | 24 | (58,013) | (18,144) | (75,082) | (15,643) |
| Other non-operating (expense), net | 25 | (6,350) | (8,829) | (21,133) | (18,755) |
| **Income / (Loss) before reorganization items and income taxes** | | **(94,224)** | **(130,680)** | **(102,472)** | **(66,588)** |
| Reorganization items | | 213,273 | - | - | - |
| **Income / (Loss) before income taxes** | | **119,049** | **(130,680)** | **(102,472)** | **(66,588)** |
| Income tax benefit / (expense) | 13 | 17,134 | 12,750 | (12,334) | 13,357 |
| **Net income / (loss)** | | **136,183** | **(117,930)** | **(114,806)** | **(53,231)** |
| Less net income / (loss) attributable to non-controlling interest | | - | - | (379) | (195) |
| **Net income / (loss) attributable to the Company** | | **136,183** | **(117,930)** | **(114,427)** | **(53,036)** |
| from operations per share of common stock, basic | 26 | $ 1.67 | $ (11,793.04) | $ (11,442.70) | (5,303.60) |
| from operations per share of common stock, diluted | 26 | $ 1.66 | $ (11,793.04) | $ (11,442.70) | (5,303.60) |
| **Other comprehensive income / (loss), net of tax** | | | | | |
| Foreign currency translation adjustments, net of tax $0 | 27 | 22,164 | 31,286 | (41,769) | (14,776) |
| **Comprehensive income / (loss)** | | $ **158,347** | $ **(86,644)** | $ **(156,575)** | **(68,007)** |
| Less comprehensive income attributable to non-controlling interest | | - | - | (379) | (195) |
| **Comprehensive income / (loss) attributable to the Company** | | $ **158,347** | $ **(86,644)** | $ **(156,196)** | **(67,812)** |

The accompanying notes are an integral part of the consolidated financial statements.

## CONSOLIDATED STATEMENTS OF CHANGES IN STOCKHOLDERS' EQUITY / (DEFICIT)

| | Common stock | | Treasury stock | | Additional paid in capital | Retained earnings / (deficit) | Accumulated other comprehensive income of continuing operations | Total Equity / (Deficit) attributable to the Company Stockholders | Non-controlling interest | Total Stockholders Equity / (Deficit) |
|---|---|---|---|---|---|---|---|---|---|---|
| | No. of Shares | Amount | No. of Shares | Amount | | | | | | |
| **Balance at December 31, 2012, Predecessor Company** | 76,047,506 $ | 760 | 246 $ | (150) $ | 1,372,378 $ | (1,584,222) $ | 14,325 $ | (196,909) $ | $ | (196,909) |
| Net income / (loss) for the period | - | - | - | - | - | (160,598) | - | (160,598) | - | (160,598) |
| Foreign currency translation adjustments | - | - | - | - | - | - | 22,164 | 22,164 | - | 22,164 |
| Comprehensive income/loss for the period | - | - | - | - | - | (160,598) | 22,164 | (138,434) | - | (138,434) |
| Common stock issued in connection with equity awards | 60,000 | 1 | - | - | 408 | - | - | 409 | - | 409 |
| **Balance at June 5, 2013, Successor Company** | 76,107,506 $ | 761 | 246 $ | (150) $ | 1,372,786 $ | (1,744,820) $ | 36,489 $ | (334,934) $ | $ | (334,934) |
| Cancellation of Predessor Company accumulated deficit and accumulated other comprehensive income | (76,107,506) | (761) | (246) | 150 | (1,252,516) | 1,912,100 | - | 658,973 | - | 658,973 |
| Roust Inc. equity position on date of common control acquisition | - | - | - | - | 32,001 | (40,334) | - | (8,333) | - | (8,333) |
| Fresh start adjustments | 10,000 | - | - | - | - | (167,280) | (36,489) | (203,769) | - | (203,769) |
| **Balance at June 5, 2013, from which common control has been reflected** | 10,000 $ | - | - $ | - $ | 152,271 $ | (40,334) $ | - $ | 111,937 $ | - $ | 111,937 |
| Net income / (loss) for the period | - | - | - | - | - | (117,930) | - | (117,930) | - | (117,930) |
| Foreign currency translation adjustments | - | - | - | - | - | - | 31,286 | 31,286 | - | 31,286 |
| Comprehensive income/loss for the period | - | - | - | - | - | (117,930) | 31,286 | (86,644) | - | (86,644) |
| Distribution to owner * | - | - | - | - | - | (1,151) | - | (1,151) | - | (1,151) |
| **Balance at December 31, 2013 Successor Company** | 10,000 $ | - | - $ | - $ | 152,271 $ | (159,415) $ | 31,286 $ | 24,142 $ | - $ | 24,142 |
| Net income / (loss) for the period | - | - | - | - | - | (114,427) | - | (114,427) | (379) | (114,806) |
| Foreign currency translation adjustments | - | - | - | - | - | - | (41,762) | (41,762) | - | (41,762) |
| Comprehensive income/loss for the period | - | - | - | - | - | (114,427) | (41,762) | (156,189) | (379) | (156,568) |
| Increase in subsidiary's equity | - | - | - | - | - | - | - | - | 750 | 750 |
| Charge to equity for common control acquisition | - | - | - | - | (250,000) | - | - | (250,000) | - | (250,000) |
| **Balance at December 31, 2014, Successor Company** | 10,000 $ | - | - $ | - $ | (97,729) $ | (273,842) $ | (10,476) $ | (382,047) $ | 371 $ | (381,676) |
| Net income / (loss) for the period | - | - | - | - | - | (53,036) | - | (53,036) | (195) | (53,231) |
| Foreign currency translation adjustments | - | - | - | - | - | - | (14,776) | (14,776) | - | (14,776) |
| Comprehensive income/loss for the period | - | - | - | - | - | (53,036) | (14,776) | (67,812) | (195) | (68,007) |
| **Balance immediately prior to RDL transaction settlement under common control** | 10,000 | - | - | - | (97,729) | (326,878) | (25,252) | (449,859) | 176 | (449,683) |
| Charge to equity for RDL common control acquisition | - | - | - | - | (39,998) | - | - | (39,998) | - | (39,998) |
| **Balance at December 31, 2015, Successor Company** | 10,000 $ | - | - $ | - $ | (137,727) $ | (326,878) $ | (25,252) $ | (489,857) $ | 176 $ | (489,681) |

*Distribution to owner made by Roust Inc. pre- acquisition

The accompanying notes are an integral part of the consolidated financial statements.

**CONSOLIDATED STATEMENTS OF CASH FLOW**

| Cash flows from operating activities | Predecessor one hundred fifty-six-day period ended June 5, 2013 | Successor Two hundred and nine days ended December 31, 2013 | Year ended December 31, 2014 | Year ended December 31, 2015 |
|---|---|---|---|---|
| Net income/ (loss) attributable to the Company | $ 136,183 | $ (117,930) | $ (114,427) | (53,036) |
| Net income / (loss) attributable to non-controlling interest | - | - | (379) | (195) |
| **Net income / (loss)** | **136,183** | **(117,930)** | **(114,806)** | **(53,231)** |
| *Adjustments to reconcile net loss to net cash provided by operating activities:* | | | | |
| Depreciation and amortization | 7,694 | 6,976 | 11,811 | 10,357 |
| Deferred income taxes | (18,481) | (16,135) | (1,849) | (22,197) |
| Unrealized foreign exchange losses | 54,332 | 23,802 | 73,124 | 16,914 |
| Stock options fair value expense | 411 | - | - | - |
| Impairment charges | - | 83,324 | - | - |
| Interest accrued (net of interest capitalized) | - | 36,771 | 62,280 | 59,175 |
| New Convertible Junior Secured Notes interest paid-in-kind | - | 8,333 | 21,354 | 23,543 |
| Reorganization items | (213,273) | - | - | - |
| Amortization of debt issue costs | 16,422 | - | - | - |
| Other non cash items | 1,113 | 4,931 | (2,809) | (2,344) |
| Changes in restricted cash | - | (1,478) | (478) | 1,172 |
| *Changes in operating assets and liabilities:* | | | | |
| Accounts receivable | 168,121 | (157,263) | 66,144 | (15,380) |
| Inventories | 33,297 | (91,649) | 103,596 | 7,527 |
| Prepayments and other current assets | (57,033) | 63,707 | 48,293 | 7,167 |
| Trade accounts payable | (56,814) | 136,531 | (15,470) | 11,013 |
| Other accrued liabilities and payables (including taxes) | (45,887) | 76,766 | (157,003) | (41,371) |
| **Net cash provided by operating activities** | **26,085** | **56,686** | **94,187** | **2,345** |
| *Cash flows from investing activities* | | | | |
| Purchase of fixed assets | (4,133) | (5,207) | (16,330) | (11,253) |
| Proceeds from the disposal of fixed assets | 459 | (987) | 2,190 | 281 |
| Loans granted to related parties | - | (159,862) | (98,650) | (87,736) |
| Loans repaid by related parties | - | 38,921 | 115,788 | 51,883 |
| Roust Inc. acquisition | - | - | (162,885) | (9,050) |
| RDL acquisition | - | - | - | (13,800) |
| **Net cash (used in) investing activities** | **(3,674)** | **(127,135)** | **(159,887)** | **(69,675)** |
| *Cash flows from financing activities* | | | | |
| Borrowings on bank loans and overdraft facility | 66,723 | 224,667 | 296,286 | 192,099 |
| Repayment of bank loans, overdraft facility and other borrowings | (102,424) | (206,570) | (232,256) | (195,121) |
| Repayment of long-term borrowings in accordance with the Restructuring Plan | - | (172,000) | - | - |
| Changes in restricted cash | (172,000) | 172,000 | - | - |
| Parent financing in accordance with the Restructuring Plan | 172,000 | - | - | - |
| Related Party Borrowings | - | 50,101 | 9,431 | 97,915 |
| Payment of Related Party Borrowings | - | (22,278) | (13,735) | (47,056) |
| **Net cash provided by / (used in) financing activities** | **(35,701)** | **45,920** | **59,726** | **47,837** |
| Currency effect on brought forward cash balances | (1,769) | 2,137 | (7,515) | (2,957) |
| **Net (decrease) in cash** | **(15,059)** | **(22,392)** | **(13,489)** | **(22,450)** |
| Cash and cash equivalents at beginning of period | 84,729 | 69,670 | 48,530 | 35,041 |
| Cash and cash equivalents at beginning of period received as a result of acquisition under common control | $ - | $ 1,252 | $ - | - |
| **Cash and cash equivalents at end of period** | **$ 69,670** | **$ 48,530** | **$ 35,041** | **12,591** |
| | | | | |
| **Supplemental disclosures of cash flow information** | | | | |
| Interest paid | $ (9,495) | $ (31,140) | $ (68,746) | (71,220) |
| Interest received from Related Parties | $ - | $ 5,282 | $ 15,332 | 6,424 |
| Income tax (paid) / received | $ (1,171) | $ 802 | $ (8,933) | (4,949) |

The accompanying notes are an integral part of the consolidated financial statements.

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

### 1.    ORGANIZATION AND SIGNIFICANT ACCOUNTING POLICIES

**Organization and Description of Business**

Roust Corporation, a Delaware corporation incorporated on September 4, 1997, and its subsidiaries (collectively referred to as "ROUST," "we," "us," "our," or the "Company") operate primarily in the alcohol beverage industry. We are one of the largest producers of vodka in the world and are Central and Eastern Europe's largest integrated spirit beverages business, measured by total volume, with approximately 24.6 million nine-liter cases produced and distributed in 2015. Our business primarily involves the production and sale of our own spirit brands (principally vodka), and the import on an exclusive basis of a wide variety of spirits and wines. Our primary operations are conducted in Poland, Russia, Ukraine and Hungary. We have six operational manufacturing facilities located in Poland and Russia. The ultimate beneficial owner of the Company is Mr. Roustam Tariko.

Our mission focuses on the key strengths of our brands and our core principle of authenticity, which in turn positions us favorably to compete and differentiate ourselves to consumers around the world. We also benefit competitively from vertical and horizontal integration as the brand owner, producer and distributor. Additionally, in working with the Russian Standard Vodka group, we have benefited from our ability to access high quality spirit sourcing for our sub-premium products in Russia and internationally.

In Poland, we are largest vodka producer, with a brand portfolio that includes the *Absolwent*, *Żubrówka*, *Żubrówka Biała*, *Soplica*, *Bols* and *Palace* brands, each of which we produce at our Polish distilleries. We primarily produce and sell vodkas in Poland in three vodka sectors: premium, mainstream and economy. The portfolio strategy is to focus on the top 2 mega brands: *Żubrówka* and *Soplica*, as well as 3 core brands in different price ranges: *Żytniówka* in Economy, *Bols* in Premium and *Absolwent* in lower mainstream.

In Russia, the world's largest vodka market, trade statistics for 2015 show that we were one of the largest vodka producers in the country. As for 2015, Roust Russia Group was a nationwide brand leader in the Russian market. Our *Green Mark* brand remains a top-selling mainstream vodka and our *Talka*, *Parliament* and *Zhuravli* brands are among the top-selling sub-premium vodkas in the country. We sell the *Urozhay* and *Yamskaya* brands in the economy segment. We also sell *Russian Standard Vodka* – the leading brand in the premium segment.

The category is highly driven by innovation, while ROUST portfolio and margin growth is definitely driven by new product development in Poland. Our production capacity gives us the ability to introduce new brands with minimal outlay. In May 2013, we launched new *Bols Platinum* onto the market. In 2014, we successfully launched new variants of our brands *Absolwent Grapefruit* and *Absolwent Apple&Mint*. In 2014, we extended the *Żubrówka* brand with new flavored *Żubrówka Kora Dębu (Oak Bark)*. In 2014, we launched *Soplica Plum* and *Soplica Blackcurrant*. In 2015, we launched 2 new *Soplica* flavors, *Walnut* and *Strawberry*, 3 new *Absolwent* flavors, *Cherry*, *Mandarin* and *Wild Strawberry*, a new *Żytniówka* flavour, *Lemon Peel* and 2 New *Żubrówka* sweet bitter flavors, *Pine Shoot* and *Maple Leaves*. We also introduced new 350 ml *Soplica* flavor packaging. Last year, we also launched a new pack for *Absolwent* and our economy brand, *Żytniówka*. Our *Soplica* brand, which we relaunched at the end of 2011, and extended since then with several new flavor products, was one of the fastest growing brands in our portfolio in Poland, with 30% growth in net sales (shipments) of our flavor brands compared to 2014 (+40% depletion based on Nielsen). The flavors launched in 2013-2015 are purely incremental to the *Soplica* brand because of the strategy to be first and unique on the market.

In Russia, we launched *Talka* in July 2011, which is accounted for almost 2 million nine-liter cases in 2015. In 2015, we restyled *Green Mark* and launched new pack sizes to attract a wider range of customers and fulfill a wider range of consumer demands. We believe our ability to introduce new brands into the market in an ever-changing economic and consumer preference environment gives us a distinct advantage.

*Liquidity and Going Concern*

These consolidated financial statements have been prepared under the assumption that the Company will continue as a going concern, realizing assets and paying liabilities in the normal course of business.

As of December 31, 2015, the Company's current liabilities exceed its current assets by $132.7 million, in addition the Company has a Stockholder's Deficit of $489.7 million. Net sales during the reporting period have decreased compared to the corresponding 2014 period.

Taking into account the above factors, management is implementing a plan to confirm that the business is a going concern. Management considered, among others, the following significant factors:

- Financial situation of the Company is improving compared to the previous quarters. Our Underlying EBITDA and Operating income for the fourth quarter 2015 increased compared to the third quarter 2015 by $8.5 million and $4.3 million, respectively.

- Despite the decline of market in Russia, our currency neutral Underlying EBITDA for the year 2015 and for the fourth quarter 2015 increased compared to previous year.

- The Company is expanding its marketing activities and continuously focus on the trade spend, which will contribute to an increase in sales.

- Operating cash flow was positive at $2.3 million for the year ended December 31, 2015.

- The Company believes that future cash flows from operations and the available credit facilities of $7.4 million will be sufficient to finance our anticipated cash requirements for working capital purposes and normal capital expenditure.

- We have been able to roll over the bank debts as they fall due for several years and believe the loans, which fall due in 2016 and later, as well as factoring facilities, will be renewed to manage the Company's working capital needs. Our current debt is primarily in Russia with local Russian banks and our payments of principal and interest due are in compliance with the debt agreements. We have been working with the banks for several years and no local lender have ever called in our debt early, even when the Company was going through the Chapter 11 process.

- The acquisition of RDL is intended to further strengthen our performance in the international segment, which will result in the overall improvement of our financial situation. This will not only increase our sales and EBITDA next years, but strengthen the share of our international business, helping further to hedge profit against any Russian ruble depreciation.

- We continuously work with our Related Parties to decrease the existing Related Party exposure. In the fourth quarter we settled $22.3 million of our liability for RDL acquisition against Related Party loans. We have also obtained new financing from our Related Party – Russian Standard Bank. As a result, our Related Party balances exposure decreased in 2015 by $39.6 million.

- We have agreed with our Related Parties a plan that envisages further settlement of loans due from Related Parties in 2016. In addition, we have obtained a letter of support from RTL on its ability and willingness to support the Company in the foreseeable future through either not calling for Company's debts or providing additional financial support, if necessary.

- Since December 31, 2015, up to the date of this report we repaid $29.2 million of our debt, rolled over $20.0 million of loans, while new loans of $10.0 million were drawn.

The Company's ability to meet its obligations depends on the management's plan being achieved. There can be no absolute assurance that the Company will be successful, while the failure to generate revenue and margin growth or roll over existing bank debts may adversely affect the Company's ability to achieve its intended business objectives. After carefully considering the above factors, management has concluded that the going concern basis of the presentation of the financial statements is appropriate.

**Significant Accounting Policies**

The significant accounting policies applied by the Predecessor Company were adopted by the Successor Company. Certain reclassifications have also been made to conform data for all periods presented with the current presentation.

The significant accounting policies and practices followed by the Company are as follows:

*Basis of Presentation*

Our consolidated financial statements are prepared in accordance with accounting principles generally accepted in the United States of America ("US GAAP"). The Company consolidates all entities in which it has a controlling interest or in which it is the primary beneficiary. All inter-company accounts and transactions have been eliminated in the consolidated financial statements.

ROUST's subsidiaries maintain their books of account and prepare their statutory financial statements in their respective local currencies. The subsidiaries' financial statements have been adjusted to reflect US GAAP.

As discussed in Note 2, the Company emerged from Chapter 11 protection on June 5, 2013 and adopted fresh start accounting in accordance with Financial Accounting Standards Board Accounting Standards Codification ("ASC"), Topic 852, *Reorganizations* ("ASC 852"). For financial reporting convenience the Company elected to use its May 31, 2013 financial and tax accounting records, adjusted for the effects of the June 5, 2013 Plan of Reorganization, as the basis for the June 5, 2013 fresh start financial presentation. The adoption of fresh start accounting also resulted in our becoming a new entity for accounting and reporting purposes. Accordingly, our consolidated financial statements on June 6, 2013 and subsequent periods are not comparable, in various material respects, to our consolidated financial statements prior to that date.

Fresh start accounting requires resetting the historical net book value of assets and liabilities to fair value by allocating an entity's reorganization value to its assets and liabilities pursuant to ASC Topic 805, *Business Combinations*. The excess of reorganization value over the fair value of tangible and identifiable intangible assets is recorded as goodwill on our consolidated balance sheet. Deferred taxes are determined in conformity with ASC Topic 740, *Income Taxes* ("ASC 740").

In addition, ASC 852 requires that financial statements for periods including and subsequent to a Chapter 11 filing distinguish transactions and events that are directly associated with the reorganization proceedings and the ongoing operations of the business, as well as additional disclosures. Effective April 7, 2013, expenses, gains and losses directly associated with the reorganization proceedings were reported as reorganization items in the accompanying consolidated statements of operations. In addition, liabilities subject to compromise in the Chapter 11 cases were distinguished from liabilities not subject to compromise and from post-petition liabilities. Liabilities subject to compromise were reported at amounts allowed or expected to be allowed under Chapter 11 bankruptcy proceedings.

The "Company", when used in reference to the period subsequent to emergence from Chapter 11 bankruptcy proceedings, refers to the "Successor Company", and when used in reference to periods prior to emergence from Chapter 11, refers to the "Predecessor Company."

*Use of Estimates*

The preparation of consolidated financial statements in conformity with US GAAP requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period. Actual results could differ from those estimates. Significant items subject to such estimates and assumptions include: discounts and allowances, valuation allowance for deferred tax asset, brands valuation, economic value of business units and allowance for doubtful debts.

As a result of applying fresh start accounting principle as described above, the basis to determine enterprise value and the values of various tangible and intangible assets were determined using a number of factors, including

the use of certain valuation methodologies and certain operational assumptions and estimates. Due to the many variables inherent in the estimation of fair value, differences in assumptions and estimates may have a material effect on the result of our future goodwill and intangible asset impairment tests.

*Foreign Currency Translation and Transactions*

For all of the Company's operational subsidiaries the functional currency is the local currency. Assets and liabilities of these operations are translated to the reporting currency at the exchange rate in effect at each year-end. The Statements of Operations and Comprehensive Income are translated on a monthly basis at the average rate of exchange prevailing during the respective month, except for significant events or transactions that are translated at the prevailing exchange rate on that day. Translation adjustments arising from the use of differing exchange rates from period to period are included as a component of comprehensive income. Foreign exchange gains / (losses) arising from transactions denominated in currencies other than functional currencies, as well as gains and losses from any specific foreign currency transactions are included in the reported net income / (loss) for the period.

The accompanying consolidated financial statements have been presented in US dollars.

*Fair value measurements*

The Company measures certain assets and liabilities at fair value. Fair value is defined as the exchange price that would be received for an asset or paid to transfer a liability (an exit price) in the principal or most advantageous market for the asset or liability in an orderly transaction between market participants on the measurement date. The Company uses a fair value hierarchy which gives the highest priority to unadjusted quoted prices in active markets for identical assets and liabilities (level 1 measurements) and the lowest priority to unobservable inputs (level 3 measurements). The three levels of inputs used to measure fair value are:

Level 1        Unadjusted quoted prices in active markets for identical assets or liabilities.

Level 2        Observable inputs other than Level 1 prices such as quoted prices for similar assets or liabilities; quoted prices in markets that are not active; multiples or other inputs that are observable or can be corroborated by observable market data for substantially the full term of the assets or liabilities.

Level 3        Unobservable inputs that are supported by little or no market activity and that are significant to the fair value of the assets or liabilities.

*Cash and Cash Equivalents*

Short-term investments which have a maturity of three months or less from the date of purchase and present insignificant risk of changes in value because of changes in interest rates are classified as cash equivalents.

*Restricted cash*

The Company classifies cash as restricted when the cash is unavailable for withdrawal or usage. Restrictions may include legally restricted deposits, contracts entered into with others, or the Company's statements of intention with regard to particular deposits.

*Accounts Receivable*

Accounts receivables are recorded based on the invoice price, inclusive of VAT (sales tax). Past due amounts are determined based on established payment term. The allowances for doubtful accounts are based on our experience with past due accounts, collectability, history of write-offs, aging of accounts receivable, our analysis of customer data and our relationships with and the economic status of our customers. Individual trade receivables are provided against when management deems them not to be fully collectable. When a trade account receivable is deemed uncollectible, the balance is charged off against the allowance for doubtful accounts.

The transfer of accounts receivable to financial institutions is accounted for as a sale when all of the following conditions are met: 1) the transferred accounts receivable are isolated from the Company, 2) the receiving financial institution has the right to pledge or sell the factored accounts receivable, and 3) the Company does not

maintain effective control over the transferred accounts receivable. Isolation of the transferred accounts receivable from the Company occurs when, based on legal opinion, it is determined that in accordance with local legislation the transferred accounts receivable are put presumptively beyond the reach of the Company and its creditors even in the event of bankruptcy of the Company. Once it is determined that the transfer of the accounts receivable should be accounted for as a sale, the related accounts receivable are derecognized from the balance sheet, the recourse liability (if applicable) is recorded, and the resulting gain or loss recorded in the statement of comprehensive income / (loss) in the period the transfer is complete.

*Inventories*

Inventories are stated at the lower of cost or market value. Cost is determined using the average cost method or first-in, first-out (FIFO).

Cost includes customs duty (where applicable), and all costs associated with bringing the inventory to a condition for sale. These costs include importation, handling, storage and transportation costs, and exclude rebates received from suppliers, which are reflected as reductions to closing inventory. Inventories are comprised primarily of wine, spirits and packaging materials.

*Loans Receivable*

Loans receivable are initially measured at fair value plus directly attributable transaction costs, and are subsequently measured at amortized cost using the effective interest method (including interest accruals less provision for impairment).

*Loans granted to Related Parties*

The Company has classified the loans granted to our shareholder as assets on our accompanying balance sheet. Under US GAAP, such investments are presented as assets or in shareholders' equity depending on the underlying facts and circumstances. We have reflected them as assets as we believe our shareholder has the intention and ability to settle the loans upon maturity.

*Goodwill*

Goodwill is not subject to amortization. Goodwill is tested for impairment annually in December, or earlier upon the occurrence of certain events or substantive changes in circumstances that indicate goodwill is more likely than not impaired, which could result from significant adverse changes in the business climate and declines in the value of our business. Such indicators may include a decline in our expected future cash flows, adverse change in the economic or business environment, the testing for recoverability of a significant asset group, among others. Fair value measurement techniques, such as the discounted cash flow methodology, are utilized to assess potential impairments. The testing of goodwill is performed at each reporting unit level. The Company performs a two-step goodwill impairment test. The first step, used to indentify potential impairment, compares the fair value of a reporting unit with its carrying amount, including goodwill. If the first step does not indicate that the carrying value of the reporting unit exceeds its fair value, the second step is not required. When the first step indicates potential impairment, the Company completes the second step of the impairment test and compares the implied fair value of the reporting units' goodwill to the corresponding carrying value of goodwill. Instead of calculating fair value of a reporting unit, the Company may assess qualitative factors to determine whether it is more likely than not that the fair value of a reporting unit is less than its carrying amount, including goodwill. The evaluation of potential impairment is performed on the basis of the weight of evidence provided by the analysis of events and circumstances that may affect the determination, whether it is more likely than not that the fair value of a reporting unit is less than its carrying amount. See Note 11 for further details.

*Intangible assets other than goodwill*

Intangible assets with an indefinite life are not amortized but are reviewed for impairment annually in December or more frequently, if facts and circumstances indicate such need. Intangible assets consist primarily of acquired trademarks. The Company has acquired trademark rights to various brands, which were capitalized as part of the purchase price allocation process in connection with acquisitions of Bols, Polmos Bialystok, Parliament and

Roust Russia Group (previously Russian Alcohol Group). These trademarks include *Soplica, Żubrówka, Absolwent, Royal* vodka, *Parliament, Green Mark, Zhuravli* and the trademark rights to *Bols* vodka in Poland and Hungary. During fresh start accounting we have also recognized *Talka* brand which was not previously on the books. Management considers trademarks associated with high or market-leader brand recognition within their market segments to be indefinite-lived assets, based on the length of time they have existed, the comparatively high volumes sold and their general market positions relative to other products in their respective market segments.

Based on this and together with the evidence provided by analyses of vodka products life cycles, market studies, competitive and environmental trends, we believe that these trademarks will continue to generate cash flows for an indefinite period of time, and that the useful lives of these trademarks are therefore indefinite.

Indefinite lived assets are tested annually for potential impairment by using a discounted cash flow on a relief from royalty basis. See note 10 for further details.

*Property, plant and equipment*

Property, plant and equipment are stated at cost, less accumulated depreciation. Depreciation is computed by the straight-line method over the following useful lives:

| Type | Depreciation life in years |
|---|---|
| Transportation equipment including capital leases | 5-15 |
| Production equipment | 10-30 |
| Software | 5-10 |
| Computers and IT equipment | 3 |
| Other equipment | 2-26 |
| Freehold land | Not depreciated |
| Freehold buildings | 50 |

Leased equipment meeting appropriate criteria is capitalized and the present value of the related lease payments is recorded as a liability. Amortization of capitalized leased assets is computed on a straight-line method over the useful life of the relevant assets and included in the depreciation expense.

*Impairment of long-lived tangible assets*

The Company reviews its long-lived tangible assets for impairment whenever events or changes in circumstances indicate that the carrying amount of an asset may not be recoverable. Recoverability of assets to be held and used is measured by a comparison of the carrying amount of an asset to estimated undiscounted cash flows expected to be generated by the asset. If the carrying amount of an asset exceeds its estimated undiscounted future cash flows the asset is deemed to be impaired. An impairment charge is recognized for the amount by which the carrying amount of an asset exceeds its estimated fair value.

*Debt*

Debt instruments are measured using effective interest rate method. Debt discounts or premiums and debt issuance costs are amortized into interest expense using the effective interest method.

*Equity investments*

If the Company is not required to consolidate its investment in another company, the Company uses the equity method if the Company can exercise significant influence over the other company. Under the equity method, investments are carried at cost, plus or minus the Company's equity in the increases and decreases in the investee's net assets after the date of acquisition and certain other adjustments. The Company's share of the net income or loss of the investee is included in equity in earnings of equity method investees in the Company's Consolidated Statements of Operations.

*Revenue Recognition*

Revenues of the Company include sales of its own produced spirit brands, imported wine, beer and spirit brands as well as other third party alcoholic products purchased locally. The sale of each of these revenues streams are all processed and accounted for in the same manner. For all of its sources of revenue, the Company recognizes revenue when persuasive evidence of an arrangement exists, delivery of product has occurred, the sales price charged is fixed or determinable and collectability is reasonably assured. This generally means that revenue is recognized when title to the products are transferred to our customers. In particular, title usually transfers upon shipment to or receipt at our customers' locations, as determined by the specific sales terms of the transactions.

Sales are stated net of sales tax (VAT) and reflect reductions attributable to consideration given to customers in various customer incentive programs, including pricing discounts on single transactions, volume discounts, promotional listing fees and advertising allowances, cash discounts and rebates. In most countries where the company does business the local authorities impose an alcohol/excise tax. It is generally a sliding scale tax based on alcohol content. In general tax liability is triggered at the moment of sale in Poland and at the spirit purchase in Russia. The payment is due within 25 days of the triggering event in Poland and made in advance in Russia if there is no bank guarantee. In case the bank guarantee is issued the payment in Russia may be postponed and become due within 25 days following the month the triggering event occurred. Net sales are presented net of excise tax.

*Revenue Dilution*

As part of normal business terms with customers, the Company provides for additional discounts and rebates off our standard price for all of the products we sell. These revenue reductions are typically associated with annual or quarterly purchasing levels as well as payment terms. These rebates are divided into on-invoice and off-invoice discounts. The on-invoice reductions are presented on the sales invoice and deducted from the invoice gross sales value. The off-invoice reductions are calculated based on the analysis performed by management and are provided for in the same period the related sales are recorded. Discounts or fees that are subject to contractual based term arrangements are amortized over the term of the contract. The early payments discounts are also presented as revenue reduction. For the years ended December 31, 2013, 2014 and 2015, the Company recognized $161.2 million (including $122.1 million as the Successor and $39.1 million as the Predecessor), $182.7 million and $140.7 million of off-invoice rebates and early payment discounts as a reduction to net sales, respectively.

*Shipping and Handling*

Costs related to outbound shipping and handling are classified within selling, general and administrative expenses for all periods presented. For the years ended December 31, 2013, 2014 and 2015, the Company recognized $62.4 million (including $39.0 million as the Successor and $23.4 million as the Predecessor), $47.8 million and $29.8 million of shipping and handling costs, respectively.

*Non-direct advertising costs*

Non-direct-response advertising costs are expensed as incurred.

*Income Taxes and Deferred Taxes*

The provision for income taxes is determined using the balance sheet method. Deferred tax assets and liabilities are recognized for the tax consequences of temporary differences between the financial reporting basis and the tax basis of existing assets and liabilities. The tax rate used to determine the deferred tax assets and liabilities is the enacted tax rate for the year and manner in which the differences are expected to reverse. Deferred tax assets are reduced by a valuation allowance if it is more likely than not that some portion, or all, of the deferred tax assets will not be realized. Provision is generally made for taxes payable on remittances of overseas earnings; no provision is made for taxes on overseas retained earnings that are deemed to be permanently reinvested.

The Company uses a comprehensive model to recognize, measure, present and disclose in its financial statements uncertain tax positions that the Company has taken or expects to take on an income tax return.

Benefits from tax positions are recognized in the financial statements only when it is more likely than not that the tax position will be sustained upon examination by the appropriate taxing authority that would have full knowledge of all relevant information. A tax position that meets the more-likely-than-not recognition threshold is measured at the largest amount of benefit that is greater than fifty percent likely of being realized upon ultimate settlement. Tax positions that previously failed to meet the more-likely-than-not recognition threshold are recognized in the first subsequent financial reporting period in which that threshold is met. Previously recognized tax positions that no longer meet the more-likely-than-not recognition threshold are derecognized in the first subsequent financial reporting period in which that threshold is no longer met. The Company recognizes interest expense and penalties related to unrecognized tax benefits within income tax expense.

*Legal Contingencies*

We are involved in various lawsuits, claims, investigations and proceedings that arise in the ordinary course of business. We record a provision for a liability when we believe that it is both probable that a liability has been incurred and the amount can be reasonably estimated. Significant judgment is required to determine both probability and the estimated amount. We review these provisions at least quarterly and adjust these provisions to reflect the impact of negotiations, settlements, rulings, advice of legal counsel and updated information. Litigation is inherently unpredictable and is subject to significant uncertainties, some of which are beyond our control. Should any of these estimates and assumptions change or prove to have been incorrect, it could have a material impact on our results of operations, financial position and cash flows. See Note 18 to the Consolidated Financial Statements for a further discussion of litigation and contingencies.

*Employee Stock-Based Compensation*

Upon emergence, all common stock as well as equity based incentive compensation, including but not limited to stock options and restricted stock units of the Predecessor, were cancelled in accordance with the Plan.

*Comprehensive Income / (Loss)*

Comprehensive income / (loss) is defined as all changes in equity during a period except those resulting from investments by owners and distributions to owners. Comprehensive income / (loss) includes net income / (loss) adjusted by, among other items, foreign currency translation adjustments, that result from translation from functional currencies (primarily the Polish zloty and Russian ruble) of subsidiaries to US dollars.

*Segment Reporting*

The Company primarily operates in one industry segment, the production and sale of alcoholic beverages. The Company used to operate and manage its business based on the primary geographic segments: Poland, Russia and Hungary. Our Ukrainian operations were directly linked to our Russian operations, so they were treated as one segment. Starting in 2015, we manage our business on the basis of the following segments: Poland domestic, Russia domestic, Corporate and International, which is comprised of other segments of an international nature. Each of the geographic regions generates revenues and incurs expenses from transactions with external parties as well as from transactions with other geographic areas. Operating results of each individual geographic region are regularly reviewed and assessed by management. Therefore management's approach to the business determined the Company's segmental approach based upon geographic locations.

*Net Income / (loss) per Common Share*

Net income per common share is calculated in accordance with ASC Topic 260 *Earnings per Share.* Basic earning/ (loss) per share (EPS) are computed by dividing income / (loss) available to common shareholders by the weighted-average number of common shares outstanding for the year. The stock options and warrants discussed in Note 19 were included in the computation of diluted earning/ (losses) per common share in Note 26.

**Accounting changes**

There were no significant changes in accounting principles nor in reporting entity except for application of fresh start accounting described in Notes 2 and 3 below.

**Recently Issued Accounting Pronouncements**

In March 2016, FASB issued ASU 2016-08 Revenue from Contracts with Customers (Topic 606), Principal versus Agent Consideration (Reporting Revenue Gross versus Net). The amendments in this update affect the guidance in ASU 2014-09, Revenue from Contracts with Customers (Topic 606), which is not yet effective. The amendments in this update do not change the core principle of the guidance in Topic 606. The amendments clarify the implementation guidance principal versus agent considerations. The effective date and transition requirements for the amendments in this update are the same as the effective date and transition requirements of update 2014-19, and this is deferred by the ASU 2015-14 Revenue from Contracts with Customers (Topic 606), Deferral of the Effective Date, issuded in August 2015, to annual reporting periods beginning after December 15, 2017. Earlier application is permitted only as of annual reporting periods beginning after December 15, 2016, including interim reporting periods within that reporting period. We are in the process of analyzing the changes in the related ASU 2014-09 and 2016-08 and intend to take advantage of the deferral included in the ASU 2015-14.

In February 2016, FASB issued ASU 2016-02 Leases (Topic 842). This update creates a new Topic 842, Leases, of FASB Accounting Standards Codification. The main difference between previous GAAP and Topic 842 is the recognition of lease assets and lease liabilities by lessees for those leases classified as operating leases under previous GAAP. The amendments in this update are effective for fiscal years beginning after December 15, 2018, including interim periods within those fiscal years. Early application of the amendments in this update is permitted. We began analysis of the changes and expect the amendments will have a material impact on the Company's financial statements. The Company plans to implement the amendments of this update in the first quarter 2019.

In January 2016, the FASB issued ASU 2016-01 Financial Instruments-Overall (Subtopic 825-10), Recognition and Measurement of Financial Assets and Financial Liabilities. This update enhances the existing financial instruments reporting model by modifying fair value measurement tools, simplifying impairment assessments for certain equity instruments, and modifying overall presentation and disclosure requirements. The amendments in this update are effective for fiscal years beginning after December 15, 2017, including interim periods within those fiscal years. Early adoption of the amendments in this update is not permitted, with some exception. The Company does not expect that the adoption of the ASU 2016-01 will have a material impact on its results of operations, financial condition or disclosures.

In November 2015, FASB issued ASU 2015-17 Income Taxes (Topic 740), Balance Sheet Classification of Deferred Taxes. The amendments in this update require that deferred tax liabilities and assets be classified as noncurrent in a classified statement of financial position. The amendments in this update are effective for financial statements issued for annual periods beginning after December 15, 2016, and interim periods within those annual periods. The amendments in this update may be applied either prospectively to all deferred tax liabilities and assets or retrospectively to all periods presented. The Company analyzed ASU 2015-17 and implemented its requirements in the fourth quarter 2015. For details please refer to Note 13.

In August 2015, FASB issued ASU 2015-15 Interest-Imputation of Interest (Subtopic 835-30), Presentation and Subsequent Measurement of Debt Issuance Costs Associated with Line-of-Credit Arrangements, Amendments to SEC Paragraphs Pursuant to Staff Announcement at June 18, 2015 EITF Meeting. Given the absence of authoritative guidance within the ASU 2015-03 Interest-Imputation of Interest (Subtopic 835-30), Simplifying the Presentation of Debt Issuance Costs for debt issuance costs related to line-of-credit arrangements, the SEC staff would not object to an entity deferring and presenting debt issuance costs as an asset and subsequently amortizing the deferred debt issuance costs ratably over the term of the line-of-credit arrangement, regardless of whether there are any outstanding borrowings on the line-of-credit arrangement. In April 2015, FASB issued ASU 2015-03 Interest-Imputation of Interest (Subtopic 835-30), Simplifying the Presentation of Debt Issuance Costs. The amendments in this update simplify the presentation of debt issuance costs in such a way, that debt issuance costs related to a recognized debt liability are presented in the balance sheet as a direct deduction from the carrying amount of that debt liability, consistent with debt discounts. The related ASU 2015-15 and ASU 2015-03 are effective for financial statements issued for fiscal years beginning after December 15, 2015 and interim periods within those fiscal years. These updates does not impact current period financial statements of ROUST as the Company does not have debt issuance costs. The Company will implement amendments of this update in the future at occurrence of debt issuance costs.

In July 2015, FASB issued ASU 2015-11 Inventory (Topic 330), Simplifying the Measurement of Inventory. The amendments apply to inventory that is measured using first-in, first-out (FIFO) or average cost. According to the update an entity should measure inventory at the lower of cost and net realizable value instead of applying measurement at the lower of cost or market. The amendments are effective for fiscal years beginning after December 15, 2016, including interim periods within those fiscal years. The amendments in this update should be applied prospectively with earlier application permitted as of the beginning of an interim or annual reporting period. We reviewed the amendments in the ASU 2015-11 and do not expect material impact on our consolidated financial statements. We consider implementing amended requirements in the first quarter 2016.

In June 2015, FASB issued ASU 2015-10 Technical Corrections and Improvements. The amendments cover a wide range of Topics in the FASB Accounting Standards Codification ("Codification"). The amendments represent changes to clarify the Codification, to correct unintended application of guidance and to make minor improvements to the Codification to make it easier to understand and easier to apply. As a rule this update is not expected to have a significant effect on current accounting practices. Transition guidance varies based on the amendments. The amendments that require transition guidance will become effective for fiscal years, and for interim periods within those fiscal years, beginning after December 15, 2015. Early adoption is permitted. All other amendments are effective upon the issuance of this update. We reviewed the amendments in the ASU 2015-10 and believe it has not significant impact on our consolidated financial statements.

In April 2015, FASB issued ASU 2015-05 Intangibles-Goodwill and Other-Internal-Use Software (Subtopic 350-40), Customer's Accounting for Fees Paid in a Cloud Computing Arrangement. The amendments in this update provide guidance to customers about whether a cloud computing arrangement includes a software license. If a cloud computing arrangement includes a software license, then the customer should account for the software license element of the arrangement consistent with the acquisition of other software licenses. If a cloud computing arrangement does not include a software license, the customer should account for the arrangement as a service contract. In addition, the guidance in this update supersedes paragraph 350-40-25-16. Consequently, all software licenses within the scope of Subtopic 350-40 will be accounted for consistent with other licenses of intangible assets. The amendments are effective for annual periods, including interim periods within those annual periods, beginning after December 15, 2015. An entity can elect to adopt the amendments either (1) prospectively to all arrangements entered into or materially modified after the effective date or (2) retrospectively. The Company will review existing cloud computing arrangement and implement the requirements of ASU 2015-05 in the first quarter 2016.

Other accounting pronouncements that have been issued since the last annual report for the year ended December 31, 2014 have no impact on the Company's consolidated financial statements nor are expected to have an impact on the Company's consolidated financial statements in future periods.

## 2.    REORGANIZATION AND EMERGENCE FROM CHAPTER 11

**Emergence from Reorganization Proceedings**

On April 7, 2013 (the "Petition Date"), Roust Corporation and its two wholly owned subsidiaries, CEDC Finance Corporation International Inc. and CEDC Finance Corporation LLC (the "Debtors") filed Chapter 11 cases under the Bankruptcy Code in the Bankruptcy Court in Delaware in order to effectuate the Debtors' prepackaged Plan of Reorganization (the "Plan" or "Plan of Reorganization"). The Chapter 11 cases were jointly administered under the caption "In re: Central European Distribution Corporation, et al." Case No. 13-10738. The Plan of Reorganization was confirmed by the Bankruptcy Court on May 13, 2013. The Plan became effective when all material conditions to it were satisfied and the Debtors emerged from bankruptcy protection on June 5, 2013 (the "Effective Date").

Upon emergence from bankruptcy protection, the Company adopted the "fresh start accounting" provisions of ASC 852. Under fresh start accounting, a new reporting entity was deemed to have been created and all assets and liabilities were revalued to their fair values. Accordingly, the consolidated financial statements for the reporting entity pre-emergence are not comparable to the consolidated financial statements for the reporting entity post-emergence. ASC 852 requires that the financial statements for periods subsequent to the filing of a Chapter 11 petition and prior to the Effective Date distinguish transactions and events that are directly associated with the reorganization from the ongoing operations of the business. Revenues, expenses (including professional fees),

realized gains and losses, and provisions for losses that can be directly associated with the reorganization and restructuring of the business must be reported separately as reorganization items in the consolidated statements of operations. The consolidated balance sheet must distinguish prepetition liabilities subject to compromise from both those pre-petition liabilities that are not subject to compromise and from post-petition liabilities. Liabilities that may be affected by the Plan must be reported at the amounts expected to be allowed, even if they may be settled for lesser amounts. In addition, cash provided by reorganization items must be disclosed separately in the consolidated statement of cash flows.

## Chapter 11 Reorganization Items

In accordance with ASC 852, reorganization items are presented separately in the accompanying consolidated statements of operations and include expenses, gains and losses directly related to the Debtors' reorganization proceedings. A summary of reorganization items, net for the Predecessor is shown below:

|  | Predecessor One hundred fifty-six days ended June 5, 2013 |
| --- | --- |
| Gain on settlement of prepetition liabilities upon emergence (a) | $    509,260 |
| Revaluation of assets and liabilities (b) | (233,351) |
| Professional and other fees directly related to reorganization (c) | (62,636) |
| **Total Reorganization Items** | **$    213,273** |

(a)     Net gain on prepetition liabilities reflects amounts related to the settlement of prepetition obligations pursuant to the Plan of Reorganization, net of fair value of consideration. For details refer to paragraph "Effects of Plan Adjustments" included further in Note 3.

(b)     The revaluation of assets and liabilities relates to the fresh start adjustments in accordance with ASC 852. For details refer to paragraph "Effects of Plan Adjustments" included in Note 3.

(c)     Professional and other fees comprise legal costs of $33.2 million, financial and assurance fees of $7.9 million, consent fee of $4.4 million, investment advisory fees of $11.9 million and other professional costs of $5.2 million directly associated with the reorganization process. The consent fee in the amount of $4.4 million relates to consents to the Covenant Amendments, the Collateral and Guarantee Amendments and the Bankruptcy Waiver Amendments, each as defined in the Amended and Restated Offering Memorandum, Consent Solicitation Statement and Disclosure Statement, dated March 8, 2013, filed as an exhibit to a tender offer statement on Schedule TO-I/A on March 8, 2013, as amended and supplemented by Supplement No. 1 to the Offering Memorandum, dated March 18, 2013, filed as an exhibit to the Form 8-K filed on March 19, 2013.

## Liabilities Subject to Compromise

Liabilities subject to compromise refers to those liabilities which were addressed through the bankruptcy process. ASC 852 requires pre-petition liabilities, including those that became known after filing the Chapter 11 petitions, which are subject to compromise to be reported at the amounts expected to be allowed, even if they may be settled for lesser amounts. These liabilities represent the estimated amounts expected to be resolved on known or potential claims through the Chapter 11 process and remain subject to future adjustments from negotiated settlements, actions of the Bankruptcy Court and non-acceptance of certain executory contracts and unexpired leases.

|  | Predecessor June 5, 2013 |
| --- | --- |
| Senior Secured Notes due 2016 | $    960,700 |
| Convertible Senior Notes due 2013 | 262,177 |
| Other debt | 71,243 |
| **Total Liabilities Subject to Compromise** | **$    1,294,120** |

**Discharge and Treatment of Claims**

Pursuant to and by operation of the Plan of Reorganization, all of the Predecessor Company's existing equity securities, including common stock and stock options, were extinguished and deemed cancelled. On the Effective Date, in accordance with the Plan:

- Roust Trading Ltd. ("RTL") made a $172.0 million cash investment and exchanged the $50.0 million secured credit facility provided by RTL to ROUST pursuant to the facility agreement dated March 1, 2013 (the "RTL Credit Facility") for new shares of common stock of the Company, with the proceeds of the $172.0 million used to fund the cash consideration in the exchange offer for Senior Secured Notes due 2016 ("SSN") described below;

- all SSN representing approximately $960.7 million, including interest, were exchanged for (i) Senior Secured Notes due 2018 ("New Senior Secured Notes" or "NSSN") in aggregate principal amount equal to $464.6 million; (ii) 10% Convertible Junior Secured Notes due 2018 ("New Convertible Junior Secured Notes" or "NCJSN") in aggregate principal amount equal to $200.0 million; and (iii) $172.0 million in cash;

- all 3% Convertible Senior Notes due 2013 ("CSN") and the $20.0 million aggregate principal amount of ROUST Senior Notes due March 18, 2013 (the "RTL Notes") were exchanged for their pro rata share (based upon the approximate $282.2 million sum of aggregate principal amount of CSN and the RTL Notes outstanding and accrued interest calculated through April 7, 2013) and RTL Notes of $16.9 million in cash, which was funded separately by RTL; and

- in exchange for the investment described above, RTL and its affiliates received new shares of common stock of the Company representing 100% of the reorganized ROUST.

## 3.    FRESH START ACCOUNTING

As discussed in Note 2, *Reorganization and Emergence from Chapter 11*, the Debtors emerged from Chapter 11 on June 5, 2013. In accordance with ASC 852, the Company adopted fresh start accounting and adjusted the historical carrying value of its assets and liabilities to their respective fair values at the Effective Date. Simultaneously, the Company determined the fair value of its equity at the Effective Date. For financial reporting convenience, the Company elected to use May 31, 2013 financial and tax accounting records, adjusted for the effects of the June 5, 2013 Plan of Reorganization, as the basis for the June 5, 2013 fresh start financial presentation. As a result, the Company recorded fresh start accounting adjustments to historical carrying values of assets and liabilities using market prices, discounted cash flow methodologies based primarily on observable market information and, to a lesser extent, unobservable market information, and other techniques. The adoption of fresh start accounting results in a new reporting entity. The financial statements as of June 5, 2013 and for subsequent periods report the results of a new entity with no beginning retained earnings.

The Bankruptcy Court confirmed the Plan based upon an estimated enterprise value of the Company between $840.0 million and $1,050.0 million, which was estimated using various valuation methods, including (i) a comparison of the Company and its projected performance to the market values of comparable companies; (ii) a review and analysis of several recent transactions of companies in similar industries to the Company; and (iii) a calculation of the present value of the future cash flows of the Company based on its projections for years ending 2013 through 2017. Based upon a subsequent evaluation of relevant factors used in determining the range of enterprise value and updated expected cash flow projections, the Company concluded the enterprise value, or fair value, was $892.2 million including cash and short-term securities of $70.4 million, as of June 5, 2013.

The basis of the discounted cash flow analysis used in developing the enterprise value was based on Company prepared projections which included a variety of estimates and assumptions. While the Company considers such estimates and assumptions reasonable, they are inherently subject to significant business, economic and competitive uncertainties, many of which are beyond the Company's control and, therefore, may not be realized. Changes in these estimates and assumptions may have had a significant effect on the determination of the Company's enterprise value. The assumptions used in the calculations for the discounted cash flow analysis, which had the most significant effect on our estimated enterprise value, included the following: forecasted revenue, costs

and free cash flows through 2017, discount rate of 12.9% that considered various factors, including bonds yields, risk premium and tax rates. A terminal value was determined using a blended long-term growth rate of 4.1%. The long-term growth rate was based on the internal projections, expected inflation rates and industry growth prospects.

The four-column condensed consolidated statement of financial position as of June 5, 2013 included herein, applies the effects of the Plan and fresh start accounting to the carrying values and classifications of assets or liabilities. Upon adoption of fresh start accounting, the recorded amounts of assets and liabilities were adjusted to reflect their estimated fair values. Accordingly, the reported historical financial statements of the Predecessor Company prior to the adoption of fresh start accounting for periods ended on or prior to June 5, 2013 are not comparable to those of the Successor Company.

In applying fresh start accounting, the Company followed these principles:

- The reorganization value, which represents the concluded enterprise value plus excess cash and cash equivalents and non-interest bearing liabilities, of the entity was allocated to the entity's reporting units in conformity with ASC Topic 805, *Business Combinations*. The reorganization value exceeded the sum of the fair value assigned to assets and liabilities. This excess was recorded as Successor Company goodwill as of June 5, 2013.

- Each liability existing as of the fresh start accounting date, other than deferred taxes, has been stated at the fair value, and determined at appropriate risk adjusted interest rates.

- Deferred taxes were reported in conformity with applicable income tax accounting standards, principally ASC 740. Deferred tax assets and liabilities have been recognized for differences between the assigned values and the tax basis of the recognized assets and liabilities.

- Fresh start accounting resulted in the selection of appropriate policies for the Successor. The significant policies disclosed in the Predecessor Company's audited financial statements for the year ended December 31, 2012, were adopted by the Successor Company.

The following four-column condensed consolidated statement of financial position table identifies the adjustments recorded to the Predecessor's June 5, 2013 consolidated statement of financial position as a result of implementing the Plan and applying fresh start accounting:

| | Predecessor June 5, 2013 | Effects of Plan | | Fresh Start | | Successor June 5, 2013 |
|---|---|---|---|---|---|---|
| ASSETS | | | | | | |
| Current Assets | | | | | | |
| Cash and cash equivalents | $69,670 | $0 | | $0 | | $69,670 |
| Accounts receivable | 166,816 | 0 | | (1,219) | (f) | 165,597 |
| Restricted cash | 226 | 172,000 | (a) | 0 | | 172,226 |
| Inventories | 134,307 | 0 | | 19,643 | (g) | 153,950 |
| Prepaid expenses | 26,174 | 0 | | (4,185) | (f) | 21,989 |
| Income taxes receivable | 10,642 | 0 | | (1,612) | | 9,030 |
| Other current assets | 105,525 | 0 | | (480) | (f) | 105,045 |
| Deferred income taxes | 5,412 | 0 | | (2,644) | (h) | 2,768 |
| | | | | | | |
| Total Current Assets | 518,772 | 172,000 | | 9,503 | | 700,275 |
| | | | | | | |
| Intangible assets, net | 433,706 | 0 | | (99,596) | (i) | 334,110 |
| Goodwill | 368,337 | 0 | | (109,012) | (j) | 259,325 |
| Property, plant and equipment, net | 157,281 | 0 | | (28,161) | (k) | 129,120 |
| Other non-current assets | 750 | 0 | | 0 | | 750 |
| Deferred income taxes, net | 503 | 0 | | 481 | (h) | 984 |
| | | | | | | |
| Total Non-Current Assets | 960,577 | 0 | | (236,288) | | 724,289 |
| | | | | | | |
| **Total Assets** | **$1,479,349** | **$172,000** | | **$(226,785)** | | **$1,424,564** |
| | | | | | | |
| LIABILITIES AND EQUITY | | | | | | |
| Current Liabilities | | | | | | |
| Trade accounts payable | $64,497 | $0 | | $0 | | $64,497 |
| Bank loans and overdraft facilities | 91,156 | 0 | | 0 | | 91,156 |
| Deferred income taxes | 880 | 0 | | (142) | (h) | 738 |
| Income taxes payable | 2,356 | 0 | | 0 | | 2,356 |
| Taxes other than income taxes | 80,367 | 0 | | 0 | | 80,367 |
| Other accrued liabilities | 76,774 | 0 | | 0 | | 76,774 |
| Other current liabilities | 68,803 | 172,000 | (a) | 0 | | 240,803 |
| Current portions of obligations under capital leases | 808 | 0 | | 0 | | 808 |
| Liabilities subject to compromise | 1,294,120 | (1,294,120) | (c) | 0 | | 0 |
| | | | | | | |
| Total Current Liabilities | 1,679,761 | (1,122,120) | | (142) | | 557,499 |
| | | | | | | |
| Long-term obligations under capital leases | 624 | 0 | | 0 | | 624 |
| Long-term obligations under New Convertible Secured Notes | 0 | 200,000 | (b) | 0 | | 200,000 |
| Long-term obligations under New Secured Notes | 0 | 464,590 | (b) | 0 | | 464,590 |
| Long-term accruals | 839 | 0 | | 0 | | 839 |
| Long term income taxes payable | 7,586 | 0 | | 0 | | 7,586 |
| Deferred income taxes | 96,030 | 0 | | (22,874) | (h) | 73,156 |
| | | | | | | |
| Total Long-Term Liabilities | 105,079 | 664,590 | | (22,874) | | 746,795 |
| | | | | | | |
| Temporary equity | 29,443 | (29,443) | (d) | **0** | | **0** |

| Stockholders' Equity | | | | | | |
|---|---|---|---|---|---|---|
| Predecessor common stock | 761 | (761) | (d) | 0 | | 0 |
| Successor common stock | 0 | 0 | | 0 | | 0 |
| Additional paid-in-capital | 1,372,786 | (1,252,516) | (d) | 0 | | 120,270 |
| Accumulated deficit | (1,744,820) | 1,912,100 | (e) | (167,280) | (l) | 0 |
| Accumulated other comprehensive income | 36,489 | 0 | | (36,489) | (l) | 0 |
| Less Treasury Stock | (150) | 150 | (d) | 0 | | 0 |
| | | | | | | |
| Total Stockholders' Equity | (334,934) | 658,973 | | (203,769) | (l) | 120,270 |
| | | | | | | |
| **Total Liabilities and Equity** | **$1,479,349** | **$172,000** | | **$(226,785)** | | **$1,424,564** |

## Effects of Plan Adjustments

(a)   Reflects the cash infusion from RTL which was paid to holders of the SSN claims by June 20, 2013 and the corresponding short term accrual.

(b)   Issuance of New Senior Secured Notes and New Convertible Junior Secured Notes for satisfaction of the SSN claims.

(c)   The adjustment to liabilities subject to compromise relates to the extinguishment of the 2016 Senior Secured Notes, 2013 Convertible Notes, RTL Credit Facility and RTL Notes. The 2016 Senior Secured Notes were settled with new debt and cash, the 2013 Convertible Senior Notes and RTL Notes were settled with cash and the RTL Credit Facility along with the RTL cash investment were settled with new common stock at emergence.

(d)   Pursuant to the Plan, the Company's common stock was cancelled and new common stock of the Company was issued. The adjustment eliminated the Predecessor Company's common stock, treasury stock, additional paid-in-capital and temporary equity of $0.8 million, ($0.2) million, $1,372.8 million, and $29.4 respectively, and recorded the Successor Company's common stock and additional paid-in-capital of $120.3 million, which represents the fair value of the newly issued common stock.

(e)   As a result of the Plan, the adjustment to accumulated deficit recorded the elimination of the Predecessor Company's common stock, treasury stock and additional paid-in-capital and the gain on extinguishment of debt, offset by the issuance of the Successor Company's new common stock, New Senior Secured Notes and New Convertible Junior Secured Notes.

*Extinguishment of Predecessor claims pursuant to the Plan:*

| | | |
|---|---|---|
| Senior Secured Notes due 2016 | $(960,700) | |
| Convertible Senior Notes 2013 | (262,177) | |
| RTL Credit Facility | (50,175) | |
| RTL Notes | (21,068) | |
| **Total liabilities subject to compromise** | | **(1,294,120)** |

*Establishment of Successor obligations pursuant to the Plan:*

| | | |
|---|---|---|
| New Senior Secured Notes | $464,590 | |
| New Convertible Junior Secured Notes | 200,000 | |
| Issuance of New Common Stock | 120,270 | |
| **Total settlements on debt** | | **784,860** |
| | | |
| **Gain on settlement of prepetition liabilities** | | **$(509,260)** |
| | | |
| Other adjustments to accumulated deficit: | | |
| Extinguishment of Predecessor common stock and paid-in-capital | | $(1,402,840) |
| | | |
| **Accumulated deficit change at emergence** | | **$(1,912,100)** |

**Fresh Start Adjustments**

(a)    Decrease in accounts receivable, prepayments and other current assets represent expected slowdown or termination of contracts directly related to the plan.

(b)    Inventories were mainly valued using comparative sales method which utilizes the expected selling prices to customers as a basis for valuing finished goods. The basis is adjusted for relevant factors such as costs to complete and time to dispose of inventory and a reasonable profit margin on the selling and disposal efforts. An adjustment of $19.6 million was recorded to increase the book value of inventories to fair value.

(c)    Primarily reflects the tax effects of the fresh start adjustments at statutory tax rates applicable to such adjustments, net of adjustments to the valuation allowance.

(d)    Reflects the fair value of identifiable intangible assets in connection with fresh start accounting. The Company's primary intangible is its trade names which were valued using the relief from royalty method. The significant assumptions used in this method included:

      a.    forecasted revenue for each trade name,

      b.    royalty rates, which were derived using the results of the profit split analysis, analysis of market comparable transactions and analysis of internal transactions,

      c.    discount rates ranging from 12.6% to 18.6% based on the average cost of capital, adjusted for perceived business risks related to these intangible assets, and

      d.    indefinite economic life for our trade names.

(e)    Adjustment eliminated the balance of Predecessor Company goodwill and recorded Successor Company reorganization value in excess of amounts allocated to identified tangible and intangible assets, also referred to as Successor Company goodwill. The Successor Company's June 5, 2013 statement of financial position reflects the allocation of the business enterprise value to assets and liabilities immediately following emergence as follows:

| | |
|---|---:|
| **Business enterprise value** | **$892,235** |
| Add: Fair value of liabilities excluded from enterprise value | 554,802 |
| Less: Fair value of tangible assets | (853,602) |
| Less: Fair value of identified intangible assets | (334,110) |
| **Reorganization value of assets in excess of amounts allocated to identified tangible and intangible assets (Successor Company goodwill)** | **$259,325** |

(f)    Reflects the fair values of property, plant and equipment in connection with fresh start accounting. Fair value estimates were based on the following valuation methods:

      a.    Land was valued using the market approach which was primarily based on pertinent local sales and listing data.

      b.    Other real property such as buildings, building improvements, and leasehold improvements were valued using either: 1) current market cost to construct improvements where information regarding size, age, construction type, etc. was available and 2) current market trending indices applied to historical capital costs where such detailed information was not available.

      c.    Computer hardware and software were valued using a percent of cost market approach.

      d.    Other personal property such as equipment and furniture and fixtures were valued using the cost approach based on replacement costs and current market trending indices.

(g)     The Predecessor Company's accumulated deficit and accumulated other comprehensive income is eliminated in conjunction with the adoption of fresh start accounting. The Predecessor Company recognized a pre-tax loss of $233.4 million related to fresh start accounting adjustment as follows:

| | |
|---|---:|
| Establishment of Successor Company's goodwill | $(259,325) |
| Elimination of Predecessor Company's goodwill | 368,337 |
| Establishment of Successor Company's other intangible assets | (334,110) |
| Elimination of Predecessor Company's other intangible assets | 433,706 |
| Inventory adjustments | (19,643) |
| Property, plant and equipment adjustments | 28,161 |
| Other fair value adjustments | 7,496 |
| Currency translation adjustments | 8,729 |
| **Pre-tax loss on fresh start accounting adjustments** | **$233,351** |
| Deferred tax adjustments | (20,853) |
| Less: Fresh start currency translation adjustments | (8,729) |
| **Fresh start accounting stockholder's equity adjustment** | **$203,769** |

## 4.     *ACQUISITION UNDER COMMON CONTROL*

**Acquisition of Roust Distribution Limited ("RDL")**

On December 30, 2015 the Company completed its acquisition of Roust Distribution Limited ("RDL") from Roust Trading Ltd. ("RTL") through the transfer of the 100% ownership interest in RDL from RTL to Pasalba Limited, a wholly owned subsidiary of ROUST.

RDL is a worldwide distributor of *Russian Standard Vodka*. Through the acquisition of RDL we acquired the *Russian Standard Vodka* international distribution contracts, which were historically managed by RTL's subsidiaries. Acquisition of RDL is the next step for ROUST in distributing this premium brand globally. It follows the great success of Roust Inc., which distributes *Russian Standard Vodka* in Russia.

*Russian Standard Vodka* have had significant investments globally over recent years. It is now well established brand internationally, being number 3 vodka in UK excluding private labels (after *Smirnoff* and *Glen's*), number 7 in Germany (after for example *Absolut* and *Smirnoff*), number 4 in Global Travel Retail and having 2 million nine-liter cases of international sales with 12% revenue compound average growth rate (CAGR) over last 5 years. *Russian Standard Vodka* strengths are authenticity, quality and prominence. These features give us significant competitive advantage being in line with recent trends in global consumptions.

After acquisition of RDL, ROUST has now a full portfolio of brands to compete in western markets in all price segments. Bringing *Russian Standard Vodka* into our international portfolio gives us a significant opportunity to accelerate our market share, in particular in such markets as Germany, France, the UK, the US and Israel. ROUST has now a complete vodka portfolio to serve client's needs on these markets.

Strategically, the Company believes the transaction will allow it to benefit from the significant incremental EBITDA and cash flows increase, leading to a much stronger position in its International segment of operations, and to capture significant synergies across the key international markets through the integration of the Company's existing own and agency brands portfolios with the leading *Russian Standard Vodka* brand, as well through the integration of sales and route to market opportunities. It strongly supports our objective to become a leading global alcohol business.

Before ROUST entered into this agreement the board of directors of the Company engaged an independent valuation expert to perform a valuation of the RDL business and issue a fairness opinion on its valuation, to ensure that the conditions of the transactions are at least as favorable as might reasonably have been obtained from a non-Affiliate. After analyzing the independent valuation and the Company's strategic objectives, an aggregate purchase price for RDL was agreed at $40.0 million. The deposits of $4.8 million and $9.0 million were paid in October and December 2015, respectively. The majority of the consideration amounting to $22.3 million was settled against

loans granted by ROUST to Related Parties (within the RTL legal structure). The remaining $3.9 million of the consideration was paid in cash in February 2016.

RDL was incorporated in August 2014 and for 10 months was dormant. In June 2015 RDL started to take over contracts related to international distribution of RSV products that were previously managed by RTL's subsidiaries and established key processes in order to efficiently organize international distribution of alcohol beverages within Roust Corporation Group. No processes used previously by RTL's subsidiaries were taken over by RDL.

*Presentation of Results of Operations after the Acquisition of RDL*

RTL is the sole shareholder of RDL and ROUST, therefore for accounting purposes, the acquisition was accounted for under the "as if pooling-of-interest" method of accounting applicable to the transfer of assets or exchange of equity interests between entities under common control. Under the "as if pooling-of-interest" method of accounting, the value of the assets and liabilities transferred is recognized at historical carrying costs as of the date of the transfer, rather than at fair value.

As RDL commenced its activity in June 2015, there was no impact on prior period income or expense or assets and liabilities under the "as if pooling-of-interests" method. Given that RDL established its own processes, management has determined the contracts taken over by RDL from RTL subsidiaries, prior to the acquisition of RDL by ROUST, did not represent a business and therefore prospective accounting for the activities of RDL is appropriate.

The RDL transaction has an economic value of $40.0 million, however that value is not reflected in our accompanying financial statements as an asset. The treatment of an acquisition on a common control basis versus the traditional approach of fair valuing the assets acquired and liabilities assumed is based on the concept that because there is a controlling shareholder on both seller and buyer sides of the transaction, the transaction misses the fundamental, third party aspect to validate its value. However, as required by the indentures of our long-term debt, the Company provided significant governance efforts around the transaction to ensure that all parties were treated on an arm's length basis. In particular, the valuation of RDL was subject to an independent third party assessment that was used as the basis to negotiate the final purchase price. Under common control accounting, and different from the typical purchase accounting in an acquisition, the "difference" between the historical net assets of the acquired company and the total consideration paid is charged to equity, whereas in the typical acquisition accounting, the net assets are fair valued and the difference goes to goodwill. The effect on the balance sheet for a common control transaction, therefore, is that net equity will typically be lower than in a purchase accounting situation. In effect, under common control the goodwill (or "premium" paid over the historical net assets) is written off to equity on the date of the combination. The Company recognized $40.0 million, being the difference between net assets of the acquired entity and consideration paid, as a decrease in equity (whole amount was charged to additional paid in capital). Therefore, the common control treatment of the transaction has substantially decreased our book equity, despite the fact that the transaction has an economic value of $40.0 million.

**Acquisition of Roust Inc.**

As a part of its strategy to further expand its marketing strength and product portfolio in key markets, on June 30, 2014 the Company completed its acquisition of Roust Inc. from RTL. To effect the transaction on June 30, 2014, Pasalba Limited, a wholly-owned subsidiary of ROUST acquired all of the outstanding shares of Roust Inc. from RTL, pursuant to a Share Purchase Agreement, dated May 26, 2014 among the Company, RTL and certain subsidiaries of the Company and RTL.

Before ROUST entered into this agreement the board of directors of the Company engaged an independent US investment bank to perform a valuation of the Roust Inc. business and issue a fairness opinion on its valuation. The independent valuation developed a fair value range to support the Company in the acquisition process. Based on the independent valuation and the Company's strategic objectives, an aggregate purchase price for Roust Inc. was agreed at $250.0 million, consisting of cash consideration and consideration in-kind. $0.4 million of the cash consideration is expected to be paid post-closing December 31, 2015 and is subject to a purchase price adjustment. Roust Inc. was and continues to be after the transaction a guarantor to certain Related Parties (as defined in Note

16). The outstanding guarantees were taken into account when calculating the accretive effect of the transaction as required by our New Notes indentures.

Roust Inc. is a 20 year old sales and distribution company and a leader in the spirits distribution business in Russia, which has helped to build many existing premium alcohol brands. Currently Roust Inc. is distributing the market leading premium vodka *Russian Standard,* the fast growing *Gancia* brand, *Remy* range, *Jägermeister*, *Concha Y Toro* wines, *Constellation* wines, *Jose Cuervo* and *Sierra* tequilas, *Sevan* Armenian brandy, *DeKuyper* spirits and a number of other leading premium spirit brands.

ROUST has acquired Roust Inc., giving ROUST the opportunity to combine a large vodka business, with a premium spirits business, in the same manner as the Polish and Hungarian ROUST business units currently operate. Premium spirits, wine, whiskey and cognac have in general been growing faster than the vodka market in the last five years in Russia, giving ROUST access to faster growth alcohol categories. *Russian Standard Vodka* and many of the premium spirit brands have a higher margin per case than our core Russian alcohol business. With no significant excise tax increases in the year, we believe there is substantial opportunity to drive volume growth for these new brands. ROUST and Roust Inc. combined were able to significantly reduce the combined cost base and drive operating improvements to both businesses.

Strategically, the transaction led to diversification of its portfolio in the Russian segment of operations and provided enhanced opportunities for expansion in the Russian market through the integration of sales, back office and route to market opportunities. For the year ended December 31, 2015, the transaction was accretive to our earnings to fixed charge coverage ratio (as defined in our New Notes indentures), and is expected to be accretive to our overall earnings and cash flows in the future. Historically, as a private company Roust Inc. was not required to report, and did not report, it's operating results on a regular basis. The historical results of the Roust Inc. business have been included herein based on the actual results of Roust Inc. for the applicable periods, no adjustments have been made to the historical results to reflect the nature of the synergies between the Company and Roust Inc. or the savings that have already been captured through the integration of Roust Inc. and the Company's existing operations. In addition, as the accounting for the transaction is based on historical values due to the common control, our financial statements do not reflect any fair value adjustments that would be necessary if, for example, we were required to use purchase accounting.

All subsidiaries of ROUST are currently considered "Restricted Subsidiaries". Whitehall Holdings and its subsidiaries (collectively "Whitehall Group"), which, starting from October 3, 2013 were "Unrestricted Subsidiaries", became re-restricted as a result of the ROUST acquisition. ROUST and its Restricted Subsidiaries are not required to maintain any specific financial ratios, but are restricted from taking certain actions (e.g., incurring additional debt, paying dividends) unless they meet an exception from the relevant restrictions. For more details on restrictive covenants please see Note 14 "Notes and Borrowings".

*Presentation of Results of Operations after the Acquisition of Roust Inc.*

RTL is the sole shareholder of Roust Inc. and ROUST, therefore for accounting purposes, the acquisition was accounted for under the "as if pooling-of-interest" method of accounting applicable to the transfer of assets or exchange of equity interests between entities under common control. Under the "as if pooling-of-interest" method of accounting, the value of the assets and liabilities transferred is recognized at historical carrying costs as of the date of the transfer, rather than at fair value.

In accordance with US GAAP common control of Roust Inc. and ROUST is deemed to have existed since June 5, 2013, the date that RTL acquired ROUST. As a result, the subsequent transfer of the assets and liabilities was accounted for "as if pooling-of-interest" at Roust Inc's. historical cost at June 5, 2013, including its necessary consolidation adjustments. Accordingly, the consolidated financial statements of ROUST beginning as of June 5, 2013 include the balance sheet, results of operations and cash flows of Roust Inc. for the subsequent periods.

The Roust Inc. transaction had an economic value of $250.0 million, however that value is not reflected in our accompanying financial statements as an asset. The treatment of an acquisition on a common control basis versus the traditional approach of fair valuing the assets acquired and liabilities assumed is based on the concept that because there is a controlling shareholder on both seller and buyer sides of the transaction, the transaction misses the fundamental, third party aspect to validate its value. However, as required by the indentures of our long-term debt,

the Company provided significant governance efforts around the transaction to ensure that all parties were treated on an arm's length basis. In particular, the valuation of Roust Inc. was subject to an independent third party assessment that was used as the basis to negotiate the final purchase price. Under common control accounting, and different from the typical purchase accounting in an acquisition, the "difference" between the historical net assets of the acquired company and the total consideration paid is charged to equity, whereas in the typical acquisition accounting, the net assets are fair valued and the difference goes to goodwill. The effect on the balance sheet for a common control transaction, therefore, is that net equity will typically be lower than in a purchase accounting situation. In effect, under common control the goodwill (or "premium" paid over the historical net assets) is written off to equity on the date of the combination. The Company recognized $258.3 million, being the difference between net assets of the acquired entity and consideration paid, as a decrease in equity (out of which $218.0 million was charged to additional paid in capital and $40.3 was charged to retained earnings). Therefore, the common control treatment of the transaction has substantially decreased our book equity, despite the fact that the transaction has an economic value of $250.0 million.

As noted immediately above, the accounting for the Roust Inc. acquisition under common control resulted in the excess of the purchase price of the transaction of $250.0 million over the book value of Roust Inc. being charged immediately to our stockholders' equity. In addition, as the accounting is under common control, the stockholders' equity shows the combined equity of ROUST and Roust Inc. from the date of our emergence from bankruptcy (the periods prior to our emergence did not change). The Company engaged an independent US investment bank to perform an evaluation of the Roust Inc. business and issue a fairness opinion on its valuation.

Consolidated Statements of Changes in Stockholders' Equity / (Deficit) represents the significant changes in our equity post emergence due to the Roust Inc. acquisition (note that the common stock shares of 10,000 and common stock par value of less than one thousand USD are not shown separately).

Our combined shareholder's equity, immediately before the book keeping entry for the Roust Inc. common control acquisition, was a retained deficit of approximately $23.1 million.

## 5.     RESTRICTED CASH

As of December 31, 2014 the Company had $0.8 million of deposits for custom office and $0.4 million of other restricted cash and $0.9 million of bank guarantees. As of December 31, 2015 the Company had $0.3 million of deposits for custom office, and $0.6 million of bank guarantees. The Company has presented these funds as restricted cash since the use of the funds is restricted to pre-determined use.

## 6.     ACCOUNTS RECEIVABLE

### Sale of Accounts Receivable (Factoring)

From time to time the Company enters into factoring arrangements with financial institutions to sell trade accounts receivable under recourse and non-recourse agreements. As of December 31, 2014 and December 31, 2015 the Company was a party to the following factoring agreements:

| Party to the agreement | Date of signing the agreement | Recourse/ Non-recourse | Financing limit under the Agreement | Status as of December 31, 2014 | Status as of December 31, 2015 |
|---|---|---|---|---|---|
| ING Polska | June 2011 | non-recourse | none | active | replaced by the agreement signed in April 2015 (see below) |
| ING Polska | April 2015 | non-recourse | none | N/A | active |
| Bank Handlowy w Warszawie Spółka Akcyjna ("Bank Handlowy") | January 2012 | non-recourse | none | active | active |
| Bank Zachodni WBK S.A. | August 2012 | non-recourse | none | active | active |
| RBS Bank | January 2013 | non-recourse | 60 million Polish zlotys till April 14, 2013; 82 million Polish zlotys till November 4, 2013; 150 million Polish zlotys till January 13, 2014; 200 million Polish zlotys till March 31, 2014; 190 million Polish zlotys till May 4, 2014 and 180 million Polish zlotys since May 5, 2014 (as per appendix signed) | active | active, in proces of transfer to Bank Pekao (see below) |
| Bank Polska Kasa Opieki SA ("Bank Pekao") | December 2015 | non-recourse | 180 million Polish zlotys | N/A | active |
| ING Polska | February 2013 | recourse/non-recourse | initially only service factoring without financing; 20 million Polish zlotys since December 2013; 37 million Polish zlotys since August 2014 (recourse option added as per appendix signed) | active | active |
| RBS Bank | March 2013 | non-recourse | none | active | active |
| Citibank Dublin | May 2014 | non-recourse | none | active | active |
| Pekao Faktoring Sp. z o.o. | October 2014 | non-recourse | 30 million Polish zlotys | active | active |
| Pekao Faktoring Sp. z o.o. | October 2014 | recourse | 60 million Polish zlotys till December 22, 2014; 95 million Polish zlotys till January 15, 2015; 75 million Polish zlotys till February 15, 2015; 60 million Polish zlotys since February 16, 2015; 95 million Polish zlotys in period November 1, 2015 - February 29, 2016; 60 million Polish zlotys since March 1, 2016; (as per appendix signed) | active | active |
| Alfa Bank | December 2013 | recourse | 2,500 million Russian rubles | active | active |
| Promsvyaz Bank | June 2014 | recourse | 135 million Russian rubles | active | closed |
| MDM | October 2014 | recourse | 800 million Russian rubles | active | closed |
| FC Otkrytie (Nomos Bank) | October 2014 | recourse | 500 million Russian rubles | active | active |
| BRS (Russian Standard Bank) | December 2015 | recourse | 739.7 million Russian rubles | N/A | active |
| Raiffeisen Bank Zrt | October 2014 | recourse | 440 million Hungarian forints till June 21, 2015; 874 million Hungarian forints since June 22, 2015 | active | active |

The Company has no continuing involvement with the receivables sold under non-recourse factoring agreements.

The recourse factoring with Alfa Bank existing as of December 31, 2014 and December 31, 2015 as well as recourse factoring agreements with Russian Standard Bank and FC Otkrytie existing as of December 31, 2015, were not qualified as a secured borrowing. As a result the underlying receivables were derecognized and no liability was recognized.

The table below summarizes our exposure to the economic return on the transferred financial assets:

| | December 31, 2014 | | December 31, 2015 | |
|---|---|---|---|---|
| | Carrying amount derecognized | Gross cash proceeds received for assets derecognized | Carrying amount derecognized | Gross cash proceeds received for assets derecognized |
| Factoring accounted for as sales | $            63,584 | $            57,225 | $            50,950 | $            45,855 |

Due to the short-term nature of factored receivables their carrying values approximate their fair values.

During the year ended December 31, 2015 certain customers repaid the factored amounts to the Company instead of the factor. As a result the Company has a liability of $20.6 million, which is presented as other

borrowings in our balance sheet as of December, 2015 (for details refer to Note 1, section "Critical Accounting Polices and Estimates" and Note 14 "Notes and Borrowings").

As of December 31, 2014 and as of December 31, 2015 our gross obligations resulting from recourse factoring accounted for as secured borrowings amounted $22.7 million and $27.8 million, respectively (see also Note 14 "Notes and Borrowings"). All of our obligations of this type mature up to 90 days. The Company considers risk associated with the agreements on recourse factoring as low. Based on our history we have not faced such obligations yet.

During the year ended December 31, 2014 and the year ended December 31, 2015, we recognized costs related to factoring in the statement of operations and comprehensive income in the amounts of $11.2 million and $13.1 million respectively.

**Allowances for doubtful accounts**

Changes in the allowance for doubtful accounts during each of the three years in the period ended December 31, were as follows:

| | Predecessor one hundred fifty-six-day period ended June 5, 2013 | Successor Two hundred and nine days ended December 31, 2013 | Year ended December 31, 2014 | Year ended December 31, 2015 |
|---|---|---|---|---|
| Balance, beginning of period | $ 25,250 | $ 19,101 | $ 24,953 | $ 13,442 |
| Change in allowance for doubtful accounts as a result of acquisition under common control | - | 838 | - | - |
| Change in provision for bad debts | 601 | 4,930 | (3,559) | 1,833 |
| Other, including charge-offs | (5,250) | (2,079) | (2,674) | (1,508) |
| Foreign currency translation adjustments | (1,500) | 2,163 | (5,278) | (1,763) |
| **Balance, end of period** | **$ 19,101** | **$ 24,953** | **$ 13,442** | **$ 12,004** |
| of which: | | | | |
| Allowance for doubtful trade accounts receivable | 19,101 | 24,953 | 13,317 | 11,634 |
| Allowance for doubtful other accounts receivable | - | - | 125 | 370 |

## 7.    INVENTORIES

The following table summarizes our inventories:

| | December 31, 2014 | December 31, 2015 |
|---|---|---|
| Raw materials and supplies | $ 12,023 | $ 12,516 |
| In-process inventories | 1,563 | 3,251 |
| Finished goods and goods for resale | 82,362 | 59,051 |
| **Total** | **$ 95,948** | **$ 74,818** |
| Inventories consigned to others | 239 | - |
| **Total inventories, including consigned to others** | **$ 96,187** | **$ 74,818** |

Because of the nature of the products supplied by the Company, great attention is paid to inventory rotation. The number of days in inventory amounted to 23 days as of December 31, 2014 and 22 days as of December 31, 2015.

Consigned inventory is typically inventory placed in third party warehouse due to capacity constraints that, for local regulatory purposes, requires a formal sale. The Company still retains control over the inventory. As of December 31, 2014 and December 31, 2015 inventory consigned to others amounts to $0.2 million and nil respectively.

## 8.    PREPAID EXPENSES

The table below presents balances of our prepaid expenses.

|  | December 31, 2014 | December 31, 2015 |
|---|---|---|
| Prepaid expenses - current | $ 6,993 | $ 9,975 |
| Prepaid expenses - non-current | 923 | 805 |
| **Total** | **$ 7,916** | **$ 10,780** |
| of which: |  |  |
| Prepaid to Related Parties | $ 1,025 | $ 5,780 |

The prepaid expenses comprise prepaid insurance and prepaid marketing services which will be performed in future periods, as well as prepayments for goods for resale and for spirit. Prepaid expenses to Related Parties as of December 31, 2015 include prepayments for purchases of goods of $5.8 million. As of December 31, 2014 prepaid expenses to Related Parties include prepayments for spirit of $0.5 million and other prepayments of $0.5 million.

## 9.    OTHER CURRENT ASSETS

The table below summarizes our other current assets

|  | December 31, 2014 | December 31, 2015 |
|---|---|---|
| Other accounts receivable | $ 23,960 | $ 15,981 |
| VAT | 10,532 | 9,021 |
| Other taxes and duties | 6,223 | 6,426 |
| Other current assets | 146 | 22 |
| **Total** | **$ 40,861** | **$ 31,450** |

The following table summarizes other accounts receivable.

|  | December 31, 2014 | December 31, 2015 |
|---|---|---|
| Receivables related to amounts held by factors | $ 16,288 | $ 4,933 |
| Recharges receivable for marketing services | 4,072 | 4,718 |
| Receivables from subcontracted producers | 1,014 | 490 |
| Receivables from employees | 348 | 301 |
| Other receivables | 2,238 | 5,539 |
| **Total** | **$ 23,960** | **$ 15,981** |

Other receivables as of December 31, 2015 include management service recharges receivable from Related Parties in amount of $1.7 million and $1.6 million of receivable from debt collection agent.

Receivables related to amounts held by factors decreased as of December 31, 2015 as compared to December 31,2014 due to significant decrease in factoring from Alfa Bank, end of factoring from Promsvyazbank and MDM Bank in Roust Russia.

## 10.    INTANGIBLE ASSETS OTHER THAN GOODWILL

Intangible assets other than goodwill consist of trademarks and related rights. These trademarks include *Soplica, Żubrówka, Absolwent, Royal* vodka*, Parliament, Talka, Green Mark, Zhuravli* and the trademark rights to *Bols Vodka* in Poland and Hungary. Management considers trademarks associated with high or market-leader brand recognition within their market segments to be indefinite-lived assets, based on the length of time they have existed, the comparatively high volumes sold and their general market positions relative to other products in their respective market segments.

Intangible assets with an indefinite life are not amortized but are reviewed for impairment annually or more frequently, if facts and circumstances indicate such need. The Company performed its annual impairment test of trademarks as of December 31, 2015 as described below. The test indicated that no trademarks were impaired, the fair market value of each trademark was above its carrying value.

No impairment charge was recognized during the twelve-month period ended December 31, 2014 or during the twelve-month period ended December 31, 2015.

Accumulated impairment related to trademarks as of December 31, 2014 and December 31, 2015 amounts to $58.3 million and $26.0 million, respectively. The main changes in the value of our trademarks between December 31, 2014 and December 31, 2015 resulted from foreign exchange rate movement.

The table below summarizes balances and movements in our intangible assets other than goodwill.

| | Trademarks and trademark rights | Other Intangible assets | Total Intangible assets |
|---|---|---|---|
| **Balance as of January 1, 2014 (Successor)** | $ 279,816 | $ 3,023 | $ 282,839 |
| Acquisition during the period | 4 | 402 | 406 |
| Disposals during the period | - | (142) | (142) |
| Depreciation charge for the period | (87) | (794) | (881) |
| Foreign currency translation adjustment | (81,786) | (1,198) | (82,983) |
| **Balance as of December 31, 2014 (Successor)** | $ 197,947 | $ 1,291 | $ 199,239 |

| | Trademarks and trademark rights | Other Intangible assets | Total Intangible assets |
|---|---|---|---|
| **Balance as of January 1, 2015** | $ 197,947 | $ 1,291 | $ 199,239 |
| Acquisition during the period | - | 78 | 78 |
| Disposals during the period | - | - | - |
| Depreciation charge for the period | (1) | (633) | (634) |
| Foreign currency translation adjustment | (29,023) | (132) | (29,157) |
| **Balance as of December 31, 2015** | $ 168,923 | $ 604 | $ 169,526 |

*Impairment test on trademarks performed as of December 31, 2015*

At December 31, 2015, the Company performed its annual impairment test of trademarks, and in order to support its value the Company calculated the fair value of trademarks (Level 3) using a discounted cash flow approach based on the following assumptions:

- Risk free rates for Poland, Russia and Hungary used for calculation of discount rate were based on the risk free rate for local 10-year treasury bonds and specific country risks for Poland, Russia and Hungary, respectively. A discounting factor was further adjusted by 3.7% to reflect a company size premium and an additional 1% was added to reflect additional risks related to trademarks as separate assets. Poland's discount rate was further increased by 2% to reflect company's specific risks. As a result of our assumptions and calculations, discount rates of 11.6%, 20.0% and 13.7% for Poland, Russia and Hungary, respectively have been determined.

- The Company estimated the growth rates in projecting cash flows for each of trademarks separately, based on five year plan related to each trademark.

- The Company estimated the terminal value growth rates of 0.4% for Polish trademarks, 6.3% for Russian trademarks and 0.5% in relation to Hungarian trademark.

Based upon the above analysis performed, the Company has determined that the fair market value of each trademark is above its carrying value.

## 11.   *GOODWILL*

Goodwill is not amortized but is reviewed for impairment annually, or more frequently, if facts and circumstances indicate such need. The Company performed its annual impairment test of goodwill as of December 31, 2015 as described below. As a result of this test no impairment charge was recognized in 2015. Management closely monitors performance of each business unit based on the analysis of year to date performance aligned with the expected year-to-go results, as well as benchmarking versus current macroeconomic and industry market factors. Accumulated impairment related to goodwill as of December 31, 2014 and December 31, 2015 amounts to $24.6 million and $12.2 million, respectively (excluding foreign exchange impact). Changes in the value of goodwill between December 31, 2014 and December 31, 2015 were the result of foreign exchange rate movement.

The table below summarizes balances and movements in goodwill.

|  | Poland | Russia | Hungary | Total |
|---|---|---|---|---|
| Balance as of January 1, 2014 | $ 162,092 | $ 71,772 | $ 13,641 | $ 247,505 |
| Impairment charge | - | - | - | - |
| Foreign currency translation adjustment | (22,886) | (31,174) | (2,313) | (56,373) |
| Balance as of December 31, 2014 | $ 139,206 | $ 40,598 | $ 11,328 | $ 191,132 |

|  | Poland | Russia | Hungary | Total |
|---|---|---|---|---|
| Balance as of January 1, 2015 | $ 139,206 | $ 40,598 | $ 11,328 | $ 191,132 |
| Impairment charge | - | - | - | - |
| Foreign currency translation adjustment | (14,057) | (8,586) | (1,096) | (23,739) |
| Balance as of December 31, 2015 | $ 125,149 | $ 32,012 | $ 10,232 | $ 167,393 |

*Impairment test on goodwill performed as of December 31, 2015*

As mentioned in Note 1 "*Organization and significant accounting policies*" ROUST Group comprised in 2014 of three operating segments being Poland, Russia and Hungary. From January 1, 2015 we manage our business on the basis of the following segments: Poland domestic, Russia domestic, Corporate and International, which comprises other segments of an international nature. Hungary is a segment which does not constitute separate reportable segment and as result is aggregated with other international markets. According to the ASC 350 a reporting unit is an operating segment or one level below an operating segment (component). The Company identified reporting units for the purpose of goodwill impairment test at the level of operating segment and one of reporting unit at the level of component of operating segment. Based on the ASC 350 a component of an operating segment is a reporting unit if the component constitutes a business for which discrete financial information is available and segment management regularly reviews the operating results of that component. An operating segment shall be deemed to be a reporting unit if all of its components are similar, if none of its components is a reporting unit, or if it comprises only a single component. In result of the analysis the following reporting units for impairment test purpose were identified: Poland Domestic Business Unit, Russia Domestic Business Unit and Hungary Business Unit.

At December 31, 2015, the Company performed its annual impairment test of goodwill. The Company tested the fair value of the following reporting units: Poland Domestic Business Unit, Russia Domestic Business Unit, and Hungary Business Unit. In order to support its value, the Company calculated the fair value of the reporting units (Level 3) using a discounted cash flow approach based on the following assumptions:

- Risk free rates for Poland, Russia and Hungary used for calculation of discount rate were based on the risk free rate for local 10-year treasury bonds and specific country risks for Poland, Russia and Hungary, respectively. A discounting factor was further adjusted by 3.7% to reflect a company size premium. Poland's discount rate was further increased by 2% to reflect company's specific risks. As a result of our assumptions and calculations, discount rates of 10.6%, 19.0% and 12.7% for Poland, Russia and Hungary, respectively have been determined.

- The Company estimated the growth rates in projecting cash flows for each of reporting group separately, based on a detailed five year plan related to each reporting unit.

- The Company estimated the terminal value growth rates of 0.4% for Polish reporting unit, 6.3% for Russian reporting unit, and 0.5% for its Hungarian reporting unit.

Based on the goodwill impairment test as of December 31, 2015, it was determined that the carrying value of all units does not exceed their fair value.

As a result no impairment charge was recognized for the year ended December 31, 2015.

## 12. PROPERTY, PLANT AND EQUIPMENT

The table below summarizes balances of our property, plant and equipment.

|  | December 31, 2014 | December 31, 2015 |
|---|---|---|
| Land and Buildings | $ 58,791 | $ 48,060 |
| Equipment and other fixed assets | 27,193 | 27,821 |
| Motor vehicles | 7,075 | 6,066 |
| Motor vehicles under lease | 3,524 | 3,934 |
| Computer hardware and software | 5,355 | 6,067 |
| Fixed assets under construction | 1,008 | 3,227 |
| **Total gross book value** | **102,946** | **95,175** |
| Less - Accumulated depreciation | (13,456) | (18,783) |
| Less - Accumulated depreciation of leased assets | (906) | (1,721) |
| **Total** | **$ 88,584** | **$ 74,671** |

Property, plant and equipment is presented net of accumulated depreciation in the consolidated balance sheets. Depreciation expenses for twelve-month period ended December 31, 2014 and December 31, 2015 amounted to $10.7 million and $9.7 million, respectively. The accumulated depreciation of property, plant and equipment as of December 31, 2014 and December 31, 2015 amounted to $14.4 million and $20.5 million, respectively.

### 13.    INCOME TAXES

The Company operates in several tax jurisdictions primarily: the United States of America, Poland, Hungary, Russia and Ukraine. All subsidiaries file their own corporate tax returns as well as account for their own deferred tax assets and liabilities. The Company does not file a tax return in the United States of America based upon its consolidated income, but does file a return in the United States based on its income taxable in the United States of America.

Statutory rate reconciliation for continuing operations:

|  | Predecessor one hundred fifty-six-day period ended June 5, 2013 | Successor Two hundred and nine days ended December 31, 2013 | Successor Year ended December 31, 2014 | Successor Year ended December 31, 2015 |
|---|---|---|---|---|
| **Tax at US statutory rate of 35%** | 41,667 | (45,738) | (35,865) | (23,306) |
| Tax rate differences | 53,830 | 51,343 | 18,002 | 11,516 |
| Valuation allowance | 7,958 | (21,225) | (1,811) | (16,132) |
| Permanent differences | 34,174 | 22,280 | 12,785 | 5,725 |
| Reorganization related permanent differences | (157,977) | - | - | - |
| Utilization of tax loss covered by valuation allowance | - | (11,947) | - | - |
| Reduction of net operating losses due to cancelation of indebtness income | - | - | 13,045 | - |
| Other | 3,214 | (7,463) | 6,178 | 8,840 |
| **Income tax (benefit)/expense** | **$ (17,134)** | **$ (12,750)** | **$ 12,334** | **$ (13,357)** |

The jurisdictions with lower tax rates that have the most significant effective tax rate impact in the periods presented include Russia and Poland, where the income tax rates are 20% and 19% respectively.

The permanent differences for one-hundred fifty-six days ended June 5, 2013 (Predecessor) are primarily the result of goodwill fresh start accounting revaluation of $109.0 million and gain on cancellation of debt amounting to $509.3 million. The permanent differences related to these items amounted to $20.3 million and $(178.2) million, respectively. The permanent differences for two hundred nine days ended December 31, 2013 (Successor) are mainly related to costs incurred by the Company that are not deductible for local tax purposes. The goodwill impairment recognized in Successor accounts in the amount of $24.6 million gave rise to $3.9 million permanent difference. The permanent differences for 2014 and 2015 are primarily related to costs incurred by the Company that are not deductible for local tax purposes.

The Company's significant components of the provision for income taxes from continuing operations were as follows:

|  | Predecessor one hundred fifty-six-day period ended June 5, 2013 | Successor Two hundred and nine days ended December 31, 2013 | Successor Year ended December 31, 2014 | Successor Year ended December 31, 2015 |
|---|---|---|---|---|
| Current (domestic) | - | - | - | - |
| Current (foreign) | (351) | 4,312 | 13,096 | 5,600 |
| Deferred (domestic) | (249) | - | - | - |
| Deferred (foreign) | (16,534) | (17,062) | (762) | (18,957) |
| Income tax (benefit)/expense | $ (17,134) | $ (12,750) | $ 12,334 | $ (13,357) |

The Company is headquartered in the United States. Pre-tax book loss earned from continuing operations in the United States (domestic) and outside the United States (foreign) in 2013, 2014 and 2015 was as follows:

|  | Predecessor one hundred fifty-six-day period ended June 5, 2013 | Successor Two hundred and nine days ended December 31, 2013 | Successor Year ended December 31, 2014 | Successor Year ended December 31, 2015 |
|---|---|---|---|---|
| Pre-tax income/(loss)-domestic | 456,871 | (135,337) | 7,631 | 725 |
| Pre-tax income/(loss)-foreign | (337,822) | 4,657 | (110,103) | (67,313) |
| Income tax (benefit)/expense | $ 119,049 | $ (130,680) | $ (102,472) | $ (66,588) |

Total income tax payments for 2013, 2014 and 2015 were $0.3 million, $8.9 million and $4.9 million, respectively. In 2015 ROUST utilized $0.9 million of US net operating loss (''NOL'') carry-forward and paid $0.02 million of U.S. income taxes. As of December 31, 2015 ROUST has net operating loss carry-forward for U.S. federal tax purposes totaling $0.9 million.

The Company's US net operating loss ("NOL") carry-forward may be restricted under Section 382 of the Internal Revenue Code ("IRC"). IRC Section 382 limits the use of NOLs to the extent there has been an ownership change of more than 50 percentage points. As a result, the taxable income for any post change year that may be offset by a pre-change NOL may not exceed the general IRC Section 382 limitation, which is the fair market value of the pre-change entity multiplied by the IRC long-term tax exempt rate.

Regardless of the amount of the basic IRC § 382 limitation, any NOLs that carry over to ROUST's 2014 taxable year were reduced to zero on January 1, 2014 as a result of tax reduction attributable to cancellation of indebtedness income excluded in the bankruptcy. For that reason, none of ROUST's taxable income in 2014, 2015 and beyond will likely be offset by ROUST's NOL carryovers existing as of December 31, 2013.

On November 20th, 2015 Financial Accounting Standards Board ("FASB") issued an Accounting Standards Update (ASU 2015-17) simplifying the balance sheet classification of deferred taxes, which requires that all deferred tax assets and liabilities, along with any related valuation allowance, be classified as noncurrent on the balance sheet.

The Company analyzed impact of the update and decided to adopt early the requirements of ASU 2015-17 to all deferred tax assets and liabilities. The amendments were applied prospectively, therefore prior periods were not retrospectively adjusted.

Significant components of the Company's deferred tax assets and liabilities are as follows:

**Deferred Tax Assets**

| | December 31, 2014 | December 31, 2015 |
|---|---|---|
| Accrued expenses, deferred income and prepaid | 9,440 | 8,323 |
| Receivable and allowance for doubtful accounts receivable | 10,503 | 13,370 |
| Payables and borrowings | 19,118 | 23,825 |
| Net operating loss carry-forward benefit | 39,464 | 32,715 |
| Property, plant & equipment, intangibles | 1,587 | 1,360 |
| Other | 476 | 1,193 |
| Valuation allowance | (56,127) | (29,164) |
| **Deferred tax assets, net of valuation allowance** | $ 24,461 | $ 51,622 |

**Deferred Tax Liabilities**

| | December 31, 2014 | December 31, 2015 |
|---|---|---|
| Trademarks | 36,549 | 31,335 |
| Property, plant & equipment | 4,407 | 1,979 |
| Payables | 654 | 2,963 |
| Receivables | 20,004 | 28,606 |
| Other | 415 | 267 |
| **Deferred tax liability** | $ 62,029 | $ 65,150 |
| | | |
| Total deferred tax asset, net of valuation allowance | 24,461 | 51,622 |
| Total deferred tax liability | 62,029 | 65,150 |
| **Total net deferred tax asset/ (liability)** | **(37,568)** | **(13,528)** |
| Classified as | | |
| Current deferred tax assets | 11,502 | - |
| Non-current deferred tax assets | 3,185 | 4,875 |
| Current deferred liability | (16) | - |
| Non-current deferred tax liability | (52,239) | (18,403) |
| **Total net deferred tax asset/ (liability)** | **(37,568)** | **(13,528)** |

The Company is significantly restricted from paying dividends or other asset transfers. For purposes of its foreign subsidiaries, no deferred tax liabilities have been established for the potential deferred taxes on the excess of any retained earnings over the tax basis. It is not practicable to determine the amount of unrecognized deferred tax liability for temporary differences related to foreign subsidiaries that are essentially permanent in duration.

The Company's valuation allowance relates primarily to losses carried forward in Poland, Russia and the United States that we believe it is more likely than not will not be utilized in the future.

During the one hundred fifty six days ended June 5, 2013 (Predecessor), due to the weak performance of certain of the Company's subsidiaries, the Company determined that an additional valuation allowance for deferred tax asset of $8.0 million was recognized. The decrease in valuation allowance for the Successor period is mainly driven by utilization of NOLs that previously were covered by valuation allowance of $11.9 million. The decrease was partially offset by additional valuation allowance recognized due to weak performance of certain of the Company's subsidiaries.

As described above, ROUST NOL's were reduced to zero on January 1, 2014. Therefore valuation allowance amounting to $13.0 million related to these losses was also reduced to zero.

Due to the deteriorating performance of certain of the Company's subsidiaries in 2014 and 2015, the Company determined that an additional non cash valuation allowance for deferred tax assets of $11.2 million and $6.5 million was required and took the charge during 2014 and 2015, respectively. Additionally, in 2014, the Company did not recognize a tax asset for losses at these subsidiaries therefore the tax expense for the profitable entities was not offset by a tax benefit at loss making entities.

Tax losses can be carried forward for the following periods:

| | |
|---|---|
| Hungary* | 5 years |
| U.S. | 20 years |
| Russia | 10 years |
| Poland | 5 years |

*Transitional provisions allow to carry the loss coming from operation of tax years ended before December 31, 2015 till the end of year 2025.*

The amounts and expiration dates of operating loss carryforwards for tax purposes are as follows:

| Expiration date | Amount of operating loss carry forward |
|---|---|
| December 31, 2016 | 149,929 |
| December 31, 2017 | 12,942 |
| December 31, 2018 | - |
| December 31, 2019 | 5,161 |
| December 31, 2020 | 6,789 |
| Afterwards | 915 |
| **Total** | **175,736** |

The following table summarizes the changes in the accrual for unrecognized income tax benefits and related interest and penalties for the years ended December 31, 2013, 2014 and 2015:

| | Predecessor one hundred fifty-six-day period ended June 5, 2013 | | Successor Two hundred and nine days ended December 31, 2013 | | Successor Year ended December 31, 2014 | | Successor Year ended December 31, 2015 | |
|---|---|---|---|---|---|---|---|---|
| | Unrecognized income tax benefits | Interest and penalties | Unrecognized income tax benefits | Interest and penalties | Unrecognized income tax benefits | Interest and penalties | Unrecognized income tax benefits | Interest and penalties |
| **Balance, beginning of the period** $ | **16,452** | **2,476** | $ **9,547** | **1,747** | $ **13,907** | **3,363** | $ **12,058** | **2,786** |
| Amounts assumed at acquisitions under common control | - | - | 5,143 | 1,929 | | | | |
| **Balance, beginnig of the period (recast)** $ | **16,452** | **2,476** | $ **14,690** | **3,676** | $ **13,907** | **3,363** | $ **12,058** | **2,786** |
| Additions based on tax positions related to the current period | - | 218 | 2,827 | 873 | 4,037 | 1,035 | 1,952 | 549 |
| Additions of tax positions of prior periods | 297 | 165 | 1,180 | 570 | 973 | 825 | 1,992 | 1,197 |
| Reductions of tax positions of current period | (1,549) | - | (34) | (8) | (10) | (2) | - | - |
| Reductions of tax positions of prior periods | (3,140) | (357) | (3,620) | (1,566) | (858) | (390) | (5,886) | (1,101) |
| Reduction of tax positions relating to settlements with tax authorities | (2,098) | (658) | (895) | (116) | - | - | - | (18) |
| Lapse of statute of limitations | - | - | - | - | (581) | (168) | - | - |
| Foreign currency translation adjustments | (415) | (97) | (241) | (66) | (5,410) | (1,877) | (1,829) | (680) |
| **Balance, end of period** $ | **9,547** | **1,747** | $ **13,907** | **3,363** | $ **12,058** | **2,786** | $ **8,287** | **2,733** |

The Company records interest and penalties related to unrecognized tax benefits as a component of income tax expenses.

The Company files income tax returns in the U.S., Poland, Hungary, Russia and Ukraine, as well as in various other countries throughout the world in which we conduct our business. The major tax jurisdictions and their earliest fiscal years that are currently open for tax examinations are 2010 in Poland and Hungary and 2012 in the U.S., Russia and Ukraine.

Tax liabilities (including corporate income tax, Value Added Tax (VAT), social security and other taxes) of the Company's subsidiaries may be subject to examinations by the tax authorities for up to certain period from the end of the year the tax is payable, as follows:

| | |
|---|---|
| Poland | 5 years |
| Hungary | 5 years |
| Russia | 3 years |
| United States | 3 years |
| Ukraine | 3 years |

ROUST's state and federal income tax returns are also subject to examination by the U.S. tax authorities. In 2015 the IRS completed the process of auditing the Company's 2009, 2010 and 2011 federal income tax returns. The tax examinations were also carried in 2014 in Russia, Poland and Cyprus. As the application of tax laws and regulations, and transactions are susceptible to varying interpretations, amounts reported in the consolidated financial statements could be changed at a later date upon final determination by the tax authorities. Due to uncertainties about the timing of existing tax examinations being settled and about potential tax examinations being started, it is not possible to project the amount of liability that will reverse in the upcoming 12 months.

## 14.    NOTES AND BORROWINGS

**New Notes**

*Successor*

### New Senior Secured Notes

On June 5, 2013, the Company along with CEDC Finance Corporation International, Inc. (the "Issuer"), entered into an Indenture, between the Company, certain subsidiary guarantors and US Bank N.A., as Trustee. In connection with the New Senior Secured Notes Indenture, the Company issued $464.6 million Senior Secured Notes due 2018 (the "New Senior Secured Notes" or "NSSN") to holders of the SSN, which were cancelled pursuant to the Plan of Reorganization. The issuance of the New Senior Secured Notes to holders of the SSN was completed on June 25, 2013.

The NSSN are secured by, among other things:

- a first-priority pledge over the shares of the Issuer and certain subsidiaries of the Company,

- a first-priority assignment of rights under certain bank accounts of the Company,

- certain intercompany loans, and

- a first-priority mortgage over certain real property and fixtures.

The New Senior Secured Notes bear interest as follows:

| Period | Interest rate |
|---|---|
| From June 1, 2013 to but excluding April 30, 2014 | 8.0% |
| From April 30, 2014 to but excluding April 30, 2015 | 9.0% |
| From April 30, 2015 to but excluding April 30, 2018 | 10.0% |

Interest under the NSSN is payable in cash on April 30 and October 31 of each year. The first interest payment of $15.5 million was made on October 31, 2013. The following interest payments of $18.6 million, $20.9 million, $20.9 million and $23.2 million were paid in cash on April 28, 2014, October 30, 2014, April 30, 2015 and October 28, 2015, respectively. As of December 31, 2014 and as of December 31, 2015 the balance of interest accrued under the effective interest method amounted is $14.0 million.

During the period from issuance of the NSSN up to the date of this report, the Company has not repurchased any of the NSSN.

Total obligations under the NSSN are shown in the table below. There are no deferred finance costs relating to the NSSN.

|  | December 31, 2014 | December 31, 2015 |
|---|---|---|
| New Senior Secured Notes - principal amount | $ 464,590 | $ 464,590 |
| Interest accrued | 14,042 | 13,969 |
| **Total** | **$ 478,632** | **$ 478,559** |

The Level 1 fair value of the NSSN as of December 31, 2014 and as of December 31, 2015 was $400.7 million and $409.4 million, respectively (86.25 cents and 88.13 cents per 1 US dollar of face value of NSSN). As of March 26, 2016 the fair value of NSSN amounted to 78.75 cents per 1 US dollar.

### New Convertible Junior Secured Notes

The Company and the Issuer, entered into an Indenture ("New Convertible Junior Secured Notes Indenture") on June 5, 2013, between the Company, the Issuer, certain subsidiary guarantors named therein, and US Bank N.A., as the Trustee ("Trustee"). In connection with the New Convertible Junior Secured Notes Indenture, the Issuer issued $200 million Convertible Junior Secured Notes due in 2018 ("New Convertible Junior Secured Notes" or "NCJSN" and, together with the New Senior Secured Notes, "New Notes") to the holders of the SSN, which were cancelled under the Reorganization Plan. The issuance of the New Convertible Junior Secured Notes to holders of the SSN was completed on June 25, 2013.

The NCJSN are secured by, among other things:

- a first-priority pledge over the shares of the Issuer and certain subsidiaries of the Company,

- a first-priority assignment of rights under certain bank accounts of the Company,

- certain intercompany loans, and

- a first-priority mortgage over certain real property and fixtures.

The NCJSN bear interest at a rate of 10% per annum. Interest on the NCJSN is payable, at the election of the Issuer, (1) entirely in cash, (2) in-kind, by increasing the principal amount of the outstanding NCJSN or (3) with a combination of cash interest and payment-in-kind interest. The first interest payment was payment-in-kind interest of $8.3 million on October 31, 2013. The second and third in-kind interest payment of $10.4 million and $10.9 million was capitalized on April 30, 2014 and October 31, 2014, respectively. As of December 31, 2014 the balance of interest accrued under the effective interest method amounted to $3.8 million. In 2015 the Company capitalized the following in-kind interest: $11.5 million on April 30, 2015 and $12.1 million on October 30, 2015. As of December 31, 2015 the balance of interest accrued under the effective interest method amounts to $4.2 million.

The NCJSN are redeemable at any time at par value. The NCJSN must be redeemed in increments of $20 million, although if a redemption results in less than $130 million outstanding, all the NCJSN must be redeemed by the Issuer. Starting from December 1, 2014, any holder of the NCJSN over $0.1 million can convert its NCJSN into shares of the Company's common stock. The conversion rate depends on the period in which conversion is exercised. As of December 31, 2015 the NCJSN were not redeemed. The Company has not made any assumptions and has not raised any financing as of December 31, 2015 with regard to the NCJSN conversion option.

The Company has not redeemed any NCJSN up to the date of this report.

Total obligations under the NCJSN are shown in the table below. There are no deferred finance costs relating to the NCJSN.

| | December 31, 2014 | December 31, 2015 |
|---|---|---|
| New  Convertible Junior Secured Notes - principal amount | $          229,687 | $          253,230 |
| Interest accrued | 3,755 | 4,150 |
| **Total** | **$          233,442** | **$          257,380** |

- The Level 1 fair value of the NCJSN as of December 31, 2014 and as of December 31, 2015 was $160.6 million and $125.0 million, respectively (69.90 cents and 49.38 cents per 1 US dollar of face value of NCJSN). As of March 26, 2016 the fair value of NCJSN amounted to 43.00 cents per 1 US dollar.

Bank Loans and Overdraft Facilities

According to the NSSN and the NCJSN the Company is permitted to raise the borrowing up to a certain limit ("Permitted Debt"). As at December 31, 2014 and December 31, 2015 our indebtedness is below allowed limit. Please refer to the table on the following page for details of our bank loans and overdraft facilities.

Except for one bank loan and five Related Party borrowings total balances of which as of December 31, 2015 amounting to $60.9 million, all bank loans and overdraft facilities raised by the Company are in the local currencies of the entities being party to the applicable loan or overdraft facility agreement. As a result, the Company's exposure to cash flow risk is partially mitigated, as the debt issued locally by our subsidiaries is in their local currency. Total unutilized overdraft and credit facilities (including factoring facilities) as of December 31, 2015 amounted to $7.4 million.

As of December 31, 2014, and as of December 31, 2015, the Company had other borrowings of $24.9 million and $20.6 million which represent mainly the amount of factored receivables repaid by customers to the Company instead of the factor.

As of December 31, 2015 our Related Parties - Russian Standard Bank and its affiliates - provided financial support of $86.4 million, being 42.4% of the total portfolio of bank loans. As of December 31, 2014 finance support provided by Russian Standard Bank and its affiliates amounted to $49.3 million and represented 26.4% of our bank loans portfolio.

| Bank | Type of the facility | Facility currency | Date of drawing | Maturity date | Financial covenants | Outstanding liability including accrued interest as of December 31, 2014 thousand USD | Outstanding liability including accrued interest as of December 31, 2015 thousand USD |
|---|---|---|---|---|---|---|---|
| Bank 1 | credit line | RUB | 1/14/2014 | 5/14/2015 | Yes | 860 | - |
| Bank 1 | credit line | RUB | 8/8/2014 | 2/8/2015 | Yes | 3,440 | - |
| Bank 1 | credit line | RUB | 8/15/2014 | 2/15/2015 | Yes | 3,440 | - |
| Bank 1 | credit line | RUB | 8/22/2014 | 2/22/2015 | Yes | 3,440 | - |
| Bank 1 | credit line | RUB | 9/5/2014 | 3/5/2015 | Yes | 4,301 | - |
| Bank 1 | credit line | RUB | 9/12/2014 | 3/12/2015 | Yes | 3,441 | - |
| Bank 1 | credit line | RUB | 9/19/2014 | 3/19/2015 | Yes | 3,441 | - |
| Bank 1 | credit line | RUB | 9/24/2014 | 3/24/2015 | Yes | 2,580 | - |
| Bank 1 | credit line | RUB | 10/3/2014 | 4/3/2015 | Yes | 5,161 | - |
| Bank 1 | credit line | RUB | 10/3/2014 | 4/30/2015 | Yes | 1,548 | - |
| Bank 1 | credit line | RUB | 10/6/2014 | 4/6/2015 | Yes | 3,441 | - |
| Bank 1 | credit line | RUB | 10/8/2014 | 4/8/2015 | Yes | 1,720 | - |
| Bank 1 | credit line | RUB | 10/10/2014 | 4/10/2015 | Yes | 2,581 | - |
| Bank 1 | credit line | RUB | 10/28/2014 | 4/28/2015 | Yes | 860 | - |
| Bank 1 | credit line | RUB | 10/31/2014 | 4/30/2015 | Yes | 1,032 | - |
| Bank 1 | credit line | RUB | 11/20/2014 | 5/20/2015 | Yes | 1,721 | - |
| Bank 1 | credit line | RUB | 11/26/2014 | 5/26/2015 | Yes | 8,604 | - |
| Bank 1 | credit line | RUB | 7/22/2015 | 1/22/2016 | Yes | - | 1,628 |
| Bank 1 | credit line | RUB | 7/23/2015 | 1/23/2016 | Yes | - | 1,357 |
| Bank 1 | credit line | RUB | 7/27/2015 | 1/27/2016 | Yes | - | 1,357 |
| Bank 1 | credit line | RUB | 8/6/2015 | 2/6/2016 | Yes | - | 2,443 |
| Bank 1 | credit line | RUB | 8/20/2015 | 2/20/2016 | Yes | - | 1,357 |
| Bank 1 | credit line | RUB | 8/21/2015 | 2/21/2016 | Yes | - | 1,086 |
| Bank 1 | credit line | RUB | 8/26/2015 | 2/26/2016 | Yes | - | 2,036 |
| Bank 1 | credit line | RUB | 9/17/2015 | 3/17/2016 | Yes | - | 2,714 |
| Bank 1 | credit line | RUB | 9/18/2015 | 3/18/2016 | Yes | - | 2,036 |
| Bank 1 | credit line | RUB | 9/23/2015 | 3/23/2016 | Yes | - | 2,036 |
| Bank 1 | credit line | RUB | 9/30/2015 | 3/30/2016 | Yes | - | 2,036 |
| Bank 1 | credit line | RUB | 10/1/2015 | 4/1/2016 | None | - | 679 |
| Bank 1 | credit line | RUB | 10/2/2015 | 4/2/2016 | None | - | 3,393 |
| Bank 1 | credit line | RUB | 10/19/2015 | 4/19/2016 | None | - | 6,785 |
| Bank 1 | credit line | RUB | 11/10/2015 | 5/10/2016 | None | - | 1,357 |
| Bank 1 | credit line | RUB | 11/10/2015 | 6/10/2016 | None | - | 679 |
| Bank 1 | credit line | RUB | 11/20/2015 | 5/20/2016 | None | - | 679 |
| Bank 1 | credit line | RUB | 11/24/2015 | 5/24/2016 | None | - | 2,036 |
| Bank 1 | credit line | RUB | 12/16/2015 | 6/16/2016 | None | - | 3,664 |
| Bank 1 | credit line | RUB | 12/29/2015 | 6/29/2016 | None | - | 1,355 |
| Bank 2 | credit line | RUB | 10/16/2014 | 10/16/2015 | Yes | 4,720 | - |
| Bank 2 | credit line | RUB | 2/11/2015 | 5/27/2016 | Yes | - | 2,378 |
| Bank 2 | credit line | RUB | 7/10/2015 | 10/13/2016 | Yes | - | 794 |
| Bank 2 | credit line | RUB | 11/16/2015 | 2/17/2017 | None | - | 1,362 |
| Bank 2 | credit line | RUB | 12/28/2015 | 3/28/2017 | None | - | 1,071 |
| Bank 2 | credit line | RUB | 12/29/2015 | 3/28/2017 | None | - | 268 |
| Bank 3 | credit line | RUB | 6/9/2014 | 9/1/2016 | Yes | 13,732 | 5,461 |
| Bank 3 | credit line | RUB | 11/11/2015 | 9/1/2016 | None | - | 3,413 |
| Bank 4 | credit line | RUB | 8/20/2014 | 2/16/2015 | Yes | 5,267 | - |
| Bank 4 | credit line | RUB | 9/18/2014 | 3/17/2015 | Yes | 878 | - |
| Bank 4 | credit line | RUB | 3/4/2015 | 3/1/2016 | Yes | - | 4,815 |
| Bank 5 | credit line | RUB | 8/29/2014 | 2/5/2016 | Yes | 13,742 | 2,708 |
| Bank 6 | Overdraft | RUB | - | 7/6/2016 | None | - | 270 |
| Bank 7 | credit line | USD | 10/19/2015 | 4/19/2016 | None | - | 20,000 |

| Bank 8 | letter of credit | EUR | 8/17/2015 | 1/31/2016 | None | - | 1,480 |
|---|---|---|---|---|---|---|---|
| Bank 9 | credit line | RUB | 11/28/2007 | 9/30/2015 | None | 2,182 | - |
| Bank 9 | credit line | RUB | 1/25/2008 | 9/30/2015 | None | 26 | - |
| Bank 9 | credit line | RUB | 11/16/2012 | 9/30/2016 | None | 3,217 | 2,539 |
| Bank 9 | credit line | RUB | 2/19/2013 | 2/19/2016 | None | 3,612 | 2,848 |
| Bank 9 | credit line | RUB | 4/1/2013 | 4/1/2016 | None | 1,720 | 1,356 |
| Bank 9 | credit line | RUB | 5/30/2013 | 5/30/2016 | None | 4,076 | 3,214 |
| Bank 9 | credit line | RUB | 6/3/2013 | 6/3/2016 | None | 3,921 | 3,092 |
| Bank 9 | credit line | RUB | 7/1/2013 | 9/30/2015 | None | 172 | - |
| Bank 9 | credit line | RUB | 7/1/2013 | 9/30/2016 | None | 4,334 | 3,422 |
| Bank 9 | credit line | RUB | 7/1/2013 | 12/13/2016 | None | 14,323 | 11,298 |
| Bank 9 | credit line | RUB | 11/10/2014 | 11/3/2017 | None | 4,472 | 3,526 |
| Bank 9 | credit line | RUB | 12/30/2014 | 12/30/2017 | None | 2,027 | 1,601 |
| Bank 9 | credit line | RUB | 1/28/2015 | 2/9/2017 | None | - | 706 |
| Bank 9 | credit line | RUB | 1/29/2015 | 2/9/2017 | None | - | 1,126 |
| Bank 9 | credit line | RUB | 7/22/2015 | 1/21/2016 | None | - | 4,181 |
| Bank 9 | credit line | RUB | 11/17/2015 | 5/20/2016 | None | - | 3,231 |
| Bank 9 | credit line | USD | 1/1/2011 | 9/30/2016 | None | 250 | 251 |
| Bank 9 | credit line | USD | 9/29/2015 | 12/20/2016 | None | - | 10,041 |
| Bank 9 | credit line | USD | 9/30/2015 | 12/20/2016 | None | - | 9,037 |
| Bank 9 | credit line | USD | 11/24/2015 | 5/20/2016 | None | - | 7,029 |
| Bank 9 | credit line | USD | 12/21/2015 | 3/21/2016 | None | - | 14,500 |
| Bank 10 | credit line | UAH | 12/14/2015 | 11/14/2016 | None | - | 422 |
| Bank 11 | credit line | RUB | 1/2/2011 | 1/20/2016 | None | 1,317 | 1,039 |
| Bank 11 | credit line | RUB | 1/3/2011 | 1/20/2016 | None | 751 | 593 |
| Bank 11 | credit line | RUB | 8/31/2013 | 1/20/2016 | None | 2,922 | 1,357 |
| Other banks * | | RUB | | | | 23,756 | - |
| Factoring | | | | | | 22,729 | 27,811 |
| **Total** | | | | | | 185,757 | 198,948 |

* Loans repaid before the report date

As of December 31, 2015, there were no borrowings secured by pledge.

As of December 31, 2015 one local subsidiary was technically non-compliant with certain credit ratios under their loans. The above mentioned non-compliance did not cause acceleration of the bank credit repayment before their maturity dates.

The table below presents the amount of outstanding lines of credit for financing and the weighted average interest rate on those borrowings:

| | December 31, 2014 | | December 31, 2015 | |
|---|---|---|---|---|
| | Principal Amount outstanding | Weighted average interest rate | Principal Amount outstanding | Weighted average interest rate |
| Bank loans and overdraft facilities | $ 113,373 | 14.9% | $ 82,980 | 15.2% |
| Other borrowings - amount repayable to the factor | 24,851 | - | 19,253 | - |
| Bank loans and borrowings from Related Parties | 44,380 | 12.9% | 83,599 | 14.1% |
| Recourse factoring | 22,729 | - | 27,811 | - |
| Other borrowings - 3rd party | - | - | 6,102 | 24.0% |
| Letters of credit | - | - | 1,480 | - |

As of December 31, 2014 and 2015, the liabilities from factoring with recourse amounted to $22.7 and $27.8 million, respectively and are included in the short term bank loan in the balance sheet as described in Note 6.

Apart from bank borrowings, in 2015 local subsidiaries obtained other than bank loans facilities, presented as of December 31, 2015 as current and non-current other borrowings in the amount of $1.4 million and $4.7 million, respectively.

**Debt issuance cost and future principal repayments**

Debt issuance cost balance related to the Company's debt was nil as of December 31, 2014 and December 31, 2015.

The following is a schedule by years of the future principal repayments for borrowings as of December 31, 2015:

| Future repayments of borrowings (principal) | December 31, 2015 |
|---|---|
| 2016 | 206,826 |
| 2017 | 14,387 |
| 2018 | 717,820 |
| 2019 and beyond | - |
| **Total** | **$ 939,033** |

*Covenants*

The New Notes Indentures contains a number of covenants restricting the actions of ROUST and its Restricted Subsidiaries. All subsidiaries of ROUST are currently considered "Restricted Subsidiaries". Whitehall Holdings and its subsidiaries (collectively "Whitehall Group"), which, starting from October 3, 2013 were "Unrestricted Subsidiaries", became re-restricted as a result of the Roust Inc. acquisition in June 2014. ROUST and its Restricted Subsidiaries are not required to maintain any specific financial ratios, but are restricted from taking certain actions (e.g., incurring additional debt, paying dividends) unless they meet an exception from the relevant restrictions. The New Notes Indentures include customary cross-default provisions that are activated if the Company fails to pay other debt and interest when due or if other debts are accelerated in excess of $25.0 million. To date no such event has occurred.

As of December 31, 2015 the Company have complied with all material conditions and covenants under the New Notes Indentures. As mentioned above one local subsidiary was technically non-compliant with certain credit ratios under their loans. As this non-compliance does not cause acceleration of other debt with principal amount over $25 million there is no cross default event for debt issued under the Indentures.

The Company is obliged to meet the following financial restrictive covenants:

***Incurrence of Indebtedness and Issuance of Preferred Stock***

This covenant limits any incurrence of debt by ROUST or its Restricted Subsidiaries. ROUST and its Restricted Subsidiaries may not incur any Indebtedness, including "Acquired Debt," nor issue "Disqualified Stock," nor permit its Restricted Subsidiaries to issue preferred stock, in each case, unless (i) certain ratios are met and the Indebtedness is subordinated to the New Notes or (ii) such Indebtedness is "Permitted Debt". Main exceptions from that rule are:

- Any Subsidiary Guarantor may incur debt expressly subordinated to the New Notes if the Fixed Charge Coverage Ratio and Consolidated Leverage Ratio of the Company are within an allowed range;

- Permitted Debt: (a) Restricted Subsidiaries may incur debt for which total amount does not exceed greater of $146.0 million and the Borrowing Base. Non-Guarantor Restricted Subsidiaries may not exceed $50.0 million outstanding at any time. (b) Debt (including capital leases) for the purpose of financing any construction or improvement of property, provided that the principal amount does not exceed $25.0 million at any time outstanding;

- An acquisition of a company is deemed to be an incurrence of debt of the acquired company.

### *Transactions with Affiliates*

The term "Affiliates" as defined by the Indenture comprises RTL and entities that control or are controlled by or are under common control with RTL, also officers and directors of ROUST, and Unrestricted Subsidiaries. Transactions among ROUST and its Restricted Subsidiaries are not restricted by this covenant.

The terms of transactions with affiliates should be not materially less favorable than those that might reasonably have been obtained in a comparable transaction on an arm's-length basis from a non-Affiliate and, if a transaction is above $20.0 million, a fairness opinion is required.

The below mentioned transactions are not subject to the above requirements:

- Any transaction of $2.5 million or less;

- Any employment agreement, employee benefit plan or other arrangement entered into in the ordinary course of business;

- Loans or advances to employees in the ordinary course of business not exceeding $2.5 million;

- Transactions contemplated by supply, purchase or sale agreements with suppliers or purchasers or sellers of goods or services in the ordinary course of business and otherwise in compliance with the Indentures that are at least as favorable as might reasonably have been obtained from a non-Affiliate.

### *Limitations on Restricted Payments*

Restricted Payments include the following:

- dividends and other distributions by ROUST and Restricted Subsidiaries;

- redemptions and repurchases of Equity Interests of ROUST or a direct or indirect parent of ROUST;

- payments on subordinated obligations (excluding the Convertible Notes) other than payments of interest or payments of principal within 90 days prior to maturity; and

- "Investments" other than Permitted Investments.

- ROUST and its Restricted Subsidiaries are restricted from making any investments (loans, acquisitions of equity interests, capital contributions advances and other investments that appear as such on the US GAAP balance sheet) unless they qualify as Permitted Investments. Permitted Investments include:

- Investments in a Restricted Subsidiary or in another company, if as a result of such investment such other company becomes a Restricted Subsidiary;

- loans to employees up to an aggregate principal amount of $2.5 million outstanding at any time;

- Investments existing on the Effective Date and Investments pursuant to contractual commitments existing on the Effective Date and modifications, extensions, renewals and refinancing thereof;

- Investments in cash or Cash Equivalents; and

- Investments that do not exceed the greater of (i) $90.0 million and (ii) 3% of total assets of CEDC and its Restricted Subsidiaries.

### *Limitations on Assets' Sales*

This covenant is designed to regulate sales of assets. Asset Sales are understood as any sale, lease or other disposition of assets or any issuance of shares of a Restricted Subsidiary, except for:

- dispositions in the ordinary course of business of inventory, equipment and other assets or damaged, worn out or obsolete assets;

- disposition of assets with a Fair Market Value of less than $20.0 million; and

- transactions between or among the Parent and its Restricted Subsidiaries.

Generally, this covenant requires for any transaction that qualifies as an Asset Sale:

- receipt of Fair Market Value;

- that 75% of the consideration consists of cash (including any liabilities that are assumed in connection with an asset transfer, as well as any securities, notes or other obligations that are converted into cash or Cash Equivalents within 90 days) – while the cash requirement is 75%, 100% of the proceeds must be used to redeem the New Notes (see below); and

- the Net Proceeds of an Asset Sale be used to redeem the New Notes at 100% of principal amount plus accrued interest.

### *Change of Control*

This covenant requires CEDC FinCo to make an offer to purchase the New Notes in cash at 101% plus accrued interest in the event of a "Change of Control", which include among the other:

- the consummation of any transaction pursuant to which ROUST or any of its Restricted Subsidiaries consolidates with, or merges with or into (or otherwise combines with), RTL or any of its Affiliates (other than ROUST and its Restricted Subsidiaries);

- the consummation of any transaction pursuant to which ROUST (or any Restricted Subsidiary) sells, conveys, transfers or otherwise disposes of the Roust Russia Group (previously Russian Alcohol Group) to RTL or any of its Affiliates (other than ROUST and its Restricted Subsidiaries); and

- a majority of Directors on ROUST's Board of Directors changes (excluding changes approved by a majority of the Board on the Issue Date or directors approved by such directors).

### *Limitations on Liens*

The Limitation on Liens covenant limits liens on Collateral and other assets of the ROUST Group. CEDC FinCo may not incur or suffer to exist any liens on any of its property that are not Issuer Permitted Liens. The ROUST Group may not incur liens on any Collateral other than Permitted Collateral Liens. The main Permitted Collateral Lien exceptions are for liens on Collateral securing debt incurred under the credit facility basket and liens securing the New Notes and refinancing thereof.

The ROUST Group may not incur liens on property or assets that are not Collateral unless such assets will also secure the New Notes or there is a Permitted Liens exception.

### *Post-Closing Security Obligations*

If ROUST acquires or creates any material intellectual property rights relating to the brands owned or used by ROUST or its Restricted Subsidiaries, such intellectual property rights must also be pledged. Also, if a bank account owned by a Restricted Subsidiary becomes a Specified Bank Account (i.e., the balance in the account exceeds $10.0 million measured as of the Issue Date and thereafter as of the last day of each fiscal quarter after the

Issue Date), the bank account must also be pledged. In addition, if ROUST acquires or creates a "Significant Subsidiary", the shares of that subsidiary must be pledged to secure the New Notes within 20 Business Days.

### Amendments to or Prepayments of the Intercompany Loans

The Indentures restrict amendments to and prepayments of the "Intercompany Loans" – which are the loans from CEDC FinCo to Jelegat and CEDC International sp. z o.o., originally made with the proceeds of the Senior Secured Notes due 2016 issued by CEDC FinCo as amended (the "Original Notes"), in connection with the issuance of the New Notes. Generally, amendments to the Intercompany Loans are prohibited by the Indentures. However, the Intercompany Loans and any RAG On-Loans may be amended solely to provide for the repayment of the Intercompany Loans in connection with the issuance of the New Notes and to provide for the issuance of any additional PIK Notes or Senior Secured Notes. There are also restrictions on amendments to the RAG On-Loans, which are the loans between Jelegat (as lender) and the Roust Russia Group (previously Russian Alcohol Group) made with the proceeds of the Original Notes.

## 15.    TAXES OTHER THAN INCOME TAXES

Taxes payable other than income taxes comprise mainly excise and VAT payable as presented in the table below.

|  | December 31, 2014 | December 31, 2015 |
|---|---|---|
| VAT payable | $        39,139 | $        30,140 |
| Excise tax payable | 90,919 | 78,495 |
| Other taxes and charges payable | 3,043 | 2,930 |
| **Total** | **$      133,101** | **$      111,565** |

## 16.    ACCRUALS

### Current Accruals

The table below presents details of our current accruals.

|  | December 31, 2014 | December 31, 2015 |
|---|---|---|
| Accrued marketing related services | $        12,169 | $        20,703 |
| Accrued employee benefits | 11,299 | 7,646 |
| Accrued costs to satisfy the claims | 3,258 | 500 |
| Accrued legal and professional services | 3,408 | 3,141 |
| Other | 18,577 | 13,897 |
| **Total** | **$        48,711** | **$        45,887** |

As of December 31, 2015 the amount of marketing related services accruals increased in Poland and in Roust Inc. in amount of $8.9 million (due to lack of account receivables to be netted off), partially offset by retro-bonus accruals decrease in amount of $6.2 million, presented in other current accruals.

### Non-current Accruals

Non-current accruals amount to $0.4 million as of December 31, 2014 and $0.3 million as of December 31, 2015. They are mainly comprised of retirement benefits and jubilee award accruals.

## 17.    OTHER LIABILITIES

### Other Current Liabilities

Other current liabilities as of December 31, 2014 and December 31, 2015 amounted to $18.5 million and $20.5 million, respectively. As of December 31, 2015 the amount of liability for the Roust Inc. acquisition is $0.4 million, the amount of liability for the RDL acquisition is $3.9 million. The majority of other current liabilities relates to marketing services, finance leases and employee benefits payable.

**Other Non-current Liabilities**

Other non-current liabilities (excluding non-current accruals described in Note 16 above) amount to $1.7 million as of December 31, 2014 and $17.3 million as of December 31, 2015. As of December 31, 2015 deferred income due to interests income received in advance, on loans granted to Related Parties amounts to $16.0 million. Current part of this deferred income amounting to $0.8 million is presented in other current liabilities. The non-current part of this deferred income amounting to $15.2 million is included in other non-current liabilities. The other non-current liabilities are comprised of finance lease liabilities.

## 18.    COMMITMENTS AND CONTINGENT LIABILITIES

**Supply contracts**

The Company has various agreements covering its sources of supply, which, in some cases, may be terminated by either party on relatively short notice. Thus, there is a risk that a portion of the Company's supply of products could be curtailed at any time.

**Bank Guarantees**

The Company is a party to guarantee agreements with banks relating to purchases of spirit, excise stamps and custom duties. In accordance with current legislation in Russia, a producer purchasing spirit alcohol must (a) prepay the excise tax in full or (b) provide the relevant tax body with a bank guarantee in the full amount of the excise tax before purchasing, to secure payment of the excise tax. The bank guarantee serves as insurance that the excise tax is paid on time.

- The JSC "Roust Russia" and subsidiaries has in place a guarantee line agreement with multiple banks pursuant to which it has been provided with a guarantee limit of 16.1 billion Russian rubles (approximately $218.5 million) for a period from one to three years.

- Bravo Premium has also guarantee line agreements with multiple banks pursuant to which it has been provided with a total guarantee limit of 0.8 billion Russian rubles (approximately $10.8 million) for a period from one to two years.

According to these agreements, our subsidiaries have the right to obtain bank guarantees during the agreement term for each purchase of excise stamps which are needed to import alcohol to the Russian Federation. The guarantees for excise stamps are being issued in favor of Central Custom for the whole period until products are delivered to the territory of the Russian Federation and passed the customs clearance procedure after which they are allowed to be sold on the territory of the Russian Federation.

In Poland, as of December 31, 2014 and December 31, 2015 the Company had bank guarantees related to excise stamps and customs duties on imported goods at a value of 5.8 million Polish zlotys (approximately $1.8 million), and 5.8 million Polish zlotys (approximately $1.5 million), respectively.

In Hungary, as of December 31, 2014 the Company had a guarantee related to office rent and insurance for bonded warehouse at a value of 22.0 million Hungarian forints (approximately $0.1 million) and 60.0 million Hungarian forints (approximately $0.2 million). As of December 31, 2015, the value of these guarantees is 20.1 million Hungarian forints (approximately $0.1 million) and 60.0 million Hungaruan forints (approximately $0.2 million).

**Operating Leases and Rent Commitments**

Total rental expenses related to operating leases for the years ended December 31, 2013, December 31, 2014 and December 31, 2015 amounted to $16.4 million, $13.3 million and $6.0 million, respectively.

The following is a schedule by years of the future rental payments under the non-cancelable operating leases as of December 31, 2015:

| Future rental payments under operating leases | | December 31, 2015 |
|---|---|---|
| 2016 | $ | 6,752 |
| 2017 | | 6,793 |
| 2018 | | 4,848 |
| 2019 | | 3,732 |
| 2020 | | 3,732 |
| Thereafter | | 4,764 |
| **Total** | $ | **30,621** |

The future minimum lease payments for the assets under capital leases as of December 31, 2015 are as follows:

| Future minimum lease payments under capital leases | | December 31, 2015 |
|---|---|---|
| 2016 | | 1,972 |
| 2017 | | 1,425 |
| 2018 | | 489 |
| 2019 | | 307 |
| 2020 | | 18 |
| **Gross payments due** | $ | **4,211** |
| Less interest | | 233 |
| **Net payments due** | $ | **3,978** |

**Factoring**

As of December 31, 2015 the Company is a party to recourse factoring as described in Note 6. In case of recourse factoring, if our debtors will not pay the amounts due under the factoring agreement, the factors have the right to require payments from the Company. In such case the Company will have to re-recognize the related receivable from the debtor and related liability to the bank. The Company believes that there are no substantial risks of the debtors not paying on time.

**Assets Subject to Pledges in Respect of the NSSN and NCJSN**

As of December 31, 2015 the following assets were subject to pledges:

- Poland:

  - pledges of shares in each of CEDC International Sp. z o.o. and PWW Sp. z o.o.;

  - mortgages over real property and fixtures at CEDC International Sp. z o.o.'s factories located at Oborniki and Bialystok;

  - security over certain intellectual property rights owned by CEDC International Sp. z o.o. related to the *Palace*, *Żubrówka*, *Absolwent* and *Soplica* brands;

- Hungary:

  - registered business quota pledge over Roust Hungary Kft (previously Bols Hungary Kft);

  - security over certain intellectual property rights owned by Roust Hungary Kft (previously Bols Hungary Kft) in respect of the *Royal*, *Royal Feny* and *Royal* vodka trademarks;

- Cyprus:

  - registered pledges of shares in each of Latchey Limited, Jelegat Holdings Ltd., Pasalba Ltd;

- United Kingdom:

- English law assignment of the NCJSN and the NSSN intercompany proceeds loans from Jelegat Holdings Ltd. to Roust Russia (previously Russian Alcohol Group) subsidiaries granted by Jelegat Holdings Ltd.;

- Luxembourg:

  - pledges of shares in each of Lion/Rally Lux 1 S.A., Lion/Rally Lux 2 S.à r.l. and Lion/Rally Lux 3 S.à r.l.;

- United States:

  - pledges of the capital stock of each of CEDC Finance Corporation LLC and CEDC Finance Corporation International Inc.;

  - pledges of the intercompany loans made by CEDC Finance Corporation International Inc. to CEDC International Sp. z. o. o and Jelegat Holdings Ltd. (respectively);

- Russia:

  - pledges of participatory interests in LLC "Glavspirttirest", Bravo Premium LLC, LLC "The TH Russian Alcohol";

  - mortgages over real property, land rights and fixtures (to the extent qualified as real property under Russian law) of the JSC "Siberian Distillery" (First Tula Distillery LLC was merged with JSC Siberian Distillery in December 2014);

  - pledges of shares of JSC "Distillery Topaz", JSC "Roust Russia", CJSC "Roust Inc.", JSC "Siberian Distillery" (First Tula Distillery LLC and CJSC Mid-Russian Distilleries was merged with JSC Siberian Distillery in December 2014);;

  - security over certain intellectual property rights owned by LLC "Glavspirittrest", LLC "Parliament Distribution", JSC "Roust Russia", Vlaktor Trading Limited, AUK Holdings Limited and Ardy Investments Limited related to the *Green Mark*, *Zhuravli*, *Marusya*, *Yamskaya*, *Parliament*, *Talka*, *Urozhay*, *Perchik* and *Kauffman* vodka brands.

**Legal proceedings**

From time to time, we are involved in litigation arising from the normal course of our business, including appeal and cancellation proceedings with respect to trademarks that are similar to some of our brands, as well as other proceedings, in the United States, Russia, Poland and elsewhere. Except as set forth below, we are not currently involved in or aware of any pending or threatened litigation that we reasonably expect, either individually or in aggregate, will result in a material adverse effect on our consolidated financial statements.

Our subsidiary, CEDC International, filed an action against Stock Polska S.A. ("Stock") in December 2013 for unfair competition relating to the misleading term, "wódka", placed on Stock's flagship product *Żołądkowa Gorzka*. Following CEDC International's petition, the court issued an interim injunction in December 2013 prohibiting Stock from selling the products with the misleading term "wódka". CEDC International has taken a number of steps with respect to old inventory of products released by Stock onto the market, which still use the term "wódka" on the bottle. Three different court pleadings were filed, including a petition to extend the previously issued injunction. The court agreed with the arguments presented by CEDC International and extended the original injunction, imposing the obligation on Stock to withdraw all incorrectly labeled products from the market. Stock filed an appeal against this new injunction imposing the obligation to withdraw the product. The Court of Appeal dismissed the interim injunction. The first instance court proceedings were completed on March 11, 2016. The court followed our claim, and ruled out as follows:

- Stock's placement of "wódka" indicator on *Żołądkowa Gorzka* product was the unfair competition act in the meaning of unfair competition law,

- Stock must withdraw all products with wrong "wódka" indicator from the market,

- Stock must publish public apologies in "Rzeczpospolita" daily and on their *Żołądkowa Gorzka* website,

- Stock must pay a penalty of PLN 50 thousand (approximately $13 thousand) in favor of local foundation in Białystok.

### 19. STOCKHOLDERS' EQUITY

**Authorized Shares**

The Company has 90,000 $0.01 par value shares of common stock authorized of which 10,000 shares are issued and outstanding as of December 31, 2014 and December 31, 2015. Additionally the Company has authorized 10,000 preferred shares none of which had been issued or were outstanding as of December 31, 2014 and December 31, 2015.

**Stock Option Plans and Warrants**

During the five months ended May 31, 2013, the Company recognized compensation costs of $0.4 million. Upon emergence, all common stock as well as equity based incentive compensation, including but not limited to stock options and restricted stock units of the Predecessor, were cancelled in accordance with the Plan and therefore no equity based incentive compensation was recognized during 7 months from June 1, 2013 to December 31, 2013, and in the years ended December 31, 2014 and December 31, 2015.

### 20. RELATED PARTY TRANSACTIONS

**Identification of Related Parties**

Upon emergence from bankruptcy protection on June 5, 2013 (as described in Note 2 to these consolidated financial statement), Mr. Roustam Tariko became the sole ultimate shareholder of ROUST. Further, Mr. Roustam Tariko has been appointed to ROUST's Board of Directors as Executive Chairman of the Board. Given that Mr. Roustam Tariko indirectly controls RTL and RTL directly controls Russian Standard Corporation (and indirectly controls other Russian Standard entities), all entities controlled by Mr. Roustam Tariko, have become Related Parties of ROUST, including Russian Standard Bank, Russian Standard Corporation, Russian Standard Vodka (USA) Inc., LLC "Russian Standard Vodka", LLC "Union Trust Stroy" and F.lli Gancia & C. SpA.

**Transactions with Related Parties**

In the ordinary course of business, the Company is involved in transactions with entities controlled by Mr. Tariko that result in the recognition of revenues, expenses, assets and liabilities by the Company.

The following table summarizes our transactions with the Related Parties as included in these consolidated financial statements.

| CONDENSED CONSOLIDATED STATEMENTS OF OPERATIONS AND COMPREHENSIVE INCOME | Predecessor one hundred fifty-six-day period ended June 5, 2013 | Successor | | |
|---|---|---|---|---|
| | | Two hundred and nine days ended December 31, 2013 | Year ended December 31, 2014 | Year ended December 31, 2015 |
| Net sales | $        1,006 | $        1,709 | $        2,029 | $       17,697 |
| Cost of goods sold | 900 | 494 | 997 | 6,322 |
| Purchases of goods | 643 | 51,077 | 64,051 | 69,240 |
| Purchases of raw materials | 1,545 | 4,486 | 3,387 | 3,248 |
| Selling, general and administrative expenses | 653 | 10,623 | 3,387 | 4,415 |
| Other operating income | - | - | - | 9,288 |
| Interest expense | 1,339 | 4,441 | 7,846 | 8,560 |
| Interest Income | - | 8,747 | 13,114 | 11,372 |
| Other income | - | 782 | 200 | 133 |
| Other expense | $          - | $          - | $          - | $          100 |

| CONDENSED CONSOLIDATED BALANCE SHEETS | December 31, 2014 | December 31, 2015 |
|---|---|---|
| *Assets* | | |
| Accounts receivable | $        6,453 | 24,293 |
| Prepaid expenses | 1,025 | 5,780 |
| Other current assets (other current receivables) | 676 | 3,010 |
| Loans granted to Related Parties* | 83,836 | 97,299 |
| Long-term investments | - | 30 |
| **Total due from Related Parties** | $       91,990 | 130,412 |
| *Liabilities* | | |
| Trade accounts payable | $       13,149 | 20,221 |
| Other accounts payable | 9,549 | 6,142 |
| Bank loans and borrowings from Related Parties** | 49,331 | 86,392 |
| Deferred income*** | - | 16,038 |
| **Total due to Related Parties** | $       72,029 | 128,793 |

*These facilities include loans of principal amount of $17.8 million granted by Roust Inc., which originate from period before Roust Inc. acquisition.*

** *Loans from Russian Standard Bank and Russian Standard Insurance.*

*** *Interst prepaid on loans granted to Related Parties.*

Accounts receivable and trade accounts payable arise from sale, purchases of goods and transactions related to marketing activities made primarily with LLC "Russian Standard Vodka" and F.lli Gancia & C. SpA in the ordinary course of business. For details on prepaid expenses please refer to Note 8 "Prepaid expenses". Deferred income represents prepaid interest on loan granted to RTL. Selling, general and administrative expenses apply to costs of renting office premises from LLC "Union Trust Stroy" and LLC "Russian Standard Vodka". Additionally, in the year ended December 31, 2015 the Company recognized $1.7 million income of management service recharges to Related Parties. As of December 31, 2015 other accounts payable include the outstanding liability for the Roust Inc acquisition in amount of $0.4 million and for RDL acquisition in amount of $3.9 million. The liability for RDL acquisition was paid in February 2016.

The acquisition of Roust Inc. brought 9% of the shares of LLC "Russian Standard Vodka" with a historically de minimis book value. The Company believes that the fair market value of these shares is significantly higher than its book value. The shareholder has a call option on the buy-back of the shares. The option is exercisable at fair market value.

As described in Note 4 "*Acquisition under common control*" on December 31, 2015 the Company completed its acquisition of Roust Distribution Limited ("RDL") from Roust Trading Ltd. ("RTL") through the transfer of the 100% ownership interest in RDL from RTL to Pasalba Ltd., a wholly owned subsidiary of ROUST.

After analyzing the independent valuation of the RDL business and the Company's strategic objectives, an aggregate purchase price for RDL was agreed at $40.0 million. The deposits of $4.8 million and $9.0 million were paid in October and December 2015, respectively. The majority of the consideration amounting to $22.3 million was settled against loans granted by ROUST to Related Parties (within the RTL legal structure). The remaining $3.9 million of the consideration was paid in cash in February 2016.

**Loans granted to Related Parties**

As of December 31, 2014 and December 31, 2015 the Company had loan receivables from Related Parties in principal amount equal to $77.9 million and $91.1 million, respectively. All of the loans as of December 31, 2015 together with accrued interest amount to $97.3 million. The loans were granted to RTL, LLC "Russian Standard Vodka" and Russian Standard Corporation, to support the growth of their business. The details of loans granted as of December 31, 2015 are presented in the table below.

| Principal amount* | Date of signing the agreement | Maturity date | Interest rate |
|---|---|---|---|
| $61.8 million | February 17, 2014 - December 21, 2015 | January 25, 2015 - September 14, 2022 | 13.8%-18.0% |
| $23.7 million | February 20, 2014 - June 29, 2015 | November 15, 2015 - June 29, 2020 | 10.0% |
| $2.4 million | October 16, 2015 - November 2, 2015 | October 16, 2016 - November 2, 2016 | 7.0% |
| $3.2 million | March 24, 2014 | March 10, 2022 | 12.0% |

*\* These facilities include loans of principal amount of $17.8 million granted by Roust Inc., which originate from period before Roust Inc. acquisition.*

These loans have been guaranteed by Related Party subsidiaries. We believe RTL, LLC "Russian Standard Vodka" and Russian Standard Corporation have intent and ability to settle the loans upon maturity and therefore these loans are presented as assets in balance sheet not in shareholders' equity.

In the year ended December 31, 2015 Related Parties repaid the loans in amount of $51.9 million.

Since December 31, 2015, up to the date of this report Related Parties settled the loans in amount of $3.4 million.

**Borrowings from Related Parties**

As of December 31, 2014 and December 31, 2015 the Company had borrowings from Related Parties in the amount of $49.3 million and $86.4 million, respectively, which represents 26.4% and 42.4% of our bank loans portfolio, respectively, and which are described in Note 14 "Notes and Borrowings".

**Guarantees from/to Related Parties**

Roust Inc. has provided guarantees of $150.2 million to Related Parties as of December 31, 2015. RTL and its subsidiaries have provided guarantees of $50.8 million to Roust Inc. as of December 31, 2015. The majority of the guarantees relate to purchases of spirit, excise stamps and custom duties. Such guarantees are typical and necessary in our industry.

*21.*     ***FAIR VALUE MEASUREMENTS***

As of December 31, 2014 and December 31, 2015, the Company held certain financial assets that are measured at fair value on a recurring basis. These consisted of cash and cash equivalents. The monetary assets represented by these financial instruments are primarily located in Poland, Hungary and Russia. Consequently, they are subject to currency translation risk when reporting in US dollars.

The Company does not have any financial assets measured at fair value on a recurring basis as Level 3. The Company has certain financial liabilities which are to be measured at fair value on a recurring basis for disclosure purposes only, namely, the NCJSN and NSSN. The fair value of NSSN and NCJSN is determined on the basis of the quoted market prices on public markets and is categorized as Level 1. The fair value of NSSN and NCJSN is disclosed in Note 14. There were no transfers in or out of Level 1, Level 2 or Level 3 during the years ended December 31, 2014 and Decemebr 31, 2015.

The Company has other financial instruments, such as accounts receivable, accounts payable, overdrafts, short term bank loans and other liabilities which have been excluded from the tabular disclosures below. Due to the short-term nature of these instruments, their carrying values approximate their fair values. The Company did not have any other financial instruments within the scope of the fair value disclosure requirements as of December 31, 2014 and December 31, 2015.

Non-financial assets, such as goodwill, trademarks and long-lived assets, and liabilities are measured at fair value on a nonrecurring basis. The book value of these assets is the fair value as established as of the fresh start date adjusted for subsequent changes including depreciation and amortization for definite-lived assets. These items are tested for impairment on the occurrence of a triggering event or in the case of goodwill and indefinite-lived trademarks, on at least an annual basis. As of December 31, 2015 test was performed and as a result of the test no impairment was recognized. Refer to Note 10, 11 and 12 for the carrying value of the Company's long-lived assets and amount of recognized impairment as of December 31, 2014 and December 31, 2015.

The following table sets forth by level, within the fair value hierarchy, the Company's assets accounted for at fair value on a recurring basis as of December 31, 2014 and December 31, 2015:

| Fair value measurement on a recurring basis | | | | |
|---|---|---|---|---|
| | Total | Quoted prices in Activated Markets for Identical Assets (Level 1) | Significant Other Observable Inputs (Level 2) | Unobservable Inputs (Level 3) |
| December 31, 2014 | | | | |
| Cash and cash equivalents | $ 37,216 | $ 37,216 | $ - | $ - |
| December 31, 2015 | | | | |
| Cash and cash equivalents | $ 13,737 | $ 13,737 | $ - | $ - |

None of assets were measured at fair value on a non-recurring basis as of December 31, 2014 and 2015.

## 22.    OPERATING COSTS

Operating costs of the Company comprise selling, general and administrative expenses (including selling, general and administrative expenses charged by the Related Parties), provision for doubtful debts and impairment charges (if any). The table below presents details of our operating costs:

| | Predecessor one hundred fifty-six-day period ended June 5, 2013 | Successor Two hundred and nine days ended December 31, 2013 | Year ended December 31, 2014 | Year ended December 31, 2015 |
|---|---|---|---|---|
| Staff costs | $ 52,227 | $ 91,262 | $ 126,006 | 85,191 |
| Warehousing and transportation | 23,389 | 38,967 | 47,816 | 29,831 |
| Marketing | 9,247 | 30,810 | 29,051 | 16,401 |
| Administration expenses | 13,743 | 38,627 | 40,164 | 15,414 |
| Depreciation and amortization | 3,361 | 3,449 | 7,462 | 6,749 |
| Selling, general and administrative expenses | $ 101,967 | $ 203,115 | $ 250,499 | 153,586 |
| Provision for doubtful debts | 601 | 4,930 | (3,559) | 1,833 |
| Impairment charges | - | 83,324 | - | - |
| Total Operating Costs | $ 102,568 | $ 291,369 | $ 246,940 | 155,419 |

## 23.    INTEREST EXPENSE

The tables below present items included in interest expense for the periods ended December 31, 2013, December 31, 2014 and December 31, 2015. The interest expense include amounts which were ultimately

capitalized in respect of NCJSN. The first payment-in-kind interest of $8.3 million was capitalized on October 31, 2013. The following in-kind interest payments of $10.4 million, $10.9 million, $11.5 million and $12.1 million were capitalized on April 30, 2014, October 31, 2014, April 30, 2015 and October 31, 2015 respectively.

| | Predecessor | Successor | | |
| | one hundred fifty-six-day period ended | Two hundred and nine days ended | Year ended | Year ended |
| | June 5, 2013 | December 31, 2013 | December 31, 2014 | December 31, 2015 |
|---|---|---|---|---|
| Notes* | $          40,296 | $       36,917 | $       65,543 | $       68,002 |
| Other borrowings | 6,029 | 17,603 | 30,581 | 28,536 |
| **Total interest expense** | **$          46,325** | **$       54,520** | **$       96,124** | **$       96,538** |
| of which: | | | | |
| Interest expense to Related Parties | $            1,339 | $         4,441 | $         7,846 | $         8,560 |

*\* Notes: The SSN and the Convertible Senior Notes due 2013 for the Predecessor; the NSSN and the NCJSN for the Successor.*

Interest expense includes amortization of debt discounts/ provisions and debt issuance costs.

**24.    OTHER FINANCIAL INCOME / (EXPENSE), NET**

For the year ended December 31, 2013, 2014, and 2015, the following items are included in other financial income / (expense):

| | Predecessor | Successor | | |
| | one hundred fifty-six-day period ended | Two hundred and nine days ended | Year ended | Year ended |
| | June 5, 2013 | December 31, 2013 | December 31, 2014 | December 31, 2015 |
|---|---|---|---|---|
| Unrealized foreign exchange impact related to foreign currency financing | (54,332) | 85,940 | (49,636) | (15,081) |
| Unrealized foreign exchange impact - other balance sheet items | $                    - | $        (4,731) | $      (23,488) | $        (1,833) |
| Other gains / (losses) * | (3,681) | (99,353) | (1,958) | 1,271 |
| **Total foreign exchange (losses), net** | **$         (58,013)** | **$      (18,144)** | **$      (75,082)** | **$      (15,643)** |

*\* other gains / (losses) for the Successor period of two hundred and nine days ended December 31, 2013 includes $94.0 million of realized foreign exchange differences on loans*

Foreign exchange (losses), net include realized and unrealized exchange differences. The main item is the unrealized foreign exchange loss related to foreign currency financing. Unrealized foreign exchange impact related to other balance sheet items are the differences resulting from the translation of working capital items. Other gains / (losses) for annual period ended December 31, 2015 are mainly realized exchange differences related to foreign currency financing.

**25.    OTHER NON-OPERATING INCOME / (EXPENSE), NET**

For the years ended December 31, 2013, 2014 and 2015, respectively, the following items are included in other non-operating income / (expense):

| | Predecessor | Successor | | |
| | one hundred fifty-six-day period ended | Two hundred and nine days ended | Year ended | Year ended |
| | June 5, 2013 | December 31, 2013 | December 31, 2014 | December 31, 2015 |
|---|---|---|---|---|
| Factoring costs and bank guarantee fees | $ (5,631) | $ (10,699) | $ (20,022) | (17,551) |
| Other gains / (losses) | (719) | 1,870 | (1,111) | (1,204) |
| **Total other non-operating income / (expense), net** | **$ (6,350)** | **$ (8,829)** | **$ (21,133)** | **(18,755)** |

## 26.    EARNINGS/ (LOSS) PER SHARE

The following table sets forth the computation of basic and diluted earnings per share for the periods indicated.

| | Predecessor | Successor | | |
| | one hundred fifty-six-day period ended | Two hundred and nine days ended | Year ended | Year ended |
| | June 5, 2013 | December 31, 2013 | December 31, 2014 | December 31, 2015 |
|---|---|---|---|---|
| Income / (loss) from continuing operations, net of non-controlling interests in subsidiaries | $ 136,183 | (117,930) | $ (114,427) | $ (53,036) |
| Income / (loss) on discontinued operations | - | - | - | - |
| **Net Income / (loss) attributable to the Parent** | **136,183** | **(117,930)** | **(114,427)** | **(53,036)** |
| Weighted average shares of common stock outstanding (used to calculate basic EPS) | 81,553,503 | 10,000 | 10,000 | 10,000 |
| Net effect of dilutive employee stock options based on the treasury stock method | 462,397 | - | - | - |
| **Weighted average shares of common stock outstanding (used to calculate diluted EPS)** | **82,015,900** | **10,000** | **10,000** | **10,000** |
| **Net income / (loss) per common share - basic** | **$ 1.67** | **$ (11,793.00)** | **$ (11,442.70)** | **$ (5,303.60)** |
| **Net income / (loss) per common share - diluted** | **$ 1.66** | **$ (11,793.00)** | **$ (11,442.70)** | **$ (5,303.60)** |

No employee stock options were granted in the annual period ended December 31, 2015. No options were outstanding as of December 31, 2015. There is no adjustment diluted earnings per share related to the Convertible Secured Notes as the inclusion of these shares would have been antidilutive.

## 27.    COMPREHENSIVE INCOME / (LOSS)

Comprehensive income is defined as all changes in equity during a period except for those resulting from investments by owners and distributions to owners. Comprehensive income of the Company includes net income adjusted by foreign currency translation adjustments. The foreign exchange losses / gains on the translation from foreign currencies to US dollars are classified separately as foreign currency translation adjustments within accumulated other comprehensive income included in stockholders' equity.

Other comprehensive loss of $14.8 million reported on the face of the consolidated statement of operations and comprehensive income results from currency translation adjustment. The adjustment is calculated for each group entity that has functional currency different from US dollar (primarily Polish zloty and Russian ruble) when its respective financial statements are translated into US dollar.

In the year ended December 31, 2014 functional currency exchange rates used to translate the balance sheet weakened against the US dollar as compared to the exchange rates as of December 31, 2013 and as a result a loss of

$41.8 million of foreign currency translation adjustment was recognized for the annual period ended December 31, 2014.

In the year ended December 31, 2015 functional currency exchange rates used to translate the balance sheet weakened against the US dollar as compared to the exchange rates as of December 31, 2014 and as a result a loss of $14.8 million of foreign currency translation adjustment was recognized for the annual period ended December 31, 2015.

## 28. SEGMENT INFORMATION

The Company used to operate and manage its business based on the primary geographic segments: Poland, Russia and Hungary. Our Ukrainian operations were directly linked to our Russian operations, so they were treated as one segment. Starting in 2015, we manage our business on the basis of the following segments: Poland domestic, Russia domestic, Corporate and International, which comprises other segments of an international nature. The Company does not restate comparative segment information as it is impracticable to do so. In order to facilitate a comparison, segment information for the year ended December 31, 2015 has been presented in both formats.

Selected financial data splits based upon these segmentations, are shown below for the relevant periods (intercompany revenues and profits are eliminated in line with management accounting policies):

| | Net Sales | | | |
| | Predecessor one hundred fifty-six-day period ended June 5, 2013 | Successor | | |
| | | Two hundred and nine days ended December 31, 2013 | Year ended December 31, 2014 | Year ended December 31, 2015 |
|---|---|---|---|---|
| **Previous segment** | | | | |
| Poland | $ 89,572 | $ 185,959 | $ 287,999 | $ 260,154 |
| Russia | 177,267 | 455,770 | 525,082 | 297,357 |
| Hungary | 6,626 | 19,001 | 31,297 | 26,720 |
| **Total Net Sales** | $ 273,465 | $ 660,730 | $ 844,378 | $ 584,231 |

| Segment Net Sales | |
| | Year ended December 31, 2015 |
|---|---|
| **Segment** | |
| Poland domestic | $ 252,425 |
| Russia domestic | 256,185 |
| International | 75,621 |
| **Total Net Sales** | $ 584,231 |

| Underlying EBITDA (non US GAAP measure) | | | | |
| | Predecessor one hundred fifty-six-day period ended June 5, 2013 | Successor | | |
| | | Two hundred and nine days ended December 31, 2013 | Year ended December 31, 2014 | Year ended December 31, 2015 |
|---|---|---|---|---|
| **Previous segment** | | | | |
| Poland | $ 15,206 | $ 26,548 | $ 55,080 | $ 56,300 |
| Russia | 13,294 | 53,577 | 50,101 | 31,612 |
| Hungary | 418 | 3,331 | 4,774 | 3,660 |
| Corporate Overhead | (5,473) | 1,647 | (2,364) | (2,469) |
| **Total Underlying EBITDA** | $ 23,445 | $ 85,103 | $ 107,591 | $ 89,103 |

### Underlying EBITDA (non US GAAP measure)

| | | Year ended<br>December 31, 2015 |
|---|---|---|
| **Segment** | | |
| Poland domestic | $ | 55,654 |
| Russia domestic | | 30,170 |
| International | | 11,711 |
| Corporate | | (8,432) |
| **Total Underlying EBITDA** | **$** | **89,103** |

### Depreciation / Amortization Expense

| | Predecessor<br>one hundred fifty-six-day period ended<br>June 5, 2013 | | Successor | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | | Two hundred and nine days ended<br>December 31, 2013 | | Year ended<br>December 31, 2014 | | Year ended<br>December 31, 2015 | |
| **Previous segment** | | | | | | | | |
| Poland | $ | 2,345 | $ | 2,771 | $ | 5,904 | $ | 6,349 |
| Russia | | 5,250 | | 4,006 | | 5,612 | | 3,757 |
| Hungary | | 98 | | 198 | | 292 | | 251 |
| General corporate overhead | | 1 | | 1 | | 3 | | - |
| **Total depreciation / amortization expense** | **$** | **7,694** | **$** | **6,976** | **$** | **11,811** | **$** | **10,357** |

### Depreciation / Amortization Expense

| | | Year ended<br>December 31, 2015 |
|---|---|---|
| **Segment** | | |
| Poland domestic | $ | 6,326 |
| Russia domestic | | 3,640 |
| International | | 333 |
| Corporate | | 58 |
| **Total depreciation** | **$** | **10,357** |

### Income Tax

| | Predecessor<br>one hundred fifty-six-day period ended<br>June 5, 2013 | | Successor<br>Two hundred and nine days ended<br>December 31, 2013 | | Successor<br>Year ended<br>December 31, 2014 | | Successor<br>Year ended<br>December 31, 2015 | |
|---|---|---|---|---|---|---|---|---|
| **Previous segment** | | | | | | | | |
| Poland | $ | 3,645 | $ | 1,213 | $ | (3,144) | $ | 18,734 |
| Russia | | 13,473 | | 12,117 | | (5,088) | | (6,353) |
| Hungary | | (233) | | (65) | | (279) | | (175) |
| General corporate overhead | | 249 | | (515) | | (3,823) | | 1,151 |
| **Total income tax benefit / (expense)** | **$** | **17,134** | **$** | **12,750** | **$** | **(12,334)** | **$** | **13,357** |

| Income Tax | | |
|---|---|---|
| | | Year ended |
| | | December 31, 2015 |
| *Segment* | | |
| Poland domestic | $ | 18,734 |
| Russia domestic | | (4,218) |
| International | | (2,310) |
| Corporate | | 1,151 |
| **Total income tax benefit / (expense)** | **$** | **13,357** |

| Identifiable Operating Assets | | | | |
|---|---|---|---|---|
| | | December 31, 2014 | | December 31, 2015 |
| *Previous segment* | | | | |
| Poland | $ | 416,928 | $ | 436,285 |
| Russia | | 473,576 | | 349,316 |
| Hungary | | 31,742 | | 23,355 |
| Corporate | | 25,696 | | 10,753 |
| **Total Identifiable Assets** | **$** | **947,942** | **$** | **819,709** |

| Identifiable Operating Assets | | |
|---|---|---|
| | | December 31, 2015 |
| *Segment* | | |
| Poland domestic | $ | 435,464 |
| Russia domestic | | 317,550 |
| International | | 55,942 |
| Corporate | | 10,753 |
| **Total Identifiable Assets** | **$** | **819,709** |

Our identifiable operating assets decreased by $128.2 million, from $947.9 million as of December 31, 2014 to $819.7 million as of December 31, 2015 mainly due to the impact of foreign exchange differences which amounted to $135.8 million. Operating assets of the Polish segment increased by $68.3 million on a currency neutral basis, mainly as a result of higher balance of loans granted to the Related Parties of $42.0 million, higher receivables balance of $24.1 million and higher inventory levels of $12.3 million, partially offset by lower cash balance o $11.6 million. Russian operating assets decreased by $39.8 million on a currency neutral basis, mainly as a result of inventory levels lower by $17.4 million, other non-current assets lower by $8.2 million, loans repaid by Related Party entities of $4.4 and lower cash balance of $4.5 million partially offset by prepaid expenses higher by $5.4 million compared to the previous year. Operating assets of corporate segment decreased by $14.9 million as an effect of loans settled by Related Party entities of $13.9 million.

| Goodwill | | | | |
|---|---|---|---|---|
| | | December 31, 2014 | | December 31, 2015 |
| *Previous Segment* | | | | |
| Poland | $ | 139,206 | $ | 125,149 |
| Russia | | 40,598 | | 32,012 |
| Hungary | | 11,328 | | 10,232 |
| **Total Goodwill** | **$** | **191,132** | **$** | **167,393** |

| Goodwill | | |
|---|---|---|
| | | December 31, 2015 |
| *Segment* | | |
| Poland domestic | $ | 125,149 |
| Russia domestic | | 32,012 |
| International (Hungary) | | 10,232 |
| **Total Identifiable Assets** | **$** | **167,393** |

## 29.    *GEOGRAPHIC DATA*

Net sales and long-lived assets, by geographic area, consisted of the following for the three years ended December 31, 2013, 2014 and 2015:

| | Net Sales to External Customers (a) | | | |
| | Predecessor one hundred fifty-six-day period ended June 5, 2013 | Successor Two hundred and nine days ended December 31, 2013 | Year ended December 31, 2014 | Year ended December 31, 2015 |
|---|---|---|---|---|
| **United States** | $ 1,528 | $ 1,952 | $ 2,247 | $ 1,359 |
| **Other Countries** | | | | |
| Poland | 84,522 | 178,402 | 271,822 | 252,425 |
| Russia | 166,107 | 438,779 | 498,511 | 260,674 |
| Hungary | 6,626 | 19,001 | 31,295 | 26,720 |
| Other | 14,682 | 22,596 | 40,503 | 43,053 |
| **Total Other Countries** | 271,937 | 658,778 | 842,131 | 582,872 |
| **Total** | $ 273,465 | $ 660,730 | $ 844,378 | $ 584,231 |

| | Long-lived Assets (b) | |
| | Successor December 31, 2014 | Successor December 31, 2015 |
|---|---|---|
| **United States** | $ 0 | $ 0 |
| **Other Countries** | | |
| Poland | 294,280 | 267,227 |
| Russia | 172,436 | 133,337 |
| Hungary | 12,239 | 11,026 |
| **Total Other Countries** | 478,955 | 411,590 |
| **Total consolidated long-lived assets** | $ 478,955 | $ 411,590 |

(a)     Net sales to external customers based on the location to which the sale was delivered.
(b)     Long-lived assets primarily consist of property, plant and equipment and trademarks.

### 30.     *SUBSEQUENT EVENTS*

Subsequent events were evaluated through April 1, 2016 which is the date these annual consolidated financial statements were issued.

**Loans granted to Related Parties**

In January 2016 RDL granted a loan of $0.4 million to RTL. On February 17, 2016 RTL repaid a loan to CEDC International of $3.8 million.

**Loans received from Related Parties**

Up to the date of this report Roust Inc. repaid loans to Russian Standard Bank and Russian Standard Insurance in the amount of $4.5 million. In February and March 2016 CEDC International repaid loans to Russian Standard Bank of $6.6 million. On March 1, 2016 Roust Russia Group repaid a loan to Russian Standard Bank of $0.4 million.

**Other Related Party liability**

On February 17, 2016 Pasalba repaid $3.9 million to RTL for RDL acquisition.

**Factoring and other financing agreements**

On February 15, 2016 the Company signed a mixed factoring agreement with Coface Factoring with a limit of 15.0 million Polish zlotys (approximately $3.8 million).

On March 17, 2016 CEDC International repaid an external loan in the amount of $8.0 million. Up to the date of this report one of Roust Corporation's subsidiaries obtained new external financing of $10.0 million.

## PART III

### Item 10. Directors, Executive Officers and Corporate Governance

The current directors and executive officers of the Company are as follows:

| Name | Age | Position(s) |
|------|-----|-------------|
| Roustam Tariko | 54 | Executive Chairman of the board of directors |
| Eberhard von Löhneysen | 66 | Director |
| Pavel Merkul | 35 | Director |
| Alessandro Picchi | 59 | Director |
| Grant Winterton | 46 | Chief Executive Officer |
| Goran Ljubicic | 42 | Chief Financial Officer |

**Roustam Tariko** was appointed Executive Chairman of our board of directors on July 9, 2012 and continues to serve in this role. Mr. Tariko also served as Interim President of the Company from October 23, 2012 to January 10, 2013. Mr. Tariko is the founder of Russian Standard, one of the largest Russian privately owned companies working in the consumer market. Russian Standard has leading positions in banking, premium vodka, sparkling wines and spirits distribution. Dating back to 1992, the Russian Standard family of companies today includes Russian Standard Vodka (a producer and distributor of the number one premium vodka in Russia, present in over 75 countries), Roust Inc. (a leading Russian distributor of alcoholic beverages), Gancia (a legendary Italian producer of sparkling wines and vermouths founded in 1850), Russian Standard Bank (a leading consumer lender and credit card issuer in Russia) and Russian Standard Insurance. Mr. Tariko is a graduate of the Moscow Institute for Railway Engineering with a degree in economics, which he supplemented with courses at INSEAD Executive School. We believe that Mr. Tariko's extensive experience in the alcohol production and distribution business in Russia and globally makes him a significant and valued Executive Chairman of our board of directors.

**Eberhard von Löhneysen** has been a director of the Company since June 5, 2013. Mr. von Löhneysen has built an extensive career in business consulting and corporate management. After working at the World Bank with a focus on Latin America for eight years, Mr. von Löhneysen spent more than two decades with McKinsey & Co. in different fields and countries. He was responsible for the German financial institutions practice and managed the McKinsey & Co.'s office in Berlin for several years; later he moved to Moscow, where he was responsible for the Eastern European office complex. After leaving McKinsey & Co., Mr. von Löhneysen worked as group Chief Executive Officer of Russian Standard Corporation. Currently, Mr. von Löhneysen serves as the Chairman and Director for Strategy in 10EQS, an online knowledge utility that organizes the collaboration of independent experts. We believe that Mr. von Löhneysen's experience in business consulting and management enables him to make valuable contributions as a member of our board of directors.

**Pavel Merkul** has been a director of the Company since June 5, 2013. Mr. Merkul has been Chief of Staff since 2009 and Managing Director in Russian Standard Corporation. He is responsible for the key corporate projects of Russian Standard Group, including mergers and acquisitions and post-merger integration, as well as Russian Standard Group's finances. He has been actively involved in the negotiations between RTL and ROUST since 2011. He began his career in 2001 working on mergers and acquisitions projects in Russia, and then worked with Boston Consulting Group from 2004 through 2009, focusing on strategy development and corporate restructuring projects for leading banking and telecom companies throughout Russia and Ukraine. He received his BA in economics from Moscow State University and his MBA from INSEAD in France and Singapore. We believe that Mr. Merkul's experience in corporate restructuring and mergers and acquisitions makes him a valuable member of our board of directors.

**Alessandro Picchi** has been a director of the Company since April 23, 2012. He is a lawyer enrolled in the Bar of Milan and the Bar of the Italian Highest Court. From December 2011 to April 15, 2012, he was General Counsel of Russian Standard Corporation. From 2006 to 2011, he was a partner of Morri, Cornelli & Associates, a Tax and Law Firm with offices in Milan and Rome. From 2000 to 2006, he was chairman of the board of directors of Globalfin International with headquarters in Switzerland and director of Motorel Investments BV. From 1996 to 2000 he was General Counsel of Globalfin International SA and a member of the board of directors. We believe that Mr. Picchi's legal experience in international contracts and trade, mergers and acquisitions and corporate governance allows him to make valuable contributions as a member of our board of directors.

**Grant Winterton** joined the Company as General Manager of the Russian Alcohol Group in April 2012 and has been Chief Executive Officer of the Company since January 10, 2013. Mr. Winterton has over 20 years of experience working in marketing, sales and general management positions for Campbell Soup (Australia), The Coca-Cola Company (Australia, Russia, Ukraine, China), Wimm Bill Dann (Russia) and Red Bull (Russia). Mr. Winterton has lived in Russia for over 13 years, working in the consumer goods industry, and has extensive working experience across the Russia, Ukraine, Belarus and CIS markets. Mr. Winterton has a Bachelor of Commerce Degree in Marketing/Finance from the University of New South Wales, Australia.

**Goran Ljubicic** joined the Company as Chief Financial Officer of Roust Poland on November 13, 2013 and has been Chief Financial Officer of the Company since October 10, 2014. Mr. Ljubicic has extensive international work experience with fast-moving consumer goods companies, including 10 years in Russia. Prior to his work with the Company, Mr. Ljubicic was a member of the board of directors and Finance Director, Central European and Balkan Region, at Kreis Swiss from 2009 to 2013 and Region Managing Director, Dairy Business, Balkan Region, at Salford Capital Management Fund from 2005 to 2009. Mr. Ljubicic graduated in 1996 with a Bachelor of Arts degree in finance and statistical analyses from the Alfred University.

## Board of Directors Leadership Structure

Mr. Tariko is Executive Chairman of our board of directors. Mr. Grant Winterton serves as our Chief Executive Officer with responsibility for the day-to-day operations of the Company. The board of directors believes that it is currently appropriate to have the positions of Chairman and Chief Executive Officer separated to ensure adequate oversight of management.

## Director Independence

Our common stock is not listed on any national securities exchange or inter-dealer quotation system with a requirement that a majority of our board of directors be independent. Therefore, we are not subject to any director independence requirements. As a result, our board of directors has not made any formal determination as to whether any of the current members of our board of directors are independent.

Since we were listed on the NASDAQ Stock Market until April 2013, our board of directors would have used the NASDAQ Listing Rules in order to make a determination of director independence. Were we to be subject to these rules, however, we would be able to utilize an exemption to the requirement that a majority of the directors be independent, because we would be deemed a "controlled company" pursuant to NASDAQ Listing Rule 5615(c). A "controlled company" is a company of which more than 50% of the voting power for the election of directors is held by an individual, a group or another company. Based on the ownership of 100% of our common stock by Roust Trading and its affiliates, we would be considered a controlled company under the NASDAQ Listing Rules and could rely upon this exemption in having less than a majority of independent directors on our board of directors.

## Role in Risk Oversight

Risk is inherent in every business, and how well a business manages risk is an integral part of its ability to succeed. Our goal is to manage risk prudently, not to eliminate risk. In our business, we face a number of risks, including economic risks, regulatory risks, risks stemming from conducting operations in multiple countries and in different currencies, risks in integrating our acquired companies and other risks, such as the impact of competition and weather conditions. Management is responsible for the day-to-day management of risks the company faces, while the board of directors, as a whole and through its committees, has responsibility for the oversight of risk management. In its risk oversight role, the board of directors has the responsibility to satisfy itself that the risk management processes designed and implemented by management are adequate and functioning as designed.

The board of directors believes that establishing the right "tone at the top" and full and open communication between management and the board of directors are essential for effective risk management and oversight. Our executive management team meets regularly with our board of directors to discuss strategy and risks facing the company. Members of senior management attend meetings of the board of directors and are available to address any questions or concerns raised by the board of directors on risk management-related and any other matters. The board of directors receives regular presentations from senior management on strategic matters

involving our operations. The board of directors holds executive sessions at which members of the management team are not present.

While the board of directors is ultimately responsible for risk oversight, committees of the board of directors assist the board of directors in fulfilling its oversight responsibilities in certain areas of risk. The audit committee assists the board of directors in fulfilling its oversight responsibilities with respect to risk management in the areas of financial reporting, internal controls and compliance with legal and regulatory requirements and discusses policies with respect to risk assessment and risk management. The compensation committee assists the board of directors in fulfilling its oversight responsibilities with respect to the management of risks arising from our compensation policies and programs. The governance, compliance and nominating committee assists the board of directors in fulfilling its oversight responsibilities with respect to the management of risks associated with board of directors' organization, membership and structure, succession planning and corporate governance.

### Narrative Disclosure of our Compensation Policies and Practices as They Relate to Risk Management

The compensation committee reviews the Company's executive compensation program and its executive compensation policies and practices to assess whether any aspect of the program or the policies and practices would encourage any of the Company's named executive officers to take any unnecessary or inappropriate risks that could threaten the value of the Company or create or increase risks that are reasonably likely to have a material adverse effect on the Company. As a result of our review, we concluded that any risks arising from our compensation programs, policies and practices are not reasonably likely to have a material adverse effect on the Company.

### Meetings of the Board of Directors and of Committees

During 2015, the board of directors held one in person meeting and two meetings via teleconference and each director attended all of the board meetings.

The board of directors has three standing committees: an audit committee, a compensation committee and a governance, compliance and nominating committee.

### *Audit Committee*

The audit committee operates under a written charter adopted by the board of directors that may be amended by the board of directors at any time. A current copy of the audit committee's charter is available in the 'Investor Relations' section of the Company's website at http://www.roust.com, under the heading 'Corporate Governance.' Messrs. von Löhneysen and Merkul currently constitute the audit committee. Mr. von Löhneysen currently serves as the chairman of the audit committee. As described above, our common stock is not listed on any stock exchange or inter-dealer quotation system, and we are not required to have a separately designated audit committee whose members are independent. Therefore, our board of directors has not made a formal determination of whether the members of our audit committee are independent or whether that committee includes at least one audit committee financial expert. The audit committee oversees our corporate financial reporting process, internal accounting controls, audit plans and results and financial reports. In addition, the audit committee appoints, compensates, retains and oversees the work of the firm of independent auditors employed by the Company to conduct the annual audit of the Company's financial statements. The members meet with the independent auditors and financial management to review the scope of the proposed audit for the year, the audit procedures to be utilized, audit fees, and, at the conclusion of the audit, the audit reports. In addition, the audit committee reviews the financial statements, the related footnotes and independent auditors' report and makes recommendations to the board of directors as the audit committee deems appropriate. The audit committee met six times during 2015.

### *Compensation Committee*

The compensation committee operates under a written charter adopted by the board of directors that may be amended by the board of directors at any time. A current copy of the compensation committee's charter is available in the 'Investor Relations' section of the Company's website at http://www.roust.com, under the heading 'Corporate Governance.' Messrs. von Löhneysen, Merkul and Picchi currently constitute the compensation committee. As described above, our common stock is not listed on any stock exchange or inter-dealer quotation system, and we are not required to have a separately designated compensation committee whose members are independent. Therefore,

our board of directors has not made a formal determination of whether the members of our compensation committee are independent. The compensation committee's responsibilities include (i) making recommendations to the board of directors on salaries, bonuses and other forms of compensation for the Company's officers and other key management and executive employees, (ii) consulting with independent outside compensation consultants regarding the Company's executive officer and director compensation policies and (iii) reviewing any proposed plans or practices of the Company relating to compensation of its employees or directors. The compensation committee held no meetings in 2015. All actions of the compensation committee during 2015 were undertaken by written consent without a meeting.

### *Governance, Compliance and Nominating Committee*

The governance, compliance and nominating committee operates under a written charter adopted by the board of directors that may be amended by the board of directors at any time. A current copy of the governance, compliance and nominating committee's charter is available in the Investor Relations section of the Company's website at http://www.roust.com, under the heading Corporate Governance. The members of the governance, compliance and nominating committee are Messrs. Picchi and von Löhneysen. Mr. Picchi currently serves as the chairman of the governance, compliance and nominating committee. The governance, compliance and nominating committee identifies individuals qualified to become members of the Company's board of directors and makes board candidate recommendations, reviews and assesses the adequacy of the Company's corporate governance principles and, if appropriate, develops and recommends to the board of directors additional corporate governance principles and oversees and reviews the Company's compliance procedures and corporate practices. The responsibilities of the governance, compliance and nominating committee include oversight of the process of evaluating the performance of the board of directors, its committees and individuals directors, maintenance of the Company's succession plan, convening executive sessions of the board of directors at which no members of management or other representatives of the Company are present and recommending to the board of directors a candidate for Lead Director. The governance, compliance and nominating committee held no meetings in 2015. All actions of the governance, compliance and nominating committee during 2015 were undertaken by written consent without a meeting.

### Board of Directors Diversity

The governance, compliance and nominating committee believes that, in order to be effective, a board of directors should consist of directors with varying experiences and personal backgrounds. In particular, for a company that has operations around the world, the board of directors should include representatives from different industries and regions that are relevant to the company's business. To this end, the governance, compliance and nominating committee values diversity of professional experience and geographic background among its members. This diversity contributes significantly to the insight that our board of directors has into the challenges facing the Company.

### Communications with the Board of Directors

Communications to the board of directors can be mailed to the attention of the Company's Corporate Secretary at 2711 Centerville Road, Suite 400 Wilmington, New Castle County, Delaware 19808. The mailing envelope must contain a clear notation indicating that the enclosed letter is a "Stakeholder—Board Communication". All such letters must identify the author as a stakeholder and clearly state whether the intended recipients are all members of the board of directors or certain specified individual directors. The Corporate Secretary will circulate the letter to the appropriate director or directors, unless the communication is unduly hostile, threatening, illegal or similarly inappropriate, in which case the Corporate Secretary has the authority to discard it.

### Family Relationships

There are no family relationships among any directors or executive officers.

### Code of Conduct

The Company has adopted a Code of Conduct that applies to the Company's employees, officers and directors. The Company's Code of Conduct is available in the 'Investor Relations' section of the Company's website at http://www.roust.com, under the heading 'Corporate Governance.' Any changes or waivers to the Code of

Conduct for the Company's principal executive officer, principal financial officer or principal accounting officer or persons performing similar functions will be disclosed on the Company's website.

**Compliance with Section 16(a) of the Exchange Act**

Section 16(a) of the Exchange Act which requires directors, officers and more than 10% beneficial owners to file ownership reports with the SEC does not apply to the Company because it is privately held.

**Item 11. Executive Compensation**

## COMPENSATION COMMITTEE REPORT

The compensation committee has reviewed and discussed with management the Compensation Discussion and Analysis included in this annual report. Based on this review and discussion, the compensation committee recommended to the board of directors that the Compensation Discussion and Analysis be included in this Annual Report on Form 10-K for the year ended December 31, 2015.

Respectfully submitted,

*Compensation Committee*

Pavel Merkul
Alessandro Picchi
Eberhard von Löhneysen

## Compensation Discussion and Analysis

**Overview**

This Compensation Discussion and Analysis discusses the objectives, policies and elements of our executive compensation program and analyzes our decisions concerning compensation for the individuals named below who served as executive officers during 2015:

- Grant Winterton - Chief Executive Officer

- Goran Ljubicic - Chief Financial Officer

**Compensation Philosophy**

The primary purpose of our compensation philosophy is to attract and retain a qualified, talented team of executive officers in a way that is aligned with the long-term interests of our stakeholders. Therefore, a significant portion of our compensation program is not fixed and instead, in an attempt to align overall compensation with performance, is variable based on the actual performance of the individual as well as that of the Company. This performance is measured against goals established by the board of directors and the compensation committee. During 2015, the goals for our executive compensation program were to:

- attract and retain a qualified, talented team of executive officers to provide leadership for the Company's success in competitive markets,

- accomplish the above objective in a way that is aligned with the long-term interests of our stakeholders,

- increase the overall performance of the Company,

- increase stakeholder value, and

- incentivize the executive officers to prudently achieve the highest level of the Company's annual and long-term financial performance.

We believe that our executive compensation policies must remain competitive with those of our peer companies and that they should be structured in a way that rewards consistently high performance. During 2015, a substantial portion of the compensation packages for executive officers was in the form of annual cash bonus opportunities intended to reward executive officers for meeting annual financial performance goals.

We review compensation survey data and believe it is a useful guide for comparative purposes. However, we also believe that a successful compensation program requires us to apply our own judgment and subjective

determination of individual executive officer performance related to overall corporate performance. We therefore reconcile the program's objectives with the realities of rewarding strong performance and retaining valued members of management. We periodically evaluate the types and levels of compensation we pay to ensure that we are able to attract and retain qualified executive officers and that their compensation remains comparable to compensation paid to similarly situated executive officers in comparable companies.

**Executive Compensation Components**

Our executive compensation for 2015 consisted of three basic elements outlined below.

| Compensation Element | Objectives | Key Features |
|---|---|---|
| Base Salary | Attracts, retains and rewards named executive officers by providing a fixed level of cash compensation to reward demonstrated experience, skills and competencies relative to the market value of the job.<br>Can be periodically reevaluated based on (a) individual performance and (b) changes in the median level of salary of peer companies. | Annual cash compensation which, assuming acceptable performance, is not at risk.<br>Targeted at or near average base salaries of similarly situated executive officers of peer groups.<br>Adjustments are considered as the compensation committee sees fit, usually in consultation with independent compensation consultants. |
| Annual Performance Based Incentive | Focuses executive officers on our annual results by being directly linked to the Company's financial performance.<br>Aligns each executive officer's interests with those of our stakeholders by promoting strong annual results through revenue growth and operating efficiency.<br>Retains named executive officers by providing market-competitive compensation. | Annual awards are paid in cash which are at risk because they are based on financial targets.<br>Each annual award can vary from 0% to 150% of the target amount with goals set high and difficult to achieve. |
| Long-Term Time Based Incentive Awards | Promotes retention and enables us to attract and motivate our executive officers.<br>Retains executive officers through multi-year vesting of incentive awards. | Long-term cash based compensation which is at risk due to vesting requirements. |

The following describes in more specific terms the elements of compensation that implement the compensation philosophy and objectives described above.

*Base Salaries*

Base salaries of executive officers are determined at the time a person initially becomes an executive officer by evaluating the responsibilities of the position, experience and knowledge of the individual and the competitive marketplace at that time for executive talent, including a comparison to base salaries for comparable positions (considered in the context of the total compensation paid by such companies). Salaries are reviewed from time to time thereafter, generally in connection with the expiration of employment agreements or when other considerations warrant such review in the discretion of the compensation committee and the board of directors, considering the foregoing factors as well as the executive officer's performance and the other factors considered in setting total compensation described above.

When salary adjustments are considered, they are made in the context of the total compensation for executive officers, consistent with the core principles discussed earlier in this Compensation Discussion and Analysis. In each case, the participants involved in recommending and approving salary adjustments consider the performance of each executive officer. Individual performance evaluations take into account such factors as new responsibilities, the Company's performance during the previous year and the achievement of specific individual objectives. The factors impacting base salary levels are not assigned specific weights but are considered as a totality, against the backdrop of our overall compensation philosophy and knowledge of market conditions.

The annualized base salaries (in US dollars unless indicated otherwise) for our executive officers during 2015 were as follows:

| Executive Officer | Position(s) | Annual Base Salary (in US dollars) |
|---|---|---|
| Grant Winterton | Chief Executive Officer | $750,000 |
| Goran Ljubicic | Chief Financial Officer | $364,500 |

*Annual Incentive Awards*

We have historically paid annual cash bonuses to our executive officers based on the Company's performance, as measured by reference to factors which the compensation committee believes reflect objective performance criteria over which management generally has the ability to exert some degree of control. The Company establishes the performance criteria each year and amounts that can be earned by each executive officer based upon, among other things, assessment by the compensation committee and the board of directors of each executive officer's level of responsibility, expertise, tenure and ability to influence improvements in the Company's financial results.

The board of directors set performance criteria for 2015 that reflected its desire to incentivize our executive officers to maximize operational performance while also prudently managing the balance sheet. The board of directors believed that including financial measures as performance targets appropriately balanced incentives to reward strong performance without encouraging undue risk-taking and that the overall 2015 performance criteria represented an appropriate balance of management priorities.

The performance targets were set by the board of directors upon the recommendation of the compensation committee. The Company does not disclose future financial targets because we believe this information is not material to understanding our executive compensation. The board of directors and the compensation committee set performance targets at levels they consider to be reasonably attainable but challenging.

For 2015, the annual incentive award goals for our executive officers were as follows:

Mr. Winterton's bonus was based on achievement of the following:

- Roust Corporation Group Underlying EBITDA of $106.4 million (100%)

- Roust Poland (CEDC International Sp. z o.o. and PWW Sp. z o.o ) Underlying EBITDA of $57.4 million (using exchange rate PLN 3.4900 to the US dollar) (30%)

- Global optimal organization (20%):

  - $5 million further annualized saving 2015 quantified and enacted (10%)

  - ideal structure implemented by December 2015 (10%)

- Roust Russia Group Underlying EBITDA of $46 million (using exchange rate RUB 70 to the US dollar) (15%)

- Route to market changes (New Route to market prepared and completed by December 2015 with deliver of the Business plan EBITDA and Revenue in these markets) (15%)

- Roust Corporation Group operating cash flow of $76 million (20%)

Mr. Ljubicic's bonus was based on achievement of the following:

- Roust Corporation Group Underlying EBITDA on currency neutral basis (exchange rate PLN 3.4900 and RUB 70 to the US dollar) of $106.4 million (30%)

- Roust Corporation Group operating cash flow of $76 million on currency neutral basis calculated as EBITDA + Working Capital Changes - reduction in factoring and financing (25%)

- Roust Corporation Group Net contribution on currency neutral basis with excluded items approved by the Audit Committee of $213 million (25%)

- Margin improvement in Roust Russia (introduction of OBPPC strategy in Russia to yield better return on investment thus drive contribution), so EBITDA to Net Sales Revenue ratio reaches 14% (10%)

- Integration of Gancia financials within established financial routines of Roust Corporation, proper staffing and seemless consolidation of reported numbers by the year end. Realization of $2.2 million full year EBITDA (10%)

*Other Incentive Awards*

A third component of our executive officers' compensation during 2015 was in the form of incentive awards granted in the form of cash awards. For 2015, these incentive awards consisted of (i) performance-based awards with an Underlying EBITDA target of $106.4 million, and (ii) time-based awards that vest over three years.

**Employment Agreements**

Each of the executive officers of the Company is party to an employment agreement. The Company currently enters into employment agreements with its executive officers because it generally believes that, in respect of key executive officers, there is a significant value in its competitive markets to setting out compensation and fringe benefit expectations in writing, maintaining appropriate non-competition, non-solicitation of employees and confidentiality agreements with key executive officers and agreeing to post-termination payments and other obligations. These employment agreements are described below in more detail under the caption "Employment Agreements."

### Summary Compensation Table

The following table summarizes the total compensation (in US dollars) awarded to or earned by our named executive officers for the years ended December 31, 2013, 2014 and 2015 (the "named executive officers").

| Name and Principal Position | Year | Salary | Bonus | Stock Awards | Option Awards | Non-Equity Incentive Plan | | All Other Compensation | | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| Grant Winterton  *Chief Executive Officer* | 2015 | $ 750,000 | $ - | $ - | $ - | $ 1,040,000 | (1) | $ 150,000 | (6) | $ 1,940,000 |
| | 2014 | $ 750,000 | $ - | $ - | $ - | $ 1,437,904 | (2) | $ 90,301 | (7) | $ 2,278,205 |
| | 2013 | $ 750,000 | $ - | $ - | $ - | $ 1,683,333 | (3) | $ 107,172 | (8) | $ 2,540,505 |
| Goran Ljubicic  *Chief Financial Officer* | 2015 | $ 364,500 | $ - | $ - | $ - | $ 145,800 | (4) | $ 190,247 | (9) | $ 700,547 |
| | 2014 | $ 323,754 | $ - | $ - | $ - | $ 227,970 | (5) | $ 54,989 | (10) | $ 606,713 |

(1) Represents $400,000 for Mr. Winterton's 2015 time-based award in lieu of equity payable in three equal parts over three years and $640,000 performance-based award in lieu of equity. All amounts are accrued but not yet paid.

(2) Represents $588,684 for Mr. Winterton's 2014 cash bonus, $361,720 time-based award in lieu of equity payable in three equal parts over three years and $487,500 performance-based award in lieu of equity. After the date of the annual report for 2014 the amounts of the non-equity incentive plan were revised and decreased. As of the date of this report the amount of $855,350 has been paid. All other amounts are accrued but not yet paid.

(3) Represents $750,000 for Mr. Winterton's 2013 cash bonus, $400,000 time-based award in lieu of equity payable in three equal parts over three years and $800,000 performance-based award in lieu of equity. As of the date of this report all amounts have been paid.

(4) Represents Mr. Ljubicic's 2015 cash bonus. All amounts are accrued but not yet paid.

(5) Based on exchange rate of USD 1 to PLN 3.5.

(6) Represents $100,000 for Mr. Winterton's housing, $29,866 for driver services in Moscow and $20,134 for perquisites (e.g. medical insurance)

(7) Represents $72,717 for Mr. Winterton's housing and $17,584 for driver services in Moscow.

(8)  Represents $84,363 for Mr. Winterton's housing and $22,809 for driver services in Moscow.

(9)  Represents $96,000 for Mr. Ljubicic's housing, $59,157 for school fees and $35,090 for perquisites (e.g. company car, relocation costs).

(10)  Represents $15,000 for Mr. Ljubicic's housing, $18,052 for school fees and $21,937 for perquisites (e.g. company car, medical insurance).

## Grants of Plan-Based Awards During 2015

The following table sets forth information regarding all grants of plan-based awards made to our named executive officers during the fiscal year ended December 31, 2015.

Estimated Future Payouts under Non-Equity Incentive Plan Awards (in US dollars):

| Name | Grant Date | Threshold | Target | Maximum |
|---|---|---|---|---|
| Grant Winterton | May 2015 | $ | 1,950,000 | |
| Goran Ljubicic | March 2015 | $ | 364,500 | |

## Employment Agreements

### *Grant Winterton*

Mr. Winterton has served as Chief Executive Officer of the Company since January 10, 2013. Pursuant to his employment agreement, Mr. Winterton is paid an annual base salary of $750,000.

Mr. Winterton's employment agreement provides for a yearly cash bonus of up to 100% of his salary. The conditions for earning a yearly cash bonus are based upon the achievement of project and financial targets to be established by the board of directors in consultation with Mr. Winterton at the beginning of each fiscal year. The financial target portion of the yearly cash bonus is earned on a sliding scale from between 0% and 150% of the yearly cash bonus. The project target portion of the yearly cash bonus is earned based on a good faith assessment of the achievement of the project targets by the board of directors in consultation with Mr. Winterton.

Pursuant to his employment agreement, Mr. Winterton is also eligible to receive additional bonus awards granted on January 1st of each year. The agreement provides for these awards to be granted in the form of restricted stock units. However, when the Company became privately-owned, the awards were converted to cash based awards. The first type of award is a performance-based bonus with a value of $800,000. Subject to Mr. Winterton's continued employment through the vesting date, the performance-based awards vest on the first anniversary of the date of grant based on the achievement of financial targets aimed towards Company value and value creation and in line with the Company's stockholders' interests. The performance-based bonuses vest on a sliding scale from between 0% and 150%. The second type of award is a time-based bonus with a value of $400,000. Subject to Mr. Winterton's continued employment through the vesting date, the time-based bonuses will vest in three equal annual installments.

Subject to certain dollar amount limitations, Mr. Winterton's employment agreement provides for fringe benefits in the form of two roundtrip business class flights each year to Australia, rental expenses for Mr. Winterton's apartment, health insurance coverage for Mr. Winterton and his family, a company paid car and driver, as well as a company issued phone and laptop.

### *Goran Ljubicic*

Mr. Ljubicic has served as Chief Financial Officer of the Company since October 10, 2014. Pursuant to his employment agreement, Mr. Ljubicic is entitled to an annual base salary of $360,000.

Mr. Ljubicic's employment agreement provides for a contractual salary increase of 5% annually since October every year, as well as an annual performance bonus of up to 100% of his annual salary. As a result, the annual base salary earned by Mr. Lubicic for 2015 amounted to $364,500. In 2015, the conditions for earning a yearly cash bonus were based upon management by objectives ("MBO") for Roust Cousrporation Group. Mr. Ljubicic's employment agreement further provides for a long term bonus of up to 100% of his annual salary after three years of service with the Company.

Subject to certain dollar amount limitations, Mr. Ljubicic's employment agreement provides for fringe benefits in the form of roundtrip flights home, rental expenses for Mr. Ljubicic's apartment, health insurance

coverage for Mr. Ljubicic and his family, school allowance for Mr. Ljubicic's children, a company paid car and driver, as well as reallocation expenses from Belgrade to Warsaw.

Mr. Ljubicic's employment agreement may be terminated either by the Company or by Mr. Ljubicic's upon three months' notice. In the event Mr. Ljubicic's employment with the Company is terminated other than for cause, Mr. Ljubicic will be entitled to six months' compensation pursuant to the terms of the employment agreement.

**Potential Payments Upon Termination of Employment**

The Company's employment agreements with its executive officers provide for certain payments upon termination. Generally, the material terms and payment provisions under the employment agreements, including those that relate to payments upon termination of employment, were the result of individual negotiations with the relevant executive officer over the terms of his employment, and the potential payments under these arrangements were not separately considered from the entire compensation package contemplated by the employment agreement. The compensation committee considers these potential payments upon termination of employment as one portion of total potential compensation, but such payments do not materially and directly influence the decisions made regarding other aspects of compensation.

If Mr. Winterton were to have been terminated on December 31, 2015, his employment agreement sets forth termination benefits to which he may have been entitled. If the Company terminated Mr. Winterton's employment other than for cause, disability or death, and such termination did not constitute a qualifying change in control termination, then (i) Mr. Winterton would have been paid a lump sum payment in an amount equal to 1.5 times his base salary, (ii) Mr. Winterton would have received a bonus in cash equal to 50% of the yearly cash bonus applicable in the relevant year under the assumption that 92.5% of the targets for the relevant year were achieved, (iii) all of Mr. Winterton's unvested time-based awards would have been forfeited, (iv) all of Mr. Winterton's unvested performance-based awards would have vested immediately under the assumption that 92.5% of the targets for the relevant year were achieved, and (v) Mr. Winterton's housing, car and driver allowance would continue to have been paid for six months following the date of termination. If Mr. Winterton terminated his employment under conditions constituting a qualifying change in control termination, then (i) Mr. Winterton would have been paid his remaining base salary for the remainder of the term of the employment agreement, (ii) Mr. Winterton would have received a bonus in cash equal to 50% of the yearly cash bonus applicable in the relevant year under the assumption that 92.5% of the targets for the relevant year were achieved, (iii) all of Mr. Winterton's unvested time-based awards would have been forfeited, (iv) all of Mr. Winterton's unvested performance-based awards would have vested immediately under the assumption that 92.5% of the targets for the relevant year were achieved, and (v) Mr. Winterton's housing, car and driver allowance would continue to have be paid for six months following the date of termination.

If Mr. Ljubicic were to have been terminated on December 31, 2015, his employment agreement sets forth termination benefits to which he may have been entitled. If the Company terminated Mr. Ljubicic's employment other than for cause, disability or death, and such termination did not constitute a qualifying change in control termination, then Mr. Ljubicic would have been paid a lump sum payment in an amount equal to 50% of his base salary.

**Director Compensation**

The following table sets forth information regarding the compensation of the non-employee directors of the Company for the year ended December 31, 2015.

| Name | Fees Earned or Paid in Cash | Bonus | Equity Awards | All Other Compensation | Total |
|---|---|---|---|---|---|
| Eberhard von Löhneysen | $          205,000 | $          - | $          - | $          - | $    205,000 |
| Pavel Merkul | $          217,564 | $          - | $          - | $          - | $    217,564 |
| Alessandro Picchi | $          205,000 | $          - | $          - | $          - | $    205,000 |
| Roustam Tariko | $       1,250,605 | $          - | $          - | $   137,822  (1) | $ 1,388,427  (2) |

(1)   Total amount of perquisites.

(2)   All fees reflected in the above table were paid to Mr. Tariko by Roust Russia Group and Roust Inc.

For 2015, the components of compensation paid to our directors were as follows (in US dollars):

- Annual cash fee of $85,000

- Annual fee in lieu of equity of $100,000

- Lead Director and Vice Chairman fee $50,000

- Audit, Compensation and Governance members fee of $10,000

- Audit, Compensation and Governance chair fees of $10,000 (in addition to member fees)

- Physical board meeting fees of $2,500

- Physical committee meeting fees of $2,500

Mr. Tariko receives the following compensation from Roust Russia and Roust Inc. (in US dollars):

- Annual salary of $1,525,000

In 2015 Mr. Tariko's annual salary amounted to $1,250,605. The compensation committee reviewed these amounts and deemed them to be appropriate compensation for an Executive Chairman of the Company. As part of its review, the compensation committee compared these amounts to levels of compensation paid to former and current executive officers.

**Compensation Committee Interlocks and Insider Participation**

During 2015, the compensation committee consisted of Messrs. Merkul and Picchi. None of the members of the compensation committee has been an officer of the Company. None of our executive officers served on the board of directors or compensation committee of a company that has an executive officer that served on our board of directors or the compensation committee.

**Item 12. Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters**

Pursuant to the Company's Chapter 11 Plan of Reorganization, all of the Company's pre-emergence common stock was cancelled as of June 5, 2013 and Roust Trading Limited and its affiliates acquired control of 100% of the Company's new common stock.

**Item 13.          Certain Relationships and Related Transactions**

A Related Party transaction is defined as any transaction in which (1) the Company is a participant, (2) any related person has a direct or indirect material interest and (3) the amount involved exceeds $120,000 but excludes any transaction that does not require disclosure under Item 404(a) of Regulation S-K. A related person is:

- an executive officer, director or director nominee of the Company;

- any person who is known to be the beneficial owner of more than 5% of the Company's common stock;

- any person who is an immediate family member (as defined under Item 404 of Regulation S-K) of an executive officer, director or director nominee or beneficial owner of more than 5% of the Company's common stock; and

- any firm, corporation or other entity in which any of the foregoing persons is employed or is a partner or principal or in a similar position or in which such person, together with any other of the foregoing persons, has a 5% or greater beneficial ownership interest.

It is the Company's policy that directors, executive officers and any other related persons are required to report any Related Party transactions to the Chief Executive Officer. The audit committee, with the assistance of legal counsel and such other advisors as it deems appropriate, is responsible for reviewing and approving or ratifying Related Party transactions. In addition, the governance committee is responsible for ensuring that certain affiliate transactions comply with the Company's obligations under its indentures. The audit committee intends to approve only those Related Party transactions that it believes are in, or not inconsistent with, the best interests of the Company. A written policy to this effect has been adopted by the board of directors.

Every quarter, a report maintained by the Company's accounting staff is reviewed and approved by the Chief Executive Officer and the Chief Financial Officer. The audit committee conducts an annual review of all transactions between Related Parties and the Company.

Upon emergence from bankruptcy protection as of June 5, 2013 (as described in Note 2 of Part II, Item 8 of these Annual Report), Mr. Roustam Tariko became the sole ultimate stockholder of ROUST. Further, Mr. Tariko has been appointed to ROUST's board of directors as Executive Chairman. Given that Mr. Tariko indirectly controls RTL and RTL directly controls Russian Standard Corporation (and indirectly controls other Russian Standard entities), all entities controlled by Mr. Tariko have become Related Parties of ROUST, including Russian Standard Bank, Russian Standard Corporation, Russian Standard Vodka (USA), Inc., LLC "Russian Standard Vodka", Union Trust Stroy and F.lli Gancia & C. SpA.

In the ordinary course of business, the Company is involved in transactions with entities controlled by Mr. Tariko that result in the recognition of revenues, expenses, assets and liabilities by the Company.

The following table summarizes our transactions with the Related Parties as included in these consolidated financial statements.

| CONDENSED CONSOLIDATED STATEMENTS OF OPERATIONS AND COMPREHENSIVE INCOME | Predecessor one hundred fifty-six-day period ended June 5, 2013 | Successor | | |
|---|---|---|---|---|
| | | Two hundred and nine days ended December 31, 2013 | Year ended December 31, 2014 | Year ended December 31, 2015 |
| Net sales | $ 1,006 | $ 1,709 | $ 2,029 | $ 17,697 |
| Cost of goods sold | 900 | 494 | 997 | 6,322 |
| Purchases of goods | 643 | 51,077 | 64,051 | 69,240 |
| Purchases of raw materials | 1,545 | 4,486 | 3,387 | 3,248 |
| Selling, general and administrative expenses | 653 | 10,623 | 3,387 | 4,415 |
| Other operating income | - | - | - | 9,288 |
| Interest expense | 1,339 | 4,441 | 7,846 | 8,560 |
| Interest income | - | 8,747 | 13,114 | 11,372 |
| Other income | - | 782 | 200 | 133 |
| Other expense | $ - | $ - | $ - | $ 100 |

| CONDENSED CONSOLIDATED BALANCE SHEETS | | December 31, 2014 | December 31, 2015 |
|---|---|---|---|
| **Assets** | | | |
| Accounts receivable | $ | 6,453 | 24,293 |
| Prepaid expenses | | 1,025 | 5,780 |
| Other current assets (other current receivables) | | 676 | 3,010 |
| Loans granted to Related Parties* | | 83,836 | 97,299 |
| Long-term investments | | - | 30 |
| **Total due from Related Parties** | $ | 91,990 | 130,412 |
| **Liabilities** | | | |
| Trade accounts payable | $ | 13,149 | 20,221 |
| Other accounts payable | | 9,549 | 6,142 |
| Bank loans and borrowings from Related Parties** | | 49,331 | 86,392 |
| Deferred income*** | | - | 16,038 |
| **Total due to Related Parties** | $ | 72,029 | 128,793 |

* *These facilities include loans of principal amount of $17.8 million granted by Roust Inc., which originate from period before Roust Inc. acquisition.*

** *Loans from Russian Standard Bank and Russian Standard Insurance.*

*** *Interst prepaid on loans granted to Related Parties.*

     Accounts receivable and trade accounts payable arise from sale, purchases of goods and transactions related to marketing activities made primarily with LLC "Russian Standard Vodka" and F.lli Gancia & C. SpA in the ordinary course of business. For details on prepaid expenses please refer to Note 8 "Prepaid expenses". Deferred income represents prepaid interest on loan granted to RTL. Selling, general and administrative expenses apply to costs of renting office premises from LLC "Union Trust Stroy" and LLC "Russian Standard Vodka". Additionally, in the year ended December 31, 2015 the Company recognized $1.7 million income of management service recharges to Related Parties. As of December 31, 2015, other accounts payable include the outstanding liability for the Roust Inc. acquisition in amount of $0.4 million and for RDL acquisition in amount of $3.9 million. The liability for RDL acquisition was paid in February 2016.

     The acquisition of Roust Inc. brought 9% of the shares of LLC "Russian Standard Vodka" with a historically de minimis book value. The Company believes that the fair market value of these shares is significantly higher than its book value. The shareholder has a call option on the buy-back of the shares. The option is exercisable at fair market value.

     As described in Note 4 "Acquisition under common control" on December 31, 2015 the Company completed its acquisition of Roust Distribution Limited ("RDL") from Roust Trading Ltd. ("RTL") through the transfer of the 100% ownership interest in RDL from RTL to Pasalba Ltd., a wholly owned subsidiary of ROUST. After analyzing the independent valuation of the RDL business and the Company's strategic objectives, an aggregate purchase price for RDL was agreed at $40.0 million. The deposits of $4.8 million and $9.0 million were paid in October and December 2015, respectively. The majority of the consideration amounting to $22.3 million was settled against loans granted by ROUST to Related Parties (within the RTL legal structure). The remaining $3.9 million of the consideration was paid in cash in February 2016.

## Loans granted to Related Parties

     As of December 31, 2014 and December 31, 2015 the Company had loan receivables from Related Parties in principal amount equal to $77.9 million and $91.1 million, respectively. All of the loans as of December 31, 2015 together with accrued interest amount to $97.3 million. The loans were granted to RTL, LLC "Russian Standard Vodka" and Russian Standard Corporation, to support the growth of their business. The details of loans granted as of December 31, 2015 are presented in the table below.

| Principal amount* | Date of signing the agreement | Maturity date | Interest rate |
|---|---|---|---|
| $61.8 million | February 17, 2014 - December 21, 2015 | January 25, 2015 - September 14, 2022 | 13.8%-18.0% |
| $23.7 million | February 20, 2014 - June 29, 2015 | November 15, 2015 - June 29, 2020 | 10.0% |
| $2.4 million | October 16, 2015 - November 2, 2015 | October 16, 2016 - November 2, 2016 | 7.0% |
| $3.2 million | March 24, 2014 | March 10, 2022 | 12.0% |

* *these facilities include loans of principal amount of $17.8 million granted by Roust Inc., which originate from period before Roust Inc. acquisition*

These loans have been guaranteed by Related Party subsidiaries. We believe RTL, LLC "Russian Standard Vodka" and Russian Standard Corporation have intent and ability to settle the loans upon maturity and therefore these loans are presented as assets in balance sheet not in shareholders' equity.

In the year ended December 31, 2015 Related Parties repaid the loans in amount of $58.2 million.

Since December 31, 2015, up to the date of this report Related Parties settled the loans in amount of $3.4 million.

*Borrowings from Related Parties*

As of December 31, 2014 and December 31, 2015 the Company had borrowings from Related Parties in the amount of $49.3 million and $86.4 million, respectively, which represents 26.4% and 42.4% of our bank loans portfolio, respectively, and which are described in Note 11 "Notes and Borrowings" in Part II, Item 8 of this Annual Report.

*Guarantees from Related Parties*

Roust Inc. has provided guarantees of $150.2 million to Related Parties as of December 31, 2015. RTL and its subsidiaries have provided guarantees of $50.8 million to Roust Inc. as of December 31, 2015. The majority of the guarantees relate to purchases of spirit, excise stamps and custom duties. Such guarantees are typical and necessary in our industry.

## Item 14. Principal Accounting Fees and Services

The audit committee selected and appointed AO KPMG ("KPMG") to serve as the Company's independent public accountant for the year ended December 31, 2014 and for the year ended December 31, 2015 to audit the consolidated financial statements of the Company.

**Fees Paid to Independent Public Accountants and Other Information**

The following table presents the aggregate amounts billed for audit fees, audit-related fees, tax fees and other fees by the Company's independent public accountants during fiscal years ended December 31, 2014 and December 31, 2015 (in US dollars).

|  |  | 2014 (KPMG) | 2015 (KPMG) |
|---|---|---|---|
| Audit fees | $ | 1,140,628 | 1,464,287 |
| Audit-related fees *(1)* | $ | - | - |
| Tax fees *(2)* | $ | 818,640 | 510,778 |
| All other fees | $ | 43,718 | 185,207 |
| **Total fees** | **$** | **2,002,986** | **2,160,272** |

(1)   Audit-related fees include fees for assurance and related services that are reasonably related to the performance of the audit or review of the financial statements and are not reported under "Audit fees."

(2)   Tax fees include fees for professional services related to tax compliance, tax advice and tax planning.

During 2014 and 2015, the audit committee pre-approved all audit and permissible non-audit services prior to commencement of services and approved the total fees paid to KPMG. The audit committee determined that the rendering of certain non-audit services by these firms was compatible with maintaining the auditor's independence. During 2014 and 2015, the financial audit services were provided by full-time, permanent employees of KPMG.

**Roust Corporation**

**U.S. Generally Accepted Accounting Principles**

**Financial Statements and Auditor's Report**

**31 December 2014**

**Independent Auditor's Report**

The Board of Directors
Roust Corporation:

**Report on the Financial Statements**

We have audited the accompanying consolidated financial statements of Roust Corporation and its subsidiaries, which comprise the consolidated balance sheet as of December 31, 2014, and the related consolidated statements of operations and comprehensive income, changes in stockholders' equity/(deficit), and cash flows for the year then ended, and the related notes to the consolidated financial statements.

**Management's Responsibility for the Financial Statements**

Management is responsible for the preparation and fair presentation of these consolidated financial statements in accordance with U.S. generally accepted accounting principles; this includes the design, implementation, and maintenance of internal control relevant to the preparation and fair presentation of consolidated financial statements that are free from material misstatement, whether due to fraud or error.

*Auditors' Responsibility*

Our responsibility is to express an opinion on these consolidated financial statements based on our audit. We conducted our audit in accordance with auditing standards generally accepted in the United States of America. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the consolidated financial statements are free from material misstatement.

An audit involves performing procedures to obtain audit evidence about the amounts and disclosures in the consolidated financial statements. The procedures selected depend on the auditors' judgment, including the assessment of the risks of material misstatement of the consolidated financial statements, whether due to fraud or error. In making those risk assessments, the auditor considers internal control relevant to the entity's preparation and fair presentation of the consolidated financial statements in order to design audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the entity's internal control. Accordingly, we express no such opinion. An audit also includes evaluating the appropriateness of accounting policies used and the reasonableness of significant accounting estimates made by management, as well as evaluating the overall presentation of the consolidated financial statements.

We believe that the audit evidence we have obtained is sufficient and appropriate to provide a basis for our opinion.

*Opinion*

In our opinion, the 2014 consolidated financial statements referred to above present fairly, in all material respects, the financial position of Roust Corporation and its subsidiaries as of December 31, 2014, and the results of their operations and their cash flows for the year then ended in accordance with U.S. generally accepted accounting principles.

*Other Matter*

The accompanying consolidated financial statements of Roust Corporation and its subsidiaries, which comprise the consolidated statements of operations and comprehensive income, changes in stockholders' equity and cash flows for the period from January 1, 2013 to June 5, 2013, and the consolidated balance sheet as of December 31, 2013 and the related consolidated statements of operations and comprehensive income, changes in stockholders' equity and cash flows for the period from June 6, 2013 to December 31, 2013 were audited by other auditors whose reports thereon dated March 19, 2014, expressed unmodified opinions on those financial statements.

JSC "KPMG"
March 27, 2015
Moscow, Russian Federation

**Independent Auditor's Report**

To the Board of Directors and Shareholders' of Central European Distribution Corporation

We have audited the accompanying consolidated financial statements of Central European Distribution Corporation and its subsidiaries (Successor Company), which comprise the consolidated balance sheet as of December 31, 2013 and the related consolidated statements of operations and comprehensive income, changes in stockholders' equity and cash flows for the period from June 6, 2013 to December 31, 2013.

**Management's Responsibility for the Consolidated Financial Statements**

Management is responsible for the preparation and fair presentation of the consolidated financial statements in accordance with accounting principles generally accepted in the United States of America; this includes the design, implementation, and maintenance of internal control relevant to the preparation and fair presentation of consolidated financial statements that are free from material misstatement, whether due to fraud or error.

**Auditor's Responsibility**

Our responsibility is to express an opinion on the consolidated financial statements based on our audit. We conducted our audit in accordance with auditing standards generally accepted in the United States of America. Those standards require that we plan and perform the audit to obtain reasonable assurance about whehther the consolidated financial statements are free from material misstatement.

An audit involves performing procedures to obtain audit evidence about the amounts and disclosures in the consolidated financial statements. The procedures selected depend on our judgment, including the assessment of the risks of material misstatement of the consolidated financial statements, whether due to fraud or error. In making those risk assessments, we consider internal control relevant to the Company's preparation and fair presentation of the consolidated financial statements in order to design audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the Company's internal control. Accordingly, we express no such opinion. An audit also includes evaluating the appropriateness of accounting policies used and the reasonableness of significant accounting estimates made by management, as well as evaluating the overall presentation of the consolidated financial statements. We believe that the audit evidence we have obtained is sufficient and appropriate to provide a basis for our audit opinion.

**Opinion**

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of Central European Distribution Corporation and its subsidiaries (Successor Company) at December 31, 2013 and the results of their operations and their cash flows for the period from June 6, 2013 to December 31, 2013 in accordance with accounting principles generally accepted in the United States of America.

**Emphasis of Matter**

As discussed in Note 1 to the consolidated financial statements, the Company filed a petition on April 7, 2013 with the United States Bankruptcy Court for the district of Delaware for reorganization under the provisions of Chapter 11 of the Bankruptcy Code. The Company's Plan of Reorganization was substantially consummated on June 5, 2013 and the Company emerged from bankruptcy. In connection with its emergence from bankruptcy, the Company adopted fresh start accounting. Our opinion is not modified with respect to this matter.

/s/ PricewaterhouseCoopers Sp. z o.o.
Warsaw, Poland

March 19, 2014

**Independent Auditor's Report**

To the Board of Directors and Shareholders' of Central European Distribution Corporation

We have audited the accompanying consolidated financial statements of Central European Distribution Corporation and its subsidiaries (Predecessor Company), which comprise the consolidated statements of operations and comprehensive income, changes in stockholders' equity and cash flows for the period from January 1, 2013 to June 5, 2013.

**Management's Responsibility for the Consolidated Financial Statements**

Management is responsible for the preparation and fair presentation of the consolidated financial statements in accordance with accounting principles generally accepted in the United States of America; this includes the design, implementation, and maintenance of internal control relevant to the preparation and fair presentation of consolidated financial statements that are free from material misstatement, whether due to fraud or error.

**Auditor's Responsibility**

Our responsibility is to express an opinion on the consolidated financial statements based on our audit. We conducted our audit in accordance with auditing standards generally accepted in the United States of America. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the consolidated financial statements are free from material misstatement.

An audit involves performing procedures to obtain audit evidence about the amounts and disclosures in the consolidated financial statements. The procedures selected depend on our judgment, including the assessment of the risks of material misstatement of the consolidated financial statements, whether due to fraud or error. In making those risk assessments, we consider internal control relevant to the Company's preparation and fair presentation of the consolidated financial statements in order to design audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the Company's internal control. Accordingly, we express no such opinion. An audit also includes evaluating the appropriateness of accounting policies used and the reasonableness of significant accounting estimates made by management, as well as evaluating the overall presentation of the consolidated financial statements. We believe that the audit evidence we have obtained is sufficient and appropriate to provide a basis for our audit opinion.

**Opinion**

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the results of operations and cash flows of Central European Distribution Corporation and its subsidiaries (Predecessor Company), for the period from January 1, 2013 to June 5, 2013 in accordance with accounting principles generally accepted in the United States of America.

**Emphasis of Matter**

As discussed in Note 1 to the consolidated financial statements the Company filed a petition on April 7, 2013 with the United States Bankruptcy Court for the district of Delaware for reorganization under the provisions of Chapter 11 of the Bankruptcy Code. The Company's Plan of Reorganization was substantially consummated on June 5, 2013 and the Company emerged from bankruptcy. In connection with its emergence from bankruptcy, the Company adopted fresh start accounting. Our opinion is not modified with respect to this matter.

**Other Matter**

The consolidated financial statements of the Company as of December 31, 2012 and for the two years then ended were audited by other auditors whose report, dated June 17, 2013, expressed an unmodified opinion on those statements.

/s/ PricewaterhouseCoopers Sp. z o.o.
Warsaw, Poland

March 19, 2014

**Report of Independent Registered Public Accounting Firm**

**The Board of Directors and Shareholders of Central European Distribution Corporation**

We have audited the accompanying consolidated balance sheet of Central European Distribution Corporation ("CEDC") as of December 31, 2012, and the related consolidated statement of operations and comprehensive loss, consolidated statement of changes in stockholders' equity, and consolidated statement of cash flows for the year ended December 31, 2012. These financial statements are the responsibility of the company's management. Our responsibility is to express an opinion on these financial statements based on our audit.

We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the financial statements referred to above present fairly, in all material respects, the consolidated financial position of Central European Distribution Corporation as of December 31, 2012 and the consolidated results of its operations and its cash flows for the year ended December 31, 2012, in conformity with U.S. generally accepted accounting principles.

/s/ Ernst & Young Audit sp. z o.o.
Warsaw, Poland

June 17, 2013

**CONSOLIDATED BALANCE SHEETS**

| | Note | Successor December 31, 2013 as recast | Successor December 31, 2014 |
|---|---|---|---|
| **ASSETS** | | | |
| *Current Assets* | | | |
| Cash and cash equivalents | | $ 48,530 | $ 35,041 |
| Restricted cash | 5 | 1,641 | 2,119 |
| Accounts receivable, net of allowance for doubtful accounts at December 31, 2013 of $24,953 and at December 31, 2014 of $13,317 | 6 | 318,992 | 177,779 |
| Related Party receivable, net of allowance for doubtful accounts at December 31, 2013 of nil, at December 31, 2014 of nil | 19 | 1,695 | 6,453 |
| Inventories | 7 | 222,770 | 95,948 |
| Inventories consigned to others | 7 | 38,768 | 239 |
| Prepaid expenses | 8 | 34,401 | 6,993 |
| Loans granted to Related Parties | 19 | 122,332 | 59,955 |
| Income taxes receivable | 13 | 9,039 | 4,018 |
| Deferred income taxes | 13 | 7,796 | 11,502 |
| Other current assets | 9 | 76,159 | 40,861 |
| **Total Current Assets** | | $ 882,123 | $ 440,908 |
| *Non-Current Assets* | | | |
| Intangible assets, net | 10 | 282,839 | 199,239 |
| Goodwill | 11 | 247,505 | 191,132 |
| Property, plant and equipment, net | 12 | 128,585 | 88,584 |
| Deferred income taxes | 13 | 924 | 3,185 |
| Loans granted to Related Parties | 19 | 65,940 | 23,881 |
| Other non-current assets | | 1,637 | 1,013 |
| **Total Non-Current Assets** | | $ 727,430 | $ 507,034 |
| **Total Assets** | | $ 1,609,553 | $ 947,942 |
| **LIABILITIES AND EQUITY / (DEFICIT)** | | | |
| *Current Liabilities* | | | |
| Trade accounts payable | | $ 196,969 | $ 121,957 |
| Related Party trade accounts payable | 19 | 9,328 | 13,149 |
| Bank loans and overdraft facilities | 14 | 178,065 | 136,426 |
| Bank loans and borrowings from Related Parties | 19 | 32,426 | 15,516 |
| Other borrowings | 14 | - | 24,851 |
| Interest accrued under New Notes | 14 | 6,195 | 6,969 |
| Income taxes payable | 13 | 5,663 | 5,396 |
| Deferred income taxes | 13 | 620 | 16 |
| Taxes other than income taxes | 15 | 259,730 | 133,101 |
| Other accrued liabilities | 16 | 71,222 | 48,711 |
| Other current liabilities | 16 | 12,832 | 18,531 |
| **Total Current Liabilities** | | $ 773,050 | $ 524,623 |
| *Non-Current Liabilities* | | | |
| Long-term obligations under New Junior Convertible Secured Notes | 14 | 208,333 | 229,687 |
| Long-term obligations under New Senior Secured Notes | 14 | 464,590 | 464,590 |
| Interest accrued under New Notes | 14 | 6,902 | 10,828 |
| Long-term bank loans and borrowings from Related Parties | 19 | 54,735 | 33,815 |
| Long-term accruals and other long term liabilities | 16 | 1,666 | 2,087 |
| Long-term income taxes payable | 13 | 13,539 | 11,749 |
| Deferred income taxes | 13 | 62,596 | 52,239 |
| **Total Non-Current Liabilities** | | $ 812,361 | $ 804,995 |
| *Stockholders' Equity / (Deficit)* | | | |
| Successor common stock ($0.01 par value, 90,000 shares authorized, 10,000 shares issued and outstanding at December 31, 2013 and December 31, 2014) | 18 | - | - |
| Additional paid-in-capital | | 152,271 | (97,729) |
| Accumulated deficit | | (159,415) | (273,842) |
| Accumulated other comprehensive income | 27 | 31,286 | (10,476) |
| Less treasury stock | | - | - |
| **Total Equity / (Deficit) attributable to the Company Stockholders** | | $ 24,142 | $ (382,047) |
| Non-controlling interest | | - | 371 |
| **Total Stockholders Equity / (Deficit)** | | 24,142 | (381,676) |
| **Total Liabilities and Equity / (Deficit)** | | $ 1,609,553 | $ 947,942 |

The accompanying notes are an integral part of the consolidated financial statements.

**CONSOLIDATED STATEMENTS OF OPERATIONS AND COMPREHENSIVE INCOME**

| | Note | Year ended December 31, 2012 | Predecessor one hundred fifty-six-day period ended June 5, 2013 | Successor Two hundred and nine days ended December 31, 2013 as recast | Year ended December 31, 2014 |
|---|---|---|---|---|---|
| Sales | | $ 1,743,797 | $ 579,137 | $ 1,373,190 | $ 1,870,995 |
| Sales to Related Parties | 19 | 1,518 | 1,006 | 1,709 | 2,029 |
| Excise taxes | | (929,642) | (306,678) | (714,169) | (1,028,646) |
| **Net sales** | | **815,673** | **273,465** | **660,730** | **844,378** |
| Cost of goods sold | | 486,418 | 154,247 | 427,368 | 520,045 |
| Cost of goods sold to Related Parties | 19 | 1,863 | 900 | 494 | 997 |
| **Gross profit** | | **327,392** | **118,318** | **232,868** | **323,336** |
| Selling, general and administrative expenses | 21 | 276,412 | 101,967 | 203,115 | 250,499 |
| Provision for doubtful debts | 6 | 6,436 | 601 | 4,930 | (3,559) |
| Impairment charge | | 372,899 | - | 83,324 | - |
| **Operating income / (loss)** | | **(328,355)** | **15,750** | **(58,501)** | **76,396** |
| ***Non-operating income / (expense), net*** | | | | | |
| Interest income | 22 | 2,868 | 714 | 567 | 357 |
| Interest income from Related Parties | 19, 22 | - | - | 8,747 | 13,114 |
| Interest (expense) | 23 | (109,452) | (44,986) | (50,079) | (88,278) |
| Interest expense to Related Parties | 19, 23 | - | (1,339) | (4,441) | (7,846) |
| Foreign exchange gains / (losses), net | 24 | 99,273 | (58,013) | (18,144) | (75,082) |
| Other non-operating income / (expense), net | 25 | (15,875) | (6,350) | (8,829) | (21,133) |
| **Income / (Loss) before reorganization items and income taxes** | | **(351,541)** | **(94,224)** | **(130,680)** | **(102,472)** |
| Reorganization items | | - | 213,273 | - | - |
| **Income / (Loss) before income taxes** | | **(351,541)** | **119,049** | **(130,680)** | **(102,472)** |
| Income tax benefit / (expense) | 13 | (11,697) | 17,134 | 12,750 | (12,334) |
| **Net income / (loss)** | | **(363,238)** | **136,183** | **(117,930)** | **(114,806)** |
| Less net income / (loss) attributable to non-controlling interest | | - | - | - | (379) |
| **Net income / (loss) attributable to the Company** | | **(363,238)** | **136,183** | **(117,930)** | **(114,427)** |
| from operations per share of common stock, basic | 26 | $ (4.74) | $ 1.67 | $ (11.79) | $ (11.44) |
| from operations per share of common stock, diluted | 26 | $ (4.74) | $ 1.66 | $ (11.79) | $ (11.44) |
| **Other comprehensive income / (loss), net of tax** | | | | | |
| Foreign currency translation adjustments, net of tax $0 | 27 | (18,225) | 22,164 | 31,286 | (41,769) |
| **Comprehensive income / (loss)** | | **$ (381,463)** | **$ 158,347** | **$ (86,644)** | **$ (156,575)** |
| Less comprehensive income attributable to non-controlling interest | | - | - | - | (379) |
| **Comprehensive income / (loss) attributable to the Company** | | **$ (381,463)** | **$ 158,347** | **$ (86,644)** | **$ (156,196)** |

The accompanying notes are an integral part of the consolidated financial statements.

## CONSOLIDATED STATEMENTS OF CHANGES IN STOCKHOLDERS' EQUITY / (DEFICIT)

| | Common stock No. of Shares | Amount | Treasury stock No. of Shares | Amount | Additional paid in capital | Retained earnings / (deficit) | Accumulated other comprehensive income of continuing operations | Total Equity / (Deficit) attributable to the Company Stockholders | Non-controlling interest | Total Stockholders Equity / (Deficit) |
|---|---|---|---|---|---|---|---|---|---|---|
| **Balance at December 31, 2011, Predecessor Company** | 72,740 $ | 727 | 246 $ | (150) $ | 1,369,471 $ | (1,220,984) $ | 32,550 $ | 181,614 $ | $ | 181,614 |
| Net loss for 2012 | - | - | - | - | - | (363,238) | - | (363,238) | | (363,238) |
| Foreign currency translation adjustments | - | - | - | - | - | - | (18,225) | (18,225) | | (18,225) |
| Comprehensive loss for 2012 | - | - | - | - | - | (363,238) | (18,225) | (381,463) | | (381,463) |
| Common stock issued to Roust Trading Limited | 3,000 | 30 | - | - | - | - | - | 30 | | 30 |
| Common stock issued in connection with equity awards | 308 | 3 | - | - | 2,907 | - | - | 2,910 | | 2,910 |
| **Balance at December 31, 2012, Predecessor Company** | 76,048 $ | 760 | 246 $ | (150) $ | 1,372,378 $ | (1,584,222) $ | 14,325 $ | (196,909) $ | $ | (196,909) |
| Net income/loss for the period | - | - | - | - | - | (160,598) | - | (160,598) | | (160,598) |
| Foreign currency translation adjustments | - | - | - | - | - | - | 22,164 | 22,164 | | 22,164 |
| Comprehensive income/loss for the period | - | - | - | - | - | (160,598) | 22,164 | (138,434) | | (138,434) |
| Common stock issued in connection with equity awards | 60 | 1 | - | - | 408 | - | - | 409 | | 409 |
| **Balance at June 5, 2013, Successor Company** | 76,108 $ | 761 | 246 $ | (150) $ | 1,372,786 $ | (1,744,820) $ | 36,489 $ | (334,934) $ | $ | (334,934) |
| Cancellation of Predessor Company accumulated deficit and accumulated other comprehensive income | (76,108) | (761) | (246) | 150 | (1,252,516) | 1,912,100 | | 658,973 | | 658,973 |
| Roust Inc. equity position on date of common control acquisition | | | | | 32,001 | | (40,334) | (8,333) | | (8,333) |
| Fresh start adjustments | 10,000 | - | | | | (167,280) | (36,489) | (203,769) | | (203,769) |
| **Balance at June 5, 2013, from which common control has been reflected** | 10,000 $ | - | $ | - $ | 152,271 $ | (40,334) $ | - $ | 111,937 $ | $ | 111,937 |
| Net income/loss for the period | - | - | - | - | - | (117,930) | - | (117,930) | | (117,930) |
| Foreign currency translation adjustments | - | - | - | - | - | - | 31,286 | 31,286 | | 31,286 |
| Comprehensive income/loss for the period | | | | | | (117,930) | 31,286 | (86,644) | - | (86,644) |
| Distribution to owner * | | | | | | (1,151) | | (1,151) | | (1,151) |
| **Balance at December 31, 2013 as recast Successor Company** | 10,000 $ | - | $ | - $ | 152,271 $ | (159,415) $ | 31,286 $ | 24,142 $ | - $ | 24,142 |
| Net income / (loss) for the period | | | | | | (114,427) | | (114,427) | (379) | (114,806) |
| Foreign currency translation adjustments | | | | | | | (41,762) | (41,762) | | (41,762) |
| Comprehensive income/loss for the period | | | | | | (114,427) | (41,762) | (156,189) | (379) | (156,568) |
| Increase in subsidiary's equity | | | | | | | | | 750 | 750 |
| Charge to equity for common control acquisition | | | | | (250,000) | | | (250,000) | | (250,000) |
| **Balance at December 31, 2014, Successor Company** | 10,000 | - | - | - | (97,729) | (273,842) | (10,476) | (382,047) | 371 | (381,676) |

*Distribution to owner made by Roust Inc. pre- acquisition*

The accompanying notes are an integral part of the consolidated financial statements.

## CONSOLIDATED STATEMENTS OF CASH FLOW

| | Year ended December 31, 2012 | Predecessor one hundred fifty-six-day period ended June 5, 2013 | Successor Two hundred and nine days ended December 31, 2013 as recast | Year ended December 31, 2014 |
|---|---|---|---|---|
| **Cash flows from operating activities** | | | | |
| Net income/ (loss) attributable to the Company | $ (363,238) | $ 136,183 | $ (117,930) | $ (114,427) |
| Net income / (loss) attributable to non-controlling interest | - | - | - | (379) |
| **Net income / (loss)** | **(363,238)** | **136,183** | **(117,930)** | **(114,806)** |
| *Adjustments to reconcile net loss to net cash provided by operating activities:* | | | | |
| Depreciation and amortization | 20,377 | 7,694 | 6,976 | 11,811 |
| Deferred income taxes | (3,605) | (18,481) | (16,135) | (1,849) |
| Unrealized foreign exchange losses / (gains) | (93,772) | 54,332 | 23,802 | 73,124 |
| Stock options fair value expense | 2,953 | 411 | - | - |
| Impairment charges | 372,899 | - | 83,324 | - |
| Impairment related to assets held for sale | 675 | - | - | - |
| Interest accrued (net of interest capitalized) | - | - | 36,771 | 62,280 |
| New Convertible Junior Secured Notes interest paid-in-kind | - | - | 8,333 | 21,354 |
| Reorganization items | - | (213,273) | - | - |
| Amortization of debt issue costs | - | 16,422 | - | - |
| Other non cash items | 8,191 | 1,113 | 4,931 | (2,809) |
| Changes in restricted cash | - | - | (1,478) | (478) |
| *Changes in operating assets and liabilities:* | | | | |
| Accounts receivable | 82,651 | 168,121 | (157,263) | 66,144 |
| Inventories | (46,155) | 33,297 | (91,649) | 103,596 |
| Prepayments and other current assets | (51,821) | (57,033) | 63,707 | 48,293 |
| Trade accounts payable | (32,526) | (56,814) | 136,531 | (15,470) |
| Other accrued liabilities and payables (including taxes) | 3,853 | (45,887) | 76,766 | (157,003) |
| **Net cash provided by / (used in) operating activities** | **(99,518)** | **26,085** | **56,686** | **94,187** |
| **Cash flows from investing activities** | | | | |
| Purchase of fixed assets | (9,374) | (4,133) | (5,207) | (16,330) |
| Proceeds from the disposal of fixed assets | 659 | 459 | (987) | 2,190 |
| Loans granted to related parties | - | - | (159,862) | (98,650) |
| Loans repaid by related parties | - | - | 38,921 | 115,788 |
| Roust Inc. acquisition | - | - | - | (162,885) |
| **Net cash provided by / (used in) investing activities** | **(8,715)** | **(3,674)** | **(127,135)** | **(159,887)** |
| **Cash flows from financing activities** | | | | |
| Borrowings on bank loans and overdraft facility | 122,803 | 66,723 | 224,667 | 296,286 |
| Repayment of bank loans, overdraft facility and other borrowings | (77,652) | (102,424) | (206,570) | (232,256) |
| Repayment of long-term borrowings in accordance with the Restructuring Plan | - | - | (172,000) | - |
| Changes in restricted cash | - | (172,000) | 172,000 | - |
| Parent financing in accordance with the Restructuring Plan | - | 172,000 | - | - |
| Issuance of Debt Security, net of debt issuance cost of $838 | 69,162 | - | - | - |
| Related Party Borrowings | - | - | 50,101 | 9,431 |
| Payment of Related Party Borrowings | - | - | (22,278) | (13,735) |
| Repayment of Convertible Senior Notes | (50,392) | - | - | - |
| Issuance of shares in private placement | 29,870 | - | - | - |
| **Net cash provided by / (used in) financing activities** | **93,791** | **(35,701)** | **45,920** | **59,726** |
| Currency effect on brought forward cash balances | 4,761 | (1,769) | 2,137 | (7,515) |
| **Net increase / (decrease) in cash** | **(9,681)** | **(15,059)** | **(22,392)** | **(13,489)** |
| Cash and cash equivalents at beginning of period | 94,410 | 84,729 | 69,670 | 48,530 |
| Cash and cash equivalents at beginning of period received as a result of acquisition under common control | $ - | $ - | $ 1,252 | $ - |
| **Cash and cash equivalents at end of period** | **$ 84,729** | **$ 69,670** | **$ 48,530** | **$ 35,041** |

| Supplemental disclosures of cash flow information | | | | |
|---|---|---|---|---|
| Interest paid | $ (101,633) | $ (9,495) | $ (31,140) | $ (68,746) |
| Interest received from Related Parties | $ - | $ - | $ 5,282 | 15,332 |
| Income tax (paid) / received | $ (5,750) | $ (1,171) | $ 802 | $ (8,933) |

The accompanying notes are an integral part of the consolidated financial statements.

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

### 1.    *ORGANIZATION AND SIGNIFICANT ACCOUNTING POLICIES*

**Organization and Description of Business**

Roust Corporation ("ROUST"), a Delaware corporation incorporated on September 4, 1997, and its subsidiaries (collectively referred to as "we," "us," "our," or the "Company") operate primarily in the alcohol beverage industry. We are one of the largest producers of vodka in the world and are Central and Eastern Europe's largest integrated spirit beverages business, measured by total volume, with approximately 26.7 million nine-liter cases produced and distributed in 2014. Our business primarily involves the production and sale of our own spirit brands (principally vodka), and the import on an exclusive basis of a wide variety of spirits and wines. Our primary operations are conducted in Poland, Russia, Ukraine and Hungary. We have six operational manufacturing facilities located in Poland and Russia. The ultimate beneficial owner of the Company is Mr. Roustam Tariko.

We are also the largest vodka producer in Russia. Our *Green Mark* brand is the top-selling mainstream vodka in Russia and our *Parliament, Zhuravli* and *Talka* brands are among top-selling sub-premium vodkas in Russia.

In Poland, we are one of the largest vodka producers with a brand portfolio that includes *Absolwent*, *Żubrówka*, *Żubrówka Biała*, *Bols*, *Palace* and *Soplica* brands, each of which we produce at our Polish distilleries. We produce and sell vodkas primarily in three of four vodka sectors: premium, mainstream and economy. We also own and produce *Royal*, the top-selling vodka in Hungary.

*Liquidity and Going Concern*

These consolidated financial statements have been prepared assuming the Company will continue as a going concern, which contemplates the realization of assets and the liquidation of liabilities in the normal course of business.

As of December 31, 2014, the Company's consolidated long-term debt (including interest accrued) is approximately $738.9 million. The Company's total short term debt (including interest accrued and factoring) is approximately $183.8 million.

Our short-term bank loans and overdraft facilities, including bank loans and borrowings from Related Parties net of interest accrued as of December 31, 2013 amounted to $257.1 million. As of December 31, 2014 our short-term loans and borrowings net of interest accrued amounted to $171.5 million. We have been able to roll over the debts when they fall due.

Our current liabilities exceed our current assets (including the above short term bank debt) at the end of December 31, 2014 by $83.7 million. Operational cash flow was positive and amounted to $94.2 million for the year ended December 31, 2014.

Our short term debt is primarily in Russia with local Russian banks and we are in full compliance with payments of principal and interest due under such debt agreements. We have been cooperating with the banks for several years and have a strong commercial relationship with them. No local lenders have ever requested an acceleration of our indebtedness, even when the Company was going through the Chapter 11 process.

To manage our working capital we have entered into factoring agreements for our accounts receivable.

We believe that cash on hand of $35.0 million, cash from operations and available credit facilities of $22.9 million will be sufficient to fund our anticipated cash requirements for working capital purposes and normal capital expenditures. The Company's cash flow forecasts used in making this determination include the assumption that our credit and factoring facilities, as discussed further in Note 14 and Note 6, that are coming due in 2015 will be renewed to manage the Company's working capital needs. Since December 31, 2014 up to the date of this report we repaid 600 million Russian rubles (approximately $8.6 million) of our short-term debt and new tranches of 600 million Russian rubles (approximately $8.6 million) were drawn.

ROUST CORPORATION
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

*All amounts are expressed in thousands US dollars, except share and per share information*

See also our Note 14 "Notes and Borrowings" for more details on our borrowings.

**Significant Accounting Policies**

The significant accounting policies applied by the Predecessor Company were adopted by the Successor Company. Certain reclassifications have also been made to conform data for all periods presented with the current presentation.

The significant accounting policies and practices followed by the Company are as follows:

*Basis of Presentation*

Our consolidated financial statements are prepared in accordance with accounting principles generally accepted in the United States of America ("US GAAP"). The Company consolidates all entities in which it has a controlling interest or in which it is the primary beneficiary. All inter-company accounts and transactions have been eliminated in the consolidated financial statements.

ROUST's subsidiaries maintain their books of account and prepare their statutory financial statements in their respective local currencies. The subsidiaries' financial statements have been adjusted to reflect US GAAP.

As discussed in Note 2, the Company emerged from Chapter 11 protection on June 5, 2013 and adopted fresh start accounting in accordance with Financial Accounting Standards Board Accounting Standards Codification ("ASC"), Topic 852, Reorganizations ("ASC 852"). For financial reporting convenience the Company elected to use its May 31, 2013 financial and tax accounting records, adjusted for the effects of the June 5, 2013 Plan of Reorganization, as the basis for the June 5, 2013 fresh start financial presentation. The adoption of fresh start accounting also resulted in our becoming a new entity for accounting and reporting purposes. Accordingly, our consolidated financial statements on June 6, 2013 and subsequent periods are not comparable, in various material respects, to our consolidated financial statements prior to that date.

Fresh start accounting requires resetting the historical net book value of assets and liabilities to fair value by allocating an entity's reorganization value to its assets and liabilities pursuant to ASC Topic 805, Business Combinations. The excess of reorganization value over the fair value of tangible and identifiable intangible assets is recorded as goodwill on our consolidated balance sheet. Deferred taxes are determined in conformity with ASC Topic 740, Income Taxes ("ASC 740").

In addition, ASC 852 requires that financial statements for periods including and subsequent to a Chapter 11 filing distinguish transactions and events that are directly associated with the reorganization proceedings and the ongoing operations of the business, as well as additional disclosures. Effective April 7, 2013, expenses, gains and losses directly associated with the reorganization proceedings were reported as reorganization items in the accompanying consolidated statements of operations. In addition, liabilities subject to compromise in the Chapter 11 cases were distinguished from liabilities not subject to compromise and from post-petition liabilities. Liabilities subject to compromise were reported at amounts allowed or expected to be allowed under Chapter 11 bankruptcy proceedings.

The "Company", when used in reference to the period subsequent to emergence from Chapter 11 bankruptcy proceedings, refers to the "Successor Company", and when used in reference to periods prior to emergence from Chapter 11, refers to the "Predecessor Company."

*Use of Estimates*

The preparation of consolidated financial statements in conformity with US GAAP requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period. Actual results could differ from those estimates. Significant items subject to such estimates and assumptions include: discounts and allowances, valuation allowance for deferred tax asset, brands valuation, economic value of business units and allowance for doubtful debts.

ROUST CORPORATION
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
*All amounts are expressed in thousands US dollars, except share and per share information*

As a result of applying fresh start accounting principle as described above, the basis to determine enterprise value and the values of various tangible and intangible assets were determined using a number of factors, including the use of certain valuation methodologies and certain operational assumptions and estimates. Due to the many variables inherent in the estimation of fair value, differences in assumptions and estimates may have a material effect on the result of our future goodwill and intangible asset impairment tests.

*Foreign Currency Translation and Transactions*

For all of the Company's operational subsidiaries the functional currency is the local currency. Assets and liabilities of these operations are translated to the reporting currency at the exchange rate in effect at each year-end. The Statements of Operations and Comprehensive Income are translated on a monthly basis at the average rate of exchange prevailing during the respective month, except for significant events or transactions that are translated at the prevailing exchange rate on that day. Translation adjustments arising from the use of differing exchange rates from period to period are included as a component of comprehensive income. Foreign exchange gains / (losses) arising from transactions denominated in currencies other than functional currencies, as well as gains and losses from any specific foreign currency transactions are included in the reported net income / (loss) for the period.

The accompanying consolidated financial statements have been presented in US dollars.

*Fair value measurements*

The Company measures certain assets and liabilities at fair value. Fair value is defined as the exchange price that would be received for an asset or paid to transfer a liability (an exit price) in the principal or most advantageous market for the asset or liability in an orderly transaction between market participants on the measurement date. The Company uses a fair value hierarchy which gives the highest priority to unadjusted quoted prices in active markets for identical assets and liabilities (level 1 measurements) and the lowest priority to unobservable inputs (level 3 measurements). The three levels of inputs used to measure fair value are:

| | |
|---|---|
| Level1 | — Unadjusted quoted prices in active markets for identical assets or liabilities. |
| Level 2 | — Observable inputs other than Level 1 prices such as quoted prices for similar assets or liabilities; quoted prices in markets that are not active; multiples or other inputs that are observable or can be corroborated by observable market data for substantially the full term of the assets or liabilities. |
| Level 3 | — Unobservable inputs that are supported by little or no market activity and that are significant to the fair value of the assets or liabilities. |

*Cash and Cash Equivalents*

Short-term investments which have a maturity of three months or less from the date of purchase and present insignificant risk of changes in value because of changes in interest rates are classified as cash equivalents.

*Restricted cash*

The Company classifies cash as restricted when the cash is unavailable for withdrawal or usage. Restrictions may include legally restricted deposits, contracts entered into with others, or the Company's statements of intention with regard to particular deposits.

*Accounts Receivable*

Accounts receivables are recorded based on the invoice price, inclusive of VAT (sales tax). Past due amounts are determined based on established payment term. The allowances for doubtful accounts are based on our experience with past due accounts, collectability, history of write-offs, aging of accounts receivable, our analysis of customer data and our relationships with and the economic status of our customers. Individual trade receivables are provided against when management deems them not to be fully collectable. The Company typically does not provide for past due amounts due from large international retail chains (hypermarkets and supermarkets) as historically there

ROUST CORPORATION
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
*All amounts are expressed in thousands US dollars, except share and per share information*

have not been any issues with collectability of these amounts. When a trade account receivable is deemed uncollectible, the balance is charged off against the allowance for doubtful accounts.

The transfer of accounts receivable to financial institutions is accounted for as a sale when all of the following conditions are met: 1) the transferred accounts receivable are isolated from the Company, 2) the receiving financial institution has the right to pledge or sell the factored accounts receivable, and 3) the Company does not maintain effective control over the transferred accounts receivable. Isolation of the transferred accounts receivable from the Company occurs when, based on legal opinion, it is determined that in accordance with local legislation the transferred accounts receivable are put presumptively beyond the reach of the Company and its creditors even in the event of bankruptcy of the Company. Once it is determined that the transfer of the accounts receivable should be accounted for as a sale, the related accounts receivable are derecognized from the balance sheet, the recourse liability (if applicable) is recorded, and the resulting gain or loss recorded in the statement of comprehensive income / (loss) in the period the transfer is complete.

*Inventories*

Inventories are stated at the lower of cost or market value. Cost is determined using the average cost method or first-in, first-out (FIFO).

Cost includes customs duty (where applicable), and all costs associated with bringing the inventory to a condition for sale. These costs include importation, handling, storage and transportation costs, and exclude rebates received from suppliers, which are reflected as reductions to closing inventory. Inventories are comprised primarily of wine, spirits and packaging materials.

*Loans Receivable*

Loans receivable are initially measured at fair value plus directly attributable transaction costs, and are subsequently measured at amortized cost using the effective interest method (including interest accruals less provision for impairment).

*Goodwill*

Goodwill is not subject to amortization. Goodwill is tested for impairment annually in December, or earlier upon the occurrence of certain events or substantive changes in circumstances that indicate goodwill is more likely than not impaired, which could result from significant adverse changes in the business climate and declines in the value of our business. Such indicators may include a decline in our expected future cash flows, adverse change in the economic or business environment, the testing for recoverability of a significant asset group, among others. Fair value measurement techniques, such as the discounted cash flow methodology, are utilized to assess potential impairments. The testing of goodwill is performed at each reporting unit level. The Company performs a two-step goodwill impairment test. If the first step does not indicate that the carrying value of the reporting unit exceeds its fair value, the second step is not required. When the first step indicates potential impairment, the Company completes the second step of the impairment test and compares the implied fair value of the reporting units' goodwill to the corresponding carrying value of goodwill. Instead of calculating fair value of a reporting unit, the Company may assess qualitative factors to determine whether it is more likely than not that the fair value of a reporting unit is less than its carrying amount, including goodwill. The evaluation of potential impairment is performed on the basis of the weight of evidence provided by the analysis of events and circumstances that may affect the determination, whether it is more likely than not that the fair value of a reporting unit is less than its carrying amount. See Note 11 for further details.

*Intangible assets other than goodwill*

Intangible assets with an indefinite life are not amortized but are reviewed for impairment annually in December or more frequently, if facts and circumstances indicate such need. Intangible assets consist primarily of acquired trademarks. The Company has acquired trademark rights to various brands, which were capitalized as part of the purchase price allocation process in connection with acquisitions of Bols, Polmos Bialystok, Parliament and Roust Russia Group ("RRG", previously Russian Alcohol Group). These trademarks include Soplica, Żubrówka, Absolwent, Royal, Parliament, Green Mark, Zhuravli and the trademark rights to Bols Vodka in Poland, Hungary

ROUST CORPORATION
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
*All amounts are expressed in thousands US dollars, except share and per share information*

and Russia. During fresh start accounting we have also recognized Talka brand which was not previously on the books. Management considers trademarks associated with high or market-leader brand recognition within their market segments to be indefinite-lived assets, based on the length of time they have existed, the comparatively high volumes sold and their general market positions relative to other products in their respective market segments.

Based on this and together with the evidence provided by analyses of vodka products life cycles, market studies, competitive and environmental trends, we believe that these trademarks will continue to generate cash flows for an indefinite period of time, and that the useful lives of these trademarks are therefore indefinite.

Indefinite lived assets are tested annually for potential impairment by using a discounted cash flow on a relief from royalty basis. See note 10 for further details.

*Property, plant and equipment*

Property, plant and equipment are stated at cost, less accumulated depreciation. Depreciation is computed by the straight-line method over the following useful lives:

| Type | Depreciation life in years |
| --- | --- |
| Transportation equipment including capital leases | 5-15 |
| Production equipment | 10-30 |
| Software | 5-10 |
| Computers and IT equipment | 3 |
| Other equipment | 2-26 |
| Freehold land | Not depreciated |
| Freehold buildings | 50 |

Leased equipment meeting appropriate criteria is capitalized and the present value of the related lease payments is recorded as a liability. Amortization of capitalized leased assets is computed on a straight-line method over the useful life of the relevant assets and included in the depreciation expense.

*Impairment of long lived assets*

The Company reviews its long-lived assets for impairment whenever events or changes in circumstances indicate that the carrying amount of an asset may not be recoverable. Recoverability of assets to be held and used is measured by a comparison of the carrying amount of an asset to estimated undiscounted cash flows expected to be generated by the asset. If the carrying amount of an asset exceeds its estimated undiscounted future cash flows the asset is deemed to be impaired. An impairment charge is recognized for the amount by which the carrying amount of an asset exceeds its estimated fair value.

*Debt*

Debt instruments are measured using effective interest rate method. Debt discounts or premiums and debt issuance costs are amortized into interest expense using the effective interest method.

*Equity investments*

If the Company is not required to consolidate its investment in another company, the Company uses the equity method if the Company can exercise significant influence over the other company. Under the equity method, investments are carried at cost, plus or minus the Company's equity in the increases and decreases in the investee's net assets after the date of acquisition and certain other adjustments. The Company's share of the net income or loss of the investee is included in equity in earnings of equity method investees in the Company's Consolidated Statements of Operations.

*Revenue Recognition*

Revenues of the Company include sales of its own produced spirit brands, imported wine, beer and spirit brands as well as other third party alcoholic products purchased locally. The sale of each of these revenues streams

ROUST CORPORATION
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
*All amounts are expressed in thousands US dollars, except share and per share information*

are all processed and accounted for in the same manner. For all of its sources of revenue, the Company recognizes revenue when persuasive evidence of an arrangement exists, delivery of product has occurred, the sales price charged is fixed or determinable and collectability is reasonably assured. This generally means that revenue is recognized when title to the products are transferred to our customers. In particular, title usually transfers upon shipment to or receipt at our customers' locations, as determined by the specific sales terms of the transactions.

Sales are stated net of sales tax (VAT) and reflect reductions attributable to consideration given to customers in various customer incentive programs, including pricing discounts on single transactions, volume discounts, promotional listing fees and advertising allowances, cash discounts and rebates. In most countries where the company does business the local authorities impose an alcohol/excise tax. It is generally a sliding scale tax based on alcohol content. In general tax liability is triggered at the moment of sale in Poland and at the spirit purchase in Russia. The payment is due within 25 days of the triggering event in Poland and made in advance in Russia if there is no bank guarantee. In case the bank guarantee is issued the payment in Russia may be postponed and become due within 25 days following the month the triggering event occurred. Net sales are presented net of excise tax.

*Revenue Dilution*

As part of normal business terms with customers, the Company provides for additional discounts and rebates off our standard price for all of the products we sell. These revenue reductions are typically associated with annual or quarterly purchasing levels as well as payment terms. These rebates are divided into on-invoice and off-invoice discounts. The on-invoice reductions are presented on the sales invoice and deducted from the invoice gross sales value. The off-invoice reductions are calculated based on the analysis performed by management and are provided for in the same period the related sales are recorded. Discounts or fees that are subject to contractual based term arrangements are amortized over the term of the contract. The early payments discounts are also presented as revenue reduction. For the years ended December 31, 2012, 2013 and 2014, the Company recognized $112.1 million, $161.2 million (including $122.1 million as the Successor and $39.1 million as the Predecessor), $182.7 million of off-invoice rebates and early payment discounts as a reduction to net sales, respectively.

*Shipping and Handling*

Costs related to outbound shipping and handling are classified within selling, general and administrative expenses for all periods presented. For the years ended December 31, 2012, 2013 and 2014, the Company recognized $50.3 million, $62.4 million (including $39.0 million as the Successor and $23.4 million as the Predecessor) and $47.8 million of shipping and handling costs, respectively.

*Non-direct advertising costs*

Non-direct-response advertising costs are expensed as incurred.

*Income Taxes and Deferred Taxes*

The provision for income taxes is determined using the balance sheet method. Deferred tax assets and liabilities are recognized for the tax consequences of temporary differences between the financial reporting basis and the tax basis of existing assets and liabilities. The tax rate used to determine the deferred tax assets and liabilities is the enacted tax rate for the year and manner in which the differences are expected to reverse. Deferred tax assets are reduced by a valuation allowance if it is more likely than not that some portion, or all, of the deferred tax assets will not be realized. Provision is generally made for taxes payable on remittances of overseas earnings; no provision is made for taxes on overseas retained earnings that are deemed to be permanently reinvested.

The Company uses a comprehensive model to recognize, measure, present and disclose in its financial statements uncertain tax positions that the Company has taken or expects to take on an income tax return.

Benefits from tax positions are recognized in the financial statements only when it is more likely than not that the tax position will be sustained upon examination by the appropriate taxing authority that would have full knowledge of all relevant information. A tax position that meets the more-likely-than-not recognition threshold is measured at the largest amount of benefit that is greater than fifty percent likely of being realized upon ultimate settlement. Tax positions that previously failed to meet the more-likely-than-not recognition threshold are

ROUST CORPORATION
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
*All amounts are expressed in thousands US dollars, except share and per share information*

recognized in the first subsequent financial reporting period in which that threshold is met. Previously recognized tax positions that no longer meet the more-likely-than-not recognition threshold are derecognized in the first subsequent financial reporting period in which that threshold is no longer met. The Company recognizes interest expense and penalties related to unrecognized tax benefits within income tax expense.

*Legal Contingencies*

We are involved in various lawsuits, claims, investigations and proceedings that arise in the ordinary course of business. We record a provision for a liability when we believe that it is both probable that a liability has been incurred and the amount can be reasonably estimated. Significant judgment is required to determine both probability and the estimated amount. We review these provisions at least quarterly and adjust these provisions to reflect the impact of negotiations, settlements, rulings, advice of legal counsel and updated information. Litigation is inherently unpredictable and is subject to significant uncertainties, some of which are beyond our control. Should any of these estimates and assumptions change or prove to have been incorrect, it could have a material impact on our results of operations, financial position and cash flows. See Note 17 to the Consolidated Financial Statements for a further discussion of litigation and contingencies.

*Employee Stock-Based Compensation*

Upon emergence, all common stock as well as equity based incentive compensation, including but not limited to stock options and restricted stock units of the Predecessor, were cancelled in accordance with the Plan.

*Comprehensive Income / (Loss)*

Comprehensive income / (loss) is defined as all changes in equity during a period except those resulting from investments by owners and distributions to owners. Comprehensive income / (loss) includes net income / (loss) adjusted by, among other items, foreign currency translation adjustments, that result from translation from functional currencies (primarily the Polish zloty and Russian ruble) of subsidiaries to US dollars.

*Segment Reporting*

The Company primarily operates in one industry segment, the production and sale of alcoholic beverages. The Company operates in several geographic areas, namely Russia, Poland, and Hungary. Each of the geographic regions generates revenues and incurs expenses from transactions with external parties as well as from transactions with other geographic areas. Operating results of each individual geographic region are regularly reviewed and assessed by management. Therefore management's approach to the business determined the Company's segmental approach based upon geographic locations.

*Net Income / (loss) per Common Share*

Net income per common share is calculated in accordance with ASC Topic 260 Earnings per Share. Basic earnings/ (loss) per share (EPS) are computed by dividing income / (loss) available to common shareholders by the weighted-average number of common shares outstanding for the year. The stock options and warrants discussed in Note 18 were included in the computation of diluted earnings/ (losses) per common share in Note 26.

**Accounting changes**

There were no significant changes in accounting principles nor in reporting entity except for application of fresh start accounting described in Notes 2 and 3 below.

**Recently Issued Accounting Pronouncements**

In February 2015 the Financial Accounting Standards Board ("FASB") issued ASU 2015-02 Consolidation (Topic 810), Amendments to the Consolidation Analysis. The amendments in this update change the analysis that a reporting entity must perform to determine whether it should consolidate certain types of legal entities. The amendments in this update affect reporting entities that are required to evaluate whether they should consolidate certain legal entities. All legal entities are subject to reevaluation under the revised consolidation model. Specifically, the amendments: (1) Modify the evaluation of whether limited partnerships and similar legal entities

ROUST CORPORATION
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
*All amounts are expressed in thousands US dollars, except share and per share information*

are variable interest entities (VIEs) or voting interest entities; (2) Eliminate the presumption that a general partner should consolidate a limited partnership; (3) Affect the consolidation analysis of reporting entities that are involved with VIEs, particularly those that have fee arrangements and related party relationships; (4) Provide a scope exception from consolidation guidance for reporting entities with interests in legal entities that are required to comply with or operate in accordance with requirements that are similar to those in Rule 2a-7 of the Investment Company Act of 1940 for registered money market funds. The amendments in this update are effective for public business entities for fiscal years, and for interim periods within those fiscal years, beginning after December 15, 2015. Early adoption is permitted, including adoption in an interim period. A reporting entity also may apply the amendments retrospectively. The Company will analyze amendments of the ASU 2015-02 and implement it in the future at occurrence of relevant conditions meeting the criteria of the update.

In January 2015 FASB issued ASU 2015-01 – Income Statement—Extraordinary and Unusual Items (Subtopic 225-20), Simplifying Income Statement Presentation by Eliminating the Concept of Extraordinary Items. The objective of this update is to simplify the income statement presentation requirements in Subtopic 225-20 by eliminating the concept of extraordinary items. Extraordinary items are events and transactions that are distinguished by their unusual nature and by the infrequency of their occurrence. Eliminating the extraordinary classification simplifies income statement presentation by altogether removing the concept of extraordinary items from consideration. The amendments in this update are effective for fiscal years, and interim periods within those fiscal years, beginning after December 15, 2015. A reporting entity may apply the amendments prospectively. A reporting entity also may apply the amendments retrospectively to all prior periods presented in the financial statements. Early adoption is permitted provided that the guidance is applied from the beginning of the fiscal year of adoption. The effective date is the same for both public business entities and all other entities. The Company analyzed requirements of the ASU 2015-01 and believes it has no effect on the Company's current financial statements. The Company will apply the ASU 2015-01 when it becomes effective.

In November 2014 FASB issued ASU 2014-17 - Business Combinations (Topic 805) Pushdown Accounting a consensus of the FASB Emerging Issues Task Force. The objective of this update is to provide guidance on whether and at what threshold an acquired entity that is a business or nonprofit activity can apply pushdown accounting in its separate financial statements. These amendments apply to the separate financial statements of an acquired entity and its subsidiaries that are a business or nonprofit activity (either public or nonpublic) upon the occurrence of an event in which an acquirer (an individual or an entity) obtains control of the acquired entity. An acquired entity may elect the option to apply pushdown accounting in the reporting period in which the change-in-control event occurs. An acquired entity should determine whether to elect to apply pushdown accounting for each individual change-in-control event in which an acquirer obtains control of the acquired entity. If pushdown accounting is not applied in the reporting period in which the change-in-control event occurs, an acquired entity will have the option to elect to apply pushdown accounting in a subsequent reporting period to the acquired entity's most recent change-in-control event. An election to apply pushdown accounting in a reporting period after the reporting period in which the change-in-control event occurred should be considered a change in accounting principle in accordance with Topic 250, Accounting Changes and Error Corrections. If pushdown accounting is applied to an individual change-in-control event, that election is irrevocable. If an acquired entity elects the option to apply pushdown accounting in its separate financial statements, it should disclose information in the current reporting period that enables users of financial statements to evaluate the effect of pushdown accounting. The amendments in this update are effective on November 18, 2014. After the effective date, an acquired entity can make an election to apply the guidance to future change-in-control events or to its most recent change-in-control event. However, if the financial statements for the period in which the most recent change-in-control event occurred already have been issued or made available to be issued, the application of this guidance would be a change in accounting principle. The amendments in this update does not affect the company at the moment of effectiveness. The Company will consider their application upon occurrence of relevant transaction.

In November 2014 FASB issued ASU 2014-16 - Derivatives and Hedging (Topic 815) - Determining Whether the Host Contract in a Hybrid Financial Instrument Issued in the Form of a Share Is More Akin to Debt or to Equity a consensus of the FASB Emerging Issues Task Force. For hybrid financial instruments issued in the form of a share, an entity (an issuer or an investor) should determine the nature of the host contract by considering all stated and implied substantive terms and features of the hybrid financial instrument, weighing each term and feature on the basis of relevant facts and circumstances. In evaluating the stated and implied substantive terms and features, the existence or omission of any single term or feature does not necessarily determine the economic characteristics

ROUST CORPORATION
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
*All amounts are expressed in thousands US dollars, except share and per share information*

and risks of the host contract. Although an individual term or feature may weigh more heavily in the evaluation on the basis of facts and circumstances, an entity should use judgment based on an evaluation of all the relevant terms and features. The effects of initially adopting the amendments in this update should be applied on a modified retrospective basis to existing hybrid financial instruments issued in the form of a share as of the beginning of the fiscal year for which the amendments are effective. Retrospective application is permitted to all relevant prior periods. The amendments in this update are effective for public business entities for fiscal years, and interim periods within those fiscal years, beginning after December 15, 2015. Early adoption, including adoption in an interim period, is permitted. The Company will analyze and implement, when relevant, requirements of ASU 2014-16 for the first time in the fiscal year, beginning after December 15, 2015.

In August 2014 FASB issued ASU 2014-15—Presentation of Financial Statements—Going Concern (Subtopic 205-40). The update provides US GAAP guidance on management's responsibility in evaluating whether there is substantial doubt about a company's ability to continue as a going concern and about related footnote disclosures. For each reporting period, management will be required to evaluate whether there are conditions or events that raise substantial doubt about a company's ability to continue as a going concern within one year from the date the financial statements are issued. The amendments in this update are effective for all entities for the annual period ending after December 15, 2016, and for annual periods and interim periods thereafter. Early application is permitted. The Company's current procedures related to evaluation and disclosures related to going concern meet most of requirements of ASU 2014-15. Full compliance with the ASU 2014-15 is planned to be achieved in 2016 annual financial statements.

In August 2014 FASB issued ASU 2014-13—Consolidation (Topic 810) Measuring the Financial Assets and the Financial Liabilities of a Consolidated Collateralized Financing Entity; a consensus of the FASB Emerging Issues Task Force. The amendments in this update apply to a reporting entity that is required to consolidate a collateralized financing entity under the Variable Interest Entities Subsections of Subtopic 810-10 when (1) the reporting entity measures all of the financial assets and the financial liabilities of that consolidated collateralized financing entity at fair value in the consolidated financial statements based on other Topics and (2) the changes in the fair values of those financial assets and financial liabilities are reflected in earnings. A reporting entity that consolidates a collateralized financing entity within the scope of this update may elect to measure the financial assets and the financial liabilities of that collateralized financing entity using either the measurement alternative included in this update or Topic 820 on fair value measurement. When the measurement alternative is not elected for a consolidated collateralized financing entity within the scope of this update, the amendments clarify that (1) the fair value of the financial assets and the fair value of the financial liabilities of the consolidated collateralized financing entity should be measured using the requirements of Topic 820 and (2) any differences in the fair value of the financial assets and the fair value of the financial liabilities of that consolidated collateralized financing entity should be reflected in earnings and attributed to the reporting entity in the consolidated statement of income (loss). The amendments in this update are effective for public business entities for annual periods, and interim periods within those annual periods, beginning after December 15, 2015. This update does not impact ROUST as the Company does not consolidate any collateralized financing entity at the moment. The Company will continue to monitor if the ASU 2014-13 becomes applicable.

In June 2014 FASB issued ASU 2014-12, Compensation—Stock Compensation (Topic 718); Accounting for Share-Based Payments When the Terms of an Award Provide That a Performance Target Could Be achieved after the Requisite Service period a consensus of the FASB Emerging Issues Task Force. This update is not applicable to ROUST at the moment. There are no share-based payments granted to the Company's employees.

In June 2014 FASB issued ASU 2014-11, Transfers and Servicing (Topic 860). The amendments in this update require that repurchase-to-maturity transactions are accounted for as secured borrowings consistent with the accounting for other repurchase agreements. In addition, the amendments require separate accounting for a transfer of a financial asset executed contemporaneously with a repurchase agreement with the same counterparty (a repurchase financing), which will result in secured borrowing accounting for the repurchase agreement. The amendments require an entity to disclose information about transfers accounted for as sales in transactions that are economically similar to repurchase agreements, in which the transferor retains substantially all of the exposure to the economic return on the transferred financial asset throughout the term of the transaction. In addition, the amendments require disclosure of the types of collateral pledged in repurchase agreements, securities lending transactions, and repurchase-to-maturity transactions and the tenor of those transactions. The accounting changes in

ROUST CORPORATION
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
*All amounts are expressed in thousands US dollars, except share and per share information*

this update are effective for public business entities for the first interim or annual period beginning after December 15, 2014. The Company will analyze and implement the requirements of ASU 2014-11 in 2015 upon occurrence of the event subject to the update.

In May 2014 FASB issued ASU 2014-09, Revenue from Contracts with Customers (Topic 606). The core principle of this update is that an entity should recognize revenue to depict the transfer of promised goods or services to customers in an amount that reflects the consideration to which the entity expects to be entitled in exchange for those goods or services. The guidance in this update also improves US GAAP by reducing the number of requirements an entity must consider in recognizing revenue. Additionally, the guidance requires improved disclosures to help users of financial statements better understand the nature, amount, timing, and uncertainty of revenue that is recognized. ASU 2014-09 is effective for annual reporting periods beginning after December 15, 2016, including interim periods within that reporting period. Early application is not permitted. The Company analyzed the requirements of ASU 2014-09 and believes they will not have a significant impact on the Company's results.

In April 2014 FASB issued ASU 2014-08, Presentation of Financial Statements (Topic 205) and Property, Plant, and Equipment (Topic 360): Reporting Discontinued Operations and Disclosures of Disposals of Components of an Entity. The update changes the criteria for reporting discontinued operations while enhancing disclosures in this area. It also addresses sources of confusion and inconsistent application related to financial reporting of discontinued operations guidance in US GAAP. This update is effective for annual periods beginning on or after December 15, 2014 and interim periods within that year. As of December 31, 2014 the Company does not have any discontinued operations. The Company will analyze ASU 2014-08 and implement it in the future at occurrence of discontinued operations meeting the criteria of the update.

In March 2014 FASB issued ASU 2014-06, Technical Corrections and Improvements Related to Glossary Terms. This update is limited to amendments related to the Master Glossary, including technical corrections related to glossary links, glossary term deletions, and glossary term name changes. The changes incorporated by this update aim to clarify the codification or to correct unintended application of guidance and are not expected to have a significant effect on current accounting practice or create a significant administrative cost to the entity. This update does not have transition guidance and is effective upon issuance. The Company adopted ASU 2014-06 during the first quarter of current year. The adoption of ASU 2014-06 did not have an impact on the Company's consolidated financial statements.

Other accounting pronouncements that have been issued since the last annual report for the year ended December 31, 2013 have no impact on the Company's consolidated financial statements nor are expected to have an impact on the Company's consolidated financial statements in future periods.

## 2.    *REORGANIZATION AND EMERGENCE FROM CHAPTER 11*

**Emergence from Reorganization Proceedings**

On April 7, 2013 (the "Petition Date"), Roust Corporation and its two wholly owned subsidiaries, CEDC Finance Corporation International Inc. and CEDC Finance Corporation LLC (the "Debtors") filed Chapter 11 cases under the Bankruptcy Code in the Bankruptcy Court in Delaware in order to effectuate the Debtors' prepackaged Plan of Reorganization (the "Plan" or "Plan of Reorganization"). The Chapter 11 cases were jointly administered under the caption "In re: Central European Distribution Corporation, et al." Case No. 13-10738. The Plan of Reorganization was confirmed by the Bankruptcy Court on May 13, 2013. The Plan became effective when all material conditions to it were satisfied and the Debtors emerged from bankruptcy protection on June 5, 2013 (the "Effective Date").

Upon emergence from bankruptcy protection, the Company adopted the "fresh start accounting" provisions of ASC 852. Under fresh start accounting, a new reporting entity was deemed to have been created and all assets and liabilities were revalued to their fair values. Accordingly, the consolidated financial statements for the reporting entity pre-emergence are not comparable to the consolidated financial statements for the reporting entity post-emergence. ASC 852 requires that the financial statements for periods subsequent to the filing of a Chapter 11 petition and prior to the Effective Date distinguish transactions and events that are directly associated with the reorganization from the ongoing operations of the business. Revenues, expenses (including professional fees),

ROUST CORPORATION
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
*All amounts are expressed in thousands US dollars, except share and per share information*

realized gains and losses, and provisions for losses that can be directly associated with the reorganization and restructuring of the business must be reported separately as reorganization items in the consolidated statements of operations. The consolidated balance sheet must distinguish prepetition liabilities subject to compromise from both those pre-petition liabilities that are not subject to compromise and from post-petition liabilities. Liabilities that may be affected by the Plan must be reported at the amounts expected to be allowed, even if they may be settled for lesser amounts. In addition, cash provided by reorganization items must be disclosed separately in the consolidated statement of cash flows.

## Chapter 11 Reorganization Items

In accordance with ASC 852, reorganization items are presented separately in the accompanying consolidated statements of operations and include expenses, gains and losses directly related to the Debtors' reorganization proceedings. A summary of reorganization items, net for the Predecessor is shown below:

|  | Predecessor One hundred fifty-six days ended June 5, 2013 |
|---|---|
| Gain on settlement of prepetition liabilities upon emergence (a) | $      509,260 |
| Revaluation of assets and liabilities (b) | (233,351) |
| Professional and other fees directly related to reorganization (c) | (62,636) |
| **Total Reorganization Items** | **$      213,273** |

a)   Net gain on prepetition liabilities reflects amounts related to the settlement of prepetition obligations pursuant to the Plan of Reorganization, net of fair value of consideration. For details refer to paragraph "Effects of Plan Adjustments" included further in Note 3.

b)   The revaluation of assets and liabilities relates to the fresh start adjustments in accordance with ASC 852. For details refer to paragraph "Effects of Plan Adjustments" included in Note 3.

c)   Professional and other fees comprise legal costs of $33.2 million, financial and assurance fees of $7.9 million, consent fee of $4.4 million, investment advisory fees of $11.9 million and other professional costs of $5.2 million directly associated with the reorganization process. The consent fee in the amount of $4.4 million relates to consents to the Covenant Amendments, the Collateral and Guarantee Amendments and the Bankruptcy Waiver Amendments, each as defined in the Amended and Restated Offering Memorandum, Consent Solicitation Statement and Disclosure Statement, dated March 8, 2013, filed as an exhibit to a tender offer statement on Schedule TO-I/A on March 8, 2013, as amended and supplemented by Supplement No. 1 to the Offering Memorandum, dated March 18, 2013, filed as an exhibit to the Form 8-K filed on March 19, 2013.

## Liabilities Subject to Compromise

Liabilities subject to compromise refers to those liabilities which were addressed through the bankruptcy process. ASC 852 requires pre-petition liabilities, including those that became known after filing the Chapter 11 petitions, which are subject to compromise to be reported at the amounts expected to be allowed, even if they may be settled for lesser amounts. These liabilities represent the estimated amounts expected to be resolved on known or potential claims through the Chapter 11 process and remain subject to future adjustments from negotiated settlements, actions of the Bankruptcy Court and non-acceptance of certain executory contracts and unexpired leases.

|  | Predecessor June 5, 2013 |
|---|---|
| Senior Secured Notes due 2016 | $       960,700 |
| Convertible Senior Notes due 2013 | 262,177 |
| Other debt | 71,243 |
| **Total Liabilities Subject to Compromise** | **$    1,294,120** |

## Discharge and Treatment of Claims

Pursuant to and by operation of the Plan of Reorganization, all of the Predecessor Company's existing equity securities, including common stock and stock options, were extinguished and deemed cancelled. On the Effective Date, in accordance with the Plan:

ROUST CORPORATION
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
*All amounts are expressed in thousands US dollars, except share and per share information*

- Roust Trading Ltd. ("RTL") made a $172.0 million cash investment and exchanged the $50.0 million secured credit facility provided by RTL to ROUST pursuant to the facility agreement dated March 1, 2013 (the "RTL Credit Facility") for new shares of common stock of the Company, with the proceeds of the $172.0 million used to fund the cash consideration in the exchange offer for Senior Secured Notes due 2016 ("SSN") described below;

- all SSN representing approximately $960.7 million, including interest, were exchanged for (i) Senior Secured Notes due 2018 ("New Senior Secured Notes" or "NSSN") in aggregate principal amount equal to $464.6 million; (ii) 10% Convertible Junior Secured Notes due 2018 ("New Convertible Junior Secured Notes" or "NCJSN") in aggregate principal amount equal to $200.0 million; and (iii) $172.0 million in cash;

- all 3% Convertible Senior Notes due 2013 ("CSN") and the $20.0 million aggregate principal amount of ROUST Senior Notes due March 18, 2013 (the "RTL Notes") were exchanged for their pro rata share (based upon the approximate $282.2 million sum of aggregate principal amount of CSN and the RTL Notes outstanding and accrued interest calculated through April 7, 2013) and RTL Notes of $16.9 million in cash, which was funded separately by RTL; and

- in exchange for the investment described above, RTL and its affiliates received new shares of common stock of the Company representing 100% of the reorganized ROUST.

## 3.    *FRESH START ACCOUNTING*

As discussed in Note 2, Reorganization and Emergence from Chapter 11, the Debtors emerged from Chapter 11 on June 5, 2013. In accordance with ASC 852, the Company adopted fresh start accounting and adjusted the historical carrying value of its assets and liabilities to their respective fair values at the Effective Date. Simultaneously, the Company determined the fair value of its equity at the Effective Date. For financial reporting convenience, the Company elected to use May 31, 2013 financial and tax accounting records, adjusted for the effects of the June 5, 2013 Plan of Reorganization, as the basis for the June 5, 2013 fresh start financial presentation. As a result, the Company recorded fresh start accounting adjustments to historical carrying values of assets and liabilities using market prices, discounted cash flow methodologies based primarily on observable market information and, to a lesser extent, unobservable market information, and other techniques. The adoption of fresh start accounting results in a new reporting entity. The financial statements as of June 5, 2013 and for subsequent periods report the results of a new entity with no beginning retained earnings.

The Bankruptcy Court confirmed the Plan based upon an estimated enterprise value of the Company between $840.0 million and $1,050.0 million, which was estimated using various valuation methods, including (i) a comparison of the Company and its projected performance to the market values of comparable companies; (ii) a review and analysis of several recent transactions of companies in similar industries to the Company; and (iii) a calculation of the present value of the future cash flows of the Company based on its projections for years ending 2013 through 2017. Based upon a subsequent evaluation of relevant factors used in determining the range of enterprise value and updated expected cash flow projections, the Company concluded the enterprise value, or fair value, was $892.2 million including cash and short-term securities of $70.4 million, as of June 5, 2013.

The basis of the discounted cash flow analysis used in developing the enterprise value was based on Company prepared projections which included a variety of estimates and assumptions. While the Company considers such estimates and assumptions reasonable, they are inherently subject to significant business, economic and competitive uncertainties, many of which are beyond the Company's control and, therefore, may not be realized. Changes in these estimates and assumptions may have had a significant effect on the determination of the Company's enterprise value. The assumptions used in the calculations for the discounted cash flow analysis, which had the most significant effect on our estimated enterprise value, included the following: forecasted revenue, costs and free cash flows through 2017, discount rate of 12.9% that considered various factors, including bonds yields, risk premium and tax rates. A terminal value was determined using a blended long-term growth rate of 4.1%. The long-term growth rate was based on the internal projections, expected inflation rates and industry growth prospects.

The four-column condensed consolidated statement of financial position as of June 5, 2013 included herein, applies the effects of the Plan and fresh start accounting to the carrying values and classifications of assets or

ROUST CORPORATION
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
*All amounts are expressed in thousands US dollars, except share and per share information*

liabilities. Upon adoption of fresh start accounting, the recorded amounts of assets and liabilities were adjusted to reflect their estimated fair values. Accordingly, the reported historical financial statements of the Predecessor Company prior to the adoption of fresh start accounting for periods ended on or prior to June 5, 2013 are not comparable to those of the Successor Company.

In applying fresh start accounting, the Company followed these principles:

- The reorganization value, which represents the concluded enterprise value plus excess cash and cash equivalents and non-interest bearing liabilities, of the entity was allocated to the entity's reporting units in conformity with ASC Topic 805, *Business Combinations*. The reorganization value exceeded the sum of the fair value assigned to assets and liabilities. This excess was recorded as Successor Company goodwill as of June 5, 2013.

- Each liability existing as of the fresh start accounting date, other than deferred taxes, has been stated at the fair value, and determined at appropriate risk adjusted interest rates.

- Deferred taxes were reported in conformity with applicable income tax accounting standards, principally ASC 740. Deferred tax assets and liabilities have been recognized for differences between the assigned values and the tax basis of the recognized assets and liabilities.

- Fresh start accounting resulted in the selection of appropriate policies for the Successor. The significant policies disclosed in the Predecessor Company's audited financial statements for the year ended December 31, 2012, were adopted by the Successor Company.

The following four-column condensed consolidated statement of financial position table identifies the adjustments recorded to the Predecessor's June 5, 2013 consolidated statement of financial position as a result of implementing the Plan and applying fresh start accounting:

| | Predecessor June 5, 2013 | Effects of Plan | | Fresh Start | | Successor June 5, 2013 |
|---|---|---|---|---|---|---|
| ASSETS | | | | | | |
| Current Assets | | | | | | |
| Cash and cash equivalents | $69,670 | $0 | | $0 | | $69,670 |
| Accounts receivable | 166,816 | 0 | | (1,219) | (f) | 165,597 |
| Restricted cash | 226 | 172,000 | (a) | 0 | | 172,226 |
| Inventories | 134,307 | 0 | | 19,643 | (g) | 153,950 |
| Prepaid expenses | 26,174 | 0 | | (4,185) | (f) | 21,989 |
| Income taxes receivable | 10,642 | 0 | | (1,612) | | 9,030 |
| Other current assets | 105,525 | 0 | | (480) | (f) | 105,045 |
| Deferred income taxes | 5,412 | 0 | | (2,644) | (h) | 2,768 |
| | | | | | | |
| Total Current Assets | 518,772 | 172,000 | | 9,503 | | 700,275 |
| | | | | | | |
| Intangible assets, net | 433,706 | 0 | | (99,596) | (i) | 334,110 |
| Goodwill | 368,337 | 0 | | (109,012) | (j) | 259,325 |
| Property, plant and equipment, net | 157,281 | 0 | | (28,161) | (k) | 129,120 |
| Other non-current assets | 750 | 0 | | 0 | | 750 |
| Deferred income taxes, net | 503 | 0 | | 481 | (h) | 984 |
| | | | | | | |
| Total Non-Current Assets | 960,577 | 0 | | (236,288) | | 724,289 |
| | | | | | | |
| **Total Assets** | **$1,479,349** | **$172,000** | | **$(226,785)** | | **$1,424,564** |
| | | | | | | |
| LIABILITIES AND EQUITY | | | | | | |
| Current Liabilities | | | | | | |
| Trade accounts payable | $64,497 | $0 | | $0 | | $64,497 |
| Bank loans and overdraft facilities | 91,156 | 0 | | 0 | | 91,156 |
| Deferred income taxes | 880 | 0 | | (142) | (h) | 738 |
| Income taxes payable | 2,356 | 0 | | 0 | | 2,356 |
| Taxes other than income taxes | 80,367 | 0 | | 0 | | 80,367 |
| Other accrued liabilities | 76,774 | 0 | | 0 | | 76,774 |
| Other current liabilities | 68,803 | 172,000 | (a) | 0 | | 240,803 |
| Current portions of obligations under capital leases | 808 | 0 | | 0 | | 808 |

ROUST CORPORATION
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

*All amounts are expressed in thousands US dollars, except share and per share information*

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Liabilities subject to compromise | 1,294,120 | (1,294,120) | (c) | 0 | | | 0 |
| Total Current Liabilities | 1,679,761 | (1,122,120) | | (142) | | | 557,499 |
| Long-term obligations under capital leases | 624 | 0 | | 0 | | | 624 |
| Long-term obligations under New Convertible Secured Notes | 0 | 200,000 | (b) | 0 | | | 200,000 |
| Long-term obligations under New Secured Notes | 0 | 464,590 | (b) | 0 | | | 464,590 |
| Long-term accruals | 839 | 0 | | 0 | | | 839 |
| Long term income taxes payable | 7,586 | 0 | | 0 | | | 7,586 |
| Deferred income taxes | 96,030 | 0 | | (22,874) | | (h) | 73,156 |
| Total Long-Term Liabilities | 105,079 | 664,590 | | (22,874) | | | 746,795 |
| Temporary equity | 29,443 | (29,443) | (d) | **0** | | | **0** |
| Stockholders' Equity | | | | | | | |
| Predecessor common stock | 761 | (761) | (d) | 0 | | | 0 |
| Successor common stock | 0 | 0 | | 0 | | | 0 |
| Additional paid-in-capital | 1,372,786 | (1,252,516) | (d) | 0 | | | 120,270 |
| Accumulated deficit | (1,744,820) | 1,912,100 | (e) | (167,280) | | (l) | 0 |
| Accumulated other comprehensive income | 36,489 | 0 | | (36,489) | | (l) | 0 |
| Less Treasury Stock | (150) | 150 | (d) | 0 | | | 0 |
| Total Stockholders' Equity | (334,934) | 658,973 | | (203,769) | | (l) | 120,270 |
| **Total Liabilities and Equity** | **$1,479,349** | **$172,000** | | **$(226,785)** | | | **$1,424,564** |

## Effects of Plan Adjustments

(a) Reflects the cash infusion from RTL which was paid to holders of the SSN claims by June 20, 2013 and the corresponding short term accrual.

(b) Issuance of New Senior Secured Notes and New Convertible Junior Secured Notes for satisfaction of the SSN claims.

(c) The adjustment to liabilities subject to compromise relates to the extinguishment of the 2016 Senior Secured Notes, 2013 Convertible Notes, RTL Credit Facility and RTL Notes. The 2016 Senior Secured Notes were settled with new debt and cash, the 2013 Convertible Senior Notes and RTL Notes were settled with cash and the RTL Credit Facility along with the RTL cash investment were settled with new common stock at emergence.

(d) Pursuant to the Plan, the Company's common stock was cancelled and new common stock of the Company was issued. The adjustment eliminated the Predecessor Company's common stock, treasury stock, additional paid-in-capital and temporary equity of $0.8 million, ($0.2) million, $1,372.8 million, and $29.4 respectively, and recorded the Successor Company's common stock and additional paid-in-capital of $120.3 million, which represents the fair value of the newly issued common stock.

(e) As a result of the Plan, the adjustment to accumulated deficit recorded the elimination of the Predecessor Company's common stock, treasury stock and additional paid-in-capital and the gain on extinguishment of debt, offset by the issuance of the Successor Company's new common stock, New Senior Secured Notes and New Convertible Junior Secured Notes.

*Extinguishment of Predecessor claims pursuant to the Plan:*

| | |
|---|---|
| Senior Secured Notes due 2016 | $(960,700) |
| Convertible Senior Notes 2013 | (262,177) |
| RTL Credit Facility | (50,175) |
| RTL Notes | (21,068) |
| **Total liabilities subject to compromise** | **(1,294,120)** |

ROUST CORPORATION
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
*All amounts are expressed in thousands US dollars, except share and per share information*

*Establishment of Successor obligations pursuant to the Plan:*

| | | |
|---|---|---|
| New Senior Secured Notes | $464,590 | |
| New Convertible Junior Secured Notes | 200,000 | |
| Issuance of New Common Stock | 120,270 | |
| **Total settlements on debt** | | 784,860 |
| | | |
| **Gain on settlement of prepetition liabilities** | | **$(509,260)** |
| | | |
| Other adjustments to accumulated deficit: | | |
| Extinguishment of Predecessor common stock and paid-in-capital | | $(1,402,840) |
| | | |
| **Accumulated deficit change at emergence** | | **$(1,912,100)** |

**Fresh Start Adjustments**

(a)     Decrease in accounts receivable, prepayments and other current assets represent expected slowdown or termination of contracts directly related to the plan.

(b)     Inventories were mainly valued using comparative sales method which utilizes the expected selling prices to customers as a basis for valuing finished goods. The basis is adjusted for relevant factors such as costs to complete and time to dispose of inventory and a reasonable profit margin on the selling and disposal efforts. An adjustment of $19.6 million was recorded to increase the book value of inventories to fair value.

(c)     Primarily reflects the tax effects of the fresh start adjustments at statutory tax rates applicable to such adjustments, net of adjustments to the valuation allowance.

(d)     Reflects the fair value of identifiable intangible assets in connection with fresh start accounting. The Company's primary intangible is its trade names which were valued using the relief from royalty method. The significant assumptions used in this method included:

   a.     forecasted revenue for each trade name,

   b.     royalty rates, which were derived using the results of the profit split analysis, analysis of market comparable transactions and analysis of internal transactions,

   c.     discount rates ranging from 12.6% to 18.6% based on the average cost of capital, adjusted for perceived business risks related to these intangible assets, and

   d.     indefinite economic life for our trade names.

(e)     Adjustment eliminated the balance of Predecessor Company goodwill and recorded Successor Company reorganization value in excess of amounts allocated to identified tangible and intangible assets, also referred to as Successor Company goodwill. The Successor Company's June 5, 2013 statement of financial position reflects the allocation of the business enterprise value to assets and liabilities immediately following emergence as follows:

| | |
|---|---|
| **Business enterprise value** | **$892,235** |
| Add: Fair value of liabilities excluded from enterprise value | 554,802 |
| Less: Fair value of tangible assets | (853,602) |
| Less: Fair value of identified intangible assets | (334,110) |
| **Reorganization value of assets in excess of amounts allocated to identified tangible and intangible assets (Successor Company goodwill)** | **$259,325** |

(f)     Reflects the fair values of property, plant and equipment in connection with fresh start accounting. Fair value estimates were based on the following valuation methods:

ROUST CORPORATION
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
*All amounts are expressed in thousands US dollars, except share and per share information*

a.  Land was valued using the market approach which was primarily based on pertinent local sales and listing data.

b.  Other real property such as buildings, building improvements, and leasehold improvements were valued using either: 1) current market cost to construct improvements where information regarding size, age, construction type, etc. was available and 2) current market trending indices applied to historical capital costs where such detailed information was not available.

c.  Computer hardware and software were valued using a percent of cost market approach.

d.  Other personal property such as equipment and furniture and fixtures were valued using the cost approach based on replacement costs and current market trending indices.

(g)  The Predecessor Company's accumulated deficit and accumulated other comprehensive income is eliminated in conjunction with the adoption of fresh start accounting. The Predecessor Company recognized a pre-tax loss of $233.4 million related to fresh start accounting adjustment as follows:

| | |
|---|---:|
| Establishment of Successor Company's goodwill | $(259,325) |
| Elimination of Predecessor Company's goodwill | 368,337 |
| Establishment of Successor Company's other intangible assets | (334,110) |
| Elimination of Predecessor Company's other intangible assets | 433,706 |
| Inventory adjustments | (19,643) |
| Property, plant and equipment adjustments | 28,161 |
| Other fair value adjustments | 7,496 |
| Currency translation adjustments | 8,729 |
| **Pre-tax loss on fresh start accounting adjustments** | **$233,351** |
| | |
| Deferred tax adjustments | (20,853) |
| | |
| Less: Fresh start currency translation adjustments | (8,729) |
| **Fresh start accounting stockholder's equity adjustment** | **$203,769** |

## 4.   ACQUISITION UNDER COMMON CONTROL

**Acquisition of Roust Inc.**

As a part of its strategy to further expand its marketing strength and product portfolio in key markets, on June 30, 2014 the Company completed its acquisition of Roust Inc. from RTL. As described in Note 1 above, to effect the transaction on June 30, 2014, Pasalba Limited, a wholly-owned subsidiary of ROUST acquired all of the outstanding shares of Roust Inc. from RTL, pursuant to a Share Purchase Agreement, dated May 26, 2014 among the Company, RTL and certain subsidiaries of the Company and RTL.

Before ROUST entered into this agreement the board of directors of the Company engaged an independent US investment bank to perform a valuation of the Roust Inc. business and issue a fairness opinion on its valuation. The independent valuation developed a fair value range to support the Company in the acquisition process. Based on the independent valuation and the Company's strategic objectives, an aggregate purchase price for Roust Inc. was agreed at $250.0 million, consisting of cash consideration and consideration in-kind. $9.5 million of the cash consideration is expected to be paid post-closing by December 31, 2014 and is subject to a purchase price adjustment. Roust Inc. was and continues to be after the transaction a guarantor to certain Related Parties (as defined in Note 16). The outstanding guarantees were taken into account when calculating the accretive effect of the transaction as required by our New Notes indentures.

Roust Inc. is a 20 year old sales and distribution company and a leader in the spirits distribution business in Russia, which has helped to build many existing premium alcohol brands. Currently Roust Inc. is distributing the market leading premium vodka Russian Standard, the fast growing Gancia brand, Remy range, Jägermeister, Whyte and Mackay whiskies, Concha Y Toro wines, Constellation wines, Jose Cuervo and Sierra tequilas, Sevan Armenian brandy, DeKuyper spirits and a number of other leading premium spirit brands.

ROUST CORPORATION
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
*All amounts are expressed in thousands US dollars, except share and per share information*

ROUST has now acquired Roust Inc., giving ROUST the opportunity to combine a large vodka business, with a premium spirits business, in the same manner as the Polish and Hungarian ROUST business units currently operate. Premium spirits, wine, whiskey and cognac have in general been growing faster than the vodka market in the last five years in Russia, giving ROUST access to faster growth alcohol categories. Russian Standard Vodka and many of the premium spirit brands have a higher margin per case than our core Russian alcohol business. With no excise tax increases in the next two years, we believe there is substantial opportunity to drive volume growth for these new brands. ROUST and Roust Inc. combined were able to significantly reduce the combined cost base and drive operating improvements to both businesses.

Strategically, the transaction led to diversification of its portfolio in the Russian segment of operations and provided enhanced opportunities for expansion in the Russian market through the integration of sales, back office and route to market opportunities. For the 12 month period ended March 31, 2014, the transaction was accretive to our earnings to fixed charge coverage ratio (as defined in our New Notes indentures), and is expected to be accretive to our overall earnings and cash flows in the future. Historically, as a private company Roust Inc. was not required to report, and did not report, it's operating results on a regular basis. The historical results of the Roust Inc. business have been included herein based on the actual results of Roust Inc. for the applicable periods, no adjustments have been made to the historical results to reflect the nature of the synergies between the Company and Roust Inc. or the savings that have already been captured through the integration of Roust Inc. and the Company's existing operations. In addition, as the accounting for the transaction is based on historical values due to the common control, our financial statements do not reflect any fair value adjustments that would be necessary if, for example, we were required to use purchase accounting.

All subsidiaries of ROUST are currently considered "Restricted Subsidiaries". Whitehall Holdings and its subsidiaries (collectively "Whitehall Group"), which, starting from October 3, 2013 were "Unrestricted Subsidiaries", became re-restricted as a result of the Roust acquisition. ROUST and its Restricted Subsidiaries are not required to maintain any specific financial ratios, but are restricted from taking certain actions (e.g., incurring additional debt, paying dividends) unless they meet an exception from the relevant restrictions. For more details on restrictive covenants please see note 14 "Notes and Borrowings".

**Presentation of Results of Operations after the Transaction**

RTL is the sole shareholder of Roust Inc. and ROUST, therefore for accounting purposes, the acquisition was accounted for under the "as if pooling-of-interest" method of accounting applicable to the transfer of assets or exchange of equity interests between entities under common control. Under the "as if pooling-of-interest" method of accounting, the value of the assets and liabilities transferred is recognized at historical carrying costs as of the date of the transfer, rather than at fair value.

In accordance with US GAAP common control of Roust Inc. and ROUST is deemed to have existed since June 5, 2013, the date that RTL acquired ROUST. As a result, the subsequent transfer of the assets and liabilities was accounted for "as if pooling-of-interest" at Roust Inc's. historical cost at June 5, 2013, including its necessary consolidation adjustments. Accordingly, the consolidated financial statements of ROUST beginning as of June 5, 2013 have been recast to include the balance sheet, results of operations and cash flows of Roust Inc. for the subsequent periods.

The Roust Inc. transaction has an economic value of $250.0 million, however that value is not reflected in our accompanying financial statements as an asset. The treatment of an acquisition on a common control basis versus the traditional approach of fair valuing the assets acquired and liabilities assumed is based on the concept that because there is a controlling shareholder on both seller and buyer sides of the transaction, the transaction misses the fundamental, third party aspect to validate its value. However, as required by the indentures of our long-term debt, the Company provided significant governance efforts around the transaction to ensure that all parties were treated on an arm's length basis. In particular, the valuation of Roust Inc. was subject to an independent third party assessment that was used as the basis to negotiate the final purchase price. Under common control accounting, and different from the typical purchase accounting in an acquisition, the "difference" between the historical net assets of the acquired company and the total consideration paid is charged to equity, whereas in the typical acquisition accounting, the net assets are fair valued and the difference goes to goodwill. The effect on the balance sheet for a common control transaction, therefore, is that net equity will typically be lower than in a purchase accounting situation. In effect, under common control the goodwill (or "premium" paid over the historical net assets) is written

ROUST CORPORATION
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
*All amounts are expressed in thousands US dollars, except share and per share information*

off to equity on the date of the combination. The Company recognized $258.3 million, being the difference between net assets of the acquired entity and consideration paid, as a decrease in equity (out of which $218.0 million was charged to additional paid in capital and $40.3 was charged to retained earnings). Therefore, the common control treatment of the transaction has substantially decreased our book equity, despite the fact that the transaction has an economic value of $250.0 million.

**Significant Changes in Shareholder's Equity**

As noted immediately above, the accounting for the Roust Inc. acquisition under common control resulted in the excess of the purchase price of the transaction of $250.0 million over the book value of Roust Inc. being charged immediately to our stockholders' equity. In addition, as the accounting is under common control, the stockholders' equity is recast to show the combined equity of ROUST and Roust Inc. from the date of our emergence from bankruptcy (the periods prior to our emergence did not change). The Company engaged an independent US investment bank to perform an evaluation of the Roust Inc. business and issue a fairness opinion on its valuation.

Consolidated Statements of Changes in Stockholders' Equity / (Deficit) represents the significant changes in our equity post emergence due to the Roust Inc. acquisition (note that the common stock shares of 10,000 and common stock par value of less than one thousand USD are not shown separately).

Our combined shareholder's equity, immediately before the book keeping entry for the Roust Inc. common control acquisition, was a retained deficit of approximately $23.1 million.

## 5.    RESTRICTED CASH

As of December 31, 2013 the Company had $1.0 million of deposits for custom office and $0.4 million restricted for settlements to suppliers and $0.2 million of bank guarantees. As of December 31, 2014 the Company had $0.8 million of deposits for custom office, $0.4 million of other restricted cash and $0.9 million of bank guarantees. The Company has presented these funds as restricted cash since the use of the funds is restricted to pre-determined use.

## 6.    ACCOUNTS RECEIVABLE

**Sale of Accounts Receivable (Factoring)**

From time to time the Company enters into factoring arrangements with financial institutions to sell trade accounts receivable under recourse and non-recourse agreements. As of December 31, 2013 and December 31, 2014 the Company was a party to the following factoring agreements:

ROUST CORPORATION
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
*All amounts are expressed in thousands US dollars, except share and per share information*

| Party to the agreement | Date of signing the agreement | Recourse/ Non-recourse | Financing limit under the Agreement | Status as of December 31, 2013 (Successor) | Status as of December 31, 2014 (Successor) |
|---|---|---|---|---|---|
| ING Polska | June 2011 | non-recourse | none | active | active |
| Bank Handlow y w Warszaw ie Spółka Akcyjna ("Bank Handlow y") | January 2012 | non-recourse | none | active | active |
| Bank Zachodni WBK S.A. | August 2012 | non-recourse | none | active | active |
| RBS Bank | January 2013 | non-recourse | 60 million Polish zlotys till April 14, 2013; 82 million Polish zlotys till November 4, 2013; 150 million Polish zlotys till January 13, 2014; 200 million Polish zlotys till March 31, 2014; 190 million Polish zlotys till May 4, 2014 and 180 million Polish zlotys since May 5, 2014 (as per appendix signed) | active | active |
| ING Polska | February 2013 | recourse/non-recourse | initially only service factoring w ithout financing; 20 million Polish zlotys since December 2013; 37 million Polish zlotys since August 2014 (recourse option added as per appendix signed) | active | active |
| RBS Bank | March 2013 | non-recourse | none | active | active |
| Bank Handlow y | April 2013 | non-recourse | none | active | active |
| Citibank Dublin | May 2014 | non-recourse | none | active | active |
| Pekao Faktoring Sp. z o.o. | October 2014 | non-recourse | 30 million Polish zlotys | active | active |
| Pekao Faktoring Sp. z o.o. | October 2014 | recourse | 60 million Polish zlotys till December 22, 2014; 95 million Polish zlotys till January 15, 2015; 75 million Polish zlotys till February 15, 2015; and 60 million Polish zlotys since February 16, 2015 (as per appendix signed) | active | active |
| Alfa Bank | December 2013 | recourse | 5,000 million Russian rubles | active | active |
| Promsvyaz Bank | June 2014 | recourse | 135 million Russian rubles | active | active |
| MDM | October 2014 | recourse | 800 million Russian rubles | active | active |
| FC Otkrytie (Nomos Bank) | October 2014 | recourse | 500 million Russian rubles | active | active |
| Raiffeisen Bank Zrt | October 2014 | recourse | 440 million Hungarian forints | active | active |

The Company has no continuing involvement with the receivables sold under non-recourse factoring agreements.

The recourse factoring with Alfa Bank existing as of December 31, 2013 and December 31, 2014 as well as recourse factoring agreements with Promsvyaz Bank, MDM, and FC Otkrytie existing as of December 31, 2014, were not qualified as a secured borrowing. As a result the underlying receivables were derecognized and no liability was recognized.

During the twelve month period ended December 31, 2014 certain customers repaid the factored amounts to the Company instead of the factor. As a result the Company has a liability of $24.9 million, which is presented as other borrowings in our balance sheet as of December 31, 2014 (for details refer to Note 1, section "Critical Accounting Polices" and Note 14 "Notes and Borrowings").

Amounts of receivables sold during the period and the loss on sale recognized in the statement of operations and comprehensive income were as follows:

| | | Predecessor | Successor | |
|---|---|---|---|---|
| | Year ended December 31, 2012 | one hundred fifty-six-day period ended June 5, 2013 | Two hundred and nine days ended December 31, 2013 as recast | Year ended December 31, 2014 |
| Receivables sold during the period | $ 410,400 | $ 171,541 | $ 464,646 | $ 1,027,363 |
| Loss on sale | $ 3,400 | $ 1,498 | $ 3,240 | $ 11,226 |

ROUST CORPORATION
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

*All amounts are expressed in thousands US dollars, except share and per share information*

**Allowances for doubtful accounts**

Changes in the allowance for doubtful accounts during each of the three years in the period ended December 31, were as follows:

| | | Predecessor one hundred fifty-six-day period ended | Successor Two hundred and nine days ended | Year ended |
|---|---|---|---|---|
| | Year ended December 31, 2012 | June 5, 2013 | December 31, 2013 as recast | December 31, 2014 |
| Balance, beginning of period | $ 24,510 | $ 25,250 | $ 19,101 | $ 24,953 |
| Change in allowance for doubtful accounts as a result of acquisition under common control | - | - | 838 | - |
| Change in provision for bad debts | 6,436 | 601 | 4,930 | (3,559) |
| Other, including charge-offs | (8,209) | (5,250) | (2,079) | (2,674) |
| Foreign currency translation adjustments | 2,513 | (1,500) | 2,163 | (5,278) |
| **Balance, end of period** | **$ 25,250** | **$ 19,101** | **$ 24,953** | **$ 13,442** |
| of which: | | | | |
| Allowance for doubtful trade accounts receivable | 25,250 | 19,101 | 24,953 | 13,317 |
| Allowance for doubtful other accounts receivable | - | - | - | 125 |

## 7.    INVENTORIES

The following table summarizes our inventories:

| | Successor December 31, 2013 as recast | Successor December 31, 2014 |
|---|---|---|
| Raw materials and supplies | $ 17,303 | $ 12,023 |
| In-process inventories | 1,740 | 1,563 |
| Finished goods and goods for resale | 203,727 | 82,362 |
| **Total** | **$ 222,770** | **$ 95,948** |
| Inventories consigned to others | 38,768 | 239 |
| **Total inventories, including consigned to others** | **$ 261,538** | **$ 96,187** |

Because of the nature of the products supplied by the Company, great attention is paid to inventory rotation. The number of days in inventory as of December 31, 2013 amounted to 60 days as compared to 23 days as of December 31, 2014. This change is mainly due to strong control over inventories rotation and no excise tax increase.

As of December 31, 2013 and December 31, 2014 inventory consigned to others amounts to $38.8 million and $0.2 million, respectively. Consigned inventory is typically inventory placed in third party warehouse due to capacity constraints that, for local regulatory purposes, requires a formal sale. The Company still retains control over the inventory.

## 8.    PREPAID EXPENSES

The table below presents balances of our prepaid expenses.

| | Successor December 31, 2013 as recast | Successor December 31, 2014 |
|---|---|---|
| Prepaid expenses - current | $ 34,401 | $ 6,993 |
| Prepaid expenses - non current | 1,546 | 923 |
| **Total** | **$ 35,947** | **$ 7,916** |
| of which: | | |
| Prepaid to Related Parties | $ 17,604 | $ 1,025 |

ROUST CORPORATION
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
*All amounts are expressed in thousands US dollars, except share and per share information*

The prepaid expenses comprise prepaid insurance and prepaid marketing services which will be performed in future periods, as well as prepayments for goods for resale and for spirit. Prepaid expenses include prepayments to Related Parties for spirit as of December 31, 2013 and December 31, 2014 of $2.6 million and $0.5 million, respectively. Prepaid expenses include prepayments to Related Parties for purchases of goods as of December 31, 2013 and December 31, 2014 of $14.6 million and nil, respectively. Prepaid expenses include also other prepayments to Related Parties as of December 31, 2013 and December 31, 2014 of $0.4 million and $0.5 million, respectively.

## 9. OTHER CURRENT ASSETS

The table below summarizes our other current assets.

| | Successor December 31, 2013 as recast | | Successor December 31, 2014 | |
|---|---|---|---|---|
| Other accounts receivable | $ | 41,789 | $ | 23,960 |
| Short-term investments | | 501 | | - |
| VAT | | 19,248 | | 10,532 |
| Other taxes and duties | | 12,965 | | 6,223 |
| Other current assets | | 1,656 | | 146 |
| **Total** | $ | **76,159** | $ | **40,861** |

The following table summarizes other accounts receivable.

| | Successor December 31, 2013 as recast | | Successor December 31, 2014 | |
|---|---|---|---|---|
| Receivable from the insurer related to the claim described in Note 17 | $ | 10,007 | $ | - |
| Receivables related to amounts held by factors | | 4,319 | | 16,288 |
| Recharges receivable for marketing services | | 18,414 | | 4,072 |
| Receivables from subcontracted producers | | 4,026 | | 1,014 |
| Receivables from employees | | 1,042 | | 348 |
| Other receivables | | 3,981 | | 2,238 |
| **Total** | $ | **41,789** | $ | **23,960** |

## 10. INTANGIBLE ASSETS OTHER THAN GOODWILL

| | Trademarks and trademark rights | | Other Intangible assets | | Total Intangible assets |
|---|---|---|---|---|---|
| **Balance as of January 1, 2013 (Predecessor)** | $ | 452,135 | $ | 2,428 | $ | 454,563 |
| Acquisition during the period | | - | | - | | - |
| Depreciation charge for the period | | (221) | | (239) | | (460) |
| Foreign currency translation adjustment | | (19,770) | | (627) | | (20,397) |
| **Balance as of June 5, 2013 (Predecessor)** | $ | 432,144 | $ | 1,562 | $ | 433,706 |
| Fresh Start Adjustments | | (98,571) | | (1,025) | | (99,596) |
| **Balance as of June 5, 2013 (Successor)** | | 333,573 | | 537 | | 334,110 |
| Change in intangible assets as a result of acquisition under common control | | - | | 2,596 | | 2,596 |
| **Balance as of June 5, 2013 (Successor as recast)** | $ | 333,573 | $ | 3,133 | $ | 336,706 |
| Acquisition during the period | | - | | 281 | | 281 |
| Disposals during the period | $ | - | | (10) | $ | (10) |
| Depreciation charge for the period | | (381) | | (171) | | (552) |
| Impairment | | (58,319) | | - | | (58,319) |
| Foreign currency translation adjustment | $ | 4,943 | | (210) | $ | 4,733 |
| **Balance as of December 31, 2013 (Successor as recast)** | | 279,816 | | 3,023 | | 282,839 |

ROUST CORPORATION
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

*All amounts are expressed in thousands US dollars, except share and per share information*

| | Trademarks and trademark rights | Other Intangible assets | Total Intangible assets |
|---|---|---|---|
| **Balance as of January 1, 2014 (Successor as recast)** | $ 279,816 | $ 3,023 | $ 282,839 |
| Acquisition during the period | 4 | 402 | 406 |
| Disposals during the period | - | (142) | (142) |
| Depreciation charge for the period | (87) | (794) | (881) |
| Foreign currency translation adjustment | (81,786) | (1,198) | (82,983) |
| **Balance as of December 31, 2014 (Successor)** | $ 197,947 | $ 1,291 | $ 199,239 |

The impairment charge for the two hundred and nine day period ended December 31, 2013 and for the year ended December 31, 2014 amounts to $58.3 million and nil, respectively.

Accumulated impairment related to trademarks as of December 31, 2013 and December 31, 2014 amounts to $58.3 million and $33.0 million, respectively.

Accumulated depreciation and amortization of intangible assets as of December 31, 2013 and December 31, 2014 amounts to $1.4 million and $1.3 million, respectively.

The aggregate amortization expense of intangible assets for the year ended December 31, 2013 and December 31, 2014 amounts to $1.0 million and $ 1.2 million, respectively.

*Impairment test on trademarks performed as of December 31, 2014*

At December 31, 2014, the Company performed its annual impairment test of trademarks, and in order to support its value the Company calculated the fair value of trademarks (Level3) using a discounted cash flow approach based on the following assumptions:

- Risk free rates for Poland, Russia and Hungary used for calculation of discount rate were based on the risk free rate for US yield of 10-year credit default swap adjusted for excess credit default swap for Poland, Russia and Hungary, respectively. An additional 1% was added to reflect additional risks related to trademarks as separate assets. As a result of our assumptions and calculations, discount rates of 10.5%, 20.2% and 13.8% for Poland, Russia and Hungary, respectively have been determined.

- The Company estimated the growth rates in projecting cash flows for each of trademarks separately, based on five year plan related to each trademark.

- The Company estimated the terminal value growth rates of 0.4% for Polish trademarks, 4.6% for Russian trademarks and 0.5% in relation to Hungarian trademark.

Based upon the above analysis performed, the Company has determined that the fair market value of each trademark is above its carrying value.

## 11.    GOODWILL

Predecessor Company goodwill resulted from acquisitions of Bols, Polmos Białystok, Parliament, Roust Russia (previously Russian Alcohol), Whitehall, Bols Hungary and Ukrainian Premium Distribution Company. Successor Company goodwill results from valuation as of the fresh start accounting date. The goodwill by segment is presented in the table below.

| | Poland | Russia | Hungary | Total |
|---|---|---|---|---|
| **Balance as of January 1, 2013 (Predecessor)** | $ 213,897 | $ 167,848 | $ 6,640 | $ 388,385 |
| Fresh Start Adjustments | (53,020) | (71,409) | 15,417 | (109,012) |
| Foreign currency translation adjustment | (12,702) | (7,174) | (172) | (20,048) |
| **Balance as of June 5, 2013 (Successor)** | $ 148,175 | $ 89,265 | $ 21,885 | $ 259,325 |
| Impairment charge | - | (15,108) | (9,477) | (24,585) |
| Foreign currency translation adjustment | 13,917 | (2,385) | 1,233 | 12,765 |
| **Balance as of December 31, 2013 (Successor as recast)** | $ 162,092 | $ 71,772 | $ 13,641 | $ 247,505 |

ROUST CORPORATION
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

*All amounts are expressed in thousands US dollars, except share and per share information*

| | Poland | | Russia | | Hungary | | Total |
|---|---|---|---|---|---|---|---|
| Balance as of January 1, 2014 (Successor as recast) | $ | 162,092 | $ | 71,772 | $ | 13,641 | $ | 247,505 |
| Foreign currency translation adjustment | | (22,886) | | (31,174) | | (2,313) | | (56,373) |
| Balance as of December 31, 2014 (Successor) | $ | 139,206 | $ | 40,598 | $ | 11,328 | $ | 191,132 |

Accumulated impairment related to goodwill as of December 31, 2013 and December 31, 2014 amounts to $24.6 million and $15.7 million, respectively.

*Impairment test on goodwill performed as of December 31, 2014*

As mentioned in Note 1 "*Organization and significant accounting policies*" ROUST Group comprises of three operating segments being Poland, Russia and Hungary. Within these segments the Company identified reporting units for the purpose of goodwill impairment test. Based on the ASC 350 a component of an operating segment is a reporting unit if the component constitutes a business for which discrete financial information is available and segment management regularly reviews the operating results of that component. As further stated in ASC 350 two or more components of an operating segment shall be aggregated and deemed a single reporting unit if the components have similar economic characteristics. An operating segment shall be deemed to be a reporting unit if all of its components are similar, if none of its components is a reporting unit, or if it comprises only a single component. In result of the analysis the following reporting units were identified: Poland Business units, Hungary unit, Russia unit and Ukraine unit.

At December 31, 2014, the Company performed its annual impairment test of goodwill. The Company tested the fair value of the following reporting units: Poland Business Unit (Poland segment), Russia Core Business Unit, and Hungary Unit (Hungary segment). In order to support its value, the Company calculated the fair value of the reporting units (Level3) using a discounted cash flow approach based on the following assumptions:

- Risk free rates for Poland, Russia and Hungary used for calculation of discount rate were based on the risk free rate for US yield of 10-year credit default swap, adjusted for excess credit default swap for Poland, Russia and Hungary, respectively. As a result of our assumptions and calculations, discount rates of 9.5%, 19.2% and 13.8% for Poland, Russia, Hungary, respectively have been determined.

- The Company estimated the growth rates in projecting cash flows for each of reporting group separately, based on a detailed five year plan related to each reporting unit.

- The Company estimated the terminal value growth rates of 0.4% for Polish reporting units, 4.6% for Russian reporting units, and 0.5% for its Hungarian unit.

Based on the goodwill impairment test as of December 31, 2014, it was determined that the carrying value of all units does not exceed their fair value.

As a result no impairment charge was recognized for the year ended December 31, 2014.

## 12. PROPERTY, PLANT AND EQUIPMENT

Property, plant and equipment, presented net of accumulated depreciation in the consolidated balance sheets, consists of:

ROUST CORPORATION
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
*All amounts are expressed in thousands US dollars, except share and per share information*

| | Successor December 31, 2013 as recast | | Successor December 31, 2014 |
|---|---|---|---|
| Land and Buildings | $ | 92,252 | $ | 58,791 |
| Equipment and other fixed assets | | 25,137 | | 27,193 |
| Motor vehicles | | 10,872 | | 7,075 |
| Motor vehicles under lease | | 2,884 | | 3,524 |
| Computer hardware and software | | 6,481 | | 5,355 |
| Fixed assets under construction | | 584 | | 1,008 |
| **Total gross book value** | | **138,210** | | **102,946** |
| Less - Accumulated depreciation | | (9,294) | | (13,456) |
| Less - Accumulated depreciation of leased assets | | (331) | | (906) |
| **Total** | $ | **128,585** | $ | **88,584** |

Property, plant and equipment is presented net of accumulated depreciation in the consolidated balance sheets. Depreciation expense relating to property, plant and equipment for the year ended December 31, 2012, 2013 and 2014 amounts to $18.2 million, $12.9 million ($7.1 million for the Predecessor Company and $5.8 for the Successor Company), and $10.7 million, respectively.

The accumulated depreciation of property, plant and equipment as of December 31, 2013 and December 31, 2014 amounted to $ 9.6 million and $14.4 million, respectively.

### 13.    INCOME TAXES

The Company operates in several tax jurisdictions primarily: the United States of America, Poland, Hungary, Russia and Ukraine. All subsidiaries file their own corporate tax returns as well as account for their own deferred tax assets and liabilities. The Company does not file a tax return in the United States of America based upon its consolidated income, but does file a return in the United States based on its income taxable in the United States of America.

Statutory rate reconciliation for continuing operations:

| | Year ended December 31, 2012 | Predecessor one hundred fifty-six-day period ended June 5, 2013 | Successor Two hundred and nine days ended December 31, 2013 as recast | Successor Year ended December 31, 2014 |
|---|---|---|---|---|
| **Tax at US statutory rate of 35%** | (123,039) | 41,667 | (45,738) | (35,865) |
| Tax rate differences | 43,142 | 53,830 | 51,343 | 18,002 |
| Valuation allowance | 13,538 | 7,958 | (21,225) | (1,811) |
| Permanent differences | 86,906 | 34,174 | 22,280 | 12,785 |
| Reorganization related permanent differences | - | (157,977) | - | - |
| Utilization of tax loss covered by valuation allowance | - | - | (11,947) | - |
| Reduction of net operating losses due to cancelation of indebtness income | - | - | - | 13,045 |
| Other | (8,850) | 3,214 | (7,463) | 6,178 |
| **Income tax (benefit)/expense** | $ **11,697** | $ **(17,134)** | $ **(12,750)** | $ **12,334** |

The jurisdictions with lower tax rates that have the most significant effective tax rate impact in the periods presented include Russia and Poland, where the income tax rates are 20% and 19% respectively.

The permanent differences for 2012 are primarily the results of goodwill impairment charges recognized during the year of $327.9 million. The permanent differences related to goodwill impairment amounted to $63.3 million.

ROUST CORPORATION
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
*All amounts are expressed in thousands US dollars, except share and per share information*

The permanent differences for one-hundred fifty-six days ended June 5, 2013 (Predecessor) are primarily the result of goodwill fresh start accounting revaluation of $109.0 million and gain on cancellation of debt amounting to $509.3 million. The permanent differences related to these items amounted to $20.3 million and $(178.2) million, respectively. The permanent differences for two hundred nine days ended December 31, 2013 (Successor) are mainly related to costs incurred by the Company that are not deductible for local tax purposes. The goodwill impairment recognized in Successor accounts in the amount of $24.6 million gave rise to $3.9 million permanent difference. The permanent differences for 2014 are primarily related to costs incurred by the Company that are not deductible for local tax purposes.

The Company's significant components of the provision for income taxes from continuing operations were as follows:

| | Year ended December 31, 2012 | Predecessor one hundred fifty-six-day period ended June 5, 2013 | Successor Two hundred and nine days ended December 31, 2013 as recast | Successor Year ended December 31, 2014 |
|---|---|---|---|---|
| Current (domestic) | 483 | - | - | - |
| Current (foreign) | 12,797 | (351) | 4,312 | 13,096 |
| Deferred (domestic) | (1,680) | (249) | - | - |
| Deferred (foreign) | 97 | (16,534) | (17,062) | (762) |
| Income tax (benefit)/expense | $    11,697 | $    (17,134) | $    (12,750) | $    12,334 |

The Company is headquartered in the United States. Pre-tax book loss earned from continuing operations in the United States (domestic) and outside the United States (foreign) in 2012, 2013 and 2014 was as follows:

| | Year ended December 31, 2012 | Predecessor one hundred fifty-six-day period ended June 5, 2013 | Successor Two hundred and nine days ended December 31, 2013 as recast | Successor Year ended December 31, 2014 |
|---|---|---|---|---|
| Pre-tax income/(loss)-domestic | (44,928) | 456,871 | (135,337) | 7,631 |
| Pre-tax income/(loss)-foreign | (306,613) | (337,822) | 4,657 | (110,103) |
| Income tax (benefit)/expense | $    (351,541) | $    119,049 | $    (130,680) | $    (102,472) |

Total income tax payments for 2012, 2013 and 2014 were $5.7 million, $0.3 million and $8.9 million, respectively. ROUST has paid no U.S. income taxes and has net operating loss carry-forward for U.S. federal tax purposes totaling $3.6 million.

The Company's US net operating loss ("NOL") carry-forward may be restricted under Section 382 of the Internal Revenue Code ("IRC"). IRC Section 382 limits the use of NOLs to the extent there has been an ownership change of more than 50 percentage points. As a result, the taxable income for any post change year that may be offset by a pre-change NOL may not exceed the general IRC Section 382 limitation, which is the fair market value of the pre-change entity multiplied by the IRC long-term tax exempt rate.

Regardless of the amount of the basic IRC § 382 limitation, any NOLs that carry over to ROUST's 2014 taxable year were reduced to zero on January 1, 2014 as a result of tax reduction attributable to cancellation of indebtedness income excluded in the bankruptcy. For that reason, none of ROUST's taxable income in 2014 and beyond will likely be offset by ROUST's NOL carryovers existing as of December 31, 2013.

Significant components of the Company's deferred tax assets and liabilities are as follows:

ROUST CORPORATION
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

*All amounts are expressed in thousands US dollars, except share and per share information*

| | Predecessor | Successor | Successor |
|---|---|---|---|
| **Deferred Tax Assets** | December 31, 2012 | December 31, 2013 as recast | December 31, 2014 |
| Accrued expenses, deferred income and prepaid | 18,275 | 13,782 | 9,440 |
| Receivable and allowance for doubtful accounts receivable | 15,344 | 23,562 | 10,503 |
| Payables and borrowings | 15,994 | 4,053 | 19,118 |
| Net operating loss carry-forward benefit | 55,834 | 49,525 | 39,464 |
| Property, plant & equipment, intangibles | 5,775 | 92 | 1,587 |
| Other | 6,317 | 708 | 476 |
| Valuation allowance | (99,656) | (76,904) | (56,127) |
| **Deferred tax assets, net of valuation allowance** | $ 17,883 | $ 14,818 | $ 24,461 |
| | Predecessor | Successor | Successor |
| **Deferred Tax Liabilities** | December 31, 2012 | December 31, 2013 as recast | December 31, 2014 |
| Trademarks | 81,546 | 51,745 | 36,549 |
| Investmens in subsidiaries | 3,335 | - | - |
| Property, plant & equipment | 14,868 | 4,101 | 4,407 |
| ASC 470 impact | 276 | - | - |
| Payables | 7,770 | - | 654 |
| Receivables | 2,572 | 12,229 | 20,004 |
| Other | 1,122 | 1,239 | 415 |
| **Deferred tax liability** | $ 111,489 | $ 69,314 | $ 62,029 |
| Total deferred tax asset, net of valuation allowance | 17,883 | 14,818 | 24,461 |
| Total deferred tax liability | 111,489 | 69,314 | 62,029 |
| **Total net deferred tax asset/ (liability)** | (93,606) | (54,496) | (37,568) |
| Classified as | | | |
| Current deferred tax assets | 2,298 | 7,796 | 11,502 |
| Non-current deferred tax assets | 3,037 | 924 | 3,185 |
| Current deferred liability | (4,907) | (620) | (16) |
| Non-current deferred tax liability | (94,034) | (62,596) | (52,239) |
| **Total net deferred tax asset/ (liability)** | (93,606) | (54,496) | (37,568) |

The Company is significantly restricted from paying dividends or other asset transfers. For purposes of its foreign subsidiaries, no deferred tax liabilities have been established for the potential deferred taxes on the excess of any retained earnings over the tax basis. It is not practicable to determine the amount of unrecognized deferred tax liability for temporary differences related to foreign subsidiaries that are essentially permanent in duration.

During 2012 due to deteriorating performance of certain of the Company's subsidiaries, the Company determined that an additional non cash valuation allowance for deferred tax assets of $13.5 million was required and took the charge during the year. Additionally, the Company did not recognize a tax asset for losses at these subsidiaries, therefore the tax expense for the profitable entities was not offset by a tax benefit at loss making entities.

The Company's valuation allowance relates primarily to losses carried forward in Poland, Russia and the United States that we believe it is more likely than not will not be utilized in the future.

During the one hundred fifty six days ended June 5, 2013 (Predecessor), due to the weak performance of certain of the Company's subsidiaries, the Company determined that an additional valuation allowance for deferred tax asset of $8.0 million was recognized. The decrease in valuation allowance for the Successor period is mainly driven by utilization of NOLs that previously were covered by valuation allowance of $11.9 million. The decrease was partially offset by additional valuation allowance recognized due to weak performance of certain of the Company's subsidiaries.

As described above, ROUST NOL's were reduced to zero on January 1, 2014. Therefore valuation allowance amounting to $13.0 million related to these losses was also reduced to zero.

ROUST CORPORATION
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
*All amounts are expressed in thousands US dollars, except share and per share information*

During 2014 due to the deteriorating performance of certain of the Company's subsidiaries, the Company determined that an additional non cash valuation allowance for deferred tax assets of $11.2 million was required and took the charge during the year. Additionally, the Company did not recognize a tax asset for losses at these subsidiaries therefore the tax expense for the profitable entities was not offset by a tax benefit at loss making entities.

Tax losses can be carried forward for the following periods:

| | |
|---|---|
| Hungary* | 5 years |
| U.S. | 20 years |
| Russia | 10 years |
| Poland | 5 years |

*Transitional provisions allow to carry the loss coming from operation of tax years ended before December 31, 2014 till the end of year 2025.*

The amounts and expiration dates of operating loss carryforwards for tax purposes are as follows:

| Expiration date | Amount of operating loss carry forward |
|---|---|
| December 31, 2015 | 130,268 |
| December 31, 2016 | 38,155 |
| December 31, 2017 | 17,444 |
| December 31, 2018 | 3,049 |
| December 31, 2019 | 7,949 |
| Afterwards | 3,611 |
| **Total** | **200,476** |

The following table summarizes the changes in the accrual for unrecognized income tax benefits and related interest and penalties for the years ended December 31, 2012, 2013 and 2014:

| | Year ended December 31, 2012 | | Predecessor one hundred fifty-six-day June 5, 2013 | | Successor Two hundred and nine December 31, 2013 as recast | | Successor Year ended December 31, 2014 | |
|---|---|---|---|---|---|---|---|---|
| | Unrecognized income tax benefits | Interest and penalties | Unrecognized income tax benefits | Interest and penalties | Unrecognized income tax benefits | Interest and penalties | Unrecognized income tax benefits | Interest and penalties |
| **Balance, beginning of the period** | $ 5,044 | 2,093 | $ 16,452 | 2,476 | $ 9,547 | 1,747 | $ 13,907 | 3,363 |
| Amounts assumed at acquisitions under common control | - | - | - | - | 5,143 | 1,929 | - | - |
| **Balance, beginnig of the period (recast)** | $ 5,044 | 2,093 | $ 16,452 | 2,476 | $ 14,690 | 3,676 | $ 13,907 | 3,363 |
| Additions based on tax positions related to the current period | 5,606 | 457 | - | 218 | 2,827 | 873 | 4,037 | 1,035 |
| Additions of tax positions of prior periods | 8,474 | 806 | 297 | 165 | 1,180 | 570 | 973 | 825 |
| Reductions of tax positions of current period | - | - | (1,549) | - | (34) | (8) | (10) | (2) |
| Reductions of tax positions of prior periods | (1,415) | (20) | (3,140) | (357) | (3,620) | (1,566) | (858) | (390) |
| Reduction of tax positions relating to settlements with tax authorities | (1,831) | (977) | (2,098) | (658) | (895) | (116) | - | - |
| Lapse of statute of limitations | - | - | - | - | - | - | (581) | (168) |
| Foreign currency translation adjustments | 574 | 117 | (415) | (97) | (241) | (66) | (5,410) | (1,877) |
| **Balance, end of period** | $ 16,452 | 2,476 | $ 9,547 | 1,747 | $ 13,907 | 3,363 | $ 12,058 | 2,786 |

The Company records interest and penalties related to unrecognized tax benefits as a component of income tax expenses.

ROUST CORPORATION
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
*All amounts are expressed in thousands US dollars, except share and per share information*

The Company files income tax returns in the U.S., Poland, Hungary, Russia and Ukraine, as well as in various other countries throughout the world in which we conduct our business. The major tax jurisdictions and their earliest fiscal years that are currently open for tax examinations are 2009 in Poland and Hungary and 2011 in the U.S., Russia and Ukraine.

Tax liabilities (including corporate income tax, Value Added Tax (VAT), social security and other taxes) of the Company's subsidiaries may be subject to examinations by the tax authorities for up to certain period from the end of the year the tax is payable, as follows:

| | |
|---|---|
| Poland | 5 years |
| Hungary | 5 years |
| Russia | 3 years |
| United States | 3 years |
| Ukraine | 3 years |

ROUST's state and federal income tax returns are also subject to examination by the U.S. tax authorities. The IRS is in the process of auditing the Company's 2009, 2010 and 2011 federal income tax returns. The tax examinations were also carried in 2014 in Russia, Poland and Cyprus. As the application of tax laws and regulations, and transactions are susceptible to varying interpretations, amounts reported in the consolidated financial statements could be changed at a later date upon final determination by the tax authorities. Due to uncertainties about the timing of existing tax examinations being settled and about potential tax examinations being started, it is not possible to project the amount of liability that will reverse in the upcoming 12 months.

## 14.    NOTES AND BORROWINGS

**New Notes**

*Successor*

### New Senior Secured Notes

On June 5, 2013, the Company along with CEDC Finance Corporation International, Inc. (the "Issuer"), entered into an Indenture, between the Company, certain subsidiary guarantors and US Bank N.A., as Trustee. In connection with the New Senior Secured Notes Indenture, the Company issued $464.6 million Senior Secured Notes due 2018 (the "New Senior Secured Notes" or "NSSN") to holders of the SSN, which were cancelled pursuant to the Plan of Reorganization. The issuance of the New Senior Secured Notes to holders of the SSN was completed on June 25, 2013.

The NSSN are secured by, among other things:

- a first-priority pledge over the shares of the Issuer and certain subsidiaries of the Company,

- a first-priority assignment of rights under certain bank accounts of the Company,

- certain intercompany loans, and

- a first-priority mortgage over certain real property and fixtures.

The New Senior Secured Notes bear interest as follows:

| Period | Interest rate |
|---|---|
| From June 1, 2013 to but excluding April 30, 2014 | 8.0% |
| From April 30, 2014 to but excluding April 30, 2015 | 9.0% |
| From April 30, 2015 to but excluding April 30, 2018 | 10.0% |

Interest under the NSSN is payable in cash on April 30 and October 31 of each year. The first interest payment of $15.5 million was made on October 31, 2013. As of December 31, 2013 the Company had accrued (unpaid) interest of $9.7 million related to the NSSN. On April 28, 2014 and on October 30, 2014, the second and

ROUST CORPORATION
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
*All amounts are expressed in thousands US dollars, except share and per share information*

third interest payment of $18.6 million and $20.9, respectively, was made in cash. As of December 31, 2014 the balance of interest accrued under effective interest method amounts to $14.0 million.

During the period from issuance of the NSSN up to the date of this report, the Company has not repurchased any of the NSSN.

Total obligations under the NSSN are shown in the table below. There are no deferred finance costs relating to the NSSN.

| | Successor December 31, 2013 as recast | Successor December 31, 2014 |
|---|---|---|
| New Senior Secured Notes - principal amount | $          464,590 | $          464,590 |
| Interest accrued | 9,701 | 14,042 |
| **Total** | **$          474,291** | **$          478,632** |

The Level 1 fair value of the NSSN as of December 31, 2013 and as of December 31, 2014 was $432.1 million and $400.7 million, respectively (93.00 cents and 86.25 cents per 1 US dollar of face value of NSSN).

### New Convertible Junior Secured Notes

On June 5, 2013, the Company and the Issuer, entered into an Indenture (the "New Convertible Junior Secured Notes Indenture"), between the Company, the Issuer, certain subsidiary guarantors named therein, and US Bank N.A., as Trustee (the "Trustee"). In connection with the New Convertible Junior Secured Notes Indenture, the Issuer issued $200 million Convertible Junior Secured Notes due 2018 (the "New Convertible Junior Secured Notes" or the "NCJSN" and, together with the New Senior Secured Notes, the "New Notes") to holders of the SSN, which were cancelled pursuant to the Plan of Reorganization. The issuance of the New Convertible Junior Secured Notes to holders of the SSN was completed on June 25, 2013.

The NCJSN are secured by, among other things:

- a first-priority pledge over the shares of the Issuer and certain subsidiaries of the Company,

- a first-priority assignment of rights under certain bank accounts of the Company,

- certain intercompany loans, and

- a first-priority mortgage over certain real property and fixtures.

The NCJSN bear interest at a rate of 10% per annum. Interest on the NCJSN is payable, at the election of the Issuer, (1) entirely in cash, (2) in-kind, by increasing the principal amount of the outstanding NCJSN or (3) with a combination of cash interest and payment-in-kind interest. The first interest payment was payment-in-kind interest of $8.3 million on October 31, 2013. Additionally as of December 31, 2013 the Company had accrued (unpaid) interest of $3.4 million related to NCJSN. The second and third in-kind interest payment of $10.4 million and $10.9 million was capitalized on April 30, 2014 and October 31, 2014, respectively. As of December 31, 2014 the balance of interest accrued under the effective interest method amounts to $3.8 million.

The NCJSN are redeemable at any time at par. NCJSN must be redeemed in increments of $20 million, although if a redemption results in less than $130 million outstanding, all NCJSN must be redeemed by the Issuer. If they are not redeemed before December 1, 2014, then holders of the NCJSN have the option to convert to shares of the Company. The conversion percentage depend on the period in which conversion is exercised. Starting from December 1, 2014 any holder of NCJSN over $0.1 million can convert its NCJSN for shares of the Company's common stock. The Company has not made any assumptions and has not raised any financing as of December 31, 2014 in relation to the conversion option on NCJSN effective December 2014. No holders of these notes have exercised their option to convert the notes in to equity in the Company.

During the period from issuance of NCJSN up to the date of this report, the Company did not repurchase any NCJSN.

ROUST CORPORATION
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
*All amounts are expressed in thousands US dollars, except share and per share information*

Total obligations under the NCJSN are shown in the table below. There are no deferred finance costs relating to the NCJSN.

| | Successor December 31, 2013 as recast | Successor December 31, 2014 |
|---|---|---|
| New Convertible Junior Secured Notes - principal amount | $ 208,333 | $ 229,687 |
| Interest accrued | 3,396 | 3,755 |
| **Total** | **$ 211,729** | **$ 233,442** |

- The Level 1 fair value of the NCJSN as of December 31, 2013 and as of December 31, 2014 was $171.0 million and $160.6 million, respectively (82.06 cents and 69.90 cents per 1 US dollar of face value of NCJSN). As of March 13, 2015 the face value of NCJSN amounted to 55.25 cents per 1 US dollar.

Predecessor

The instruments held by Predecessor as of December 31, 2012 being the CSN, SSN and Debt Security were described in detail in our Annual Report on Form 10-K for the year ended December 31, 2012, filed with the SEC on June 18, 2013.

Covenants under New Notes

The NSSN Indenture and NCJSN Indenture (together the "New Notes indentures") contain a number of covenants restricting the actions of ROUST and its Restricted Subsidiaries. As of December 31, 2013, as of December 31, 2014 and until the date of signing this report, ROUST and its Restricted Subsidiaries have complied with all material conditions and covenants under the New Notes indentures.

Bank Loans and Overdraft Facilities

According to the NSSN and the NCJSN the Company is permitted to raise the borrowing up to a certain limit ("Permitted Debt"). As at December 31, 2013 and December 31, 2014 our indebtedness is below allowed limit. Please refer to the table on the following page for details of our bank loans and overdraft facilities.

Except for one insignificant Related Party borrowing, all bank loans and overdraft facilities raised by the Company are in the local currencies of the entities being party to the applicable loan or overdraft facility agreement. As a result, the Company's exposure to cash flow risk is partially mitigated, as the debt issued locally by our subsidiaries is in their local currency. Total unutilized overdraft and credit facilities (including factoring facilities) as of December 31, 2014 amounted to $22.9 million.

As of December 31, 2014, the Company has other borrowings of $24.9 million which represent the amount of factored receivables repaid by customers to the Company instead of the factor. There was no such liability as of December 31, 2013.

As of December 31, 2014 Russian Standard Bank and its affiliates provided financial support of $49.3 million, being 26.4% of the total portfolio of bank loans.

ROUST CORPORATION
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

*All amounts are expressed in thousands US dollars, except share and per share information*

| Bank | Type of the facility | Facility currency | Date of drawing | Financial covenants | Successor Outstanding liability including accrued interest as of December 31, 2013 thousand USD (as recast) | Successor Outstanding liability including accrued interest as of December 31, 2014 thousand USD |
|---|---|---|---|---|---|---|
| Bank 1 | credit line | RUB | 23/10/13 | Yes | 18,240 | - |
| Bank 1 | credit line | RUB | 29/10/13 | Yes | 6,080 | - |
| Bank 1 | credit line | RUB | 01/11/13 | Yes | 6,080 | - |
| Bank 1 | credit line | RUB | 14/11/13 | Yes | 6,080 | - |
| Bank 1 | credit line | RUB | 19/11/13 | Yes | 15,200 | - |
| Bank 1 | credit line | RUB | 13/12/13 | Yes | 9,120 | - |
| Bank 1 | credit line | RUB | 23/12/13 | Yes | 10,640 | - |
| Bank 1 | credit line | RUB | 14/01/14 | Yes | - | 860 |
| Bank 1 | credit line | RUB | 08/08/14 | Yes | - | 3,440 |
| Bank 1 | credit line | RUB | 15/08/14 | Yes | - | 3,440 |
| Bank 1 | credit line | RUB | 22/08/14 | Yes | - | 3,440 |
| Bank 1 | credit line | RUB | 05/09/14 | Yes | - | 4,301 |
| Bank 1 | credit line | RUB | 12/09/14 | Yes | - | 3,441 |
| Bank 1 | credit line | RUB | 19/09/14 | Yes | - | 3,441 |
| Bank 1 | credit line | RUB | 24/09/14 | Yes | - | 2,580 |
| Bank 1 | credit line | RUB | 03/10/14 | Yes | - | 5,161 |
| Bank 1 | credit line | RUB | 03/10/14 | Yes | - | 1,548 |
| Bank 1 | credit line | RUB | 06/10/14 | Yes | - | 3,441 |
| Bank 1 | credit line | RUB | 08/10/14 | Yes | - | 1,720 |
| Bank 1 | credit line | RUB | 10/10/14 | Yes | - | 2,581 |
| Bank 1 | credit line | RUB | 28/10/14 | Yes | - | 860 |
| Bank 1 | credit line | RUB | 31/10/14 | Yes | - | 1,032 |
| Bank 1 | credit line | RUB | 20/11/14 | Yes | - | 1,721 |
| Bank 1 | credit line | RUB | 26/11/14 | Yes | - | 8,604 |
| Bank 2 | term loan | RUB | 06/12/13 | Yes | 15,838 | - |
| Bank 2 | term loan | RUB | 09/12/14 | Yes | - | 6,918 |
| Bank 3 | credit line | RUB | 23/10/13 | Yes | 6,069 | - |
| Bank 3 | credit line | RUB | 13/11/13 | Yes | 7,586 | - |
| Bank 3 | credit line | RUB | 16/10/14 | Yes | - | 4,720 |
| Bank 4 | Overdraft* | HUF | 02/08/12 | None | - | - |
| Bank 5 | credit line* | RUB | 22/04/14 | Yes | - | 8,600 |
| Bank 5 | term loan** | EUR | 16/08/12 | Yes | 13,775 | - |
| Bank 6 | credit line | RUB | 08/10/14 | None | - | 858 |
| Bank 6 | credit line | RUB | 14/10/14 | None | - | 515 |
| Bank 6 | credit line | RUB | 25/12/14 | None | - | 858 |
| Bank 7 | credit line | RUB | 15/08/14 | None | - | 3,622 |
| Bank 7 | credit line | RUB | 11/09/14 | None | - | 1,837 |
| Bank 7 | credit line | RUB | 15/09/14 | None | - | 257 |
| Bank 7 | credit line | RUB | 16/09/14 | None | - | 292 |
| Bank 8 | credit line | RUB | 09/06/14 | Yes | - | 13,732 |
| Bank 10 | credit line | RUB | 20/08/14 | Yes | - | 5,267 |
| Bank 10 | credit line | RUB | 18/09/14 | Yes | - | 878 |
| Bank 11 | credit line | RUB | 28/11/07 | None | 3,862 | 2,182 |
| Bank 11 | credit line | RUB | 25/01/08 | None | 30 | 26 |
| Bank 11 | credit line | RUB | 16/11/12 | None | 11,496 | 3,217 |
| Bank 11 | credit line | RUB | 19/02/13 | None | 6,384 | 3,612 |
| Bank 11 | credit line | RUB | 01/04/13 | None | 3,041 | 1,720 |
| Bank 11 | credit line | RUB | 30/05/13 | None | 7,205 | 4,076 |
| Bank 11 | credit line | RUB | 03/06/13 | None | 6,931 | 3,921 |
| Bank 11 | credit line | RUB | 18/09/13 | None | 4,864 | 172 |
| Bank 11 | credit line | RUB | 02/10/13 | None | 7,661 | 4,334 |
| Bank 11 | credit line | RUB | 16/12/13 | None | 24,912 | 14,323 |
| Bank 11 | credit line | RUB | 10/11/14 | None | - | 4,472 |
| Bank 11 | credit line | RUB | 30/12/14 | None | - | 2,027 |
| Bank 11 | credit line | USD | 23/03/11 | None | 2,554 | 250 |
| Bank 12 | credit line | RUB | 02/01/11 | None | 2,328 | 1,317 |
| Bank 12 | credit line | RUB | 03/01/11 | None | 1,329 | 751 |
| Bank 12 | credit line | RUB | | None | 2,748 | 1,756 |
| Bank 12 | credit line | RUB | | None | 1,825 | 1,166 |
| Bank 13 | credit line | RUB | | Yes | - | 13,742 |
| Other banks*** | | RUB | | | 63,349 | |
| Factoring | | | | | - | 24,851 |
| Total | | | | | | **187,879** |

\* - Full limit under the agreement is unutilized.

\*\* - As of December 31, 2013 - six open tranches released between March 11, 2013 and August 13, 2013, repayable between March 7, 2014 and April 25, 2014.

\*\*\* - Loans repaid before the report date

As of December 31, 2014, $25.9 million out of the total amount of borrowings was secured by pledge.

As of December 31, 2014 some local subsidiaries were technically non-compliant with certain credit ratios under their loans. The above mentioned non-compliance did not cause acceleration of the bank credit repayment before their maturity dates.

The table below presents the amount of outstanding lines of credit for short-term financing and the weighted average interest rate on those short term borrowings:

| | Successor December 31, 2013 as recast | | Successor December 31, 2014 | |
|---|---|---|---|---|
| | Principal Amount outstanding | Weighted average interest rate | Principal Amount outstanding | Weighted average interest rate |
| Bank loans and overdraft facilities | $ 177,633 | 11.2% | $ 113,373 | 14.9% |
| Other borrowings - amount repayable to the factor | - | - | 24,851 | - |
| Bank loans and borrowings from Related Parties | 79,445 | 11.2% | 44,380 | 12.9% |
| Recourse factoring | - | - | 22,729 | - |

As of December 31, 2013 and 2014, the liabilities from factoring with recourse amounted to nil and $22.7 million, respectively and are included in the short term bank loan in the balance sheet as described in Note 6.

**Debt issuance cost and future principal repayments**

Debt issuance cost balance related to the Company's debt was nil as of December 31, 2013 and December 31, 2014.

The following is a schedule by years of the future principal repayments for borrowings as of December 31, 2014:

| Future repayments of borrowings (principal) | December 31, 2014 |
|---|---|
| 2015 | 171,518 |
| 2016 | 27,327 |
| 2017 | 6,488 |
| 2018 and beyond | 694,277 |
| **Total** | **$ 899,610** |

Covenants

The Indenture contains a number of covenants restricting the actions of ROUST and its Restricted Subsidiaries. All subsidiaries of ROUST are currently considered "Restricted Subsidiaries". Whitehall Holdings and its subsidiaries (collectively "Whitehall Group"), which, starting from October 3, 2013 were "Unrestricted Subsidiaries", became re-restricted as a result of the Roust Inc. acquisition. ROUST and its Restricted Subsidiaries are not required to maintain any specific financial ratios, but are restricted from taking certain actions (e.g., incurring additional debt, paying dividends) unless they meet an exception from the relevant restrictions. The New Notes indentures include customary cross-default provisions that are activated if the Company fails to pay other debt and interest when due or if other debts are accelerated in excess of $25.0 million. To date no such event has occurred.

As of December 31, 2014 the Company have complied with all material conditions and covenants under the Indentures. As mentioned above some local subsidiaries were technically non-compliant with certain credit ratios under their loans. As this non-compliance does not cause acceleration of other debt with principal amount over $25 million there is no cross default event for debt issued under the Indentures.

The Company is obliged to meet the following financial restrictive covenants:

*Incurrence of Indebtedness and Issuance of Preferred Stock*

This covenant limits any incurrence of debt by ROUST or its Restricted Subsidiaries. ROUST and its Restricted Subsidiaries may not incur any Indebtedness, including "Acquired Debt," nor issue "Disqualified Stock," nor permit its Restricted Subsidiaries to issue preferred stock, in each case, unless (i) certain ratios are met and the Indebtedness is subordinated to the New Notes or (ii) such Indebtedness is "Permitted Debt". Main exceptions from that rule are:

- Any Subsidiary Guarantor may incur debt expressly subordinated to the New Notes if the Fixed Charge Coverage Ratio and Consolidated Leverage Ratio of the Company are within an allowed range;

- Permitted Debt: (a) Restricted Subsidiaries may incur debt for which total amount does not exceed greater of $146.0 million and the Borrowing Base. Non-Guarantor Restricted Subsidiaries may not exceed $50 million outstanding at any time. (b) Debt (including capital leases) for the purpose of financing any construction or improvement of property, provided that the principal amount does not exceed $25 million at any time outstanding;

- An acquisition of a company is deemed to be an incurrence of debt of the acquired company.

*Transactions with Affiliates*

The term "Affiliates" as defined by the Indenture comprises RTL and entities that control or are controlled by or are under common control with RTL, also officers and directors of ROUST, and Unrestricted Subsidiaries. Transactions among ROUST and its Restricted Subsidiaries are not restricted by this covenant.

Transactions with affiliates require arm's length conditions and, if a transaction is above $20.0 million, a fairness opinion is required.

The below mentioned transactions are not subject to the above requirements:

- Any transaction of $2.5 million or less;

- Any employment agreement, employee benefit plan or other arrangement entered into in the ordinary course of business;

- Loans or advances to employees in the ordinary course of business not exceeding $2.5 million;

- Transactions contemplated by supply, purchase or sale agreements with suppliers or purchasers or sellers of goods or services in the ordinary course of business and otherwise in compliance with the Indentures that are at least as favorable as might reasonably have been obtained from a non-Affiliate.

*Limitations on Restricted Payments*

- Restricted Payments include the following:

- dividends and other distributions by ROUST and Restricted Subsidiaries;

- redemptions and repurchases of Equity Interests of ROUST or a direct or indirect parent of ROUST;

- payments on subordinated obligations (excluding the Convertible Notes) other than payments of interest or payments of principal within 90 days prior to maturity; and

- "Investments" other than Permitted Investments.

*Limitations on Assets' Sales*

This covenant is designed to regulate sales of assets. Asset Sales are understood as any sale, lease or other disposition of assets or any issuance of shares of a Restricted Subsidiary, except for:

- dispositions in the ordinary course of business of inventory, equipment and other assets or damaged, worn out or obsolete assets;

- disposition of assets with a Fair Market Value of less than $20.0 million; and

- transactions between or among the Parent and its Restricted Subsidiaries.

Generally, this covenant requires for any transaction that qualifies as an Asset Sale:

- receipt of Fair Market Value;

- that 75% of the consideration consists of cash (including any liabilities that are assumed in connection with an asset transfer, as well as any securities, notes or other obligations that are converted into cash or Cash Equivalents within 90 days) – while the cash requirement is 75%, 100% of the proceeds must be used to redeem the New Notes (see below); and

- the Net Proceeds of an Asset Sale be used to redeem the New Notes at 100% of principal amount plus accrued interest.

*Change of Control*

This covenant requires CEDC FinCo to make an offer to purchase the New Notes in cash at 101% plus accrued interest in the event of a "Change of Control", which include among the other:

- the consummation of any transaction pursuant to which ROUST or any of its Restricted Subsidiaries consolidates with, or merges with or into (or otherwise combines with), RTL or any of its Affiliates (other than ROUST and its Restricted Subsidiaries);

- the consummation of any transaction pursuant to which ROUST (or any Restricted Subsidiary) sells, conveys, transfers or otherwise disposes of the Roust Russia Group (previously Russian Alcohol Group) to RTL or any of its Affiliates (other than ROUST and its Restricted Subsidiaries); and

- a majority of Directors on ROUST's Board of Directors changes (excluding changes approved by a majority of the Board on the Issue Date or directors approved by such directors).

*Limitations on Liens*

The Limitation on Liens covenant limits liens on Collateral and other assets of the ROUST Group. CEDC FinCo may not incur or suffer to exist any liens on any of its property that are not Issuer Permitted Liens. The ROUST Group may not incur liens on any Collateral other than Permitted Collateral Liens. The main Permitted Collateral Lien exceptions are for liens on Collateral securing debt incurred under the credit facility basket and liens securing the New Notes and refinancing thereof.

The ROUST Group may not incur liens on property or assets that are not Collateral unless such assets will also secure the New Notes or there is a Permitted Liens exception.

*Post-Closing Security Obligations*

The Indentures do not require that all Collateral for the New Notes be in effect on the Issue Date, but do require that such Collateral be put in place within specified time periods thereafter. If ROUST acquires or creates any material intellectual property rights relating to the brands owned or used by ROUST or its Restricted Subsidiaries, such intellectual property rights must also be pledged. Also, if a bank account owned by a Restricted

Subsidiary becomes a Specified Bank Account (i.e., the balance in the account exceeds $10.0 million measured as of the Issue Date and thereafter as of the last day of each fiscal quarter after the Issue Date), the bank account must also be pledged. In addition, if ROUST acquires or creates a "Significant Subsidiary", the shares of that subsidiary must be pledged to secure the New Notes within 20 Business Days.

*Amendments to or Prepayments of the Intercompany Loans*

The Indentures restrict amendments to and prepayments of the "Intercompany Loans" – which are the loans from CEDC FinCo to Jelegat and CEDC International sp. z o.o., originally made with the proceeds of the Senior Secured Notes due 2016 issued by CEDC FinCo as amended (the "Original Notes"), in connection with the issuance of the New Notes. Generally, amendments to the Intercompany Loans are prohibited by the Indentures. However, the Intercompany Loans and any RAG On-Loans may be amended solely to provide for the repayment of the Intercompany Loans in connection with the issuance of the New Notes and to provide for the issuance of any additional PIK Notes or Senior Secured Notes. There are also restrictions on amendments to the RAG On-Loans, which are the loans between Jelegat (as lender) and the Roust Russia Group (previously Russian Alcohol Group) made with the proceeds of the Original Notes.

## 15.    TAXES OTHER THAN INCOME TAXES

Taxes payable other than income taxes comprise mainly excise and VAT payable as presented in the table below.

| | Successor December 31, 2013 as recast | Successor December 31, 2014 |
|---|---|---|
| VAT payable | $          71,234 | $          39,139 |
| Excise tax payable | 183,187 | 90,919 |
| Other taxes and charges payable | 5,309 | 3,043 |
| **Total** | **$        259,730** | **$        133,101** |

The higher excise tax balance in 2013 was a result of building higher stocks in Poland and Russia ahead of excise tax increases in 2014. The excise tax on this prebuilt inventory was a payable in January 2014.

In Russia our inventories consigned to others before year-end required formal sale for local regulatory purposes. As a result a significant VAT payable balance was on our balance sheet as of December 31, 2013. The VAT connected with these transactions was paid in January 2014.

## 16.    ACCRUALS AND OTHER LIABILITIES

**Accruals**

The table below presents details of our current accruals.

| | Successor December 31, 2013 as recast | Successor December 31, 2014 |
|---|---|---|
| Accrued marketing related services | $          20,746 | $          12,169 |
| Accrued employee benefits | 16,088 | 11,299 |
| Accrued costs to satisfy the claims | 12,743 | 3,258 |
| Accrued legal and professional services | 7,502 | 3,408 |
| Other | 14,143 | 18,577 |
| **Total** | **$          71,222** | **$          48,711** |

**Other current liabilities**

The amount of contingent consideration for the Roust Inc. acquisition is $9.5 million. The remaining amount of other current liabilities as of December 31, 2014 relates mainly to marketing services and employee benefits payable.

*Long-Term Accruals*

Long-term accruals and other long-term liabilities amount $1.7 million as of December 31, 2013 and $2.1 million as of December 31, 2014. They are comprised mainly of retirement benefits and jubilee award accruals.

## 17.    COMMITMENTS AND CONTINGENT LIABILITIES

**Supply contracts**

The Company has various agreements covering its sources of supply, which, in some cases, may be terminated by either party on relatively short notice. Thus, there is a risk that a portion of the Company's supply of products could be curtailed at any time.

**Bank Guarantees**

The Company is a party to guarantee agreements with banks relating to purchases of spirit, excise stamps and custom duties. In accordance with current legislation in Russia, a producer purchasing spirit alcohol must (a) prepay the excise tax in full or (b) provide the relevant tax body with a bank guarantee in the full amount of the excise tax before purchasing, to secure payment of the excise tax. The bank guarantee serves as insurance that the excise tax is paid on time.

- The JSC "Russian Alcohol Group" and subsidiaries ("RAG") has in place a guarantee line agreement with multiple banks pursuant to which it has been provided with a guarantee limit of 24.1 billion Russian rubles (approximately $413.7 million) for a period from one to three years.

- Bravo Premium has also guarantee line agreements with multiple banks pursuant to which it has been provided with a total guarantee limit of 1.0 billion Russian rubles (approximately $16.3 million) for a period from one to two years.

- Whitehall Group has in place a guarantee line agreement with multiple banks pursuant to which it has been provided with a guarantee limit of 500.0 million Russian rubles (approximately $8.6 million) as providing performance of obligations of the owner of a customs warehouse and insurance against illegal usage of excise stamps.

According to these agreements, our subsidiaries have the right to obtain bank guarantees during the agreement term for each purchase of excise stamps which are needed to import alcohol to the Russian Federation. The guarantees for excise stamps are being issued in favor of Central Custom for the whole period until products are delivered to the territory of the Russian Federation and passed the customs clearance procedure after which they are allowed to be sold on the territory of the Russian Federation.

In Poland as of December 31, 2014 the Company had bank guarantees related to excise stamps, customs duties on imported goods, office rent and supplies from one of our Brand owner of 0.3 million Polish zlotys (approximately $0.1 million), 2.7 million Polish zlotys (approximately $0.8 million), 0.8 million Polish zlotys (approximately $0.2 million) and 2.1 million Polish zlotys (approximately $0.6 million), respectively.

In Hungary as of December 31, 2014 the Company had guarantee related to office rent and insurance for tax warehouse of 22.0 million Hungarian forints (approximately $0.1 million) and 60.0 million Hungarian forints (approximately $0.2 million).

**Operating Leases and Rent Commitments**

Total rental expenses related to operating leases for the years ended December 31, 2012, December 31, 2013 and December 31, 2014 amounted to $13.4 million, $16.4 million and $13.3 million, respectively.

The following is a schedule by years of the future rental payments under the non-cancelable operating leases as of December 31, 2014:

| Future rental payments under operating leases | December 31, 2014 |
|---|---|
| 2015 | $ 8,368 |
| 2016 | 5,735 |
| 2017 | 5,314 |
| 2018 | 4,272 |
| 2019 | 4,153 |
| Thereafter | 13,356 |
| **Total** | **$ 41,198** |

The future minimum lease payments for the assets under capital leases as of December 31, 2014 are as follows:

| Future minimum lease payments under capital leases | December 31, 2014 |
|---|---|
| 2015 | 1,515 |
| 2016 | 1,301 |
| 2017 | 576 |
| 2018 | - |
| 2019 | - |
| **Gross payments due** | **$ 3,392** |
| Less interest | 255 |
| **Net payments due** | **$ 3,137** |

**Factoring**

As of December 31, 2014 the Company is a party to recourse factoring as described in Note 6. If our debtors will not pay the amounts due under the factoring agreement, the factors have the right to require payments from the Company. In such case the Company will have to re-recognize the related receivable from the debtor and related liability to the bank. The Company believes that there are no substantial risks of the debtors not paying on time.

**Assets Subject to Pledges in Respect of the NSSN and NCJSN**

As of December 31, 2014 the following assets were subject to pledges:

- Poland:

  - pledges of shares in each of CEDC International Sp. z o.o. and PWW Sp. z o.o.;

  - mortgages over real property and fixtures at CEDC International Sp. z o.o.'s factories located at Oborniki and Bialystok;

  - security over certain intellectual property rights owned by CEDC International Sp. z o.o. related to the *Palace*, *Żubrówka*, *Absolwent* and *Soplica* brands;

- Hungary:

  - registered business quota pledge over Roust Hungary Kft (previously Bols Hungary Kft);

  - security over certain intellectual property rights owned by Roust Hungary Kft (previously Bols Hungary Kft) in respect of the *Royal*, *Royal Feny* and *Royal Vodka* trademarks;

- Cyprus:

- registered pledges of shares in each of Latchey Limited, Jelegat Holdings Ltd., Pasalba Ltd;

- United Kingdom:

  - English law assignment of the NCJSN and the NSSN intercompany proceeds loans from Jelegat Holdings Ltd. to Roust Russia (previously Russian Alcohol Group) subsidiaries granted by Jelegat Holdings Ltd.;

- Luxembourg:

  - pledges of shares in each of Lion/Rally Lux 1 S.A., Lion/Rally Lux 2 S.à r.l. and Lion/Rally Lux 3 S.à r.l.;

- United States:

  - pledges of the capital stock of each of CEDC Finance Corporation LLC and CEDC Finance Corporation International Inc.;

  - pledges of the intercompany loans made by CEDC Finance Corporation International Inc. to CEDC International Sp. z. o. o and Jelegat Holdings Ltd. (respectively);

- Russia:

  - registered pledge of participatory interests in LLC "Glavspirttirest", Bravo Premium LLC, LLC "The TH Russian Alcohol";

  - mortgages over real property, land rights and fixtures (to the extent qualified as real property under Russian law) of the JSC "Siberian Distillery" and First Tula Distillery LLC;

  - pledge of shares of JSC "Distillery Topaz", JSC "Siberian Distillery" (First Tula Distillery LLC and CJSC Mid-Russian Distilleries was merged with JSC Siberian Distillery) in December 2014 and JSC "Roust Russia" (previously JSC "Russian Alcohol Group" );

  - security over certain intellectual property rights relating to the *Green Mark*, *Zhuravli*, *Marusya, Yamskaya, Parliament*, *Talka* and *Kauffman* vodka trademarks.

Additionally, in 2015 the following collateral is to be provided:

- pledge of additional shares in Bravo Premium LLC and JSC "Siberian Distillery".

**Legal proceedings**

From time to time we are involved in legal proceedings arising from the normal course of our business, including opposition and cancellation proceedings with respect to trademarks similar to some of our brands, and other proceedings, in the United States, Russia, Poland and elsewhere. Except as set forth below, we are not currently involved in or aware of any pending or threatened proceedings that we reasonably expect, either individually or in the aggregate, will result in a material adverse effect on our consolidated financial statements.

As noted in the Company's Annual Report on Form 10-K/A for the year ended December 31, 2011, filed with the SEC on October 5, 2012, the Audit Committee of the Company's board of directors, through its counsel, voluntarily notified the SEC of its internal investigation regarding the Company's retroactive trade rebates, trade marketing refunds and related accounting issues. The Company was subsequently contacted by the Fraud Division of the Criminal Division of the US Department of Justice ("DOJ") regarding the disclosure in the Company's Form 10-K/A for the year ended December 31, 2011, filed with the SEC on October 5, 2012 that there was a breach of the

books and records provisions of the Foreign Corrupt Practices Act ("FCPA") of the United States and potentially other breaches of the FCPA. The Company was asked to provide information about these matters on a voluntary basis to the SEC and DOJ. The Company cooperated with the SEC and DOJ and to date, the DOJ has not taken any additional action or been in further contact with the Company regarding this matter. Should the DOJ further contact the Company and we will continue to cooperate with the DOJ or the SEC. Any action by the SEC or DOJ could result in criminal or civil sanctions against the Company and/or certain of its current or former officers, directors or employees. The Company cannot predict the duration, scope or ultimate outcome of the investigations and is unable to estimate the financial impact they may have, or predict the reporting periods in which any such financial impacts may be recorded.

As previously described in the Company's quarterly and annual reports, shareholder class action complaints were filed against the Company and its former CEO and CFO. The actions, before the United States District Court for the District of New Jersey, are captioned Grodko v. Central European Distribution Corporation, et al. Civil Action No. 12-CV-5530, and In re Central European Distribution Corporation, Civil Action No. 11-CV-6247. The Company has been incurring defense costs in connection with these actions. Upon confirmation of the Chapter 11 Plan of Reorganization, the Company was dismissed as a defendant in these actions. The parties have finalized preliminary settlement agreements to resolve the claims against former management that remain pending. As of December 31, 2013 the Company accrued $11.2 million of costs to satisfy the claims with $10 million of such costs to be paid from the proceeds of its director and officer insurance. The relevant receivable was recognized in other current assets as of December 31, 2013. The claims were resolved in the year 2014 and the above asset and liabilities were derecognized.

In December 2013 our subsidiary, CEDC International sued Stock Polska S.A. ("Stock") for unfair competition in the form of the misleading term "wódka" placed on Stock's flagship product Żołądkowa Gorzka. In December 2013, following CEDC International's application, the court issued an interim injunction order prohibiting Stock from selling the products with the misleading "wódka" term. CEDC International has taken a number of actions in respect of old inventory of product released by Stock to the market, still claiming "wódka" on the bottle. Three different court pleadings were filed, including the application to extend the previously issued injunction. The court has agreed with the arguments of CEDC International and extended the original injunction, imposing the obligation on Stock to withdraw all improperly labeled products from the market. Stock filed an appeal in relation to this new injunction order imposing the obligation to withdraw the product. The Court of Appeal dismissed the interim injunction order. Among other things and in addition to the regular litigation pending, CEDC International tries to enforce the penalty under the original injunction issued in December 2013, the court enforcement proceedings are pending and the decision in that respect is now expected in the second quarter of 2015.

## 18.    STOCKHOLDERS' EQUITY

### Authorized Shares

On September 6, 2011, the Company adopted a Rights Agreement between the Company and American Stock Transfer & Trust Company LLC, as rights agent, dated as of that date ("the Rights Agreement"), and declared a dividend distribution of one preferred share purchase right (a "Right") for each outstanding share of common stock that was payable to stockholders of record as of the close of business on September 19, 2011 (the "Record Date"). Subject to the terms, provisions and conditions of the Rights Agreement, each Right entitles the registered holder to purchase from the Company one one-thousandth of a share of series A Junior Participating Preferred Stock of the Company, par value $0.01 per share (the "Preferred Shares"), at a price of $45.00 per one one-thousandth of a Preferred Share (the "Purchase Price"), subject to adjustment.

On the Effective Date of the Plan on June 5, 2013, all of the Company's shares of common stock along with all Rights associated therewith, were cancelled. As a result, the Rights Agreement was terminated.

The Successor Company has 90,000 $0.01 par value shares of common stock authorized of which 10,000 shares are issued and outstanding as of, December 31, 2013 and December 31, 2014. Additionally the Company has authorized 10,000 preferred shares of which none are issued and outstanding as of December 31, 2013 and December 31, 2014.

**Stock Option Plans and Warrants**

During the five months ended May 31, 2013, the Company recognized compensation costs of $0.4 million. Upon emergence, all common stock as well as equity based incentive compensation, including but not limited to stock options and restricted stock units of the Predecessor, were cancelled in accordance with the Plan and therefore no equity based incentive compensation was recognized during 7 months from June 1, 2013 to December 31, 2013, and in the year ended December 31, 2014.

**19.    RELATED PARTY TRANSACTIONS**

**Related Parties Identification**

As disclosed in Note 2, upon emergence from bankruptcy protection as of June 5, 2013 (effective date), Mr Roustam Tariko became the sole ultimate shareholder of ROUST. Further, Mr Roustam Tariko has been appointed to ROUST's Board of Directors as Executive Chairman of the Board. Given that Mr Roustam Tariko indirectly controls RTL and RTL directly controls Russian Standard Corporation (and indirectly controls other Russian Standard entities), all entities controlled by Mr Tariko have become related parties of ROUST, including Russian Standard Bank, Russian Standard Corporation, Russian Standard Vodka (USA), Inc., Russian Standard Vodka, Union Trust Stroy and F.lli Gancia & C. SpA.

**Transactions with Related Parties**

In the ordinary course of business, the Company is involved in transactions with entities controlled by Mr Tariko that result in the recognition of revenues, expenses, assets and liabilities by the Company.

The following table summarizes our transactions with Related Parties as included in these Consolidated Financial Statements:

| CONDENSED CONSOLIDATED STATEMENTS OF OPERATIONS AND COMPREHENSIVE INCOME | Year ended December 31, 2012 | | Predecessor one hundred fifty-six-day period ended June 5, 2013 | Successor Two hundred and nine days ended December 31, 2013 as recast | | Successor Year ended December 31, 2014 |
|---|---|---|---|---|---|---|
| Net sales | $ | 1,518 | $ 1,006 | $ 1,709 | $ | 2,029 |
| Cost of goods sold | | 1,863 | 900 | 494 | | 997 |
| Purchases of goods | | 1,863 | 643 | 51,077 | | 64,051 |
| Purchases of raw materials | | - | 1,545 | 4,486 | | 3,387 |
| Selling, general and administrative expenses | | 1,059 | 653 | 10,623 | | 3,387 |
| Interest expense | | - | 1,339 | 4,441 | | 7,846 |
| Interest income | | - | - | 8,747 | | 13,114 |
| Other income | $ | - | $ - | $ 782 | $ | 200 |

| CONDENSED CONSOLIDATED BALANCE SHEETS | Successor December 31, 2013 as recast | | Successor December 31, 2014 |
|---|---|---|---|
| *Assets* | | | |
| Accounts receivable | $ | 1,695 | $ 6,453 |
| Prepaid expenses | | 17,604 | 1,025 |
| Other current assets (other current receivables) | | 1,474 | 676 |
| Loans granted to Related Parties | | 188,272 | 83,836 |
| **Total due from Related Parties** | $ | 209,045 | $ 91,990 |
| *Liabilities* | | | |
| Trade accounts payable | $ | 9,328 | $ 13,149 |
| Other accounts payable | | 1,924 | 9,549 |
| Bank loans and borrowings from Related Parties | | 87,161 | 49,331 |
| **Total due to Related Parties** | $ | 98,413 | $ 72,029 |

Accounts receivable and trade accounts payable result from sale and purchase transactions made primarily with LLC "Russian Standard Vodka" and F.lli Gancia & C. SpA in the ordinary course of business. Prepaid expenses as of December 31, 2013 are comprised mainly of prepayments for purchases of goods and spirit in the amount of $14.6 million and $2.6 million, respectively. As of December 31, 2014 prepaid expenses comprised of prepayments for finished goods and spirit purchases amounted to nil and $0.5 million, respectively. Selling, general and administrative expenses relate to costs of renting office premises from LLC "Union Trust Stroy" and LLC "Russian Standard Vodka". As of December 31, 2014 other accounts payable of $9.5 million include the contingent part of the consideration payable for the Roust Inc. acquisition.

The acquisition of Roust Inc. brought 9% of the shares of LLC "Russian Standard Vodka" with a historical de minimis book value. The Company believes that the fair market value of these shares is significantly higher than its book carrying value. The shareholder has a call option on the repurchase of the shares. The option is exercisable at fair market value.

**Loans granted to Related Parties:**

As of December 31, 2013 and December 31, 2014 the Company had loan receivables from Related Parties in principal amount equal to $176.3 million and $77.9 million, respectively. Loans outstanding as of December 31, 2013 in principal amount of $72.5 million were repaid by the Roust Inc. acquisition transaction in June 2014. All of the loans as of December 31, 2014 are included in the consolidated balance sheet together with accrued interest in the amount of $83.8 million. The loans were granted to RTL, LLC "Russian Standard Vodka", LLC "Union Trust Stroy" and Russian Standard Asia Pte. Ltd. to support the growth of their business. The details of loans granted as of December 31, 2014 are presented in the table below.

| Principal amount * | Date of signing the agreement | Maturity date | Interest rate |
|---|---|---|---|
| $46.0 million | February 17, 2014 - December 1, 2014 | January 17, 2015 - July 2, 2016 | 13.8 % - 16.8 % |
| $27.9 million | September 24, 2012 - February 20, 2014 | April 18, 2016 - September 12, 2022 | 10.00 % |
| $4.0 million | March 24, 2014 | March 10, 2022 | 12.00 % |

*these facilities include the loans of principal amount of $31.5 million which originate from period before Roust Inc. acquisition*

These loans have been guaranteed by related party subsidiaries and are secured by the pledge of RTL receivables in the amount of $29.2 million. We believe RTL, LLC "Russian Standard Vodka" and LLC "Union Trust Stroy" have intent and ability to repay the loans upon maturity and therefore these loans are presented as assets in balance sheet not in shareholders' equity.

**Borrowings from Related Parties**

As of December 31, 2014 the Company had borrowings from Related Parties in the amount of $49.3 million which are described in Note 14 "Notes and Borrowings".

**Guarantees from Related Parties**

Roust Inc. has provided guarantees to Related Parties of $195.2 million as of December 31, 2014. RTL and its subsidiaries have provided guarantees to Roust Inc. of $99.6 million as of December 31, 2014. Majority of the guarantees relates to purchases of spirit, excise stamps and custom duties. Such guarantees are typical and necessary in our industry.

**20.   *FAIR VALUE MEASUREMENTS***

As of December 31, 2014 and December 31, 2013, the Company held certain financial assets that are measured at fair value on a recurring basis. These consisted of cash and cash equivalents. The monetary assets represented by these financial instruments are primarily located in Poland, Hungary and Russia. Consequently, they are subject to currency translation risk when reporting in US dollars.

The Company does not have any financial assets measured at fair value on a recurring basis as Level 3. The Company also has certain financial liabilities which are to be measured at fair value on a recurring basis for disclosure purposes only, namely, the NCJSN and NSSN. The CSNs, SSN, RTL Notes held by the Predecessor as of December 31, 2013 were described in detail in our Annual Report on Form 10-K for the year ended December 31,

2012, published on June 18, 2013. The fair value of NSSN and NCJSN is determined based on quoted market prices in public markets and is categorized as Level 1. The fair value of NSSN and NCJSN is disclosed in Note 14 Notes and Borrowings. There were no transfers in or out of Level 1, Level 2 or Level 3 during the annual period ended December 31, 2013 and December 31, 2014.

The Company has other financial instruments, such as, receivables accounts payable, overdrafts, short term bank loans and other liabilities which have been excluded from the tabular disclosures below. Due to the short-term nature of these instruments, their carrying values approximate their fair values. The Company did not have any other financial instruments within the scope of the fair value disclosure requirements as of December 31, 2014 and December 31, 2013.

Non-financial assets, such as goodwill, trademarks and long-lived assets, and liabilities are measured at fair value on a nonrecurring basis. The book value of these assets is the fair value as established as of the fresh start date adjusted for subsequent changes including depreciation and amortization for definite-lived assets. These items are tested for impairment on the occurrence of a triggering event or in the case of goodwill and indefinite-lived trademarks, on at least an annual basis. As of December 31, 2014 test was performed and as a result of the test no impairment was recognized. Refer to Note 10, 11 and 12 for the carrying value of the Company's long-lived assets and amount of recognized impairment as of December 31, 2013 and December 31, 2014.

The following table sets forth by level, within the fair value hierarchy, the Company's assets accounted for at fair value on a recurring basis as of December 31, 2013 and December 31, 2014:

| Fair value measurement on a recurring basis | | | | |
|---|---|---|---|---|
| | Total | Quoted prices in Activated Markets for Identical Assets (Level 1) | Significant Other Observable Inputs (Level 2) | Unobservable Inputs (Level 3) |
| December 31, 2013 | | | | |
| Cash and cash equivalents | $ 50,171 | $ 50,171 | $ - | $ - |
| December 31, 2014 | | | | |
| Cash and cash equivalents | $ 37,216 | $ 37,216 | $ - | $ - |

The following table sets forth by level, within the fair value hierarchy the Company's assets accounted for at fair value on a non-recurring basis (goodwill, trademark) as of December 31, 2013:

| Fair value measurements on a non-recurring basis | | | | | |
|---|---|---|---|---|---|
| | Total | Quoted prices in Activated Markets for Identical Assets (Level 1) | Significant Other Observable Inputs (Level 2) | Unobservable Inputs (Level 3) | Total loss |
| December 31, 2013 | | | | | |
| Trademarks (1) | $ 98,337 | $ - | $ - | $ 98,337 | $ 58,319 |
| Goodwill (2) | $ 13,641 | $ - | $ - | $ 13,641 | $ 24,585 |

(1)  In 2013 trademarks with a carrying amount of $156.7 million were written down to their fair value of $98.3 million, resulting in an impairment charge of $58.3 million, which was included in earnings for the year ended December 31, 2013. Total trademarks measured at fair value and at historical cost as at December 31, 2013 amounted to $280.5 million.

(2)  In 2013 goodwill with a carrying amount of $38.2 million was written down to its fair value of $13.6 million, resulting in an impairment charge of $24.6 million, which was included in earnings for the year ended December 31, 2013. Total goodwill measured at fair value and at historical cost as at December 31, 2013 amounted to $247.5 million.

None of assets were measured at fair value on a non-recurring basis as of December 31, 2014.

## 21.   OPERATING COSTS

Operating costs of the Company comprise selling, general and administrative expenses (including selling, general and administrative expenses charged by the Related Parties), provision for doubtful debts and impairment charges (if any). The table below presents details of our operating costs.

| | | Year ended December 31, 2012 | Predecessor one hundred fifty-six-day period ended June 5, 2013 | Successor Two hundred and nine days ended December 31, 2013 as recast | Year ended December 31, 2014 |
|---|---|---|---|---|---|
| Staff costs | $ | 119,111 | $ 52,227 | $ 91,262 | $ 126,006 |
| Warehousing and transportation | | 50,254 | 23,389 | 38,967 | 47,816 |
| Marketing | | 28,932 | 9,247 | 30,810 | 29,051 |
| Administration expenses | | 69,118 | 13,743 | 38,627 | 40,164 |
| Depreciation and amortization | | 8,997 | 3,361 | 3,449 | 7,462 |
| **Selling, general and administrative expenses** | $ | **276,412** | $ **101,967** | $ **203,115** | $ **250,499** |
| Provision for doubtful debts | | 6,436 | 601 | 4,930 | (3,559) |
| Impairment charges | | 372,899 | - | 83,324 | - |
| **Total Operating Costs** | $ | **655,747** | $ **102,568** | $ **291,369** | $ **246,940** |

## 22.    INTEREST INCOME

For the years ended December 31, 2012, 2013 and 2014 respectively, the following items are included in Interest income:

| | | Year ended December 31, 2012 | Predecessor one hundred fifty-six-day period ended June 5, 2013 | Successor Two hundred and nine days ended December 31, 2013 as recast | Year ended December 31, 2014 |
|---|---|---|---|---|---|
| Interest income from third parties | $ | 2,868 | $ 714 | $ 567 | $ 357 |
| Interest income from Related Parties | | - | - | 8,747 | 13,114 |
| **Total interest income** | $ | **2,868** | $ **714** | $ **9,314** | $ **13,471** |

## 23.    INTEREST EXPENSE

The tables below present items included in interest expense for the periods ended December 31, 2012, December 31, 2013 and December 31, 2014. The first interest payment was payment-in-kind interest of $8.3 million on October 31, 2013. The second and third in-kind interest payment of $10.4 million and $10.9 million was capitalized on April 30, 2014 and October 31, 2014, respectively.

| | | Year ended December 31, 2012 | Predecessor one hundred fifty-six-day period ended June 5, 2013 | Successor Two hundred and nine days ended December 31, 2013 as recast | Year ended December 31, 2014 |
|---|---|---|---|---|---|
| Notes* | $ | 98,941 | $ 40,296 | $ 36,917 | $ 65,543 |
| Other borrowings | | 10,511 | 6,029 | 17,603 | 30,581 |
| **Total interest expense** | $ | **109,452** | $ **46,325** | $ **54,520** | $ **96,124** |
| of which: | | | | | |
| Interest expense to Related Parties | $ | | $ 1,339 | $ 4,441 | $ 7,846 |

\* Notes: The SSN and the Convertible Senior Notes due 2013 for the Predecessor; the NSSN and the NCJSN for the Successor.

Interest expense includes amortization of debt discounts/ provisions and debt issuance costs.

## 24.    OTHER FINANCIAL INCOME / (EXPENSE), NET

For the year ended December 31, 2012, 2013, and 2014, the following items are included in other financial income / (expense):

|  | Year ended | Predecessor one hundred fifty-six-day period ended | Successor Two hundred and nine days ended | Year ended |
|---|---|---|---|---|
|  | December 31, 2012 | June 5, 2013 | December 31, 2013 as recast | December 31, 2014 |
| Unrealized foreign exchange impact related to foreign currency financing | 98,863 | (54,332) | 85,940 | (49,636) |
| Unrealized foreign exchange impact - other balance sheet items | $ - | $ - | $ (4,731) | $ (23,488) |
| Gain on debt extinguishment | 1,949 |  | - | - |
| Other gains / (losses) * | (1,539) | (3,681) | (99,353) | (1,958) |
| Total foreign exchange gains / (losses), net | $ 99,273 | $ (58,013) | $ (18,144) | $ (75,082) |

*\* other gains / (losses) for the Successor period of two hundred and nine days ended December 31, 2013 as recast includes $94.0 million of realized foreign exchange differences on loans*

Foreign exchange losses of $75.1 million in 2014 include negative impact of foreign exchange translation of approximately $208.2 million related mainly to bond proceeds on-lent in US dollars to subsidiaries having local functional currencies different from US dollar. These foreign exchange losses are offset by net foreign exchange gains of approximately $133.1 million arising on other loans.

### 25.    *OTHER NON-OPERATING INCOME / (EXPENSE), NET*

For the years ended December 31, 2012, 2013 and 2014, respectively, the following items are included in other non-operating income / (expense):

|  | Year ended | Predecessor one hundred fifty-six-day period ended | Successor Two hundred and nine days ended | Year ended |
|---|---|---|---|---|
|  | December 31, 2012 | June 5, 2013 | December 31, 2013 as recast | December 31, 2014 |
| Impairments related to assets held for sale | (675) | $ - | $ - | $ - |
| Factoring costs and bank guarantee fees | $ (10,869) | $ (5,631) | $ (10,699) | $ (20,022) |
| Bank waiver costs | (1,867) | - | - | - |
| Other gains / (losses) | (2,464) | (719) | 1,870 | (1,111) |
| Total other non-operating income / (expense), net | $ (15,875) | $ (6,350) | $ (8,829) | $ (21,133) |

### 26.    *EARNINGS/ (LOSS) PER SHARE*

The following table sets forth the computation of basic and diluted earnings per share for the periods indicated.

| | Year ended | Predecessor one hundred fifty-six-day period ended | Successor Two hundred and nine days ended | Year ended |
|---|---|---|---|---|
| | December 31, 2012 | June 5, 2013 | December 31, 2013 as recast | December 31, 2014 |
| Income / (loss) from continuing operations, net of non-controlling interests in subsidiaries | $ (363,238) | $ 136,183 | (117,930) | $ (114,427) |
| **Net Income / (loss) attributable to the Parent** | **(363,238)** | **136,183** | **(117,930)** | **(114,427)** |
| Weighted average shares of common stock outstanding (used to calculate basic EPS) | 76,649 | 81,554 | 10,000 | 10,000 |
| Net effect of dilutive employee stock options based on the treasury stock method | 411 | 462 | - | - |
| **Weighted average shares of common stock outstanding (used to calculate diluted EPS)** | **77,060** | **82,016** | **10,000** | **10,000** |
| **Net income / (loss) per common share - basic** | **$ (4.74)** | **$ 1.67** | **$ (11.79)** | **$ (11.44)** |
| **Net income / (loss) per common share - diluted** | **$ (4.74)** | **$ 1.66** | **$ (11.79)** | **$ (11.44)** |

In the Predecessor periods employee stock options granted have not been included in the above calculations of diluted earnings per share where the exercise price is less than the average market price of the common stock. In addition, there is no adjustment to fully diluted shares related to the Convertible Senior Notes as the inclusion of these shares would have been antidilutive.

No employee stock options were granted in the period of year ended December 31, 2014. No options were outstanding as of December 31, 2014. There is no adjustment diluted earnings per share related to the Convertible Secured Notes as the inclusion of these shares would have been antidilutive.

## 27.    COMPREHENSIVE INCOME / (LOSS)

Comprehensive income is defined as all changes in equity during a period except for those resulting from investments by owners and distributions to owners. Comprehensive income of the Company includes net income adjusted by foreign currency translation adjustments. The foreign exchange losses / gains on the translation from foreign currencies to US dollars are classified separately as foreign currency translation adjustments within accumulated other comprehensive income included in stockholders' equity.

As described in the 2013 Financial Statements, upon emergence from bankruptcy protection, the Company adopted the "fresh start accounting" provisions of ASC 852. Under fresh start accounting the Predecessor Company's accumulated comprehensive income was fully eliminated.

Other comprehensive loss of $41.8 million reported on the face of the consolidated statement of operations and comprehensive income results from currency translation adjustment. The adjustment is calculated for each group entity that has functional currency different from US dollar (primarily Polish zloty and Russian ruble) when its respective financial statements are translated into US dollar.

In the year ended December 31, 2013 functional currency exchange rates used to translate the balance sheet strengthened against the US dollar as compared to the exchange rates as of December 31, 2012 and as a result a gain of $22.2 million and $31.3 million of foreign currency translation adjustment was recognized for the one hundred and fifty-six-day period ended June 5, 2013 and two hundred and nine days ended December 31, 2013, respectively.

## 28.    SEGMENT INFORMATION

The Company operates and manages its business based on primary geographic segments: Poland, Russia and Hungary. Segment information represents only continuing operations. Our Ukrainian operations are directly linked to our Russian, therefore they are treated as one segment. Selected financial data splits based upon these segmentations assuming the elimination of intercompany revenues and profits are shown below for appropriate periods:

### Net Sales

| Segment | | Year ended<br>December 31, 2012 | | Predecessor<br>one hundred fifty-six-day period ended<br>June 5, 2013 | | Successor<br>Two hundred and nine days ended<br>December 31, 2013<br>as recast | | Year ended<br>December 31, 2014 |
|---|---|---|---|---|---|---|---|---|
| Poland | $ | 237,602 | $ | 89,572 | $ | 185,959 | $ | 287,999 |
| Russia | | 550,316 | | 177,267 | | 455,770 | | 525,082 |
| Hungary | | 27,755 | | 6,626 | | 19,001 | | 31,297 |
| **Total Net Sales** | **$** | **815,673** | **$** | **273,465** | **$** | **660,730** | **$** | **844,378** |

### Underlying EBITDA (non US GAAP measure)

| Segment | | Year ended<br>December 31, 2012 | | Predecessor<br>one hundred fifty-six-day period ended<br>June 5, 2013 | | Successor<br>Two hundred and nine days ended<br>December 31, 2013<br>as recast | | Year ended<br>December 31, 2014 |
|---|---|---|---|---|---|---|---|---|
| Poland | $ | 39,166 | $ | 15,206 | $ | 26,548 | $ | 55,080 |
| Russia | | 65,058 | | 13,294 | | 53,577 | | 50,101 |
| Hungary | | 4,833 | | 418 | | 3,331 | | 4,774 |
| Corporate Overhead | | (44,135) | | (5,473) | | 1,647 | | (2,364) |
| **Total Underlying EBITDA** | **$** | **64,922 \*** | **$** | **23,445** | **$** | **85,103** | **$** | **107,591** |

*In 2012 our presented number represents reported EBITDA, as in 2012 it was our operating segment measure.*

### Depreciation / Amortization Expense

| Segment | | Year ended<br>December 31, 2012 | | Predecessor<br>one hundred fifty-six-day period ended<br>June 5, 2013 | | Successor<br>Two hundred and nine days ended<br>December 31, 2013<br>as recast | | Year ended<br>December 31, 2014 |
|---|---|---|---|---|---|---|---|---|
| Poland | $ | 5,173 | $ | 2,345 | $ | 2,771 | $ | 5,904 |
| Russia | | 14,975 | | 5,250 | | 4,006 | | 5,612 |
| Hungary | | 229 | | 98 | | 198 | | 292 |
| General corporate overhead | | - | | 1 | | 1 | | 3 |
| **Total depreciation / amortization expense** | **$** | **20,377** | **$** | **7,694** | **$** | **6,976** | **$** | **11,811** |

### Income Tax

| Segment | | Year ended<br>December 31, 2012 | | Predecessor<br>one hundred fifty-six-day period ended<br>June 5, 2013 | | Successor<br>Two hundred and nine days ended<br>December 31, 2013<br>as recast | | Successor<br>Year ended<br>December 31, 2014 |
|---|---|---|---|---|---|---|---|---|
| Poland | $ | (1,113) | $ | 3,645 | $ | 1,213 | $ | (3,144) |
| Russia | | (10,566) | | 13,473 | | 12,117 | | (5,088) |
| Hungary | | (1,082) | | (233) | | (65) | | (279) |
| General corporate overhead | | 1,064 | | 249 | | (515) | | (3,823) |
| **Total income tax benefit / (expense)** | **$** | **(11,697)** | **$** | **17,134** | **$** | **12,750** | **$** | **(12,334)** |

| Identifiable Operating Assets | | |
|---|---|---|
| | Successor December 31, 2013 as recast | Successor December 31, 2014 |
| **Segment** | | |
| Poland | $ 550,111 | $ 416,928 |
| Russia | 1,016,069 | 473,575 |
| Hungary | 31,016 | 31,742 |
| Corporate | 12,357 | 25,696 |
| **Total Identifiable Assets** | $ 1,609,553 | $ 947,942 |

Our identifiable operating assets, comparing December 31, 2014 to December 31, 2013 were lower by $661.6 million mainly due to the effect of strenghtening US dollar against the Polish zloty and Russian ruble. Total effect of foreign exchange rate fluctuations amounted to $439.0 million. Operating assets of the Polish segment decreased by $64.6 million on a currency neutral basis, mainly as a result of high inventory level at the end of 2013 before excise tax increase, that took place in January 2014. Russian operating assets decreased by $179.0 million on a currency neutral basis, due to lower level of loans granted to related parties by $81.2 million, lower prepayments for raw materials and other goods by $59.3 million, as well as lower trade receivables by $41.9 million, being an effect of better cash collection management. Operating assets of corporate segment increased by $13.3 million as an effect of loan granted to related party entity.

| Goodwill | | |
|---|---|---|
| | Successor December 31, 2013 as recast | Successor December 31, 2014 |
| **Segment** | | |
| Poland | $ 162,092 | $ 139,206 |
| Russia | 71,772 | 40,598 |
| Hungary | 13,641 | 11,328 |
| **Total Goodwill** | $ 247,505 | $ 191,132 |

## 29.    GEOGRAPHIC DATA

Net sales and long-lived assets, by geographic area, consisted of the following for the three years ended December 31, 2012, 2013 and 2014:

| Net Sales to External Customers (a) | | | | |
|---|---|---|---|---|
| | Year ended December 31, 2012 | Predecessor one hundred fifty-six-day period ended June 5, 2013 | Successor Two hundred and nine days ended December 31, 2013 as recast | Year ended December 31, 2014 |
| **United States** | $ 2,838 | $ 1,528 | $ 1,952 | $ 2,247 |
| **Other Countries** | | | | |
| Poland | 227,097 | 84,522 | 178,402 | 271,822 |
| Russia | 526,879 | 166,107 | 438,779 | 498,511 |
| Hungary | 28,043 | 6,626 | 19,001 | 31,295 |
| Other | 30,816 | 14,682 | 22,596 | 40,503 |
| **Total Other Countries** | 812,835 | 271,937 | 658,778 | 842,131 |
| **Total** | $ 815,673 | $ 273,465 | $ 660,730 | $ 844,378 |

| Long-lived Assets (b) | | |
|---|---|---|
| | Successor December 31, 2013 as recast | Successor December 31, 2014 |
| **United States** | $ 2 | $ 0 |
| **Other Countries** | | |
| Poland | 336,878 | 294,280 |
| Russia | 307,495 | 172,436 |
| Hungary | 14,554 | 12,239 |
| **Total Other Countries** | 658,927 | 478,955 |
| **Total consolidated long-lived assets** | $ 658,929 | $ 478,955 |

(a)    Net sales to external customers based on the location to which the sale was delivered.

Appendix G-182

(b)  Long-lived assets primarily consist of property, plant and equipment and trademarks.

### 30.    SUBSEQUENT EVENTS

Subsequent events were evaluated through March 27, 2015 which is the date these annual consolidated financial statements were issued.

*Effect of Sanctions against the Russian Federation*

Due to the ongoing instability in Ukraine, the US and the EU have announced a series of sanctions against selected Russian government representatives, institutions and certain businesses. Russia has also announced its own sanctions against selected countries and foreign governmental representatives. Both sides have publicly maintained that additional sanctions may be forthcoming. The Company has in its Russian business certain business arrangements, such as guarantees for our required excise tax payments, that are conducted through subsidiaries of certain banks whereby the parent bank is on the current sanctions list. Our understanding is that the sanctions do not extend to these entities and therefore we continue to have business relationships with them. As of the date of these financial statements, our business in Russia has not been significantly impacted by the sanctions. However, the full impact of the sanctions is, at this stage, difficult to determine.

*New pledges*

As of February 9, 2015 the pledge was registered in favor of BZ WBK Leasing S.A. over CEDC International's alcohol inventory up to $5.2 million.

As of January 19, 2015 the Pekao factoring pledge was registered increasing the pledge on receivables streaming from the bank accounts held by CEDC International at Bank Pekao S.A. to 150 million Polish zlotys.

*Significant Board Resolutions*

On February 27, 2015 the Board of Directors approved term sheets to purchase for fair value consideration LLC "UnionTrustStroy" and 49% of shares in F.lli Gancia & C. S.p.A. from CJSC "Russian Standard Corporation". In the light of the contemplated transaction Board of Directors has also resolved that three loans granted to RTL due on February 27, 2015 - March 24, 2015 should be extended to June 25, 2015 – September 24, 2015.

The decision to acquire LLC "UnionTrustStroy" and 49% of shares in F.lli Gancia & C. S.p.A. is in line with our strategy to further expand our marketing strength and product portfolio as well as our drive for costs base reduction.

## PART III

### Item 10. Directors and Executive Officers of the Registrant

The current directors and executive officers of the Company are as follows:

| Name | Age | Position(s) |
| --- | --- | --- |
| Roustam Tariko | 54 | Executive Chairman of the board of directors |
| Eberhard von Löhneysen | 66 | Director |
| Pavel Merkul | 35 | Director |
| Alessandro Picchi | 59 | Director |
| Grant Winterton | 46 | Chief Executive Officer |
| Goran Ljubicic | 42 | Chief Financial Officer |

**Roustam Tariko** was appointed Executive Chairman of our board of directors on July 9, 2012 and continues to serve in this role. Mr. Tariko also served as Interim President of the Company from October 23, 2012 to January 10, 2013. Mr. Tariko is the founder of Russian Standard, one the largest Russian privately owned companies working in the consumer market. Russian Standard has leading positions in banking, premium vodka, sparkling wines and spirits distribution. Dating back to 1992, the Russian Standard family of companies today includes Russian Standard Vodka (a number one premium vodka in Russia, present in over 75 countries), Roust Inc. (a leading Russian distributor of alcoholic beverages), Gancia (a legendary Italian producer of sparkling wines and vermouths founded in 1850), Russian Standard Bank (a leading consumer lender and credit card issuer in Russia) and Russian Standard Insurance. Mr. Tariko is a graduate of the Moscow Institute for Railway Engineering with a degree in economics, which he supplemented with courses at INSEAD Executive School. We believe that Mr. Tariko's extensive experience in the alcohol production and distribution business in Russia and globally will make him a significant and valued Executive Chairman of our board of directors.

**Eberhard von Löhneysen** has been a director of the Company since June 5, 2013. Mr. von Löhneysen has built an extensive career in business consulting and corporate management. After working at the World Bank with a focus on Latin America for eight years, Mr. von Löhneysen spent more than two decades with McKinsey & Co. in different fields and countries. He was responsible for the German financial institutions practice and managed the McKinsey & Co.'s office in Berlin for several years; later he moved to Moscow, where he was responsible for the Eastern European office complex. After leaving McKinsey & Co., Mr. von Löhneysen worked as group Chief Executive Officer of Russian Standard Corporation. Currently, Mr. von Löhneysen serves as the Chairman and Director for Strategy in 10EQS, an online knowledge utility that organizes the collaboration of independent experts. We believe that Mr. von Löhneysen's experience in business consulting and management enables him to make valuable contributions as a member of our board of directors.

**Pavel Merkul** has been a director of the Company since June 5, 2013. Mr. Merkul has been Managing Director of Russian Standard Corporation since 2009 and a director since 2010. He is responsible for the key corporate projects of Russian Standard Group, including mergers and acquisitions and post-merger integration, as well as Russian Standard Group's finances. He has been actively involved in the negotiations between RTL and Roust Corporation ("Roust") since 2011. He began his career in 2001 working on mergers and acquisitions projects in Russia, and then worked with Boston Consulting Group from 2004 through 2009, focusing on strategy development and corporate restructuring projects for leading banking and telecom companies throughout Russia and Ukraine. He received his BA in economics from Moscow State University and his MBA from INSEAD in France and Singapore. We believe that Mr. Merkul's experience in corporate restructuring and mergers and acquisitions makes him a valuable member of our board of directors.

**Alessandro Picchi** has been a director of the Company since April 23, 2012. He is a lawyer enrolled in the Bar of Milan and the Bar of the Italian Highest Court. From December 2011 to April 15, 2012, he was General Counsel of Russian Standard Corporation. From 2006 to 2011, he was a partner of Morri, Cornelli & Associates, a Tax and Law Firm with offices in Milan and Rome. From 2000 to 2006, he was chairman of the board of directors of Globalfin International with headquarters in Switzerland and director of Motorel Investments BV. From 1996 to 2000 he was General Counsel of Globalfin International SA and a member of the board of directors. We believe that

Mr. Picchi's legal experience in international contracts and trade, mergers and acquisitions and corporate governance allows him to make valuable contributions as a member of our board of directors.

**Grant Winterton** joined the Company as General Manager of the Russian Alcohol Group in April 2012 and has been Chief Executive Officer of the Company since January 10, 2013. Mr. Winterton has over 20 years of experience working in marketing, sales and general management positions for Campbell Soup (Australia), The Coca-Cola Company (Australia, Russia, Ukraine, China), Wimm Bill Dann (Russia) and Red Bull (Russia). Mr. Winterton has lived in Russia for over 13 years, working in the consumer goods industry, and has extensive working experience across the Russia, Ukraine, Belarus and CIS markets. Mr. Winterton has a Bachelor of Commerce Degree in Marketing/Finance from the University of New South Wales, Australia.

**Goran Ljubicic** joined the Company as Chief Financial Officer of Roust Poland on November 13, 2013 and has been Chief Financial Officer of the Company since October 10, 2014. Mr. Ljubicic has extensive international work experience with fast-moving consumer goods companies, including 10 years in Russia. Prior to his work with the Company, Mr. Ljubicic was a member of the board of directors and Finance Director, Central European and Balkan Region, at Kreis Swiss from 2009 to 2013 and Region Managing Director, Dairy Business, Balkan Region, at Salford Capital Management Fund from 2005 to 2009. Mr. Ljubicic graduated in 1996 with a Bachelor of Arts degree in finance and statistical analyses from the Alfred University.

In addition, the following persons also served as directors or executive officers during 2014:

| Name | Position | Date of Resignation/Dismissal |
|---|---|---|
| Jose Aragon | Director | July 18, 2014 |
| Joseph J. Farnan Jr. | Director | July 18, 2014 |
| N. Scott Fine | Vice Chairman and Lead Director | July 18, 2014 |
| Ryan Lee | Chief Financial Officer | October 10, 2014 |

**Board of Directors Leadership Structure**

Mr. Tariko is Executive Chairman of our board of directors. Mr. Grant Winterton serves as our Chief Executive Officer with responsibility for the day-to-day operations of the Company. The board of directors believes that it is currently appropriate to have the positions of Chairman and Chief Executive Officer separated to ensure adequate oversight of management.

**Director Independence**

Our common stock is not listed on any national securities exchange or inter-dealer quotation system with a requirement that a majority of our board of directors be independent. Therefore, we are not subject to any director independence requirements. As a result, our board of directors has not made any formal determination as to whether any of the current members of our board of directors are independent.

Since we were listed on the NASDAQ Stock Market until April 2013, our board of directors would have used the NASDAQ Listing Rules in order to make a determination of director independence. Were we to be subject to these rules, however, we would be able to utilize an exemption to the requirement that a majority of the directors be independent, because we would be deemed a "controlled company" pursuant to NASDAQ Listing Rule 5615(c). A "controlled company" is a company of which more than 50% of the voting power is held by an individual, a group or another company. Based on the ownership of 100% of our common stock by Roust Trading and its affiliates, we would be considered a controlled company under the NASDAQ Listing Rules and could rely upon this exemption in having less than a majority of independent directors on our board of directors.

**Role in Risk Oversight**

Risk is inherent in every business, and how well a business manages risk is an integral part of its ability to succeed. Our goal is to manage risk prudently, not to eliminate risk. In our business, we face a number of risks, including economic risks, regulatory risks, risks stemming from conducting operations in multiple countries and in different currencies, risks in integrating our acquired companies and other risks, such as the impact of competition and weather conditions. Management is responsible for the day-to-day management of risks the company faces,

while the board of directors, as a whole and through its committees, has responsibility for the oversight of risk management. In its risk oversight role, the board of directors has the responsibility to satisfy itself that the risk management processes designed and implemented by management are adequate and functioning as designed.

The board of directors believes that establishing the right "tone at the top" and full and open communication between management and the board of directors are essential for effective risk management and oversight. Our executive management team meets regularly with our board of directors to discuss strategy and risks facing the company. Members of senior management attend meetings of the board of directors and are available to address any questions or concerns raised by the board of directors on risk management-related and any other matters. The board of directors receives regular presentations from senior management on strategic matters involving our operations. The board of directors holds executive sessions at which members of the management team are not present.

While the board of directors is ultimately responsible for risk oversight, committees of the board of directors assist the board of directors in fulfilling its oversight responsibilities in certain areas of risk. The audit committee assists the board of directors in fulfilling its oversight responsibilities with respect to risk management in the areas of financial reporting, internal controls and compliance with legal and regulatory requirements and discusses policies with respect to risk assessment and risk management. The compensation committee assists the board of directors in fulfilling its oversight responsibilities with respect to the management of risks arising from our compensation policies and programs. The governance, compliance and nominating committee assists the board of directors in fulfilling its oversight responsibilities with respect to the management of risks associated with board of directors' organization, membership and structure, succession planning and corporate governance.

**Narrative Disclosure of our Compensation Policies and Practices as They Relate to Risk Management**

The compensation committee reviews the Company's executive compensation program and its executive compensation policies and practices to assess whether any aspect of the program or the policies and practices would encourage any of the Company's named executive officers to take any unnecessary or inappropriate risks that could threaten the value of the Company or create or increase risks that are reasonably likely to have a material adverse effect on the Company. As a result of our review, we concluded that any risks arising from our compensation programs, policies and practices are not reasonably likely to have a material adverse effect on the Company.

**Meetings of the Board of Directors and of Committees**

During 2014, the board of directors held three in person meetings and four meetings via teleconference and each director attended all of the board meetings.

The board of directors has three standing committees: an audit committee, a compensation committee and a governance, compliance and nominating committee.

*Audit Committee*

The audit committee operates under a written charter adopted by the board of directors that may be amended by the board of directors at any time. A current copy of the audit committee's charter is available in the 'Investor Relations' section of the Company's website at http://www.roust.com, under the heading 'Corporate Governance.' Messrs. von Löhneysen and Merkul currently constitute the audit committee. Mr. von Löhneysen currently serves as the chairman of the audit committee. As described above, our common stock is not listed on any stock exchange or inter-dealer quotation system, and we are not required to have a separately designated audit committee whose members are independent. Therefore, our board of directors has not made a formal determination of whether the members of our audit committee are independent or whether that committee includes at least one audit committee financial expert. The audit committee oversees our corporate financial reporting process, internal accounting controls, audit plans and results and financial reports. In addition, the audit committee appoints, compensates, retains and oversees the work of the firm of independent auditors employed by the Company to conduct the annual audit of the Company's financial statements. The members meet with the independent auditors and financial management to review the scope of the proposed audit for the year, the audit procedures to be utilized, audit fees, and, at the conclusion of the audit, the audit reports. In addition, the audit committee reviews the financial

statements, the related footnotes and independent auditors' report and makes recommendations to the board of directors as the audit committee deems appropriate. The audit committee met eight times during 2014.

*Compensation Committee*

The compensation committee operates under a written charter adopted by the board of directors that may be amended by the board of directors at any time. A current copy of the compensation committee's charter is available in the 'Investor Relations' section of the Company's website at http://www.roust.com, under the heading 'Corporate Governance.' Messrs. Merkul and Picchi currently constitute the compensation committee. Mr. Merkul currently serves as the chairman of the compensation committee. As described above, our common stock is not listed on any stock exchange or inter-dealer quotation system, and we are not required to have a separately designated compensation committee whose members are independent. Therefore, our board of directors has not made a formal determination of whether the members of our compensation committee are independent. The compensation committee's responsibilities include (i) making recommendations to the board of directors on salaries, bonuses and other forms of compensation for the Company's officers and other key management and executive employees, (ii) consulting with independent outside compensation consultants regarding the Company's executive officer and director compensation policies and (iii) reviewing any proposed plans or practices of the Company relating to compensation of its employees or directors. The compensation committee held no meetings in 2014. All actions of the compensation committee during 2014 were undertaken by written consent without a meeting.

*Governance, Compliance and Nominating Committee*

The governance, compliance and nominating committee operates under a written charter adopted by the board of directors that may be amended by the board of directors at any time. A current copy of the governance, compliance and nominating committee's charter is available in the Investor Relations section of the Company's website at http://www.roust.com, under the heading Corporate Governance. The members of the governance, compliance and nominating committee are Messrs. Picchi and von Löhneysen. Mr. Picchi currently serves as the chairman of the governance, compliance and nominating committee. The governance, compliance and nominating committee held no meetings in 2014. The governance, compliance and nominating committee identifies individuals qualified to become members of the Company's board of directors and makes board candidate recommendations, reviews and assesses the adequacy of the Company's corporate governance principles and, if appropriate, develops and recommends to the board of directors additional corporate governance principles and oversees and reviews the Company's compliance procedures and corporate practices. The responsibilities of the governance, compliance and nominating committee include oversight of the process of evaluating the performance of the board of directors, its committees and individuals directors, maintenance of the Company's succession plan, convening executive sessions of the board of directors at which no members of management or other representatives of the Company are present and recommending to the board of directors a candidate for Lead Director. All actions of the governance, compliance and nominating committee during 2014 were undertaken by written consent without a meeting.

**Board of Directors Diversity**

The governance, compliance and nominating committee believes that, in order to be effective, a board of directors should consist of directors with varying experiences and personal backgrounds. In particular, for a company that has operations around the world, the board of directors should include representatives from different industries and regions that are relevant to the company's business. To this end, the governance, compliance and nominating committee values diversity of professional experience and geographic background among its members. This diversity contributes significantly to the insight that our board of directors has into the challenges facing the Company.

**Compensation Committee Interlocks and Insider Participation**

During 2014, the compensation committee consisted of Messrs. Merkul and Picchi. None of the members of the compensation committee has been an officer of the Company. None of our executive officers served on the board of directors or compensation committee of a company that has an executive officer that served on our board of directors or the compensation committee.

**Communications with the Board of Directors**

Communications to the board of directors can be mailed to the attention of the Company's Corporate Secretary at 2711 Centerville Road, Suite 400 Wilmington, New Castle County, Delaware 19808. The mailing envelope must contain a clear notation indicating that the enclosed letter is a "Stakeholder—Board Communication". All such letters must identify the author as a stakeholder and clearly state whether the intended recipients are all members of the board of directors or certain specified individual directors. The Corporate Secretary will circulate the letter to the appropriate director or directors, unless the communication is unduly hostile, threatening, illegal or similarly inappropriate, in which case the Corporate Secretary has the authority to discard it.

**Family Relationships**

There are no family relationships among any directors or executive officers.

**Code of Conduct**

The Company has adopted a Code of Conduct that applies to the Company's employees, officers and directors. The Company's Code of Conduct is available in the 'Investor Relations' section of the Company's website at http://www.roust.com, under the heading 'Corporate Governance.' Any changes or waivers to the Code of Conduct for the Company's principal executive officer, principal financial officer or principal accounting officer or persons performing similar functions will be disclosed on the Company's website.

**Section 16(a) Beneficial Ownership Reporting Compliance**

Section 16(a) of the Exchange Act which requires directors, officers and more than 10% beneficial owners to file ownership reports with the SEC does not apply to the Company because it is privately held.

**Item 11. Executive Compensation**

## COMPENSATION COMMITTEE REPORT

The compensation committee has reviewed and discussed with management the Compensation Discussion and Analysis included in this annual report. Based on this review and discussion, the compensation committee recommended to the board of directors that the Compensation Discussion and Analysis be included in this Annual Report on Form 10-K for the year ended December 31, 2014.

Respectfully submitted,

*Compensation Committee*

Pavel Merkul
Alessandro Picchi

### Compensation Discussion and Analysis

**Overview**

This Compensation Discussion and Analysis discusses the objectives, policies and elements of our executive compensation program and analyzes our decisions concerning compensation for the individuals named below who served as executive officers during 2014:

- Grant Winterton - Chief Executive Officer

- Goran Ljubicic - Chief Financial Officer

- Ryan Lee - Former Chief Financial Officer

**Compensation Philosophy**

The primary purpose of our compensation philosophy is to attract and retain a qualified, talented team of executive officers in a way that is aligned with the long-term interests of our stakeholders. Therefore, a significant portion of our compensation program is not fixed and instead, in an attempt to align overall compensation with performance, is variable based on the actual performance of the individual as well as that of the Company. This performance is measured against goals established by the board of directors and the compensation committee. During 2014, the goals for our executive compensation program were to:

- attract and retain a qualified, talented team of executive officers to provide leadership for the Company's success in competitive markets,

- accomplish the above objective in a way that is aligned with the long-term interests of our stakeholders,

- increase the overall performance of the Company,

- increase stakeholder value, and

- incentivize the executive officers to prudently achieve the highest level of the Company's annual and long-term financial performance.

We believe that our executive compensation policies must remain competitive with those of our peer companies and that they should be structured in a way that rewards consistently high performance. During 2014, a substantial portion of the compensation packages for executive officers was in the form of annual cash bonus opportunities intended to reward executive officers for meeting annual financial performance goals.

We review compensation survey data and believe it is a useful guide for comparative purposes. However, we also believe that a successful compensation program requires us to apply our own judgment and subjective determination of individual executive officer performance related to overall corporate performance. We therefore reconcile the program's objectives with the realities of rewarding strong performance and retaining valued members of management. We periodically evaluate the types and levels of compensation we pay to ensure that we are able to attract and retain qualified executive officers and that their compensation remains comparable to compensation paid to similarly situated executive officers in comparable companies.

For 2014, Hay Group provided the compensation committee with benchmarking data based on the following peer group:

| | |
|---|---|
| Amcon Distributing Co. | Hain Celestial Group Inc. |
| Beam Inc. | J&J Snack Foods Corp. |
| Boston Beer Inc. | Molson Coors Brewing Co. |
| Brown-Forman | Monster Beverage Corp. |
| Coca-Cola Bottling Cons | National Beverage Corp. |
| Constellation Brands | Vector Group Ltd. |
| Cott Corp Que | Vina Concha y Toro SA |
| Diageo plc | |

The compensation committee reviewed the data provided Hay Group and considered its recommendations in the context of its annual review of executive compensation.

## Executive Compensation Components

Our executive compensation for 2014 consisted of three basic elements outlined below.

| Compensation Element | Objectives | Key Features |
|---|---|---|
| Base Salary | Attracts, retains and rewards named executive officers by providing a fixed level of cash compensation to reward demonstrated experience, skills and competencies relative to the market value of the job.<br>Can be periodically reevaluated based on (a) individual performance and (b) changes in the median level of salary of peer companies. | Annual cash compensation which, assuming acceptable performance, is not at risk.<br>Targeted at or near average base salaries of similarly situated executive officers of peer groups.<br>Adjustments are considered as the compensation committee sees fit, usually in consultation with independent compensation consultants. |
| Annual Performance Based Incentive | Focuses executive officers on our annual results by being directly linked to the Company's financial performance.<br>Aligns each executive officer's interests with those of our stakeholders by promoting strong annual results through revenue growth and operating efficiency.<br>Retains named executive officers by providing market-competitive compensation. | Annual awards are paid in cash which are at risk because they are based on financial targets.<br>Each annual award can vary from 0% to 150% of the target amount with goals set high and difficult to achieve. |
| Long-Term Time Based Incentive Awards | Promotes retention and enables us to attract and motivate our executive officers.<br>Retains executive officers through multi-year vesting of incentive awards. | Long-term cash based compensation which is at risk due to vesting requirements.<br>Previously awarded in the form of equity and now that the Company is privately held awarded in the form of cash. |

The following describes in more specific terms the elements of compensation that implement the compensation philosophy and objectives described above.

*Base Salaries*

Base salaries of executive officers are determined at the time a person initially becomes an executive officer by evaluating the responsibilities of the position, experience and knowledge of the individual and the competitive marketplace at that time for executive talent, including a comparison to base salaries for comparable positions (considered in the context of the total compensation paid by such companies). Salaries are reviewed from time to time thereafter, generally in connection with the expiration of employment agreements or when other considerations warrant such review in the discretion of the compensation committee and the board of directors, considering the foregoing factors as well as the executive officer's performance and the other factors considered in setting total compensation described above.

When salary adjustments are considered, they are made in the context of the total compensation for executive officers, consistent with the core principles discussed earlier in this Compensation Discussion and Analysis. In each case, the participants involved in recommending and approving salary adjustments consider the performance of each executive officer. Individual performance evaluations take into account such factors as new responsibilities, the Company's performance during the previous year and the achievement of specific individual objectives. The factors impacting base salary levels are not assigned specific weights but are considered as a totality, against the backdrop of our overall compensation philosophy and knowledge of market conditions.

The annualized base salaries (in US dollars unless indicated otherwise) for our executive officers during 2014 were as follows:

| Executive Officer | Position(s) | Annual Base Salary |
|---|---|---|
| Grant Winterton | Chief Executive Officer | $750,000 |
| Goran Ljubicic | Chief Financial Officer | $360,000 |
| Ryan Lee | Former Chief Financial Officer | $450,000 |

*Annual Incentive Awards*

We have historically paid annual cash bonuses to our executive officers based on the Company's performance, as measured by reference to factors which the compensation committee believes reflect objective performance criteria over which management generally has the ability to exert some degree of control. The Company establishes the performance criteria each year and amounts that can be earned by each executive officer based upon, among other things, assessment by the compensation committee and the board of directors of each executive officer's level of responsibility, expertise, tenure and ability to influence improvements in the Company's financial results.

The board of directors set performance criteria for 2014 that reflected its desire to incentivize our executive officers to maximize operational performance while also prudently managing the balance sheet. The board of directors believed that including financial measures as performance targets appropriately balanced incentives to reward strong performance without encouraging undue risk-taking and that the overall 2014 performance criteria represented an appropriate balance of management priorities.

The performance targets were set by the board of directors upon the recommendation of the compensation committee. The Company does not disclose future financial targets because we believe this information is not material to understanding our executive compensation. The board of directors and the compensation committee set performance targets at levels they consider to be reasonably attainable but challenging.

For 2014, the annual incentive award goals for our executive officers were as follows:

Mr. Winterton's bonus was based on achievement of the following:

- CEDC International Sp. z o.o. and PWW Sp. z o.o (together, the "Polish Business") underlying EBITDA of $50.6 million (30%)

- Global optimization of $30.0 million in savings (25%)

- Roust Russia Group (RRG) underlying EBITDA of $60 million, vodka market share increase of 0.5 points (25%)

- All export sales in the Roust Corporation Group, excluding Russia, Poland, Ukraine and Hungary, net revenue growth of $52.9 million (10%)

- Mission and vision projects (10%)

Mr. Ljubicic's bonus was based on achievement of the following:

- Total of CEDC International Sp. z o.o., PWW Sp. z o.o. and export EBITDA of PLN 174.3 million (PLN 152.8 million, PLN 7.0 million and PLN 14.5 million, respectively) (40%)

- Liquidity management (30%)

- The Polish Business' net sales revenue of PLN 841.5 million and net sales revenue from exports of PLN 91.4 million (10%)

- Business plan project (10%)

- Wholesalers' financial management (10%)

- Organizational capabilities development

Mr. Lee's bonus was based on achievement of the following:

- The Polish Business' underlying EBITDA of $50.6 million (30%)

- Global optimization of 10% annualized savings (20%)

- Roust restructure (20%)

- Liquidity management (30%)

*Other Incentive Awards*

A third component of our executive officers' compensation during 2014 was in the form of incentive awards that were previously granted in the form of equity. Now that the Company is privately-held they are granted in the form of cash awards. For 2014, these incentive awards consisted of (i) performance-based awards with an underlying EBITDA target of $122.7 million, with the exception of Mr. Ljubicic, and (ii) time-based awards that vest over three years.

**Employment Agreements**

Each of the executive officers of the Company is party to an employment agreement. The Company currently enters into employment agreements with its executive officers because it generally believes that, in respect of key executive officers, there is a significant value in its competitive markets to setting out compensation and fringe benefit expectations in writing, maintaining appropriate non-competition, non-solicitation of employees and confidentiality agreements with key executive officers and agreeing to post-termination payments and other obligations. These employment agreements are described below in more detail under the caption "Employment Agreements."

**Section 162(m)**

The Compensation Committee considers the deductibility of executive compensation under Section 162(m) of the Internal Revenue Code, which provides that certain compensation of more than $1,000,000 that is paid to

certain individuals may not be deductible. Generally, the Company expects that compensation paid to its executive officers will be fully deductible for federal income tax purposes. However, in certain situations, the Company may approve compensation that will not meet these requirements in order to ensure competitive levels of total compensation for its executive officers.

### Summary Compensation Table

The following table summarizes the total compensation (in US dollars) awarded to or earned by our named executive officers for the years ended December 31, 2012, 2013 and 2014 (the "named executive officers").

(1)   Includes $38,113 for Interim CEO salary and $36,250 for Board fees.

(2)   Based on exchange rate of USD 1 to PLN 3.

(3)   Amounts reflect the aggregate grant date fair value of stock awards computed in accordance with FASB ASC Topic 718. These amounts do

| Name and Principal Position | Year | Salary | | Bonus | Stock Awards | | Option Awards | Non-Equity Incentive Plan | | All Other Compensation | | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Grant Winterton *Chief Executive Officer* | 2014 | 750,000 | | 0 | — | | — | 1,816,667 | *(4)* | 90,301 | *(8)* | $2,656,968 |
| | 2013 | 750,000 | | 0 | 0 | | 0 | 1,683,333 | *(5)* | 107,172 | *(9)* | $2,540,505 |
| Goran Ljubicic *Chief Financial Officer* | 2014 | 323,754 | | 0 | — | | — | 227,970 | *(6)* | 54,989 | *(10)* | $606,713 |
| Ryan Lee *Former Chief Financial Officer* | 2014 | 337,500 | | 0 | — | | — | 0 | | 439,301 | *(11)* | $776,801 |
| | 2013 | 450,000 | | 0 | 0 | | 0 | 850,000 | *(7)* | 190,662 | *(12)* | $1,490,662 |
| David Bailey *Former Interim Chief Executive Officer* | 2013 | 74,363 | *(1)* | 0 | 0 | | 0 | 282,000 | | 62,716 | *(13)* | $419,079 |
| | 2012 | 471,643 | | 0 | 0 | | 0 | 0 | | 8,000 | *(14)* | $479,643 |
| Bartosz Kołaciński *Former Interim Chief Financial Officer* | 2013 | 200,000 | *(2)* | 0 | 0 | | 0 | 163,333 | *(2)* | 19,650 | *(15)* | $382,983 |
| | 2012 | 110,448 | | 0 | 8,440 | *(3)* | 0 | 0 | | 1,213 | *(15)* | $120,101 |
| James Archbold *Former Vice President and Director of Investor Relations* | 2013 | 53,207 | | 0 | 0 | | 0 | 0 | | 1,529,196 | *(16)* | $1,582,403 |
| | 2012 | 366,666 | | 0 | 225,000 | *(3)* | 0 | 95,000 | | 40,662 | *(17)* | $727,328 |

not reflect whether the recipient actually realized a financial benefit from the awards. As a result of the Company's restructuring, all existing equity awards were cancelled.

(4)   Represents $750,000 for Mr. Winterton's 2014 cash bonus, $400,000 time-based award in lieu of equity payable in three equal parts over three years and $800,000 performance-based award in lieu of equity. All amounts are accrued but not yet paid.

(5)   Represents $750,000 for Mr. Winterton's 2013 cash bonus, $400,000 time-based award in lieu of equity payable in three equal parts over three years and $800,000 performance-based award in lieu of equity. As of the date of this report the amount of $1,439,870 has been paid. All other amounts are accrued but not yet paid.

(6)   Based on exchange rate of USD 1 to PLN 3.5.

(7)   Represents $450,000 for Mr. Lee's 2013 cash bonus, $133,333 time-based award in lieu of equity payable in three equal parts over three years and $266,667 performance-based award in lieu of equity. As of the date of this report all amounts have been paid.

(8)   Represents $72,717 for Mr. Winterton's housing and $17,584 for driver services in Moscow.

(9)   Represents $84,363 for Mr. Winterton's housing and $22,809 for driver services in Moscow.

(10)   Represents $15,000 for Mr. Ljubicic's housing, $18,052 for school fees and $21,937 for perquisites (e.g. company car, medical insurance).

(11)   Represents $273,000 compensation for non-compete clause, $73,242 for Mr. Lee's housing, $20,287 for driver services in Moscow, $41,301 for school fees and $31,471 for personal travel.

(12)   Represents $93,411 for Mr. Lee's housing, $23,606 for driver services in Moscow, $65,449 for school fees and $8,197 for personal travel.

(13)   Represents $50,000 for consulting fees paid to Mr. Bailey, $3,229 for company car and $9,487 for medical insurance.

(14)   Represents perquisites (e.g., company car) provided to Mr. Bailey.

(15)   Represents perquisites (e.g., company car, medical insurance) provided to Mr. Kołaciński.

(16)   Represents $15,000 for perquisites (e.g., company car, medical insurance) provided to Mr. Archbold and $1,514,196 in severance.

(17)   Represents perquisites (e.g., company car, medical insurance) provided to Mr. Archbold.

(18)  This total does not include an annual bonus of PLN 314,910 and a retention bonus of PLN 329,606 to be paid to Mr. Kołaciński in 2014 for his continuing role as a non-executive officer.

### Grants of Plan-Based Awards During 2014

The following table sets forth information regarding all grants of plan-based awards made to our named executive officers during the fiscal year ended December 31, 2014.

Estimated Future Payouts under Non-Equity Incentive Plan Awards (in USD):

| Name | Grant Date | Threshold | Target | Maximum |
|------|-----------|-----------|--------|---------|
| Grant Winterton | 06/02/2014 | | $1,950,000 | |
| Goran Ljubicic | 05/30/2014 | | $227,970 | |

## Employment Agreements

*Grant Winterton*

Mr. Winterton has served as Chief Executive Officer of the Company since January 10, 2013. Pursuant to his employment agreement, Mr. Winterton is paid an annual base salary of $750,000.

Mr. Winterton's employment agreement provides for a yearly cash bonus of up to 100% of his salary. The conditions for earning a yearly cash bonus are based upon the achievement of project and financial targets to be established by the board of directors in consultation with Mr. Winterton at the beginning of each fiscal year. The financial target portion of the yearly cash bonus is earned on a sliding scale from between 0% and 150% of the yearly cash bonus. The project target portion of the yearly cash bonus is earned based on a good faith assessment of the achievement of the project targets by the board of directors in consultation with Mr. Winterton.

Pursuant to his employment agreement, Mr. Winterton is also eligible to receive additional bonus awards granted on January 1st of each year. The agreement provides for these awards to be granted in the form of restricted stock units. However, when the Company became privately-owned, the awards were converted to cash based awards. The first type of award is a performance-based bonus with a value of $800,000. Subject to Mr. Winterton's continued employment through the vesting date, the performance-based awards vest on the first anniversary of the date of grant based on the achievement of financial targets aimed towards Company value and value creation and in line with the Company's stockholders' interests. The performance-based bonuses vest on a sliding scale from between 0% and 150%. The second type of award is a time-based bonus with a value of $400,000. Subject to Mr. Winterton's continued employment through the vesting date, the time-based bonuses will vest in three equal annual installments.

Subject to certain dollar amount limitations, Mr. Winterton's employment agreement provides for fringe benefits in the form of two roundtrip business class flights each year to Australia, rental expenses for Mr. Winterton's apartment, health insurance coverage for Mr. Winterton and his family, a company paid car and driver, as well as a company issued phone and laptop.

*Goran Ljubicic*

Mr. Ljubicic has served as Chief Financial Officer of the Company since October 10, 2014. Pursuant to his employment agreement, Mr. Ljubicic is paid an annual base salary of $360,000.

Mr. Ljubicic's employment agreement provides for a contractual salary increase of 5% annually as well as an annual performance bonus of up to 100% of his annual salary. In 2014, the conditions for earning a yearly cash bonus were based upon management by objectives ("MBO") for Poland. Mr. Ljubicic's employment agreement further provides for a long term bonus of up to 100% of his annual salary after three years of service with the Company.

Subject to certain dollar amount limitations, Mr. Ljubicic's employment agreement provides for fringe benefits in the form of roundtrip flights home, rental expenses for Mr. Ljubicic's apartment, health insurance

coverage for Mr. Ljubicic and his family, school allowance for Mr. Ljubicic's children, a company paid car and driver, as well as reallocation expenses from Belgrade to Warsaw.

Mr. Ljubicic's employment agreement may be terminated either by the Company or by Mr. Ljubicic's upon three months' notice. In the event Mr. Ljubicic's employment with the Company is terminated other than for cause, Mr. Ljubicic will be entitled to six months' compensation pursuant to the terms of the employment agreement.

*Ryan Lee*

Mr. Lee served as Chief Financial Officer of the Company from January 22, 2013 to October 10, 2014. Pursuant to his employment agreement, Mr. Lee was paid an annual base salary of $450,000.

Mr. Lee's employment agreement provided for a yearly cash bonus of up to 100% of his salary. The conditions for earning a yearly cash bonus were based upon the achievement of project and financial targets established by the board of directors in consultation with Mr. Lee at the beginning of each fiscal year. The financial target portion of the yearly cash bonus was earned on a sliding scale from between 0% and 150% of the yearly cash bonus. The project target portion of the yearly cash bonus was earned based on a good faith assessment of the achievement of the project targets by the board of directors in consultation with Mr. Lee.

Pursuant to his employment agreement, Mr. Lee was also eligible to receive additional bonus awards granted on January 1st of each year. The agreement provided for these awards to be granted in the form of restricted stock units. However, when the Company became privately-owned, the awards were converted to cash based awards. The first type of award was a performance-based bonus with a value of $266,667. Subject to Mr. Lee's continued employment through the vesting date, the performance-based awards vested on the first anniversary of the date of grant based on the achievement of financial targets aimed towards Company value and value creation and in line with the Company's stockholders' interests. The performance-based bonuses vested on a sliding scale from between 0% and 150%. The second type of award was a time-based bonus with a value of $133,333. Subject to Mr. Lee's continued employment through the vesting date, the time-based bonuses would have vested in three equal annual installments.

Subject to certain dollar amount limitations, Mr. Lee's employment agreement provided for fringe benefits in the form of flights each year to Cyprus, rental expenses for Mr. Lee's apartment, health insurance coverage for Mr. Lee and his family, school allowance for Mr. Lee's children, a company paid car and driver, as well as a company issued phone and laptop.

**Potential Payments Upon Termination of Employment**

The Company's employment agreements with its executive officers provide for certain payments upon termination. Generally, the material terms and payment provisions under the employment agreements, including those that relate to payments upon termination of employment, were the result of individual negotiations with the relevant executive officer over the terms of his employment, and the potential payments under these arrangements were not separately considered from the entire compensation package contemplated by the employment agreement. The compensation committee considers these potential payments upon termination of employment as one portion of total potential compensation, but such payments do not materially and directly influence the decisions made regarding other aspects of compensation.

If Mr. Winterton were to have been terminated on December 31, 2014, his employment agreement sets forth termination benefits to which he may have been entitled. If the Company terminated Mr. Winterton's employment other than for cause, disability or death, and such termination did not constitute a qualifying change in control termination, then (i) Mr. Winterton would have been paid a lump sum payment in an amount equal to 1.5 times his base salary, (ii) Mr. Winterton would have received a bonus in cash equal to 50% of the yearly cash bonus applicable in the relevant year under the assumption that 92.5% of the targets for the relevant year were achieved, (iii) all of Mr. Winterton's unvested time-based awards would have been forfeited, (iv) all of Mr. Winterton's unvested performance-based awards would have vested immediately under the assumption that 92.5% of the targets for the relevant year were achieved, and (v) Mr. Winterton's housing, car and driver allowance would continue to have been paid for six months following the date of termination. If Mr. Winterton terminated his employment under conditions constituting a qualifying change in control termination, then (i) Mr. Winterton would have been paid his

remaining base salary for the remainder of the term of the employment agreement, (ii) Mr. Winterton would have received a bonus in cash equal to 50% of the yearly cash bonus applicable in the relevant year under the assumption that 92.5% of the targets for the relevant year were achieved, (iii) all of Mr. Winterton's unvested time-based awards would have been forfeited, (iv) all of Mr. Winterton's unvested performance-based awards would have vested immediately under the assumption that 92.5% of the targets for the relevant year were achieved, and (v) Mr. Winterton's housing, car and driver allowance would continue to have be paid for six months following the date of termination.

If Mr. Ljubicic were to have been terminated on December 31, 2014, his employment agreement sets forth termination benefits to which he may have been entitled. If the Company terminated Mr. Ljubicic's employment other than for cause, disability or death, and such termination did not constitute a qualifying change in control termination, then Mr. Ljubicic would have been paid a lump sum payment in an amount equal to 50% of his base salary.

On October 10, 2014, Mr. Lee's employment with the Company terminated. Mr. Lee received a total of $273,000 in severance pay, paid in equal monthly installments over a six month period from the date of his resignation. The final payment to Mr. Lee will be paid on March 31, 2015.

### Director Compensation

The following table sets forth information regarding the compensation of the non-employee directors of the Company for the year ended December 31, 2014.

| Name | Fees Earned or Paid in Cash | Bonus | Equity Awards | All Other Compensation | Total |
|---|---|---|---|---|---|
| Jose Aragon | $114,913 | $0 | — | $0 | $114,913 |
| Joseph J. Farnan Jr. | $143,431 | $0 | — | $0 | $143,431 |
| N. Scott Fine | $302,983 | $0 | — | $0 | $302,983 |
| Eberhard von Löhneysen | $212,500 | $0 | — | $0 | $212,500 |
| Pavel Merkul | $246,594 | $0 | — | $0 | $246,594 |
| Alessandro Picchi | $205,000 | $0 | — | $0 | $205,000 |
| Roustam Tariko | $975,000 | $0 | — | $150,000 *(1)* | $1,125,000 *(2)* |

(1)  Total amount of perquisites.

(2)  All fees reflected in the above table were paid to Mr. Tariko by Roust Russia Group.

For 2014, the components of compensation paid to our directors were as follows:

- Annual cash fee of $85,000

- Annual fee in lieu of equity of $100,000

- Lead Director and Vice Chairman fee $50,000

- Audit, Compensation and Governance members fee of $10,000

- Audit, Compensation and Governance chair fees of $10,000 (in addition to member fees)

- Physical board meeting fees of $2,500

- Physical committee meeting fees of $2,500

Mr. Tariko receives the following compensation from Roust Russia:

- Annual salary of $975,000

The compensation committee reviewed these amounts and deemed them to be appropriate compensation for an Executive Chairman of the Company. As part of its review, the compensation committee compared these amounts to levels of compensation paid to former and current executive officers.

## Item 12. Security Ownership of Certain Beneficial Owners and Management

Pursuant to the Company's Chapter 11 Plan of Reorganization, all of the Company's pre-emergence common stock was cancelled as of June 5, 2013 and Roust Trading Limited and its affiliates acquired control of 100% of the Company's new common stock.

## Item 13.          Certain Relationships and Related Transactions

A related party transaction is defined as any transaction in which (1) the Company is a participant, (2) any related person has a direct or indirect material interest and (3) the amount involved exceeds $120,000 but excludes any transaction that does not require disclosure under Item 404(a) of Regulation S-K. A related person is:

- an executive officer, director or director nominee of the Company;

- any person who is known to be the beneficial owner of more than 5% of the Company's common stock;

- any person who is an immediate family member (as defined under Item 404 of Regulation S-K) of an executive officer, director or director nominee or beneficial owner of more than 5% of the Company's common stock; and

- any firm, corporation or other entity in which any of the foregoing persons is employed or is a partner or principal or in a similar position or in which such person, together with any other of the foregoing persons, has a 5% or greater beneficial ownership interest.

It is the Company's policy that directors, executive officers and any other related persons are required to report any related party transactions to the Chief Executive Officer. The audit committee, with the assistance of legal counsel and such other advisors as it deems appropriate, is responsible for reviewing and approving or ratifying related party transactions. In addition, the governance committee is responsible for ensuring that certain affiliate transactions comply with the Company's obligations under its indentures. The audit committee intends to approve only those related party transactions that it believes are in, or not inconsistent with, the best interests of the Company. A written policy to this effect has been adopted by the board of directors.

Every quarter, a report maintained by the Company's accounting staff is reviewed and approved by the Chief Executive Officer and the Chief Financial Officer. The audit committee conducts an annual review of all transactions between related parties and the Company.

As disclosed in Note 2, upon emergence from bankruptcy protection as of June 5, 2013 (the "Effective Date"), Mr. Roustam Tariko became the sole ultimate stockholder of ROUST. Further, Mr. Tariko has been appointed to ROUST's board of directors as Executive Chairman. Given that Mr. Tariko indirectly controls RTL and RTL directly controls Russian Standard Corporation (and indirectly controls other Russian Standard entities), all entities controlled by Mr. Tariko have become related parties of Roust, including Russian Standard Bank, Russian Standard Corporation, Roust Inc., Russian Standard Vodka (USA), Inc., Russian Standard Vodka, Union Trust Stroy and F.lli Gancia & C. SpA.

In the ordinary course of business, the Company is involved in transactions with entities controlled by Mr. Tariko that result in the recognition of revenues, expenses, assets and liabilities by the Company.

The following table summarizes our transactions with related parties as included in the accompanying consolidated financial statements:

| CONDENSED CONSOLIDATED STATEMENTS OF OPERATIONS AND COMPREHENSIVE INCOME | Year ended | Predecessor one hundred fifty-six-day period ended | Successor | |
|---|---|---|---|---|
| | | | Two hundred and nine days ended | Year ended |
| | December 31, 2012 | June 5, 2013 | December 31, 2013 as recast | December 31, 2014 |
| Net sales | $ 1,518 | $ 1,006 | $ 1,709 | $ 2,029 |
| Cost of goods sold | 1,863 | 900 | 494 | 997 |
| Purchases of goods | 1,863 | 643 | 51,077 | 64,051 |
| Purchases of raw materials | - | 1,545 | 4,486 | 3,387 |
| Selling, general and administrative expenses | 1,059 | 653 | 10,623 | 3,387 |
| Interest expense | - | 1,339 | 4,441 | 7,846 |
| Interest Income | - | - | 8,747 | 13,114 |
| Other income | $ - | $ - | $ 782 | $ 200 |

| CONDENSED CONSOLIDATED BALANCE SHEETS | Successor December 31, 2013 as recast | Successor December 31, 2014 |
|---|---|---|
| **Assets** | | |
| Accounts receivable | $ 1,695 | $ 6,453 |
| Prepaid expenses | 17,604 | 1,025 |
| Other current assets (other current receivables) | 1,474 | 676 |
| Loans granted to Related Parties | 188,272 | 83,836 |
| **Total due from Related Parties** | **$ 209,045** | **$ 91,990** |
| **Liabilities** | | |
| Trade accounts payable | $ 9,328 | $ 13,149 |
| Other accounts payable | 1,924 | 9,549 |
| Bank loans and borrowings from Related Parties | 87,161 | 49,331 |
| **Total due to Related Parties** | **$ 98,413** | **$ 72,029** |

Accounts receivable and trade accounts payable result from sale and purchase transactions made primarily with LLC "Russian Standard Vodka" and F.lli Gancia & C. S.p.A. in the ordinary course of business. Prepaid expenses as of December 31, 2013 are comprised mainly of prepayments for purchases of goods and spirit in the amount of $14.6 million and $2.6 million, respectively. As of December 31, 2014 prepaid expenses comprised of prepayments for finished goods and spirit purchases amounted to nil and $0.5 million, respectively. Selling, general and administrative expenses relate to costs of renting office premises from LLC "Union Trust Stroy" and LLC "Russian Standard Vodka". As of December 31, 2014 other accounts payable of $9.5 million include the contingent part of the consideration payable for the Roust Inc. acquisition.

The acquisition of Roust Inc. brought 9% of the shares of LLC "Russian Standard Vodka" with a historical de minimus book value. The Company believes that the fair market value of these shares is significantly higher than its book carrying value. The shareholder has a call option on the repurchase of the shares. The option is exercisable at fair market value.

*Loans granted to Related Parties:*

As of December 31, 2013 and December 31, 2014 the Company had loan receivables from Related Parties in principal amount equal to $176.3 million and $77.9 million, respectively. Loans outstanding as of December 31, 2013 in principal amount of $72.5 million were repaid by the Roust Inc. acquisition transaction in June 2014. All of the loans as of December 31, 2014 are included in the consolidated balance sheet together with accrued interest in the amount of $83.8 million. The loans were granted to RTL, LLC "Russian Standard Vodka", LLC "Union Trust Stroy" and Russian Standard Asia Pte. Ltd. to support the growth of their business. The details of loans granted as of December 31, 2014 are presented in the table below

| Principal amount * | Date of signing the agreement | Maturity date | Interest rate |
|---|---|---|---|
| $46.0 million | February 17, 2014 - December 1, 2014 | January 17, 2015 - July 2, 2016 | 13.8 % - 16.8 % |
| $27.9 million | September 24, 2012 - February 20, 2014 | April 18, 2016 - September 12, 2022 | 10.00 % |
| $4.0 million | March 24, 2014 | March 10, 2022 | 12.00 % |

* these facilities include the loan of principal amount of $31.5 million which originate from period before Roust Inc. acquisition

These loans have been guaranteed by related party subsidiaries and are secured by the pledge of RTL receivables in the amount of $29.2 million. We believe RTL, LLC "Russian Standard Vodka" and LLC "Union Trust Stroy" have intent and ability to repay the loans upon maturity and therefore these loans are presented as assets in balance sheet not in shareholders' equity.

**Borrowings from Related Parties**

As of December 31, 2014 the Company had borrowings from Related Parties in the amount of $49.3 million which are described in Note 14 "Notes and Borrowings".

**Guarantees from Related Parties**

Roust Inc. has provided guarantees to Related Parties of $195.2 million as of December 31, 2014. RTL and its subsidiaries have provided guarantees to Roust Inc. of $99.6 million as of December 31, 2014. Majority of the guarantees relates to purchases of spirit, excise stamps and custom duties. Such guarantees are typical and necessary in our industry.

For a description of the transactions with RTL prior to the Effective Date please see "Item 13. Certain Relationships and Related Party Transactions – Transactions with Roust Trading" included in the Annual Report on Form 10-K filed with the Securities and Exchange commission on June 5, 2013, which description is incorporated herein by reference.

**Item 14. Principal Accountant Fees and Services**

The audit committee selected and appointed Pricewaterhouse Coopers Sp. z .o.o. ("PwC") to serve as the Company's independent public accountant for the year ended December 31, 2013 and ZAO KPMG ("KPMG") for the year ended December 31, 2014 to audit the consolidated financial statements of the Company.

**Fees Paid to Independent Public Accountants and Other Information**

The following table presents the aggregate amounts billed for audit fees, audit-related fees, tax fees and other fees by the Company's independent public accountants during fiscal years ended December 31, 2013 and December 31, 2014 (in USD). Ernst & Young ("E&Y") was our independent registered public accounting firm until August 13, 2013 when we engaged PwC for the fiscal year ended December 31, 2013. PwC was our independent registered public accounting firm until December 31, 2014 when we engaged KPMG for the fiscal year ended December 31, 2014:

|  | **2013 (E&Y)** | **2013 (PwC)** | **2014 (KPMG)** |
|---|---|---|---|
| Audit fees | $2,695,192 | $3,150,000 | $1,140,628 |
| Audit-related fees *(1)* | --- | --- | --- |
| Tax fees *(2)* | --- | --- | 818,640 |
| All other fees *(3)* | --- | --- | 43,718 |
| **Total fees** | **$2,695,192** | **$3,150,000** | **$2,002,986** |

(1)   Audit-related fees include fees for assurance and related services that are reasonably related to the performance of the audit or review of the financial statements and are not reported under "Audit fees."

(2)   Tax fees include fees for professional services related to tax compliance, tax advice and tax planning.

(3)   All other fees include fees for professional services rendered in connection with translation services.

During 2013 and 2014, the audit committee pre-approved all audit and permissible non-audit services prior to commencement of services and approved the total fees paid to E&Y, PwC and KPMG. The audit committee determined that the rendering of certain non-audit services by these firms was compatible with maintaining the auditor's independence. During 2013 and 2014, the financial audit services were provided by full-time, permanent employees of E&Y, PwC and KPMG

**Limited Liability Company**

**Russian Standard Vodka**

**International Financial Reporting Standards**

**Financial Statements and Auditor's Report**

**31 December 2015**

**Contents**

INDEPENDENT AUDITOR'S REPORT

FINANCIAL STATEMENTS

Statement of Financial Position ................................................................................................... 1

Statement of Profit or Loss and Other Comprehensive Income ................................................ 2

Statement of Changes in Equity ................................................................................................. 3

Statement of Cash Flows ............................................................................................................ 4

Notes to the Financial Statements

PART I.     FINANCIAL INFORMATION ...................................................................................... 2

PART III   109

PART III   184

1            General Information ................................................................................................. 208

2            Operating Environment of the Company ................................................................. 208

3            Basis of Preparation and Significant Accounting Policies ...................................... 208

3            Basis of Preparation and Significant Accounting Policies (continued) ..... **Error! Bookmark not defined.**

4            Critical Accounting Estimates and Judgements ...................................................... 216

5            Adoption of New or Revised Standards and Interpretations ................................... 218

6            New Accounting Pronouncements ........................................................................... 218

7            Balances and Transactions with Related Parties ..................................................... 219

8            Cash .......................................................................................................................... 222

9            Trade and Other Receivables ................................................................................... 222

10           Inventories ................................................................................................................ 222

11           Property, Plant and Equipment ................................................................................ 223

12           Intangible Assets ...................................................................................................... 223

13           Trade and Other Payables ........................................................................................ 224

14           Borrowings ............................................................................................................... 224

15           Other Taxes Payable ................................................................................................ 225

16           Other Operating Expenses ....................................................................................... 225

17           Other Operating Income ........................................................................................... 225

18           Other Finance Costs ................................................................................................. 225

19    Foreign Exchange Differences, Net ....................................................................................... 226

20    Income Taxes ......................................................................................................................... 226

21    Contingencies and Commitments ......................................................................................... 227

22    Financial Risk Management .................................................................................................. 229

23    Events After the Reporting Period ........................................................................................ 232

*Russian Standard Vodka LLC*
*Statement of Changes in Equity for the year ended 31 December 2015*
*(In thousands of US Dollars, unless otherwise stated)*

| | Note | 31 December 2015 | 31 December 2014 |
|---|---|---|---|
| **ASSETS** | | | |
| **Current assets** | | | |
| Cash | 8 | 7 | 328 |
| Trade and other receivables – third parties | 9 | 2,144 | 8,335 |
| Trade and other receivables – related parties | 7, 9 | 34,642 | 34,757 |
| Loans issued – related parties | 7 | 10,975 | - |
| Inventories | 10 | 4,692 | 5,690 |
| **Total current assets** | | **52,460** | **49,110** |
| **Non-current assets** | | | |
| Property, plant and equipment | 11 | 33,139 | 46,461 |
| Intangible assets | 12 | 11,116 | 14,554 |
| Loans issued – related parties | 7 | - | 18,343 |
| **Total non-current assets** | | **44,255** | **79,358** |
| **TOTAL ASSETS** | | **96,715** | **128,468** |
| | | | |
| **LIABILITIES** | | | |
| **Current liabilities** | | | |
| Trade and other payables – third parties | 13 | 10,043 | 8,482 |
| Trade and other payables – related parties | 7, 13 | 10,273 | 21,159 |
| Borrowings – third parties | 14 | 11,792 | 14,372 |
| Borrowings – related parties | 7, 14 | 431 | 559 |
| Liabilities for financial guarantees | 7 | 209 | 829 |
| Current income tax payable | | 171 | 1,156 |
| Other taxes payable | 15 | 4,505 | 4,732 |
| **Total current liabilities** | | **37,424** | **51,289** |
| **Non-current liabilities** | | | |
| Borrowings – third parties | 14 | 24,697 | 39,112 |
| Borrowings – related parties | 7, 14 | 4,509 | 6,267 |
| Deferred income tax liability | 20 | 2,702 | 2,874 |
| **Total non-current liabilities** | | **31,908** | **48,253** |
| | | | |
| **EQUITY** | | | |
| Charter capital | | 3,815 | 4,942 |
| Additional paid in capital | | 24,388 | 31,595 |
| Translation reserve | | (1,039) | (2,727) |
| Retained earnings/ (Accumulated deficit) | | 219 | (4,884) |
| **TOTAL EQUITY** | | **27,383** | **28,926** |
| **TOTAL LIABILITIES AND EQUITY** | | **96,715** | **128,468** |

Approved for issue and signed on 31 March 2016

_____

Ilya Blinov
Chief Executive Officer

_____

Elena Karnysheva
Chief Financial Officer

_____

Dmitry Gultsev
Chief Financial Officer

3

The accompanying notes on pages 5-32 are an integral part of these financial statements.

| | Note | 2015 | 2014 |
|---|---|---|---|
| ...enue – related parties | 7 | 74,619 | 98,774 |
| ...enue – third parties | | 9,849 | 23,740 |
| ...counts, allowances and other sales incentives | | (15,602) | (34,160) |
| **...tal revenue** | | **68,866** | **88,354** |
| | | | |
| Changes in inventories of finished goods and work in progress | | 608 | 2,030 |
| Raw materials and consumables used | | (29,420) | (36,972) |
| Staff costs and payroll taxes (including contribution to State Pension Fund of USD 1,958 thousand (2014: USD 2,860 thousand)) | | (11,727) | (18,035) |
| Depreciation and amortisation | 1, 12 | (3,837) | (7,487) |
| Advertising and marketing expenses | | (2,687) | (7,779) |
| Other operating expenses | 16 | (10,553) | (13,596) |
| Other operating income | 17 | 1,885 | 2,127 |
| Foreign exchange differences, net | 19 | 1,068 | 15,202 |
| Amortisation of liabilities for financial guarantees | | 908 | 1,185 |
| Interest income | 7 | 1,822 | 2,218 |
| Interest expense | | (6,185) | (9,438) |
| Other finance costs | 18 | (2,847) | (4,490) |
| **...fit before income tax** | | **7,901** | **13,319** |
| Income tax expense | 20 | (1,543) | (3,092) |
| **...fit for the year** | | **6,358** | **10,227** |

**...er comprehensive income / (loss):**

*Items that may be reclassified subsequently to profit or loss:*

| | | | |
|---|---|---|---|
| Currency translation difference | | (7,588) | (17,539) |
| **Other comprehensive (loss) / income for the year** | | **(7,588)** | **(17,539)** |
| **Total comprehensive loss for the year** | | **(1,230)** | **(7,312)** |
| | | | |
| **Profit attributable to the participants of the Company** | | 6,358 | 10,227 |
| | | | |
| **...tal comprehensive loss attributable to the participants of the Company** | | **(1,230)** | **(7,312)** |

| | Note | Charter capital | Additional paid in capital | Currency translation reserve | Retained earnings / (Accumulated deficit) | Total equity |
|---|---|---|---|---|---|---|
| Balance at 31 December 2013 | | **7,729** | **31,061** | **(116)** | **(19,279)** | **19,395** |
| Profit for the year | | - | - | - | 10,227 | 10,227 |
| Other comprehensive income | | (3,519) | (21,678) | (2,611) | 10,269 | (17,539) |
| **Total comprehensive income for the year** | | **(3,519)** | **(21,678)** | **(2,611)** | **20,496** | **(7,312)** |
| Liabilities for financial guarantees net of deferred tax | | - | - | - | (1,524) | (1,524) |
| Contribution from participants | | 732 | 22,212 | - | (4,577) | 18,367 |
| **Total transactions with the participants** | | **732** | **22,212** | **-** | **(6,101)** | **16,843** |
| **Balance at 31 December 2014** | | **4,942** | **31,595** | **(2,727)** | **(4,884)** | **28,926** |
| Profit for the year | | - | - | - | 6,359 | **6,359** |
| Other comprehensive income | | (1,127) | (7,207) | 1,688 | (942) | **(7,588)** |
| **Total comprehensive income for the year** | | **(1,127)** | **(7,207)** | **1,688** | **5,417** | **(1,229)** |
| Liabilities for financial guarantees net of deferred tax | 7 | - | - | - | (314) | **(314)** |
| **Total transactions with the participants** | | **-** | **-** | **-** | **(314)** | **(314)** |
| **Balance at 31 December 2015** | | **3,815** | **24,388** | **(1,039)** | **219** | **27,383** |

| | Note | 2015 | 2014 |
|---|---|---|---|
| **Cash flows from operating activities** | | | |
| **Profit before income tax** | | **7,901** | **13,319** |
| | | | |
| Adjustments for: | | | |
| Depreciation of property, plant and equipment | 11 | 3,650 | 7,090 |
| Amortisation of intangible assets | 12 | 187 | 397 |
| Amortisation of financial guarantees | | (908) | (1,186) |
| Loss / (gain) on disposal of property, plant and equipment | | (18) | (21) |
| Interest income | | (1,822) | (2,218) |
| Interest expense | | 6,185 | 9,438 |
| Impairment of trade and other receivables | | 1,411 | 102 |
| Accounts payable write off | | (2) | (61) |
| Inventory impairment | | 249 | 562 |
| Tax provisions | | (674) | (67) |
| Foreign exchange differences, net | 19 | 1,068 | (15,202) |
| **Operating cash flows before working capital changes** | | **17,227** | **12,153** |
| (Increase) / decrease in trade and other receivables | | (1,238) | (8,990) |
| (Increase) / decrease in inventories | | (607) | (2,733) |
| Increase / (decrease) in trade and other payables | | (1,586) | 7,126 |
| Increase / (decrease) in other taxes payable | | 2,143 | 404 |
| **Change in working capital** | | **(1,288)** | **(4,193)** |
| Income taxes paid | | (2,230) | (2,201) |
| Interest received | 7 | 232 | 98 |
| Interest paid | | (6,570) | (11,915) |
| **Net cash (used in) / generated from operating activities** | | **7,371** | **(6,058)** |
| | | | |
| **Cash flows from investing activities** | | | |
| Purchase of property, plant and equipment | | (389) | (1,418) |
| Acquisition of intangible assets | | (53) | (455) |
| Loans issued – related parties | | (1,411) | - |
| Loans repaid – related parties | | - | 377 |
| **Net cash used in investing activities** | | **(1,853)** | **(1,496)** |
| **Cash flows from financing activities** | | | |
| Proceeds from borrowings – related parties | | - | 14,498 |

| | Note | 2015 | 2014 |
|---|---|---|---|
| *Proceeds from borrowings – third parties* | | - | *6,500* |
| *Repayment of borrowings – related parties* | | - | *(11,127)* |
| *Repayment of borrowings – third parties* | | *(5,742)* | *(3,900)* |
| **Net cash generated from / (used in) financing activities** | | **(5,742)** | **5,971** |
| Exchange gain / (loss) on cash and cash equivalents | | *(97)* | *(88)* |
| **Net (decrease) / increase in cash and cash equivalents** | | **(321)** | **(1,671)** |
| **Cash at the beginning of the year** | | **328** | **1,999** |
| **Cash at the end of the year** | | **7** | **328** |

1.       **General Information**

These financial statements have been prepared in accordance with International Financial Reporting Standards for Limited Liability Company Russian Standard Vodka (the "Company").

The Company is incorporated and domiciled in the Russian Federation. The Company is a limited liability company and was set up in accordance with Russian regulations. The Company's registered address is Pulkovskoye shosse, 46/2, Saint-Petersburg, Russian Federation.

The Company's immediate parents are Roust Trading Limited (67.986% share of charter capital) registered in Bermuda, hereinafter the "Parent Company", CJSC Roust Incorporated (9.014% share of charter capital) and JSC "Russian Standard Bank" (23% share of charter capital), hereinafter "Other participants" (2014: Roust Trading Limited owned 90.986% share of charter capital, CJSC Roust Incorporated owned 9.014% share of charter capital). The Company is ultimately controlled by Mr Roustam Tariko (2014: the same).

The Company's principal business is production of vodka at its factory in St. Petersburg and sales and marketing of vodka under brand names "Russian Standard" and "Imperia" within the Russian Federation and internationally. A substantial proportion of the Company's assets and liabilities are with related parties and a significant component of the Company's earnings is derived from activities with related parties (Note 7 "Balances and transactions with related parties").

2.       **Operating Environment of the Company**

The Russian Federation displays certain characteristics of an emerging market. Its economy is particularly sensitive to oil and gas prices. The legal, tax and regulatory frameworks continue to develop and are subject to frequent changes and varying interpretations (Note 21 "Contingencies and commitments"). During 2015 the Russian economy was negatively impacted by a decline in oil prices and ongoing political tension in the region and international sanctions against certain Russian companies and individuals. Management is taking necessary measures to ensure sustainability of the Company's operations. The future economic and regulatory situation and its impact on the Company's operations may differ from management's current expectations.

3.       **Basis of Preparation and Significant Accounting Policies**

***Basis of preparation.*** These financial statements have been prepared in accordance with International Financial Reporting Standards ("IFRS") under the historical cost convention, as modified by the initial recognition of financial instruments based on fair value and revaluation of indefinite life intangible assets. The principal accounting policies applied in the preparation of these financial statements are set out below. These policies have been consistently applied to all the periods presented, unless otherwise stated (refer to Note 5 for new and amended standards adopted by the Company).

The preparation of financial statements in conformity with IFRS requires the use of certain critical accounting estimates. It also requires management to exercise its judgement in the process of applying the Company's accounting policies. The areas involving a higher degree of judgement or complexity, or areas where assumptions and estimates are significant to the consolidated financial statements are disclosed in Note 4.

***Functional and presentation currency.*** These financial statements are presented in thousands of US dollars ("USD"), which is the Company's presentation currency and the operating currency used by management for the management analysis and management reporting purposes. Functional currency of the Company is the national currency of the Russian Federation, Russian Roubles ("RUB"). Foreign currency transactions are translated into the functional currency at the exchange rates prevailing at the date of the transaction. Monetary assets and liabilities are translated into entity's functional currency at the official exchange rate of the CBRF at the respective end of the reporting period. Foreign exchange gains and losses resulting from the settlement of the transactions and from the translation of monetary assets and liabilities into entity's functional currency at year-end official exchange rates of the CBRF are recognised in profit or loss. Translation at year-end rates does not apply to non-monetary items that are measured at historical cost.

The results and financial position of the Company is translated into the presentation currency as follows:

(i)     assets and liabilities for statement of financial position presented are translated at the closing rate at the end of the respective reporting period;

(i)     revenue in the statement of comprehensive income is translated at actual rates at the dates of revenue recognition (dates of transactions);

(iii)     income and expenses for statement of comprehensive income which are in high correlation with revenue are translated at effective exchange rate applied to revenue (see (ii) above);

(iv)     all other income and expenses for statement of comprehensive income are translated at average exchange rates (unless this average is not a reasonable approximation of the cumulative effect of the rates prevailing on the transaction dates, in which case income and expenses are translated at the dates of the transactions); and

(v)     all resulting exchange differences are recognised in other comprehensive income;

(vi)     equity items are translated at the closing rate at the end of the respective reporting period;

(vii)     cash flow movements which are in high correlation with revenue are translated at effective exchange rates applied to revenue (see (ii) above);

(viii)     all other cash flow movements are translated at average exchange rates unless this average is not a reasonable approximation of the cumulative effect of the rates prevailing on the transaction dates, in which case inflows and outflows are translated at the dates of the transactions).

| RUB/USD exchange rate | Closing rate | Effective rate applied to revenue | Average for the year |
|---|---|---|---|
| Year ended 31 December 2014 | 56.26 | 39.25 | 38.46 |
| Year ended 31 December 2015 | 72.88 | 60.96 | 60.96 |

***Property, plant and equipment.*** Property, plant and equipment are stated at cost, less accumulated depreciation and provision for impairment, where required. The cost of property, plant and equipment acquired in the way of business combination was determined by reference to its fair value at the date of acquisition.

Costs of minor repairs and maintenance are expensed when incurred. Cost of replacing major parts or components of property, plant and equipment items are capitalised and the replaced part is retired. Gains and losses on disposals determined by comparing proceeds with carrying amount are recognised in profit or loss.

At each reporting date management assesses whether there is any indication of impairment of property, plant and equipment. If any such indication exists, management estimates the recoverable amount which is determined as the higher of an asset's fair value less costs to sell and its value in use. The carrying amount is reduced to the recoverable amount and the difference is recognised as an expense (impairment loss) in the profit or loss for the year. An impairment loss recognised in prior periods is reversed if there has been a positive change in the estimates used to determine an asset's recoverable amount.

Subsequent costs are included in the asset's carrying amount or recognised as a separate asset, as appropriate, only when it is probable that future economic benefits associated with the item will flow to the Company and the cost of the item can be measured reliably. The carrying amount of the replaced part is derecognised. All other repairs and maintenance are charged to the profit or loss for the year during the financial period in which they are incurred.

Gains and losses on disposals are determined by comparing the proceeds with the carrying amount and are recognised in profit or loss for the year within other operating income or costs.

***Depreciation.*** Land and construction in progress are not depreciated. Depreciation on items of property, plant and equipment is calculated using the straight-line method to allocate their cost over their estimated useful lives:

| | Useful Economic Life, years |
|---|---|
| Buildings and Constructions | 5-35 |
| Plant and Equipment | 1-30 |
| Furniture | 5-20 |
| Other | 1-15 |

The residual value of an asset is the estimated amount that the Company would currently obtain from disposal of the asset less the estimated costs of disposal, if the asset were already of the age and in the condition expected at the end of its useful life. The assets' residual values and useful lives are reviewed, and adjusted if appropriate, at each balance sheet date.

***Operating leases.*** Where the Company is a lessee in a lease which does not transfer substantially all the risks and rewards incidental to ownership from the lessor to the Company, the total lease payments, including those on expected termination, are charged to profit or loss on a straight-line basis over the period of the lease. All lease payments are under operating lease agreement.

The lease term is the non-cancellable period for which the lessee has contracted to lease the asset together with any further terms for which the lessee has the option to continue to lease the asset, with or without further payment, when at the inception of the lease it is reasonably certain that the lessee will exercise the option.

***Intangible assets.*** The Company's intangible assets other than trademarks aquired in 2014 have definite useful lives and primarily include capitalised computer software, patents, trademarks and licenses. Acquired computer software licenses, patents and trademarks are capitalised on the basis of the costs incurred to acquire and bring them to use. Development costs that are directly associated with identifiable and unique software controlled by the Company are recorded as intangible assets if inflow of incremental economic benefits exceeding costs is probable.

Capitalised costs include staff costs of the software development team and an appropriate portion of relevant overheads. All other costs associated with computer software, and its maintenance, are expensed when incurred.

Trade marks related for the Company's products in the Russian Federation which were aquired in 2014 have an indefinite useful life and are not amortized.

The Company tests trademarks with indefinite useful life for impairment at least annually and whenever there are indications that trademarks may be impaired. The carrying value of the trademarks with indefinite useful life is compared to the recoverable amount, which is the higher of value in use and the fair value less costs of disposal. If impaired, the carrying amount of intangible assets is written down to the recoverable amount.

Intangible assets other than trade marks with indefinite useful life are amortised using the straight-line method over their useful lives:

| | Useful Economic Life, years |
|---|---|
| Patents | 5-10 |
| Trademarks | 5-20 |
| Software licenses | 3-10 |
| Capitalised internal software development costs | 5-20 |
| Other | 2-10 |

If impaired, the carrying amount of intangible assets is written down to the higher of value in use and fair value less costs to disposal.

Assets contributed by participants in exchange for shares in the Company are recognised at the fair value at the date of contribution of the assets contributed, with a corresponding increase in equity. Fair value is defined as the amount for which an asset could be exchanged between knowledgeable, willing parties in an arm's lengths transaction. If there is a material difference between the fair value of the asset contributed and the fair value of the

shares issued to acquire it, unidentifiable services are recognised as an expense in the income statement in the amount of this difference, with a corresponding increase in equity (within contributions from participants).

Costs associated with maintaining computer software programmes are recognised as an expense as incurred. Development costs that are directly attributable to the design and testing of identifiable and unique software products controlled by the Company are recognised as intangible assets when the following criteria are met:

- it is technically feasible to complete the software product so that it will be available for use;

- management intends to complete the software product and use or sell it;

- there is an ability to use or sell the software product;

- it can be demonstrated how the software product will generate probable future economic benefits;

- adequate technical, financial and other resources to complete the development and to use or sell the software product are available; and

- the expenditure attributable to the software product during its development can be reliably measured.

***Income taxes.*** Income taxes have been provided for in the financial statements in accordance with Russian legislation enacted or substantively enacted by the balance sheet date. The income tax charge comprises current tax and deferred tax and is recognised in the statement of comprehensive income unless it relates to transactions that are recognised, in the same or a different period, directly in equity.

Current tax is the amount expected to be paid to or recovered from the taxation authorities in respect of taxable profits or losses for the current and prior periods. Taxes, other than on income, are recorded within operating expenses.

Deferred income tax is provided using the balance sheet liability method for tax loss carry forwards and temporary differences arising between the tax bases of assets and liabilities and their carrying amounts for financial reporting purposes. In accordance with the initial recognition exemption, deferred taxes are not recorded for temporary differences on initial recognition of an asset or a liability in a transaction. Deferred tax balances are measured at tax rates enacted or substantively enacted at the balance sheet date which are expected to apply to the period when the temporary differences will reverse or the tax loss carry forwards will be utilised. Deferred tax assets for deductible temporary differences and tax loss carry forwards are recorded only to the extent that it is probable that future taxable profit will be available against which the deductions can be utilised.

***Tax provisions.*** The Company's uncertain tax positions are reassessed by management at the end of each reporting period. Liabilities are recorded for income tax positions that are determined by management as more likely than not to result in additional taxes being levied if the positions were to be challenged by the tax authorities. The assessment is based on the interpretation of tax laws that have been enacted or substantively enacted by the balance sheet date and any known court or other rulings on such issues.

Liabilities for penalties, interest and taxes other than on income are recognised based on management's best estimate of the expenditure required to settle the obligations at the end of each reporting period. Provisions for potential tax risks are recognised when the Company has identified probable outflow of resources.

***Inventories.*** Inventories are current assets since they have a more fluctuating character from period to period with many movements on a daily basis. The capital invested in inventories forms part of the working capital, which is under continuous focus to be minimised.

Inventories are recorded at the lower of cost and net realisable value.

Goods for resale, raw materials and consumables are measured at cost comprising purchase price and other costs incurred in bringing them to their existing location and condition. Movements into and out of stock is made at the actual cost of the unit, thus the value of the inventory is at actual cost through the year.

Finished goods and work in progress are measured at cost, comprising the cost of raw materials, consumables, direct wages and salaries and indirect production overheads. Indirect production overheads comprise indirect materials and wages and salaries, maintenance and depreciation of production machinery, buildings and equipment, and factory administration and management.

Net realisable value of inventories is calculated as the sales amount less costs of completion and costs necessary to make the sale, and is determined taking into account marketability, obsolescence and development in expected sales price.

Movements of finished goods and goods for resale are made at the average batch cost.

The provision for inventories is created in relation to obsolete, damaged stock, or finished goods with expired shelf-life.

The cost of inventory includes all cost of materials and the costs of conversion to bring those materials into the finished goods, including indirect production overhead.

***Trade and other receivables.*** Trade receivables are amounts due from customers for merchandise sold or services performed in the ordinary course of business. If collection is expected in one year or less (or in the normal operating cycle of the business if longer), they are classified as current assets. If not, they are presented as non-current assets. Trade receivables are recognised initially at fair value and subsequently measured at amortised cost using the effective interest method, less provision for impairment.

At each balance sheet date the Company management assesses whether there is evidence that the carrying amount of a receivable is greater than its estimated recoverable amount. A provision for impairment of receivables is established when there is objective evidence that the Company will not be able to collect all amounts due according to the original terms of receivables. The amount of the provision is expected to be sufficient to cover losses and recognised in the statement of comprehensive income.

***Prepayments.*** Prepayments are carried at cost less provision for impairment. A prepayment is classified as non-current when the goods or services relating to the prepayment are expected to be obtained after one year, or when the prepayment relates to an asset which will itself be classified as non-current upon initial recognition. Prepayments to acquire assets are transferred to the carrying amount of the asset once the Company has obtained control of the asset and it is probable that future economic benefits associated with the asset will flow to the Company. Other prepayments are written off to profit or loss when the goods or services relating to the prepayments are received. If there is an indication that the assets, goods or services relating to a prepayment will not be received, the carrying value of the prepayment is written down accordingly and a corresponding impairment loss is recognised in profit or loss for the year.

***Cash and cash equivalents.*** Cash and cash equivalents include cash in hand, deposits held at call with banks, and other short-term highly liquid investments with original maturities of three months or less.

***Value added tax (VAT).*** Output value added tax related to sales is payable to tax authorities on the earlier of (a) collection of receivables from customers or (b) delivery of goods or services to customers. Input VAT is generally recoverable against output VAT upon receipt of the VAT invoice. The tax authorities permit the settlement of VAT on a net basis. VAT related to sales and purchases is recognised in the statement of financial position on a gross basis and disclosed separately as an asset and liability. Where provision has been made for impairment of receivables, impairment loss is recorded for the gross amount of the debtor, including VAT.

***Borrowings.*** Borrowings are carried at amortised cost using the effective interest method. Borrowings are recognised initially at fair value, net of transaction costs incurred. Borrowings are subsequently carried at amortised cost; any difference between the proceeds (net of transaction costs) and the redemption value is recognised in the statement of comprehensive income over the period of the borrowings using the effective interest method.

***Capitalisation of borrowing costs.*** Borrowing costs directly attributable to the acquisition, construction or production of assets that necessarily take a substantial time to get ready for intended use or sale (qualifying assets) are capitalised as part of the costs of those assets, if the commencement date for capitalisation is on or after 1 January 2009.

The commencement date for capitalisation is when (a) the Company incurs expenditures for the qualifying asset; (b) it incurs borrowing costs; and (c) it undertakes activities that are necessary to prepare the asset for its intended use or sale. Capitalisation of borrowing costs continues up to the date when the assets are substantially ready for their use or sale.

The Company capitalises borrowing costs that could have been avoided if it had not made capital expenditure on qualifying assets. Borrowing costs capitalised are calculated at the company's average funding cost (the weighted average interest cost is applied to the expenditures on the qualifying assets), except to the extent that funds are borrowed specifically for the purpose of obtaining a qualifying asset. Where this occurs, actual borrowing costs incurred less any investment income on the temporary investment of those borrowings are capitalised.

***Impairment of non-financial assets.*** Intangible assets that have an indefinite useful life or intangible assets not ready for use are not subject to amortisation and are tested annually for impairment. Assets that are subject to depreciation and amortisation are reviewed for impairment whenever events or changes in circumstances indicate that the carrying amount may not be recoverable. An impairment loss is recognised for the amount by which the asset's carrying amount exceeds its recoverable amount. The recoverable amount is the higher of an asset's fair value less costs of disposal and value in use. For the purposes of assessing impairment, assets are grouped at the lowest levels for which there are largely independent cash inflows (cash-generating units). Prior impairments of non-financial assets (other than goodwill) are reviewed for possible reversal at each reporting date.

***Trade and other payables.*** Trade payables are accrued when the counterparty performed its obligations under the contract and are carried at amortised cost.

***Financial guarantees.*** Financial guarantees are contracts that require the Company to make specified payments to reimburse the holder of the guarantee for a loss it incurs because a specified debtor fails to make payment when due in accordance with the terms of a debt instrument. Financial guarantees are initially recognised at their fair value, which is normally evidenced by the amount of fees received. This amount is amortised on a straight line basis over the life of the guarantee. At each balance sheet date, the guarantees are measured at the higher of (i) the remaining unamortised balance of the amount at initial recognition and (ii) the best estimate of expenditure required to settle the obligation at the balance sheet date.

The fair value of the financial guarantee is determined as the undiscounted amount of a gross receivable for future premiums not yet due, or the estimated amount that would be payable to a third party for assuming the obligation.

Where guarantees in relation to borrowings or other payables of fellow subsidiaries are provided for no compensation, and the Company is acting as the agent of the common parent, the fair values of the guarantees issued to the related parties are accounted for as distributions to the participant as part of equity in the financial statements of the Company.

***Financial instruments – key measurement terms.*** Depending on their classification financial instruments are carried at fair value or amortised cost as described below.

Fair value is the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date. The best evidence of fair value is the price in an active market. An active market is one in which transactions for the asset or liability take place with sufficient frequency and volume to provide pricing information on an ongoing basis.

Fair value measurements are analysed by level in the fair value hierarchy as follows: (i) level one are measurements at quoted prices (unadjusted) in active markets for identical assets or liabilities, (ii) level two measurements are valuations techniques with all material inputs observable for the asset or liability, either directly (that is, as prices) or indirectly (that is, derived from prices), and (iii) level three measurements are valuations not

based on observable market data (that is, unobservable inputs). Management applies judgement in categorising financial instruments using the fair value hierarchy. If a fair value measurement uses observable inputs that require significant adjustment, that measurement is a Level 3 measurement. The significance of a valuation input is assessed against the fair value measurement in its entirety.

*Fair value* is the amount for which an asset could be exchanged, or a liability settled, between knowledgeable, willing parties in an arm's length transaction. Fair value is the current bid price for financial assets and the current asking price for financial liabilities which are quoted in an active market. For assets and liabilities with offsetting market risks, the Company may use mid-market prices as a basis for establishing fair values for the offsetting risk positions and apply the bid or asking price to the net open position as appropriate.

A financial instrument is regarded as quoted in an active market if quoted prices are readily and regularly available from an exchange or other institution and those prices represent actual and regularly occurring market transactions on an arm's length basis.

Valuation techniques such as discounted cash flow models or models based on recent arm's length transactions or consideration of financial data of the investees are used to measure at fair value certain financial instruments for which external market pricing information is not available. Valuation techniques may require assumptions not supported by observable market data. Disclosures are made in these financial statements if changing any such assumptions to a reasonably possible alternative would result in significantly different profit, income, total assets or total liabilities.

*Transaction costs* are incremental costs that are directly attributable to the acquisition, issue or disposal of a financial instrument. An incremental cost is one that would not have been incurred if the transaction had not taken place. Transaction costs include fees and commissions paid to agents (including employees acting as selling agents), advisors, brokers and dealers, levies by regulatory agencies and securities exchanges, and transfer taxes and duties. Transaction costs do not include debt premiums or discounts, financing costs or internal administrative or holding costs.

*Amortised cost* is the amount at which the financial instrument was recognised at initial recognition less any principal repayments, plus accrued interest, and for financial assets less any write-down for incurred impairment losses. Accrued interest includes amortisation of transaction costs deferred at initial recognition and of any premium or discount to maturity amount using the effective interest method. Accrued interest income and accrued interest expense, including both accrued coupon and amortised discount or premium (including fees deferred at origination, if any), are not presented separately and are included in the carrying values of related items in the statement of financial position.

*The effective interest method* is a method of allocating interest income or interest expense over the relevant period, so as to achieve a constant periodic rate of interest (effective interest rate) on the carrying amount. The effective interest rate is the rate that exactly discounts estimated future cash payments or receipts (excluding future credit losses) through the expected life of the financial instrument or a shorter period, if appropriate, to the net carrying amount of the financial instrument. The effective interest rate discounts cash flows of variable interest instruments to the next interest repricing date, except for the premium or discount which reflects the credit spread over the floating rate specified in the instrument, or other variables that are not reset to market rates. Such premiums or discounts are amortised over the whole expected life of the instrument. The present value calculation includes all fees paid or received between parties to the contract that are an integral part of the effective interest rate.

***Classification of financial assets.*** Financial assets have the following categories: (a) loans and receivables; (b) financial assets held to maturity and (c) financial assets at fair value through profit or loss. Financial assets at fair value through profit or loss are assets designated as such upon initial recognition.

*Loans and receivables* are unquoted non-derivative financial assets with fixed or determinable payments other than those that the Company intends to sell in the near term.

***Classification of financial liabilities.*** Financial liabilities have the following measurement categories: (a) held for trading which also includes financial derivatives and (b) other financial liabilities. Liabilities held for trading are carried at fair value with changes in value recognised in profit or loss for the year (as finance income or

finance costs) in the period in which they arise. Other financial liabilities are carried at amortised cost. The Company's financial liabilities are included within other financial liabilities.

***Initial recognition of financial instruments.*** Financial instruments at fair value through profit or loss are initially recorded at fair value. All other financial instruments are initially recorded at fair value plus transaction costs. Fair value at initial recognition is best evidenced by the transaction price. A gain or loss on initial recognition is only recorded if there is a difference between fair value and transaction price which can be evidenced by other observable current market transactions in the same instrument or by a valuation technique whose inputs include only data from observable markets.

All purchases and sales of financial assets that require delivery within the time frame established by regulation or market convention ("regular way" purchases and sales) are recorded at trade date, which is the date on which the Company commits to deliver a financial asset. All other purchases are recognised when the entity becomes a party to the contractual provisions of the instrument.

***Derecognition of financial assets.*** The Company derecognises financial assets when (a) the assets are redeemed or the rights to cash flows from the assets otherwise expire or (b) the Company has transferred the rights to the cash flows from the financial assets or entered into a qualifying pass-through arrangement while (i) also transferring substantially all risks and rewards of ownership of the assets or (ii) neither transferring nor retaining substantially all risks and rewards of ownership but not retaining control. Control is retained if the counterparty does not have the practical ability to sell the asset in its entirety to an unrelated third party without needing to impose additional restrictions on the sale.

***Provisions for liabilities and charges.*** Provisions for liabilities and charges are non-financial liabilities of uncertain timing or amount and are recognised when the Company has a present legal or constructive obligation as a result of past events, and it is probable that an outflow of resources will be required to settle the obligation, and a reliable estimate of the amount can be made. Where there are a number of similar obligations, the likelihood that an outflow will be required in settlement is determined by considering the class of obligations as a whole. A provision is recognised even if the likelihood of an outflow with respect to any one item included in the same class of obligations may be small.

Where the Company expects a provision to be reimbursed, for example under an insurance contract, the reimbursement is recognised as a separate asset but only when the reimbursement is virtually certain.

***Revenue recognition.*** Revenues from sales of goods are recognised at the point of transfer of risks and rewards of ownership of the goods.

Revenues are shown net of VAT, similar taxes, volume based and other discounts and allowances to customers, including listing and facing fees, promotional incentives and other similar sales support services provided by customers.

Revenues are measured at the fair value of the consideration received or receivable. There are no barter transactions.

Interest income is recognised on a time-proportion basis using the effective interest method.

***Employee benefits.*** Wages, salaries, contributions to the Russian Federation state pension and social insurance funds, paid annual leave and sick leave, and bonuses are accrued in the year in which the associated services are rendered by the employees of the Company.

***Fair Value of Financial Instruments.*** Fair value is the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date. The best evidence of fair value is price in an active market. An active market is one in which transactions for the asset or liability take place with sufficient frequency and volume to provide pricing information on an ongoing basis. The valuation models reflect current market conditions at the measurement date which may not be representative of market conditions either before or after the measurement date. As at the balance sheet date management has

Appendix G-215

reviewed its models to ensure they appropriately reflect current market conditions as at the reporting date, including the relative liquidity of the market and credit spreads.

*Offsetting financial instruments.* Financial assets and liabilities are offset and the net amount reported in the statement of financial position only when there is a legally enforceable right to offset the recognised amounts, and there is an intention to either settle on a net basis, or to realise the asset and settle the liability simultaneously. Such a right of set off (a) must not be contingent on a future event and (b) must be legally enforceable in all of the following circumstances: (i) in the normal course of business, (ii) in the event of default and (iii) in the event of insolvency or bankruptcy.

## 4.    Critical Accounting Estimates and Judgements

The preparation of financial statements in conformity with IFRSs requires management to make judgements, estimates and assumptions that affect the application of accounting policies and the reported amounts of assets, liabilities, income and expenses. Actual results may differ from these estimates.

Estimates and underlying assumptions are reviewed on an ongoing basis. Revisions to accounting estimates are recognised in the period in which the estimates are revised and in future periods affected. Information about critical judgements in applying accounting policies that have the most significant on the amount recognised in the financial statements are included in this note.

*Tax legislation.* Russian tax, currency and customs legislation is subject to varying interpretations. For contingent tax liabilities refer to Note 21 "Contingencies and commitments".

*Related party transactions.* In the normal course of business the Company enters into transactions with its related parties. IAS 39 requires initial recognition of financial instruments based on their fair values . Judgement is applied in determining if these transactions are priced at market or non-market interest rates where there is no active market for such transactions. The basis for judgement is pricing for similar types of transactions with unrelated parties and effective interest rate analysis (Note 7 "Balances and transactions with related parties").

As further disclosed in Note 7 "Balances and transactions with related parties", the Company sells its vodka products to the Parent Company and one of Other participant (CJSC Roust Incorporated). The Parent Company and CJSC Roust Incorporated, in turn, charge the Company certain fees for compensation of marketing costs. The compensation fees charged are presented within discounts, allowance and other sales incentives and marketing expenses as appropriate.

The Company acted as an agent of the common parent when issuing financial guarantees free of commission to related parties and therefore the initial fair value of the guarantee was recognised through equity within distributions to participants.

*Fair value assessment of indefinite life intangible assets*

Management estimated the fair value of indefinite life intangible assets (trademarks for the Company's products within the Russian Federation) contributed by CJSC Roust Incorporated, at the contribution date, using the royalty relief method. The fair value was determined in 2014 on the basis of discounted cash flows based on a ten year forecast. There are some significant assumptions, including:

- forecast revenue for all products associated with the contributed trademarks,

- royalty rate of 8% of net revenue, which was derived using the results of the profit split analysis, analysis of market comparable transactions and analysis of internal transactions,

- discount rate of 17.1% based on the weighted average cost of capital, adjusted for perceived business risks related to these intangible assets, and

- indefinite economic life for all trademarks.

Should the royalty rate be increased/decreased by 1 p.p. then an estimate of the fair value of the intangible assets aquired would be higher/lower by USD 2,868 thousand at the contribution date.

Should the discount rate be increased/decreased by 1 p.p. then an estimate of the fair value of the intangible assets acquired would be lower/higher by USD 1,616 thousand / USD 1,884 thousand at the contribution date.

Should the terminal growth rate be increased/decreased by 0.2 p.p. then an estimate of the fair value of the intangible assets acquired would be higher/lowerby USD 121 thousand USD / USD 117 thousand at the contribution date.

Should the net sales revenue by increased/decreased by 1 p.p. then an estimate of the fair value of the intangible assets aquired would be higher/lower USD 715 thousand / USD 689 thousand at the contribution date.

Should the intangible assets useful life be 30 years then an estimate of the fair value of the intangible assets aquired would be USD 22,267 thousand at the contribution date.

***Impairment of property, plant and equipment.*** At the end of each reporting period management assesses whether there is any indication of impairment of property, plant and equipment and indefinite useful life intangible assets. If any such indication exists, management estimates the recoverable amount, which is determined as the higher of an asset's fair value less costs to sell and its value in use. Management concluded that there were no indicators of impairment of property, plant and equipment at 31 December 2015.

***Impairment of indefinite life intangible assets.*** Management considers trademarks to be indefinite-lived assets, based on the length of time they have existed, the comparatively high volumes sold and their general market positions relative to other products in their respective market segments. Based on this and together with the evidence provided by analyses of vodka products life cycles, market studies, competitive and environmental trends, management believes that these trademarks will continue to generate cash flows for an indefinite period of time, and that the useful lives of these trademarks are therefore indefinite.

***Useful lives of property, plant and equipment.*** The estimation of the useful lives of items of property, plant and equipment is a matter of judgment based on the experience with similar assets. The future economic benefits embodied in the assets are consumed principally through use. However, other factors, such as technical or commercial obsolescence and wear and tear, often result in the diminution of the economic benefits embodied in the assets. Management assesses the remaining useful lives in accordance with the current technical conditions of the assets and estimated period during which the assets are expected to earn benefits for the Company. The following primary factors are considered:
(a) expected usage of the assets; (b) expected physical wear and tear, which depends on operational factors and maintenance programme; and (c) technical or commercial obsolescence arising from changes in market conditions. If the estimated useful lives differ by 10% from management's estimates, the impact on depreciation for year 2015 would be to increase it by USD 402 thousand (2014: USD 607 thousand) or decrease it by USD 329 thousand (2014: USD 502 thousand).

***Fair values of financial guarantees***. Management has estimated the fair values of financial guarantees issued free of commission to related parties, including CJSC Roust Incorporated (Other participant) using market approach (Note 7 "Balances and transactions with related parties"). The market approach in this particular case involved the application of fee rate of 1.41% per annum determined on the basis of publicly available data from observable recent market transactions in the similar instruments.

Should the market fee rate be increased/decreased by 30% then an estimate of the fair value of the financial guarantee contracts issued would be higher / lower by USD 63 thousand as at 31 December 2015 (as at 31 December 2014: by USD 252 thousand).

The Company acted as an agent of the common parent and therefore the initial fair value of the guarantees had been recognised through equity within distributions to participants.

5.      **Adoption of New or Revised Standards and Interpretations**

The following amended standards became effective for the Company from 1 January 2015, but did not have any material impact on the Company.

- Amendments to IAS 19 – "Defined benefit plans: Employee contributions" (issued in November 2013 and effective for annual periods beginning 1 July 2014).

- Annual Improvements to IFRSs 2012 (issued in December 2013 and effective for annual periods beginning on or after 1 July 2014).

- Annual Improvements to IFRSs 2013 (issued in December 2013 and effective for annual periods beginning on or after 1 July 2014).

6.      **New Accounting Pronouncements**

Certain new standards and interpretations have been issued that are mandatory for the annual periods beginning on or after 1 January 2016 or later, and which the Company has not early adopted.

*IFRS 9 "Financial Instruments: Classification and Measurement" (amended in July 2014 and effective for annual periods beginning on or after 1 January 2018)*. Key features of the new standard are:

- Financial assets are required to be classified into three measurement categories: those to be measured subsequently at amortised cost, those to be measured subsequently at fair value through other comprehensive income (FVOCI) and those to be measured subsequently at fair value through profit or loss (FVPL).

- Classification for debt instruments is driven by the entity's business model for managing the financial assets and whether the contractual cash flows represent solely payments of principal and interest (SPPI). If a debt instrument is held to collect, it may be carried at amortised cost if it also meets the SPPI requirement. Debt instruments that meet the SPPI requirement that are held in a portfolio where an entity both holds to collect assets' cash flows and sells assets may be classified as FVOCI. Financial assets that do not contain cash flows that are SPPI must be measured at FVPL (for example, derivatives). Embedded derivatives are no longer separated from financial assets but will be included in assessing the SPPI condition.

- Investments in equity instruments are always measured at fair value. However, management can make an irrevocable election to present changes in fair value in other comprehensive income, provided the instrument is not held for trading. If the equity instrument is held for trading, changes in fair value are presented in profit or loss.

- Most of the requirements in IAS 39 for classification and measurement of financial liabilities were carried forward unchanged to IFRS 9. The key change is that an entity will be required to present the effects of changes in own credit risk of financial liabilities designated at fair value through profit or loss in other comprehensive income.

- IFRS 9 introduces a new model for the recognition of impairment losses – the expected credit losses (ECL) model. There is a 'three stage' approach which is based on the change in credit quality of financial assets since initial recognition. In practice, the new rules mean that entities will have to record an immediate loss equal to the 12-month ECL on initial recognition of financial assets that are not credit impaired (or lifetime ECL for trade receivables). Where there has been a significant increase in credit risk, impairment is measured using lifetime ECL rather than 12-month ECL. The model includes operational simplifications for lease and trade receivables.

- Hedge accounting requirements were amended to align accounting more closely with risk management. The standard provides entities with an accounting policy choice between applying

Appendix G-218

the hedge accounting requirements of IFRS 9 and continuing to apply IAS 39 to all hedges because the standard currently does not address accounting for macro hedging.

The Company is currently assessing the impact of the new standard on its financial statements.

*IFRS 15, Revenue from Contracts with Customers (issued on 28 May 2014 and effective for the periods beginning on or after 1 January 2018).* The new standard introduces the core principle that revenue must be recognised when the goods or services are transferred to the customer, at the transaction price. Any bundled goods or services that are distinct must be separately recognised, and any discounts or rebates on the contract price must generally be allocated to the separate elements. When the consideration varies for any reason, minimum amounts must be recognised if they are not at significant risk of reversal. Costs incurred to secure contracts with customers have to be capitalised and amortised over the period when the benefits of the contract are consumed. The Company is currently assessing the impact of the new standard on its financial statements.

The following other new pronouncements are not expected to have any material impact on the Company when adopted:

- IFRS 14, Regulatory deferral accounts (issued in January 2014 and effective for annual periods beginning on or after 1 January 2016).

- Accounting for Acquisitions of Interests in Joint Operations - Amendments to IFRS 11 (issued on 6 May 2014 and effective for the periods beginning on or after 1 January 2016).

- Clarification of Acceptable Methods of Depreciation and Amortisation - Amendments to IAS 16 and IAS 38 (issued on 12 May 2014 and effective for the periods beginning on or after 1 January 2016).

- Agriculture: Bearer plants - Amendments to IAS 16 and IAS 41 (issued on 30 June 2014 and effective for annual periods beginning 1 January 2016).

- Equity Method in Separate Financial Statements - Amendments to IAS 27 (issued on 12 August 2014 and effective for annual periods beginning 1 January 2016).

- Sale or Contribution of Assets between an Investor and its Associate or Joint Venture - Amendments to IFRS 10 and IAS 28 (issued on 11 September 2014 and effective for annual periods beginning on or after 1 January 2016).

- Annual Improvements to IFRSs 2014 (issued on 25 September 2014 and effective for annual periods beginning on or after 1 January 2016). Disclosure Initiative Amendments to IAS 1 (issued in December 2014 and effective for annual periods on or after 1 January 2016).

- Investment Entities: Applying the Consolidation Exception Amendment to IFRS 10, IFRS 12 and IAS 28 (issued in December 2014 and effective for annual periods on or after 1 January 2016).

Unless otherwise described above, the new standards and interpretations are not expected to affect significantly the Company's financial statements.

**7.    Balances and Transactions with Related Parties**

Parties are generally considered to be related if the parties are under common control or if one party has the ability to control the other party or can exercise significant influence or joint control over the other party in making financial and operational decisions. In considering each possible related party relationship, attention is directed to the substance of the relationship, not merely the legal form.

The Company's immediate Parent Company, Other participants and ultimate controlling party are disclosed in Note 1 "General information".

The nature of the related party relationships for those related parties with whom the Company entered into significant transactions or had significant balances outstanding at 31 December 2015 are detailed below. At 31 December 2015 and 31 December 2014 the outstanding balances with related parties were as follows:

| | Parent Company | | Other participants | | Entities under common control | |
|---|---|---|---|---|---|---|
| | 31 December 2015 | 31 December 2014 | 31 December 2015 | 31 December 2014 | 31 December 2015 | 31 December 2014 |
| Trade and other receivables | 19,172 | 32,181 | 1 | 1,806 | 15,469 | 770 |
| Prepayments | - | - | - | - | - | 192 |
| Loans issued (weighted average rate 12.5% p.a. (2014: 12.5%)) | 10,975 | 18,343 | - | - | - | - |
| Borrowings (weighted average rate 12.6% p.a. (2014: 12.6% p.a.)) | - | - | 3,205 | 4,496 | 1,735 | 2,330 |
| Liabilities for financial guarantees | - | - | 209 | 829 | - | - |
| Trade payables | 1,372 | 20,608 | 3,086 | - | 509 | 20 |
| Other payables | - | - | - | - | - | - |
| Advances received | - | - | 5,306 | - | - | 531 |

Trade payables and advances received result from sale and purchases transactions in the ordinary course of business. At 31 December 2015 trade payables represent mainly payables for marketing expenses incurred by the Parent Company which were re-invoiced at the end of the reporting period and advances received for further sale of goods.

Trade receivables from related parties arise mainly from sale transactions, they are unsecured in nature and bear no interest.

In 2015 the Company set off other receivables in amount of USD 1,772 thousand and interest receivables in amount of USD 5,693 thousand against equivalent mutual obligation for marketing expenses which is payable to the Parent Company.

The fair value of loans issued as at 31 December 2015 were USD 10,481 thousand (at 31 December 2014: USD 16,545 thousand). The fair values are determined on the basis of expected cash flows discounted at current interest rates for new instruments with similar credit risks and remaining maturities and were categorised to level 2 of the fair value hierarchy.

Transactions with related parties for the years ended 31 December 2015 and 31 December 2014 were as follows:

| | Parent Company | | Other participants | | Entities under common control | |
|---|---|---|---|---|---|---|
| | 2015 | 2014 | 2015 | 2014 | 2015 | 2014 |
| Revenue | 23,616 | 65,417 | 24,599 | 29,105 | 26,404 | 4,252 |
| Discounts and allowances | 3,965 | 21,567 | 8,190 | 12,593 | 3,447 | - |
| Other operating income | 201 | 44 | 795 | 1,361 | 503 | 363 |
| Interest income | 1,776 | 2,159 | - | 14 | 46 | 46 |
| Royalty | - | - | - | 147 | - | - |
| Interest expense and other finance costs | - | - | 460 | 512 | 221 | - |
| Marketing and | 748 | 5,234 | 846 | 739 | 800 | - |

| | | | | | |
|---|---|---|---|---|---|
| consulting expenses | | | | | |
| Design expenses | 283 | 1,386 | - | - | - | - |
| Other expenses | - | - | 124 | 2 | 698 | 553 |

The Parent Company and CJSC Roust Incorporated (Other participant) arrange design, marketing and other services on behalf of the Company. The Parent Company and CJSC Roust Incorporated charges the Company a certain portion of these expenditures. For the year ended 31 December 2015, the recharges comprised USD 1,593 thousand and USD 283 thousand respectively (2014: USD 5,973 thousand and USD 1,386 thousand respectively).

Other operating income from Other participant and entities under common control relates mainly to management fees and renting services.

In 2015 the Company received interest from related parties in the amount of USD 232 thousand (2014: USD 98 thousand) and paid interest to related parties in the amount of USD 1,074 thousand (2014: USD 3,681 thousand).

Other rights and obligations with related parties were as follows:

| | Parent Company | | Other participants | | Entities under common control | |
|---|---|---|---|---|---|---|
| | 31 December 2015 | 31 December 2014 | 31 December 2015 | 31 December 2014 | 31 December 2015 | 31 December 2014 |
| Amounts guaranteed by the Company in respect of obligations of related parties | - | - | 37,929 | 94,922 | - | - |

Guarantees issued by the Company are free of charge. At 31 December 2015 USD 19,982 thousand of the amount guaranteed by the Company in respect of obligations of related parties relates to bank guarantees for customs payments, excise tax, purchase of excise duty stamps made in the ordinary course of business (at 31 December 2014: USD 51,728 thousand).

All guarantees were issued for obligations with maturities less than twelve months after the end of the reporting period.

The Company does not expect any cash outflows resulting from the guarantees provided.

The Company received free of charge guarantees from related parties under common control in relation to bank guarantees for customs payments, excise tax, purchase of excise duty stamps of USD 110,125 thousand at 31 December 2015 (at 31 December 2014: USD 140,847 thousand).

Additionally the Company's borrowings from third parties are secured by Other participant and entities under common control (Note 14).

In 2015 remuneration of Chairman of the board, who also is the Company's president and the ultimate controlling party, and key management personnel (6 persons) comprised salaries, discretionary bonuses and related state pension and social security costs of USD 1,668 thousand (in 2014: USD 2,457 thousand). Remuneration of the key management personnel unpaid as at 31 December 2015 is USD 79 thousand due in 2016 (as at 31 December 2014: USD 690 thousand due in 2015). As at 31 December 2015 Company's liability due to key management personnel in respect of unused vacation comprised USD 195 thousand (as at 31 December 2014: USD 95 thousand).

In August 2015 Parent Company sells part of its share in carter capital to JSC "Russian Standard Bank" in exchange for cash. As a result JSC "Russian Standard Bank" acquired 23% shares of the Company's charter capital.

Consequently, JSC "Russian Standard Bank" is presented within "Entities under common control" before the date of this this transaction and within "Other participants" after it.

In May 2014 CJSC Roust Incorporated became a 9.014% participant in the Company in exchange for a contribution of intangible assets, mainly trademarks for the Company's products within the Russian Federation. These intangible assets were recorded at fair value at the contribution date of USD 22,954 thousand. The fair value was estimated by management. In relation to this contribution, the Company recorded an increase in charter capital of USD 732 thousand and an increase in additional paid in capital of USD 22,222 thousand, all translated to USD at the exchange rate at the date of contribution.

Consequently, CJSC Roust Incorporated is presented within "Other participant" after the date of this this transaction.

**8.    Cash**

Cash is represented by bank balances payable on demand.

**9.    Trade and Other Receivables**

|  | 31 December 2015 | 31 December 2014 |
|---|---|---|
| Trade receivables from related parties | 34,642 | 34,565 |
| Trade receivables from third parties | 1,300 | 5,489 |
| Less impairment loss provision - third parties | (1,221) | (1) |
| **Total financial assets within trade and other receivables** | **34,721** | **40,053** |
|  |  |  |
| VAT recoverable | 962 | 2,579 |
| Other receivables | 12 | 13 |
| Prepayments to related parties | - | 192 |
| Prepayments to third parties | 1,091 | 313 |
| Less impairment loss provision - third parties | - | (58) |
| **Total non-financial assets within trade and other receivables** | **2,065** | **3,039** |
| **Total trade and other receivables** | **36,786** | **43,092** |

Movements in the impairment provision for trade and other receivables are as follows:

|  | Total provision for impairment of trade and other receivables |
|---|---|
| **At 1 January 2014** | **76** |
| Additional impairment charge | 102 |
| Provision used during the year | (50) |
| Translation to presentation currency | (69) |
| **At 31 December 2014** | **59** |
| Additional impairment charge | 1,411 |
| Provision used during the year | - |
| Translation to presentation currency | (249) |
| **At 31 December 2015** | **1,221** |

**10.    Inventories**

|  | 31 December 2015 | 31 December 2014 |
|---|---|---|
| Raw materials | 2,406 | 3,092 |
| Finished goods | 1,680 | 1,683 |
| Spare parts and other materials | 118 | 360 |
| Work in progress | 702 | 743 |
| Inventory provision | (214) | (188) |
| **Total** | **4,692** | **5,690** |

Inventory was pledged as collateral for bank guarantees as of 31 December 2015 (Note 21 "Contingencies and Commitments").

## 11. Property, Plant and Equipment

Movements in the carrying amount of property, plant and equipment were as follows:

| | Land | Buildings | Plant and equipment | Furniture | Other | Construction in progress | Total |
|---|---|---|---|---|---|---|---|
| Cost | 983 | 68,514 | 62,220 | 2,967 | 2,842 | 3,563 | 141,089 |
| Accumulated depreciation | - | (14,391) | (36,215) | (2,346) | (2,309) | - | (55,261) |
| Carrying amount at 1 January 2014 | 983 | 54,123 | 26,005 | 621 | 533 | 3,563 | 85,828 |
| Additions | - | 226 | 1,561 | 1 | 132 | 113 | 2,033 |
| Transfers | - | - | 2,475 | - | - | (2,475) | - |
| Disposals | - | - | (8) | - | (8) | - | (16) |
| Depreciation charge | - | (2,247) | (4,323) | (202) | (318) | - | (7,090) |
| Translation to presentation currency | (411) | (21,996) | (10,782) | (197) | (165) | (743) | (34,294) |
| Cost | 572 | 40,014 | 38,926 | 1,710 | 1,351 | 458 | 83,031 |
| Accumulated depreciation | - | (9,908) | (23,998) | (1,487) | (1,177) | - | (36,570) |
| Carrying amount at 31 December 2014 | 572 | 30,106 | 14,928 | 223 | 174 | 458 | 46,461 |
| Additions | 16 | 69 | 77 | 50 | 12 | 206 | 430 |
| Transfers | - | 22 | 24 | - | - | (46) | - |
| Disposals | - | - | (11) | - | - | (25) | (36) |
| Depreciation charge | - | (1,421) | (2,034) | (116) | (79) | - | (3,650) |
| Translation to presentation currency | (134) | (6,649) | (3,088) | (39) | (30) | (126) | (10,066) |
| Cost | 454 | 30,959 | 30,087 | 1,335 | 945 | 467 | 64,247 |
| Accumulated depreciation | - | (8,832) | (20,191) | (1,217) | (868) | - | (31,108) |
| Carrying amount at 31 December 2015 | 454 | 22,127 | 9,896 | 118 | 77 | 467 | 33,139 |

At 31 December 2015 land, buildings and equipment carried at USD 28,328 thousand (2014: USD 32,806 thousand) were pledged to third parties as collateral for borrowings of the Company and related parties under common control (Note 21).

There was no capitalized interest for 2015 (2014: nill).

## 12. Intangible Assets

| In thousands of Russian Roubles | Note | Internally developed software | Acquired software licences | Trade-marks | Other | Total |
|---|---|---|---|---|---|---|
| Cost at 1 January 2014 | | 893 | 918 | 845 | 249 | 2,905 |
| Accumulated amortisation | | (780) | (397) | (601) | (125) | (1,903) |
| Carrying amount at 1 January 2014 | | 113 | 521 | 244 | 124 | 1,002 |
| Additions | | 183 | 189 | 22,954 | 13 | 23,339 |
| Amortisation charge | 16 | (110) | (193) | (54) | (40) | (397) |
| Effect of translation to presentation currency | | (70) | (215) | (9,062) | (43) | (9,390) |

| | | | | | |
|---|---|---|---|---|---|
| Cost at 31 December 2014 | | 645 | 664 | 14,469 | 154 | **15,932** |
| Accumulated amortisation | | (529) | (362) | (387) | (100) | **(1,378)** |
| **Carrying amount at** | | | | | | |
| **31 December 2014** | | **116** | **302** | **14,082** | **54** | **14,554** |
| Additions | | - | 43 | 2 | - | **45** |
| Amortisation charge | 0 | (36) | (93) | (34) | (24) | **(187)** |
| Effect of translation to presentation currency | | (20) | (62) | (3,206) | (8) | **(3,296)** |
| Cost at 31 December 2015 | | 498 | 549 | 11,170 | 119 | 12,336 |
| Accumulated amortisation | | (438) | (359) | (326) | (97) | (1,220) |
| **Carrying amount at** | | | | | | |
| **31 December 2015** | | **60** | **190** | **10,844** | **22** | **11,116** |

During 2014 the Company acquired trademarks from other participant related to product distribution in the Russian Federation in the amount of USD 22,954 thousand in exchange of 9.014% of share in the Company's charter capital.

Additions for 2014 related to a contribution of intangible assets by an entity under common control – see Note 7 "Balances and transactions with related parties".

At 31 December 2015, management performed an annual impairment test of trademarks with indefinite useful life and concluded that there was no impairment (at 31 December 2014: the same).

## 13.    Trade and Other Payables

| | 31 December 2015 | 31 December 2014 |
|---|---|---|
| Trade payables to related parties | 4,967 | 20,628 |
| Trade payables to third parties | 8,882 | 7,024 |
| **Total financial liabilities within trade and other payables** | **13,849** | **27,652** |
| Accrued employee benefit costs | 765 | 1,440 |
| Advances received from related parties | 5,307 | 18 |
| Advances received from third parties | 395 | 531 |
| **Total non-financial liabilities within trade and other payables** | **6,467** | **1,989** |
| **Total trade and other payables** | **20,316** | **29,641** |

## 14.    Borrowings

The Company's borrowings are RUB denominated.

At 31 December 2015, borrowings from third parties of USD 36,489 thousand (31 December 2014: USD 53,484 thousand) were secured by the Company's property, plant and equipment (Note 21) and guarantees issued by related parties.

At 31 December 2015 the weighted average interest rate on the loans was 13.21% (31 December 2014: 11.37%).

The Company is required to comply with certain covenants which are disclosed in Note 21.

At 31 December 2015 and 2014 the Company has no unused credit facilities.

The fair value of bank borrowings as at 31 December 2015 were USD 41,404 thousand (31 December 2014: USD 58,836 thousand). The fair values are determined on the basis of expected cash flows discounted at current interest rates for new instruments with similar credit risks and remaining maturities and were categorised to level 2 of the fair value hierarchy.

### 15. Other Taxes Payable

|  | 31 December 2015 | 31 December 2014 |
|---|---|---|
| Excise tax | 4,136 | 3,639 |
| Tax provisions | - | 202 |
| Other taxes | 369 | 891 |
| **Total** | **4,505** | **4,732** |

### 16. Other Operating Expenses

|  | 2015 | 2014 |
|---|---|---|
| Electricity, gas, water | 2,062 | 3,374 |
| Impairment of trade and other receivables | 1,411 | 102 |
| Transportation and related costs | 1,384 | 1,362 |
| Taxes other than income tax | 919 | 1,436 |
| Equipment repairs and maintenance | 797 | 1,135 |
| Staff related expenses | 715 | 1,258 |
| Operating lease of property, plant and equipment | 694 | 460 |
| Premises related expenses | 656 | 947 |
| IT expenses (software, hardware, telecom) | 495 | 900 |
| Office expenses | 439 | 572 |
| Information, consulting and other professional services | 362 | 381 |
| Inventory impairment charge | 165 | 562 |
| Auto repairs and maintenance | 162 | 268 |
| Donations and entertainment | 96 | 273 |
| Quality assurance | 73 | 76 |
| Royalty | - | 147 |
| Tax provision / (reversal) | (187) | 67 |
| Other expenses | 310 | 276 |
| **Total** | **10,553** | **13,596** |

### 17. Other Operating Income

|  | 2015 | 2014 |
|---|---|---|
| Warehouse operating lease and loading services | 546 | 838 |
| Management fee | 395 | 712 |
| Income on purchase and sales of receivables | 387 | - |
| Inventory surplus | 106 | 108 |
| Furniture sales | 165 | 35 |
| Sales of advertising materials | 48 | 210 |
| Royalty income | 48 | - |
| Accounts payable write-off | 40 | 168 |
| Other income | 150 | 56 |
| **Total** | **1,885** | **2,127** |

### 18. Other Finance Costs

|  | 2015 | 2014 |
|---|---|---|
| Bank guarantees fee | 2,426 | 3,178 |
| Other charges | 421 | 1,312 |
| **Total** | **2,847** | **4,490** |

Bank guarantees are issued by banks and respective fees are treated as finance costs.

**19.      Foreign Exchange Differences, Net**

|  | 2015 | 2014 |
|---|---:|---:|
| Foreign exchange gain on operating items, net | 995 | 14,485 |
| Foreign exchange gain on loans issued and cash in bank | 73 | 94 |
| Foreign exchange gain on borrowings | - | 623 |
| **Total** | **1,068** | **15,202** |

**20.      Income Taxes**

Income tax expense comprises the following:

|  | 2015 | 2014 |
|---|---:|---:|
| Current tax expense | 886 | 3,861 |
| Deferred tax (benefit) / expense | 657 | (769) |
| Income tax expense for the year | **1,543** | **3,092** |

The income tax rate applicable to the Company's income is 20%. A reconciliation between the expected and the actual tax charge is provided below.

| . | 2015 | 2014 |
|---|---:|---:|
| **Profit before income tax** | **7,901** | **13,319** |
| Theoretical tax charge at statutory rate of 20%: | 1,580 | 2,664 |
| Income tax provision reversal | (488) | (2) |
| Fines and Penalties | 140 |  |
| Tax effect of items which are not deductible or assessable for taxation purposes: |  |  |
| - Allowance for doubtful debt | 281 |  |
| - VAT write-off | 89 | 135 |
| - Inventory write-off | 4 |  |
| - Sponsorship and entertainment | 10 | 42 |
| - Employees' benefits | 5 | 38 |
| - Telecommunication expenses | 29 | 55 |
| - Reverse of tax provision | (37) | - |
| - Other | (70) | 160 |
| **Income tax expense for the year** | **1,543** | **3,092** |

Differences between IFRS and statutory taxation regulations in Russia give rise to temporary differences between the carrying amount of assets and liabilities for financial reporting purposes and their tax bases. The tax effect of the movements in these temporary differences is detailed below:

|  | 1 January 2015 | Translation differences | (Charged)/ credited to profit or loss | Credited to equity | 31 December 2015 |
|---|---:|---:|---:|---:|---:|
| **Tax effect of deductable and taxable temporary differences** |  |  |  |  |  |
| Property, plant and equipment | (926) | 217 | (37) | - | (746) |
| Intangible assets | (2,732) | 601 | 133 | - | (1,998) |
| Trade and other payables | 147 | 24 | (174) | - | (3) |
| Trade and other receivables | 471 | (37) | (431) | - | 3 |
| Liabilities for financial guarantees | 166 | (55) | (148) | 79 | 42 |
| **Recognised deferred tax asset / (liability)** | **(2,874)** | **750** | **(657)** | **79** | **(2,702)** |

|  | 1 January 2014 | Translation n | (Charged)/ credited to | Credited to equity | 31 December 2014 |
|---|---:|---:|---:|---:|---:|

| | | differences | profit or loss | | |
|---|---|---|---|---|---|
| **Tax effect of deductable and taxable temporary differences** | | | | | |
| Property, plant and equipment | (1,886) | 709 | 251 | - | (926) |
| Intangible assets | (4) | 1,764 | 86 | (4,578) | (2,732) |
| Trade and other payables | 309 | (168) | 6 | - | 147 |
| Trade and other receivables | 32 | (224) | 663 | - | 471 |
| Liabilities for financial guarantees | 116 | (94) | (237) | 381 | 166 |
| **Recognised deferred tax asset / (liability)** | **(1,433)** | **1,987** | **769** | **(4,197)** | **(2,874)** |

The analysis of deferred tax assets and deferred tax liabilities is as follows:

| | 2015 | 2014 |
|---|---|---|
| Deferred tax asset to be recovered after more than 12 months | - | - |
| Deferred tax asset to be recovered within 12 months | 42 | 851 |
| **Total deferred tax asset** | **42** | **851** |
| | | |
| Deferred tax liability to be recovered after more than 12 months | (2 669) | (3,520) |
| Deferred tax liability to be recovered within 12 months | (75) | (205) |
| **Total deferred tax liability** | **(2 744)** | **(3,725)** |
| **Deferred tax liabilities (net)** | **(2 702)** | **(2,874)** |

## 21.    Contingencies and Commitments

*Legal proceedings*. From time to time and in the normal course of business, claims against the Company are received. On the basis of its own estimates and both internal and external professional advice management is of the opinion that no material losses will be incurred in respect of claims in excess of provisions that have been made in these financial statements.

*Capital expenditure commitments.* At 31 December 2015 the Company has contractual capital expenditure commitments in respect of property, plant and equipment in the amount of USD 93 thousand (at 31 December 2014: USD 42 thousand).

*Guarantees*. Financial guarantee contracts are contracts that require the issuer to make specified payments to reimburse the holder for a loss it incurs because a specified debtor fails to make payments when due, in accordance with the terms of a debt instrument. Such financial guarantees are given to banks, financial institutions and other bodies on behalf of subsidiaries or associates to secure loans, overdrafts and other banking facilities. Guarantees are irrevocable assurances that the Company will make payments in case if another party cannot meet its obligations. The Company has guaranteed the obligations of its related parties for the amount of USD 37,929 thousand (Note 7 "Balances and transactions with related parties") as at 31 December 2015 (31 December 2014: USD 94,922 thousand). Major part of the amount guaranteed by the Company in respect of obligations of related parties relates to bank guarantees for customs payments, excise tax, purchase of excise duty stamps and represent the specificity of the Russian alcohol business regulation by the state, i.e. ordinary course of business.

*Tax contingencies.* Russian tax and customs legislation which was enacted or substantively enacted at the end of the reporting period, is subject to varying interpretations when being applied to the transactions and activities of the Company. Consequently, tax positions taken by management and the formal documentation supporting the tax positions may be challenged by relevant tax authorities. Russian tax administration is gradually strengthening, including the fact that there is a higher risk of review of tax transactions without a clear business purpose or with tax incompliant counterparties. Fiscal periods remain open to review by the authorities in respect of taxes for three calendar years preceding the year of review. Under certain circumstances reviews may cover longer periods.

Russian transfer pricing legislation was introduced from 1999 and was amended with effect from 1 January 2012. The new transfer pricing rules appear to be more technically elaborate and, to a certain extent, better aligned with the international transfer pricing principles developed by the Organisation for Economic Cooperation and

Development (OECD). The new legislation provides the possibility for tax authorities to make transfer pricing adjustments and impose additional tax liabilities in respect of controlled transactions (transactions with related parties and some types of transactions with unrelated parties), provided that the transaction price is not arm's length. Management believes that the Company has implemented internal controls to be in compliance with the new transfer pricing legislation.

Tax liabilities arising from transactions between companies are determined using actual transaction prices. It is possible, with the evolution of the interpretation of the transfer pricing rules, that such transfer prices could be challenged. The impact of any such challenge cannot be reliably estimated; however, it may be significant to the financial position and/or the overall operations of the Company.

As Russian tax legislation does not provide definitive guidance in certain areas, the Company adopts, from time to time, interpretations of such uncertain areas that reduce the overall tax rate of the Company. While management currently estimates that the tax positions and interpretations that it has taken can probably be sustained, there is a possible risk that outflow of resources will be required should such tax positions and interpretations be challenged by the tax authorities. The impact of any such challenge cannot be reliably estimated; however, it may be significant to the financial position and/or the overall operations of the Company.

In addition to the above matters, management estimates that the Company has other possible obligations from exposure to other than remote tax risks as at 31 December 2015 in the amount of USD 3,740 thousand (31 December 2014: USD 5,308 thousand). These exposures primarily relate to VAT and income tax. These exposures are estimates that result from uncertainties in interpretation of applicable legislation and related documentation requirements. Management will vigorously defend the entity's positions and interpretations that were applied in determining taxes recognised in these financial statements if these are challenged by the authorities.

*Assets pledged and restricted.* The Company has the following assets pledged as collateral:

| | 31 December 2015 | | |
| --- | --- | --- | --- |
| | Assets pledged at pledged value | Assets pledged at carrying value | Related liability |
| Property, plant and equipment – Company's obligations | 17,901 | 15,798 | 33,059 |
| Property, plant and equipment – Related parties obligations | 13,475 | 12,530 | 8,997 |
| Inventories - the Company's obligations | 2,115 | 1,690 | 3,430 |
| **Total** | **33,491** | **30,018** | **45,486** |

| | 31 December 2014 | | |
| --- | --- | --- | --- |
| | Assets pledged at pledged value | Assets pledged at carrying value | Related liability |
| Property, plant and equipment – Company's obligations | 23,191 | 21,530 | 49,041 |
| Property, plant and equipment – Related parties obligations | 10,933 | 11,276 | 14,220 |
| **Total** | **34,124** | **32,806** | **63,261** |

*Compliance with covenants.* Under the terms of its loan agreements the Company is required to comply with a number of covenants, including regular provision to the banks of information, restrictions on the level of financial indebtedness, obtaining new credit facilities, issuing guarantees, dividend distribution, restrictions with regard to value and composition of pledged assets and the disposal of assets, requirements to maintain a certain specified debit turnover in banks, EBITDA, EBITDA to debt ratio, trade receivables to average revenue ratio and certain other requirements.

At 31 December 2015 the Company was in compliance with all covenants of its borrowings (31 December 2014: the same).

## 22.      Financial Risk Management

**Financial risks and instruments**

Activities of the Company are exposed to financial risks such as currency risks, interest rate risks, refinancing and liquidity risks, counterparty risks and credit risks. Those financial risks are managed as part of total company risk portfolio. The Company continuously assesses the risks and opportunities of its business decisions in order to limit unnecessary or excessive risks.

*Credit risk.* The Company takes on exposure to credit risk, which is the risk that one party to a financial instrument will cause a financial loss for the other party by failing to discharge an obligation. Exposure to credit risk arises as a result of the Company's sales of products on credit terms and other transactions with counterparties giving rise to financial assets. Significant amount of revenue is received from related parties trading with the Company on ordinary commercial terms. All loans are issued to related parties. Consequently the Company's credit risk is mainly related to related parties.

Financial assets, which potentially subject the Company to credit risk, consist principally of trade and other receivables (Note 9 "Trade and other receivables"), loans issued (Note 7 "Balances and Transactions with Related Parties") and cash in bank (Note 8 "Cash").

Company does not hold any collateral as security.

The maximum exposure to credit risk is equal to the carrying amount of financial assets, which is disclosed below:

|  | 31 December 2015 | 31 December 2014 |
|---|---|---|
| Trade and other financial receivables – third parties | 79 | 5,488 |
| Trade and other financial receivables – related parties | 34,642 | 34,565 |
| Loans issued – related parties | 10,975 | 18,343 |
| Cash | 7 | 328 |
| **Total on-balance sheet exposure** | **45,703** | **58,724** |
| Financial guarantees – amount of guaranteed borrowings | 37,929 | 94,922 |
| **Total maximum exposure to credit risk** | **83,632** | **153,646** |

The maximum exposure to credit risk arising from guarantees issued is limited to the amounts guaranteed. Major part of the amount guaranteed by the Company in respect of obligations of related parties relates to bank guarantees for customs payments, excise tax, purchase of excise duty stamps made in the ordinary course of business.

The Company's management reviews ageing analysis of outstanding trade receivables and follows up on past due balances.

|  | 31 December 2015 | | | 31 December 2014 | | |
|---|---|---|---|---|---|---|
|  | Trade and other receivables | Loans issued to related parties | Total | Trade and other receivables | Loans issued to related parties | Total |
| **External** |  |  |  |  |  |  |
| Not past due | 36 | - | 36 | 5,402 | - | 5,402 |
| **Related Parties** |  |  |  |  |  |  |
| Not past due | 34,642 | 10,975 | 45,617 | 34,565 | 18,343 | 52,908 |
| **Total neither past due not impaired** | **34,678** | **10,975** | **45,653** | **39,967** | **18,343** | **58,310** |
| **External** |  |  |  |  |  |  |
| Past due 1-3 month | 60 | - | 60 | 32 | - | 32 |
| Past due 3-6 month | - | - | - | 41 | - | 41 |
| Past due more than 6 month | - | - | - | 13 | - | 13 |

| | | | | | | |
|---|---|---|---|---|---|---|
| **Total past due but not impaired** | **60** | **-** | **60** | **86** | **-** | **86** |
| **Individually determined to be impaired (gross)** | | | | | | |
| **External** | | | | | | |
| Not past due | 805 | - | 805 | - | - | - |
| Past due less than 1 month | 370 | - | 370 | - | - | - |
| Past due more than 6 month and impaired | 29 | - | 29 | 38 | - | 38 |
| **Total individually impaired** | **1,204** | **-** | **1,204** | **38** | **-** | **38** |
| **Less impairment provision** | **(1,221)** | **-** | **(1,221)** | **(38)** | **-** | **(38)** |
| **Total** | **34,721** | **10,975** | **45,696** | **40,053** | **18,343** | **58,396** |

*Credit risks concentration.* The Company is exposed to concentrations of credit risk. At 31 December 2015 the Company had 4 counterparties (31 December 2014: 6 counterparties) with aggregated receivables balances above USD 300 thousand. The total aggregate amount of these balances was USD 35,387 thousand (31 December 2014: USD 38,965 thousand) or 96% of trade and other receivables (31 December 2014: 97%).

The table below outlines bank balances at 31 December 2015 as compared to 31 December 2014. Cash is placed in financial institutions, which, at the time of deposit, are considered to have a minimal risk of default. A general risk assessment is made on the basis of international credit ratings of the banks, or, if they are not available, on the basis of analysis of financial results of the banks, the rating of Russian banks in terms of size of their net assets and cooperation experience.

| | Credit agency | Credit rating | 31 December 2015 | 31 December 2014 |
|---|---|---|---|---|
| OJSC Sberbank of Russia | Fitch Ratings | "BBB-" | 4 | 19 |
| CJSC Russian Standard Bank | Moody's Investors Service | "Caa2" | 1 | - |
| CJSC VTB | Standard & Poor's | "BB+" | 2 | 307 |
| UniCredit Bank | Standard & Poor's | "BBB-" | - | 1 |
| Finservice | Not applicable | - | - | 1 |
| **Total cash in bank** | | | **7** | **328** |

*Currency risks.* As a company which is trading to international markets, the Company is exposed to exchange rate fluctuations related to currency flows from sales and purchases (transaction risk) and from translation of balance sheet items (translation risk). As described in Note 3 the presentation currency is US dollars, the functional currency is Russian Roubles. The initial exposure is managed by taking into account the foreign exchange risk considerations when deciding on the currencies used in export/import pricing and invoicing. The company does not formally hedge the initial transaction exposure.

Current assets and liabilities denominated in foreign currencies as at 31 December 2015 and 31 December 2014 are provided in the table below:

| **31 December 2015** | **EURO** | **USD** | **GBP** | **CHF** | **Total** |
|---|---|---|---|---|---|
| Cash | - | - | - | - | - |
| Loan issued – related parties | - | - | - | - | - |
| Trade and other receivables – third parties | 32 | 1,209 | - | - | 1 241 |
| Trade and other receivables – related parties | - | 1,206 | - | - | 1 206 |
| Trade and other payables – third parties | (996) | (338) | (1) | (11) | (1,346) |
| Trade and other payables – related parties | - | (8,429) | - | - | (8,429) |
| **Total on-balance sheet exposure** | **(964)** | **(6,352)** | **(1)** | **(11)** | **(7,328)** |
| Financial guarantees – amount of guarantees issued | - | - | - | - | - |
| **Net exposure** | **(964)** | **(6,352)** | **(1)** | **(11)** | **(7,328)** |

| 31 December 2014 | EURO | USD | GBP | Total |
|---|---|---|---|---|
| Cash | - | 306 | - | 306 |
| Loan issued – related parties | - | - | - | - |
| Trade and other receivables – third parties | 744 | 4,694 | - | 5,438 |
| Trade and other receivables – related parties | - | 31,346 | - | 31,346 |
| Trade and other payables – third parties | (1,120) | (360) | - | (1,480) |
| Trade and other payables – related parties | - | (12,624) | - | (12,624) |
| **Total on-balance sheet exposure** | **(376)** | **23,362** | **-** | **22,986** |
| Financial guarantees – amount of guarantees issued | - | - | - | - |
| **Net exposure** | **(376)** | **23,362** | **-** | **22,986** |

The foreign exchange rate sensitivity analysis is based on foreign currency nominated balance sheet items at the closing date. The analysis includes only risks arising from financial instruments.

If the exchange rate of US dollar to Russian Rouble at 31 December 2015 would have increased/decreased by 30%, while other variables are assumed as unchanged, profit after tax for the year ended 31 December 2015 and equity as at 31 December 2015 would have increased/decreased by USD 1,524 thousand. If the exchange rate of US dollar to Russian Rouble at 31 December 2014 would have increased/decreased by 30%, while other variables are assumed as unchanged, profit after tax for the year ended 31 December 2014 and equity as at 31 December 2014 would have decreased/increased by USD 5,607 thousand.

If the exchange rate of EURO to Russian Rouble at 31 December 2015 would have increased/decreased by 30%, while other variables are assumed as unchanged, profit after tax for the year ended 31 December 2015 and equity as at 31 December 2015 would have decreased/increased by USD 231 thousand. If the exchange rate of EURO to Russian Rouble at 31 December 2014 would have increased / decreased by 30%, while other variables are assumed as unchanged, profit after tax for the year ended 31 December 2014 and equity as at 31 December 2014 would have increased/decreased by USD 90 thousand.

***Interest Rate Risks.*** Changes in interest rates on borrowings and loans issued create interest rate risks. The company did not have floating rate liabilities, however borrowings agreements with third parties stipulate the right of creditors to change interest rates at any time with an effective period of 30 days as well as change (increase) their possible response to covenants breaches. No interest rate derivatives were in use during 2015 and 2014. Management tries to minimize risks by monitoring economic environment for changes in interest rates.

***Liquidity risks.*** Liquidity risk is defined as the risk that an entity will encounter difficulty in meeting obligations associated with financial liabilities. The Company's finance department is responsible for managing liquidity risk, including funding, settlements, and related processes and policies. The operational, capital, tax and other requirements and obligations of the Company are considered in the management of liquidity risk. Management utilises cash flow forecasts and other financial information to manage liquidity risk.

The Company seeks to maintain a stable funding base primarily consisting of amounts due to other banks. The liquidity position is monitored on regular basis by the finance department.

The effective use of advance and progress payments is the most important means of managing the liquidity risk. In addition, to minimise funding and liquidity risks and to cover estimated financing needs, the Company has obtained a credit facility with Finservice Bank. The availability of credit facilities together with long-term borrowings allow to balance the loan portfolio and to minimise the downturn movements in the financial markets.

Management controls current liquidity by forecasting cash inflows and outflows. In long-term, liquidity risk is determined by forecasting future cash flow at the moment of signing new financing agreements and also by budget control procedures.

The table below analyses the Company's financial liabilities by their remaining contractual maturity. The amounts disclosed in the maturity table are the contractual undiscounted cash flows, including gross finance lease obligations, and gross loan commitments. Such undiscounted cash flows differ from the amount included in the statement of financial position because the balance sheet amount is based on discounted cash flows.

|  | 31 December 2015 | | | |
| --- | --- | --- | --- | --- |
|  | < 1 year | 1-5 years | More than 5 years | Total |
| Borrowings | 16,410 | 30,966 | 5,589 | 52,965 |
| Trade and other payables | 13,849 | - | - | 13,849 |
| Financial guarantee issued | 37,929 | - | - | 37,929 |
| **Total Outflows** | **68,188** | **30,966** | **5,589** | **104,743** |

|  | 31 December 2014 | | | |
| --- | --- | --- | --- | --- |
|  | < 1 year | 1-5 years | More than 5 years | Total |
| Borrowings | 20,233 | 46,900 | 11,953 | **79,086** |
| Trade and other payables | 27,652 | - | - | **27,652** |
| Financial guarantee issued | 94,922 | - | **-** | **94,922** |
| **Total Outflows** | **142,807** | **46,900** | **11,953** | **201,660** |

Management is unable to reliably estimate the effects on the Group's financial position of any further deterioration in the liquidity of the financial markets and the increased volatility in the currency and equity markets. Management believes it is taking all the necessary measures to support the sustainability and development of the Group's business in the current circumstances.

***Management of Capital.*** The ultimate goal of capital risk management in the Company is to ensure continuity of the Company and contribute to the creation of participant value, as well as to ensure that the Company funding needs can be optimised at all times in a cost-efficient way. Debt levels are managed taking into account instructions from the Parent Company. Management believes that the current amount of the capital is adequate to fund the Company's current projects and for its further development.

**23.    Events After the Reporting Period**

Related party JSC "Russian Standard Bank" has provided the Company with short-term credit lines for the working capital financing after the reporting period before the financial statement authorization.